# EXHIBIT 2

Neutral Citation Number: [2004] EWHC 373 (Ch)

<u>Case No: HC 00 04556</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**

**<u>CHANCERY DIVISION</u>**

<u>Royal Courts of Justice</u>

<u>Strand, London, WC2A 2LL</u>

<u>Date: 1 March 2004</u>

**Before** :

**<u>THE HONOURABLE MR JUSTICE MANN</u>**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

|  |  |
|---|---|
| **(1) USP Strategies Plc** | **<u>Claimants</u>** |
| **(2) Unicorn Strategies LLC** | |
| **- and -** | |
| **(1) London General Holdings Limited** | **<u>Defendants</u>** |
| **(2) AON Warranty Group Limited** | |
| **(3) AON Warranty Services Limited** | |

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**Mr Anthony Watson Q.C.** (instructed by **Denton Wilde Sapte**) for the **Claimants**

**Mr Andrew Monson** (instructed by **Berwin Leighton Paisner**) for the **Defendants**

Hearing dates: 2nd, 3rd, 4th and 5th February 2004

- - - - - - - - - - - - - - - - - - - - -

**Judgment**

**Mr Justice Mann :**

**Background**

1. The two applications before me are related applications which turn on the question of legal professional privilege and, to a more limited extent, general obligations of disclosure and listing. In 1998 the claimants prepared, or caused to be prepared, documentation for a warranty scheme which they sought to sell to retailers to replace insurance based schemes which had been rendered commercially unattractive by a change in the tax regime. A Mr Chan and a Mr Cooper, solicitors on the Isle of Man, devised a scheme involving moneys being held off-shore and in trust. In the course of devising the scheme a document known in these proceedings as a CAA (an acronym for Collections Account Agreement) was prepared. Copyright in that document vested in the second claimant; in due course it was transferred to the first claimant. I shall not distinguish between those two companies for the purposes of this judgment (because it is not necessary to do so) and shall treat all relevant copyright and confidentiality rights as being vested in what I will call "USP". The CAA came into the possession of the first defendant ("LGH") because that company was, at the time, the administrator of the scheme in question ("the Scottish Power scheme"), but it was the subject of a confidentiality agreement. Modifications were carried out to it, and a finalised version was used in that scheme. As a result of joint input into the final document, the judge at the hearing on liability referred to below found that copyright in that final version vested jointly in Scottish Power and USP.

2. In 2000 the claimants and LGH were rivals in bidding to participate in another scheme, this time for an entity which I will call Powerhouse. In this context LGH and the other two defendants, who are all companies in the same group (the AON group), used the final form draft CAA as a starting point for the drafting of a similar document which they put forward in their bid to devise and operate a scheme for Powerhouse. In doing so they are said to have been able to maintain a bidding position in competition with the claimants until Powerhouse ultimately decided that the claimants' scheme was one that they preferred. In a judgment delivered on 8th November 2002 HH Judge Weeks QC held that that use was an infringement of the copyright in the 1998 original and a breach of confidentiality, and he ordered an inquiry as to the damages arising from those wrongs. That inquiry is not confined to the actual breaches that he found; it is set to be held at the end of April before a Master.

3. In the context of the inquiry questions of privilege arise. In the course of considering their participation in the Powerhouse scheme LGH instructed lawyers on the Isle of Man. The results of their deliberations were apparently passed to Powerhouse. It is in relation to that advice and certain matters passing among the defendants and between the defendants and Powerhouse that privilege questions arise. In addition, the inquiry will consider infringements relating to another transaction in relation to a concern identified as Apollo. The defendants, or their group, did enter into a scheme with Apollo, and it is not alleged that the final scheme involved the use of any documents over which copyright or confidentiality is claimed. However, it is said that at some stage consideration was given

to using the CAA, and that there were infringements at that stage of the transaction. Questions of privilege and disclosure arise in relation to that too.

**The Powerhouse claim facts – detail**

4.  The background to this matter leading up to the infringements found by HH Judge Weeks is set out in some detail in his judgment; I do not propose to set them out again here. For present purposes I can take the story up at the beginning of 2000. At that point of time, as HH Judge Weeks QC stated, LGH and USP found themselves in competition. The claimants offered their scheme at a given price (the details do not matter). A Mr Brimacombe of LGH had a copy of the Scottish Power CAA on his computer. It was copied for a Mr Mian, a sales director of LGH, with names blanked out. In due course it was sent to Powerhouse's lawyers, on 7th March (which was the infringement relied on and established at the trial). Part of the case of the claimants is that the defendants did this in order to establish that they had a workable (or "robust", as it was put at the time) scheme, so that they remained in the game. That gave Powerhouse competing bidders and they were able to play one off against the other. As a result of this Powerhouse were able to come back to the claimants at the end of March and negotiate a reduction in the price quoted. A deal was done at that reduced price. This reduction in price forms part of the damages claim. The claimants say that the infringement helped to keep the defendants in the running, and the fact that they were in the running enabled Powerhouse to come back and require a reduction in price. I do not need to consider this chain of causation – that is a matter for the inquiry.

5.  However, the claimants also now rely on earlier matters. The claimants seek to establish an earlier breach. I have already referred to a reduction of price at the end of March. However, earlier, on 1st March 2000 Powerhouse had been also been able to negotiate a reduction in price from the claimants. In the inquiry the claimants will seek to establish that that reduction was attributable to earlier infringements. In mid-February 2000 LGH had sought advice from Manx lawyers. According to a chronology submitted by Mr Monson, who appeared for the defendants, a letter from Mr de Freitas, the solicitor acting for the defendants, stated that:

"The nature of the advice sought from the solicitors in the Isle of Man concerned whether a trust based arrangement could be set up to protect monies from the Powerhouse scheme from being merged, or treated as merged, with other moneys held by AWS for other clients";

but at the same time it was made clear that in providing those details privilege was not waived in the instructions and the advice. The claimants will seek to establish that in order to get that advice, the CAA was copied, and that copying was a further infringement of copyright and of confidentiality rights. The advice that was obtained was apparently passed on to Powerhouse; it is said that it was the subject of a confidentiality agreement operating between the defendants and Powerhouse. The agreement is dated

15th March 2000 and is made between "Aon Warranty Group" and Powerhouse Retail Ltd. The relevant clauses are as follows:

In consideration of AON making available to the Recipient [i.e. Powerhouse] certain information, the Recipient hereby undertakes to AON in the terms set out below:

Confidential Information

For the purposes of this confidentiality agreement the expression Confidential Information includes information available (whether before or after this confidentiality agreement is agreed) in writing (including by fax) and other forms of electronic transmission (including but not limited to information relating to clients data belonging to AON, know-how, trade secrets and any other information concerning the Purpose and also any information or analyses derived from, containing or reflecting such information…

The recipient shall:

Keep the Confidential Information secret and confidential and not disclose any of it to any person other than the persons who need to know the same for the purposes of considering, evaluating, advising on or furthering the Purpose and whom the Recipient shall procure are informed of the terms of this confidentiality agreement and observe the terms of this confidentiality agreement as if they were party hereto;

Only use the Confidential Information for the sole purpose of considering, evaluating, advising on or furthering the Purpose and, in particular, not for any other commercial purpose;…

Keep the Confidential Information and any copies thereof secure and in such a way so as to prevent unauthorised access by any third party, shall not make copies of it or reproduce it in any form except for the purpose of supplying the same to those to whom disclosure is permitted in accordance with this confidentiality agreement.

[There is a provision for the return of all written Confidential Information within 7 days of termination of the agreement].

The Purpose is defined as being the wish of the group to "[launch] an offshore extended warranty programme".

6.   In late February 2000, Mr Borrill of the claimants was told by Mr Turner of Powerhouse that their bid was still too high, and on 1st March 2000 Mr Turner was able to negotiate a drop in the price that the claimants had originally quoted for their scheme. This price drop was bigger in amount than that negotiated at the end of the month. The case of the claimants is that Mr Turner was only able to do this because of what he had been told by the defendants; and the defendants were only able to say what they said by dint of their legal advice; and they were only able to get that legal advice by infringing copyright in

the CAA, and breaking the confidentiality agreement. Since this earlier price drop is greater than the later one, it is a more valuable part of the claimant's claim. The losses flowing from this price drop are a material part of what the claimants seek in this action as flowing from the wrongs alleged. Again, it is not for me to comment on the merits of this chain of causation.

7. It is in the context of that earlier part of the claim that the material which is the subject of this part of the present application came into existence. I am not asked to rule on relevance; both parties accept that the documents and material that I have to consider are relevant. The question for me is whether it is privileged. The material, and the issues relating to each part of it, can be summarised as follows:

a. There are documents or parts of documents where the documents have already been disclosed by the defendants but in respect of which privilege is claimed in whole or as to part. Where privilege is claimed as to the whole, the document has not been produced for inspection. Where it has been claimed in part, the allegedly privileged part has been obscured for the purposes of inspection. These documents are e-mail or letter correspondence passing between one or more of the defendants of the one part and Powerhouse of the other, one e-mail from the Manx solicitors to the third defendant, and one e-mail from the third defendant to the first defendant.

b. I am asked to strike out parts of certain witness statements which are said to refer to privileged communications in a manner which makes it improper for the witnesses to give evidence of that material. The witnesses are witnesses for the claimants. One is Mr Turner, who at certain points in his evidence makes reference to the legal advice which the defendants had told him they had received, and at one point sets out the terms of an e-mail referring to it. The second and third are Mr Borrill (a director of each of the claimant companies) and Mr Chan, another director and also a Manx solicitor. The allegedly objectionable parts of their witness statements are those containing what Mr Turner told them in the negotiations leading up to the Powerhouse contract, and in which Mr Turner made reference to the advice which the defendants had obtained on their (the defendants') scheme. In Mr Chan's case objection is taken to a reference to legal advice which, it is to be inferred, he heard about from Mr Turner and one paragraph in an e-mail that he sent at the time which refers to the same sort of thing.

c. I am asked to order the removal from the evidence of part of two Powerhouse internal memoranda which Powerhouse has disclosed to the claimants and which contain, among other things, a reference to the legal advice which had been obtained in the Isle of Man. It is that reference which I am asked to order the deletion of.

d. There was one document, a copy letter from LGH to Powerhouse (document 15), in respect of which privilege was originally maintained, but which on reflection was sought to be excluded from inspection on the grounds that further consideration of the letter indicated that it was not relevant. The parties agreed

that that dispute would be resolved by my looking at the document and ruling on the point. The claimants have not seen it, but were happy to adopt that expedient.

    e.  I am asked to strike out parts of the Particulars of Claim in the inquiry on the footing that they are abusive because they refer to and rely on privileged material, or can only be pleaded because the claimants are in possession of material which has been obtained in infringement of the rights of the defendants.

    f.  I am asked to order that the defendants serve a formal list of documents in relation to the inquiry.

**The contentions of the parties**

8. Mr Monson, for the defendants, maintains that privilege exists in all the material that he seeks to have excluded, and that it has not been waived. That being the case, the documentary material containing privileged material ought to be excluded, with limited exceptions. All the material fell within the proper definition of material that was the subject of legal professional privilege. For the purposes of the exercise of analysis, and to distinguish various types of material for the purposes of the debate, the written material was divided into three categories or levels:

    a.  Level 1 – this was a reference which merely referred to the fact of getting solicitors advice, without indicating the instructions, advice or even the subject matter.

    b.  Level 2 – these were indications that advice had been obtained from solicitors, and indicating its subject matter but not its content or the instructions given.

    c.  Level 3 – written advice, or written instructions, or paraphrases, summaries or extracts from that advice.

Using this categorisation he was able to go through the redacted documents and explain the basis, in respect of each, on which privilege was claimed. The same categorisation was adopted for the purposes of considering the witness statement material and the Powerhouse documents, but Mr Monson did abandon his claims to strike out the Level 1 and 2 material from those statements and documents, which narrowed the scope of the debate (but not by much).

9. The principal dispute between the parties was the extent to which the defendants could claim privilege in relation to the substance of communications between the client (in effect, the defendants) and a third party where what was communicated was, or referred to, privileged advice given to the client. Mr Monson's case was that the advice started out as privileged and it remained privileged notwithstanding its wider dissemination, as a result of two strands of authority. The first is *The Good Luck* [1992] 2 Lloyds Rep 540, which demonstrates that privileged material disseminated within the client company that obtained it is capable of retaining its privilege, but he seeks to apply it to show that privilege exists in documents communicated to a third party on the facts of this case. The second is *Gotha City v Southeby's* [1998] 1 WLR 114. That case is said to demonstrate that it is possible to disclose advice to an outsider without destroying or waiving the privilege which attaches to it other than as between the privilege owner and the third party. Those principles entitle the defendants to redact material which would otherwise

be disclosed. So far as restraining material which emanates from Powerhouse is concerned (the Powerhouse documents, Mr Turner's evidence and evidence from USP witnesses as to what Mr Turner told them at the time about legal advice) Mr Monson says that the defendants are entitled to restrain that on the footing that the material was and remained privileged, and its use ought to be restrained on principles to be gleaned from *Lord Ashburton v Pape* [1913] 2 Ch 469 and *Goddard v Nationwide Building Society* [1987] QB 670. This applies whether or not Mr Turner, Mr Chan or Mr Borrill is giving evidence of it, or whether it is in documents revealed voluntarily by Powerhouse. So far as the Particulars of Claim go, the claim which attempts to base itself on this material must similarly be struck out as an abuse of the process.

10. Mr Watson QC, for the claimants, comes at this from a slightly different angle. He obviously starts by accepting that there is privilege in the original advice from the Manx lawyers. He also accepts that it remains privileged while being passed within the client company, and he accepted that there would be common interest privilege where the advice was shared between the defendants. (This last concession makes it unnecessary for me to distinguish between the various defendants and enables me to treat the defendants as if they were one body for the purposes of considering the issues I have to decide). However, with the exception of a passing on of the advice verbatim and in whole, which he accepts remains privileged, he says that passing on summaries or parts of the advice to a third party does not amount to a privileged communication. This is because those communications do not fall within what he says are the requisite elements of privileged communications (which he extracts from the decision of Moore-Bick J in *United States of America v Philip Morris & others*, unreported, 10th December 2003) because:

   a. They are not communications passing between lawyer and client – they are communications passing between client and a third party.

   b. They are not confidential, on the facts of this case. This means that the communications were not privileged, and if privilege might otherwise attach it has been waived.

   c. They were not for the dominant purpose of obtaining or giving legal advice – the legal advice was conveyed as part of a sales pitch.

11. Mr Watson goes on to submit that so far as Level 1 and Level 2 communications are concerned, they do not even contain a sufficient reference to advice to get a privilege case off the ground, and in any event there has been waiver of privilege because of material already deployed by the defendants in this litigation. *Gotha* is irrelevant, he says, because it is a case about waiver, and the question of whether a communication is privileged has to be answered first. So far as restraining the use of information that has already been obtained is concerned, he says that the principles to be extracted from *Goddard* and *Lord Ashburton* do not apply so as to restrain officers of the claimants giving evidence of what they were told in negotiations by Mr Turner, and Mr Turner should not be constrained from giving the evidence sought because his communications did not infringe any confidentiality rights of the defendants. He has various particular points on the wording which is sought to be excluded and in addition says that even if some of the material would otherwise be within an unwaived privilege, I should exercise my discretion not to strike it out, or otherwise restrain witnesses from giving evidence, because the defendants are using privilege to cover up wrong-doing (a sort of "clean hands" point), the claimants

were innocent recipients of the information from Powerhouse and there has been delay on the part of the defendants in making their application.

12. In relation to this last point Mr Watson relies on an e-mail which has already, as a matter of form, already appeared in evidence in this case. He relies on this as showing not only that the defendants were or ought to have been aware of disclosures by Mr Turner as long ago as August 2001, when it was disclosed in this action as part of the disclosure process, but also in support of a proposition that much if not all of the position that the defendants seek to protect has been put in the public domain by the previous (and current) use of that e-mail. I need to set out this material.

13. On 6ᵗʰ March 2000 Mr Chan, who it will be remembered is a director of the Claimant companies, wrote to Mr Turner in the course of his negotiations. Apparently, Mr Turner had asked for a copy of the Claimants' collection account agreement for the purpose of comparing it with the scheme proposed by the AON Group. He declined to supply it. The email observes that at that stage Mr Chan suspected that the Defendants had used "a draft prepared from our precedent". The sentence relied on by Mr Watson is a paragraph which reads as follows:

"The solution promoted to you by AON and their advisors is that a Collections Account Agreement (sic) in the form of a trust will attain this and that therefore they have demonstrated the robustness required of them."

(This, I would observe, is the passage that the defendants seek to have removed from the evidence, as referred to above. It will appear below that I am against redacting this material, so I am free to set it out in this judgment.) This email was annexed to a witness statement used by Mr Chan at the trial on liability. Mr Watson says that this email points to the fact that Mr Turner was saying things about legal advice, and that accordingly the Defendants have been aware of his disclosures, or the possibility of his disclosures, ever since the discovery process. So far as publicity is concerned, Mr Watson also relies on this email as demonstrating that the present position which the Claimants rely on in their particulars of claim is already in the public domain because the judge will be taken to have read this material at the trial, and it was formally part of Mr Chan's evidence on that occasion, although it does not appear that any specific reference was made to it at the trial. I shall deal with the significance, if any, of this email below.

**The legal principles involved**

14. One doctrine can be put on one side for the purposes of this judgment, and that is the doctrine of common interest privilege. I have already indicated that Mr Watson for his part accepted that common interest privilege existed as between the three defendant companies, so that communications of advice between the three of them attracted this form of privilege. Mr Monson for his part accepted that the doctrine did not operate as between the defendants on the one hand and Powerhouse on the other, because one of the tests which have to be fulfilled in order for joint privilege to exist is that the parties in question have to be capable of acting by the same solicitor in the matter in question, which requirement could not be fulfilled in the case of the defendants and Powerhouse.

15. It is therefore necessary to consider the extent to which privilege is maintained in material which is communicated to a third party by the client, which is the issue lying at the heart of these applications. This involves considering whether the communication was capable of being privileged, and if so whether the privilege has been waived.

16. Mr Watson's submissions rely heavily on the effect of the Court of Appeal decision in *Three Rivers District Council v The Governor & The Company of the Bank of England (no 7)* [2003] EWCA Civ 474. He claims that that authority confines privilege to communications between solicitor and client, or vice versa. Communications with a third party fall outside that, because they do not fall within the description of communications between solicitor and client. While the case allows evidence of the contents of communications to attract privilege, that is limited to internal communications disseminating the information in question. Since the communication of advice to Powerhouse was not a solicitor/client communication, it cannot be privileged.

17. I do not think that that is a correct application or analysis of the *Three Rivers* case. That case concerned not advice given by the solicitors, but preparations for the giving of instructions which were to lead to advice. In that context it was held that information gathered for that purpose was not within the privilege, because only communications were. But before too much is read into that, it must be born in mind that it concerns instructions, not advice. The Court of Appeal in that case did not have before it the extent to which the product of those instructions (the advice) was or was not communicated and what might happen to it thereafter, and care must be taken before taking the concept of "communication" too literally for these purposes.

18. In my view, a correct reading of the case indicates that it does not support Mr Watson's proposition, and that reading is consistent with authority preceding *Three Rivers*. In paragraph 19 of his judgment Longmore LJ stated that "By the end of the nineteenth century it was, therefore, clear that legal advice privilege … [applied] only to communications passing between [the] client and his solicitor (whether or not through any intermediary) <u>and documents evidencing such communications</u>" (my emphasis). A document evidencing the communication cannot be the communication itself, so Longmore LJ's formulation goes beyond the communication itself. Again, at paragraph 21 he concludes that the 19th century authorities allowed privilege to "documents … passing between the client and his legal advisers <u>and evidence of the contents of such communications</u>", (again, my emphasis) and went on to apply that principle. Again, therefore, records of communications were privileged. If emphasis be needed, it can be seen in the form of order made by the Court of Appeal, which is set out in a judgment of Tomlinson J in a later hearing in the same case ([2003] EWHC 2565 (Comm)) – the declaration as to privilege encompassed:

"(1) Communications passing between the Bank and its legal advisers (including any solicitor seconded to the Bank) for the purposes of seeking or obtaining legal advice;

(2) Any part of a document which evidences the substance of such a communication."

19. That extended formulation would be capable of catching a number of things beyond the actual communication (oral or written) between solicitor and client, when applied to advice rather than instructions, all of which would be consistent with the policy

underlying privilege and with a common sense application of that policy to the practicalities of everyday commercial life.

a.   First, it obviously applies to a letter of legal advice, or a letter containing legal advice.

b.   Second, it would cover the client's own written record of what his solicitor had told him orally. There is every reason why it should.

c.   Third, it would cover the situation where a client representative who obtains the advice passes that advice internally in the organisation in question. This would apply whether the advice is passed on verbatim or whether it is summarised or extracted. This is in line with *The Good Luck*, referred to above. In that case the relevant issue was whether or not breaches of duty by insurers were causative of a bank lending money to the owners of a vessel. The bank obtained some legal advice, and parts of the advice were disseminated internally so that the bank could decide whether to lend the money. It was submitted that the advice so extracted was not privileged because "such documents cannot be described (using the words of Lord Justice Taylor in *Balabel v Air India*) as part of that necessary exchange of information of which the object is the giving of legal advice as and when appropriate nor (again using the words of the Lord Justice) as documents made confidentially for the purposes of legal advice …". That argument looks rather like an argument that only solicitor/client communications strictly so called can be privileged. Saville J rejected that argument. First, he pointed out that if the argument were right then in a great number of commercial cases the ability of a client to get legal advice in confidence (which underlay the doctrine of privilege) would be destroyed. He saw "no good reason or valid reason for the suggestion that the confidence which it is accepted attaches to the lawyer client communication itself, should somehow be lost once the advice is put to the commercial use for which it was sought in the first place". After pointing out that the logic of the argument he was rejecting would allow cross-examination of the officers of the client company about privileged advice, which would be a strange conclusion, he ended this section in his judgment by saying:

"[The argument] is, in truth, based on the false premise that that which is communicated ceases to be a communication and thus loses the privilege attaching to lawyer-client communications."

This last sentence is, perhaps (and with all due respect) a little dense. In *The Sagheera* [1997] 1 Lloyds Rep 160 at p 169 Rix J wondered whether it should not be understood in the sense "the false premise that that which is communicated <u>internally</u> ceases to be <u>confidential</u>" (his emphasis). Without wishing to pore over the sentence as if it were a statute, I think that it probably has a different meaning. I take it to mean that a record of a privileged communication has the same sort of quality as the communication itself for the purposes of privilege. In a literal sense a communication ceases to be that once it is communicated; but the law of privilege is not so blinkered as to regard privilege as attaching just to that event and to nothing else whatsoever. For privilege purposes a record of a communication is the same as the communication itself, and that is as true of

summaries as of the verbatim original communication. That, I think, is what Savile J is saying. That formulation and reasoning recognises that something beyond the initial communication itself, strictly so called, is and should be within the privilege. It remains good law after *Three Rivers*, and is consistent with it.

d.   It would continue to cover cases such as *Gotha City* and the examples discussed in that case. In *Gotha City*, the apparent owner of a picture wished to sell it through Sothebys. It took advice from Messrs Herbert Smith (presumably relating to the sale, though the report does not say so) and sent a copy of the letter of advice to Sotheby's. Sotheby's also sat in on a meeting between the seller and Herbert Smith in respect of which an attendance note was produced. The plaintiff, who claimed to own the picture, sought inspection of the letter and attendance note. The argument was, in effect, about waiver of privilege, and it was held on the facts that there was no waiver. I shall return to that in the context of the present case. For the moment it should be noted that privilege was assumed to exist in both documents; it was not argued that the copy letter sent to Sotheby's was not a privileged communication. If Mr Watson's argument were correct then logically it ought not to be, subject to his distinction between verbatim content (privileged) and summarising content (not privileged); yet the argument did not occur to anyone in that case. In fact, it is quite clear that Staughton LJ had no difficulty with the concept of preserving privilege in privileged advice notwithstanding that it was communicated by the client to the third party, because at page 119 he cited, obviously with approval, a passage from *Style & Hollander on Documentary Evidence:*

"If A shows a privileged document to his six best friends, he will not be able to assert privilege if one of the friends sues him because the document is not confidential as between him and the friend. But the fact six other people have seen it does not prevent him claiming privilege as against the rest of the world."

I think that it follows from that that A would be able to restrain each of the friends from disclosing to the outside world what they were told on the basis that it remained privileged. The friends could not give secondary evidence of the privileged material – it would be "evidence of [privileged] communications", or their evidence would be "evidencing such communications" within the formulation in *Three Rivers*. By the same token, if a client summarises or extracts advice in a letter to a third party, that written communication is capable of retaining or attracting the privilege which attached to the original advice, subject to waiver. It, too, is something which evidences a privileged communication.

e.   This analysis gives rise to a regime which maintains intellectual consistency and maintains the policy underlying privilege, which is that a man is entitled to make a clean breast of matters to his lawyers without fear of disclosure, a policy which covers both the giving of instructions and the receiving of advice. It means that a

client can reproduce the advice for his own purposes without necessarily risking that reproduction not being privileged, which in my view is essential to the sensible operation of the doctrine. It also means that he can discuss the advice with others without necessarily risking the same thing. A client may well wish to discuss advice received with a partner, or with another adviser, or (as in *Gotha City*) with a contractual counterparty who might be affected. The effect of privilege would be seriously dented if those communications were held to be not privileged so that, if evidence of them could be obtained, an insight as to the advice would become available. That is not a sensible result.

20. The position therefore seems to me to be as follows. Where privileged advice is disclosed to a third party the privilege is capable of attaching to the third party communication because that communication is evidence of the privileged advice within the formulation in *Three Rivers*. It does not matter whether that third party communication is of the whole of the advice (like the letter in Herbert Smith) or a paraphrase of or extract from the advice. To be fair to Mr Watson, he conceded that privilege would be maintained in relation to actual full copies of written advice obtained, so that in the present case he did not press for inspection of one document, or part of a document, which (on the evidence) is a straight reproduction, or forwarding, of the Manx legal advice verbatim. However, he sought to distinguish between the complete advice and summaries, extracts or paraphrases. Those, he said, were not privileged. The only justifications he was able to advance for this distinction were first that the paraphrases were not the original communication, and second that there was a potential for inaccuracy in any summary or paraphrase. Any inaccurate summary would not be the original advice. These submissions are not convincing. If it is right that the original verbatim advice remains privileged, then it is illogical to exclude paraphrases or parts of it. If 100% is privileged, then would communicating 99% of it remain privileged? – it is hard to see why not. But if that is right, then why not 90%, or 75%, or 50%? There is no reason to draw a line anywhere, and every reason not to. Mr Watson's demarcation would also, in practice, mean that any passing on of oral advice would be likely to be unprivileged, because it is most unlikely that it would be passed on in whole and verbatim. That, again, is an unmeritorious distinction. The proper analysis, consistent with *Three Rivers*, is to continue to afford privilege to material which evidences or reveals the substance of legal advice (subject, of course, to waiver). The possibility of inaccuracy is not a reason for departing from this principle. If the passed on "advice" were so inaccurate that it could no longer be properly described as a summary of the advice, then it might be that that communication would not be privileged (though even then it might attract privilege if it tended to reveal instructions given, which it might well), but there is no suggestion that that is the case here and I need not consider it further. Short of that, I do not see why some degree of inaccuracy, even if it exists, should necessarily destroy the privilege; so there is all the more reason for saying that the <u>possibility</u> of inaccuracy should not destroy the privilege which would otherwise exist in paraphrases or summaries.

21. This means that the subsistence or otherwise of privilege, where advice is communicated to a third party, turns on the extent to which there is a waiver of privilege on that occasion. *Gotha City* demonstrates that it is not inevitable that there is a waiver in those circumstances. In that case it was held that the receipt of the advice by Sotheby's was attended by a degree of confidentiality which meant that, while there was waiver as

between the owner and Sotheby's, there was no waiver vis-à-vis the outside world. The question in the present case, therefore, is whether and to what extent there was a waiver. I consider the application of these principles to the facts of this case below.

22. In these proceedings the question was raised whether the Level 1 and Level 2 references were capable of being privileged. This raises (in theory) the question of whether, after *Three Rivers* and its emphasis on privilege attaching only to communications, there can be privilege attaching to evidence of the fact of instructing solicitors or getting advice from them (Level 1), or to evidence of the fact of instructing solicitors and getting advice on a particular subject (Level 2) because those facts are not communications or evidence of communications. I do not propose to consider this as a matter of principle, because on the facts of this case there has been a plain waiver even if there was privilege.

23. The next question of law which arises is the extent to which a party entitled to an unwaived privilege is entitled to restrain those in possession of the information from disclosing it or otherwise making use of it. It arises in this case if and insofar as Mr Turner received privileged information in confidence and then disclosed it to representatives of the claimants, if and insofar as Powerhouse has disclosed documents which contain unwaived privileged material. It is accepted by both sides that this material contains some Level 3 documents, though they do not always entirely agree as to which pieces of evidence fall into that category.

24. There is not much disagreement between the parties as to the principles applicable in this area, although there is serious disagreement as to how they should be applied. It is sufficient for these purposes to refer to only two authorities. The first is *Goddard v Nationwide Building Society* [1987] Q.B. 670. In that case the Court of Appeal was asked to consider whether or not to restrain the use of a note, containing privileged information, which a solicitor, who had at one stage been acting for both the plaintiff and defendant, had passed to the defendant. Privilege in the material contained in the note was held to belong to the Plaintiff. Having determined that, the Court of Appeal granted relief restraining use of the material contained in that note, which relief included striking out allegations in the pleading which were based on that note, an injunction restraining the Defendant from relying upon the note and orders for delivery up of all copies. In his leading judgment May L.J. considered the case of *Lord Ashburton v Pape* [1913] 2 Ch. 469 and another authority, and pronounced the following proposition (at page 683):

"If a litigant has in his possession copies of documents to which legal professional privilege attaches he may nevertheless use such copies as secondary evidence in his litigation: however, if he has not yet used the documents in that way, the mere fact that he intends to do so is no answer to a claim against him by the person in whom the privilege is vested for delivery up of the copies or to restrain them from disclosing or making any use of any information contained in them."

His citation of authority indicates, I think, that he considered that he would normally expect the restraint to be ordered. That last point is rather clearer in the judgment or Nourse L.J. He made the following points, relevant to this application:

"The crucial point is that the party who desires the protection must seek it before the other party has adduced the confidential communication in evidence or otherwise relied on it at trial.

"… Although the equitable jurisdiction [that is to say, the jurisdiction to restrain the misuse of confidential information] is of much wider application, I have little doubt that it can prevail over the rule of evidence [viz the rule of evidence which allows secondary evidence to be given of primary material where the latter is privileged] only in cases where privilege can be claimed …

"Once it is established that a case is governed by *Lord Ashburton v Pape*, there is no discretion in the court to refuse to exercise the equitable jurisdiction according to its view of materiality of the communication, the justice of admitting or excluding it or the like. The injunction is granted in aid of privilege which, unless and until it is waived, is absolute. In saying this I do not intend to suggest that there may not be cases where an injunction can properly be refused on general principles affecting the grant of a discretion remedy, for example on the ground of inordinate delay."

25. From this it is clear that not only does the court have jurisdiction to grant appropriate relief to prevent reliance upon privileged material where privilege has not been waived, the starting point is that one would expect that relief to be granted. That was certainly the view of Lawrence Collins J in the second relevant authority, *ISTIL Group Inc. v Zahoor* [2003] 2 All E.R. 252. At paragraph 91 of that judgment (at page 273) he observed that "in such cases the court should 'ordinarily' intervene". The court is "not concerned with weighing the materiality of the document and the justice of admitting it". (Paragraph 92). He went on to say this:

"93 Fifth, there is nothing in the authorities which would prevent the application of the rule that confidentiality is subject to the public interest. In this context, the emergence of the truth is not of itself of sufficient public interest. The reason why the balancing exercise is not appropriate is because the balance between privilege and truth has already been struck in favour of the former by the establishment of the rules concerning legal professional privilege.

"94 Sixth, other public interest factors may still apply. So there is no reason in principle why the court should not apply the rule that the court will not restrain publication of material in relation to misconduct of such a nature that it ought in the public interest to be disclosed to others… there is no confidence as to the disclosure of iniquity. But the defence of public interest is not limited to iniquity."

He went on to hold that on the facts of his particular case, the public interest in the proper administration of justice meant that equitable relief, which would otherwise be granted to preserve the confidentiality in the privilege material, should not be granted. The facts of

that case were very strong. They involved a clear forgery, and the apparent possibility of the court actually being misled by the proposed evidence.

26. I therefore approach this point on the footing that the normal starting point would be for appropriate relief to be granted to restrain the use of privileged material. So far as I have a discretion to do otherwise, it is not to be exercised merely on the footing that if I do not exercise it, the truth is more likely to come out. There must be some other factors, such as delay, acquiescence or other equitable defences which must be sufficiently strong to override the normal, very strong principle, that privileged communications are protected from disclosure. I shall consider the application of these principles to the facts of the case before me in a separate section of this judgment below.

**The application of the law to the facts**

27. It follows from the above that, subject to waiver, communications by the Defendants to Powerhouse which contain or refer to the content of legal advice are capable of being privileged. This includes Level 3 communications. Whether or not it includes Level 1 and Level 2 communications I do not have to decide, because on any footing there has been a waiver of such privilege as might otherwise have existed in those references. At the trial on liability Mr Mian gave evidence. That evidence included his dealings with Mr Turner of Powerhouse. Having referred to the opening stages of the negotiation, when Mr Mian was trying to convince Mr Turner that he had an appealing scheme, he then said the following:

"13 Stuart Turner wanted confirmation of a protected trust account. At this stage I sought advice from our lawyers and then passed on this advice to Stuart. This was in late February 2000. I wish to make it clear that I am not waiving the privilege that attaches these communications."

28. Since that is a clear indication both that solicitors were instructed and as to the subject matter of the instructions, I do not see how it can conceivably be argued that similar references, containing the same information, in documents or otherwise can have maintained any privilege if, indeed, it ever had any. To the same effect is the extract from the letter from Mr de Freitas, which I have quoted from above. I expect that both those references occurred because it never occurred to the Defendant that, in the context of this case, the fact that legal advice was obtained on this transaction was, in itself, in the least bit confidential. If that were right then it would mean that documents containing a reference to such limited matters would not have the necessary confidentiality to attract privilege in the first place, and my first instinct is that such references would not in any event, as a matter of principle, be privileged. However, as I have indicated above, I do not need to decide that in this case. I can and do deal with the point as a matter of waiver. In fairness to Mr Monson, I should record that he did not press privilege in relation to these matters particularly strongly. His main concern was that leaving them in the documents might amount to a waiver.

29. That leaves the level 3 communications. These are communications which somehow reveal the content of the advice that was obtained. Despite the fact this was contained in

communications with a third party (Powerhouse), on the reasoning set out above, and unless waived, that privilege can be maintained. The question therefore arises whether or not there was a waiver when the material was conveyed to Powerhouse, and in particular to Mr Turner. The *Gotha City* case demonstrates that privileged matters can be conveyed to a third party in circumstances which limit the extent of the waiver. I consider that that was the case here. I have already set out the terms of the confidentiality agreement which operated between the Defendants and Powerhouse. Mr Watson submitted that it did not apply to legal advice, but only to such matters as know-how and trade secrets. I do not think that that submission is right. The expression "Confidential Information" is not defined in the agreement – the wording says what the expression includes but not what it means. That being the case, I have to consider what the expression actually does mean, particularly in its context. The very use of the word "confidential" connotes information with a degree of confidentiality, and it seems to me that legal advice is something that is likely to fall fairly and squarely within that concept. On 16th September 2003 Mr Turner signed a witness statement in which he conceded that the Defendants had asked him to keep the actual advice received from the lawyers, and forwarded to him, confidential. Indeed, confidentiality in the actual advice is in effect conceded by Mr Watson, although not in terms, when he concedes that he is not entitled to see the verbatim version of the advice which was forwarded to Powerhouse. In his witness statement Mr Turner states that he did not consider that more general statements as to the nature or the effect of the advice (the nature of which I had seen in some of the material that I am invited to strike out of witness statements) was confidential, but in my view he is wrong about that. It follows, then, that the advice retained its privileged character and any waiver of privilege was limited to Powerhouse, and the use to which it could be put was limited by the terms of the confidentiality agreement. The terms of that agreement permit only a very limited use. Accordingly, conveying the lawyers' advice to Mr Turner and Powerhouse, under those terms of confidentiality, did not destroy the confidential nature of the advice, and therefore any waiver of privilege was limited to Powerhouse and was not general.

30. Those conclusions can be summarised in relation to the redactions which have been made in the Defendants' disclosed documents is as follows:

(a) References to the mere obtaining of legal advice are not privileged.

(b) References to the obtaining of legal advice on a given subject matter are not privileged.

(c) Level 3 references, which evidence the content of that advice, are prima facie privileged.

31. I add one small point which arises in another context in this case and which may or may not arise in relation to the redacted material. The Defendants have shown some sensitivity as to the identification of the lawyers concerned. Some of the documents which I have to come on to consider later on in this judgment actually identify the Manx lawyers. In the light of the conclusion that I have come to in relation to Levels 1 and 2, I do not think that the identity of the lawyers involved is capable of attracting privilege either.

32. That brings me to the material which the Defendants wish to have struck out of the documents voluntarily disclosed by Powerhouse, and various witness statements. I will take the witness statement material first.

33. Some of the disputed material is no longer in issue in the light of Mr Monson's concession that he does not seek to strike out Level 1 and Level 2 material from the witness statements. That leaves it for me to consider what to do about what is said to be Level 3 material. So far as there is any such reference, this is made in two ways. First, there is a witness statement from Mr Turner in which he describes what he obtained from the AON Group in the course of the negotiations, which is said to include some Level 3 material; and second there is some material in witness statements of Mr Borrill and Mr Chan in which they reproduce what Mr Turner told them at the time of the negotiations, which is itself said to include some Level 3 disclosure. What is said by Mr Monson on behalf of the Defendants is that Mr Turner was not entitled to disclose the advice of the Manx lawyers to the Plaintiffs' negotiators, and it remained privileged and confidential. Privilege has not been waived, and in accordance with the "ordinary course" relief should be granted to make sure that that material is not deployed. He has applied in time.

34. To this analysis Mr Watson had a number of ripostes. They were (although not in the same order as he advanced them) as follows:

    a. On the facts, Mr Turner was at liberty to disclose what was disclosed to him within what was allowed to him by the confidentiality agreement. This distinguishes the present case from the other authorities where the disclosee was not similarly at liberty. I do not agree with this. Since it was confidential, he was not at liberty to disclose it – see above.

    b. The blatant aim of the Defendants in seeking to have parts of the witness statements excised and to have the witness barred from giving evidence of the excised contents was to hide a wrongdoing, so the discretion of the court should not be exercised in favour of the Defendants. Again, I think this begs the question. Whether or not there was a wrongdoing at the end of February 2000 is precisely the question the court will have to decide on the enquiry. Even in a case where the sole evidence of wrongdoing is in a privileged communication, that does not justify the court in exercising its discretion against the invocation of the privilege. By and large, a party can only prove what he or she can prove without the aid of the other side's privileged material.

    c. So far as the evidence of the Claimants' own officers is concerned they wish to give evidence of material that came into their possession without any wrongdoing on their part. That, said Mr Watson, is a reason for not restraining their use of that information. However, I do not think that that is a determining, or even a strong, factor. The converse may well be true – wrongdoing on the part of the recipient may strengthen a claim for relief - but it does not follow that the absence of wrongdoing means that an injunction should not be granted. I note that in *Goddard* there was no suggestion that the Defendant was guilty of wrongdoing in obtaining the privileged information from the solicitor. The solicitor was, of course, technically guilty of breaching the Plaintiff's confidentiality, but by the same token, on the facts of this case, so was Mr Turner.

    d. If the Level 3 material, such as it is, were excised from the witness statements of Mr Borrill and Mr Chan, then they would not be able to give full and frank

evidence of what had actually happened and what their motivation was. Their evidence will be that they received certain information and encouragement from Mr Turner and they adjusted their conduct accordingly. If they are not allowed to give their full evidence then their evidence will have an air of artificiality about it, or even potentially a misleading quality. I am rather more troubled about this. They did what they did, and they relied on what they relied on. To prevent them from telling the court what they actually relied on in reaching their conclusions as to pricing, when that is an issue which lies at that heart of the enquiry as to damages, would be a very strong thing. However, I think that the answer to this problem may be a practical one. I do not consider that their case will be harmed if they are allowed to give evidence (which it seems to me they must be) that they relied on what they had been told about the advice given by the Manx lawyers without actually identifying precisely what it was that they were told. What lies at the heart of the causation question on this part of the enquiry is not the advice given by Manx lawyers but whether or not an infringing copy of the CAA had been made. That is a different, though related, question. I do not think that the proper conduct of the enquiry will be effected if the evidence were limited in that way; it is not necessary for them to go further and state what the advice was, and on my findings they are not entitled to anyway. It not infrequently happens in a trial that a witness states that "as a result of the legal advice received, I did X", and it is well understood that in those circumstances the witness does not have to give evidence of what the advice was. This is therefore not a reason for departing from the normal course. On the facts of this particular case, if the Defendants were in fact to challenge that sort of evidence as to causation, then they might well risk the fact that the witness would be able to justify the statement by amplifying what he had understood the advice received by the Defendants to have been, but that is a risk for the Defendants to assess, and whether or not the matter is opened up would be a matter for the Master at the enquiry.

e. Next Mr Watson submitted that since privilege was waived vis-à-vis Mr Turner, even if it was not waived vis-à-vis the rest of the world, Mr Turner was free to use the rest of the information disclosed to him in legal proceedings. I am not sure that Mr Watson was prepared to press this submission very strongly, but in any event it is wrong. The use to which Mr Turner was entitled to put the privileged material was governed by the Confidentiality Agreement, and, as the extracts set out above demonstrate, that use was strictly limited. It did not include disclosing legal advice to competitors, whether for use as a bargaining counter or not.

f. Next, Mr Watson said that in effect the material had been deployed, so it was too late to be prevent its further deployment – see *Goddard*. The privileged material had already been deployed because of the Chan e-mail referred to above, so the defendants are too late. Since this email was part of the documentation at the trial, and should be taken to have been read by the trial judge (even though no one says that it played any material part in the trial), the matter has already been given a form of publicity which means it has been deployed, so it is too late to prevent evidence of other disclosures of the same sort of material. Related to this is a laches point. He says that the fact that Mr Turner had made disclosures of the advice given would have been apparent to the Defendants on disclosure in the

main action, which took place on 24th August 2001 when the defendants would have seen the Chan e-mail. Its wording, it will be remembered, contained the following paragraph.

"The solution promoted to you by AON and their advisors is that a Collections Account Agreement [sic] in the form of a trust will attain this and that therefore they will have demonstrated the robustness required of them. You are now seeking counsels advice on the proposed trust."

This, says Mr Watson, should have alerted the Defendants to the fact that the Claimants had found out that legal advice had been obtained on the Defendants proposed transactions, and I infer that Mr Watson would say that they should have inferred that Mr Turner was the source of this information. They should therefore have inferred at that stage that privilege information had been crossing the divide; and since about two years elapsed before the Defendants took any point on the alleged wrongful disclosure of privileged information, it was by then too late for them to do so. Mr Monson's response to this is that in the context of the claim made at the trial, when there was no suggestion that a claim of infringement of copyright was being made as early as the end of February, this passage had no great significance. He also said that the oral evidence of Mr Borrill at the trial as to the infringement of copyright contained no suggestion that the relevant date was being put as early as this. Since the email did not actually figure at the trial, and even though it was in trial bundles, that did not mean that the whole question of the legal advice given at the time had been sufficiently aired in public so as to amount to deployment of the material and so as to make it wrong to restrain its further being aired now. Since the point now in issue was not then in play, it is not surprising that the significance of this email passage was overlooked, and the fact that it was overlooked should now not be held against the Defendants now that the focus of the case had shifted, or a little more precisely now that the case had acquired a second point of focus to which it had become relevant. In my view Mr Monson is right. I do not think that this single sentence, in the circumstances, amounts to deployment of the other material. It does not amount to an airing of the other privileged material, so it does not give it a relevant degree of publicity to mean that the defendants are now too late. So far as laches is concerned, in the light of the absence of any significance of that piece of evidence at the trial, and in the light of the fact that the pre-1st March infringement claim only came after the trial, I think it would be unfair on the Defendants to say that they are too late because the material has been deployed, and that in general laches terms they should have taken the point (so far as they have one) any earlier than they did.

35. My conclusion on this point is that, if there is Level 3 material relating to privileged matter, then there are no factors of any real weight which would lead me to take anything other than the ordinary course which is to exclude such matter. I therefore have to go on to consider how much of the material falls into that category. In this context, I shall take the various passages which the Defendants say infringe their privilege in turn. Where I come to the conclusion that a matter is revealed in breach of privilege, I will not actually set out the material.

      i.    Borrill Fourth Witness Statement paragraph 25

Two sentences are sought to be excised in order, in effect to prevent Mr Borrill giving indirect evidence of material passed to him in breach of privilege and in breach of confidence. The first sentence refers to legal advice, the firm from which it was obtained, (by inference and in its context) the subject matter to which it related, and a very short expression summarising the advice it given. The last of those elements is objectionable; the first three are not. The sentence as it stands ought to be struck out, but I can see no objection to a replacement sentence which gives the first three elements and otherwise refers to the advice without stating what it was. The second sentence describes how he had got the advice ("this advice had been forwarded by LGH to Stuart Turner"). This sentence is unobjectionable.

ii.     Borrill Fourth Witness Statement paragraph 26

The words objected to are words in which Mr Turner is recorded as having passed on to Mr Borrill the view of the Manx lawyers as to the workability of the Defendants' proposals. Again, this is material said to come from Mr Turner; and again, it was imparted by the latter in breach of his duty of confidence by way of infringing the Defendants' privilege. The words as they stand ought to be struck out because the court ought not to receive evidence of privileged matter obtained in this way.

iii.    Stuart Turner First Witness Statement paragraph 22

In this paragraph Mr Turner narrates part of the history of his dealings with Mr Mian. The first sentence describes the instruction of the Manx lawyers to advise on the Defendants' scheme structure. It is not objectionable. The first half of the second sentence refers to the fact that on 22nd February he saw the advice provided by those lawyers (Cains). That, as it stands, again seems to me to be unobjectionable. It does not reveal the contents of that advice. The second half of that sentence contains a reference to a document referred to in the advice which it goes on to describe it in a certain way. The third sentence contains a further description of the document just referred to. There is no statement as to what the advice actually was. The paragraph then goes on "I was asked by AON to keep the Cains' advice confidential. I told Mr Mian on that day that the advice did not really address my particular concerns and that I would need to see a copy of [a particular document, just referred to] in order to know whether it protected customers' money. He said that he would have to clear this with AON and AON Legal, and that he would have to delete the existing client names from the document; but subject to that he agreed to provide a copy." The last sentences that I have quoted do not disclose the advice, and this part of the evidence does not contravene Mr Turner's obligation of confidentiality apart from the implicit cross-reference back. They are unobjectionable, apart from that. The

immediately preceding elements, which I have not yet dealt with, present a little more difficulty. One could argue that where a third party, who is within the privilege, merely mentions the fact that a privileged communication refers to a given document is not an infringement of privilege because it is not disclosing information which tends to indicate what the advice was. However, I do not think that is right. The question is whether a communication is privileged. To the extent that it is, production or proof of it cannot be compelled or allowed. It is not appropriate to dissect very small elements out of it and say that disclosure of small elements is not an infringement of privilege. It is either privileged or not, and if it is it is wrong to allow Mr Turner to give evidence of its content. In any event, in relation to the references in this particular case, it could be argued that what Mr Turner says might reveal what instructions were given to the lawyers, and those instructions are as privileged as the advice. Accordingly, I consider that Mr Turner is not entitled to refer to, and give evidence of, the content of this advice so far as it contains a description of a document referred to within it. Those parts of paragraph 22 will have to be struck out. The remaining sentences will have to be modified so that they do not cross-refer to a document referred to in privileged advice. He would be entitled to give evidence that he asked for a copy of a document, but not in such a way to suggest that the advice referred to it. I accept that this tends to have an air of unreality or artificiality about it, but that is the position at which one sometimes arrives when a witness is required to skate delicately around the edge of privileged communications.

iv.   Turner First Witness Statement paragraph 23 – last sentence

In this sentence, Mr Turner refers to the fact of receiving further advice from Cains via Mr Mian, and goes on to indicate something that it mentions. The first part of that sentence is permissible; the second part is not because it reveals an element of a privileged communications.

v.   Turner First Witness Statement paragraph 25

This contains a statement which is quite clearly a Level 2 Statement. Mr Monson does not pursue the excision of this sentence, and in any event I would not have required its removal.

vi.   Chan Second Witness Statement paragraph 5

This paragraph seeks to give evidence of a conversation that he had with Mr Turner during the negotiations. The objected to part reads:

"However, he [i.e. Mr Turner] told me on the phone that AON and their advisors, Cains, had nonetheless demonstrated that their scheme was sufficiently robust for the purposes

of Powerhouse, by describing how their collections account agreement would ring fence customer monies in the scheme."

I am not prepared to order the excision of this part of the witness statement. It would be unobjectionable without the words "and their advisors, Cains", but it would also have a slight air of falsity about it if Mr Turner in fact referred to them. I do not consider that a reference such as that contravenes privilege in any particular communication by revealing its content.

36. Next I have to deal with Mr Monson's claim that I should order the redaction of certain parts of two documents emanating from Powerhouse. The first is a memo from Mr Turner to Mr Broomfield and Mr Stanley, two of his colleagues in Powerhouse. It refers to the competing bids, and compares various aspects of them. Under the heading "AON" it contains first an innocuous sentence stating that the concern that Powerhouse had was to ring fence service fees and that that concern has yet to be satisfactorily resolved. There is then a sentence which states what the "initial indications" from Cains are. That sentence seems to summarise the advice of that firm, and as such it contains a reference to privileged information and ought to be redacted. The second sentence is equivocal in that it refers to a suggestion which might or might not have been contained in Cains advice. Mr Monson tells me on instructions that he and Mr de Frietas have checked whether or not it does reflect advice, and he tells me that it does. On that footing, it falls to be redacted as does the first sentence. The document then goes on, in a separate paragraph, to state as follows:

"We need to take into account that no precedent (as at the date of this memo) has been set in law, and therefore no proof exists to prove that the trust solution presented to Powerhouse by AON would have any legal weight. It would seem only wise to secure further independent legal advice."

37. I do not see how a case can be made for excising this material and in the end Mr Monson did not press for the redaction.

38. The second Powerhouse document is an undated document which was generated internally so that someone could consider the various proposals that were before it. On page 2, under the heading "The Issue" it contains wording that is identical to that which I have just considered. That wording should be treated similarly. There is one additional sentence under the heading "The Question", and it reads as follows:

"Powerhouse have read the Cains response (attached) with some interest but are concerned that they seem to have "skated around" the core issue for Powerhouse."

The Cains response referred to is not disclosed. This sentence is objected to, but I cannot really see why. It certainly does not contain any evidence of what the Cains advice was. There is nothing objectionable about it.

39. The last document is the Chan email that I have referred to above. I am not prepared to order the excision of this part of the evidence. It is no more objectionable than paragraph 5 of his witness statement, which I have already declined to excise.

40. Next I turn to the particulars of claim in the enquiry. Mr Monson says I should strike out certain allegations made in the Particulars of Claim because they were only able to be made because of unauthorised disclosure by Mr Turner. In effect, he invites me to take the same approach in relation to this statement of case as the Court of Appeal took to the relevant pleading in the *Goddard* case. Some of the objected to parts correspond to parts of witness statements which I have allowed to stand in that they refer merely to the receipt and transmission of legal advice. However, two sentences go further and refer to the content of legal advice, in a similar manner to parts of Mr Turner's witness statement which I have ordered should be excised. I was at first tempted to accede to Mr Monson's application to strike out at least those limited parts. However, I have decided I should not do so. Now that the position as to admissible evidence has (I hope) become clearer as a result of this judgment, Mr Watson may well wish to reconsider how he is going to make his case, since part of his submissions to me involve assertions that he could get to where he wanted through different routes in any event. If he is right about that then he may wish to consider re-pleading. I do not think it is necessary, in that context, for me to start striking out parts of the existing statement of case. If Mr Watson has no other way of getting to where he wants apart from relying on evidence that I have required to be removed, then he will not be able to make good the allegations in the Particulars of Claim. No harm is done by leaving them in. If he thinks he can get there through another route, then he should be at liberty to do so. It may be that in fact he may wish to reconsider how he puts his case and remove or amend certain parts of the present claim. That is obviously a matter for him. At the moment I think the most sensible course is to leave the particulars of claim where they are.

**Apollo Transaction**

41. In his judgment on the trial of liability, Judge Weeks Q.C. observed:

"I suspect that in the morass of documents the parties may have lost sight of their commercial interests and the purpose of litigation".

42. In some ways I cannot help sharing that view in relation to this section of the application before me. I find it difficult to see that the events to which I now have to refer can give rise to any particular material claim, and I cannot help thinking that what I shall call the Apollo claim is a storm in a teacup, and Mr Watson at one stage was disposed to accept that that was an accurate description of at least part of the dispute in relation to this matter. However, it is a matter which is raised in the enquiry as to damages, and there has been no attempt to strike it out on the basis that it is frivolous or otherwise that it should not be dealt with, so I am forced to deal with it.

43. In 1999 the AON Group entered into a warranty support scheme with a concern that can be described as Apollo. It is common ground that this scheme was not a trust-based

scheme so documents of the nature of the CAA played no part in it in its final form. Furthermore, there is no suggestion that the Claimants were in competition with the Defendants for that scheme, so there is no suggestion that they have suffered direct financial loss because the Defendants got the contract. However, the allegation is that in the course of considering the Apollo transaction, consideration was given at some stage to a trust-based scheme to which the CAA would have been appropriate, and that in that context there was some copying of the Scottish Power CAA or otherwise some infringement of the claimants' rights in respect to it. There is evidence for supposing that the CAA was considered in the context of the Apollo scheme, because the infringing copy forwarded to Powerhouse had originally been saved on the Defendants' computer systems under a file name whose path included something which appears to be a directory designated to "Apollo 2000". The case of the claimants, as described to me by Mr Watson, was that if there was some copying in this context, even if (as seems clearly to be the case) the copies were in no way deployed in the actual Apollo Scheme, the Defendants are liable to pay a payment in the nature of a royalty. They therefore seek disclosure of all drafts of the CAA prepared for the purpose of the Apollo transactions, and they also seek all memoranda and similar notes referring to any such documents.

44. The disclosure sought by the Claimants is in terms as follows:

"All drafts of the collections account agreement or equivalent agreement (in both electronic and hard copy form) which have been prepared, used or intended to be used by the Defendants or any of them for the purposes of putting into effect the warranty scheme for:

[Apollo];

Any other Retailer

All memoranda, attendance notes, board minutes and correspondence (including emails) which refer to any document referred to in [the preceding paragraph] (including internal documents prepared by the Defendants' and documents passing between any two or more the Defendants)."

45. Mr Monson accepted that his clients were under an obligation to disclose documents relating to the use of the CAA in Apollo but said that they have already been disclosed (and the Claimants have been given copies,) apart from such privileged documents as may exist. I should say at this stage that in case there is any daylight between Mr Monson's concession and formulation of the category of documents sought by the Claimants, I would make an order in those terms, but I do not think that there would be much debate about that. The debate in this area centred around the question of privilege. Paragraph 17 of the particulars of claim in the enquiry states that:

"It is to be inferred from [certain pleaded material] that the first and/or second Defendant also copied the CAA for the purpose of sending it and/or sent it to Apollo 2000."

46. It does not appear that a copy of any document specifically created at this stage has been disclosed, whether as a document that the defendants have in their possession or as a document which they once had. Mr Watson seeks to make a case that CAA must at some stage have been copied for the purpose of considering whether or not to deploy it in a scheme for Apollo, even if it never was so used, and even if a copy was never sent to Apollo, and the suggestion is that such a document was, or may have been, sent to the defendants solicitors. The debate before me was principally about privilege. Various documents were debated, each of them hypothetical - they were hypothetical because the Defendants deliberately said nothing about the existence or non-existence of such documents because if they had then they would or might be admitting that which they claim they were entitled to decline to admit (because of privilege), and I suspect they were also concerned about waiver of privilege. Those documents were as follows:

    i.    Copies of the CAA prepared for the purposes of being submitted to solicitors for their consideration.

    ii.    Any amended CAA arising as a result of work by the solicitors.

    iii.    Versions of the CAA thus amended and put back in the hands of the Defendants or any of them.

47. Mr Watson's final position in argument was that such documents could not be privileged. Those described under (i) would simply be copies of an unprivileged document, and would not be privileged because of the *Three Rivers* case. Next he said that documents in category (ii) would not be privileged because once the to-ing and fro-ing on advice had been concluded it no longer formed part of the advice. So far as the drafts back in the hands of the clients were concerned (category (iii)), then they were not privileged either because they fell within category (ii) or because the disclosure of a later draft to Powerhouse waived privilege in the predecessor draft on which it was apparently based. As an alternative line of attack in relation to this alleged batch of infringements, Mr Watson also relied on the principle that "advice sought or given for the purpose of effecting iniquity is not privileged" *Barclays Bank Plc –v- Eustice* [1995] 1 WLR 1238 at 1249b. The iniquity relied on by him was giving a lawyer a draft, in respect of which copyright existed, for the lawyer to improve.

48. I think that it is appropriate to deal with this part of the case shortly. It is tempting to take the view that since it was not clearly proved that there were any documents which are worth debating (because of the position taken by Mr Monson) I should not deal with this at all. However, it has been a matter of some dispute between the parties, and I think that it would be useful and proper for me to make some rulings for the guidance of the parties, and in particular for the guidance of the defendants who can be seen to have taken a line in relation to privilege that was not justified (see their insistence on redacting level 1 and level 2 references, above). However, I shall not deal with the point at great length because I think that the answers are relatively straightforward and, because I find it very hard to believe that any significant amount of damages can turn on them. I consider the legal position to be as follows:

    a.    Any copy of the CAA which was created with a view to its being submitted to solicitors for advice does not, despite its purpose, attract privilege. That this is clearly the case appears from *Dubai Bank Limited v Galadari* [1990] Ch 1980. This principle was recently applied and approved in *Sumitomo Corporation v*

*Credit Lyonnais Rouse Limited* [2002] 1 WLR 479. Any such copy ought therefore to be disclosed and produced.

b.  Any version produced by the solicitor in draft for the purpose of carrying out his function of giving legal advice to a client would, in my view, be privileged. Such drafts, until communicated, are not communications, but it is quite apparent from paragraph 29 of the judgment of Longmore L.J. in the *Three Rivers* case that that judge considered that solicitors' drafts are privileged – "all documents passing between the BIU and Freshfield are privileged <u>as, indeed, are Freshfields' own drafts and memoranda</u>." (my emphasis).

c.  Drafts passed back to the clients, on the assumption that they were part and parcel of legal advice, are again privileged. I do not understand on what principle it can be said that privilege in those drafts is waived when a yet further draft, which is derived from them, is disclosed in circumstances such that that later draft is not privileged. Mr Watson advanced no authority in support of his proposition that privilege was waived, and I hold that it was not.

d.  There is no evidential basis upon which the iniquity principle can be invoked in this case. While I accept Mr Watson's submission that dishonesty as such is not necessary in order to invoke the principle, and reject Mr Monson's submission that it is, there is no evidence on which I can find that the Defendants were guilty of any conduct which even comes close to the level of iniquity which is required in order to bar the privilege that would otherwise cloak the communications between solicitor and client. Since there is no evidence at all that solicitors were involved, but merely supposition, that is not surprising. However, even if one were minded to suppose that solicitors were instructed, there is nothing in this case to suggest that the Defendants were anything other than innocent in what they did. Indeed, in the trial on liability HH Judge Weeks Q.C. expressly rejected a finding that the later breach of copyright was flagrant. He had that issue before him in the context of an assertion that the Powerhouse breach was flagrant within the meaning of Section 97 (2) of the Copyright, Design and Patents Act 1988. He held that it was not. In that instance the person who authorised the release to Powerhouse (Mr Witt) could be identified, as could the circumstances in which it happened. He is said to have been honest and mistaken in believing that he was entitled to release it. I have not been given evidence to suggest that any other servant or officer of the Defendants held any more iniquitous view. I therefore reject the submission that the iniquity principle operated so as to deprive the Defendants of any privilege which might have arisen in respect of the putative instructions to solicitors.

**Issues Relating to Statements of Case**

49.  The applications before me include an application that the Defendants be ordered to provide some further information in relation to their pleaded case. However, it was agreed that I need not deal with that, and accordingly I do not do so. There is also an application by the Claimants to amend their particulars of claim in the enquiry. That was resisted on the grounds that those amendments introduced some inconsistencies. I believe that most of those points, if not all of them, were ironed out, but the fate of this

application was, so far as I can see, a little lost in the detailed debate on the other, more substantial, issues that arose before me. As I understand it, at present there is no longer any opposition to these amendments, and if that is right then I shall allow them so far as I need to do so. If I am wrong about that, then I shall entertain such debate as may be necessary in order to resolve outstanding points.

### One Relevance Point

50. The documents produced by the Defendants in respect of which redactions in whole or in part were made were comprised in a further list produced by the Defendants. There were 15 of them. It has not been necessary for me to describe those documents in detail in this judgment.; I have described their nature in general terms. One special point arises in relation to the 15th document, which is the last chronological document. It is described as a "copy letter from the first Defendant to Powerhouse Retail Limited" dated 10th April 2000. this is after the date when the effective deal was done between Powerhouse and the claimants, and therefore after the second price reduction which underpins the claim for damages. The Defendants objected to the production of the whole of this document – it was not a question of merely redacting part – and the original basis of objection was privilege. During the course of the hearing, Mr Monson told me that on further reflection this document was irrelevant as well, since it did not go to the issues in the inquiry, and he sought to resist inspection on that ground too. The parties agreed that rather than have an extended debate, or even a short debate, on the appropriate course to be adopted in those changed circumstances, the convenient course would be for me to look at the document and express my view as to whether it was indeed irrelevant and need not be produced. Mr Watson in terms agreed to that course. I have looked at that document and read it carefully. Having done so, I am satisfied that Mr Monson is right – while related to the overall situation, it is of no relevance (in the disclosure sense) to the issues to be debated in the enquiry. I also record that it does contain privileged material, though in my view (which does not matter for these purposes in the light of my conclusion on relevance) only part of the content is privileged. I therefore will make no disclosure order in relation to that document.

### Judicial inspection of other documents

51. I should also record one further thing in relation to the disputed documents. The debate as to what redactions should be made to witness statements and the documents emanating from Powerhouse took place with the benefit of both parties and my knowing what words in question were. That was not the case in respect of the documents which the Defendants have themselves redacted. It was at one stage suggested that I should look at all those documents (including document 15 to which I have referred) so that I could express a view as to whether they were or were not in fact privileged. That suggestion was not actively pursued, and the debate took place with only the Defendants knowing what was in the allegedly privileged material, as is common in these situations. Nevertheless during the course of the hearing, I was provided with a bundle which had unredacted versions of all those documents. The provisional view which I reached was that it would not be necessary for me to consider the content of those documents if I were able to lay down,

with sufficient clarify, the principles with which should be applied in deciding whether those documents were privileged. Having come to the conclusions which I have set out in this judgment, I maintain that view. The parties agreed that I should retain the unredacted bundle in my possession whilst writing this judgment, so that if I thought it necessary or useful to refer to it I should be at liberty to do so. The position is that I consider that I have been able to lay down sufficient principles to enable Mr Monson and his instructing solicitors to do their job of ascertaining which parts of the relevant documents are privileged, and it is neither necessary nor appropriate for me to substitute my judgment for theirs in the circumstances now obtaining. Accordingly, with the exception of document 15 which I have referred to above, I have not looked at any of those documents.

### The Requirement for a New List

52. The Claimants have applied for an order that the Defendants should provide a further list of documents relevant to the inquiry. The Defendants have resisted this suggestion on the basis that there are no additional documents requiring disclosure beyond those that they have specifically listed for the purposes of the privilege claim, and beyond those which were already comprised within a list, or lists in the context of the trial on liability. Mr Watson countered this by saying it was still appropriate that a proper list should be supplied, not least because the Defendants ought to particularise what searches they have made. I am quite clear that the Defendants ought to provide a list. At the end of the trial on liability, HH Judge Weeks Q.C made an order providing for the enquiry, and paragraph 9 of that Order provides for the parties to give standard disclosure by a date in May 2003. Standard disclosure requires for the production of a list. I cannot see why the Defendants should not provide one, even if all it did was to relist documents already supplied, or even annex the old list. At the same time they could and should have given such statements as to searches made as were appropriate in the circumstances. That would have been very much easier and more cost effective than bringing the matter before me (albeit that the time in debate was short), and it and might well have done something to allay the suspicion that the Claimants clearly feel in relation to this matter. Declining to supply a list is only likely to fuel suspicion, not to allay it. Of course, were it the case that a further list were not being provided because the Defendants did not wish to say something that would have to be said in connection with such a list (as to which there is no evidence) then that would be all the more reason for their providing one; if it is not the case then dealing with the situation would be extremely simple. Either way, the Defendants should provide the list sought by the Claimants.

### Conclusions

53. I shall therefore make such orders as are appropriate in the light of the findings I have made in this judgment. The parties will doubtless want to consider that point and decide what is technically the best way of going about the matter. In the case of any dispute, I shall rule further.