# EXHIBIT 3

A

## West London Pipeline and Storage Ltd & Anor v Total UK Ltd & Ors.

[2008] EWHC 1729 (Comm)

Queen's Bench Division (Commercial Court).

Beatson J.

B

Judgment delivered 22 July 2008.

*Specific disclosure – Litigation privilege – Cross-examination – When court could go behind affidavit of documents – Third party sought specific disclosure of documents – Litigation privilege claimed – Material sought gathered in course of investigations into incident – Dominant purpose of investigations so that solicitors could provide legal advice in connection with expected proceedings – Implied statutory duty to investigate but no duty to report – Affidavits did not enable court to conclude that claim for privilege established – Maker of affidavits required to swear further affidavit dealing with matters on which earlier affidavits not satisfactory – Not appropriate to order cross-examination – Civil Procedure Rules 1998, r. 32.7 – Control of Major Hazard Regulations 1999.*

C

D

**This was an application by the third party (TAV) for specific disclosure of documents over which the defendants had asserted litigation privilege.**

E

**The proceedings arose out of the explosion and fire at the Buncefield Oil Terminal in Hertfordshire in December 2005. The fire engulfed a large proportion of the terminal's site and caused injuries to individuals and very significant damage to properties in the area. Negligence had been admitted. There was to be a trial of preliminary issues to determine, among other things, who was the operator of the site for the purposes of the Control of Major Hazard Regulations 1999 ('the COMAH Regulations'), which applied to the site, and who was responsible for the negligence and thus liable for the consequences of the incident. Those issues involved determining whether the relevant persons working at the terminal were 'embedded' into Hertfordshire Oil Storage Ltd (HOSL) so that HOSL alone would be vicariously liable for any negligence on the part of those persons. HOSL was a joint venture between Total and Chevron.**

F

G

**TAV was the engineering company which designed and manufactured the high level switch which was fitted to Tank 912 from which the fuel spilled. The material TAV sought from the Total defendants and from HOSL was factual material gathered by them in the course of their investigations into the incident. It included interviews conducted, the outcome of the investigations the operator of the site undertook as part of the safety management system it was required to have by the COMAH Regulations, and the reports of the accident investigation teams set up by Total and HOSL. The Total defendants and HOSL resisted the**

H

A    applications on the ground that the investigations fell within the rule in Waugh
     v British Railways Board [1980] AC 521 and were covered by litigation privilege.
     Their evidence was that it was expected that civil and criminal proceedings might
     be brought against them and that the dominant purpose of the investigations
     was to identify the causes of the explosion so that their solicitors could provide
     legal advice in connection with the expected proceedings. They argued that
B    the dominant purpose of the accident investigations was to obtain factual
     information so that the lawyers could provide advice about the contemplated
     proceedings, and that there was no jurisdiction to go behind an affidavit as to
     disclosure, including one claiming privilege, by ordering cross-examination.

C    *Held*, ruling accordingly:

     1. Where a report was prepared pursuant to a statutory obligation the purposes
     of the instigator of the report were irrelevant. There should be no difference in
     principle where the obligation was a regulatory rather than a statutory obligation.
     However, the Total defendants' claim for privilege could not be rejected on the
D    ground that the Total accident investigation reports and communications were
     produced pursuant to Total's regulatory duties under the COMAH Regulations:
     while there might be an implied duty under the regulations to investigate, there
     was no duty to report; more fundamentally, it had not been established that Total
     was the operator of the site for the purpose of the COMAH Regulations. That
E    would be a major issue at the trial. (Lonrho plc v Fayed (No. 3) (The Times, 24
     June 1993) and Re Barings plc [1998] 1 All ER 673 considered.)

     2. There were a number of respects in which the Total defendants' affidavits
     were not satisfactory. They did not enable the court to conclude that the claim
     for privilege had been established. They exhibited no documents in support of
F    what was said as to the purpose of establishing the Total accident investigation.
     However, in the light of the statement that the dominant purpose in setting up
     the investigation was to prepare for contemplated legal proceedings, it would
     not be appropriate to order inspection of the documents on the ground that the
     defendants had not satisfied the burden of proof. The affidavits did not disclose
G    all that they ought to disclose. A further affidavit should be sworn to deal with
     the matters which the earlier affidavits did not cover or on which they were
     unsatisfactory. (Birmingham & Midland Motor Omnibus Co Ltd v London &
     North Western Railway Co [1913] 3 KB 850, Ankin v London & North Eastern
     Railway Co [1930] 1 KB 527 and National Westminster Bank plc v Rabobank
     Nederland [2006] EWHC 2332 (Comm) considered.)
H
     3. On the assumption that there was jurisdiction to order cross-examination in
     this context, this was not an appropriate case for doing so.

A

The following cases were referred to in the judgment:

*Ankin v London & North Eastern Railway Co* [1930] 1 KB 527.
*Atos Consulting Ltd v Avis plc (No. 2)* [2007] EWHC 323 (TCC).
*Attorney-General v Emerson* (1882) 10 QBD 191.
*Bank Austria Akt v Price Waterhouse* (16 April 1997).

B

*Barings plc, Re* [1998] 1 All ER 673.
*Biguzzi v Rank Leisure plc* [1999] 1 WLR 1926.
*Birmingham & Midland Motor Omnibus Co Ltd v London & North Western Railway Co* [1913] 3 KB 850.
*Fiona Trust Holding Corp v Privalov* [2007] EWHC 39 (Comm).

C

*Frankenstein v Gavin's House-to-House Cycle Cleaning and Insurance Co* [1897] 2 QB 62.
*Grant v Downs* (1976) 135 CLR 674.
*Guinness Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027.

D

*Highgrade Traders Ltd, Re* [1984] BCLC 151.
*House of Spring Gardens Ltd v Waite* [1985] FSR 173.
*Jones v Monte Video Gas Co* (1880) 5 QBD 556.
*L (A Minor) (Police Investigation: Privilege), Re* [1997] AC 16.
*Lask v Gloucester Health Authority* (6 December 1985).
*London Fire and Emergency Planning Authority (LFEPA) v Halcrow Gilbert & Co Ltd* [2004] EWHC 2340 (QB).

E

*Lonrho plc v Fayed (No. 3)* (The Times, 24 June 1993).
*McAvan v London Transport Executive* [1982] CA Transcript 498.
*Motorola Credit Corp v Uzan* [2003] 2 CLC 1026; [2004] 1 WLR 113.
*National Westminster Bank plc v Rabobank Nederland* [2006] EWHC 2332 (Comm).

F

*Neilson v Laugharne* [1981] 1 QB 736.
*Nomura International plc v Granada Group Ltd* [2007] EWHC 642 (Comm); [2007] 1 CLC 479.
*Purdy v Cambran* (17 December 1999).
*R v Derby Magistrates' Court, ex parte B* [1996] AC 487.

G

*R (on the application of Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563.
*Sumitomo Corp v Credit Lyonnais Rouse Ltd* (2001) 151 NLJ 272; [2002] 1 WLR 479 (CA).
*Three Rivers District Council v Bank of England* [2005] 1 AC 610.
*Visx Inc v Nidek Co Ltd* [1999] FSR 91.

H

*Waugh v British Railways Board* [1980] AC 521.
*Winterthur Swiss Insurance Co v AG (Manchester) Ltd* [2006] EWHC 839 (Comm).
*Yukong Lines v Rendsburg* (17 October 1996, CA).

A      G Pollock QC and C Blanchard (instructed by Halliwells) for the third party/
applicant.

     Lord Grabiner QC and A Maclean (instructed by Davies Arnold Cooper) for the
first and second defendants/respondents.

B
     P Edey (instructed by Edwards Angel) for the third defendant/respondent.

JUDGMENT

### Beatson J: Introduction

C

     1. The principle issue in the applications before me is whether the court can go
behind an affidavit sworn by a person claiming litigation privilege, and, if so, in
what circumstances and by what means. The proceedings in which the applications
have been made arise out of the explosion and fire at the Buncefield Oil Terminal
in Hertfordshire on 11 December 2005. The fire engulfed a large proportion of the
D   terminal's site and caused injuries to individuals and very significant damage to
properties in the area. Several hundred million pounds are claimed. There is to be
a trial of preliminary issues before David Steel J in October 2008. Negligence has
been admitted. The principal issues now are between the defendants, Total UK Ltd,
Total Downstream UK plc (the 'Total defendants') and Hertfordshire Oil Storage Ltd
E   ('HOSL').

     2. The principal issues include: who was the operator of the site on December 11
for the purposes of the *Control of Major Hazard Regulations* 1999 (the 'COMAH
Regulations'), which applied to the site, and who was responsible for the negligence
and thus liable for the consequences of the incident. These issues involve determining
F   whether the relevant people working at the terminal were 'embedded' into HOSL
so that HOSL alone would be vicariously liable for any negligence on the part of
those people. HOSL is a joint venture between Total and Chevron. If HOSL alone is
responsible for the incident, the joint venture arrangements may mean that 40% of the
financial consequences will ultimately be borne by Chevron.

G

     3. TAV Engineering Ltd ('TAV') is the engineering company which designed and
manufactured the high level switch which was fitted to Tank 912 from which the fuel
spilled. It is the third party in this action. In application notices dated 22 May and 17
June 2008 it seeks specific disclosure of documents over which the Total defendants
and HOSL have asserted litigation privilege. TAV also applied to cross-examine Mr
H   Malcolm Jones, the Managing Director of Total UK Ltd, and Mr Richard Jones, a
director of HOSL, who served affidavits in opposition to the applications, although no
application notice supported by evidence was issued as required by CPR 32.7. During
the course of the hearing the applications concerning HOSL were abandoned. TAV
was right to do so. For reasons I give at the end of this judgment, those applications
were unsustainable.

A

4. The material TAV seeks from the Total defendants and sought from HOSL is factual material gathered by them in the course of their investigations into the incident. It includes interviews conducted, the outcome of the investigations the operator of the site undertook as part of the safety management system it was required to have by the COMAH Regulations, and the reports of the accident investigation teams set up by Total and HOSL. The Total defendants and HOSL resist the applications on the ground that the investigations fall within the rule in *Waugh v British Railways Board* [1980] AC 521 and are covered by litigation privilege. In affidavits sworn on their behalf it is stated that it was anticipated that civil and criminal proceedings would be brought against them and that the dominant purpose of the investigations was to identify the causes of the explosion so that their solicitors could provide legal advice in connection with the anticipated proceedings.

B

C

5. The Total defendants have also brought Part 20 proceedings against Chevron and Motherwell Control Systems ('MCS') who installed a computer controlled automatic tank gauging system and was responsible for maintaining that and the alarm system. The claim against TAV is for an indemnity or contribution on the basis that TAV was negligent in the design, manufacture and supply of the switch that failed to operate, a failure which caused or contributed to the incident. The switch manufactured by TAV was fitted by MCS. It was designed to be triggered when the fuel rose to a predetermined distance from the tank top. When it was triggered, an alarm would sound in the control room and the flow of oil into the tank would cease. TAV has claimed an indemnity or contribution from MCS in the event that it is held liable to pay Total anything.

D

E

**The evidence**

6. The evidence before me consists of three witness statements by Mr Robert Campbell, a partner in Halliwells LLP solicitors, on behalf of TAV, respectively dated 22 May and 17 and 19 June 2008, affidavits by Malcolm Jones, on behalf of the Total defendants, sworn on 27 June and 7 July 2008, and affidavits on behalf of HOSL by David Young, the partner in Eversheds LLP who attended the board meetings of HOSL on 5 and 12 January 2006, and Richard Jones, both sworn on 30 June 2008. I leave aside the vital question of the purpose for which the investigations were set up, and summarise the non-contentious evidence in a broadly chronological way.

F

G

7. At midday on 12 December 2005, the day after the incident, Davies Arnold Cooper gave legal advice to Total's lawyers in Paris. This was forwarded to Total UK soon afterwards and, on the same day the Total Accident Inspection Team (the 'Total AIT') was set up. Its members were; Steve Ollerhead, then the Logistics Coordinator of Marketing Europe for Total France, Jon Cook, Total's Safety Environmental and Quality Manager, John Donald, a Process Safety Expert, and Russell Poynter, Total UK's Head of Legal and HSEQ. The Total AIT was supported by a back office team which included individuals from Total's Paris headquarters. By then representatives

H

A    of the Health and Safety Executive and the Environmental Agency were on the site and had taken control of it and all computer files and paperwork on the site. A notice dated 12 December and headed 'Buncefield update for colleagues' was posted on Total's intranet in the name of Malcolm Jones.

B    8. Mr Ollerhead's accident investigation progress report for 11–18 December, dated 18 December, states that on 12 December Messrs Chamoux, Sebbane, Gabillet, Jegousse, and Blanckaert arrived from Paris and that Mr Poynter and another Total representative interviewed the two staff present at the time of the incident and the manager of the Buncefield terminal. Mr. Gabillet was at that time the Department Head of HSEQ Logistics Marketing for France.

C    9. The entry in the progress report for 13 December refers to a list of questions of a general nature developed by Mr. Gabillet for the Executive Overview Group. It also states that it was agreed on that day that all email communication should be channelled through Mr Ollerhead to ensure confidentiality and that there was a meeting with the Health and Safety Executive on site to discuss how the HSE investigation would proceed and to discuss eventual handover of the site to Total.

D    10. A notice dated 14 December posted on Total UK's intranet over Malcolm Jones's name and headed, 'Total UK Investigation Team' states that Malcolm Jones had appointed a Total UK team to investigate the incident.

E    11. Mr Ollerhead's accident investigation progress report records that on Thursday 15 December 'the AIUK team met to discuss the terms of reference of the AI (see separate note)'.

F    12. HOSL's Board met on 16 December and resolved to appoint lawyers to conduct the defence of any criminal proceedings and to advise the Board whether the company needed to carry out its own investigation into the incident.

G    13. A document dated 18 December by Mr Ollerhead, and headed 'Confidential and Legally Privileged' deals with the organisation and objectives of the Total AIT. Its introduction states:

> 'It is of course vitally important that the accident investigation is carried out as effectively and quickly as possible in order to learn the lessons from this incident and to implement whatever actions are deemed necessary at other terminals.'

H    14. This document lists and describes the members of the team and the back office team. There is an organogram with the Total UK accident investigation team in the middle and lines above it to Total Paris and to Total UK's Managing Director, Mr Malcolm Jones. There is a line below the Total AIT to the back office team, to Total UK and HOSL personnel as necessary (and through them to the Health and Safety Executive and the Environmental Agency), to consultants if required, and to Chevron-

West London Pipeline v Total UK           **[2008] 2 CLC**
(*Beatson* J)

A

Texaco personnel. There was a query with regard to Chevron-Texaco whose role had not then been agreed. There is also a line to Mr Coull of Total UK HSE on whose HSE expertise Mr Poynter is stated to have relied heavily.

15. Under the heading 'terms of reference', the document states that Total UK's investigation would take place in parallel with the HSE investigation and that experience from earlier investigations suggested that the HSE would probably not be interested in Total's investigation and their main interest in Total at that stage was to be confident that they were cooperating fully. The proposed deliverables include 'make recommendations for measures to be put in place to prevent a recurrence', 'reappraise existing risk assessments' and 'satisfy legal reporting and recording duties'. It is also stated that, 'due to the urgent need to learn lessons and to make recommendations it is suggested that a preliminary report is published by Friday 23 December'.

B

C

16. A memorandum from Mr Ollerhead dated 19 December 2005 was sent to a number of people in Total, including Mr Malcolm Jones, Mr Poynter, and others from locations in the UK, France and Belgium. It states *inter alia* that the Buncefield explosion had many similarities to an explosion which occurred at Saint Herblain near Nantes and recommends that the 'back office' team in Paris look into the lessons learned from that incident 'and what we know so far of the incident at Buncefield to come up with proposals for a 'SAFETY/FLASH' report for rapid implementation in order to minimise the risk of this type of explosion happening again'. This memorandum is headed 'Confidential and legally privileged' and Mr Ollerhead states that recipients should ensure that any replies by email also have this heading. On 19 December Russell Poynter emailed Barbara Dyer at Chevron, stating *inter alia* that 'the TOTAL investigation team will be required by its parent to continue with its work'.

D

E

17. On 20 December 2005 the Health and Safety Commission exercised its power to require the Health and Safety Executive and the Environmental Agency to investigate the incident. The Buncefield Major Incident Investigation Board ('BMIIB') was set up under the chairmanship of Lord Newton of Braintree and is doing so. Its terms of reference include; a thorough investigation of the incident, establishing causation including root causes, identification of information requiring immediate action and recommendations for future action to ensure management of major incident risk sites governed by the COMAH regulations. The terms of reference envisage that the BMIIB's report for the HSE and the EA would, subject to legal considerations, be made public. The BMIIB has produced progress reports in February, April and May 2006 and an 'initial report' in July 2006. The health and safety investigations after the incident suggest that the TAV switch fitted to Tank 912 did not have the padlock used to hold the check lever in its normal operational position in place and that the check lever had either fallen or been left considerably below its proper operational position.

F

G

H

A      18. On 21 December DLA Piper Rudnick Gray Cary LLP met Total's in-house legal team and were instructed in relation to possible criminal proceedings against Total.

B      19. On 22 December HOSL's Board authorised its Company Secretary and in-house lawyer to seek advice from solicitors as to whether it should carry out its own investigation. Following receipt of such advice, on 5 January 2006 HOSL's Board resolved to set up a separate HOSL accident investigation team. The team was approved at a Board meeting on 12 January and it reported to the Board through HOSL's solicitors, Eversheds.

C      20. The material before the court includes a number of other documents published by Total UK Ltd. There are a number of versions of Total UK Ltd's *Incident Reporting and Investigation Application Guide* ('the Guide'), dated between January 2004 and February 2006, but there are no material differences between them. The cover of the Guide states 'this Application Guide provides a mandatory system for the reporting and investigation of all incidents and near misses throughout Total UK Ltd'.

D

      21. In the section on its scope, it is stated that the Guide applies throughout all of the various operating areas of the company and that all significant incidents or near misses involving Total UK's staff or contract staff that occur on Total premises, or while working for Total, must be reported. It is also stated that the guide covers

E      investigation and that the investigation's purpose is to examine the events leading up to the incident, during the incident and the final outcome. This, it is stated 'will aid the discovery of root causes from which remedial action plans can be developed'.

      22. The Guide states there is provision for the electronic recording of incident reports and investigations and the downloading of such material onto a database

F      system. The information held on the database includes relevant data concerning the incident to allow prompt reporting to line management, the insurance department, the HSEQ department and the relevant authorities. It includes a calculation of the loss potential to determine the level of investigation required, and a description of any immediate actions that have been taken to rectify the situation and to prevent the

G      incident from occurring again. The 'investigation and review' section of the database contains information about the investigation taken to identify the immediate and root causes of the incident and an action plan to address them. It also refers to a review of high potential incidents by senior management to ensure that all necessary steps have been taken to prevent the incident from happening again, and a final review

H      by the HSEQ department to ensure that the incident was appropriately reported and investigated and that suitable corrective and preventive actions have been identified and put in place.

      23. In the case of incidents with a high potential there is a mandatory requirement of a formal team SCTA (Systematic Causal Tree Analysis) investigation. The Guide states that the categorisation of an incident as of 'low', 'medium', or 'high'

**West London Pipeline v Total UK**          **[2008] 2 CLC**
                    (*Beatson* J)

potential depends on the score achieved in matrices of potential severity factors and         A
probability of reoccurrence factors. Guidance is given as to the application of the
two matrices. Thus an incident that causes multiple fatalities, or major pollution
with sustained environmental consequences, or over £6 million loss is categorised
as catastrophic. To qualify as being of high potential a score of 8 or more has to be
achieved. Accordingly, an incident with 'catastrophic' potential severity but a         B
'remote probability' of reoccurrence would only qualify as of 'medium' potential.
The Guide requires an incident report to be completed within one working day, and
an investigation to be completed within 10 working days. It states that 'any fire or
explosion' should be reported on the database.

24. The major accident prevention policy, applicable to the Buncefield site, which         C
is headed 'Totalfina Terminal: HOSL' and 'Totalfina Great Britain Ltd.' states that
the company are committed to 'evaluate and report our accidents and near misses'. It
also states that procedures, systems and processes have been put in place to manage
the integrity of the company's activities. Paragraph 4 of the section concerned with
realising the policy states 'we will report and investigate incidents and near misses
and follow up as necessary to improve our performance'. This document is signed         D
by Mr White, then Buncefield's Terminal Manager, and Mr Ollerhead, then Total's
Director of Logistics. It will be recalled that Mr Ollerhead was a member of the Total
Accident Investigation Team.

25. Element 5 of Total's Loss Control Manual is headed 'Accident Investigation'         E
This states:

> 'There is a formal procedure HSEQ20, for investigating accidents or near misses.
> This procedure is aimed at fact finding rather than fault finding, and seeks to
> establish basic or root causes of any accident or incident in an effort to prevent
> a reoccurrence.'         F

26. HSEQ20 is Total's Incident reporting and Investigation Application Guide
to which I have referred. The Loss Control Manual also states that in the case of
specified accidents or near-misses, including major fires and spillages:

> 'A report must be completed and sent within one working day, with any necessary         G
> immediate actions recorded. Where an investigation is required this must be
> completed within ten working days, followed by a review meeting to ensure that
> all required actions have either been implemented or programmed.'

27. An undated document entitled 'Spillage Procedure EP03' states that spillages         H
are considered 'critical failures' which are to be reported. The September 2005 job
specification for safety advisers at terminals includes responsibility for ensuring 'that
all incidents are appropriately investigated within 10 working days and that copies are
sent to the relevant persons as defined in the Application Guide'.

A

28. Total UK's corporate social responsibility policy, authorised in May 2005, contains a statement by Mr Malcolm Jones that 'health and safety is a paramount priority for the company' and that it is committed to complying with legislation appropriate to its activities to minimise the risk to health and safety at work to all employees, contractors, customers, local communities, and general public. Its

B

environmental charter signed by Thiery Desmarest, its Chairman and CEO, also refers to safety as a paramount priority, the formulation of relevant action plans and suitable control procedures and 'emergency facilities and procedures … in order to respond effectively in the case of accidents'.

C

29. Total UK's *Environment and Social Responsibility Report 2006* contains an introduction signed by Michel Contie, a senior vice president for Northern Europe. The introduction states that Total continues 'to put safety at the forefront of everything we do and the company acts on near misses'. The introduction also states:

D

'We are still analysing lessons learned from the December 2005 fire at the Buncefield terminal operated by Hertfordshire Oil Storage Ltd (HOSL), in which we are a 60% share holder. While still awaiting the findings of the official enquiry, we are nonetheless working with the industry and the regulators to share information and consider lessons learned.'

E

30. The Corporate Social Responsibility section of the report refers to safety reporting and internal audits. The section on health and safety has a section entitled 'Lessons from Buncefield'. This states:

F

'Following the fire at Buncefield terminal in 2005, investigations have been carried out by the Health and Safety Executive (HSE), the Environment Agency, site operator Hertfordshire Oil Storage Ltd (HOSL) and Total. In parallel, a task group comprising a number of working groups with both regulator and industry representatives has very successfully brought together all the industry stakeholders including unions to share learnings and recommend improvements across the industry.

G

Although we still await the HSE's final report and response, along with the rest of the industry we have already taken many actions including assessments of remotely operated shut off valves and tank alarms set points.'

H

31. An update notice about the Buncefield incident posted on Total UK's intranet on 10 February 2006 over Malcolm Jones's name states *inter alia* 'there are three investigation teams currently working to ascertain the cause of the incident. One each from the HSE, Total and HOSL'.

A

**The COMAH Regulations**

32. These regulations impose obligations on the operator of the Buncefield site. The COMAH Regulations define the operator of a site as 'a person who is in control of the operation of an establishment or installation': reg. 2(2). Regulation 5 requires the operator to have a Major Accident Prevention Policy ('MAPP') document with sufficient particulars to demonstrate it has established a Safety Management System ('SMS'), taking account of the principles specified in the regulations (reg. 5(3)).

B

33. Regulation 4 imposes a general duty on operators to take 'all measures necessary to prevent major accidents and limit their consequences to persons and the environment'. It was submitted on behalf of TAV that the 'measures' include investigations into incidents. Regulation 5(5) requires the operator to implement the policy set out in its MAPP document.

C

34. Regulation 7(7) requires the operator of an existing establishment to send to the competent authority (the Health and Safety Executive and Environmental Agency combined) a safety report containing the information specified in the schedule. Schedule 2, which applies to regulation 5(3), provides that the Safety Management System issue shall address monitoring performance and 'the mechanisms for investigation and taking corrective action in the case of non compliance' (paragraph 4(f)). Paragraph 4(f) also provides that the procedures should cover the operator's system for reporting major accidents or near misses, 'and their investigation and follow up on the basis of lessons learned'. The purpose of safety reports, including those required by regulation 7(7), is to demonstrate that a safety management system for implementing the major accident prevention policy has been put into effect and that adequate safety and reliability have been incorporated into the design and construction, and operation and maintenance of any installation and equipment.

D

E

F

**The requests for the documents and the claim to privilege**

35. On 13 March 2008 Pinsent Masons, which acts of behalf of some of the claimants in the action, wrote to Total's solicitors, Davies Arnold Cooper, about a number of disclosure matters. Paragraph 9 of this letter states:

G

'… There are certain categories of post-incident documents, including (i) investigation report or "root cause" analysis carried out by your clients or HOSL and (ii) documents generated as a result of the HSE investigation which ought to have been, but do not appear to have been, disclosed. As to (i) it is common practice within the industry for oil companies to prepare such reports/analyses following major health and safety incidents which occur during the course of their operation. Indeed, the COMAH regulations require the operator of sites such as HOSL to have in place a major accident prevention policy, which includes procedures for reporting major accidents or near misses, particularly those involving failure of protective measures … Any such report would go into

H

A    significant detail as to the causes of the incident and would be of considerable
evidential value. There is no obvious reason why any such documents would
be privileged. As to (ii), we consider that documents which passes between
your clients/HOSL and the HSE in the course of its investigation would not be
privileged and ought to be disclosed, including final witness statements.'

B    36. On 4 April, Pinsent Masons wrote to Davies Arnold Cooper and Herbert
Smith noting that although Davies Arnold Cooper had indicated it would revert
on the matters raised in paragraph 9 and other paragraphs 'in due course'. They
had not had a response. The letter states that they are principally concerned to see
documents pertaining to Total's post incident investigation or root cause analysis into
C    the incident. The letter enclosed a copy of the email from Russell Poynter to Barbara
Dyer at Chevron to which I have referred.

37. Davies Arnold Cooper responded to Pinsent Masons in a letter dated 23 April.
The material parts of this letter state:

D    'In the immediate aftermath of the Buncefield incident, by which we mean the
morning of the incident itself, Sunday 11 December 2005, it was apparent to
senior members of our client's management structure, including Mr Russell
Poynter, Head of Legal at Total UK Limited ("Total"), that the size and scale
of the incident was such that civil claims for compensation were inevitable and
E    that, given our clients' connection with the terminal amongst others, it was likely
that they would be parties to those proceedings. It was also apparent that there
was a real prospect of criminal prosecution under health and safety legislation.
There was therefore an immediate recognition that it would be necessary to
ascertain the causes of the explosion in order to obtain properly informed legal
advice and to defend Total's position in the anticipated legal proceedings.
F    Accordingly, whilst there also existed Total's own internal requirements for
an accident investigation and the requirement under the COMAH regulations
for the reporting of major incidents, the immediate and primary purpose of the
investigation which followed was to obtain a detailed factual understanding of
the causes of the incident in order that Total's legal advisers could be properly
G    informed when providing legal advice and more specifically when defending
Total's interests in the anticipated legal proceedings.

At midday on 12 December 2005, that is fewer than 36 hours after the incident,
this firm provided a report containing detailed legal advice to Total's Parisian
lawyers which was forwarded to our clients at 14.57 on 12 December 2005. That
H    document, *inter alia*, highlighted the requirement for investigations to ascertain
the cause of the incident so that lawyers could be properly instructed for the
purposes of the anticipated civil and criminal proceedings.

It is in this context that Total's Accident Investigation Team ("AIT") was created
on Monday 12 December. …

On 21 December 2005, a meeting was held between six members of Total's in A
house legal team, including Mr Poynter, and Total's newly appointed criminal
solicitors, Messrs DLA Piper Rudnick Gray Cary LLP ("DLA"). At that meeting,
DLA repeated that in order to be able to provide clear and unambiguous advice
in connection with the anticipated criminal proceedings, they needed to know
the full facts surrounding the incident. DLA emphasised the requirement for
Total's investigations to be aimed at explaining the factual position in order B
that Total's defence to the contemplated criminal prosecution could be properly
formulated. The advice provided during the course of that meeting was reiterated
and amplified in detail in a briefing note to Total dated 6 January 2006, which
was acted upon by Mr Poynter in his capacity as Total's Head of Legal and as a
AIT member.
C

We confirm that the AIT referred to above produced various reports between
22 December 2005 and 23 June 2006. Those documents were created for the
dominant purpose of identifying the causes of the explosion in order that our
clients' solicitors could provide legal advice in contemplation of the expected D
civil litigation and criminal proceedings and to assist them to defend Total's
interests in the civil proceedings once they were commenced. They are
therefore privileged. It is not disputed that the AIT investigation and reports also
address lessons that could be learned from the incident and fulfilled COMAH
requirements. However, for the reasons already explained, those purposes were
subsidiary and subservient to the dominant purpose as set out above.' E

38. The letter also deals with other reports which it states were prepared for the
dominant purpose of assisting Total in its defence of civil and criminal proceedings
and notes of interviews by the competent authority prepared by Total's lawyers who
were present and in respect of which legal advice privilege as well as litigation F
privilege is asserted. It also deals with other interviews and the HOSL post incident
investigation in respect of which both legal professional privilege and common
interest privilege were claimed.

39. On 7 May, Halliwells replied stating they did not agree that Total's
investigations were privileged and that the relevant question should be whether the G
investigation following the incident would have been undertaken even if there was
no reasonable anticipation of proceedings. On 14 May, Davies Arnold Cooper replied
stating that they had nothing to add to their further letter and maintaining their claim
to privilege.

40. Following TAV's application against the Total defendants, Halliwells wrote H
stating that they would be issuing a specific disclosure application against HOSL and
stating that Davies Arnold Cooper's position in the letters dated 23 April and 14 May
'can be characterised as a bare assertion that the documents in question were created
for the dominant purpose of obtaining legal advice in anticipation of litigation' and
that despite the invitation to do so 'you have chosen not to expand on that assertion

A    in correspondence'. The letter then sets out the basis upon which TAV disputes the
     claim that the applicable 'dominant purpose' test has been satisfied and particularises
     the documents sought.

     41. On 17 June the application was issued against HOSL. Halliwells' letter dated
B    18 June accepts that the documents had not previously been requested directly from
     HOSL and that HOSL and its solicitors had not expressed any comments in relation
     to HOSL's entitlement to assert privilege.

     42. There were further exchanges between the solicitors about the service of
     evidence. In their letter dated 27 June enclosing Mr Malcolm Jones' affidavit, Davies
C    Arnold Cooper provided two of the documents sought by TAV, a report entitled 'Initial
     Findings on the Ultra High Alarm Functioning Testing carried out by HSE and HOSL'
     and the preliminary analysis of the Motherwell disk data. The letter states that these
     reports are subject to legal professional privilege but that Total is willing to waive
     privilege in these documents which were not prepared under the auspices of either the
     Total accident investigation team or the HOSL accident investigation team.
D

     43. In a letter dated 30 June 2008, Halliwells asked Davies Arnold Cooper to
     confirm that Mr Malcolm Jones would be available for cross-examination at the
     hearing. A similar request was made to Edwards Angel Palmer and Dodge in respect
     of Mr Richard Jones. Neither request gives a reason for the request for cross-
E    examination of the affidavit of a witness at an interlocutory hearing. No reasons were
     given in relation to the request concerning Mr Richard Jones. In a letter dated 2 July to
     Davies Arnold Cooper, Halliwells state, relying on *LFEPA v Halcrow* [2004] EWHC
     2340 (QB) that the court has jurisdiction to order cross examination on an affidavit
     and this 'is particularly so when the affidavit in question cries out for elucidation, as
     is the case with Mr [Malcolm] Jones' affidavit'.
F

     44. Although Davies Arnold Cooper's letter of 23 April containing reasons the
     writer regards the documents sought as privileged is before the court, there is no
     affidavit in support of the claim from a member of the firm. The evidence in support
     of the claim is contained in Mr Malcolm Jones' first affidavit. Paragraph 5 lists the
G    members of the Total AIT and states that Russell Poynter is a member 'in his capacity
     as Total's Legal Manager'. The affidavit also states:

          '4. As Managing Director of TUKL, my duty is to protect its best interests. In
          that capacity, I was responsible for setting up the Total Accident Investigation
          Team ("AIT") on 12 December 2005 in response to the major fire and explosion
H         at Buncefield on Sunday 11 December 2005 (the "incident").

          6. At the time that I set up the AIT, the Health and Safety Executive ("HSE")
          and the Environmental Agency ("EA") were already on site and had started
          their investigation. These investigations are ongoing. The HSE took control
          of the Buncefield site and of all access to all computer files and paperwork

on site in order to carry out their investigation. The investigation was then the    A
HSE's highest priority investigation and in the region of 40 HSE personnel were
involved from the outset. The purpose of the HSE's investigation was to find out
what happened and the cause or causes of the incident. Total has at all times fully
cooperated with the HSE's investigation.

7. As soon as I learned of the incident, my immediate concern was to ascertain    B
the extent of any injuries and other damage. Having quickly established that only
minor injuries had been suffered, I then turned my mind to the risks affecting
Total as a Company. I was fully aware of the likelihood of both civil and criminal
proceedings and that Total needed to establish the facts in order to be in a position
to defend its interests in relation to any proceedings.    C

8. In setting up the AIT, the main risks to Total which I was concerned with were:
(1) the risk of criminal proceedings being brought either by HSE or the EA; (2)
the risk of civil claims being brought by third parties; and (3) the risk to the
image and reputation of Total. I considered TUKL to be at real risk of potential
proceedings following the Incident. The fact that the terminal was under joint    D
venture control through Hertfordshire Oil Storage Limited did not make me
feel Total was free of risk of litigation. I expected that parties who had suffered
damage might very well explore the chance to claim from Total. My objective in
setting up the AIT was therefore to gather facts in order that Total could address
these risks and, in particular, secure legal advice in respect of any criminal and    E
civil proceedings.

9. Given that the primary purpose of the AIT was to prepare for criminal and civil
claims and get legal advice, I appointed Russell Poynter, Total's Legal Manager,
to the AIT from the outset. There is no provision for the inclusion of a legal
representative on accident investigation teams in Total's procedures and this was    F
the first time that Russell Poynter, or any other legal representative, had been
included in a Total accident investigation team. Russell Poynter reported to me
routinely in line with the primary purpose of the AIT and following the Incident,
he took immediate steps to instruct external solicitors to act for Total. Davies
Arnold Cooper were instructed to advise Total in respect of potential civil claims    G
on the day of the Incident. DLA Piper ("DLA") were instructed on 21 December
2005 to advise Total in respect of potential criminal liability.

10. On their appointment DLA took over responsibility for the AIT and from
then onwards Russell Poynter and DLA reported to me in respect of the AIT's
progress. I had regular updates from both Roy Tozer, the partner at DLA, and    H
Russell Poynter as to the progress of the AIT.

11. Of course, the AIT investigation would by necessity carry out a factual
analysis and look at what went wrong and what lessons could be learned.
However, this was not the primary purpose for which the AIT was established.

A
I knew that the HSE investigation would consider the lessons to be learned by Total and others in the industry. My main concern was to protect Total from the risks I have outlined above. Steve Ollerhead, Jon Cook and John Donald's role on the AIT was to provide the appropriate expertise to establish the facts in order that the legal risks could be addressed. I wanted the members of the team to have a free rein to investigate the facts in order that the lawyers and I could understand the risks identified above as soon as possible.

B

12. I have been shown a note prepared by Steve Ollerhead dated 18 December 2005 attached to an email from Steve Ollerhead dated 19 December 2005 to, amongst others, me. [The email and the documents attached to it are exhibited to Mr Jones's affidavit.] I understand that this email and its exhibits are among
C
the documents over which TAV has challenged Total's claim to privilege in this application. For the avoidance of doubt by referring to in and exhibiting this document to this Affidavit for the limited purposes of this application, I am not waiving Total's legal professional privilege in it or in any other document or legal advice received by Total. I do not recall seeing this document at the time
D
and do not believe I would have looked at the document as we were working mainly through oral communication at the time. In the aftermath of the Incident most of my days were spent either in meetings or on the telephone, and I was only reading emails which were specifically being brought to my attention. In his note of 18 December 2005, Steve Ollerhead sets out his understanding of the
E
terms of reference of the AIT, in particular under the "Proposed Deliverables" heading. Steve Ollerhead's note reflects an incorrect understanding of my aims in instituting the investigation and does not encapsulate the primary purpose of the AIT as set out above. While the fact-finding exercise was important, the primary purpose of the AIT was not in relation to learning lessons for the future.

F
13. It has been explained to me that TAV have asserted that (i) the AIT may have been set up in accordance with either HOSL's Safety Management System ("SMS") or TUKL's corporate emergency response plan and (ii) that it would have been undertaken even if there were no resulting damage to non-Total property and no reasonable anticipation of litigation. Those assertions are not
G
correct.

14. In respect of HOSL's SMS, that was only relevant to HOSL and had no bearing on Total's response to the Incident. I presumed that HOSL would have had an SMS in place but I had no knowledge of its contents. As regards TUKL's corporate emergency response plan, this is aimed at business recovery and
H
focuses on how emergencies are handled by TUKL. In setting up the AIT, I did not have regard to any internal Total (or HOSL) procedures. In the normal course of events if an incident occurred at a joint venture site, the joint venture would carry out the investigation itself, not Total. I am aware of a number of occasions prior to the Incident when HOSL carried out its own investigation into incidents at the Buncefield site.

A

15. In respect of TAV's hypothetical suggestion that the AIT would nevertheless have been undertaken even if there were no resulting damage to non-Total property and no reasonable anticipation of litigation, I do not agree. The AIT was only set up because litigation was reasonably anticipated given the extraordinary nature of the Incident.'

B

45. Mr Jones states, of the one day and ten day reports required by the Safety Management System, that 'no such documents were produced'. Nor were any documents required by the Total UK Emergency Response Plan produced.

C

46. The information contained in Mr Ollerhead's email and the documents attached to it is summarised in paragraphs 8-9, 11, and 13-16 of this judgment. After the service of Mr Jones' affidavit, Halliwells wrote to Davies Arnold Cooper asking to see the complete chain of correspondence from which the emails exhibited to Mr Jones' statement were extracted and for disclosure of all documents evidencing the purpose of the Total investigation referred to in Mr Jones' affidavit. Davies Arnold Cooper replied in a letter dated 1 July stating that the email exhibited to Mr Jones' affidavit was not part of a chain of emails, that Mr Jones did not reply to it, and that there were no further documents evidencing his purpose in establishing the Total investigation. Halliwells responded requesting disclosure of all documents relating to the same subject matter as the documents exhibited to Mr Jones' affidavit and stating that its request was not limited to Mr Jones' purpose but extended to all documents evidencing the purpose of the Total investigation.

D

E

47. On 4 July, Davies Arnold Cooper again stated that there were no further documents evidencing Mr Jones' purpose and enclosed the extracts from notices posted on Total's intranet in the name of Mr Jones, some of which touch on the Total AIT and other investigations, to which I have referred. This letter was written while Mr Jones was out of the country and he dealt with the material referred to in his second affidavit sworn on 7 July. Mr Jones states that these postings do not deal with the purpose of the Total AIT investigation and do not record that his primary purpose in setting up the Total AIT was to gather facts in order to secure legal advice in respect of prospective civil and criminal proceedings. He states that although the postings bear his name, they were drafted by Total's corporate communications team. He does not recall commenting on the drafts although it was likely he would have reviewed them. He states that there is nothing in the postings that causes him concern as they simply advise staff that the fact-finding exercise was underway. He also states that Total's internal web pages are not an appropriate place to advertise to Total's staff his motive for setting up the AIT enquiry. The final paragraph of this affidavit states that, as set out in his first affidavit, Mr Jones' primary objective in setting up the AIT enquiry was to gather the facts in order that Total could secure legal advice in respect of any criminal and civil proceedings.

F

G

H

A

### Summary of the parties' submissions

48. Mr Pollock QC's submissions on behalf of TAV can be summarised as follows:

B

(1) Mr Malcolm Jones's affidavit is unsatisfactory for a number of reasons.

(a) It states that, but for the anticipated legal proceedings, Mr Jones would not have set up an AIT. However:

C

(i) It does not deal with the Total documents. These show that there is a mandatory investigation of all major incidents and near misses.

(ii) It does not explain the roles of others in the company and the role of the Paris HQ although there was input from Paris to the AIT. Mr Ollerhead's organogram suggests the AIT reported to Paris. In considering the evidence, it is important that the parties claiming privilege are Total UK Ltd. and Total Downstream Oil Storage Ltd. It is their status and their purpose that is important. Mr Jones' evidence must be assessed in the light of this.

D

(iii) The statement is not consistent with Davies Arnold Cooper's letter of 23 April. That letter refers to Total's own internal requirements and to the COMAH regulations but states that the immediate and primary purpose of the investigation was to obtain a factual understanding so the lawyers could be properly informed when advising.

E

(b) It states (paragraph 10) that Mr Poynter and DLA Piper reported to him in respect of the AIT's progress. However, the emails exhibited to the affidavit suggest that information went to a wide variety of people within the Total group including a number of people in Total France, who were more likely to be interested in safety given the number of Total sites. Moreover, Mr Ollerhead's organogram does not include links to the legal advisers.

F

(c) It states that they were working mainly though oral communication at that time and that was why he did not read Mr Ollerhead's email and its attachments, but there is no evidence of oral communication with Mr Ollerhead, whose progress report states that it had been agreed that all email communications be channelled through him.

G

(d) It states that Mr Ollerhead's note misunderstands Mr Jones's aims in instituting the investigation but does not say what, if anything, he said to Mr Ollerhead or other members of the AIT about those aims. The purposes and the timetable set by Mr Ollerhead reflected 'the urgent need to learn lessons' and suggest that Mr Jones did not explain his objectives to the AIT team.

H

A

(e) His statement that he had no regard to any of Total or HOSL's procedures does not make clear whether he did not know about these or whether he knew about them but did not consider they were applicable or decided to bypass them.

B

(f) Mr Jones' statements as to what his 'objective' was do not make it clear whether the stated one was his only objective. His statement in paragraph 9 that preparation for anticipated legal proceedings was the 'primary purpose' of the AIT, does not exclude another non-privileged purpose.

C

(g) Mr Jones states that his duty was to protect Total UK's best interests and in that capacity he was 'responsible' for setting up the Total AIT. Mr Pollock submitted that 'responsible' means that it was Mr Jones who appointed the members of the AIT, and not that it was he who decided to have an AIT.

D

(2) It must be possible to go behind an affidavit as to discovery because otherwise a party would be able conclusively to claim litigation privilege by his *ipse dixit*. The Rules of the Supreme Court did not make provision for cross-examination on affidavits prior to trial as CPR 32.7 does. The effect of CPR 32.7 taken together with the procedure in CPR 31.19 for challenging a claim of privilege means that the old authorities do not survive. Accordingly, there is jurisdiction under the CPR to order cross-examination on an affidavit as to discovery where the court, having carried out the necessary balancing, considers that the overriding objective requires it.

E

(3) Total's position as the operator of the site within the COMAH regulations meant it was under a regulatory duty to investigate with the result that, irrespective of what Mr Jones' purpose was in setting up the Total AIT, in the light of the decision of Sir Richard Scott V-C in *Re Barings plc* [1998] 1 All ER 673 the AIT's reports were not protected. That decision is authority for the proposition that, where a person or entity is under a statutory or regulatory duty to investigate and report, the purposes of those who instigate the investigation that leads to the report are irrelevant. Mr Pollock recognised the difficulty faced by the court that arises from the fact that a major issue in the litigation is whether it was Total or HOSL that was the operator of the site for the purpose of the COMAH regulations.

F

G

49. Lord Grabiner QC's submissions on behalf of Total (and those of Mr Edey on behalf of HOSL) can be summarised as follows:

(1) The affidavits sworn on behalf of the Total defendants and HOSL clearly state that the dominant purpose for the AITs was to obtain factual information so that the lawyers could provide advice about the contemplated proceedings.

H

(2) There is no jurisdiction to go behind an affidavit as to disclosure (including one claiming privilege) by ordering cross-examination. If there is such jurisdiction, it is confined to the very narrow circumstance where the maker of the affidavit or the responsible authority contradicts what is said in the affidavit. In the case of the

A   Total defendants, the issue is Malcolm Jones's purpose in setting up the Total AIT,
    not Mr Ollerhead's or anyone else's. None of the material relied on by TAV directly
    contradicts what Mr Jones says. There should be no cross-examination where it would
    lead to a mini-trial at an interlocutory stage on what is an important issue in the case,
    as will often be the case. It would in this case because one important issue is whether
    Total or HOSL was the operator of the site within the COMAH regulations. Mr Edey
B   also submitted that there should be no cross-examination where cross-examination
    was likely to stray into areas undoubtedly covered by legal professional privilege.
    Cross-examination of Richard Jones would necessarily have involved questions about
    the purposes of the HOSL Board at meetings attended by Mr Young who was present
    and gave the Board legal advice about the setting up of a HOSL AIT.

C
    (3) TAV's reliance on *Re Barings plc* is misplaced. First, there is no duty under the
    COMAH regulations to investigate and report. Secondly, both Total and HOSL deny
    they were the COMAH operator of the site. Which of them was the operator will be a
    major issue in the litigation. It is not possible for the court to resolve the submission
    that as a result of *Re Barings plc* the AIT reports and papers are not privileged without
D   resolving who is the COMAH operator, and it is not appropriate to do this in respect
    of a major issue at an interlocutory stage. Thirdly, *Re Barings plc* is not authority for
    the proposition for which it is cited by TAV.


E   **Discussion**

    *Litigation privilege*

    50. Legal professional privilege is recognised as a fundamental substantive right
    which prevails over the public interest in all relevant material being available to
F   courts when deciding cases: see *R v Derby Magistrates' Court, ex parte B* [1996] AC
    487, 507–508; *Re L (A Minor) (Police Investigation: Privilege)* [1997] AC 16, 32; *R
    (Morgan Grenfell & Co Ltd) v Special Commissioner of Income Tax* [2003] 1 AC 563
    at [7]. The burden of establishing that a communication is privileged lies on the party
    claiming privilege. This is implicit in Lord Edmund Davies's words in *Waugh's* case,
    quoted in paragraph [52] below, and is also implicit in the other speeches in *Waugh's*
G   case: see also *Re Highgrade Traders Ltd* [1984] BCLC 151, at 175d; *National
    Westminster Bank plc v Rabobank Nederland* [2006] EWHC 2332 (Comm) at [53];
    *LFEPA v Halcrow Gilbert & Co Ltd* [2004] EWHC 2340 (QB) at [48]; *Matthews &
    Malek on Disclosure* (2007) 11-46.

H   51. Litigation privilege differs from legal advice privilege, which protects all
    communications to lawyers. It relates only to communications at the stage when
    litigation is pending or in contemplation, and only those made for the sole or dominant
    purpose of obtaining legal advice or conducting that litigation. The modern law on
    litigation privilege stems from the decision of the House of Lords in *Waugh v British
    Railways Board* [1980] AC 521, a decision in which the approach of the High Court

of Australia in *Grant v Downs* (1976) 135 CLR 674, and in particular the formulation     A
of Barwick CJ (at 677), was adopted.

52. In *Waugh's* case Lord Edmund Davies stated that he would certainly deny
a claim for privilege when litigation was merely one of several purposes of equal
or similar importance intended to be served by the material sought to be withheld
from disclosure. He stated (at 542) 'it is surely right to insist that, before the claim is     B
conceded or upheld, such purposes must be shown to have played a paramount part'
and (at 543) that 'the public interest is, on balance, best served by rigidly conforming
within narrow limits the cases where material relevant to litigation may lawfully be
withheld'. Lord Wilberforce said (at 531) that it was clear that the due administration
of justice strongly required the disclosure and production of the Board's report on     C
an accident, and that in order to override this public interest the sole or dominant
purpose of the report had to be to prepare for litigation. In *Bank Austria Akt v Price
Waterhouse* (16 April 1997) Neuberger J said:

    'A claim for privilege is an unusual claim in the sense that the legal advisers to
    the party claiming privilege are, subject to one point, the judges in their own     D
    client's cause. The court must therefore be particularly careful to consider how
    the claim for privilege is made out.'

53. Thus, affidavits claiming privilege whether sworn by the legal advisers to the
party claiming privilege as is often the case, or, as in this case, by a Director of the     E
party, should be specific enough to show something of the deponent's analysis of the
documents or, in the case of a claim to litigation privilege, the purpose for which they
were created. It is desirable that they should refer to such contemporary material as
it is possible to do so without making disclosure of the very matters that the claim
for privilege is designed to protect. On the need for specificity in such affidavits, see
for example, Andrew Smith J in *Sumitomo Corp v Credit Lyonnais Rouse Ltd* (2001)     F
151 NLJ 272 at [39], referred to without criticism by the Court of Appeal [2002] 1
WLR 479 at [28], although the court did not (see [81]) consider the criticisms of the
affidavit in that case were justified.

54. Notwithstanding these threshold requirements, and the care the court must     G
show, once it is established that a communication was made when litigation was
contemplated or pending and for the dominant purpose of obtaining legal advice,
the privilege cannot be overridden by another public interest. As Lord Scott stated in
*Three Rivers District Council v Bank of England (No. 6)* [2005] 1 AC 610 at [25]:

    'if a communication or document qualifies for legal professional privilege, the     H
    privilege is absolute. It cannot be overridden by some supposedly greater public
    interest. It can be waived by the person, the client, entitled to it and it can be
    overridden by statute but it is otherwise absolute.'

A    55. The principles applicable to litigation privilege were usefully summarised by
Aikens J in *Winterthur Swiss Insurance Co v AG (Manchester) Ltd* [2006] EWHC
839 (Comm) at [71]:

B    '"Litigation privilege" extends, in time, to information (which must include
information stored in electronic form as well as in documentary form) which is
produced either during the course of adversarial (as opposed to inquisitorial or
investigative) litigation, or when such litigation is in contemplation. The privilege
obviously covers legal advice given by a lawyer to his client for the purposes
of such existing or contemplated litigation. It also extends to communications
between the lawyer and his client and the lawyer and third parties, provided that
C    those communications are made for the sole or dominant purpose of obtaining
legal advice or conducting that litigation. (*Grant v Downs* (1976) 135 CLR 674,
per Barwick CJ (dissenting in the result) at p. 677, *Waugh v British Railways
Board* [1980] AC 521, *Three Rivers DC v Bank of England (No. 6)* at paras 100
to 102 per Lord Carswell.) In deciding whether a communication is subject to
"litigation privilege", the court has to consider objectively the purpose of the
D    person or authority that directed the creation of the communication. (*Guinness
Peat Properties Ltd v Fitzroy Robinson Partnership* [1987] 1 WLR 1027 at 1037
per Slade LJ, with whom Woolf LJ and Sir George Waller agreed.)'

E    56. Aikens J considered (see [83]) that in considering whether material might be
subject to litigation privilege three questions arise. These are:

'First, at the time that the relevant communications were created, was litigation
contemplated? Secondly, were the communications created for the dominant
purpose of obtaining legal advice for that litigation or in aid of that litigation?
Thirdly, under the direction of which person or entity, objectively speaking, were
F    those communications created.'

57. In the present case, there is an issue as to the second and third of these
questions. The issue as to the second question depends on the approach of the court
to the affidavits sworn by Mr Malcolm Jones. The issue as to the third question
G    depends on whether what is relevant is the purpose of Mr Jones, the purpose of Total
UK and Total Downstream Oil Storage Ltd., or the purpose of the wider Total group.
In *Guinness Peat Properties v Fitzroy Robinson Partnership* [1987] 1 WLR 1027 the
defendant architects were required by the terms of their insurance policy to notify
their insurers of any potential claim and their administrative partner Mr McLeish did
H    so. He wrote the letter because of that requirement and not to obtain legal assistance.
The letter was held to be privileged. Slade LJ stated (at 1036C–1037C):

'In my judgment the proposition that the dominant purpose of a document
does not necessarily fall to be ascertained by reference to the intention of its
actual composer is borne out by a number of recent authorities. Barwick CJ's
formulation of the test [in *Grant v Downs*] itself refers to the dominant purpose of

A

its author "or of the person or authority under whose direction, whether particular or general, it has produced or brought into existence". These words are not to be read as if they had statutory force. Nevertheless, I think that in the present case the insurers are to be regarded as the persons under whose direction the McLeish letter was brought into existence, within the sense and spirit of this formulation.

B

In *Waugh* itself, it seems clear that their Lordships were directing their attention not so much to the intentions of the two officers of the British Railways Board who prepared the report there under consideration as to the intentions of the board in directing them to prepare it. In that case the claim for privilege failed only because the purpose of obtaining legal advice in anticipation of litigation was of no more than equal weight with the board's purpose of railway operation and safety.'

C

58. Slade LJ stated that, similarly, in *McAvan v London Transport Executive* [1982] CA Transcript 498 and *Re Highgrade Traders Ltd* [1984] BCLC 151 the Court of Appeal reached its decisions by reference to the intentions respectively of the London Transport Executive and the insurance company which procured the reports rather than by reference to the intentions of the writers of the reports.

D

59. The *Guinness Peat* case and *Re Highgrade Traders* differed from *Waugh's* case because in *Waugh's* case it was officers within the defendant who prepared the report whereas in the other cases it was an entity other than the party seeking privilege, in *Guinness Peat*, the architectural partnership, and in *Re Highgrade*, the loss adjusters. In *Re Highgrade Traders* the affidavit had been made by Mr Alexander, the responsible officer in the insurance company dealing with the claims. There was no suggestion that what he stated about the insurance company's purpose was unauthorised or did not reflect that purpose.

E

F

60. In the present case, Mr Pollock submitted that, in the light of the decision in *Re Barings plc* [1998] 1 All ER 673, whatever the purpose of Total UK Ltd and Mr Jones, the reports of the Total AIT are not protected by litigation privilege. In *Re Barings* a firm of solicitors prepared a report for the Department for Trade and Industry at the request of the administrators of a company 'in compliance with' the administrators' statutory duty to report to the DTI pursuant to section 7 of the *Company Directors Disqualification Act* 1986. The statutory intention in requiring a report to be made is to place the Secretary of State in the possession of facts and opinions necessary to enable him to decide whether to commence disqualification proceedings: see [1998] 1 All ER at 676b. Inspection was resisted on the grounds of privilege and lack of sufficient relevance. The latter ground was rejected.

G

H

61. As to the claim of privilege, Scott V-C stated (at 678g–h) that his initial reaction on being told that legal professional privilege was being claimed for a statutory report was one of 'some incredulity'. He stated that, despite the weight of authority cited by Miss Gloster QC, that sense of incredulity remained but (at 685j and 686e–f)

A accepted, in the light of *Re Highgrade Traders Ltd* and *Guinness Peat Properties Ltd v Fitzroy Robinson Partnership*, that the dominant purpose test in litigation privilege is a free-standing criterion which, if satisfied, will entitle a document to privilege regardless to whether the production might impinge on the inviolability of lawyer/client communications. But (see 687e–688b) none of the authorities involved

B a statutory report.

62. Scott V-C stated that in the case of a statutory report the maker has no choice and is obliged by law to make the report; 'the only relevant purpose … is a statutory purpose'. He did not accept that the question whether such a report or information for such a report is to be protected by legal professional privilege is to be determined

C by reference to the purposes of the administrators who make the reports or by their expectations as to the use that will be made of those reports. He considered the question whether such statutory reports are privileged depends on whether there is a public interest requiring protection from disclosure to be afforded to them which overrides the administration of justice reasons that are reflected in the discovery rights given to litigants. He concluded that in the absence of any public immunity claim

D there was no public interest that required privilege to be afforded to the report. The decision has been cited with approval by the Court of Appeal in *Visx v Nidex* [1999] FSR 91 and, although Hollander's *Documentary Evidence* 14-23–14-24 criticises the use of a balancing exercise in this context, the issue of a report produced under a statutory obligation is not addressed.

E
*Going behind an affidavit*

63. It is necessary to distinguish the wider issue of when a court may go behind an affidavit of documents (including one claiming privilege) from the narrower issue of whether, and, if so, when, it may order the deponent of such an affidavit to be cross-examined. I first consider the authorities on the wider issue.

F

64. In *Frankenstein v Gavin's House-to-House Cycle Cleaning and Insurance Co* [1897] 2 QB 62, a decision of the Court of Appeal concerned with the 1875 Rules, the defendants' affidavit objected to producing documents for inspection on the ground that they were part of the evidence supporting its case and did not support or tend

G to support the plaintiff's case. It was held that such an affidavit must be accepted as conclusive save in very limited circumstances, and the plaintiff was not entitled to inspect the documents. There was no discussion of cross-examination upon affidavits of documents.

H

65. Lord Esher MR referred to the earlier case of *Attorney-General v Emerson* (1882) 10 QBD 191, in which he had been a member of the Court of Appeal. He stated (at 64) that *Attorney-General v Emerson* had decided that an affidavit of documents 'must be accepted as conclusive, unless the Court can see, that is to say, is reasonably certain, from the statements of the party making it, that he has erroneously represented or has misconceived the character of the document in question'. Chitty

LJ (at 65) stated that there are a few exceptions to the rule, and that the exception material to *Frankenstein's* case was that stated in *Attorney-General v Emerson*, which he formulated in the same terms as Lord Esher. AL Smith LJ's formulation of the exception was not tied to the circumstances in *Attorney-General v Emerson* and *Frankenstein's* case and was broader. He stated (at 64–65):

> '…it lies upon the plaintiff to get rid of the effect of [the statement in the affidavit] by falsifying it, by which I do not mean that he must necessarily shew that it is wilfully untrue, but he must establish by some means other than by a conflicting affidavit that the defendants' affidavit is incorrect. … In order that the plaintiff may succeed in doing so, the Court must be satisfied with reasonable certainty either from the defendants' own statements that they have erroneously represented or misconceived the nature of the documents, as was held to have been the case in *Attorney-General v Emerson*, or from some source other than by affidavit that the defendants' affidavit is incorrect.'

AL Smith LJ thus appeared to be prepared to go behind an affidavit where it appears from a source other than the defendants' own statements that the defendants' affidavit is incorrect, but stated that the source could not be a counter-affidavit.

66. *Neilson v Laugharne* [1981] 1 QB 736 is an example of a court going behind an affidavit in determining the dominant purpose of documents for which privilege had been claimed. The court relied on contemporary correspondence and the evidence of the person responsible for instituting the inquiry which led to the creation of the documents in making a claim that the documents were subject to public interest immunity. The case concerned a claim against the Chief Constable of Lancashire for trespass, wrongful imprisonment, false arrest and assault. The Chief Constable's response to the letter before action was to write to the plaintiff's solicitors stating he had decided to call for an investigation under section 49 of the *Police Act* 1964, that the investigating officer would be contacting them and the plaintiff, and that the question of compensation would be considered at the conclusion of the investigation. The defendant claimed that, save for the plaintiff's own statement, statements taken from the plaintiff and a number of other people were protected on public interest grounds and by litigation privilege. The affidavit in support of the public interest claim was by the deputy chief constable. That in support of the claim of litigation privilege was by a common law clerk who stated that the dominant purpose of the investigating officer's inquiry was to obtain evidence for the defence to the action. The claim to public interest immunity succeeded but that to litigation privilege did not.

67. The Court was not prepared to accept the affidavit of the common law clerk in the face of the Chief Constable's letter to the plaintiff's solicitor, which was direct and contemporaneous evidence by the person responsible for instituting the inquiry: see Lord Denning MR, and Oliver and O'Connor L JJ, at 745G, 750B–E and 757C. Oliver LJ stated that the Chief Constable's letter to the plaintiff's solicitors demonstrated that

A   the dominant purpose of the investigation was the statutory purpose and that had its dominant purpose been to provide material for the threatened legal proceedings it was a very tricky letter indeed because it in effect invited the prospective plaintiff to make a statement to the representative of the prospective defendant under the guise of carrying out a statutory inquiry.

B   68. The issue came before the Court of Appeal again in *Lask v Gloucester Health Authority* (6 December 1985). The question was whether the Court could go behind affidavits sworn by the defendant's solicitor and one of its administrators that an accident report prepared on a report form by the defendant was for submission to solicitors in the event of a claim and subject to litigation privilege. O'Connor LJ

C   considered *Frankenstein's* case and *Attorney-General v Emerson* and concluded that it could, and that the claim of privilege was not established.

69. In *Lask's* case the administrator's affidavit stated the only reason for requiring accident report forms to be completed was to enable them to be given to solicitors in the event of a claim. The solicitor's affidavit stated that he approved a standard form

D   for use in accident cases in the 1950s, the form in that case was virtually identical to the standard form, and privilege had always been maintained for such forms. His affidavit also referred to and exhibited a 1955 National Health Service Circular which suggested that an appropriate form be used. Paragraph 1 of the circular, which was still in force, stated 'from time to time accidents or other untoward occurrences arise

E   at hospitals which may give rise to complaints followed by claims for compensation or legal proceedings, and which may also call for immediate enquiry and action to prevent a repetition'.

70. The report form itself stated that the report was prepared for the use of solicitors in the event of a complaint or legal proceedings and it was to be submitted

F   to the head of department, who should forward it to the unit administrator for onward transmission to the sector and district administrators. O'Connor LJ stated that the circular differed from the report form because in paragraph 1 the Department stated in terms that the report had a double function; to assist in dealing with claims, and to consider whether action is necessary to prevent a repetition. The rest of the circular,

G   however, was concerned with the importance of getting a report would attract the privilege which it was, before the decision in *Waugh's* case, thought a dual purpose report would attract and the solicitor's affidavit referred to correspondence about the form in 1977 which showed the intention was that the form was to be for solicitors' use in the event of a claim and thus would attract the privilege.

H   71. O'Connor LJ applied the test stated in *Frankenstein's* case and *Attorney-General v Emerson*: were there statements from the party making the affidavit that they had erroneously misconceived or represented the character of the accident report. He concluded that it was plain from the circular that the report was prepared for a dual purpose. He also considered this was plain from the form itself because he saw no legal professional purpose in submitting the form to the head of department and the

other administrators before sending it to the person who was to hold it for submission    A
to the solicitor unless there was a second purpose as envisaged in the circular. The
county court judge's decision that the report was a document prepared for a dual
purpose was upheld. The question of cross-examination on an affidavit of documents
was not discussed in either *Lask's* case or *Neilson v Laugharne*.

72. In *Re Highgrade Traders Ltd* [1984] BCLC 515 the liquidators of a company    B
successfully applied under section 268 of the *Companies Act* 1948 for an order to
examine an officer in an insurance company about reports by loss adjusters, fire
experts and accountants prepared for the insurance company in respect of which
litigation privilege was claimed. Affidavits were sworn by the insurance company's
solicitors stating that the dominant purpose for which the reports came into existence    C
was in anticipation of litigation and for the purpose of obtaining legal advice.
The Court of Appeal accepted a submission by the officer that he could not have
anticipated the need for more detailed evidence before the hearing. A further affidavit
was sworn and taken into account by the court which, was, however, not convinced
that it added anything to what was reasonably deducible from the material before it.    D

73. Oliver LJ analysed the evidence before the court and concluded that it
established overwhelmingly that the insurers were actuated by the motive of
obtaining legal advice in relation to contemplated litigation, which was confirmed
by a letter written by the insurers' solicitors. Oliver LJ (with whom Goff LJ agreed)
stated (at 175) that:    E

'I would not want it to be thought that the mere writing of such a letter by
solicitors, whether for insurers or for anyone else, sometimes perhaps as a matter
almost of routine drill, is in all cases going to be determinative of the question.
At highest, it is no more [than] evidence of a fact which may require to be
independently proved.'    F

See also Simon J in *National Westminster Bank plc v Rabobank Nederland* [2006]
EWHC 2332 (Comm) at [52]. Earlier in his judgment (at 162) Oliver LJ said:

'[I]f there is something in the circumstances of the case which shows that the    G
affidavit evidence is wrong (as there was in *Nielson v Laugharne*), the court is
entitled to go behind the affidavit, but I would not … feel able to subscribe to
the view that the court is necessarily bound to accept a bare assertion as to the
dominant motive of a deponent, unaccompanied by some explanation of the
circumstances, at any rate in a case where more than one motive is possible.'    H

74. Where the Court is minded to go behind an affidavit, there are four options
open to it. It may conclude, as happened in *Nielson v Laugharne* and *Lask's* case, that
the evidence in the affidavit does not establish that which it seeks to establish, i.e.
that the person claiming privilege has not discharged the burden that lies on him, and
order disclosure or inspection. It may order a further affidavit to deal with matters the

A   earlier affidavit does not cover or on which it is unsatisfactory. This is seen in cases on inadequate affidavits disclosing assets in response to freezing orders, but also in the case of an affidavit as to disclosure or inspection: see *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* [1913] 3 KB 850. See also *National Westminster Bank plc v Rabobank Nederland* [2006] EWHC 2332 (Comm) at [53] and [63]; *Atos Consulting Ltd v Avis plc (No. 2)* [2007] EWHC 323 (TCC) at

B   [36]–[37], although in those cases the evidence was by witness statement rather than by affidavit: see [2006] EWHC 2332 (Comm) at [34]–[44] and [2007] EWHC 323 (TCC) at [7], [12], [18]. They are also cases on the third option open to the Court, to inspect the documents, which it may do in the circumstances set out in the next two paragraphs. The fourth option is that, subject to the restrictions in paragraphs 79–84

C   of this judgment, the court may order cross-examination of the deponent.

75. Neither TAV not the Total defendants invited me to inspect documents in this case. Neuberger J's view in *Bank Austria Akt v Price Waterhouse* that inspection of documents should be a solution of last resort (in part because of the danger of looking at documents out of context) was shared by Simon J in *National Westminster Bank plc*

D   *v Rabobank Nederland* see [54–55], and by Ramsay J in *Atos Consulting Ltd v Avis plc (No. 2)* [2007] EWHC 323 (TCC) at [36]–[37]. Simon J stated that Rabobank's evidence about the dominant purpose of the report the court was invited to inspect was difficult to reconcile with both its documents created at the time and some of its other evidence so that, if there is a threshold which has to be crossed before a court can properly be invited to look at documents, that threshold had been crossed and the

E   court had discretion to do so: see [34] and [49]–[51]. Simon J stated that the court should not inspect the documents unless there is credible evidence that the lawyers have either misunderstood their duty, or are not to be trusted, or there is no reasonably practical alternative. He did not inspect them but ordered Rabobank's solicitors to make an affidavit verifying the claims to privilege in relation to the documents

F   withheld.

76. Although inspection is not at issue in this case, what is said in cases on inspection gives guidance as to the general approach of the court where a claim to privilege is challenged. In *Atos Consulting Ltd v Avis plc (No. 2)* Ramsay J stated

G   (at [37]) that the appropriate course to be adopted where privilege or irrelevance is relied on is for the Court to proceed by way of stages. Ramsay J's first two stages are to consider whether the evidence produced on the application establishes the right to withhold inspection of a document and there are no sufficient grounds for challenging the correctness of that asserted right. If these conditions are met, the Court should uphold the right. His third stage arises where the Court is not satisfied

H   that the right to withhold inspection is established because, for instance, the evidence does not establish a legal right to withhold inspection. He states that in such a case the Court will order inspection of the documents. His fourth stage arises where sufficient grounds are shown for challenging the correctness of the asserted right. He states that in this situation the Court may order further evidence to be produced on oath or, if there is no other appropriate method of properly deciding whether the right to

A

withhold inspection should be upheld, it may decide to inspect the documents. If it inspects the documents it may invite representations. Neither Ramsay J nor Simon J referred to the possibility of cross-examination, to which I now turn.

B

77. CPR 32.7 makes provision for cross-examination at a hearing other than the trial where evidence is given in writing. CPR 31.19(5) provides for a challenge to a claim of privilege made under CPR 31.19(3), which when made, is supported by a statement of truth. Cross-examination on an affidavit at an interlocutory stage has been considered in the context of affidavits disclosing assets sworn in response to the order of the court when making a freezing injunction. In that context, it has been recognised that the circumstances may mean that it is more sensible, if only for reasons of speed and urgency, not to order further affidavits in order to fill the vacuum alleged to exist in the affidavits but to order cross-examination: see *House of Spring Gardens Ltd v Waite* [1985] FSR 173 at 183 *per* Stephenson LJ.

C

78. In *Yukong Lines v Rendsburg* (17 October 1996, CA) Phillips LJ stated that the background of applications for freezing orders is often a situation in which it is urgently necessary for the court to intervene in order to assist the claimant to prevent the defendant from frustrating the object of the proceedings. He also stated that the test is whether it is just and convenient to order cross-examination, and that cross-examination is not only available where there is no alternative relief. Even in the context of an affidavit in response to a freezing order, however, he regarded ordering cross-examination as 'an exceptional measure'. *Motorola Credit Corp v Uzan* [2003] 2 CLC 1026; [2004] 1 WLR 113 is an example of the circumstances in which cross-examination may be ordered. In that case the court found (see at [141] and [147]) that there had been piecemeal, late, untruthful and manifestly incomplete disclosure by the defendants.

D

E

F

79. Does the position in relation to affidavits of documents (including those claiming privilege) differ? It was submitted on behalf of the Total defendants and HOSL that no cross-examination of such affidavits is to be ordered. *Matthews & Malek on Disclosure* (2007) 6-44 states that the weight of authority under the RSC 'was to the effect that an opposing party could not cross-examine the deponent on his verifying affidavit at all' because the affidavit did not go to any of the issues in the action, and that the position is the same under the CPR. The authors state that in the context of freezing and search orders the position at an interlocutory stage is different because it may be crucial to establish what has happened to assets prior to trial.

G

80. Matthews & Malek rely on the decisions of the Court of Appeal in *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* [1913] 3 KB 850 and *Lonrho plc v Fayed (No. 3)* (14 June 1993, The Times, 24 June 1993). In *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* the defendants' affidavit of documents claimed litigation privilege for certain documents. The case was primarily concerned with whether the Court could inspect the documents for the purpose of deciding the validity of the claim of privilege,

H

A     but also considered the affidavit. The Court of Appeal inspected the documents, as the judge in chambers had, and decided that privilege had properly been claimed. As to the affidavit, Buckley LJ (with whom Vaughan Williams LJ agreed) stated (at 855):

B
> 'An affidavit of documents is sworn testimony which stands in a position which is in certain respects unique. The opposite party cannot cross-examine upon it and cannot read a contentious affidavit to contradict it. He is entitled to ask the Court to look at the affidavit and all the documents produced under the affidavit, and from those materials to reach the conclusion that the affidavit does not disclose all that it ought to disclose. In that case he can obtain an order for a further and better affidavit.'

C
    81. Buckley LJ also stated that, under the rule then applicable to a specific document, the party who is seeking discovery may file an affidavit specifying further documents and calling the party making the affidavit of documents to account for them. Hamilton LJ, citing *Jones v Montevideo Gas Co* (1880) 5 QBD 556, stated (at 858) that although an affidavit of discovery cannot be challenged by cross-

D examination, counter-affidavit or administration of interrogatories:

> 'If from the affidavit itself, or from the documents therein referred to, or from an admission in the pleadings of the party from whom discovery is sought, the Master or judge is of the opinion that the affidavit is insufficient, he ought to

E make an order for a further affidavit …'

    82. The *Birmingham and Midland Motor Omnibus* case was considered in *Ankin v London and North Eastern Railway Co* [1930] 1 KB 527. Scrutton LJ (at 534) stated:

F
> 'It has long been settled that a deponent stating grounds on which he claims privilege is not to be met by an opposing affidavit either contradicting him or cross-examining him with a view of showing that what he has stated is untrue. The other party can only look at the affidavit itself. If it is ambiguously or too ingeniously worded, so that its meaning is obscure, he may take the objection that

G the claim for privilege is not sufficient and may obtain a more precise statement of facts.'

    83. The authorities were reviewed in *Lonrho plc v Fayed (No. 3)* (14 June 1993, The Times, 24 June 1993). Lonrho sought discovery of documents relating to very large profits which the Fayed brothers said they had made from an oil trading

H partnership in the Middle East since 1979 and about their fortune in Egypt prior to 1961. The Fayed brothers made affirmations stating there were no such documents in their possession. On behalf of Lonrho it was argued that it was incredible that if such a partnership existed over many years generating huge profits there were no documents in the Fayeds' possession. Swinton Thomas J ordered that the Fayed brothers should be cross-examined on their affidavits of documents. In the Fayed brothers' appeal, it

was submitted on behalf of Lonrho that an affidavit of documents made pursuant to an order for specific discovery under RSC Order 24 Rule 7 was not conclusive, and that, if it was conclusive, the Court would be powerless to enforce its orders. Stuart-Smith LJ (with whom Kennedy and McCowan L JJ agreed) stated (at p. 19C–D of the transcript) that the authorities led him to the conclusion that:

'… on whatever ground the order for a further affidavit is made, whether because of some admission by the deponent or the belief of the opposite party that other documents exist, the oath of the deponent in answer is conclusive; it cannot be contravened by a further contentious affidavit and cannot be the subject of cross-examination.'

84. His Lordship stated that dicta in a number of more recent cases and the cases in which cross-examination on affidavits is ordered at an interlocutory stage in aid of Mareva relief did not alter or modify the well-established rule laid down in the authorities for over a century. He said that applications in those cases are for the most part concerned with discrete issues which do not impinge on the issues at trial. He said (see pp. 24–26 of the transcript) that in other cases 'the reasons for the rule that the statement in the affidavit of documents is conclusive save to the extent that a further affidavit may be ordered are not far to seek'. He referred to the fact that the issue to be canvassed at the interlocutory stage may impinge on, and be crucially relevant to the issues in the trial. To try it at an interlocutory stage could involve injustice, and replace the adversarial process at trial by an inquisitorial inquiry. He also stated that protracted interlocutory applications add to both delay and expense and should be avoided as far as possible. He stated (see p. 28 of the transcript) that, if he was wrong in holding that the statement in an affidavit of documents is conclusive so that the court has no power to order cross-examination, 'the exercise of that power should … be reserved for those cases where the existence or non-existence of the document raises a discrete issue which does not impinge to any serious extent on the issue in the action'.

85. Finally, there is *LFEPA v Halcrow Gilbert & Co Ltd* [2004] EWHC 2340 (QB), a decision of the Technology and Construction Court, in which HH Judge Toulmin QC dealt with a claim to privilege of a report prepared for the London Fire and Emergency Planning Authority sought by the defendants in proceedings about a construction project that had overrun. The Deputy Head of Legal Services of the Authority had made a witness statement and gave evidence that a reference in the statement to the report being part of a 'technical audit' meant a legal audit for the purpose of litigation. It appears that she was cross-examined. The judge stated (at [48]) that the burden of proof lies on the party claiming privilege. He rejected the evidence of the Deputy Head of Legal Services and concluded that the dominant purpose of the report was not for the purposes of litigation.

A

### Summary of law

86. It is possible to distil the following propositions from the authorities on challenges to claims to privilege:

B

(1) The burden of proof is on the party claiming privilege to establish it: see *Matthews & Malek on Disclosure* (2007) 11-46, and paragraph [50] above. A claim for privilege is an unusual claim in the sense that the party claiming privilege and that party's legal advisers are, subject to the power of the court to inspect the documents, the judges in their or their own client's cause. Because of this, the court must be particularly

C
careful to consider how the claim for privilege is made out and affidavits should be as specific as possible without making disclosure of the very matters that the claim for privilege is designed to protect: *Bank Austria Akt v Price Waterhouse*; *Sumitomo Corp v Credit Lyonnais Rouse Ltd* (per Andrew Smith J).

D
(2) An assertion of privilege and a statement of the purpose of the communication over which privilege is claimed in an affidavit are not determinative and are evidence of a fact which may require to be independently proved: *Re Highgrade Traders Ltd*; *National Westminster Bank plc v Rabobank Nederland*.

E
(3) It is, however, difficult to go behind an affidavit of documents at an interlocutory stage of proceedings. The affidavit is conclusive unless it is reasonably certain from:

(a) the statements of the party making it that he has erroneously represented or has misconceived the character of the documents in respect of which privilege is claimed: *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per Lord Esher MR and Chitty LJ; *Lask v Gloucester Health Authority*.

F

(b) the evidence of the person who or entity which directed the creation of the communications or documents over which privilege is claimed that the affidavit is incorrect: *Neilson v Laugharne* (the Chief Constable's letter), *Lask v Gloucester HA* (the NHS Circular), and see *Frankenstein v Gavin's House to House Cycle Cleaning and Insurance Co*, per A L Smith LJ.

G

(c) the other evidence before the court that the affidavit is incorrect or incomplete on the material points: *Jones v Montevideo Gas Co*; *Birmingham and Midland Motor Omnibus Co v London and North Western Railway Co*; *National Westminster Bank plc v Rabobank Nederland*.

H

(4) Where the court is not satisfied on the basis of the affidavit and the other evidence before it that the right to withhold inspection is established, there are four options open to it:

A

(a) It may conclude that the evidence does not establish a legal right to withhold inspection and order inspection: *Neilson v Laugharne*; *Lask v Gloucester Health Authority*.

(b) It may order a further affidavit to deal with matters which the earlier affidavit does not cover or on which it is unsatisfactory: *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co*; *National Westminster Bank plc v Rabobank Nederland*.

B

(c) It may inspect the documents: see CPR 31.19(6) and the discussion in *National Westminster Bank plc v Rabobank Nederland* and *Atos Consulting Ltd v Avis plc (No. 2)*. Inspection should be a solution of last resort, in part because of the danger of looking at documents out of context at the interlocutory stage. It should not be undertaken unless there is credible evidence that those claiming privilege have either misunderstood their duty, or are not to be trusted with the decision making, or there is no reasonably practical alternative.

C

D

(d) At an interlocutory stage a court may, in certain circumstances, order cross-examination of a person who has sworn an affidavit, for example, an affidavit sworn as a result of the order of the court that a defendant to a freezing injunction should disclose his assets: *House of Spring Gardens Ltd v Waite*; *Yukong Lines v Rensburg*; *Motorola Credit Corp v Uzan*. However, the weight of authority is that cross-examination may not be ordered in the case of an affidavit of documents: *Frankenstein's* case; *Birmingham and Midland Motor Omnibus Co Ltd v London and North Western Railway Co* and *Fayed v Lonrho*. In cases where the issue is whether the documents exist (as it was in *Frankenstein's* case and *Fayed v Lonrho*) the existence of the documents is likely to be an issue at the trial and there is a particular risk of a court at an interlocutory stage impinging on that issue.

E

F

87. Mr Pollock submitted that, had the framers of CPR 32.7 wished to preserve the old rule and to exclude a power to cross-examine in disputes concerning privilege, they could have done so. The Rule does not do so and there is no reference in the notes to the White Book to the authorities cited by Matthews and Malek. He submitted that there is provision in CPR 31.19(5) for a challenge to a claim of privilege made under CPR 31.19(3) which is made, supported by a statement of truth. There is no indication that a court considering a challenge to such a claim cannot order the cross-examination of the person claiming privilege. Mr Pollock argued that the CPR is a self contained code to which effect should be given. He relied on *Biguzzi v Rank Leisure plc* [1999] 1 WLR 1926 at 1934 where Lord Woolf MR stated that, once the CPR applies, 'earlier authorities are no longer generally of any relevance'. He also relied on the statement of May LJ in *Purdy v Cambran* (17 December 1999). May LJ stated that Lord Woolf 'was not saying that the underlying thought processes of previous decisions should be completely thrown overboard' but that decisions will depend on the justice in all the circumstances of an individual case and that it is necessary to

G

H

A   concentrate on the intrinsic justice of a particular case in the light of the overriding objective rather than on authorities under the former rules.

88. Notwithstanding Mr Pollock's submissions, I have concluded that, in view of the fact that Rule 32.7 follows the old County Court Rules Order 20 Rule 5 which has

B   the same effect as RSC Order 38 Rule 2(3), the old law cannot be discarded in the way he submitted it should be. Even if there is no longer a jurisdictional bar to ordering cross-examination of the deponent on his affidavit in this context, the exercise of that power should be reserved for extreme cases where there is no alternative relief.

89. In *Nomura International plc v Granada Group Ltd* [2007] EWHC 642 (Comm);

C   [2007] 1 CLC 479 Cooke J stated (at [25]–[26]) that 'where the new rule under the CPR follows the same form and appears to have the same underlying intention' as the rule in the RSC, regard should be had to the principles which the court previously applied under the old rule. That statement was made in the context of consideration of whether an abuse of process had taken place. The same approach in substance was taken in the context of disclosure of documents for the purpose of interlocutory

D   proceedings (albeit without reference to the old rules) in *Fiona Trust Holding Corp v Privalov* [2007] EWHC 39 (Comm) at [25]–[27].

90. The procedure under the CPR is, in substance, the same as that under the RSC although now the claim for privilege is made in a disclosure statement instead of an

E   affidavit. The rationale of avoiding mini-trials at an interlocutory stage is still there. Mr Pollock was not able to point to any post CPR authority in support except for *LFEPA v Halcrow Gilbert and Co*. Lord Grabiner and Mr Edey submitted *inter alia* that case was different because the evidence challenged was in a witness statement rather than an affidavit. While there are, no doubt, differences between witness statements supported by a statement of truth and sworn affidavits, it is difficult to see

F   why cross-examination should be permitted where the claim for privilege is made in a witness statement but not where the claim is made in an affidavit. That case, however, proceeded without consideration of any of the authorities to which I have referred and it does not appear from the judgment that there was any argument as to whether cross-examination on the evidence given in support of the claimed privilege was a

G   proper course. In those circumstances it is of limited assistance, save as indicating (see *Hollander's Documentary Evidence* (9th edn.), 2-33) that the position in practice may be less dogmatic than the theory.

91. As to whether there is still a jurisdictional bar to ordering cross-examination of the deponent on his affidavit in this context, the need to avoid the party claiming

H   privilege being judge in his own case and the statements in the cases that an assertion of privilege is not determinative and may require to be independently proved are difficult to reconcile with an absolute bar. In the light of the overall approach in the CPR, in an extreme case where there is no alternative relief, it may be just to order such cross-examination rather than concluding, without such examination, that the evidence before the Court does not establish a legal right to withhold inspection and

A

ordering inspection. This in turn, however, should only be contemplated if it can be done without impinging to any material extent on the issues in the action, and only after the court has considered whether the position can be addressed by ordering further evidence to be produced on oath, or by inspecting the documents. Even at that stage cross-examination is unlikely to be necessary. If the deponent is not able to deal with any gaps and inadequacies in a further affidavit it is likely that the burden of proof that lies on a person claiming privilege will not have been satisfied.

B

**Application of the principles to the circumstances of this case**

92. Having summarised the relevant legal principles, I turn to their application in the circumstances of this case.

C

93. I first deal with the submissions based on the decision in *Re Barings plc*. That case is authority for the proposition that where a report is prepared pursuant to a statutory obligation the purposes of the instigator of the report are irrelevant. There should be no difference in principle where the obligation is a regulatory rather than a statutory obligation. However, I reject the submission that the Total defendants' claim for privilege should be rejected because the Total AIT reports and communications were produced pursuant to Total's regulatory duties under the COMAH Regulations.

D

94. While there may well be an implied duty under the regulations to investigate, there is no duty to report. More fundamentally, it has not been established that Total is the operator of the site for the purpose of the COMAH Regulations. That will be a major issue at the trial. Mr Pollock recognised the difficulty facing the court in dealing with this issue. He submitted that I should decide the matter as a question of principle, or on alternative assumptions. I am not, however, in a position to deal with this issue at this stage, even as a matter of principle. It would risk prejudging the issue at the trial on the basis of very limited, indeed almost no, material. The only material before me concerning this issue was the exchange of correspondence between HOSL and the competent authority which Mr Pollock relied on as showing that HOSL had held itself out to the authority as the operator of the site. Apart from the fact that that was used as an argument in support of the contention that HOSL was the operator under the COMAH Regulations, I was informed that there were similar communications between Total and the competent authority. At the trial, there is bound to be a substantial quantity of evidence on this issue. I have not seen any of that evidence. This issue is a classic example of the dangers to which Stuart-Smith LJ adverted in *Lonrho plc v Fayed*.

E

F

G

95. The next issue concerns Mr Malcolm Jones's affidavits. Are there grounds for going behind them? I have concluded that there are a number of respects in which the first affidavit is guarded and not satisfactory and that those matters are not addressed in the second affidavit. The affidavits do not enable me to conclude that the claim for privilege has been established. They exhibit no documents in support of what Mr Jones says as to the purpose of establishing the Total AIT. The only documents exhibited are

H

A    Mr Ollerhead's memoranda which are said by Mr Jones to reflect a misunderstanding,
     and the postings on Total's intranet. I set out my reasons for concluding that the first
     affidavit is not satisfactory and then consider the consequence and the appropriate
     course of action.

B    96. I do not accept Mr Pollock's submission based on Mr Jones's statement of
     what his 'objective' was and the references in the affidavit to the 'primary purpose'
     of the AIT. It is clear, on a fair reading of the affidavit as a whole, that Mr Jones's
     evidence is that his dominant purpose in setting up the investigation was to prepare
     for contemplated legal proceedings. Moreover, in referring only to Mr Poynter's role
     as Head of Legal and not his HSEQ role the affidavit is guarded, but, in the light of
C    what Mr Ollerhead's memorandum says about Mr Poynter having to rely on Mr Coull
     on HSEQ matters, this may reflect the reality.

     97. Mr Jones does not say that he made the decision alone. As Managing Director
     of Total UK Ltd, he no doubt had considerable authority, but the affidavit does not
     state what roles, if any, were played by others in the company, in particular members
D    of the Board, on 12 December when the decision to set up the AIT was taken, or
     what part was played by the French parent company at that time. There is evidence
     of initial contact with people from the French parent company and Davies Arnold
     Cooper advised Total's French lawyers on 12 December. Since what is relevant is
     the purpose of Total UK and Total Downstream Oil Storage Ltd. at the time the AIT
E    was established on 12 December, these are matters which are relevant and which
     should have been addressed. Mr Jones states (in paragraph 12) that at that time they
     were working 'mainly through oral communication', which suggests there were
     some documents, but he does not refer to any document other than the Ollerhead
     memoranda which he mistakenly (see below) considered were privileged.

F    98. Mr Jones may not have told Mr Ollerhead of his purpose, or Mr Ollerhead
     may have misunderstood what he was told. There is, however, no explanation of
     how a misunderstanding by Mr Ollerhead may have come about, or whether it was
     shared by others within Total. The affidavit does not state whether Mr Jones told Mr
     Ollerhead or anyone in Total UK or the group what his purpose was and whether that
G    was the corporate purpose. Mr Jones states that Mr Poynter and (after 21 December)
     DLA Piper reported to him in respect of the AIT's progress. There is, however, no
     explanation of why, if the dominant purpose was to prepare for contemplated legal
     proceedings and Mr Ollerhead's understanding of the purpose of the investigation
     was wrong, Mr Poynter, who was copied in to all the emails, did not correct him.

H    99. Mr Jones states in paragraphs 13 and 15 of his first affidavit that, but for
     the contemplation of litigation, the Total AIT would not have been set up. The
     affidavit states that he had no regard to any internal Total procedure and that the one
     day and ten day reports required by element 5 of the Safety Management System
     were not produced. It is not explained whether he was not aware of the mandatory
     requirements in place under the Application Guide or whether he decided not to use

A

them, or why the required reports were not produced. There is no explanation in either of his affidavits as to why no account was taken of the lesson-learning culture expressed in the Application Guide and other documents and how this fits with, for example, the section on 'Lessons from Buncefield' in Total's Environment and Social Responsibility Report 2006. The legitimacy within the Total corporate structure of the Managing Director having no regard to procedures described as mandatory which have specified 'lesson learning' purposes is not explained. There is also no explanation of the difference with the DAC letter which refers to Total's internal requirements and does not suggest that, but for the legal proceedings contemplated, no AIT would have been set up. The affidavit is thus, at a minimum, incomplete on matters which it is necessary for the court to know in order to determine the claim to privilege.

B

C

100. Paragraph 12 of Mr Jones's affidavit can only be understood as a claim of privilege in relation to documents concerning the setting up of the AIT. As Lord Grabiner recognised at the hearing, there is no ground for such a claim. Lord Grabiner gave an undertaking that Total would look for and disclose other documents in this class. However, Mr Jones's affidavit shows a misapprehension as to the extent of any privilege to which Total is entitled which requires elucidation.

D

101. Having concluded that the affidavits are not satisfactory, the question is what order should be made. I have said that they do not enable me to conclude that the claim for privilege is established. I have considered whether this means that the Total defendants have not satisfied the burden of proof and that I should order inspection of the documents. The affidavits do not disclose all that they ought to disclose. However, in the light of Mr Jones's unequivocal statements as to his purpose and the time some of TAV's evidence was served (Mr Poynter's email – paragraph 16 above – referring to what Total's parent company would require was produced during the hearing) this would not be appropriate. I have decided that, having regard to the decisions such as *Birmingham and Motor Omnibus Co Ltd v London and North Western Railway Co*, *Ankin v L & NE Railway Co*, and *National Westminster Bank plc v Rabobank Nederland*, Mr Jones should be ordered to swear a further affidavit to deal with the matters which the earlier affidavits do not cover or on which they are unsatisfactory. As to cross-examination, for the reasons I have given, on the assumption there is jurisdiction to order cross-examination in this context, I do not consider this is an appropriate case for doing so.

E

F

G

**The applications in respect of the HOSL AIT**

102. I have referred to the abandonment of the applications in respect of HOSL and Mr Richard Jones, and said that they were unsustainable. The documents had not been requested from HOSL prior to the application. Nor were HOSL's solicitors contacted on the issue. As in the case of Mr Malcolm Jones, there was no formal application to cross-examine him supported by evidence as required by the CPR. Since TAV's case was in effect that Mr Jones' affidavit should not be believed, a serious allegation, it should have been made by application supported by the evidence on which it was

H

A    proposed to rely. The supporting material on which TAV relied was in fact served only
     on 4 July, very shortly before the hearing.

     103. There was nothing in the material before the court which cast doubt on the
     affidavits sworn on behalf of HOSL by Mr Richard Jones and Mr Young. In view of
     HOSL's status, the existence of the HSC's Buncefield Major Incident Investigation
B    Board and Total's Accident Inspection Team's investigations, it was unsurprising that
     HOSL's dominant purpose in setting up its accident investigation team was to assist
     HOSL's legal advisers in advising it in relation to contemplated civil and criminal
     proceedings. Although a number of other points were relied on in TAV's written
     submissions, at the hearing its case that the HOSL investigation was also for lesson-
C    learning purposes rested on HOSL having held itself out to the competent authority as
     the operator of the site and was therefore under a duty under the COMAH Regulations
     to investigate incidents and near misses. Mr Young's affidavit, which is unchallenged,
     addresses this issue. Moreover, Mr Young was at the relevant board meetings and
     advised the board. His evidence is that the sole purpose of setting up the HOSL AIT
     was to assist in relation to contemplated criminal and civil proceedings. His evidence
D    is not challenged. The application to cross-examine Mr Richard Jones thus falls at
     the first hurdle.

     104. There were other fundamental difficulties in the application. I have dealt
     with the position as to cross-examination in relation to an affidavit as to disclosure
E    including one claiming privilege, elsewhere in this judgment. In the case of HOSL,
     cross-examination would have been wholly inappropriate for two reasons. First,
     in the light of the close involvement of the lawyers in the decision to establish the
     HOSL AIT, it would be difficult to examine Mr Jones without straying into the legal
     advice Eversheds gave the HOSL board. Secondly, a major issue in the litigation is
     whether Total or HOSL were the operators of the site for the purposes of the COMAH
F    regulations. It is established that it is inappropriate to deal with such a matter at an
     interlocutory stage on the basis of limited evidence. In any event, as I have observed,
     Mr Young's affidavit addresses the Regulations point and states that there was no
     suggestion that the HOSL AIT should be set up for the purposes of the COMAH
     regulations or pursuant to any internal procedures.

G
     **Conclusion**

     105. In the light of what is stated in paragraphs 95–101 of this judgment, the
     appropriate course is to require a further affidavit to be sworn by Mr Malcolm Jones
     dealing with the matters which his earlier affidavits do not cover or on which they are
H    unsatisfactory. I shall hear submissions as to the time within which this is to be done.
     If the gaps and inadequacies are not addressed, it is difficult to see that the burden of
     proof that lies on a person claiming privilege will have been satisfied.

                              (*Order accordingly*)
                            ————————————