# EXHIBIT B

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

JEFFREY EPSTEIN,

                            Complex Litigation, Fla. R. Civ. Pro. 1.201
                            CASE NO.

            Plaintiff,             50 2009 CA 0 4 08 0 0 XXXX MB

v.



SCOTT ROTHSTEIN, individually,
BRADLEY J. EDWARDS, individually, and
L.M., individually,

           Defendants.

_____/

COPY
RECEIVED FOR FILING
DEC 0 7 2009
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## COMPLAINT

Plaintiff, JEFFREY EPSTEIN, (hereinafter "EPSTEIN"), by and through his undersigned attorneys, files this action against Defendants, SCOTT ROTHSTEIN, individually, BRADLEY J. EDWARDS, individually, and L.M., individually. Accordingly, EPSTEIN states:

### SUMMARY OF ACTION

       Attorney Scott Rothstein aided by other lawyers and employees at the firm of Rothstein, Rosenfeldt, and Adler, P.A. for personal greed and enrichment, in betrayal of the ethical, legal and fiduciary duties to their own clients and professional obligations to the administration of justice, deliberately engaged in a pattern of racketeering that involved a staggering series of gravely serious obstructions of justice, actionable frauds, and the orchestration and conducting of egregious civil litigation abuses that resulted in profoundly serious injury to Jeffrey Epstein one of several targets of their misconduct

Epstein v. RRA, et al.
Page 2

and others.   Rothstein and RRA's fraud had no boundary; Rothstein and his co-conspirators forged Federal court orders and opinions.  Amongst the violations of law that are the subject of this lawsuit are the marketing of non-existent Epstein settlements and the sanctioning of a series of depositions that were unrelated to any principled litigation purpose but instead designed to discover extraneous private information about Epstein or his personal and business associates (including well-known public figures) in order to defraud investors and  support extortionate demands for payment from Epstein. The misconduct featured the filing of legal motions and the pursuit of a civil litigation strategy that was unrelated to the merits or value of their clients' cases and, instead, had as its improper purpose the furthering of Rothstein's misrepresentations and deceit to third party investors.  As a result, Epstein was subject to abusive investigatory tactics, unprincipled media attacks, and unsupportable legal filings.  This lawsuit is filed and will be vigorously pursued against all these defendants. The Rothstein racketeering enterprise endeavored to compromise the core values of both state and federal justice systems in South Florida and to vindicate the hardworking and honest lawyers and their clients who were adversely affected by the misconduct that is the subject of this Complaint.

Plaintiff reserves the right to add additional defendants – co-conspirators as the facts and evidence is developed.

## GENERAL ALLEGATONS

1.   This is an action for damages in excess of $15,000.00, exclusive costs, interest, and attorneys' fees.

GM_00488

Epstein v. RRA, et al.
Page 3

2.  Plaintiff, EPSTEIN, is an adult and currently is residing and works in Palm Beach County, Florida.

3.  Defendant, SCOTT ROTHSTEIN ("ROTHSTEIN"), is an individual residing in Broward County, Florida, and was licensed to practice law in the State of Florida.   In November 2009, ROTHSTEIN voluntarily relinquished his law license in the midst of the implosion of Rothstein, Rosenfeldt and Adler, P.A. ("RRA").   He was disbarred by the Florida Supreme Court on November 20, 2009.   On December 1, 2009, ROTHSTEIN was arrested and arraigned in Federal Court in Broward County, Florida.

4.  At all times relevant hereto, ROTHSTEIN was the managing partner and CEO of RRA.

5.  Defendant, ROTHSTEIN and Stuart Rosenfeldt, are and were the principal owners of equity in RRA and each co-founded RRA.

6.  Defendant, BRADLEY J. EDWARDS ("EDWARDS"), is an individual residing in Broward County, Florida and is licensed to practice law in the State of Florida.   At all times relevant hereto, EDWARDS was an employee, agent, associate, partner, shareholder, and/or other representative of RRA.

7.  Defendant, L.M. ("L.M."), is an individual residing in Palm Beach County, Florida. At all times relevant hereto, L.M. was represented by RRA, ROTHSTEIN and EDWARDS in a civil lawsuit against Epstein and was an essential participant in the scheme referenced *infra* by, among other things, substantially changing prior sworn testimony, so as to assist the Defendants in promoting their fraudulent scheme for the

GM_00489

Epstein v. RRA, et al.
Page 4

promise of a multi-million dollar recovery relative to the Civil Actions (defined below) involving Epstein, which was completely out of proportion to her alleged damages.

8.   Non-party, RRA is a Florida Professional Service Corporation, with a principal address of 401 East Las Olas Blvd., Suite 1650, Fort Lauderdale, FL 33401.  In addition to its principal office, RRA also maintained seven offices in Florida, New York, and Venezuela, and employed over 70 attorneys and 200 support staff.  RRA also maintains an office at 1109 NE 2d Street, Hallendale Beach, Florida 33009-8515.  RRA, through its attorneys, including those named as Defendants herein, conducted business throughout Florida, and relevant to this action, conducted business and filed lawsuits on behalf of clients in Palm Beach County, Florida.   (RRA is currently a debtor in bankruptcy.  RRA is not named as a Defendant).

## FACTUAL ALLEGATIONS

9.   The United States in United States of America v. Scott W. Rothstein, Case No. 09-60331CR-Cohn, United States District Court, Southern District of Florida, has brought an action for Racketeering Conspiracy, 18 U.S.C. § 1962(d) against Scott W. Rothstein who was the chief executive officer and chairman of RRA.   Within the information which was filed, the United States of America has identified the enterprise as being the law firm, RRA, through which Rothstein in conjunction with "his co-conspirators" (not yet identified by the USA) engaged in the pattern of racketeering through its base of operation at the offices of RRA from sometime in 2005 up through and continuing into November of 2009.   Through various criminal activities, including mail fraud, wire fraud and money laundering, the United States of America asserts that

GM_00490

Epstein v. RRA, et al.
Page 5

Rothstein and his co-conspirators unlawfully obtained approximately $1.2 billion from investors by fraud in connection with a Ponzi scheme. The USA further alleges that "Rothstein and co-conspirators initiated the criminal conduct alleged in the instant Information in order to personally enrich themselves and to supplement the income and sustain the daily operation of RRA." In essence, in the absence of Rothstein and his co-conspirators conducting the Ponzi scheme, the daily operation of RRA, which included payroll (compensation to lawyers, staff, investigators, etc.), accounts payable including unlimited improper, harassing and potential illegal investigation on cases, including Epstein-related matters, would in all likelihood would not have been sustainable. A copy of the information is attached as **Exhibit 1** to this action.

10. As more fully set forth herein, RRA held itself out as legitimately and properly engaging in the practice of law. In reality, ROTHSTEIN and others in RRA were using RRA to market investments, as described below, so as to bilk investors out of hundreds of millions of dollars. ROTHSTEIN and others in RRA devised an elaborate plan through which were sold purported confidential assignments of a structured pay-out settlements, supposedly reached on behalf of RRA for clients, in exchange for immediate payments to these clients of a discounted lump sum amount. Investors were being promised in excess of a 30% return on their investment which was to be paid out to the investors over time. While some of the cases relied upon to induce investor funding were existing filed cases, it is believed that the confidential, structured pay-out settlements were all fabricated.

Epstein v. RRA, et al.
Page 6

11. Based on media reports, Federal Bureau of Investigation (FBI) press conferences and releases and the Information the massive Ponzi scheme and pattern of criminal activity meant to lure investors began sometime in 2005 and continued through the fall of 2009, when the scheme was uncovered by some of the investors and the FBI. As of November of 2009, civil lawsuits were and continue to be filed against various Defendants as result of their massive fraudulent and criminal scheme.

12. This fraudulent and illegal investment scheme is also evidenced by the filing of *Amended Complaint For Dissolution And For Emergency Transfer of Corporate Powers to Stuart A. Rosenfeldt, Or, In The Alternative, For the Appointment of A Custodian or Receiver* by ROSENFELDT, and RRA, against ROTHSTEIN, individually. (Case No. 09 059301, In the Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida, Complex Business Div.), (hereinafter "RRA dissolution action, and attached hereto as **Exhibit 2**).

13. Plaintiff references the RRA dissolution action for the sole purpose that it acknowledges that RRA and ROTHSTEIN were in fact conducting an illegal and improper investment or Ponzi scheme based on promises of financial returns from settlements or outcomes of supposed legal actions, including the actions brought against Plaintiff EPSTEIN.   The RRA dissolution action alleges in part that – "ROTHSTEIN, the managing partner and CEO of the firm (RRA), has, according to assertions of certain investors, allegedly orchestrated a substantial misappropriation of funds from investor trust accounts that made use of the law firm's name (RRA).   The investment business created and operated by ROTHSTEIN centered around the sale of

Epstein v. RRA, et al.
Page 7

interests in structured settlements."   See *Preliminary Statement* of RRA dissolution

action, **Exhibit 2** hereto.

14. In furtherance of the scheme, RRA's letterhead was used in communications

regarding investment opportunities in purported structured settlements.   RRA's trust

account was used to deposit hundreds of millions of dollars or wire transfer of monies

from duped investors and other victims.   RRA personally guaranteed payments.

15. Rothstein's scheme went so far as to manufacture false and fraudulent Court

opinions/orders including forging the signatures of U.S. District Judge, Kenneth A.

Marra and U.S. Circuit Court Judge, Susan H. Black, 11th Circuit in other cases.  It is not

yet known if he forged similar documents in Esptein related matters.  See **Composite**

**Exhibit 3** hereto.

16. The details of this fraudulent scheme are being revealed on a daily basis through

various media reports and court documents. The most recent estimate of the financial

scope of the scheme is that it exceeds $1.2 billion dollars.

17. Relevant to this action, EPSTEIN is currently named as a defendant in three civil

actions alleging, inter alia, sexual assault and battery that were handled by RRA and its

attorneys including EDWARDS prior to its implosion -- one of which is filed in federal

court (Jane Doe v. Epstein, Case No. 08-CIV-80893, U.S.D.C. S.D. Fla.)(Jane Doe is a

named Defendant herein), and two of which have been filed in state court in the 15th

Judicial Circuit Court, Palm Beach County, State of Florida, (L.M. v. Epstein, Case No.

502008CA028051XXXXMB AB; E.W. v. Epstein, Case No. 502008CA028058XXXXMB

Epstein v. RRA, et al.
Page 8

AB), (hereinafter collectively referred to as the "Civil Actions," and L.M is a named Defendant herein). The Civil Actions were all filed in August and September of 2008.

18. What is clear is that a fraudulent and improper investment or Ponzi scheme was in fact conducted and operated by RRA and certain of the named Defendants, which scheme directly impacted EPSTEIN as a named defendant in the Civil Actions.

19. Miami attorney and developer, Alan Sakowitz, was quoted in a November 2009 article as saying that he had met with ROTHSTEIN as a potential investor in August of 2009, but became suspicious. He stated "I was convinced it was all a Ponzi scheme and I notified the FBI in detail how Scotty ROTHSTEIN was hiding behind a legitimate law firm to peddle fake investments." Attorney Sakowitz was also quoted as saying ROTHSTEIN had sophisticated eavesdropping equipment and former law enforcement officers who would sift through a potential defendants' garbage looking for damaging evidence to use with investors to show how potential defendants could be in essence blackmailed into paying settlement that far exceeded the value of any legitimate damage claim.

20. Ft. Lauderdale attorney William Scherer represents multiple Rothstein related investors. He indicated in an article that RRA/Rothstein had used the "**Epstein Ploy** ... as a showpiece as bait. That's the way he raised all the money. He would use. . .cases as bait for luring investors into fictional cases. All the cases he allegedly structured were fictional. I don't believe there was a real one in there." In fact, on November 20, 2009, William Scherer, on behalf of certain clients, filed a 147 page Complaint against ROTHSTEIN, David Boden, Debra Villegas, Andrew Barnett, TD Bank, N.A., Frank

Epstein v. RRA, et al.
Page 9

Spinosa, Jennifer Kerstetter, Rosanne Caretsky and Frank Preve asserting various allegations that further prove the massive Ponzi scheme behind the RRA façade; and as of November 25, 2009, a 249 page Amended Complaint naming additional Defendants was filed.

21. In addition, and upon information and belief, ROTHSTEIN, David Boden, Debbie Villegas, Andrew Barnett, Michael Fisten and Kenneth Jenne (all employees of RRA) through brokers or middlemen would stage regular meetings during which false statements were made about the number of cases/clients that existed or RRA had against EPSTEIN and the value thereof. They would show and share actual case files from the EPSTEIN actions with hedge fund managers. Thus, the attorneys and clients have waived any attorney-client or work- product privileges that otherwise may have existed.

22. Because potential investors were given access to some of the actual Civil Action files, investor-third parties may have became aware of a name of an existing Plaintiff who had filed anonymously against Epstein and had opposed disclosure of her legal name.

23. In all other instances, by RRA, ROTHSTEIN and EDWARDS claiming the need for anonymity with regard to existing or fabricated clients, they were able to effectively use initials, Jane Doe or other anonymous designations which was a key element in the fraudulent scheme. Fictitious names could be created to make the investors believe many other cases existed against Epstein.

24. In each of RRA's Civil Actions, the Plaintiffs are or were represented by RRA and its attorneys, including ROTHSTEIN and EDWARDS.

25. In addition, investors were told that in addition to the Civil Actions another fifty (50) plus anonymous females were represented by RRA, with the potential for hundreds of millions of dollars in settlements, and that RRA and its attorneys would sue Epstein unless he paid exorbitant-settlement amounts to protect his high-profile friends.

26. Upon information and belief, EDWARDS knew or should have known that ROTHSTEIN was utilizing RRA as a front for the massive Ponzi scheme and/or were selling an alleged interest or investment in the Civil Actions (and other claims) involving Epstein.

27. Further evidencing that EDWARDS (and possibly other attorneys of RRA) knew or should have known and participated in the continuation of the massive Ponzi scheme, a front-page Palm Beach Post article, dated November 24, 2009, reported on the recent filing of an amended forfeiture complaint by prosecutors against "dozens of ROTHSTEIN's real estate properties, foreign cars, restaurants and other assets – including $12 million in the lawyer's bank account in Morocco, along with millions more donated to political campaigns and charitable funds."  The article further reported that –

> Attorney Scott ROTHSTEIN tapped into millions of dollars from his massive investment scam to cover payroll costs at his expanding Fort Lauderdale law firm, federal authorities said in court records released Monday.
>
> ROTHSTEIN's law firm (RRA) generated revenue of $8 million in one recent year, yet his 70-lawyer law firm had a payroll of $18 million,

Epstein v. RRA, et al.
Page 11

prosecutors said.   ROTHSTEIN, who owned half of RRA used investors'
money from his Ponzi scheme to make up the shortfall, they said.

Subsequent articles and court filings have reflected ROTHSTEIN received
compensation in excess of $35.7 million in 2008 and $10.5 million in 2009, while
his partner Rosenfeldt received greater than $6 million in 2008.

28.   ROTHSTEIN attempted to lure the entity known as D3 Capital Club, LLC,  ("D3"),
by offering D3 "the opportunity" to invest in a pre-suit $30,000,000.00 court settlement
against EPSTEIN; yet this supposed settlement never existed and was entirely
fabricated.  To augment his concocted story, ROTHSTEIN, upon information and belief,
invited D3 to his office to view thirteen (13) banker's boxes of case files in Jane Doe
(one of the Civil Actions)[1] in an attempt to substantiate that the claims against EPSTEIN
were legitimate and that the evidence obtained against him by RRA, ROTHSTEIN, and
EDWARDS (the "Litigation Team") was real.

29.   Upon information and belief, ROTHSTEIN and others offered other investors like
the entity D3 fabricated investment opportunities in the Civil Actions involving EPSTEIN.
Fisten (a former Dade County police officer with a questionable police record  and RRA
investigator) and Jenne (a former attorney, Broward County Sheriff and felon) assisted
ROTHSTEIN in making these offers by providing confidential, privileged and work-
product information to prospective third-party investors.

---

[1] It appears that 13 out of the 40 boxes seized by the FBI as part of its investigation at RRA
consisted of files relating to the Civil Actions involving EPSTEIN, as reported by counsel for the
Bankruptcy Trustee.  Until those boxes can be reviewed, as well as other discovery, Epstein will
not know the depth of the fraud and those involved.

GM_00497

Epstein v. RRA, et al.
Page 12

30.  By using the Civil Actions against EPSTEIN as "bait" and fabricating settlements regarding same, ROTHSTEIN and others were able to lure investors into ROTHSTEIN'S lair and bilked them of millions of dollars which, in turn, was used to fund the litigation against EPSTEIN for the sole purpose of continuing the massive Ponzi scheme.

31.  As part of this scheme, ROTHSTEIN and the Litigation Team, individually and in a concerted effort, may have unethically and illegally:

    a.  Sold, allowed to be sold and/or assisted with the sale of an interest in non-settled personal injury lawsuits (which are non-assignable and non-transferable) or sold non-existent structured settlements (including those cases involving Epstein);

    b.  Reached agreements to share attorneys fees with non-lawyers;

    c.  Used investor money to pay plaintiffs (i.e., L.M., E.W. and Jane Doe) "up front" money such that plaintiffs would refuse to settle the Civil Actions;

    d.  Conducted searches, wiretaps or intercepted conversations in violation of state or federal laws and Bar rules; and

    e.  Utilized the judicial process including, but not limited to, unreasonable and unnecessary discovery, for the sole purpose of furthering the Ponzi scheme.

32.  Any such actions by ROTHSTEIN, and other attorneys, including the Litigation Team, directly or indirectly, would potentially be a violation of various Florida Bar Rules,

GM_00498

Epstein v. RRA, et al.
Page 13

including prohibiting the improper sharing of fees or costs and various conflicts of issues rules.

33. Evidencing that the Litigation Team knew or should have known of the improper purpose that ROTHSTEIN was pursuing in the continuation of the scheme, ROTHSTEIN used RRA's Litigation Team in the EPSTEIN cases to pursue issues and evidence unrelated to and unnecessary to the claims pled in the Civil Actions, but significantly beneficial to lure investors into the Ponzi scheme orchestrated by ROTHSTEIN and other co-conspirators.

34. Upon information and belief, ROTHSTEIN and others claimed their investigators discovered that there were high-profile individuals onboard Epstein's private jet where sexual assaults took place and showed D3 (and possibly others) copies of a flight log purportedly containing names of celebrities, dignitaries, and international figures.

35. For instance, the Litigation Team relentlessly and knowingly pursued flight data and passenger manifests regarding flights EPSTEIN took with these famous individuals knowing full well that no underage women were onboard and no illicit activities took place. ROTHSTEIN and the Litigation Team also inappropriately attempted to take the depositions of these celebrities in a calculated effort to bolster the marketing scam that was taking place.

36. One of Plaintiffs' counsel, EDWARDS, deposed three of EPSTEIN'S pilots, and sought the deposition of a fourth pilot (currently serving in Iraq). The pilots were deposed by EDWARDS for over twelve (12) hours, and EDWARDS never asked one question relating to or about E.W., L.M., and Jane Doe (RRA clients) as it related to

Epstein v. RRA, et al.
Page 14

transportation on flights of RRA clients on any of EPSTEIN'S planes.  But EDWARDS asked many inflammatory and leading irrelevant questions about the pilots' thoughts and beliefs (which will never be admissible at trial) which could only have been asked for the purposes of "pumping" the cases and thus by using the depositions to sell the cases (or a part of them) to third parties.

37. Because of these facts, ROTHSTEIN claimed that Epstein wanted to make certain none of these individuals would be deposed and therefore he had offered $200,000,000.00 to settle the claims of RRA female clients various potential plaintiffs in actions against EPSTEIN.  The offer of a $200 million dollar settlement by EPSTEIN was completely fabricated; no such offer had ever been made.

38. EDWARDS' office also notified Defendant that he intended to take the depositions of and was subpoenaing:

> (i) Donald Trump (real-estate magnate and business mogul);
>
> (ii) Alan Dershowitz (noted Harvard Law professor, constitutional attorney and one of EPSTEIN'S criminal defense attorneys);
>
> (iii)Bill Clinton (Former President of the United States);
>
> (iv)Tommy Mottola (former President of Sony Record); and
>
> (v) David Copperfield (illusionist).

39. The above-named individuals were friends and acquaintances of EPSTEIN with whom he knew through business or philanthropic work over the years.  None of the above-named individuals had any connection whatsoever with any of the Litigation Team's clients, E.W., L.M. or Jane Doe.

Epstein v. RRA, et al.
Page 15

40. EDWARDS filed amended answers to interrogatories in the state court matters, E.W. and L.M., and listed additional high profile witnesses that would allegedly be called at trial, including, but not limited to:

> (i) Bill Richardson (Governor of New Mexico, formerly U.S. Representative and Ambassador to the United Nations); and

> (ii) Any and all persons having knowledge of EPSTEIN'S charitable, political or other donations;[2]

41. The sole purpose of the scheduling of these depositions or listing high profile friends/acquaintances as potential witnesses was, again, to "pump" the cases to investors. There is no evidence to date that any of these individuals had or have any knowledge regarding RRA's Civil Actions.

42. In furtherance of their illegal and fraudulent scheme against EPSTEIN, ROTHSTEIN, EDWARDS (who either know or should have known) and, at times, L.M. in her Civil Action against EPSTEIN:

> a) Included claims for damages in Jane Doe's federal action in excess of $50,000,000.00 rather than simply alleging the jurisdictional limits.

> b) Organized a Jane Doe TV media interview without any legitimate legal purpose other than to "pump" the federal case for potential

---

[2] These high-profile celebrity "purported" witnesses have no personal knowledge regarding the facts on these "Three Cases", but were being contacted, subpoenaed or listed to harass and intimidate them and Epstein, and to add "star" appeal to the marketing effort of the Ponzi scheme.

Epstein v. RRA, et al.
Page 16

    investors or to prejudice Epstein's right to a fair trial in Palm Beach County.

c) EDWARDS, Berger and Russell Adler (another named partner in RRA) all attended EPSTEIN's deposition.   At that time, outrageous questions were asked of EPSTEIN which had no bearing on the case, but so that the video and questions could be shown to investors.

d) Conducted and attempted to conduct completely irrelevant discovery unrelated to the claims in or subject matter of the Civil Actions for the purpose of harassing and embarrassing witnesses and EPSTEIN and causing EPSTEIN to spend tens of thousands of dollars in unnecessary attorneys' fees and costs defending what appeared to be discovery related to the Civil Actions but was entirely related to the furtherance of the Ponzi scheme.

e) After EDWARDS was recruited and joined RRA in the spring of 2009, the tone and tenor of rhetoric directed to cases against EPSTEIN used by Attorney EDWARDS and Berger changed dramatically in addressing the court on various motions from being substantive on the facts pled to ridiculously inflammatory and sound-bite rich such as the July 31, 2009, transcript when EDWARDS stated to the Court in E.W./L.M.:   "What the evidence is really going to show is that Mr. Epstein -- at least dating back as

Epstein v. RRA, et al.
Page 17

far as our investigation and resources have permitted, back to 1997 or '98 – has every single day of his life, made an attempt to sexually abuse children. We're not talking about five, we're not talking about 20, we're not talking about 100, we're not talking about 400, which, I believe, is the number known to law enforcement, we are talking about thousands of children. . . and it is through a very intricate and complicated system that he devised where he has as many as 20 people working underneath him that he is paying well to schedule these appointments, to locate these girls."

f) As an example, EDWARDS filed an unsupportable and legally deficient Motion for Injunction Restraining Fraudulent Transfer of Assets, Appointment of a Receiver to Take Charge of Property of Epstein, and to Post a $15 million Bond to Secure Potential Judgment, in Jane Doe v. Epstein, Case No. 08-CV-80893-Marra/Johnson. The motion was reported in the press as was the ultimate goal (i.e., to "pump" the cases for investor following). However, the Court found "Plaintiff's motion entirely devoid of evidence . . . ", and denied the motion in toto.

g) ROTHSTEIN told investors he had another 52 females that he represented, and that Epstein had offered $200 million to resolve,

GM_00503

Epstein v. RRA, et al.
Page 18

but that he could settle, confidently, these cases for $500 million, separate and apart from his legal fees.

h) ROTHSTEIN and the Litigation Team knew or should have known that their three (3) filed cases were weak and had minimal value for the following reasons:

(i)     L.M. – testified she never had any type of sex with Epstein; worked at numerous strip clubs; is an admitted prostitute and call girl; has a history of illegal drug use (pot, painkillers, Xanax, Ecstasy); and continually asserted the 5th Amendment during her depositions in order to avoid answering relevant but problem questions for her;

(ii)    E.W. – testified she worked at eleven (11) separate strip clubs, including Cheetah which RRA represented and in which ROTHSTEIN may have owned an interest; and E.W. also worked at Platinum Showgirls in Boynton Beach, which was the subject of a recent police raid where dancers were allegedly selling prescription painkillers and drugs to customers and prostituting themselves.

(iii)   Jane Doe (federal case) seeks $50 million from Epstein. She and her attorneys claim severe

GM_00504

Epstein v. RRA, et al.
Page 19

emotional distress as a result of her having voluntarily gone to Epstein's home. She testified that there was never oral, and or sexual intercourse; nor did she ever touch his genitalia. Yet, Jane Doe suffered extreme emotional distress well prior to meeting Epstein as a result of having witnessed her father murder his girlfriend's son. She was required to give sworn testimony in that matter and has admitted that she has lied in sworn testimony. Jane Doe worked at two different strip clubs, including Platinum Showgirls in Boynton Beach.

i) Conducted ridiculous and irrelevant discovery such as subpoenaing records from an alleged sex therapist, Dr. Leonard Bard in Massachusetts, when the alleged police report reflected that EPSTEIN had only seen a chiropractor in Palm Beach named Dr. Bard. No records relating to EPSTEIN existed for this alleged sex therapist, Dr. Bard, and the alleged subpoena for records was just another mechanism to "pump" the cases for investor appeal;

j) Allowed a Second Amended Complaint to be filed on behalf of L.M. alleging that EPSTEIN forced the minor into "oral sex," yet L.M. testified that she never engaged in oral, anal, or vaginal

Epstein v. RRA, et al.
Page 20

intercourse with EPSTEIN and she had never touched his genitalia.

k) Told investors, as reported in an Associated Press article, that celebrities and other famous people had flown on EPSTEIN'S plane when assaults took place. Therefore, even though none (zero) of RRA's clients claim they flew of EPSTEIN'S planes, the Litigation Team sought pilot and plane logs. Why? Again, to prime the investment "pump" with new money without any relevance to the existing claims made by the RRA clients.

l) After EDWARDS joined RRA, EDWARDS and former Circuit Judge William Berger filed and argued motion to make the Non-Prosecution Agreement (NPA) between Epstein and USAO public. But, RRA, EDWARDS and Berger, and their three clients, already had a copy of the NPA. They knew what it said and they knew the civil provisions in the agreement had no impact whatsoever on the three pending Civil Actions.

The concept behind certain civil provisions in the NPA was to allow an alleged victim to resolve a civil claim with Epstein, maintain her complete privacy and anonymity and move on with her life. As an assistant United States Attorney stated at a hearing in federal court, the NPA was not designed "to hand them a jackpot or a key to a bank."

Epstein v. RRA, et al.
Page 21

43. ROTHSTEIN, with the intent and improper motive to magnify his financial gain so continue to fund the fraudulent and illegal investment and/or Ponzi scheme, had EDWARDS demand excessive money from EPSTEIN in the Civil Actions.

44. The actions described in paragraph 42 above herein had no legitimate purpose in pursuing the Civil Actions against EPSTEIN, but rather were meant to further the fraudulent scheme and criminal activity of ROTHSTEIN so that he and others could fraudulently overvalue the settlement value of the existing and non-existent claims against EPSTEIN to potential investors.

45. As a result of the fraudulent investment or (Ponzi) scheme, RRA and its attorneys in the Civil Actions against EPSTEIN may have compromised their clients' interests. ROTHSTEIN and the Litigation Team would have been unable to give unbiased legal counsel because outside investor(s) had been promised a financial interest in the outcome of the actions. Additionally, if a plaintiff received payments from investment monies while her action is pending, this clearly could impact the plaintiff's decision of whether or not to settle the current litigation or shade their testimony (i.e. commit perjury) to gain the greatest return on the investment and to further promote the Ponzi Scheme.

46. The truthfulness of L.M.'s allegations and testimony in L.M.'s state civil action have been severely compromised by the need to seek a multi-million dollar payout to help maintain RRA's massive fraud. Because fictitious settlements of tens of millions of dollars in cases relating to EPSTEIN were represented to "investors" in this Ponzi scheme, RRA and the attorneys in the Civil Actions needed to create a fiction that

Epstein v. RRA, et al.
Page 22

included extraordinary damages. However, the actual facts behind her action would never support such extraordinary damages. Therefore, extraordinary measures were undertaken to create an entirely inflated value of her claims against EPSTEIN.

    a. Though she held herself out as a "victim" of Epstein, she admitted to having returned over and over again to him despite her current claim of abuse. She has now admitted, under oath, to being a call girl/escort since the age of 15. (in her deposition September 24, 2009 Transcript "DT" 280:16-19). She testified "Well, I lived life as a prostitute," (see DT 156:7) and "I am a prostitute when I make money" (see DT 156:12-13). L.M. admitted her activity with men other than Epstein to making $1,000 a day from prostitution on maybe more than 20 occasions in one year alone (DT 157:11-158:21). L.M. admitted under oath to keeping a list of amounts she collected from "Johns" in "two or three" lined books including a book of "Psalms" that she obtained from a religious store (DT 152:1-14). Under the circumstances, her claim for damages against EPSTEIN, one of L.M.'s many "Johns" during that same period, would be so incredible and certainly not likely to produce the extraordinary settlements promised to "RRA's investors."

    47.    In April 2007, before she was represented by EDWARDS, and RRA, L.M. gave sworn taped recorded testimony to the agents of the FBI. She was represented by a lawyer other than EDWARDS at that statement. She spoke of EPSTEIN in a very positive and friendly terms and directly contradicted the central allegations on which L.M.'s civil action against Epstein is now based. However, once in the hands of

Epstein v. RRA, et al.
Page 23

EDWARDS and RRA, L.M.'s story changed dramatically.  All of a sudden she wanted to sue EPSTEIN and like other RRA clients, sought tens of millions of dollars.

    a.  For example, in her sworn statement to the FBI, L.M. was insistent that "Jeffrey is an awesome man." (p. 21 – FBI);  At the conclusion of she stated: "I hope Jeffrey, nothing happens to Jeffrey because he's an awesome man and it really would be a shame.  It's a shame that he has to go through this because he's an awesome guy and he didn't do nothing wrong, nothing." (pp. 57-58 - FBI).  In fact, L.M. spoke so highly of EPSTEIN and her interactions with him that the US Attorney's office informed a federal court in July 2008 that the US Attorney could not consider L.M. a victim.

—————————

    Yet, by September 24, 2009, the date on which L.M. began her deposition in her civil action and now represented by RRA and EDWARDS, L.M.'s new and very different tale about purported sexual misconduct under the supposed influence of EPSTEIN had been thoroughly rehearsed and her role into the ROTHSTEIN scam was complete.  In her deposition in her civil action, L.M. declared that:

    "I, I don't really care about money." (DT 206:8)

    "He needs time in jail.  He doesn't want to be – this is not right for him to be on the streets living daily . . ." (DT 219:21-23)

Epstein v. RRA, et al.
Page 24

"You don't think my whole life I have lived that shitty life because of Jeffrey Epstein?" (DT 222:7-8)

b.      In her sworn FBI testimony (pre-EDWARDS and RRA), L.M. was emphatic that her interactions with Epstein involved no inappropriate sexual touching in any way.  In fact, it was exactly the opposite:

Q: Did he at any point kiss you, touch you, show any kind of affection towards you?

A: Never, never.  (p. 21 – FBI) . . .

Q: So he never pulled you closer to him in a sexual way?

A: I wish.   No, no, never, ever, ever, no, never.   Jeffrey is an awesome man, no. (p. 21 - FBI)

———————————

Yet, L.M. filed her second amended complaint in April 2009, after EDWARDS joined RRA, the allegations against EPSTEIN in L.M.'s complaint became even more salacious.  In paragraph 12 of L.M.'s Second Amended Complaint, L.M. alleges among other things, that:

"Jeffrey Epstein coerced, induced, or enticed . . .the then minor Plaintiff to commit various acts of sexual misconduct.  These acts included, but were not limited to, fondling and inappropriate and illegal sexual touching of the then minor Plaintiff, forcing or inducing the then minor plaintiff into oral sex or other sexual misconduct…"

Epstein v. RRA, et al.
Page 25

c.  In her sworn FBI statement (pre-EDWARDS and RRA), L.M. testified that Carolyn Andriano, the individual who first brought L.M. to EPSTEIN's home, told L.M. "make sure you're 18 because Jeffrey doesn't want any underage girls." (p. 8 - FBI).

———————————

Yet at her September, 2009 deposition now represented by EDWARDS and RRA, L.M. told a very different story:

Q: My question was what did Carolyn tell you to tell Mr. Epstein about your age?

A: She said it didn't matter.

Q: That's your recollection about what she said?

A: Yes, she said — I remember her saying it doesn't matter. Don't worry about it.

(DT 199:20-25)

d.      Pre-EDWARDS and RRA, L.M. testified to the FBI : "I always made sure — I had a fake ID, anyways saying that I was 18." (p. 8 - FBI).

———————————

Yet, when questioned about her fake ID at her September 2009 depo, she stated:

Q: And did you have a fake ID?

A: No.

Q: Have you ever had a fake ID?

Epstein v. RRA, et al.
Page 26

A: No.

(DT 300:5-8)

e.     In her FBI statement (pre-EDWARDS and RRA), L.M. testified about others L.M. brought to the Epstein home. L.M. testified that women she brought to EPSTEIN's home were eager for the opportunity and content with their experiences:

A: None of my girls ever had a problem and they'd call me. They'd beg me, you know, for us to go to Jeffrey's house because they love Jeffrey. Jeffrey is a respectful man. He really is. I mean, and he all thought we were of age always. This is what's so sad about it. (p 30 - FBI).

. . .

Q: Did any of the girls complain about what happened after they left there?

A: No. You asked me that question. No, everybody loved Jeffrey. (p. 44 - FBI)

. . .

A: Every girl that I brought to Jeffrey, they said they were fine with it. and like for example [E.W. — another of RRA's clients in the Civil Actions], a lot of girls begged me to bring them back for the money. And as far as I know, we all had fun there. (p. 45 - FBI)

Epstein v. RRA, et al.
Page 27

Yet, with EDWARDS and RRA as her attorneys, L.M. did a "180" at her

September, 2009 deposition in saying:

> A: . . . Once they were there, they were scared out of their mind.
> They did it anyways and some of them walked out and said L.M.
> don't ever do this to me again.  That was the worst thing that ever
> happened to me.  (DT 170:6-11)
>
> . . . A: And then, a lot of girls weren't comfortable.  (DT 171:13)

    f.     The above represent only a few of the dramatic changes L.M. made

in her testimony prior to her representation by EDWARDS/RRA and after she

hired ROTHSTEIN, EDWARDS and RRA.

48. As a result of the fraudulent investment or (Ponzi) scheme, L.M. may knowingly

have compromised her alleged interests in her  Civil Action, or committed a fraud on the

court.

49. RRA and the Litigation Team took an emotionally driven set of facts involving

alleged innocent, unsuspecting, underage females and a Palm Beach Billionaire and

sought to turn it into a gold mine.  Rather than evaluating and resolving the cases based

on the merits (i.e. facts) which included knowledgeable, voluntary and consensual

actions by each of the claimants and substantial pre-Epstein psychological and

emotional conditions of each of the claimants and substantial sexual experiences pre-

Epstein, RRA and the Litigation Team sought  through protective orders and objections

to block relevant discovery regarding their claimants.  They instead forged ahead with

discovery the main purpose of which was to pressure Epstein into settling the cases.

Epstein v. RRA, et al.
Page 28

Fortunately, their tactics have not been successful.    As Magistrate Judge Linnea Johnson wrote in a discovery order dated September 15, 2009 (DE 299 in Federal Case #08-80119) in denying Plaintiffs' Motion for Protective Order:

> "This is his [Epstein's] right.  The Record in this case is clear that the childhood of many of the Plaintiffs was marred by instances of abuse and neglect, which in turn may have resulted, in whole or in part, in the damages claimed by the Plaintiffs."

In addition, in an Omnibus Order dated October 28, 2009 (DE 377 in Federal Case #08-80119) Magistrate Judge Linnea Johnson wrote:

> "Here the request at issue goes to the very heart of the Plaintiff's damage claims, requesting not only general information relating to Plaintiff's sexual history, but inquiring as to specific instances wherein Plaintiff received compensation or consideration for sex acts, claim other males sexually assaulted, battered, or abuses her, and/or claim other males committed lewd or lascivious acts on her. As a global matter, Plaintiffs clearly and unequivocally place their sexual history in issue by their allegations that Epstein's actions in this case has negatively affected their relationships by, among other things, "distrust in men," "sexual intimacy problems," "diminished trust," "social problems," " problems in personal relationships," " feeling of stress around men," "premature teenage pregnancy," "antisocial behaviors," and "hyper-sexuality and promiscuity."  Considering these allegation, there simply can be no question that Epstein is entitled to know whether Plaintiffs were molested or the subject of other "sexual activity" or "lewd

Epstein v. RRA, et al.
Page 29

and lascivious conduct" in order to determine whether there is an alternative basis for the psychological disorders Plaintiffs claim to have sustained, whether Plaintiffs engaged in prostitution or other similar type acts and how certain acts alleged in the Complaint materially affected Plaintiffs' relationships with others or how those acts did not have such an affect on those relationships and/or whether Plaintiffs suffered from the alleged emotional and psychological disorders as a result of other sexual acts prior to the acts alleged in the Complaint.  To deny Epstein thus discovery, would be tantamount to barring him from mounting a defense."

50. ROTHSTEIN, EDWARDS and L.M.'s actions constitute a fraud upon EPSTEIN as RRA, ROTHSTEIN and the Litigation Team represented themselves to be acting in good faith and with the bests interests of their clients in mind at all times when in reality, they were acting in furtherance of the investment or Ponzi scheme described herein. EPSTEIN justifiably relied to his detriment on the representations of RRA, and Defendants, ROTHSTEIN, EDWARDS and L.M. as to how he conducted and defended the Civil Actions brought against him.

51. As a direct and proximate result of the fraudulent and illegal investment or Ponzi scheme orchestrated by ROTHSTEIN and as yet other unknown co-conspirators and as a result of the litigation tactics undertaken by the Litigation Team and L.M. as set forth herein,  Plaintiff EPSTEIN has incurred and continues to incur the monetary damages including, but not limited to, having to pay an amount in excess of the Civil Actions' true value as a result of them refusing to settle in that a percentage of any payment by

Epstein v. RRA, et al.
Page 30

EPSTEIN may have been promised to third party investors; incurring significant additional legal fees and costs as result of Defendants refusal to conduct settlement negotiations in a forthright and good faith manner because any monies paid by EPSTEIN is in reality a promised return on an investment; and incurred significant attorneys' fees and costs in defending the discovery that was not relevant, material and/or calculated to lead to the admissibility of evidence, but which was done for the sole purpose of "pumping" the cases to investors.

52. EPSTEIN has also been injured in that the scope of the fraudulent and criminal or racketeering activity so permeated the RRA law firm that EPSTEIN has been prevented from fully and fairly defending the civil actions brought against him. In essence, the very existence of RRA was based on the continuation of the massive Ponzi scheme orchestrated by ROTHSTEIN and other co-conspirators. In order to continue to bring in monies from investors, ROTHSTEIN and other co-conspirators used the Civil Actions against EPSTEIN, along with other manufactured lawsuits, as a means of obtaining massive amounts of money.

53. ROTHSTEIN, EDWARDS and L.M. are liable for damages caused to EPSTEIN – individually, and jointly and severally.

### Count I – Violation of §§772.101, et seq., Fla. Stat. - Florida Civil Remedies for Criminal Practices Act – Against All Defendants

54. Plaintiff realleges and incorporates paragraphs 1 through 53 as if fully set forth herein.

Epstein v. RRA, et al.
Page 31

55. RRA, ROTHSTEIN, EDWARDS and L.M. each and collectively constitute an enterprise pursuant to §772.102(3), Fla. Stat. (2009).

56. ROTHSTEIN, EDWARDS and L.M. engaged in a pattern of criminal activity as defined in §772.102(3) and (4), Fla. Stat. (2009).

57. As alleged herein, ROTHSTEIN and EDWARDS committed multiple predicate acts in violation of §772.103(1), (2), (3) and (4), Fla. Stat., including violations of Florida Statutes - Chapter 517, relating to securities transactions; Chapter 817, relating to fraudulent practices, false pretenses, and fraud generally (which includes L.M.); Chapter 831, relating to forgery; §836.05, relating to extortion (which includes L.M.); and Chapter 837, relating to perjury (which includes L.M.).  Substantially more than two predicate acts (i.e., the selling of or participation of the sale of fabricated settlements outlined herein, including the Civil Actions involving Epstein as well as the improper litigation tactics outlined above) occurred within a five-year time period.

58. As a direct and proximate result of ROTHSTEIN, EDWARDS and L.M.'s violations of §772.103, Fla. Stat., EPSTEIN has been injured.

59. Pursuant to §772.104(1), Fla. Stat., Plaintiff EPSTEIN is entitled to threefold of his actual damages sustained, reasonable attorney's fees and court costs, and such other damages as allowed by law.

WHEREFORE, Plaintiff EPSTEIN respectfully demands the entry of a judgment for damages against all the named Defendants.

### Count II – Florida RICO -
### "Racketeer Influenced and Corrupt Organization Act"
### Pursuant to §§895.01, et seq., Fla. Stat. (2009),
### Against All Defendants

Epstein v. RRA, et al.
Page 32

60. Plaintiff realleges and incorporates paragraphs 1 through 53 as if fully set forth herein.

61. RRA, along with ROTHSTEIN, EDWARDS and L.M., each and collectively, constitute an enterprise pursuant to §895.02(3), Fla. Stat. (2009).

62. During all times relevant hereto, ROTHSTEIN, EDWARDS and L.M. were and are associated with the enterprise, RRA, and each other.

63. Defendants, ROTHSTEIN, EDWARDS and L.M., as persons associated with the enterprise, RRA and each other (as an enterprise), unlawfully conducted or participated, directly or indirectly, in such an enterprise through a pattern of racketeering, § 895.03(3), Fla. Stat., as alleged above herein.

64. The breadth and scope of ROTHSTEIN, EDWARDS and, potentially, L.M.'s racketeering activity continues to be investigated by the FBI, as numerous civil lawsuits against some of the Defendants and others continue to be filed by persons who have been damaged. As of the filing of this Complaint, criminal charges have only been brought against ROTHSTEIN.

65. Substantially more than two predicate acts (i.e., the selling of fabricated settlements outlined herein, including the Civil Actions involving Epstein as well as the improper litigation tactics outlined above) occurred within a five year time period.

66. Pursuant to §895.02, Fla. Stat., ROTHSTEIN and EDWARDS engaged in a pattern of "racketeering activity" through the commission of crimes as defined in § 895.02(1)(a)-(b), Fla. Stat., including Chapter 517, relating to securities; Chapter 817, relating to fraudulent practices, false pretenses, and fraud (including L.M.) generally;

Epstein v. RRA, et al.
Page 33

Chapter 813, relating to forgery; §836.05, relating to extortion (including L.M.); Chapter

837, relating to perjury (including L.M.).

67. Pursuant to §895.05, Fla. Stat., Plaintiff seeks the following relief against

Defendants, ROTHSTEIN, EDWARDS and L.M.:

> a) Ordering ROTHSTEIN and EDWARDS to divest themselves of
>    any interest in the enterprise, RRA;
>
> b) Enjoin all Defendants from engaging in the same type of conduct
>    and activities as described herein; and
>
> c) Temporarily enjoining ROTHSTEIN, EDWARDS and L.M., from
>    the continuation of the Civil Actions brought against EPSTEIN
>    until criminal charges have been formally brought against RRA
>    and/or any of the Defendants, such that EPSTEIN may be
>    allowed to evaluate whether a stay or dismissal of all Civil Actions
>    against him is merited.

68. EPSTEIN further seeks an award of his reasonable attorney's fees and costs,

and such other relief that this Court deems appropriate.

WHEREFORE, Plaintiff EPSTEIN respectfully demands the entry of a judgment for

the relief sought and damages against the named Defendants.

### Count III – Abuse of Process –
### Against All Defendants

69. Plaintiff realleges and incorporates paragraphs 1 through 53 as if fully set forth

herein.

Epstein v. RRA, et al.
Page 34

70. After instituting the Civil Actions against EPSTEIN, the actions of Defendants, ROTHSTEIN, EDWARDS and L.M. as alleged in paragraphs 9 through 53 herein, constitute an illegal, improper or perverted use of process.

71. ROTHSTEIN, EDWARDS and L.M. possessed ulterior motives or purposes in exercising such illegal, improper, or perverted use of process.

72. As a result of ROTHSTEIN, EDWARDS and L.M.'s actions, EPSTEIN suffered damages.

WHEREFORE, Plaintiff EPSTEIN respectfully demands the entry of a judgment for damages against all the named Defendants.

### Count IV – Fraud
### Against All Defendants

73. Plaintiff realleges and incorporates paragraphs 1 through 53 as if fully set forth herein.

74. ROTHSTEIN, by and through Defendant EDWARDS and L.M. made false statements of fact to EPSTEIN and his attorneys and agents, known to be false at the time made, and/or intentionally concealed material information from EPSTEIN and his attorneys and agents, for the purpose of inducing EPSTEIN to act in reliance thereon.

75. EPSTEIN did so act on the misrepresentation and/or concealment by incurring additional attorney's fees, costs, and expenses in aggressively defending the civil actions whereas in reality, because the Civil Actions against Plaintiff were being exploited and over-valued so as to lure additional investors and to attempt to extort as much money as possible from EPSTEIN so as to continue the massive fraud.

Epstein v. RRA, et al.
Page 35

WHEREFORE Plaintiff EPSTEIN demands judgment against Defendants for damages incurred and for any other relief to which he is entitled under the law.

### Conspiracy to Commit Fraud
### Against All Defendants

76. Plaintiff realleges and incorporates paragraphs 1 through 53, and 74 and 75 as if fully set forth herein.

77. ROTHSTEIN, EDWARDS and L.M. conspired to commit a fraud upon EPSTEIN.

78. ROTHSTEIN, EDWARDS and L.M. combined by and through concerted action as detailed herein to accomplish an unlawful purpose or accomplish some purpose by unlawful means. The unlawful purpose was, among other things, the orchestrating and continuation of the massive fraudulent Ponzi scheme and receipt of monies for the continuation of the scheme. The unlawful means includes, but is not limited to, the use of the Civil Actions against EPSTEIN in an unlawful, improper, and fraudulent manner.

79. As a direct and proximate result of ROTHSTEIN, EDWARDS and L.M.'s conspiracy to defraud EPSTEIN, EPSTEIN suffered damages.

WHEREFORE Plaintiff EPSTEIN demands judgment against Defendants for damages incurred and for any other relief to which he is entitled under the law.

### Jury Trial

Plaintiff demands Jury Trial on all issues so triable.

By: _____
ROBERT D. CRITTON, JR., ESQ.
Florida Bar No. 224162

GM_00521

Epstein v. RRA, et al.
Page 36

rcrit@bclclaw.com
MICHAEL J. PIKE, ESQ.
Florida Bar #617296
mpike@bclclaw.com

BURMAN, CRITTON, LUTTIER & COLEMAN
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
561-842-2820
Fax:  561-253-0154
*(Attorneys for Plaintiff)*

GM_00522