# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JANE DOE NO. 2, Case No: 08-CV-80119
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

JANE DOE NO. 3, Case NO: 08-CV-80232

Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

JANE DOE NO. 4, Case No: 08-CV-80380

Plaintiff,

Vs.

JEFFREY EPSTEIN,

Defendant.
_______________________/

JANE DOE NO. 5, Case No: 08-CV-80381
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

NON PARTY (VR) 000247

GIUFFRE000935

Page 2

JANE DOE NO. 6, Case No: 08-CV-80994
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 7, Case No. 08-CV-80993
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

C.M.A., Case No: 08-CV-80811
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE, Case No: 08-CV-80893
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

Page 3

JANE DOE NO. II, Case No: 08-CV-80469
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 101, Case No: 09-CV-80591
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 102, Case No: 09-CV-80656
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_____________________/

1031 Ives Dairy Road
Suite 228
North Miami, Florida
July 29, 2009
11:00 a.m. to 5:30 p.m.

Page 4

VIDEOTAPED
DEPOSITION
of
ALFREDO RODRIGUEZ

taken on behalf of the Plaintiffs pursuant to a Re-Notice of Taking Deposition (Duces Tecum)

- - -

APPEARANCES:

MERMELSTEIN & HOROWITZ, P.A.
BY: STUART MERMELSTEIN, ESQ.
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Attorney for Jane Doe 2, 3, 4, 5, 6, and 7.

ROTHSTEIN ROSENFELDT ADLER
BY: BRAD J. EDWARDS, ESQ., and
CARA HOLMES, ESQ.
Las Olas City Centre
Suite 1650
401 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
Attorney for Jane Doe and E.W. And L.M.

PODHURST ORSECK
BY: KATHERINE W. EZELL
25 West Flagler Street
Suite 800
Miami, Florida 33130
Attorney for Jane Doe 101 and 102.

Page 5

APPEARANCES:

LEOPOLD-KUVIN
ADAM J. LANGINO, ESQ.
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410
Attorney for B.B.

RICHARD WILLITS, ESQ.
2290 10th Avenue North
Suite 404
Lake Worth, Florida 33461
Attorney for C.M.A.

BURMAN, CRITTON, LUTTIER & COLEMAN, LLP
BY: ROBERT CRITTON, ESQ.
515 North Flagler Drive
Suite 400
West Palm Beach, Florida 33401
Attorney for Jeffrey Epstein.

ALSO PRESENT:

JOE LANGSAM, VIDEOGRAPHER

- - -

Page 94

A. I don't remember, sir.
Q. The next page is a message in the upper left dated January 13, 2005, from C.W. Correct?
A. Yes.
Q. That's the same C. that we've been talking about. Correct?
A. Yes.
Q. That was at 7:30 p.m. Correct?
A. Yes.
Q. And you don't recall what that particular call was about. Right?
A. No, sir.
Q. The message dated January 20, 2005, from Maria. Do you see that on the bottom right?
A. Yes.
Q. Do you know who that is?
A. I think I have a different page.
Q. You're a little ahead of me. January 20, 2005.
MR. CRITTON: I think that's page 31.
THE WITNESS: I don't remember who she was, sir.
BY MR. MERMELSTEIN:
Q. You don't recall what that message was about?

Page 95

A. No, sir.
Q. What about the next page there is a message that Eva called?
A. Yes.
Q. Dated January 21, 2005?
A. Yes.
Q. Do you know who Eva is?
A. Yes.
Q. Who is Eva?
A. The assistant comptroller from the New York office.
Q. Do you remember her last name?
A. Polish last name I guess. She was Russian. She is Russian actually.
Q. Did you ever travel to any other residences that Mr. Epstein had?
A. No.
Q. Are you aware he had a residence in the Virgin Islands?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. MERMELSTEIN:
Q. And would he sometimes travel to that residence from Palm Beach?
A. Yes.

Page 96

Q. Okay. Do you recall on any occasion who would travel with him to the Virgin Islands?
MR. CRITTON: Form.
THE WITNESS: No, sir.
BY MR. MERMELSTEIN:
Q. I think we were talking about the money before, the household account, sometimes you gave gifts?
A. Yes, I was told to buy some gifts.
Q. For whom?
A. For the guests.
Q. Okay. And what kind of gifts?
A. Shoes, sweaters, clothes.
Q. So were you instructed to buy something in particular at a particular store?
A. They would go to the store, if they like something I will go after and pay them and retrieve it.
Q. Okay. So would this be a girl who was staying at the house?
A. Yes.
Q. Okay. This was one of the girls who travelled with Mr. Epstein to Palm Beach. Correct?
A. Yes.

Page 97

Q. And so Mr. Epstein would instruct you to go shopping with this girl?
A. Yes.
Q. And instructed you to pay for whatever it is she wanted to buy?
A. Yes.
Q. Was there a price limit or anything of that nature?
A. No, sir.
Q. So when the girl decided what she wanted you would --
A. I would write them a check.
Q. In that instance you would pay by check?
A. Yes.
Q. Any other instances where you gave gifts to girls at the instruction of Mr. Epstein?
A. No. I was just told, you know, when they told me I will buy the item.
Q. I'm sorry?
A. You know, when I was told to purchase this item for them, you know, I will do that, but not on any other occasions.
Q. What do you mean not in any locations?
A. Any other occasions.
Q. Not any other occasions. Okay. Did you

Page 98

ever buy flowers for a girl?
A. Yes, sir.
Q. Tell me about that.
A. I was told to buy flowers and roses for a girl performing in high school.
Q. Which girl was that?
A. I don't remember the name, sir.
Q. What was Mr. Epstein's relationship to this girl?
MR. CRITTON: Form.
THE WITNESS: I think she was an acquaintance, friend.
BY MR. MERMELSTEIN:
Q. She was a friend?
A. Yes, sir.
Q. Now, she was performing at the high school in what capacity?
A. There was like a -- like a play in the graduation for high school.
Q. A play for graduation?
A. Yes, in the high school theatre there was some kind of performance.
Q. Was it like a theatre production?
A. Yeah, something like that. I didn't go inside so I didn't know what was going on inside.

Page 99

Q. Why do you say it was for graduation?
A. Because everybody was the graduation outside, there were parents, there were a lot of people at the school.
Q. Okay. A lot of high schools have theatre production companies and they put on plays. Correct?
MR. CRITTON: Form.
THE WITNESS: It was towards the end of the year. Well, I think I overheard that there was a graduation performance of some kind.
BY MR. MERMELSTEIN:
Q. But you didn't go in so you don't know?
A. No, sir.
Q. But this was a high school student you were bringing the flowers to. Is that correct?
A. Yes.
Q. Had you seen this girl before at the El Brillo Way property?
A. Yes, sir.
Q. You had seen her a number of times?
A. Yes, sir.
Q. Do you recall her name?
A. I don't remember her name, sir.

Page 100

Q. Now, you said you never went inside the theatre?
A. No, sir.
Q. Okay. How did you get to the flower store?
A. I called the girl to her cell and she will come to the back door and I give her the flowers.
Q. Was anyone else around at the time?
A. No, sir.
Q. And you mentioned this was a girl you had seen before?
A. Yes.
Q. Was this girl who had come to give massages to Mr. Epstein?
MR. CRITTON: Form.
THE WITNESS: I don't know if she was doing massages but she was at the house.
BY MR. MERMELSTEIN:
Q. What would she have been there for?
A. To visit him.
Q. This was a high school girl who was coming to visit Mr. Epstein at the house?
A. She came to the house, I open the door and I left, you know.

Page 101

Q. Did you take her to the kitchen like you did --
A. Yes.
Q. So you brought her to the kitchen just like you did for the girls who gave him massages. Correct?
A. Yes, sir.
Q. Did you ever pay her?
A. I don't remember, sir, but probably I did.
MR. CRITTON: Form, move to strike, speculation.
BY MR. MERMELSTEIN:
Q. Why do you say you probably did?
A. Because I was the only one paying -- well, not the only one but, you know, but chances are I paid her but I don't remember that particular instance that I gave her money.
Q. Is it fair to say that the girls who came to the Palm Beach residence, these are not the girls who are staying there, the girls who came -- were there to give massages. Correct?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. MERMELSTEIN:

Page 166

written down anywhere?
A. No.
Q. It's my understanding that C. and T. either came to his house alone to visit with Mr. Epstein or brought other girls in their age group to Mr. Epstein.
Were you familiar with that type of recruitment process of girls bringing other girls?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. Can you tell me more about what you know about girls bringing other girls that are relatively the same age to come to Jeffrey Epstein's house and to use your words, have a good time?
MR. CRITTON: Form.
THE WITNESS: It's hard to know who they knew. But I think that was -- they feel better themselves when they're in a group than going by themselves, but I don't know somebody recruiting.
BY MR. EDWARDS:
Q. Okay. And you've talked about, at least referred to yourself I believe to the police and

Page 167

as well today as a human ATM machine. Right?
MR. CRITTON: Form.
THE WITNESS: Something like that. I was supposed to carry cash at all times.
BY MR. EDWARDS:
Q. One of the primary reasons why you carried cash was to pay the girls in this age group of C. and T. for whatever happened at the house. Right?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. That's a fair statement. Right?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. Okay. And when C., let's use her for example, would bring somebody else to the house, did you pay C. as well as whomever she brought to the house, pay them both?
A. No, I pay only one person.
Q. Okay. My understanding, and tell me if this is wrong or you can corroborate this, is that Mr. Epstein would pay the girl that was actually performing whatever was happening in the room --

Page 168

for now we'll call it a massage -- as well as anybody who brought that person over to the house, they would both get paid cash. Are you familiar with that?
MR. CRITTON: Form.
THE WITNESS: No.
BY MR. EDWARDS:
Q. If C. brought another girl over to the house and C. stayed downstairs but this other girl went upstairs with Mr. Epstein, which one would you pay?
A. I don't know because I was told who to pay.
Q. And Sarah Kellen always told you?
A. Sarah told me pay so and so.
Q. So if we were going to ask anybody else about the exact method in terms of who would get paid and for what, who would the people be? I mean, other than Mr. Epstein who else could we ask these questions?
A. Sarah.
Q. Sarah Kellen?
A. Yes.
Q. She would know this?
A. Yes.

Page 169

Q. What about Ghislaine Maxwell?
MR. CRITTON: Form.
THE WITNESS: You're talking about the boss. I don't know.
BY MR. EDWARDS:
Q. To your knowledge was Ghislaine Maxwell aware of these girls that are in the age group of C. and T. coming to Jeffrey Epstein's house to have a good time?
MR. CRITTON: Form.
THE WITNESS: I have to say something. Mrs. Maxwell called me and told me not to ever discuss or contact her again in a threaten way.
BY MR. EDWARDS:
Q. When was this?
A. Right after I left because I call one of the friends for a job and she told me this, but, you know, I feel intimidated and so I want to keep her out.
Q. What exactly did she say? First of all, was this a telephone call?
A. Yes, she was in New York.
Q. She called you on your cell phone?
A. Yes.

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

Page 170

Q. Is this the cell phone that was issued to you by Mr. Epstein?
A. No, it was my personal phone. I was already --
Q. Gone?
A. Yeah, this is three, four months down the road.
Q. So if you left in --
A. February, March -- it was May or June.
Q. Of 2005?
A. Yes.
Q. And you got a call from Ghislaine Maxwell out of the blue?
A. Yes.
Q. And do you know what prompted that telephone call?
A. Because I contact somebody in New York to get a job.
Q. Who was that person?
A. I contact Jean-Luc and I contact Eva, the Swedish girl, she used to be very good friends with Mr. Epstein because she asked me she need somebody in New York.
Q. What does Eva do?
A. Eva was a model many years ago and he

Page 171

married -- Eva is the mother of the girl who was on the wall.
Q. Who is on the wall of Mr. Epstein's house?
A. Yeah.
Q. All right. There is a younger girl model that's on the wall of Mr. Epstein's house and this lady Eva is her mother?
A. Yes.
Q. And at some point in time you called her in New York to get a job?
A. That's right.
Q. And you also called Jean-Luc Bernell? That's his name. Right?
A. Jean-Luc, yeah, I don't remember his last name.
Q. Does that sound familiar to you, Jean-Luc Bernell?
A. Yeah.
Q. What did Eva and/or Jean-Luc say about employing you?
A. No, they said they're going to find out and obviously the first thing they did was talk to Mrs. Maxwell.
Q. She made a telephone call to you and what

Page 172

precisely did she say?
A. She said I forbid you that you're going to be -- that I will be sorry if I contact any of her friends again.
Q. Okay. Other than you will be sorry if you contact any of my friends again did she say anything else about what you know about Mr. Epstein and/or what goes on at his house?
A. She said something like don't open your mouth or something like that. But you have to understand, I'm a civil humble, I came as an immigrant to service people, and right now you feel a little -- I'm 55 and I'm afraid. First of all, I don't have a job, but I'm glad this is on tape because I don't want nothing to happen to me. This is the way they treat you, better do this and you shut up and don't talk to nobody and --
Q. When you say this is the way they treat, who specifically are you talking about when you say the word they?
A. Maxwell.
Q. And usually when you say the word they, you're not only talking about one person --
A. Wealthy people.
Q. Are you also putting Jeffrey Epstein in

Page 173

that category?
MR. CRITTON: Form.
THE WITNESS: I didn't talk to him directly most of the time.
BY MR. EDWARDS:
Q. What's the reason why if you were his head of security that you wouldn't have more direct contact with him? Why is that?
MR. CRITTON: Form.
THE WITNESS: He wanted that way, you know, so, yeah, I have to talk to Sarah, Sarah is not available talk to Lesley in New York. He didn't want to be disturbed.
BY MR. EDWARDS:
Q. Even while you were in the same house with him he still had other people you could talk to directly but he was not one of them?
A. Yeah.
Q. When you were fired you were not fired directly by him?
A. No.
Q. It was through somebody else?
A. Ms. Maxwell.
Q. Okay. But it was for upsetting him for taking the wrong car?

Page 174

A. Yes.
Q. Okay. Ever since this communication that Ms. Maxwell made to you where she called you sometime in May or June of 2005, and have you felt threatened?
A. Yes.
MR. CRITTON: Form.
BY MR. EDWARDS:
Q. Have you felt reluctant to come forward and give truthful, honest, and full disclosure of all information that you know about this case?
MR. CRITTON: Form.
THE WITNESS: I said this off the record but I will say it on the record, being in the Epstein case for me resulted in two years I have -- I won't bring the names but I was in the third interview to get hired as a household manager in Palm Beach and they told me you are the Jeffrey Epstein guy. Not in the sense I did something wrong because of the scandal, so they shun the job away from me. And so I was afraid that -- this is very powerful people and one phone call and you finish, so I'm the little guy. Even I'm wearing a tie I'm a -- I'm talking

Page 175

from my heart. This is the way it is.
BY MR. EDWARDS:
Q. I feel for you, I'm sorry that you have to be in this position.
MR. CRITTON: Move to strike this.
BY MR. EDWARDS:
Q. Well, when you applied for these jobs and they turned you down and gave you the reason that you're the person involved in the Jeffrey Epstein scandal, was it that they are associated or friends with Jeffrey Epstein or is it that you have information and you have this confidentiality but you're revealing some certain information that Mr. Epstein would not like?
MR. CRITTON: Form.
THE WITNESS: Both.
BY MR. EDWARDS:
Q. Both?
A. Both.
Q. And since then given what you just told us about these people being very powerful, are you afraid for your life given the fact that you're involved to some extent in this case?
MR. CRITTON: Form.
THE WITNESS: I just start thinking about

Page 176

this. Because I went through -- the first time I went to the deposition I was in Palm Beach and I did my duty, I mean, I tell what I know, but now I know there is more digging, all I want is this to be to get on with my normal life and stuff.
BY MR. EDWARDS:
Q. So when you come here today to testify, your main objective is to get back to your normal life and get out of the spotlight of this case. Yes?
A. Yes.
Q. And in doing so have you held back some of the details that you know about that happened in this case to remove yourself from the spotlight?
MR. CRITTON: Form.
THE WITNESS: No, sir.
BY MR. EDWARDS:
Q. Okay. Have you ever talked to Ghislaine Maxwell after that telephone call where she called you and you felt threatened?
A. No.
Q. Okay. So going back to where we started here was, does Ghislaine Maxwell have knowledge of

Page 177

the girls that would come over to Jeffrey Epstein's house that are in roughly the same age group as C. and T. and to have a good time as you put it?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. And what was her involvement and/or knowledge about that?
MR. CRITTON: Form.
THE WITNESS: She knew what was going on.
BY MR. EDWARDS:
Q. You referred to her at one point in time as Jeffrey Epstein's companion. But then later on you said that if she flew she flew on a different airplane and oftentimes or sometimes she slept in a different bed from Mr. Epstein. Did that seem unusual to you?
MR. CRITTON: Form.
THE WITNESS: It was odd but, I mean, and again, everything is odd in Palm Beach.
BY MR. EDWARDS:
Q. Okay, I don't mean to laugh.
A. Mr. Epstein fly to Jet Aviation, she fly to Galaxy Aviation, but they never flew the same

Page 266

BY MR. LANGINO:
Q. Are you currently in fear of Mr. Epstein?
A. Not at this particular moment but it's something I have to be worry about, yes.
Q. Are you personally afraid of criminal prosecution?
A. No.
Q. Do you believe that you did anything illegal?
A. Illegal, no.
MR. LANGINO: I have no further questions. Thank you.
MR. CRITTON: We're going to break in about 15 minutes. Do you want to start and go for 15 minutes or do you want to -- it's up to you.
MS. EZELL: I'll start.
MR. WILLITS: When are we going to quit, folks?
MR. CRITTON: In 15 minutes.
THE VIDEOGRAPHER: Might as well change tapes.
MR. EDWARDS: Bob has to get back so we've agreed we're going to come back some other time.

Page 267

MR. WILLITS: Why don't we just stop now?
MS. EZELL: Okay.
MR. EDWARDS: Rather than you start.
MS. EZELL: Yeah, I won't get very far.
MR. EDWARDS: Sorry to do this with you, we didn't finish.
MR. CRITTON: So we're stopped?
MR. EDWARDS: We're stopped.
THE VIDEOGRAPHER: Off the record.
(Thereupon, the videotaped deposition was adjourned at 5:30 p.m.)

\- - -

Page 268

THE STATE OF FLORIDA, )
COUNTY OF DADE. )

I, the undersigned authority, certify that ALFREDO RODRIGUEZ personally appeared before me on the 29th day of July, 2009 and was duly sworn.

WITNESS my hand and official seal this 31st day of July, 2009.

______________________________
MICHELLE PAYNE, Court Reporter
Notary Public - State of Florida

Page 269

CERTIFICATE

The State Of Florida, )
County Of Dade. )

I, MICHELLE PAYNE, Court Reporter and Notary Public in and for the State of Florida at large, do hereby certify that I was authorized to and did stenographically report the videotaped deposition of ALFREDO RODRIGUEZ; that a review of the transcript was requested; and that the foregoing pages, numbered from 1 to 269, inclusive, are a true and correct transcription of my stenographic notes of said deposition.

I further certify that said videotaped deposition was taken at the time and place hereinabove set forth and that the taking of said videotaped deposition was commenced and completed as hereinabove set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 31st day of July, 2009.

______________________________
MICHELLE PAYNE, Court Reporter