# EXHIBIT 6

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.08-CV-80119-CIV-MARRA/JOHNSON

JANE DOE NO. 2,

    Plaintiff,
-vs-

JEFFREY EPSTEIN,

    Defendant.

Related cases:
08-80232, 08-80380, 98-80381, 08-80994,
08-80993, 08-80811, 08-80893, 09-80469,
09-80591, 09-80656, 09-80802, 09-81092

VIDEOTAPED DEPOSITION OF JUAN ALESSI
VOLUME I

Tuesday, September 8, 2009
10:12 a.m. - 3:45 p.m.

2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33401

Reported By:
Sandra W. Townsend, FPR
Notary Public, State of Florida
PROSE COURT REPORTING AGENCY
West Palm Beach Office

## Page 2

APPEARANCES:
On behalf of the Plaintiffs:
  RICHARD WILLITS, ESQUIRE
  RICHARD H. WILLITS, P.A.
  2290 10th Avenue North, Suite 404
  Lake Worth, Florida 33461
  Phone: 561.582.7600
  reelrhw@hotmail.com

  STUART MERMELSTEIN, ESQUIRE
  MERMELSTEIN & HOROWITZ, P.A.
  18205 Biscayne Boulevard, Suite 2218
  Miami, Florida 33160
  Phone: 305.931.2200
  ssm@sexabuseattorney.com
  ahorowitz@sexabuseattorney.com
  WILLIAM J. BERGER, ESQUIRE
  ROTHSTEIN ROSENFELDT ADLER
  401 East Las Olas Boulevard, Suite 1650
  Fort Lauderdale, Florida 33301
  Phone: 954.522.3456
  bedwards@rra-law.com

  KATHERINE W. EZELL, ESQUIRE
  PODHURST ORSECK, P.A.
  25 West Flagler Street, Suite 800
  Miami, Florida 33130
  Phone: 305.358.2800
  rjosefsberg@podhurst.com
  kezell@podhurst.com
  ADAM J. LANGINO, ESQUIRE
  LEOPOLD KUVIN
  2925 PGA Boulevard, Suite 200
  Palm Beach Gardens, Florida 33410
  Phone: 561.515.1400
  skuvin@leopoldkuvin.com

## Page 3

On behalf of the Defendant:
  ROBERT J. CRITTON, ESQUIRE
  BURMAN, CRITTON & LUTTIER
  515 North Flagler Drive, Suite 400
  West Palm Beach, Florida 33401
  Phone: 561.842.2820
  rcrit@bclclaw.com
  mpike@bclclaw.com

## Page 4

- - -
EXHIBITS
- - -

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit number 1 | Photographs | 45 |
| Exhibit number 2 | Transcript | 130 |
| Exhibit number 3 | Incident Report | 137 |
| Exhibit number 4 | Incorporation Papers | 149 |
| Exhibit number 5 | Incorporation Papers | 150 |

1 (Pages 1 to 4)

Page 37

1  bathroom was in the same quarters, his quarters.
2      So we had quite a bit of expensive tables.
3    Q. Did you ever get a massage while you were
4  working for Mr. Epstein?
5    A. I wasn't that lucky.
6    Q. Okay. I'm sorry.
7    A. I don't want to lie. Yes, I did. By a guy.
8      It was a -- occasionally it was male massage
9  therapists there, there were called. They did massages
10 for Mr. Epstein and Ms. Maxwell.
11     And one time I had some pains in my back and I
12 was given as a gift.
13   Q. Now, there came to be an incident where you
14 were arrested that caused you to be terminated from
15 Mr. Epstein?
16   A. No.
17   Q. Were you terminated from Mr. Epstein's
18 employment?
19   A. Yes.
20   Q. Did you promise to pay him back some money?
21   A. Yes.
22   Q. Did you make all the payments?
23   A. Yes, I did.
24   Q. When was the last time you made a payment?
25   A. I made a payment immediately, the same

Page 38

1  payment, same amount.
2    Q. The full amount?
3    A. Full amount.
4    Q. Okay. It wasn't a payment plan?
5    A. No.
6      MR. WILLITS: I don't have any other
7  questions. You want to take a short break?
8      MR. CRITTON: Would you like to take a short
9  break?
10     THE WITNESS: I'm fine.
11     VIDEOGRAPHER: Off the record, 10:56.
12     (Brief recess.)
13        CROSS EXAMINATION
14 BY MS. EZELL:
15   Q. I'm Catherine Ezell. I want to ask you a few
16 questions about some things that came up during your
17 deposition, your earlier questioning in this deposition.
18   A. Okay.
19   Q. The book of policies that you mentioned that
20 was there by the time you left, I just wanted to
21 clarify, was that done by somebody in Palm Beach to be
22 used by different households in Palm Beach or was it
23 done by someone employed by Jeffrey Epstein to apply to
24 all the homes he --
25   A. Yes.

Page 39

1    Q. The latter?
2    A. The latter.
3    Q. What, if anything, can you remember or tell us
4  about your separation agreement?
5    A. It was basically an agreement between him and
6  myself that we will leave after all those years of
7  service.
8      And I regret to agree with the amount, but it
9  was $30,000 for me and $20,000 for my wife.
10     And it was -- he give my wife the car that she
11 usually drive. It was a minivan, Chrysler minivan, as
12 part of the -- as part of the separation. She loved
13 that car and she did all the shopping, it was done in
14 that car.
15     So Mr. Epstein was kind enough to give her the
16 car.
17     The rest of the stuff is, was mainly lawyer
18 stuff that you can't understand. But basically that was
19 it. And that it was a part that I think I can -- I
20 would says, it was more or less that I will not sue him
21 later or he cannot sue me for any reasons or -- and it
22 was like a confidentiality issue in that separation
23 agreement.
24   Q. And do you understand that in this instance
25 you are subpoenaed under the power of the Court?

Page 40

1    A. Absolutely.
2    Q. And that would include matters that would
3  otherwise be confidential?
4    A. Can you repeat that again?
5    Q. Yeah. Do you understand that because you're
6  under subpoena by the Court to give your testimony, --
7    A. Today.
8    Q. -- truthfully -- yes.
9    A. Uh-huh.
10   Q. That the confidentiality agreement would not
11 control; the Court's subpoena --
12   A. Oh, yeah.
13   Q. -- controls?
14   A. I understand that.
15   Q. You mentioned Ghislaine Maxwell did photo
16 shoots and kept an album?
17   A. Yes. She was fanatic about photographs --
18 camera. She had a whole bunch of different cameras and
19 she took all the pictures all over.
20   Q. Did you ever observe her doing a photo shoot
21 of V.?
22   A. No.
23   Q. Did you ever observe her doing a photo shoot
24 of any of the other young women whose names you
25 mentioned?

10 (Pages 37 to 40)

Page 41

1   A.  Young woman?
2   Q.  Yes.
3   A.  No, I can't remember. I know that she went
4   out and took pictures in the pool because later on I
5   would see them at the desk or at the house.
6       And nude -- 99.9 percent of the time they were
7   topless. They were European girls. They were --
8   Q.  You stated that you believe V.'s name was P.,
9   but you weren't sure?
10  A.  Not sure.
11  Q.  Could it have been R.?
12  A.  R., yeah. Yeah. Could have been.
13  Q.  I want to show you a picture and have it
14  marked as an Exhibit to this deposition.
15      MS. EZELL: And did we have the agreement
16  beforehand that we've been having all along that
17  we're just using initials and not names?
18      MR. WILLITS: My client has waived the
19  confidentiality as to herself. But I certainly
20  agree as to everybody else.
21      MR. LANGINO: As do I.
22      MS. EZELL: Is that okay?
23      MR. CRITTON: That's what we agreed to on the
24  last.
25      MS. EZELL: Right.

Page 42

1       MR. CRITTON: For the court reporter, at
2   least, in terms of the -- I guess in terms of the
3   transcript she gives to us, if you would just use a
4   first initial and a last initial.
5       MR. WILLITS: So when you ask about V., it
6   would be V.R. is what the court reporter would
7   write down?
8       MS. EZELL: Right.
9       MR. CRITTON: But make sure everybody uses the
10  full name, because that way we'll have two
11  initials.
12      MR. WILLITS: When they speak, but she's going
13  to write it down as initials. Is that what you're
14  saying? I'm confused about everything.
15      MR. CRITTON: The reason is, is there may be
16  25, you know, there may be three V.s. So if you
17  just mention V. and it just shows up as a V., it
18  won't make sense. So ergo you need to do that.
19  But Carolyn Andriano, his client, she gets the
20  whole megillah.
21      MR. WILLITS: Right.
22      MR. BERGER: How is it preserved that we're
23  talking about your client? You gave her full name
24  a minute ago. How is it preserved if she's -- the
25  court reporter is going to change the full name to

Page 43

1   V.R.? Obviously the tape preserves it. We're not
2   asking the tape gentleman to edit it.
3       MS. EZELL: Right.
4       MR. BERGER: So how is it preserved that V.R.
5   means your client's full name?
6       MS. EZELL: Well, we had just agreed in
7   previous depositions that that's the way it would
8   read. The written transcript would not have the
9   full name, but would just have the initials.
10      MR. BERGER: I'm not so sure that constitutes
11  an identification by Mr. Alessi that's going to be
12  clear. But this is the first deposition I've
13  attended, so I'm not sure if I'm -- if what I'm
14  saying has been dealt with or not.
15      MR. MERMELSTEIN: I think we're working on
16  good faith. Mr. Critton is agreeing that the
17  name -- and I don't think anyone's going to come
18  back later and say, oh, you meant Vince Robinson or
19  anything like that, so...
20      MR. BERGER: Well, I'm not -- I'm not talking
21  about Mr. Critton. Bob Critton I have the full
22  trust in. I'm just talking about a jury watching
23  this or reading this transcript believing that
24  Mr. Alessi has accurately identified one of these
25  victims. That's all. I don't know if you've all

Page 44

1   thought about that.
2       MS. EZELL: Well, for one thing, the jury
3   might, if they're -- if they're hearing or reading
4   his testimony, they most likely would be seeing the
5   video, which would have the full name. Unless the
6   Judge allows us to block out names and we haven't
7   come to that point.
8       MR. MERMELSTEIN: I think the idea at trial,
9   V.R., if it's read to the jury would become then
10  V.R. It would be read as V.R. But if it's filed
11  with the Court, this transcript, it will be V.R.,
12  and that way it doesn't have to be redacted.
13      MR. WILLITS: As I also understood it, if
14  there would be any question at all, we could simply
15  ask the court reporter and she would say, according
16  to my notes, V.R. is Virgil Robinson and not -- or
17  whatever her notes show. Wouldn't she be the final
18  authority?
19      MS. EZELL: Well, she would certainly have
20  that record.
21      MR. CRITTON: You could listen to the tape.
22  It would be pretty easy. I think we're making it a
23  lot more complicated than it need be.
24      MR. WILLITS: For once, I agree.
25      MR. CRITTON: I think it will be all right.

11 (Pages 41 to 44)

Page 73

1  us.
2  Q. Where would he sleep?
3  A. In the main room, the main guest bedroom.
4  That was the blue room.
5  Q. And, so, when he would come and stay, during
6  that time would he frequently have massages?
7      MR. CRITTON: Form.
8      THE WITNESS: I would says, daily massages.
9  They have a daily massage.
10 BY MS. EZELL:
11 Q. Was it sometimes more than one a day?
12 A. I can't remember if he had more than one, but
13 I think it was just a massage for him. We set up the
14 tables and --
15 Q. Do you have any recollection of V.R. coming to
16 the house when Prince Andrew was there?
17 A. It could have been, but I'm not sure.
18 Q. Not sure. When Mr. Dershowitz was
19 visiting, --
20 A. Uh-huh.
21 Q. -- how often did he come?
22 A. He came pretty -- pretty often. I would says,
23 at least four or five times a year.
24 Q. And how long would he stay typically?
25 A. Two, three days.

Page 74

1  Q. Did he have massages sometimes when he was
2  there?
3  A. Yes. A massage was like a treat for
4  everybody. If they want it, we call the massage and
5  they have a massage.
6  Q. Now, Mr. Trump had a home in Palm Beach,
7  correct?
8  A. Uh-huh.
9  Q. So he didn't come and stay there, did he?
10 A. No, never.
11 Q. He would come for a meal?
12 A. He would come, have dinner. He never sat at
13 the table. He eat with me in the kitchen.
14 Q. Did he ever have massages while he was there?
15 A. No. Because he's got his own spa.
16 Q. Sure.
17     MS. EZELL: I don't have any other questions
18 right now. I'd just like to reserve if something
19 comes up to ask. But, otherwise, you may go ahead.
20     MR. LANGINO: It is noon, so I don't know what
21 everybody else's schedule is. I don't know how
22 you're feeling.
23     THE WITNESS: I am fine.
24     MS. EZELL: I do have another question. May I
25 ask it?

Page 75

1      MR. LANGINO: Go ahead. Sure.
2  BY MS. EZELL:
3  Q. You said that you set up the massage tables.
4  And would you also set up the oils and the towels?
5  A. Yes, ma'am.
6  Q. And I think I read one time you said they used
7  40 or 50 towels a day?
8      MR. CRITTON: Form.
9      THE WITNESS: That's correct. There was a
10 tremendous amount of work in the house, especially
11 laundry towels, because they were -- we have
12 towels, piles of towels. And they use in the pool.
13 There was a lot of people in the pool and there
14 were a towel that went in the floor, we have to go
15 and pick it up, wash it. So it was -- it was a lot
16 of towels, yes.
17 BY MS. EZELL:
18 Q. And did you ever have occasion to go upstairs
19 and clean up after the massages?
20 A. Yeah, uh-huh.
21 Q. Did you ever find any vibrators in that area?
22 A. Yes. I told him, yes.
23     MS. EZELL: And did you ask that? I'm sorry.
24     MR. CRITTON: Yes.
25     MS. EZELL: I don't know how I missed that.

Page 76

1  BY MS. EZELL:
2  Q. Since I did miss it, if you don't mind, let me
3  just ask you again.
4      Would you describe for me what kinds of
5  vibrators you found?
6  A. I'm not familiar -- not too familiar with the
7  names, but they were big dildos, what they call the big
8  rubber things like that (indicating). And I used to go
9  and put my gloves on and pick them up, put them in the
10 sink, rinse it off and put it in Ms. Maxwell --
11 Ms. Maxwell had in her closet, she had, like, a laundry
12 basket, one of those laundry basket that you put laundry
13 in. She have full of those toys. And that was -- and
14 that was me being professional, leaving the room ready
15 for bed when he would come back to the room again.
16 Q. Okay.
17 A. That happened a few times, few times.
18 Q. Were there other sex toys that you found in
19 the area --
20 A. No.
21 Q. -- sometimes? You mentioned she kept them in
22 a basket in her closet?
23 A. She kept them in her basket. She had some
24 videos there and she have a costume there. I know that
25 she bought it, that she brought it with her.

19 (Pages 73 to 76)

(561) 832-7500    PROSE COURT REPORTING AGENCY, INC.    (561) 832-7506

Electronically signed by Sandra Townsend (401-377-676-2895)
Electronically signed by Sandra Townsend (401-377-676-2895)

76ef564a-4a1c-4dee-87ac-479898cc7

GIUFFRE000109

Page 77

1  Q. What kind of costume?
2  A. I don't know. It was a black, shiny costume.
3  I never saw it on her.
4  Q. Was it leather?
5  A. No. I think it was like a vinyl. But we were
6  very fussy about touching any of that stuff. We just...
7  MS. EZELL: No other questions. Thank you,
8  sir.
9  THE WITNESS: You're welcome.
10  MR. LANGINO: I shouldn't have more than a
11  half hour's worth of questions, if everybody is
12  okay to power through.
13  MR. BERGER: I probably have a half hour to an
14  hour.
15  MR. LANGINO: Okay.
16  MR. BERGER: Unless you cover what I cover.
17  MR. MERMELSTEIN: I could say the same thing,
18  so probably less than that.
19  MR. LANGINO: So I guess my question is --
20  MR. BERGER: I think we ought to take a break.
21  MR. LANGINO: That was my question.
22  MR. BERGER: We're going to take a break.
23  Do you have any problem with that?
24  THE WITNESS: No. Whatever you guys want to
25  do.

Page 78

1  (Lunch recess.)
2  (Continued to Volume II.)

Page 79

CERTIFICATE OF OATH
STATE OF FLORIDA
COUNTY OF PALM BEACH

I, the undersigned authority, certify that JUAN ALESSI personally appeared before me and was duly sworn on the 8th day of September, 2009.

Dated this 19th day of September, 2009.

*Sandra Townsend*

Sandra W. Townsend, Court Reporter
Notary Public - State of Florida
My Commission Expires: 6/26/12
My Commission No.: DD 793913

Page 80

CERTIFICATE
STATE OF FLORIDA
COUNTY OF PALM BEACH

I, Sandra W. Townsend, Court Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the aforementioned witness was by me first duly sworn to testify the whole truth; that I was authorized to and did report said deposition in stenotype; and that the foregoing pages numbered 1 to 78, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

Dated this 19th day of September, 2009.

*Sandra Townsend*

Sandra W. Townsend, Court Reporter

20 (Pages 77 to 80)