UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

VIRGINIA GIUFFRE,

                Plaintiff,          15 Civ. 7433

    -against-                   SEALED
                                     OPINION

GHISLAINE MAXWELL,

                Defendant.

------------------------------------------X

A P P E A R A N C E S:

        Counsel for Plaintiff

        BOEIS, SCHILLER & FLEXNER LLP
        401 East Las Olas Boulevard, Suite 1200
        Fort Lauderdale, FL 33301
        By:   Sigrid S. McCawley, Esq.
             Meredith L. Schultz, Esq.

        Counsel for Defendant

        HADDON, MORGAN AND FOREMAN, P.C.
        150 East Tenth Avenue
        Denver, CO 80203
        By:   Laura A. Menninger, Esq.
             Jeffrey S. Pagliuca, Esq.

        Counsel for Respondent Sharon Churcher

        DAVIS WRIGHT TREMAINE LLP
        1251 Avenue of the Americas, 21st Floor
        New York, NY 10020
        By:   Eric J. Feder

        1919 Pennsylvania Ave. NW, Suite 200
        Washington, DC 20006
        By:   Laura R. Handman

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-2-16

Case 1:15-cv-07433-RWS Document 440-1 Filed 09/20/16 Page 2 of 21

**Sweet, D.J.**

Non-party Sharon Churcher ("Churcher"), a professional journalist, has moved under Federal Rule of Civil Procedure 45 to quash the subpoena served upon her by Defendant Ghislaine Maxwell ("Maxwell" or the "Defendant") to testify at a deposition in this civil action and to produce documents (the "Subpoena") relying upon the New York Reporters Shield Law, N.Y. Civ. Rights Law § 79-h ("Section 79-h"). Upon the conclusions set forth below, the motion of Churcher is granted, and the Subpoena is quashed.

## I. **Prior Proceedings**

On June 4, 2016, Churcher was served with the Subpoena commanding her to appear at a deposition on June 16, 2016. The Subpoena also commands Churcher to bring with her to the deposition several broad categories of documents:

> 1. All Documents containing communications with Virginia Roberts.
>
> 2. All communications with any agent for Virginia Roberts, including without limitation attorneys Bradley Edwards, Paul Cassell, David Boise [sic], Sigrid McCawley, Meredith Schultz, Stanely [sic] Pottinger, Ellen Brockman, Stephen Zac, Brittany Henderson, Bob Josefsberg, Katherine Ezell, Amy Ederi.

1

3.    All Documents containing communications with Jason Richards.

4.    All Documents containing communications with law enforcement agency concerning Virginia Roberts.

5.    All Documents reflecting any payment of any money to Virginia Roberts.

6.    All Documents reflecting any contract concerning Virginia Roberts.

## II.    Facts Relating to Churcher and the Parties to this Action

Churcher is a professional print journalist who has worked continuously in New York since 1983. Churcher Decl. ¶ 1. She is currently employed by American Media, Inc., which publishes the National Enquirer (the "Enquirer") and RadarOnline.com ("Radar"), where she has worked since November 2014. Id. ¶ 4. From 1992 through October 2013, she was employed as the New York-based Chief American Correspondent of The Mail on Sunday, a publication owned by Associated Newspapers of London, England. During the interim she worked as a freelance reporter for publications including The Mail on Sunday, the U.S. operation of its digital arm, the Mail Online, and the Enquirer. Id.

In her capacity as a journalist, Churcher has reported on the events that underlie this case going back to at least April

2

2007, when she wrote an article published in The Mail on Sunday about the alleged ties between Prince Andrew, the British royal, and convicted sex offender Jeffrey Epstein ("Epstein"). See Id. ¶ 5 & Ex. 1. Maxwell was mentioned in that article.

Churcher first reported about the plaintiff Virginia Giuffre ("Guiuffre" or the "Plaintiff"), then identified as Virginia Roberts, in March 2011, when she wrote a series of articles published in The Mail on Sunday and affiliated newspapers containing extensive interviews with and photographs of Giuffre, in which she "agreed to waive her anonymity and tell for the first time her deeply disturbing story." Churcher Decl. Ex. 2 at 3; see also Churcher Decl. Ex 3. Churcher traveled to Australia to meet and interview the Plaintiff in person for those stories. Churcher Decl. ¶ 7(b).

In January 2015, Churcher wrote a series of stories that appeared in several publications, including The Mail on Sunday, the Enquirer and Radar, containing extensive new details from the Plaintiff about her involvement with Epstein, Maxwell, and Prince Andrew, as well as excerpts from a handwritten "diary" about those experiences, which appeared on Radar's website. See Churcher Decl. Exs. 5-8.

3

From 2011 through the present day, Churcher, in her capacity has a journalist, has communicated extensively with the Plaintiff and in certain instances, agents for Churcher, including her attorneys. Churcher Decl. ¶ 10. The 2007 and 2015 publications were authored by Churcher (the "Articles").

## III.   The Applicable Standard

Pursuant to Federal Rule of Civil Procedure 45(c)(3)(A), a court "must quash or modify a subpoena that . . . (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." "The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." Night Hawk Ltd. v. Briarpatch Ltd., L.P., No. 03 CIV.1382 RWS, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003) (citations omitted). Once that initial burden has been met, "[a] party contending that a subpoena should be quashed pursuant to Rule 45(c)(3)(A)(iv) must demonstrate that compliance with the subpoena would be unduly burdensome." Bridgeport Music Inc. v. UMG Recordings, Inc., No. 05 Civ. 6430(VM)(JCF), 2007 WL 4410405, at *1 (S.D.N.Y. Dec. 17, 2007).

4

**IV. The New York Shield Law Applies**

The New York Shield Law, or reporter's privilege, protects reporters from compelled disclosure of both confidential information and sources, as well as non-confidential, unpublished newsgathering materials and information. Under Federal Rule of Evidence 501, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Because this case concerns a state law claim that is in federal court because of diversity of citizenship, evidentiary and discovery privileges are governed by New York law. See Giuffre v. Maxwell, No. 15 Civ. 7433, 2016 WL 1756918, at *2-*5 (S.D.N.Y. May 2, 2016) (citing inter alia Fed. R. Evid. 501). Moreover, Churcher is a New York-based journalist. Churcher Decl. ¶¶ 1, 4. Accordingly, the New York Reporters Shield Law applies to the Subpoena. See In re Application to Quash Subpoena to Nat. Broad. Co., Inc., 79 F.3d 346, 351 (2d Cir. 1996) (applying New York Shield Law where subpoena in Massachusetts wrongful death suit issued out of Southern District of New York to a New York-based broadcaster).

While now codified in Section 79-h of the Civil Rights Law, the reporter's privilege has its origins in the New York Constitution's free press provision (art. I, § 8), which

5

provides "the broadest possible protection to 'the sensitive role of gathering and disseminating news of public events.'" O'Neill v. Oakgrove Constr., 523 N.E.2d 277, 281, 71 N.Y.2d 521, 529 (1988) (quoting Matter of Beach v. Shanley, 62 N.Y.2d 241, 256, 476 N.Y.S.2d 765, 465 N.E.2d 304 [Wachtler, J., concurring]); see also In re Daily News, L.P., 31 Misc. 3d 319, 322, 920 N.Y.S.2d 865, 868 (Sup. Ct. 2011) ("The legislature enacted the statute now codified at Civil Rights Law Section 79–h, and mooted any possible issues about the constitutional law conclusions of the Court of Appeals."). Indeed, "New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—and their confidential sources—that has been recognized as the strongest in the nation." Holmes v. Winter, 22 N.Y.3d 300, 310, 3 N.E.3d 694 (2013).

Accordingly, the New York Shield Law provides protection of information "obtained or received in confidence" by a reporter, as well as for the identity of a confidential source. N.Y. Civ. Rights Law § 79-h(b) (McKinney). The statute also provides qualified protection for non-confidential newsgathering information, which can be overcome only with a "clear and specific showing" that the information is "highly material and relevant," "critical or necessary to the maintenance of a

6

party's claim" and "not obtainable from any alternative source."
Id. § 79-h(c). The qualified privilege is a stringent one that
imposes a "very heavy burden" on any party seeking to overcome
it. In re Am. Broad. Companies, Inc., 189 Misc. 2d 805, 808, 735
N.Y.S.2d 919 (Sup. Ct. 2001). For confidential information, the
privilege can be overcome by the same showing as for non-
confidential information under the Shield Law. See Gonzales v.
Nat'l Broad. Co., 194 F.3d 29, 33 (2d Cir. 1999). For non-
confidential information, the party seeking disclosure must show
that "(1) 'that the materials at issue are of likely relevance
to a significant issue in the case,' and (2) the materials at
issue 'are not reasonably obtainable from other available
sources.'" Schoolcraft v. City of New York, No. 10 CIV. 6005
RWS, 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 22, 2014) (quoting
Gonzales, 194 F.3d at 36).

**A.   Information Received Pursuant to Promises of
      Confidentiality is Absolutely Privileged Under the
      Shield Law**

The Shield Law provides an absolute privilege against the
compelled disclosure of "news obtained or received in confidence
or the identity of the source of such news." N.Y. Civ. Rights
Law § 79-h (McKinney). The statute thus bars compelled

7

disclosure of "news or its source obtained in confidence."
Baines v. Daily News L.P., 51 Misc. 3d 229, 232, 26 N.Y.S.3d
658, 662 (N.Y. Sup. Ct. 2015) (collecting citations); Holmes v.
Winter, 22 N.Y.3d 300, 308, 3 N.E.3d 694, 699 (2013) ("The
Shield Law . . . prohibits a New York court from forcing a
reporter to reveal a confidential source"); Flynn v. NYP
Holdings Inc., 235 A.D.2d 907, 908, 652 N.Y.S.2d 833 (1997) ("if
the requested documents were deemed confidential, defendants
would be afforded unqualified protection from having to divulge
such sources or materials").

At a minimum, the Shield Law would absolutely preclude any
inquiry into the identity of confidential sources on which
Churcher relied in reporting the Articles or any information
that may reveal those sources' identities). On their face, many
of the Articles rely on confidential sources, including law
enforcement sources. See, e.g., Churcher Decl. Ex. 2 at 8 ("a
source"); id. Ex. 3 at 2 ("a law enforcement source"); id. Ex. 4
at 3 ("[massage] therapist, who does not wish to be named"); id.
Ex. 8 at 2 ("a legal expert"; "a source familiar with the
case"). Churcher has stated in her declaration that, in
reporting the Articles, she relied extensively on information
received in confidence, as well as sources whose identities are
confidential. Churcher Decl. ¶¶ 8-9. To the extent any

8

communications with those sources fall within the categories of
the document requests, those communications are absolutely
privileged from disclosure. Moreover, although the Plaintiff was
plainly a non-confidential on-the-record source for several of
the Articles, to the extent she provided Churcher with any
information on a confidential basis, that information would also
be absolutely privileged. See Baker v. Goldman Sachs & Co., 669
F.3d 105, 107 (2d Cir. 2012) ("New York's Shield Law provides
journalists an absolute privilege from testifying with regard to
news obtained under a promise of confidentiality").

**B.    The Information Sought by the Subpoena is Protected by
        the Qualified Privilege**

"[I]mportant interests beyond confidentiality ... are
served by the reporter's qualified privilege," including "the
privacy of editorial processes and the press's independence in
its selection of material for publication in accordance with the
broader public policy of encouraging the free flow of
information and avoiding a chill on the press." Pugh v. Avis
Rent A Car Sys., Inc., No. M8-85, 1997 WL 669876, at *5-6
(S.D.N.Y. Oct. 28, 1997). The Privilege therefore protects "the
independence of the press and the need to allow the press to
publish freely on topics of public interest without harassment

9

and scrutiny by litigants seeking to conduct 'fishing expeditions' into [unpublished] materials in the hope that some relevant information may turn up." Id. at *5.

In O'Neill, the New York Court of Appeals stressed the need for courts to exercise "particular vigilance . . . in safeguarding the free press against undue interference," and "prevent[ing] undue diversion of journalistic effort and disruption of press functions." 71 N.Y.2d at 528-29 (discussing New York Constitution, article I, § 8 from which the Shield Law derives). See also Brown & Williamson Tobacco Corp. v. Wigand, No. 101678/96, 1996 WL 350827, at *3 (N.Y. Sup. Ct. Feb. 28, 1996) ("Attempts to obtain evidence from [journalists] as nonparties would, if unrestrained, subject news organizations to enormous depletions of time and resources as well as seriously impede their ability to obtain materials from confidential sources."), aff'd, 228 A.D.2d 187, 187, 643 N.Y.S.2d 92 (1st Dep't 1996).

Similarly, in recognizing that the First Amendment reporter's privilege also applies to non-confidential newsgathering information, the Second Circuit has explained that the reporter's privilege reflects "broader concerns" beyond the confidentiality of a reporter's sources, noting that the

10

privilege is designed to protect against the burdens that would
accrue if it were to become "standard operating procedure for
those litigating against an entity that had been the subject of
press attention to sift through press files in search of
information supporting their claims." Gonzales, 194 F.3d at 35.
The court explained further that those harms include
"burden[ing] the press with heavy costs of subpoena compliance,"
increased requests for anonymity from sources anxious to avoid
being "sucked into litigation," and "the symbolic harm of making
journalists appear to be an investigative arm of the judicial
system, the government, or private parties." Id.

New York courts have pointed out that the legislature's
express purpose in passing the Shield Law was "to avoid
'problematic incursions into the integrity of the editorial
process.'" In re Grand Jury Subpoenas Served on Nat. Broad. Co.,
Inc., 178 Misc. 2d at 1055 (quoting 1990 McKinney's Session
Laws, Memorandum of State Executive Department, p. 2331-32)).
See also United States v. Cuthbertson, 630 F.2d 139, 147 (3d
Cir. 1980) ("The compelled production of a reporter's resource
materials can constitute a significant intrusion into the
newsgathering and editorial processes."). Moreover, in seeking
testimony to support their theory of the case, the plaintiffs
"inevitably would have to ask questions regarding [the

11

reporter's] techniques for conducting his investigation, the
backgrounds of . . . co-authors and the [publication's]
editorial staff, and whether [the author] consulted with any
experts or other sources in the course of the investigation—all
inquiries into the newsgathering process protected by the Shield
Law." Baker, 669 F.3d at 109 (internal quotation marks omitted).
Although none of that information is confidential, the
"unpublished details of the newsgathering process" are,
nevertheless, protected by the Shield Law, and where the
testimony is not "critical or necessary" to maintain the
plaintiffs' claims, a motion to quash must be granted by the
district court. In re Eisinger, No. 09-10053-PBS, 2011 WL
1458230, at *2 (S.D.N.Y. Apr. 12, 2011), aff'd sub nom. Baker v.
Goldman Sachs & Co., 669 F.3d 105 (2d Cir. 2012). In such
circumstances, it is "virtually self-evident that the Shield Law
would protect [a journalist] from compelled testimony." Baker at
110.

In her Response, Maxwell raises two arguments why the
information she seeks is not protected from disclosure: (1) that
the Shield Law does not apply at all because, at some point,
Churcher ceased to be a reporter with respect to the Plaintiff;
and (2) to the extent the Shield Law applies, Maxwell has met

12

the three elements to overcome the qualified privilege for non-confidential materials.

The Second Circuit instructs that, in determining whether the reporter's privilege applies, the Court should look to the nature of the "primary relationship between" the respective parties to determine whether it "ha[s] as its basis the intent to disseminate the information to the public garnered from that relationship." von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 145 (2d Cir. 1987). That intent must "exist[] at the inception of the newsgathering process." Id. at 144. Here, the "primary relationship" between Churcher and Plaintiff was that of a professional reporter gathering information from a source for the Articles that were, in fact, subsequently published under Churcher's byline over the next several years.

In von Bulow, the court held that the reporter's privilege did not apply to notes that a woman, Andrea Reynolds, took while watching the criminal trial of Claus von Bulow nor to investigative reports she had commissioned about von Bulow's wife's children. Reynolds, an "intimate friend" of von Bulow's, had stated that her "primary concern" in commissioning the reports was "vindicating Claus von Bulow" and "[her] own peace of mind." Id. at 136, 139, 145. Even if she later decided to

13

collect the information and publish it in a book, her intent at
the time she gathered the information was not to publish it.


Subsequent decisions have concluded that "the relevant time
frame is not when any fact gathering for the subject of the
subpoena began, but when the information sought by the subpoena
at issue was gathered." In re McCray, Richardson, Santana, Wise,
Salaam Litig., 991 F. Supp. 2d 464, 467 (S.D.N.Y. 2013)
(emphasis and internal quotation marks removed). Maxwell has
failed to overcome the evidence establishing that Churcher was a
professional journalist, that her intent from the very beginning
of her relationship with the Plaintiff was to gather information
to publish news stories, or that she did, in fact, publish many
news stories based on the information she learned from Plaintiff
and other sources over the next several years. The "primary
relationship" between them has always "ha[d] as its basis the
intent to disseminate the information to the public garnered
from that relationship." von Bulow, 811 F.2d at 145.


Successful journalists must cultivate extensive networks of
sources, and communicate with them regularly on a variety of
topics. See, e.g., United States v. Marcos, No. SSSS 87 CR. 598
JFK, 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990) ("The
underpinning of [the reporter's privilege] lies in the

14

recognition that effective gathering of newsworthy information
in great measure relies upon the reporter's ability to secure
the trust of news sources."). Indeed, frequent, often informal
communication with sources, even if not for the immediate
purpose of gathering information for a specific article, is an
integral part of the overall newsgathering process. Accordingly,
the Shield Law does not narrowly apply only to the specific
exchanges where the source conveys "news." As the Second Circuit
has held, the Shield law protects journalists from "inquiries
into the newsgathering process," as a whole. Baker v. Goldman
Sachs & Co., 669 F.3d 105, 109 (2d Cir. 2012) (affirming holding
that Shield Law applied to "unpublished details of the
newsgathering process," such as who made calls and interviewed
particular sources, techniques for the reporters' investigation,
and the backgrounds of the coauthors and editorial staff).

In any event, the e-mails that Maxwell submits to
demonstrate that Churcher was not acting as a journalist, in
fact, show that even as she was consulting with the Plaintiff on
seemingly separate topics, her overarching intent remained
newsgathering. ███████████████████████████

███████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

15



Because Churcher has established that she was, and is, a journalist using Plaintiff as a source, the Subpoena is quashed as a consequence of the protections of the Shield Law.

Maxwell's conclusory assertion that "[n]one of the communications" between Churcher and Plaintiff's attorneys/agents or law enforcement "are in a newsgathering capacity," Response at 8, is contradicted by Churcher's statements to the contrary and by the fact that individuals in those categories are quoted in the articles themselves (both by

16

name and anonymously) as sources. See Churcher Decl. ¶¶ 8-10,
and Exs. 2, 3, & 8.

## V.    **Maxwell Has Not Overcome the Protections of the Shield Law**

Maxwell argues that "[t]he information sought from Churcher
is highly material in proving that each time [Plaintiff's] story
is told, new salacious detail are added." Resp. at 11; see also
id. at 15 (arguing that the information is "critical to
establishing" that fact). But Churcher's newsgathering materials
and testimony are not needed to "prove" an assertion about the
allegedly changing nature of a public "story." Similarly, to the
extent that the Joinder Motion is inconsistent with published
articles by Churcher, that would be apparent from the face of
the Articles themselves, and would not justify invading the
Shield Law-protected newsgathering process.

Maxwell has contended that Churcher's testimony is
"critical or necessary" to her truth defense because it is
"relevant to Plaintiff's credibility," which is "the central
issue in the case." Id. at 15. However, in almost any civil
lawsuit, the credibility of a party or witness will be a
"central issue"—all the more so in a defamation case, where
truth or falsity of the underlying statements is at issue. zthis

17

makes Churcher's materials no more critical than any other
evidence in this case. Maxwell has not cited any authority for a
wholesale "libel exception" or a "plaintiff's credibility
exception" to the Shield Law. Cf. In re Am. Broad. Companies,
Inc., 189 Misc. 2d 805, 808, 735 N.Y.S.2d 919 (Sup. Ct. 2001)
("[T]he privilege may yield only when the party seeking the
material can define the specific issue, other than general
credibility, as to which the sought-after interview provides
truly necessary proof.") (citing U.S. v. Burke, 700 F.2d 70 (2d
Cir. 1983)).

Finally, even if the information sought were as critical as
Maxwell contends, she has not yet established that she has
turned to Churcher "only as a last resort." In re Grand Jury
Subpoenas Served on Nat. Broad. Co., Inc., 178 Misc. 2d at 1055
("[Section 79-h] established the qualified privilege in both
civil and criminal cases by requiring disclosure of
nonconfidential material only as a last resort."). Maxwell seeks
to reopen Plaintiff's deposition, a motion which has been
granted, and is still awaiting further production from
Plaintiff. See Dkt. Nos. 205, 207, 230; Minute Entry, June 23,
2016. Epstein's motion to quash has been denied (Dkt. No. 252),
and Cassell's motion to quash has been denied in part. And all
that Maxwell has done to "exhaust" law enforcement sources,

18

apparently, is to file a single FOIA request. Resp. at 16 n.7.

There thus remain numerous alternative sources for the

information Maxwell seeks. She may not conscript Churcher as her

"investigative arm" in the meantime. Gonzales, 194 F.3d at 35.

## VI. Conclusion

Upon the conclusions set forth above, the motion of Churcher is granted and the Subpoena is quashed.

The parties are directed to jointly file a proposed redacted version of this Opinion consistent with the Protective Order or notify the Court that none are necessary within two weeks of the date of receipt of this Opinion.

It is so ordered.

New York, NY
September  /  , 2016

ROBERT W. SWEET
U.S.D.J.

20