H2G8GIUC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   VIRGINIA L. GIUFFRE,

 4                  Plaintiff,

 5             v.                           15 Cv. 7433 (RWS)

 6   GHISLAINE MAXWELL,

 7                  Defendant.

 8   ------------------------------x

 9                                          February 16, 2017
                                            12:45 p.m.
10
     Before:
11
                         HON. ROBERT W. SWEET
12
                                            District Judge
13
                              APPEARANCES
14
     BOIES, SCHILLER & FLEXNER LLP
15        Attorneys for Plaintiff
     BY:  SIGRID S. McCAWLEY
16        MEREDITH L. SCHULTZ

17   PAUL G. CASSELL
     S.J. QUINNEY COLLEGE OF LAW AT THE UNIVERSITY OF UTAH
18
     HADDON MORGAN AND FOREMAN, P.C.
19        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
20        LAURA A. MENNINGER
          TY GEE
21
     RANDAZZA LEGAL GROUP, PLLC
22        Attorneys for Intervenor Cernovich Media
     BY:  JAY M. WOLMAN
23

24

25
```

 1           (Case called)

 2           THE COURT:  I think we have got to try to bring a

 3   little order out of this chaos.  Chaos being, by my

 4   approximation, five feet of paper, maybe I am wrong, it might

 5   be four, but it's between four and five, and myriad motions and

 6   so on.

 7           There are some preliminaries I would like to ask you

 8   about.

 9           How do you all feel about our trial setting of March

10   13.  Is that real?

11           MS. McCAWLEY:  We are set for March 13 right now, and

12   we actually had on the agenda, Jeff and I spoke about wanting

13   to talk to you about this today.  We had originally anticipated

14   a two-week trial.  We have set aside our experts, other

15   individuals that need to be here for that time period, so we

16   are planning to go to trial during that time period if it works

17   with the Court's schedule.

18           There is a concern that we may run long.  So one

19   thought we had, I had, was whether or not it would be amenable

20   to the Court to possibly pick our jury on the Friday before,

21   which would be the 10th, so that by the time Monday rolls

22   around we can start the actual trial.  Mr. Pagliura has a

23   family wedding the third weekend, so if we roll into that third

24   week that may become problematic for him.  So we want to try to

25   find a way to keep the trial date and get through it, and

1    hopefully we can work with the Court on that.

2         I will let them speak on that as well, but that's our

3    position, is we would like to go forward on the 13th and

4    proceed forward.

5         MR. PAGLIUCA:  We actually conferred with Mr. Edwards

6    about this last week, and I advised Mr. Edwards that we were

7    going to be filing a motion to continue the trial that's

8    presently scheduled.

9         The Court can see from the pretrial order that we

10   filed, there is some roughly, by my count, 80 witnesses that

11   have been identified as trial witnesses.  When you actually try

12   to tally up the recorded testimony that's been designated, I

13   don't think you could play that testimony within a two-week

14   time frame.  So, in my view, this case as currently postured

15   would roughly take about a month to try as currently postured.

16   When we originally scheduled the case, we all agreed it would

17   be a two-week time frame.  My daughter's wedding is not the

18   issue in this case.  So I don't want that to be an issue.

19        THE COURT:  When is it?

20        MR. PAGLIUCA:  It is before the trial, shortly before

21   the trial, your Honor.  So it is not the third week.  There was

22   some discussion about opening up the trial, moving it earlier,

23   which is why I said I really need to be at my daughter's

24   wedding, which is March 4, but that's not the issue.  The issue

25   is the two weeks that have been set aside are not sufficient to

4

H2G8GIUC

1        try this case, number one.

2                There is another real problem and a prejudicial

3        problem to the defense, should it go as the plaintiffs have

4        currently postured it, which is we have witnesses in England,

5        South Africa, Colorado, and these people all have to come here

6        on a date certain.  And the pretrial order, the plaintiff's

7        statement suggests that they may need 10 to 15 trial days, but

8        I can't schedule international witnesses and Colorado witnesses

9        and expert witnesses on a rolling basis because they have to

10        get here and be available to testify.

11                So there are a plethora of problems with this case

12        proceeding on March 13.  And that's sort of the tip of the

13        iceberg, your Honor, because then there are all these other

14        discovery and evidentiary issues that, frankly, I don't believe

15        will be resolved in sufficient time to have an orderly trial

16        here.  If we go through all of the deposition designations and

17        then end up with designations, I don't see how anyone can cut

18        together that much designation testimony in a short time before

19        trial in the case.  So I predict, if we were to go to trial, we

20        would end up with massive delays, massive juror problems, and

21        delay of time and waste of court resources.

22                So I think for all of those reasons, your Honor, I am

23        anticipating filing a motion to continue, but that's as I see

24        the lay of the land here.  If we had planned for this to be a

25        month long case, I think we would have approached this

1    differently, but we didn't.

2              THE COURT:  What do you think is a reasonable trial

3    date under your view of the matter?

4              MR. PAGLIUCA:  I would say sometime this summer would

5    be fine, your Honor.  June would be fine.  We are talking about

6    90 days from the original trial date.  Believe me, we all want

7    to resolve this case, and my client wants to resolve this case.

8    I am not looking for any tactical delay here.  I am just

9    looking for a reasonable solution to what I see as a global

10   problem.

11             THE COURT:  OK.  Let me ask you this.  Would anybody

12   have any problem if we were to start this on April 10?

13             MS. McCAWLEY:  Your Honor, I don't believe at this

14   very moment that that would be a problem.  My only issue is I

15   cleared all of my experts.  They had to set aside their

16   schedule to be here for that date.  So I would hate to commit

17   to something and have one of my critical experts say they have

18   already scheduled something in that time period.  The earlier

19   the better for us.  We want to get this case tried, but I would

20   have to double-check before I committed our group to that

21   because I just don't know at this point.

22             THE COURT:  I think based on the joint pretrial order,

23   and the outstanding problems that we have, which we will get

24   to, I think we are probably talking about a four-week trial.

25             How about the defense, April 10.

H2G8GIUC

```
 1            MS. MENNINGER:  Your Honor, I have a trial scheduled
 2    in federal court in Colorado beginning on April 24.
 3            THE COURT:  When?
 4            MS. MENNINGER:  April 24, your Honor.  And I have
 5    another state court trial scheduled on May 8.  So I would ask
 6    to set it past those two dates.
 7            THE COURT:  That sounds like May 15.
 8            MS. MENNINGER:  That's fine, your Honor.  We haven't
 9    checked with our experts either.
10            THE COURT:  I understand the problem of witness
11    availability and so on, I have got that, but that's something
12    we can work out, hopefully.  How about May 15 then?
13            MS. McCAWLEY:  Yes, your Honor.  Again, we have two of
14    the partners trying the case with us as well.
15            THE COURT:  Let's do this then.  Let's plan on May 15,
16    and I would direct counsel not to take any other commitments,
17    trial counsel, so that we can go forward with that.
18            So that's first order of business.
19            MS. McCAWLEY:  Your Honor, could I ask one question,
20    just so I am clear when we are scheduling witnesses.  Do you
21    typically run your trials five days through or take off
22    Thursdays?  In other words, do we get five full days straight
23    or do you usually have a break where we won't be on trial on
24    Thursday, for example?
25            THE COURT:  I don't understand the question.
```

H2G8GIUC

```
 1              MS. McCAWLEY:  If we start trial on a Monday, do you
 2     typically run the full week or do you take a break on Thursdays
 3     for these hearings?
 4              THE COURT:  No.  We would probably run a full week.
 5     Friday has sort of a sacrosanct atmosphere, but that's not
 6     written down anywhere.  It will depend.  See how we go and
 7     whatever.
 8              MS. McCAWLEY:  Thank you, your Honor.
 9              MR. PAGLIUCA:  Your Honor, might I ask one other
10     question on the scheduling matter?
11              THE COURT:  Yes.
12              MR. PAGLIUCA:  One of the things that would be very
13     helpful in scheduling would be if we had a system where the
14     plaintiff had a start date and an end date so that I could then
15     contact witnesses and say, here's your day.
16              THE COURT:  There's a lot of things that have to be
17     ironed out.  Let's start with a couple.
18              The Flores motion, I think we should probably have a
19     hearing on the admissibility of the challenged document -- I am
20     calling it that -- because if the document doesn't get in,
21     there is no sense worrying about Flores.  So that's one thing.
22              Secondly, we have got to figure out how you all want
23     to handle the confidential material, any materials that have
24     been designated as confidential, when we get to the trial.  And
25     we have got to have some kind of a protocol as to how that's
```

H2G8GIUC

1    going to be done.

2          So I would say counsel should get together and decide

3    when you want to have a hearing on the admissibility issue, the

4    Rodriguez materials, and then, also, how you would propose that

5    we handle the question of confidentiality.  Because I hope we

6    are not going to be opening and closing the courtroom.  It

7    should be open all the time, as far as I am concerned.

8          Let me put it this way.  I would certainly urge that

9    we remove the confidential designation for any material that's

10   going to be submitted to the jury.

11         MR. PAGLIUCA:  Your Honor, I think that's what our

12   protective order contemplates.

13         THE COURT:  Well, work out how we are going to deal

14   with it.  The mechanics are not easy.

15         Having said all of that, I think what I should do

16   right now, I think we might hear briefly on the motion to

17   intervene and then hear the motion for summary judgment.  My

18   sense of that at the moment is that some of the issues that are

19   involved in that motion for summary judgment have to be decided

20   before you really come to grips with the seven experts that

21   have been de-expertized, if that's a word.

22         So that's the way I would suggest we proceed.  So you

23   meet and confer and decide when you want to have a hearing on

24   the Rodriguez documents, and if you can agree on how we are

25   going to handle the confidential materials, bring it back to me

H2G8GIUC

```
 1   if you can't agree.  And at the moment, I will hear the motion

 2   to intervene.

 3           Anybody for it?

 4           MR. WOLMAN:  Good afternoon, your Honor.  Jay Wolman,

 5   Randazza Legal Group, on behalf of putative intervenor Michael

 6   Cernovich, d/b/a Cernovich Media.

 7           Consistent with how your Honor is approaching trial,

 8   saying that it should be open all the time, summary judgment is

 9   a proceeding --

10           THE COURT:  I didn't make a decision on that.  I said

11   that would be my preference.  We have a confidentiality

12   agreement and that's controlling.

13           MR. WOLMAN:  I understand, your Honor.

14           The orders already here did not require the Court to

15   analyze any material submitted to be sealed.  The parties were

16   given the opportunity to freely submit in support of judicial

17   documents.  There is no question summary judgment papers are

18   judicial documents.  They can determine the outcome of the

19   case.  The Second Circuit is quite clear on this.  It's

20   settled.

21           So then the only question becomes whether or not the

22   plaintiffs, or whomever would want the materials sealed,

23   because the motion for summary judgment itself was filed by the

24   defendants who didn't say why it should be sealed.

25           THE COURT:  Let's talk about the motion to intervene.
```

H2G8GIUC

1          MR. WOLMAN:  Yes, your Honor.  It's to intervene for

2     the purposes of unsealing.  My client is a member of the media.

3     The Fourth Estate has a First Amendment right to review

4     judicial documents, a common law right of access to the court

5     proceedings as to what is going on, because the Court may find

6     for the defendants.  The court may say, no, it has to go to

7     trial.  But that is an adjudication and the standard for

8     sealing any of these documents has not been met because nobody

9     has asked the Court for a finding on any of the materials.

10          THE COURT:  Thank you.

11          MS. SCHULTZ:  This is Meredith Schultz for the

12     plaintiff.

13          This Court has already ruled that the protective order

14     should not be disturbed by a proposed intervenor seeking to

15     unseal and publish self-selected, piecemeal portions of the

16     record.  The latest attempt at intervention by a party line

17     defendant failed on the applicable law, as it is little more

18     than an attempt to taint the jury pool and malign the plaintiff

19     in the eyes of the public immediately prior to trial.

20          This Court's analysis can begin and end with the

21     Second Circuit's presumption against modifying protective

22     orders on which the parties have reasonably relied.  The Second

23     Circuit test on this is clear.  It's articulated in *In re*

24     *Teligent*, 640 F.3d 53, and *In re Sep. 11 Litig.*, 262 F.R.D.

25     274.  Courts can only set aside protective orders if they are

1    improvidently granted or if there is some extraordinary

2    circumstance or compelling need.  The proposed intervenors fail

3    to make any showing whatsoever for either prong of this test.

4            The Second Circuit has been hesitant to permit --

5            THE COURT:  Forgive me, but we are talking about the

6    motion to intervene.  You're talking about the substance of

7    unsealing.  But do they get in to make that motion?

8            MS. SCHULTZ:  No, your Honor, and this is why.

9            The First Amendment does not give the proposed

10   intervenor standing to intervene in this case.  Nonparties

11   cannot claim a First Amendment infringement on their freedom of

12   speech.  The right to speak in public does not carry with it an

13   unrestrained right to gather information.  Moreover, the

14   proposed intervenor's brief is completely silent on how the

15   public access to pretrial proceedings would play a significant

16   positive role in the functioning of the judicial process.  And

17   under the test set forth by the Second Circuit in *Newsday LLC*,

18   730 F.Supp.2d, at page 417, he makes no showing of that

19   whatsoever.  So already there is no standing to intervene based

20   on the Second Circuit test.

21           Finally, this Court has already ruled that it's

22   appropriate for these materials to be sealed, and nothing in

23   either the purported intervenor or Professor Dershowitz's

24   joining of that brief put forth any evidence that the law

25   should be disturbed.

1          THE COURT:  Anything further?

2          MS. SCHULTZ:  Before you are going to reach the merits

3  going to the sealing order, the protective order, there is no

4  standing to intervene in this case.

5          THE COURT:  Thank you.  Anything else?

6          MS. SCHULTZ:  Yes, if you don't mind, your Honor.

7          It fails for other reasons under the law.  In the

8  entire motion and reply brief, it is wholly bereft of case law

9  in which a motion to intervene and publish confidential

10 information has been granted in a case with circumstances like

11 this at all.

12         Here, there are clear and compelling reasons for the

13 sealed documents to remain sealed.  They involve the sexual

14 abuse and sexual trafficking of minors.  Both parties in this

15 case and the Court in its March 17, 2016 hearing articulated

16 clear and compelling reasons why these records should be

17 sealed.

18         Contrary to the *Bernstein* case cited by the purported

19 intervenor, where records were unsealed after settlement, not

20 weeks prior to trial, these documents were not sealed because

21 of some pedestrian reason like an alleged kickback scheme.

22 There can hardly be a more compelling reason to seal documents

23 than those that depict the sexual abuse and sexual trafficking

24 of plaintiff, other minors and other young women.

25         Here, there is no showing why some unspecified

H2G8GIUC

interest in revealing documents concerning sexual assault
should disturb the protective order.  Moreover, there is prima
facie evidence here that there is an illegitimate purpose.

        There are two purported intervenors -- one intervenor
and one purported intervenor moving the Court to unseal these
documents right now.  Under *Nixon v. Warner,* Supreme Court
case, 435 U.S. 598, and *Amodeo*, 71 F.3d at 1044, the purported
intervenor's history of being, as New York Magazine termed, a
rape apologist and attacking victims of sexual abuse point to a
highly illegitimate purpose to get these unsealed documents
that relate to sexual assault.  Also, Dershowitz's now official
joining of this motion shows that both directly and by proxy
are acting to ratify Dershowitz's private spite.

        Courts in this district and others routinely seal
summary judgment materials, such as in *Louis Vuitton v. My
Other Bag*, wherein the court held that privacy interests of
business figures were sufficient to keep summary judgment
documents sealed.  Here, the privacy interests are those of
underage victims of sexual assault.  If this Court can extend
protection to summary judgment materials related to business
figures, it can certainly protect documents surrounding sexual
assault of minors.

        Again, I don't think the Court needs to reach the
merits because I don't think there is standing to intervene.

        Thank you, your Honor.

H2G8GIUC

```
 1              THE COURT:  Anything further?

 2              MR. WOLMAN:  I am surprised by the question of

 3    standing.  Nothing in any of the opposition suggests that my

 4    client is not a member of the Fourth Estate.  Nothing in the

 5    opposition suggests that this is not a newsworthy case.  There

 6    have been plenty of articles about Mr. Epstein, about this

 7    entire proceeding.  This has been in the media.  So my client

 8    is just another journalist looking to find out here what's

 9    going on.

10              Honestly, I am litigating a little bit with one arm

11    tied behind my back because I am being told that the summary

12    judgment motions and papers have information about all these

13    other minors.  I wouldn't know that, your Honor.  The motion

14    for summary judgment is redacted, pages 1 to 68.  Every single

15    exhibit, the opposition, the reply, this is all redacted.  This

16    is not part of the public record.  The public cannot examine

17    it.

18              Regardless of my client's relationship with Professor

19    Dershowitz does not negate his standing as a member of the

20    media looking to report on a newsworthy case.  If there are

21    particular materials in the summary judgment motion or

22    opposition that are proper to be sealed, we recognize that, but

23    we don't know what they are in order to make that analysis.

24    They are putting the cart before the horse saying it should be

25    sealed or remain sealed when they haven't made a showing of
```

H2G8GIUC

1    what it is that should be sealed.  So we can't address that

2    issue.

3            With respect to the Second Circuit precedent, this is

4    not about tainting the jury pool or self-selecting.  This isn't

5    even about discovery materials.  Mr. Dershowitz's motion was

6    about discovery materials.  This isn't.  This is about a

7    judicial document, the motion for summary judgment.

8            Now, the case they relied upon, the documents weren't

9    at issue until after settlement.  Well, this is actually more

10   important because this is about what the Court will or will not

11   decide on the ultimate outcome potentially of this case,

12   because defendants could walk out of here winning summary

13   judgment based upon these very papers that the public has no

14   idea what is in them.  That distinguishes *Martindale*.  It fits

15   as seen in *Agent Orange*.  Just because, unfortunately, it does

16   involve allegedly the sexual assault of minors, that does not

17   in and of itself mean there should be a blanket sealing order

18   in all cases.

19           In fact, *Globe Newspaper* was the Supreme Court case

20   that specifically held that a Massachusetts statute that

21   automatically sealed material relating to sexual assault of

22   minors does not pass muster.  We have to look at an

23   individualized, particularized basis as to why these particular

24   materials should be sealed.  Maybe they should be, some of

25   them.  We are not looking to embarrass or expose the plaintiff.

H2G8GIUC

1    We are looking to publicize about a defendant who is now sued

2    in multiple cases relating to a pedophilia ring.  This is the

3    news.  This is what the public is interested in.  This is about

4    there is justice in the courts and there is justice in the

5    court of public opinion.

6            THE COURT:  Thank you all.  I will reserve decision.

7            Now I would like to hear on the motion for summary

8    judgment.

9            MR. PAGLIUCA:  Your Honor, this Mr. Gee who will be

10   arguing this motion.  I think it might be prudent at this

11   point, given that I think we are likely going to be talking

12   about information that is subject to the protective order --

13           THE COURT:  I think you won't.

14           MR. PAGLIUCA:  OK.

15           MR. GEE:  Good afternoon, your Honor.  My name is Ty

16   Gee.  The Court granted my PHV motion last week.

17           We have 80-some-odd witnesses and the Court has talked

18   about four to five feet of material.  I think the summary

19   judgment motion, your Honor, might cut to the chase, and the

20   Court has suggested that perhaps it could, at least with regard

21   to the pending 702 motions.

22           I am here to suggest to the Court that the disposition

23   of this motion for summary judgment, at least with regard to

24   issue number one, certainly can narrow the issues considerably.

25   There would not necessarily need to be 80 witnesses.  And with

H2G8GIUC

regard to the other three issues raised on the motion for

summary judgment, they would resolve the case entirely.

I would like to talk in order of the issues that I

think require the least amount of facts in order for the

defendant to prevail on summary judgment.  The first had to do

with republication.

Your Honor, this Court decided the *Davis* case in 1984,

which, frankly, has been consistent with all of the

republication law in the state of New York.  It requires that

for there to be liability for republication, it must be based

on real authority to influence the final product.  So that's

what we, the defense, have been focusing on with regard to this

issue.  Was there real authority to influence the final

product?  Authority has a specific meaning.  In *Davis*, the

Court said that authority means the authority to decide upon or

implement the republication.  And the Court further said that

acquiescence or peripheral involvement in any republication is

legally insufficient.

Of course, I have read the response and the plaintiff

chafes at this idea that an original publisher should not be

liable for republication.  Your Honor, I guess I have a couple

of responses to that.  One is that this disagreement with that

rule is directed to the wrong forum.  The New York Court of

Appeals and the New York law, of course, is what applies here.

The New York Court of Appeals already has spoken on this topic.

1    And in *Geraci*, the court said that *Davis* is right, that you

2    need control and authority over the republication in order for

3    a defendant to incur liability.

4         I would also say, Judge, that the plaintiff's

5    disagreement with this rule fails to acknowledge the unique

6    history and the robust protection of free speech that the New

7    York Constitution has afforded speakers in the state of New

8    York.  This is discussed in the *Immuno AG* case cited in our

9    papers.  At the end of the day, Judge, the plaintiff chose to

10   sue in New York, chose to have New York State law apply.  The

11   plaintiff doesn't have to like it.  They just have to live with

12   it.  And the law is very clear as stated in *Davis*.

13        Now, with regard to the undisputed facts on this

14   question, Judge, there is no question that Mr. Barton, Ms.

15   Maxwell's lawyer, as her agent, caused the January 2015

16   statement to issue.  The e-mail that accompanies that January

17   2015 statement says, in effect, here is a quotable statement.

18        Here is what it does not say, Judge.  It does not say,

19   you are hereby commanded to reprint and republish what we say

20   here.  It doesn't say, if you do not print this quotable

21   statement, we will sue you.  It does not say that if you

22   republish the joinder motion allegations, you must also

23   republish the statement.  Ultimately, what the e-mail does is

24   that it leaves totally in the discretion of the media whether

25   to publish this quotable statement or not to publish the

1    quotable statement.

2          There was some discussion in the papers about whether

3    this was a, quote unquote, press release.  The plaintiff wants

4    to call it a press release.  That's not what the statement

5    calls itself.  As we point out in our papers, it would be quite

6    an unusual press release to make these arguments about how the

7    plaintiff has told falsehoods and then threatened to sue the

8    very people to whom this quotable statement is submitted.

9          The dispositive fact for *Davis* purposes and for *Geraci*

10   purposes, Judge, is that we have uncontested testimony from the

11   defendant, Ms. Maxwell, from Mr. Barton and Mr. Gow that they

12   did not control the republication of this quotable statement,

13   and they had no decision-making authority over any of the

14   media.  You did not see a contest on that question.

15          In *Davis*, this Court held that if there is no evidence

16   that the defendant controlled republication or made the

17   decision to republish, the trial court has "no option" but to

18   dismiss the case.  And here, your Honor, to grant summary

19   judgment.

20          There was some confusion, I believe, in the

21   plaintiff's papers with regard to the question of republication

22   and the separate question of republication of excerpts from the

23   quotable statement.  These are two different points, your

24   Honor, and we submit that the plaintiff loses on both of these

25   issues.

1          It loses on the first issue because it has not

2     produced any admissible evidence that Ms. Maxwell or her agent

3     had any control or authority over the media or making a

4     decision about the republication of the quotable statement.

5          On the second issue, with regard to excerpts, we

6     pointed out that, as bad as it is to hold a defendant liable

7     for the republication of a statement, it must ever so be wrong

8     to make that defendant liable for someone else's decision to

9     republish portions of a statement she has issued.

10         Now, the New York state law on this is set out in the

11    *Rand v. New York Times* case.  The undisputed facts with regard

12    to this second point with regard to republication, Judge, is

13    that Mr. Barton drafted the bulk of this statement.  If you

14    look at the Barton declaration, paragraphs 13 to 20, this makes

15    it absolutely clear.  I understand from the plaintiff that

16    there is some dispute about whether Mr. Barton drafted the bulk

17    of the statement.  That's not true at all.  If the Court looks

18    at the papers cited by the response, there is no contradiction

19    of Mr. Barton's testimony.  Mr. Barton said that, I drafted the

20    vast majority of it.  He said that it's possible that someone

21    else may have contributed, but, ultimately, I'm the one who

22    drafted it, and I adopted all of these statements in the

23    January 2015 statement.

24         It is undisputed, Judge, that Mr. Barton's purposes in

25    drafting the statement on behalf of Ms. Maxwell was two-fold:

H2G8GIUC

1    To mitigate the damage caused by the plaintiff's salacious

2    statements to the media, in the form of that joinder motion in

3    the CVRA case, and the second purpose was to prevent further

4    damage to Ms. Maxwell by issuing this quotable statement.

5            Now, the quotable statement is unique, as I pointed

6    out earlier, because it threatens to sue the very people to

7    whom it is sent.  And Mr. Barton says that that was

8    intentional.  This quotable statement was intended to be a

9    cease and desist.  If you republish this plaintiff's

10   allegations in that CVRA joinder motion, you do so at your own

11   legal peril.  That was the message that Mr. Barton was

12   delivering in that January 2015 statement.

13           Mr. Barton also testifies -- and this is actually

14   shown in the statement itself, January 2015 statement -- that

15   he was building, in effect, a syllogism.  The syllogism went

16   something like this, Judge:

17           Premise number one is that this woman has made false

18   statements in the past, referring to the original allegations

19   from as far back as 2011 and the Sharon Churcher articles.

20           Premise number two was she is doing it again.  These

21   allegations, these new allegations in the CVRA joinder motion

22   are different from, and more salacious than, and contradictory

23   of the March 2011 statements that were made to the press, for

24   example, the two Churcher articles attached as Exhibit A and B

25   to our motion.

1          The conclusion from these two premises, Judge, is

2     found in the third paragraph of the January 2015 statement,

3     that this plaintiff is uttering, quote, obvious lies, the

4     claims are obvious lies.

5          THE COURT:  Meaning all that you have referred to?

6          MR. GEE:  I'm sorry?

7          THE COURT:  Meaning all that you have referred to, the

8     2011 and the intervenor's claims?

9          MR. GEE:  That's a very good question.

10          THE COURT:  Yes, it is.

11          MR. GEE:  The recipients of this quotable statement,

12     of course, are the 6 to 30 journalists to whom Mr. Gow sent

13     e-mails to.  There is no indication whatsoever in the January

14     2015 statement about which allegations are being referred to

15     and the allegation -- there's two references to allegations in

16     the first paragraph of the January 2015 statement.

17          THE COURT:  Original.

18          MR. GEE:  Right.  If we go back to the original

19     allegations --

20          THE COURT:  Those are 2011.

21          MR. GEE:  That's right, Judge.

22          So let's go back to the original allegations.  I'm not

23     sure exactly what are the original allegations.  I have no

24     doubt that the recipients of this January 2015 statement had no

25     idea what qualifies as, quote, the original allegations.

1          THE COURT:  I don't care about that.  What I am trying

2      to figure out is what claims are we talking about.

3          MR. GEE:  Your Honor, I think that is the problem with

4      the plaintiff's case.  Is that we have no idea what we are

5      talking about.  Because if we listen to what Mr. Barton is

6      intending, he is not trying to focus --

7          THE COURT:  His intent, it seems to me -- I don't mean

8      to be rude, but I don't know that his intent matters.  There is

9      no question but that Ms. Maxwell authorized the issuance of the

10     statement.  So it seems to me it's her statement.

11         MR. GEE:  Your Honor, in fact, why don't we just set

12     aside Mr. Barton's declaration for purposes of discussion of

13     this second point about republication.

14         The *Rand* point is that you cannot take a statement, an

15     excerpt from a statement; you, the republisher, cannot choose

16     which part of a statement to extract from and then republish it

17     and then have the plaintiff choose to sue the person whose

18     statement was extracted.  That's the *Rand v. New York Times*

19     point, Judge.  And we don't need Mr. Barton's support there

20     because it is uncontested that what happened in this case is

21     that every single one of the republications were excerpts from

22     that quotable statement.

23         The only point I was trying to make, and I don't need

24     Mr. Barton to make this for me, is that that quotable statement

25     sets up a legal argument that says, she lied here, she lied

1   here, these are obvious lies.

2          Now, the *Rand* point is this.  You can't take one of

3   the premises, or, for example, a conclusion, and then republish

4   that and then make Ms. Maxwell liable for that republication.

5   She didn't choose to say only premise one.  She didn't choose

6   just to say premise two.  She chose to say all of it.  She is

7   building a point.  She is making a point to the media that you,

8   media, need to be responsible, you need to be questioning, and

9   you need to make comparisons between her earlier statements and

10  her new statements, and you figure it out, because if you

11  figure it out wrong, you could be on the wrong end of a lawsuit

12  filed by my client.

13         What the media did in this case, and, frankly, what

14  the plaintiffs did in their own complaint, paragraph 30, your

15  Honor, was to take portions, in fact, it was words in the

16  complaint, the complaint that your Honor ruled on in that

17  12(b)(6) motion.  They didn't even take the sentences; they

18  literally extracted phrases and stuck it into paragraph 30 of

19  their complaint.  But the problem here is, if you do anything

20  like what the plaintiffs did, or what the media did in this

21  case, you can't hold Ms. Maxwell liable for that republication.

22  You change the meaning.  How do you change the meaning?  You

23  changed the meaning because you excluded premise one or premise

24  two or the conclusion or the entire argument that Mr. Barton

25  was trying to make on behalf of Ms. Maxwell.

1            So that's the second republication point, your Honor.

2            Let me move quickly to the pre-litigation privilege.

3     This was argument three in our summary judgment papers, Judge.

4            We know under New York law that if you're in

5     litigation, a lawyer makes a statement that's absolutely

6     privileged.  The question in the *Front v. Khalil* case is what

7     happens if a lawyer makes a statement before litigation has

8     begun?  And in that case, litigation did not begin until six

9     months after the allegedly defamatory statements by the lawyer.

10           So what the New York Court of Appeals says in 2015 is

11    that, because of the possibility of abuse by lawyers -- I can't

12    imagine that -- what we are going to do instead is we are not

13    going to give you an absolute privilege, we will give you a

14    qualified privilege.  But it defines a qualified privilege

15    rather carefully, Judge.  It says that the qualified privilege

16    that you have is that any statement that a lawyer makes in good

17    faith anticipated litigation, that's pertinent to good faith

18    anticipated litigation, is privileged.

19           Now, you can look at this as being absolutely

20    privileged or qualifiedly privileged.  It's absolutely

21    privileged, in my view, so long as the lawyer can establish

22    that there was a good faith anticipated litigation.  Once you

23    have established that point, then it is an absolute privilege.

24    Or you can talk about it in a qualified sense, which is that

25    the lawyer has a privilege to make defamatory statements, but

H2G8GIUC

1    the privilege is qualified by whether or not the statement is

2    pertinent to good faith anticipated litigation.

3            Regardless of which way we want to look at this

4    privilege, as articulated in the *Khalil* case, Judge, it applies

5    here.  The elements that *Khalil* says we must establish in order

6    to prevail on summary judgment on this privilege, Judge, is it

7    has to be a statement by an attorney or an agent under his

8    direction.  We have undisputed testimony, paragraphs 7 to 20 of

9    Mr. Barton's declaration, saying that:  I'm the one who engaged

10   Mr. Gow.  I am the one who directed Mr. Gow.  I am the one who

11   drafted the vast majority of the statement.  As to the

12   possibility that other parts were drafted by someone else, I

13   adopted them as my own before I directed Mr. Gow to send out

14   the statement.  We have satisfied that.

15           The second element is that it had to be pertinent to

16   good faith anticipated litigation.  Well, the test on

17   pertinence, I don't believe that the plaintiff is contesting

18   this but I will just mention it quickly, which is that in the

19   *Flomenhaft* case, the appellate court said that the test on

20   pertinence is "extremely liberal."  And for a statement to be

21   actionable it must be "outrageously out of context."

22           Well, there is good reason why the plaintiff would not

23   dispute this, Judge.  The January 2015 statement was certainly

24   not outrageously out of context.  It was fully within context.

25   Be careful if you choose to republish the plaintiff's salacious

H2G8GIUC

 1   allegations because we may end up suing you for defamation.  As

 2   a matter of fact, in the last paragraph of the January 2015

 3   statement, the word defamatory is used twice, Judge.

 4          The last element is, was there anticipated good faith

 5   litigation?  Well, that's not a difficult hurdle for us, Judge.

 6   Mr. Barton says in his declaration that, as a matter of fact,

 7   he did anticipate litigation.  He did not have in his eye a

 8   particular reporter or medium to bring a lawsuit against.  In

 9   fact, that was the whole point of the January 2015 statement,

10   was to dissuade the media from republishing plaintiff's false

11   statements.  And that's why he made the argument that he did:

12   Do not trust this person, this person tells falsehoods.  He

13   could easily see, and he did see, that if the media chose to

14   republish the plaintiff's false allegations, it would be

15   "defamatory," as he says in the fourth paragraph of the January

16   2015 statement, and he would be entitled to sue.  So that

17   certainly is good faith anticipated litigation.

18          Judge, once we have satisfied those elements, this

19   privilege kicks in and that statement, the January 2015

20   statement, all of it, becomes non-actionable under the New York

21   Constitution.

22          It seems to me that the main point of the plaintiff's

23   in opposition to the pre-litigation privilege is this idea that

24   malice applies.  Well, Judge, that was addressed in the Khalil

25   case.  There is no malice question in the application of the

H2G8GIUC

1    pre-litigation privilege.  It specifically talks about how

2    malice does not apply.  In other words, the privilege removing

3    malice that applies to, let us call it, a qualified privilege,

4    a general qualified privilege in the State of New York, does

5    not apply to the pre-litigation privilege.  It says so in

6    *Khalil*.  And all that we must show to prevail on summary

7    judgment is good faith anticipated litigation that is related

8    to the statement made by an attorney.  It could not be a

9    simpler rule.  And, Judge, we have satisfied all the standards.

10   We don't even need to rely on Mr. Barton frankly.  We have to

11   rely on Mr. Barton to the extent that he is the lawyer who

12   prepared the statement, but that's not a contested fact, your

13   Honor.

14           I see the plaintiff, as they sometimes want to do, is

15   simply making an argument that, no, he did not prepare the

16   statement, but they have no opposition to Mr. Barton's

17   declaration.  They say that Mr. Gow prepared the statement, or

18   Ms. Maxwell prepared the statement.  Where is the evidence for

19   that, Judge?  There is absolutely no evidence.  Mr. Barton's

20   declaration is undisputed on the question of who prepared the

21   statement, who engaged Mr. Gow, who directed Mr. Gow to cause

22   this statement to issue to the media.

23           Let me move on to the issue of opinion, Judge.  This

24   is argument two in our motion for summary judgment.

25           The New York Constitution, under *Immuno AG* and the

*Steinhilber* case, requires the application of those four

so-called *Omen* factors.  I call them the *Steinhilber* factors

because *Steinhilber* adopted the four factors in the D.C.

Circuit *Omen* case.  And these factors, your Honor, all come our

way.  The plaintiff loses on the question of opinion as well.

On the question of indefiniteness and the ambiguity,

the Court brought out the point earlier about, well, what is

meant by the word allegations used twice in the first

paragraph.  First, allegations without an adjective, and then

the second time, original allegations.  What is meant by that?

Well, here is the indefiniteness and the ambiguity,

Judge, that comes right into play.  The plaintiff is facing an

insurmountable problem, both at trial against the 80 witnesses

and in the summary judgment motion, because they are trying to

establish that every allegation ever made by the plaintiff is

true, and provably true.  So here they are chasing windmills

trying to prove that every allegation the plaintiff has ever

made is true.  It can't be done, and I am going to talk a

little bit more about that in a moment as far as why it cannot

be done.  For now I just wanted to talk about the

indefiniteness and the ambiguity.

The third statement in the January 2015 statement, the

third sentence that is the subject of the complaint, paragraph

30, is Mr. Barton's statement in paragraph 3 that plaintiff's

claims are "obvious lies."  Well, we don't know what, quote

1    unquote, claims Mr. Barton is referring to.  He just says

2    claims.  That is another area of indefiniteness and ambiguity,

3    Judge.  The Court doesn't know, the plaintiff doesn't know, and

4    none of the reporters would know what is meant by the words

5    allegations, original allegations, and claims.

6          As Mr. Barton tells it, he is not trying to go blow by

7    blow to try to rebut plaintiff's allegations.  He is going

8    after something bigger.  He is going after the plaintiff's

9    credibility.  And that comes out in the January 2015 statement

10   itself.  It talks in generalities about how her claims have

11   proven to be untrue.  Well, how are they proven to be untrue?

12   Well, you don't need Mr. Barton for this.  Take a look at the

13   March 2011 statement issued by Ms. Maxwell, and that also was

14   drafted by Mr. Barton, but it doesn't really matter.  The point

15   is that in the March 2011 statement, and this answers your

16   question with regard to that statement, Judge, the March 2011

17   statement, in the very first paragraph of the March 2011

18   statement, Ms. Maxwell says that the allegations by the

19   plaintiff are "all entirely false."  That is to be

20   distinguished from the January 2015 statement when she does not

21   say "all entirely false."  She says simply that the allegations

22   are false.

23         Now, the distinction between the March 2011 statement

24   and the January 2015 statement bear on this question of

25   indefiniteness and ambiguity.  It's certainly not indefinite

H2G8GIUC

1      and it's certainly not ambiguous when Ms. Maxwell says in March

2      of 2011 that these allegations are "all entirely false."  It is

3      ambiguous and it is indefinite when she fails to say "all

4      entirely false."

5            The second issue is whether these three sentences

6      identified in paragraph 30 of the complaint are capable of

7      being characterized as true or false.

8            Now, this is a kind of binary question that the

9      *Steinhilber* factor two has us look at.  But recognizing at the

10     same time that there are some statements that appear factual,

11     but are not when looked at in context -- and now we are jumping

12     to factor number three in *Steinhilber*, the contextual issue.

13           On the question of whether it could be proved true or

14     false, well, the plaintiff has taken to chasing this windmill

15     of trying to prove whether the allegations are true or false.

16     What I suggest to the Court is that you can't prove whether

17     the, quote unquote, allegations are true or false because they

18     are not identified.  You can't prove whether the, quote, claims

19     are obvious lies because they are not identified.  If you broke

20     down every single allegation made by the plaintiff into

21     constituent sentences, discrete constituent sentences, you

22     might have over a thousand statements.  These plaintiffs have

23     chosen to go on this adventure of trying to prove each one of

24     these allegations is true, and, conversely, that there was no

25     good faith basis for Ms. Maxwell to say that any of them were

H2G8GIUC

1    not true, to say that any of them were false.

2            Judge, I don't know that this is an adventure that is

3    going to get us very far.  The Court is setting a one-month

4    trial for us to figure out whether these hundreds of

5    allegations made by the plaintiff are true or false, but what I

6    was trying to do, Judge, was cut to the chase.  Are there at

7    least two allegations, plural?  Because the Second Circuit in

8    the *Law Firm of Foster Case* says that substantial accuracy is

9    the standard here for defendants, not literal accuracy.  But

10   what I am trying to focus on is that, if that's the standard,

11   Judge, and we show you literal accuracy, then surely we win on

12   the *Law Firm of Foster Case*.

13           Judge, may I approach the Court?  I have a hand-out I

14   would like to share with the Court.

15           So that I don't need to discuss this on the record,

16   Judge, I ask two things.  Number one, that the Court let me

17   know when it has finished reading this, and, number two, I

18   would like for this document to be included in today's record.

19           THE COURT:  Yes.

20           MR. GEE:  Thank you, Judge.

21           What I have done here is to do a very simple

22   comparison between the March 2011 allegations, i.e., the

23   original allegations by the plaintiff, and her new, her CVRA

24   joinder motion allegations.  The first allegations were given

25   to Sharon Churcher, reporter, for $160,000, where Ms. Churcher

1    says in the article that she interviewed the plaintiff "at

2    length."  In the article it says -- I think it was on page 3 of

3    the article; Exhibit A to our motion for summary judgment --

4    for a week or better she interviewed the plaintiff.

5         This was plaintiff's coming-out story, first time that

6    she had publicly disclosed who she was and what has happened to

7    her, supposedly, to Ms. Churcher.  Ms. Churcher then writes a

8    very lengthy article, Exhibit A to our memorandum, and the

9    second column, Judge, discusses the plaintiff's allegations on

10   the very same subjects.  The first encounter with Mr. Epstein

11   and then the second encounter with Prince Andrew.

12        As the Court can see from this very simple comparison,

13   anyone with half a brain in January of 2015 could take a look

14   at column 1 and look at column 2 and decide that the original

15   allegations are either true or they are false; the new

16   allegations are either true or false.

17        Now, here is a situation where we are not talking

18   about opinion; we are talking about remembered fact or,

19   alternatively, manufactured fact.  Now, either the plaintiff

20   had these encounters as she described in 2011, or she had the

21   encounters as described in her CVRA joinder motion in December

22   2014.

23        As the Court says in its 12(b)(6) order, one of these

24   must be true.  This is a binary question, Judge.  You can't

25   have both of these being true.

H2G8GIUC

1              Now, when we are talking about that second *Steinhilber*

2      element, whether something can be characterized as true or

3      false, of course, we are applying the second factor to the

4      January 2015 statement and, specifically, to those three

5      sentences:  The allegations are false, the original allegations

6      were shown to be untrue, and the third sentence is, the claims

7      are obvious lies.

8              Now, when the Court issued its 12(b)(6) order, it did

9      not have the benefit, of course, of Exhibits A and B, the

10     Sharon Churcher articles to our memorandum of law; it did not

11     even have the benefit of the full January 2015 statement; it

12     didn't have the benefit of the original allegations proven to

13     be a true statement from March of 2011, because all that it had

14     before it was what the plaintiff chose to select, excerpt, and

15     put into paragraph 30 of the complaint.

16             In that context, it was fairly easy for the Court to

17     say, well, accepting these allegations as true, and drawing all

18     inferences in favor of the plaintiff, I, the Court, can see how

19     this idea of an opinion defense doesn't fly, because it says

20     here that the allegations are false.  I could see how the Court

21     would say, well, either the allegations are true or they are

22     false.  When we place into context the statement, however, we

23     now see all kinds of problems with the plaintiff's case.

24             The one problem this Court already identified was this

25     question of, What does it mean allegations, plural?  What does

1     it mean original allegations, plural?  And what does it mean

2     claims, plural?  We don't know, Judge, what that means.  And I

3     will predict that if you have Mr. Barton, Mr. Gow, and Ms.

4     Maxwell testify in this case, they will say, we don't know what

5     it means.  They will say, we don't know what it means because

6     it is totally vague.  That's not the point they are trying to

7     make.  They are not trying to make the point in 2015 that

8     everything this plaintiff has ever said is a falsehood.  They

9     are making the point that, media, use your head, figure out

10    which of these allegations are true and false before you go

11    around republishing her allegations.  That's the point.

12            When we get to the third factor, the third *Steinhilber*

13    factor, we know that the New York Constitution requires that we

14    consider the full context.  And in the *Boeheim* case, the court

15    said that the full context factor is often the key

16    consideration.  I think it is here too, Judge.  It makes sense,

17    this factor.  It is a First Amendment sin to take things out of

18    context and then sue people for it.  Everything must be read in

19    context.  If you take something out of context, as the

20    plaintiffs do in paragraph 30, you have no idea the environment

21    in which those excerpted statements are being used.  But we

22    know now, Judge.  We know now because of the Rule 56 record.

23            We know that in context that January 2015 statement in

24    its entirety actually makes a lot of sense.  It actually is

25    something that you can see a lawyer drafting, on one hand, to

H2G8GIUC

try to fend off the allegations he believes are false on behalf
of his client, and on the other hand, to tell the media, you
republish her false allegations at your peril.  That is the
context of that statement.  As I say, Judge, you don't need Mr.
Barton to take a look at the statement and see what he was
building there.  He is building a syllogism.  He is trying to
persuade the media don't republish the plaintiff's statements.

As a side note, Judge, on the question of
republication, you will note that Mr. Barton gets it right.
Mr. Barton doesn't say, if you republish plaintiff's
allegations, we are going to sue the plaintiff.  He doesn't say
that.  He says, in the fourth paragraph of the January 2015
statement, if you republish the plaintiff's false allegations,
we are going to sue you, the plaintiff.  The January 2015
statement is not issued to the plaintiff, although she would
certainly be a critical witness if Mr. Barton were to sue the
media.

Let's get to the last factor, Judge.  The last factor
is a broader setting, and the broader setting as applicable to
our motion for summary judgment has to do with the question of
to whom this January 2015 statement was issued.  It was issued
to 6 to 30 media.  It doesn't really matter what the number is.
It could be one, it could be eight, it could be 100 newspaper
reporters.  The point is that it was issued to this audience,
and the audience of reporters, not to the general public.  It

H2G8GIUC

1     didn't make any sense to issue to the general public because he

2     is talking about threatening to sue the media.

3              So he sends it to the reporters, the reporters who had

4     contacted Mr. Gow and asked for a response from Ms. Maxwell.

5     You want a response?  I will give you a response.  Here is the

6     response.  The response is this woman is telling falsehoods.

7     Her original allegation had proven to be false.  She is doing

8     it again.  This time they are more salacious, yes.  The claims

9     are obvious lies.  If you're not careful about republishing, we

10    will sue you.  That's the message.

11             So, Judge, the New York Constitution would require

12    that the jury be instructed, if it gets that far, that this has

13    to be looked at, not as a member of the general public, the

14    January 2015 statement must be viewed from the viewpoint of

15    these journalists who are the recipients, the exclusive

16    recipients of the 2015 statement.

17             The last argument that we made I can be fairly short

18    with, Judge.  This is the argument that discusses the

19    plaintiff's heavy burden.  Plaintiff has to prove two things by

20    clear and convincing evidence.  One is it has to prove falsity

21    of the three sentences that are the subject of this lawsuit:

22    The allegations are false, the original allegations have proven

23    to be false, and the claims are obvious lies.

24             By the way, on the "obvious lies" question, Judge,

25    just to step back for a second, on the question of opinion, I

1   don't see how anyone could look at that sentence, "these are

2   obvious lies," and not see an opinion here.  Because what is an

3   obvious lie?  That is purely subject to opinion.  It certainly

4   can't be proven true or false what is obvious.  I would suggest

5   to the Court that the hand-out that I gave titled "Two examples

6   of Plaintiff Giuffre's original and new allegations" is an

7   example of where there are obvious lies.

8          Now, moving back to this question of what the

9   plaintiff's heavy burden is, they have to prove by clear and

10  convincing evidence -- and we set out what the standard is in

11  the Southern District of New York in our papers what clear and

12  convincing is -- they have to prove falsity and they have to

13  prove actual malice, actual malice being that Ms. Maxwell, when

14  that January 2015 statement was issued, knew that those three

15  sentences were false or had been published anyway through Mr.

16  Gow with reckless disregard to whether they were false or not.

17         For the Court's benefit, what we tried to do to make

18  this point more salient is, rather than have the Court wade

19  through the hundreds of pages of materials the plaintiff

20  submitted, we look at it from the converse angle, and that is,

21  are there at least two allegations?  I use two because I am

22  trying to follow the *Foster* case, and I am trying to show

23  literal truth or literal falsity, and allegations plural means

24  two or more.  So if I can find two occasions when this

25  plaintiff has told falsehoods, or has said something that would

1    lead Ms. Maxwell or Mr. Barton on her behalf to believe in good

2    faith that she has told a falsehood, this case ends, Judge, the

3    plaintiff loses.

4           In our papers, we actually identified for the Court

5    some of those facts.  I won't go into them now because we are

6    on the record and the court hasn't been sealed, but I submit to

7    the Court, Judge, that there is no dispute that at least two,

8    and we know of many more of course, but at least two of

9    plaintiff's original allegations are false.  We know that at

10   least two of her new allegations are false.  And any way you

11   cut it, this plaintiff has lied, and she has lied in statements

12   to the public.  The only way that Ms. Maxwell would know about

13   the statements are the ones that she made to the public.  In

14   her own deposition, she has admitted that parts of the Sharon

15   Churcher article, Exhibit A to our memorandum, at least 11

16   statements that she made are not true.

17          That's it.  The case is over, Judge.  We have shown

18   more than one allegation made by this plaintiff is false.  Or

19   we don't even have to prove that it's false.  We can simply

20   show that we had a good faith basis for believing that it was

21   false, and under *New York Times v. Sullivan*, that's good

22   enough.  The case is over, Judge.

23          I anticipate that what is going to happen as soon as I

24   leave this podium, Judge, is that the plaintiff is going to

25   trot out about a hundred pages of facts and spend most of the

H2G8GIUC

 1     time talking about facts.  That's simply an homage to the idea

 2     that if the law is opposed to you, go with the facts.  I

 3     suggest that the Court do what I am going to be doing, which is

 4     I am going to be trying to figure out, every time they mention

 5     a fact, whether it is something that is of consequence to our

 6     motion for summary judgment.  I have laid out what the law is.

 7     I don't expect them to be talking much about the law.  It will

 8     be about the facts and about how there must be conflicts.  But

 9     there is no disputing Mr. Barton's declaration to the extent

10     that it is required for a motion for summary judgment.

11             So, your Honor, we would ask that the Court enter a

12     motion for summary judgment and we can have our May free.

13             MS. McCAWLEY:  May I be heard, your Honor?

14             THE COURT:  Sure.

15             MS. McCAWLEY:  I would like to start by handing your

16     Honor some materials, if I could approach the bench.

17             THE COURT:  Sure.

18             MS. McCAWLEY:  I did three this time.  I remembered.

19             I want to be very clear to start.  We are going to

20     focus on the law, but as you know, at the summary judgment

21     stage, if there are factually disputed issues, it would be

22     improper to be granting summary judgment.  So let's talk about

23     both.

24             To start, there is a plethora of evidence that shows

25     that the defendant sexually abused and sexually trafficked my

H2G8GIUC

1   client when she was a minor.  A plethora.  We don't have to

2   prove hundreds of allegations.  All we have to prove is that my

3   client was abused and trafficked by Maxwell.  The statement

4   comes out two days after the CVRA filing where my client says

5   she was abused and trafficked by Maxwell, and that statement is

6   released and calls her allegations, plural, untrue, obvious

7   lies, etc.

8           So let's just look at what we have.  I am not going to

9   repeat it because it's in your binder, but in there you will

10  see -- and, also, because it's confidential right now -- you

11  will see a number of witnesses who corroborate the story that

12  they were similarly abused by both Maxwell and Epstein.  You

13  will see eyewitnesses at the time back in 2000 who defendant

14  asked to assist in this process with.  You will see the flight

15  log showing over 23 flights when my client was a minor flying

16  with Maxwell and Epstein.  You are going to see a number of

17  witnesses taking the Fifth when asked about Maxwell.  You're

18  going to see the house staff talking about how these things

19  occurred, that there was evidence of sexual trafficking and

20  abuse.

21          More importantly, your Honor, you're going to see the

22  hard copy documents.  As my partner, David Boies, often says,

23  the documents don't lie, and in this case they prove the case.

24  It needs to go to the jury.  You will see that there are

25  pictures from early 2000.  Nothing produced by Maxwell, mind

H2G8GIUC

1   you; she has produced nothing.  From the early 2000s, the first

2   documents we get, after pulling tooth and nail, is 2011.  So

3   there is nothing from her for the early years 2000.

4          But we have pictures, hard copy pictures.  We have

5   hospital records from when my client was a minor here in New

6   York with them.  We have time and travel records saying call

7   Maxwell.  We have message pads.  We have the FBI 302, which was

8   taken in 2011, mentions Prince Andrew in it, in the unredacted

9   part, so you can see it there.  The victim notification letter,

10  the black book, which we have talked about, and you said with

11  respect to Alfredo Rodriguez, which has a Florida massage

12  section that has a 14-year-old girl's name in it.

13         So this information is all relevant to the factual

14  issue of whether defendant's defamatory statement that my

15  client lied about sexual abuse that's at issue here.

16         Your Honor, they have been careful about trying to

17  carve around your February 27th order, and I am mindful of the

18  fact that that was an order that was issued at the motion to

19  dismiss stage, but to be clear, that order has well-reasoned

20  language because it talks about sexual abuse being a clear-cut

21  issue.  You either were abused or you were not.  You said

22  either Maxwell is telling the truth and she was involved or the

23  plaintiff is telling the truth.  It's a factual issue that can

24  be determined by the finder of fact, as you said.

25         So, your Honor, let's look at this republication issue

H2G8GIUC

 1   because I think that is an issue that they focused on

 2   tremendously, and I want to be very clear on that.

 3           First of all, Maxwell issued this press release, not

 4   her lawyer Barton.  They can file as many self-serving

 5   declarations as they want, but the documents don't lie.  If you

 6   look in your binder, your Honor, you will see the smoking gun

 7   e-mail.  And I will tell you, we didn't get that e-mail from

 8   Maxwell.  You will remember that we had to fight tooth and nail

 9   to get the deposition of Ross Gow, her press agent.  We spent

10   close to $100,000 getting all the way over to London, fighting

11   in those courts, to get the deposition of her agent.  They

12   wouldn't produce him.  And now they are submitting this

13   affidavit on behalf of Barton.

14           Your Honor, that document is critical, because what it

15   shows very clearly is it was Maxwell who sent the press release

16   to her press agent, Ross Gow, for publication.  That press

17   release goes out from Ross Gow, not from a lawyer.  His Web

18   site says he is a reputation manager.  He is a press agent who

19   issued a press release.  This is not a cease and desist letter.

20   This was a press release.  In fact, a press release that said,

21   "Please find the attached quotable statement by Ms. Maxwell."

22   It's a press release telling the press, please quote these

23   defamatory statements.

24           They have admitted at least 30 different international

25   press folks to defame my client in the international press.

1   And now they want to say, Oh, no, no, hands off, we are not

2   liable for any of that; we are not liable for our statement

3   being disseminated in the international press; there is

4   republication case law and we didn't control or authorize that.

5   There is no better evidence, your Honor, of control and

6   authorization than sending a press release to the international

7   press saying, please publish this, please publish these

8   defamatory statements so that the international public thinks

9   that this little girl is a liar.  So that is what is happening

10  here.

11          So when we look at the republication law, you will see

12  very clearly, there are cases that we can follow -- and it is

13  New York case law; we have cited nothing but New York case

14  law -- that says it's different when you issue a press release.

15  Look at *Levy v. Smith*, and that's in your binder, your Honor.

16  That case says, yes, there is republication case law that says

17  you have to control or authorize.  But issuing a press release

18  so that it goes out to the media, is that control or

19  authorization?  It's saying, here is a statement, I want to

20  publish this and disseminate it internationally.

21          We also have the *National Puerto Rican Day* case, which

22  is the same thing.  It was an opinion piece that was paid for

23  and disseminated to the press.  And there the court held, yes,

24  there is control and authorization over that dissemination.

25          Here, your Honor, we have the same thing.  We have

H2G8GIUC

1    Maxwell hiring a paid press agent to issue a statement to the

2    international press with defamatory statements in it, your

3    Honor.

4            They focus on the *Geraci* case.  And that is case law

5    in New York.  We looked at that case.  We take no issue with

6    that case.  That case is vastly different than the situation

7    here.  In that case, the republication happened three years

8    later.  The initial publication was a statement to a fire

9    commissioner, it was a letter, but then three years later a

10   newspaper published.

11           This here is vastly different.  We have a press

12   release that's given directly to the international media for

13   publication saying, Please, here, attached find a quotable

14   statement for your distribution, your Honor.  This is the

15   perfect situation.  If the law were otherwise, it would turn

16   defamation on its head.  It would mean that you could issue a

17   press release to the international press and then sit back and

18   say, I am not liable because those other publications put the

19   quotes in, I didn't.  That's not the law, your Honor.  She

20   controlled and authorized this entire process.

21           So, your Honor, we believe that the cases that they

22   focus on there are distinguishable because they are situations

23   where -- for all of their cases -- where the publication was in

24   a different type of publication, happened years after the fact.

25   Those are the types of republication issues where the court

1    says, well, that person is not really liable.  Three years

2    later a different movie came out with a statement that the

3    original publisher had no involvement with.  That's where the

4    republication law lands.  But if you look at *Levy* and if you

5    look at the *National Puerto Rican Day* cases, you will see that

6    the courts do hold you liable when you issue a press release,

7    which is what happened here.

8         So I submit to you that on republication and the

9    publication issue, she is certainly liable for publication of

10   the initial statement to the 30 international press, and then

11   thereafter she is liable for those being quoted.

12        Now, she says, well, there is another issue, because

13   if it's excerpted or quoted or edited in any way, under *New*

14   *York v. Rand*, I am not liable.  *New York v. Rand* is a case that

15   involves an interview of a singer, and it's a long interview

16   that takes place, and then the publication that comes out takes

17   statements from that interview and changes the words.  So it

18   uses different words than what happened during the interview.

19        That's not our situation here, your Honor.  The

20   defamation that we have gone after, that you see from our

21   expert, Jim Jansen, has gone after, are the quoted statements.

22   That's what we are looking at.  The press release has those

23   statements; those being quoted by the international media that

24   she sent it to, she is liable for that.  It's not a *Rand*

25   situation.  This is exact quotes from her statement that she

H2G8GIUC

1   said, Please find a quotable statement.  She didn't say, you

2   have to quote the whole thing.  She said, Please find a

3   quotable statement.  And what are they going to quote?  The

4   defamatory pieces, the obvious lies, the things that make my

5   client look like a liar when she is not.

6           So that issue, in my view, is something that is clear

7   that there was publication, and that if anything is deemed

8   republication, it was clearly authorized by the defendant.

9           So let's look at the second issue that they raise, and

10  that is they raise the issue of the pre-litigation privilege.

11          Now, your Honor well knows, I know you're familiar

12  with the pre-litigation privilege because you have had cases

13  that have talked about it.  But with respect to the

14  pre-litigation privilege, that was crafted to handle situations

15  like when, for example, a lawyer sends a cease and desist

16  letter in advance of litigation.  If you look at the _Khalil_

17  case, which they talk about, that case was a situation where an

18  employee had stolen intellectual property and the lawyer sent a

19  letter saying, this person has stolen this intellectual

20  property, we want them to cease and desist and give our

21  property back.  Then that person sued for defamation.

22          We are in a remarkably different situation here.  We

23  are not in a pre-litigation context here, no matter how many

24  times they want to say it.  No matter how much they want Barton

25  to throw himself on the sword and say, oh, this is all about

H2G8GIUC

1    litigation, it's not, your Honor, because the documents don't

2    lie.  So if you look at the documents, you will see it's not

3    about pre-litigation.

4         The *Block v. First Blood* case, which is your case,

5    your Honor, in that case you denied summary judgment saying, to

6    prevail on a qualified privilege defense, the defendant must

7    show that his claim of privilege does not raise a triable issue

8    of fact that would defeat it.  Here, we clearly have triable

9    issues of fact.  We believe that there is no pre-litigation

10   privilege that's applicable, but at a minimum, we have triable

11   issues of fact.

12        So with respect to pre-litigation, let's look at what

13   the facts are.  The facts are that this statement, which they

14   say we haven't contested or disputed, that's not correct.  We

15   submitted the statements themselves, those e-mails that show

16   that Maxwell is sending the statement; not her lawyer, Maxwell.

17   The documents don't lie.  So Maxwell sends a statement to her

18   press agent, which gets issued to the international press.

19   They say, no, the purpose was -- let's rephrase that, the

20   purpose was that we really were thinking about suing the

21   international press.  Maxwell in her deposition said she never

22   sued the international press.  So this never occurred.  There

23   was no lawsuit that came out of this.

24        If you look at what the statements are, if you

25   accepted that, you would be able to say, someone can defame

1    someone freely, a nonparty, included in a statement, issue it

2    to the international press and then stand back and say, oh,

3    well, my lawyer really intended to sue those other entities,

4    those publications, so therefore I get protected by the

5    pre-litigation privilege.  That's not the law, your Honor.  It

6    doesn't apply here.  This was Maxwell issuing a statement for

7    her own benefit, to try to clear up her reputation, because she

8    had been implicated in a very serious sexual trafficking and

9    sexual abuse situation.  That is what that statement was about.

10   It was not about litigation.  It was about taking down my

11   client and her reputation and trying to build back defendant's

12   reputation.

13          And while we are on that, your Honor, they admitted

14   that by submitting Barton's declaration, they waived the work

15   product privilege.  We contend that they also waived an

16   attorney-client privilege.  They have submitted a privilege log

17   to you that you have reviewed that had documents on it,

18   communications between the two of them.  We should be able to

19   see all of that.  Certainly, if they waived the work product

20   privilege, where are the drafts of this document, where are the

21   e-mails back and forth on how this was created?  That's all

22   factual issues.  We are entitled to see that.

23          So, your Honor, I submit to you that there is no

24   pre-litigation privilege here.  This was not done for the

25   purposes of litigation, regardless of what they are doing as a

H2G8GIUC

1  post hoc self-serving declaration, and that they don't meet the

2  case law for that either.  If anything, there is clearly a

3  questionable issue of fact as to that.

4       So, your Honor, I would like to turn now to the issue

5  of whether or not -- they have now argued again, as they did at

6  the motion to dismiss stage, that these statements are not

7  fact, they are opinion.

8       So, your Honor, if you look at that, that argument

9  turns logic on its head.  Mr. Gee said today, these folks would

10  have to prove a hundred allegations are all true in order to

11  win this case.  That's not the case, your Honor.  We only have

12  to prove, because her statement says the allegations that my

13  client has made are false, we only have to prove that my client

14  was sexually abused and trafficked, which we can do.  We prove

15  that, we win this defamation case.  She defamed my client by

16  calling her a liar about sexual abuse and trafficking claims.

17       Your Honor, when we look at whether that's fact or

18  opinion, you were very clear in your motion to dismiss order,

19  talking about the nature of calling someone a liar, and that

20  being able to be proven true or false when it relates to sexual

21  abuse.  You said either Maxwell was involved or she was not.

22  This issue is not a matter of opinion, and there cannot be a

23  differing understanding of the same fact that justify

24  diametrically opposed opinions as to whether defendant was

25  involved in the plaintiff's abuse as plaintiff has claimed.

H2G8GIUC

1   Either plaintiff is telling the truth about her story and

2   defendant's involvement or defendant is telling the truth and

3   she was not involved in the trafficking and ultimate abuse of

4   the plaintiff.  The answer depends on facts.

5            Your Honor, that is the case.  So let's look at this

6   four-factor test that they talk about, because that four-factor

7   test, which you did analyze in your motion to dismiss papers as

8   well, but that four-factor test bodes clearly in favor of

9   finding that this is fact and not opinion.

10           If you look at the first factor, the statement has to

11  be definite and unambiguous, clearly, the statement is definite

12  here.  She is calling my client a liar.  She is saying her

13  claims of sexual abuse and trafficking are obvious lies.  So in

14  that context, there is definiteness, it is not ambiguous.  She

15  is either telling the truth or she is not.  That's it.

16           With respect to the second factor, it says the

17  statement must be verifiable and be capable of being proven

18  true or false.  That's clearly the issue here.  It is capable

19  of being proven true or false as to whether or not my client

20  was sexually abused and trafficked by Ms. Maxwell.  Again, you

21  have a plethora of facts in the binder that show, we believe,

22  that that is the case.  But, nevertheless, it's not an opinion.

23  It is a factual issue as to whether that occurred.

24           The third is looking at the entire context of the

25  statement and to compel a finding of whether it's a statement

1    of fact or opinion.  Again, the context of this statement --

2    and that bleeds into the fourth factor -- is a press release.

3    This was a press release by Maxwell.  It wasn't an opinion

4    piece.  It wasn't a letter to the editor.  It was a press

5    release, your Honor, where Maxwell's goal was to put false

6    facts into the public to try to repair her reputation.

7             So, your Honor, we contend that under that four-factor

8    test, it is absolutely clear that this would be fact and not

9    opinion.

10            The last issue that they raise -- they skipped a few

11   things, but the last issue that they did raise was the issue of

12   malice, and they say that we would be unable to prove in this

13   case malice.

14            First, they haven't met their burden for showing that

15   we have to prove malice.  But if we do have to prove malice, we

16   absolutely can, because what this statement is about is sexual

17   abuse, and the person who made the statement is Maxwell.  So if

18   Maxwell abused my client, and then knowingly made a statement

19   that my client was lying about that abuse, that those claims

20   were obvious lies, that establishes malice.  It's knowledge on

21   the part of the person making the statement.  She made it

22   intentionally to try to deflect from her own self, and she

23   would be responsible for that action, and we would have

24   established malice.

25            So with respect to that issue, we absolutely can

H2G8GIUC

1    establish malice without question.  The only question is

2    whether we have to establish that.

3              Now, I just want to touch one more moment on this idea

4    they have just raised in the summary judgment papers that they

5    only have to show that two issues are false, and if they show

6    that, they win.  That's not the case, your Honor.  The

7    statement is about any of the allegations.  So she is saying my

8    client's allegations are untrue.  So if we prove that those

9    allegations of sexual abuse and trafficking are true, that my

10   client was sexually abused and trafficked, we win.  That's

11   defamatory.  So they have just flipped logic on its head with

12   respect to this, oh, we can prove two things and then we win.

13   That's not the case here.

14             But regardless, bottom line, your Honor, this is a

15   case that must go to the jury.  There are clearly questions of

16   disputed fact.  They don't qualify for the issue of

17   republication.  They don't qualify for the pre-litigation

18   privilege.  Malice is a factual issue that goes to the jury,

19   your Honor.  So summary judgment should be denied, and we are

20   entitled to take this case to a jury.

21             Thank you, your Honor.

22             MR. GEE:  Thank you, your Honor.

23             Well, I didn't give the plaintiff enough credit.  I

24   thought they were going to try to prove this case, but instead,

25   they are going to try to prove a different case.

H2G8GIUC

1          I didn't think that it was possible to prove, for

2    example, all of the allegations the plaintiff made to

3    Ms. Churcher in Exhibit A and B were all true.  I didn't think

4    that they were going to be able to prove that all of the

5    allegations made by the plaintiff in the CVRA joinder motion

6    are true.  And put a different way, I didn't think that they

7    were going to be able to prove by clear and convincing evidence

8    that Ms. Maxwell, through Mr. Barton, could not have in good

9    faith believed that at least two of these allegations, the

10   original and the new, were false.  I didn't think they could do

11   that.

12          I think what Ms. McCawley has just done is implicitly

13   confirm that they can't do that, that's why they are not going

14   to do it.  Instead, they have changed the case, Judge.  And I

15   want to spend a little bit of time on this because I think it's

16   really important for the parties and for the Court, and

17   ultimately, if this case makes it that far, to the jury.

18          I heard Ms. McCawley say multiple times that what this

19   case is about is sexual abuse.  My client was sexually abused

20   and trafficked, that's what we have to prove.  That's coming

21   right out of Ms. McCawley's mouth.

22          Judge, they brought a defamation case; they didn't

23   bring a sexual abuse case.  The question is not whether Ms.

24   Maxwell sexually abused anyone.  The question is whether Ms.

25   Maxwell defamed someone, specifically, the plaintiff.  And,

H2G8GIUC

1    judge, they don't cite any case law for this idea that if

2    you're alleged to have defamed someone about the underlying

3    transaction, that we get to prove whether the underlying

4    transaction is true, and if it is true, then we win.  That's

5    not the case they brought.

6         The allegation in the complaint, the requirement of

7    defamation law in the State of New York is that, if you, the

8    plaintiff, allege that you have been defamed, your obligation,

9    or burden as the defamation plaintiff, is to prove that the

10    allegations made against you are false.

11         Furthermore, if you, the plaintiff, are a public

12    figure, as the plaintiff in this case must certainly be -- a

13    person who writes books, a person who gives out interviews is a

14    public figure.  A person who establishes a nonprofit

15    organization for this very purpose of making public this idea

16    of assisting victims of sexual abuse, I can't imagine a more

17    limited public figure set of facts.  But setting that aside,

18    the defamation law in New York says, if you bring a defamation

19    claim, you have to prove the defamation.  And if you're a

20    public figure, as the plaintiff is, then you would also have to

21    prove actual malice.  You have to prove falsity by clear and

22    convincing evidence, falsity of the allegedly defamatory

23    statement, and you have to prove actual malice.

24         Now, I don't know what case Ms. McCawley is trying.

25    She is the one who brought this lawsuit.  She has to prove

H2G8GIUC

1    defamation.  If she proves that the plaintiff was sexually

2    abused, in fact, if I were to concede right now that the

3    plaintiff had been sexually abused, does that mean that she

4    wins the defamation case, Judge?  I think not.  She has said

5    that three sentences in the January 2015 statement are false,

6    are defamatory.  One is, the allegations are false.  Sentence

7    number two is, the original allegations have been proven to be

8    untrue.  And the third sentence is, the claims are obvious

9    lies.

10          Well, one thing that I took away from Ms. McCawley's

11   conversation with the Court is that she didn't answer your

12   question, Judge.  The question was, What does it mean when the

13   January 2015 statement says allegations twice in the first

14   paragraph?  What does it mean in the third paragraph when Ms.

15   Maxwell, through Mr. Barton, says the claims, plural, are

16   obvious lies?  Ms. McCawley doesn't answer the question

17   because, as I predicted the first time I was up here, there is

18   no answer to that question.  She doesn't want to answer the

19   question because she can't answer the question.  The Court

20   can't answer the question, and I guarantee you I cannot answer

21   the question.  No one knows what that means.  As I said before,

22   there is no witness who will testify in this courtroom about

23   what that means, what specific statement is being referenced.

24   It doesn't exist.

25          So what does the plaintiff do?  What the plaintiff

1    does is, since we can't figure out what it means, what we will

2    try to do is just prove that she was sexually abused.  In the

3    words of Ms. McCawley, I am going to prove that my client was

4    sexually abused and trafficked.  Well, that doesn't satisfy

5    your burden of proving defamation.  The fact that the plaintiff

6    was sexually abused and trafficked?  No.

7           To use Ms. McCawley's words, there is a plethora of

8    allegations.  Take a look at Exhibits A and B.  Take a look at

9    the CVRA joinder motion.  Talk about plethora.  Judge, this

10   plaintiff has said at least 100 different things in all these

11   news articles, the original allegations, and then another

12   couple of dozen in the CVRA joinder motion.  Well, which of

13   these allegations is the plaintiff going to prove, if true, in

14   order to show that my client's statement from January 2015 is

15   false?

16          I think what we hear from Ms. McCawley is we are not

17   going to do that.  Well, Judge, if we are not going to do that,

18   can we please have summary judgment because they can't prove

19   their case.  You can't prove your case by showing that Ms.

20   Giuffre was sexually abused and trafficked.

21          On the republication issue, Judge, Ms. McCawley says

22   there is no better evidence about the authorization and control

23   of republication other than the words in Mr. Gow's e-mail,

24   "please find this quotable statement," on behalf of Ms.

25   Maxwell.

1          Well, that's not true, Judge.  That sentence from Mr.

2    Gow tells us two things.  One is that this is a statement

3    written on behalf of Ms. Maxwell.  This is not Ms. Maxwell's

4    statement per se.  It is written on behalf, by her agent.

5          Now, the reporters may very well have thought that Mr.

6    Gow prepared the statement, but it doesn't really matter

7    because we have Mr. Barton's declaration saying that, I

8    prepared the statement.

9          But with regard to the issue of republication, Judge,

10   it says, here is a quotable statement.  It doesn't say, as Ms.

11   McCawley recharacterizes it, please publish the statement.

12   Actually, you won't see those words in that January 2015

13   statement.  It doesn't say, please publish this statement.  It

14   says, here is a statement.

15         And Ms. McCawley wants to put all of her eggs into the

16   question whether this is a press release or whether it's not a

17   press release.  Judge, that seems like an irrelevant road to go

18   down to try to characterize something as a press release or as

19   not a press release.

20         How about we look at it this way?  It is a statement

21   that was issued to 6 to 30 media.  We should look at it that

22   way because that's what the undisputed facts are.  It wasn't

23   issued to anyone else.

24         What is also true is that the press were free to do

25   with that statement as they wished because we, Ms. Maxwell and

1    her agent, did not control what the media did with that.

2           I hear Ms. McCawley try to characterize the

3    authorization and control law relevant to republication.  I

4    guess I could ask the Court to disregard what Ms. McCawley and

5    I say altogether because we have laid out the law.  If the

6    Court looks at, for example, footnote 3 on page 3 of our reply

7    brief, we cited to five, six cases from the federal district

8    courts in New York.

9           In *Egiazaryan*, the 2012 case, it says the original

10   publisher is not liable for republication where he had nothing

11   to do with the decision to republish and he had no control over

12   it.  Well, those are facts, Judge.

13          In *Egiazaryan* II, same holding.  That's a 2011

14   opinion.

15          In *Davis v. Costa-Gavras*, which is this Court's 1984

16   decision, what does the court say?  Under New York law,

17   liability for a subsequent republication must be based on real

18   authority to influence the final product, not upon evidence of

19   acquiescence or peripheral involvement in the republication

20   process.

21          Judge, we are within *Davis*.  We didn't have any

22   influence over the final product.  At best, we had acquiescence

23   or peripheral involvement, but *Davis* says that's not enough.

24          In the earlier *Davis* case, from 580 F.Supp., at 1094,

25   it says the original publisher is not liable for injuries

H2G8GIUC

caused by the republication "absent a showing that they

approved or participated in some other manner in the activities

of the third-party republisher."  Well, we win on that case,

Judge.  We certainly didn't participate or approve of any

republication or any third-party republisher's decision to

republish.

          Then we have the *Croy* case from 1999, "The original

author of a document may not be held personally liable for

injuries arising from its subsequent republication absent a

showing that the original author approved or participated in

some other manner in the activities of the third-party

republisher."

          Then, finally, we have the *Cerasani* case, also from

this court, 1998, "A liable plaintiff must allege that the

party had authority or control over or somehow ratified or

approved the republication."

          Well, we win on that case, Judge.

          So I appreciate Ms. McCawley's attempt to

recharacterize and redefine what authority and control are, but

it's totally unnecessary because the federal courts and the

state courts have made it clear what kind of control or

authority is required.

          With regard to the pre-litigation privilege,

Judge -- I'm sorry.  Let me step back on the republication

issue.  There was a mention of the *Levy* case and the *National*

H2G8GIUC

1   *Puerto Rican* case, two New York intermediate appellate court

2   decisions.  Once again, the plaintiff fails to acknowledge that

3   those, like this Court's opinion back in October, are 12(b)(6)

4   cases.  They are not summary judgment cases, not relevant to

5   this proceeding, Judge.  Those are cases where, actually, the

6   courts made inferences of control and authority based on the

7   pleaded facts.  Of course, the Court isn't able to do that in a

8   Rule 56 proceeding.

9          On the pre-litigation privilege, Judge, the statement

10  made by Ms. McCawley is that Ms. Maxwell sends the statement.

11  She is the one who drafts the statement.  She is the one who

12  prepares the statement.  She points to a, quote unquote,

13  smoking gun.  What is the smoking gun Ms. McCawley is referring

14  to?  This e-mail that they spent upwards of $100,000 to get.

15         Well, Judge, the smoking gun turns out to be nothing

16  but a peashooter.  This smoking gun is an e-mail from Ms.

17  Maxwell to Mr. Gow saying this is the statement.  That's it.

18  It is the actual transmission.  It was the actual approval by

19  Ms. Maxwell of the statement that Mr. Gow ultimately sends to

20  these 6 to 30 newspaper reporters.

21         Well, since Ms. McCawley wants to call this a conflict

22  of facts and wants a jury, then it's her burden to show that

23  there is a conflict between the smoking gun and Mr. Barton's

24  declaration.  Well, where is the conflict, Judge?

25         Ms. Maxwell, in sending out that smoking gun, didn't

H2G8GIUC

1    say, Mr. Gow, I just drafted this statement without the help of

2    any lawyers, would you please issue the statement?  That's not

3    what Ms. Maxwell said.  She said, this is the statement, this

4    is the agreed statement.  That's perfectly in consonance with

5    Mr. Barton's declaration.  What does Mr. Barton say?  Mr.

6    Barton says, I drafted the vast majority of the statement, and

7    to the extent that anyone else contributed to drafting the

8    statement, I adopted it and I approved it as my own, and I am

9    the one who directed Mr. Gow to issue the statement.  Those are

10   not inconsistent.  That's not a basis for a jury trial, Judge.

11            Finally, we get to this issue of the plaintiff having

12   to prove falsity by clear and convincing evidence, actual

13   malice by clear and convincing evidence.  There was very little

14   discussion of this by Ms. McCawley, but she points out that we

15   are not going to try to prove actual malice as to any discrete

16   set of statements made by our client.  We are not going to try

17   to prove the truth of her allegations that makes Ms. Maxwell's

18   January 2015 statement false.  We are not going to do that.

19   What we are going to do instead, Judge, according to Ms.

20   McCawley, is we are going to prove that our client was sexually

21   abused and trafficked.

22            This returns us to the beginning, Judge.  It is

23   crucially important to the parties that they know what they are

24   litigating, and I see two ships passing in the night on the

25   central question in this case.  On the one hand, the plaintiff

1   says we are proving a sexual abuse case; we are going to prove

2   that our client was sexually abused and trafficked.  We on the

3   defense are trying to prove -- well, we have no obligation to

4   prove anything, but here is what we are defending against.  We

5   are defending against a defamation claim.  The defamation

6   claim, as alleged in the complaint, paragraph 30, says there

7   are three sentences in your January 2015 statement that are

8   false.  So, naturally, we have focused on those three sentences

9   in the 2015 statement to see whether they are true or false.

10          If we, Judge, the parties, the lawyers cannot agree on

11   that central question, it may not take four weeks to try this

12   case, it might take eight weeks to try this case.  They are

13   proving something that we have no obligation to defend against.

14   We are defending a defamation claim because that's the claim

15   that they brought.

16          So, Judge, we think it's just imperative that the

17   Court step in on this central question of what is at issue in

18   this lawsuit, this defamation lawsuit.

19          THE COURT:  Thank you all.  I will reserve decision.

20          I think we will leave the other motions for

21   consideration after I resolve the summary judgment.

22          MS. McCAWLEY:  Thank you, your Honor.

23          (Adjourned)

24

25