```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    VIRGINIA L. GIUFFRE,

4                    Plaintiff,

5            v.                        15 CV 7433 (RWS)

6    GHISLAINE MAXWELL, et al.,

7                    Defendants.

8    ------------------------------x
                                      New York, N.Y.
9                                     March 9, 2017
                                      12:20 p.m.
10
     Before:
11
                        HON. ROBERT W. SWEET,
12
                                         District Judge
13
                            APPEARANCES
14
     STANLEY POTTINGER PLLC
15        Attorneys for Plaintiff
     BY:  STANLEY POTTINGER
16
     S.J. QUINNEY COLLEGE OF LAW AT THE UNIVERSITY OF UTAH
17        Attorneys for Plaintiff
     BY:  PAUL G. CASSELL
18
     HADDON MORGAN AND FOREMAN, P.C.
19        Attorneys for Defendant Ghislaine Maxwell
     BY:  LAURA A. MENNINGER
20        JEFFREY S. PAGLIUCA

21

22

23

24

25
```

1          THE COURT:  Giuffre.  I was thinking the two

2     plaintiff's motions with respect to Epstein and Barden and then

3     the Ransome application and the Edwards application.  That's

4     what I was thinking, but I'll be guided by you all.

5          How does that sound to you, all?

6          MR. CASSELL:  That sounds good, your Honor, although

7     we had one small request on behalf of Mr. Pottinger here.  He

8     is handling the one Ransome motion.  If that could be handled

9     first, he could be returned to his office more rapidly.

10          THE COURT:  Why should we be nice to him?

11          MR. POTTINGER:  Other people have said that before,

12     your Honor.  It is entirely, of course, up to the Court.  We'll

13     accommodate you any way you want.  Ms. Menninger has been kind

14     enough to say -- I think I will speak for her to say she's

15     indifferent to going first or second with this particular

16     Ransome motion.  It's entirely up to you.

17          THE COURT:  Sure.

18          MS. MENNINGER:  Your Honor, I did have one small

19     concern about the Ransome motion that might foreshorten the

20     hearing on this topic.  As Your Honor is aware, at the time

21     plaintiff filed a motion for a protective order about

22     Ms. Ransome's discovery, I had been in the process of trying to

23     confer with them about some discovery issues.

24          THE COURT:  I think we can cut through that pretty

25     easy by simply saying that I believe that as for any of the

1   witnesses in this case, the protective order should apply.

2   Anybody that wants it should have it, and if they wish it and

3   invoke it, then I think it's up to whoever thinks that that's

4   inappropriate to challenge it.

5          So I take it she would want it, and as far as I'm

6   concerned, she's got it.

7          MS. MENNINGER:  We have no problem with that,

8   your Honor.  I just meant in terms of the order of business

9   today, I did file a combined motion to compel Ms. Ransome in

10  response to the motion for a protective order.

11         THE COURT:  You want to deal with all of those?

12         MS. MENNINGER:  We haven't finished briefing on that,

13  your Honor.  You have set that motion for hearing on March 30.

14  So, instead of bifurcating a motion for a protective order

15  regarding this witness and then hearing later the motion to

16  compel regarding this witness, it would be my suggestion,

17  because we haven't actually finished briefing those issues --

18         THE COURT:  What's your view about that?  You've got

19  the protective order.  So do you want to put the whole thing

20  over?  The rest of it over, both sides of it?

21         MS. MENNINGER:  There's no objection with the

22  protective order, your Honor.  Of course it's all marked

23  confidential.  The discovery has been marked confidential.  The

24  deposition is marked confidential.

25         MR. POTTINGER:  Thank you, your Honor.  No,

1    your Honor.  Frankly, we would prefer to go forward with a

2    limited argument about the extent to which the protective order

3    actually applies in this case to this particular witness, the

4    reason being that the defendant has asked for some very

5    specific things to happen, documents to be produced that should

6    not be produced by a nonparty witness, and we would just simply

7    like to present that to the Court today, if we may.

8              THE COURT:  That's the compel motion.

9              MR. POTTINGER:  Well, yes, it is.

10             THE COURT:  Let me ask you this:  It's their motion.

11             MR. POTTINGER:  We're actually responding to their

12    motion.

13             THE COURT:  Is there anything further that anybody

14    wants to submit with respect to the compel motion?

15             MS. MENNINGER:  Yes, your Honor.  Their response was

16    just emailed over Tuesday night.  It was 25 pages, and I

17    haven't, frankly -- I traveled here yesterday, and we are

18    needing to reply to it, which would be next week.

19             MR. POTTINGER:  By the same token, your Honor, what

20    we're trying to do is make sure that this particular witness

21    who lives abroad is not subject to the continuing sense of

22    burden and harassment --

23             THE COURT:  I take it she has not been deposed.

24             MR. POTTINGER:  She has been for ten hours,

25    your Honor.

```
1              THE COURT:  Where is she now?

2              MR. POTTINGER:  She's in Spain, and what we would like

3   to do is cut short the notion that she has to come back again.

4              THE COURT:  We don't know about that yet.  What

5   they're talking about are records.  So we'll put that part of

6   it over.  Is it next week?

7              MS. MENNINGER:  It's set, your Honor, on March 30.

8   It's also set on the same day our motions in limine are going

9   to be heard.  One of our motions in limine is to exclude her

10  testimony altogether, which would foreclose the need for any

11  additional discovery obviously.

12             THE COURT:  Our trial date is?

13             MS. MENNINGER:  May 15, your Honor.

14             THE COURT:  Well, look.  Let's do this:  Let's

15  accelerate it.  Your reply is due when?

16             MS. MENNINGER:  I believe next Tuesday, your Honor.

17             THE COURT:  Then let's hear this next week.  Let's

18  hear the compel motion next week.

19             MS. MENNINGER:  That's fine, your Honor.

20             THE COURT:  I think maybe that takes care of this.

21             MR. POTTINGER:  For the moment, perhaps --

22             THE COURT:  For the moment.

23             MR. POTTINGER:  Yes, your Honor.  Two things, please,

24  very quickly.  One is I believe we have a reporter for a

25  newspaper in the courtroom, and she has indicated obviously her
```

```
 1    desire in a brief conversation to comply with whatever
 2    protective orders and confidentiality orders apply in this
 3    case.
 4         If we could ask the names of any of the individuals
 5    who have been spoken here not be reported in the press, we
 6    would appreciate that.  She can speak for herself, but I
 7    believe she would agree to that.
 8         THE COURT:  I'm not sure.  I don't think we need to do
 9    anything because I haven't heard anything today that is --
10         MR. POTTINGER:  Only the name of the witness.  We did
11    speak the name of the witness here a few moments ago.  If it's
12    agreeable, we would like that not reported.  The witness for
13    whom we are seeking a protective order was spoken a moment ago.
14    I'm certainly not asking anyone to intrude on any newspaper's
15    First Amendment rights.  We simply ask that that be treated
16    with respect.
17         THE COURT:  What's the defense's view of that?
18         MS. MENNINGER:  Your Honor, I don't care.  I was
19    unaware that anyone had moved for confidentiality of the
20    identities.  It's a witness they've designated for trial in
21    May, but I don't have a position really.
22         MR. POTTINGER:  I've only noticed that her name, the
23    witness' name, has been redacted both in the defense papers and
24    in our papers.
25         THE COURT:  Was it redacted in all the documents which
```

1    were submitted?

2              MR. POTTINGER:  I'm not sure.

3              THE COURT:  On the motions.

4              MR. POTTINGER:  Honestly, I'm not sure.  I'm not

5    positive of that.

6              THE COURT:  Let me take a look.

7              MS. MENNINGER:  Your Honor, the beginning of the reply

8    was not redacted, and her name is in the first line.

9              THE COURT:  Neither is the motion.

10             MS. MENNINGER:  I believe it's already a matter of

11   public record.

12             THE COURT:  I guess that's right.

13             MR. POTTINGER:  If that's the case then, I withdraw my

14   request.  What I might do is make an oral motion at the moment

15   to redact her name, if that's possible.  We simply are trying

16   to avoid --

17             THE COURT:  I do think what's done is done.

18             MR. POTTINGER:  It may or may not influence

19   your Honor's decision about this, but the reporter herself has

20   indicated her willingness not to use the name if requested, not

21   ordered, but requested.

22             THE COURT:  Less is more.  I'm for that.  So let's do

23   it this way:  I'll grant your application to redact the name

24   where it has appeared in the documents, and you'll have to

25   police that.

```
 1              MR. POTTINGER:  Yes.

 2              THE COURT:  That means I would ask the reporter not to

 3    violate the confidentiality order as I've just amended it.

 4              MR. POTTINGER:  Yes.  Thank you so much, your Honor.

 5    We'll see you next week.

 6              MS. MENNINGER:  Your Honor, I apologize, but there is

 7    one other issue that I think would affect our order of business

 8    today, if you don't mind.

 9              THE COURT:  Yes.

10              MS. MENNINGER:  Your Honor, with respect to

11    plaintiff's motion to compel work product from Mr. Barden, the

12    attorney Mr. Barden, as your Honor -- I'm not trying to get

13    into the substance of that argument, but a reply was submitted

14    again on Tuesday night in that case that was more than twice as

15    long as the original motion and contained entirely new

16    arguments, new documents, new everything that were not in the

17    original motion at all.

18              Again, I got it on Tuesday night at 7:30.  I was

19    traveling yesterday, and I would ask that we -- I think there

20    is typically an order of operations that is supposed to occur.

21    Issues are supposed to be raised in the motion, there's a

22    response that addresses them, and then there's a reply.  In

23    this case the reply was not a reply.  It was really the motion

24    that was not filed originally.

25              Your Honor, I think basic fairness would dictate that
```

1    we have an opportunity either to argue today just the motion in

2    response or alternatively, your Honor, provide us an

3    opportunity to submit a surreply to the 17-page reply that was

4    just tendered on Tuesday night.

5          MR. CASSELL:  Your Honor, I think there are three

6    subheadings in the reply brief.  Each of those subheadings

7    links directly to an argument that was made in the response

8    brief.  So our reply brief simply replied to each of the three

9    components that were in the response brief.  So I'm not sure

10   that this is any different than usual.  We filed it Tuesday

11   night in anticipation of flying -- I flew from Salt Lake City,

12   Utah.

13         THE COURT:  Did we have any agreement on filing dates?

14         MR. CASSELL:  Not that I'm aware of.  We've been

15   filing replies -- I think both sides have -- on Tuesdays for

16   Thursday hearings on the understanding it would give the Court

17   Wednesday to review the matters.

18         THE COURT:  I'll grant the defendant an opportunity to

19   file additional papers.  We'll hear the argument today, and if

20   the plaintiff feels it's necessary to file a surreply after

21   that, they may do so, but all of that to be completed within

22   the week on dates that you all will agree upon.

23         Now what?

24         MR. CASSELL:  Would you like to hear argument on the

25   Epstein case?

1          THE COURT:  No, but I will.

2          MR. CASSELL:  Thank you, your Honor.  Paul Cassell

3    with the law offices out at the University of Utah College of

4    Law on behalf of Ms. Giuffre.

5          Your Honor has certainly had an opportunity to read

6    the brief.  So I won't belabor what we argue there.  This is a

7    case that obviously involves Giuffre v. Maxwell, but the third

8    party in interest is Mr. Epstein.

9          As you know, Ms. Giuffre has made allegations that she

10   was sexually trafficked by Epstein's conspiracy in which

11   Ms. Giuffre was the madam or key lieutenant.  So he's the first

12   most important witness in the case after the two identified

13   parties.

14         There doesn't seem to be any debate that your Honor

15   will decide this issue based on federal law, and the Second

16   Circuit in the LiButti case has very clearly said that a party

17   can call a witness for the purpose of having them invoke the

18   Fifth Amendment and then having the jury potentially draw an

19   adverse inference in their discretion based on that invocation

20   of the Fifth Amendment right to remain silent.

21         The LiButti case lays out four different factors that

22   your Honor is supposed to look at in deciding whether that's

23   appropriate, and the first factor and the most important

24   factor, according to the Second Circuit, is the nature of the

25   relationships involved.

 1          What we have here is the director of the conspiracy

 2     and his key lieutenant, Maxwell, obviously in a very tight

 3     relationship, and we made that argument in our initial brief.

 4     In response, what we heard at page 2 of the response brief from

 5     the defendants is that Maxwell and Epstein have -- and I'm

 6     quoting here -- "have no relationship," which we find, frankly,

 7     astonishing.

 8          THE COURT:  Let me ask you:  There's been talk of a

 9     joint defense agreement.

10          Does such an agreement exist?

11          MR. CASSELL:  Well, your Honor knows that we have made

12     a request to have it produced, and your Honor directed the

13     defense to provide it to you in camera.  So we're not familiar

14     with what's been provided to you in camera.

15          THE COURT:  Has it been provided?  Not as far as I

16     know.

17          MR. CASSELL:  You directed them to do that in, I

18     believe, September for in-camera review because we requested it

19     as part of discovery.  We wanted to see a copy.  They objected,

20     and you said, well, I'll take a look at it in camera to see

21     whether it's relevant.

22          So the defense will have to speak to whether it's been

23     provided as directed.  We have no control whether the defense

24     complies with the orders.

25          THE COURT:  Excuse the interruption.

1          I don't think I've gotten it.  Right?

2          MS. MENNINGER:  Your Honor, I do not recall.

3    Perfectly honestly, I do not recall if it's been tendered to

4    the Court or not.

5          THE COURT:  It obviously is relevant under what I just

6    heard.  So what's reasonable?  Within a week?

7          MS. MENNINGER:  Yes, your Honor.

8          THE COURT:  Okay.

9          Yes.  Sorry.

10         MR. CASSELL:  Certainly, your Honor.  You can see

11   where we're sitting.  During the deposition of Ms. Maxwell,

12   there were objections raised on grounds of the joint defense

13   agreement.  When we tried to depose Epstein, the Epstein lawyer

14   said --

15         THE COURT:  That's why I asked, because it's not clear

16   to me whether it's agreed that there is a joint agreement or

17   not.  So that's why -- okay.

18         MR. CASSELL:  We'd ask your Honor to look at that very

19   carefully because, remember.  Just last week they filed a brief

20   in which they represented to your Honor, hey, Epstein shouldn't

21   be called here because we have -- again, I'm quoting.  This is

22   a direct quote -- "have no relationship" with Epstein.

23         And yet I suspect in the next week you're going to get

24   a document showing they in fact have what kind of a

25   relationship?  A common interest relationship, which of course

1    bears directly on the first LiButti factor, are the witness and

2    the party -- are they in a close relationship.

3            They're in a working relationship, a legal working

4    relationship.  They're not in some remote event, in this very

5    lawsuit.  But that's not all we have, your Honor.  Remember.

6    They said they have again "no relationship."

7            Well, we provided to you in our reply brief emails,

8    and what do the emails show?  We have a reporter here.  So I

9    won't go into all the details, but your Honor has had a chance

10   to look into them, but you can see the defendant, Ms. Maxwell,

11   and Mr. Epstein talking about fabricating evidence by producing

12   a non-existent witness who will cover up for Ms. Maxwell.

13           MR. PAGLIUCA:  Your Honor, I object to this.

14           THE COURT:  Don't now.  He's entitled to argue.

15           MR. CASSELL:  Again, I'm not revealing the specifics

16   of the material that are under seal, but that's the nature of

17   the material that is under seal, and you can certainly see

18   them.

19           Again, for them to represent to this Court that there

20   is no relationship and then ask you to prevent what I think is,

21   frankly, the most pivotal and nonparty witness being presented

22   to the jury is highly unfair to Ms. Giuffre.

23           Now, also one of the things the Second Circuit asks

24   you to take a look at in the LiButti factors is whether the

25   witness in question is -- I think the phrase they use -- a

1    non-captioned party in interest.

2            Well, clearly Epstein is a non-captioned party in

3    interest here.  This case revolves around whether there was a

4    sex-trafficking organization with Epstein as its head and

5    Maxwell as his madam or key lieutenant.

6            Clearly, if Ms. Maxwell wins the case, that's good for

7    Epstein.  Clearly he is very interested in the case which is

8    presumably why he was exchanging emails with Ms. Maxwell about

9    whether they could have witnesses come forward or things like

10   that.

11           Now, the other point to remember that I think the

12   defense has not responded to at all is we're going to have

13   jurors sitting here.  They're going to here Ms. Giuffre say she

14   was sexually trafficked.  They're going to hear Ms. Maxwell

15   say, I can't remember whether I was on the airplane with you or

16   not.

17           They're going to wonder, well, what does Epstein say

18   about all of this.  The only way to answer the jury's natural

19   question is going to be, let's bring Epstein in and put him

20   onto the stand so the jury can hear what's going on.

21           Maxwell says, well, look.  We want to ask him some

22   questions as well.  We're, frankly, skeptical of that.

23   Remember the steps that Ms. Giuffre had to take to get him

24   deposed.

25           We made 16 separate attempts with a professional

1    process server constantly being evaded, and finally we had to

2    come to the Court to seek your assistance with alternative

3    service of process, and then once we did that, then at that

4    point, one of the attorneys for Epstein came forward and said,

5    all right.  I'll accept service.  That was the only way we

6    could get him deposed.

7         Remember, the defense is, to our understanding, in a

8    joint defense agreement with Epstein.  They can get him to

9    produce whatever information they want, and yet we've been the

10   ones who have been forced to do this, precisely because we know

11   that what Epstein says will be so corroborative of

12   Ms. Giuffre's testimony.

13        If he told the truth, he would have to explain what

14   was going on on those 23 flights where he, Ms. Giuffre, and the

15   defendant were flying into places such as London.

16        Now, the last thing your Honor has to look at in this

17   adverse inference issue is:  All right.  Of these questions

18   that are being asked, is there independent evidence that makes

19   those questions fair questions to propound to Mr. Epstein.

20        One of those questions is based, of course, on

21   Ms. Giuffre's testimony.  So we do have independent evidence in

22   that sense.  Even setting that aside, let's look at some of the

23   questions that we want to ask, and I don't believe the

24   questions themselves would be under seal.  So I'll put those

25   into open court.

1          One of the questions we want to ask is:  Did you meet

2     Prince Andrew, the Duke of York, in March 2001 in London?

3     That's the question we want to ask him.

4          And you notice what the defense responds to that is.

5     They say that's irrelevant.  How can that possibly be

6     irrelevant when that's one of the central issues in the case?

7          By the way, is there independent evidence

8     corroborating that?  Remember.  We have a photograph showing

9     Prince Andrew, Ms. Giuffre, and Ms. Maxwell all together in

10    what appears to be London.

11         Again, Ms. Giuffre has testified about the

12    significance of that photograph.  What do we hear from the

13    defendant?  She can't remember where that photograph was taken.

14    So then we're forced to try to get another witness, Mr. Epstein

15    being of course the logical candidate to tell us exactly what

16    was going on there.

17         Another question we want to ask is:  "On or about

18    March 9, 2001, you, the defendant in this case, Emmy Taylor,

19    and Virginia, flew on your private jet from Tangier to Luton

20    International Airport in London England's metropolitan area."

21         Is there corroborating evidence for that independent

22    evidence?  Flight logs show that flight happening with exactly

23    those people there.  Once again, Ms. Giuffre has testified that

24    the flight occurred.  The defendant was deposed about that, and

25    once again, her memory failed her.  She has no memory

 1    whatsoever of this flight.

 2          So then we called the pilot, and the defense says,

 3    well, your records are inaccurate.  Who is GM?  Maybe that's

 4    somebody else, Greg somebody or whatever.  So they're

 5    challenging all that.

 6          So what do we do?  We go to the next person listed on

 7    the flight logs, which is Mr. Epstein, and we want to ask him

 8    what is going on, and we want to present all of that

 9    information to the jury.

10          So we think we easily satisfy the four LiButti

11    factors.  We think we've provided independent evidence.  We'd

12    be happy to provide more briefing on each and every question if

13    your Honor thinks that would be useful.

14          We believe it is highly appropriate to call

15    Mr. Epstein to this case and let the jury hear what he has to

16    say.

17          MR. PAGLIUCA:  Thank you, your Honor.

18          I'd like to go through each of these factors, and I

19    think it's instructive to talk a little bit about the LiButti

20    case and how those factors do not apply in this case.

21          First, when we talk about the nature of the relevant

22    relationship, the LiButti court said that this relationship

23    should be examined from the perspective of a nonparty witness'

24    loyalty, and in this case, to the defendant.  So that's the

25    first issue.

1          There is an interesting comparison, I think,

2     your Honor, to the facts of LiButti and this particular case.

3     In the LiButti case, we're talking about Edith LiButti, who is

4     a child, and her father, Robert LiButti.  Robert LiButti is

5     someone who was convicted of tax evasion and was using his

6     daughter, Edith LiButti, to hide money from the United States

7     government.

8          That was a significant fact for the LiButti court, the

9     nature of that relationship, father and daughter.  The court

10    described Edith LiButti as a nominee as part of the

11    relationship between this father and daughter.  Edith was a

12    nominee because she had a company that was created by her

13    father, Lion Crest, in which the assets that her father owned

14    were placed.  So the daughter is then holding assets for her

15    father as a nominee in this Lion Crest company, and the asset

16    happened to be a horse in that particular case.

17         There were significant financial ties between Edith,

18    the daughter, and her father.  Mr. LiButti was using the bank

19    account of Lion Crest to pay his bills.  Mr. LiButti was using

20    the bank account of Lion Crest to pay his mortgage.

21    Mr. LiButti lived at the house that was owned by his daughter.

22    That's the type of significant relationship that the LiButti

23    court felt was appropriate to look at.

24         We compared that to the relationship here, which is

25    non-existent.  Any relationship between Ms. Maxwell and

1    Mr. Epstein ended over a decade ago.  There's no dispute about

2    that.

3            Mr. Epstein and Ms. Maxwell have never been married.

4    They have no financial relationship.  They have no financial

5    ties.  So the disparity between the LiButti relationship and

6    the relationship of Ms. Maxwell is significant.

7            The common interest agreement which the plaintiff

8    makes so much about, your Honor, I submit to you is really not

9    a relationship that is significant in the sense of what the

10   LiButti court was talking about.

11           As you know, your Honor, it is not uncommon for

12   lawyers to enter into these agreements, and essentially it

13   allows for a voluntary sharing of information.  That's it.

14   There is no way that anyone under a common interest agreement

15   can make somebody give them a document.  You're not entitled to

16   information from the other lawyer or the other party.

17           In my mind, these are two one-way streets that never

18   really converge.  If somebody gives you something under a

19   common interest agreement, that's fine, but you're not entitled

20   to anything.  So there is no legal relationship of the sort

21   that would qualify under the LiButti factors to allow for any

22   adverse inference here.

23           They talk about these emails.  Your Honor, I objected,

24   and I'm sorry.  There is so much noise and vitreal in the

25   arguments and the papers that it distracts from the issues.

1    When I read these papers now, I'm accused of criminal activity,

2    something that's never happened to me in my entire life.

3            When I read these papers, my client is accused of all

4    sorts of things.  A good example, on page 3 of the reply brief,

5    there's a quote in the first full paragraph under the nature of

6    the relevant relationship, and the words "madam," which have

7    been repeated here today, are quoted with a citation, id,

8    there.  That id purports to go to Ms. McCawley's declaration at

9    lines 17 through 19.

10           When you look there, there is no support for that

11   proposition.  It is a misrepresentation in the pleadings, just

12   like, your Honor, when we get to this email issue that they are

13   so proud of here.

14           First I note that the emails -- they want to say that

15   Mr. Epstein is lying and Mr. Epstein is falsely inducing a

16   witness to come forward by the email that's in the middle of

17   page 4.

18           There's nothing false about that.  There's no

19   misrepresentation there.  That is simply again, in my view, a

20   misrepresentation by the plaintiff about the evidentiary

21   significance of this.

22           Note the date on these emails, your Honor, that begin

23   at page 4 and go through page 5 and compare the date of these

24   emails with the actual date of the purported defamatory

25   statement that was written by Mr. Barden and issued by Mr. Gow.

1     These emails all are weeks after that statement is

2   issued.  Why does that become important, your Honor?  Because

3   not only does it not support the plaintiff's claim about the

4   relationship and the control here, it supports Ms. Maxwell's

5   position because this is a series of emails that is exchanged

6   or written by Mr. Epstein after the alleged defamatory remark

7   in this case.  And Mr. Epstein is urging Ms. Maxwell to come

8   out with another statement, to make another statement denying

9   the allegations.

10     Well, guess what happens, your Honor.  Precisely

11   demonstrating the lack of any control by Mr. Epstein and the

12   lack of any relationship between Mr. Epstein and my client,

13   what happens is my client declines to make any further

14   statement in this regard.

15     So not only does this not support any theory of any

16   relationship, it directly supports the fact that Ms. Maxwell is

17   not doing Mr. Epstein's bidding and really could care less

18   about what Mr. Epstein says she should or should not do.

19     What is buried in these papers, your Honor, and is

20   very disingenuous to the Court is the notion that this somehow

21   predated, predated, the January 4, 2015, statement that's at

22   issue in this case.  These are all post hoc and, in fact, do

23   not support the motion that there's any collaboration that's

24   occurring before the defamatory statement is issued.

25     I want to turn next to -- well, your Honor, so we're

1    clear, there is no economic relationship.  That's established

2    in the testimony of Ms. Maxwell.  They have not come forward

3    with any economic relationship.

4         There's no social relationship.  That's established

5    and is uncontroverted in this case.  There's no employment

6    relationship, and there's no family relationship.  So, in

7    short, these folks were involved more than a decade ago and

8    have nothing to do with each other, other than the plaintiff

9    wants to harm my client.

10         The next factor, your Honor, the degree of control of

11    the party over the nonparty.  I think it's significant to refer

12    to the LiButti case itself when we're talking about this

13    because what the LiButti court said -- and I quote.  This is

14    from page 123 -- "The degree of control which the party has

15    vested" -- and I highlight the word "vested" your Honor -- "in

16    the nonparty witness.

17         So what we're talking about here in the second factor

18    is the party giving over control to the nonparty in some

19    fashion.  In the LiButti case, Edith, the daughter, acceded

20    control over all of the assets to her father who was writing

21    his checks and paying for his lavish lifestyle.

22         The LiButti court characterized that conduct quite

23    disparagingly, frankly.  We're talking about Mr. LiButti,

24    Robert's, "indiscriminate manipulations of monies and business

25    affairs."

1    So we don't have that here, your Honor.  Ms. Maxwell

2   has not vested any control over any issue to Mr. Epstein in

3   relationship to this litigation or her affairs.  Here, in fact,

4   the record evidence is that the exact opposite is true.

5   Ms. Maxwell issued a statement and got sued for making that

6   statement.  Mr. Epstein is not a party to this litigation and

7   has no control over this litigation.

8    Ms. Maxwell moved to compel Mr. Epstein's testimony.

9   I would challenge the plaintiff to find one case or one

10  circumstance where the person against whom an adverse inference

11  is being offered actually moved to compel the testimony.

12    THE COURT:  We keep talking about the adverse

13  interest, but that's really not the issue, is it?  Isn't the

14  issue whether or not he gets called?

15    If he's called, if he were to invoke his privilege, as

16  he has in the past, there presumably would be some kind of an

17  instruction which would be given to the jury as to what they do

18  about that, but that's not being decided now.

19    MR. PAGLIUCA:  Well, I'm not sure.  They're asking you

20  to decide that now, your Honor.  They are asking you to decide

21  two things --

22    THE COURT:  I don't think so.  I may be wrong, but I

23  don't think so.

24    Let me ask you this:  If I bought your argument, if I

25  adopt your position, what are we going to do about a missing

1   witness charge?

2          MR. PAGLIUCA:  Well, we address that, your Honor.  I

3   think there are a number of ways to deal with it through

4   instructions.  First of all, my position is that Mr. Epstein's

5   absence hurts Ms. Maxwell in terms of any speculation that the

6   jury might enter into.

7          THE COURT:  Well, he's going to call him.

8          MR. PAGLIUCA:  Well, he's going to take the Fifth.

9          THE COURT:  Maybe he will, and maybe he won't.  He has

10  in the past, but we don't know.  I presume he would, yes.

11         MR. PAGLIUCA:  His lawyers have said --

12         THE COURT:  By the way, he's not here.

13         MR. PAGLIUCA:  Who is not here?  His lawyer is here,

14  your Honor.

15         THE COURT:  I haven't heard from him.

16         MR. PAGLIUCA:  I don't think he is on the docket

17  today.  They have filed a separate motion, your Honor, to quash

18  Mr. Epstein's subpoena which is not being heard today.

19         So that is an issue that has not been briefed but is

20  before the Court at this point because Mr. Epstein has moved to

21  quash the subpoena that his lawyers accepted service of

22  essentially saying that he shouldn't have to appear to invoke

23  the Fifth Amendment.

24         So I may be a little bit ahead of the Court, given the

25  pleadings that have been filed but not fully briefed before

 1     your Honor.

 2              THE COURT:  Well, logically speaking, doesn't that

 3     issue take precedence over this?

 4              MR. PAGLIUCA:  What I would suggest to you,

 5     your Honor, is if the Court were to decide that there is no

 6     adverse inference against Ms. Maxwell based on Mr. Epstein's

 7     invocation of the Fifth Amendment privilege, all of this

 8     becomes moot because there would be no reason for Mr. Epstein

 9     to testify, because the only reason for Mr. Epstein to testify

10     would be so the plaintiffs could then say, see.  He took the

11     Fifth.  You should hold that against Maxwell.  That's what

12     they're asking you to do, your Honor.

13              If he simply comes in and says, I take the Fifth,

14     frankly, that's not what's being asked of your Honor, but I

15     suppose you could issue an instruction that says, you can't

16     hold that against either party.  You can hold it against

17     Epstein, but you can't --

18              THE COURT:  You can draw whatever conclusion you want.

19              MR. PAGLIUCA:  Then we would have to have additional

20     discussion about this because then it becomes what can people

21     argue about that in closing and what it means, etc.

22              However, what I am talking about is what they are

23     asking for, your Honor, which they are asking for you, first of

24     all, to say that they can play Epstein's deposition testimony

25     first.

1           Second, that you will then look at a jury and say to a

2   jury, because Epstein took the Fifth, you can take an adverse

3   inference against Maxwell in this case.  That's what they're

4   asking in their papers.  When I'm going through the LiButti

5   factors, I don't see how this adds up here.

6           Continuing on, your Honor, in terms of the control

7   issue, had we had control over Epstein, we would want him to

8   testify.  You know that we moved to compel his testimony, and

9   you, your Honor, denied that motion to compel and found that

10  Mr. Epstein had a Fifth Amendment privilege.

11          The control issue I think is also significant here,

12  your Honor, because not only does Ms. Maxwell not have control

13  over this topic, the plaintiff does.  That is a central tenant

14  to this that, again, is unlike any other case that I have read.

15          The plaintiff here, her lawyers and the plaintiff,

16  have sought to revoke Mr. Epstein's nonprosecution agreement,

17  which is the primary basis for his invocation of the Fifth

18  Amendment privilege.  They can withdraw that, and that then, in

19  my view, allows Epstein to testify or at least takes away the

20  primary basis for his non testimony.

21          THE COURT:  I'm sure Epstein wouldn't agree with you.

22          MR. PAGLIUCA:  It's a different day.  However, in my

23  view, they have created this situation.  Here is why,

24  your Honor.  This is the control issue.  They all know, because

25  of history of litigation, years of litigation against Epstein,

1     a decade of litigation against Epstein -- what he does is he

2     takes the Fifth.  They know that they get an adverse inference.

3     He has to settle the lawsuit against him.

4          So he's become a serial target for Mr. Edwards, who

5     has been involved in this since 2006, and that's what happens.

6     Serially Epstein is the defendant, he takes the Fifth, he

7     settles the lawsuit, and we move on.

8          That's part of their control of this issue.  In my

9     view, they have manufactured him asserting a Fifth Amendment

10    privilege in this case so that they can then try to bootstrap

11    that against my client, and they're the ones that have the

12    control here.

13         The next factor, your Honor, compatibility of the

14    interests of the party and the nonparty.  Again, compare this

15    to LiButti.  In LiButti, the interests are perfectly aligned.

16    Mr. LiButti, Robert, the father, was taking his assets and

17    giving them to his daughter to hide them from the government.

18         Mr. LiButti had to assert the Fifth because they were

19    his assets.  Their interests are aligned because if he says,

20    yes, they're my assets, guess what.  The government takes the

21    race horse that was worth $400,000 and won a $77,000 prize that

22    was being held by the government at the time.

23         So they get together, and collude, and they said,

24    fine.  These are your assets.  If I'm asked, I'll take the

25    Fifth.  They can't use that against you.  You get to keep it, I

1   get to write the checks, and we all live happily ever after.

2   The court found that their interests were completely

3   compatible, and that is the third factor.

4          The fourth factor, your Honor, the nonparty, the key

5   figure in the litigation and playing a controlling role in the

6   litigation.  Again, that's not happening here.

7          I understand their argument, but you have to take a

8   step back and say, wait a minute.  This is a defamation action

9   that is as a result of Mr. Barden's writing of a statement that

10  gets issued by Mr. Gow, Mr. Barden, a lawyer, not Mr. Epstein.

11  Mr. Epstein didn't write the statement that is being at issue

12  here.  Mr. Barden did, and you have his declaration.

13         So Mr. Epstein isn't controlling that statement, isn't

14  controlling the litigation around that statement.  I think

15  that's important because, unlike LiButti, Mr. LiButti was

16  controlling his daughter and controlling the actions that were

17  occurring during the litigation.

18         This case is entirely different.  Ms. Maxwell, her

19  lawyer, and her press agent issued the statement, not

20  Mr. Epstein.  It might be a little different if Mr. Epstein

21  actually had something to do with, here.  This is the statement

22  that we want you to send out there on behalf of Epstein, if

23  some interest of Epstein was being protected, but there's not.

24  There's no nexus between those two things.

25         So, your Honor, it would be patently unfair in this

1    case to allow a jury to see -- well, let me touch on one other

2    thing, your Honor.  This is what happens when lawyers know that

3    somebody is going to invoke the Fifth Amendment privilege.

4         It is like chumming waters, and the sharks come out,

5    and they just go to town, and everybody asks the most

6    ridiculous question they can think of, and that's what happened

7    during Epstein's deposition.

8         There were some 500 highly flammatory or inflammatory,

9    as the case may be, questions that were asked by Mr. Cassell

10   during the course of the deposition, far ranging, having little

11   or nothing to do with this litigation.  That then turns the

12   question into the answer and the evidence that the plaintiff

13   wants the jury to hear.  That's just not fair.

14        They want to say to you, well, Ms. Maxwell can't

15   remember.  Therefore, we get to ask these questions.  Those two

16   things have nothing to do with each other.  We're talking about

17   events that happened 15-plus years ago, and it is not unusual

18   or uncommon for people to not remember details of events 15

19   years ago.  So that's a non sequitur.

20        Whether or not she remembers has nothing to do with

21   whether Epstein should be a witness or not.  She can be

22   cross-examined on her memory.  A jury can decide, we think

23   that's credible or not credible, based on the testimony from

24   the witness stand.  Epstein brings nothing to that equation by

25   asserting his Fifth Amendment privilege.

1      The other thing that they say in her papers is she

2  said go ask Epstein.  Again, that's disingenuous because the

3  questions that were being asked to her during her deposition

4  called for speculation by Epstein.

5      So if I asked you, your Honor, what does Jeff like to

6  eat for breakfast, you're going to say, well, go ask him.  I

7  don't know.  I don't sit there and eat breakfast with him.

8  They are the kinds of questions that they are now relying on to

9  say, well, she invited Epstein to this party.  Well, she

10 didn't.

11      To sum up here, your Honor, the whole point of this

12 exercise that was first articulated by the LiButti court was

13 where it fits, where it is appropriate, where the person

14 invoking the Fifth Amendment privilege somehow controls the

15 party, benefits from the invocation through the party.  We're

16 not going to let people manipulate the system around the

17 truth-seeking process to have that happen.  So those are the

18 four factors.

19      That has absolutely nothing to do with this case.

20 In fact, this is exactly the opposite.  The questions by the

21 lawyers -- they want them to become the truth, not the answers

22 from the witness stand.

23      I believe, your Honor, that the appropriate thing to

24 do is to deny this motion.  There is no good ground to say that

25 Epstein's invocation of the fifth is somehow imputed to

1    Ms. Maxwell.  If you do that, this issue is moot, I don't

2    believe Mr. Epstein needs to testify, and we move on with the

3    actual evidence in the case.  Thank you.

4         MR. CASSELL:  Your Honor, may I have a moment to

5    confer with counsel?

6         THE COURT:  Sure.

7         (Pause)

8         MR. CASSELL:  Your Honor, I apologize for interrupting

9    a moment ago.  I think your Honor may have come up with a

10   solution for cutting through some of the morass here.

11        We could just call Epstein to the stand.  We'll ask

12   our questions.  I was trying to make the point we would have no

13   objection to Ms. Maxwell calling him to the stand and asking

14   whatever questions they want as well.

15        Your Honor has already ruled that with respect to at

16   least one area of inquiry, the nude photographs that Epstein

17   has in his possession.  He doesn't have a Fifth Amendment

18   interest in preventing disclosure of that.  So that's one of

19   the things we would have him produce at trial.

20        So we could see which questions he invokes on, which

21   ones he's unable to invoke on, and then sort all of the issues

22   out at trial.  We thought it would be useful for the Court if

23   we aired this issue ahead of time rather than having it come up

24   in the middle of trial.

25        We think that certainly at a minimum, Ms. Giuffre

1    would be entitled to some instruction to the jury that, look.

2    Ms. Giuffre has been trying to put Mr. Epstein on the stand.

3    This isn't a situation where she's afraid of his testimony.

4    She sent out process servers 16 different times to try to get

5    him to appear.  So we think the jury is entitled to have that

6    information when they decide the case.

7           Mr. Pagliuca goes through the various four factors

8    that the LiButti test requires.  The first one of course is

9    whether there is a relationship here.  I'm not sure if I got a

10   direct concession from Mr. Pagliuca today that there is in fact

11   a joint defense agreement.  It seemed to me he was suggesting

12   that there was.

13          A prerequisite for a joint defense agreement is that

14   the interest of the parties to that agreement are aligned.  So

15   obviously, that bears quite directly on the most important

16   LiButti factor.

17          You can't have a joint defense agreement if the

18   interests of the two folks in the agreement are at odds with

19   each other.  Mr. Pagliuca cites the LiButti case and says that

20   case involved a father and his daughter, and this case doesn't

21   involve a father and daughter.  That's true.

22          There were other cases -- and we cited them in our

23   brief -- such as FDIC v. Fidelity Deposit Company, the Fifth

24   Circuit case.  That involved coconspirators, and the Fifth

25   Circuit said, if you got one conspirator, he's taking the

1    Fifth, that can be used against the other conspirators, which

2    is exactly our situation here.

3         Once again, we hear -- again, I think this is a direct

4    quote. "Any relationship ended over a decade ago" is the

5    argument that's being made today. Your Honor, we just do not

6    understand how that argument can be made, given that we

7    included in our reply brief emails between Epstein and Maxwell

8    dated January 13, 2015; January 21, 2015; January 27, 2015.

9         What are they talking about? They're talking about

10   this case. They're talking about fabricating evidence.

11   They're talking about witnesses coming forward to say, oh,

12   Maxwell wasn't the girlfriend. We'll have somebody else be the

13   girlfriend. That's the nature of those communications.

14        How can the argument be that there was no

15   relationship? I guess the technical argument is aha.

16   January 15 is 12 days after the statement. It's 12 days after

17   the statement. It's obviously connected in time and in subject

18   matter with the events in this case.

19        Your Honor is familiar, having already directed that

20   the jury could draw an adverse inference in this case, from the

21   defendant's failure to produce all of the email accounts that

22   she was supposed to produce, that if we've got emails on the

23   15th, the 21st, and the 27th, there very well may be other

24   emails that she has failed to produce.

25        We hear about the economic relationship being

 1   nonexistent.  We would certainly like to see all the financial

 2   records.  Your Honor has ordered those records be produced but

 3   has directed that that won't happen until shortly before trial.

 4              THE COURT:  Tell me where did these emails come from?

 5              MR. CASSELL:  Eventually, we got them from production

 6   from the defense.

 7              THE COURT:  I see.

 8              MS. MENNINGER:  Your Honor, they were produced at the

 9   outset of our production, the one he's referring to.

10              MR. CASSELL:  So they're within 12 days -- January 15

11   is within 11 days of the --

12              THE COURT:  In other words, there's no reason I would

13   have known about these of course.  There's no impropriety in

14   the production of these emails.

15              MR. CASSELL:  These emails, of course, have been

16   properly produced.  Our argument has been that we have not

17   gotten -- as you know from the earlier briefing, that there has

18   been withholding of other information by the defendant.

19   Your Honor has already said the jury could draw an adverse

20   inference.

21              THE COURT:  I'm sorry to go over plowed ground, but

22   these were not produced after that weekend of review?

23              MR. CASSELL:  No, not these particular emails.

24              THE COURT:  They were subsequently produced.

25              MR. CASSELL:  No.  I believe they were produced, as

1    Ms. Menninger indicates, in the initial production.

2              MR. PAGLIUCA:  These were all produced at the same

3    time, your Honor.  There's no subsequent production of these

4    emails.  We produced them as part of the emails that we had.

5    That's it.  There is no surprise here.

6              THE COURT:  Am I wrong then that there were no -- I

7    was under the impression that there were no emails produced

8    after the initial search.

9              MR. CASSELL:  So we have discovered -- for example,

10   Ms. Schultz, one of my colleagues from Florida, traveled to

11   London, deposed Mr. Gow, that kind of stuff.

12             THE COURT:  I know about the Gow email.  That one I

13   know.

14             MR. CASSELL:  Right.

15             THE COURT:  That's the only instance?  After that

16   initial weekend review, there was production?

17             MR. CASSELL:  Maybe you would --

18             MR. PAGLIUCA:  I'm unclear on what the weekend is that

19   we're talking about here, your Honor.  We produced whatever we

20   had is all I can tell you, and we reviewed all the emails.

21   Whatever was responsive got produced.

22             THE COURT:  In other words, your view is everything

23   was produced except the Gow email, and I understand there's an

24   argument about that, an explanation for that.

25             MR. PAGLIUCA:  Gow had it, and we didn't.

```
 1              THE COURT:  I understand.

 2              MS. MENNINGER:  Your Honor, I actually believe that

 3    these emails were some that your Honor had reviewed because we

 4    had asserted a joint defense agreement privilege, and your

 5    Honor reviewed these emails, and they were produced last April,

 6    the ones that Mr. Cassell is talking about right now.

 7              THE COURT:  I see.  Okay.

 8              MR. CASSELL:  Of course it's our position that there

 9    are email accounts and things like that, as you know from our

10    other papers, where we think -- so the fact that we have emails

11    on January 15, 21, and 27 and they're discussing this very

12    issue, we think a reasonable inference could be drawn by the

13    jury, and we'll be arguing at trial that there may well be

14    other smoking-gun emails that haven't been produced by the

15    defendant in this case.  I'm not attacking the lawyers here.

16    I'm saying we believe there's been inadequate production, as

17    you know from our other papers.

18              In addition, with regard to the financial information,

19    your Honor has directed the defense to produce all of the

20    financial information but just shortly before trial.  So we

21    haven't had an opportunity to look at, for example, the

22    $17,000,000 townhouse to see if there is any financial

23    connection between Maxwell and Epstein.  She's a coconspirator.

24    We're told that the plaintiffs are somehow responsible for

25    Epstein taking the Fifth.
```

```
 1              THE COURT:  You just said something that I had not
 2    heard before, that you have reason to believe Epstein was
 3    involved in the townhouse?
 4              MR. CASSELL:  We believe that was a gift from Epstein
 5    to Ms. Maxwell.  It may be a payment to keep her silent.  That
 6    could be one of the arguments that would be advanced.  We
 7    haven't had a chance to look at the financial information.
 8    Once we do, we'll work with it from there.
 9              I think the speculation is that that was a gift from
10    Epstein to his loyal lieutenant in exchange --
11              THE COURT:  I hear you say that, but I haven't seen
12    anything to support it.
13              MR. CASSELL:  We haven't been given access to the
14    financial records.  Your Honor has said that that will be
15    produced shortly before trial.  That's why we're pursuing that
16    line of inquiry.  I don't believe I'm the only one who is
17    speculating --
18              THE COURT:  By the way, that was not stated with
19    respect to the financial information dispute.  Let's call it
20    that.  This is the first time I hear this.
21              MR. CASSELL:  I can't recall whether we included that
22    in our papers, that particular issue or not.  We won the
23    argument to get our -- our argument all along has been that
24    financial information is appropriate to show an inner
25    relationship.
```

```
 1          THE COURT:  Like a number of other things in this
 2  case, it's back before me.  Thanks very much.
 3          MR. CASSELL:  It's back before you because, I believe,
 4  once you ruled in our favor, they filed a motion to reconsider.
 5          THE COURT:  Be it right, wrong, or rain, it is back
 6  before me.  In that briefing -- correct me if I'm wrong -- I
 7  don't think I saw any reference that Epstein was involved in
 8  any way with the house.
 9          MR. CASSELL:  It's been a while since I've looked at
10  the briefing.  What I recall is we have a separate heading
11  where we say the reason we want the financial records is to
12  show a close financial relationship between Epstein and
13  Maxwell.
14          I know we made that argument generally.  I can't
15  recall, sitting here, whether we said and an illustration of
16  that general point would be the townhouse.  I think we provided
17  some illustrations.  I can't recall immediately whether that
18  was one of the illustrations.  We think their financial
19  affairs --
20          THE COURT:  It's not an issue.
21          MR. CASSELL:  We think their financial affairs are
22  interwoven, and of course, we will know that for sure once we
23  get the financial production before trial.
24          THE COURT:  It depends on what you get.
25          MR. CASSELL:  There may be.  We're, frankly,
```

1    fearful -- as you know, we have alleged in our papers that this

2    money is being moved offshore so that it will not be reachable

3    in the event that Ms. Giuffre --

4              THE COURT:  This I understand.  That point you made.

5              MR. CASSELL:  Whether Epstein is involved in that,

6    obviously, we'll have to see what the evidence shows.  We heard

7    that somehow Mr. Epstein is taking the Fifth because we have

8    this pro bono Crime Victims' Rights Act lawsuit going on down

9    in Florida.

10             Mr. Epstein has criminal problems, frankly, all over

11   the country, in the Southern District of New York, for example.

12   So let's assume that we withdraw that lawsuit tomorrow, which

13   we won't, he would still have criminal exposure --

14             THE COURT:  Hold the phone just a second.  You just

15   said Epstein has criminal issues --

16             MR. CASSELL:  Exposure.

17             THE COURT:  -- in the Southern District of New York.

18             MR. CASSELL:  Right.

19             THE COURT:  That's the first time I hear this.

20             MR. CASSELL:  Our papers have said he's running a

21   sex-trafficking organization that included not only Florida --

22             THE COURT:  Criminal.  That means U.S. Attorney.

23             MR. CASSELL:  I can't make any representations for

24   what law enforcement in the Southern District of New York is

25   doing.

1          THE COURT:  You just said.

2          MR. CASSELL:  Maybe I misspoke.  I said, in our view,

3    in our opinion, Epstein has committed federal sex-trafficking

4    offenses.

5          THE COURT:  Look.  I don't doubt for a moment that you

6    believe that or Ms. Giuffre believes that he has liability.

7    God only knows where.

8          MR. CASSELL:  Right.

9          THE COURT:  That's not what you said.

10          MR. CASSELL:  I apologize then, and I retract what I

11    said.  When I said he has criminal exposure, what I should have

12    said, I guess to be more precise, is that in the opinion of

13    Ms. Giuffre and her attorneys, Jeffrey Epstein has committed

14    federal sex-trafficking crimes in the Southern District of New

15    York.

16          Therefore, in our opinion, his lawyers will direct him

17    to invoke the Fifth Amendment for any and all questions that

18    are asked, regardless of whether or not the Florida

19    proceeding --

20          THE COURT:  Perhaps I misunderstood you.

21          MR. CASSELL:  I apologize.  I think that was my error,

22    and I apologize.

23          The point is he's going to take the Fifth, I would

24    suspect, regardless of what's happening in Florida.  That's the

25    overarching point here.

 1          The last thing that was said was somehow we have

 2    manufactured Epstein and tried to inject him into this case.

 3    Ms. Giuffre was trafficked by Epstein and Maxwell.  It was

 4    their choice to operate this conspiracy together, not hers.

 5    They have completely compatible interests here.

 6          Remember the one thing -- I was waiting to hear what

 7    Mr. Pagliuca was going to say about this.  You're supposed to

 8    figure out, look.  Is this witness a key figure in the case?

 9          I can't imagine a case that has a keyer figure, if

10    that's the right way of putting it, a more important figure,

11    than Epstein in this case.  He's the one who's running the

12    sex-trafficking organization.  This won't be just a missing

13    witness.  This will be a missing main event if he's not allowed

14    to testify.

15          So the last point I'll make is we were told that I

16    asked a series of ridiculous, far-fetched questions.  Remember.

17    I read two of the questions that we wanted to ask in front of

18    the jury.

19          Is this a ridiculous question?  "On or about March 9,

20    2001, you, Mr. Epstein; the defendant, Ms. Maxwell; Emmy

21    Taylor; and Virginia, flew on your private jet from Tangier to

22    Luton in the London area?"

23          That's not a ridiculous and far-fetched question.

24    That's a question that goes to the heart of this case about

25    whether sex-trafficking was taking place in London.

 1          So we would ask your Honor to rule now that we could

 2   get an adverse inference.  We would have no objection to

 3   your Honor deferring ruling on this.  We'll call him at trial,

 4   they can call him at trial, hear what his answers are, and we

 5   can sort out the issues then.  Either approach is acceptable to

 6   us.

 7          THE COURT:  Thank you.  We have one more to go.

 8          MR. CASSELL:  I believe I'm the moving party on this

 9   as well.  Is this Barden now?

10          MS. MENNINGER:  I think we also have an Edwards

11   subpoena issue, your Honor.

12          THE COURT:  Pardon me?

13          MS. MENNINGER:  There is also a motion regarding their

14   motion to quash our subpoena on Mr. Edwards that was

15   transferred from Florida.

16          THE COURT:  True.

17          MR. CASSELL:  Attorney Barden, your Honor will

18   remember, I think it was two weeks ago we were here on the

19   summary judgment issue, and Mr. Barden's name came up a lot.  I

20   won't rehash the issues on the summary judgment motion, and I

21   won't rehash what we've presented in our briefs.

22          I did just want to answer one question your Honor

23   might be wondering, why is it that suddenly we are now hearing

24   this issue about Mr. Barden.  The reason I think is

25   straightforward.

1          Earlier in the case, we requested on behalf of

2     Ms. Giuffre all the documents connected with the defamatory

3     statements at issue here, and we got sporadic production, as

4     your Honor is aware.  Some of the production we got was a

5     privilege log that said, Barden communications, Bates numbers

6     and so forth, attorney-client privilege.  So our opportunity to

7     go after Barden was cut off.  Your Honor sustained the

8     attorney-client privilege invocations, and we respected that

9     ruling of course.

10          Then we show up here two weeks ago for the summary

11     judgment motion and papers being filed just shortly before

12     that.  Suddenly the attorney-client privilege has been asserted

13     over the witness, a blanket thrown over him so we can't

14     approach him.  Now he's suddenly the central figure in the

15     summary judgment motion.

16          What do we discover?  Lo and behold this statement

17     that we had thought had been crafted by Ms. Maxwell and

18     released by her, the lawyer is -- I think the phrase that's

19     commonly used is falling on his sword.  He's the one that has

20     done essentially everything.  At least that's the impression

21     he's trying to create.

22          So now that puts us in a position where we want to

23     know what did Barden say to the defendant.  What did the

24     defendant say so Barden.  He's now become a central figure in

25     this case.

1          In fact, his declaration which he wrote out and then

2     was included as an exhibit in support of the summary judgment

3     motion explicitly and implicitly reveals all kinds of

4     attorney-client communications.  In our reply brief we list a

5     whole series of those and which statements are made.

6          In addition to that, Mr. Barden says in his affidavit,

7     "The content of the statement was entirely based on information

8     I acquired in connection with my role as counsel for

9     Ms. Maxwell."

10         Again, you're being asked to throw out Ms. Giuffre's

11    claims based on this affidavit, I guess.  So that's why the

12    issue is just being presented to you now.  I think it's fair to

13    see we've had a sea change in the landscape.

14         Ordinarily, if you got a lawyer in the case, fine.

15    Let's not talk to him.  Let's not get evidence from him.  But

16    when suddenly he shows up at the summary judgment for the first

17    time, we're entitled to say, why were you asserting

18    attorney-client privilege over these communications during the

19    discovery phase of the case?

20         One of the things that was interesting, when you look

21    at that reply brief that they filed, the defense filed, they

22    concede that work product protection has been waived now.  They

23    say, okay.  The attorney can waive work product, and we're

24    waiving it.  If there is any work product protection over his

25    communication or other evidence, that's gone.

1            What about the attorney-client issue?  Well, the

2     declaration that was provided to you two weeks ago clearly

3     waives communications.  Here is one example.  This is from

4     Mr. Barden.  "I did not ask Ms. Maxwell to respond point by

5     point to Ms. Giuffre's factual allegations in the CVRA joinder

6     motion.  What we needed to do was issue an immediate denial,

7     and that necessarily had to be short and to the point."

8            That's a discussion between the lawyer and the

9     defendant in this case about how they're going to craft the

10     statement, whether it's going to be broad or narrow, point by

11     point, or something else, which is of course the central issue

12     in this case.

13            So he has revealed communications.  Even if you say

14     that technically doesn't reveal a communication, he's certainly

15     placed the communications at issue, and I say Barden has done

16     that.

17            Maybe I should speak a little more precisely.  Once

18     Barden wrote that declaration out, I'm assuming at the request

19     of the defense attorneys, the defense attorneys put it in

20     evidence here.  We raised an objection saying you're waiving

21     attorney-client privilege.

22            I suppose at that point they could have said,

23     Ms. Maxwell doesn't want to waive her privilege.  They could

24     pull back, but what they've done is doubled down.  They've now

25     said, nope.  We're going forward with that.  We want your Honor

 1   to throw out the case based on what Barden is saying.

 2          So clearly we now have issues involving what

 3   Mr. Barden said to Ms. Giuffre.  Those should be resolved

 4   before you rule on the summary judgment motion, although we

 5   think you can deny the summary judgment motion without ever

 6   looking at this.

 7          We want all the communication that's were logged as

 8   attorney-client protection.  We also want an opportunity to

 9   depose Mr. Barden about what those communications mean,

10   something that we clearly would have done if the

11   attorney-client privilege had not been invoked during the

12   discovery phase of this case.  So we could ask for the

13   communications from Barden, and we would ask for an opportunity

14   to depose him.

15          MS. MENNINGER:  Your Honor, last February, over a year

16   ago, Ms. Maxwell provided her initial disclosures under Rule 26

17   which requires her to disclose anybody upon whom she intends to

18   rely to assert a defense.

19          The number three witness disclosed in her Rule 26

20   disclosures was Mr. Barden.  In particular, "He has knowledge

21   concerning press statements by plaintiff and defendant in 2011

22   to 2015 at issue in this matter."

23          In March of 2016, over a year ago, plaintiff had

24   submitted discovery requests to Ms. Maxwell.  None of those

25   discovery requests asked for Mr. Barden's work product, asked

1    for communications with Mr. Barden, asked for anything having

2    to do with Mr. Barden.

3            Other requests were made, your Honor.  For example, as

4    you know, because you reviewed them all, requests for all of

5    Ms. Maxwell's communications with Mr. Gow.  Incidental to

6    producing her communications with Mr. Gow, some of those

7    emails, as you may recall, included Mr. Barden because

8    Mr. Barden was her lawyer.  Mr. Gow was working with Mr. Barden

9    on issuing this statement, and Ms. Maxwell asserted a privilege

10    over those communications.

11            We submitted a privilege log.  We gave it to the

12    Court.  We gave the communications to the Court.  Your Honor

13    overruled that assertion of privilege.  Your Honor found that

14    Mr. Gow was not necessary for purposes of provision of legal

15    advice and, therefore, any communications with Mr. Gow had to

16    be produced, whether or not the attorney was also on there.

17            If I may, your Honor, approach, because the plaintiffs

18    attached as Exhibit 1 to their motion, this privilege log.

19    Your Honor, as you will see when I hand you this document, if I

20    may approach.

21            The vast majority of those documents in Plaintiff's

22    Exhibit 1 were produced to plaintiff.  All of the documents

23    that are grayed out were in fact produced.  Included among the

24    documents that were produced were ones that said things --

25    for example, Ms. Maxwell said to Mr. Gow, copying Mr. Barden,

 1    "Just sent you a letter of re-engagement plus a letter that

 2    Philip is slightly reworking," "Philip" being Mr. Barden.

 3    Another document that was produced pursuant to the Court's

 4    order from Mr. Gow to Ms. Maxwell, "Will do.  Awaiting

 5    revamped note from Devonshire," "Devonshire" being Mr. Barden's

 6    law firm.

 7         So since April of last year, plaintiff not only had

 8    Mr. Barden disclosed as a witness, they also had the emails

 9    showing that Mr. Barden was the one who was drafting the

10    statement at issue.

11         In April Ms. Maxwell was deposed.  At that time she

12    said her attorney, Mr. Barden, was the one who had directed

13    Mr. Gow to release the statement.  In may and June, as

14    your Honor knows from the extensive litigation, both sides took

15    ten depositions.  Ms. Giuffre asked for permission to take more

16    depositions.  She took more depositions.

17         The depositions continued into November when Mr. Gow

18    was deposed overseas, and he also explained that Mr. Barden was

19    involved in drafting and disclosing the statement at issue.

20         So Mr. Cassell's representation to the Court that

21    Mr. Barden has just somehow magically appeared at the 11th hour

22    is not supported by the record evidence in this case.  There

23    are a number of different problems with the motion to compel.

24    First of all, a motion to compel is supposed to include the

25    discovery request to which any such work product would be

1    responsive.

2           Your Honor, you can search in vain in their motion to

3    compel.  There's not a single discovery request that they

4    identify as calling for any of the records they now seek.

5           The cases cited in our response at page 7 require that

6    a motion to compel be dismissed in circumstances where the

7    moving party doesn't actually have a discovery request pending.

8           Secondly, your Honor, this motion is addressed to the

9    wrong person, Ms. Maxwell.  Ms. Maxwell is not the one who

10   holds the work product protection.  Her attorney, Mr. Barden,

11   holds the work product protection.

12          There has been no attempt by plaintiff to seek

13   discovery from Mr. Barden, despite all of the evidence that

14   they have had for over a year now that Mr. Barden was the one

15   who drafted the statement at issue.

16          Fourth, your Honor, they've noted that there have been

17   suggestions that Mr. Barden placed the work product materials

18   at issue and then, therefore, goes on to demand that

19   Ms. Maxwell be the one to produce all of the work product, not

20   work product related to a topic, not work product related to a

21   certain time period, that she should then get all of her work

22   product from Mr. Barden somehow overseas and produce it in this

23   case.

24          Your Honor, they make another extraordinary request of

25   this Court, and that is that Mr. Barden be compelled to come

1    sit in the U.S. for a deposition based on this declaration when

2    they have taken no steps to take his deposition in the UK.

3    For example, when we were there altogether taking Mr. Gow's

4    deposition, Mr. Barden was actually in the room.  No request to

5    take his deposition there in his presence.

6            Finally, your Honor -- and I think perhaps the most

7    problematic -- they've quoted to you what they claim is the

8    basis for the placing of an attorney-client communication at

9    issue thereby waiving the entire attorney-client privilege.

10           As your Honor is well aware, there are two completely

11   different protections we're talking about here, the work

12   product protection that belongs to an attorney that an attorney

13   can waive under certain circumstances and an attorney-client

14   communication privilege which the client holds and the client

15   can waive.

16           Their assertion for the waiver of this entire

17   attorney-client communication is Mr. Barden's statement that he

18   "did not ask Ms. Maxwell to respond point by point to

19   Ms. Giuffre's factual allegations in the CVRA joinder motion."

20           So an attorney saying he did not have a communication

21   with his client they would submit to your Honor completely

22   waives the attorney-client privilege as between Ms. Maxwell and

23   her attorney, Mr. Barden.  There is not a single case that a

24   statement by the attorney that he did not have a communication

25   with his client waives that privilege.

1      Finally, your Honor, the cases regarding waiver that

2  plaintiff has cited come in the nature of an advice of counsel

3  defense.  There has been no assertion of an advice of counsel

4  defense in this case.

5      Ms. Maxwell is not disclaiming that her attorney and

6  her agent with whom she was working issued a statement.  She's

7  not saying she only did it on the advice of counsel and,

8  therefore, she should be excused from having done so.

9      Mr. Barden was proffered as a witness for a separate

10  privilege, the litigation privilege, your Honor.  And that

11  litigation privilege, as we discussed during the summary

12  judgment proceedings a couple of weeks ago, requires that there

13  be a showing that there was a good-faith anticipated litigation

14  for which the statement was issued in connection.

15      In this case, Mr. Barden is, for example, a fact

16  witness because he is the one who told your Honor during his

17  declaration that there was good-faith anticipated litigation.

18      THE COURT:  But isn't there also another issue

19  involving Barden?  That is, that it was a question of the

20  intent for the issuance of the release?

21      MS. MENNINGER:  Yes, your Honor, that is true.  It is

22  not, however, an advice of counsel defense.

23      THE COURT:  No.

24      MS. MENNINGER:  The advice of counsel cases that are

25  cited by plaintiff for the proposition are in opposite for that

1   reason.

2           Your Honor, in the absence of an actual discovery

3   request for which these documents would be responsive, there is

4   no basis for a motion to compel.  Plaintiff chose not to seek

5   Mr. Barden's deposition.  Nor did they choose to serve a

6   subpoena upon him as they did, for example, for Mr. Gow, who

7   also lives in the United Kingdom.

8           There is nothing about the reliance on Mr. Barden's

9   declaration that opens up the attorney-client communications.

10  Simply saying I did not have a particular conversation with my

11  client certainly does not qualify, and plaintiff has offered no

12  proof or legal support that it does.

13          Frankly, your Honor, I believe this is an attempt by

14  plaintiff to ask this Court to produce discovery, demand

15  international travel of a UK citizen to come to the U.S. to sit

16  for a deposition without a single citation to any legal

17  authority for the ability to do that.

18          I would ask your Honor to deny the motion.  And,

19  furthermore, as I mentioned earlier, your Honor, because I

20  received a reply that raised five new legal issues, I'd like

21  the opportunity to brief those issues.

22          THE COURT:  You have that.  Do I not have a joint

23  pretrial order in this case?

24          MS. MENNINGER:  We do, your Honor, yes.

25          THE COURT:  Is Barden listed as a witness?

 1          MS. MENNINGER:  I don't recall, your Honor.  I

 2   apologize.  I don't have a computer to look it up.

 3          THE COURT:  If Barden appears as a witness, it would

 4   seem to me certainly fair to have a deposition at that point.

 5   However, I'll take a look and see.  Okay.  Thanks.

 6          MS. MENNINGER:  Thank you.

 7          THE COURT:  Yes.

 8          MR. CASSELL:  Following up on your Honor's suggestion,

 9   we're happy to work on logistics, if it would make sense, when

10   he's traveling over to do the deposition, shortly before he

11   testifies, if it would be more convenient to do a video

12   deposition.  We're not trying to create an unnecessary expense.

13          THE COURT:  But the point is taken -- you heard it --

14   there is no proceeding.

15          MR. CASSELL:  I guess they could tell us whether

16   they're planning to call him as a witness at trial.

17          THE COURT:  They could tell you, but then they might

18   change their mind.  I don't know.  The defense is there is --

19   well, you heard it.  What do you say?

20          MR. CASSELL:  And the answer I think is clear-cut.  I

21   think roughly a year ago we had rulings from your Honor that

22   his communications are attorney-client protected.  They've just

23   handed up to you a chart.  If you look at item 16 there, it's

24   marked --

25          THE COURT:  Are you saying that the only thing you're

1    asking at this point is a determination as to whether there was

2    a waiver?

3         MR. CASSELL:  We're asking for a determination as to

4    whether there was a waiver of the attorney-client privilege --

5         THE COURT:  And of course, if there was a waiver, then

6    you would say you would like to have the documents.

7         MR. CASSELL:  That's right.

8         THE COURT:  But that's it.

9         MR. CASSELL:  That's right.

10        THE COURT:  No deposition.  There's nothing else

11   pending.  So what you're really doing is moving to reconsider

12   the determination based on his later thing.

13        MR. CASSELL:  Based on intervening circumstances.

14        THE COURT:  Based on this affidavit.  That's all there

15   is.

16        MR. CASSELL:  That's right.  Now the centrality of

17   that affidavit -- I should be clear.  It's not just the

18   affidavit.  It was the arguments that you heard two weeks ago.

19        THE COURT:  Argument shmargument.  There's always an

20   argument, particularly in this case.  This case is not unique.

21   The argument I don't care.  Factually, the only basis for your

22   motion to alter the decision on the attorney-client is his

23   affidavit.

24        MR. CASSELL:  When you boil it down, I think that's

25   right.  What we don't want to have happen is the jury sitting

 1    there, and they're going to say, hey, this is all Mr. Barden's

 2    idea.  Ms. Maxwell had nothing --

 3        THE COURT:  How that comes up is a whole different

 4    thing.  That's a question is he going to testify, etc., etc.  I

 5    inquired on that.  Nobody seems to know.

 6        MR. CASSELL:  Right.

 7        THE COURT:  I think we do know.

 8        MR. CASSELL:  I think he's going to show up and fall

 9    on his sword, and we want to have an opportunity, and I think

10    your Honor was suggesting it would be fair for us to at least

11    get a chance to depose him.  Remember.  We were limited to ten.

12    We had to fight to get a couple more.  We had to make some

13    choices.  In the face of --

14        THE COURT:  It's perfectly obvious.  I say "perfectly

15    obvious."  It's maybe not that clear.  If you were to seek his

16    deposition tomorrow, it would be a tough job to get it

17    accomplished by the trial date.

18        MR. CASSELL:  Our team could do it.

19        THE COURT:  I presume you do not want to delay the

20    trial date.

21        MR. CASSELL:  Right.

22        THE COURT:  So that's really what we're talking about.

23        MR. CASSELL:  Our team could take the deposition on a

24    moment's notice, on one week's notice I would represent.  We

25    could do it by video.  We live in a world where --

```
 1              THE COURT:  I can't compel him.  Who am I?  I'm just a

 2   little, old district court judge in New York.  I can't compel

 3   Mr. Barden to come here.

 4              MR. CASSELL:  He's Maxwell's lawyer.

 5              THE COURT:  You say he's their agent.

 6              MR. CASSELL:  That's right.  He's their lawyer.

 7              THE COURT:  So I could compel them to direct him to

 8   come.

 9              MR. CASSELL:  Right.

10              THE COURT:  Suppose he says, sorry, Judge.  I don't

11   want to do it.

12              MR. CASSELL:  Then we would just ask you to exclude

13   any reference to Mr. Barden's communications at trial.

14              THE COURT:  I see.  Unbelievable.

15              MR. CASSELL:  This case has every evidentiary -- a law

16   professor's dream, I guess you could say, all the twists and

17   turns.

18              THE COURT:  This case certainly has got it all.  Your

19   quite right about that.

20              Is there anything else you want to tell me?

21              MR. CASSELL:  That would be the main point.  Their

22   suggestion we haven't identified the documents, they're right

23   there on their own exhibit, the documents we want.

24              We're happy, again, to work on logistics, or if they

25   would just represent, we're not calling him and not going to
```

 1   make an issue of him at trial, then this issue goes away, but I

 2   think we all know they're planning on calling him.

 3          THE COURT:  Okay.  Mr. Edwards.

 4          MR. CASSELL:  Your Honor has already ruled on a

 5   parallel subpoena.

 6          THE COURT:  Now, let me ask you this:  If I were to

 7   simply say, this motion is granted in part and denied in part

 8   and controlled by the decision on your --

 9          MR. CASSELL:  Right.  I believe the defense can

10   correct me if I'm wrong.  Those were overlapping subpoenas in

11   all respects except for three.

12          THE COURT:  Can we dispose of it that way?

13          MR. CASSELL:  It resolves all the issues except for

14   one issue, which is requests 3, 4, and 5, in my view.  But I

15   should let the defense speak to that.

16          MR. PAGLIUCA:  I agree the majority of this has been

17   disposed of by your opinion, your Honor.  I can walk through

18   all of these and tell you which ones I believe have been

19   resolved and which ones haven't been resolved, if you would

20   like me to do that.

21          THE COURT:  If you all agree with that, then that's

22   fine.  So what's left?

23          MR. PAGLIUCA:  What is left is 3, 4, and 5.  Those

24   deal with the Epstein v. Edwards litigations.  12 is still at

25   issue.  That deals with disclosures made to the plaintiff by

 1   Mr. Edwards.

 2          14, 16, 17, and 18 are different from what was in

 3   Mr. Cassell's subpoena.  Those items were not contested in

 4   response to the pleadings in Florida.  So I assume that they're

 5   not at issue before the Court because they were never

 6   contested.

 7          19 and 20 are specific to Mr. Edwards, and those deal

 8   with communications, letters or communications, from

 9   Mr. Edwards to prospective witnesses in this matter and

10   responses thereto.  So that's what at issue and not resolved by

11   your order.

12          THE COURT:  Let's do it again.  3, 4, and 5 were

13   documents related to Epstein against Edwards.

14          MR. PAGLIUCA:  Correct.

15          THE COURT:  Epstein against Edwards I never heard of

16   before.  What's that?

17          MR. PAGLIUCA:  Mr. Epstein sued Mr. Edwards in the

18   Southern District of Florida.  This is part of the submission

19   is the complaint in these litigations.  Mr. Epstein accused

20   Mr. Edwards and his former partner, Rothstein, of RICO

21   violations, fraud, and other things.  Mr. Epstein claimed that

22   Mr. Edwards and Mr. Rothstein manufactured --

23          THE COURT:  I thought that lawsuit went away.

24          MR. PAGLIUCA:  It is still pending in some fashion,

25   your Honor.  It is on appeal, as I understand it, and has not

 1    yet been resolved.

 2            THE COURT:  What happened below?  What's being

 3    appealed?

 4            MR. CASSELL:  I don't mean to interrupt, but I can

 5    give you a more complete accounting.

 6            MR. PAGLIUCA:  I'm trying to remember, your Honor.  It

 7    was set for trial at some point, and there are claims that have

 8    not been resolved that are on appeal.  That's what I recall of

 9    this.

10            THE COURT:  What is it you want?

11            MR. PAGLIUCA:  I'm informed that the case is in the

12    Supreme Court of Florida now by Mr. Epstein's lawyer.

13            What I want, your Honor, are the documents that were

14    produced in those litigations.

15            THE COURT:  Why?

16            MR. PAGLIUCA:  Well, because Mr. Edwards is a central

17    figure in this case.  He is listed as a witness.

18            THE COURT:  I know what he's done in this case, but

19    what's that case got to do with this case?

20            MR. PAGLIUCA:  There is a theme that runs through

21    these cases, your Honor.  The complaint that's attached as part

22    of the submission, the Epstein v. Edwards complaint, details a

23    scheme in Florida that was started by Mr. Rothstein, who was

24    Mr. Edwards' partner.

25            Mr. Rothstein is in prison I think for 15 years as a

1    result of this scheme, having been convicted in the Southern

2    District of Florida.  The scheme was that Mr. Rothstein would

3    manufacture claims against Mr. Epstein.  So Rothstein was

4    manufacturing claims against Epstein claiming that Rothstein

5    represented victims of sex abuse by Epstein.

6              Rothstein was then selling participation interests in

7    these lawsuits and was going around southern Florida telling

8    people, if you invest X amount of dollars in this particular

9    lawsuit against Epstein, I'm going to give you a return of X on

10   your money.

11             It's unbelievable, but those are the allegations, and

12   that's what Mr. Rothstein was convicted of.  So there are a

13   number of fake plaintiffs that were created by Mr. Rothstein

14   and in the complaint alleging that Mr. Edwards participated in

15   this conduct, and then that is why Mr. Rothstein ended up in

16   prison.

17             The relevance to this, your Honor, here -- again, I go

18   back to Mr. Edwards is sort of a central hub, in my view.

19             THE COURT:  Just for the sake of argument, let's

20   assume that Edwards was in the middle of that scheme.

21             So what in my case?

22             MR. PAGLIUCA:  Well, Edwards is listed as a witness in

23   your case, your Honor.

24             THE COURT:  I beg your pardon?

25             MR. PAGLIUCA:  He is listed as a witness.

```
 1              THE COURT:  He's not going to testify.  I can't
 2    imagine that he's going to testify.  I was unaware of that.  We
 3    all know about lawyers testifying.  So I would think it highly
 4    unlikely that he would testify.
 5              MR. PAGLIUCA:  You may recall some year ago, your
 6    Honor, when Mr. Edwards and Mr. Cassell moved to enter this
 7    case and enter their appearance.  I put in the pleading I
 8    anticipated they were going to be witnesses, and you said,
 9    rightly at the time, we'll take that up when we get there
10    because you can't disqualify them now on a future anticipated
11    witness.
12              THE COURT:  You're saying if he testifies, you think
13    this might be -- okay.  I can see that certainly would bear on
14    his credibility, etc., etc., if he testifies.
15              MR. PAGLIUCA:  Mr. Edwards represents a number of
16    witnesses in this case.
17              THE COURT:  Whatever he is as a lawyer, that's one
18    thing.
19              MR. PAGLIUCA:  What I'm getting at, your Honor, is
20    that there is a central hub here, in my view.  That hub ends up
21    likely, the argument is, disseminating information to others
22    like the plaintiff in this case.
23              One of the main issues in this case is -- and you've
24    seen it attached to all the pleadings.  There are the Palm
25    Beach police reports that relate to a 2005-2007 time frame
```

1    which antedates, is well after, the allegations in this case.

2           And you've seen this in the police reports and in the

3    pleadings.  You don't see my client's name in those police

4    reports as being involved as a target of that investigation.

5           The question then becomes the plaintiff in this case

6    who leaves the country well before any of this surfaces.  So

7    what's the source of the information that she is then

8    disseminating to the media and to the CVRA litigation which

9    results in the denial which then results in this lawsuit.

10          There is certainly a reasonable inference that the

11   conduit of the information is the lawyer that's at the center

12   of all of this.  That is fair game and fair cross-examination,

13   not only of Mr. Edwards, should he testify, but also of the

14   plaintiff.  Where did you get this from?  Why are you saying

15   this?  Isn't it true that your lawyer who has represented you

16   since 2011 has had access to all of this information?

17          THE COURT:  Do you intend to call him?

18          MR. PAGLIUCA:  We very well may, your Honor.  We very

19   well may.  That's why we put him as a witness on our pretrial

20   order.  I'm not trying to be coy about this because I try to

21   think through these things.

22          One of the problems you have as a defendant in a case

23   is I'm not exactly sure what I'm going to need to do until I

24   get there.  So I try to anticipate the problems or what I need

25   to be able to do that so somebody doesn't say, gee, you didn't

1    list him.  So, therefore, you can't call him.

2         When you look at all the tentacles that go out from

3    Mr. Edwards' participation in these various litigations, that's

4    the source of the information, and I need to be able to look at

5    it.

6         Now, your Honor made a ruling that I would suggest to

7    your Honor is very similar.  Both Mr. Cassell and Mr. Edwards

8    in categories 1 and 2 were required to produce the documents in

9    the Edwards and Cassell v. Dershowitz litigations.  It's sort

10   of the same notion here, that these folks are all involved in

11   all of the underbelly of all of this.

12        THE COURT:  This issue certainly did not come up in

13   the Dershowitz.

14        MR. PAGLIUCA:  It did not.  This is a separate issue.

15   Correct.  That's why Mr. Cassell was not subpoenaed for that

16   information, because he was not the defendant in that

17   litigation, which was Mr. Edwards was the defendant, Epstein

18   against Edwards.

19        So that's the reason why at least I believe that's

20   discoverable, your Honor.  They say that it's burdensome.  It's

21   really not burdensome.  Mr. Edwards was separately represented.

22   He was represented by a competent lawyer.  They will have

23   electronic files of these things that can be produced.

24        THE COURT:  Parenthetically, he's not here.

25        MR. PAGLIUCA:  He's not here today.  Correct.

1              MR. CASSELL:  I'm sorry to interrupt, but I'm here

2    representing Mr. Edwards today.

3              MR. POTTINGER:  Mr. Scarola is not here, which is a

4    very good point, your Honor.  I didn't even dawn on that.

5    Mr. Scarola entered his appearance in Florida on behalf of

6    Mr. Edwards.

7              I don't think he's entered his appearance here.  I'm

8    happy to have Mr. Cassell represent Mr. Edwards' interests to

9    move this along, but it is a good point that the lawyer that

10   was on the paper in Florida is not here today.

11             THE COURT:  If he's represented -- and I'm told he

12   is --

13             MR. PAGLIUCA:  Your Honor, I can move along here.

14             THE COURT:  So that's 3, 4, and 5.

15             What was the next?

16             MR. PAGLIUCA:  You have resolved 6, 7, 8, 9, 10, and

17   11.  That's either by it's already been produced or you denied

18   the production.  So that's no longer in issue.  6 through 11

19   are no longer at issue.

20             The next item that's at issue is 12.  I think this is

21   a fairly discreet item, your Honor, and I suspect that the

22   answer is there are no documents responsive.  I haven't heard

23   that yet, but 12 relates to disclosures from Mr. Edwards to the

24   plaintiff in this case under the Florida Rules of Professional

25   Conduct.

1      The objection to this is attorney-client privilege.

2  I'm not asking for anything that's privileged.  I'm asking for

3  disclosure documents of the type that would be associated with

4  a fee agreement, for example.  If they don't have any, they

5  don't have any, and I'm happy to accept that representation,

6  whether they do or they don't, as concluding that.

7      If they have something that they think is privileged,

8  I'm simply going to suggest that they put it on a log, and the

9  Court can make that determination.  That's a very discreet

10  item, number 12.

11      THE COURT:  Okay.

12      MR. PAGLIUCA:  Number 13 has been resolved.  You

13  denied this request as part of the Cassell subpoena.  14 has

14  never been contested.  So I assume someone will respond, and

15  maybe we don't have any of these documents or not, but it's not

16  contested.

17      15 has been resolved by your Honor in the Cassell

18  order.  16, 17, and 18 have not been contested.  So I'm

19  assuming they will either be produced or they don't have any of

20  these documents.

21      19 and 20 have been contested.  19 and 20 are

22  requests.  19 is any letter or communication from you to any

23  witness or prospective witness in this case, Giuffre v.

24  Maxwell.  And 20 is any letter or communication to you from any

25  witness or prospective witness in Giuffre v. Maxwell.  I don't

 1    understand the objection to this, quite frankly.  What I'm

 2    asking for are written communications from Mr. Edwards to

 3    prospective witnesses in this matter.

 4         I know that Mr. Edwards has written to witnesses

 5    soliciting their participation in this case, and I know that

 6    witnesses have responded.  I have not been produced any of that

 7    information, and we've subpoenaed it.  Frankly, I think it

 8    should have been produced as part of the underlying request for

 9    production of documents in this case.  When it wasn't, we

10    subpoenaed it from Mr. Edwards.

11         It's not privileged because it's a communication to a

12    third party.  It's not work product because it's a

13    communication to a third party.  To the extent that Mr. Edwards

14    conveys facts or makes representations or promises in these

15    communications, they are discoverable substantively and

16    potentially usable, either as impeachment or for additional

17    discovery, should those witnesses testify.

18         I can't understand how this would be burdensome on

19    anyone.  If you write someone a letter, you keep it in a file,

20    electronically no doubt, and you say, here are the letters that

21    I've written, and here are the communications I've gotten back.

22    That's it, your Honor.  Thank you.

23         MR. CASSELL:  Thank you, your Honor.  Let me describe

24    a little bit about this Florida lawsuit since I think this is

25    the first time it's shown up on your docket here, and that's, I

1    think, an indication of how removed it is from this particular

2    case.

3          What happened was Mr. Epstein, unhappy with the fact

4    that Brad Edwards and I guess me as well had been representing

5    a number of victims of his sexual assault organization, filed a

6    frivolous lawsuit against Brad Edwards saying he was making up

7    claims.

8          Edwards responded with a counterclaim saying, these

9    are not frivolous claims, and indeed this is a malicious

10   prosecution designed to burden me from my representation of

11   victims of your sex-trafficking organization.

12         Mr. Edwards then moved for summary judgment on the

13   claim against him, and the day before the summary judgment

14   motion was to be argued, Epstein dropped his claim.

15         All that remains now is the Edwards against Epstein

16   malicious prosecution claim, that you filed a bogus lawsuit

17   against me to try to keep me from representing these young

18   women who have been the victims of your sex abuse.

19         And the trial court judge allowed that case to move

20   forward and allowed there to be a punitive damages claim which

21   requires a specialized finding in Florida law that the claims

22   have in fact so much merit that punitive damages might be

23   appropriate.

24         However, under a Florida Court of Appeals decision

25   that came out while the litigation was going on, which appeared

1    to abolish the tort of malicious prosecution in Florida,

2    Edwards' case was thrown out based on this Florida Court of

3    Appeals decision.

4         It went up to the Florida Court of Appeals, which

5    reaffirmed its earlier decision, and then it went to the

6    Florida Supreme Court which, not surprisingly, unanimously held

7    about three weeks ago that yes, the tort of malicious

8    prosecution, including punitive damages, still exists in

9    Florida.

10        THE COURT:  I'm sorry.  Say it again.

11        MR. CASSELL:  The Florida Supreme Court ruled

12   unanimously that a malicious prosecution tort still exists in

13   Florida, and implicitly that means that Edwards' malicious

14   prosecution claim against Epstein can move forward.

15        The only thing that's going on is Edwards' lawsuit

16   against Epstein saying, you were trying to shut me down as a

17   lawyer representing these women because you knew these were

18   legitimate claims, and this was a malicious prosecution.

19        The Florida Supreme Court ruling, by the way, was not

20   in the Edwards v. Epstein case.  It was in a parallel case, but

21   the issues were overlapping and I think essentially

22   consolidated or held together because they're the same issues.

23        So now, under the trial court's order that's in place

24   in the Edwards counterclaim against Epstein, as soon as the

25   Florida Supreme Court disposes of the pending motion to

1   reconsider, which Epstein has filed to kind of slow things

2   down, in our opinion, once that happens, there will be a trial

3   within 60 days on the punitive damages and other claims against

4   Epstein.  So that's that lawsuit.

5        Let's understand a couple things about that lawsuit.

6   Epstein filed that lawsuit against Edwards in 2009.  I think

7   it's undisputed the first time Mr. Edwards had any contact with

8   Ms. Giuffre was 2011.

9        So the lawsuit is two years prior, was filed two years

10  prior to anything having to do with contact between Edwards and

11  Ms. Giuffre.  Of course, the events that are central to this

12  case occurred in late December/early January 2014/2015, which

13  was, if I'm doing my math correctly, about six years after the

14  lawsuit was filed.

15       So now the issue is, okay.  What's going on here.  In

16  our view -- I'll be very candid here.  We believe that this is

17  an effort to distract Mr. Edwards from preparing for trial.

18       Our trial team that has been assembled for this very

19  complicated case will be headed by David Boies of the Boies,

20  Schiller law firm, his partner Sigrid Mc Cawley in Florida, and

21  Brad Edwards.

22       Those are going to be the three central figures on our

23  trial team, and Mr. Edwards has critical pieces of the case.

24  My understanding is, for example, he'll be handling the

25  examination of Ms. Maxwell.

1          THE COURT:  That simply means that he cannot testify.

2          MR. CASSELL:  That's our position.  We believe the

3     only reason this litigation is going on is to try to knock out

4     the key person who knows the most about this case.

5          Your Honor has seen this before.  The reported

6     decisions are filled with, you know, lawyers moving to call a

7     lawyer as a witness and what have you.  The reason that they're

8     doing that is to try to disrupt the preparations of the

9     opposing side in the case.  For example, they could call me as

10    a witness, but they don't want to call me.

11         THE COURT:  So your representation is that he is going

12    to be an active participation in the trial.

13         MR. CASSELL:  There are lawyers.  He's going to be

14    handling, for example, my understanding is the direct and

15    cross-examination of Maxwell.

16         THE COURT:  That's the representation.

17         MR. CASSELL:  Yes.  That's the representation.

18    Mr. Boies has gotten involved in the case in the last year or

19    two.  Mr. Edwards has the institutional knowledge.  Think about

20    it.  If you're on the defense team, who do you want to knock

21    out of the lawyers here.  You don't want to knock out some law

22    professor from Utah.  You want to knock out someone who is

23    intimately familiar with the witnesses.

24         THE COURT:  Is there anything else you want to tell

25    me?

1           MR. CASSELL:  Yes.  So, with regard to 3, 4, and 5,

2     the issue is should he be required to produce these documents

3     in this lawsuit that was filed in 2009.  You have in front of

4     you an uncontested declaration from Mr. Edwards which

5     indicates --

6           THE COURT:  How about 19 and 20?

7           MR. CASSELL:  Let's turn to 19 and 20.  In the letter

8     to any perspective witness -- lawyers contact witnesses in

9     cases, and you generally don't get discovery about we haven't

10    subpoenaed them to say any time you've called up a witness, let

11    us know and give us all your communications with them.  That

12    would have a chilling effect on lawyers doing their job with

13    respect to contacting witnesses.

14          You'll notice too the way this is phrased.  It says

15    any letter or any communication.  Mr. Edwards would have to go

16    through all of his emails, all of his phone logs, and you'll

17    notice the indication is "any prospective witness."

18          there have been, I suppose, I think several hundred

19    prospective witnesses that have been identified, and I think

20    that the idea here is to burden Mr. Edwards with trying to

21    figure out who are prospective witnesses, has he had any

22    contact with them, is there some email in either his current

23    law firm or his old law firm that indicated some --

24          THE COURT:  So you're not telling me that there is

25    anything improper except the statement that you just made,

 1    well, it would have a chilling effect.

 2         Has anybody said that besides you?

 3         MR. CASSELL:  That's what we've argued in our papers

 4    on this, as I recall.  Let's see.  At page 19 of our moving

 5    motion to quash, we have said that, "Most important, like the

 6    other requests the subpoena makes, this request appears to be

 7    exclusively designed to burden Mr. Edwards.  Defendant Maxwell

 8    is certainly free to depose any witness --"

 9         THE COURT:  I take a look at your reply, and I don't

10    see anything about 20 in the reply.

11         MR. CASSELL:  Let me see how the course of the

12    briefing went on this.  There is a three-sentence response from

13    a defendant at page 16 of their response.  I'm now looking.  I

14    think maybe we just thought the issues were sufficiently well

15    briefed that we wouldn't provide an additional argumentation

16    above and beyond.

17         THE COURT:  Do you want to add anything now?

18         MR. CASSELL:  Yes, I do, your Honor.

19         THE COURT:  Okay.  Let's do this --

20         MR. CASSELL:  I'll file something by Monday on this.

21         THE COURT:  It's your motion.  So I think, if you want

22    to file something in addition with respect to 20 --

23         MR. CASSELL:  And 19 I think, 19 and 20.

24         THE COURT:  What's the difference between 19 and 20?

25         MR. CASSELL:  I'm not certain.

```
 1              MR. PAGLIUCA:  19 is outgoing letters; 20 is incoming
 2    letters, your Honor.  So it's whatever goes out and whatever
 3    comes back.
 4              THE COURT:  So they're the same.
 5              You want to file something.  When?
 6              MR. CASSELL:  We'll file it on Monday, if that's all
 7    right.
 8              THE COURT:  So the defendant is going to get
 9    additional time.  Monday to when from the defense?
10              MR. PAGLIUCA:  A week from Monday would be fine.  I'm
11    going to be back here on Thursday.
12              THE COURT:  Thursday?
13              MR. PAGLIUCA:  Thursday is fine, your Honor.
14              MR. CASSELL:  Is that for the argument?
15              THE COURT:  Is there anything else you all want to
16    add?
17              MR. CASSELL:  Is that being set for argument next
18    Thursday then?
19              THE COURT:  No, not as far as I'm concerned.
20              MR. CASSELL:  Just the briefing.  All right.
21              THE COURT:  If you want to give me some authorities
22    and something, that might help.  What I'm hearing from the
23    defendant is that aside from this business of burdening
24    Edwards, which that I don't pay much attention to -- lawyers
25    burden lawyers, and that's life.  So that doesn't cut any ice
```

1   with me, frankly.  I'm being told that there is no basis for

2   objecting, and you say, there is, but I don't see any authority

3   for it.

4           MR. CASSELL:  All right.  If we could provide a brief.

5   If I could just say one thing about lawyers burdening lawyers.

6   Typically what you're saying is lawyers are saying they're

7   really busy.  These are subpoenas asking for Mr. Edwards --

8           THE COURT:  I understand what they are.  I understand

9   what they are, but you're not saying that it's irrelevant.

10          MR. CASSELL:  We are saying it's irrelevant.

11          THE COURT:  You didn't say it was irrelevant.  The

12  first word "irrelevant" came out of my mouth, not yours.

13          MR. CASSELL:  What we've set out in our brief --

14          THE COURT:  It seems to me that as to work product, I

15  don't know.  I can imagine that there may very well be a work

16  product privilege.

17          MR. CASSELL:  The reason we didn't put that --

18          THE COURT:  But that hasn't been briefed either.

19          MR. CASSELL:  What we put in our initial paper was we

20  thought that this was going to be resolved on burdensome

21  grounds, burdensomeness grounds, and that we reserved the right

22  then to do the additional, if your Honor --

23          THE COURT:  Fine.  So we've got these additional

24  grounds that you want to advance.

25          We've still got 3, 4, and 5 that I have to resolve.

 1            MR. PAGLIUCA:  Correct.

 2            THE COURT:  As far as 19 and 20 are concerned, we'll

 3   split that off, and you can argue that next week.

 4            MR. CASSELL:  All right.

 5            MR. PAGLIUCA:  That's fine, your Honor.

 6            MR. CASSELL:  I think we were going to also see about

 7   possibly moving next week?

 8            MR. PAGLIUCA:  No.

 9            THE COURT:  Is there anything else?

10            MR. CASSELL:  Not for today, your Honor.  Thank you.

11            MR. PAGLIUCA:  No.  Thank you.

12            THE COURT:  Thanks.  I almost forgot.  When are we

13   going to get together to determine how we're going to try this

14   thing with respect to the protective order?

15            MR. PAGLIUCA:  I believe you entered an order,

16   your Honor, saying we're going to talk about that next Thursday

17   is my recollection.  So I will be prepared to do that next

18   Thursday.  I'm hoping to talk to plaintiff's counsel before

19   then.

20            THE COURT:  Work it out if you can.  Okay.  Good.

21   Thanks.

22            (Adjourned)

23

24

25