H3GVGIUC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

VIRGINIA L. GIUFFRE,

              Plaintiff,

         v.                           15 CV 7433 (RWS)

GHISLAINE MAXWELL,

              Defendant.              CONFERENCE

------------------------------x

                                      New York, N.Y.
                                      March 16, 2017
                                      1:05 p.m.

Before:

                  HON. ROBERT W. SWEET,

                                      District Judge

                      APPEARANCES

BOIES SCHILLER & FLEXNER
     Attorneys for Plaintiff
BY:  SIGRID S. McCAWLEY

HADDON MORGAN AND FOREMAN
     Attorneys for Defendant
BY:  JEFFREY S. PAGLIUCA

H3GVGIUC

1          THE COURT:  First order of business from me, have you

2     all reached any decision as to how we're going to conduct the

3     trial with respect to the matters covered by the protective

4     order?

5          MS. McCAWLEY:  Your Honor, Mr. Pagliuca and I were

6     just discussing that, the issue of the protective order.

7          There's two points on that, and he can address them as

8     well.

9          The protective order itself that we entered in the

10    case does have a paragraph in it that addresses the trial.  It

11    provides that -- that's just for reference, that's going to be

12    document 62, and it's in paragraph 13.  It says:  The

13    protective order shall have no force and effect on the use of

14    any confidential information at the trial in this matter.

15         So, full disclosure, I want to let you know that

16    that's what the protective order currently says.

17         The plaintiff would like to request that names of

18    victims, of individuals who consider themselves to be a victim

19    of sexual abuse, a pseudonym be able to be used for them and

20    any identifying information, for example, their Social Security

21    number or an address be able to be protected for those that are

22    coming to testify.  I know that makes it a little bit more

23    difficult, but if we plan that in advance with initials or a

24    pseudonym for those individuals to garner that protection for

25    them, that is one consideration we would like with respect to

H3GVGIUC

         the trial.  But I understand that all other matters would have

         to be -- obviously it's a public trial and so we would not be

         able to protect the other specifics.

                    THE COURT:  Have you all reached an agreement to that

         effect?

                    MS. McCAWLEY:  No, your Honor.  We were just

         discussing that.  That was what I had proposed to Mr. Pagliuca.

                    MR. PAGLIUCA:  Your Honor, I certainly am not opposed

         to further discussions about this issue.  I think I would need

         to know who we're talking about in particular as to the

         witnesses.  So I think we'll be able to deal with this, your

         Honor.  We'll just need to have some more -- a little bit of

         detail that the parties are going to need to have to talk about

         before we work something out.

                    Here's my concern, your Honor, I guess:  If there's a

         witness that shows up in court, I think it's prejudicial to the

         defendant if we're using initials or things like that, because

         it implies that something untoward has happened.

                    THE COURT:  Correct me if I'm wrong, anybody who

         testifies is going to have to state their identity --

                    MR. PAGLIUCA:  Right.

                    THE COURT:  -- and whatever.  It seems to me, that's

         clear.  Maybe I'm wrong about that.

                    There are occasions which we're all familiar with from

         security reasons and whatever that sometimes people don't, but

1    that's certainly the exception.  And I would think that that

2    would not be the case, unless there is a particular application

3    for a particular person.

4              How does that sound to you all?

5              MR. PAGLIUCA:  That's what I think, your Honor, what

6    you just said.

7              MS. McCAWLEY:  Your Honor, if I could, I'd like the

8    opportunity -- because there are only a few of the witnesses

9    that fall into this category --

10             THE COURT:  Okay.  That's one thing.  Let's sort of

11    understand that that's -- without a specific application, and I

12    would think that that would be done sufficiently in advance so

13    that we can consider it not -- in other words, pretrial.

14             MS. McCAWLEY:  Yes.

15             THE COURT:  And I was hoping we'd have all this

16    resolved today.  So maybe you all could think about that and

17    maybe we can cover that next week, who knows.

18             MS. McCAWLEY:  Yes, your Honor.

19             THE COURT:  As far as exhibits are concerned, I take

20    it that the same would be true with exhibits; that everything

21    goes unless somebody makes a particular application.

22             MS. McCAWLEY:  Yes, your Honor, that's my

23    understanding.

24             MR. PAGLIUCA:  That's my understanding as well, your

25    Honor.

1              THE COURT:  All right.

2              Well, that's some degree of clarification.  And if you

3    all manage to do something better than that, I'd be grateful.

4              Now, aside from that, Mrs. Lincoln, how was the play?

5              I guess I should hear from the plaintiff about how

6    this -- the issue here, as I see it, is the handwriting

7    expert -- well, let's assume just for the moment that the black

8    book gets in.  If the black book gets in, what's the

9    handwriting expert going to testify to?

10             Forgive me, I lost --

11             MS. McCAWLEY:  Sure.  That's fine.

12             Let me give you a little bit of background.

13             We retained the handwriting expert in an abundance of

14   caution because the black book, which is a telephone directory,

15   has at the beginning of it handwriting on various pages by

16   Alfredo Rodriguez.  So in order to make sure we could get the

17   document into evidence, we retained the handwriting expert to

18   be able to say the handwriting on these pages matched the other

19   documents that he testified under oath were his handwriting on

20   checks and things of that nature.  So that's why there is any

21   issue with handwriting, only because the document itself on the

22   front of it, on the front few pages, has that handwriting.  So

23   she would simply be testifying --

24             THE COURT:  That it's Rodriguez --

25             MS. McCAWLEY:  Yes.

H3GVGIUC

1        THE COURT:  Okay.

2        MS. McCAWLEY:  That it matches his handwriting, it's

3   an exact match on his handwriting, yes.  That would be the

4   purpose of her testimony.

5        THE COURT:  So the objection on the business record,

6   as I understand it, is we don't have anybody who can testify

7   that it's a business record, or do we?

8        MS. McCAWLEY:  Your Honor, I would say that we

9   absolutely do.

10        Let me just, if it's all right, preview the evidence

11   for you, since I believe that's the purpose of this hearing, so

12   you have an appreciation, first of all, for why the black book

13   is such a critical piece of evidence in the case, in our view,

14   of course, but also who can testify about it.

15        So the black book, as I said, is a telephone directory

16   of all the names and numbers of anybody who was associated with

17   either the defendant or Maxwell -- of the defendant or Epstein.

18   It was kept at their home; they had various homes, but the main

19   home in Palm Beach is where this document was taken from.  It

20   was for purposes of the house staff being able to use to

21   contact people or when people called in, so it was a reference,

22   a telephone directory reference.

23        So what testimony do we have on that?

24        We have Maxwell herself -- and I'm going to review her

25   testimony; I have it for you here today -- in her deposition

H3GVGIUC

1    identified the black book, when I handed it to her as an

2    exhibit, as the stolen document.  So she -- and I'll read that;

3    it's very clear -- authenticates that document.  She even asked

4    me how did I get it.  So that testimony is pretty powerful.

5          We then have two different house staff that have

6    testified about this document.

7          The first is Juan Allessi.  He testified in this case

8    back in June and he was given the exhibit.  He was the butler

9    for a period of time in Palm Beach.  So he was responsible to

10   help with the management of the house.  And he identified the

11   document, identified names of individuals in the document,

12   young girls who came over to provide these massages.  There's a

13   section in the directory that's called "Florida Massages" that

14   has numbers, names of females, some parents' numbers.  We

15   allege that there are underaged individuals in that directory

16   with their phone numbers.  So we reviewed that with him.

17         He has testimony about the fact that the black book

18   was something that was kept in the course of their work.  It

19   was something that was on Maxwell's desk.  So I'm going to

20   review that testimony for you.

21         Then we have Alfredo Rodriguez.  Now, Mr. Rodriguez

22   is, unfortunately, deceased.  He testified in the *Jane Doe*

23   cases about the fact that there was this what they called the

24   black book, which was a telephone directory.  So we have his

25   testimony.

H3GVGIUC

1          We also have at trial Jeffrey Epstein, Sara Kellen,

2     and Nadia Marcinkova.

3          Now, at this point, we have been told that they are

4     planning to take the Fifth on everything.  But this is a

5     telephone directory; we may be able to solicit information from

6     them about the directory itself.

7          So that's the universe of the individuals that we

8     anticipate will testify about this.  If you don't mind, if I

9     can just pass you up my binder that has the testimony in it.

10          THE COURT:  Sure.

11          MS. McCAWLEY:  So what you're going to see in here is

12     the document itself, and then you're going to see the

13     testimony.

14          So the testimony, for example, Ms. Maxwell, I asked

15     her during her deposition:  Was there a hard-copy book as well

16     as something on the computer or was there only electronic

17     information on the phone numbers?

18          This is after I handed her the document.

19          She said:  I can only testify to what I know

20     obviously.  And I believe that this is a copy of the stolen

21     document.  I would love to know how you guys got it.

22          I said:  Next, I'm asking you during the time you

23     worked for Jeffrey Epstein, was there a hard-copy document of

24     any kind that kept phone numbers for Jeffrey Epstein if he

25     needed to contact someone?

H3GVGIUC

1   "A.   The stolen document I have in front of me, that's what
2   you're referring to.
3   "Q.   So was there -- during your time, was there no other --
4   you mentioned information on a computer.  Was there any
5   hard-copy document you would refer to to find someone's number?
6   "A.   You have the stolen document in front of you.
7   "Q.   You had access to this when you worked for Jeffrey
8   Epstein?
9   "A.   This, I believe the book was stolen.  That was the hard
10  copy, whatever was there.
11  "Q.   So when you were working for Jeffrey Epstein, you were
12  able to access this book?
13  "A.   This book, if this is what it is, I believe it is the
14  stolen document from his house."
15          So that is defendant's testimony when she reviews the
16  exhibit that we gave her, which is the black book, during her
17  deposition.  She clearly authenticates it.
18          THE COURT:  When you say "the black book," there's a
19  question about copy and so on.  Do you have the original?
20          MS. McCAWLEY:  We have a copy of what was taken.
21          When it's referred to as "the black book," I believe
22  that's because that's sort of colloquially what they referred
23  to -- the house staff referred to as this large document; they
24  called it the black book.  And Juan Allessi calls it that as
25  well, so we've used that term in the course of this.  But it's

1    really a telephone directory.

2         THE COURT:  Yes, yes, I understand that.  But it's not

3    the -- what you have is not the original.

4         MS. McCAWLEY:  We have the copy.

5         The course of events is that Alfredo Rodriguez, who

6    was also a butler for Mr. Epstein and the defendant, took the

7    document when he left his employment, stole it, left with it.

8    And then he tried to sell that document.  In the course of

9    trying to do that, to sell it, there was an undercover sting,

10   because they knew he was trying to sell evidence basically in a

11   case.  And so they obtained the document, and then they

12   produced it in the civil discovery in the *Jane Doe 102* cases in

13   Florida.  So it was a document in that case -- in discovery in

14   that case as well, and that's why we have testimony on --

15        THE COURT:  Was it introduced in that case?

16        MS. McCAWLEY:  It was in the course of depositions.

17   Those cases were settled, I believe, your Honor, so I don't

18   think there was a trial on any of those issues.

19        But to be clear on the fact that -- because I

20   understand the concern over this, and you'll hear from

21   Mr. Pagliuca that, you know, Oh, well, it looks like it's

22   photocopied and these are differences.  Defendant didn't

23   testify and we have not heard yet that any of the information

24   in the book is wrong.  In other words, you'll see, for example,

25   on page 41, there's a list -- and I've highlighted it for you,

H3GVGIUC

1    flagged it -- of Maxwell's family members, all of her family

2    members, their London phone numbers, her Yorkie's veterinarian

3    is list in there.  There's no debate that these numbers of

4    these individuals -- Prince Andrew's number is in there -- all

5    of this information in the black book is incorrect, no one is

6    saying that.  What they are saying is, Well, I don't know how

7    you got it.  And I want to say to Maxwell, Why didn't you

8    produce it in this case?  It was on your computer.  Where is

9    it?  Why do we have to fight over a document that should have

10   been produced in this matter?

11        So, your Honor, I think the integrity of the document

12   is there.  But I also want to tell you that there's a couple --

13   when we look at it from an evidentiary perspective, there are a

14   couple of reasons why it's important, and there are a couple of

15   reasons why it doesn't have to come in for the truth of the

16   matter asserted.

17        In other words, the fact that, for example, Virginia,

18   my client's number is listed in the massage section, whether or

19   not that number is correct doesn't matter.  What matters is the

20   fact that there was information in this book that Maxwell was

21   knowledgeable of at the time she made her defamatory statement.

22   So not offered for the truth of the fact that the number was

23   one, two, three, four, but for the fact that she was aware of

24   this information.

25        So there's a couple ways this can come into evidence.

1   Of course, we would like to propose it for the truth of the

2   matter asserted, and I think we can do that under the

3   exceptions that I'm going to talk about here today.  But there

4   are also other ways that it can get in, be admissible not for

5   the truth, but to show her awareness of it.

6          So we talked about Maxwell's testimony.

7          The other person I think is really key, because he's

8   basically an uninterested party, is Juan Allessi.  So Juan

9   Allessi was the house staff member that we deposed in this

10  matter.  He identified the book.  That's also in the document

11  that I gave you.  What he says -- he's shown the exhibit.  And

12  he says:  This was a Rolodex.  It was a blue book.  It was

13  called the blue or the black book.  I think it was thick.

14         And he says -- okay.

15         He says:  With these pages in it, to begin with -- he

16  starts looking at the pages.

17         And then he says -- the question is:  And where would

18  this book be kept in the house?

19         This book was kept at Jeffrey's desk, his desk, his

20  pool house, it was with Ms. Maxwell, it was in his bedroom.

21  "Q.  Ms. Maxwell, what -- you're naming the locations where the

22  book was kept; correct?

23  "A.  Yes, at Ms. Maxwell's desk."

24         And that's in Juan Allessi's testimony, the transcript

25  that I gave you, at 114 and 115.

H3GVGIUC

1          And then finally, your Honor, we have Rodriguez's

2     testimony, who is the deceased individual who took the book.

3     And he testified that Ms. Maxwell kept the book with the names

4     of the girls who would provide the massages.

5          And the question was:  Did she keep them on a pad of

6     paper, did she keep them in a notebook, did she keep them in

7     her computer?

8          And he said, answer:  We used to have internal books

9     for pilots, masseuses, chefs, so they would have a -- she would

10    have a copy of the black book with herself as well as on her

11    computer.

12         So that's from Rodriguez in the *Jane Doe 102* cases.

13    Of course he's deceased, so we couldn't depose him in this

14    case.

15         So, your Honor, I believe, in my view, that there is

16    definitely a plethora of witness testimony we can utilize to,

17    first, authenticate under 901, which, as you know, that burden

18    is not extremely high.  The *Discenzi* case, which we cite, which

19    is a Second Circuit case from 2001, talks about the fact that

20    authentication is not a beyond-a-reasonable-doubt standard;

21    it's a standard for the reasonable juror to be able to say the

22    document is what it purports to be.  This is a telephone

23    directory.  It's got the names and numbers in it; it is what it

24    purports to be.  So I think we clearly meet that hurdle, your

25    Honor.

1            And then when we look at the exceptions, you mention

2      the business records exception.  I believe that we can

3      establish through the testimony that this was a document that

4      the house staff used in order to contact these young girls,

5      contact other individuals that they socialized with, what have

6      you; it was kept in the course of their employment for purposes

7      of a telephone directory.  So I believe it meets that

8      qualification under 803(6).

9            But, your Honor, there's a couple of others that I

10     want to point out to you.

11           I also believe that it's nonhearsay under 801(d)(2)

12     because it's an admission of Maxwell.  She's admitted that this

13     is the stolen document.  She's also admitted in her testimony,

14     because I asked her about some entries, there's the name of

15     Gwendolyn Beck, and that's in your binder as well.  Gwendolyn

16     Beck is listed under the category that says "Florida Massage."

17           And so I asked her, Is she a masseuse?

18           And she said, No.

19           I said, Why is she there?

20           And she said, An input error, were her words.

21           So she also adopts the document in that she knows that

22     there were input errors in it; it was something they had at the

23     house that they utilized for contacting people.

24           I also think it falls within an exception that's not

25     regularly used, but it does address this issue, and that's

H3GVGIUC

1   803(17).  That's a market reports and directories exception.

2   What that does it is says telephone directories have an

3   inherent exception to the hearsay rule because typically there

4   are not an immense amount of errors in them.  They're phone

5   numbers with names; it's not a document that doesn't have

6   trustworthiness to it.  So I think it falls under that

7   exception as well.

8          But as a fallback, I think this is the perfect type of

9   document for 807, which is the residual hearsay exception,

10  because it meets all four prongs of that test, your Honor.  I

11  know that is not something that's often used, but the reason

12  for that exception is if you've got a document that is what it

13  purports to be and has the circumstances of trustworthiness

14  about it, it's an important piece of material evidence in the

15  case, it's probative on the point, and admitting it is in the

16  interest of justice.  I think that's the fourth prong.  I think

17  that's key here.  Because we don't have Jeffrey Epstein

18  testifying about it.

19         If he takes the Fifth, I can't say, Was this the

20  record that you kept in your house for all your house staff to

21  use.  It's in the interest of justice because this is something

22  that wasn't produced in this case; so I don't have it directly

23  from Maxwell's computer.  But it is something that is what it

24  purports to be and should be admitted into evidence, your

25  Honor.  So I believe it meets that exception.

H3GVGIUC

1          Finally, I just want to cover very briefly the fact

2     that it meets for nonhearsay purposes.  So this document can be

3     admitted to show that on January 2nd, when Maxwell said my

4     client was lying about her claims of sexual abuse and

5     trafficking, that those claims were obvious lies; that she was

6     aware that this document existed.  Even if the numbers in it

7     are wrong, even if there's a name in it that's incorrect, she

8     was aware that there was a document that had these categories

9     in it.  For each of the houses there are lists of female

10    masseuses and things of that nature.  Whether they're actually

11    masseuses is contested obviously, but there's a category for

12    those various places.

13          So we believe that it can be offered for that reason,

14    the nonhearsay reasons, to show the relationship between

15    Epstein and Maxwell, the fact that all of her family members

16    are listed in it, it's got other contact information that is

17    important to her personal world that's in that document.  So we

18    believe it should be admitted for those reasons as well.

19          Your Honor, finally, I wanted to say if the concern is

20    over the handwriting on the first several pages of the

21    document -- and again, we did the handwriting expert really in

22    an abundance of caution so that we could be sure to get the

23    document into evidence -- we could just admit the piece of the

24    document that's the directory itself.  So that would be another

25    option to bypass any concern to the extent there is concern

H3GVGIUC

1    over that.

2            THE COURT:  The handwriting in the front, what is the

3    handwriting in the front?

4            MS. McCAWLEY:  The handwriting in the front is Alfredo

5    Rodriguez's handwriting.  He wrote out basically on the front

6    of the document the people that he thought were important in

7    this sex trafficking scheme.  So he put the people that he

8    thought had important information.

9            THE COURT:  So it's not really -- that's separate and

10   apart from the --

11           MS. McCAWLEY:  The actual directory, yes, yes.

12           It was produced as an entire document; but the first

13   several pages, which is attached actually to their motion *in

14   limine* -- but there's an affidavit from the special agent

15   Christina Pryor in Florida that lays out what that is and the

16   fact that that document was the purchase document, the one that

17   he tried to sell.

18           THE COURT:  That handwriting is a different issue than

19   the admission of the book.

20           MS. McCAWLEY:  Yes.  So, in other words, that's what

21   I'm trying to say; it could be separated.  So we did it, again,

22   in an abundance of caution, because that's how we have the

23   document.  The first, I think, six pages are the handwriting --

24           THE COURT:  Let me ask you this.

25           MS. McCAWLEY:  Sure.

H3GVGIUC

1          THE COURT:  Does Rodriguez's testimony get in in this

2     case?  I think not.

3          MS. McCAWLEY:  That's a separate hearing, I think, in

4     two weeks, your Honor.

5          So there's a debate over that.  There is testimony

6     from Rodriguez's testimony in the *Jane Doe 102* complaint -- or

7     case, I'm sorry, that we are trying to get into evidence.

8          THE COURT:  Whatever the decision on Rodriguez's

9     testimony is, that portion, that handwriting portion, is going

10    to be the same issue, and that's not a black book issue.

11         MS. McCAWLEY:  Right.

12         I think the issue can be separated is what I'm trying

13    to say.

14         THE COURT:  Well, it is separate, is it not?

15         MS. McCAWLEY:  Yes.  I mean the directory itself could

16    be admitted into evidence, regardless of the --

17         THE COURT:  No, but I mean there are two different

18    things.  The directory is whatever it is; maybe it's a business

19    record or whatever.  But his handwriting is not part of the

20    black book.

21         MS. McCAWLEY:  Right.

22         The only reason we tied it is because what you're

23    probably going to hear from Mr. Pagliuca is they brought up

24    things like chain of custody, which I don't believe is at issue

25    here, but concerns over that.  So we wanted to make sure that

H3GVGIUC

```
1    we had somebody who could say, This came from this source, and
2    you can tell -- if for no other reason, you can tell because
3    the handwriting matches up.
4              THE COURT:  You mean you would want that handwriting
5    admitted not for the substance of what is being said, but
6    simply to identify that it's Rodriguez and Rodriguez had the
7    book.
8              MS. McCAWLEY:  Exactly.  Exactly.
9              The handwriting is not being put in for the truth of
10   whatever he was writing or anything of that nature.  We only
11   did it, again, in an abundance of caution to say it matches up.
12   Because we can't bring him in here, because he's deceased.  So
13   it matches up; this is what he took; this is the directory.
14   Again, Maxwell identified it.
15             THE COURT:  All of that relates to the chain of
16   custody presumably.
17             MS. McCAWLEY:  Right, which I think -- it does.  But I
18   think that's a bit of a red herring because, again, we're not
19   talking about --
20             THE COURT:  Well, I'm leaving aside Maxwell's
21   statement.
22             MS. McCAWLEY:  Sure.  Right.
23             We're not talking about cocaine being transported
24   where you would have a concern over the chain of custody and it
25   being what it is.  It's the telephone directory.  There's no
```

H3GVGIUC

1    question about that.

2           So, yes, your Honor.  So we believe that it is

3    admissible.  At a minimum, we'd like you to allow us to at

4    least try to present that at trial.  If you have any concerns,

5    because we will, again, have the witnesses here, so we can

6    present additional testimony to the extent there is any

7    concern.  But we do believe that that is a critical piece of

8    evidence that should be admitted and the jury should be able to

9    see.

10          Thank you, your Honor.

11          MR. PAGLIUCA:  Your Honor, first let me start with the

12   Court set this for an evidentiary hearing today, which I

13   understood to mean that we were going to actually have some

14   evidence, which we don't.  And it shouldn't be a do-over at

15   trial after we argue about all of this.

16          But I think it's important for the Court to understand

17   and put into context first what I will call the Alfredo

18   Rodriguez timeline.

19          By the way, your Honor, there's a response that I have

20   due tomorrow on this issue.  I think there's a reply on this

21   issue as well that will be forthcoming.  So the Court is going

22   to get additional briefing on this in the next few days.

23          First of all, your Honor, Mr. Rodriguez worked for

24   Mr. Epstein, as I understand it, in 2004 for a period of six

25   months.  That testimony is reflected in Mr. Rodriguez's

H3GVGIUC

1   deposition testimony.  I will give the Court those pages.  So

2   we're talking about a short period of time in 2004 that

3   Mr. Rodriguez was actually part of Mr. Epstein's employ.  I

4   bring that up because we are not talking about a long-term

5   trusted employee that would have any actual information about

6   anything.

7            After 2005, he works for someone else.  Mr. Rodriguez

8   is first interviewed by the Palm Beach Police Department in

9   2006 and denies possessing any documents.  He's then

10  interviewed by the FBI in 2007 and denies possessing any

11  documents.

12           In 2009, he is the subject of not one, but two

13  depositions in which he denies possessing any documents.  Then

14  in August of 2009, Mr. Rodriguez contacts what the FBI refers

15  to as "CW."  CW is one of the lawyers involved in the *Jane Doe*

16  cases, who I reasonably believe is Mr. Edwards, who's one of

17  the lawyers in this case, your Honor.  And CW then contacts the

18  FBI; and the FBI sets up a sting operation to indict

19  Mr. Rodriguez.

20           If I can approach, your Honor, I'd like to talk a

21  little bit about the affidavit that I will tender as

22  Defendant's Exhibit 1 to this hearing.

23           Your Honor, this is the arrest affidavit as part of

24  the criminal complaint involving Mr. Rodriguez.  This is

25  important, your Honor, in terms of this discussion because what

H3GVGIUC

you will see when you compare the description of the documents,

plural -- and the Court has already identified that as an issue

with what the plaintiff wants to proffer as evidence in this

case -- you will see that they are two different things.

          In paragraph 6 of this document, your Honor, the

affiant, who's Special Agent Pryor, at the end of paragraph 6

says that the CW, who I believe is Mr. Edwards, explained this

conversation with Rodriguez.  And according to CW, Rodriguez

explained that he, Rodriguez, not anyone else, had compiled

lists of additional victims in the case and their contact

information.  Rodriguez explained that the information

contained hundreds of additional victims and their phone

numbers from diverse geographical locations, including New

York, New Mexico, and Paris, France.  So the FBI is affirming

initially that Rodriguez is claiming that this is his document.

          Then we go to paragraph 9 of this arrest warrant

affidavit, your Honor.  The FBI has an undercover employee that

sets up the telephone conversation with Mr. Rodriguez, which is

recounted in paragraph 9.  The undercover employee of the FBI

calls Mr. Rodriguez on October 29th, 2009, and Mr. Rodriguez

says he didn't turn this over before, because in the first

bracketed paragraph 1 at the end of paragraph 9, it was his

property and he should be compensated for it.  So Rodriguez, to

the FBI, is claiming that this is his property, not something

that belonged to Epstein or anyone else.

1          Then, your Honor, the next important part of this

2     document is paragraph 11 of this arrest warrant affidavit.

3     It's on page 4.  This is on November 3rd, is the meeting

4     between Rodriguez and the undercover agent.  And at that

5     meeting, the FBI says that Rodriguez produced a small bound

6     book and several sheets of legal pad paper containing

7     handwritten notes.  So what they are describing here, your

8     Honor, is two separate items of evidence that they recovered

9     from Rodriguez, the first being these legal pad notations, and

10    the second being a bound book.

11         If I can approach now, your Honor, with Exhibit B to

12    this hearing.  You have multiple copies of this, but I thought

13    it might be easier for discussion purposes if you had one when

14    we are talking about the actual document.

15         There are a couple of things, your Honor, that are

16    critically important about how this document appears, which

17    belies all of the assertions that were made by plaintiff's

18    counsel about this.

19         The first thing that I will point out, your Honor, is,

20    as you already noted, that the first what I have is five pages

21    of this document are handwritten and, according to the

22    plaintiff, it's by Mr. Rodriguez.  When you look at the

23    substance of the handwriting in the first five pages, your

24    Honor, and if you go to page 5, in the middle of page 5, there

25    is -- first of all, there are a number of stars next to

24

H3GVGIUC

1   different names.  But in the middle, there's a bracket.  And it

2   says "important witness" there, your Honor.

3            THE COURT:  I'm not --

4            MR. PAGLIUCA:  Page 5.  They are paginated at the

5   bottom of the document, your Honor.

6            THE COURT:  Oh, yes, I see.

7            MR. PAGLIUCA:  And they are double-sided.

8            THE COURT:  Oh, yes, yes.

9            MR. PAGLIUCA:  So if we look at page 5, we have this

10  bracket, "important witness," and then these names and phone

11  numbers.  And then if you go down, there's another name at the

12  bottom of the page.  And then it says, "Witness, interacted and

13  chat daily with underaged girls."

14           So this is clearly not a phone directory.

15           THE COURT:  Excuse me.  Where I'm looking at says

16  "important email/addresses."

17           MR. PAGLIUCA:  That's at the top of the page.

18  Correct.

19           THE COURT:  And then --

20           MR. PAGLIUCA:  And then in the middle of the page

21  there's a bracket.

22           THE COURT:  Oh, yes.

23           MR. PAGLIUCA:  "Important witness."

24           THE COURT:  I got you.

25           MR. PAGLIUCA:  And then at the bottom of the page

H3GVGIUC

1    there's a description of a named person, "Witness, interacted

2    and chat daily with underaged girls."

3           So this document is prepared by Mr. Rodriguez in an

4    effort to make money in connection with these Jane Doe cases.

5           Now, here's what is also very curious and very

6    interesting about this document, your Honor, and this cannot be

7    lost in the shuffle here:  The document in its entirety, your

8    Honor, is paginated 1 through 97.  So here's the question:  How

9    did those numbers get on this document, your Honor?  When we

10   compare the description of what the FBI got to this document,

11   the FBI is describing handwritten legal pages and then a book.

12          THE COURT:  It would appear, would it not, that the

13   book is what follows.

14          MR. PAGLIUCA:  Well, one might think that, your Honor.

15   However, it's not paginated in this format when it's taken by

16   the FBI.  And that's the point that I'm trying to make here,

17   that this document is paginated after the fact.

18          I know your Honor has done hundreds, if not thousands,

19   of criminal cases and involving the FBI.  Your Honor knows, as

20   I do, for having done that kind of work, that when the FBI

21   takes something as evidence, they log it.  And they are going

22   to log it in this case as two separate items, and it's going to

23   be produced -- if it gets produced as part of Rule 16 criminal

24   discovery, it's going to get produced exactly how it was

25   obtained by the FBI.  And they describe what it looked like in

H3GVGIUC

 1    this affidavit.

 2          They do not describe what the Court has that was shown

 3    to Ms. Maxwell as a complete Exhibit 13.  This document has

 4    never been referred to as anything other than some "black book"

 5    prepared by Maxwell by the plaintiff.  I think now they realize

 6    the multitude of evidentiary problems with this.  So now they

 7    are trying to say, Oh, well, we take it back.  It's not one

 8    document; maybe it's two documents, because we want part of it.

 9    But it's produced as one document here with 97 pages, which I

10    submit to you, your Honor, happened after the fact.  Recall

11    that the FBI gets this document in 2009.  The first time I ever

12    see it as part of this case, so in 2015, I'm supposing, is the

13    first time I see this.

14          What I want to switch to, your Honor, because I think

15    it becomes important, as well, this document has a lot of

16    unexplained problems with it.

17          So on the first page, if you look at the top, this is

18    the cover page of this document.  You can see that there used

19    to be staples on the first page, because there are these little

20    black holes that look exactly like somebody removed staples and

21    then photocopied it.  And then if you look at the fourth page

22    of the document, which also says "confidential," it looks like

23    staples have been photocopied over there at the top of the

24    page.  And when you continue through the document, there are

25    all these odd-looking, what appear to be tabs that appear at

H3GVGIUC

1    the sides of the pages.  For example, page 6, page 7, there are

2    these tabs that are sticking off the side that look like they

3    got photocopied that are unexplained, and randomly throughout

4    this document appear and disappear, making the entire content

5    of this document highly suspect, in my view.

6            When you further go through the document, there's

7    highlighting, there's underlining, there are brackets, there

8    are boxes.  So all of this tells you that this document has

9    been manipulated, and I don't mean manipulated in a bad way;

10   it's changed over time, which leads me next to the chain of

11   custody.

12           THE COURT:  What was shown to the defendant?

13           MR. PAGLIUCA:  This document itself, your Honor,

14   exhibit -- this is Maxwell --

15           THE COURT:  What I have in my hand?

16           MR. PAGLIUCA:  Yes, the one you have in your hand,

17   Maxwell Exhibit 13.  And you can see there's two stickers on

18   there, the Maxwell Exhibit 13, 4/22/16, and then my sticker as

19   well.

20           THE COURT:  Oh, yes.  I see.  I see.

21           MR. PAGLIUCA:  That's what was shown to my client.

22           THE COURT:  Okay.  Thanks.

23           MR. PAGLIUCA:  So Mr. Rodriguez, your Honor, to

24   continue with this saga, he first gets arrested for this and

25   then pleads guilty on March 18th, 2010, to obstruction of

28

H3GVGIUC

1   justice.  On the same day, the same day, March 18th, 2010, the

2   same day, he drives from the meeting with the undercover folks

3   to somewhere in Miami and gets arrested with a bunch of guns

4   when he's coming out of a house carrying guns.  And the

5   arresting officers then go into his car and find the plea

6   paperwork from this plea.  They then go to his house, they

7   search his house, and he ends up with somewhere in the

8   neighborhood of 84 guns and gets indicted under 18 U.S.C.

9   922(g), possession of a weapon by a convicted felon.  So we

10  have a two-time now-convicted felon that is the seminal font,

11  according to the plaintiff, of this highly-reliable document.

12            In my view, this is a very curious transition here.

13            The plaintiff says in their papers that the document,

14  the document, whatever that is, goes from the FBI to

15  Mr. Rodriguez's criminal defense lawyer as part of the criminal

16  discovery; and then somehow Mr. Edwards ends up with that, and

17  then somehow that gets produced in this case.  Well, that is

18  not a reliable chain of custody, your Honor.  It vitiates any

19  business record exception or any other exception in the hearsay

20  rules, because no one knows what happened to this thing in

21  between 2009 and 2015, when it gets produced in this case.  I

22  am not willing to accept plaintiff's representations on this as

23  to what it is or isn't.  I've never had the opportunity to

24  question or cross-examine anybody about this document; it just

25  shows up in the course of this case.  Mr. Edwards somehow got

H3GVGIUC

1    it and just trust us about the chain of custody here, which

2    does not match up with the FBI affidavit.

3           So let me now talk about what they claim is the

4    deposition testimony.

5           Your Honor, this is selective editorializing by

6    plaintiff's counsel about what these transcripts say.  So I

7    would just like to tender to the Court, having gone through

8    these transcripts -- I tried, and I think I accomplished,

9    pulling out every reference to this document that I could find

10   in the Allessi, Rodriguez, and Maxwell deposition testimony.

11   And I hate to burden the Court -- well, it's not too much, but

12   we shouldn't have to be doing this.  Unfortunately, you have

13   this selective ellipses on the actual testimony which ends up

14   making this very, in my view, disingenuous.

15          So Exhibit C, your Honor, is going to be Mr. Allessi's

16   testimony; Exhibit D is going to be Mr. Rodriguez's testimony;

17   and Exhibit E is going to be Ms. Maxwell's testimony.

18          So let me start, your Honor, with Ms. Maxwell's

19   testimony, which I believe is Exhibit E.

20          What I would like the Court to note is that, first of

21   all, what you have, Exhibit 13 in this hearing, Exhibit A, was

22   what was shown to Ms. Maxwell.  There is no way that she could

23   have ever seen that document before, because as you've already

24   pointed out, the first five pages are handwritten and they are

25   handwritten, we assume, some time in circa 2009, if

H3GVGIUC

1    Mr. Rodriguez is to be believed.  Mr. Rodriguez, who's there

2    for a brief time in 2004, we've already highlighted the fact

3    that he's said that he didn't have these documents for a number

4    of years after the fact.  When she's asked about the document,

5    she is surmising that this is what she's referring to as the

6    stolen document.  And when you go through that transcript, you

7    can see that she's asked directly by Ms. McCawley, "Do you know

8    how this book was created?"  That's the question.

9    "A.  No."

10            That's the transcript at 317, lines 21 through 23.

11            She's asked about the book again and she says:  "I

12    have read that Alfredo stole the document."

13            That's what she says.

14            "I have read that Alfredo stole the document."

15            That's at page 330, lines 19 through 20.

16            Then she's asked:  "Where did you read that?"

17            And she says:  "I believe it was reported in the

18    press."

19            And that's at lines 22 and 23.

20            She's asked a question by Ms. McCawley:  "So is

21    Alfredo Rodriguez telling the truth when he says he downloaded

22    that book from your computer?"

23            Which is another interesting sort of side turn here,

24    your Honor, because I'm a little unclear, frankly, reading the

25    papers, where the plaintiff says this book actually came from,

because in parts of their papers they claim it was downloaded from Ms. Maxwell's computer; in other parts of their papers they claim that it was stolen from somewhere in one of the houses. I don't think they know and they don't care. They just want to say, We want this in and we don't care. And she says she has no knowledge of anything coming off of her computer, and it wouldn't have come off of her computer because she didn't keep anything like whatever this is on her computer. That's her testimony.

She says: "I don't know where this document came from, so I can't possibly say this document was on any computer that I may have had access to."

That's at transcript page 332, lines 8 through 11.

So that sort of rounds out the morass of the questioning about what this questioning is. There's no way Maxwell could know what it is because it's created by Mr. Rodriguez after the fact. Anything that she says about it, frankly, is just speculative.

Let me then turn to Mr. Allessi's testimony.

First of all, it's important to note that Mr. Allessi was not employed in this time frame. Mr. Allessi, I believe, left the employment of Mr. Epstein in 2001, late '1 or early '02. So this is some two, three years after the fact. And Mr. Allessi would have really no knowledge about what this is, Exhibit 13, in Maxwell's deposition.

H3GVGIUC

 1              When Mr. Allessi sees this document in the deposition,

 2     your Honor, he looks at the pages and he says, "This is not my

 3     writing.  I never saw it."  I never saw this, meaning this

 4     exhibit, this exact same exhibit.  That's in Mr. Allessi's

 5     transcript at page 113, lines 20 through 21.

 6              And then when he was talking about historical

 7     information regarding how books, phone books, if you will, were

 8     created, he said, "This book was changed.  It would change

 9     every year.  It was sent from New York."

10              That's his testimony on the subject.  I may not have

11     the exact cite on that, but it will be in my papers; it will

12     show up tomorrow, so you will get it.  But that's his testimony

13     on this, your Honor.

14              And then Mr. Rodriguez, his testimony is very slim on

15     this and very confusing.  But, in any event, you have the three

16     pages of Mr. Rodriguez, who really doesn't lay any evidentiary

17     foundation here, because what they are talking about here is

18     accessing information on a computer, not in any sort of a book.

19              So now let me turn to what I believe are some of the

20     real evidentiary issues in this case, your Honor.

21              First, let's talk about the authentication of this

22     document.

23              I recognize that there is a lower threshold for

24     authentication, but they don't have a witness, any witness, who

25     could come into this courtroom and say what this thing is,

H3GVGIUC

1    because it is a compilation document, apparently created by

2    Mr. Rodriguez, but I don't know that, that has clearly been

3    manipulated over the years, given the staple holes, the

4    different pages, the handwriting, and so there is no confidence

5    that this document is what they purport it to be, which is some

6    address book of Epstein's.  And that's their burden.  And their

7    burden is to produce a witness in this case that can actually

8    provide some form of reliable chain of custody, which they

9    cannot.

10             803(6).  The law is very clear that in order to admit

11   a document under a business record exception to the hearsay

12   rule, we have to meet certain requirements, the first being

13   that whatever the document is, that it's kept in the ordinary

14   course of someone's business.  Here, there is no evidence to

15   that.  There is no author that has personal knowledge of the

16   matters that are represented in the book; there is no person

17   who can say that this information was transmitted by someone

18   with knowledge and kept in the regular course of

19   regularly-conducted activity; and that it was the practice of

20   someone to actually record that information.  There's not one

21   person who will testify to that or has testified to that.  So

22   they don't meet this standard.

23             In this case, it's clear that this document, the

24   document, and they call it the black book, well, it's neither

25   black nor a book, and let me make that point clear.  This was

H3GVGIUC

1    prepared by Mr. Rodriguez trying to extort $50,000 out of the

2    plaintiff's lawyers in the civil case.  So there is no

3    regularly-conducted business activity that this document is

4    associated with; it's associated with a crime is what it's

5    associated with.  And these kinds of documents that are

6    prepared by individuals for some other purpose are regularly

7    rejected as business records in this circuit and every other

8    circuit that has addressed this kind of an issue.

9         So then they turn to 801(d)(2).  Again, this shows you

10   that they don't know what they are doing with this document,

11   the plaintiff and her lawyers, your Honor.  Because when you

12   look at their notice of residual hearsay that they filed with

13   the Court, which is at docket entry 601, they claim in that

14   docket entry that Alfredo Rodriguez is the declarant for

15   purposes of this exhibit.

16        So why is that important, your Honor?

17        Well, first of all, they've represented to the Court

18   in their pleading, in their notice of residual hearsay

19   exception, that Mr. Rodriguez is the declarant.  That, in my

20   view, is a judicial admission.  You cannot take that position

21   in docket entry 601 and then say something else.  In order for

22   something to be admissible as an admission under 801(d)(2),

23   well, guess what, the person you're admitting it against has to

24   be the declarant of the statement.  They've already said that

25   Rodriguez is the declarant of this statement, so that leaves

H3GVGIUC

Maxwell out for any 801(d)(2) admission by law, by definition, under Rule 801(d)(2).

And then they make a weak argument that somehow this is an adoptive admission and there's no evidence to support that. In order to make this an adoptive admission, Ms. Maxwell would have had to direct someone to do it, have knowledge of them doing it, somehow said, Oh, yeah, that's right. There's no evidence of that before the Court. And, in fact, the evidence is to the contrary. Ms. Maxwell repeatedly testified at her deposition that she didn't have anything to do with anybody entering in phone numbers or addresses or anything else as part of this book. But, in any event, the declarant is Rodriguez, according to the plaintiff in her pleadings.

803(17). I laughed when I read this in the papers. This exception is for telephone books. Ma Bell didn't put together this book, your Honor. So the notion that this is something that is admitted under 803(17) is absurd and I'm not going to spend anymore time on it.

Then finally, they argue the residual hearsay exception. It's worth pointing out that when you flunk every other admissibility test under the rules of evidence, you probably have a real problem with circumstantial guarantees of trustworthiness. Here, we have lots of problems with guarantees of trustworthiness.

First, it's Mr. Rodriguez is creating this book to get

H3GVGIUC

1    50 grand out of the lawyers.  So we start with a suspect motive

2    and purpose.  This is Mr. Rodriguez, who has either lied two

3    times under oath saying he doesn't have this stuff, or

4    manufactured it after the fact.  But, in any event, he's a liar

5    and a perjurer at that.  He gets indicted not once, but twice,

6    and gets sentenced to 48 months in a federal penitentiary.  So

7    that's the seminal fount of credulity that they are offering

8    this person, the declarant, Mr. Rodriguez, for this document.

9         I wonder about No. 2, what's the material fact that

10   this is being offered for.  I haven't heard it.  I've heard a

11   lot of noise.  At the end of the day, what they really want is

12   this giant hearsay document from an unknown source and an

13   unknown origin that has all of these names in it that they can

14   then point to and argue off of and argue the truth of the

15   matter asserted during the course of the trial.  It is, I

16   believe, irresponsible to admit this kind of a document without

17   any foundation for what's the purpose of this thing in the

18   course of this trial.  Probative.  Again, I don't know what

19   they are offering it for, so I'm questioning the probative

20   nature of this.  But this is not a residual hearsay document,

21   given how it's been created.

22        Finally and sort of the last gasp of someone who can't

23   get in a piece of hearsay evidence, is, Well, we are not

24   offering it for the truth of the matter asserted.  How many

25   times have you heard that, your Honor, from people who are

H3GVGIUC

1    trying to get in evidence that they don't have an evidentiary

2    foundation for.  Well, they are clearly trying to offer it for

3    some truth of the matter asserted, otherwise it's not relevant

4    to any issue in this case.  You're going to put in a 97-page

5    document, the first five pages of which are handwritten and

6    contain things like "important witness," star, star, star, and

7    say, Well, we are not offering that for the truth of the matter

8    asserted.  Well, then what are you offering it for?  I haven't

9    heard any precise evidentiary hypothesis that would support the

10   notion that this should be admitted for anything.  And if it

11   were, the ability to create confusion with the jury and

12   prejudice in this case grossly outweighs any alleged nonhearsay

13   purpose.

14          Unless you have any other questions for me, your

15   Honor, that's all I have.

16          MS. McCAWLEY:  Your Honor, I just have some brief

17   points in reply, if you would entertain them.

18          THE COURT:  Sure.

19          MS. McCAWLEY:  Thank you.

20          You've obviously heard a lot about Mr. Rodriguez,

21   because the defendants want you to focus on that, because

22   that's a distraction.  You haven't heard them say, The names

23   and numbers in this book are not correct.  Maxwell looked at

24   the exhibit during her deposition.  She identified it.  She

25   said, This is the stolen document.  She knows it because they

H3GVGIUC

used it regularly at the house to call people.  For goodness

sake, her veterinarian for her Yorkie is in there, okay; all of

her family members; every single house that they had that they

owned together.  If you look at it, like, for example, on page

41 and 91, where each of the houses are listed, you'll see

Epstein's numbers, all of his various cell phones, and you'll

see Maxwell's numbers and all of her various things, right.  So

there's no evidence that this is not what it purports to be, a

telephone directory.

        We have already said that with respect to the

beginning pages that are handwritten, we don't need to admit

those.  I'm frankly happy to not have those in.  It's the

telephone directory that we're interested in here.  And it does

have guarantees of trustworthiness.  It has Maxwell

identifying.

        They are saying no witness.  Juan Allessi, who they

were entitled to cross-examine on this document during his

deposition, identified the document.  We did put all of those

pages, by the way, your Honor, in the binder that I gave you.

I'd like to mark that as Plaintiff's Composite Exhibit 1.  It

includes the document -- it's the black book.  It includes

Maxwell's testimony, Juan Allessi's testimony, Alfredo

Rodriguez's testimony, your Honor, and all of the pages where

those were referenced.  And we didn't clip them; they are all

in there.

1            So, your Honor, if you look at that though, that's

2      what you're going to see; you're going to see Juan Allessi

3      saying specifically in his testimony, this was the book.  He

4      says, This book was kept at Jeffrey's desk, his desk at the

5      pool.  It was with Ms. Maxwell.  It was in his bedroom.  He

6      identified the phone directory and said, I worked there; I was

7      the butler; this was the book; and this is where it was in the

8      house.  So if they didn't cross-examine him on that, that's not

9      my problem.  This is the book; it's the phone directory; it was

10     identified by staff who worked there, who has no incentive to

11     say it's something else.  So, your Honor, that testimony is in

12     here with respect to that.

13            Now, also I want to point out that the affidavit of

14     Christina Pryor, that paragraph 13 is very important in that

15     affidavit because while they try to make a lot of fuss about

16     this trying to elude that this is not the book -- I'm sorry,

17     it's paragraph 11.  In that affidavit she says, Rodriguez

18     explained that he had taken the bound book from his employer's

19     residence while employed there in 2004 to 2005; and that the

20     book has been created by persons working for his former

21     employer.

22            This is the telephone directory book.  They are

23     identifying it right here.  He's trying to say something about

24     pagination and, Oh, it looks photocopied and things of that

25     nature.  Your Honor, what matters is that the evidence in the

H3GVGIUC

1    book, the names, the numbers, that information.  Maxwell didn't

2    look at it and say, Oh, wait, that's not the book, because it

3    has -- at the very bottom there's a one, two, three, four, and

4    I don't recognize it.  That's not what she said, your Honor.

5    And we should be entitled to put her on the stand, if that's

6    going to be their position, and get that information from her.

7             So, your Honor, what she did during her deposition was

8    identify it as the document that it is.  So we believe that it

9    certainly comes in through her; it certainly comes in through

10   Juan Allessi and has been authenticated by them.

11            THE COURT:  Clearly what she was shown was not the

12   book.

13            MS. McCAWLEY:  No, that's not correct, your Honor.

14   What she was shown is Exhibit 13.

15            THE COURT:  I'm saying, yes, but that's not the book;

16   it's a copy of the book.

17            MS. McCAWLEY:  Yes, your Honor.  You're correct.  We

18   have a copy is what we have.  You're correct.  We don't have

19   anything that's bound; we have the copy that was produced in

20   discovery, that is correct.

21            But, your Honor, I will tell you, she didn't say, Oh,

22   those aren't the names and numbers of my family members on

23   pages 41, or that isn't what was the directory that we utilized

24   at the home.  She said, That's the stolen document.  I'd like

25   to know how you got it.

H3GVGIUC

1          So, your Honor, it's clear that --

2          THE COURT:  But going to the probative use of this, it

3  is, in your view, probative that there is a record of her phone

4  numbers in Epstein's house, is that the point?

5          MS. McCAWLEY:  That's one of the points, your Honor.

6  But more important is the section at page 91 which says

7  "Florida Massage."  It has my client's number listed, who was

8  underage, it has witnesses that we are going to put on the

9  stand who were underage at the time they are listed in that

10  book.  So it shows that they kept, as part of their sex

11  trafficking ring, a book that had phone numbers of a number of

12  people, but clearly had "Florida Massage," underage individuals

13  listed in that book.

14          So Maxwell has come forward in the international press

15  and said, You're a liar, Virginia Giuffre, because I didn't

16  sexually abuse you or sexually traffic you.  So that book, this

17  phone directory, that they kept at their home with the names

18  and numbers of underaged people in it, is highly probative in

19  this case.  First of all, it shows that Maxwell had knowledge

20  generally.  Even if you don't put it in for the truth of the

21  fact that that person's name and number is what's represented,

22  she had knowledge of the fact that there were these sections

23  within the book.  So, your Honor, it's highly probative in this

24  case.  I believe it's a critical piece of evidence and it shows

25  she had knowledge that this information was there.  It also

1   shows, as you said, the relationship that they were together,

2   that they had all the contact information for one another

3   within this document.  It also shows all of the other

4   individuals, many of whom are witnesses here, who are listed in

5   that book.  So it's a directory that, for a number of reasons,

6   is probative in this case.

7          So, your Honor, with respect to that, we've set forth

8   the testimony.  And particularly Juan Allessi who, again, is an

9   uninterested party because he was just simply the house staff,

10  and he identifies it, I read to you that portion at page 114.

11  There's also the portion where he says -- at 115 he says -- the

12  question is:  Do you know whether the people within this book

13  are Jeffrey Epstein's friends, Ghislaine Maxwell's friends or

14  both, and he answers both.  So that's Juan Allessi talking

15  about the substance of the book.  He identifies it; he knows

16  what's in it; and he talks about the substance of the book.

17  And he was an employee at the home, your Honor.

18         With respect to 801(b)(2), the legal argument there,

19  it is an adoptive admission.  So while Jeff tried to make a

20  fuss about the fact that the declarant -- okay.  Sorry.

21         THE COURT:  Nobody has testified that people listed on

22  that page, you say the critical page, were -- it's a copy that

23  has a listing.  But nobody has testified that it is a copy of

24  the black book.

25         MS. McCAWLEY:  Yes, your Honor.

1          Juan Allessi, who we're talking about right now -- and

2     that's the testimony that we elicited from him.  We showed him

3     Exhibit 13, the entire document --

4          THE COURT:  He did not -- well, you think his

5     testimony says, I know that this is a copy of what was on page

6     whatever of the black book.

7          MS. McCAWLEY:  For example, we show him the book.  And

8     you'll see he says -- and we ask him what I just read:  Do you

9     know whether the people within this book -- so we're showing

10    him the exhibit.  Do you know whether the people within this

11    group are Jeffrey Epstein's friends, Ghislaine Maxwell's

12    friends, or both.  And he says both.

13         How do you know that, we said.

14         Because these people I know; they were his friends;

15    they called; they came by the house, etc.

16         And then we went through some of the names with him in

17    the book.  So we did identify the book and the names in the

18    book.

19         And, your Honor, at trial we are going to call

20    witnesses who are in the book and who will say, I was underage

21    at the time I was brought in.  My name and number are listed

22    there.

23         THE COURT:  That's a whole different thing.

24         MS. McCAWLEY:  If your concern is over identifying

25    whether the book is what it purports to be, there is witness

H3GVGIUC

1    testimony on that, both what I provided to you today and what

2    we'll be eliciting at trial.

3           So, your Honor, in conclusion, the book does have

4    guarantees of trustworthiness.  This idea of a concern over a

5    chain of custody, again, Maxwell did not say that is not the

6    book; she said that's the stolen document from the home.  She

7    identified it as being from Jeffrey's home.  That testimony I

8    read to you earlier, I won't read it again, but it's very

9    clear, your Honor.

10          So we believe that this document definitely has

11   guarantees of trustworthiness.  It is a directory.  I know that

12   Jeff made a comment about 803(17), but there are reasons why we

13   have rules of evidence and there are reasons why they cover

14   certain topics.  And that one does cover telephone directories,

15   because they have inherentness when they are kept in the course

16   of employment, which that addresses.

17          THE COURT:  Yes.  But clearly that doesn't work here.

18          Let me put it to you.  If you have a case that has a

19   document like this that is in, I'd be pleased to see it.

20   Offhand, just without looking at any authority, I would say a

21   telephone directory is a telephone directory.  And this isn't

22   Ma Bell, as your brother has indicated.

23          MS. McCAWLEY:  I understand, your Honor.

24          So just in closing, I would like to reiterate that if

25   for some reason the Court does not find that it meets one of

H3GVGIUC

 1    the exceptions that we put forward or it is nonhearsay, we

 2    should be able to use it at trial to be able to say that

 3    Ms. Maxwell was aware of this document at the time she made her

 4    defamatory statement; not for the truth of the document itself,

 5    but that she was aware of the document itself at the time she

 6    made the defamatory statement.

 7              So, your Honor, there are a number of nonhearsay

 8    reasons why the document should be able to be presented to the

 9    jury.

10              THE COURT:  Well, but then you would have to have the

11    document admitted --

12              MS. McCAWLEY:  Not for the truth.  Of course in civil

13    discovery we do that often.

14              THE COURT:  No, but you do want it for the truth;

15    because you're identifying people that --

16              MS. McCAWLEY:  I understand.  Yes, I would like to

17    admit it for the truth under the exceptions I've given you.

18              My fallback position is if you're not going to entitle

19    me to admit it for the truth --

20              THE COURT:  What I'm trying to get at is I don't see

21    how you can use it not for the truth.

22              MS. McCAWLEY:  Because I can use it not for the truth,

23    not that on page 41 lists Maxwell's family member.  I can use

24    it for the fact that Maxwell knew this document existed,

25    whether it's true or not.  Whether the numbers in it are

H3GVGIUC

1    correct, whether the names in it are correct, she knew that it

2    existed at the time she made the statements about --

3            THE COURT:  You already have that testimony.  You

4    already have her testimony that she was aware of a telephone

5    directory.

6            MS. McCAWLEY:  Yes.  And we should be able to elicit

7    that at trial, your Honor.

8            THE COURT:  I don't think there's any question about

9    that.  But I don't know how you're going to use the document

10   itself --

11           MS. McCAWLEY:  To show --

12           THE COURT:  -- without offering it for the truth.

13           MS. McCAWLEY:  Your Honor, in the same manner as you

14   just discussed, to show her -- for example, if you say that it

15   cannot come in for the truth, which I think it should,

16   obviously, for all the reasons I've set forth today.  But if

17   not, I can use the document with her on the witness stand, hand

18   her Exhibit 13, have her identify it, and ask her those

19   questions.  So not for the truth of the matter asserted, but

20   whether she was aware of that document, its existence, at the

21   time she made the defamatory statement.

22           THE COURT:  Okay.  That you can do, no question about

23   that, because that's already been done.  But then what happens

24   to the document?

25           MS. McCAWLEY:  I'm not sure I follow.

H3GVGIUC

```
1              THE COURT:  The document still hasn't gotten to the
2    jury; it hasn't been admitted.  She knows there's a phone
3    directory.
4              MS. McCAWLEY:  But my point is, your Honor, we should
5    be able to admit it into evidence, not for the truth, but to
6    show that there's a phone directory that she was aware of.  In
7    other words, not the --
8              THE COURT:  That there was a phone directory -- well,
9    all right.  Okay.  Enough is enough, I guess.
10             MS. McCAWLEY:  Thank you, your Honor.
11             THE COURT:  Okay.
12             Anything further from Ms. Maxwell?
13             MR. PAGLIUCA:  No, your Honor.
14             THE COURT:  Thank you, all.
15             MS. McCAWLEY:  Thank you.
16                              *    *    *
17
18
19
20
21
22
23
24
25
```