H3NSGIUC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VIRGINIA L. GIUFFRE,

                Plaintiff,

           v.                            15 Civ. 7433 (RWS)

GHISLAINE MAXWELL,

                Defendant.

------------------------------x
                                     New York, N.Y.
                                     March 23, 2017
                                     12:10 p.m.

Before:

                    HON. ROBERT W. SWEET,

                                     District Judge

                         APPEARANCES

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Plaintiff Giuffre
BY:  SIGRID S. MCCAWLEY

J. STANLEY POTINGER PLLC
     Attorneys for Plaintiff Guiffre
BY:  J. STANELY POTTINGER

S.J. QUINNEY COLLEGE OF LAW AT THE UNIVERSITY OF UTAH
     Attorneys for Plaintiff Guiffre
BY:  PAUL G. CASSELL

HADDON, MORGAN and FOREMAN, P.C.
     Attorneys for Defendant Maxwell
BY:  LAURA A. MENNINGER
     JEFFREY S. PAGLUICA

H3NSGIUC

1          (Case called)

2          THE COURT:  There a couple of things that I would like

3  to raise at this point, and then we'll get to the affairs of

4  the day.  I was reading the pretrial order, and it's ham and

5  eggs without the ham, in other words, and you recognize that

6  because you said that you would provide a list of the exhibits

7  on February 21.  If you did, I don't think you did is my guess,

8  but you must.  Somewhere along the line we have got to get this

9  exhibit list in shape.

10          What's your thought with respect to that?

11          MS. MCCAWLEY:  Your Honor, I don't have the pretrial

12  order that we submitted in front of us.  My recollection is we

13  did put in a date for the exchange of exhibits internally and

14  then submission to the court.  I believe it was in early April,

15  but I could be wrong about that.  I'm sorry, I don't have it in

16  front of me right now.  I know we did put in a date certain in

17  the joint pretrial statement that we submitted to your Honor.

18          THE COURT:  You did.  It said February 21.

19          MS. MCCAWLEY:  I'm sorry.  That was the first -- no,

20  you're correct, your Honor.  That was our first order, and we

21  submitted a revised joint pretrial stipulation a couple weeks

22  ago, I believe it was.

23          THE COURT:  Oh, I missed that.  All right.  What does

24  that provide?

25          MS. MCCAWLEY:  It provides that we are going to be

H3NSGIUC

1   exchanging them to put forth the objections, and I think we

2   submitted it, I want to say, in early April.  I don't have the

3   date in front of me.  I'm sorry.

4           THE COURT:  That solves that problem.  I have the

5   joint interest agreement.  It's been submitted.  It occurs to

6   me that it is relevant.  If anybody thinks it is not relevant,

7   give me some authority to exclude it.

8           Is that agreeable?

9           MR. PAGLIUCA:  Well, your Honor -- this is Jeff

10  Pagliuca on behalf of Ms. Maxwell -- I am not understanding

11  precisely the court's question, but I think if the court is

12  talking about it being introduced into evidence in the trial or

13  for some other purpose?

14          THE COURT:  Well, obviously that is the purpose,

15  right?

16          MR. PAGLIUCA:  I believe there is authority that they

17  shouldn't be admitted at trial.

18          THE COURT:  All right.  You will recall that it was a

19  demand, a request for production, and I said submit it in

20  camera to see if it is relevant.  It was just submitted just

21  recently, parenthetically, two days ago, that is why I raised

22  it before.  It has been submitted.

23          I'm sure that the plaintiff believes that it's

24  relevant, obviously, or they wouldn't have asked for it in the

25  first place.  If you want to suppress it for some reason, but I

1    think I said a moment ago, it seems to me that it is relevant.

2    It should be produced unless you want to raise that issue.  OK?

3           I am told we have 45 motions on next week.  Would you

4    believe that?  45.  You people are nuts, but never mind.

5    Never mind.  I shouldn't have said that.  I withdraw.  You're

6    not nuts.  You're very diligent.  Maybe overly diligent.

7           Well, anyhow, whatever you are, I'm going to break

8    that up, I think.  Plan to stay for another day next week.  I

9    think also today, it probably makes sense, I will be taking the

10   discussion about the experts on submission.  But if you would

11   like to be heard, I can do that, or if you think it would be

12   useful to be heard, let's do that tomorrow at noon.  The others

13   we'll cope with today.

14           MR. PAGLIUCA:  Your Honor, you said tomorrow?

15           THE COURT:  Yes, tomorrow.

16           MR. PAGLIUCA:  We are not available tomorrow.  I have

17   matters pending in Colorado that I have to be back for.

18           THE COURT:  Don't give me this Colorado stuff.  You're

19   going to be here for the better part of April and May, I

20   understand.

21           MR. PAGLIUCA:  I'm happy to be here, your Honor.

22           THE COURT:  Oh, I'm sure.

23           MR. PAGLIUCA:  I have two children that live here.  It

24   is not a bad gig for me to come back.

25           THE COURT:  Understood.  I'll take them on submission.

H3NSGIUC

1          There is one thing I wanted to ask about the experts.

2     I want to be sure that I understand, what is the plaintiff's

3     damage claim?  I think I know, but tell me.

4          MS. MCCAWLEY:  Right.  So the damage claim, we're not

5     asserting special damages.  I know that was raised in the

6     context of these motions.  Our damage claim is the claim for

7     loss of standing in the community, it's the defamation, per se,

8     claim that we have made in our filings.

9          Within that, we have proposed two experts that talk

10    about the dissemination generally of the defamatory statement,

11    and those are experts that they have moved to exclude all of

12    our experts.  Those two also they have moved to exclude.  One

13    of them is Mr. Anderson, and he is the one who is basically

14    what you call an electronic reputation manager.

15         THE COURT:  Yes.

16         MS. MCCAWLEY:  The other one is Dr. Jansen.

17    Dr. Jansen is the one who does web analytics.  He testified in

18    the Erin Andrews case.  He follows the dissemination on the

19    Internet to show where the quoted statement --

20         THE COURT:  Yes, but there is no claim for emotional

21    damage?

22         MS. MCCAWLEY:  Yes, that is within that claim.  So the

23    actual language of it, which is set forth in our Rule 26

24    disclosures, goes to the emotional, it's emotional distress,

25    loss of standing in the community, reputation.

H3NSGIUC

| | |
|---|---|
| 1 | THE COURT:  Well, she is going to testify obviously. |
| 2 | Is there going to be an expert on the emotional damage? |
| 3 | MS. MCCAWLEY:  Yes, your Honor.  Dr. Kliman is our |
| 4 | expert. |
| 5 | THE COURT:  That's what I thought. |
| 6 | MS. MCCAWLEY:  Yes. |
| 7 | THE COURT:  That's fine.  Thanks. |
| 8 | MS. MENNINGER:  Your Honor, if I may respond to that, |
| 9 | please? |
| 10 | THE COURT:  Sure. |
| 11 | MS. MENNINGER:  Plaintiff has just said that they're |
| 12 | not asking for special damages, except the claim to clean up |
| 13 | her reputation on the Internet has been found by people like |
| 14 | Professor Sachs to be a special damage, and they did not plead |
| 15 | that special damage under Rule 90 and they did not disclose |
| 16 | that. |
| 17 | THE COURT:  I take it that that is covered in your |
| 18 | papers? |
| 19 | MS. MENNINGER:  It is, your Honor.  I just wanted to |
| 20 | clarify the statement on the record here regarding that. |
| 21 | THE COURT:  How do you all want to proceed? |
| 22 | MS. MCCAWLEY:  Well, your Honor -- |
| 23 | THE COURT:  Here is a question.  We have a question |
| 24 | about a witness and that raises the protective order. |
| 25 | MS. MCCAWLEY:  Yes, your Honor. |

H3NSGIUC

1          THE COURT:  My suggestion is that you be careful in

2    whatever you say and maintain the protective order.  If I don't

3    understand what you're telling me, I'll say so.

4          MS. MCCAWLEY:  Sure, your Honor.  I think you're

5    referring to the nonparty motions that are pending?

6          THE COURT:  Yes.

7          MS. MCCAWLEY:  As I see it, just so I'm clear, so

8    we're all on the same page, the expert motions that were their

9    motions and the two that were ours are going to be taken under

10   submission.  Then if I'm correct, what remains would be --

11   there's a defendant's motion in toto, there is plaintiff's

12   motion regarding the phrase testimony in another case, the

13   Dershowitz motion was resolved, he is going to be appearing

14   live, they explain that in their opposition, that one is moot,

15   and then the nonparty motion.

16         THE COURT:  Yes.  Why don't we do the nonparty

17   business first, because then that will save attorney time.

18         MS. MENNINGER:  Your Honor, the nonparty motions are

19   twofold.  On the one hand, plaintiff has filed a motion for a

20   protective order asking that there be no more discovery, and at

21   the same time, we had moved to compel her to provide discovery.

22   I am the movant in terms of the motion to compel, the

23   respondent in terms of the protective order, but I really think

24   the two issues are one.

25         As you may recall, because we were just here on this

H3NSGIUC

particular witness about a month and a half ago, your Honor,
this was a witness that was "late disclosed."  Plaintiff said
they had only recently learned about her.  It turns out that
they had learned about her several months before they told the
court they recently learned of her.  But in any event, in order
to cure the late disclosure, they offered to reopen discovery
to allow her to be deposed and also accept service of the
subpoena.

          We are here today to talk about her refusal to answer
certain questions during her deposition that occurred on
February 17, and we are here to talk about her refusal to
provide certain documents pursuant to the subpoena, both of
which were, if you will, matters that were proposed by
plaintiff to cure the late disclosure so that they could
present her testimony at trial.

          In the first place, we served this witness with -- I
don't know if we are supposed to use her name or not based on
the last time we were here, I'll just call her the witness --
we served the witness with a subpoena accepted by counsel for
plaintiff, and approximately 18 pages of documents were
produced and some photographs.  The photographs apparently were
given to her by another person.  Then a copy of her expired
passport.  That was, as you might imagine, not the only
documents that were requested from her.

          Part of the problem here, your Honor, is that this

H3NSGIUC

1   witness is not only a witness in the trial --

2              THE COURT:  I know.  I know what she is.

3              MS. MENNINGER:  -- she also has --

4              THE COURT:  I know.  Let me just say flat out, I am

5   not going to get involved in that other case.

6              MS. MENNINGER:  I totally understand, your Honor.  The

7   only issue that I was raising in this regard is that she has

8   the same lawyers in this case who are also plaintiff's lawyers.

9   So there are, I think, seven or so lawyers representing her.

10  She said she was unable to produce a privilege log for any of

11  her privileged materials that she asserted in her responses to

12  requests one, three, and five.

13             THE COURT:  That was only related with respect to

14  Dershowitz, right?

15             MS. MENNINGER:  That was at her deposition, your

16  Honor.  That is not the only privilege she asserted in

17  responding to subpoena requests.  In her subpoena requests,

18  there were four specific requests.  She asserted privilege and

19  she did not produce a privilege log.  Those are items number

20  one, two, three and five.  She raised privilege, she didn't say

21  whether she actually had any privileged materials, and then she

22  did not provide a privilege log.

23             You are correct, your Honor, with respect to the

24  assertion of privilege during the deposition.  She asserted

25  that her conversations with Mr. Dershowitz were privileged, but

H3NSGIUC

1    they occurred in front of a third party, in particular

2    Mr. Epstein, who she said was there for her "moral support" and

3    he was not part of her litigation team.

4            So, in our opinion, having a conversation with a

5    lawyer -- by the way, that lawyer denies he is her lawyer -- in

6    any event, she said she had a conversation with him in the

7    presence of a third party, and so there is no privilege, your

8    Honor.  That is just black-letter law on privilege.  There was

9    no basis for asserting that privilege during the deposition,

10   and we would ask her to be deposed and answer the questions

11   related to that conversation.

12           Your Honor, with respect back to the subpoena

13   responses one, two, three and five, she asserted a privilege

14   and she did not produce a privilege log.  Again, black-letter

15   law, you waive your privilege when you don't do a log.  She

16   said only that it would be burdensome and that witness

17   interviews are subject to work protection.  So, again, your

18   Honor, this relates to the question of which lawyers are

19   representing her at what time and when.  They claim that all

20   conversations that they have had with her are privileged work

21   product, but they have not produced a log regarding those work

22   product protection materials that they claim.

23           Regarding burdensomeness, your Honor, they made no

24   argument other than saying it was burdensome.  They didn't say

25   how many documents there were.  They only knew her two or three

H3NSGIUC

1    months.  I don't know how burdensome --

2              THE COURT:  These are conversations with the

3    plaintiff's counsel in this case?

4              MS. MENNINGER:  That's right, your Honor.  That's what

5    I am trying to explain, your Honor.

6              Sitting at counsel table right now in front of you are

7    three lawyers from three separate firms.  Each of these three

8    lawyers represent both the witness and represent plaintiff.

9              THE COURT:  Well, Giuffre's lawyers do not represent

10   the witness here.

11             MS. MENNINGER:  Yes, they do, your Honor.

12             THE COURT:  Oh, do they?

13             MS. MENNINGER:  At her deposition, they were

14   instructing her to answer and instructing her not to answer,

15   participating in all of the conversations with her lawyers out

16   in the hallway when they would confer during the pendency of

17   questions.

18             THE COURT:  I mean, I don't think that makes them her

19   lawyer in this case, but I guess, yeah, isn't it pretty clear

20   that Giuffre -- well, I see your point.

21             MS. MENNINGER:  Your Honor, I think in order to

22   understand whether any of these materials are or are not

23   privileged, one needs to know who her lawyers are, for what

24   purpose, when and see a privilege log so that you can test it.

25   That wasn't produced at all.  No effort was made.

H3NSGIUC

1          Three more weeks have gone by.  Still none has been

2     produced.  She has four law firms and seven attorneys.  I don't

3     understand the burdensomeness argument, your Honor, not one

4     bit, and I think they have waived the privilege on it by not

5     producing a privilege log.

6          With respect to our request for her communications

7     with witnesses in this case, those were requests one, four,

8     five, and 14, and variance iterations.  She produced, as I

9     said, 18 pages of e-mails that she got off of her Yahoo inbox,

10    but she testified -- and I quoted in the papers -- that she

11    only searched her inbox.  She produced screenshots of the

12    e-mails which reveal other e-mails that were not produced that

13    were responsive.  So certain ones, they would take a screenshot

14    of a part of an e-mail.  Another one would be hidden in the

15    screenshot and another one would be disclosed.  So there are

16    obviously e-mails that are responsive to our requests that were

17    not produced.

18          THE COURT:  These are e-mails with --

19          MS. MENNINGER:  Witnesses in this case, your Honor.

20          THE COURT:  In this case?

21          MS. MENNINGER:  In this case, yes, your Honor.

22          Another issue, your Honor, is that this witness claims

23    that she came forward after communicating with a journalist.

24    She said she e-mailed that journalist several times.  She

25    testified to the e-mails with the journalist about the subject

H3NSGIUC

1    matter of her testimony in this case and she has this e-mail

2    exchange still within her Yahoo account.  Those e-mails were

3    not produced either, your Honor.

4            There was another witness -- I mentioned it in the

5    paper, I'll be oblique in my references to it now -- to whom

6    she discussed the subject matter of her testimony in this case,

7    but only produced selected e-mails with that individual because

8    they have been marked confidential.  I won't say the name, but

9    it is on page four of my motion, your Honor.

10           My second request, request number two, related to her

11   fee agreements.  One fee agreement was produced for four of her

12   lawyers, but not the other fee agreement for the remaining

13   three that have entered their appearance on her case.  Again,

14   your Honor, I think the fee agreement is relevant.  I'm sorry.

15   There is two other lawyers she did not produce her agreements

16   with.  One is the lawyer who appeared with her at her

17   deposition.  She produced no fee agreement with that particular

18   attorney.  Then secondly, she did not produce her fee agreement

19   with the Boies, Schiller firm who has entered their appearance

20   on her behalf.

21           THE COURT:  Have they?

22           MS. MENNINGER:  They entered in another matter, your

23   Honor.

24           THE COURT:  Well, that's what I thought.

25           MS. MENNINGER:  Your Honor, requests six and seven

H3NSGIUC

1    relate to some photographs.  There were photographs produced.

2    They were represented to the court to have been photographs

3    that the witness took, but it turns out after her deposition

4    that they were not taken by her, they were given to her on a

5    disk.  We asked for an actual copy of the disk, and you can see

6    some of the screenshots from that disk in my pleading.  But

7    also attached to my declaration reply, Exhibit J, the full

8    screenshot of the contents reveals that approximately

9    50 photographs were deleted before they were provided to us.

10         There are just jumps in the numbering.  And these

11   photographs, the witness testified, were relevant to her

12   testimony in this case, so I would ask that the complete set of

13   photographs be produced and no reason for not producing them

14   has been provided by counsel for the witness, who is also

15   counsel for the plaintiff.

16         Requests nine through 12, your Honor, there were some

17   passports and visa documents.  This woman made claims that she

18   came to this country for the purposes of education, and so we

19   asked for her visas where she was seeking the ability to study

20   in this country.  None of those were produced.  We asked for

21   her passports that reflected her travel to and from the

22   country, because the dates of her travel are relevant to her

23   claims here and certainly to our 404(b) motion, your Honor.

24   She testified that she had two passports.  She only produced a

25   copy of one.  We would ask that her other passport be produced,

H3NSGIUC

1    her other expired passport be produced, and both of her current

2    passports.

3              THE COURT:  Why the current one?

4              MS. MENNINGER:  Your Honor, there were certain claims

5    made about when she had traveled to this country and whether

6    she had been here.  She made a claim -- I don't know how to say

7    it without getting into the subject matter of some of her

8    testimony -- but she made allegations that she had and had not

9    traveled on certain dates up to and including today.

10             THE COURT:  Oh, I see.

11             MS. MENNINGER:  That is why it would be relevant.

12             Your Honor, request 15 and 16 of the subpoena, there

13   were allegations made by this witness that she was provided

14   things of value.  We asked for records that would reflect

15   whether or not that allegation is true.  We were told that no

16   such records would be produced based on privacy concerns.  As

17   your Honor has suggested, any privacy concerns can be

18   alleviated based on the protective order already entered in

19   this case.  We are happy to abide by it and have been abiding

20   by it.

21             With respect to request 18, her driver's license, your

22   Honor, that provides some background information that can be

23   useful in investigation of an individual's criminal history and

24   the like.  We, again, are happy to have that subject to the

25   protective order.  Frankly, the response was that it would be

H3NSGIUC

1   provided at her deposition, but it was not.

2           Request 19 and 20 related to her education records.

3   Her education records, your Honor, her claim that she was a

4   victim relates to claims related to education.  I don't know

5   how else to see it, your Honor, if you know what I'm saying.

6           THE COURT:  I do.

7           MS. MENNINGER:  One of the issues would be whether or

8   not that truly was -- whether that claim is true.  Part of

9   whether or not that claim is true depends upon her

10   qualifications and her other educational background.  She

11   testified about some of this, but she didn't produce any of her

12   records related to it.

13           One record in particular, her application for that

14   particular institution was not provided.  An essay was

15   provided, but not the application, which, by the way, she

16   testified she had on her computer.

17           Requests 21 and 22 relate to her contracts.

18           THE COURT:  Yes.

19           MS. MENNINGER:  Request 30 is social media.

20           Your Honor, those are the subpoena issues.

21           THE COURT:  But how is it relevant here?

22           MS. MENNINGER:  Which one?

23           THE COURT:  The modeling.

24           MS. MENNINGER:  Your Honor, she testified that while

25   she was here in this country about a decade ago, she was

H3NSGIUC

performing modeling services.  At the same time, she says she
was just here to further her education.  So if she has
contracts from that time period -- and I am happy to limit it
to that time period, your Honor -- then it would not be
credible that she was only here for purposes of furthering her
education.

THE COURT:  OK.

MS. MENNINGER:  If I may turn to the deposition
question issues, your Honor.  Those also are outlined in our
papers.  There are some witnesses, based on claims that she has
made, we asked for their identifying information, including
their names and, if known, addresses, in particular, her
partner's phone number.  She was directed by her counsel not to
answer the phone number.  There was no privilege asserted.

We asked for her financial information in our opening
papers.  We explained the relevance of that financial
information.  There was no response to that relevance argument,
your Honor, so I would deem it admitted by the other side.  We
have already discussed category three, the allegedly privileged
communications with Mr. Dershowitz.

Finally, your Honor, on page 11 of our reply, there
were six categories of questions that we asked during the
deposition.  She was instructed not to answer.  And when her
lawyer, who is plaintiff's lawyer, moved for a protective
order, they didn't move to cover any of these.  Your Honor,

H3NSGIUC

1   again, I would argue that those have been deemed admitted.  The

2   relevance for each one of them is, again, asserted after the

3   categories on page 11 of our reply.

4          I think saying any more would get us in some water.

5   Thank you, your Honor.

6          THE COURT:  Yes.

7          MR. POTTINGER:  Good afternoon, your Honor.  Stan

8   Pottinger here for a nonparty witness.  If I slip and use her

9   name, I believe your Honor's redaction order of two weeks ago

10  probably covers this.  If I'm wrong about that, I'll be happy

11  to stand corrected.  I do believe, I'm guessing, that there may

12  be press in the courtroom today.

13         Your Honor, a moment of context.  What we are talking

14  about here is a nonparty witness, not a party, being attacked,

15  if you will, by a party, the defendant, who has produced less

16  information than this nonparty witness has produced to date.

17  This is true both for photographs, e-mails and relevant

18  documents.  I mean, at some point, enough is enough, your

19  Honor.

20         With regard to what has been produced in response to

21  the subpoena, the nonparty witness has produced documents in

22  response to --

23         THE COURT:  Let's get to the ones that are contested,

24  the communication with witnesses.

25         MR. POTTINGER:  All right.  Your Honor, with regard to

H3NSGIUC

1    request number 12, she has testified that she does not have

2    credit cards or receipts.

3              THE COURT:  Well, look, if she doesn't have something,

4    then all we need is that statement.

5              MR. POTTINGER:  Fine.  That takes care of many of the

6    burdensome requests that have been made here.  They are

7    burdensome and irrelevant.

8              With regard to the four items in specific that are

9    being raised, passport, driver's license --

10             THE COURT:  How about the communications with

11   witnesses?

12             MR. POTTINGER:  Are you speaking now of the matter

13   involving Dershowitz and --

14             THE COURT:  Well, I am looking at your opponent's

15   papers.  That was the request one, four, five and 14.  They say

16   no forensic search, no search.

17             MR. POTTINGER:  Your Honor, she has testified that she

18   searched her computer.  I'm not sure what kind --

19             THE COURT:  Counsel just said --

20             MR. POTTINGER:  A forensic search meaning more than

21   her searching.  She is a nonparty witness who resides in Spain.

22   We are supposed to send an IT expert to Spain?  I'm not sure

23   what this involves.  I mean, she has gone through her computer,

24   she has gone through --

25             Your Honor, may I hand up, if I may, a bench book for

H3NSGIUC

1   your consideration for a moment to get some idea what has been

2   produced here?  This will give you some idea.

3          THE COURT:  Wait just a second.  Has she identified

4   her e-mail accounts?

5          MR. POTTINGER:  Yes.

6          THE COURT:  She has stated that she has searched

7   those?

8          MR. POTTINGER:  That's correct.

9          THE COURT:  Has counsel searched those?

10          MR. POTTINGER:  I have not searched those.  I can't

11   speak for other possible counsel, but I believe that there have

12   been efforts to ascertain that her searches have been accurate.

13   Certainly she has told us what she has done.  She has testified

14   under oath that she searched every single e-mail and that she

15   has produced every single e-mail there was and is responsive to

16   the subpoena.

17          THE COURT:  Does that include this reporter business?

18          MR. POTTINGER:  No.  There may be some e-mails that

19   existed between her and the reporter before we met her or knew

20   her.  Our view is that those reporter e-mails happened a matter

21   of a few months ago, have nothing to do with 10, 11 years ago

22   when the events of this trial are put to the test.  They have

23   nothing to do with that.

24          I mean, should she produce every e-mail she's ever had

25   on this subject for the last 10 years?  I don't understand the

H3NSGIUC

1   level of that burden in light of the prevailing case law,

2   including your own, your Honor, doesn't seem to require a

3   nonparty witness to go through those burdensome and harassment

4   lengths.

5        THE COURT:  But those statements have nothing to do

6   with this case.

7        MR. POTTINGER:  Well, not in our view.  They have to

8   do with, as I understand them, they have to do with her desire

9   to be recognized as someone who was an important witness.  This

10  happened before we even heard of her.  I have to remind your

11  Honor, this is someone who should have been produced by the

12  defendant as a Rule 26 witness and was never mentioned.

13       Unless the defendant, Ghislaine Maxwell, is prepared

14  to say that she literally forgot about someone with whom she's

15  been photographed and exchanged information and was trafficked

16  by her, and she actually forgot about her, we don't understand

17  why this is coming up at this late date.  This should have been

18  produced many, many months ago, but it was not.

19       Look, we heard about her.  She came forward.  She

20  heard about the case.  She summoned her courage and came

21  forward.  Our response in terms of having heard about this in

22  November is not to go ahead and produce her in any respect

23  until we ourselves did the due diligence, which we might add

24  defendants have requested in very severe terms that they be

25  done, including Mr. Dershowitz himself, who is always saying

H3NSGIUC

1    what happens to lawyers when they don't do careful due

2    diligence.  Well, we did the careful due diligence.

3          We did ascertain that she was speaking with

4    credibility, and then we produced her very quickly.  This

5    happened, by the way, over the holiday season at the end of

6    December.  So from November to December, we did our job.  We

7    then went to Spain.  We did the interviews with her.  We

8    concluded that she was credible and we produced her.

9          Now we're up against things like a passport, a

10   passport now, a passport that she is using today as opposed to

11   10 years ago.  We produced her passport from 10 years ago.

12   They have that.  They have that in completion.  We haven't

13   produced her passport that she uses today.  What's the

14   relevance of that?

15         We have not produced her driver's license today.  She

16   is fearful of what that may lead to.  We have not produced

17   financial statements only because she says she doesn't have

18   them, not because we have them and we are sitting on them.

19         Modeling contracts?  She doesn't have them.  She

20   herself has said, I was not a top flight model, for a number of

21   reasons that she candidly explains.  She doesn't have those.

22   She testified to that in 10 hours, your Honor; 10 hours of

23   sitting in a deposition.  She came to this country from Spain

24   and sat for 10 hours, testified truthfully to each of these

25   questions, and yet we're now facing questions we want more

H3NSGIUC

1   deposition, we want more documents, we want things like

2   paycheck records.  She testified she doesn't have them.

3           We want her boyfriend's cell phone number.  Why do

4   they want her boyfriend's cell phone number?  She is very

5   nervous about that.  So is her family.  They want her parents'

6   current address information.

7           We covered the Dershowitz business.  They want her

8   partner's occupation.  They want to know what hotel she stayed

9   in four weeks ago, six weeks ago, when she was here in New York

10  to testify.  They want to know what hotel.  What hotel did you

11  stay in?

12          They want to know her stepmother's telephone number,

13  e-mail address, her physical address.  That makes her and her

14  family extremely nervous.

15          They want to know when she provided her photographs to

16  her lawyers.  I think it is a privileged matter, but, I mean,

17  these are the subjects that they want to go into and have her,

18  at her expense and the difficulty involved, fly from Spain back

19  to New York to answer those questions.  I mean, at what

20  point -- look, I grant you, we are now representing her.  If we

21  didn't represent her, where would she be?  She is in Spain.  If

22  they want to go to Spain with letters interrogatory, fine.  We

23  are not trying to do that.

24          We acknowledge we represent her, and we are trying to

25  be as cooperative and fulsome and productive as we can be.  At

H3NSGIUC

1   some point, enough is enough.  I understand why they are

2   worried about this witness.  It makes sense.  I would be in

3   their shoes as well.

4           At some point, we have got to draw lines here.  This

5   is someone who has come forward at great both personal and

6   other expense.  I mean, 10 hours, 10 hours of sitting here

7   doing this, at some point, why are these additional points

8   raised other than to harass her?

9           Your Honor, I might add one other thing.  One of the

10  things that they have been honest about, we appreciate the

11  honesty of defense counsel in saying that they do want to use

12  this proceeding in order to find out information in another

13  lawsuit.  That's a problem for us.  We cite your Honor's

14  Mademoiselle case as a reference point on that particular

15  point.

16          THE COURT:  Thank you.

17          MS. MENNINGER:  Your Honor, I would like to ask

18  counsel where any representation has been made by myself or my

19  co-counsel that we intend to use any of this in another matter.

20  That is not true.

21          Also not true, this witness did not sit for 10 hours

22  of deposition.  It was just repeated three times.  She sat for

23  six and a half hours of a deposition.  Her lawyers took so many

24  breaks, that it took up 10 hours.  I didn't leave the room.  I

25  ate at the table.  They took three and a half hours and then

H3NSGIUC

1    brought a salad back and ate it during the deposition.

2              Another misrepresentation on the record just now made

3    by Mr. Pottinger, they want to stand here in open court and

4    say, We don't want to use her name.  Then they say things that

5    are not true, like this woman was photographed with my client.

6    Not true.  Look through the documents you were just handed in a

7    book.  Find a photograph of the two of them together.  You

8    won't.  It doesn't exist.

9              He just stated to you on the record in open court that

10   this witness communicated with my client.  Look through that

11   book.  There is not a single communication between her and my

12   client.  Not true.  Stated in open court.

13             Your Honor, I'm sorry, but I am offended when

14   misrepresentations are made to the court, especially when

15   they're done under the guise of I want some protection, I am

16   just going to say things and you can't respond to them.

17             Your Honor, related to this discussion about the

18   reporter, the witness testified that she tried to sell her

19   story about my client to a *New York Post* reporter.  She did

20   that after she read the *New York Post* reporter's claim that

21   Mr. Epstein often settles lawsuits out of court.  She has

22   testified that she read that statement and decided to approach

23   the reporter to try to sell her story.  She did that just a

24   couple weeks before she called plaintiff's counsel.  That

25   *New York Post* reporter refused, apparently, to publish her

H3NSGIUC

1    story, and the fact that she refused to publish her story was

2    what then led her to just voluntarily, after 10 years, give a

3    call to plaintiff's counsel over here and see if she could get

4    joined up in this lawsuit.  So to say that the e-mails that she

5    testified directly --

6            THE COURT:  But that is not relevant to this case.

7            MS. MENNINGER:  Absolutely, your Honor.  The reason

8    why she decided to come forward as a witness in this case is

9    highly relevant.  If she came forward because she has a money

10   motive to be a witness in this case, that is motive and that is

11   cross-examination material, your Honor.  She testified the

12   e-mails with the reporter existed within two weeks of when she

13   had a signed fee agreement with these lawyers, so it's not like

14   we're talking about e-mails from 10 years ago.  We are talking

15   about e-mails from two weeks before she signed a fee agreement

16   with these lawyers.

17           So you can't say someone trying to sell their story,

18   getting shut down, giving a call to plaintiff's counsel when

19   you've read that Mr. Epstein settles lawsuits is somehow

20   irrelevant to her testimony as a biased financially motivated

21   witness in this case.

22           Then I asked her, where are those e-mails with the

23   reporter?  Well, they're in my Yahoo on my computer sitting

24   right there.  Did you produce them?  No.  Was there a request

25   that asked for you to produce any e-mails where you're

H3NSGIUC

1   discussing my client?  Yes, I do have that request, I just

2   didn't produce them.

3          There's been no basis presented to your Honor for why

4   she can't produce an e-mail she just testified is sitting in

5   her Yahoo inbox with a reporter she tried to peddle her story

6   to, her story she plans to tell here on the stand here in this

7   case.

8          MR. POTTINGER:  Your Honor.  I'm sorry, I beg your

9   pardon.

10          THE COURT:  Anything else?

11          MS. MENNINGER:  No, your Honor.

12          THE COURT:  OK.

13          MR. POTTINGER:  May I?

14          THE COURT:  Let's produce the statement of the

15   journalist.

16          Let me ask the relevance of the stepmother and the

17   boyfriend's occupation.

18          MS. MENNINGER:  Yes, your Honor.  She has made claims

19   that my client called her parents back in 2007, called them on

20   the phone and had a conversation with them about her and about

21   my client.  So she has described these people as percipient

22   witnesses to what she claims was her sex trafficking.

23          She said she had those conversations with my client,

24   she said my client had those conversations with her mother, her

25   father and/or her stepmother back in 2007.  So I asked, OK.

H3NSGIUC

1    What is their phone number?  Where do they live?  Can I give

2    them a call to ask whether or not they really had a

3    conversation with my client or not?

4          She testified at first that she doesn't have a

5    relationship with those parents anymore.  She doesn't speak to

6    them anymore.  So I'm not sure where the fear that is being

7    generated about her stepparents is coming from when she hasn't

8    spoken to them in years.  But simply asking where someone lives

9    in South Africa, where these stepparents were, you know, I

10   can't exactly go down the street and try to find them in the

11   phone book.  I just asked for their phone number and their

12   address so I can give them a call and see if they had a

13   conversation with my client.

14         With regard to her partner's cell phone, your Honor,

15   what she testified is that she had originally contacted this

16   reporter using her own cell phone, and she claims that after

17   she contacted the reporter in October using her cell phone,

18   that she got followed around Spain by some unknown people.  She

19   saw them a few times.  She would go out on her normal route,

20   and she saw the same people.  She thought they were following

21   her, so she got rid of her cell phone and started using her

22   partner's cell phone to have conversations with all of these

23   attorneys, your Honor.  Specifically, Mr. Cassell.

24         She said she spoke on that cell phone to Ms. McCawley

25   for over 11 hours.  She said she spoke to Mr. Pottinger on that

H3NSGIUC

1    cell phone number.  She said she spoke to Mr. Edwards on that

2    cell phone number.  Mr. Edwards and Mr. Pottinger flew to Spain

3    to have a meeting with her and showed her some unknown

4    documents while they were there with her.  So the relevance of

5    her partner's cell phone number directly relates to whether or

6    not these attorneys have helped her, in my opinion, concoct a

7    story to come and testify in this trial about my client.

8              MR. POTTINGER:  Your Honor, may I have one moment?

9              THE COURT:  Sure.

10             MR. POTTINGER:  Since we're talking about statements

11   made before your Honor that may not be supported by the record,

12   our client, I should say our client, a non-witness party, has

13   never said that she was attempting to sell her story to the

14   *New York Post* or anyone else.  There is nothing in the record

15   that suggests that she was trying to sell an article.  That has

16   been stated more than once in this courtroom in the last

17   10 minutes.  That is inaccurate.

18             With regard to the matter of her general knowledge of

19   both the defendant and the people who were trafficked on the

20   island, the photographs that are in front of you, your Honor,

21   I defy anyone who looks at them to contend that they are not

22   related to each other and that they are not at the same time

23   and place and the same people, including the defendant and

24   including this particular witness.

25             Look, we have never gotten a single photograph, not

H3NSGIUC

1    one, from someone who had cameras, who was said to have been

2    photographing people frequently.  I think one phrase at one

3    point was "snap happy," someone who actually makes photographs,

4    and not one has been produced.  Yet, we have now finally found

5    some photographs because a party who took those photographs

6    turned them over to this witness.  This witness produced them.

7    Now, they simply show what they show.  I think even a cursory

8    glance at them will show there was not even a very close

9    relationship between and knowledge between the defendants and

10   the witness in this case, but also other parties who were part

11   of this.  It is all there.  It is all in the bench book.

12        THE COURT:  Let's do this.  The journalist statement,

13   those communications will be produced.  The contacts for the

14   stepparents will be given, if she has them and can get them.

15   Nothing about the cell phone.

16        I think what we should do is for those productions to

17   be made, and then I'll rule at the moment to deny the request

18   for a renewed deposition.  If, after those materials are

19   produced, you want to renew that request, that's fine.  Thanks.

20        MR. POTTINGER:  Thank you, your Honor.

21        MS. MENNINGER:  Your Honor, I just have to make one

22   point of clarification, since I know your oral order will be

23   binding.  It was just not her stepparents, it was her actual

24   parents and then stepfather.

25        THE COURT:  OK.

31

H3NSGIUC

```
 1              MS. MENNINGER:  OK.

 2              THE COURT:  My mistake.

 3              MS. MENNINGER:  Thank you.

 4              THE COURT:  What's next?

 5              MS. MENNINGER:  I'm sorry, your Honor.  There was one

 6     other category, the photographs.  Some photographs were

 7     omitted, and I put the screenshots in there.

 8              THE COURT:  The admissibility of those photographs is

 9     certainly in question.  There's no question about that.

10              MS. MENNINGER:  Absolutely.

11              THE COURT:  That's a whole other issue.  I mean,

12     they're nice pictures, but will they get in?  I don't know.

13     Where did they come from?  I don't know.

14              MS. MENNINGER:  Chain of custody, right?

15              THE COURT:  Are they hers, etc., etc.  I think that is

16     something that would come up if they are sought to be

17     introduced.

18              MS. MENNINGER:  Your Honor, the question is whether

19     she took out photographs from a disk she was given.

20              THE COURT:  Yes, I assume that she has.

21              MS. MENNINGER:  But if we asked for all of the

22     photographs related to this experience, and she just willingly

23     chose to extract some photographs and not produce them to us,

24     that is my point, your Honor.

25              MR. POTTINGER:  Your Honor.
```

H3NSGIUC

1          THE COURT:  I'm assuming that she complied with the

2     request, that is, all photographs relating to the events with

3     which she was familiar.

4          MS. MENNINGER:  I would have assumed that as well,

5     your Honor, but the numbers of the photographs just omit 10 or

6     so there.

7          THE COURT:  Presumably this is not her disk.

8          MS. MENNINGER:  I understand if she didn't get them.

9     I get that, your Honor.

10          MR. POTTINGER:  Correct.

11          MS. MENNINGER:  If she got them and chose not to

12     produce them, that should be --

13          THE COURT:  Whoever produced, whoever did the disk is

14     the one who has those pictures.

15          MR. POTTINGER:  Excuse me.  May I?  I don't want to

16     cut my counsel short, but let me just say that the disk is

17     fully responsive, your Honor, to the subpoena and the request.

18     Any photographs on the disk that were not produced had nothing,

19     have nothing to do, as my co-counsel just said, with the events

20     of this case.

21          THE COURT:  Well, I'm assuming that she complied.

22     Now, ultimately that disk is going to have to be produced in

23     order to get the document in, I presume.

24          MS. MENNINGER:  Well, if counsel is saying she got a

25     disk, and photographs 1 through 50 were taken on the island and

1    we asked for all photographs taken on the island, and then

2    somehow photographs 51, two and three were not taken on the

3    island and photographs 54 through 90 were taken on the island,

4    there are obviously four photographs either the taker took off

5    the disk or they left the island.  I don't know which it is.

6    We will find out, I guess.

7              THE COURT:  Thank you, all.

8              MR. POTTINGER:  Thank you, your Honor.

9              THE COURT:  What's next?

10             MS. MCCAWLEY:  Your Honor, we have one that we

11   discussed in response of here.  The defendants had filed a

12   motion in toto to exclude certain witness testimony, and a

13   variety of our issues, they relate to the designations we are

14   going to be dealing with on April 5, your Honor.

15             Counsel for the defendants, his motion asked if we

16   could just do that on that day when we're already dealing with

17   those witnesses' designations, which I have no objection to.

18   It seems to make sense to not have you do it twice, basically.

19             MR. PAGLIUCA:  They are somewhat intertwined, your

20   Honor.  This would make sense, pointed out in the plaintiff's

21   papers, we should deal with these issues at the same time.  And

22   I agree, we would be revisiting the issue again.

23             THE COURT:  OK.

24             MR. PAGLIUCA:  I think we can defer that until the

25   5th.  And then on my list then, your Honor, I think I have

H3NSGIUC

1   three things that remain, I think.

2          One relates to the Dershowitz deposition exhibits,

3   which Ms. McCawley already pointed out, I believe, as moot.

4   Mr. Dershowitz is going to testify in person.  Unless something

5   happens to Mr. Dershowitz, we don't need to address this issue

6   now.  We intend to present his testimony live.  That's a moot

7   issue at this point.

8          Then I have two remaining.  I think one relates to the

9   deposition excerpts of the plaintiff in this case, which has

10   been briefed.  It's simply our position, which I think is well

11   founded, that these are party admissions.  Under 801(d)(2), the

12   rules provide that we can use these admissions as substantive

13   testimony at trial.  I would expect, assuming that they call

14   her as their witness, that we can cross-examine her with her

15   prior statements under the rules and/or introduce these as

16   admissions.  I am not frankly sure what the objection is,

17   because I believe this is clearly covered under rule 801(d)(2).

18   That would be the prior deposition testimony of the plaintiff

19   in another matter.

20          MS. MCCAWLEY:  Your Honor, can I address that issue

21   since he raised it?

22          So what this is, is our client was deposed as a

23   nonparty in another action in Florida, and they are seeking to

24   not only -- she obviously is going to be called here live at

25   trial, which is, of course, the preferred method for obtaining

1    testimony at a trial.  They wanted to also, as I understand it,

2    simultaneously publish excerpts of her deposition that was

3    taken in that matter.

4         The case law on that, your Honor, is pretty clear.

5    In the United States v. International Business case, which we

6    cited in our papers, which says that you shouldn't mix and

7    match those.  That is out of the Southern District of New York.

8    If you have got a live witness with live testimony, you should

9    ask those questions on the stand.  Of course, if she says

10   something other than what she said previously, you can impeach

11   her with that.

12        THE COURT:  Sure.

13        MS. MCCAWLEY:  But to have them playing her video

14   deposition from that case, as well as putting her live on the

15   stand, I think, under that case law, is inappropriate.  Again,

16   they can use it for impeachment if they need to.

17        Also, the Judge Learned Hand Napier case said the same

18   thing, live testimony is the preferred method, and while

19   depositions can be used for those other purposes, it is not

20   appropriate to have her both live and then showing deposition

21   testimony at the same time.

22        That is our objection, your Honor, that we believe

23   that we are producing her live, and unless she contradicts

24   something she has said previously in a deposition, that should

25   also be designated and then played for the jury.

1      MR. PAGLIUCA:  May I respond, your Honor?

2      THE COURT:  Yes.

3      MR. PAGLIUCA:  These are 801(d)(2) admissions.  The

4  law is abundantly clear on this.  These are statements by a

5  party related to the subject matter at issue here.  They are

6  not hearsay and they are admissible as admissions.  They are

7  not impeachment necessarily, although they could be, but we

8  need to talk about what the rules say about these kinds of

9  things.

10      Rule 801(d)(2) allows for the admission by a party

11  to be used against that party.  That can be a handwritten

12  document, that can be a statement to another person, that can

13  be deposition testimony under oath in 32 different matters.  If

14  I testify to something in one proceeding, it can be admitted

15  against me, assuming that it is relevant, as an 801(d)(2)

16  admission.  That is black-letter law, period, end of story.  It

17  is admitted as substantive testimony.

18      Now, what do I expect to happen during the course of

19  this case?  I expect that she will testify and I expect that

20  all of this will be used while she is on the witness stand in

21  some fashion, largely for impeachment purposes, but I don't

22  believe that the court can enter a blanket rule that an

23  801(d)(2) admission can't be used in a proceeding.  I think

24  that is contrary to the law, your Honor.

25      I think if we are going to talk about this, it is

H3NSGIUC

```
1    likely going to have to come up in the context of the
2    examination so that there is a proffer of here is what I want
3    to introduce, and then they can say why it is relevant or not
4    relevant and whether we meet evidentiary foundation for that
5    question.  To take this on a blanket basis and say an 801(d)(2)
6    admission by somebody can't be used in a proceeding just
7    doesn't make any sense to me.
8            MS. MCCAWLEY:  Your Honor, I understand the issue
9    that's been raised, and I would just direct your attention to
10   the International Business case that I cited in my papers
11   because it addresses this issue.  I am not saying, again, that
12   it can't be used for impeachment.  If she says something other
13   than that in her live testimony, certainly it can be.  But what
14   they have proposed is that they designated that testimony to be
15   played for the jury full stop.  We are saying, no, you're
16   getting her as a live witness.  If she says something
17   otherwise, at that point, you can present it.
18           In fact, in this case, the same issue came up.  The
19   court said you have to ask those questions.  You should ask
20   those questions of the live witness.  You shouldn't be asking
21   them and playing them at the same time.
22           THE COURT:  What we will do about this is nothing.
23   We will wait and see.
24           MS. MCCAWLEY:  Sure.
25           THE COURT:  We'll wait and see whether it comes up and
```

38

H3NSGIUC

1      it's dealt with directly or whether, on the plaintiff's case,

2      and if it is not in some fashion or other and the defense case

3      wants to put it in, we'll struggle with it then.

4            MS. MCCAWLEY:  For purposes of streamlining this, your

5      Honor, so they have designated and we have objected to the

6      designations of this testimony from the other case.  We have a

7      number of, as you know, witnesses that will be testifying by

8      designation.

9            Can we not have to argue the objections on these

10     designations if we are tabling it for trial?  In other words,

11     let them put her on live, if we say we want to show the video,

12     deal with that issue at that time?

13           THE COURT:  I think if you have any live witness, I

14     would think if you have any live witness and they've got a

15     prior deposition, that can be used in connection with their

16     testimony.  No question about that.

17           MS. MCCAWLEY:  I guess the question I'm raising, I'm

18     sorry, is that we are going to have to go through the folks

19     that have been designated, and your Honor on the 5th of April,

20     that is set to look at those objections for the tapes that are

21     going to be shown.

22           With respect to that, I'm saying, can we table her,

23     like take her off the list for this one?  Do we have to run

24     through all the objections on that designation as well?

25           THE COURT:  Well, you're saying that --

H3NSGIUC

1              MS. MCCAWLEY:  On April 5 --

2              THE COURT:  -- what I've heard so far is that there is

3      admissions that they seek to introduce.  That's all I've heard.

4              MS. MCCAWLEY:  Right.  Yes, your Honor.  They have

5      designated certain witnesses they have videotaped testimony

6      from.  One of them is my client, who is going to be appearing

7      live.  That is testimony from another case.  What I'm saying is

8      that that is supposed to be heard on April 6 along with all the

9      other designations, and your Honor is saying that you are going

10     to take that at trial.

11             THE COURT:  Well, there's nothing other than the

12     so-called admissions that they want to introduce, right?

13             MR. PAGLIUCA:  That's correct, your Honor, as it

14     relates to this particular issue.  I mean, these are all

15     801(d)(2) statements by the plaintiff under oath in the

16     Dershowitz matter.  That's what they are.

17             THE COURT:  Yes.  Well, I don't understand what the

18     question --

19             MS. MCCAWLEY:  I'm sorry.  Maybe I'm not being clear.

20             My understanding is we have raised objections to

21     certain of that testimony coming in.  So with respect to those

22     objections, for example, if they ask her a hearsay question on

23     the stand and they asked her a hearsay question in the

24     deposition and they designated that, the objections to that

25     information coming in, would that be heard on the 6th?

H3NSGIUC

1          THE COURT:  I would assume that we'll deal with that

2     at the time of trial.

3          MS. MCCAWLEY:  Thank you, your Honor.

4          MR. PAGLIUCA:  Then I think on my list, your Honor,

5     the only thing I have left -- I can't recall whether it is for

6     today or another day, I don't remember what day we put it over

7     to -- relates to the Edwards subpoena, questions 19 and 20.

8     I'm prepared to argue that again today if we are arguing it

9     today, or if it is some other time, that's fine.

10          THE COURT:  That's fine.

11          MR. CASSELL:  Paul Cassell for Brad Edwards, your

12     Honor.  I appreciate accommodation of counsel.  We delayed this

13     one week so I could be here today to argue it.

14          Your Honor recalls that, about a year ago, the defense

15     attorneys in this case served a subpoena on me, one of the

16     attorneys for Ms. Guiffre, and an attorney subpoena on Brad

17     Edwards.  We have narrowed that down through your rulings.

18     Most of the subpoena against me was squashed.

19          What is left now for argument today, as I understand

20     it, is request number 19 and 20 that have been directed to

21     Mr. Edwards, an attorney for Ms. Guiffre.  I set that

22     background up there, which I know your Honor --

23          THE COURT:  I take it these are, well, the defense

24     have said that it is form letters, whatever they are.  These

25     are communications that Edwards made and responses that he

H3NSGIUC

```
1    received in connection with the matters of this case.

2              MR. CASSELL:  The subpoena is, let's see, any letter

3    or communication from you, Mr. Edwards, to any witness -- and

4    then here is one of the catches -- prospective witness in

5    Guiffre v. Maxwell, this case.  By definition --

6              THE COURT:  I take it it's your position that all of

7    these are work product?

8              MR. CASSELL:  That's correct, your Honor, and

9    obviously so.

10             THE COURT:  The only issue really is whether or not

11   you've got to produce a log, and if you produced a log, you

12   would have dates and identification of people which you would

13   say would violate the work product.

14             MR. CASSELL:  That's part of our argument.  You have

15   captured it exactly right.  But there are some additional

16   points, if I could just take a couple of minutes.

17             Remember the witness that Mr. Pottinger was just

18   referring to?  So one of the things this wouldn't cover is

19   Mr. Edwards sending a communication to that witness.  One of

20   our points is that the defense should have disclosed that

21   witness long ago.

22             THE COURT:  Well, so what.  I mean, fine.

23             MR. CASSELL:  "So what," your Honor, is a matter of

24   fundamental fairness.

25             THE COURT:  Fundamental fairness in this case?
```

H3NSGIUC

1              MR. CASSELL:  Yes, your Honor.

2              THE COURT:  Well, all right, but it's got to be better

3       than that, as far as I'm concerned.

4              MR. CASSELL:  All right.

5              THE COURT:  I mean, look, I can't sit here and

6       evaluate the production of one party as opposed to another and

7       then say it's unfair.  No, I can't do that.

8              MR. CASSELL:  The point I'm making --

9              THE COURT:  I am not going to.

10             MR. CASSELL:  The point I am making is, I think when

11      you rule on issues of burden, you should --

12             THE COURT:  I don't care about burden either, frankly.

13      He's a lawyer.  He's in the case.  Burden schmerden.  We've all

14      got burdens.  Talk about burden, 45 motions?  Well, so that

15      doesn't impress me.

16             But what else do you want to tell me besides the work

17      product?

18             MR. CASSELL:  I think before we get to the work

19      product, the reason we haven't produced a log at this point,

20      there is this phrase witness or potential witness.  It is

21      difficult to identify what they mean by potential witness.

22             Mr. Edwards, for example, can't go into his e-mails

23      and type in the words "potential witness."  There hasn't been

24      any --

25             THE COURT:  He's a lawyer.  He knows what a potential

H3NSGIUC

1      witness is.

2              MR. CASSELL:  Potential, you know, with the parties

3      who we are litigating against, your Honor, for example, I

4      believe I am a potential witness.  I have been working with

5      Mr. Edwards pro bono for eight years in Florida.  I am assuming

6      they want, as part of the reason they are doing this, in our

7      view, is to burden Mr. Edwards with producing a privilege log

8      of eight years of communications with me as a potential

9      witness.

10              They have also identified Mr. Edwards as a potential

11      witness.  It is difficult for us to understand what the

12      privileged log would embrace.  But if we get to the issue of

13      privilege, you're exactly right, we would then be simply

14      logging communications where we are trying to piece together

15      the criminal organization, which witnesses are we contacting,

16      what time are we doing it, what leads are being exposed.  Those

17      are classic work product issues, so there would be no reason.

18              One of the things, your Honor, burden schmerden, there

19      is no reason for someone to do something if there is not going

20      to be anything that results at the end of the production.  At

21      the end of the production here, these materials are all going

22      to be work product protected.  We cited a number of cases to

23      that effect.  The Gerber case from the District of Maine, the

24      Stokes case from the District of --

25              THE COURT:  The District of Maine?  Where is Maine?

H3NSGIUC

 1          MR. CASSELL:  It's a little bit north of the Eastern

 2   District of New York.

 3          THE COURT:  It's north of here.  There was one

 4   Southern District case.  Now, you're telling me that discovery

 5   is more active up in Maine than it is here?  I don't think so.

 6          No, I understand.  Fine.

 7          MR. CASSELL:  That was the most on-point case.

 8          THE COURT:  Let's hear from the other side.

 9          MR. PAGLIUCA:  Your Honor, let me be clear, there is

10   no surprise to these lawyers what we're looking for, because

11   they have seen this letter.  I would challenge them to say it

12   doesn't exist.

13          What Mr. Edwards does, and I know this, is that

14   he sends these letters to prospective witnesses that are

15   solicitation letters and they are begging letters.  Please help

16   me because this is such a worthy cause kind of letters.  These

17   letters do not include any mental thought process or any

18   secret.

19          THE COURT:  Well, maybe yes, maybe no.  But, look,

20   practically speaking, every lawyer wants to get any scrap of

21   information or support that they can, obviously, and that's all

22   part of the process.  It seems to me that however it's put is

23   an effort to find people who know something about the case or

24   might have some effect on the case.

25          MR. PAGLIUCA:  Here is the twist on that, your Honor.

H3NSGIUC

1  These letters include assertions --

2            THE COURT:  Sure, of course.

3            MR. PAGLIUCA:  -- that are being used to draw people

4  out.  It ends up becoming cross-examination material about why

5  someone is saying what they are saying and what their motive

6  is, what their bias is, why are they being involved.  That is

7  the first point to this that this is not simply, I heard you

8  might have something to say, please give me a call, a letter

9  that we're talking about here.  This is something much more

10  than that, and they know what I'm talking about, and I'm sure

11  they've seen these letters.

12            So that is why, number one, I don't view this really

13  as a work product issue, because there is nothing private about

14  this.  There is nothing that would be something that a lawyer

15  would say, Gee, my opponent is going to get a tactical

16  advantage if this gets revealed.  That's the real problem here.

17            In my view, your Honor, by doing what they've done,

18  they have waived any work product protection that may exist.

19  But before I get there, this is why the log is important, your

20  Honor.  I mean, I'm arguing --

21            THE COURT:  If you get the log, you get the product,

22  because the only point of this is the people in the date.

23            MR. PAGLIUCA:  What I would suggest, your Honor, is

24  that these letters get submitted in camera for your review.

25  There aren't going to be thousands of them, there aren't

H3NSGIUC

1    hundreds of them.  You can make that decision about whether or

2    not these things should be produced.

3              THE COURT:  You mean whether or not they are work

4    product?

5              MR. PAGLIUCA:  Exactly.  Give them to you in camera

6    and you make that decision.

7              THE COURT:  Thanks very much.  Thank you very much.

8              MR. PAGLIUCA:  I'm sorry.

9              THE COURT:  What a nice suggestion.

10             MR. PAGLIUCA:  The other thing I would say, your

11   Honor, in terms of the scope of this, I am happy to limit this

12   to their Rule 26(a) disclosures in this case and the pretrial,

13   joint pretrial submission that we made.  Now we are talking

14   about a universe of, you know, less than 100 people, I think.

15             THE COURT:  You mean the people who have been

16   identified?

17             MR. PAGLIUCA:  Yes, in either the 26(a) disclosures or

18   the pretrial order.  Because those are the people who are going

19   to testify or not in this trial, and so we want to narrow the

20   scope of this.  Let's just put it to that, and then we're

21   taking away a lot of burden off of the shoulders of all the

22   lawyers over here, including Mr. Edwards.

23             THE COURT:  And placing it on my shoulders.  Thank you

24   very much.

25             Yes.  OK.  You all have a habit of doing this.  I wish

H3NSGIUC

1    I could cure you.

2              MR. PAGLIUCA:  Well, your Honor, I'm happy --

3              THE COURT:  I'll take them.  What do you think about

4    that?

5              MR. CASSELL:  Here is the problem, your Honor.

6    They're saying it is just 100 people.  One of them is me.

7    There are going to be thousands --

8              THE COURT:  I don't think you're going to testify.

9              MR. CASSELL:  The problem is, they want a privilege

10   log.  This is what we're hearing, your Honor, this is no big

11   deal, make them do this.  They know I am one of the people

12   here.  They know Mr. Edwards is going to have to log --

13             MR. PAGLIUCA:  I'll take him off the list, your Honor.

14             MR. CASSELL:  The other is the plaintiff, Ms. Guiffre.

15             MR. PAGLIUCA:  She is off too.

16             MR. CASSELL:  If we go through, there are a number of

17   other people that --

18             THE COURT:  Let's do it.  Let's cut down my workload

19   as much as we can anybody else.

20             MR. CASSELL:  The Jane Does that were identified in

21   the Crime Victims Rights Act pro bono action that was in

22   Florida.

23             THE COURT:  The Jane Does he wants because -- you know

24   why he wants them.  I'll take a look and see if it looks like

25   work product to me, and if it does, it will be sustained.

H3NSGIUC

1      MR. CASSELL:  So the difficulty there is identifying,

2   some of them were interacting, we interacted with them through

3   attorneys.  This is, again, a pro bono action that we have had

4   for eight years.

5      THE COURT:  Forgive me, but lawyers are lawyers.

6   Whatever, pro bono, money, contingency, those matters don't

7   concern me, obviously.

8      MR. CASSELL:  OK.  There are approximately

9   36 witnesses in the <u>Crime Victims' Rights Act</u> case.  Many of

10   them represent --

11      THE COURT:  In what?

12      MR. CASSELL:  The <u>Crime Victims' Rights Act</u> case down

13   in Florida, the one trying to set aside Mr. Epstein's plea

14   agreement.

15      MR. PAGLIUCA:  Maybe counsel didn't hear me, your

16   Honor.  I am limiting this to the 26(a) disclosures filed in

17   this case and the joint submission of witnesses.  I am not

18   talking about those cases.  I am talking about the witnesses

19   that have been identified as prospective witnesses in this

20   case.

21      THE COURT:  OK.

22      MR. CASSELL:  So the difficulty is then Mr. Edwards --

23   oh, and a time frame then.  After the filing of this case?

24      MR. PAGLIUCA:  No, not after the filing of the case.

25      THE COURT:  No, not after the filing.  I would

H3NSGIUC

1    think --

2              MR. PAGLIUCA:   This is a discrete list, your Honor.

3    We have the 26(a) disclosures.   They have been filed.   They can

4    look at the 26(a) disclosures and limit it to that.   That is

5    all I'm saying.

6              MR. CASSELL:   Mr. Edwards has been at various law

7    firms that involve various servers over the last eight years.

8    If we can confine it to on or after 2015, when the lawsuit was

9    filed, he has been at a single law firm and he has a single

10   e-mail server.   It is recreating the old servers that becomes

11   very difficult because, you know, when you transfer from one

12   firm to another, the mechanics of that are extremely

13   complicated.

14             MR. PAGLIUCA:   I cannot believe that a lawyer who

15   sends that kind of letter to a witness doesn't keep a copy of

16   that letter, your Honor.   That is patently unbelievable.

17   Patently unbelievable.   They ought to call their malpractice

18   carrier if that is what they did.

19             MR. CASSELL:   These aren't formal letters.   This is

20   any communications.   If they restrict it to formal letters,

21   that would simplify it immensely.   If we restrict it to formal

22   letters, it would be very helpful as well.

23             MR. PAGLIUCA:   This is obfuscation here, your Honor.

24   They know what I'm talking about.   They know what the letters

25   are.   They don't want you to see it.   They know it is not work

H3NSGIUC

1    product, and they are not happy about it.

2              MR. CASSELL:  Your Honor, that is a representation

3    being made about what my feelings are.  I have been working on

4    that case pro bono and we have nothing to hide about what those

5    communications are.

6              THE COURT:  Send the bloody communications to me to

7    that restricted list.  You've got yourself off.  You got the

8    plaintiff off it.

9              Is there anybody else you want to get off?

10             MR. CASSELL:  If I can have an opportunity to consult

11   with my co-counsel?

12             THE COURT:  No.

13             MR. CASSELL:  If I could have --

14             THE COURT:  Take a look now and make a decision.

15             MR. CASSELL:  We'll need a copy.  There are over

16   100 people on the list.  That is why I would need a moment.

17             THE COURT:  So look at them.

18             MR. CASSELL:  All right.  Thank you.  If I can have a

19   moment to confer with co-counsel?

20             THE COURT:  Sure.

21             (Pause)

22             Maybe we can move to something else while you're doing

23   that.  What else have we got?

24             MR. PAGLIUCA:  Your Honor, we are not exactly done

25   with this issue yet, because the question 20 or request for

H3NSGIUC

1    production 20 deals with responses.

2              THE COURT:  The responses are all part of it.

3              MR. PAGLIUCA:  OK.

4              THE COURT:  Obviously.

5              MS. MCCAWLEY:  Your Honor, after this issue, my

6    understanding, if the experts are taken under submission, we

7    are concluded for today.

8              THE COURT:  Pardon me?

9              MS. MCCAWLEY:  I'm sorry.  After this issue, if the

10   expert issues are all taken under submission, as you said

11   earlier, then we're concluded for the day.  There is nothing

12   else pending on our list.

13             THE COURT:  Then we'll take a couple of minutes.

14             MR. PAGLIUCA:  That's correct, your Honor.

15             (Pause)

16             THE COURT:  By the way, looking forward to next week,

17   I think we're probably going to have to break that argument up.

18   Plan to have a further discussion, in other words, the next

19   day, or if you want to pick another day, if for some reason the

20   following day is not satisfactory to you all, we'll pick

21   another day.

22             I think the probability is, I haven't started looking

23   at those motions yet, but I would think the probability is that

24   we are not going to be able to get them all done at one

25   session.

H3NSGIUC

1          MS. MCCAWLEY:  Yes, your Honor.  There was one other

2     procedural matter that both counsel and I, opposing counsel and

3     I wanted to raise.  That is with respect it is just a logistic

4     issue.

5          THE COURT:  It is what?

6          MS. MCCAWLEY:  A logistic issue.

7          With respect to the upcoming hearings, can we submit a

8     letter request to you to be able to bring our electronics like

9     our computer and our phone?  Because it is just a lot of paper,

10    as you know, and it would be helpful.

11         THE COURT:  Sure.

12         MS. MCCAWLEY:  Thank you, your Honor.

13         THE COURT:  One other thing.  Today's hearing sort of

14    highlights it.  There are going to be substantial problems with

15    respect to the privacy -- let's call them privacy claims or

16    however you want to put it -- that are in the protective order.

17    We've got to get that resolved.

18         When do you all want to do that?  In other words, how

19    are we going to conduct the trial?

20         MS. MCCAWLEY:  Yes, your Honor.  I know we touched on

21    this a little bit last week with respect to the names.

22         THE COURT:  I know, but it sort of drifted off into

23    Never Never Land as far as I think.

24         MS. MCCAWLEY:  Yes, your Honor.  I think where we left

25    it was we were supposed to consider whether there were any

H3NSGIUC

1   child abuse victims that we believed we had some basis for

2   asserting to you that there should be a protection of their

3   identity --

4            THE COURT:  Yes.

5            MS. MCCAWLEY:  -- and that we would need to submit

6   that to you for those individuals.

7            We are considering that.  Could we have two weeks to

8   submit if there is one or two individuals who need that

9   protection for purposes of trial?  I think you were inclined

10  not to allow it is what you said because, of course, they are

11  going to be testifying before the jury.  But if we believe

12  that, some of these individuals did make that request --

13           THE COURT:  Well, that's one thing.

14           How about exhibits?

15           MS. MCCAWLEY:  Yes, your Honor.  Under the protective

16  order, with respect to the exhibits, my understanding is that

17  everything that we submit at trial is public at that point.

18           THE COURT:  That's fine.  That's fine.  Well, that

19  rather simplifies it, doesn't it?

20           MS. MCCAWLEY:  Yes, your Honor.

21           MR. CASSELL:  All right, your Honor.  I've had an

22  opportunity to go through the list here, and there are

23  approximately 12 names that I would like to...

24           THE COURT:  OK.

25           MR. CASSELL:  The first we already had agreement.

H3NSGIUC

1   Ms. Virginia Giuffre, the plaintiff in this action.  The second

2   would be defendant Ghislaine Maxwell.  Obviously, if you run a

3   search term for Ghislaine Maxwell, that produces probably

4   thousands of e-mails, and we are not trying to get Maxwell to

5   be a witness in the case.

6           The next one would be item seven is Doug Band.  He was

7   the --

8           THE COURT:  I'm sorry?

9           MR. CASSELL:  Doug Band.  He was chief of staff for

10  President Bill Clinton after Mr. Clinton left the White House.

11          Number 18 is Bill Clinton.  Again, if you run search

12  term Bill Clinton, given their preference in the case, a

13  variety of communications might come up.  There isn't a

14  solicitation for former President Bill Clinton or something.

15          Again, we are trying to avoid what is going to be

16  presumably hundreds of e-mails that might have the term --

17          THE COURT:  Well, how do we deal with Clinton?

18          MR. CASSELL:  I was just asking.

19          THE COURT:  No, I'm asking the defense, Clinton and

20  his chief of staff.

21          MR. PAGLIUCA:  We can get rid of Clinton.  I am not

22  agreeing to Band.  If they send a letter to Band, I want the

23  letter that went to Band.  When I say letter, it may not have

24  been electronically or it may have gone in the snail mail, but

25  what we are talking about here, your Honor, is something that

H3NSGIUC

1    is going to have an address and it is going to say, here is so

2    and so, I represent the plaintiff, and here is what I am

3    contacting you about.  Gee, wouldn't it be nice if you got back

4    in touch with me.  It's really important that people like you

5    come forward and give me this information.

6            That is what I'm talking about.  I'm not looking at,

7    hey, what are you doing next Thursday?  This is what I'm

8    talking about here.  They know what I'm talking about.

9            MR. CASSELL:  Your Honor, if I could just briefly

10   respond.

11           In the Rule 26 disclosures, there is an address for

12   Doug Band.  Again, this is an exercise that is not likely to

13   lead to the production of relevant evidence, it is just that

14   there may have been a communication at some point with someone

15   that mentions Doug Band.  They know what his address is.  They

16   know where President Clinton is.  I'm not sure why we are

17   burdening Mr. Edwards with the need to run the term Band

18   through thousands of e-mails or Doug through thousands of

19   e-mails, which may produce a variety of search terms.

20           Again, for what purpose here?  We would ask if Clinton

21   is not going to be on the list, his chief of staff shouldn't be

22   on the list or the list of search terms that Mr. Edwards is

23   running.

24           MR. PAGLIUCA:  They listed him as a witness, your

25   Honor.  If they had communications with him that are

H3NSGIUC

1    responsive, they should produce them.  It's as simple as that.

2                    THE COURT:  What else?

3            MR. CASSELL:  Number 13, Jean Luc Brunel, care of his

4    attorney Joe Titone, address listed in Florida.  Again, Brunel

5    is one of the close friends of Mr. Epstein.  There is no reason

6    to burden Mr. Edwards with trying to, you know -- but Brunel

7    may show up because he was touch a key friend of Mr. Epstein,

8    will show up I am predicting in hundreds, if not thousands, of

9    e-mails.

10           THE COURT:  Can we define this search in some way to

11   eliminate -- we know what the defense is looking for.  It's an

12   e-mail.  It's a communication with somebody who might be a

13   witness.

14           MR. CASSELL:  Soliciting them to participate in the

15   case.

16           THE COURT:  Yes.  How about that?  How about that?

17           MR. PAGLIUCA:  That's fine, your Honor.

18           THE COURT:  Good.

19           MR. CASSELL:  Brunel is one of them.

20           The next one that we have is Alan Dershowitz.  Again,

21   if you run the search term Dershowitz, since we've been in

22   litigation --

23           THE COURT:  We are not going to do that.

24           MR. CASSELL:  He was never solicited to be a witness

25   for us.

H3NSGIUC

1          THE COURT:  We can skip Dershowitz, can't we?

2          MR. PAGLIUCA:  Yes, we can skip Dershowitz.

3          MR. CASSELL:  Prince Andrew.

4          THE COURT:  Prince Andrew?  We are not skipping him.

5          MR. PAGLIUCA:  No, we are not skipping him.

6          MR. CASSELL:  The problem there again is --

7          THE COURT:  The same thing, a letter asking him if he

8    will testify.

9          MR. CASSELL:  Mr. Epstein, Jeffrey Epstein.  Again,

10   there is no letter asking him -- well, that's just it, is there

11   a letter --

12         THE COURT:  We can skip Epstein.

13         MR. CASSELL:  Ross Gow, who is the press agent.

14         THE COURT:  Likewise.

15         MR. CASSELL:  Leslie Groth.

16         THE COURT:  I don't know who Leslie is.

17         MR. PAGLIUCA:  Leslie Groth is a former, as I

18   understand it, employee of Mr. Epstein, who is going to be in

19   the same position as other employees of Mr. Epstein, so they

20   did send solicitation letters to.

21         THE COURT:  I think we get that.

22         MR. CASSELL:  George Mitchell, former Senator.

23         THE COURT:  We'll skip him.

24         MR. CASSELL:  Bill Richardson, former politico.

25         THE COURT:  Likewise.  They are not going to be

H3NSGIUC

1    covered by this definition, I trust.

2            MR. CASSELL:  At some point, is there some

3    communication --

4            THE COURT:  If they are, well --

5            MR. CASSELL:  Dave Rogers, I think he has already been

6    deposed in the case.

7            THE COURT:  You can skip him.

8            MR. CASSELL:  Larry Gikofsky, another one of Epstein's

9    pilots.

10           MR. PAGLIUCA:  Who has not been deposed, so I would

11   include him on the list.

12           THE COURT:  Yes.

13           MR. CASSELL:  One of the most important is a witness

14   listed on disclosure number 90.  I'll refer to her by initials

15   C.W.  She is Jane Doe number two in the pro bono Crime Victims'

16   Rights action down in Florida and is an eight-year client of

17   Mr. Edwards.

18           THE COURT:  Again, the letter is a letter from Edwards

19   seeking to get his participation in this case.

20           MR. CASSELL:  All right.  Then the only remaining ones

21   are items 93 to 97.  These are generic listings, like all

22   females identified in police reports, all girls recruited by

23   Maxwell, all pilots who were employees of Epstein.  You know,

24   there is no precision that would permit Mr. Edwards to -- it

25   says all pilots, chauffeurs, chefs, other employees of either

H3NSGIUC

1    Defendant Maxwell or Jeffrey Epstein, with knowledge of

2    inappropriate conduct.  There is no precision that would let

3    Mr. Edwards run an e-mail search over that generic category.

4              MR. PAGLIUCA:  Your Honor, here is the problem with

5    this claim, that is, their definition of these witnesses in

6    their disclosure documents.  I didn't define this.  They did.

7    So if they want to put on their list anybody and everything,

8    then they ought to put up the letters that they sent to these

9    people.

10             THE COURT:  Amen.  Correct.

11             MR. CASSELL:  Thank you, your Honor.  With that

12   clarity, we will move forward.

13             THE COURT:  Thank you, all.  Have a nice flight.

14             MR. PAGLIUCA:  Thank you, your Honor.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25