H3u1giua

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    VIRGINIA L. GIUFFRE,

4                    Plaintiff,

5            v.                            15 Civ. 7433 (RWS)

6    GHISLAINE MAXWELL,

7                    Defendant.            Oral Argument

8    ------------------------------x
                                          New York, N.Y.
9                                         March 30, 2017
                                          12:08 p.m.
10
     Before:
11
                         HON. ROBERT W. SWEET,
12
                                          District Judge
13
                              APPEARANCES
14
     BOIES, SCHILLER & FLEXNER LLP
15        Attorneys for Plaintiff
     BY:  SIGRID S. McCAWLEY, ESQ.
16        MEREDITH L. SCHULTZ, ESQ.

17   S.J. QUINNEY COLLEGE OF LAW AT THE UNIVERSITY OF UTAH
          For Plaintiff
18   BY:  PAUL G. CASSELL, ESQ.

19   FARMER, JAFFE, WEISSING, EDWARDS, FISTOS, LEHRMAN, P.L.
          Attorneys for Plaintiff
20   BY:  BRADLEY J. EDWARDS, ESQ.

21   HADDON, MORGAN AND FOREMAN, P.C.
          Attorneys for Defendant
22   BY:  JEFFREY S. PAGLIUCA, ESQ.
          LAURA A. MENNINGER, ESQ.

23

24

25

H3u1giua

1

2              (Case called)

3              THE COURT:  We have a problem, folks.  By my count --

4    and of course one can count differently depending on how you

5    treat these matters, but one count I have is that we have 45

6    motions before me.  That may not be entirely accurate, but it's

7    not too far off.

8              Here's my suggestion.  Well, first of all, I think,

9    though you have shown absolutely no mercy to me, I am prepared

10   to show a little mercy to you.  Translated, if you want to, we

11   can schedule this so you can have lunch.  On the other hand, if

12   you don't want lunch, that's okay.  I can endure.

13             By the way, the Epstein motion will go over to

14   tomorrow because we were told, if I understand it correctly,

15   that they didn't know it was on for today.  How that ignorance

16   exists, I don't know, but anyhow, we'll put that over to

17   tomorrow.

18             So what I would suggest is that today -- and today

19   ends, for our joint effort, at 3:30 -- the defendant's motion

20   with respect to the supplemental reports of Jansen and Kliman;

21   the 302 motion; and there are three that seem to me to go

22   together -- the references to the Florida action, the CVRA

23   action; the Epstein plea agreement and nonprosecution, and

24   registration; and the victim notification letter.  Seems to me

25   all those present same of the same basic problems, and I'll

H3u1giua

```
1    hear those together.  And then the defendant's motion with

2    respect to Giuffre's sexual history and the Giuffre motion on

3    Maxwell's involvement with Epstein's activities.

4             So that's my thought.  We could go say until 1:30 and

5    then break for lunch, resume at 2:30 and go another hour, or go

6    straight through.  Why don't you all confer, see what you want

7    to do.  And the remainder, we can do tomorrow.  We'll start at

8    10:00.  Do you all want to confer for a moment and see what you

9    want to do?

10             MS. McCAWLEY:  Well, your Honor, on our part, we want

11   to spend as much time getting through this today as we can, so

12   we would prefer not to take a lunch break because there are so

13   many things we need to get through, we'd want to try to utilize

14   as much of your time as we can.

15             THE COURT:  Okay.  No lunch.  Go.  Defendant's motion

16   with respect to the supplemental reports.

17             MS. McCAWLEY:  Your Honor, could I just have one point

18   of clarification.  I'm sorry.  With respect to plaintiff's

19   omnibus motion, we were planning to argue that today.  That has

20   several subparts.

21             THE COURT:  Well, why don't we leave that for

22   tomorrow.

23             MS. MENNINGER:  Your Honor, I would like to leave it

24   for tomorrow.  There was a 60-page reply that was served on

25   Monday night and so if we could just have until tomorrow on
```

H3u1giua

1    that, I would appreciate it.

2            There was a 60-page reply filed on that motion on

3    Monday night.

4            THE COURT:  Does that surprise you?  Doesn't surprise

5    me.

6            MS. MENNINGER:  No.  It doesn't.

7            THE COURT:  Well, okay.

8            MS. MENNINGER:  But if we could do it tomorrow, I'd

9    appreciate it.

10           THE COURT:  Well, I was planning to, wasn't I?  Yes.

11           MS. MENNINGER:  I agree with your Honor.

12           THE COURT:  Yes.  Okay.

13           MR. PAGLIUCA:  Good afternoon again, your Honor.

14           THE COURT:  Good afternoon.

15           Yes.

16           MR. PAGLIUCA:  Your Honor, with regard to the motion

17    on the late-disclosed supplemental report of Jansen and the

18    video exhibit of Dr. Kliman, first, I'd like to start with

19    Kliman, if I could.

20           Dr. Kliman is a summary witness who has no firsthand

21    knowledge about the facts associated with this case.  He's been

22    proffered as an expert in psychiatry.  And the majority of his

23    opinions don't really relate to psychiatry; they relate to

24    credibility issues of the plaintiff in this case.  Replete

25    through the opinion, original opinion that he offered, are a

H3u1giua

1    number of what I deem to be improper vouching.

2            THE COURT:  Let's get to the supplemental reports.

3    I've read the papers on the *Daubert* aspect and I have some

4    familiarity with the report, but let's get to the supplemental.

5            MR. PAGLIUCA:  I will, your Honor.  And I start there

6    because that is a primary problem with the -- it's not a

7    supplemental report.  I mean, what happened was, in terms of

8    the backdrop here --

9            THE COURT:  Let me see if I can shorthand this.  What

10   you're complaining about is not the video of Giuffre but the

11   summary.

12           MR. PAGLIUCA:  I'm complaining about both, your Honor.

13   And let me explain why.

14           THE COURT:  Okay.  Forget about the summary for a

15   moment.  You didn't get the video at the time the report was

16   filed.  You got the report, I think it was September, whenever

17   it was.  You didn't get the video, but you did get it before

18   the deposition.

19           MR. PAGLIUCA:  Here's the distinction I need the Court

20   to understand.  What we got after the report was filed was

21   approximately four hours of video conducted over a two-day time

22   frame.  So there's a large portion of video conducted over a

23   two-day time frame.  When I arrived at Dr. Kliman's office on

24   November 17th, I believe it was --

25           THE COURT:  Well, you were in San Francisco, so what's

H3u1giua

1    wrong with that?

2            MR. PAGLIUCA:  I love San Francisco, if I could

3    actually spend some time there, but going from an airport to a

4    hotel and Dr. Kliman's office was not my idea of a good time.

5            So we get there, and I get a 15-megabyte flash drive,

6    which has a lot of things on it, including something I've never

7    seen before.

8            THE COURT:  By the way, so was that as a result of a

9    request of yours?

10           MR. PAGLIUCA:  Yes.

11           THE COURT:  Oh.

12           MR. PAGLIUCA:  Yes.  We had requested, and in fact

13   issued a subpoena, for all of Dr. Kliman's materials, and, you

14   know, I don't mind things coming in a little bit late in these

15   regards because I can prepare for the deposition.  But the

16   problem, your Honor, is, the morning of the deposition, I get

17   this --

18           THE COURT:  No.  I know.

19           MR. PAGLIUCA:  Okay.  And it is not simply a --

20           THE COURT:  I understand.  You got it right just

21   before.

22           MR. PAGLIUCA:  But your Honor, this is not clear in

23   the papers, and indulge me, please, for one moment.  The video

24   that I get when I get there is a professionally edited video,

25   and it takes different segments of what I was previously

H3u1giua

1    provided and it compiles it in, you know, almost a documentary

2    fashion, if you will.  And so we have the plaintiff, in

3    different clips, from different days, and different times,

4    saying things --

5              THE COURT:  Of course the other problem is, so that's

6    in September.  When was this, late September?

7              MR. PAGLIUCA:  No.  November 17th.

8              THE COURT:  November.

9              MR. PAGLIUCA:  So the reports are due in September, we

10   get this in --

11             THE COURT:  It would have been nice to have this issue

12   raised then, not now.

13             MR. PAGLIUCA:  Well, your Honor, I said to them at the

14   time, you know, I don't believe this is admissible and I don't

15   need to do anything about it.  So it's not my -- they're the

16   ones who are not in compliance with the rule, not me.  And so

17   if you want to do something about it, I think you need to be

18   prophylactic.

19             THE COURT:  Okay.  Anything else you want to tell me?

20             MR. PAGLIUCA:  Yes, your Honor.  Embedded in this

21   edited footage are nine separate statements, advocacy

22   statements by Kliman, such as calling Ms. Maxwell a

23   perpetrator, someone he's never met before, but he feels free

24   to call her a perpetrator in the middle of this videotape.  He

25   feels free to opine, you know, in these editorial comments of

H3u1giua

1   his that --

2              THE COURT:  That's a whole different issue.  Right?

3              MR. PAGLIUCA:  Yes.  I agree.

4              And finally, your Honor, on this Kliman issue, it

5   seems to me that all of this is -- well, let me back up.  Here

6   are the reasons why it's prejudicial, and I don't think we can

7   just say, this is a videotape, so what?  I never had the

8   opportunity, because the deadlines expired for experts, to give

9   the edited version to any other expert to analyze the footage,

10  to compare it to the original footage, to see how it was

11  filmed; never had the opportunity to give it to any

12  psychological expert to examine those particular clips and how

13  they were put together.

14             THE COURT:  Of course, we could have extended the

15  deadlines if you had wanted.

16             MR. PAGLIUCA:  Your Honor, again, I'm not the person

17  who didn't comply with the rule.  It's not on me to do that, in

18  my view.

19             THE COURT:  Okay.

20             MR. PAGLIUCA:  So that's Kliman, your Honor.

21             THE COURT:  Okay.

22             MR. PAGLIUCA:  Well, and by the way, it's also

23  cumulative testimony.  I don't believe that it would be

24  appropriate for the plaintiffs to testify, then have Kliman

25  testify, and then during Kliman's testimony there's this staged

H3u1giua

1    presentation in front of Kliman that he gets to then comment

2    on.  And so really what we're doing is we're trying to clean up

3    the in-court testimony by an out-of-court statement to this

4    psychologist that he then gets to stop and opine on for the

5    jury during the middle of all of this.  That seems to be

6    cumulative.  It's also prejudicial, and it also denies my

7    ability to confront and cross-examine a witness who is

8    appearing for the camera and acting.  So that's Kliman.

9            Jansen, your Honor, is a true new report.  Dr. Jansen

10   issued his report.  We then issue a rebuttal report to

11   Dr. Jansen in which our expert points out that Dr. Jansen

12   didn't record any of the data that he purportedly relies on.

13   So right after we issue our rebuttal report, we get new data

14   from Dr. Jansen, and it's curious because the report by Jansen

15   is written on September 9th but the data that we then get, in

16   response to our subpoena, is November 2nd.  That's fine.  I

17   go take his deposition, and during his deposition I'm asking

18   him questions about, well, you know, how do you come up with

19   this number?  And he can't give me an answer, because he

20   doesn't have any of the material that he purportedly relied on

21   to issue the opinion.  So I'm feeling pretty good about all

22   this when we leave because I have a guy who issues a report

23   that doesn't have any underlying data to support it and can't

24   explain to me what these different numbers are and where they

25   came from.  You know, two weeks later, I get in the mail, or

H3u1giua

1    email, a supplemental report that is materially different than

2    the report that I deposed this person on.  And, you know,

3    materially how?  I mean, they want to say, oh, no, he's just

4    doing ongoing work here.  Well, the alleged number of articles

5    has more than doubled in his review.  The alleged unique users,

6    which is his phrase for somebody who went on a website

7    somewhere, is more than 10 million more, and the other number,

8    which is the number of publications, has also more than

9    doubled.  So, you know, that is patently unfair, your Honor, to

10   have somebody go redo their report after they've been

11   cross-examined and come up with different opinions that I've

12   never been able to depose anyone on.  That's the problem.  They

13   should live with their opinion if it is admissible at all.

14        MS. SCHULTZ:  Your Honor, this is Meredith Schultz for

15   Ms. Giuffre.

16        I'll address the Dr. Kliman report first.  And what

17   defendant's briefing and what oral argument didn't make clear

18   is that in advance of the deposition, Dr. Kliman provided

19   defense counsel the entire videotaped interview with Ms.

20   Giuffre.  They had all the footage already.

21        THE COURT:  Wait.  In fairness, in advance of the

22   deposition by ten minutes.

23        MS. SCHULTZ:  Sorry, your Honor.  No.  I think that's

24   a misunderstanding.  What they received "ten minutes before"

25   were clips of the video.  The entire video was produced well in

H3u1giua

1    advance of the deposition.  What they're complaining about is

2    that from that entire video certain segments were produced.  So

3    they already had that material already.  They just didn't have

4    it in a clip form.

5           THE COURT:  So you say that the production of the

6    entire video was timely.

7           MS. SCHULTZ:  Yes, your Honor.  And I would also say

8    that the supplement was timely too.  What was on that flash

9    drive, 98 percent of that had already been produced before

10   because they had the full-length video.  It did include clips

11   that Dr. Kliman made with subtitles.  And then also it had some

12   new billing statements that were more updated that were

13   produced in accordance to Rule 26's requirements to supplement

14   reports.  So they had the long-form video ahead of the

15   deposition.  The clips of the videos that they already had is

16   what they're complaining about here, and I don't think the

17   briefing makes that clear.

18           With regard to Dr. Jansen, I think there are also some

19   misunderstandings there.  The bottom line is that it is very

20   reasonable to get the results that he did in his supplement.

21   And it's based on how search engines index web content.  So in

22   the briefing, it says, oh, the supplemental report has articles

23   from before the first report and so it's illegitimate.  That's

24   not a correct argument.  And I think it's easily confused

25   because of how search engines work.  Basically documents that

H3u1giua

1    are the supplemental report, articles prior to September 9th,

2    you know, if one does two searches on different days on a

3    search engine, it's very reasonable to retrieve results during

4    the second search that were published prior to the first

5    search.  It all depends on when the search engine added that

6    content to its search index.  So that's how search engines

7    work.  It's not going to have every single article on that day.

8    It has to be added to the index.  So the methodology employed

9    was exactly the same as was employed in the first report.  No

10   expert has stated otherwise.  And its methodology is rock

11   solid.

12          Counsel for defendant complained about no underlining

13   data, but that's a little -- it's a misstatement.  The expert

14   provided what traffic services were used, provided the website

15   domains, the URLs, provided the traffic numbers as well.  So

16   the data is there.  So employing the exact same methodology to

17   supplement the report, it's no surprise that additional

18   articles are going to come up.  For example, search engines

19   will take a major website like the New York Times and crawl

20   that multiple times a day to get new articles.  Articles on

21   more obscure websites won't be crawled by the search engine at

22   the same rate.  So doing a search on two different days, you

23   are necessarily going to have two different results.  And it

24   will even pick up results that predate the first search,

25   because it hasn't been crawled yet by the search engine that

H3u1giua

1    you're using.

2          I know this is a little bit hypertechnical, but I

3    think that understanding is important to understand why a

4    supplemental report varies from the original report.  If you

5    did one today, you'd probably have even more articles.

6          THE COURT:  Anything else?

7          MS. SCHULTZ:  That's all I have.

8          THE COURT:  Okay.  Let me ask you, defense --

9          MR. PAGLIUCA:  Yes, your Honor.

10          THE COURT:  -- I gather from that, if I understand it,

11    that it's the edited version on the flash drive, or whatever

12    you call it, that's the one that you want excluded.

13          MR. PAGLIUCA:  Correct.  Your Honor, as I understand

14    it, that is a proposed trial exhibit, although we haven't had

15    an exhibit list yet.  That is a specific rule that relates to

16    trial exhibits.  And to be clear, your Honor, there were four

17    separate video clips that were late provided that I didn't

18    complain about because I had them in advance of the deposition.

19    Those four video clips total roughly four hours, give or take.

20    From that four hours there was a professionally made exhibit

21    that -- there are different camera angles displayed in this,

22    the plaintiff has makeup on, the plaintiff is dressed in a

23    suit.  It is clearly edited to be an advocacy piece, your

24    Honor.  And so that is what was given to me the morning of and

25    I didn't have an opportunity to look at it or cross-examine on

H3u1giua

```
 1    it or give it to anybody to evaluate.  That's the problem.

 2              THE COURT:  Okay.  Do you want to add anything on

 3    the --

 4              MR. PAGLIUCA:  On Jansen?

 5              THE COURT:  Jansen?

 6              MR. PAGLIUCA:  Yes.  I'm not mistaken and there is no

 7    misunderstanding here, your Honor.  Jansen redid his report to

 8    try to take care of the deficiencies in the original report,

 9    the deficiencies pointed out in his deposition, and he ended up

10    with substantially different results.  That's point number one.

11              Point number two is, it is not accurate to say that

12    the additional 170 articles or multiples of sites postdated his

13    deposition because in the reply -- and it's a bit of a

14    confusing chart, I might add, your Honor.  We have the dates of

15    these publications which all show that they predate his

16    deposition and his report, or the majority of them.  So there's

17    no excuse for it.

18              THE COURT:  Thank you.

19              Next.  302.

20              MS. MENNINGER:  Good afternoon, your Honor.

21              As you know, the 302 statement we're talking about

22    here purports to be from an interview with the FBI in 2011

23    about events supposedly occurring in 1997 through 2002, so some

24    14 years later, and the report itself was purportedly written

25    two years after the interview, in 2013.  It is so heavily
```

H3u1giua

1    redacted, we have no idea who the author of the report is.

2              THE COURT:  What's the provenance of this report that

3    we're talking about?

4              MS. MENNINGER:  It showed up in my discovery.

5              THE COURT:  You mean the plaintiff had it?

6              MS. MENNINGER:  Plaintiff had it, plaintiff provided

7    it to us in discovery, plaintiff has not explained where it

8    came from.

9              THE COURT:  End of story.

10             MS. MENNINGER:  Right.  The author is redacted, your

11   Honor.  I don't know who authored the report.

12             THE COURT:  Right.  All we know about it is that she

13   had a copy of it.

14             MS. MENNINGER:  Apparently someone did and put it into

15   the discovery.  I don't know who had it or where they got it.

16             THE COURT:  Well, yes.  Okay.  All right.

17             MS. MENNINGER:  So, you know, alluding to that point,

18   your Honor, there are so many redactions, it's unclear who

19   wrote the report, but more importantly, the content of the

20   report is so heavily redacted, we don't know what she's saying.

21   I mean, there are pages where there are just sentence

22   fragments.  And so the problem, your Honor, which seems clear

23   to me, is that, to the extent there are statements in there,

24   they are hearsay statements.  They are out of court.  And so we

25   raised that in our motion *in limine*, your Honor.

H3u1giua

```
1            In response, the plaintiffs submitted that they're not

2    trying to offer this report for the truth.  They're offering it

3    for the fact that their client, they say, reported this

4    information to law enforcement, in 2011.  Well, you don't need

5    the report for her to get on the stand and testify that she met

6    with FBI agents in 2011.  She can just say that without the

7    report itself coming in.  And even if it were to come in, it's

8    unclear why anything in the report is relevant to a disputed

9    fact in our case.  We don't know what she reported.  We don't

10   see the names of people in there.  We can't tell what she said.

11   And because of the redactions, we don't know who she said it

12   to, etc.  So we can't talk to that unknown person that's

13   redacted.  She apparently must know who she talked to, and she

14   didn't disclose that person, for example, in her Rule 26

15   disclosures, your Honor, so if she talked to someone about the

16   facts of this case, didn't put them in her Rule 26 disclosures,

17   then, your Honor, she's denied us the ability to get in touch

18   with that person.

19           As a backup and completely different argument to

20   "we're not offering it for the truth of the matter,"

21   plaintiff's second argument is that they are offering it for

22   the truth of the matter as a public record under 803(8).  Your

23   Honor, we already discussed for you why the document lacks

24   trustworthiness.  The source of the information is her.  It's

25   self-serving, to the extent it is a statement of fact, because
```

H3u1giua

1    I can't tell what it says.  It would be self-serving.  So your

2    Honor, it essentially puts plaintiff in the position of getting

3    on the stand and trying to say what she said to the FBI agent

4    and denying us the ability, because of the redactions, to

5    cross-examine her about what she actually said because the

6    redactions cover up the content for the most part.

7            Your Honor, prior consistent statements, I think our

8    law is clear in the brief that it has to be a specific

9    statement of fact and it has to be predating the motive to lie.

10   This statement came after she had already sold her story to the

11   reporter -- about a month later, I believe.  So your Honor, her

12   motive to lie had already arisen at the time it says that this

13   interview was given, and that's all we really know about it.

14   Because the interview with the reporter is actually contained

15   in the FBI statement.

16           MS. McCAWLEY:  Good morning, your Honor.  It's Sigrid

17   McCawley on behalf of Virginia Giuffre.

18           Your Honor, this is not some obscure document that the

19   Court would not recognize.  I'd like to pass up some copies for

20   your Honor.  This is an FBI 302 report.  It contains the seal

21   of the FBI at the top of it.  It contains the date.  Can I

22   approach, please.

23           It's a document that's commonly used when FBI agents

24   are conducting their investigations; in fact, it's required.

25   It indicates that the signer of the document, the recorder of

H3u1giua

1    the document, was the individual who conducted the interview.

2            And I'd like to clarify.  A statement was made that we

3    have not indicated who was involved in this FBI 302.  We

4    produced email traffic about the meeting and about the FBI

5    agents involved in this meeting in discovery, probably nine

6    months ago, your Honor.  This FBI 302 has all of the

7    trustworthiness that goes along with one of these documents.

8    Again, it has the seal and everything that is required.  Your

9    Honor, it did come to us as a result of a FOIA request that we

10   sent.  It is, your Honor, produced in accordance with how the

11   FBI 302s are typically kept.  This is a public record under

12   803(8)(a), your Honor.

13           To be clear, it's actually a case that the defendants

14   cited in their brief, *Upstate Shredding*, which is a Southern

15   District of New York case, your Honor, that holds that these

16   types of reports do come into evidence under the public record

17   exception.  Similarly, the *Spanierman* case, which is also, your

18   Honor, a Southern District of New York case, similarly holds

19   FBI records like the one that we are seeking to introduce are

20   entered into evidence under this public records exception.

21           So let's take a look at it.  Again, at the top

22   right-hand corner you're going to see the FBI seal, you're

23   going to see the date, and you are going to see a lot of detail

24   about the client's interview during this interview.  And as you

25   know, your Honor, this comes into play because the FBI was

H3u1giua

1    continuing to investigate Epstein.  They flew to Australia to

2    interview our client.  She gave her witness statement to them

3    along with other evidence that she produced to them, and that's

4    recorded in this.  And why is that important?  That's important

5    because in this very case, the defendants have claimed that

6    other witnesses who did not report to law enforcement is

7    problematic.  So we want to be able to show this jury that yes,

8    our client did report this to law enforcement, she gave a

9    detailed statement to the FBI about what happened to her during

10   her time with the defendant and Epstein, and it does outline

11   those details, as you'll see looking through it.  Of course

12   there are redactions, but that doesn't make the document

13   something that shouldn't be shown to the jury.  In fact, it

14   needs to be shown to the jury to show that our client did

15   report her allegations to law enforcement and cooperated with

16   law enforcement.  So your Honor, it comes in for that, which is

17   a nonhearsay purpose, to show simply that she did report to

18   authorities, but it also comes in under the hearsay exception

19   of 803(8)(a), so that it can come in as a public record.

20        And let's just look at the prongs of that test.  A

21   requires that it was an office activity.  This is something

22   that the FBI regularly does.  It regularly conducts

23   investigations, meetings with individuals and then records them

24   in these 302s.  It was a matter done under their legal duty to

25   report.  The FBI is required to have these forms, and that is

H3u1giua

1   why it was recorded in this manner, your Honor.  And it also

2   has no indications of a lack of trustworthiness.  Again, it

3   says that the writer of the report, on the final page, was the

4   interviewee.  They make hay about the dates when the interview

5   was versus the date of recording.  That's not unusual either,

6   your Honor.  In the course of their work they will record

7   information, interview witnesses, and then make their official

8   recording at the time that it's needed, and that is what

9   happened here, your Honor.  So it meets all of the

10   trustworthiness prongs that are necessary for an 803 public

11   record, your Honor, and we believe that it should come in both

12   under that as a hearsay exception and as nonhearsay to show

13   that Ms. Giuffre did report her allegations to law enforcement

14   and cooperated with law enforcement.

15          Thank you, your Honor.

16          MS. MENNINGER:  What you did not just hear is -- well,

17   we don't have the FOIA request.  We just have counsel

18   testifying that they issued a FOIA request and got this

19   document.  We don't know who redacted the document.  We don't

20   know whether that was plaintiff's counsel or some other person

21   before they got the document.  We don't know when they got it.

22   She's sitting here and telling your Honor she wants to

23   introduce it for the fact that it was reported to law

24   enforcement.  Your Honor, this was supposedly a 2011 interview

25   talking about events that happened, as I just mentioned, in

1    1997 through 2002, so this is not some contemporaneous report

2    to law enforcement.  We're talking about, at a minimum, an

3    11-year gap between some report to law enforcement.  And you

4    don't need the document.  Plaintiff can testify that she talked

5    to the FBI agents when she gets on the stand and she can say

6    she did that in March 2011.  But the report itself is nothing

7    but hearsay offered for the truth of the matters asserted, your

8    Honor.  I find it wholly improbable, the testimony -- and I'll

9    call it testimony -- by plaintiff's counsel that it's "not

10   unusual" for the FBI to delay writing a report for two years.

11   Your Honor, I practice in this area.  I can tell you, it is

12   quite unusual, in my experience, to have an FBI report

13   generated two years after an interview.  Was it generated from

14   a recording, or was it generated from memory?  Was it generated

15   from notes?  We have no idea, because you know what, we don't

16   know who it is that wrote the report that plaintiff says she

17   wants to introduce, and she hasn't provided that person's name.

18          Counsel said that there is no indications of a lack of

19   trustworthiness.  In addition to the fact that we don't know

20   its provenance or where it came from, we don't know who wrote

21   it, we don't know when it was written or how, we don't know

22   what it actually says, because your Honor can see with your own

23   two eyes that the vast majority of the content is crossed out.

24   So if they introduce this evidence, we're going to have

25   plaintiff saying, well, what it says beneath that redaction is

H3u1giua

1   XYZ, and I'm going to have no way, your Honor, of

2   cross-examining her with regard to what's underneath the

3   redaction because we don't have it.

4          So your Honor, for all those reasons, it does not meet

5   the test for 803(8)(a).  They have asserted, without any

6   substance or proof, that this was pursuant to an authorized

7   investigation.  They have asserted that it was prepared in due

8   course after two years.  There's no proof.  We don't know who

9   wrote it.  We don't know what was said.  I can't really picture

10   a less reliable document, your Honor.

11          THE COURT:  Okay.  The CVRA action and the plea and

12   prosecution and so on, and the victim notification letter.

13          MR. PAGLIUCA:  Your Honor, we've broken this up, but

14   when I stop, Ms. Menninger can -- I'll tag her and she can come

15   into the ring.

16          THE COURT:  That's fine.

17          MR. PAGLIUCA:  Your Honor, I'm addressing the CVRA

18   litigation motion, 669.  I have to start with first, your

19   Honor, one of my apparently pet peeves in this litigation is

20   the point of all of the pleadings that are being referenced in

21   this particular motion are drafted and filed by the lawyers

22   that are sitting in this room, and it is troubling to me,

23   because when we're arguing about the admissibility of this and

24   what goes to the jury, it seemed inescapable to me that we are

25   then in the position of, whether it's by document or from the

H3u1giua

```
 1    witness stand or from the podium, having lawyers offer facts to
 2    a jury, statements to a jury, that they are going to be then
 3    arguing are credible, and so we have this joinder motion,
 4    drafted by Mr. Edwards and Mr. Cassell, that they would like to
 5    introduce into evidence, whole cloth into evidence, that
 6    contains the legal arguments and the statements of lawyers,
 7    these lawyers, in a motion in another courtroom, of which they
 8    will then be arguing to a jury that's all true.  And so I don't
 9    see how that's any different than a lawyer testifying in court,
10    and so that's, to me, part of the backdrop to this.
11             I also submit, your Honor, that the vast majority --
12    well, frankly, all of these pleadings are not relevant to this
13    action, and I say that because the plaintiffs continue to turn
14    the issue of what's at issue in this case around.  They have
15    the burden of proving that what Ms. Maxwell said was false.
16    That's what is at issue.  We have to look at Ms. Maxwell's
17    statement issued by Barden and Gow and then go backwards from
18    there.  And the burden on the plaintiff is proving falsity of
19    that statement.  It is not the situation where -- which is what
20    they're trying to do is to say we have to prove what we said
21    was true, what we the lawyers said was true, and therefore, we
22    get to prove whatever we want to in connection with this
23    litigation.  And so it seems to me that we have turned all of
24    this on its head, because instead of saying, the issue is, can
25    the plaintiff meet its burden to prove the statement issued by
```

H3u1giua

1    Gow and Barden on Maxwell's behalf was false, they are now

2    saying, we want to prove whatever we want to prove is true and

3    that needs to be the focus of this litigation.

4            So with that as the context and the backdrop, your

5    Honor, I simply don't understand or see how any of these

6    pleadings are (A) relevant to this case, and (B) I don't see it

7    or understand how they're simply not self-serving

8    lawyer-vouchered statements, and I haven't heard any reason

9    from the plaintiff, either orally or in writing, as to exactly

10   how the introduction of these documents would be relevant to

11   prove that Ms. Maxwell's statement was false.

12           THE COURT:  But look, the problem obviously is that

13   this is the document to which the defendant was responding, or

14   at least portions of it.

15           MR. PAGLIUCA:  Can I respond to that, your Honor?

16           THE COURT:  Yes.

17           MR. PAGLIUCA:  I think that that's what they would

18   like everyone to believe, but indeed, what the plaintiff was

19   responding to were communications from the media about a

20   document, these documents, that she had never seen, and so the

21   factual backdrop here is that -- I mean, this doesn't get

22   dropped on Ms. Maxwell's doorstep in December of 2014.  She's

23   getting calls from the media about, What do you have to say

24   about this thing that these lawyers filed in this case in

25   Florida?  She is I think in England at the time.  I don't

H3u1giua

1    recall, frankly, but I believe she was in England; or her

2    agents certainly are in England who are issuing this release.

3    And so it's not that Ms. Maxwell reads this and then the

4    lawyers issue their statement.  So what she's responding to are

5    press reports and calls from the media.  I think that's pretty

6    clear by Mr. Barden's declaration in the summary judgment

7    paperwork as well as Mr. Gow's deposition.

8            The other thing that I have been pondering, your

9    Honor, because this is a large problem for this case, is,

10   assume for a moment, your Honor, what you just said is

11   absolutely true, that she's responding to this pleading.

12   Well --

13           THE COURT:  But she refers to Giuffre's statement, or

14   allegations.

15           MR. PAGLIUCA:  Right.

16           THE COURT:  And so it's those allegations that she's

17   responding to.

18           MR. PAGLIUCA:  Well, the difficulty I have, your

19   Honor, and I think it's going to be a difficulty we're living

20   with here --

21           THE COURT:  But that's what the statement is.  And --

22           MR. PAGLIUCA:  You asked a question during the summary

23   judgment hearing, and it's a great question:  What are the

24   allegations?  And I think that's at the heart of dealing with

25   the difficulty in a lot of these issues because as I stand here

H3u1giua

```
 1    today, a year plus into this case, I don't know what they were.

 2    And --

 3              THE COURT:  But we do know in this instance.  We know

 4    exactly what they are.

 5              MR. PAGLIUCA:  Well, but let me push back on this for

 6    a second, your Honor, because what we're talking about is not a

 7    statement by the plaintiff.  If that's what we're talking

 8    about.  If we're talking about this joinder motion, the Jane

 9    Doe 102 joinder motion is a legal pleading filed by these two

10    lawyers.  And there are no quotation marks in this thing --

11              THE COURT:  Of course.  That's what an allegation is.

12              MR. PAGLIUCA:  Yes, but there are no quotation marks

13    in this.  There are no direct quotes.  There is a lot of legal

14    hyperbole and conjecture throughout the entire pleading.  There

15    are statements by counsel contained in the pleading.  And so I

16    asked a question rhetorically:  What's she responding to?  Is

17    she defaming Mr. Edwards or Mr. Cassell, or is she defaming the

18    plaintiff?  When you parse through this pleading, you could be

19    defaming all of these people, if that's what the allegation is.

20    So I think it's problematic to say this is the pleading that is

21    the allegation, because what happens is, this pleading gets

22    filed --

23              THE COURT:  But this is an allegation of hers.

24              MR. PAGLIUCA:  Of who?

25              THE COURT:  Of the plaintiff's.
```

H3u1giua

1        MR. PAGLIUCA:  Well, filed on her behalf by her

2   lawyers.

3        THE COURT:  Come on.  It's hers.  It's her allegation.

4        MR. PAGLIUCA:  And she is Jane Doe 102 and it is filed

5   by her lawyers, and that's what they are saying on her behalf.

6   That's what I can say about that, your Honor.

7        THE COURT:  I do understand how these documents are

8   prepared.

9        MR. PAGLIUCA:  I know you do.

10       THE COURT:  This much I got.  I've got that.  But it's

11  her statement.  Come on.

12       Similarly, Ms. Maxwell's statement is her statement,

13  regardless of how it was prepared.  So I know the motive issue

14  and all that.  Now whether it should be in some form, but your

15  client does not say, "The allegations with respect to me are

16  false."

17       MR. PAGLIUCA:  Well, I disagree with that, your Honor.

18  I mean, I believe --

19       THE COURT:  They're all false.

20       MR. PAGLIUCA:  But I believe a fair reading of that

21  document, the press release by Barden and Gow, is that she's

22  talking about the allegations against her, Maxwell, and she

23  includes Dershowitz, and that's essentially it.  I mean, she's

24  not parsing through the 102 pleading and saying, you know, this

25  is wrong and that is wrong.  And the fundamental reason for it

H3u1giua

1   is, she's never read the document prior to Barden and Gow

2   issuing the statement, and what she is reacting to are people

3   calling her and saying, you know --

4                THE COURT:  Well, whatever she knew.  Well, okay.  All

5   right.

6                MR. PAGLIUCA:  That's it.

7                THE COURT:  I guess we're as far as we can go on that.

8                MR. PAGLIUCA:  It is whatever she knew.  But what is

9   in the document is way broader, much broader, than her base of

10  knowledge, or Barden's or Gow's, at the time this press release

11  issued.  So I think that's point number one.

12               Point number two is, they apparently want to introduce

13  a lot more information from the Jane Doe 102 CVRA litigation

14  than this simple document, and we can address those as we go

15  along.  If the Court were to deem portions of this relating to

16  Ms. Maxwell and Mr. Dershowitz relevant to this matter, we had

17  proposed, as part of our pleadings, a redacted version of this,

18  which is also to your point just now, your Honor.

19               And my colleague points me directly to the statement,

20  your Honor -- the first line, second sentence.  "The

21  allegations made by," and then it says Victoria Roberts, which

22  is inaccurate by the drafter, "against Ghislaine Maxwell are

23  untrue."  And then it follows.  But that is the backdrop to

24  this.  And she's responding to things about herself, not about

25  anybody else that are contained in this pleading.

H3u1giua

        MR. CASSELL:  And we have a point of agreement here,

your Honor, now.  We agree with the last point.  The

allegations that Ms. Giuffre made against Maxwell are what's at

issue in this case, not allegations against, you know, third --

Maxwell and of course Epstein, those kinds of things, but not

other irrelevant players.  But I think your Honor was exactly

right.

        THE COURT:  Well, so you would have no objection to

the introduction of the motion to intervene, the portions that

describe Maxwell or talk about Maxwell.

        MR. CASSELL:  And Epstein, of course.

        MS. MENNINGER:  No.

        MR. CASSELL:  And Epstein.  Because Maxwell isn't

running around recruiting girls just for herself; she's running

around recruiting girls for Epstein.  So the allegation is

against Maxwell and Epstein.  The allegation that Ms. Giuffre

made was that Maxwell was recruiting girls to give to her

boyfriend Epstein, so the allegations against Maxwell --

        THE COURT:  So you would not object to the redaction

of everything else in that motion.

        MR. CASSELL:  The principle is correct.  The devil, of

course, is in the details, because when you look at what

they've redacted, here's one of the things they want to redact.

Maxwell -- they want to redact this: "was a primary

co-conspirator in Epstein's sexual abuse and sex trafficking

H3u1giua

1    scheme."  They want to redact, She recruited in a manner --

2    this is what they want to redact, "in a fashion very similar to

3    the manner in which Epstein and his co-conspirators coerced

4    dozens of other children."  So they want to redact everything

5    that provides the context for what the allegations are.

6    Ms. Giuffre wasn't saying, hey, on one Tuesday I happened to

7    bump into Maxwell and something happened.  She was alleging a

8    broader pattern of activity, that she was recruited into, as

9    your Honor well knows, sex trafficking by Maxwell and Epstein.

10   And so what I think --

11              THE COURT:  Well, her allegation is that Maxwell was a

12   co-conspirator.

13              MR. CASSELL:  Correct.

14              THE COURT:  We're not talking about --

15              MR. CASSELL:  Yes, we are talking --

16              THE COURT:  In our case, in our case, there's no crime

17   charged.  I mean, I understand the underlying --

18              MR. CASSELL:  Sure.

19              THE COURT:  -- facts.  So it would be anything, in the

20   motion to intervene, that dealt with obviously Maxwell directly

21   or a co-conspirator.

22              MR. CASSELL:  That's right.  And the main

23   co-conspirator here would be Epstein, of course.  These girls

24   were not being recruited, you know, just for Maxwell's personal

25   consumption but for, obviously, Epstein, to satisfy Epstein's

H3u1giua

 1    sexual desires.  When you look at what they're trying to

 2    redact, I think they're trying to make a mismatch out of the

 3    original allegations so it will be difficult for us to explain

 4    to the jury, well, why was this woman running around recruiting

 5    young girls if we can't mention, well, she was recruiting the

 6    young girls to take the sexual pressure off her and to satisfy

 7    the sexual desires of Mr. Epstein.  That's why there was this

 8    vast --

 9            THE COURT:  Anything else you want to tell me?

10            MR. CASSELL:  Yes, your Honor.  I mean, it's critical

11    to use the context here.  As your Honor is pointing out -- and

12    I think you're even getting pushback from them on this basic

13    point.  This is the core of the case.  These were the original

14    allegations that Ms. Giuffre made, and they say this wasn't

15    what she was responding to.  If you look at, for example, their

16    pleading on June 6 of last year, there was only one public

17    statement that existed on January 2nd to which Ms. Maxwell

18    was responding.  The document is the joinder motion filed in

19    the Crime Victims' Rights Act case on behalf of plaintiff.

20    That's what they said.  That's what we said.  We want to show

21    to the jury the one document that set off this whole defamatory

22    backlash, and what they want to do then is to redact it and

23    essentially take out things like references to Maxwell being a

24    co-conspirator, which means we won't be able to explain to the

25    jury the appropriate context here.

H3u1giua

1            Also, the other point that's I think important to

2     remember is we're going to be seeking not just compensatory

3     damages but punitive damages, and when we get to that point,

4     which will be part of the initial phase -- I know the financial

5     issues may be different, but we're going to be arguing our

6     punitive damages case in the initial portion of the trial -- we

7     have to prove that she acted with actual malice.  Her state of

8     mind is obviously a critical issue.  And so the jury's going to

9     be wondering, well, why would she do this?  One of the points

10    that we need to make is, why was Ms. Giuffre trying to get into

11    this case in Florida?  It was a Crime Victims' Rights Act case.

12    It was designed to rip up a plea agreement, a nonprosecution

13    agreement.  And that agreement said all of Epstein's

14    co-conspirators get a free pass from criminal prosecution in

15    Florida.  Which directly goes to Ms. Maxwell's motivation for

16    all this.

17            THE COURT:  How do we know that?

18            MR. CASSELL:  Well, because we're going to be arguing

19    that.  We have --

20            THE COURT:  No.  Arguing.  How do we know that the

21    nonprosecution agreement gave immunity to Ms. Maxwell?

22            MR. CASSELL:  Because it says it extends immunity to

23    any of the "potential co-conspirators of Epstein."  And we will

24    introduce ample evidence at trial from which a reasonable jury

25    could conclude that one of the potential co-conspirators of

H3u1giua

Epstein was Maxwell.  In fact, she was the number two, the most

likely co-conspirator that benefited from that; his right-hand

girl.  His right-hand woman.  I'm sorry.  Ms. Maxwell.  And so

who got the benefit of that immunity provision?  We're going to

present to the jury it's Maxwell who got the benefit of the

immunity provision.  So why was it that she came out all guns

blazing when Ms. Giuffre filed a motion to join, to rip up the

nonprosecution agreement?  Because she had a horse in that

race.  She was trying to protect immunity for herself.

        And so again, we bear the burden of proving that she

acted with actual malice, that is, from a vindictive motive

rather than for benign reasons.  And of course trying to keep

yourself immune from crimes you've committed is a classic

example of acting with actual malice.  And that again is just

one of the arguments, and we're going to be able to connect all

those links in the chain through cross-examining Maxwell,

through cross-examining Epstein, and by also introducing ample

documents, presenting evidence of her direct involvement in

criminal offenses.  And I realize crimes haven't been charged,

but we're going to show that there are going to be ample crimes

that could have been charged, which is why she needed the

immunity that was extended by the nonprosecution agreement.

And which is why she attacked Ms. Giuffre, in an effort to try

to make her allegations seem noncredible.

        And, I mean, if I understood the motion, they were

H3u1giua

sort of just saying, well, we're not really sure whether she's

a victim or not.  That's going to have to be proven to the

jury.  Fair point.  We have no objection saying, look, these

documents are coming in because they show the initial

allegations that Ms. Giuffre made.  It's up to the plaintiffs

to introduce evidence and to prove that's all true.  We're

going to shoulder that burden at trial.  But what this motion

seems to be designed to do, in our point of view, is to take

out things like the allegation that Ms. Giuffre was a

co-conspirator of Epstein.  They don't want the jury to hear

that, and of course that is a pivotal part of our case.

          MR. PAGLIUCA:  They used the term "actual malice."  I

use the term "actual nonsense," your Honor.

          You know, I first have to say, unless we're going to

close the courtroom or I get to respond in kind, half of what

this argument is is in violation of the protective order right

here.  And it's lawyer argument.  And there are no facts to

back it up.

          Let's talk about the nonprosecution agreement.  It is

absolutely factual, Ms. Maxwell was never, not once, ever,

contacted by the Palm Beach Police in reference to this

investigation.  She was never, not once, contacted by the FBI

or the U.S. Attorney's Office in reference to this

investigation.  She testified in her deposition that she didn't

hire a lawyer because she wasn't at risk in any of this.  She

H3u1giua

didn't even know about any of this, your Honor.  That's the

evidence in this case.  There is zero evidence that will be

produced at trial to put Ms. Maxwell in any of this, in any of

the investigation.  The lead detective, Recarey, never spoke to

her, never tried to call her.  And when I asked him questions

about, you know, what did you know about Ms. Maxwell when you

were doing this investigation, his answer was, "Nothing."  So

that's the backdrop to this.

        There are in fact certain individuals named directly

as co-conspirators of Epstein's in the nonprosecution

agreement.  Maxwell is not one of them.  She had absolutely no

hand in crafting that agreement; none whatsoever.  She never

talked to anybody; she never had a lawyer talk to anybody on

her behalf.  So to start with the proposition that she then has

to eat this nonprosecution agreement in this case is absolute

nonsense.  You want to take the backdrop to this in terms of

what the investigation was, there were a number of individuals

that were presented to the Florida State grand jury as a result

of the state investigation.  Maxwell was not one of them.  Not

at all.  Never on anybody's radar about any of this.  She

didn't need to participate in this and she didn't know anything

about it.  That makes this nonprosecution agreement wholly

irrelevant as it relates to Ms. Maxwell.

        And the entire argument you just heard is these two

lawyers' argument in the CVRA litigation that they now want to

H3u1giua

1    present from here to this jury during the course of this trial,

2    which is, again, wholly improper.

3          There is no evidence -- and in fact direct testimony

4    is contrary to this -- that Ms. Maxwell knew about a

5    nonprosecution agreement, knew about Epstein's plea agreement,

6    knew about any of these things.  So the idea that somehow this

7    goes to actual malice is, again, actual nonsense.  Because in

8    order for it to be malice, in some fashion you have to know

9    about it.  And they have no evidence, they can present no

10   evidence that she knew about any of these things.  There will

11   be no witness who gets on the witness stand who says Maxwell

12   knew about the nonprosecution agreement, Maxwell knew about

13   Epstein's immunity, Maxwell knew about Epstein's deal.  Not

14   one.  So the notion that they can then say, oh, you know, this

15   has something to do with her motive, well, all of the case law,

16   all of the case law on this issue, on introducing these kinds

17   of things to prove knowledge, requires that the person you're

18   introducing against actually knew about it.  There is not one

19   case that they can cite, and they haven't cited, that says, I'm

20   going to introduce it for notice or knowledge.  Well, you have

21   to know about it.  The person has to know about it for it to be

22   introduced as notice or knowledge.

23         Again, I have to go back to the statement, your Honor.

24   What they're trying to do is very selectively say, we like this

25   evidence so, oh, yeah, that's something that is part of what

H3u1giua

we're going after; we don't like this evidence so of course
that's not what was at issue here.  The statement doesn't say
Epstein in this statement.  Not one mention of Epstein in this
statement.  And I vigorously dispute the notion that because
lawyers put in a pleading, called someone a co-conspirator,
these two lawyers put in their pleading identifying somebody as
a co-conspirator when there's no evidence of that, that they
then, these two same lawyers, get to come into a courtroom and
give that to a jury and say, see, that was in this pleading
here.  Well, there's no evidence of that.  And they're not
going to produce any evidence of that.

          And, by the way, your Honor, what we have to talk
about here are factual assertions, in a defamation case.  We're
not talking about opinions.  And what is the determination of
whether someone is a co-conspirator or not, your Honor?  First
of all, it's a legal decision that certainly a layperson is not
qualified to make.  You have conducted 801(d)(2)(E) hearings
for, you know, as long as I've been alive, I think, and you're
the one who's making those determinations after the
consideration of evidence.  So to say that somebody can say
someone is a co-conspirator and then you issue a press release
that doesn't say, "I deny being a co-conspirator," that doesn't
talk about that document at all other than to say Jane Doe 3 is
Virginia Roberts, to then say we get to introduce a bunch of
evidence because we said she was a co-conspirator against her

H3u1giua

```
 1    stands this case right on its head.  That is not a factual

 2    assertion by Ms. Giuffre that my client is a co-conspirator;

 3    that's opinion.  And what we are concerned about here, I think

 4    as you pointed out in the very beginning of this case, is that

 5    we're not dealing with opinions, we're dealing with facts and

 6    factual assertions, which are at the heart of the defamation

 7    claim, not lawyer opinions in a pleading.

 8            Thank you.

 9            MR. CASSELL:  May I just briefly respond, your Honor?

10            MR. PAGLIUCA:  You know, this is my motion, and I

11    don't think he gets that.

12            THE COURT:  Yes.

13            MR. CASSELL:  All right.  Thank you, your Honor.

14            THE COURT:  I take it that that concludes everything

15    anybody wants to say about the Epstein plea and his

16    registration.

17            MR. EDWARDS:  No, your Honor.  I was going to address

18    that separately.  I don't know if there's an additional

19    argument from counsel.  It was their motion, so if it is,

20    then --

21            THE COURT:  Yes.  Okay.

22            MR. EDWARDS:  And by the way, this is Brad Edwards on

23    behalf of Ms. Giuffre, but I believe it's their up.

24            MS. MENNINGER:  Your Honor, a couple more points.

25    They are related to what was just articulated for your Honor.
```

H3u1giua

1      But I think they are somewhat distinct.

2              With respect to the plea agreement, what we're talking

3      about here is Mr. Epstein entered a plea agreement with the

4      state of Florida, the district attorney's office.  Again, as my

5      co-counsel just articulated, there's no evidence that

6      Ms. Maxwell had any participation in, knowledge of, etc., with

7      regard to that plea agreement.  The same is true with respect

8      to the nonprosecution agreement, which was the federal side.

9      And then finally, he also moved to exclude any references to

10     Mr. Epstein's sex offender registration.  All of these are

11     out-of-court statements.  These documents are out-of-court

12     statements that they would like to introduce, they say in their

13     papers, for the "effect on the hearer," which, again, your

14     Honor, requires that the hearer actually have heard of them or

15     have seen them, and they have no evidence whatsoever that

16     Ms. Maxwell ever had possession of those documents.  In fact,

17     when they asked her about this at deposition, she said that she

18     had not actually ever seen those documents.

19             The documents that were produced in discovery are

20     incomplete, by the way.  I don't even have some of the

21     documents they reference in their response.  They're talking

22     about lists of victims that were attached to some plea

23     agreements.  It hasn't been given to me.  It hasn't been given

24     to us.  I still haven't seen it to this day.

25             And finally, your Honor, they claim, again, this

H3u1giua

1    notion that this somehow goes to Ms. Maxwell's state of mind.

2    And that reflects right back, your Honor, on counsel's argument

3    that we just had, which is, you can't have an effect on a state

4    of mind if you've never actually seen the document.

5            I had a couple more comments on the notification, the

6    victim notification letter, your Honor.  While I'm here, I'll

7    just add those to it.

8            THE COURT:  Sure.

9            MS. MENNINGER:  Your Honor, the victim notification

10   letter, if you will, as it's been called in this litigation,

11   was purportedly sent to plaintiff in 2008, which is three years

12   before that FBI interview we were just talking about a minute

13   ago, in 2011.  So at the time this so-called victim

14   notification letter says it was sent, plaintiff had never even

15   spoken to law enforcement.  So it is entirely unclear on what

16   basis anybody reached a legal conclusion that plaintiff was the

17   victim of a federal crime.  Even looking at the document

18   itself, your Honor, the document doesn't say on what grounds

19   anyone determined her to have been a victim.  It doesn't say

20   who decided that.  It doesn't say what evidence they looked at.

21   Doesn't say when they reached that conclusion.  And more

22   importantly, it says she was identified as a victim of crimes

23   by Mr. Epstein.  You can scour that document in vain trying to

24   find any reference to Ms. Maxwell.  It's not in there.

25           Your Honor, at the same time that particular document

H3u1giua

1    was supposedly sent to plaintiff, the US attorney at the time,

2    Mr. Acosta, also sent a letter saying that he believed it was

3    preferable to have engaged in that kind of plea bargaining with

4    Mr. Epstein because they had a risk of not winning at trial.

5    In other words, your Honor, he didn't believe he had sufficient

6    evidence for a conviction against Mr. Epstein, thereby

7    undermining anybody's suggestion that that victim notification

8    letter actually was any type of adjudication or determination

9    that Ms. Giuffre was in fact a victim.  There is no grounds

10   within the letter or outside the circumstances of the letter to

11   explain who reached a conclusion, why or when.  It is, your

12   Honor, inadmissible hearsay.  It does not meet the

13   trustworthiness requirement for an 803(8) public record.  Even

14   if, for example, a person could come in and authenticate the

15   record and explain its provenance, no such witness has been

16   identified by plaintiff to do that.  And I submit, your Honor,

17   they cannot.

18        THE COURT:  The problem that I see is that, I

19   understand the argument about the truth of the notification,

20   whether or not she's a victim.  I get that.  But it is an

21   explanation of her standing or her view of her standing in the

22   CVRA litigation.

23        MS. MENNINGER:  Well, your Honor, that's an

24   interesting point.  The letter does itself talk about, there's

25   been a challenge to the way in which victims have been

H3u1giua

1    notified, and if you want any more information about that,

2    here's a lawyer you can get in touch with.  So supposedly she

3    got this letter in 2008, right?  When, your Honor -- pop quiz

4    here -- did she file a joinder motion trying to join that CVRA

5    litigation?  December 30, 2014.  So we have in excess of a

6    six-year gap between being notified that there is some kind of

7    CVRA litigation and her effort to join that litigation.  And in

8    the interim, your Honor, she had counsel.  Not these two

9    counsel.  She did get them in 2011.  But in 2009 she had her

10   own lawyer, who is identified in that letter.  And so what we

11   have is a letter, we don't know the provenance of it, but it

12   does give her some notice about her rights in the CVRA

13   litigation, telling her who to contact.  She doesn't do that

14   for six years.

15           I think, your Honor, we are looking at having an

16   entire -- I don't even want to call it a sideshow, just an

17   entire CVRA litigation in this courtroom, because if that

18   letter comes in, then we are necessarily going to have to

19   explain a whole lot of law, a whole lot of facts to this jury

20   that are not pertinent to the statement issued by Ms. Maxwell's

21   counsel and press agent.  We are going to have jury

22   instructions about what the Crime Victims' Rights Act means,

23   we're going to have Judge Marra's order explaining why did

24   someone wait six years and put in all these allegations about

25   nonparties like Ms. Maxwell, Mr. Dershowitz, and striking them.

H3u1giua

1      And I mean striking them.  You can't go on Pacer right now and

2      get that joinder motion because he struck them.  So we're

3      talking about then taking all of that information, that legal

4      discussion and factual discussion -- there's other Jane Does,

5      we're talking about 404(b) there, some other things we'd move

6      to redact, there was a Jane Doe 4 who also wasn't allowed to

7      join who has completely different allegations.  We're talking

8      about things that are in those documents and law and rulings

9      that are frankly, you know -- Ms. Maxwell certainly wasn't a

10     part of the CVRA litigation so we haven't had an opportunity to

11     even get all this information.  We've had to subpoena these

12     counsel for information, and they've moved to quash all of

13     those subpoenas, your Honor.  Even when we're asking, what is

14     it that you even have from that litigation that relates to our

15     litigation?  They don't even want to provide that.  But they

16     want to come in here and bring in letters and plea agreements

17     and all this other stuff that they've been litigating against

18     Epstein but Ms. Maxwell has had no part of because she was not

19     one of the people accused, by anybody else, except this

20     plaintiff.

21          THE COURT:  The difficulty, obviously, is the -- and

22     we're back to where we were some moments ago, of allegations.

23          MS. MENNINGER:  It's not really that difficult because

24     we've had depositions of people like Ms. Maxwell.  We've had

25     depositions of Mr. Gow.  You know, they've had an opportunity

H3u1giua

1     to develop this factual record.  And guess what?  No facts have

2     supported that anybody gave a copy of that CVRA joinder motion

3     to Ms. Maxwell.  They didn't send it to her.  They sent it to

4     the press.  They called the press and told the press, cover

5     this motion.  But they didn't send it to Ms. Maxwell.  So they

6     don't have any evidence that she actually had the document.

7     What they have evidence of, Mr. Gow testified to, is she was

8     getting calls and he was getting calls from the press asking

9     for a response and, frankly, suggesting that there was a new

10    person out there who was making allegations against

11    Ms. Maxwell, when it turned out no other person has made

12    allegations against Ms. Maxwell, only plaintiff has done that.

13    And so the very first line of the statement, your Honor, is,

14    this is not a new person, this is the same person from 2011

15    that I already issued a statement about, and it talks directly

16    about, the allegations against Ghislaine Maxwell are untrue.

17    It doesn't say the allegations against Jeffrey Epstein are

18    untrue.  It doesn't say the allegation about being a

19    co-conspirator, that part's untrue.  It just talks about the

20    allegations against Ms. Maxwell.

21          THE COURT:  But correct me if I'm wrong.  There were

22    no allegations prior to this time of misbehavior by

23    Ms. Maxwell.

24          MS. MENNINGER:  That's untrue, your Honor.  Plaintiff

25    sold her story to Sharon Churcher.  When she sold her story to

H3u1giua

Sharon Churcher, she made some allegations against Ms. Maxwell

then.

      THE COURT:  Oh, all right.

      MS. MENNINGER:  And you know what?  Ms. Maxwell issued

a press release, an actual one that's out on the wires back in

2011, so when she's referring in this one to "already been

responded to," she's got that prior statement that's out,

still.  You can go on the internet yourself right now and get

it.

      THE COURT:  So there were statements in the initial

story about Ms. Maxwell.

      MS. MENNINGER:  They were different.  I mean, that was

part of this point is that over time the statements from 2011

were more minimal, and then by 2014, they had grown.  That's

one of the points that was actually made in the --

      THE COURT:  What were they?

      MS. MENNINGER:  At first she says she was the one,

that Ms. Maxwell was the one who introduced her to Epstein but

it was a different woman who led her upstairs to engage in

sexual contact with Mr. Epstein and that that other person is

the one who actually showed her and trained her how to be a

masseuse.  That's what she said in the Sharon Churcher

published articles.

      THE COURT:  And that's the only reference to Maxwell

in the Churcher articles.

H3u1giua

1          MS. MENNINGER:  In the first Churcher article.  But

2     your Honor, Ms. Churcher ran a series of articles in 2011 that

3     she had a, you know, an exclusive contract for a certain period

4     of time to keep publishing different stories.  So that was the

5     first one.  It got bigger and bigger as time went on.

6          MR. EDWARDS:  Your Honor, Brad Edwards on behalf of

7     Ms. Giuffre.  I prepared notebooks for a separate hearing, but

8     this hearing has evolved into a need for these notebooks, so

9     may I approach, your Honor?  I believe it will help all of us

10     to focus on the issues.

11          And your Honor, I took the liberty to highlight

12     portions of it, and if by any means somebody believes, in

13     reading more of what is in this notebook, that other portions

14     may be helpful, then that's okay.  But just to kind of focus

15     what this case is about.  And for me, the parameters of this

16     case are defined by the statements and by the law governing

17     defamation.  And if we start with, under Tab 1, Ms. Maxwell's

18     statement, line 1 is, "The allegations made against Ms. Maxwell

19     are untrue."  So we are in agreement -- it's the allegations

20     made against Ms. Maxwell.  Sentence two:  "The original

21     allegations are not new and have been fully responded to and

22     shown to be untrue."  So we have to first find the allegations

23     against Ms. Maxwell that she's responded to, and then for the

24     second sentence, what were the original allegations, and that

25     she fully responded to and shown to be untrue, and that's where

H3u1giua

```
1    we go to -- Tab 2 is the CVRA motion, and within that motion

2    there are allegations about Ms. Maxwell.  There are also

3    allegations about others.  We agree; the allegations that are

4    exclusively about others and are not related to Ms. Maxwell or

5    do not provide context for the allegations against Ms. Maxwell

6    are not relevant to this action.  We go to the second sentence

7    of Ms. Maxwell's statement, which refers to the original

8    allegation, and we find the original allegations -- your Honor

9    just asked the question, were there previous allegations, and

10   there were.  And under Tab 3, Jane Doe 102 v. Epstein, which

11   has been referred to today in this hearing, that was an action

12   that was filed by Virginia Roberts in 2009.  Those were the

13   first allegations about Ms. Maxwell.  And again, they're --

14        THE COURT:  But there's no evidence, or is there, of

15   Maxwell's knowledge of that case or those allegations.

16        MR. EDWARDS:  There is, and I will explain.  Beginning

17   in paragraph 17 of the Jane Doe 102 complaint through

18   paragraph 19, there are -- yeah, 17 through 19 -- there are

19   allegations about Ms. Maxwell.

20        In 2011, which is Tab 4 and 5, two articles come out.

21   If we start with Tab 4, that is one of the articles that was

22   being referred to by Ms. Maxwell, and the first line, the title

23   of the article is, "Prince Andrew and the 17-year-old girl his

24   sex offender friend flew to Britain."  The next line down says,

25   "Virginia Roberts reveals she is Jane Doe 102 in the Epstein
```

H3u1giua

1   action."  It's talking about the original allegations from Jane

2   Doe 102.  That is in the body of the 2011 article.

3        And there are more allegations within these articles

4   paraphrasing what was in Jane Doe 102 as well as elaborating

5   upon them through an interview that Virginia Roberts had, and

6   it results in a second article, a few days later, issued

7   March 7, 2011, that is entitled, "Epstein's Girl Friday fixer,"

8   and the article is about Ms. Maxwell.  And after that article,

9   a few days later, Ms. Maxwell issues a statement saying, "The

10  allegations against me are abhorrent and entirely untrue,"

11  which she adopts in the first statement.

12       So this book contains the universe of statements --

13       THE COURT:  Yes, I understand that obviously she was

14  responding to this Churcher article, but there's nothing to me

15  that indicates that she was responding to the Epstein

16  complaint.

17       MR. EDWARDS:  Well, she's responding to what she says

18  are the original allegations.  The original allegations were in

19  Jane Doe 102 that's referred to in the Churcher articles.  So

20  for certain, by 2011, she's looking at Jane Doe 102 to learn --

21       THE COURT:  Well, that's a leap.

22       MR. EDWARDS:  Well, it may be, and she can get on the

23  stand and say, I saw that, that it said Jane Doe 102.  This was

24  my boss who had gone to jail, who had been sued.

25       And so let me go into the second part of this, which

H3u1giua

1  deals with the admissibility of things like the nonprosecution

2  agreement, Jeffrey Epstein's plea, his sex offender

3  registration, because if it relates to Ms. Maxwell's statement

4  or the statement that Ms. Maxwell refers to, then it's

5  relevant.  Or it goes to an element of defamation.  If it does

6  not, then it cannot.  And so the thing that I will tell you

7  about those documents is, Ms. Maxwell has admitted she was

8  employed by Mr. Epstein from a time period well before he went

9  to jail until 2009, until he's out of jail.  She's on flight

10 logs with him.  She's his number one employee.  In fact, when

11 we took, in a separate case, Mr. Dershowitz' deposition on

12 specifically the topic of what did Jeffrey Epstein tell you

13 about Virginia's allegations, or what did Ms. Maxwell tell

14 you --

15          THE COURT:  Give me a break.  This I don't need, do I?

16          MR. EDWARDS:  Well, I'm only bringing it up for the

17 last point, which is, he says:  There was a joint defense

18 agreement in place during the 2005-2006 allegations between

19 Ghislaine Maxwell and Jeffrey Epstein.  Therefore I can't give

20 you the answers.  So we're talking about --

21          THE COURT:  As far as I know, there's no evidence

22 available to me of a joint defense agreement.

23          MR. EDWARDS:  Okay.  I only know what was testified to

24 in sworn testimony, so I presume --

25          THE COURT:  But it's not in this case.

H3u1giua

```
 1              MR. EDWARDS:  Okay.

 2              THE COURT:  So problems enough I've got.

 3              MR. EDWARDS:  I understand.  I understand, your Honor.

 4      So at a time when Jeffrey Epstein is investigated, Ghislaine

 5      Maxwell is flying on his plane, she's vacationing with him.  We

 6      have flight logs, we have photographs that were taken during

 7      that time.

 8              THE COURT:  So what --

 9              MR. EDWARDS:  So she knows --

10              THE COURT:  -- relative to what we're dealing with?

11              MR. EDWARDS:  So she knows that he's pleading guilty.

12              THE COURT:  You mean because she was on the plane I

13      can say she knows that he pled guilty?

14              MR. EDWARDS:  She knows her employer went to jail

15      while --

16              THE COURT:  Okay.  She knows the employer went to

17      jail.  So?

18              MR. EDWARDS:  It's a public record that --

19              THE COURT:  Okay.  So?

20              MR. EDWARDS:  -- that he's on the sex offender

21      registration.

22              THE COURT:  Okay.  Agreed.

23              MR. EDWARDS:  So at the time --

24              THE COURT:  So?

25              MR. EDWARDS:  So at the time she issues her statement
```

H3u1giua

          in 2015, which is, all of these allegations that deal with

 1

 2        Jeffrey Epstein and Ghislaine Maxwell, all of those allegations

 3        are untrue, she has the ability to know all of the public

 4        information that would tell her this is factually true.

 5                    THE COURT:  But that's not -- okay.  All right.

 6                    MR. EDWARDS:  She can definitely --

 7                    THE COURT:  It doesn't wash.  You know it doesn't

 8        wash.  You must know it doesn't wash.

 9                    MR. EDWARDS:  I'm not saying she can't get on the

10        stand and say she doesn't know.  I get that.  But for her to be

11        the main employee and not know what's going on in his life when

12        everybody knows --

13                    THE COURT:  Well, okay.  All right.  What's next?

14                    MS. SCHULTZ:  Your Honor, I'd like --

15                    MR. PAGLIUCA:  I'd like to respond to this joint

16        defense agreement issue just raised by Mr. Edwards.

17                    You're going to see a pleading later today that is

18        going to have the actual Dershowitz transcript testimony in

19        this, and this is now, again, I say lawyer testimony here,

20        unsupported by the facts.  There is no joint defense agreement

21        between Maxwell and Dershowitz.  I've told these lawyers that

22        ten times now.  When you go back to the Dershowitz transcript,

23        which I have appended the portions of the pages they're now

24        talking about, Dershowitz is asked a question by -- not

25        Mr. Edwards, who's the defendant in that case, your Honor, and

H3u1giua

the plaintiff and counterclaimant are the defendant in that

case.  Who's in the room.  Dershowitz is asked a question:  Did

you talk to Maxwell?  And Dershowitz says:  Gee, I think that

may be privileged and I'm not going to answer.  And I'm

paraphrasing, but you will have this testimony.  There's then

an objection by the lawyer who's representing Mr. Edwards,

about:  Is this a legitimate assertion of joint defense

privilege?  Dershowitz then says:  Well, you know, I know that

I talked to people who were alleged as co-conspirators, and I

think that comes under Epstein's privilege.  Mr. Edwards, in

the transcript, who is a party litigant, says:  She wasn't a

co-conspirator.  That's what he says in this transcript, which

you will see.  He makes that affirmative representation to the

special master and Dershowitz.  Then Dershowitz says:  Gee,

this was a long time ago.  I may be wrong about that, but I'm

going to err on the side of invoking the privilege.  And the

special master says:  Well, we can figure all this out later.

If there is a joint defense agreement, you know, produce it and

they can complain about it.  They've taken that and

disingenuously represented in pleadings and now again in court

that there is some joint defense agreement with my client,

which is emblematic of the problem of having lawyers as

witnesses in this case, your Honor.

          MS. SCHULTZ:  Your Honor, just to respond specifically

with regard to the victim notification letter, if your Honor

H3u1giua

1   will allow, I'd like to approach and give you a copy of it.

2           Your Honor, you have the briefing in front of you so

3   you have our reasons why this should be admissible at trial.  I

4   would just like to add to that we have a witness who can

5   authenticate this letter as well.  It's Jeffrey Epstein.  He

6   can authenticate what went into this letter, who it went to,

7   and why it did when he testifies.

8           I would also add that the chronology of events here is

9   really relevant and this victim notification letter comes into

10  play.  You can see Ms. Giuffre received this in 2008.  Several

11  months later, she filed suit against Jeffrey Epstein pursuant

12  to this letter in the Jane Doe 102 complaint.  Paragraph 29 of

13  that complaint references this specific letter, and of course

14  that complaint is referenced in the Churcher articles, which is

15  referenced by Ms. Maxwell's first public statement about

16  Ms. Giuffre in 2011.  So almost like a Russian nesting doll,

17  all this information is contained in the next document and the

18  next document and the next document.

19          This letter actually should also come in under 803(8)

20  as a public record.

21          THE COURT:  Forgive me.  What does Churcher say about

22  the Jane Doe complaint?

23          MS. SCHULTZ:  She says that Virginia Roberts is the

24  Jane Doe of that complaint, and that complaint says that

25  Maxwell was a recruiter and abuser, and that complaint also

H3u1giua

1    says that Ms. Giuffre received the victim notification letter.

2              Okay.  It says:  In her civil writ against him, under

3    a pseudonym, Jane Doe 102, she alleged that her duties included

4    being sexually exploited by Epstein's adult male peers, and it

5    says what her real name is, and of course these articles to

6    which defendant responded mention defendant as well.

7              THE COURT:  Yes.  Ms. Maxwell is not saying that the

8    article was false with respect to the filing of that complaint,

9    right?

10             MS. SCHULTZ:  I'm sorry.  I apologize, your Honor.  I

11   don't think I follow your question.  I think that Ms. Maxwell

12   knew about the Churcher article, which told her about the

13   litigation against Epstein.

14             THE COURT:  It told her there was a complaint.

15             MS. SCHULTZ:  Your Honor, this is also a public record

16   that should come in under 803(8).  This came from a public

17   office, the United States Department of Justice.  It contains

18   findings of a legally authorized investigation into the sex

19   crimes of Epstein.  Defendant cannot make a showing that it

20   lacks trustworthiness.  She does not cite to any cases in which

21   a victim notification letter has been excluded.  Defendant has

22   in her briefing tried to recharacterize this as a witness

23   notification letter, but that's not what this is.  It says

24   right at the top, Jeffrey Epstein, Virginia Roberts,

25   Notification of Identified Victims, not identified witness.

H3u1giua

1   The Seventh Circuit case cited by defendant can be

2   distinguished because in that case someone was trying to show

3   that he wasn't a criminal and that he was a victim instead.

4   That's not the situation here.  So this has all the components

5   to warrant admission under 803(8).

6          And one more point.  Alex Acosta never said he didn't

7   have enough evidence to convict Epstein.  He said it was a risk

8   to go to trial.  Every trial is a risk, and a decision not to

9   go to trial against someone does not mean that any of these

10  victims were not victims.  It's a decision an attorney made

11  about whether to go to trial or to seek restitution in a

12  different manner.

13          That's all I have on that.

14          THE COURT:  Tell me again why you think this is

15  relevant.

16          MS. SCHULTZ:  I think, your Honor, that it goes to the

17  state of mind that Maxwell had when she issued her defamatory

18  statement.  She knew that Ms. Giuffre had brought this claim

19  against Epstein and the rubric under which she brought it

20  because she knew about the Churcher article, alerted her to it.

21  She had that knowledge for nearly five years.  This was 2011.

22  She made a defamatory statement in 2015.

23          THE COURT:  She knew that a case had been brought by

24  Giuffre against Epstein, right?

25          MS. SCHULTZ:  Yes, sir.  Yes, your Honor.

H3u1giua

| | |
|---|---|
| 1 | THE COURT:  More than that? |
| 2 | MS. SCHULTZ:  It also shows that she knew about |

THE COURT:  More than that?

MS. SCHULTZ:  It also shows that she knew about
Ms. Giuffre's standing under the CVRA joinder motion, because
that's also in this letter.  And defendant did testify that she
knew why her boyfriend went to jail.  She testified that she
knew about that.  So it's kind of disingenuous to say that
defendant had no idea what was going on and all of a sudden in
2015 --

THE COURT:  Well, she knew that he went to jail, and
presumably she knew --

MS. SCHULTZ:  For sex crimes with minors.

THE COURT:  Yes.

MS. McCAWLEY:  Your Honor, could I just add one point.
I'm sorry.  Just one point of clarification with respect to the
Jane Doe 102 complaint, which is May 4th of 2009.  Defendant
testified she was still working for Epstein in 2009, and this
has, if you turn in your binder, paragraph 17, specific
allegations about Maxwell leading her up to the room, about the
abuse she suffered by Maxwell, about how she engaged in that
abuse.  I mean, there's no way to say Maxwell did not know
about the allegations in a complaint in 2009 when she's still
working for Epstein that specifically talk about her abusing
somebody.  Taking off clothes -- I mean, it goes into grand
detail about the abuse.

THE COURT:  But that's an assumption.

H3u1giua

1          MS. McCAWLEY:  Well, we're entitled to ask her on the

2     stand; we're entitled to ask Jeffrey what he told her.

3          THE COURT:  That's a different issue.  That's a

4     different issue.  I mean, that's a wholly different thing.

5     You're talking about your affirmative case.

6          MS. McCAWLEY:  Thank you, your Honor.

7          MS. MENNINGER:  Your Honor, in the binder behind Tab 6

8     is the statement issued by Ms. Maxwell in 2011, which says,

9     "Ghislaine Maxwell denies the various allegations about her

10    that have appeared recently in the media."  It doesn't

11    reference Jane Doe 102.  There's no evidence that she even had

12    a copy of the complaint or knew anything about the complaint

13    that Virginia Roberts had filed as an anonymous person back in

14    2011.  That's a statement she issued in response to the

15    articles behind Tabs 4 and 5.

16         I don't even understand the argument that Jeffrey

17    Epstein can authenticate this victim notification letter.  I

18    really don't.  I'm struggling.

19         And I also struggle with the Russian nesting dolls,

20    because to say that one thing gives you notice to another

21    thing, that gives you notice to another thing, it really kind

22    of just eliminates the rules of evidence, your Honor.

23         THE COURT:  In the interest of humanity, we will have

24    a short break.

25         (Recess)

H3u1giua

1             (In open court)

2             THE COURT:  Much as I'd like to move on, I do have one

3       other question.  Is there going to be evidence of settlement of

4       Jane Doe, from the defense?

5             MR. PAGLIUCA:  You anticipate this answer, your Honor.

6       It kind of depends on what happens in the plaintiff's case in

7       chief.  You know, that's as best as I can answer it.  I mean,

8       it is not my present intention to introduce that evidence

9       during the course of the trial, I think is the best way I can

10      say it, but it's obviously going to depend on what happens in

11      the first part of the case.  I mean, you know, if this thing

12      busts wide open, then it may be a donnybrook here about all

13      this stuff.

14            THE COURT:  Well, and I thought that the information

15      that I have about that came from the defense.

16            MR. PAGLIUCA:  It may be.  I think we filed a motion

17      *in limine* to preclude the plaintiff from introducing it in

18      their case in chief.  I think that's why you have that

19      information.

20            THE COURT:  Ah.  And is that --

21            MS. McCAWLEY:  Yes, your Honor.

22            THE COURT:  That's part of the --

23            MS. McCAWLEY:  It's a separate motion, your Honor.  I

24      can give you the docket entry.  No. 6 --

25            THE COURT:  Where is it?  I mean, we don't have it

H3u1giua

1    today.

2              MS. McCAWLEY:  They moved for an extension of time to

3    respond to that.  So it's their motion, the defendant's motion.

4    They moved to exclude the Jane Doe 102 complaint and the Jane

5    Doe settlement.  Docket entry 663.  We opposed that, in part,

6    and then they asked for an extension.  I believe they're

7    supposed to be filing their reply to that this evening, so we

8    can argue that -- I'm happy to argue it now, but --

9              THE COURT:  No, no.  Thanks very much.  It is

10   conceivable that that would solve many of the problems that we

11   just talked about, however.

12             Okay.  Where are we?  Yes.  Evidence of Maxwell's

13   involvement.

14             MR. CASSELL:  Is this 686?

15             THE COURT:  Yes.

16             MR. CASSELL:  Yes, your Honor.  Paul Cassell for

17   Ms. Giuffre.  I'm arguing this motion.

18             As you know, the motion was an affirmative motion to

19   avoid disputes arising in the middle of trial, and so we set

20   out at the beginning of the pleading -- and I won't recount all

21   of it here, but -- illustrative types of evidence that we were

22   going to produce.  And this, of course, is going to be evidence

23   that goes directly to proving the allegations that we've been

24   talking about today.  For example, we're going to produce Tony

25   Figueroa, who's going to say that Epstein's assistants

H3u1giua

1    regularly called him asking him to bring girls over for

2    Epstein, and in fact the defendant once or twice called him

3    personally asking him to bring girls over.  Epstein and the

4    defendant were always with each other --

5            MR. PAGLIUCA:  Your Honor, this is all subject to the

6    protective order, and I guess I don't know -- if we're throwing

7    it out the window, we're throwing it out the window and I will

8    respond in kind, but, you know, I just put it out there so that

9    there can be a fair response.  This is a defamation case.  I

10   think I'm entitled to a fair response to these comments, but I

11   don't want to be hamstrung by the protective order in

12   responding to these claims.

13           THE COURT:  Well, look, and this goes to all counsel.

14   This would be part of the trial --

15           MR. CASSELL:  Yes.

16           THE COURT:  -- except that you chose to bring it now,

17   and I'm not critical of that.  That's perfectly all right by

18   me.  But this is really part of the trial.  And so I think the

19   defense comment is an appropriate one -- I mean, noting the

20   fact that the order is no longer in effect.

21           MR. PAGLIUCA:  That's all fine with me, your Honor.

22           THE COURT:  Well, I understand, but just so we all

23   know where we are.  I mean, as I understood it, you all had

24   agreed -- now maybe I'm wrong -- that anything that was

25   introduced or anything that, absent a particular application,

H3u1giua

 1    anything that occurred in the trial is open.  And this is part

 2    of the trial.  It isn't, but it is.  And so what I'm saying is,

 3    I think it is part of the trial, even though it's in the *in*

 4    *limine* motion.  It would be made during the trial.  Now of

 5    course it would not be made in front of a jury, but it would be

 6    public.

 7            MR. PAGLIUCA:  The only reason I'm raising this issue,

 8    your Honor, is twofold.

 9            THE COURT:  No.  I think it's useful.

10            MR. PAGLIUCA:  I don't want to be in violation of your

11    order.

12            THE COURT:  No, no.  Understood.

13            MR. PAGLIUCA:  But the other is, we have these

14    arguments, and then after the fact plaintiff's counsel moves to

15    redact things that they don't like from the transcripts when,

16    you know -- it's like either it is or it isn't part of the

17    record.

18            THE COURT:  Well, that we don't have today.  I mean,

19    that issue we don't have today.  But I've already said what I

20    think about it.  And, I mean, it's not written in stone,

21    obviously.  I'd be pleased to have any authority that anybody

22    wants to give me on it.  But that's my reaction, that this is

23    part of the open record, just so we all know where we are.

24            MR. PAGLIUCA:  Great.

25            MR. CASSELL:  If I could just make a note about two

H3u1giua

1    points.  One would be, there are minor victims of sexual

2    assaults who are not parties to this case.

3              THE COURT:  Well, now, you can't have it both ways.

4    Okay?  If there's somebody you want to talk about whose

5    identity you want concealed, I thought we had understood that

6    that was fine.  Make an application, we'll deal with that.

7    We'll deal with that.  Absent that --

8              MR. CASSELL:  It's going to be my practice to refer to

9    under-age victims of sexual assault by initials rather than

10   their full names, and I would hope defense counsel would agree

11   to follow the same approach.

12             MR. PAGLIUCA:  No.

13             MR. CASSELL:  Then we would make an oral application

14   that the names of minor victims of sexual assault be referred

15   to by their initials, because it's not like --

16             THE COURT:  Well, wait, wait, wait, wait, wait.  One

17   of the problems I have at the moment is trying to bring order

18   out of chaos, and I think we had agreed that if there's going

19   to be an application for that kind of relief, it should be made

20   and we'll deal with it.  I don't want to do it on the fly,

21   suddenly, without any notice to anybody about anything, and so

22   if you want to do that, I'm not prejudging it at all.  That's

23   fine with me.  But I think where we are at the moment is that

24   anything that's referenced now is open.  That's the way I look

25   at it.  Okay.

H3u1giua

1          MR. CASSELL:  Thank you, your Honor.  For example, I'm

2     going to refer, in the next bit of evidence, which is in our

3     reply brief, to a woman who I will identify by the initials SR.

4     She described defendant as "the main right-hand woman of

5     Epstein" in connection with recruiting girls.  She described a

6     rotation.  She said the rotation was organized by defendant.

7     Every single day defendant would go to another girl and say,

8     "It's your turn."

9          THE COURT:  Well, wait, wait, wait.  Maybe I'm

10    wrong -- which, parenthetically, I have been wrong on a number

11    of occasions, which I regretfully report -- but this is the

12    kind of an argument that somebody gets on the stand and they

13    begin to testify and somebody makes an objection.  And isn't

14    that the case here?  I mean, I don't know.  I guess I'm saying,

15    is this a proper *in limine* motion?  I mean, we can't try the

16    case twice.

17         MR. CASSELL:  Right.  But your Honor, the reason we

18    brought this to your Honor's attention early is, this is going

19    to permeate a number of the significant witnesses in the case.

20    And rather than doing it on the fly in the middle of the trial

21    with the jury here, since the issue can be clearly framed for

22    your Honor at this point, there's no dispute as to what kind of

23    evidence we're going to try to produce at trial, and I think

24    there's obviously no dispute the defendant is going to oppose

25    it, we wanted to surface the issue --

H3u1giua

```
 1              THE COURT:  Yes, but what you just said, you see, it
 2     will be a question of what time frame are we talking about, of
 3     what was the witness' access.  I mean, there are a lot of
 4     foundational questions that will come up, it seems to me.  I
 5     mean, what I'm hoping is, as we proceed, we'll have an idea of
 6     who's going to testify and a rough idea of what their testimony
 7     is going to be, and at that point I'm perfectly prepared to sit
 8     with counsel and deal with it, but I'm not sure that we can go
 9     through witness by witness now.  Does that make sense?
10              MR. CASSELL:  It does very much, your Honor.  I was
11     simply offering in our brief -- as you know, our papers offered
12     illustrative examples of an issue that your Honor is certain to
13     face at trial so that we could get your guidance pretrial as to
14     how --
15              THE COURT:  If you have a witness who's going to
16     testify that Ms. Maxwell did in fact do the things that she
17     says Giuffre said she did, that --
18              MR. CASSELL:  That's all we're looking for.
19              THE COURT:  Well, that's the case, isn't it?
20              MR. CASSELL:  As you know, it seems like in this case,
21     what's being --
22              THE COURT:  Well, let me ask the defense:  What's your
23     view of all this?
24              MR. PAGLIUCA:  Well, your Honor --
25              THE COURT:  There's a propriety of trying to deal with
```

H3u1giua

1    this now.

2            MR. PAGLIUCA:  We pointed this out in the papers,

3    which is precisely this problem you're struggling with.  In the

4    response that we filed, we pointed out that they haven't

5    complied with Rule 404(b) and they haven't complied with

6    Rule 415 because, you know, the allusion to this testimony are

7    things like these bullet points on page 3 of their application:

8    "Ms. Giuffre will introduce testimony from a female,"

9    unidentified.  "Ms. Giuffre intends to introduce testimony of

10   another witness."  There is no time frame, there's no identity.

11   We have a bullet point that is literally three sentences long

12   for each of these.  So there's no context for the Court to rule

13   on any of this.

14           So I agree with you, your Honor.  I think, though, it

15   is going to be an issue that is going to be struggled with

16   during the course of this trial, in my view.  And there are

17   competing 404(b) motions here, in essence, your Honor.  They

18   have filed a 404(b) motion to introduce evidence and we have

19   filed a 404(b) motion to exclude evidence.  Frankly, we don't

20   know what the evidence is that they're talking about in this

21   application to introduce the evidence, and we don't believe

22   that they have complied with the rules, and so as a matter of

23   pretrial ruling, it should just be denied and, you know, if

24   there is some evidence then that we need to discuss, we need to

25   discuss it.

H3u1giua

```
 1              But for example, there are specific requirements under
 2     Rule 404(b) that has to be offered for a specific purpose.  You
 3     know, we have to be able to separate out the impermissible
 4     inference from the appropriate purpose.  There has to be a
 5     finding by the Court under *Huddleston*, and so on and so forth.
 6     And unless the plaintiffs can provide you with sufficient
 7     information that can then be challenged, we're just spinning
 8     our wheels here, because we're talking about things that we
 9     don't know about.
10              Similarly, Rule 415 has specific requirements that
11     have to be complied with for the proponent of the evidence.
12     None of those have been complied with here.
13              So my suggestion is that this motion at this point be
14     denied, and if there's a specific evidentiary foundation that
15     the Court can have that would allow the Court to make a ruling
16     after argument, that's fine, but right now we just have
17     counsel's representations in papers and in court and no actual
18     evidence before your Honor.
19              MR. CASSELL:  Your Honor, may I approach briefly,
20     because with regard to compliance with the rules, it requires
21     notice of the specific testimony at issue, and we included an
22     appendix, I believe it's approximately a 25-page-long document,
23     so --
24              MS. MENNINGER:  Is that in your reply?
25              MR. CASSELL:  Appendix A?
```

H3u1giua

1          MS. MENNINGER:  You provided the notice in the reply?

2          MR. CASSELL:  Your Honor, I'm happy to argue, but I

3     don't believe counsel should be interjecting in the middle of

4     my argument.  I'd like to just provide this document to your

5     Honor at this time.

6          MR. PAGLIUCA:  Well, the point of what Ms. Menninger

7     is saying, your Honor --

8          MR. CASSELL:  Your Honor, is it my turn to speak?  I

9     would request that I be given an opportunity to make my case

10    now.

11         THE COURT:  Well, wait a minute.  I'm trying to --

12         MS. MENNINGER:  Can you give us a copy.

13         THE COURT:  I'm trying to figure out whether I'm going

14    to hear any of this now.

15         Well, there we are.  I take it under 415 there are

16    certain requirements.

17         MR. CASSELL:  Yes, your Honor.  And that's what

18    Appendix A is.

19         THE COURT:  Witness' statements or summary of the

20    expected testimony.

21         MR. CASSELL:  Yes, your Honor.  That's what Appendix A

22    is designed to do.  It's a 20-page summary of approximately I

23    believe ten different witnesses.  We've asked in our pleading

24    to have Appendix A construed as the appropriate notice under

25    Rule 415(b).  If your Honor were to rule today that that notice

H3u1giua

1      is not adequate, we would certainly provide additional notice.

2      We notice, by the way, that 415 requires notice 15 days in

3      advance of trial.

4                THE COURT:  Yes.

5                MR. CASSELL:  So today, one of the things I'm trying

6      to make certain isn't overlooked is that we provided fair

7      notice to the other side.

8                THE COURT:  That's fine.  You say Appendix A.

9                MR. CASSELL:  I believe your law clerk has it right in

10     front of you.

11               THE COURT:  Ah, okay.

12               On the question of whether this is ripe, let me ask

13     the defense, what do you think about Appendix A?

14               MR. PAGLIUCA:  The first thing I would point out, your

15     Honor, is that it wasn't proffered as part of their motion; it

16     was proffered as part of the reply, and very recently, and we

17     haven't had the time to respond to it.  That's point one.

18               Point two is, the cited transcript testimony, frankly,

19     is the subject of a number of other objections and motions that

20     are pending for a lot of these witnesses.  And so the testimony

21     that's being proffered is also -- I know, because I wrote some

22     of the objections -- being objected to for other reasons.  So

23     if we're going to talk about this testimony as the proffer, I'd

24     like an opportunity to respond to it.  But it also makes some

25     sense to me that this would be put in abeyance until after we

H3u1giua

1    rule on some of the other motions, including issues

2    specifically related to the questions and answers in the

3    deposition, because that may impact the Court's ruling on this.

4              THE COURT:  Okay.  Now what else do we have?  I think

5    I know what we're doing tomorrow.  Ah.  Oh, so with this, we're

6    going to deal with that.  Right?

7              MS. MENNINGER:  Correct.

8              THE COURT:  So that makes some kind of sense to me.

9              I understand that you believe some of the designated

10   testimony is inadmissible for various reasons, and that we'll

11   deal with on the 5th, and I think maybe it would be

12   appropriate -- and tell me if you agree or disagree -- that on

13   the 5th, if you have any other objections to the notice element

14   in the rules, raise them then and then we'll decide whether we

15   want to pursue this now or hold it for trial.

16             MR. PAGLIUCA:  That makes perfect sense to me, your

17   Honor.

18             THE COURT:  How does that sound to the plaintiffs?

19             MR. CASSELL:  I think that's satisfactory, your Honor.

20   I would just point out that the notice is not due until 15 days

21   before trial.

22             THE COURT:  No.  I understand that.

23             MR. CASSELL:  But we are planning to supplement this

24   notice, particularly in light of, we continue to hear

25   objections today that this isn't sufficient, so I'm planning to

H3u1giua

1    provide a supplemental notice.

2             THE COURT:  Well, when will your notice be complete?

3    And of course you're entitled to say not until 15 days before

4    trial.

5             MR. CASSELL:  I'm the one who will be preparing the

6    notice.  I'm out of town until I get back in my office next

7    Tuesday, and so I can have it ready for you by Wednesday night,

8    of next week.

9             THE COURT:  But you heard what I said, that --

10            MR. CASSELL:  Right.

11            THE COURT:  -- that's it?

12            MR. CASSELL:  We would then have what we think is a

13   sufficient notice by next Wednesday night.

14            THE COURT:  No, no, no.  But that's not quite what I'm

15   saying.

16            MR. CASSELL:  I'm sorry.

17            THE COURT:  What I'm saying is, do you want to use the

18   entire period that is available to you --

19            MR. CASSELL:  No.

20            THE COURT:  All right.  Well, then you tell us.  What

21   date will you make your final --

22            MR. CASSELL:  Next Wednesday night.  Because I think

23   we're here next Wednesday, and Thursday it could be argued.

24            THE COURT:  All right.  So then obviously we won't be

25   able to deal with this question of the notice until the

H3u1giua

1    following week.

2                MR. CASSELL:  Are we here next Wednesday and Thursday

3    or --

4                THE COURT:  I don't know.  Oh, yes.  Well, but you're

5    also going to be here on the 10th.

6                MR. PAGLIUCA:  We're here next Wednesday, not next

7    Thursday.

8                MR. CASSELL:  Oh, I'm sorry.

9                THE COURT:  I don't know.  Wednesday, Thursday?

10               MR. PAGLIUCA:  We're here next Wednesday, not next

11   Thursday.  And just to this point, I'd rather not get a notice

12   either Tuesday night or Wednesday --

13               THE COURT:  Oh, no.  Of course.  I understand that.

14               MR. PAGLIUCA:  Thank you.

15               THE COURT:  Oh, yes.  Okay.  So next Wednesday is the

16   drop dead date for the notice under 415.  And we will consider

17   it, and defense will let us know if they have any objections to

18   the notice *qua* notice.

19               MR. CASSELL:  Right.

20               THE COURT:  And then at that point we'll determine

21   whether we want to hear it in advance of trial or save it for

22   the trial.  Okay?

23               MR. CASSELL:  The only thing that we would request is,

24   if the defense says, your notice is defective on point A or B,

25   since we don't have to finally file it until 15 days before, we

H3u1giua

 1    would then request leave to have a chance to fix it.  We want

 2    to --

 3              THE COURT:  Well, that's just exactly what I was

 4    trying to avoid.  So look, okay, you want to take your full

 5    time, go ahead, take it.  Obviously we will not be able to deal

 6    with this until 15 days before the trial.  Which is okay.

 7              MR. CASSELL:  All right.  Thank you, your Honor.

 8              THE COURT:  Okay.  All right.  So where are we now?

 9    What's the plaintiff's plan?

10              MS. McCAWLEY:  I think you said the next motion that

11    you wanted to hear was defendant's motion prohibiting

12    questioning regarding defendant's sexual activities, which

13    is --

14              THE COURT:  675?  No.

15              MS. McCAWLEY:  -- 665.

16              MS. MENNINGER:  I have 675, as your Honor had

17    indicated.

18              THE COURT:  Yes.

19              Forgive me.  Maybe you all know where we are on the

20    415 problem, timingwise, but I don't.

21              MS. MENNINGER:  I don't.

22              MS. McCAWLEY:  You mean what you were just discussing,

23    your Honor, for our notice?  We'll provide the notice within 15

24    days prior to trial.  Is that what you're asking?

25              THE COURT:  Okay.

H3u1giua

                    MS. McCAWLEY:  That's how we'll do that.

                    THE COURT:  So you won't do anything before then.

Okay.

                    MS. McCAWLEY:  So I'm sorry.  I confused you.  I

thought you were asking about -- when you gave the list at the

beginning of the hearing, I think what you said, one of the

ones you wanted to hear was DE 665, which is defendant's motion

*in limine* to prohibit questions regarding defendant's adult

sexual activities.

                    THE COURT:  The only ones --

                    MS. McCAWLEY:  That's fully briefed.

                    THE COURT:  Yes.  Okay.  It's Maxwell's motion.

                    MS. McCAWLEY:  Yes, your Honor.

                    MS. MENNINGER:  Are you talking about 665 or 675?

                    THE COURT:  I think 675?

                    MS. McCAWLEY:  Or -- oh, do I have the number wrong?

I'm sorry.

                    MR. EDWARDS:  665 is --

                    MS. MENNINGER:  I have 675, which is our motion *in*

*limine* to permit questioning regarding plaintiff's sexual

history and reputation.

                    THE COURT:  Yes.

                    MS. McCAWLEY:  Oh.  But you also have a motion *in*

*limine* to prohibit questions regarding defendant's adult sexual

activity.  That's 665.  That's defendant's motion *in limine*.

H3u1giua

 1          THE COURT:  Well, you want to do that?  It's the same

 2     problem.  Well, no, it isn't.  No, it isn't.

 3          Okay.  So let's do 675.

 4          MS. MENNINGER:  Your Honor, I will say that it is my

 5     reading of Rule 412 that any hearing that is based upon in part

 6     Rule 412 is supposed to be conducted in a *in camera* setting.

 7          MS. SCHULTZ:  Counsel for Ms. Giuffre has no objection

 8     to that.

 9          MS. MENNINGER:  It's our position that the materials

10     are not barred by 412, but I am trying to be cautious here,

11     your Honor.

12          THE COURT:  Well, let me ask you a dumb question.

13     This is not a sex offense case.

14          MS. MENNINGER:  Your Honor, in fact, the notes, the

15     committee notes in regard to Rule 412 specifically exclude

16     defamation actions involving statements concerning sexual

17     misconduct, which is pretty directly on point, I think.

18          THE COURT:  Oh, yes.  Okay.  All right.  Okay.  Is

19     there anybody in the courtroom that is not part of the

20     litigation team?  Okay.

21          MS. MENNINGER:  Your Honor, there is counsel for a

22     witness who happens to be present who is covered by the

23     protective order, but I believe there are other people who are

24     not related to the trial team.

25          UNIDENTIFIED SPEAKER:  I am not part of the

H3u1giua

| | |
|---|---|
| 1 | litigation, but I wanted to read something.  Our attorney said |
| 2 | to read something in the courtroom. |
| 3 | (Reporter interrupted for clarification) |
| 4 | THE COURT:  Will the lawyers get this sorted out. |
| 5 | MR. CASSELL:  It's a -- |
| 6 | MR. EDWARDS:  I think it's the press objecting to the |
| 7 | court proceedings.  She wants to put something on the record |
| 8 | for the press.  That's what I understand. |
| 9 | UNIDENTIFIED SPEAKER:  Yes.  Exactly. |
| 10 | THE COURT:  Thanks very much but no thanks.  The |
| 11 | courtroom will be closed. |
| 12 | (Unidentified member of the press excused from the |
| 13 | courtroom) |
| 14 | MS. McCAWLEY:  He's with our firm over there. |
| 15 | MS. MENNINGER:  Your Honor, I hope I'm being clear, |
| 16 | but I'm going to say it one more time.  I do not believe that |
| 17 | Rule 412 bars the evidence that we seek to admit by virtue of |
| 18 | this motion.  However, we filed this motion in an abundance of |
| 19 | caution.  I was directing your Honor to the advisory committee |
| 20 | notes that actually say that 412 does not bar this kind of |
| 21 | evidence in a defamation action involving statements concerning |
| 22 | sexual misconduct, which this case clearly is. |
| 23 | Your Honor, there are four categories of evidence that |
| 24 | we would like to introduce and we believe are not precluded by |
| 25 | Rule 412 or any of the other rules of evidence, and so that's |

H3u1giua

1   what the point of my motion is.  The first one relates to

2   plaintiff's allegations that prior to ever meeting Mr. Epstein

3   or Ms. Maxwell, she was the victim of sex trafficking by an

4   individual named Ronald Eppinger.  Mr. Eppinger apparently was

5   indicted in Florida for some sex crimes, and plaintiff's

6   counsel took Mr. Eppinger's sex crimes information, his

7   indictment, his arrest, neither of which mentioned plaintiff,

8   by the way, but they took those materials and gave them to

9   their psychiatric expert, Dr. Kliman, who made the video we

10  talked about earlier.  Dr. Kliman also administered a number of

11  tests to plaintiffs to figure out whether she had any

12  preexisting mental health conditions, in particular

13  posttraumatic stress disorder.  In response to plaintiff's

14  claims that she had posttraumatic stress disorder, she

15  described a period of time when she says she was victimized by

16  Mr. Eppinger, and she attributed her PTSD to that time period.

17  Then, in Dr. Kliman's report, he describes both Mr. Eppinger's

18  criminal charges and also -- and this is very important, your

19  Honor -- plaintiff claims that when she first met Mr. Epstein

20  and Ms. Maxwell, she told them about Ron Eppinger, that she

21  said she had previously been the victim of sex crimes by this

22  Ron Eppinger, and she said she told them that so they knew that

23  she was a vulnerable victim.  And she attributes that

24  conversation to the very first time she met Ms. Maxwell and

25  Mr. Epstein.  She not only has put that into her book

H3u1giua

manuscript but she told that to her psychiatrist, who was the

expert endorsed by her in this case.  So Dr. Kliman, at his

deposition, was asked about any preexisting conditions that

Ms. Giuffre has, and he found that she already had PTSD from

this Eppinger event prior to ever meeting Mr. Epstein or

Ms. Maxwell.  And he also said that she needs treatment for the

fact that she had already been trafficked; she needs

psychiatric treatment going forward for that prior event, even

without any alleged defamatory statement.  In other words, he

said that even if this statement had never been made, he would

also have recommended that she continue to have treatment going

forward.  And then, as you know, from reading all of the 702

motions, he has said she needed a certain dollar value of

treatment going forward.

        So for us, now she's got a claim for PTSD from the

alleged defamatory statement, or at least she's claiming her

prior PTSD was exacerbated by the defamatory statement.

There's no way to talk about her preexisting condition without

talking about the fact that she says she was sexually

trafficked before meeting Epstein and Maxwell, and also she

says she told them about it in their first meeting.  There's

simply no way to cross-examine her about either her condition

or her story as it relates to Epstein and Maxwell without

getting into this alleged prior sex trafficking.  Plaintiff in

their response said they want to keep it out.

H3u1giua

1          It also was a part of her story in those Sharon

2     Churcher articles, your Honor now has in a book in front of

3     you, that we talked about a little bit earlier, so it is

4     plaintiff who publicized to the entire world the fact that she

5     says she was sexually trafficked prior to Epstein and Maxwell.

6     She put that into her Sharon Churcher story.  She got paid for

7     that story.  And so one of the issues in our case are her

8     damages to her reputation.  And if she's the one who was

9     affirmatively selling that story to the press, publicizing it

10    to the world, it is impossible for us to cross-examine her with

11    regard to what her reputation was like in advance of any

12    supposed statement that she claims is defamatory.  So in other

13    words, Rule 412 excludes -- even if your Honor were to find

14    that it applies for some reason, it explicitly excludes

15    evidence offered to show the defamatory statement did not

16    damage her reputation, if the victim puts her reputation in

17    issue.  That's in the plain language of the rule.

18          The second category of evidence we seek to introduce

19    at trial, your Honor, relates to testimony by her fiancé

20    Michael Ostrich and her boyfriend Tony Figueroa.  The facts on

21    this, your Honor, are that Ms. Giuffre met Mr. Ostrich, he was

22    the brother of someone she was in rehab with, she was in drug

23    rehab from the ages of 14 to 15, and she made a friend there

24    and it turned out to be Mr. Ostrich's sister, so when she got

25    out of drug rehab in 1999, she moved in with Mr. Ostrich's

H3u1giua

family, met him and became engaged to him.  While she was

engaged to him, she and he -- and he described at the

deposition, he got down on one knee and proposed to her and

gave her a ring.  They then moved back in with plaintiff's

parents for a while.  And again, your Honor, this all predates

when she says that she met Ms. Maxwell or Mr. Epstein.  She

moved back in with her parents with her fiancé.  Both of her

parents talked about her having this fiancé and living in the

trailer outside of their home.  And then ultimately she -- I'm

sorry.  There was a period of time she and this fiancé lived

apart in another city, in an apartment, and then later they

moved back in with plaintiff's parents, and then they got their

own apartment near her parents' house, and she says that when

she was living in this apartment is when she met Mr. Epstein

and Ms. Maxwell.

        Your Honor, we seek -- I did not ask Mr. Ostrich

questions about any particular sexual acts.  I asked him

questions about her being engaged to him and living with him

during the period of time she claims she was a sex slave of

Mr. Epstein.  So Mr. Ostrich has relevant testimony regarding

the time period, his observations, his conversations with her,

and the fact that he was her fiancé at that period of time.  I

don't think any of that implicates Rule 412, the fact that she

was engaged to and living with her boyfriend, but plaintiffs

have taken a different view in their response, somehow claiming

H3u1giua

 1    that a 16 year old can't legally be engaged and therefore it's

 2    somehow a commentary on her sex life.  I don't get it.  She's

 3    engaged, she's living with a guy, and she's presenting herself

 4    to her parents and the world as being engaged to him.

 5            Secondly, your Honor, she held herself out to

 6    Ms. Maxwell as being engaged to this individual, by her own

 7    account.  So she told Ms. Maxwell she was engaged.  One of the

 8    issues in this case is the age at which she met Ms. Maxwell,

 9    etc., but certainly if you're talking about an individual's

10    state of mind, if they are presented as an engaged person

11    when's living alone with their fiancé, it certainly suggests

12    that they are 18 or older.  Because it does not relate to any

13    evidence of her sexual behavior or predisposition, I don't

14    think Rule 412 covers it either.

15            Finally, your Honor, there are two instances -- and

16    your Honor has heard about these obliquely during the course of

17    litigation in this case -- where plaintiff made prior false

18    allegations of sex assault, when she was 14 years old.  And in

19    those same committee notes, your Honor, that I just referred

20    you to under Rule 412, is the following statement:  "Evidence

21    offered to prove allegedly false prior claims by the victim is

22    not barred by Rule 412."  So right there in the committee

23    notes, which the Supreme Court has directed are to be given

24    weight, controlling weight, and authority, prior false claims

25    are not covered by the rule.

H3u1giua

1          There were two instances, your Honor.  One was in

2     1998, when plaintiff was a runaway from home, using drugs and

3     alcohol, and while she was living with Tony Figueroa, she went

4     out partying with two boys, and later, after she was in rehab,

5     weeks later, after she was in rehab -- not voluntarily, by the

6     way, her mother took her against her will and put her in

7     rehab -- she made an allegation that that incident involved

8     nonconsensual sexual contact.  That was made in about February

9     of 1998.  There was a ten-month investigation.  The boys were

10    interviewed.  And ultimately the DA in that case found that

11    Ms. Giuffre lacked credibility and they had a low likelihood of

12    success at trial and they decided to drop the charges against

13    the boys.  And that came after they had interviewed her a

14    number of times.

15         The second incident, your Honor, is a police report

16    from November of 1997.  Again, plaintiff was drinking with her

17    friends, skipped school, according to her mother, she dropped

18    her off, and she went drinking and hanging out with her

19    boyfriend, who was a few years older.  I think he was 17 or 18.

20    And she was found by the police, after some complaints by

21    neighbors, drunk in the backyard of a home.  And she was on the

22    ground in a simulated sex act with her boyfriend, the person

23    she described as her boyfriend, and later said that she had a

24    consensual sexual relationship with.  When she was found, she

25    was extremely intoxicated.  And she made two statements that

H3u1giua

are noteworthy on this topic.  When the police came, she said
to one of them, "If you don't tell my parents, I will," and she
used an expletive, basically saying, I'll engage in sexual
contact with you, Mr. Police Officer.  That was one statement
made in the police reports.  Later, when she was in the
ambulance, going to the hospital for her intoxication, she made
an allegation that she had been subjected to nonconsensual
penetration by her friends, or one of the boys there.  It's a
little unclear.  And your Honor, she later was interviewed by
the police and recanted that allegation.  She said that she had
not been subjected to any nonconsensual penetration.

        Your Honor, I understand that these are not pleasant
topics, but these are two instances in which plaintiff, prior
to ever meeting Ms. Maxwell or Mr. Epstein, made very serious
allegations about individuals and either, in the first case,
the DA found she lacked credibility or, in the second case, she
changed her mind and said it didn't happen, what she had
earlier said did happen.  Your Honor, she did not disclose any
of these to her psychiatrist, who, as I just mentioned, had
found that she had preexisting PTSD, and so it is also
important to note that in the findings he has made about
possible sources of PTSD, it did not include this information.
However, I believe that Rule 412 specifically allows for
evidence of false prior claims by the victim and so I believe
that's what we have here.

H3u1giua

```
1              It also is important for a jury to understand, because
2    they might not, that someone who is 14 years old or 15 years
3    old can lie about these things.  Not only did she lie about
4    this.  Her boyfriend, for example, Mr. Ostrich -- or excuse
5    me -- her fiancé, Mr. Ostrich, said that she had been lying to
6    him at that time.  She had been lying about where she was.  She
7    told him she was working, and she wasn't; she was with Tony
8    Figueroa.  Tony Figueroa later became her boyfriend.  She broke
9    up with Mr. Ostrich and Tony Figueroa moved into her apartment.
10   So Tony Figueroa is someone plaintiff had a consensual sexual
11   relationship with during the same time she claims that she was
12   sexually trafficked.  And so these people are percipient
13   witnesses to what plaintiff did or didn't say or places she did
14   or didn't go, but they are also people to whom plaintiff held
15   herself out, in Mr. Ostrich's case, as her fiancé; in Tony
16   Figueroa's case, as her boyfriend.  We would ask that the
17   evidence related to the Eppinger materials, Ostrich, Figueroa,
18   and these two police incidents, be admitted at trial.
19             THE COURT:  As to Ostrich, did I understand correctly
20   that what you want to present there is statements by the
21   plaintiff during the period that this relationship, while she
22   was, according to her, in the employ of Epstein?
23             MS. MENNINGER:  Exactly.  He is someone who she was
24   living with and engaged to at the time she says she met Maxwell
25   and Epstein and she didn't tell him about being a sex slave, I
```

H3u1giua

1    think is the fairest way to characterize the evidence.

2                  THE COURT:  Yes.  Okay.

3                  MS. SCHULTZ:  Your Honor, this is a classic Rule 412

4    situation here.  Defendant is doing an old routine trying to

5    blame the victim by introducing evidence of other sexual

6    conduct.  These tactics are expressly forbidden by Rule 412's

7    rape shield law.

8                  Let's take a moment to talk about the committee notes

9    there.  Defendant did not issue a statement alleging sexual

10   misconduct here.  She was denying Ms. Giuffre's allegations of

11   being abused by her, so this is not a situation where someone

12   says, "that woman is a prostitute," and then to prove the truth

13   of that statement, you have to introduce evidence of her being

14   paid for sex.  That's not what's going on here.  And none of

15   these things that counsel for defendant seeks to introduce

16   makes it more or less probable that defendant was telling the

17   truth when she issued her defamatory statement, which is the

18   claim at issue here.

19                 The first thing I would like to address specifically

20   is the Eppinger experience.  Plaintiff is not relying on that,

21   nor relying on Kliman's evaluation of that, to claim damages.

22   She's not relying upon that at trial and not presenting that

23   that at trial.  The only claim for damages in this case relates

24   to defamation in 2015 perpetrated by defendant.  Any marginal,

25   peripheral value, probative value here is highly outweighed by

H3u1giua

the prejudicial effect because it makes her look like a person

of ill repute.  Frankly, they're trying to paint her as a

promiscuous person.  So we're not presenting anything on that

at trial.

THE COURT:  Well, you're presenting Kliman.

MS. SCHULTZ:  We're presenting Kliman but not his

opinion with regard to Eppinger.  And we're not claiming

damages on that.

THE COURT:  But it's in the report.

MS. SCHULTZ:  He did a full psychiatric report of

Ms. Giuffre.  She's not claiming damages for every single

psychiatric event that happened in her life.  She's claiming

damages for one.

THE COURT:  Counsel said, and it was my recollection

as well, that she did indicate that she had previous PTSD.

MS. SCHULTZ:  Right.  For which we're not claiming

damages.  Plaintiff could have all kinds of problems, but

that's not what the case is about.

THE COURT:  Hold on just a second.  You're telling me

you're not claiming PTSD?

MS. SCHULTZ:  Not where Eppinger is the source of

that.  We're claiming damages only related to defendant's

defamation.

THE COURT:  Yes, yes, but you understand their

position -- okay.  That's one thing, defamation.  Yes.  But

H3u1giua

1    there's another cause for this.

2              MS. SCHULTZ:  I think you have to keep in mind that

3    this is defamation --

4              THE COURT:  No.

5              MS. SCHULTZ:  Sorry.

6              THE COURT:  The value as against the prejudice, that's

7    a different argument.  I understand that.

8              MS. SCHULTZ:  And also, your Honor, the PTSD that

9    arose out of the Eppinger event was something 17 years ago.

10   The psychological damage from defamation is something that

11   arose two years ago.  That goes to the weight of the evidence

12   as well.

13             THE COURT:  Well, yes.  All right.

14             MS. SCHULTZ:  With regard to the Churcher articles --

15             THE COURT:  The point about Eppinger -- it's probably

16   in the papers -- what age?

17             MS. MENNINGER:  She said 1999, your Honor, which is

18   also when she said she met Mr. Epstein and Ms. Maxwell.  1999.

19             THE COURT:  What?

20             MS. SCHULTZ:  She was 15 years old in the police

21   report.  It says she was later identified as Virginia Roberts

22   and she was in fact 15 years old.

23             THE COURT:  Okay.

24             MS. SCHULTZ:  So we're also dealing with a child,

25   which is obviously something that would be very prejudicial.

H3u1giua

1              With regard to the argument that you heard from

2    defendant's counsel regarding Churcher articles, where this is

3    mentioned, again, the prejudicial effects of admitting this far

4    outweigh any probative value.  These are peripheral issues.  I

5    wouldn't even categorize them as that.  These are so far afield

6    of the case that's being tried that they're not relevant.

7    They're being introduced to make her look like a bad kid.

8              Also, with regard to her romantic relationships as a

9    young teenager with Mr. Figueroa and Mr. Ostrich, you know, of

10   course Ms. Giuffre would not object to evidence showing her

11   whereabouts, but defendant wrote an entire brief and just

12   presented about her cheating on one of them with the other.

13   That testimony about cheating comes squarely under 412, and any

14   probative value is far outweighed by the prejudicial effect.

15   Again, this is a 2015 defamation claim related to sexual abuse

16   by defendant.  The shifting affections of a teenager with her

17   boyfriend and another boyfriend is peripheral at best.  It's of

18   no probative value here.  It does not prove the truth or

19   falsity of defendant's statement.

20             With regard to the police report, first of all, there

21   is no exception to the hearsay rule that would allow those to

22   be admitted into evidence at this trial.  So already I think

23   that's a nonstarter right off the bat.  But most importantly is

24   that these are not false allegations of rape.  The police

25   reports of course speak for themselves.  And if your Honor were

H3u1giua

1    to allow questioning about this at trial, Ms. Giuffre could

2    prove that she was raped here at 14.  You heard defendant's

3    counsel say that she was intoxicated to the point where she

4    needed treatment.  The police report goes a little bit further.

5    It says she could not walk.  A person that intoxicated cannot

6    give consent to sex under Florida law or, frankly, any law that

7    I know of, any state law.  Excuse me.  There are also signs of,

8    you know -- she's also 14 years old, so we have statutory rape

9    implications there.  There's evidence in the police report of

10   forcible rape, including internal blood and external abrasions

11   and physical injuries around areas of penetration.  So here you

12   have a person lacking the capacity to consent because of

13   extreme intoxication and age and signs of forcible rape, and

14   Ms. Giuffre can -- I think the document speaks for herself that

15   she could prove at trial that this is a true statement that she

16   gave that she did not have sex according to her own volition

17   there.

18          And that would take the trial down a very different

19   road.  It would waste time, proving that this is true, and it

20   would be confusing to the jury, because the perpetrator is

21   not -- police reports are not part of this case.

22          The same thing with the second one.  You heard

23   defendant say that a DA, a district attorney, found that she

24   was not credible.  That's not what the police report says.

25   That is a conjecture by defendant's counsel.  She has no idea

H3u1giua

who made that determination, when, based on what evidence or anything like that.

That circles back to the hearsay problems that are inherent in these two police reports.  There are no exceptions under which they come in.  Defendant's brief is silent on that.

Another thing that defendant's briefs are silent on is the fact that there are no other cases, in all these pages of briefing, where a court has allowed this type of evidence to come in.  This is a classic Rule 412 case, trying to dirty up the victim of sexual assault, and it's prohibited by law.  And defendant's counsel said, oh, this isn't about sexual assault. I heard you question that as well.  But the underlying claim here is that defendant defamed Ms. Giuffre when she called her a liar about speaking out about her sexual abuse.  So sexual abuse and sexual misconduct is central to this case.  I don't think you can take that away.

So I think that the Rule 412 absolutely applies in this case, but even if it doesn't, this is a tangent, to say the least, and should be precluded under both Rule 401 and Rule 403 because it's nothing more than just trying to make her look like a bad child in front of the jury and to distract from the issues that actually go to the claim of this case.

MS. MENNINGER:  Plaintiff brought a lawsuit based on defamation, based on a statement that her claims about being a sexual abuse victim were not true.  She took Eppinger materials

H3u1giua

1    and gave them to her expert Dr. Kliman, and Dr. Kliman included

2    them in his report.  She also included her story about Ron

3    Eppinger in stories that she sold to the media.  So your Honor,

4    reflect for one minute.  Do you remember an hour ago when

5    plaintiff's counsel handed you a book that had the Sharon

6    Churcher articles in and they argued to you, hey, that Jane Doe

7    102 is mentioned in that Sharon Churcher article and therefore,

8    Ms. Maxwell's denial about that statement somehow related to

9    the Jane Doe 102?  Do you remember that argument?  That's the

10   same article that has Ron Eppinger in it.  So what plaintiff

11   would like to do, I guess, is, when we start talking about the

12   Sharon Churcher article, they're just going to scratch out the

13   part where plaintiff herself told the story about Ron Eppinger

14   and Ms. Maxwell denied it in a pleading and then they gave that

15   same information to their expert and we'll just ignore that

16   part of his report that relied on it.  I don't understand this

17   kind of litigation, your Honor.  If you're going to bring a

18   lawsuit, put your reputation at issue -- and by the way, all of

19   this stuff that's available on the internet goes to her

20   reputation, and whether her reputation was damaged by any

21   statement from Ms. Maxwell.  You're going to put all that story

22   on the internet, you're going to give it to your expert, and

23   then you don't want us to be able to cross-examine about it and

24   say well, wait a second, you already had PTSD, didn't you, and

25   you're the one who said you already had PTSD when you talked to

H3u1giua

 1   your expert in a video clip?  You know, that's been put in with

 2   his commentary.

 3        Your Honor, secondly, saying that the Churcher

 4   articles are prejudicial, in a defamation case -- and she's the

 5   one that incited that entire media spectacle on herself by

 6   getting paid to give those stories -- just belies common sense

 7   and the rules of evidence.

 8        Your Honor, the police reports -- I think I just heard

 9   Ms. Schultz say that I was inaccurately reciting what they

10   said, so I will just read from the document itself, a certified

11   copy, according to the sheriff of Palm Beach.  It says, "I

12   received a letter from assistant state attorney Teresa Bowman

13   concerning the filing disposition on this case.  Bowman's

14   letter said that this case is no-filed due to the victim's lack

15   of credibility and no substantial likelihood of success at

16   trial."  So I don't believe I have misconstrued the state

17   attorney's letter.  I'm reading from the document that is a

18   certified copy.

19        I believe there was mention of hearsay rules, your

20   Honor.  Admissions by a party are not hearsay under the rules,

21   your Honor, so all of Ms. Giuffre's statements in these police

22   reports are admissions by a party.  They are not, your Honor,

23   hearsay by definition.

24        Another important point, your Honor, and it goes to

25   plaintiff's reputation, the 1998 event I just talked about,

H3u1giua

 1    that was also in a news article published in February of 2015.

 2    The information was apparently obtained by a news reporter and

 3    published on the internet.  And the title of the article I

 4    think was, "Friends describe a sex kitten," and it goes into

 5    the fact that Ms. Giuffre was found not credible by the state's

 6    attorney's office.  So again, your Honor, when plaintiff

 7    chooses to sell her story to the internet and then she

 8    publicizes her story and she gives it to her expert and she

 9    talks about her boyfriends and her fiancé and she talks about

10    her sexual history and she's asking a jury to decide whether

11    her reputation has been damaged, the jury has every right to

12    hear everything else that was on the internet, including Ron

13    Eppinger and sex kitten and police reports at which she was

14    found to lack credibility.

15            The import of all of these rules, including 405(b),

16    are that when someone puts their reputation at issue and

17    they're asking for damages to their reputation, a lot more

18    things come into evidence than otherwise might be the case.

19    This is exactly that kind of case, your Honor.  This is a case

20    that turns on plaintiff's claim that she was a victim of sex

21    abuse by my client, Ms. Maxwell, and here we have evidence: (1)

22    that challenges her damages calculation by Dr. Kliman; (2) that

23    challenges her reputation on the internet and whether there was

24    any reputation that could be harmed by a statement by

25    Ms. Maxwell; and (3) we're talking about whether or not she had

H3u1giua

1    preexisting conditions.  Those are the at-issue points that

2    plaintiff chose when she brought this particular lawsuit, your

3    Honor, and the evidence challenging those assumptions are what

4    we are seeking to introduce.

5         THE COURT:  Thank you.  I look forward to seeing you

6    tomorrow morning.

7         ALL COUNSEL:  Thank you, your Honor.

8         (Adjourned)

9         MR. INDYKE:  Your Honor?  Your Honor, may I please

10   approach.  My name is Darren Indyke.  I'm an attorney admitted

11   in New York and the general business attorney for Mr. Epstein.

12   I'm sorry I'm late and I'm sorry I came after you had gone

13   through that beginning decision about the issue, but I only

14   found out this morning -- and ran here from New Jersey -- that

15   this case was going to be heard today.  The lawyers had filed

16   the motion to quash, Martin Weinberg and Jack Goldberger.  Jack

17   Goldberger is a Florida lawyer.  He's in Palm Beach right now.

18   Martin is in Boston.  Martin, I think he sent an email to

19   chambers.  And what he told me before I came here -- and turned

20   off my cellphone so I haven't had further discussions with

21   him -- was that he had a medical appointment tomorrow but if he

22   absolutely had to, he could find a way to cancel it, but he was

23   not really comfortable with doing a hearing without having any

24   kind of prior notice of it and would prefer if we could do it

25   at the first opportunity in April.

H3u1giua

|  |  |
|---|---|
| 1 | THE COURT:  Do I understand you represent Epstein? |
| 2 | MR. INDYKE:  As a general basis.  I'm not a litigator. |
| 3 | I don't really do this sort of thing.  And I apologize if I'm |
| 4 | stumbling.  I just don't do this -- |
| 5 | THE COURT:  It just shows that you're a very smart |
| 6 | lawyer not to be a litigator. |
| 7 | MR. INDYKE:  Thank you. |
| 8 | THE COURT:  On Epstein's behalf, you're asking that |
| 9 | the motion to quash be adjourned a week, is that correct? |
| 10 | MR. INDYKE:  Yes, your Honor. |
| 11 | THE COURT:  Well, what do you all say? |
| 12 | MR. PAGLIUCA:  We don't object, your Honor. |
| 13 | MR. EDWARDS:  Sure, no objection, your Honor. |
| 14 | THE COURT:  The 5th. |
| 15 | MR. INDYKE:  Thank you, your Honor. |
| 16 | MR. EDWARDS:  Your Honor, I'm sorry.  Do you have ten |
| 17 | seconds for me to answer a question that you asked me earlier |
| 18 | and I wasn't able to answer?  It only relates to whether or not |
| 19 | I'm making a leap that Ghislaine Maxwell knew of the sex |
| 20 | offender registration and the plea agreement.  Both the fact |
| 21 | that Jeffrey Epstein was a registered sex offender and the plea |
| 22 | agreement, the fact that he pled and what he pled to and the |
| 23 | number of charges are in the Churcher articles in 2011 to which |
| 24 | she responded.  And that's all I wanted to add to that point, |
| 25 | that it was less of a leap.  Thank you, your Honor. (Adjourned) |