```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   VIRGINIA L. GIUFFRE,

 4                    Plaintiff,

 5            v.                              15 Civ. 7433 (RWS)

 6   GHISLAINE MAXWELL,

 7                    Defendant.              Oral Argument

 8   ------------------------------x
                                             New York, N.Y.
 9                                           March 31, 2017
                                             10:10 a.m.
10
     Before:
11
                          HON. ROBERT W. SWEET,
12
                                             District Judge
13
                              APPEARANCES
14
     BOIES, SCHILLER & FLEXNER LLP
15        Attorneys for Plaintiff
     BY:  SIGRID S. McCAWLEY, ESQ.
16        MEREDITH L. SCHULTZ, ESQ.

17   S.J. QUINNEY COLLEGE OF LAW AT THE UNIVERSITY OF UTAH
          For Plaintiff
18   BY:  PAUL G. CASSELL, ESQ.

19   HADDON, MORGAN AND FOREMAN, P.C.
          Attorneys for Defendant
20   BY:  JEFFREY S. PAGLIUCA, ESQ.
          LAURA A. MENNINGER, ESQ.
21

22

23

24

25
```

1          (Case called)

2          THE COURT:  Like all of you, you woke up in the middle

3   of the night thinking about this case.  I would like to see if

4   I can clarify my understanding.

5          In the motion to dismiss, I concluded, I think, that

6   what was at issue was the truth or falsity of the plaintiff's

7   allegations concerning sexual abuse and the activities of the

8   defendant.  I think that's my sense of my own opinion.

9          Yesterday, we were discussing the redactions of the

10  intervention motion.  I got the sense, perhaps wrongly, that

11  the plaintiff's position was that the defamation was the truth

12  or falsity of the statements relating to the defendant.

13  Period.  Am I correct?

14          MS. McCAWLEY:  You are, your Honor, in that the

15  statements about the defendant -- to be clear, because one of

16  the allegations is, of course, she was a madam and a

17  coconspirator with Epstein -- do involve Epstein.

18          THE COURT:  Listen.  Leave the pejorative out.  Okay?

19  Please.

20          MS. McCAWLEY:  Sure.

21          THE COURT:  Simply because I'm trying to come to

22  grips, obviously, with the scope of this case, which is a real

23  issue, obviously.  So is it you are restricting your claim to

24  the truth and falsity of the statements about Maxwell?

25          MS. McCAWLEY:  Yes, that is the case, your Honor.  The

1   statements about Maxwell and her activities, without using any

2   description of what that is, but yes, as we've described in our

3   pleadings.

4          THE COURT:  And whether or not the plaintiff was

5   subject to sexual abuse as a minor is not part of it.  I mean,

6   yes, of course, whatever she was when whatever, but that issue

7   we don't have to deal with.

8          MS. McCAWLEY:  I'm sorry, your Honor.  I think I lost

9   you there.  I apologize.

10          So the allegations in the complaint are that when our

11   client came forward and said she was abused by the defendant

12   and Epstein, the defendant came out and said she was lying

13   about that abuse, and some of that abuse did occur when she was

14   a minor.

15          THE COURT:  Yes.  Well, okay.  But there are other

16   things that she sets forth in the Churcher articles, in the

17   motion to intervene, there are a whole series of other things

18   that are -- I mean, there are things that have been said, and

19   my reading of the defendant's statement is, I read it to say

20   all those things are false.  But those are not at issue, as far

21   as you're concerned.

22          MS. McCAWLEY:  Yes, your Honor.  In fact, the omnibus

23   motion we filed today -- and I think, if I'm following you

24   correctly, this may help -- we were trying to streamline the

25   case because there's other individuals, obviously, that my

```
 1    client made statements about.  So we were trying to streamline
 2    the case to the statements about Maxwell and her involvement
 3    with Epstein.
 4            So in the omnibus motion you'll see, for example, that
 5    they have claimed she's made statements about other
 6    individuals, and we say that that's not what's at issue, what's
 7    at issue are the statements --
 8            THE COURT:  That may be an issue of credibility.  That
 9    may be an issue of credibility.  I'm talking about what we're
10    going to go to the jury on.
11            MS. McCAWLEY:  Yes.  And that is the statements that
12    Maxwell made about my client.
13            THE COURT:  And that's it.
14            MS. McCAWLEY:  Yes, your Honor.
15            THE COURT:  Let me ask the defense.  Does that clarify
16    anything for you?
17            MS. MENNINGER:  Could I have one second, your Honor?
18            THE COURT:  Sure.  Of course.
19            MS. MENNINGER:  Your Honor, I think it's slightly more
20    nuanced.  Plaintiff has claimed our client's statement is
21    false.  Our client's statement is not just limited to the
22    little snippets that they included in their complaint, it's the
23    entire statement.  That entire statement talks about Virginia
24    Giuffre's allegations against Ms. Maxwell have been proven
25    untrue.
```

1    THE COURT:  Yes.  But the statement wasn't limited to

2    those allegations.

3    MS. MENNINGER:  That's exactly right, your Honor,

4    because right in the middle of that particular statement, the

5    one that's at issue in this case, our client said, "Now her

6    story has grown and evolved, and she's included allegations

7    about world leaders and Alan Dershowitz, which he denies."  We

8    can't just take that part out of her statement, that's what

9    Ms. Maxwell put in her statement.

10   And your Honor, what we will ultimately be hearing

11   from Ms. Maxwell about what she believed were the obvious lies

12   that she was referring to and the allegations that she was

13   referring to when she issued that statement.

14   THE COURT:  Now, one other question, and then we'll

15   get to the business of the day.  I apologize for this

16   diversion.

17   Let me ask you both.  Suppose the plaintiff proves

18   that she was sexually abused and that her story is

19   substantially true but she does not prove the role that Maxwell

20   had.  Does she win?

21   MS. MENNINGER:  No, she loses, your Honor.

22   THE COURT:  I think she wins.

23   MS. MENNINGER:  Your Honor, the very first --

24   THE COURT:  Other than what you've just said.

25   MS. MENNINGER:  Your Honor, our client can only be

1    alleged to have defamed someone based on facts, not opinions.

2              THE COURT:  Agreed.  Agreed.

3              MS. MENNINGER:  And so she can -- the Davis v. Boeheim

4    case is a perfect example of that, your Honor.  She can only

5    speak to facts about which she has personal knowledge.  If

6    plaintiff goes and proves that plaintiff went and had sex with

7    Jeffrey Epstein at some point in time and our client wasn't

8    there, our client's statement about that would be opinion, it

9    would not be a fact based on personal knowledge.

10             THE COURT:  I mean, okay.  But that's an issue of

11   knowledge.  That's a different --

12             MS. MENNINGER:  You just said --

13             THE COURT:  That's a different --

14             MS. MENNINGER:  The hypothetical was if our client

15   wasn't involved.  If our client wasn't involved then it would

16   be an opinion.

17             THE COURT:  Thanks very much.  I'm glad for this

18   clarity, which frankly, at the moment, alludes me.

19             Okay, let's move on.  Yes, I'll hear from the movant.

20             MS. McCAWLEY:  Thank you, your Honor.

21             The first order of business we'd like to address, if

22   it's okay with the Court, is our filing, which was 691, which

23   is our omnibus motion in limine.  And if it's okay with the

24   Court, we've split that up a bit.  I'm going to start with

25   respect to that motion in limine.

1            What we attempted to do with our motion in limine was

2     streamline the trial.  And your Honor, based on the comments

3     you've just made, if you want to give me guidance, I'll tell

4     you what I'm thinking with respect to this and what we put

5     forth in our filing.

6            But there are statements that are attributed to my

7     client in other articles and things.  For example, there are

8     statements about Bill Clinton being on the island, and the

9     defense wants to bring in those statements to show that -- they

10    believe they can show evidence that he wasn't on the island, so

11    therefore, my client is a liar or is lying about that.

12           Now, your Honor will remember, back in June we sought

13    to depose him because we were concerned about that fact, that

14    they were going to raise it, and we wanted to have him under

15    oath --

16           THE COURT:  Let's back up a little bit.

17           MS. McCAWLEY:  Sure.

18           THE COURT:  What and where was the statement made?

19           MS. McCAWLEY:  The statement was made in a March 5th

20    article.  So not the two articles we showed you yesterday --

21           THE COURT:  The Churcher article.

22           MS. McCAWLEY:  Yes.  But it was another article that

23    came out in March of 2011.

24           And the statement was with respect to my client saying

25    she saw him on Epstein's island.  She was introduced to him

1   there.  Although no allegations of trafficking or anything of

2   that nature, just that she was there.  And they are seeking to

3   introduce evidence through Louie Freeh, who we'll discuss in a

4   moment, they've proposed, and he's clearly an expert that was

5   undisclosed, and through a FOIA record, and through the

6   articles to allege that he wasn't on the island.

7           And so in your Honor's order in 264-1, which is one of

8   the sealed orders, you did not allow us to depose him because

9   you said it was irrelevant.

10          So we're now in a position where at trial they want to

11  put forth that information against my client, and I don't have

12  an under-oath statement from that individual saying whether or

13  not he actually was.

14          Now, what we know is he flew with Jeffrey Epstein at

15  the same time 19 different times internationally and

16  nationally, but we don't have him with respect to this

17  particular allegation under oath.  So we would say it would be

18  highly prejudicial for them to be able introduce evidence

19  saying that he wasn't there or that they have some proof or

20  some expert saying he wasn't there when, in fact, we weren't

21  able to ask him directly, the person who is at issue, under

22  oath, whether or not he did, in fact, go there.

23          So one of the streamlining of this case is that

24  allegation has nothing to do with sexual abuse, it doesn't have

25  to do with the statements --

1          THE COURT:  It has to do with credibility.

2          MS. McCAWLEY:  Well, your Honor, I would say, if

3     you're inclined to think that that has --

4          THE COURT:  Well, look.  I'm no genius.  I don't claim

5     any -- but you know, that is precisely what the defense is

6     going to say.

7          MS. McCAWLEY:  Right.  I understand, your Honor.  And

8     that's why we sought to depose him because it's inherently

9     unfair --

10          THE COURT:  Okay.  So you would say I made a mistake.

11          MS. McCAWLEY:  No, your Honor.  I think it should be

12     excluded, and in my view, I think it's not relevant to the

13     issue at trial here.  But they are, of course, going to argue

14     that it is and that they want to bring that in.  In fact, like

15     I said, they've got lined up Mr. --

16          THE COURT:  Well, on the question of credibility, why

17     isn't it relevant?

18          MS. McCAWLEY:  Because the statement -- so this case

19     is about whether or not she was sexually abused and

20     trafficked --

21          THE COURT:  Now, that's where I started out.  Is it

22     about that?  If that is your position, that's something else.

23     If it's a question about her sexual abuse, in addition to, then

24     that's something else.  But you just said it isn't about that,

25     it's just about Maxwell and did she tell the truth about

1    Maxwell.

2          Well, I suppose, I suppose -- I haven't heard the

3    other side and I haven't really thought it all out -- but I

4    suppose if she is untruthful in other instances, that may be

5    relevant to her credibility.

6          MS. McCAWLEY:  Well, your Honor, if that's the Court's

7    position, again, we would be in a circumstance -- I mean,

8    there's a couple reasons why the evidence itself that they want

9    to put forth doesn't come in.

10          THE COURT:  Well, that's a different thing.

11          MS. McCAWLEY:  Sure.  That's part of our motion, as

12    well, your Honor.

13          THE COURT:  Sure.  I read that.  I understand that.

14          MS. McCAWLEY:  Right.  So on the same note, since

15    we're talking about this, I'll just tick off the few that fall

16    within this category, if you don't mind.  I understand, your

17    Honor's position, so --

18          THE COURT:  Well, I'm not sure what my position is

19    right now.

20          MS. McCAWLEY:  Okay.  So with respect to -- there's

21    another category where there's been statements where my client

22    said that she was trafficked to foreign presidents and world

23    leaders that they want to bring into evidence.  And in order to

24    streamline the case, we've said, well, there's none of those

25    people on the witness list, and just statements in an article

of that nature shouldn't be able to come in.  Because when we

talk about a character issue, what's at issue here is

reputation, and reputation to show the truthfulness of that

would not be able to be proven in that circumstance because we

don't have the other individuals there to make that statement,

so there's no substantive evidence on that point that would be

coming in.

          And the third category is with respect to

Mr. Dershowitz, who is on the defendant's witness list for

trial, and we have a few points there to raise.  I mean, one is

obviously that if that were allowed to come in, that causes the

trial to become a mini trial about whether or not he, for

example, was in the places where she says he was, his

calendars, his credit card receipts, his telephone records, all

of that.  It gets into the issue, you know, obviously we have

another witness who says that they were in a similar

circumstance with respect to him.  So it takes the trial away

from whether or not the allegations relating to Maxwell are

true or false and turns it into a trial about another

individual who we have not made a claim against who comes in.

          There's also a problem with respect to that because he

is also -- he has claimed attorney/client privilege as to his

conversations and his advice with respect to Epstein which

relates to the issues with Maxwell.  So in other words, he

would be able to testify what he says he didn't do, but then

1    any questions we wanted to ask him about Epstein or Maxwell he

2    says he's got an attorney/client privilege.  So we're hand-tied

3    because we can't ask about the issues that we need to ask about

4    with respect to that witness.  So in my view, it's highly

5    prejudicial to have him as a witness at trial when, again, our

6    claims are not against him, and we have those issues.

7            Now, you did have -- in your February 2nd order, you

8    also precluded us from asking questions that we contended were

9    non-Fifth Amendment questions of Jeffrey Epstein about

10   Dershowitz, holding that those were not relevant.  So we're in

11   a situation where we have another witness that we are not able

12   to elicit all of the information we need to be able to prove

13   the truth or falsity of that, and again, it would be subject to

14   a number of mini trials on that issue of Mr. Dershowitz.

15           So with respect to those three categories -- and it

16   also allows them to use the attorney/client privilege as a

17   sword and a shield in the midst of a trial, which is inherently

18   unfair to my client, as well.

19           So in our view, it's highly prejudicial under 403.

20   Those groupings should not come in.  It should not be about,

21   for example, Clinton and whether or not he was on an island, or

22   Mr. Dershowitz or these other world leaders, it should be about

23   the defendant and her statements that my client was lying when

24   she claimed to be abused and trafficked in those statements.

25           THE COURT:  Just a second.

1          MS. McCAWLEY:  Sure.

2          THE COURT:  What you just said, could you repeat what

3     you just said?

4          MS. McCAWLEY:  Yes.  So the statements that

5     Ms. Maxwell denied were statements that my client made that

6     defendant and Epstein trafficked her, brought her in, had her

7     participate in the sexual abuse of her and other females, she

8     was in that circumstance, she lived that circumstance for a

9     period of time, and so Maxwell came out and called my client a

10    liar, said she was lying about those statements that she made,

11    and said that, obviously, as you know, to the international

12    press about my client and what her experience was with them.

13         So with respect to that, your Honor, those are the

14    categories that we believe would help streamline the case, and

15    again, that those witnesses would be highly prejudicial.

16         On the issue of the information that they'd like to

17    put in with respect to Mr. Clinton, they have Louie Freeh who

18    they've identified.  This is a former FBI director.

19         THE COURT:  I know.

20         MS. McCAWLEY:  You know, yes.  So they've put him in

21    without giving us a Rule 26 expert report.  He was never

22    disclosed during the time period.  His report or what he's

23    going to say, as we understand it, is that he's reviewed the

24    FOIA response and that there's no evidence in his view that

25    Clinton was on this island, again, even though he flew

1    regularly with Mr. Epstein to other places.

2            So again, we didn't get to depose him as an expert in

3    this matter.  We didn't know that he was going to be called as

4    an expert.  They're saying he's a lay opinion because he's a

5    private investigator, your Honor.  The case law says otherwise.

6    He's been certified as an expert in these exact kind of cases.

7    We put those in our brief.  So your Honor, he is really a wolf

8    in sheep's clothing.  They're trying to put him on as a lay

9    opinion when he's really an expert witness in this case with

10   sufficient and sophisticated knowledge, that the jury will

11   recognize him as someone who has expertise in this area so,

12   your Honor, we believe he should be precluded from testifying.

13   He has no personal knowledge, it's simply his reliance, as we

14   understand it, on the one FOIA response letter.

15           So your Honor, with respect to the FOIA response

16   letter that's at issue that they are going to try to get into

17   evidence, we've put forth in our papers, again, that's a

18   hearsay document.  It's highly prejudicial under 403.  They say

19   that it meets self-authentication, but unlike the documents

20   that we showed, for example the 302 that have the seal on it,

21   it has none of those qualifications.

22           They cite to two cases, the Zamara case and the Gary

23   case.  Both of those involve getting into evidence underlying

24   records that were produced by the government, not a FOIA

25   letter.  So what they're trying to produce is a letter that

1    says we've looked and we can't find these records that you've

2    requested.

3        Now, it doesn't address the fact that the government

4    only typically retains records for a few years when they were

5    requesting records from 15 years ago, so it doesn't have the

6    indicia of trustworthiness to be able to say that this is

7    actually the fact because, of course, as we know, the

8    government regularly has to get rid of records.

9        So to use this letter to say, 'Ah-hah, he was never on

10   the island,' when we never got to examine him under oath and

11   say, 'You traveled with him a bunch.  Did you also go to the

12   island?  My client says she met you there.'  We didn't get to

13   ask those questions, so we're in a situation now where that

14   letter coming in would be highly prejudicial because the jury

15   will wonder, well, what does he have to say about this?  And we

16   haven't been in a position to be able to do that.

17       So your Honor, for all those reasons we believe that

18   Mr. Freeh should be excluded, the FOIA letter should not come

19   into evidence, and again, we believe that the issue of

20   Mr. Clinton should not be an issue relevant to this trial.

21       Next, your Honor, they also seek to include

22   statements, hearsay statements and newspaper articles about

23   Prince Andrew, and it's actually not his denial, as I

24   understand it, Buckingham Palace's denial of the allegation of

25   my client.  But again, Prince Andrew is not on the witness

list, we're not able to cross examine him, so what they want to

do is introduce triple hearsay of Buckingham Palace saying what

Prince Andrews said in a news article without the reporter

against my client without our ability to cross examine him on

that.

So your Honor, they've tried to argue a little bit of

a securitous way, I think that it's a verbal act on behalf of

Prince Andrew, it doesn't meet that criteria, there's been no

statement by -- there's been no action by my client against

him, and what's at issue in this case is, again, Maxwell's

statements against my client.

The case that they cite actually, the Minemyer case,

goes against them.  It actually talks about how you would have

to call the reporter, that that couldn't come into evidence.

And so, your Honor, for those reasons, we believe that, again,

that's a distraction, it's highly prejudicial to allow a triple

hearsay document like that to come in without our ability to be

able to cross examine that individual.  So for those reasons,

your Honor, we believe that that should not come in.

They also made an argument that it's somehow an

intervening cause or that, you know, it goes to the issue of

she should be seeking damages from Prince Andrew, things of

that nature.  But as we know, because your Honor reviewed the

case law with respect to the summary judgment, each individual

is responsible for their own defamation, so it doesn't come

1  into consideration whether she could have sued six people for

2  it, 20 other people for it, this case is about Maxwell and her

3  defamation against my client.

4          So again, your Honor, if you look at Sack on

5  Defamation, it addresses that directly, and we believe that

6  that should not come into evidence.

7          So your Honor, that's the first chunk of the omnibus

8  motion that I was addressing.  I'm not sure how you want to

9  take it, if you want to have opposing counsel speak on those

10 issues now and then move to the others, or if you want us to

11 keep moving through it?

12         THE COURT:  What's your preference?

13         MS. McCAWLEY:  I think keep moving through it would be

14 great.

15         THE COURT:  What?

16         MS. McCAWLEY:  To keep moving it through it, if that's

17 all right, so we can get through argument and then have them

18 address it?

19         THE COURT:  Sure.

20         MS. McCAWLEY:  Thank you, your Honor.

21         MS. SCHULTZ:  Your Honor, this is Meredith Schultz for

22 the plaintiff.  The next article in the omnibus motion is to

23 exclude testimony references to prior sexual assault.  This is

24 an issue that I spoke on yesterday related to another motion

25 regarding the same, so I'll keep it brief.

1           But prior sexual assault, all of which occurred while

2   Ms. Giuffre was a child, it's irrelevant to this action.   It

3   doesn't come in under 401.   It doesn't involve defendant.   It

4   predates even meeting defendant.   And these assaults do not

5   make it more or less probable that defendant defamed

6   Ms. Giuffre, and neither does it tend to prove or disprove that

7   defendant abused her.

8           These are also classic examples of evidence that

9   should be excluded under Rule 412.   The Rape Shield Law forbids

10  evidence concerning these unrelated events involving

11  Ms. Giuffre.   This rule should be strictly enforced,

12  particularly because these events happened when she was 14 and

13  15 years old.   Rule 412(a) bars this evidence if it's offered

14  to prove that she engaged in any type of sexual behavior to

15  prove any type of disposition.

16          It should also be excluded under Rule 403.   This is

17  extremely prejudicial, and because it is irrelevant, it would

18  only encourage the jury to view Ms. Giuffre, a married mother

19  in her 30s, as an immoral person for having sexual contact with

20  individuals as a child.

21          This should also be excluded under 608(a), which

22  limits interaction of evidence for specific instances of

23  conduct in order to attack the witness' character for

24  truthfulness.   Now, I spoke about this at length yesterday.

25  Defendant tries to offer two particular things to say that, oh,

1    she wasn't truthful about something, about being sexually

2    assaulted, but the documents themselves describe something

3    that's unequivocally sexual assault under Florida law,

4    something that is unequivocally nonconsensual.  So that would

5    honestly be another mini trial and would take us far afield of

6    what facts are relevant to this case.

7         And again, any minor probative value that's past

8    sexual assault that Ms. Giuffre experienced as a child is

9    completely swallowed by the prejudicial effect on the jury.

10        MR. CASSELL:  Your Honor, I think I'm the next one up.

11   For purposes of clarity, we're up to point number 7 in our

12   omnibus motion.

13        This one I think is just a very simple and

14   straightforward one.  We move to exclude derogatory sexual

15   characterizations.  This is a case that your Honor has been

16   framing this morning.  It doesn't require use of a term from

17   defense counsel, for example, describing our client as a

18   prostitute or as a slut.  We thought we would get agreement

19   when we saw the responsive papers from the defense, but as you

20   know, they objected in it's entirety to this motion, so we're

21   here asking that defense counsel not refer to our client as a

22   prostitute, not refer to her as a slut, and they also advise

23   their witnesses that such language would be inappropriate in a

24   federal trial dealing with a defamation issue.

25        On this particular point about prostitute, it's

1   interesting.  Am I conjuring up something that's not going to

2   happen?  No, your Honor.  The defendant's own expert report

3   described our client as a prostitute.  Your Honor has under

4   advisement the expert report from Dr. Esplin, and so I deposed

5   Dr. Esplin, and I said, "Are you sure that's an accurate term

6   in the context of this case?  Because we have a child who

7   cannot consent to sexual activities."  And he backed off

8   immediately and agreed that that was an inaccurate term for him

9   to use to describe my client, Ms. Giuffre.  So even the

10  defense's own expert says the term "prostitute" is

11  inappropriate.

12          Your Honor has authority, of course, under Rule 611 to

13  manage the trial, to avoid undue harassment or embarrassment.

14  Also Rule 403 allows you to restrict things that would be

15  substantially prejudicial with no probative value, which is

16  exactly what we have here.  So we would ask you simply to reign

17  in derogatory language, both from witnesses and opposing

18  counsel.

19          MS. SCHULTZ:  Your Honor, I'll be addressing the next

20  several points in the omnibus motion, starting with number 8.

21  I think I can narrow this issue a little bit at the outset.

22          Ms. Giuffre concedes here that illegal or

23  nonprescription use of drugs during the years that she was with

24  defendant is admissible.  However, any evidence pertaining to

25  any use of drugs, illegal or not, and alcohol from any periods

1   before or after Ms. Giuffre was abused by defendant is

2   irrelevant to this action and should be excluded under Rule

3   401.

4           It is also, of course, highly prejudicial and should

5   be excluded under Rule 403.  Whether or not Ms. Giuffre ever

6   used drugs while not being abused by defendant does not go to

7   any claim or defenses in this case.

8           Courts in the Southern District of New York routinely

9   exclude evidence of prior drug use under both of these rules,

10  as fully briefed in the papers.  Defendant attempts to admit

11  this evidence of prescription drug use related to damages,

12  specifically whether or not the emotional distress Ms. Giuffre

13  suffered is preexisting.

14          THE COURT:  And why do you have it in your expert's

15  report?

16          MS. SCHULTZ:  Well, our expert is -- I'm assuming

17  you're referring to Dr. Kliman, who is a physician.  He's a

18  medical doctor.  He took a full --

19          THE COURT:  There's a whole thing about it.  Are you

20  going to withdraw the --

21          MS. SCHULTZ:  No, your Honor.  We're only claiming

22  damages with respect to the emotional distress suffered from

23  the defamation.  And also, taking drugs prescribed for various

24  mental health issues is not the same thing as emotional

25  distress.  They're two different issues.  So any marginal

1   probative value is outweighed by the prejudice.  Again, this is

2   only seeking damages based on defendant's defamation.

3          I'm going to move on to point number 9.  Ms. Giuffre

4   seeks to exclude any alleged criminal history from coming into

5   this case.  And the Federal Rules of Evidence bar the

6   introduction of this evidence, full stop.

7          As the Court is aware, the only way criminal history

8   could come into evidence is through Rule 609, but that rule

9   itself bars this evidence because, one, there's no conviction,

10   and two, the alleged crime does not go to truthfulness.

11          Of the two parties, your Honor, Ms. Giuffre is the

12   only one who has not been convicted of a crime here, this is

13   merely an alleged prior bad act which is excluded under Rule

14   404.

15          And this alleged act, which Ms. Giuffre denies, does

16   not go to truthfulness, and that's an important point here.  An

17   accusation of a crime with no conviction does not go to

18   truthfulness, especially a crime like this, which specifically

19   is defendant says she stole from a tip jar when she was a

20   teenager.  Knowing that this type of evidence is excluded,

21   counsel for defendant has put forth an unsupported argument

22   that Ms. Giuffre left the United States because of allegations

23   that she stole from a tip jar.  That is, of course, false.  She

24   left the United States to get away from defendant's abuse.

25          And moreover, the documentary evidence in this case,

1    which has been produced in discovery and submitted to this

2    Court, shows that it was defendant who sent her to Thailand,

3    sending her with handwritten instructions about what to do when

4    she gets there.  So if this unsupported argument that defendant

5    left the United States because of some accusation of a tip jar

6    is to be believed, then that makes defendant an accessory after

7    the fact and implicates her in the wrongdoing.

8            So I don't -- basically, there's just -- this argument

9    is also undone by the fact that later, Ms. Giuffre comes back

10   to the United States to live here.  She's not fleeing

11   accusations, she was fleeing defendant.  If she were worried

12   about criminal liability in the United States, she wouldn't

13   come back to live here.

14           But the overall point is any marginal probative value

15   from these allegations, which I don't think there is any, but

16   it's far vastly outweighed by the prejudice it would cause

17   Ms. Giuffre and should be excluded under all those rules.

18           Moving now to point 10.  Ms. Giuffre has requested

19   that the Court exclude any evidence regarding special

20   schooling, truancy, and juvenile delinquencies.  For this

21   argument, your Honor, I request that I approach the bench and

22   give you a few documents upon which these arguments are based.

23   I have four documents that I'm handing up.

24           I have to get a little bit into the weeds here, so

25   please bear with me.  In this case, Ms. Giuffre -- well, school

records have been part of discovery.  They show a history of

rampant truancy and failed courses.  This constitutes prior bad

acts which are excluded under Rule 404, particularly since

these bad acts do not go to truthfulness, so they're also

excluded under Rule 608.

They should also be excluded because their prejudice

that it would cause Ms. Giuffre greatly outweighs any probative

value and should be excluded under 403.

There's a huge remoteness issue here, your Honor.

These truancies and juvenile delinquencies took place many

years ago when she was a minor.  There's a lot of case law on

this that is in Mr. Giuffre's brief on page 22 to 23.  But what

you should be aware of, your Honor, is that a close examination

of records, looking up what the number codes on these

transcripts actually mean, it shows the opposite of the

argument that defendant advances in her response brief; that

she was in school, and therefore, not abused by her client.

To the contrary, the records show that she was not in

school over half the time she was supposed to be and did not

complete her courses.  These transcripts are not

self-explanatory.  Indeed, looking at the face of them, it

seems like she was enrolled and attending school, but much of

the information in these records are number codes used by the

Palm Beach County School District.  These school records could

not be placed into evidence for all the reasons above, but if

1    you are inclined to do them, you could not place them into

2    evidence fairly without testimony regarding what all these

3    codes on the transcripts mean, or at a bare minimum, the

4    introduction of evidence and instruction that makes explicit

5    what all the codes on the transcripts mean.

6          Defendant either failed to do her due diligence on

7    this and looked at what the codes are before advancing this

8    argument, but either way, it's not a good faith argument

9    because, as you can see in the document I handed up, these

10   codes and their meanings were detailed at length in

11   Ms. Giuffre's opposition to the motion for summary judgment,

12   and I would ask the Court to refer to the facts at page 32 of

13   the statement of facts.

14         So what the records actually show is rampant truancy,

15   years of absence from school while defendant was abusing her,

16   which show ample opportunity for abuse, and are, in fact, in

17   accord with the flight records, which have also been produced

18   in this case, which place Ms. Giuffre on 23 flights with

19   defendant aboard Jeffrey Epstein's private plane.

20         So as these records actually show truancy, failed

21   grades, failure to complete courses, these should be excluded

22   under all the rules I cited earlier, or at a bare minimum,

23   instruction to the jury about what the codes mean and detailing

24   how many days of school Ms. Giuffre actually attended, a number

25   that is conspicuously absent from defendant's brief.

1              Turning next to plaintiff's motion in limine number

2      11.  This is a related issue.  We ask that the Court exclude

3      characterizations of Ms. Giuffre's bad behavior during her

4      childhood, including characterizations of her as a bad child or

5      a runaway.  Defendant's response to this tries to conflate two

6      separate things; prior bad acts, an assault on her character on

7      one hand, with a reputation for truthfulness of another.

8              Prior bad acts she may have committed as a child, like

9      running away, is inadmissible and a defamation action where the

10     damages relate to her reputation.  That she ran away from home

11     or was an ill-behaved child does not go to truthfulness.

12             These events also do not go to her reputation.  Her

13     reputation for truthfulness as an adult prior to the defamation

14     is the only reputation that's at issue in this case.

15     Defendant's defamatory statements damaged Ms. Giuffre's

16     reputation when she was in her 30s.  This does not open the

17     door into evidence of Ms. Giuffre's generalized character,

18     particularly one from a troubled childhood.  Occurrences, such

19     as running away from her home when she was a child, are simply

20     prior bad acts under Rule 404 that should be excluded.  They

21     should also be excluded under Rule 405 because this is

22     introduction of evidence to try to show her character.  And

23     Rule 608(a) also limits evidence and testimony about a witness'

24     reputation for having a character for truthfulness or

25     untruthfulness, it doesn't come in under that rule.

                    Her reputation for truthfulness does not go to any bad

acts she may have committed 20 years ago.  And your Honor, even

criminal convictions are generally not admissible 10 years

after the fact.  So presentation of this type of evidence is

simply nothing more than a smear campaign, which is prescribed

by multiple Federal Rules of Evidence.

                    And finally, any marginal probative value of these bad

acts as a child is vastly outweighed by the undue prejudice it

would cause Ms. Giuffre before a jury.

                    Your Honor, now I'm turning to point number 12.  We've

asked the Court to exclude evidence relating to the tax

compliance of Ms. Giuffre's not-for-profit Victims Refuse

Silence.  Rule 401 is the first rule under which this should be

excluded.  The alleged tax compliance of her not-for-profit

does not go to whether or not defendant defamed Ms. Giuffre and

does not go to whether or not defendant abused Ms. Giuffre.

                    It should also be excluded under 403.  It is highly

prejudicial.  It would give the wrong impression to the jury

that Ms. Giuffre's organization is not tax compliant, which, in

fact, it is a fact that defendant does not acknowledge in her

briefing.

                    Proving whether or not Ms. Giuffre's not-for-profit is

tax compliant would also be a mini trial and, frankly, a

sideshow to this case.

                    Furthermore, all of defendant's conclusions about

1     Ms. Giuffre's not-for-profit tax compliance are based on an

2     errant report by her purported expert, an expert who should be

3     excluded from testifying because his report lacked methodology

4     and he opined on topics far afield from his expertise.

5            Second, any allegations that her not-for-profit is not

6     tax compliant is prejudicial, misleading, confusing to the jury

7     because it has nothing to do with the claim at issue in this

8     case.

9            Your Honor, we asked for defendant's tax returns in

10    this case.  If they go to truthfulness, as defendant argues,

11    they also go to defendant's truthfulness.  At this point, we're

12    not going to get them until the first day of trial, so we will

13    not be able to effectively cross examine defendant on those tax

14    returns, and we won't be able to see until then if she's paid

15    taxes on all the money and gifts and in-kind payments from

16    Epstein that she's received or has kept that away from the

17    government.  Unlike Ms. Giuffre's tax information, defendant's

18    tax information goes to our case in chief and is relevant

19    evidence.

20           On point number 13, we move to exclude evidence

21    relating to Ms. Giuffre's alleged tax compliance.  Your Honor,

22    this is a defamation action where reputation is at issue.  Tax

23    compliance does not go to a reputation, it is a private matter.

24           Second, there is no evidence in this case that any

25    government, either United States or Australia, believes that

1    she is noncompliant with her taxes.  Defendant's purported

2    expert's evaluation of this is wholly flawed, as explained in

3    Ms. Giuffre's motion in limine on the same.

4          Similarly, Ms. Giuffre's taxes are wholly irrelevant

5    to this case.  Even actions brought by the government, your

6    Honor, where the cause of action is centered on nontax

7    compliance exclude evidence of prior tax noncompliance when it

8    takes the case too far afield of the issue being tried.

9          Courts also exclude this evidence under 403 if there's

10   no substantial nexus between the alleged tax noncompliance and

11   the matter at hand.  Here, defendant fails to show any type of

12   substantial nexus to this defamation claim.  None whatsoever.

13         Additionally, resolving Ms. Giuffre's tax compliance,

14   this is a point that's in dispute among the parties, and

15   resolving such an issue would also involve another mini trial

16   where Ms. Giuffre would put on evidence of her tax compliance

17   and, at the end of that mini trial, the jury would have no more

18   information whether or not defendant defamed Ms. Giuffre when

19   she called her a liar about being sexually abused.  Trying to

20   make this an issue, this is simply a device for putting the

21   settlement agreement and the amount between Ms. Giuffre and

22   Jeffrey Epstein into evidence.

23         As has been briefed extensively, such a settlement

24   payment is tax exempt under the United States law, but that's

25   all this is, it's a device to try to get an improper admission

1   of a settlement amount between Ms. Giuffre and Jeffrey Epstein.

2   Accordingly, this should be completely excluded because any

3   marginal probative value this has on the claims is greatly

4   outweighed by the prejudice to Ms. Giuffre.

5          I am not up for the next one, so I'm going to take a

6   break.  Thank you.

7          MR. CASSELL:  Again, your Honor, I'm up to number 14

8   now, the issue of Ms. Giuffre's being a victim of domestic

9   violence.  This is not relevant or minimally relevant.  It's

10  Ms. Giuffre's burden, of course, to show the emotional distress

11  damages that she suffered as a result of Ms. Maxwell's

12  defamatory statement, and the jury can agree or disagree with

13  whether she's carried her burden of proof.

14         If we understand the defendant's argument correctly,

15  they say, well, this would have been a distressing event in

16  your life and, therefore, we should be free to introduce it in

17  front of the jury.  Of course, that argument would allow, if

18  accepted, essentially any bad thing that's happened in any

19  plaintiff's life to be introduced if they seek emotional

20  distress damages because, my goodness, this event here or there

21  had some emotionally distressing effect on you.  So it has

22  minimal to low probative value, and the prejudice is very

23  substantial.

24         Your Honor, obviously, has a great deal of experience

25  and are well aware of the domestic violence, blame the victim

1    attitude that has to be confronted in various cases.

2    Frequently, if there's domestic violence that's at issue, an

3    expert witness comes in to explain to the jury, oh, why didn't

4    she leave?  Why did she stay with this fellow who was beating

5    her up?  She was free to walk out of the relationship.  Why

6    didn't she do so?  And there is a whole literature that I know

7    your Honor is familiar with and that we cited in our brief, as

8    well.

9           We don't want to get into that in front of the jury in

10   this particular case.  This is a blame the victim tactic that

11   shouldn't be allowed.  This has very marginal, if any,

12   probative value and a very significant prejudicial effect

13   because the jury will potentially blame the victim for staying

14   with her abusive spouse.

15          Now, in addition, you'll notice from the pleading that

16   the defendants aren't intent just on asking questions about

17   this, but they also want to go into the whole criminal case

18   against Ms. Giuffre's husband, you know, whether he appeared or

19   what the felony charges are and a variety of things.  That,

20   obviously, has even less probative value than the information I

21   was discussing a moment ago and should be independently

22   excluded.

23          The next issue up is item 15.  And here, we ask to

24   have excluded any suggestions that sex with a 17-year-old is

25   permissible.  You will recall that there's debate about exactly

1    what years and what birthdays were in play and exactly what

2    Ms. Giuffre said about whether she was 15, 16, or 17.  Fair

3    enough.  They can cross examine her about, 'Did you say 16 when

4    you were, in fact, 17,' or whatever it is.  We're not trying to

5    exclude that.

6           The limited point that we're trying to address here is

7    that they shouldn't say, 'Ah-hah, she was 17, therefore, she's

8    fair game.'

9           Under Florida law that we've cited in our pleadings,

10   there is no possibility of a child under the age of 18

11   consenting to sexual activities of the nature that are at issue

12   here, and therefore, the defendant should be precluded from

13   making that kind of suggestion.  And so that's item 15.

14          MS. SCHULTZ:  Turning to item 16 in the omnibus

15   motion.  Ms. Giuffre has moved the Court to exclude medical

16   records.  Here, I would actually like to direct the Court's

17   attention to defendant's response.  Defendant here does not

18   cite a single case where a court allowed admission of unrelated

19   and irrelevant medical records into evidence at trial.

20          Defendant's brief also doesn't show how any medical

21   records are relevant here, and there are privacy issues at

22   stake.  In fact, defendant does not cite to a single case in

23   which a court allows any medical records into evidence.

24          In defendant's entire response she cites two cases

25   only.  Neither of them have anything to do with what documents

1   might be admitted at trial.  Both are orders resolving

2   discovery disputes under Rule 26.

3           Apart from her medical records, while defendant was

4   abusing her, such as when defendant took her to a hospital here

5   in New York when she was only 17, and the psychological records

6   related to Ms. Giuffre, which have been produced, which

7   incidentally are from 2011 and name defendant as her abuser, no

8   other medical records are relevant and should be excluded under

9   Rule 401.

10          Ms. Giuffre is seeking damages for emotional distress

11   from defamation.  It does not open up the flood gates to every

12   single medical issue she's ever had in her life.  Ms. Giuffre

13   has produced records, everything from treatment for a ferret

14   bite to details of her giving birth.  These are not relevant,

15   and we can have a ruling in advance of trial that these things

16   should be excluded.

17          Defendant only seeks to use these records to confuse

18   the issues before the jury.  Defendant offers no reason for

19   addressing the relevance of such documents one by one at trial,

20   and I think these can be safely excluded at this juncture.

21          MS. McCAWLEY:  Your Honor, next is number 17, which we

22   addressed in our papers, as well, about the prior settlement

23   agreement.  You've heard about it in this case, and we have

24   said that that should not come into evidence.

25          I think they'd like to use it to propose that that

 1    amount has something that the jury should consider.  Your

 2    Honor, the papers set forth very clearly that there's a

 3    specific rule of evidence directly on point with respect to

 4    settlement agreements, and they can't be used in that manner.

 5         Your Honor, we cite to our papers on that with respect

 6    to any prior settlement agreement being entered into evidence

 7    at the trial.

 8         MR. CASSELL:  I believe I have the next three.

 9         Item 18 then is defamation litigation.  And your Honor

10    is aware that there was a separate lawsuit that's spun out of

11    this situation where Cassell and Edwards filed a defamation

12    action in Florida State Court against Alan Dershowitz.  Alan

13    Dershowitz then counterclaimed.  That was litigated in Florida

14    State Court for about a year.  Ultimately, the parties settled

15    their differences in an undisclosed financial arrangements and,

16    as part of the comprehensive settlement, Cassell and Edwards

17    then withdraw summary judgment against Dershowitz.

18         It was as expressly understood when the parties agreed

19    upon this confidential settlement, there was then a statement

20    in which it was said that Ms. Giuffre reaffirms her

21    allegations, and the withdrawal of the reference to the filings

22    is not intended to be and should not be construed as being an

23    acknowledgment by Edwards and Cassell that the allegations made

24    by Ms. Giuffre were mistaken.

25         There was a portion of the statement that talked about

1    "mistake", and that was indicated in the pleading withdrawing

2    the summary judgment motion as follows:  "Edwards and Cassell

3    do acknowledge that the public filing in the Crime Victims

4    Rights Act case of the client's allegations against Defendant

5    Dershowitz became a major distraction from the merits of the

6    well-founded Crime Victims Rights Act case by causing delay

7    and, as a consequence, turned out to be a tactical mistake."

8    "Tactical mistake."  "For that reason Edwards and Cassell have

9    chosen to withdraw the referenced filing as a condition of the

10   settlement."

11          That's all a very interesting lawsuit, but that's a

12   lawsuit that does not have Ms. Giuffre as a party.  It was

13   Cassell and Edwards versus Alan Dershowitz, with claims going

14   back and forth.  Cassell and Edwards were, of course,

15   vindicating their own professional interests and their

16   professional reputation responding to the attacks that had been

17   made by Mr. Dershowitz, and they chose to settle the case, as

18   did Mr. Dershowitz, for undisclosed financial reasons.

19          And also, from the fact I think your Honor is now

20   aware, that there were some witnesses who were not available.

21   Sarah Ransome has come forward in this case to say that she was

22   a traffic to Alan Dershowitz in the same way that Ms. Giuffre

23   alleges, and that was information that has only recently become

24   available.

25          The point is, you have enough business on your hands

1    without getting into the details of another separate lawsuit

2    that did not involve Ms. Giuffre as a party, and so we've moved

3    in limine.

4         And let me make clear that I emphasize the narrowness

5    of our motion here.  We seek to preclude evidence involving

6    that litigation.  Your Honor has already heard from my

7    colleague, Ms. McCawley, who has presented our argument for why

8    Dershowitz should not be in this case at all, and of course, if

9    we prevail on point 1, this point becomes irrelevant.

10        But in addition to point 1, we don't need to be

11   getting into the details of the separate lawsuit.  It's not

12   relevant to the case of Giuffre versus Maxwell.  Defendants, in

13   their responsive brief, if I understand correctly what they say

14   is, oh, well look.  Why didn't Ms. Giuffre join the lawsuit or

15   why hasn't she filed a lawsuit against Dershowitz?  What's

16   going on there?

17        Well, of course, your Honor is aware, there are a

18   variety of statutes of limitation around the country, and

19   indeed around the world.  Ms. Giuffre has not -- those statutes

20   have not all run at this point.  There are varying

21   considerations that go into whether or not someone like

22   Ms. Giuffre would file a lawsuit, and these issues shouldn't be

23   discussed in front of the jury.  That's nothing to do with this

24   particular lawsuit.

25        Moreover, defendant apparently argues that statements

```
1    that Edwards and Cassell made in this other lawsuit are somehow

2    binding on Ms. Giuffre.  Edwards and Cassell had separate legal

3    counsel, Florida attorney Jack Scarola.  Whatever was going on

4    in that case isn't binding on Ms. Giuffre.

5          Under the relevant rules, an attorney's statements are

6    binding on a client only on a matter within the scope of the

7    relationship.  And this was vindicating separate professional

8    interests, this was not vindicating some interest of

9    Ms. Giuffre.

10         So for all those reasons, we ask that the defamation

11   litigation between Dershowitz and Edwards and Cassell be

12   excluded.  Of course, you have the separate issue of Dershowitz

13   in front of you already.

14         Let me turn then to point number 19.  Here again, we

15   have a narrow issue presented to your Honor.  We are asking

16   that you exclude Judge Marra's ruling on the joinder motion.

17   As your Honor is well aware, the triggering event in this case

18   was when Ms. Giuffre, then known as Jane Doe Number 3, filed a

19   motion to join Jane Doe 1 and Jane Doe 2 in the Florida pro

20   bono Crime Victims Rights action.

21         Now, Judge Marra denied that motion to join, but at

22   the same time he said, "The reason I'm denying the motion to

23   join is you can participate in the case in other ways without

24   being a formal party."  He cited, and I quote, "Of course, Jane

25   Doe 3 can participate in this litigated effort to vindicate the
```

 1    rights of similarly situated victims" --

 2              THE COURT:  I'm familiar with it.

 3              MR. CASSELL:  Okay.  Right.  So that's Judge Marra's

 4    ruling.

 5              And you understand that was obviously on a technical

 6    joinder issue.  The joinder issue, whether that was a

 7    good joinder motion or a bad motion, has nothing to do with

 8    whether or not Ms. Giuffre was defamed.

 9              THE COURT:  How do you propose to handle the joinder

10    motion evidentially?

11              MR. CASSELL:  Right.  We think the joinder motion

12    should simply come into evidence as the pleading to which

13    Ms. Giuffre -- I'm sorry -- Ms. Maxwell was responding.

14              THE COURT:  Lock, stock, and barrel?

15              MR. CASSELL:  So we are obviously waiting for guidance

16    from your Honor.  For example, if you say, look, Dershowitz,

17    let's just not get into that, that's --

18              THE COURT:  That didn't answer my question.  Please.

19              MR. CASSELL:  I apologize.

20              THE COURT:  You talk about many trials, many

21    arguments.  You want to put in the entire motion?

22              MR. CASSELL:  Yes, unless your Honor -- I want to be

23    direct here.

24              Yes.  However, if you say, look, Dershowitz isn't

25    coming into this case, there are some allegations about

1    Dershowitz that we would then believe, in light of your ruling,

2    should be redacted.  But until we have any rulings from your

3    Honor restricting the case, it's our position that all --

4              THE COURT:  But you don't have an edited version of

5    the intervention motion that you would like me to consider.

6              MR. CASSELL:  We would propose one once we get rulings

7    from your Honor on the motions in limine.

8              THE COURT:  By the way, just parenthetically, folks,

9    these motions in limine are good fun, and we're all having a

10   nice time, but they're not binding.  I mean by that, I'm

11   expressing my view, or I will, I hope, some day express my view

12   on these issues, but the trial may turn in a different

13   direction and, you know, who knows.  Okay.

14             MR. CASSELL:  We understand.  And one of the reasons

15   we have not proposed a redacted joinder motion, that showed up

16   in a reply brief from the defendant, we didn't move to file a

17   surreply with a possible motion.  We think the best way to

18   proceed, and we're happy to get guidance from your Honor, but

19   once we have rulings from you on what's in the case and what's

20   out, then we might go through the joinder motion.  But where

21   we're sitting today, the joinder motion goes in in its

22   entirety.

23             But what does not come in is then, all right, that's a

24   legal pleading.  Gee, I wonder what happened.  Judge Marra made

25   a ruling, we don't need to get into the details of that ruling.

1    Of course, we would want to explain that there were nine

2    separate reasons why those allegations were included.  Judge

3    Marra referred to the first of the nine reasons.  We have eight

4    other additional reasons why those were included.  It would

5    essentially, again, be a mini trial about, well, what does a

6    joinder motion mean?  Did you file under Rule 15?  It should

7    have been under Rule 21.  What did the judge do?

8           It has no bearing at all on the issues in the case,

9    and it, of course, has very substantial prejudicial effect

10   because it leads to a confusion of the jury.  The jury's trying

11   to figure out, well, what's going on in the Crime Victims

12   Rights Act case when the issue is whether or not Ms. Giuffre

13   defamed.

14          Now, there is an issue in their pleadings.  They say,

15   well, this could end up being relevant because there might be

16   some kind of a privileged setting issue.  Again, I think your

17   Honor correctly was pointing out a moment ago, if things show

18   up in the trial, it's possible that something could change, but

19   we don't anticipate that becoming an issue in the trial at this

20   point.  If the issue of whether this was a privileged setting

21   somehow becomes an issue in the case, then it would be time to

22   revisit that during the trial.

23          In any event, issues of whether this was a privileged

24   setting or not aren't litigated in front of the jury, that's a

25   legal issue for your Honor to determine whether the setting was

1    or was not privileged.  We don't take jury evidence on that,

2    you know, Judge Marra's ruling, and therefore, that should be

3    excluded.  So that is item number 19.

4         Let me turn then to item 20, and I'm handling that.

5    This is essentially a hearsay exercise.  We want information to

6    be excluded regarding Rebecca Boylan.  Why?  Because Rebecca

7    Boylan has not been deposed and is not going to be a witness in

8    the case.

9         As we understand what the defendant is planning to do,

10   she's planning to call Mr. Dershowitz.  Mr. Dershowitz is going

11   to say Ms. Boylan told him that Ms. Giuffre told him something,

12   and so we have the classic hearsay within a hearsay situation.

13   The problem, of course, is that Boylan is not here.

14        The defendant's pleadings say, ah-hah, but this is an

15   admission by Ms. Giuffre, and it would be if Ms. Boylan were on

16   the stand so we could ask her questions about, well, did

17   Ms. Giuffre really say that?  And what did she mean?  And

18   wasn't she saying that she's been abused by Ms. Maxwell?  But

19   they want to skip over that intermediate stuff, have Dershowitz

20   describe what Boylan describes Ms. Giuffre said, and that's

21   obviously -- and then I'm assuming Dershowitz is going to put

22   his spin on what Ms. Boylan allegedly said to him.  There are

23   no set of circumstances in which that hearsay within hearsay

24   could be admissible because Ms. Boylan has not been deposed,

25   and is not here, it's rank multiple hearsay.

1              I am about done at this point.

2              With regard to the remaining issues, you'll be happy

3    to hear that I think things can be sped up.  We believe that

4    these issues should simply be, as your Honors I think was

5    suggesting a moment ago, deferred to trial.

6              Items 21, 22, 23, 24, 25, 26, 27, 28, and 29, those

7    were sort of just kind of protective measures.  The one

8    footnote or caveat we would add to that, your Honor.  We think

9    this gets punted to the trial, but we would simply ask your

10   Honor to direct defense counsel before they let the cat out of

11   the bag on any of these that there be a sidebar or hearing

12   outside of the jury just so that, you know, our motion in

13   limine doesn't become moot because they've already effectively

14   put it in front of the jury.

15             The one that's of particular concern is alleged bad

16   acts by the defense team.  At various points, I think your

17   Honor, unfortunately, has seen some, you know, frankly

18   aggressive language directed to the plaintiff's team here by

19   the defense team.  We're prepared to respond to each and every

20   one of those allegations.  We've tried not to get into the back

21   and forth because we think it's irrelevant.

22             But if there was to be some kind of an attack launched

23   on any of the members of the Boies Schiller Firm, of Brad

24   Edwards, myself, we would ask that we be given leave to address

25   that at sidebar, in-camera, or outside the presence of the jury

1    so that we can keep the fact that we have done something bad

2    that should then be held against our client away from the jury.

3          But all these remaining things we are in agreement, I

4    think with the suggestion you were perhaps making a moment ago,

5    we can deal with these issues at trial.

6          That's our omnibus motion in limine, your Honor.

7          THE COURT:  Thank you.

8          MS. MENNINGER:  The omnibus motion reads like a list

9    of everything plaintiff has lied about or anything that would

10   undercut her claim for damages.

11         Plaintiff quoted Passim in her reply brief from a

12   particular federal evidence treatise, and I would like to tell

13   the Court, she left out the most important parts, and that is

14   the ones that relate to 405(b).

15         As that treatise reads, "Character is an element of a

16   defense in a defamation case if the defending party claims that

17   the statements in question are true and seeks to prove that the

18   plaintiff has the character ascribed to her or to reduce

19   damages by showing that her reputation is so bad the statement

20   did no harm.

21         "In such cases, pursuant to Rule 405, all forms of

22   character evidence are admissible wherever relevant, including

23   opinion, reputation, and specific instances of conduct."

24         As your Honor found in our motion to dismiss ruling of

25   February 29th of last year, "Though defendant never called

1   plaintiff a liar, to call her claims obvious lies that have

2   been shown to be untrue demands the same meaning.  Plaintiff

3   cannot be making claims shown to be untrue that are obvious

4   lies without being a liar."

5          Ms. Maxwell has stated in her answer after that that

6   her statement was true; that is, plaintiff is a liar.  She is

7   thus entitled by Rule 405 to introduce all forms of character

8   evidence, including specific instances of conduct, opinion, and

9   reputation.

10          What does that evidence look like?  Plaintiff's mother

11  described her as a liar, plaintiff's fiance described her as a

12  liar, plaintiff's employer from 2002 described her as a liar.

13          Your Honor, I would like to start with the first one

14  that plaintiff started with, and that is motion in limine 2,

15  which is Bill Clinton being on the island.

16          Ms. Maxwell is going to testify at this trial, and

17  she's going to testify regarding the obvious lies that

18  plaintiff told her.  One story that plaintiff has told is that

19  Ms. Maxwell was on the island with Bill Clinton and herself at

20  a dinner party.  If I may approach, your Honor?  I have three

21  exhibits.  Two for now.

22          THE COURT:  I think in duplicate, to the extent that I

23  think.

24          MS. MENNINGER:  I'd like to first direct the Court's

25  attention to the news article by --

1          THE COURT:  I've read it.

2          MS. MENNINGER:  -- Sharon Churcher.

3          THE COURT:  Yes, I've read it.

4          MS. MENNINGER:  Okay.  It's the one in which

5    Ms. Giuffre, on March 5th, 2011, gave a long and lengthy

6    interview to Sharon Churcher describing her experience on the

7    island with Bill Clinton, with Al Gore, with Al Gore's wife,

8    with all kinds of famous people.  And the island event featured

9    large and media coverage.  If you notice the date of that

10   article, your Honor, it's March 5th, 2011.

11         The next document I provided is a press statement

12   issued by Ghislaine Maxwell on March 10th, 2011, so five days

13   later, in which she writes, care of her attorneys, "Ghislaine

14   Maxwell denies the various allegations about her that have

15   appeared recently in the media.  These allegations are all

16   entirely false."

17         Your Honor, the last document I would like to direct

18   your attention to -- by the way, after Ms. Maxwell published

19   this press release, Virginia Roberts did not sue her, she did

20   not claim that she had been emotionally distressed or injured

21   by being called, essentially, a liar in this particular press

22   release.  And also, with respect to the Bill Clinton article,

23   your Honor, the evidence at trial will show a substantial

24   number of emails between Virginia Roberts and Ms. Churcher

25   contemporaneous with this article.  In none of them does she

say, 'You got it wrong.  I never saw Ghislaine Maxwell on a

helicopter with Bill Clinton.  I never said that to you,' she

did none of that.

So your Honor, the last document, and it really, I

think, actually helps clarify the question your Honor raised

when you came out to court this morning, is an email.  It's an

email from Ghislaine Maxwell to Alan Dershowitz, January 6,

2015, and it has a document attached called "Four Press

Complaints".

Your Honor will notice that this document is not

marked confidential, it was produced by Ms. Maxwell over a year

ago, it is marked Ghislaine Maxwell 0006, and it's a

communication between herself and Alan Dershowitz, someone with

whom she does not have a joint defense agreement, and that's

why she produced this email.

Your Honor, this email, as you can tell from the date,

was sent four days after the allegedly defamatory statement at

issue.  It reflects Ms. Maxwell's dossier of all of the

statements from the papers that have been shown to be

completely untrue or show inconsistency in her story.  Each

article is listed so you can find that link that references the

lies are inconsistencies.

Your Honor, if you look at this document that was sent

just a few days after the January 2nd email, and you turn to

page 3, which is actually the attached document, "Four Press

Complaints", because Ms. Maxwell says she's preparing a press

complaint in the UK, in other words a legal action, the third

page, your Honor, is the document that was attached that was

produced over a year ago.

How this document reads at the top, "Drafted by

Ms. Maxwell.  I have copied direct lines and quotes from

articles, and my comments are in orange after the quote.  The

relevant article that the quotes came from is listed below the

last quote.  Below, I think, are some of the irrefutable

contradictions and interesting additional details that can be

used in the letter to the mail and in the following press

complaints.  In addition, this article on Rothstein you may

find helpful.

"What is the number one lie that Ms. Maxwell points

to?  Number 1.  Bill Clinton identified in lawsuit against his

former friend and pedophile Jeffrey Epstein who had regular

orgies."

And then Ms. Maxwell's commentary directly afterwards,

in a quotation, "Huge problem is that Clinton never came to the

island."

Your Honor, in plaintiff's response -- excuse me --

reply brief, they claim Ms. Maxwell had no knowledge in early

January, 2015 that Bill Clinton had never been to the island.

Obviously, she had knowledge of that because she was claimed to

have been there with him and claimed to have flown on a

1    helicopter with him by plaintiff in her Sharon Churcher

2    published articles.

3            And here, in January of 2015, Ms. Maxwell is saying he

4    was never on the island.  It doesn't depend on Louie Freeh or

5    anybody else.  That's obviously -- in this particular email,

6    your Honor, she's cataloged all of the changed stories of

7    Virginia Roberts, all of the lies Virginia Roberts has told,

8    all of the different news articles in which those lies were

9    told, and said that this is going to be the basis of her press

10   complaint in the UK.

11           Likewise, on the next page, your Honor, GM009, at the

12   bottom, again, she specifically refutes the claims about Bill

13   Clinton being on the island and says, "He was never there."

14   Right after that, she says, "Virginia discussed that Al Gore

15   and his wife Tipper were also guests on the island."  And

16   Ms. Maxwell writes, "They have also never been on the island,

17   and I don't believe they even know Jeffrey Epstein."

18           So when the jury is asked to consider what Ms. Maxwell

19   meant when she issued, through her attorney and her press

20   agent, the January 2nd, 2015 statement, we have a

21   contemporaneous document drafted by her that was produced in

22   discovery a year ago.  None of it refers to the Jane Doe 102

23   complaint, none of it refers to the CVRA joinder motion.  None

24   of it.  It refers simply to press allegations that have been

25   floating around about her and about her involvement with

Jeffrey Epstein and Virginia Roberts.

Plaintiff's counsel has said statements made in the newspaper articles are hearsay.  That is often true, but when it's plaintiff's statement in a news article, it's called a party admission.

Plaintiff complains that she didn't have the opportunity to depose President Clinton.  Your Honor, plaintiff's counsel sought to depose President Clinton in their reply brief at the end of June, 2016, about a week before discovery was to close.  They didn't even mention it in their opening brief, they raised it in docket number 211.

In that request, which I didn't have an opportunity to object to because it came in reply, she said she wanted to depose him to, "establish his close personal relationship with Epstein", she said nothing about wanting to see whether he had been on the island, whether he flew in a helicopter, or anything like that.

With regard to Louie Freeh, your Honor, we disclosed him as a witness in our Rule 26 disclosures last March –– excuse me –– February of 2016.  Plaintiff made no effort to try to depose him, made no effort to find out his basis of knowledge.  We produced in discovery his report in which he submitted a FOIA request.

Yesterday, you will recall Ms. McCawley testifying about how she, herself, issued a FOIA request and got in

1    response an FBI 302 motion -- excuse me -- statement of -- she

2    claims is authentic, but she doesn't know how it was redacted,

3    doesn't explain how it's redacted, but she wants to admit that

4    into evidence.

5        We are actually offering to put on the stand the

6    person who submitted the FOIA request to explain what was

7    requested and what was received.  That is not expert testimony,

8    your Honor, that's chain of custody.

9        With regard to motion in limine number 5, evidence of

10   denials by Prince Andrew and Buckingham Palace.  Again, your

11   Honor, in a defamation case -- and I'm now quoting from

12   plaintiff's treatise that they cited throughout their response

13   and their reply -- excuse me -- "In defamation cases,

14   defendants can also prove that other liables and rumors about

15   the claimant are circulating, at least if they are widespread,

16   to demonstrate that it is not what the defendant said about the

17   plaintiff that causes her reputation to suffer but what others

18   said."

19       Plaintiff also cites Sack of Defamation.  He supports

20   our position, your Honor.  Here, we have a statement by

21   Buckingham Palace that was issued on the internet and widely

22   circulated.  There is also a videotape of Prince Andrew denying

23   Virginia Roberts' claims.  Both of those were far more

24   circulated than anything Ms. Maxwell said, as evidenced by the

25   fact that plaintiff can't even find Ms. Maxwell's statement on

1     the internet anywhere quoted in whole.

2           Also, Alan Dershowitz widely circulated his denials of

3     plaintiff's claims.  He was on Good Morning America, he was on

4     CNN's Nancy Grace Show, he was on Fox News.  All of those

5     places he called Virginia Roberts a liar, and a serial liar,

6     and other things.

7           We are entitled, your Honor, both through cross

8     examination of plaintiff as well as cross examination of her

9     experts, to challenge whether or not anything said by

10    Ms. Maxwell caused damage to her reputation or whether other

11    people calling her a liar on national news and international

12    news is, in fact, the cause of any damage to her reputation.

13          She is the one, of course, who has put her reputation

14    at issue.  Having the Duke of York and Buckingham Palace issue

15    denials is not hearsay, your Honor, it is offered for the fact

16    that the denial was widely circulated and very likely

17    contributed to people considering plaintiff to be a liar.

18          Motion in limine number 6, plaintiff's sexual history

19    and reputation.  This salient point, your Honor, of course,

20    again, under 405(b), is that once you have put your reputation

21    for being a liar in question, then other specific instances of

22    false claims become highly relevant and probative of your

23    character for truthfulness, particularly with regard to sexual

24    assault and sexual abuse.

25          Furthermore, your Honor, plaintiff is the one who's

1    claiming she has damages of post-traumatic stress disorder, and

2    she is the one who is going to call to the stand her

3    psychiatrist to talk about that patient, and she is the one

4    that gave him evidence about these other acts to him and on

5    which he has relied in reaching his conclusions.  It is

6    impossible for us to not be able to cross examine her expert

7    about preexisting PTSD caused by incidents and events unrelated

8    to Ms. Maxwell.

9          Motion in limine number 7, whether or not Ms. Giuffre

10   can be called a prostitute.  Your Honor, no one in this case,

11   no counsel, nobody that I'm aware of involved with the

12   litigation has referred to Virginia Giuffre as a slut.  That is

13   something that plaintiff's counsel has brought up, and you will

14   notice there is absolutely no cite in any record, in any

15   document referring to her as such.

16         What has come up, your Honor, are internet sites in

17   which Ms. Giuffre has been called all kinds of things that are

18   unrelated to Ms. Maxwell, that do not cite Ms. Maxwell.  For

19   example, her friends gave interviews to the press in which they

20   described -- and this is attached as my Exhibit L -- described

21   Virginia Giuffre as "a money hungry sex kitten who enjoyed her

22   lavish lifestyle".  We cannot talk about plaintiff's reputation

23   on the internet without talking about what is out there on the

24   internet.  We cannot cross examine her or cross examine her

25   experts about what her reputation is if we can't ask about

these other things that are circulating about her that have

nothing to do with Ms. Maxwell.

        Mr. Cassell referred to our expert Phillip Esplin,

Dr. Esplin, and saying that he agreed not to refer to Virginia

Roberts as a prostitute.  Your Honor, that came up in the

context of a cross examination in which he said he has no idea

whether any of her claims are credible or not.  He does not

believe it's within the province of the psychiatrist to be

making credibility determinations.  So he was not in any way

suggesting, in fact he testified for hours to the contrary,

that he knows whether her claims of being a prostitute are true

or not true, and he agreed not to talk about.

        The only context in which I think this comes up, your

Honor, are witnesses or people on the internet who have made

disparaging remarks about the plaintiff that have to be the

subject of her reputation and her request for damages that she

says are related to Ms. Maxwell.

        Plaintiff's drug abuse, motion in limine number 8.

They have conceded, as they must, that the period of time about

which Ms. Giuffre is testifying is fair game for her discussion

of all of her illegal drug use.  And it wasn't just

prescription drugs, she has testified that she was on a number

of different drugs at the time, and that because of those

drugs, her memory of events from 2000 are, quote/unquote,

foggy.  And she says that's one of the reasons she can't

1   remember the names of the foreign presidents that she was

2   trafficked to, and these other famous people, because she was

3   taking so many drugs she just can't remember.

4           Obviously, your Honor, a witness' ability to perceive

5   and recall and relate events that happened a long time ago that

6   were affected by drug use need to be brought to light before

7   the jury.

8           The second issue, your Honor, relates to the use of

9   prescription medication.  What you heard plaintiff say is they

10  would like to introduce evidence that she's taking prescription

11  drugs properly, but they want to exclude us from cross

12  examining her about that to see whether or not she was taking

13  prescription drugs improperly.  That's called cross

14  examination, your Honor.

15          Her use of prescription drugs has been well-documented

16  in her doctor's records, and she has made false statements to

17  her doctors regarding her need for prescription drugs.  She's

18  gone from one doctor to the next, telling one that she hasn't

19  taken any Valium for years, and then the next one -- and then

20  we have the records showing that that's just not true.  She's

21  told doctors that she was stressed out about a big litigation

22  in New York, she told a doctor that in the year 2014, this

23  lawsuit wasn't filed until 2015, so she's made statements to

24  doctors that are inaccurate.

25          Your Honor, her statements reflected in her medical

records may or may not be admissible depending on what she says

on the stand, but they are her statements and they are,

therefore, potentially admissible as admissions of a party

opponent under 801(d)(2).

Moreover, her doctor is the one who wants to testify

about her need for medications going forward, and he has been

the one who's talked about her previous use of medications.

Her Colorado doctor testified that she had misled him and not

fully disclosed her need for prescription medications, and

there's also the question about whether or not, if she opens

the door and says she's properly used medications for

post-traumatic stress disorder, then we should be able to

examine her, not only with respect to that, but her other use

of prescription and illegal drugs.

And your Honor, I think it is inappropriately limiting

to say we can only talk about her use of drugs during the

period of '99 to 2002 because any drug use that she has used in

the meantime can go to establish whether or not she truly had

post-traumatic stress disorder or any other mental health

disorder.

She has filed a lawsuit asking for $30 million in

emotional distress, pain and suffering, and her doctor is going

to testify that she needs medications as a part of managing

that pain and stress and emotional distress.  If she's been

using drugs in the interim that may affect her memory, if she's

1    using drugs now that may affect her memory, or if she's

2    inappropriately used drugs in the meantime, all of that would

3    go to whether or not she truly has the emotional distress that

4    she claims.

5            Motion in limine 9, plaintiff's criminal history.  If

6    I understand plaintiff's argument, they do not want her to be

7    cross examined either under 608(b) or 405(b) with regard to a

8    specific instance of dishonesty; that is, her theft from her

9    employer.

10           There are legions of cases, your Honor, that find

11   theft to be a crime of dishonesty and admissible for proof of

12   character of dishonesty.

13           Not only, your Honor, did she get charged by the

14   authorities in Florida with this crime of theft from her

15   employer, an arrest warrant was issued for her, that arrest

16   warrant was outstanding at the time she, quote/unquote, fled to

17   Thailand.  That arrest warrant remained outstanding until the

18   year, I think 2009 or 2010, when it was quashed.  Plaintiff

19   failed to come back to this country during that entire time.

20   It got quashed because it had been such a long passage of time.

21           THE COURT:  Who was the employer?

22           MS. MENNINGER:  It was the Roadhouse Grill, your

23   Honor.  It was a burger joint.  And she was working at that

24   Roadhouse Grill in March of 2002 during the period of time she

25   claims that she was a sex slave.  She claimed that she was a

1   sex slave, that she was getting paid wads of cash, thousands of

2   dollars by Jeffrey Epstein, and this was happening 24/7.  And

3   we asked in discovery, and we got a bunch of records, not only

4   of her working at the Roadhouse Grill, but also of her working

5   at a bunch of other restaurants, at a veterinarian's office,

6   all kinds of things during the period of time that she says she

7   was a -- what is commonly known as a sex slave, is how she

8   described it in her papers.

9          Your Honor, she compounded the lie about the theft

10  because she wrote a book manuscript, as you know.  And in that

11  book manuscript, she describes that it was not her who took the

12  money from the tip jar, it was her boyfriend, Tony Figueroa,

13  and that's also what she testified during her deposition.

14         She said, for example, that she didn't commit the

15  theft, that he came in at the end of her shift, and while she

16  wasn't looking, he's the one that took the tips.

17         Well, we deposed Tony Figueroa, and Tony Figueroa,

18  your Honor might be surprised to hear, is a gentleman with

19  several felonies to his name, which he gladly recounted on the

20  witness stand on videotape.  He talked about all the thefts he

21  has committed, thefts from a video store, he was charged with

22  felonies, he was put on probation for ten years, he recently

23  had gotten out, but he actually denied that he was the one who

24  took the money from the tip jar.

25         So there's the lie, there's the tip jar theft, then

1    there's the lie about the tip jar theft, and then there is the

2    arrest warrant that was issued that plaintiff left the country

3    for over a decade while that arrest warrant was outstanding.

4          Your Honor, the fact of police contacts during this

5    timeframe, including this one, go directly to other issues,

6    including whether or not plaintiff was truly the sex slave that

7    she describes.  She had an opportunity, because she called the

8    police on numbers of occasions during the relevant time

9    period -- she called them to report a theft, she called them to

10   help with a civil assist getting her out of her apartment, she

11   called them for all kinds of reasons -- and at none of those

12   points of time did she tell the police that she was currently

13   then a, quote/unquote, sex slave.

14         Your Honor, the Roadhouse Grill also -- the Mail On

15   Sunday is the one who printed a story about the Roadhouse Grill

16   and confronted her aunt who was being interviewed for one of

17   their stories about it.  The aunt was in the process of saying

18   what a great niece she had, and then the news asked her about

19   the Roadhouse Grill theft, and she said, "Wow, I didn't even

20   know that she was working in a burger joint."  So it goes to

21   her internet reputation.

22         And finally, your Honor, I think if you look back to

23   that email between our client and Mr. Dershowitz on page GM009,

24   it's one of the lies that our client specifically referred to.

25   She quotes Virginia Giuffre's statement, "Jeffrey bought me

jewelry, diamonds were his favorite, and wonderful furniture.

He was paying me very well because I'd give him sex whenever he

wanted," to which our client responded, "If he was paying her

so well, why steal from her burger job in 2002?"  So it's

within our client's knowledge on January 6, 2015, and that is

an additional reason why it should be admitted going to her

state of mind or actual malice, as plaintiff likes to call it.

Your Honor, with respect to the school records, the

school records are what they are.  They explain that she was in

school during the entire time she claims that she was a sex

slave, it gives her numbers of days of attendance, I don't

understand why those records wouldn't be admitted in cross

examination of her as to her whereabouts at certain occasions.

Plaintiff certainly intends to introduce flight logs to show

that she was or wasn't in certain places, so school records

show where she was and wasn't on certain dates, and that's

important, your Honor.

Moreover, plaintiff is the one who told Sharon

Churcher about her own problems with school.  She told Sharon

Churcher, and Sharon Churcher published with her authorization

that she went back to school to get her GED, and she wanted to

study for massage.  She talked about dropping out of school.

Police records reflect the fact that she was a truant during

this period of time, that her mother was concerned about her

abusing drugs and alcohol.  The school records intimately

1       intersect with the entire story that plaintiff has told about

2       being a sex slave in the years 1999 to 2002.

3              Also, your Honor, they go to damages because plaintiff

4       has claimed that she should be entitled to a certain amount of

5       damages, and her own experts have talked about her being a

6       troubled child.  Again, this is something that they told their

7       psychiatric expert, and he relied on finding that she was a

8       troubled child, and then he's made inferences from there about

9       why she should be entitled to certain damages, and I think the

10      school records are a fair game for cross examination of him.

11             Motion in limine number 11, her bad childhood

12      behavior.  Again, your Honor, this is exactly -- plaintiff went

13      in to see the psychiatrist, went in to see hers and our

14      independent medical examiner, and in both cases she described

15      all of her, quote/unquote, bad childhood behavior.  So it goes

16      to her damages, your Honor.  They want to elicit what they want

17      to elicit and keep us from eliciting anything that would

18      contradict it.

19             But putting your reputation and your character in

20      issue, as she has in this case, about the time when she was a

21      child is necessarily a part of our cross examination to explain

22      to a jury what her reputation at the time of the acts in

23      question were.

24             She was a truant, reported to the schools as a truant,

25      reported by her mother to the police, circulated with people in

1   the community out trying to find her, and she was known as such

2   in her community.  So to say somehow that we can't talk about

3   her reputation for truth telling, her reputation for honesty at

4   the time she was a child when she claims that she was the

5   victim of sex abuse, is not supported by the law.

6          Plaintiff also cites to Sack on Defamation, and I

7   believe the cite is 10, Section 5.  And your Honor, I think

8   this helps clarify a lot of what our position is in this case.

9          Sack believes, as we do, that it is entirely

10  appropriate under 405(b) to question a plaintiff who has

11  alleged defamation, whose reputation is an issue about all

12  kinds of bad acts.  They have said, just now, that there is

13  just no reason we should be allowed to ask about all these

14  other bad acts.

15         Sack cites, your Honor, to an Eleventh Circuit case,

16  Schafer vs. Time, Inc.  In that case, your Honor, Sack says the

17  Eleventh Circuit found the district court had been correct when

18  it ruled that the defendant, which allegedly accused the

19  plaintiff of being a traitor, "would be permitted to question

20  the plaintiff about a felony conviction, a possible violation

21  of his subsequent parole, convictions for driving under the

22  influence, an arrest for writing a bad check, failure to file

23  tax returns, failure to pay alimony and child support, and

24  evidence concerning plaintiff's efforts to change his name and

25  social security number."  In other words, once you put your

1    reputation at issue, all of these specific instances going to

2    your honesty are fair game.

3         In this case, we have asked plaintiff whether she

4    filed tax returns.  She said, "No."  Tax fraud is not a private

5    matter, as plaintiff contends, it is a crime.  It is a crime of

6    dishonesty.

7         She likewise put into her complaint that her

8    reputation was injured in her professional capacity as

9    President of Victims Refuse Silence.  We inquired whether

10   Victims Refuse Silence was, indeed, a legitimate enterprise.

11   We learned that they had not met their tax obligations and they

12   had not been funded.  That is, as your Honor knows, the subject

13   of 702 motions, so I won't repeat it all here.

14        I will say, however, that both of those issues,

15   failure to file tax returns and tax fraud, are exactly the

16   kinds of evidence permissible under 405(b) when you are

17   attempting to establish the truth of your statement that

18   plaintiff is a liar.

19        Motion 14, evidence of being a victim of domestic

20   violence.  Your Honor, in this case, plaintiff claims

21   $30 million in pain, suffering, and emotional distress.

22   Plaintiff's expert, Dr. Kliman, testified that domestic

23   violence by her husband is likely a cause of exacerbation of

24   her PTSD.  He also testified it was a very violent episode and

25   more likely happened more than once.  He also testified that

1  she needs additional marital and sexual counseling based on her

2  disinterest in sex, which she claims is caused by the

3  defamatory statement.

4      Our expert, your Honor, likewise found that the far

5  more likely cause of any dysfunction in her marriage which

6  arose at the time of the domestic violence incident and was

7  more likely the cause of any PTSD pain, suffering, or emotional

8  distress that she was experiencing.

9      That domestic violence incident happened in early

10  March, 2015, a couple of months after the allegedly defamatory

11  statement, and seven months before plaintiff brought this

12  lawsuit.

13      The criminal proceedings against her husband also are

14  relevant to her damages, apart from Dr. Kliman's testimony.

15  Her husband was ordered to live away from their home, leaving

16  her to care for her three children alone.  He then stopped

17  participating in the court-ordered domestic violence

18  counseling, and he fled the country with an active arrest

19  warrant that remains outstanding to this date from Colorado.

20      All of these alternative sources of emotional distress

21  for plaintiff should be admitted, as her expert, Dr. Kliman,

22  has testified, in as far as they impact supposed pain,

23  suffering, loss of enjoyment of life.

24      Motion in limine number 15, any testimony that sex

25  with a 17-year-old girl is, quote/unquote, lawful.  Plaintiff

1    is the one who claims she had sex with various people at

2    various places at various times, some when she was 17, some

3    when she was 18, some when she was 19, some in Florida, some in

4    England, some in New York, some in New Mexico.  In all of those

5    cases, except Florida, the age of consent is 17.

6         I don't know what evidence plaintiff is going to

7    introduce about what sex she had, where, with whom, and her age

8    at that time because those sands have shifted dramatically

9    during the course of this litigation.  All I can say, your

10   Honor, is, if she tries to introduce evidence that she had sex

11   at a certain place and time and claimed that it was unlawful,

12   your Honor will be duty bound to instruct a jury on what is or

13   isn't lawful in a particular jurisdiction at a particular time

14   in a particular place.

15        Your Honor, I would submit that motion in limine 16

16   regarding the medical records, again, is something that depends

17   dramatically on what plaintiff introduces during her case in

18   chief, but there are many statements, as I mentioned earlier,

19   to her doctors which would be admitted as nonhearsay if offered

20   against her as party admission.

21        There are many statements over the last 15 years that

22   relate to her mental condition, that relate to her medications.

23   Do I anticipate asking about her ferret bite?  I do not.  Do I

24   anticipate asking about the other things that are listed in her

25   motion in limine?  I do not.  But I do believe that there are a

1    number of times that she saw doctors, made statements, sought

2    treatment, got medications, all of which are reflected in her

3    medical records and are something that about which she may be

4    cross examined.

5            She claims her medical records are private.  She is

6    the one seeking $30 million in emotional distress, pain and

7    suffering, and I think when you do that, I'm sure her lawyers

8    advised her that her privacy rights with respect to her medical

9    records would no longer be the same as a private individual.

10           Your Honor, Motion in limine 17, again, the dollar

11   value of the Jane Doe settlement depends entirely on what

12   happens in terms of plaintiff's case in chief and whether any

13   other evidence regarding the Jane Doe 102 litigation comes into

14   evidence, because if it does, then the settlement and the

15   settlement amount may very well become relevant, but I can't

16   say right now how anyone intends to use that at trial, why it

17   would be relevant, and I can't say whether or not the

18   settlement amount would likewise be relevant.

19           Motion in limine 18, the Cassell-Edwards-Dershowitz

20   litigation and their settlement.  It's interesting to note

21   Mr. Cassell to refer to himself in the third person when he was

22   talking about that litigation.

23           Your Honor, there are a number -- I can count five

24   reasons, at least, that that case is relevant to the facts in

25   this case.

1        Plaintiff was a witness in that case.  She was deposed

2   in that case.  She testified under oath in that case,

3   represented by the same counsel that she has here.  Her

4   testimony in that case is admissible.

5        She participated in that case, your Honor, from March

6   of 2015 or so until it settled in or around April of 2016, and

7   she reported to her doctors that it was causing her a

8   significant amount of stress.  In fact, shortly before she was

9   deposed in that case she went to a doctor and requested that

10  she get more Valium to help her handle her upcoming deposition.

11       Dr. Miller, our psychiatrist, found that her

12  participation in that lawsuit as a witness caused her

13  significant stress and explained many of her complained of

14  symptoms, and he said that they were exacerbated by her

15  participation in that litigation.

16       Third, evidence regarding that lawsuit goes to her

17  reputational damages.  Again, your Honor, I refer to the

18  federal evidence treatise relied on by plaintiff.  In

19  defamation cases, defendants can also prove other liables and

20  rumors about the claimant are circulating, at least if they are

21  widespread, to demonstrate it is not what the defendant said

22  about the plaintiff that caused her reputation to suffer but

23  what others said.

24       Your Honor has read the 702 pleadings.  Plaintiff's

25  experts have pulled off the internet all kinds of stories that

1    relate to plaintiff and said that those stories are evidence of

2    her damaged reputation.  When you look at the stories that

3    actually were pulled off the internet, a substantial number of

4    them relate to the Cassell-Edwards-Dershowitz litigation; what

5    happened in the litigation, statements made by the parties in

6    the litigation, statements made about Virginia Giuffre relevant

7    to that litigation.

8           If her reputation is damaged by some other litigation

9    that has nothing to do with Ms. Maxwell, Ms. Maxwell can't be

10   responsible for that reputational damage.

11          THE COURT:  What's your explanation of the damage

12   caused to Giuffre by the Dershowitz case?

13          MS. MENNINGER:  I'm sorry?

14          THE COURT:  I understand the testimony part.  That's a

15   different kind of thing.  But the case itself, how does that

16   damage her reputation?

17          MS. MENNINGER:  It's the press attendant to that case,

18   your Honor.

19          THE COURT:  Okay.  So the press attendant.

20          MS. MENNINGER:  There was a lot of press attendant to

21   that case which was, frankly, negative to the plaintiff that

22   had nothing do with Ms. Maxwell's denial.  And their experts

23   have relied on that press and claimed that that press somehow

24   supports their claim for damages against Ms. Maxwell, even

25   though she's not mentioned in the particular stories.

1          THE COURT:  But how is that going to figure into

2     damages in our case?

3          MS. MENNINGER:  Your Honor, I think the jury would be

4     instructed here not to hold Ms. Maxwell responsible for any

5     harm to plaintiff's reputation caused by third parties or

6     alternate sources, including stories that were generated by

7     statements made by her own counsel, by Alan Dershowitz, by

8     Prince Andrew, by anyone else.

9          THE COURT:  Well, yes.  But what I'm trying to figure

10    out, what about that case was damaging to Giuffre?

11         MS. MENNINGER:  I can't tell you that, your Honor.

12    It's actually plaintiffs who are asking for $1.9 million in

13    reputational cleanup costs, and when you ask them what

14    reputational cleanup costs are you trying to clean up, they

15    point to stories having to do with the Dershowitz litigation.

16    They say her reputation was damaged by that litigation and by

17    the stories related to it, and they want to push all of those

18    stories down on the internet searches.  Not stories that relate

19    to Ms. Maxwell, stories that relate to her litigation with --

20    her lawyer's litigation with Alan Dershowitz.

21         THE COURT:  Okay.

22         MS. MENNINGER:  I don't think that evidence should

23    come in because I don't think it's based on science, but I

24    realize that's not for today.

25              Likewise, your Honor, her failure to sue Alan

1   Dershowitz, although he's gone on all of these other shows and

2   called her a liar after she said she had sex with him seven

3   times, goes to her failure to mitigate any of her damages.

4          Finally, your Honor, there is, as you heard from

5   Mr. Cassell, talking about Cassell lawsuit, a statement issued

6   that that lawsuit was a mistake.  Whether her attorneys have

7   made representations, they did so while they were representing

8   plaintiff.  This was while Mr. Cassell and Mr. Edwards were

9   both pursuing their own lawsuit and also representing plaintiff

10  in this case.  So any statements that they issued that are

11  within the scope of their agency, your Honor, are

12  representations, frankly, made by plaintiff.

13         With regard to the Judge Marra order, motion in limine

14  19, your Honor, plaintiff would like to make a lot of arguments

15  now.  She's already litigated those points.  She lost.  She's

16  collaterally estopped from reraising them.  And it would be

17  seriously misleading, your Honor, to admit the joinder motion

18  and not inform the jury that a judge found that the allegations

19  contained in that joinder motion were impertinent.

20         Motion in limine 20, Rebecca Boylan.  They said she's

21  not been deposed.  She was a disclosed witness.  They said

22  she's not going to be a witness.  Well, we'll see.  Your Honor,

23  I don't think this is the appropriate time to raise this issue.

24  It's not an appropriate motion in limine.  I know what the

25  rules of evidence are with regard to hearsay and double

1   hearsay.

2          That's also true, your Honor, largely with respect to

3   the rest of the motions.  They are asking for an advisory

4   opinion from this Court about things that may or may not

5   happen.  Your Honor, I just don't see the need to waste more

6   time on it.

7          There is only one issue, the one raised in 28 where we

8   have presented the possibility that as the party that bears the

9   burden of proof, we would be allowed during closing arguments,

10  for example, to comment on the lack of proof, which is a common

11  closing argument.

12         If they have control over a party and that party

13  doesn't come and testify, we may, under the appropriate

14  circumstances and with the right foundation, ask for a missing

15  witness instruction, your Honor, but these are all advisory

16  questions at this point.

17         MS. McCAWLEY:  Your Honor, Sigrid McCawley on behalf

18  of the plaintiff.  Would the Court like to take a break at this

19  point?  I know we've gone for a couple hours.  I'm not sure how

20  you'd like to proceed.  We're happy to address --

21         THE COURT:  Let's finish.

22         MS. McCAWLEY:  Let's finish.  Okay, great.  Thank you.

23         MR. CASSELL:  Paul Cassell, your Honor, for

24  Ms. Giuffre.

25         The defense started with an overview of Rule 405(b),

1        so let meet respond to that overview.

2                They reference Mueller and Kirkpatrick, a treatise

3        that we think is very instructive on this particular point.

4                Mueller and Kirkpatrick says, "It is true that in a

5        defamation case there is more latitude to introducing

6        reputational types of evidence.  However, it's important to

7        remember, say Mueller and Kirkpatrick, that actual character is

8        not so much the question as reputation."

9                And it follows that "specific instances of misconduct

10       cannot be proved if they were not generally known because then

11       they would not affect reputation."

12               They go on to say that, "When a defendant's proof goes

13       to specific instances under 405(b), caution from the judge is

14       in order.  Proving misbehavior can, in effect, become a game of

15       character assassination that adds insult to injury which courts

16       can block by carefully considering relevancy issues and the

17       rule against unfair prejudice found in Rule 403."  And so it is

18       against that backdrop that the Court should be considering

19       these 405 issues.

20               What I would like to do is offer three illustrations

21       of what I think is going to be a pervasive flaw in many of the

22       arguments advanced by the defense.

23               So we heard that, "Your Honor, look under 405(b).  The

24       fact that the mother -- plaintiff's mother described her as a

25       liar about using drugs and running away from home, that comes

in to show reputation."  Let me explain why I believe that

argument is fundamentally flawed, and that will, of course,

carry over to other illustrations, as well.

        The statement to which defense counsel was referring

was a statement that Ms. Giuffre's mother made during a

deposition as a witness in this case where the only people in

the room were the court reporter and the attorneys.  The fact

that when asked, "What did you think of your daughter 17 years

ago?  Well, I thought at the time that she was a liar," wasn't

something that goes to Ms. Giuffre's reputation because there's

no evidence anybody knew about it other than, you know, the

mother who is now being deposed in 2016.

        Moreover, the question was, "What did you think about

the fact that your then 17-year-old child was running away from

school?  Well, I thought she was lying to me about that."  That

would go, I guess, to her reputation back in, what, 1999, 2000,

2001, that time period, but of course the damages that are at

issue in this case are damages around 2016 and thereabouts when

the defamatory statement is released.

        So it's hard to see even an argument for the statement

of the mom in a deposition going to reputation.  I don't know,

maybe I'm missing something, maybe there's some marginal

relevance that can be distilled out of all of that.  But of

course then your Honor has to weigh whatever marginal value

that has as to reputational issues against the very significant

1    prejudicial effect.

2          Obviously, this is going to be considered by the jury

3    to think she's a bad kid.  They're not going to like

4    Ms. Giuffre, and they're going to hold it against her, not

5    because it has some technical reputational aspect to it, but

6    because it is something that shows she's a bad person.  Under

7    403, the evidence should be excluded.

8          Let me give you a second illustration of reputational

9    points.  They say, "Ah-ha, look.  Ms. Giuffre went to

10   Dr. Kliman," and I believe your Honor referred to that as well.

11   And your Honor asked, I think, a very good question, and let me

12   see if I can answer that question.

13         You said, "Well, why did she disclose all this stuff

14   to Dr. Kliman?"  Well, the answer is obvious, she was under

15   instructions from the doctor to tell everything that happened,

16   and of course she told, to the best of her ability, everything

17   that happened.  Some of the stuff is going to turn out in a

18   court of law to be relevant, some of this stuff in a court of

19   law is going to turn out to be irrelevant.  But that's not the

20   psychiatrist's job to say, 'No, no, no, don't talk about

21   illegal drug use because the prejudicial effect outweighs the

22   probative value,' he just gets a full medical history.  And

23   having collected all that information, you know, through

24   Dr. Kliman, or they also have Dr. Miller who did a similar sort

25   of thing.  Now once you have all of this vast array of

1    information, then the lawyers present arguments to your Honor

2    and say, 'Wait a minute.  Some of the things that are in the

3    report aren't relevant to the case and, in fact, are going to

4    be highly prejudicial for the jury.'  That's why we're here

5    this morning asking for some of those things to be excluded.

6          For example, there are some references -- I won't

7    belabor the point -- but the references that we're making to

8    some of the illegal drug usage and so forth, that's not

9    something we're trying to deploy affirmatively.  The good

10   doctor simply listed all of the information that had been

11   recited as part of his report so that the lawyers and the judge

12   can now make a determination.

13         And the fact that Ms. Giuffre told Dr. Kliman in a

14   confidential psychiatric examination certain things about drug

15   use can't possibly go to her reputation because no one was

16   there who was assessing what kinds of things might be going on.

17         A similar point can be made about tax fraud.  We're

18   told, "Well, your Honor, tax fraud goes to her reputation."  I

19   suppose that goes to her reputation with some IRS agent who is

20   looking at a return, but it can't possibly go to a general

21   reputation that is at issue in this case.

22         And once again, the cases that we cite in our briefs I

23   think make this point clear, there is a vast risk of

24   prejudicial effect to Ms. Giuffre because the jury is going to

25   think, oh, she's a tax cheat, and they're going to hold that

1    against her because they don't like her actions in that

2    particular circumstance as opposed to the merits of the case.

3           And by the way, we are going to strongly contest that

4    she's a tax cheat, so your Honor is going to have, I guess,

5    competing tax information, and jury instructions on whether

6    personal injury returns have to be reported on your return, all

7    of which is going to deflect the jury's time and attention, not

8    to mention the Court's and counsel's, away from the fundamental

9    issue of did Ms. Maxwell defame Ms. Giuffre.  So that's our

10   response to the initial overview regarding 405, and I'm going

11   to turn the time over to my colleague now to dive into some

12   specifics.

13         MS. McCAWLEY:  Thank you, your Honor.  I'm going try

14   to keep this very brief and just touch on some of the

15   highlights quickly.

16          So we were talking initially at the beginning about

17   the issue of various pieces of different witnesses, whether

18   their information would come in, and we hit on the issue --

19   they brought up the issue of Mr. Freeh, and actually gave

20   you -- told you that he was going to be just somebody who was

21   going to sit on the stand and validate the FOIA response.

22          Well, very clear from the documents they've produced

23   in this case, if I could hand them up, your Honor, this is the

24   pages that they produced with respect to Mr. Freeh.  And you'll

25   see on the first page, he gives his conclusion and he says,

1    "Based on my experience, knowledge, and duties of these

2    protocols in the USS Protective Details of Special Agents, a

3    company escorting Mr. Clinton" -- so he is relying on his

4    expertise as a former FBI head in order to opine on whether or

5    not these records are correct, your Honor.

6           They disclosed him as a lay witness in this case, not

7    an as an expert witness.  We went through a series -- as you

8    know your Honor, you've seen all the expert depositions in this

9    case that we've had.  They say, "Well, you could have deposed

10   him as a lay witness."

11          Your Honor, will remember, we were very limited.  We

12   were limited to ten depos.  We had to beg, borrow, and steal to

13   get a few more, and we had to be very careful in who we picked

14   and chose with respect to establishing our claims.  If we had

15   known, of course, that Mr. Freeh was going to be put on the

16   stand as an expert in this case, we, of course, would have

17   sought his deposition through the expert process.

18          So, your Honor, I think those documents speak for

19   themselves.  They're very clear, that's GMOO526, where he's

20   giving that clear opinion.  The letter is sent to

21   Mr. Dershowitz and he signs it, and then it has the relevant

22   attachments.  So, your Honor, we firmly believe that that

23   should be kept out of evidence because he was not disclosed

24   properly as an expert in this case.

25          The other thing I want to point your attention to is

1    another document that they gave you, and I think this document

2    is really telling for what it doesn't say, and that's the email

3    traffic.

4            Right after -- a few days after she makes the

5    defamatory statement, she's conversing with Alan Dershowitz

6    about this statement.  And this is GM0006 through 00015.

7            What's really interesting about this is nowhere in

8    this statement does she say, 'I didn't participate in this

9    abuse.  I didn't know this person.  I wasn't around.  This

10   didn't happen with JE.' Instead, she picks statements and says

11   things like -- which sound like a jealous girlfriend -- she

12   says, "I called Jeffrey and told him I've fallen madly in love,

13   Virginia says.  I was hoping he'd be delighted, but he said,

14   "Have a nice life" and hung up on me."  And she puts in parens

15   to Mr. Dershowitz, "Did she want Jeffrey to say no, don't do

16   it, I want to marry you?"

17           Clearly, she knows -- while during her deposition she

18   claimed to not recollect my client whatsoever, she clearly

19   knows her and this shows that they were together.

20           It's also interesting, if you look on page 0008,

21   because she's putting in parens individuals, other people that

22   my client was lent out to that they forgot to mention in the

23   list that they give.  I mean, what's really telling about this

24   document is what it doesn't say, but it clearly shows she knew

25   my client, she knew what was occurring, and she's simply trying

1    to pick apart nuances in the statement.  So, your Honor, I

2    submit that to you for what it doesn't say from Ms. Maxwell

3    since they've provided that to you today.

4           There are a few more things that I just want to touch

5    on that I think need to be clarified, and that is, with respect

6    to -- there was this mention about newspaper articles, and as

7    you know we've submitted an expert who analyzed through his web

8    analytics, he's the same expert that was in the Anders case who

9    followed that video of the Fox reporter over the internet and

10   tracked that he uses a well-accepted methodology.  We've set

11   that forth all in our papers.

12          But he tracked the specific quoted statements, your

13   Honor.  And if they have an issue, if they want to say, oh,

14   they're proposing today that these articles related to the

15   Dershowitz matter, that's subject for cross examination of him

16   if they want, but he has a very clear methodology, and those

17   articles that he tracked were in that manner, your Honor, so I

18   just want to make that point since they raised it.  I know

19   we're not discussing the experts in detail today, but I did ask

20   that question.

21          So your Honor, in just summarizing on those points, I

22   think we made clear in our opening argument why we believe that

23   this shouldn't be subject to a number of mini trials on a

24   variety of these issues, we're hoping to streamline this

25   matter, and that's why we proposed this motion in limine to you

1    in the way that we did.

2         I'm just going to let my counsel address any final

3    issues.

4         MS. SCHULTZ:  Your Honor, I don't have anything

5    further to say on motion in limine number 6.  The defendant has

6    not given any valid reason or justification for introducing any

7    evidence of prior sexual assault that should be excluded for

8    all the reasons in the brief and the oral argument over these

9    two days.

10        With regard to drugs, there are voluminous medical

11   records presented here.  Defendant's counsel has stood up and

12   said there are false statements to doctors and have suggested

13   that Ms. Giuffre is doctor shopping.  I'll submit that the

14   records do not reflect that.

15        Defendant apparently seeks to introduce a jotted down

16   note here or there from medical records, but these are plainly

17   hearsay, and a sentence fragment in the middle of a medical

18   chart is not admissible evidence, it's hearsay.  And then,

19   they're certainly not a party admission, they don't even

20   reflect the totality of what the conversation is between

21   patient and doctor.

22        Also, I would also submit that the prescription

23   records show that they are not doctor shopping to a mass

24   amounts of pills or medication.  The prescription records speak

25   for themselves.  You can count the number of pills that were

1   prescribed over a period of time, and you'll understand that

2   this is not a situation of someone being a drugee and doctor

3   shopping, something that's in the news a lot these days.  So

4   trying to submit it that way is not only irrelevant to this

5   case, but the prejudice greatly outweighs whatever probative

6   value it might be.  Ms. Giuffre would not, of course, object to

7   testifying with regard to what current medication she takes,

8   but that's a different subject altogether.

9          With regard to criminal history, as I mentioned,

10  Ms. Giuffre denied that she stole the money.  She said her

11  boyfriend took the money while he was there with her.  And

12  defense counsel reminded Court that this victim is a thief.

13  Again, none of this information comes in under the Federal

14  Rules of Evidence.  Even the charging document and the warrant

15  are classic hearsay and should be excluded.

16         With regard to the next one, I'm going to skip ahead

17  to school records.  The records don't show that she was in

18  school, as much as defendant seems to think she is.  They don't

19  have also what days she attended and what days she doesn't.  It

20  doesn't say that she was there on, for example, May 23rd, 2000.

21  What they do show is that there are no courses taken between

22  1999 and the 2000 school year, and no courses taken during the

23  2000 to 2001 school years.

24         Ms. Giuffer's attempt to work and resume school at

25  another school as as a tenth grader in the 2001 to 2002 school

1   year was limited to a portion of the school year starting

2   October 20th, 2001, ending only in March 7th, 2002, which only

3   further substantiates Ms. Giuffre's testimony that at one point

4   she attempted to get away from defendant's abuse, along with --

5   and Mr. Figueroa testified to the same.

6         So again, I would also reiterate that her reputation

7   as a child for being a truant or a runaway is not what is at

8   issue in this case.  She is a 30-something-year-old woman and

9   did not have a reputation related to her school attendance.

10        There is also in this case zero evidence of her

11  not-for-profit being a tax fraud.  It's not funded and it's in

12  compliance with United States tax rules.

13        Additionally, Ms. Giuffre has produced volumes of

14  papers of tax returns filed with the Australian government, the

15  country where she has predominantly resided since she was 19

16  years old.  And that's all I'm going to say for that, to keep

17  it brief.

18        MR. CASSELL:  Your Honor, I'm just going to address

19  all of the points that -- I'll just take very few minutes here,

20  with your permission.

21        So on point number 7 that I addressed, the issue of

22  slut, it seems like we're in agreement that that should be a

23  term that's not used.

24        The debate was over the term "prostitute".  Again, Dr.

25  Esplin, their own expert, you can see in the 702 motions, he

1    concluded that was an inappropriate word.

2          The only -- let me be clear.  If there's some document

3    that has the word "prostitute" in it, we're not suggesting that

4    then it would be -- if that document is in evidence and the use

5    of that word is appropriate and admissible and relevant, we're

6    not saying that that has to be redacted.  But the only example

7    they gave is there's some comments in some internet chat room

8    somewhere, we're not sure exactly how they're going to

9    authenticate those, there's no evidence Ms. Giuffre has heard

10   of those, so as you say, we can take that up at the time.  But

11   we would ask that defense counsel be instructed, and their

12   witnesses be instructed, not to use that term unless it appears

13   in a particular document.

14         With regard to item 14, this is the domestic violence

15   issue.  And they say, look, it has relevance because it shows

16   an alternative cause of emotional distress damages.

17         Our position is primarily based on Rule 403.  We

18   conceded, I think, that there's some arguable chain of

19   relevance that perhaps could be teased out here, but let's

20   understand, this domestic violence incident took place in

21   March, 2015, and the statement at issue that caused the

22   worldwide reputational damages was launched in January of 2015.

23         So the relevance here is marginal, and ultimately the

24   question your Honor has to, of course, sort out is the

25   prejudicial effect.  There wasn't any response that I heard

1    from defense counsel about a blame the victim mindset that the

2    jury would very well adopt once they heard that Ms. Giuffre's

3    staying with her husband is a victim of domestic violence.  So

4    your Honor has in front of it, I think, essentially uncontested

5    evidence, or at least uncontested argument of substantial

6    prejudicial effect that will exist that tips decisively in

7    favor of excluding this, particularly when they get to subjects

8    like criminal proceedings.  We're going to then get into what

9    is the scope of the protective order if they live in Australia

10   and things like that.  That's far afield from any effect on

11   emotional distress damages.

12        Item 15 has to do the 17-year-old, 16-year-old,

13   15-year-old.  I think we have agreement from both sides that

14   sex with a 17-year-old is unlawful under the age of consent

15   statute that exists in Florida, and we'll be asking either to

16   cover that through an expert witness or through a jury

17   instruction.  But they say, oh, what if she's flown to New

18   Mexico?  The age of consent there might be different.  And this

19   is where I believe your Honor can take a close look at the

20   expert witness on sex trafficking, the 702 motion is currently

21   pending in front of you, Professor Terry Conan, who is at the

22   Florida State Trafficking Institute, and we've offered him as

23   an expert witness.

24        If you take a 17-year-old from Florida, fly her to New

25   Mexico for sexual purposes, it makes no difference what the age

1    of consent is at that point because you have a federal sex

2    trafficking crime that has been committed.

3          The same thing is true if you fly a 17-year-old into

4    London, or if you fly her into New York.  All of those are sex

5    trafficking crimes, and Professor Conan is prepared to explain

6    both that particular aspect, I would describe it as a mixed

7    question of fact and law, and also some of the psychological

8    techniques that are used to create the -- I think he refers to

9    them as the invisible chains of sex traffickers.

10         So we either have a crime in Florida, because she's

11   under the age of consent, or we have a federal or, in all

12   likelihood, state trafficking offense if she's flown to another

13   state.

14         Which regard to item 18, the Cassell and Edwards

15   litigation, I think your Honor asked some excellent questions

16   on that.

17         We were told that there are five reasons why

18   Ms. Giuffre's connection to that case has some relevance.  The

19   first argument, I guess, is their strongest argument, was that,

20   well, she was a witness in that case.  But, of course, that was

21   a confidential deposition, so it couldn't have anything to do

22   with reputational damages or something else.

23         Let me be clear.  Ms. Giuffre made statements when she

24   was deposed, and if they say, ah-hah, you've said X from the

25   witness stand, but last year when you were deposed you said not

1    X, fair enough, cross examine her about it, inconsistent

2    statement.  We're not objecting to that aspect of that.

3         What we don't want is the lawsuit itself and the

4    circumstances surrounding the lawsuit to be paraded in front of

5    jury.  If they simply want to put in a deposition statement to

6    stay it's inconsistent, and that's properly done, of course,

7    that would be appropriate.

8         Their second point is, she participated for a period

9    of time.  I guess she participated if you're subpoenaed as a

10   witness and testified, but that wasn't -- you know, she wasn't

11   a party to the case.

12        Their third point was that the reputational damages

13   somehow link into what Dershowitz was saying.  Again, your

14   Honor already knows our point one is to keep out Mr. Dershowitz

15   from the case, and you'll make a ruling one way or the other on

16   it.  If he's kept out of the case then this becomes a moot

17   point.  But even if you decide he's in the case, well, okay,

18   fine.  Have him testify and do whatever else you think is

19   appropriate.  We don't need to hear all about this unrelated

20   lawsuit.

21        Their fourth point had to do with, I believe, you

22   know, damages suffered by Ms. Giuffre.  Your question was, if

23   I'm -- I don't have the transcript in front of me -- I think

24   you said, well, how does the case itself go to damages?  And I

25   believe this is a direct quote from Ms. Menninger.  "I can't

1    tell you that."  So even the defense counsel when given an

2    opportunity to articulate the relevance failed to do so, in our

3    view.

4         She says -- then her next argument is, well, the

5    plaintiff's experts are using Dershowitz's statements.  As you

6    know from the 702 pleadings, no, we're using Maxwell's

7    statements.  We're only going to be proving a case about what

8    Maxwell's defamation did to Ms. Giuffre.

9         And then the last argument was that there was a

10   failure to mitigate damages by suing Dershowitz.  Well, your

11   Honor knows, if a person A commits a defamation, you sue A and

12   you get your damages.  Then if person B does something, you

13   sort that out in a separate proceeding in a separate way.

14   Sacks and others are very instructive on that.

15        The last point they made was that, well, look, these

16   statements were going on while Cassell and Edwards were

17   representing her.  They've shown simultaneity in time, but not

18   simultaneity in the scope.

19        It is true that the lawsuit was settled, and I won't

20   refer to myself in the third person.  Mr. Edwards and I settled

21   the lawsuit and made certain statements in connection with

22   that, but that was to take care of our own professional

23   reputation and the lawsuit associated with that, it had nothing

24   to do with representing Ms. Giuffre.

25        I believe I have two left, your Honor, and you've been

1    extremely patient.  Let me just take two more minutes to cover

2    point 19.  This is Judge Marra's ruling.

3           They say we want to put it in that she lost.  Well, in

4    our view, actually, that was a victory.  Our goal was to try to

5    get her into the case, and Judge Marra ruled that she could

6    participate by being a witness.

7           Now, are we really going to try the implications of

8    Judge Marra's ruling in a pro bono Crime Victims Rights Act

9    organization ruling?  He ruled on this, but allowed this other

10   thing.  It's highly, first, irrelevant, and obviously, highly

11   prejudicial in the sense that it's going to divert the jury's

12   attention away from the facts at hand here.

13          And again, Judge Marra only ruled on the first of nine

14   reasons that we offered for putting those allegations in.  He

15   said point 1 doesn't work, the others we'll see how things play

16   out.

17          The litigation is moving forward.  I can tell you the

18   government will be responding to our summary judgment motion, I

19   believe on May 15th.  We'll be replying on July 15th, so the

20   litigation continues.

21          The last point that I'll make is Boylan.  This is item

22   20.  Remember, Dershowitz is going to say that Boylan says that

23   Ms. Giuffre said certain things.  And we were told that, well,

24   maybe she will be a witness.

25          It's my understanding that Boylan is not on the final

1    pretrial witness list.  Maybe during a break I can confirm

2    that.  But if she's not on the witness list, we've got double

3    hearsay and it can't come in.

4         The last point I would leave you with, your Honor, is

5    many of these issues are going to come down to balancing.

6    They're of minimal relevance for the reasons we've explained,

7    very significant prejudice, and we would ask that each of the

8    motions in limine we've asked today be granted.

9         THE COURT:  Thank you.  We'll resume at 1:30, and I

10   guess, unless you all think it's been covered, the Maxwell

11   motions.  What do you think?

12        MR. PAGLIUCA:  Your Honor, I would --

13        THE COURT:  Would you rather catch your plane?

14        MR. PAGLIUCA:  No.  I'm prepared to stay until

15   tomorrow, your Honor.  I'm not leaving until tomorrow morning,

16   just in case you need me this afternoon.  I'm sure you're

17   thrilled about that.

18        I think, your Honor, when I went through these, it

19   seems to me that we have dealt with number 679, 716, in

20   connection with 683, 742, and 774.  That deals with the

21   Rodriguez, we call it the unauthenticated hearsay document from

22   a suspect source.  They call it the black book.  I think the

23   Court heard argument about all of that and, in my view, this

24   does not all need to be repeated today.

25        Yesterday, we talked about the -- I can't remember the

name of it, but it was the plaintiff's motion, sort of omnibus

related to different acts either under 404(b) or 415.

        The plaintiff wanted until 15 days before trial to

make whatever showing they wanted.  It would make sense --

well, in defendant's 404(b) motion, there are some of those

issues, as well.  We certainly could argue part of that.  The

Court may want to defer that to the entirety of when we have

whatever the supplement is to that motion yesterday.

        Then we also, I believe, dealt with yesterday the

issue related to the Jane Doe 102 complaint.  We have a

competing motion on that.  That's 663.  It seems to me that was

argued yesterday, and we don't need to repeat those arguments,

which is the same argument we had yesterday.

        So in my view, your Honor, that leaves the bifurcated

trial motion, which has been fully briefed, the Kellen and

Marcinkova issue, and the police report issue.  So by my count,

we have those three.

        I also have on my calendar that our motion to

preclude -- or the plaintiff's motion to preclude calling

attorneys as witnesses, which is 685 and 772, and by my

calendaring the reply was due yesterday.  I think Ms. McCawley

has a different version of that, and so frankly, I don't care

whether we hear that today or some other time.

        So that's my accounting of what we have ripe for

argument today, or shouldn't have argument today, as the case

1    may be, your Honor.

2                   (Discussion held off the record)

3                   THE COURT:  We'll resume at 1:30.

4                   (Luncheon recess)

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            AFTERNOON SESSION

 2                               1:30 p.m.

 3              THE COURT:  Who's up?  I think the defense?

 4              MR. PAGLIUCA:  Yes, your Honor.  I think Ms. Schultz

 5    requested that we take up No. 666 at this point, which we're

 6    happy to do.

 7              THE COURT:  Oh, yes.  Yes.

 8              MS. MENNINGER:  Your Honor, this motion relates to our

 9    request that we exclude evidence barred as a consequence of

10    plaintiff's summary judgment concessions.  We asked in argument

11    4 of our summary judgment motion for partial summary judgment

12    with respect to the oral statement on January 4$^{th}$ to a

13    reporter.

14              THE COURT:  Hold the phone.

15              MS. MENNINGER:  Sure.

16              THE COURT:  Sorry.  Needless to say, I'm drowning.

17              Ah, okay.  Okay.  Sorry.  Yes.

18              MS. MENNINGER:  We asked for partial summary judgment

19    with respect to our client's statement on a New York street

20    that, "I am referring to the statement that we made."  As we

21    set forth in our summary judgment brief, this Court's ruling in

22    Adelson v. Harris is directly on point, that a mere reference

23    to another writing that contains defamatory statements does not

24    constitute an actionable repetition or republication.  In that

25    case, in Adelson, there was, first, an allegedly defamatory
```

 1   statement and later a press release which said, we stand by

 2   everything we said.  It's directly on point.  Your Honor there

 3   held that such republication is not actionable.  We set forth

 4   that clearly in our argument 4 of the summary judgment motion,

 5   and plaintiff, in her response to summary judgment, made

 6   absolutely no reference, no response, nothing with respect to

 7   that argument.  We, therefore, believe that she has conceded

 8   the point and we would ask that no evidence regarding that

 9   statement be entered in the trial.

10          We predicted, and we were correct, that having not

11   argued it in response to our summary judgment motion, they

12   would try to use the opportunity of their response to this

13   motion *in limine* to make substantive arguments.  They should

14   not be permitted to do so, your Honor.  In any event, their

15   arguments that they have set forth in response --

16          THE COURT:  I'm a little lost.  Perhaps totally lost.

17   But the partial summary judgment, that's not been dealt with,

18   or has it?

19          MS. MENNINGER:  It was not part of your Honor's

20   ruling, no.

21          THE COURT:  Tell me the context of the summary

22   judgment.

23          MS. MENNINGER:  Certainly, your Honor.  There were a

24   number of things that we believed plaintiff had conceded

25   because they failed to respond to our requests in our summary

1    judgment motion.  Your Honor ruled against us on a couple of

2    points, but your Honor was silent with respect to this

3    particular argument, argument No. 4 --

4           THE COURT:  Ah.

5           MS. MENNINGER:  -- in your ruling.

6           THE COURT:  And that was?

7           MS. MENNINGER:  Our plaintiff's statement two days

8    after the --

9           THE COURT:  The one on the street.

10          MS. MENNINGER:  Exactly.  That in that statement, our

11   client said, we stand by the statement, or, I am referring to

12   the statement that we made.

13          THE COURT:  Yes, yes, yes.  Okay.  I'm just trying to

14   figure it out.  So in a very nice, polite way, you're telling

15   me I failed to deal with that motion of yours.

16          MS. MENNINGER:  That's correct, your Honor.

17          THE COURT:  So it's still out there.

18          MS. MENNINGER:  Still out there.  There was no

19   response by plaintiff to that argument is our point; that in

20   their response to summary judgment, they didn't mention it at

21   all.

22          THE COURT:  Well, that's probably where I missed it.

23          MS. MENNINGER:  Exactly.  So I think the fact that

24   they failed to respond to it then, as your Honor has held in

25   other cases, has consequences; namely, it's a conceded point.

1    And so their failure to respond --

2            THE COURT:  What was the point, that that was not

3    another defamation?

4            MS. MENNINGER:  Exactly.  In the case of *Adelson v.*

5    *Harris*, just like in this case, there was one allegedly

6    defamatory statement afterwards.  There was a press release

7    issued that stated, we stand by everything we said.  Those

8    facts are very similar to ours, where there was a written

9    statement issued and then our client, did she or did she not

10   republish that, is that a separate defamatory event.

11           THE COURT:  Okay.  Thank you very much.  Now, at least

12   in this little small part of this dispute, I know where I am.

13   Okay.  Thanks.

14           MS. MENNINGER:  And the *Adelson* case, your Honor,

15   controls and says that referring back to a statement, such as a

16   previous press release, is not actionable, and summary judgment

17   has been granted on such alleged republications.  So now, in

18   this motion *in limine*, is not the time to be dealing with the

19   substantive point that plaintiff basically conceded during

20   summary judgment.

21           Thank you.

22           MS. SCHULTZ:  Hi, your Honor.  Meredith Schultz,

23   counsel for Ms. Giuffre.

24           This motion *in limine* has already been decided by this

25   Court's summary judgment order, thereby rendering it moot in

1    its entirety.  Accordingly it should be summarily denied as

2    moot.

3          This motion should also be denied because it advances

4    the exact same arguments defendant advanced in her summary

5    judgment motion.  She is seeking rehearing on her summary

6    judgment motion, dressed up as a motion *in limine*.  Many courts

7    in this district have summarily denied motions *in limine* that

8    seek to relitigate arguments from summary judgment, and I have

9    listed six such cases on pages 7 and 8 of our response in

10   opposition.  You ordered nine defendant's motions for summary

11   judgment.  This Court rejects the argument that she should have

12   partial summary judgment on the January 4th statement.  The

13   last sentence of that order states, "Because of the existence

14   of triable issues of material fact rather than opinion and

15   because the prelitigation privilege is inapplicable, the motion

16   for summary judgment is denied."  Defendant's reiteration of

17   her defamatory press release confirming it two days later is

18   something that this Court did not rule that that is not

19   actionable.  So she's seeking rehearing.

20         Also importantly, your Honor, Ms. Giuffre opposed

21   summary judgment on defendant's defamation in its entirety.

22   She opposed the motion for summary judgment in its entirety,

23   and this statement, as part and parcel of defendant's

24   defamation and part and parcel of defendant's motion for

25   summary judgment.

```
 1              THE COURT:  Well, what do you say about the case
 2    that's been cited?
 3              MS. SCHULTZ:  Well, about Adelson?  I would say that
 4    it's factually distinguished because here she is two days later
 5    reiterating her defamatory statement.  And I would also direct
 6    you to the case in my brief, Wheelings v. Iacuone.
 7              THE COURT:  Let me just get the time frame right.
 8              MS. SCHULTZ:  Sure.
 9              THE COURT:  The initial statement is January, and when
10    is this?
11              MS. SCHULTZ:  So, your Honor, the email that went to
12    the media, it was first issued on January 2, 2015; it was
13    published on January 3, 2015; and the statement took place the
14    next day, on January 4, 2015.
15              THE COURT:  Okay.
16              MS. SCHULTZ:  A recent opinion in this district, the
17    Wheelings case, makes it clear that you can't reargue summary
18    judgment on a motion in limine and also makes it clear that you
19    can't say, oh, because one person --
20              THE COURT:  The issue is, was the second statement
21    defamatory?
22              MS. SCHULTZ:  I think that was an issue at summary
23    judgment that Ms. Giuffre opposed in its entirety, and I think
24    that's already been resolved.
25              THE COURT:  How?
```

1                MS. SCHULTZ:  Because it was denied, your Honor.

2                THE COURT:  The motion was -- well, okay.

3                MS. SCHULTZ:  Your Honor, even assuming, arguendo,

4      that this is not cause of action, it should still be admitted

5      as evidence.  This is a motion *in limine* to exclude it as

6      evidence.

7                THE COURT:  All right.  Assume for the moment that the

8      case that counsel has given me is accurate, and then why would

9      it get in?  What does it add?

10               MS. SCHULTZ:  It adds state of mind, defendant's state

11     of mind in issuing --

12               THE COURT:  The state of mind didn't change in two

13     days.

14               MS. SCHULTZ:  Right.  It says that she stood by her

15     statement and did not retract it.

16               THE COURT:  Well, she certainly is standing by it

17     today.

18               MS. SCHULTZ:  And your Honor, it shows one other

19     thing.  Throughout this litigation defendant has tried to argue

20     that defendant had nothing to do with the defamatory

21     statements.  In fact, just yesterday defendant's counsel was

22     saying that it was issued by her lawyer and by her press agent.

23     It's her statement, and in this video she is personally owning

24     it, and she can't hide behind her lawyer or her press agent.

25               THE COURT:  Oh, okay, okay, okay.

1          MS. SCHULTZ:  So it goes to a material argument that

2     defendants have advanced.

3          THE COURT:  So to the extent that becomes an issue,

4     and that's a whole other thing, as to whether she intended the

5     statement, I can see that.

6          Okay.  All right.  Anything else?

7          MS. SCHULTZ:  Yes.  I'm just going to say that this is

8     a motion *in limine* and there are no evidentiary problems with

9     this piece of evidence.  This is the defendant herself on

10    camera, this is not hearsay, and there's no Federal Rule of

11    Evidence that should exclude this.

12         THE COURT:  Okay.  Do you want to add anything?

13         MS. MENNINGER:  No, thank you, your Honor.

14         THE COURT:  Okay.  Thank you.

15         What else?

16         MR. PAGLIUCA:  Your Honor, we can take up the

17    bifurcation issue that's presented in 662 and 766, and then

18    there was a reply filed last evening.

19         THE COURT:  Yes.

20         MR. PAGLIUCA:  Your Honor, I think -- well, I don't

21    think.  The law is very clear on this issue in this circuit.

22    There is a --

23         THE COURT:  Well, I think we can shorthand this.

24         MR. PAGLIUCA:  Yes.

25         THE COURT:  Yes, yes.  Maxwell's money doesn't come in

1    on the liability case.  That's your position.

2           MR. PAGLIUCA:  That is my position, your Honor.

3           THE COURT:  I think that's correct.  Tell me why

4    that's wrong.

5           MR. CASSELL:  All right.  Thank you, your Honor.

6           The problem, as usual, is, yeah, her net worth doesn't

7    come in at the liability stage, but I think the defendant is

8    trying to get the camel's nose under the tent and say, oh, if

9    financial issues don't come in, then you can't --

10          THE COURT:  Well, I don't know what financial issues

11   you mean.  He's saying no introduction of her finances -- that

12   is, how much money she's got or where it comes from or anything

13   like that comes in.

14          MR. CASSELL:  As I understand the motion, it's with

15   reference to her "financial status."

16          THE COURT:  Well, I just told you what I think that

17   means.

18          MR. CASSELL:  Right.  And I think, with the

19   construction that you were just giving, I'm not sure that we're

20   concerned about this, but let me be clear.

21          THE COURT:  What would you like to present?

22          MR. CASSELL:  There were three or so things we would

23   like to present.  If your Honor rules that Ms. Giuffre's tax

24   compliance can go to her credibility, then we would like to be

25   able to reciprocally say, all right, then Ms. Maxwell's tax

1    compliance, if there is questions about that, could be

2    introduced.  We think that there shouldn't be tax compliance

3    issues coming in with regard to Ms. Giuffre.  They've said,

4    well, that goes to her credibility.  What's good for

5    Ms. Giuffre should be good for the defendant.  But again, to be

6    clear, we don't want to turn this into a tax trial; we want it

7    to be a defamation trial.  But they've made an argument, tax

8    issues are relevant to Ms. Giuffre.  Then we would like to have

9    a parallel opportunity then with respect to Ms. Maxwell.

10                THE COURT:  Well, that's different.

11    there's a organization that is paying girls to give sex to

12    Epstein.  And who's making the payments?  Well, Ms. Maxwell,

13    among others.  We have her on bank records, at the Epstein

14    mansion, where she's in charge of the --

15                THE COURT:  Well, that's different.

16                MR. CASSELL:  Yes, and that's exactly --

17                THE COURT:  That's not her financial status.

18                MR. CASSELL:  Right.  So that's not her financial

19    status.  For example, we want to show those kinds of payments.

20    We also want to show more broadly that Ms. Giuffre and the

21    other girls were not coming into a bungalow in the middle of

22    Hoboken or whatever.  They were coming into a mansion in one of

23    the most --

24                THE COURT:  Well, that's got nothing to do with her

25    financial status.

 1          MR. CASSELL:  All right.  Well, we thought, when we

 2   filed our response, they continued to oppose it.  If they had

 3   just stipulated, you know, I wouldn't be taking your Honor's

 4   time.

 5          But this is where I think they're taking a narrow

 6   uncontested principle, that her net worth doesn't come in, and

 7   are going to try to use it to exclude evidence that Ms. Maxwell

 8   is making payments to the girls, that this mansion is a very --

 9          THE COURT:  Well, okay.  I don't think so.

10          MR. CASSELL:  Let me just make sure that I have on the

11   table the things that we want to introduce.

12          For example, Mr. Epstein purchased a helicopter for

13   Ms. Maxwell, and they might say, oh, well, that shows financial

14   status or something.  We think that shows a very close

15   connection.

16          Well, the last one and perhaps the most controversial

17   one in connection with this case is the townhouse.  It is our

18   belief that a --

19          THE COURT:  Well, wait a minute.  What's the basis of

20   your belief?

21          MR. CASSELL:  The basis for our belief is, I believe

22   they've conceded that there was a sale of a $17 million

23   townhouse in 2016.

24          THE COURT:  Okay.  Is it the defendant's townhouse?

25          MR. CASSELL:  Yes.  So the question is --

1           THE COURT:  So that's part of her net worth.  I mean,

2      that's part of the financial part.  I don't see how that gets

3      into the liability case.

4           MR. CASSELL:  Right.  So Epstein was the one who

5      provided the loan to get that --

6           THE COURT:  Says who?

7           MR. CASSELL:  Ms. McCawley, who took Maxwell's

8      deposition, is advising me that during Maxwell's deposition,

9      she conceded that.

10           THE COURT:  Well, all right.  Okay.  But that isn't

11      financial information.  That's the relationship between Maxwell

12      and Epstein.

13           MR. CASSELL:  Right.  I think you and I are on the

14      same page.  My concern is that we may, as on other issues, may

15      not be on the same page with the defendant.

16           THE COURT:  I don't think so, but maybe I'm wrong.

17           MR. CASSELL:  There's one other point, if I can just

18      be heard on the townhouse.  The townhouse was sold at a time

19      shortly after Ms. Maxwell is discussing with her advisers, hey,

20      I could get sued for libel.  We believe that transferring

21      $17 million outside the jurisdiction of your Honor --

22           THE COURT:  Tell me about that after you've got a

23      verdict.

24           MR. CASSELL:  All right.  But we want to introduce it

25      during the trial to show consciousness of guilt, that she is

1   transferring assets away from the jurisdiction of the court

2   because --

3           THE COURT:  She sold the house.

4           MR. CASSELL:  Right.  After she wrote an email that

5   said, hey, I could get --

6           THE COURT:  You can't argue, I don't think, that

7   that's an admission.

8           MR. CASSELL:  We believe it goes to consciousness of

9   guilt, and we've cited a case in our brief to that effect.

10          But I think if you have a difficulty with that small

11  piece of our argument, I mean, I think the rest of it is

12  really, you know, the meat and potatoes here, so --

13          THE COURT:  Okay.  Yes.

14          MR. PAGLIUCA:  Your Honor, I'm going to not try to

15  belabor this, but I have to respond to some of the points, just

16  so that the record is clear.

17          The language that we proposed to the Court about the

18  financial status comes from the very cases that are in the

19  Second Circuit, and that's the words that the Second Circuit

20  and district courts in the Southern District use.  And I quote

21  from *Tillery*:  No evidence as to defendant's financial status

22  may be presented to the jury during the first phase of the

23  trial by either of the parties to this action.  And the Second

24  Circuit says that that's the preferred method.  Mr. Cassell, I

25  think, knowing that he's losing this battle, then tries to

 1  change it.

 2          But first of all, let's talk about this consciousness

 3  of guilt issue.  And not only the supposed facts behind this

 4  but the law that they cite.  There are references to a New York

 5  Post article that is the --

 6          THE COURT:  Well, that's no good, obviously.

 7          MR. PAGLIUCA:  Of course.  And then there's a

 8  reference to Radar Online.  That's their entire evidentiary

 9  basis for the proffer that they just made to you, your Honor,

10  about this townhome.  It doesn't fly.  And I don't need to

11  spend --

12          THE COURT:  Well, wait a minute.  There was a little

13  bit more.  There was Maxwell saying she got a loan, they say,

14  from Epstein to buy the house.

15          MR. PAGLIUCA:  What she said, your Honor -- and I

16  wrote it down because I looked at the deposition transcript

17  last night.

18          First of all, I think it's important for this

19  discussion, we allowed questions relating to anything financial

20  with Mr. Epstein.  So the one instruction that I gave to

21  Ms. Maxwell during this deposition was, anything they ask you

22  about Epstein is fine.  I'm not going to let you talk about

23  your own personal financial information because it's not

24  discoverable at this point.  And so they had fair opportunity

25  to ask her questions.  They asked her questions about the

1    townhome, and she said part of it was a loan from Mr. Epstein

2    that had been paid back, and that's going to be years ago,

3    before any of the defamatory allegations arose in this case.

4    That's my understanding of the factual basis here.

5            So we can I think deal with that particular issue, you

6    know, if and when it comes up, but what I'm saying to the

7    Court -- I mean, the Court and I are on the same page -- the

8    sale of the townhome, the amount of the sale of the townhome,

9    you know, what did or didn't happen to the money from the sale

10   of the townhome, those are all off limits during the liability

11   phase of the trial.

12           THE COURT:  Well, correct me if I'm wrong.  We don't

13   have any evidence as to what happened to the proceeds of the

14   sale.

15           MR. PAGLIUCA:  We don't.

16           THE COURT:  Oh, okay.

17           MR. PAGLIUCA:  There is none.

18           THE COURT:  Okay.

19           MR. PAGLIUCA:  And the notion that this money went

20   outside of the jurisdiction of the court is pure fiction.

21   Frankly, unless it went to some country that I'm unfamiliar

22   with, I think the jurisdiction of this court extends pretty

23   far.

24           THE COURT:  I think that's for another day.

25           MR. PAGLIUCA:  Right.

1          The last point I want to make, your Honor, on this

2     issue of consciousness of guilt relates to the one case that

3     they cite for the proposition that there is some ability to

4     have a consciousness of guilt theory in a civil case.  They

5     cite a Second Circuit criminal case in which the defendant was

6     a man named Amuso.  This is at 21 F.3d 1251, and it's a 1994

7     case.  Mr. Amuso was a leader in the Lucchese crime family who,

8     over a course of time, ordered 14 murders and then absconded

9     from the jurisdiction during the trial of a number of

10    co-defendants.  And it was called "The Windows" case here in

11    New York, and you may remember it, your Honor, because it was

12    the Lucchese crime family that was controlling the replacement

13    window unions in the city of New York.  So Mr. Amuso goes to

14    trial, and the government requested and received an instruction

15    to the jury that said not only his flight was consciousness of

16    guilt but the length of the absence of his flight was

17    consciousness of guilt.  And in fact, the Second Circuit

18    reversed that instruction and disapproved it in that criminal

19    case but didn't reverse his conviction because the evidence of

20    guilt was overwhelming.  So the one case that they cite for

21    this proposition in fact is inapposite to the position that

22    they're taking here today.

23          So I think your Honor and I are indeed on the same

24    page here, and I'd ask that the Court simply apply the law in

25    *Tillery*.

1          Oh, Ms. Menninger reminds me, your Honor -- and I

2     think the Court and I are on the same page on this as well --

3     the tax argument made by Mr. Cassell.  Indeed, Ms. Maxwell and

4     the plaintiff are not on the same footing in this case with

5     regard to who put their reputation at issue, who is claiming

6     emotional distress damages, and plaintiffs are in a much

7     different position than defendants when it comes to

8     cross-examinations about these issues, particularly in

9     defamation cases, because as Ms. Menninger pointed out earlier,

10    under Rule 405, everything that impacts the plaintiff's

11    reputation in the community, including the failure to follow

12    laws, is the subject of cross-examination.  So the argument

13    that what is good for the goose is good for the gander in a

14    defamation case simply doesn't apply when you're talking about

15    damage issues and reputational issues.

16          Thank you, your Honor.

17          MR. CASSELL:  Could I just have 15 seconds, your

18    Honor?

19          THE COURT:  No.

20          MR. CASSELL:  All right.  Thanks.

21          THE COURT:  Next.

22          MR. PAGLIUCA:  Your Honor, we could next take up the

23    issue relating to the police reports which I have as

24    defendant's motion *in limine* to exclude police reports and

25    other inadmissible hearsay at 677, response at 747, and then

 1    reply was also filed yesterday.

 2              THE COURT:  Okay.  Yes.

 3              MR. PAGLIUCA:  Your Honor, these reports, that are

 4    loosely described as police reports, encompass a one-year

 5    purported investigation by the Palm Beach Police Department

 6    into the affairs of Mr. Epstein roughly beginning I think in

 7    2005 and going through 2006.  The detective initially assigned

 8    to the case was a woman named Michelle Pagan, and then

 9    Detective Recarey took over the investigation from Ms. Pagan.

10    There were a number of things, according to the reports --

11    although we don't really have any actual witness testimony,

12    with current knowledge.  The police did a number of things.

13    They surveiled Epstein's house, they did trash pulls, and

14    ultimately they executed a search warrant at Mr. Epstein's

15    house.  And that's sort of the totality of the investigation.

16              I give you that as the backdrop, your Honor, because

17    then next what seems to happen is very curious, in my

18    experience, and was testified to by Detective Recarey.  The

19    police get crossways with the state attorney's office in

20    Florida, and there is a complete distrust between the two

21    agencies.  As a result of that -- and there's a bunch of

22    in-fighting that goes on between these two agencies.  The

23    police make the decision to, in some fashion, turn over

24    everything that they have to the FBI.  And as best I can figure

25    it out, the FBI issued a grand jury subpoena, or the U.S.

1   Attorney's Office, in the Southern District of Florida, issued

2   a grand jury subpoena for the entirety of the Palm Beach Police

3   Department's evidence relating to the Epstein investigation.

4   So as we sit here today and indeed for the last ten years since

5   2006, the Palm Beach Police Department has not been the

6   custodian of any of this evidence.

7           And so that's the factual backdrop to then what

8   becomes continuing problems with the types of evidence that I

9   anticipate the plaintiffs are going to try to introduce in this

10  case.  The first is these police reports themselves.  And that

11  is about 87 or 88 pages of documents, depending on which

12  iteration of these police reports someone is looking at.  That

13  essentially runs through the course of the investigation.  And

14  I'm sure things that your Honor's seen before, you know, police

15  officer does something, they put it down on a piece of paper,

16  somebody puts it into a system, and then that's where it goes.

17  But the problem here, fundamentally, with these police

18  reports --

19          THE COURT:  Let me back up just a moment.

20          MR. PAGLIUCA:  Yes, sir.

21          THE COURT:  How are these going to be entered into

22  evidence?  They're not self authenticating.

23          MR. PAGLIUCA:  They're not.

24          THE COURT:  So how are they going to be presented?

25          MR. PAGLIUCA:  Good question, your Honor.

1              MS. McCAWLEY:  Do you want me to address that, your

2    Honor?  I mean, it's our evidence that we're trying to get in.

3    Or do you want me to wait?

4              THE COURT:  Well, you don't know.  The defense doesn't

5    know.

6              MR. PAGLIUCA:  There is no way.  There is no way to

7    present these documents, your Honor.

8              THE COURT:  Yes.  Okay.  All right.  Because there's

9    no DOJ witness listed.

10             MR. PAGLIUCA:  There is no record custodian at all for

11   these documents.  Detective Recarey in his deposition -- and

12   you have this, the relevant answers to these questions --

13   acknowledged that they don't have any of this evidence.  And so

14   that's going to be, you know -- you have seen, in multiple

15   filings from the plaintiffs, they attach excerpted documents

16   containing what they say are phone messages secured from the

17   trash pulls.  So that would be an example of evidence for which

18   there is no record custodian.  Frankly, I don't know who the

19   source of any of that information is.  This is yet another

20   piece of information that has appeared, I'm presuming through

21   Mr. Edwards getting it somehow, you know, in relation to some

22   other case and then it appears in discovery in this case.  And

23   what it looks like is, you know, a number of, you know, what

24   they say are photocopies of message pads from Epstein's trash.

25   But there is no person who will say, this particular piece of

1    paper came from Epstein's trash in the first instance.  There

2    is no person that will say, we kept these documents and we have

3    the originals and you can come look at them and you can test

4    them and feel them.  There is no person that will say any of

5    that because it went to the grand jury and presumably, under

6    Rule 60, it's never coming out of the grand jury again.

7           So the other point about these message pads is, I

8    don't to this day know whether that's just hand-picked portions

9    of whatever plaintiff's counsel got years ago or it's the

10   entirety of what, you know, Palm Beach did or didn't do, but

11   when I asked Detective Recarey those questions in his

12   deposition, he said, I can't tell you if that's everything.  I

13   just got handed this stuff by plaintiff's counsel, you know, in

14   the course of this deposition, and that's all I can tell you

15   about it.  So that's another piece of this that's problematic

16   for the plaintiffs.

17          There's another issue that relates to a transcript of

18   a witness, Ms. Hall, and the plaintiffs, I think, want to try

19   to introduce that transcript or, alternately, what they say is

20   an audio recording of an interview with her, and I'm not sure

21   which they are trying to introduce, but there are problems

22   either way.  The transcript, what I will call the Hall

23   transcript, was in fact not prepared by the Palm Beach Police

24   Department.  According to Detective Recarey, he had never seen

25   it before, during his deposition, and he surmised that it had

1    been prepared by the state's attorney's office but he didn't

2    know.  So what happens then with this transcript is, there is

3    an attempt at a deposition of Ms. Hall in Miami, this summer,

4    and Ms. Hall comes in and she sits down, and she doesn't want

5    to answer any questions about anything, and she says, I don't

6    remember anything about any of this.  Her lawyer says, she

7    doesn't remember anything about any of this and she spent the

8    last ten years forgetting about all of this and she's not going

9    to remember anything about this.  Mr. Edwards then puts the

10   transcript in front of her and she doesn't look at it.  She

11   doesn't even look at the transcript.  She doesn't turn the

12   page.  She doesn't read any of it.  There's a question asked at

13   some point later:  Isn't it true that everything you said in

14   the police department was true?  And then shortly after that,

15   the deposition ends.  And they're trying to say that that is a

16   sufficient factual basis and an evidentiary basis for the

17   admission of this transcript, which is, you know, unsponsored

18   hearsay.

19          There's a similar problem with this recording because

20   Ms. Hall never listened to the recording, never authenticated

21   the recording.  And so there's no evidence whatsoever that it's

22   Ms. Hall's statement or that it was subject to any

23   cross-examination.

24          So to try to get around all of these evidentiary

25   problems, now what's being advanced by the plaintiffs is, well,

1    we're not offering any of this for the truth of the matter

2    asserted.  So 87 pages of police reports, a hundred pages or

3    however many there are of trash, you know, witness transcripts,

4    no, no, no, no, none of that is being offered for the truth of

5    the matter asserted, we want to offer it to show Ms. Maxwell's

6    state of mind when she issued her statement through Mr. Barden

7    and Mr. Gow.  So the huge problem with that, your Honor, which

8    we've already dealt with, is, Ms. Maxwell has no knowledge of

9    what's in these police reports, the trash pulls, any of these

10   things, and so as a matter of law, this can't be part of her

11   state of mind.

12           What is instructive on this point, your Honor, I went

13   and read every single case that plaintiff's counsel cited for

14   this proposition that it is state of mind, and what's great

15   about these cases, frankly, every single one of them, whoever

16   the statement is being introduced on behalf of, or against,

17   knows about the statement.  So when you look at their papers,

18   they cite *United States v. Gotti* for the proposition that it

19   goes to state of mind.  Well, you know who Mr. Gotti is, and

20   Mr. Gotti was charged with witness tampering.  Mr. Gotti wanted

21   to introduce some wiretapped statements that the FBI had, where

22   he was talking to an informant and telling the informant things

23   that Gotti said went to his state of mind.  Well, the Second

24   Circuit said, yes, you can do that, Mr. Gotti, first of all,

25   because the government's introducing part of these transcripts,

and second of all -- so that's a rule of completeness, and

second of all, you were there and you heard it and therefore,

it would go to your state of mind and not for the truth of the

matter asserted.

        The next case is *United States v. Dupree*.  That's

another criminal case in this circuit, where a bank fraud

defendant was the subject of a temporary restraining order

issued to that defendant, okay?  So, you know, he has a

temporary restraining order, you can't take any money out of

this bank unless you do X, Y, and Z.  Well, he took the money

out of the bank without doing X, Y, and Z, and when he came to

trial in his criminal case, the government was allowed to

introduce that restraining order because it was his restraining

order, he knew about it, and it showed his willful intent to

defraud as part of the bank fraud.  So that's that case.

        *Arista Records, LLC v. Lime Group, LLC* was another

case they rely on.  Again, these are emails that are being

talked about that were written by the defendant's employees and

then the responses to those emails.  So clearly the defendants

LLC had corporate knowledge of those things.  Screenshots of

software programs, statements made by an agent of the

defendant, those are all the things that we're talking about in

that case, and so there's actual knowledge of the entity of

those statements, which then can go for state of mind.

        There are two more cases.  *Crescenz v. Penguin Group*,

and the case says, it's undisputed the defendant had actual

prior knowledge of the issues, of the at-issue statements that

were offered by the defendant.  Again, the statements were made

to Crescenz.

And then the last case is a 1983 case, *Tierney v. Davidson*.  That involved civil rights violations and objective

reasonableness by the officers who conducted a search of a

building.  I think the Court knows from doing this kind of work

that pretty much anything in an officer's head is allowed in a

qualified immunity case, because whether the officer did

something that was objectively reasonable or not depends on

what's in the officer's head, and so there is (A) an exception

in these kinds of cases, but (B), in fact, the evidence that

was being discussed in the qualified immunity situation related

to statements that the officers had heard, which formed the

basis of why they went into a building.

So in each and every one of these cases and all cases

that deal with state of mind, the person who it is being

introduced either for or against, not for the truth of the

matter asserted but for their state of mind, has to know about

it.

You have attached to our reply an affidavit from

Ms. Maxwell who says she's never read any of these police

reports prior to January 2015.  And there is good reason for

that, your Honor.  It's not easy to get these police reports.

As you've heard, the chain of custody behind these things after

2006 is a little sketchy.  And, you know, it requires some

effort.  And so, you know, ordinary folks I don't believe are

going to be, you know, rooting around trying to ferret out

police reports from South Florida.  Even if you get them, they

are heavily redacted, and so when one looks at them, it's

virtually impossible to tell who's at issue, who's saying what

about whom, because there are lots of blackouts through these

police reports.  We managed somehow -- and frankly, I don't

even know how -- to get an unredacted copy, and Detective

Recarey was surprised when he saw the unredacted copy because

he said, we always redact these things.  And so I'm unclear as

to how ours is unredacted, but in any event, there is one out

there.  But I don't know how we got it.

          The other point on this, your Honor, is, again, there

is some liberty taken in the plaintiff's papers about what

Ms. Maxwell said or didn't say in her deposition about these

police reports, and they try to make hay over, she knew about

the police reports by the selective presentation of that

deposition testimony.  And I've cited the actual quote for you

in the reply brief, but what is notable, in my view, is that

when Ms. Maxwell is presented with these police reports, it is

for the first time at her deposition by Ms. McCawley, and there

is an exchange in the transcript where Ms. McCawley and

Ms. Maxwell are going back and forth and Ms. Maxwell says, you

1    know -- she's holding these police reports and she says, I know

2    there is a police report.  We go on 300 pages or so in the

3    deposition, and it is clear from the transcript that when we

4    get back to the police report issue again, Ms. Maxwell is being

5    asked questions by Ms. McCawley.  Ms. McCawley says -- and this

6    is at page 169, lines 4 through 8 -- "Now that you have the

7    police report that I showed you this morning that you had an

8    opportunity to look at it," and Ms. Maxwell responds, "You gave

9    it to me.  I did not look at it."  And there was no really

10   other questioning at the deposition about Ms. Maxwell's

11   knowledge of these police reports.

12           So the record on this issue, your Honor, which is

13   going to continue to be the record, is that Ms. Maxwell has no

14   knowledge of this police report, the investigation, anything

15   that's going on with Mr. Epstein substantively during this

16   investigation by the Palm Beach Police Department.  So that's

17   why it's not admissible.  They try to cobble together what they

18   view as sort of indicia of she should have known about what's

19   in these police reports, and they first of all say -- we get

20   back to this Dershowitz joint defense agreement issue, which I

21   touched on yesterday, but you're going to hear it again today,

22   so I think it's worth mentioning again.  And here are the

23   quotes exactly from Mr. Dershowitz' deposition.

24   Mr. Dershowitz -- somebody objects during this deposition, and

25   then there's a colloquy.  There's an assertion of privilege.

 1    There's a little bit more colloquy, and then Mr. Dershowitz

 2    says:  "This is a long time ago.  My recollection is that very

 3    early on there was a joint defense agreement between several of

 4    the people who were of interest to the district attorney and to

 5    the federal government.  That's my recollection.  And I would

 6    only want to resolve doubts in favor of privilege."  Then

 7    Mr. Dershowitz says:  "We can check further.  I would be happy

 8    to answer the question if it's not privileged."  That's the

 9    testimony that they say supports their assertion of this joint

10    defense agreement with Alan Dershowitz.

11          But there's more, your Honor.  Mr. Edwards -- again,

12    who is a party in this deposition and not a lawyer -- chimes in

13    to the special master and Mr. Dershowitz:  "Q.  Ghislaine

14    Maxwell was never the target of the investigation, was she?"

15    Confirming and arguing that Dershowitz is wrong about this

16    joint defense agreement at the time.  And Dershowitz is

17    admitting that he doesn't really know and we should check and

18    we'll get back and people can ask these questions if I'm wrong

19    about this agreement.

20          They also take liberty with Ms. Maxwell's discussion

21    in her deposition about her knowledge about what happened to

22    Mr. Epstein and what he pled guilty to.  When you look at those

23    pages of the transcript, you know, she says, I know he went to

24    jail, and then there's a back-and-forth between Ms. McCawley

25    and Ms. Maxwell about what did he go to jail for, and

1    eventually Ms. Maxwell says, you know, I'm not really sure what

2    he went to jail for.  It had something to do with, she

3    thinks -- Ms. Maxwell -- teenage prostitution or under-age

4    prostitution or something like that.  That certainly doesn't

5    give you the ability then to ram in 400 pages of uncorroborated

6    hearsay under the idea that somehow this is notice to somebody.

7          And I think there is one other factual claim that they

8    make about, you know, what Ms. Maxwell should have known, which

9    is not the standard.  It is not incumbent upon an individual

10   defendant to go investigate things.  That's not the standard.

11         It seems to me that they have conceded that these

12   documents are hearsay because they're saying, we're not

13   offering them for the truth of the matter asserted; we want to

14   offer it for this knowledge theory that we have.

15         So I've briefed the issue about business records,

16   which they are not.  I've briefed the issue about government

17   police records, which they are police records, but essentially

18   the same tests for business records applies to police records,

19   which is, you have to be under a business duty to record the

20   information, and court after court after court after court,

21   across the country, has said, people in police reports, like

22   witnesses, are not under a business duty as part of the police

23   department.  So all of those statements, the second- and

24   thirdhand hearsay statements, are inadmissible, either as

25   government records or police records or whatever you want to

1    call them.  They're just simply inadmissible for the truth of

2    the matter asserted.  You know, there may be a few things in

3    these police reports that someone could, if they had a record

4    custodian available, try to offer into evidence, but we don't

5    have that here.

6         And so I think for all of those reasons, your Honor,

7    this is a very strong motion that should be granted by the

8    Court.

9         MS. McCAWLEY:  Good afternoon, your Honor.  Thank you.

10        The reason why they're battling so hard on this

11   document is because it's so critical to the case.  This is a

12   police report that records numerous, over 20, under-age minors

13   saying virtually the exact same story that my client gave about

14   her abuse, over and over and over again.  What they didn't say

15   to you -- they skirt around Detective Recarey.  You have his

16   entire deposition transcript, which we've noted for next week,

17   with all of his testimony.  He took these statements.  We went

18   through the business records exception with him.  He walked

19   through, yes, I recorded this in the course of my work.  We've

20   got it in our papers.  I did this under my duty.  I interviewed

21   these witnesses.  I recorded it, etc., etc., etc., all in this

22   document.  I mean, with every document that's come up, they

23   claim, particularly government documents, this is something

24   that we've found out of thin air and that it has no value to it

25   or trustworthiness.  He sat in his deposition as the detective

1    who handled this entire investigation and walked through each

2    of those people, your Honor, and walked through how he recorded

3    it in this document.  So this is authenticated through

4    Detective Recarey, who is a witness in this trial, on our trial

5    exhibit list.

6            To be very clear, this document is so critical because

7    it mentions Maxwell in it.  It talks about Maxwell's stationery

8    being at the house, it talks about other issues with respect to

9    Maxwell.  When I asked her at her deposition and I gave her

10   this document -- and you can look at the testimony, your Honor,

11   we want you to look at the testimony -- she says:  I've seen

12   it.  Later in that deposition, they talk about her battling me

13   over she wouldn't look at certain things I gave her, in front

14   of her, right?  So there was an attitude issue during that

15   deposition that I had to manage.  And that was what was coming

16   up in that section.  It wasn't that she didn't say she had seen

17   it.  But your Honor, we are allowed to put that in front of

18   her, in front of the jury, and say:  Did you know about this at

19   the time in 2005 when you were photographed kissing Epstein on

20   the day the investigation started?  You were working for him.

21   You've admitted that.  You didn't know about all these little

22   girls coming to the Palm Beach house that you were working at,

23   that you claim you were the house manager for?  We should be

24   entitled to get this in --

25            THE COURT:  That is for the truth of the matter.

1           MS. McCAWLEY:  Whether she knew about it.  That's not

2      for the truth of the matter, your Honor.  That's what she knew

3      at the time, right, she made the statement, did she know about

4      all these individuals in the police report, did she know about

5      this.  So that can be offered not for the truth but to show

6      whether she knew about it.  Whether she knew that at the time

7      she was making that statement, it was false, because not only

8      did my client get abused there but so many other girls as well.

9           So, your Honor, that's part of it.  And in your order,

10     in your June 20th order, you said --

11          THE COURT:  Excuse me.

12          MS. McCAWLEY:  Sure.

13          THE COURT:  You say the detective authenticated these

14     documents.  He didn't authenticate them in the sense of saying

15     that these are part of the file.  I mean, it's not that kind of

16     an authentication.

17          MS. McCAWLEY:  It is, your Honor.  There are two

18     different things, and I'm jumping around a little bit, so

19     that's my fault.  I'm sorry.  But there are a series of

20     questions -- and I believe it's in our brief but it's also in

21     our designations -- where we walked through with him how he

22     conducted the investigation, how he recorded the information of

23     these witnesses, the interviews of the witnesses, the fact that

24     they were reported in this document, etc., in his testimony.

25     So that's one piece.  And that's why this could come in under

1   the business records exception.  But even if it weren't to come

2   in under the business records exception, it can come in not for

3   the truth of the matter asserted but to show for knowledge.

4   And you say in your June 20th order, "Notwithstanding the

5   questions are directed to reveal relevant answers regarding

6   defendant's knowledge of plaintiff's allegations, that

7   knowledge goes directly to the truth or falsity of the

8   defamation, a key element of plaintiff's claims."  In other

9   words, what Maxwell knew at the time she's making the statement

10  goes to the truth of the falsity of those statements, and that

11  includes this police report, your Honor, so we believe that

12  it's critical evidence to show that.  And you'll see that,

13  again, she was working for the defendant at the time that this

14  investigation happened.  She has testified to that.  She was on

15  the flights with him at the time this was going on over 300

16  times during that period.

17              THE COURT:  You know, spare me the flights, okay?

18              MS. McCAWLEY:  Sure.  Okay.

19              THE COURT:  I've heard that before.

20              MS. McCAWLEY:  Sure.  I'm sorry, your Honor.  I'll try

21  to cut to the chase here.

22         So certainly, you know, it's interesting, because you

23  heard defense counsel here not too long ago saying that they

24  wanted to get in police reports of an under-aged minor,

25  Virginia Giuffre, from when she was 14, being raped by two

other boys, right?  But now police reports are not allowed in

at all, right?  A police report where I've got the detective

coming to testify about the police report that he took in his

investigation, oh, but that can't come in.  And what's

interesting is, they went through all of our cases but they

failed to look at their own cases, because *Smith*, which is a

case that they cite in their brief on trying to get the police

reports in, a Southern District of New York case, says that

this can come in.  It says, "Statements in a police report are

not inadmissible hearsay where, as here, they are not offered

for the truth of the matter asserted but for purposes of

showing whether the arresting officer had the information

giving them probable cause in that instance."  So what we are

doing here, your Honor, is putting forth this police report to

show whether or not Maxwell had the knowledge of that, which we

are entitled to ask her those questions at trial, your Honor,

and to utilize this police report in that regard.

So, your Honor, it comes in for two reasons.  One,

under the hearsay exception, which is the business records

exception through Mr. Recarey's testimony, which is detailed in

our briefs.  He was deposed for a full day.  He walked through

all of these documents in his investigation, and we laid out

that, the standard in there.  He testified that it was a record

kept in the regular course of his work.  He testified that it

was something he had to do in accordance with that work.  He

1    testified that he was the primary author of that and that it

2    had -- and of course it had the trustworthiness, your Honor.

3    So we were very careful, because we knew how important this

4    document was, to walk him through that when we had him at his

5    deposition.  And again, your Honor, those deposition

6    designations are set forth for next Wednesday.

7            THE COURT:  How do we know that this is the total

8    record?  Or is it the total record?  We don't know.

9            MS. McCAWLEY:  Well, Recarey testified -- we showed

10   him this document as an exhibit in his deposition, and he

11   testified regarding this being something that he recorded in

12   the course of his own work.

13           THE COURT:  But it's part of the record.  Is it all of

14   the record?

15           MS. McCAWLEY:  Meaning all of the record of the entire

16   investigation?  We have produced that in discovery, your Honor,

17   through the -- we have a FOIA response, which is how we got the

18   videotapes of them walking through the Palm Beach house, all of

19   the other materials related to the investigation.

20           THE COURT:  I see.  Okay.

21           MS. McCAWLEY:  So then, your Honor, we deposed the

22   detective to try, of course, to establish that this was the

23   record to get into evidence.

24           Your Honor, they also mentioned -- and this is

25   actually in the *in toto* motion, but they jumped to it so I need

 1    to address it, and that is one of the witnesses in here, AH,

 2    who was a minor at the time, also gave a recorded statement as

 3    part of that.  We took her deposition, and they're, you know,

 4    in my view, vastly misrepresenting the deposition.  And you can

 5    look at the quotes themselves, but she testified in great

 6    detail about the activity at the house, verifying that what she

 7    said in her recording and in the police report was in fact

 8    correct.  And she is a witness on our trial list.  She is a

 9    minor who was abused in the same manner that my client was.

10    She was exposed to him on a number of occasions.  And we have

11    her testimony, and we have sought to enter that as a witness in

12    this case.  And again, that's in the *in toto* motion which I

13    think is being heard next Wednesday, but just to address it,

14    since they raised it.

15            The other issue they raised are the message pads.

16    These have come up from time to time in this case and come up

17    through different witnesses.  Now the message pads come in in a

18    number of ways.  One is Juan Alessi, who is one of the house

19    butlers.  He testified that those were the messages for which

20    they recorded -- we showed him the messages.  Yes, that's my

21    signature.  Yes, this is how we recorded our messages.  He

22    worked at the house.  That was his duty to do those things.

23    Maxwell's on those messages as well, so we intend to ask her

24    about those, you know, were you having three girls come on this

25    particular day, etc., etc.?  So those are documents that should

1    come into evidence because they have been validated by an

2    employee who works at the home and are things that should be

3    able to be utilized at trial, and Maxwell should be able to be

4    shown those and explain whether or not there is some issue with

5    respect to those statements.

6        So your Honor, that's all evidence that we do want to

7    enter at the trial, and certainly we have done our diligence

8    with respect to the police report to make sure that we do have

9    Detective Recarey's testimony on it.  I submit if you review

10   that, you will see the reason why that it should come into

11   evidence.  But regardless of the hearsay issue and the business

12   records exception, again, as you said in your June 20th

13   order, the point of defendant's knowledge at the time she made

14   a defamatory statement is very significant in this case, so if

15   she knew -- even if she didn't believe my client, if she knew

16   that there had been a number of other under-age minors that

17   were abused in this circumstance, to call my client a liar in

18   the face of all that knowledge is something the jury should be

19   able to consider.  So that is a piece that is important and

20   relevant to this case.  And you can always give a cautionary

21   instruction.  If you're concerned at any level, as you know,

22   you could add a cautionary instruction with respect to the

23   police report.  But we should be entitled to ask her questions

24   on the stand when she's under oath about what she knew with

25   respect to this very significant document.

1              Thank you, your Honor.

2              MR. PAGLIUCA:  Briefly, your Honor.

3              So first, we're doing a mix and match here of

4    different things, which I like the rules of evidence because

5    they're rules and I can read them and they say what they say.

6              Even if, even if, you had a gold-plated record

7    custodian from the Palm Beach Police Department come in here

8    and make all of the findings that you needed to find as a

9    business record exception or a government record exception, the

10   case law is absolutely clear that second- and thirdhand hearsay

11   is inadmissible through police reports.

12             I use this example because it's a good one, I think.

13   As part of my practice, I represent people accused of crimes,

14   and so we get discovery as part of my practice.  Guess what?

15   That goes into my files and I keep it as a matter of course,

16   and it is a business record of mine because I keep it in due

17   course.  Now that doesn't mean that it simply would get

18   admitted into a trial whole cloth for the truth of the matter

19   asserted, just because it's a business record of mine.  And

20   why?  What's the answer?  Because the statements that are

21   included in the police report, or the discovery that I get,

22   that I put in my file and I keep very carefully as a business

23   record, don't magically become nonhearsay, because the people

24   who are making those statements are not under any business duty

25   to report to me.  And that's what the business record exception

1    is all about.  There is trustworthiness when someone, you

2    know -- if it was a billing record of mine, that's a different

3    story.  But the business record exception, 803(6), everyone in

4    the chain of the hearsay link has to be under a business duty

5    to report.  So there are cases where officers are allowed to

6    testify about things that they wrote in their report because

7    they observed them or another officer told them or it was a

8    test that maybe happened within the police department.  But

9    what they're not allowed to talk about, under a business record

10   exception, are witness statements.  And that's what

11   Ms. McCawley wants to try to introduce to the jury in this

12   case -- 87 pages of witness statements from people who we don't

13   know who they are and there's no evidence that they had any

14   association with Ms. Maxwell.

15              Let me finish with this state of mind issue.

16              THE COURT:  But before you do, why isn't it an 803(6)

17   exception?

18              MR. PAGLIUCA:  It could be, your Honor.  So 803(6) --

19              THE COURT:  Okay.  So what you're saying is, yes, the

20   reports could get in, but not the hearsay part.

21              MR. PAGLIUCA:  Exactly.  That's exactly right.

22              THE COURT:  Well, okay.  Of course what the plaintiff

23   would say to that is, okay, fine.

24              MR. PAGLIUCA:  Well, then you're redacting

25   90 percent --

1          THE COURT:  I didn't say redaction.  It's hearsay,

2     it's not being offered, but of course it is being offered for

3     the truth of the matter.

4          MR. PAGLIUCA:  Exactly.  You know, this is a

5     smokescreen about it goes to Maxwell's state of mind.  And when

6     you carefully go through these police reports, there is not one

7     of these alleged victims who identifies Ms. Maxwell as having

8     anything to do with any of this.  Which is another important

9     point.

10          What I find curious, again, Ms. McCawley usually says

11    there are 30 victims identified in these police reports, which

12    isn't true.  And when I asked Detective Recarey to go through

13    them with me and identify how many people he said were victims,

14    there were 17.  And so now today she said there were 20.  So

15    she's working her way my way.  But, you know, that's the

16    problem here, your Honor.  This is being offered for the truth

17    of the matter asserted.  All they want to do is get in front of

18    a jury that there was a police department investigation in

19    which Epstein was the target and Epstein is alleged to have

20    done all of these bad things; therefore, you should punish

21    Maxwell because then they're going to say, she was his

22    girlfriend, she had to have known, yada, yada, yada, yada, he's

23    a bad person, she's a bad person, find her liable, and whack

24    her with a big damage award.  That's what's going on here.

25          Thank you.

```
1              THE COURT:  What's next?

2              MR. CASSELL:  The motion on Kellen and Marcinkova, our

3    motion to get in adverse inference.

4              THE COURT:  Yes.

5              MR. CASSELL:  If I can be heard on that, your Honor.

6              THE COURT:  Excuse me.  Let me go back to where we

7    were.

8              Those statements, the statements of the "victims," are

9    being offered for the truth, are they not?

10             MS. McCAWLEY:  Your Honor, I do not believe they're

11   being offered for the truth because what we're saying -- we're

12   not saying whether or not what those victims said was

13   necessarily true.  We're saying was she aware that there were a

14   number -- and they take issue with the number.  I don't see a

15   difference between 17 and 30.  But was she aware that there

16   were a number of other individuals making reports at the time

17   she said my client must have been lying about being abused as a

18   minor.  So whether or not those are true or not, the reports,

19   was she aware that there were a number of reports out there

20   from other little girls saying that they were also brought to

21   the massage room.  And that goes to her state of mind at the

22   time she made that statement where she defames my client

23   internationally.

24             THE COURT:  Yes.  But aware of the reports.  How could

25   she be aware of the reports?  Aware of the girls and the
```

1      activity, that's the truth.  But aware of the reports.

2              MS. McCAWLEY:  Yes, your Honor, and the reason why she

3      could be aware of the reports is because she'll -- remember,

4      her testimony is that she worked for Epstein from the early

5      '90s until 2009.  This investigation took place in 2006, your

6      Honor, during the course of the time she was allegedly managing

7      the Palm Beach home and his active employee, his right-hand

8      person.  So yes, of course, we should be able to ask her those

9      questions, show her the report:  Were you aware of this, of

10     these reports?  Were you aware that these reports were made,

11     you know, as part of this investigation?  And then she can

12     answer that.

13             THE COURT:  Well, that's fine.  You could do that.

14     You could show her the reports and say, were you aware of them,

15     but that would not get the hearsay part in.

16             MS. McCAWLEY:  Well, your Honor, and of course we have

17     two other of the exceptions, the business record exception,

18     which we talked about, and we also noticed this as one of the

19     residual hearsay --

20             THE COURT:  Yes, but even as a business record, I

21     think counsel is correct -- under the business records

22     exception, the activities of the cops and what they did, all of

23     that can go in, yes, because they're under a duty, etc., but

24     not the statements.

25             MS. McCAWLEY:  So for example, one of the witnesses on

1   our witness list is AH, who is in the report and she testified

2   in this case.

3            THE COURT:  Well, that's a different issue.  And you

4   said you're going to present her.

5            MS. McCAWLEY:  Yes.

6            THE COURT:  Well, all right.  That's a different

7   question.  But in other words, you could show her the report

8   and ask her if she's aware of these reports.  I assume what her

9   answer is going to be.  And that's the end of it.

10           MS. McCAWLEY:  Well, your Honor, I mean, obviously

11   we'd like to enter the reports under the business record

12   exception through Recarey and through the residual hearsay --

13           THE COURT:  But even if you do that, I don't see how

14   you avoid eliminating the hearsay.

15           Well, okay.  All right.

16           MR. PAGLIUCA:  Your Honor, could I have one final

17   comment on this.  If they're not being offered for the truth of

18   the matter asserted, they're really not relevant to this case

19   is my final point, because if they're not being offered for the

20   truth of the matter asserted, at best it's a neutral as to

21   whether these things did or didn't happen.  If they didn't

22   happen, they would certainly be supportive of Ms. Maxwell's

23   state of mind if she knew about them.  If they're not being

24   offered for the truth of the matter --

25           THE COURT:  Well, it might be material that she knew

1    that there was an investigation.

2           MR. PAGLIUCA:  You know, she could be asked that

3    question:  Did you know there was an investigation?  I think

4    she's going to say no.  I gave you her affidavit in which she

5    said prior to making her statement, she had never seen these

6    police reports.  So we all know --

7           THE COURT:  That's a different question.

8           MR. PAGLIUCA:  I understand.  But we all know the

9    answer is, that's in these police reports, and I'm pretty sure

10   she testified at her deposition that she wasn't really aware of

11   this investigation.  All she knew -- I think is what she

12   testified to -- was that Epstein went to jail and she knew at

13   some point he was a registered sex offender.  Those are the two

14   things I think she knew at the end of the day at this

15   deposition.  Anyway, I agree with you that the question, did

16   you know there was an investigation, you know, I suppose you

17   can ask that question and the answer will be yes or no,

18   whatever it is.

19          THE COURT:  Okay.

20          MR. PAGLIUCA:  All right.  Thank you.

21          THE COURT:  Okay.  I'm sorry.  Forgive me for

22   interrupting.

23          MR. CASSELL:  No.  Your patience has been appreciated

24   today, your Honor.

25          I want to address now the Marcinkova and Kellen

1   adverse inference motions. We're a moving party. There are

2   reciprocal motions both ways on this. I have the numbers

3   available, if that would be useful. I believe 673 is the

4   defendant's motion and 689 is our motion. So those would be

5   the two motions going, obviously, in different directions.

6        Your Honor is familiar with these issues because of

7   the Epstein adverse inference motion that was argued I think

8   two weeks ago by me, and at that time -- I know you have not

9   yet formally ruled on the motion, but there was extensive

10  discussion about could we just kick this down the road to the

11  trial and see, you know, what Epstein says at that time and,

12  you know, after he testifies, sort out whether there's an

13  adverse inference. Again, you haven't ruled on that, but I

14  think I indicated at the time that certainly from Ms. Giuffre's

15  point of view, we would have no objection to handling

16  Mr. Epstein in that way. I want to make clear that we would

17  also have no objection to handling the Marcinkova and Kellen

18  issue in that way as well. You can put them on via deposition,

19  and then we could sort out in the context of the case with a

20  full record whether an adverse inference is appropriate. But

21  we surface the issue for you now so it wouldn't be something

22  you'd have to do on the fly in the middle of trial. And all

23  the allegations, of course, that have been made here, I think

24  it's important to put Kellen and Marcinkova on the conspiracy

25  scheme, if you will. The top of the conspiracy is Mr. Epstein,

1   his right-hand player then is Ms. Maxwell, and in the

2   conspiracy, again, in our view -- we understand the defense

3   will take a differing point of view on this, but in our view,

4   the conspiracy's next echelon is Kellen and Marcinkova.

5           And so for example, Ms. Giuffre has made allegations

6   about certain things.  Ms. Maxwell can't remember or denies

7   them, so of course Ms. Giuffre then looks to corroborate her

8   allegations of a conspiracy, and the first person she goes to

9   is Epstein, and you're familiar with that.  The second and

10  third people that she goes to are Kellen and Marcinkova,

11  because they report immediately to Ms. Maxwell in the

12  conspiracy.  And Ms. Giuffre is going to be talking about that

13  during the course of the trial, and immediately the jury is

14  going to wonder, well, gosh, I wonder what Kellen says about

15  that?  I wonder what Marcinkova says about that?  And your

16  Honor will recall that we went to great lengths to get them to

17  testify.  They were evading service, in our view.  We

18  ultimately had to come to your Honor to get alternative

19  service, and it was only at that point that we were able to

20  have them sit for their depositions.  They sat for their

21  depositions now, and what we hear from the defense, if I

22  understand it, is that we don't have a good-faith basis for

23  asking Kellen and Marcinkova, gee, weren't you a part of this

24  sex trafficking and sex abuse conspiracy?  I think the way they

25  put it in their brief is, all of this evidence shows nothing

other than Ms. Maxwell might have been at the same place at the same time. It's just, you know, a happenstance they were in the same place and that's not admissible. Well, your Honor will notice in our opening brief on this, at pages 15 I think through the next ten pages or so, we've gone through with a chart and we've said, okay, here's the question we asked, and then in the right-hand column of our chart we put in the witnesses and, you know, the flight logs. I know other things that your Honor is very familiar with. This is why we're asking these questions. You know, the flight logs have been talked about over and over again, but for good reason. Kellen is on some of these flight logs, and what's up? Those are the questions that we asked, and of course she takes the Fifth.

There are other things as well. For example, Sarah Ransome testified, I witnessed with my own two eyes Sarah Kellen reporting to Ghislaine in front of me, but I can't remember specifics. They weren't talking about girls. I can't remember the specific conversation, but every single person, 100 percent, 200 percent, reported to Ghislaine. Later on in that same deposition -- that was at page 288 and thereabouts. At page 387: I witnessed the same thing -- all the girls did -- the same thing I had to do was go and report to Sarah Kellen, Leslie Groff, and Ghislaine Maxwell. Ghislaine was the main lady. So again, we have an allegation by our client that Ms. Maxwell was a part of a larger conspiracy. That's one of

1    the central issues, of course, in the case.  One of the things

2    that was called an obvious lie.  And so we want to bring in the

3    co-conspirators and ask them, Ms. Giuffre says you were in a

4    conspiracy and what's your side of the story on that?  And they

5    take the Fifth.  So there we are.  The question is, are we

6    going to conceal that from the jury or are we going to present

7    it to them?  Well, the Second Circuit case that your Honor is

8    well familiar with, *LiButti*, sets out the factors that have

9    determined that issue, and one of the things we hear from the

10   defendant is, oh, it's never been applied in a case like this.

11   I would just direct your attention, as I did during the Epstein

12   argument, to the case of *FDIC v. Fidelity & Deposit Co. of*

13   *Maryland*.  That's a Fifth Circuit case from 1995, in which a

14   bank officer was accused of dishonest and fraudulent acts and

15   kind of bogus loans, and the Fifth Circuit allowed Fifth

16   Amendment invocations from the loan recipients to be used

17   against him, reasoning that, well, in this kind of a case, the

18   collusion then is shown by the Fifth Amendment invocation of

19   the participants in the conspiracy there.  Fifth Amendment

20   invocations can be held against someone who's accused to be a

21   part of that conspiracy, which of course is exactly what we

22   have going on here in a civil context.

23          *LiButti*, by the way, the Second Circuit case, which is

24   controlling in this jurisdiction, favorably cites the Fifth

25   Circuit case in *FDIC v. Fidelity & Deposit Co.*, explaining that

1    that is one of the reasons why in the Second Circuit they think

2    this is a good rule of law, because they approve of the result

3    that the Fifth Circuit reached in that co-conspirator case.

4         And *LiButti* then goes on, as your Honor is well

5    familiar, with laying out four different factors.  The first is

6    the nature of the relationship involved.  The relationship here

7    is co-conspirators.  They're in the immediate next echelon of

8    the conspiracy.  They are direct reports in the business sense,

9    although this is a criminal enterprise, but Kellen and

10   Marcinkova are direct reports to Ms. Maxwell.  Of course the

11   conspiracy continues.  This is not just at the time of those

12   events.  The conspiracy continues to today, and your Honor is

13   familiar with that from the fact that they were evading service

14   while we were trying to obtain their testimony last year.

15   Eventually they show up with lawyers, a Bruce Reinhart I think

16   is an Epstein lawyer; I think at some point Ms. Marcinkova had

17   Mr. Goldberger, who's an attorney for Mr. Epstein now.  They've

18   both made significant efforts to evade service.  Why?  Because

19   in our view the conspiracy continues to this day.  The

20   conspiracy is trying to conceal what was done to girls in

21   Florida over an extended period of time.  The concealment

22   continues through the efforts not only of the defendant but

23   also through the efforts of Kellen and Marcinkova.

24        But there's more that binds them together even today.

25   Your Honor is of course familiar with the nonprosecution

1    agreement that's at the heart of this case.  Remember the issue

2    that we were talking about yesterday.  The nonprosecution

3    agreement says to Mr. Epstein, we will not prosecute you, or

4    any potential co-conspirators, or, and then there were four

5    named individuals.  Two of those named individuals are

6    Marcinkova and Kellen.  So they're bound together and have a

7    common interest in trying to preserve that nonprosecution

8    agreement, which means, of course, attacking people who are

9    attacking the nonprosecution agreement, such as Jane Doe 3,

10   that is, my client, Ms. Giuffre.

11          And that is the first factor, the nature of the

12   relationship there.  Very tightly bound.

13          The second one is the degree of control in which the

14   party has vested the nonparty witness in regard to key facts

15   and the general subject matter of the litigation.  That's a

16   direct quote from *LiButti*.  And the evidence here -- and again,

17   I won't belabor all of the flight logs and specific evidence,

18   but it's recited, you know, in a ten-page chart in our brief.

19   Kellen and Marcinkova are very tightly bound with the

20   defendants.  They are direct reports.  They are working closely

21   together.  I just quoted Ms. Ransome saying, you know, that

22   that was the person that they were talking to, and so you have

23   a very significant degree of control.

24          The third factor from *LiButti* is compatibility of

25   interests.  Perfect compatibility of interests here.

1    Ms. Giuffre has said there was a conspiracy involving all of

2    these individuals.  They're all going to say no, there wasn't.

3    We'll have a trial on that and hear the evidence.  But the

4    compatibility of interests is, that team is against

5    Ms. Giuffre.  Those co-conspirators are all working together to

6    try to undercut the credibility of Ms. Giuffre.  And of course

7    they're all hoping that she will lose this trial, which they

8    will then celebrate as a victory.  Of course if Ms. Giuffre

9    wins the trial, they will all suffer a defeat because her

10   credibility in making these allegations will have been

11   established.

12        The final factor *LiButti* directs you to consider is

13   the role in the underlying aspects of the litigation, and

14   again, it's hard to imagine.  I won't say they are the most

15   important members of the conspiracy.  Epstein is the most

16   important member of the conspiracy, but the next most

17   important, after Maxwell, who's the number two position, the

18   next most important conspirator is Kellen and Marcinkova.  I've

19   used the expression before, it's kind of playing Hamlet without

20   the ghost.  We're going to be talking about a conspiracy

21   without the conspirators in the case.  We are trying to bring

22   the conspirators here in front of the jury so that they can

23   hear what the conspirators have to say when asked questions

24   about what they were doing to Ms. Giuffre and what they were

25   doing to similarly situated young girls.

          The final point that the *LiButti* case directs you to

consider is whether admitting the evidence will advance the

search for truth.  And here we have a conspiracy, and I'm using

that term not as a lawyer but as a layperson for this purpose.

Webster's defines to conspire means to join together in a

secret agreement to do an unlawful or wrongful act or an act

which becomes unlawful as a result of a secret agreement.  And

so we want to present the conspirator.  Now we think that makes

the case that this is highly relevant and also appropriate for

an adverse inference.  Again, your Honor could wait to rule on

this at trial, but we think it's clear-cut now.

          Of course once you determine that something's

relevant, you then have to consider possible prejudicial

effect.  Obviously this is a case in which sex allegations are

going to be at their heart.  It's not like we have a business

dispute where somebody wants to throw in sex abuse.  We want to

prove, in a case involving a sex conspiracy, what the

conspirators have to say.  And there's no prejudice then to

Maxwell in the sense of unfair prejudice.  He can ask whatever

questions they deem appropriate as well.  But the absence of

the co-conspirators is of course highly prejudicial to

Ms. Giuffre.  Naturally the jury is going to wonder, you said

Kellen was reporting to Maxwell.  Where is Kellen?  That's

going to be the first thing they'll say when they go back into

the jury room.  Where are these people?  And that's what

1    they're going to say if we don't have an opportunity to present

2    them to the jury.

3        The Court will recall the extraordinary lengths to

4    which Ms. Giuffre had to go to procure their testimony.  They

5    finally were able to secure it, and they should be presented.

6        Also -- I think you'll be hearing these issues next

7    week -- we used some leading questions during the deposition.

8    We tried to also use some nonleading.  Leading questions can be

9    used when?  When you have a witness who's associated with the

10   party on the other side.  Well, we said they're in a

11   conspiracy.  I can't imagine a case where there would be a

12   clearer example of when leading questions would be appropriate.

13       The final argument they made, I think last night in

14   their late replies was that we somehow missed the deadline in

15   taking their deposition.  What they don't disclose I think in

16   their papers is, your Honor will recall that we had to come to

17   you, obtain an application for alternative service, and then,

18   as a result of that, they came in.  We did all these things

19   with the Court's blessing and approval of taking depositions.

20   Those schedules were discussed with opposing counsel.  And as

21   soon as we'd taken the deposition, within approximately a week,

22   we provided the designations.  That was back in February of

23   this year.  There's no prejudice.

24       So for all these reasons, we would ask that we be

25   allowed to present two of the co-conspirators in the witness

1    box via the video depositions that we've taken.

2            MR. PAGLIUCA:  I thought I was back to my old days as

3    a public defender when I started the practice of law, your

4    Honor.  Now I'm arguing an 801(d)(2)(E) motion instead of a

5    defamation case.

6            I think we have to start with the notion that is true,

7    that this is a defamation case in which Ms. Maxwell is alleged

8    to have made a defamatory statement in 2015.  In that

9    defamatory statement Ms. Maxwell does not mention any of these

10   individuals and doesn't mention Mr. Epstein, and so the

11   starting point for this is, this is an entirely different issue

12   than Mr. Cassell and his fantastical conspiracy argument here.

13           If we want to stick to the legal issues in this case,

14   I think we first need to understand that there is actually a

15   specific rule of evidence that relates to co-conspirator

16   hearsay exception, and that is Rule 801(d)(2)(E) of the Federal

17   Rules of Evidence, and significantly, under that rule -- and

18   this is why the cases using Rule 801(d)(2)(E) find indicia of

19   trustworthiness in co-conspirator hearsay statements -- they

20   are made at or during the course or in furtherance of a

21   conspiracy.  And absent that finding, statements of

22   co-conspirators are deemed to be hearsay.

23           So what we're talking about here are not statements

24   purportedly made by any of these individuals in 2000 or 2001.

25   We're talking about statements that they are seeking to (A)

1   introduce or (B) adversely inference that are made in 2015 that

2   had nothing to do with any alleged course of or in furtherance

3   of a conspiracy.  Any alleged conspiracy would have terminated

4   years ago by operation of many different rules and law.  So

5   Mr. Cassell's entire conspiracy theory predicate to this has

6   nothing to do with the four *LiButti* factors.

7          And when we talk about the *LiButti* factors, you know,

8   there is really zero evidence that's been presented to your

9   Honor.  First of all, the relationship now, in 2017, between

10  these individuals -- because that is what the controlling

11  relationship is, not some relationship that happened or didn't

12  happen in 2000 or 2001.  It is the relationship during the

13  course of this litigation, not some other litigation.  And

14  indeed, there is no relationship between these folks.  At best,

15  for a brief period of time, a brief period of time, these folks

16  worked in different capacities for Mr. Epstein, at best, and

17  that brief period of time is more than ten years ago.

18         The other part of this that Mr. Cassell overlooks or

19  doesn't want to talk about is what really is at issue -- and

20  this relates to this close present relationship -- does this

21  witness have some reason to protect Ms. Maxwell.  I mean,

22  that's really the inquiry here.  Is the witness invoking her,

23  in this case, privilege against self-incrimination because it's

24  going to have some benefit to Ms. Maxwell?  Well, there is no

25  benefit to Ms. Maxwell for the invocation of the Fifth

1   Amendment privilege here because indeed, if these witnesses

2   were to testify truthfully, the testimony would be beneficial

3   to Ms. Maxwell.

4          If you ever get the opportunity to watch the video of

5   these two witnesses, your Honor, it's remarkable because

6   there's a lot of eye rolling and facial expressions in response

7   to the leading questions by plaintiff's lawyers that, in my

8   analysis -- I may be testifying, your Honor, I must admit.  But

9   in my observation, it was basically a nonverbal "that's not

10  true" and then the invocation of the Fifth Amendment privilege,

11  and if that gets played for the jury, the jury can see that or

12  you can see it.  At one point Ms. McCawley chided one of these

13  witnesses and said something like, you know, if you keep doing

14  what you're doing, we're going to have to do something else,

15  because she didn't like the facial expressions or the words

16  that the witness was using to invoke the Fifth Amendment

17  privilege.  That's how much these folks could help Ms. Maxwell

18  but can't, and they can't because they're protecting their own

19  interests.  They're not protecting Ms. Maxwell's interests.

20  They're worried that if the plaintiff's lawyers succeed in

21  Florida, they have some threat of prosecution, so they're not

22  going to testify.  But again -- and this is, again, a point

23  that seems to be overlooked by plaintiff's counsel -- these two

24  individuals are indeed named in this nonprosecution agreement

25  by name.  Ms. Maxwell is not, and Ms. Maxwell didn't choose to

1    invoke her Fifth Amendment privilege.  She shouldn't be

2    penalized because the people who are concerned and are named in

3    this nonprosecution agreement can't testify because the

4    plaintiff's lawyers are trying to undo their agreement with the

5    government.

6        Ms. Maxwell has no ability to control these folks.

7    You know, we certainly weren't going to stand in the way of

8    plaintiff's trying to take their depositions, but we have no

9    control over them, in securing their testimony or requiring

10   them to cooperate in any sense.

11       I cite to the Court the case of *Coquina Investments v.*

12   *Rothstein*, which I didn't realize until I was reading this last

13   night is ironic because the defendant in the Rothstein case is

14   Mr. Edwards' former partner, who's doing 55 years in a federal

15   penitentiary right now.  But in that case, which is very

16   similar here, the court wouldn't impose an adverse inference

17   against an employer for an employee, even though the employer

18   was paying for the representation of the employee.  And that

19   case is I think significant because the court again focused on

20   the relationship at the time of the deposition and not some

21   prior relationship.

22       I talked about the co-conspirator issue.  You know,

23   that's just attorney argument asserted as fact here, your

24   Honor.  No one has ever found that these folks are

25   co-conspirators.  It's Mr. Cassell's and Mr. Edwards' theory,

1   but it certainly is not anything that there is going to be any

2   real evidence about in this case.

3          The next two *LiButti* factors, the next one relates to

4   any interest in the outcome of the litigation.  Again,

5   Mr. Cassell has to manufacture some interest here.  These folks

6   are not defendants in this case, these witnesses.  They have no

7   financial interest.  They have no ties.  There is no joint

8   defense agreement.  There is no indemnification agreement.

9   There is nothing.  They have absolutely no dog in this fight,

10  again, which is no interest in the litigation.

11         There's just really nothing that would allow any

12  adverse inference in this case one way or the other.

13         Finally, your Honor -- well, two final points.  The

14  questioning, you know, the kind of questions that were posed to

15  these witnesses were precisely the kind of questions that have

16  been disapproved in the Second Circuit.  And that's *Brink's*

17  *Inc. v. City of New York*, which is in the papers; *WorldCom*

18  *Security Litigation*, also in the papers; and *LiButti* itself.

19  These are not technical objections.  It serves no legitimate

20  evidentiary purpose for a lawyer to come in and simply ask a

21  very bunch of highly charged, leading questions to which they

22  know the witness is going to say, "I take the Fifth."  There is

23  no evidentiary ball advanced with those questions, because it's

24  just lawyer argument that doesn't do anything for anybody.  So

25  both sides could ask a hundred questions, they could both be

1    leading, they could both be exact opposite questions.  The

2    witnesses would say the Fifth to everything, and then you look

3    at the jury and you say, okay, now you can impose an adverse

4    inference against anybody you want to based on the questions

5    that the lawyers asked.  I mean, that's really what this ends

6    up being, and it's a waste of time, and it is of no evidentiary

7    significance.

8            Then the last point, which I'm just going to need to

9    correct Mr. Cassell on, the plaintiffs were saying somehow that

10   we were untimely in not designating portions of these

11   depositions which we believe are wholly inadmissible, and the

12   point of our reply was, wait a minute, you didn't designate any

13   of this testimony until after the designation date was over.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. PAGLIUCA:  (continued) I don't care about that,

2     but, you know, I mean, we're going to deal with these issues,

3     and we'll deal with them so the timing is of no consequence to

4     me, but I'm not complaining about it, I'm just responding to

5     it.

6          But for those reasons, your Honor, you shouldn't allow

7     anybody to present any adverse inference from these witnesses.

8     They should not just be part of this trial.  Thank you.

9          MR. CASSELL:  In reply, your Honor, I think you can

10    just see from the upset there what's going to be happening at

11    this trial.  This is the direct quote from Mr. Pagliuca.

12    "Fantastical conspiracy".  That's going to be the argument from

13    the other side.  They're obviously entitled to advance that

14    argument.  But that's what Ms. Giuffre is going to need to

15    respond to at the trial.  And, of course, the jury will think

16    this is a fantastical conspiracy if Ms. Giuffre doesn't even

17    bring in some of the alleged conspirators such as Epstein,

18    Kellen, and Marcinkova.

19         Now, we'll hear that this is somehow a hearsay issue

20    under 801(d)(2).  This is not a hearsay.  There are going to be

21    witnesses in the case, questioned and cross examined.  So this

22    isn't a question of inadmissible hearsay, this is a question of

23    presenting a witness to the jury.

24         THE COURT:  How do you think this evidence is -- it's

25    going to go in by way of either deposition or the depositions

1    already taken --

2              MR. CASSELL:  Yes.

3              THE COURT:  -- or by the witnesses being compelled to

4    come and invoke and so on?  I think we know how that's going to

5    work out.

6              MR. CASSELL:  Right.  I think in this case it's going

7    to be through the deposition that's been recorded.

8              With Mr. Epstein, we're going to bring him here live

9    because we've been able to reach him by subpoena, but these two

10   have been difficult to reach by subpoena, that's why we've

11   taken their deposition.

12             And so Mr. Epstein will testify live, he would invoke,

13   Nadia Marcinkova and Sarah Kellen, the deposition has already

14   been taken.  And in our --

15             THE COURT:  What do you do about the statement that

16   counsel just made about the impropriety of the questions?

17             MR. CASSELL:  Right.  So you can't just say, hey, is

18   the moon made of green cheese and they take the Fifth.  You

19   can't put that in, and Booty recognizes that.  There has to be

20   independent evidence that supports each question that's asked.

21             And so what we've done in our brief, if you look at

22   page 17 of our initial paper -- if I can just illustrate one.

23             THE COURT:  No, that's all right.  That's fine.  I get

24   the point.

25             MR. CASSELL:  Right.  But I think this is a fair point

1    about the defense.  I'm not sure that they get the point

2    because we've said here's a question --

3              THE COURT:  Don't worry about educating them.  It's me

4    you've got to educate.

5              MR. CASSELL:  So I would just direct you to our --

6    we've tried to show, this is not a moon made of green cheese,

7    we have very specific support for each --

8              THE COURT:  I hear you.  I hear you.

9              MR. CASSELL:  -- of the questions.

10             THE COURT:  You've got it in the brief.  I understand.

11             MR. CASSELL:  Right.

12             So with regard to their interest in the case,

13   obviously, they have an interest in this woman who is accusing

14   them of being involved in a sex trafficking and sex abuse

15   conspiracy having her lose this case.  They would be popping

16   champagne corks.  They clearly have an interest in the case.

17             The other problem, remember, under Booty, the question

18   is well, are these witnesses that the plaintiff had some

19   control over?  Is this somebody that the defendant has vested

20   control over these facts?

21             These were direct reports.  I don't think I heard any

22   response to that from the other side.  These were direct

23   reports to Maxwell, and so these are the people who, you know,

24   when Ms. Giuffre alleged that she's involved -- Ms. Maxwell is

25   involved in doing these things, these are the women who are

1   executing the orders for Ms. Maxwell, and it's not part of a

2   fantastical conspiracy.

3          All we want to do is have the jury hear this

4   information.  We've provided in our brief very specific support

5   for each of the questions that we want to ask.  We think it's

6   entirely appropriate that the jury hear what these two have to

7   say.

8          THE COURT:  Thank you.

9          Where are we now?  Yes.

10         MS. MENNINGER:  Your Honor, by my estimation, we have

11  one motion left, which is 665 with the opening brief.

12         THE COURT:  And what's that?

13         MS. MENNINGER:  It was our motion to prohibit

14  questioning of our client regarding her consensual adult sexual

15  activities.

16         THE COURT:  Yes.

17         MS. MENNINGER:  Do I take that as a go ahead and talk

18  or --

19         THE COURT:  No.

20         MS. MENNINGER:  Okay.  I wasn't sure.

21         THE COURT:  Yes, well, I can understand.

22         How can you possibly know what we're going to do when

23  I don't know what we're going to do?

24         MS. MENNINGER:  Your Honor, I'm happy to defer this

25  issue.  I believe it is somewhat --

1          THE COURT:  Yes.

2          MS. MENNINGER:  -- enmeshed with some of the other

3    motions that, based on plaintiff's representation, they want to

4    put off until another day, so -- until the 15 days before, in

5    particular, so I'm happy to wait.

6          THE COURT:  How does that figure -- I'm sorry.

7    Explain to me how that figures into the --

8          MS. MENNINGER:  Into this motion?

9          THE COURT:  Well, these are the things about which

10   they have to give notice.

11         MS. MENNINGER:  Exactly, your Honor.  The issue in

12   this motion, and I'll try to be slightly circumspect, but in

13   this motion, we have agreed that our client can be cross

14   examined with respect to plaintiff, any of plaintiff's

15   allegations, with respect to any other minor victim.  Our

16   client has absolutely denied having been involved sexually with

17   plaintiff or with the minor victim.

18         They would like to introduce evidence of some kind

19   every other acts with other people.  They have not yet

20   specified, apparently, completely, what other acts and what

21   other people they're talking about.

22         THE COURT:  So I think we should --

23         MS. MENNINGER:  Right.

24         THE COURT:  So I think we should wait until we get it

25   all.  Okay.  So that takes care of that.

 1              MS. McCAWLEY:  Your Honor, there's just one more thing

 2      procedurally, if I could indulge the Court while I have your

 3      attention before we all leave.  That would be helpful.

 4              THE COURT:  Don't count on it.

 5              MS. McCAWLEY:  Sorry.

 6              THE COURT:  Yes.

 7              MS. McCAWLEY:  It's just, in your order about the ESI

 8      and the issue with the non-production, you said that we should

 9      suggest hearing dates.  I see that your Honor has moved the

10      hearing dates to Wednesdays, so we were hoping to, since

11      there's only a few Wednesdays left before our trial, reserve

12      one of those to handle that hearing?

13              THE COURT:  Well, I'm not sure.

14              MS. McCAWLEY:  Or whatever day would work.

15              THE COURT:  No.  Okay.  Now, it seems to me, correct

16      me if I'm wrong, on the 5th we're going to do Epstein's motion,

17      the deposition designations, the biforcation --

18              MR. CASSELL:  I'm sorry, we just did that.

19              THE COURT:  By the way, maybe we could do the

20      biforcation issue very quickly.  What is it you want to --

21              MR. CASSELL:  I think we just did that a few moments

22      ago, your Honor.

23              MS. McCAWLEY:  That was the one about the financial

24      records.

25              THE COURT:  By what?

1        MS. McCAWLEY:  We just did that about the financial

2   records, and you gave us some direction on that, so that one's

3   been --

4        THE COURT:  Oh, okay.  So that's done.  Okay.  So

5   that's the 5th.

6        MS. McCAWLEY:  Yes.  So then there's April 12th, which

7   I believe is the following Wednesday, and then I think the one

8   after that is the 19th.

9        THE COURT:  Well, are we going to do a hearing -- I

10  take it we're going to do a hearing on the reconsideration of

11  the --

12       MS. McCAWLEY:  That's what I'm talking about, your

13  Honor.  I'm sorry.  Yes.  So that's the evidentiary issue of --

14  you said they could present a forensic, based on your order of

15  reconsideration of the November 2nd.  So that's the date I'm

16  looking for.  I'm sorry, I should have been clearer about that.

17       THE COURT:  When are we going to do that?

18       MS. McCAWLEY:  Maybe the 12th or the 19th possibly?

19       THE COURT:  How about the 10th.

20       MS. McCAWLEY:  Okay.

21       THE COURT:  Does that work for you all?

22       MR. PAGLIUCA:  I can't do the 10th, your Honor, I'm in

23  a deposition all day in Colorado.  I'm sorry.

24       THE COURT:  How could you possibly take another case?

25       MR. PAGLIUCA:  Well, believe me, I have a lot of

1   clients that are saying that exact same thing right now, your

2   Honor.

3       MS. MENNINGER:  Your Honor, could we do the 13th, the

4   Thursday of that week?

5       THE COURT:  Yes.  I don't see any reason not to.

6   Okay.

7       MS. McCAWLEY:  That's all I had, your Honor.  Thank

8   you.  And thank you for your patience, everyone, today.

9       THE COURT:  Have we completed the briefing and

10  everything everybody wants to submit on the black book issue?

11      MS. McCAWLEY:  Well, yes, your Honor.  So now, as of

12  last night, it was fully briefed.  So there are three briefs on

13  it, essentially.  We had a motion in limine to allow it in,

14  they had a motion in limine to exclude it, and it came up

15  previously -- I forget, we argued it a couple weeks ago in the

16  context of another motion -- oh, I'm sorry, because, your

17  Honor, you requested that with respect to Diane Flores.  So we

18  didn't reargue it today, it is fully briefed for you.

19      THE COURT:  Okay.  In other words, I've got everything

20  on that.

21      MS. McCAWLEY:  You do, your Honor, yes.

22      THE COURT:  Okay.  Anything else?

23      MS. McCAWLEY:  Not that I'm aware of.

24      MR. PAGLIUCA:  I think we're concluded today, your

25  Honor.  Thank you.

1              THE COURT:  Okay, thanks.  Have a nice weekend.

2              (Adjourned)