H45AGIU1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VIRGINIA L. GIUFFRE,

4                  Plaintiff,

5          v.                            15 Civ. 7433 (RWS)

6   GHISLAINE MAXWELL,

7                  Defendant.            Oral Argument

8   ------------------------------x
                                        New York, N.Y.
9                                       April 5, 2017
                                        12:10 p.m.
10
    Before:
11
                      HON. ROBERT W. SWEET,
12
                                        District Judge@@
13
                          APPEARANCES
14
    BOIES, SCHILLER & FLEXNER LLP
15       Attorneys for Plaintiff
    BY:  SIGRID S. McCAWLEY, ESQ.
16
    FARMER, JAFFE, WEISSING, EDWARDS, FISTOS, LEHRMAN, P.L.
17       Attorneys for Plaintiff
    BY:  BRADLEY J. EDWARDS, ESQ.
18
    HADDON, MORGAN AND FOREMAN, P.C.
19       Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA, ESQ.
20

21

22

23

24

25

H45AGIU1ps

1              (In open court)

2              THE COURT:  OK.  Epstein?

3              MR. EDWARDS:  Yes.  Good morning, your Honor.

4              THE COURT:  Hi.

5              MR. INDYKE:  Your Honor, Darren Indyke again, general

6      counsel for Mr. Epstein.

7              THE COURT:  I'm sorry?

8              MR. INDYKE:  My name is Darren Indyke, general counsel

9      for Mr. Epstein.  I do not litigate.  We discussed that last

10     time.  Martin Weinberg, who drafted the motion, was at Logan

11     Airport this morning.  Didn't get here on time.  His flight was

12     fogged in because of something at La Guardia.  He is now on an

13     11 o'clock flight into JFK and is going to come directly from

14     JFK to the court as soon as he gets here.

15             THE COURT:  Let me ask you, what is Epstein's

16     residence?

17             MR. INDYKE:  What is Epstein's -- he is a Virgin

18     Islands resident.

19             THE COURT:  I beg your pardon?

20             MR. INDYKE:  A Virgin Islands resident.

21             THE COURT:  If that's true, then he is beyond my

22     reach.  Correct?

23             MR. INDYKE:  We do maintain that, yes.

24             MR. EDWARDS:  Your Honor, can we be heard on that

25     issue?

H45AGIU1ps

1              THE COURT:  Sure.

2              MR. EDWARDS:  Brad Edwards on behalf of the plaintiff.

3              While Mr. Epstein owns his own island and calls that

4      his domicile, he does have a residence in New York City.  He

5      does regularly conduct business in New York City.

6              THE COURT:  That doesn't do it under the rule, does

7      it?

8              MR. EDWARDS:  Under Rule 45, it's where you reside,

9      where you regularly conduct business.  And he regularly

10     conducts business in New York.  In fact, as Mr. Indyke just

11     indicated, that is his primary business affairs attorney, who

12     has been in charge of his business affairs for many years.

13     Mr. Epstein employs numerous employees in New York City.

14              (Pause)

15              MR. EDWARDS:  Your Honor, additionally, Mr. Epstein

16     has a home in New York City, a very large townhouse, a 50,000

17     square foot townhouse, where he employs many employees there.

18              THE COURT:  But having a home in New York doesn't

19     subject him to the jurisdiction, I mean, a house in New York.

20     If that were the case, we would be in a lot of trouble,

21     wouldn't we?

22              OK.  There is an issue.  I don't have any facts except

23     what I've just been told with respect to his residence,

24     employed, regularly transacts business.

25              MR. EDWARDS:  Yes, your Honor.

H45AGIU1ps

1              THE COURT:  So "regularly transacts business," we

2      don't have any facts, which is not to say that you're not

3      correct.

4              MR. EDWARDS:  Your Honor, that's why I was raising the

5      point about his home and who he employs.

6              THE COURT:  No, no, no.  I hear you.

7              MR. EDWARDS:  I understand.

8              THE COURT:  But I don't have a piece of paper that is

9      any evidence of that.

10             MR. EDWARDS:  The point that I was trying to reach

11     was, we can't ask Mr. Epstein these questions because he

12     invokes the Fifth.

13             THE COURT:  I understand.  Good Lord, I understand

14     that.  I'm just simply saying, I don't have any facts on which

15     I can say that he regularly transacts business here.  I don't

16     have any facts.  I hear what you say.  Thanks.  But that's

17     lawyer talk, and I don't have any facts.

18             OK.  Well, I think I understand the problem.  Tell him

19     I'll take the motion on submission.  I've had enough of this

20     guy and his airplanes and his being late.  We put it over at

21     his request.  If he's fogged in Logan, I'm fogged in New York.

22     So what can I say.

23             MR. INDYKE:  Your Honor, he is actually on his way to

24     the -- he's on his way now.

25             THE COURT:  Well, of course he's on his way.  Where?

H45AGIU1ps

```
 1      In an airplane?

 2              MR. INDYKE:  The airplane left at 11, so he's

 3      probably --

 4              THE COURT:  If he shows up before we're finished, I'll

 5      hear him.  OK?

 6              MR. INDYKE:  Thank you, your Honor.

 7              THE COURT:  All right.  Now what's next?  Where are

 8      we?

 9              MS. McCAWLEY:  Your Honor, I think there is one motion

10      that is pending that we've pushed off, it's the defendant's

11      motion, to this day, because it deals with depositions in

12      general that they're trying to exclude.  So it may be a good

13      starting point.  Jeff, if you want to take the in toto motion?

14              MR. PAGLIUCA:  Sure.  That's probably the sensible

15      starting point because it, again, deals with them trying to get

16      rid of witnesses in their entirety, and, again, we waited until

17      today to do that.

18              THE COURT:  Yes.

19              MR. PAGLIUCA:  Your Honor, the motion that we are

20      talking about is captioned "Defendant's Motion in Limine to

21      Exclude In Toto Certain Depositions Designated by Plaintiff for

22      Use at Trial."  We are talking specifically about four

23      witnesses.  The first relates to Mr. Epstein, which I

24      understand we don't want to talk about anymore today, so I will

25      leave that, having heard your Honor on that issue.
```

H45AGIU1ps

1              THE COURT:  Well, I was just dealing with the subpoena

2     issue.

3              MR. PAGLIUCA:  All right.  Then I'm happy to talk

4     about it, your Honor.  It does relate in part to what we are

5     talking about.  And I will more narrowly focus it as a Rule 32

6     issue, as opposed to a subpoena issue.

7              The issue relates to the use of depositions at trial,

8     which, in my view, is governed by Rule 32 of the Rules of Civil

9     Procedure.  And those rules are clear with regard to

10    depositions as to unavailability of witness.  And then we talk

11    about the requirements that, whether they're dead, more than a

12    hundred miles away, illness, age, infirmity, etc.  And in my

13    view, there is no unavailability under Rule 32 for Mr. Epstein

14    in this particular case.

15             There seems to be an attempt, I think, to -- or a

16    misunderstanding of sort of conflating Rule 32 and Rule 804.

17    Rule 804 of course deals with unavailability as defined under

18    the Federal Rules of Evidence for hearsay purposes, which is

19    different than Rule 32, as it relates to use of a deposition in

20    a trial.  And so I don't think we can take Rule 804 and then

21    say that's the definition of unavailability.

22             Rule 804 unavailability applies to many things, and it

23    can apply to written statements.  It can apply to testimony in

24    trial.  But Rule 32 of the rules of civil procedure deals

25    specifically with depositions.  And in my view, that has not

H45AGIU1ps

1      been met as it relates to Mr. Epstein.

2              Mr. Rizzo is the second witness, your Honor.

3      Mr. Rizzo lives here in New York.  He was deposed in New York.

4      And there has been no showing, and I don't believe there can be

5      any showing, that he is unavailable under Rule 32.  I

6      understood from the response filed by the plaintiff that they

7      were checking with Mr. Rizzo's lawyer to see what his status

8      was.  In my view that's not sufficient for this discussion

9      today.  Unavailability under Rule 32 would require something to

10     happen.  Mr. Rizzo would be sick or dead, something like that.

11     Simply saying we're checking with his lawyer doesn't satisfy

12     the requirements of Rule 32.  And so I don't understand what

13     their position is, frankly.  We took a discovery deposition of

14     Mr. Rizzo here in New York within a hundred miles of this

15     courthouse.  Mr. Rizzo, if he's going to testify, should show

16     up.

17             What I'm afraid of, your Honor, is that there -- and

18     I'm not accusing, I'm just afraid, because, you know, call it

19     spider sense or something -- what can happen is, we get to

20     trial and then someone says, oh, gee, he went on vacation, and

21     so now he's more than a hundred miles away and we're going to

22     use the deposition transcript.  That's not sufficient

23     unavailability.  The party that's attempting to establish

24     unavailability has to show some good-faith effort to subpoena

25     the witness or get the witness here.  As far as I know,

H45AGIU1ps

1    Mr. Rizzo lives here in New York, and if he's going to testify,

2    he should testify in person.

3            The third witness that we're talking about here is

4    Dr. Esplin.  The Court may recall that Dr. Esplin is a rebuttal

5    expert designated by the defense in this case specifically

6    relating to what we call the vouching opinions of Dr. Kliman

7    and Mr. Coonan, Professor Coonan.  What happened with

8    Dr. Esplin is, he was designated for a very narrow purpose and

9    he was deposed for some seven hours.  Most of the deposition by

10   plaintiff's counsel was far outside of the designated purpose,

11   and there were repeated objections during the course of the

12   deposition -- you know, this is not what he was hired for, he

13   hasn't looked at that, he doesn't have an opinion about that --

14   and now they're trying to designate a rebuttal expert in their

15   case in chief to talk about opinions that he wasn't hired to

16   offer and didn't opine on in the first instance.

17           The briefing, I think, is sufficient on this, your

18   Honor, that, here, it's not appropriate designate a defense

19   rebuttal on these kinds of topics.  And so I don't think that

20   they should be allowed to use that testimony, which is

21   objectionable, frankly, as rebuttal testimony.

22           The next witness, your Honor, is Alexandra Hall.

23   Ms. Hall was deposed in Florida.  And the Court may recall that

24   Ms. Hall basically said, I don't remember anything about any of

25   this, and essentially didn't answer any substantive questions

H45AGIU1ps

1    during the deposition.

2            The colloquy that has been provided to the Court as

3    part of briefing establishes that Ms. Hall was subpoenaed to

4    this deposition by the plaintiff.  She appeared with her

5    counsel, Mr. Josephsberg, who represented her in the 102 case

6    that was filed against Mr. Epstein, many years ago.  Ms. Hall

7    sat down, essentially -- I'm paraphrasing -- said, I've spent

8    years forgetting all of this, I've spent lots of time in

9    therapy forgetting all of this, I'm not going to remember any

10   of this, and basically refused to answer questions for whatever

11   reasons.

12           Mr. Josephsberg, her lawyer, made a proffer during

13   this deposition reaffirming that the witness didn't remember

14   anything and wasn't going to testify about anything.

15   Mr. Edwards plunked down what he says is her -- a transcript of

16   the statement she gave to the police.  She didn't look at it at

17   all, and that's part of the record in this case; the lawyer

18   said it and she said it: I didn't look at it.  She didn't turn

19   the page.  Mr. Edwards said something like, isn't the thing you

20   told the police in 2006 true.  She said yes.  And that's

21   basically the deposition.

22           We have moved to exclude that in its entirety because,

23   you know, in part there really is no testimony here.  There is

24   no establishment of any actual personal knowledge by this

25   particular witness.  There has been no foundation for either

H45AGIU1ps

1    impeachment or refreshing recollection.  This wasn't a

2    situation where the questioner then said, well, I'm going to

3    show you line 3, paragraph 5, or did you not say that.  I'm

4    going to show you this, that, or the other thing.  That never

5    happened during the course of this deposition.

6              So you have a witness sitting there, looking at

7    nothing, and now there is going to be this attempt, I think, to

8    introduce what I view as a hearsay document without foundation

9    into this trial through that deposition.

10             That, I think, primarily deals --

11             THE COURT:  Through Hall?  You're suggesting that the

12   plaintiff will seek to introduce the police statement through

13   Hall?

14             MR. PAGLIUCA:  Yes, or Recarey.  I'm not sure which

15   one.  But it doesn't change the quality of it being hearsay.

16   You can't wave a wand over this thing and say this is now not

17   hearsay.

18             THE COURT:  If the statement gets in, if this

19   statement gets in, then the deposition would be admissible,

20   because she has said, yes, that's true.

21             MR. PAGLIUCA:  This is the problem, your Honor.  This

22   is the nuance that I think I'm trying to get to, which you have

23   narrowly focused now.  There is a multiple-layer issue here

24   under the rules of evidence.  The first is this.  She had

25   pieces of paper in front of her, so I don't know how long the

H45AGIU1ps

```
 1    statement is.
 2                THE COURT:  Whatever.
 3                MR. PAGLIUCA:  Right.  She never looked at it, not
 4    once.  She didn't read it.
 5                THE COURT:  Well, but she said that it was true.
 6                MR. PAGLIUCA:  No, no, no, no.  The question was, is
 7    what you told the police in 2006 true, words to that effect.
 8                THE COURT:  Oh.
 9                MR. PAGLIUCA:  Not, is this the statement you gave to
10    the police and is the contents of this statement true.  There
11    was a very vague and generic question about conversations with
12    the police.  And by the way, she talked with the police more
13    than one time.  And so there's no specificity about what she is
14    referring to in that context.  That's the first issue.
15                The second issue is -- we talked about this the last
16    time we were in court -- that particular transcript is not a
17    police record.  That's the other problem here.  That particular
18    transcript, Detective Recarey testified about.  And he said, I
19    don't know what this is, it wasn't prepared by my department,
20    I've never looked at it.
21                And so whatever this document is has not been
22    authenticated by anyone.  That's the first problem.
23                And then it gets in front of this witness who doesn't
24    look at it and doesn't read it and makes this blanket
25    statement.
```

H45AGIU1ps

```
 1              So there is no foundation or establishment that this
 2      is a prior recollection recorded or any of the requirements
 3      under the 800 series of rules that deals with hearsay.  So
 4      there is no foundation for any of this.
 5              THE COURT:  OK.  Thank you.
 6              MR. PAGLIUCA:  Finally, then, your Honor, we're
 7      talking about Mr. Rodriguez and his two depositions that
 8      occurred in 2009.  This is a bit of an extended discussion, I
 9      think, your Honor.
10              I need to set the stage here a little bit with regard
11      to Mr. Rodriguez and this deposition testimony.
12              THE COURT:  Well, how does it get in?  It's not in
13      this case.
14              MR. PAGLIUCA:  Exactly.  That's my point exactly.
15      You've cut right to the heart of this.  They say, your Honor,
16      their argument is that, in spite of Rule 32, that somehow there
17      was -- that Mr. Epstein's lawyer, in this 2009 deposition, is
18      the predecessor in interest to Ms. Maxwell, and therefore, as a
19      predecessor in interest, it is admissible under Rule 804.
20      That's their position.
21              THE COURT:  What do they have to show to establish
22      that?
23              MR. PAGLIUCA:  Right.  There are a couple of cases on
24      this issue, your Honor.  What they have to show is what they
25      can't show.
```

H45AGIU1ps

1          THE COURT:   The case in which he was deposed was one

2     of the cases against Epstein?

3          MR. PAGLIUCA:   Yes.   Well, there were -- the answer is

4     yes.   There were a number of cases against Mr. Epstein.   There

5     was a series of Jane Doe cases.

6          THE COURT:   That arose out of the nonprosecution

7     agreement and all of that.

8          MR. PAGLIUCA:   Exactly.

9          So, your Honor, if I could approach, I wanted to talk

10     about the nonprosecution agreement and why the nonprosecution

11     agreement, I think, ends this discussion.

12          In order to be aligned as a predecessor in interest,

13     the proponent of the evidence has to show essentially that

14     whoever is there at the deposition has the exact same

15     motivation to cross-examine, to develop the testimony, as the

16     person that you're trying to use it against in this case.   If

17     you look at this, what I just handed you, your Honor, and we go

18     to paragraph 8, which is found on page 4 of this document, 7

19     and 8, part of Mr. Epstein's agreement in this nonprosecution

20     deal is that the government gives Mr. Epstein a list of who

21     they say are victims of Epstein.   Epstein agrees to confess

22     liability and damages in connection with these litigations,

23     your Honor.   That's paragraph 7 and paragraph 8.   So going into

24     these depositions, Mr. Epstein is rolling over and saying, I'm

25     not contesting liability, and I'm not contesting damages.

H45AGIU1ps

1    That's paragraphs 7 and 8.

2         So how then, how then can Mr. Epstein's lawyer be in a

3    position to be aligned or defend Ms. Maxwell's interests in

4    2009?  Ms. Maxwell isn't a party to this litigation.  She's not

5    named as a defendant.  She's not represented by counsel.  There

6    is no agreement with her and Epstein that would allow for

7    Epstein to do anything to represent her in this deposition.

8    There's no indemnification agreement.  There's no identity of

9    counsel.  None of these things apply at all.  And Mr. Epstein,

10   who has agreed to be liable under his deal, in which

11   Ms. Maxwell is not mentioned, by the way -- her name did not

12   appear in this nonprosecution agreement -- shows up, I don't

13   know why, since he has confessed liability and damages, and he

14   has absolutely no incentive to cross-examine Mr. Rodriguez

15   about anything.  He's already agreed that he's responsible and

16   he's going to pay money.  So there is no effort to do anything

17   on Ms. Maxwell's behalf.

18        This is, when you think about it logically, had

19   Ms. Maxwell been named as a defendant in that action, she would

20   have had separate counsel, because her interests are not

21   aligned with Epstein in these matters.  She would have had the

22   opportunity to cross-examine this witness.  And she would have

23   had the opportunity to develop her own evidence separate and

24   apart from Epstein.  And the cross-examination of Mr. Rodriguez

25   would have gone something like this, your Honor:  Well, isn't

H45AGIU1ps

1     it true that Epstein did those things, isn't it true that

2     Epstein was the guy that did whatever it is that we're talking

3     about, isn't it true that Maxwell did not have anything to do

4     with X, Y, and Z.  None of these questions could be asked by

5     Mr. Epstein's lawyer because there would be an obvious conflict

6     of interest between those two positions.

7          There is one case that the plaintiffs cite for this

8     proposition that there is an identity of interests, and that

9     is, they cite a Third Circuit Court of Appeals case *Lloyd v.*

10    *American Export Lines Incorporated*, found at 580 F.2d 1179.

11    This is an interesting case, your Honor, and it highlights why

12    there is no identity of interest in this case.  So first let me

13    start with, the Third Circuit is not the Second Circuit, as you

14    well know, your Honor.  This 1978 case is a pretty complicated

15    fact pattern, your Honor, that involved a fight on a ship in

16    Yokohama, Japan.  So two sailors on this ship got into a fight,

17    allegedly, and there was an action brought first in a Coast

18    Guard proceeding, apparently akin to some sort of Coast Guard

19    court-martial proceeding, and in that case, the Coast Guard

20    finder of fact, in sort of a trial, found against Mr. Alvarez,

21    who is the third-party defendant in this case.  So both, the

22    two seamen, Lloyd and Alvarez, end up suing the ship owner and

23    have these competing claims.  Lloyd is saying, I didn't assault

24    Alvarez, and Alvarez is saying, Lloyd assaulted me.  And both

25    of them are saying that the ship owner is liable because

H45AGIU1ps

1    they're negligent and they have an unseaworthy ship.

2            Mr. Lloyd doesn't show up in the Third Circuit -- I

3    guess in New Jersey -- no, Pennsylvania.  Doesn't show up in

4    Pennsylvania for this trial.  And so Mr. Alvarez is the only

5    person who testifies, and then wins, because Lloyd is not

6    there, and Alvarez wins against the ship company.  It goes up

7    on appeal, and the American Export Lines, the company, said,

8    wait a minute, that's not fair because we want to introduce

9    Lloyd's testimony from the trial to show that Lloyd says he

10   didn't assault Alvarez.  So that's sort of the backdrop to

11   this.

12           The Third Circuit Court of Appeals said, yeah, that's

13   not fair, that Alvarez gets to say whatever he wants to say and

14   there's directly contradictory testimony against Alvarez in

15   this Coast Guard hearing, so we're going to say for a variety

16   of reasons that it comes in.  There is a, what I would call a

17   concurring/dissenting opinion by then-District Court Judge

18   Stern.  And he actually says, you know, this is not a

19   predecessor-in-interest case, in his part of the opinion.  And

20   what he does then is he actually cites to the Second Circuit

21   law on this and has to go back to 1900 for the case

22   *Metropolitan State RY Co*., and I couldn't figure out what "RY"

23   stands for, *v. Gumby*.  And that's at 99 F. 192.  And this *Gumby*

24   case is still good law and sort of sets the Second Circuit

25   apart from the Third Circuit with regard to these issues,

H45AGIU1ps

because the Second Circuit in the *Gumby* decision takes a much
more conservative view of what it means to be a predecessor in
interest.  And this *Gumby* case has been cited by other courts
for a number of years and essentially says, no, this is not
just simply, maybe you guys have something in common here.  A
predecessor in interest is, I die, and I am the predecessor in
interest in my estate, or I am in privity of contract with
someone, and so therefore I'm the predecessor in interest; a
company bought my company and so the depositions in that
litigation are therefore admissible against the third or the
fourth company because these are all predecessors in interest,
not, Mr. Epstein signed a nonprosecution agreement that
required him to confess liability and damages and therefore,
ten years later, my client has to eat this deposition.  That's
not a predecessor in interest.  There are a lot of things I
could call that, but predecessor in interest wouldn't be one of
them, your Honor.

          They also argue, your Honor, that somehow
Mr. Rodriguez's statements are reliable and therefore should be
admitted under the residual hearsay rule.  Let me remind you
again, your Honor, this is Mr. Rodriguez, who either committed
perjury during this deposition that they are saying is so
reliable or manufactured evidence after the fact.  You can't
have it both ways.  He was asked questions about the book that
we talked about in court here, during his deposition, and he

H45AGIU1ps

1    said he had no such document, and then called someone,

2    Mr. Edwards most likely, and said, hey, I'm going to sell you

3    this thing for $50,000, after which he was arrested and

4    prosecuted, and, the day of his change of plea hearing, then

5    goes to Miami and gets arrested for 922(g) charges for

6    possessing multiple -- multiple, dozens -- of weapons by a

7    convicted felon.

8            So this is the foundation upon which this reliability,

9    according to the plaintiff, is established, which, it's not.

10           I think that's all of the witnesses that relate to

11   this particular motion, your Honor.  And so for all of the

12   reasons, we ask that you grant this motion and exclude these

13   depositions in their entirety.

14           MS. McCAWLEY:  Thank you, your Honor.  May I be heard?

15   It's Sigrid McCawley on behalf of Ms. Giuffre.

16           A couple of these issues, I think, are pretty easy to

17   deal with out of the box.  As an initial matter, your Honor,

18   you knew you were here today to talk about whether Mr. Epstein

19   will show up pursuant to his trial subpoena.  In an abundance

20   of caution because multiple witnesses in this case have been

21   evasive, we designated his testimony in case he doesn't show up

22   and in case we can't compel him to be here pending your

23   decision.  We want him here in person, obviously.  We believe

24   that he falls within those rules and should have to be here in

25   person.  But in an abundance of caution we've designated his

H45AGIU1ps

testimony.  The defendants have argued that he is available, he

should be here as well.  So we're on the same page with respect

to that.  But if not, we have designated his testimony.  And

that's -- they were quibbling over our designating that

testimony.  We did it as a fallback in case there is an issue

with him being compelled to be here at trial.

THE COURT:  One of the things that he's advancing,

regrettably not here at the moment, but is his Fifth Amendment

privilege.  And am I not correct that there are a number of

decisions that say it's up to me to decide whether or not the

exercise of Fifth Amendment privilege comes in directly or by

deposition?

MS. McCAWLEY:  I believe that's correct, your Honor.

We obviously -- there's been a number of motions pending with

respect to Mr. Epstein and the adverse inference with respect

to his taking his Fifth Amendment right, and you heard from my

wonderful colleague, Mr. Cassell, who argued last week about

the adverse inference and *LiButti* factors with respect to his

testimony coming in.  So with respect to whether he is here in

person versus deposition, like I said, in an abundance of

caution, we've done both; we have compelled him to try to --

subpoena him here in person as well as designating his

testimony.

We do believe that, if he were on the stand, we would

have the ability to ask him those questions.  For example, your

H45AGIU1ps

Honor compelled him to produce, you'll remember, pursuant to
this subpoena, the pictures, which were no. 5 of that subpoena.
We have not been able to ask him questions about that at this
time because that was ruled on after we were able to take his
deposition.  So we would like to have to have him here in
person and be able to have --

THE COURT:  Have any pictures been produced?

MS. McCAWLEY:  They have not, your Honor, of course.
I mean, he is not -- obviously they're not here either.  But if
we have the power to do that, we would like to have him here in
person.

So that's with respect to Epstein.

With Mr. Rizzo, we answered in our response, he will
be here.  He is within the hundred-mile jurisdiction.  So
Mr. Rizzo we again designate.

THE COURT:  So that's not a question.

MS. McCAWLEY:  Right, exactly.

Mr. Esplin, we designated him in case they pulled him
as an expert, so we designated that testimony.  They have said
that they're going to have Mr. Esplin here at trial.  So that
is not an issue anymore.

I would like to address the more poignant issues, and
that is with respect to Alexandra Hall.  With all due respect
to my colleague, the deposition, which I would like to hand up
to your Honor, has 70 pages of substantive testimony from

H45AGIU1ps

```
 1    Alexandra Hall.  She was 15 years old at the time she was
 2    recruited in this circumstance, in the same exact manner that
 3    my client was recruited.  So I would like to just pass that up
 4    so your Honor can consider that during my argument.
 5            May I approach?
 6            So, your Honor, the defendant would love to have you
 7    believe that Alexandra Hall walked into this deposition and
 8    didn't say anything.  That is not the case.  You can view it
 9    with your own eyes in the testimony that she has given.  Was
10    she apprehensive?  Absolutely.  Was she unhappy about having to
11    talk about this circumstance again?  Absolutely.  Did she say
12    everything in my police statement is correct?  Absolutely.  So
13    that is in her deposition.  But she also gives substantive
14    testimony, very substantive testimony.  I would like to direct
15    your attention to paragraph at page 25.  She starts to talk
16    about how she was recruited.  She was brought into the bedroom
17    under the guise of a massage.  She was abused by Epstein during
18    that time.  She was asked by him and others to bring friends
19    over of similar high school age.  She was introduced to Nadia,
20    had to participate in group sex in a similar manner that my
21    client was subjected to.  She was there over a hundred times
22    during this time period.  She was brought in by people who are
23    associated with the defendant in this case because the
24    defendant, as you'll recall when you've heard Tony Figueroa's
25    testimony, was asked to bring young girls to the house.  These
```

H45AGIU1ps

young girls then brought Alex Hall to the house.  So there is a

chain of events directly linked to the defendant in this case.

Her testimony, they're trying to get rid of it because it's so

poignant, your Honor.  It goes to the exact issues in this

case.  Unfortunately, she's in Florida.  We can't compel her to

be here.  But we do have sworn deposition testimony by her.

        And most importantly, at page 54 of 57, she testifies

that Epstein intimidated her, that his folks tried to get her

not to talk, not to cooperate with the police, which is very

similar to a number of other witnesses in this case.

        So this testimony is very powerful.  The jury should

be able to hear this, your Honor.  There is no reason for it to

be excluded.  It's substantive.  Again, was she apprehensive?

Yes.

        With respect to her -- and they've made arguments with

respect to the questions being leading, your Honor.  We cite

you to *U.S. v. Rojas*.  When you have a witness that's a sexual

abuse victim of this type, you're entitled to ask leading

questions in order to solicit the response.  That's 520 F.3d

867.  And that is a similar circumstance where, when a witness

is in a circumstance where they have been abused and they are

apprehensive and they are considered an adverse witness, at

that point you can ask leading questions to solicit that

testimony.

        So, your Honor, she is a very important witness in

1    this case, again because her circumstances are so substantially

2    similar to that of my client.  And there is absolutely no valid

3    reason to be excluding her testimony.

4         With respect to the police report that she was asked

5    about, it was her statement, her police statement that was

6    shown to her during that deposition.  She was given the

7    statement.  She testified, the statement is correct, my

8    recollection, so it's recorded recollection there, at the time

9    in 2011.  And that's at page 7.  She states that, back from

10   November 21, 2005 when she provided that sworn statement, that

11   everything in that statement is correct.  But then, she didn't

12   just stop there, your Honor.  Again, it's 60 pages of

13   deposition.  She gave substantive testimony reiterating what

14   happened to her during her time period with Epstein, again,

15   facts analogous to what happened to my client.

16        So, your Honor, her testimony is substantive.  There

17   is absolutely no reason to be keeping it out in any way.  And

18   we submit that it should be before the jury in this case.

19        And, again, I pointed you to some of those key pages.

20   But really from page about 20 back is all substantive testimony

21   in that deposition.

22        Now, I would like to move, if your Honor doesn't have

23   any questions with respect to Alex Hall, I would like to move

24   on to Alfredo Rodriguez.  Obviously Alfredo Rodriguez is

25   deceased.  If he was not, we would want to have him here.

H45AGIU1ps

Unfortunately we cannot.  Why is he important?  Rodriguez is

important because he testified that Maxwell, in this time

period, which was around the 2004, 2005 time period, with as

his direct supervisor at the home.  So that contradicts

directly what Maxwell has said in her sworn testimony.  So he

testified -- this is back years and years ago -- Who was your

supervisor?  Who did you report directly to at all times, day,

night, etc.?  It was Maxwell, the defendant in this case.  He

worked at the Palm Beach house for several years.  He testified

that Maxwell lived there.  He testified regarding her computer,

direct contradiction to what she has testified, that there were

nude photographs on her computer, things of that nature.

He testified that he was directed to go to a high

school to drop off flowers to a high school student as part of

this massage recruiting scheme.  He testified that Maxwell was

on a bank account for the Palm Beach house at the time he was,

they were jointly able to write checks, etc., etc.  And he

testified regarding the numerous under-aged girls there.

Finally, at page 172 of his testimony, he testified

that Maxwell threatened him.  When he left his employment, she

said, if you talk, you will be in trouble.  And that's in his

testimony at page 172.

So, your Honor, we believe that Rodriguez is a highly

important witness.  Yes, he is deceased.  He is not here.  I

understand that.  They have called his credibility in question

H45AGIU1ps

by saying, oh, he was arrested for stealing a black book.  We

stipulate to that.  We don't mind the jury knowing he stole a

black book.  He was arrested for it.  But that doesn't mean his

testimony regarding his employment and what he was required to

do, etc., shouldn't come into evidence.  Again, if we could

call him we would.

          So you heard a lot about the seaman case, which is

that Third Circuit case that we talked about.  But more

important than seaman, which I do think is on point there, that

case, the 804(b)(1) rule is explicitly on point on this issue.

So it addresses former testimony, as we know.  And that rule

says that former testimony in this situation, when someone is

unavailable, which the deceased qualifies as, can be offered

against a party who in a civil case was a predecessor in

interest, had an opportunity or similar motive to develop it by

direct cross or redirect examination.  So you've heard from

Mr. Pagliuca, oh, well, Maxwell's lawyers weren't there, she

wouldn't have had any incentive, she would have a different

incentive than Epstein in that case.  So these are the Jane Doe

cases, as your Honor knows.  And the purpose of those cases, of

course Epstein was trying to call into question the witnesses.

So the point was to show that the witnesses were not telling

the truth.  Rodriguez is being deposed in that case.  So their

incentive is to show that he's wrong.

          And what do they do?  Epstein's lawyer spends time in

H45AGIU1ps

1      that deposition cross-examining Alfredo Rodriguez specifically

2      about the testimony relating to Maxwell.  So there is

3      cross-examination with respect to the claims of what was on

4      Maxwell's computer, etc.  And I will point you to that.  That's

5      at pages, you're going to see that at pages 364 through 369,

6      375 through 376, and 416 to 417.

7              So while they say, oh, there was no incentive to

8      cross-examine with respect to Maxwell, they certainly were

9      doing it at the deposition.

10             And they are aligned, your Honor.  The point is to try

11     to take down the witnesses and prove that this did not happen.

12     So in that respect, your Honor, they are aligned.

13             With respect to the case law on this, I cite to the

14     *U.S. Carnivalia* case, which is an Eastern District of New York

15     case, that talks about this, the interest issue.  And it says,

16     at the time testimony was given, did they have an interest of

17     substantially similar intensity to prove or disprove the same

18     side or substantially similar issues before the Court.

19             THE COURT:  But the issues are markedly different,

20     aren't they?  The issue, what interest did Epstein have in

21     establishing Maxwell's role?

22             MS. McCAWLEY:  The interest that Epstein had, just as

23     if Rodriguez were here on the stand, the interest that Epstein

24     had -- and you'll see it in the deposition -- is to disprove

25     the allegations of girls coming into the house, nude photos on

H45AGIU1ps

1  the computer, abuse happening in the home that other people

2  knew about, all those things that were occurring at the West

3  Palm Beach home.  He had the same incentive as Maxwell would.

4  If we put Rodriguez on the stand here, she would be

5  cross-examining him on those same exact issues.

6          So, your Honor, their interests --

7          THE COURT:  But counsel points out, he's conceded

8  liability.  So what's point?

9          MS. McCAWLEY:  I don't believe in the Jane Doe cases

10  he conceded liability in that manner, your Honor.  He is

11  cross-examining these witnesses because of course they are

12  determining how much they're going to have to pay, all the

13  issues relating to these witnesses.  So he's fought those hard.

14  He deposed and fought every single witness that was brought up

15  in those cases.  They went on for several years, as your Honor

16  knows.

17          THE COURT:  Who called Rodriguez?

18          MS. McCAWLEY:  A number, there was probably, I think

19  it was jointly six or seven lawyers from varying plaintiffs.

20  There was Jane Doe 102, Jane Doe 1, you know, etc., all

21  represented by varying counsel, so they were all present.  And

22  Creighton was present for Epstein.

23          And that raises a good point, your Honor, because

24  another --

25          THE COURT:  So the issue, Epstein's issue with respect

H45AGIU1ps

1    to Rodriguez was, were there girls, how many, and who they

2    were.

3         MS. McCAWLEY:  Yes, your Honor.  Did the, yes,

4    exactly, what was occurring at the house.  So they were trying

5    to establish whether or not those things occurred, how many

6    girls were they really abused, all of those issues.  And so

7    they called Rodriguez to try to establish that, which, they got

8    his testimony with respect to him.

9         On the lawyers, I do want to point something out,

10   because this talk about interests being aligned, you'll

11   remember Detective Recarey in this case.  He gave testimony.

12   He is the detective who investigated this.  He testified that

13   he tried to interview Maxwell, and Guy Fronstin stopped him

14   from doing it, wouldn't produce her as a witness.  That is

15   Epstein's lawyer.  So there is -- while I we haven't seen a

16   JDA, your Honor has directed it to be produced, and there is a

17   fight over that.  At that time back in 2006-7, when these

18   depositions are happening, you have the lawyer for Epstein,

19   also representing Maxwell, saying she can't be interviewed by

20   the detective.  So, your Honor, there is an interest alignment.

21        THE COURT:  That clearly doesn't do it.

22        MS. McCAWLEY:  I'm sorry?

23        THE COURT:  That clearly doesn't do it.

24        MS. McCAWLEY:  Well, your Honor, I believe that when

25   we look at just the purpose of 804 and how this would come in,

H45AGIU1ps

1    it's for a situation like this.  Again we have a diseased.  So

2    we cannot produce him to be here to give the testimony.

3          THE COURT:  I do understand he's dead.  Probably a

4    good thing based on everything that we know about Rodriguez,

5    however.

6          MS. McCAWLEY:  All right, your Honor.  Well, I

7    appreciate your entertaining my argument on that, and I'm happy

8    to answer any questions you have.

9          MR. PAGLIUCA:  I won't talk about the first two

10   people.  It seems to me that there is a concession that

11   Mr. Rizzo is going to be here and why, and so we can move on.

12         THE COURT:  Yes.

13         MR. PAGLIUCA:  As to Alexandra Hall, Ms. McCawley

14   directs you to page 7 of her deposition.  And the question by

15   Mr. Edwards first is, I'm going to go ahead and show you a

16   police report.  Mr. Josephsberg says, I've seen it about five

17   years ago.  And Mr. Edwards says, if you need to refer to it

18   for any reason, you can.  That's the entirety of that colloquy

19   about whatever this police report is.

20         Then on line 17 there's a question, "Do you remember a

21   police officer coming to speak with you in Jacksonville on

22   October 11, 2005?"  And she says, "No."

23         Just because you like some testimony doesn't mean that

24   you've complied with the rules of evidence, your Honor.  And if

25   in fact someone was going to actually try to introduce whatever

H45AGIU1ps

1    this is, what would you do?  Well, if you had an audio/video

2    copy of this statement, you would push "play" in this

3    deposition and the witness would watch the whole thing, and

4    then you could say, is that you?  Is that you on that tape?

5    Oh, OK, yeah.  And who's that you're talking to?  And is that

6    what you said?  And is that your voice?  Well, none of that

7    happened, your Honor.

8            Alternatively, if you were the questioner, you would

9    say, I'm going to direct your attention to page 1; did you say

10   that or did you not say that?  None of that happened in this

11   deposition.  In fact, the opposite happened, your Honor.  The

12   lawyer for the witness said --

13           THE COURT:  But that's as to the statement.  That's

14   all as to the statement.

15           MR. PAGLIUCA:  That's right.  OK.  I've said enough

16   about that, your Honor.

17           THE COURT:  I mean, it doesn't get in through her.

18           MR. PAGLIUCA:  Precisely.  That was my point

19   precisely, that there's no evidentiary foundation through this

20   witness for admission of those pieces of paper.

21           Let me finish up with this Rodriguez issue.

22           THE COURT:  But the so-called substantive testimony

23   does get in.

24           MR. PAGLIUCA:  Well, I suppose -- it depends on which

25   part of it you're talking about, because there are, other than

H45AGIU1ps

1   specific objections to different parts of this designated

2   transcript.

3          THE COURT:  Is that part of the -- I have roughly,

4   what is that, two feet --

5          MR. PAGLIUCA:  Right.

6          THE COURT:  -- two and a half feet of depositions to

7   review with objections.  Is she included in that?

8          MR. PAGLIUCA:  Yes.

9          THE COURT:  OK.

10         MR. PAGLIUCA:  To the line-by-line objections and the

11  designations.  So this is a more overarching issue.

12         THE COURT:  Yes.

13         MR. PAGLIUCA:  Finally with regard to Rodriguez, your

14  Honor, first of all, we are here in 2017 in a defamation

15  action.  Maxwell was not named a defendant in these Jane Doe

16  litigations.  And you asked the question, who took the

17  deposition.  The deposition was taken by the plaintiff's

18  counsel in these various Jane Doe cases.  Mr. Edwards was

19  there.  There were three or four other lawyers there that were

20  asking Rodriguez questions.  Maxwell was not represented.

21         The notion of Recarey saying that he was prevented

22  from talking to Maxwell by some guy named Guy Fronstin, I'm

23  just going to call that a lie, your Honor, because that's what

24  it is.  Maxwell was never represented by anybody during the

25  course of any of these investigations, Fronstin or anybody

H45AGIU1ps

else.  So that's just a lie.  Recarey said something offhand

like, Fronstin said don't talk to the employees, but at the end

of the day, Recarey never talked to talk to Ms. Maxwell, not

once.  And Ms. Maxwell didn't have a lawyer.  Fronstin would

have been conflicted.  There is just no substance to that

testimony whatsoever.

           And, again, I don't know how they can say that Epstein

has a different role given the fact that he admitted liability

and admitted damages.  He has no incentive to cross-examine, at

all.

           THE COURT:  Well, he has an incentive to limit the

number of claimants.

           MR. PAGLIUCA:  Well, the number of claimants was

defined by the United States government, your Honor.  So he

couldn't limit the number of claimants.  He got a non-- the

nonprosecution agreement says, I think in paragraph --

           THE COURT:  If they were not named by the government,

they could not sue -- I mean, they could sue, but they wouldn't

be part of the confession.

           MR. PAGLIUCA:  Exactly.  That's exactly right.

           So all of these people had been named and were in this

case.

           So there is no incentive for him to cross-examine.

           And, you know, the thing that really doesn't make any

sense, their argument, there's a reason why co-defendants have

1    different lawyers.  There is a reason why, in criminal cases,

2    the same lawyer --

3         THE COURT:  Well, of course the real thing that they

4    want Rodriguez's testimony for, more than anything else, is the

5    role of Maxwell.  And I don't see how that is an interest.  Do

6    they have the same interest in trying to disprove the sexual

7    trafficking allegation?  Well, you say no, because that's all

8    taken out of it by the agreement.

9         MR. PAGLIUCA:  Yes to that.  But let me follow up.

10   This is where I was going with why there are two lawyers for

11   two defendants in a case.  If I am in that deposition,

12   representing Ms. Maxwell, or any competent lawyer is in that

13   deposition representing Ms. Maxwell, I am cross-examining this

14   guy about -- this is all on Epstein, Epstein did it, Epstein

15   did it, Epstein did it, Epstein did it.  That's what I'm

16   cross-examining this guy about.  I am distancing myself from

17   Epstein and putting it all on him.  If I'm Epstein's lawyer in

18   this deposition, I'm trying to distance myself from everybody,

19   including myself, your Honor.  And so they have completely

20   different motives in cross-examination of these witnesses.  And

21   time and time again, in any case before your Honor where there

22   is a group of people that are accused of some kind of

23   wrongdoing, everybody is pointing the finger in the other

24   direction.  And that's why you get different lawyers and that's

25   why their interest aren't aligned.

H45AGIU1ps

1          But Maxwell is not at this party.  She's not named as

2     a defendant and she has nothing to do with this case.  Her name

3     comes up in three -- there is about, I think, 500 pages of

4     transcript for Rodriguez.  Maybe her name comes up four times,

5     five times, during the entire 500 pages.  That in and of itself

6     shows you that there is really no commonality of interest here,

7     because Maxwell is not on anybody's radar screen as having done

8     anything when these cases are going.

9          THE COURT:  But what is his testimony about, Maxwell?

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H45AAGIU2

1            MR. PAGLIUCA:  So it's sort of, I don't have it in

2      front of me but I can tell you generally because I've read it.

3      There's a conversation about what did Rodriguez look at and did

4      he have access to computers?  And so at some point he says you

5      know, I went on Ms. Maxwell --

6            THE COURT:  There is the whole black book

7      conversation.

8            MR. PAGLIUCA:  There is really no black book

9      conversation other than there's some discussion about there's a

10     system called Citrix which is apparently an internal e-mail

11     system that Rodriguez talks about and talks about the lists

12     coming from New York or words to that effect.  So there's very

13     brief discussion about that and then there is some other

14     discussion about who did he report to and when.  And then that

15     is pretty much it for the entire deposition.

16            THE COURT:  And he reported to Maxwell?

17            MR. PAGLIUCA:  Well, there's conflicting testimony

18     about that in Rodriguez's deposition.  And it's very unclear to

19     me who he actually reported to based on that deposition

20     testimony.

21            The point though, your Honor, is there's no incentive

22     for anybody to develop that testimony on Maxwell's behalf.

23     That's the point and that's why there's no identity of interest

24     or any reason that this would be admissible under Rule 804.

25     Thank you.

H45AAGIU2

1           THE COURT:  Yes.  Anything further?

2           MS. MCCAWLEY:  Just two points of clarification, your

3      Honor, just to guide the Court.  If you look at page 24 and 25

4      of the Rodriguez deposition there's a question.  So you took

5      your instructions from Ms. Maxwell, as well as Mr. Epstein?

6      She gave me instructions of how to run the household directly

7      in other words like towels, et cetera.  So there's testimony

8      about who was your direct supervisor?  Ms. Maxwell.

9           And then, your Honor, as well there's testimony

10     regarding Ms. Maxwell being in the bank accounts on page 121.

11     There's testimony about her threatening him post leaving work

12     on page 172.  There's testimony about the high school flowers

13     issue on page 119.  And then there's, of course, the

14     cross-examination of her regarding the computer.  So there's

15     lots of testimony regarding her computer throughout the

16     deposition but lot's of deposition testimony about that on page

17     364 as well as 369, as well as some of the other pages.

18          Finally, one point of clarification, on the notion

19     with respect to fact, you were asking whether liability was

20     determined in the lower court cases, the Jane Doe cases.  And I

21     just wanted my co-counsel to address one point of clarification

22     very briefly.

23          MR. EDWARDS:  Sure, your Honor.  I just wanted to

24     dispel the notion that because of the non prosecution agreement

25     Mr. Epstein conceded liability.  If you see that paragraph

H45AAGIU2

number eight, it really indicates that if those victims agreed

to exclusively pursue damages under 18 U.S.C. 2255, then he

would concede liability.  The reason that the cases were so

hotly contested is because that did not allow for punitive

damages, so it did not allow for a battery claim or an

intentional infliction claim.  So the plaintiffs elected then

to sue him for claims outside of 18 U.S.C. 2255 which resulted

in a hotly contested years long litigation where Epstein

contested everything, liability, causation, damages, whether

they were there, not there, all of that.

         So that provision while it came into play for a select

few people that pursued claims exclusively under that, the bulk

of the litigation, the vast majority of the litigation, the

claims, the claimants did not pursue exclusive remedy under

that section and so therefore it was totally inapplicable and

completely inapplicable to all of the depositions.  I just

wanted your Honor to have that understanding so that you would

understand why any of these depositions were taken, why the

cross-examination was so extensive and why when you read

Mr. Rodriguez's deposition or any of the others from the

underlying case, they will read that way.  There was no

concession.

         MR. PAGLIUCA:  Well, your Honor, I'm going to move to

strike that.  And my point is exactly about Mr. Edward and his

role in these multiple litigations.  Unless he wants to get

H45AAGIU2

1    sworn-in and we actually have the opportunity to cross examine

2    any of this purported evidence, I don't think the Court should

3    consider it.  You have the non prosecution agreement in front

4    of you.  It says what it says.  And Mr. Edwards at this point

5    is not a witness and he is not sworn-in and he is not subject

6    to cross-examination.

7             THE COURT:  Well, the 2255 damages, what kind of

8    damages are they?  Do you know?

9             MR. PAGLIUCA:  Your Honor, that's a statutory

10   provision under the Trafficking Act that allows for civil

11   damage claims under that particular statute, 18 U.S.C. 2255.

12   It allows for extensive damages including pain and suffering,

13   attorney's fees, et cetera.  And so there are a panoply of very

14   large damages recoverable under that statute.

15            THE COURT:  Presumably not punitive damages?

16            MS. MCCAWLEY:  That's correct, your Honor.

17            MR. EDWARDS:  That's correct, your Honor.

18            MR. PAGLIUCA:  So what?

19            THE COURT:  Yes.  OK.  All right.  Thank you.  We're

20   done.

21            MS. MCCAWLEY:  Those were the only pending motions,

22   your Honor.  With respect to the depositions that we

23   designated, we know we've submitted objections and responses.

24            THE COURT:  Well, oh, yeah.  Well, I have that file

25   and I'll take that on submission.  God Lord, it would take us

H45AAGIU2

1      forever.

2              MS. MCCAWLEY:  Thank you.  We appreciate your time.

3              MR. EDWARDS:  Thank you, your Honor.

4              (Pause)

5              THE COURT:  My clerk graciously points out to me that

6      we have the "lawyer as witness" issue that has not been argued.

7      I'm perfectly willing to take that on submission.  Do you want

8      to be heard on it?

9              MR. PAGLIUCA:  I'm happy to address it briefly, your

10     Honor.  If we have time today, that's fine.

11             THE COURT:  OK.

12             MS. MCCAWLEY:  I'm sorry, your Honor.  I didn't know

13     it was set for today and Paul Cassell was handling that motion.

14     I don't have the papers with me either.  I'm sorry.  I didn't

15     realize that we had that teed up for today.

16             THE COURT:  Well, I'll hear counsel and then --

17             MS. MCCAWLEY:  I'm sorry, your Honor.

18             MR. PAGLIUCA:  This a brief argument, your Honor.  The

19     only thing that I want to point out is this.

20             THE COURT:  You're not going to call them, I take it.

21             MR. PAGLIUCA:  That didn't sound like a question, your

22     Honor.

23             THE COURT:  Well, absent their testifying on

24     plaintiff's case do you intend to call them?

25             MR. PAGLIUCA:  No.

H45AAGIU2

1           THE COURT:  No, that's what I thought.  So it's

2     only -- and it's only really Edwards on the chain of custody of

3     the black book.  That's the only thing, it seems to me that the

4     plaintiff could call him for.  And of course, if he's called

5     for and they say they're not going to call them for that, so.

6           MS. MCCAWLEY:  That's correct, your Honor.

7           MR. PAGLIUCA:  Here is what I perceive to be the

8     problem here and I may be forecasting a little bit, your Honor.

9     Mr. Edwards and Mr. Cassell, Mr. Edwards in particular, are

10    really inextricably intertwined with a lot of factual issues.

11          THE COURT:  Yes, I know the history.  I mean, some of

12    the history.

13          MR. PAGLIUCA:  And in my view -- and I suppose

14    reasonable people can differ about this.  In my view this is

15    not the kind of case that if I were in either of their shoes I

16    would be litigating in front of a jury.

17          THE COURT:  That's fine.  I understand the ethical

18    point.

19          MR. PAGLIUCA:  Right.  And that's their issue.  I

20    agree it's their issue but when it spills over into my client's

21    ability to get a fair trial it becomes my issue.

22          THE COURT:  Yes.

23          MR. PAGLIUCA:  And so what I have put in my papers

24    which I just want to highlight is I think the Court has the

25    authority to disqualify these lawyers.  The Court may or may

H45AAGIU2

1   not choose to do that.  I have asked as remedy one a

2   disqualification.

3           THE COURT:  But you haven't moved to disqualify them.

4           MR. PAGLIUCA:  In response to their papers I have and

5   that's in my responsive pleading.  However, your Honor, the

6   real problem that I am forecasting here -- and I think the

7   Court can address this in the context of the trial of this

8   case -- is the pervasive tendency of plaintiff's counsel to

9   offer testimony from the podium or the table.

10          THE COURT:  Well, that of course, first of all, I

11  would hope that it would not happen and if it does happen and

12  if it should happen more than once or twice, we'll see.  There

13  must be something a judge could do about that.

14          MR. PAGLIUCA:  I would think so.

15          THE COURT:  Maybe put the lawyer in jail?  I don't

16  know.  Is that possible?

17          MR. PAGLIUCA:  It is possible, your Honor.

18          THE COURT:  By George, it is, isn't it?  Depending on

19  what I order, yeah.

20          MR. PAGLIUCA:  Precisely.

21          THE COURT:  OK.  It seems to me we can probably

22  control that.

23          MR. PAGLIUCA:  Enough side, your Honor.

24          THE COURT:  But I don't want to leave your motion to

25  disqualify hanging.  What under all these circumstances, do you

H45AAGIU2

```
 1    want to press it?  I mean --
 2              MR. PAGLIUCA:  Your Honor, I'm raising --
 3              THE COURT:  Do you really -- I understand the thought
 4    about the ethical issues here.  That's it, really, isn't it?
 5              MR. PAGLIUCA:  You know, your Honor, it's something
 6    that I've struggled with because it's not my ethical issue.
 7              THE COURT:  No.  And those are unattractive motions.
 8              MR. PAGLIUCA:  Sure.  My fear -- and again, I don't
 9    know how this is going to play out -- but my fear is during the
10    middle of this trial there's going to be an issue.  Whether
11    it's somebody --
12              THE COURT:  Of course you know if it's extreme bingo,
13    bango, that's the end of the trial.
14              MR. PAGLIUCA:  Right.  And that's what I say in my
15    response is that I'm foreshadowing this because I'd rather if
16    there is going to be an issue --
17              THE COURT:  Let me ask you this because I say based on
18    this colloquy and the fact that it does come in on your reply
19    which really isn't kosher --
20              MR. PAGLIUCA:  I agree.
21              THE COURT:  I mean, as an affirmative motion, all of
22    those things I'll consider that at the moment it's withdrawn
23    and they're subject to renewal.
24              MR. PAGLIUCA:  That's fine, your Honor.
25              THE COURT:  At least I got rid of one motion.
```

H45AAGIU2

1          MS. MCCAWLEY:  Thank you, your Honor.

2          THE COURT:  One motion that is inappropriately

3   brought.

4          MR. PAGLIUCA:  By admission, your Honor.  I admit when

5   that's a problem.

6          THE COURT:  OK.

7          MS. MCCAWLEY:  Thank you, your Honor.

8          THE COURT:  There's a gentleman who just walked in.  I

9   don't know whether --

10          MR. WEINBERG:  Good afternoon, your Honor.

11          Martin Weinberg.  And I apologize for being late in

12   the Epstein motion to quash.

13          THE COURT:  Well, I don't know why you should

14   apologize.  You are only two and a half hours late.

15          MR. WEINBERG:  LaGuardia was swamped, your Honor.

16          THE COURT:  OK.  I'll hear you.

17          MR. WEINBERG:  Thank you very much, your Honor.

18          THE COURT:  Now before you start I have a question.

19   What is Epstein's residence?

20          MR. WEINBERG:  Epstein's legal residence is the Virgin

21   Islands, your Honor.

22          THE COURT:  And has he done business here in New York

23   regularly?

24          MR. WEINBERG:  He has done business in New York and

25   whether it's regular or not, your Honor, would be --

H45AAGIU2

1              THE COURT:  An issue.

2              MR. WEINBERG:  An issue.  We accepted service to try

3    to facilitate the decision making knowing about all of the

4    issues in the case but we reserved all our rights to oppose

5    both the surface and the necessity for Mr. Epstein to reassert

6    his Fifth Amendment which I represent to you as his counsel

7    would be his position.  His Fifth Amendment is just as

8    necessary to his rights today as it was when your Honor wrote

9    your opinion under seal on February 2.

10             THE COURT:  Well, as this record stands, I don't think

11   I have the power -- and you would I am sure agree with me -- I

12   don't think I have the power to compel him to attend as this

13   record stands at the moment.

14             MR. WEINBERG:  We would agree, your Honor.

15             THE COURT:  So it's really just a question of using

16   his deposition.

17             MR. WEINBERG:  Excuse me, your Honor?

18             THE COURT:  Of using his deposition.

19             MR. WEINBERG:  Yes, your Honor.  And the deposition

20   would cause no prejudice to either party.  In the event your

21   Honor determined there was no adverse inference, there would be

22   no reason for more testimony and your Honor was going to look

23   question by question, subject by subject, the video deposition

24   600 questions, over five hours provides the Court with a

25   pretrial basis to make the rulings.

H45AAGIU2

1          THE COURT:  Can you imagine?  Oh, my goodness.  My

2     gracious.  Well, such a procedure would give me an opportunity

3     to rest and doze off and so, all right.

4          MR. WEINBERG:  Thank you, judge.

5          THE COURT:  Anything else you want to tell me?

6          MR. WEINBERG:  No, your Honor.

7          THE COURT:  OK.  I'll hear from anybody who wants to

8     challenge that.

9          MS. MCCAWLEY:  Your Honor, I just wanted to ask, I

10    know the concern is about the regularly conducted business in

11    New York.  Could we have an opportunity to submit evidence with

12    respect to his regular conduct of business in New York?

13         THE COURT:  Look, you really want to try that?  Do you

14    really want to try that?  And just for the purpose of trying to

15    compel him -- look, I guess you've served him.  You have the

16    right.  Fine.  Do whatever you want to do, I guess.  I don't

17    know how you're going to do it but good luck.

18         As the record now stands, there's an assertion by

19    counsel which I take in good faith that his residence is the

20    Virgin Islands.  Where are the Virgin Islands?  They are not

21    within the Southern District, I don't think.  There are islands

22    but no, no, oh, yes this is an island.  Yeah, that's right.

23    OK.

24         MS. MCCAWLEY:  I understand, your Honor.

25         THE COURT:  The fact is I don't have on this record, I

H45AAGIU2

 1     don't think I have the ability to send the marshals out for

 2     him.

 3               MS. MCCAWLEY:  I understand, your Honor.  Thank you.

 4               THE COURT:  OK.  So you do whatever you want to do.

 5     At the moment it's his deposition.  Parenthetically, there's a

 6     little issue about that which maybe we could clear up.  His

 7     disposition on the use of the Fifth Amendment will be

 8     eliminated.

 9               MR. EDWARDS:  Thank you, your Honor.

10               THE COURT:  Any problems with that?  OK.  We all know

11     what we're talking about.

12               MR. EDWARDS:  Yes.

13               THE COURT:  Squib at the top there when he initially

14     invoked.

15               MS. MCCAWLEY:  So, yes.  Thank you, your Honor.

16               THE COURT:  That will be eliminated.  All right.

17     Anything else?

18               MS. MCCAWLEY:  That's it, your Honor.  Thank you so

19     much for your time.

20               THE COURT:  Thanks.

21                         (Adjourned)

22

23

24

25