**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

               Plaintiff,                    Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

               Defendant.

_____/

**PLAINTIFF'S SUPPLEMENT TO MOTION FOR ADVERSE INFERENCE**
**INSTRUCTION BASED ON NEW INFORMATION**

       Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this

Supplement to her Motion for Adverse Inference Instruction Based on New Information. Eleven

months into this case, and after the close of fact discovery, Defendant continues to refuse to

abide by her most basic and fundamental discovery obligations. A summary of this ongoing and

willful non-compliance, as well as a supplement to her motion for an adverse inference

instruction based on new information, follows. Most notably, Defendant claims to have run

search terms and reviewed over 10,000 documents, but, remarkably, claims that not a single

document - **not one** - is relevant to this litigation, and therefore produced nothing with respect to

the search.

    **I.**      **FACTUAL BACKGROUND**

       On October 27, 2015, Ms. Giuffre submitted her first set of Requests for Production.

Defendant failed to make a reasonable search or production of her documents, and Ms. Giuffre

sought relief from the Court numerous times:

- Plaintiff's Response in Opposition to Defendant's Motion to Stay Discovery (DE 20) - Defendant's Motion to Stay - Denied (DE 28).
- Plaintiff's February 26, 2016 Letter Motion to Compel Defendant to Sit for Her Deposition (DE 63) - Granted (DE 106).
- Plaintiff's Motion to Compel Documents Subject to Improper Claim of Privilege (DE 33) - Granted in Part (DE 73).
- Plaintiff's Motion to Compel Documents Subject to Improper Objections (DE 35) - Granted in part (106).
- Plaintiff's Response in Opposition to Defendant's Motion for a Protective Order Regarding Defendant's Deposition (DE 70) - Defendant's Motion Denied (DE 106).
- Plaintiff's Motion for Forensic Examination (DE 96) - Granted in part (June 20, 2016 Sealed Order).
- Plaintiff's Motion to Compel Defendant to Answer Deposition Questions (DE 143) – Granted (June 20, 2016 Sealed Order).
- Plaintiff's Motion for Adverse Inference Instruction (DE 279) - Pending.
- Plaintiff's Motion to Enforce the Court's Order and Direct Defendant to Answer Deposition Questions (DE 315) - Pending.

On June 20, 2016, this Court Granted in Part Ms. Giuffre's Motion for Forensic Exam, and directed Defendant to capture her data and run mutually agreed-upon search terms. The Court also ordered Defendant to produce documents to Ms. Giuffre by July 11, 2016. (This part of the Court's Order is not under seal and can be found at DE 264-1). On June 30, 2016, and on July 8, 2016, counsel for Ms. Giuffre sent letters to Defendant following up on this Order and proposing search terms (attached as exhibits to DE 279). Defendant did not respond. The July 11, 2016, deadline passed without any production from Defendant.

On July 13, 2016, Ms. Giuffre moved for an adverse inference instruction (DE 279). Thereafter, the Court denied Defendant's motion to strike Ms. Giuffre's motion for an adverse inference instruction, directing the parties to submit search terms to the Court on August 1, 2016, advising that "[a] briefing schedule and the submission date will be set after search terms are determined." (DE 301).

Pursuant to this Court's July 22, 2016, on Monday, August 1, 2016, Ms. Giuffre filed the list of search terms that Ms. Giuffre believes should be run over Defendant's data. (DE 323).

## II.     DISCUSSION

At a minimum, the Court should direct Defendant to run the search terms in the list originally submitted by Ms. Giuffre.  More broadly, the Court should grant Ms. Giuffre's request for an adverse inference based on the incurable prejudice she has suffered as a result of Defendant's failure to comply with her discovery obligations and this Court's June 20, 2016, Order.

### A.     Defendant's Refusal to Even Run Ms. Giuffre's Name as a Search Term.

Defendant has been recalcitrant in running even the most basic searches of electronic data.  For example, in a letter sent on June 8, 2016, and in a meet and confer call on July 26, 2016, counsel for Ms. Giuffre asked Defendant to run Ms. Giuffre's name as a search term to find documents responsive to (for example) Ms. Giuffre's Request No. 12, which sought Defendant's documents relating to Ms. Giuffre. That request was refused in writing on Friday, July 29, 2016, at 7:02 p.m. (EST). *See* McCawley Decl. at Exhibit 1, July 29, 2016, 7:02 p.m., Letter from Ty Gee to Ms. Schultz (refusing to run Ms. Giuffre's name as a search term as part of effort to identify responsive documents). Specifically, Mr. Gee's letter said that such a search term was inappropriate because it was "guaranteed" to generate "thousands of hits":

In your June 8 letter, apparently acknowledging the overbreadth of the RFP, you suggest the defendant could respond by conducting an electronic search for plaintiff's various names—searching all documents in defendant's possession. Setting aside that this is not what the RFP asked for, that too would entail an extraordinary and unreasonable amount of time and money, since plaintiff's various names are guaranteed to have thousands of hits, and someone would have to review every hit to determine, e.g., whether the document previously was provided to you, whether the document is not subject to production because of privilege, or whether it was a false hit. What would be the purpose of such an enormous expenditure of time and money? You have not said, but it appears fairly obvious that this is fishing with a drift net. We decline your request to engage in this exercise.

Having represented that running Ms. Giuffre's that name was an "extraordinary and unreasonable" task "guaranteed to have thousands of hits, and someone would have to review every hit …" (McCawley Decl. at Exhibit 1 at pg. 2 (emphasis added)), *a mere three days later*, on Monday, August 1, 2016, Defendant seemingly reversed her position, and represented to the Court that she had, in fact, run Ms. Giuffre's names as search terms. (DE 321-6). But, contrary to the previous claim that it would be enormously burdensome to sort through these "hits," Defendant now claimed that she had not found <u>any</u> responsive documents.

It is possible that Defendant changed her mind over the weekend and reversed course. And, it is possible that Defendant did run those recently-contested terms over the weekend. And, it is possible that Defendant, over the weekend, gathered a team of lawyers to review the "thousands of hits" yielded by those terms. And, it is possible that not a single one of Defendant's thousands of documents bearing Ms. Giuffre's name was relevant to this action. All these things are possible, but none is likely.

Either way, Defendant's refusal to even include Ms. Giuffre's name as a search term (either in reality or in the position she took on Friday) is evidence of Defendant's continued bad faith and complete avoidance of her discovery obligations.  The case centers on Defendant's

defamatory statements made *about Ms. Giuffre*.  Obviously, Ms. Giuffre has a compelling need to obtain Defendant's documents about her, and she has accordingly requested Defendant's communications concerning her. Defendant's documents concerning Ms. Giuffre are directly relevant to this action, particularly because Defendant has created multiple drafts of statements to the press defaming Ms. Giuffre.

Throughout the months of motion practice concerning these issues, and throughout all of the meet and confers, Defendant's counsel has ***never*** presented a case supporting the far-fetched position that documents in the possession of the Defendant, and containing explicit references to Ms. Giuffre, are irrelevant and not subject to discovery.  Defendant's refusal to use Ms. Giuffre's name as a search term, in light of Ms. Giuffre's requests for production, and in light of the defamation claim in this case, is so unfounded and obstructionist that it constitutes a violation of this Court's Order, ***whether or not*** Defendant actually engaged in the "extraordinary and unreasonable" task of running the term over the weekend.

The refusal to run this term is particularly inappropriate in light of this Court's order directing the Defendant to run "mutually agreed" upon search terms.  It is impossible for Ms. Giuffre's counsel to begin working with opposing counsel to craft appropriate search terms when they refuse to extend minimal cooperation - first by completely ignoring Ms. Giuffre's multiple attempts to negotiate terms, then by ignoring the deadline to produce documents, and then by refusal to run the most basic search term.  The first term that should be run in this defamation action - the most fundamental term - is Ms. Giuffre's name. Defendant's refusal to run that term is palpably unreasonable.

Defendant's refusal to cooperate is even more egregious given Ms. Giuffre's extensive efforts to provide discovery to Defendant.  Ms. Giuffre has complied with Defendant's overly-

broad discovery requests that sought documents concerning dozens of individuals, including Ms.

Giuffre's close family members. To comply with these extraordinarily broad requests, Ms.

Giuffre ran search terms constituting the names of all these individuals. For example, Ms.

Giuffre has run the following names as search terms, including Defendant's name, over her data:

- Ghislaine (the defendant)

- Maxwell (the defendant)

- Jeffrey (Jeffrey Epstein)

- Epstein (Jeffrey Epstein)



Indeed, to date Ms. Giuffre has produced 8,321 pages of documents in her possession.

Fact discovery has now closed. Ms. Giuffre has requested that Defendant negotiate search

terms with her as far back as March 10, 2016. This Court ordered Defendant to run mutually

agreed upon search terms and produce relevant documents. Yet Defendant has yet to make any

document production pursuant to this Court's June 20, 2016, Order.

### B.  Defendant's Other Failures to Produce Documents

Defendant's ignoring the July 11, 2016, court-ordered deadline to produce documents

pursuant to mutually agreed upon terms, and Defendant's recalcitrance in searching for

documents related to Ms. Giuffre are not the only examples of Defendant's failure to make

appropriate discovery.  Defendant claims to have run a number of Ms. Giuffre's search terms, yet

claims that such a search yielded no responsive documents, save the few added to Defendant's

privilege log. Defendant did not provide any "hit" information to show which terms yielded

results, or how many results they yielded. Defendant claims to have reviewed over 10,000

documents containing the search terms and remarkably states that <u>none</u> – not a single one of the documents are responsive or relevant to the issues in this matter. Defendant's representation is simply implausible, as a review of Defendant's interactions with several of the important players in this case makes clear.

i. █████████

█████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████:

> Q. And then below there is an email from ████████ to you and cc'ing ████████ on January 11, 2015. Do you see that?
>
> A. Uh-huh.
>
> Q. It says, Dear Ghislaine, as you know I have been working behind the scenes and this article comes from that. It helps but doesn't answer the VR claims. I will get the criminal allegations out. This shows the MOS will print truth, not just a VR voice piece. We can only make the truth by making a statement. What did he mean when he said, I will get the criminal allegations out, what was he referring to?
>
> A. I have no idea.

Maxwell Dep. Tr. at 405:13-406:7 (April 22, 2016) (McCawley Decl. at Exhibit 2).

█████████████████████████████████████████████

██████████:

> Q. This is an email from you on January 10, 2015 to ████████████████. The statement you had before you earlier, that, if you can pull that in front of you, the one page press release that you gave. You might know from memory. Was the press release that you issued with the statement about Virginia issued in or around January 2, 2015?
>
> A. As best as I can recollect.

Maxwell Dep. Tr. at 361:4-13 (April 22, 2016) (McCawley Decl. at Exhibit 2).

███████████████████████████████████

Q. Did you authorize ████████ to issue that statement on your behalf in January of 2015?

A. I already testified that that was done by my lawyers.

Maxwell Dep. Tr. at 273:6-10 (April 22, 2016) (McCawley Decl. at Exhibit 2).

In both years, 2011 and 2015, Defendant communicated with her counsel, communicated ██████████████████, and caused a statement regarding Ms. Giuffre to be released publically, whereupon it was disseminated abroad. Yet, Defendant claims that she has no communications related to Ms. Giuffre beyond the handful of communications this Court ordered her to produce after the Court's *in camera* review. (DE 73).

ii.   ████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████.

Q. Is ████████ one of your friends?
A. Yes.

Maxwell Dep. Tr. at 57:22-23 (April 22, 2016) (McCawley Decl. at Exhibit 2).

Q.  You remember from time to time being at ██████████, correct?
A. I do.

Maxwell Dep. Tr. at 163:6-8 (July 22, 2016) (McCawley Decl. at Exhibit 3).

███████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

iii. █████████

Q. Do you remember speaking with a female by the name of ███████████?

A. Yes.

Q. And is that -- did you learn from ███████████ about ███████████?

THE WITNESS: That's correct.

Q. And what did you understand ███████████ interaction with Jeffrey Epstein to be?

THE WITNESS: ███████████ was allegedly dating Jeffrey Epstein at the time. And ████s and ████ were roommates. During that time, ████ had met with ████ and went shopping with her at the Palm Beach Mall, where they purchased items from Victoria's Secrets. After spending the day together, they went over to the Palm Beach house, where Epstein requested to see what was purchased. She was a little reluctant initially, but because of the fact that it was his money that purchased the items, she showed the outfit that she had purchased at Victoria's Secrets. He had asked her to try it on, at which time she did. She went back to the house at another time, where she was going to meet with ████ and Epstein. They went for a bike ride, but ████ had a

9

massage, which Epstein walked in on while she was getting a massage. He asked her to turn over, expose her breasts to him. I think he performed a chiropractic move on her. And she was completely uncomfortable with the whole situation.

Recarey Dep. Tr. at 106:2-107:20 (June 21, 2016) (McCawley Decl. at Exhibit 5).

Indeed, one of the witnesses who gave testimony in this case, ███████████████

████████████████████████████████████████████████████████████

███████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

███████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████████████

Even Defendant has admitted ██████████ involvement with her and Epstein:

Q. Does ████████████ know Jeffrey Epstein?

A. Can you ask again, please?

Q. Does ████████████ know Jeffrey Epstein?

A. What do you mean by know?

Q. Has she met her him before?

A. I can't recollect a time when ██████ -- I've seen ██████ with Jeffrey but --

Q. You are not sure --

A. I know they know either other. I can't testify to a meeting between them.

Maxwell Dep. Tr. at 270:18-271:8 (April 22, 2016) (McCawley Decl. at Exhibit 2).

Q. Why do you think that ████████████ might know Jeffrey?

A. Because you know, I know Jeffrey.

Maxwell Dep. Tr. at 271:18-22 (April 22, 2016) (McCawley Decl. at Exhibit 2).

Yet, Maxwell now wants this court to believe that she has no responsive communications with ▇▇▇▇▇ relevant to this case.

### C.    Defendant's Failures to Search All Email Accounts

Perhaps part of the reason that Defendant has failed to produce responsive document is that still refusing to collect data from all of her email accounts. In particular, Defendant has not collected data from her ▇▇▇▇▇▇▇▇ account nor produced relevant documents from her ▇▇▇▇▇▇▇ account. Both email accounts are listed as part of Defendant's contact information gathered by the police from Epstein's home, and turned over to the Palm Beach County State Attorney as part of the investigation and prosecution of Epstein:



*See* (DE 280-2), Palm Beach County State Attorney's Office, Public Records Request No.: 16-268, Disc 7 at p. 2305 (GIUFFRE007843).

#### i.    The mindspring.com Account

As evidenced from the police collection above, ▇▇▇▇▇▇▇, was an email address Defendant used while she was with Epstein. *Id*. In her filing with this Court, Defendant represented that this was merely a "spam" account "to use when registering for retail sales notifications and the like," and that it contains no relevant documents. Br. at pg. 8. Of course, if she wasn't using the ▇▇▇▇▇▇ or the ▇▇▇▇▇▇▇, what email address *was* Defendant using while she was with Epstein, and why hasn't that account been disclosed and searched?  This Court should order Defendant to disclose *__all__* email accounts she has used from 1999 to the present.

11

At any rate, both recent testimony in this case, and older testimony in a related case, completely belies Defendant's claim that her ▮▮▮▮▮▮▮▮▮▮ account was merely for "spam."  Jeffrey Epstein's house manager, Juan Alessi testified that ▮▮▮▮▮▮▮▮ was in daily use by the Epstein household to send and receive messages, a household to which Defendant belonged:

Q. So when there would be a message from one of them while they were out of town, they would call you, call you on the telephone?

A. I haven't spoken to Ghislaine in 12 years.

Q. Sorry. I'm talking about when you worked there and you would receive a message that they were coming into town, would that be by way of telephone?

A.  Telephone, and also, there was a system at the house, that it was MindSpring, MindSpring I think it's called, that it was like a message system that would come from the office.

Q.  What is MindSpring?

A.  It was a server.  I think it was -- the office would have, like, a message system between him, the houses, the employees, his friends.  They would write a message on the computer.  There was no email at that time.

Q.  Okay.  So what computer would you use?

A.  My computer in my office.

Q.  And so was part of your daily routine to go to your computer and check to see if you had MindSpring messages?

A.  No.  That was at the end of my stay.  That was the very end of my stay.  I didn't get involved with that too much.  But it was a message system that Jeffrey received every two, three hours, with all the messages that would have to go to the office in New York, and they will print it and send it faxed to the house, and I would hand it to him.

Q.  Did it look like the message pads that we've been looking at?

A.  No, no, nothing like that.

Q.  Was it typed-out messages?

A.  Yes, typed-out messages.

Q.  Just explain one example of how it would work.  Let's say that Ghislaine wanted to send him a message on MindSpring.  How would that work?

A.  An example?

Q.  Sure.

A.  It got so ridiculous at the end of my stay, okay?  That Mr. Epstein, instead of talking to me that he wants a cup of coffee, he will call the office; the office would type it; they would send it to me, Jeffrey wants a cup of coffee, or Jeffrey wants an orange juice out by the pool.

Q.  He would call the office in New York. They would then type it in MindSpring?

A.  Send it to me.

Q.  How would you know to check for it?  How would you know to look for this MindSpring?

A.  Because I was in the office.  I was there. I was there.  And we have a signal when it come on and says, Hey, you've got mail.

Q.  Okay.

A.  Every day.  Every day it was new things put in.  That's why I left, too.

Q.  Do you know who set up the mind spring system?

A.  It was a computer guy.  It was a computer guy who worked only for Jeffrey. ▮▮▮▮▮▮▮▮▮▮▮▮.

Q.  Was he local to Palm Beach?

A.  No.  He was in New York.  Everything was set up from New York.  And▮▮▮▮▮ ▮▮▮▮▮ I remember he came to Palm Beach to set up the system at the house.

Alessi Dep. Tr. at 223:5-225:17. (June 1, 2016) (McCawley Decl. at Exhibit 7). Accordingly, mindspring was a server set up for Jeffrey Epstein and his household to use to communicate to one another, and was, in fact, used in this manner.



███████████████████████████████████████████

Defendant's ████████████████ email account was part of Epstein's ████████████ account through which he communicated with his employees and other members of his household, including his co-conspirators ██████████████████, and the Defendant. This email account likely has (or had) myriad of communications between and among Defendant and Jeffrey Epstein, Defendant and ████████████, Defendant and ██████████████, and others. This email account is the one *most likely* to have the most relevant documents in this case, as it was used by Jeffrey Epstein and his sex trafficking organization. The fact that this account - an account created for the sole purpose of enabling Defendant and others to communicate with Jeffrey Epstein - has no communications with Epstein or the other co-conspirators, is extremely strong indicia that someone destroyed those email communications. Their destruction warrants an adverse inference instruction.  And, at the very least, the Court should direct Defendant to retrieve her data from the Citrix server or any other applicable server upon which the mindspring.com account was hosted.

        ii.      The ████████████ Account

The ████████████ account bears Defendant's initials, and, again, listed as part of her contact information gathered by the police from Epstein's home, and turned over to the Palm Beach County State Attorney as part of the investigation and prosecution of Epstein:

| Ms. Ghislaine Maxwell | Email | ███████████████████ |
| --- | --- | --- |

*See* (DE 280-2), Palm Beach County State Attorney's Office, Public Records Request No.: 16-268, Disc 7 at p. 2305 (GIUFFRE007843)

Because of Defendant's refusal to search this important email account, any production yielded from any search terms will necessarily be incomplete. Indeed, this failure is particularly prejudicial, as this account appears to be the one she used while she was with Epstein, and therefore, the one she used during the time period Defendant was abusing Ms. Giuffre.

Defendant does not appear to have pursued access to this account very far. This inaction lies in stark contrast to Ms. Giuffre's efforts to recover data. Ms. Giuffre has sent executed releases to Microsoft for her inaccessible account, and even issued a Rule 45 Subpoena to Microsoft for the production of her account data. *See* McCawley Decl. at Exhibit 9, Microsoft Subpoena. At a minimum, the Court should direct the Defendant to take these steps to access the earthlink.net email account.

### D.    An Adverse Inference Instruction is Appropriate.

In light of this clear and persistent pattern of recalcitrance, the Court should instruct the jury that it can draw an adverse inference that the Defendant has concealed relevant evidence. Defendant has yet to provide responsive information.  And even if Defendant were, at this late date, to run Ms. Giuffre's proposed search terms over her data (which has not yet been collected), such a production would be both untimely and prejudicial. Fact discovery has closed. Numerous depositions have already been taken by Ms. Giuffre without the benefit of these documents. The window for authenticating the documents through depositions has shut. Expert reports are due at the end of the month, and Ms. Giuffre's experts do not have the benefit of reviewing these documents. Late production of information robs Ms. Giuffre of any practical ability to use the discovery.

The Second Circuit has stated, "[w]here documents, witnesses, or information of any kind relevant issues in litigation is or was within the exclusive or primary control of a party and is not provided, an adverse inference can be drawn against the withholding party. Such adverse inferences are appropriate as a consequence for failure to make discovery." *Bouzo v. Citibank, N.A.*, 1993 WL 525114, at *1 (S.D.N.Y. 1993) (internal citations omitted).  The Defendant's continued systemic foot-dragging and obstructionism – even following the Court's June 20 order – makes an adverse inference instruction with regard to Defendant's documents appropriate.  An adverse inference instruction is appropriate when a party refuses to turn over documents in defiance of a Court Order. *See Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 2005 WL 1026461, at *1 (S.D.N.Y. May 2, 2005) (denying application to set aside Magistrate Judge Peck's order entering an adverse inference instruction against defendant for failure to produce documents that the Judge Peck had ordered Defendant to produce). Accordingly, because a "party's failure to produce evidence within its control creates a presumption that evidence would be unfavorable to that party" an adverse inference should be applied with respect to Defendant's failure to produce "in order to ensure fair hearing for [the] other party seeking evidence." *Doe v. U.S. Civil Service Commission*, 483 F. Supp. 539, 580 (S.D. N.Y., 1980) (*citing International Union v. NLRB*, 148 U.S. App. D.C. 305, 312-317, 459 F.2d 1329, 1336-41 (D.C.Cir.1972)).

"An adverse inference serves the remedial purpose of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013) (granting an adverse inference when defendants refused to produce documents pursuant to the District Court's order). Where "an adverse inference ... is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must

show (1) that the party having control over the evidence had an obligation to timely produce it;
(2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and
(3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable
trier of fact could find that it would support that claim or defense." *Id*. (citing *Residential
Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).

Furthermore, as discussed in detail in Ms. Giuffre's Motion for an Adverse Inference
Instruction (DE 315), an adverse inference is appropriate regarding the documents that
Defendant is withholding under the Second Circuit's test set forth in *Residential Funding*.
Defendant has admitted to deleting emails as this Court noted in its Order. Defendant has not
collected what data remains from at least half of her email accounts. An adverse inference is
equally appropriate if the non-compliance was due to Defendant's destruction of evidence. *See
Brown v. Coleman*, 2009 WL 2877602, at *2 (S.D.N.Y. Sept. 8, 2009) ("Where a party violates a
court order—either by destroying evidence when directed to preserve it or by failing to produce
information because relevant data has been destroyed—Rule 37(b) of the Federal Rules of Civil
Procedure provides that the court may impose a range of sanctions, including dismissal or
judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment
of attorneys' fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge
Financial Corp.*, 306 F.3d 99, 106–07 (2d Cir.2002)"). *See also Essenter v. Cumberland Farms,
Inc.*, 2011 WL 124505, at *7 (N.D.N.Y. Jan. 14, 2011); and Rule 37(e), Fed. R. Civ. P. ("If
electronically stored information that should have been preserved in the anticipation or conduct
of litigation is lost because a party failed to take reasonable steps to preserve it . . . the court: (2)
only upon finding that the party acted with the intent to deprive another party of the
information's use in the litigation may: (A) presume that the lost information was unfavorable to

18

the party; (b) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.").

The Court may also wish to consider the possibility of a having a neutral, third-party expert review Defendant's production.  In her filing with the Court on Monday, August 1, 2016, Defendant represented that she ran hundreds of search terms - including the names of people involved in the sex trafficking ring with whom she still associates in the present - and got zero "hits" for any of them. That is strong indicia that Defendant intentionally deleted documents. This strongly suggests that relevant documents either lie in the two email accounts that were not searched or Defendant has deleted these communications. Defendant does not state that the individual who examined Defendant's devices attempted to recover Defendant's deleted email and other documents, or attempted to identify if and when a hard drive was wiped.

In these circumstances, the Court should allow an independent forensic expert review the computer and all her email accounts to determine whether responsive materials exists and have either not been produced or have been deleted. The Court could then use that information in determining whether an adverse inference is appropriate.

## III.    CONCLUSION

For the reasons set forth above, Ms. Giuffre respectfully request that this Court grant her motion for an adverse inference jury instruction pursuant to Rule 27(b), (e), and (f), with respect to the electronic documents and electronic communications that this Court Ordered her to produce, allow a forensic review of her computer to evaluate whether material was intentionally deleted; and direct Defendant to recover any remaining mindspring.com data from the applicable server.

Dated: August 8, 2016

19

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Sigrid McCawley
    Sigrid McCawley (Pro Hac Vice)
    Meredith Schultz (Pro Hac Vice)
    Boies Schiller & Flexner LLP
    401 E. Las Olas Blvd., Suite 1200
    Ft. Lauderdale, FL 33301
    (954) 356-0011

    David Boies
    Boies Schiller & Flexner LLP
    333 Main Street
    Armonk, NY 10504

    Bradley J. Edwards (Pro Hac Vice)
    FARMER, JAFFE, WEISSING,
    EDWARDS, FISTOS & LEHRMAN, P.L.
    425 North Andrews Avenue, Suite 2
    Fort Lauderdale, Florida 33301
    (954) 524-2820

    Paul G. Cassell (Pro Hac Vice)
    S.J. Quinney College of Law
    University of Utah
    383 University St.
    Salt Lake City, UT 84112
    (801) 585-5202[2]

---

[2] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on the 8th day of August, 2016, I electronically filed the

foregoing document with the Clerk of Court by using the CM/ECF system.  I also certify that the

foregoing document is being served this day on the individuals identified below via transmission

of Notices of Electronic Filing generated by CM/ECF.

>   Laura A. Menninger, Esq.
>   Jeffrey Pagliuca, Esq.
>   HADDON, MORGAN & FOREMAN, P.C.
>   150 East 10th Avenue
>   Denver, Colorado 80203
>   Tel: (303) 831-7364
>   Fax: (303) 832-2628
>   Email: <u>lmenninger@hmflaw.com</u>
>           <u>jpagliuca@hmflaw.com</u>

>                               /s/ Sigrid S. McCawley
>                               Sigrid S. McCawley