# Exhibit G

1     IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
           IN AND FOR BROWARD COUNTY, FLORIDA
2                   CASE NO. 15-000072

3
   BRADLEY J. EDWARDS and PAUL G.
4  CASSELL,

5              Plaintiffs,

6  -vs-                              **CONFIDENTIAL**

7  ALAN M. DERSHOWITZ,

8              Defendant.
   _____/
9

10     VIDEOTAPED DEPOSITION OF VIRGINIA ROBERTS GIUFFRE

11

12              Saturday, January 16, 2016
                 9:07 a.m. - 2:48 p.m.
13

14          401 East Las Olas Blvd., Suite 1200
              Fort Lauderdale, Florida 33301
15

16

17

18  Reported By:

19  Deborah A. Harris, Court Reporter
    Notary Public, State of Florida
20  Phone - 305.651.0706

21
    Job No. J0277789
22

23

24

25

```
 1   APPEARANCES:

 2       On behalf of the Plaintiffs:
         Jack Scarola, Esquire
 3       SEARCY, DENNEY, SCAROLA, BARNHART &
         SHIPLEY, P.A.
 4       2139 Palm Beach Lakes Boulevard
         West Palm Beach, Florida 33409
 5       (561) 686-6300

 6       On behalf of the Deponent:
         Sigrid McCawley, Esquire
 7       BOIES, SCHILLER & FLEXNER, LLP
         401 East Las Olas Boulevard,
 8       Suite 1200
         Fort Lauderdale, Florida 33301
 9       (954) 356-0011

10       On behalf of the Defendant:
         Mary Borja, Esquire
11       WILEY REIN, LLP
         1776 K Street NW
12       Washington, DC 20006
         (202) 719-7000
13
         On behalf of the Defendant:
14       Richard Simpson, Esquire
         WILEY REIN, LLP
15       1776 K Street NW
         Washington, DC 20006
16       (202) 719-7000

17       On behalf of the Defendant:
         Thomas E. Scott, Esquire
18       COLE, SCOTT & KISSANE, P.A.
         9150 South Dadeland Boulevard,
19       14th Floor
         Miami, Florida 33156
20       (305) 350-5300

21       On behalf of the Defendant:
         Kenneth A. Sweder, Esquire
22       SWEDER & ROSS, LLP
         131 Oliver Street.
23       Boston, Massachusetts 02110
         (617) 646-4466
24

25
```

1  ALSO PRESENT

2
      Edward J. Pozzuoli, Special Master
3     Robert Pacheco, Videographer
      Ryan Kick, Videographer
4     Bradley J. Edwards
      Paul G. Cassell
5     Alan M. Dershowitz
      Brittany N. Henderson, Esq.
6     Meridith Schultz, Esquire

7
                        -   -   -
8
                     I N D E X
9

10  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

11  Virginia Roberts Giuffre
      By Ms. Borja      5
12    By Mr. Scarola            201
      By Ms. Borja                        204
13                       -   -   -

14                 E X H I B I T S

15  DEFENDANT VR EXHIBITS                    FOR ID

16  1 - Notice.                                6
    2 - Disclosure list.                      26
17  3 - Order.                                59
    4 - E-mail.                               92
18  5 - Photo (Confidential)                 100
    6 - Article.                             124
19  7 - Daily Mail.                          155
    8 - Daily Mail.                          168
20  9 - Declaration.                         170
    10- FBI doc.                             187
21
    REPORTER'S NOTE:  Exhibit 5 marked confidential, sealed,
22                    and retained by the Special Master.

23

24

25

1      Deposition taken before Deborah A. Harris,

2  Florida Professional Court Reporter and Notary Public in

3  and for the State of Florida at Large, in the above

4  cause.

5                                  - - -

6          THE VIDEOGRAPHER:  We are now on video

7          record.  This is disk number one in the videotaped

8          deposition of Virginia Roberts in the matter of

9          Bradley J. Edwards and Paul G. Cassell, Plaintiff

10         versus Alan M. Dershowitz, Defendant.

11         The deposition is being held at the Law

12         Office of Boies, Schiller & Flexner located at 401

13         East Las Olas Boulevard, Suite 1200.  Fort

14         Lauderdale, Florida 33301.  Today's date is

15         January 16th, 2016.  The time is 9:07 a.m.

16         My name is Robert Pacheco, I am the

17         videographer.  The court reporter is Deborah

18         Harris, both from Esquire Deposition Solutions.

19         Would counsel please introduce yourselves and your

20         affiliation and the witness will be sworn in.

21         MS. MCCAWLEY:  My name is Sigrid McCawley.

22  I'm with the Law Firm of Boies, Schiller &

23  Flexner.  I'm here with my colleague, Meridith

24  Schultz and we represent non-party Virginia

25  Roberts Giuffre.

1    MR. SCAROLA:  Jack Scarola, counsel on

2    behalf of Bradley Edwards and Paul Cassell.  Mr.

3    Edwards and Mr. Cassell are also present.

4    MS. HENDERSON:  Brittany Henderson also on

5    behalf of the Plaintiff.

6    MS. BORJA:  Mary Borja for Defendant, Alan

7    Dershowitz.

8    MR. SCOTT:  Thomas Scott for the Defendant.

9    MR. SIMPSON:  Richard Simpson on behalf of

10   Professor Dershowitz.

11   MR. SWEDER:  Ken Sweder of Sweder and Ross

12   on behalf of Professor Dershowitz.

13   SPECIAL MASTER:  Ed Pozzuoli, Special

14   Master.

15                    -  -  -

16   Thereupon,

17            VIRGINIA ROBERTS GIUFFRE,

18   having been first duly sworn or affirmed, was examined

19   and testified as follows:

20   THE WITNESS:  Yes, I do.

21            DIRECT EXAMINATION

22   BY MS. BORJA:

23   Q.   We have noticed this examination for you as

24   Virginia Roberts.  I understand you have a different

25   married last name?

1          A.     Yes.

2          Q.     Could you pronounce that for me?

3          A.     Giuffre.

4          Q.     Giuffre.  If I from time to time call you

5     Ms. Roberts, would that be okay with you today?

6          A.     Absolutely.

7                 (Thereupon, Defendant's VR Exhibit No. 1,

8                 was Marked for Identification.)

9     BY MS. BORJA:

10         Q.     I'm going to hand you a document that's

11    been marked as VR Exhibit Number 1, which is a notice of

12    taking video duces tecum.  Ms. Roberts, are you appearing

13    here today pursuant to this notice of video deposition

14    duces tecum?

15         A.     Yes.

16         Q.     And you've seen this document before today?

17         A.     No.

18         Q.     Did you bring any documents with you today

19    pursuant to the duces tecum?

20         A.     No.

21         Q.     Were you asked to bring any documents with

22    you today?

23         A.     No.

24         Q.     You understand that you're under oath today

25    and that your testimony is being taken down by the court

1   reporter, correct?

2          A.    Yes.

3          Q.    And today's testimony is the same as if you

4   were testifying before a judge and a jury.  Do you

5   understand that?

6          A.    Yes.

7          Q.    It's important that you allow me to finish

8   my question and I'll allow you to finish your answer

9   because the court reporter is very good, but she can only

10  type one of us talking at a time.  Is that okay?

11         A.    Yes.

12         Q.    It's also important that all of your

13  answers be verbal since nodding your head or shaking your

14  head if you mean yes or no, you should give it a verbal

15  response.  Is that agreeable?

16         A.    Yes.

17         Q.    What is your current home address?

18               MS. MCCAWLEY:  We're going to object on the

19               record.  You're welcome to notice anything to my

20               law office for Virginia.  She's had some safety

21               issues with respect to her location so we're not

22               going to be putting that on the record.

23               MS. BORJA:  That's fine.  You're going to

24               accept service for her for all purposes in this

25               action?

1           MS. MCCAWLEY:  Yes.

2           MS. BORJA:  That's fine.  Thank you.

3           MS. MCCAWLEY:  Yes.  If you need to serve

4      her with anything.

5  BY MS. BORJA:

6      Q.    Ms. Roberts, are you taking medication that

7  would effect in any way your ability to testify?

8      A.    No.

9      Q.    Were you involved in collecting documents

10 for production in this case?

11     A.    I don't understand.

12     Q.    I'll get back to that in a little bit.  Are

13 you aware of the action that your attorneys, Brad Edwards

14 and Paul Cassell, filed against the government?

15     A.    Yes.

16     Q.    If I call that the Federal action or the

17 CVRA action, will you understand the action that I'm

18 referring to?

19     A.    Yes.

20     Q.    And you sought to join that action,

21 correct?

22     A.    Yes.

23     Q.    And you understand that you were Jane Doe

24 #3 named in the motion for joinder, right?

25     A.    Yes.

1      Q.    I'm going to show you, I'm not going to

2  mark it as an exhibit, a copy of Jane Doe #3 and Jane Doe

3  #4 corrected motion pursuant to Rule 21 for joinder and

4  action.  Do you have that in front of you right now?

5      A.    Yes.

6      Q.    And this was entered as Document 280 in the

7  docket for purposes of identification in our record here

8  today.  Did you review this document before it was filed?

9      A.    Not this specific document, no.

10     Q.    Were you aware that this joinder motion was

11  being filed in the CVRA action?

12     A.    I knew there was an action for the CVRA for

13  me to be joined, yes.

14     Q.    And you're aware, are you not, that there

15  are allegations that you were sexually trafficked being

16  made in that action, correct?

17     A.    I'm aware that there are allegations that I

18  was trafficked.

19     Q.    If you turn to page 4 of this document the

20  numbers are on the bottom of the page.  In that first

21  full paragraph in the third line down it says, Epstein

22  required Jane Doe #3 to have sexual relations with

23  Dershowitz on numerous occasions when she was a minor?

24     MS. MCCAWLEY:  Feel free to look at the

25     entire page.

1          MR. SCAROLA:  It is a minor discrepancy,

2          but I think you read it as when she was a minor

3          and it's while she was a minor.

4    BY MS. BORJA:

5          Q.    While she was a minor.  Do you see where

6    I'm reading starting in the third line?

7          A.    Yes.

8          Q.    Is that allegation true?

9          A.    Yes.

10          Q.    If you go to page 6 of the document, do you

11    see the paragraph that's starts, Epstein also trafficked?

12          A.    Yes.

13          Q.    Is says Epstein also trafficked Jane Doe #3

14    for sexual purposes to many other powerful men including

15    numerous prominent American politicians, powerful

16    business executives, foreign presidents, a well-known

17    prime minister and other world leaders.  Do you see that?

18          A.    Yes.

19          Q.    Is that allegation true?

20          A.    Yes.

21          Q.    The reference there to foreign presidents,

22    do you see that?

23          A.    Yes.

24          Q.    You were sexually trafficked to foreign

25    presidents?

1      A.    No.

2      Q.    So that's not true, you were not sexually

3 trafficked to foreign presidents?

4      A.    I don't know what foreign president you're

5 talking about.

6      Q.    Have you ever been sexually trafficked to

7 any foreign president?

8             MS. MCCAWLEY:  I'm going to allow you to

9             ask that question, but with respect to specific

10          identification of an individual we're not going to

11          do that.  At this point she has.

12          MS. BORJA:  Counsel, your objection has

13          been made.  No speaking objections, please.  Let's

14          move on.

15          MS. MCCAWLEY:  I can make my record, and my

16          record is she's not going to be speaking with

17          respect to individuals' names that are named in

18          generalities in this document.

19          SPECIAL MASTER:  Objection overruled.  You

20          can answer.

21      A.    I understand well-known prime ministers and

22 other world leaders; as far as foreign presidents, I'm

23 not too sure, I don't know.

24      Q.    Have you ever met any foreign presidents?

25      A.    Foreign presidents as in overseas?

1     Q.    Sure, okay, overseas.

2     A.    No.

3     Q.    Have you ever met any foreign presidents

4 from countries not overseas such as Canada or Mexico?

5     A.    No.

6     Q.    So you were not sexually trafficked to any

7 foreign presidents; is that correct?

8     A.    As far as I know right now, yes.

9     Q.    It's correct that you were not sexually

10 trafficked to them, right?

11    A.    You've asked me this three times and I'm

12 telling you.

13    Q.    Okay.  A well-known prime minister.  Were

14 you sexually trafficked to a well-known prime minister?

15    A.    Yes.

16    Q.    Who was that?

17          MS. MCCAWLEY:  I'm going to object to this

18          line of questioning.  This has to do with safety

19          concerns for her.

20          MS. BORJA:  Counsel, this is under seal.

21 You can answer.

22          MS. MCCAWLEY:  No, she's not going to

23          answer.

24          SPECIAL MASTER:  Hang on one second.

25          MS. MCCAWLEY:  Let me make my objection.

1      SPECIAL MASTER:  Make your objection.

2      MS. MCCAWLEY:  Regardless of it being under

3  seal, we've seen that in this case the client that

4  you represent has violated confidentiality orders

5  regularly so we have no sense of security with a

6  sense that this is a confidential record at this

7  point.  We are doing that under the Court's order.

8      With respect to naming individuals who can

9  harm a victim of sexual trafficking, she's a

10  non-party in this action, not a plaintiff.  She is

11  not going to be revealing any names today of an

12  individual who is going to harm her physically,

13  period.  If we have to go to Judge Lynch on that

14  we will, I'm happy to do that, but she's not going

15  to be naming individuals where there's a threat to

16  her safety.

17      SPECIAL MASTER:  Response.

18      MS. BORJA:  It is under seal.  I'm shocked

19  that counsel would suggest that a prime minister

20  is threatening the physical safety of this

21  witness.  There's no foundation for that.  The

22  suggestion that a foreign minister is going to

23  physically harm has no evidence in this case, and

24  it's being to be under seal.

25      Let's get the evidence out while the

1          witness is here.  As you pointed out, she's a

2          non-party.  Let's make our record and move on.

3                  MS. MCCAWLEY:  You may be shocked by that

4          but --

5                  SPECIAL MASTER:  Hang on one second.  The

6          reason why I'm here is so we don't have the back

7          and forth.

8                  MS. MCCAWLEY:  Sure.

9                  SPECIAL MASTER:  I'm going to rule on the

10         objection.  Your objection at this point is

11         overruled.  You can answer.  And I want to

12         admonish everybody here that this is confidential

13         and the protection of this witness is of paramount

14         importance under the Confidentiality Order.  So

15         Ms. Roberts, you can answer the question that's

16         been asked.

17                 MS. MCCAWLEY:  At this point we're going to

18         need to take a break because I'm not going to

19         allow her to answer a question that's going to

20         threaten her physical safety.  So we can take a

21         break on that.

22                 THE WITNESS:  If I can just say, I

23         personally know that this is not a good person to

24         talk about and I'm not going to, point blank, I'm

25         not going to say his name.

1        SPECIAL MASTER:  Okay.  I can't twist her

2        arm and force her so we'll deal with it.

3   BY MS. BORJA:

4        Q.    Okay.  Other world leaders, what other

5   world leaders were you sexually trafficked to?

6        MS. MCCAWLEY:  We have the same objection.

7        SPECIAL MASTER:  And I would have the same

8        ruling based upon the arguments.

9        MS. MCCAWLEY:  Let me just make my record.

10       To the extent that there's a name of an individual

11       that you can reveal that you do not feel would

12       harm your physical safety, you're welcome to

13       reveal them.  Anybody else, you don't have to

14       reveal at this time and we'll take that to Judge

15       Lynch.

16       A.    Okay.  Prince Andrew for one.

17       Q.    Other than Prince Andrew?

18       A.    There is another individual that I honestly

19  do not know his name.

20       Q.    What country is he from?

21       A.    I'm not too sure, he spoke in a foreign --

22  he did speak foreign tongue, he spoke English as well,

23  but I'm not too sure where he was from.

24       Q.    How do you know he is world leader?

25       A.    I was introduced to him as a prince.

1   Q.  Okay. Did he have security with him?

2   A.  I'm sure he did somewhere around, but not

3 when I was with him.

4   Q.  Did you see security?

5   A.  No.

6   Q.  Did you -- where were you when you met him?

7   A.  On this occasion the South of France.

8   Q.  Are there witnesses to you being sexually

9 trafficked to this prince?

10   A.  Yes.

11   Q.  Name them.

12   A.  Jeffrey Epstein, Ghislaine Maxwell.

13   Q.  Anyone else?

14   A.  There was a whole bunch of people in the

15 room so of course.

16   Q.  Was this an orgy?

17   A.  No.

18   Q.  Who else was in the room?

19   A.  I can't name them all, there was a lot.

20   Q.  Name as many as you can name?

21   A.  I don't know their names. I can't name

22 their names.

23   Q.  They were present during sexual activity?

24   A.  They were present before the sexual

25 activity and then I went to have sexual activity with him

1  alone.

2          Q.      So he's the only witness to your sexual

3  activity, the prince?

4          A.      On the instruction of Epstein and

5  Ghislaine, yes.

6          Q.      Where in the South of France were you?

7          A.      I don't know.

8          Q.      Were you on a boat, were you in a house?

9          A.      We were at a like a cabana, not cabana,

10  like a resort, but it was a big party.

11          Q.      Who was throwing the party?

12          A.      I don't know.  I was just brought there.

13          Q.      You also refer to powerful business

14  executives.  What powerful business executives were you

15  sexually trafficked to?

16                  MS. MCCAWLEY:  Again, to the extent you can

17                  reveal somebody without a safety concern you're

18                  welcome to do that.

19                  SPECIAL MASTER:  Well, again --

20                  MS. MCCAWLEY:  Right.  I understand.

21                  SPECIAL MASTER:  Same objection, same

22                  ruling.

23          A.      George Mitchell.

24          Q.      When were you sexually trafficked to George

25  Mitchell?

```
1        A.     I am unable to give you times since we are
2   going back a very long time ago.
3        Q.     Tell me the best that you can remember?
4        A.     Roughly when I was 17.
5        Q.     Where were you?
6        A.     New Mexico and New York.
7        Q.     Are there witnesses to this?
8        A.     Not to the actual event itself.
9        Q.     What other powerful business executives
10  were you sexually trafficked to?
11       A.     ███████████████ .
12       Q.     Are there witnesses?
13       A.     Besides Epstein instructing me to do so,
14  no.
15       Q.     What other powerful business executives
16  that you were sexually trafficked to?
17       A.     Yes, I know what you're saying.
18              MS. MCCAWLEY:  Take your time.  Take a deep
19         breath.
20       A.     ███████████████ .
21       Q.     Who else?
22              MS. MCCAWLEY:  To the extent you recall.
23       A.     I'm just trying to think.  This is all very
24  confronting for me.  So at the same token I'm just trying
25  to recollect everybody.  ███████████████████ .
```

```
 1          Q.    You said ██████████, were you sexually

 2   trafficked to more than one ██████?

 3          A.    No.

 4          Q.    Just to ████?

 5          A.    Just to ████.

 6          Q.    ████████████████████████████████████

 7   ████████████████████████████████████.

 8          A.    Yes.

 9          Q.    What other powerful business executives

10   were you sexually trafficked to?

11          A.    None that I can remember off the top of my

12   head.

13          Q.    Was ██████████ one of the powerful business

14   executives that you were trafficked to?

15          A.    Yes.

16          Q.    So you can remember others.  Who else is

17   there?

18                MS. MCCAWLEY:  I'm going to object to that.

19          That's inappropriate.  She gave you everyone she

20          could remember at the time when you mentioned a

21          name.

22                SPECIAL MASTER:  Okay.  Okay.  Please move

23          on without --

24                MS. BORJA:  There's a question pending.

25          A.    I said yes.
```

1      Q.      What other powerful business executives?

2      A.      Wasn't that just objected?

3              MS. MCCAWLEY:  You can answer.

4              SPECIAL MASTER:  You can answer.

5      A.      I can't remember off the top of my head,

6  I'm sorry.

7      Q.      You also referred to prominent American

8  politicians.  What prominent American politicians other

9  than the ones we've already named were you sexually

10 trafficked to?

11     A.      The ones I just told you about, █████

12 ██████████████████████████████.

13     Q.      How many times were you trafficked to ████

14 ████████████?

15     A.      I don't know, over two times.

16     Q.      How old were you?

17     A.      Approximately 17, 18.

18     Q.      Are you sure you were underage during one

19 of those incidents?

20     A.      I can't be 100 percent sure of anything.

21 It's not like I recorded the dates.  I'm just giving you

22 an approximation.

23     Q.      How many times were you sexually trafficked

24 to ██████████████?

25     A.      Twice that I can recall.

```
 1        Q.    Were you underage during either of those?
 2        A.    I believe so.
 3        Q.    Both of them?
 4        A.    I can't be 100 perfect sure.
 5        Q.    When you were sexually trafficked to the
 6   █████    were you underage?
 7        A.    Not by █████     standards.
 8        Q.    You weren't in █████    , were you, you were
 9   in the South of France?
10        MS. MCCAWLEY:  Which █████?  You need to
11        clarify.
12        A.    ██████████    , sorry.  I believe I would
13   have been 17.  I don't know what their age --
14        MS. MCCAWLEY:  You don't have to know.  You
15        don't have to know anything legal.  Just answer
16        the question the best you can.
17   BY MS. BORJA:
18        Q.    So how old were you when you were sexually
19   trafficked to █████    ?
20        A.    I don't know.
21        Q.    What is your best guess?
22        A.    I'm not going to speculate.
23        Q.    How many times did you have sex with █████
24   █████?
25        A.    Once.
```

1       Q.    How many times did you have sex with ██

2  ██████?

3       A.    Multiple.

4       Q.    What's the approximate range of number,

5  more than three?

6       A.    More than three.

7       Q.    More than five?

8       A.    Possibly.

9       Q.    More than ten?

10      A.    No.

11      Q.    Did ████████ ask you to wear any

12  particular clothing during your sexual trafficking?

13         MS. MCCAWLEY:  Again, I'm going to object

14        to this line of questioning.  To the extent that

15        you revealed something to me in work product

16        circumstance or attorney-client privilege, I don't

17        want you revealing that.

18         This case is about the defamation between

19        Paul Cassell and Brad Edwards and Mr. Dershowitz.

20        It's not about the individuals other than Mr.

21        Dershowitz who is the individual here who the

22        judge said we're here to talk about the issues in

23        this case, not the litany of other individuals.

24         MS. BORJA:  Counsel, we have limited time.

25         SPECIAL MASTER:  Hang on one second.  I'm

1          going to deny the objection.  You can answer the

2          question.  I'm going to give some latitude on

3          this, but counsel, please understand it's some

4          latitude.  So you can answer the question.

5                  MS. BORJA:  And Special Magistrate, I would

6          also ask for an instruction, we have limited time

7          here and speaking objections are inappropriate and

8          unnecessary for your ruling.

9                  MS. MCCAWLEY:  I'm allowed to make my

10         record.

11                 SPECIAL MASTER:  Counsel, she needs to make

12         the record, however, the four hours in my mind is

13         not a hard and fast four hours based upon how we

14         proceed in this deposition.  So I'll take that

15         into consideration as we approach the four hours.

16         A.      Yes, I wore lingerie for him.

17         Q.      At his request?

18         A.      It wasn't his request, it was Ghislaine who

19    set it up for me.

20         Q.      And did she specify baby doll lingerie to

21    be worn?

22         A.      All different types of lingerie.

23         Q.      Was it specifically Victoria Secret

24    lingerie?

25         A.      I didn't write the brand.

1        Q.    Have you alleged that you were required to

2  wear Victoria Secret lingerie for ██████████?

3        A.    No.

4        MS. MCCAWLEY:  Alleged in what context?

5  BY MS. BORJA:

6        Q.    She's already answered.  Now, other than

7  the people you've already named for me today, were you

8  sexually trafficked to anyone else during your period

9  between 1999 and 2002?

10       A.    Yes.

11       Q.    Who else?

12       MS. MCCAWLEY:  To the extent you can

13      recall.

14       SPECIAL MASTER:  Counsel, let her think it

15      through.

16       A.    Alan Dershowitz, ████████████, the obvious

17  people that I've already stated. ██████████████,

18  Jeffrey Epstein obviously, Ghislaine Maxwell, you know,

19  there's people that I just -- I honestly can't think of

20  everybody right now.  I do feel like I am under a lot of

21  pressure to answer the questions and I'm doing the best

22  that I can honestly.

23       Q.    Were you sexually trafficked to ███████

24  ████████?

25       A.    Yes.

1    Q.    Were you sexually trafficked to a man last

2  name ▮▮▮▮▮▮?

3    A.    Who?

4    Q.    ▮▮▮▮▮▮, if the name doesn't ring a bell,

5  just tell me?

6    A.    No.

7    Q.    How many times were sexually trafficked to

8  ▮▮▮▮▮▮▮▮▮▮▮▮?

9    A.    Once.

10    Q.    How old were you?

11    A.    I don't know.

12    Q.    You're sure it was one time, correct?

13    A.    I'm not sure of anything.  There was a lot

14  of people that Jeffrey sent me to and it was a long time

15  ago.  I can't be a thousand percent correct on that.

16    Q.    Who is ▮▮▮▮▮▮▮▮▮?

17    A.    He is an older gentleman.

18    Q.    Do you know what's does for a living?

19    A.    I think he's a ▮▮▮▮▮▮, but I don't want

20  to 100 percent say.

21    Q.    Who is ▮▮▮▮▮▮▮▮▮▮?

22    A.    I think he's a ▮▮▮▮▮.

23    Q.    Do you know where?

24    A.    Possibly ▮▮▮▮, I think, or maybe ▮▮▮▮.

25  I'm not too sure.  I'm just speculating.

1      Q.      Where did you meet ████████████?

2      A.      ████████████, at the islands.

3      Q.      And when you say the islands, do you mean

4  Jeffrey Epstein's estate?

5      A.      Yes.

6      Q.      And where did you meet ████████████?

7      A.      ████████████ was at the islands as well.

8      Q.      Did you ever meet him anywhere else?

9      A.      Yes.

10     Q.      Did you have sex with him in other

11 locations?

12     A.      No.

13     Q.      Did you ever fly in a plane with him?

14     A.      No.

15     Q.      Did you ever have sex is ████████████?

16     A.      No, not that I know of.  The name does not

17 ring a bell.  You have to understand that there were a

18 lot of gentlemen that I was lent out to by Jeffrey

19 Epstein.  So it is very hard for me to remember all of

20 their names and who they were and what they did.

21              (Thereupon, Defendant's VR Exhibit No. 2,

22         was Marked for Identification.)

23 BY MS. BORJA:

24     Q.      Ms. Roberts, when you refer to ████████

25 ████████, did you mean ████████████████?

1       A.      No.

2       Q.      Have you ever met a ████████████?

3       A.      Possibly.

4       Q.      Do you know one way or the other?

5       A.      Do I know?

6       Q.      You said possibly?

7       A.      I was introduced lots of political

8  scientific, academic, so there is a possibility I could

9  have met him.

10      Q.      Did you ever have sex with ██████████████?

11      A.      No.

12      Q.      Were you ever sexually trafficked to ███

13  ███████?

14      A.      No, not that I know of.

15      Q.      I'm handing you a document that's been

16  marked as VR Exhibit 2, which is Plaintiff, Virginia L.

17  Giuffre's, I apologize, disclosure pursuant to Federal

18  Rule of Civil Procedure 26.

19              This is a document that was entered in your

20  lawsuit against Ghislaine Maxwell in the Southern

21  District of New York.  Have you ever seen this document

22  before?

23      A.      No.

24      Q.      If you take a look, there's a list of

25  witnesses starting at page 1 and continues on?

1       A.    Yes.

2       Q.    I'm wondering whether this list might help

3  you.  Can you look at the names on this list and tell me

4  who from these names you were sexually trafficked to?

5       A.    ███████████████████.  I wasn't

6  trafficked to her.  She was just a part of some of the

7  trafficking.

8       Q.    Hold on.  What part did she have in the

9  trafficking?

10      A.    She was involved in some of the orgies.

11      Q.    So she was a sexual participant in the

12  orgies?

13      A.    Yes.

14      Q.    That you were a participant in as well?

15      A.    Yes.

16      Q.    Were these orgies that ███████ was

17  involved in with any of the individuals that you have

18  named so far today?

19      A.    Not that I can remember right now.

20      Q.    Do you know what gentlemen were involved in

21  the orgies with you and ████████?

22      A.    As far as I can recall Jeffrey Epstein.

23      Q.    Okay.

24      A.    ████████████████████, ████████████ does

25  ring a bell, but I don't want to 100 percent say that.

1      Q.    Ring a bell in terms of what?

2      A.    The name rings a bell.  I mean, you have to

3 understand there was a lot, a lot, a lot of girls around

4 to remember all of their names.

5      Q.    My question is, was ███████████ a

6 participant in sexual activities with you?

7      A.    I don't know and I'm not going to

8 speculate.

9      Q.    I'm not asking you to speculate.  I'm

10 asking you under oath today was she a participant, as far

11 as you can recall today, in sexual activities --

12      MS. MCCAWLEY:  Objection, asked and

13      answered.  Sorry, I didn't mean to interrupt.

14 BY MS. BORJA:

15      Q.    -- with you?

16      A.    I'm telling you under oath that I'm not

17 sure about ██████████ being in sexual orgies with me

18 but the name does ring a bell.

19      Q.    And ███████████?

20      A.    Yes, she was involved, but I'm not going to

21 speak about her.  She has the right to her own privacy.

22 She's been hurt, she's a victim, so I'm not going there.

23      Q.    Did she participate in any of the sexual

24 activities with others that you've named today?

25      A.    Yes.

1    Q.    With whom?

2    A.    I'm not answering that.

3          MS. MCCAWLEY:  We're going to object.  To

4    the extent that you're concerned about the safety

5    of one of these individuals, we're not going to

6    testify.  We can go to the judge and we can come

7    back if he says you have to testimony regarding

8    that but --

9          MS. BORJA:  We already have the names of

10   the gentlemen.

11         SPECIAL MASTER:  Hang on one second.  For

12   purposes of the record, have you made your record?

13         MS. MCCAWLEY:  Well, let's make a record.

14   So ████████████ was underage at the time this

15   occurred so she, herself, is a victim.  So to the

16   extent that, you know, if you want to bring her

17   counsel in and have them present during something

18   like this, that's fine, but this witness who is a

19   non-party to this litigation who's a victim

20   herself doesn't have to speak about other

21   under-aged victims.

22         SPECIAL MASTER:  Counsel?

23         MS. BORJA:  I'm entitled to know the names

24   of witnesses who can either verify or discredit

25   the allegations.

1    MS. MCCAWLEY:  She's given you the name.

2    SPECIAL MASTER:  Counsel, let her make her

3    record.

4    MS. BORJA:  As to specific individuals, and

5    I do not want to bring up her name with

6    individuals with whom she's not alleged to have

7    had sexual activity, that would be unfair to this

8    witness; but what would be fair to my client who

9    is being sued in this case is to be able to check

10   the allegations with a neutral third party, and if

11   this is a witness --

12   MS. MCCAWLEY:  Why don't you ask her if

13   that's somebody who was involved with your client,

14   which is what we're here on today, Alan

15   Dershowitz, not all of these other individuals.

16   SPECIAL MASTER:  Okay.  All right.  Have

17   you made your record?

18   MS. BORJA:  Yes.

19   SPECIAL MASTER:  I'm going to overrule the

20   objection.  I understand that you're going to

21   instruct the witness not to answer, right?

22   MS. MCCAWLEY:  Yes.

23   SPECIAL MASTER:  So that will have to be

24   dealt with in front of Judge Lynch for a

25   subsequent time because I do think that it's

1          incumbent upon, especially on this question, it's

2          incumbent upon you to lay the predicate as to why

3          you're instructing the witness not to answer.

4                    MS. MCCAWLEY:  And I believe I have.

5                    SPECIAL MASTER:  I understand.  We're not

6          here to do that.  So I'm going to, for purposes of

7          the record, I'm going to overrule your objection.

8          And now make your instruction so we have a clean

9          record to deal with.

10                    MS. MCCAWLEY:  Sure.  With respect to ███

11          ███████  because she was an underaged victim at the

12          time, I'm instructing you not to answer questions

13          with respect to her other than identifying her as

14          being one of the victims involved.

15     BY MS. BORJA:

16          Q.    Are you going to follow your counsel's

17     instructions?

18          A.    Absolutely.

19          Q.    And you understand that we're going to

20     reserve the right to bring you back for another

21     deposition in the event that the judge overrules your

22     counsel's objections.  Do you still want to keep abiding

23     by those?

24          A.    Go for it.

25          Q.    I'm sorry?

1         SPECIAL MASTER:  Yes.  Yes.

2     A.    No problem.

3     Q.    We were looking at the list of names and

4 you were going through to see if they refresh your

5 recollection as to the names of individuals to whom you

6 were sexually trafficked?

7     A.    On page 3, ███████████████████ .

8     Q.    Who is ███████████ ?

9     A.    I think she also goes underneath the name

10 ███████████ , if it's the same woman that I'm thinking of

11 and she was one of Jeffrey's, I would like to say,

12 co-conspirators.  She had sex with underaged girls and

13 myself.

14              ███████████████████ .  He was not

15 only a witness, but also another co-conspirator.  Again,

16 ███████████████████ sounds familiar, but I'm not going

17 to attempt to put her out of place and I'm not too sure.

18     Q.    Do you know who the names of the others

19 are, ███████████ or ███████████ , do you know who

20 they are?

21     A.    ███████████ I think I have heard of as

22 another victim, but I don't recall meeting her.

23     Q.    Do you know who ███████████ is?

24     A.    No.

25     Q.    Okay.

1    A.    Number 19, Alan Dershowitz; ████████

2  ████████████ ;  ████████████████ .

3    Q.    Before you move on, were you sexually

4  trafficked to ████████████████ ?

5          MS. MCCAWLEY:  This has been asked and

6          answered.

7          SPECIAL MASTER:  No, it has not.

8          Overruled.

9    A.    No, I was not trafficked to ██ .  ████████

10 ████████████████████████████████████ .

11   Q.    Let my ask you this, were you sexually

12 trafficked to ████████████ ?

13   A.    No.

14         MS. MCCAWLEY:  With a question pending, I

15         think she's lost the question, Counsel.  Ask the

16         question.

17         MS. BORJA:  Okay, counsel, I'll ask the

18         question.

19         MS. MCCAWLEY:  Thank you.

20 BY MS. BORJA:

21   Q.    The question is, when you look at this list

22 of names does it refresh your recollection as to who you

23 were sexually trafficked to?

24   A.    Some of the people that I mentioned, yes.

25   Q.    Okay.  So, let's continue reviewing the

```
1    list.  I'm looking for the names of the people that you
2    allege you were sexually trafficked to?
3              A.    Okay.  ██████████████████; number 27,
4    Jeffrey Epstein; ████████████████████, she was an
5    older woman who participated.
6              Q.    Participated in what?
7              A.    In sexual acts.
8              Q.    With whom?
9              A.    With Jeffrey Epstein.
10             Q.    How do you know that?
11             A.    I was there with her.
12             Q.    Okay, who else was there?
13             A.    Ghislaine Maxwell, ███████████.
14             Q.    Anyone else?
15             A.    No.  Did I say █████████████?
16             Q.    No.
17             A.    Okay, ████████ is another one.
18             Q.    Is another what?
19             A.    Another older woman that was a part of the
20   sexual endeavors.
21             Q.    With whom?
22             A.    Ghislaine, Jeffrey and me.
23             Q.    Anyone else?
24             A.    ████████████
25             Q.    I'm sorry, I'm still talking about
```

1    ▮▮▮▮▮▮.   When you said involved, you said involved with

2    sexual activity with Ghislaine, Jeffrey and yourself.

3    Was there anybody else involved?

4         A.    Not that I can remember.

5         Q.    Was this a single incident?

6         A.    No.

7         Q.    Okay.

8         A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , ▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮ , she was involved with, very heavily

10   involved with lots of incidents of sex.

11        Q.    With yourself?

12        A.    With myself.

13        Q.    And who else?

14        MS. MCCAWLEY:   To the extent you can

15        answer.   If it's multiple incidents you can take

16        them one at a time.

17        A.    It was multiple incidents so it's going to

18   be nearly impossible for me to remember every one.   But

19   obviously Jeffrey Epstein, Ghislaine Maxwell, ▮▮▮▮▮▮▮ ,

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .   I'm sure there's more, but I

21   just can't remember off the top of my head.

22        Q.    How do know that she had sex with ▮▮▮

23   ▮▮▮▮▮ ?

24        A.    I was there.

25        Q.    How do you know she had sex with ▮▮▮▮▮

1          █████ ?

2          A.    I again was there.

3          Q.    How many times did you and ███████ and

4    ██████████ have sex together?

5          A.    Once that I can remember.

6          Q.    Where were you?

7          A.    New Mexico.

8          Q.    Are there other witnesses?

9          A.    ████████████ , I can't pronounce her last

10   name.

11         Q.    ███████████

12         A.    ██████████ , yes.

13         Q.    Anyone else?

14         A.    ████████████████████ .

15               MS. MCCAWLEY:  I'm sorry, I think she's

16         moving on with the list.  Are you still talking

17         about the incident?

18   BY MS. BORJA:

19         Q.    I understand ██████████████ was a witness

20   to your sexual activities with ██████████ in Mexico, is

21   that not what you meant?

22         A.    Yes.

23         Q.    She was a witness?

24         A.    Yes.

25         Q.    Was ████████████████ a witness?

1    A.    No, I'm sorry.  I was moving on with the

2    list.

3    Q.    What is the sexual incident involving

4    █████████████████?

5    A.    Palm Beach and the Caribbean with Jeffrey,

6    myself, possibly ████████████ if I remember correctly,

7    there was another girl, I'm pretty sure it was ██████.

8    Q.    Were you sexually trafficked to anybody

9    else on the list?

10    A.    I'll continue with the list here.   ████████

11    ████████████ I was not sent to her, but she was a part of

12    it with Jeff Epstein, ██████████████████████████████.

13    Q.    Who is ████████████████?

14    A.    He, I don't know exactly what he does, but

15    I think he's some kind of ████████████.

16    Q.    Did you have sex with him?

17    A.    Yes.

18    Q.    How many times?

19    A.    Off the top of my head, just once.

20    Q.    Where were you?

21    A.    I believe ████ was at Mexico.

22    Q.    Approximately how old were you?

23    A.    Again, I don't know.

24    Q.    Are there any other witnesses?

25    A.    Not that I can remember.  I mean, besides

1   Jeffrey asking me to give him a massage which involved

2   sexual acts, I don't remember. ███████████ was

3   another victim of Jeffrey Epstein who witnessed sexual

4   acts.

5          Q.   Witnessed sexual acts between you and

6   somebody else?

7          A.   She is another victim that I would like to

8   say that I wouldn't like to mention the stuff that

9   happened to her.  She's very sensitive about this stuff.

10         Q.   That's fine, but I'm wondering if she's a

11  witness to sexual acts that you allege were between you

12  and somebody else?

13         A.   Other than Epstein, no.  I mean, she did

14  see the meeting with ██████████ , but she did not

15  witness the act with him.

16         Q.   Okay.

17         A.   ██████████ is, I believe that be ██████

18  ██████ which is ██████████ and I've already explained

19  that one.  ████████████████ , she witnessed many

20  acts of sexual abuse by Ghislaine Maxwell, Jeffrey

21  Epstein.

22              ████████████████████ is the pilot.  I

23  don't believe he witnessed anything, but he was ██████

24  during some of the times that sexual abuse encountered.

25         Q.   Do you know why ██████████ is not on this

1  list?

2        A.    I haven't seen this list before, so, no.

3              MS. MCCAWLEY:  This is a good time to take

4        a break.

5              MS. BORJA:  The time is now 9:45.

6              THE VIDEOGRAPHER:  Going off video record

7        9:49 a.m.

8              (A recess was taken.)

9              THE VIDEOGRAPHER:  We are now back on video

10       record 10:01 a.m.

11             MS. MCCAWLEY:  Did you mark this?

12             MR. SCAROLA:  Yes.

13             MS. MCCAWLEY:  That's 2.

14  BY MS. BORJA:

15       Q.    Ms. Roberts, did you have an opportunity to

16  talk to anybody other than Ms. McCawley during the break?

17       A.    Yes, I spoke with my good friends over

18  there.

19       Q.    Who are?

20       A.    Brittany Henderson and --

21             MS. MCCAWLEY:  Meridith.

22  BY MS. BORJA:

23       Q.    Anyone else?

24       A.    Brad Edwards.  I'm sorry, I forget he came

25  in.

1         Q.     Now, do you have knowledge of Professor

2  Dershowitz having sex with any minor girls other than,

3  you claim, yourself?

4         A.     Yes, I don't know their names.

5         Q.     How do you know that?

6         A.     I witnessed it.

7         Q.     Where were you?

8         A.     On an airplane.

9         Q.     How many girls?

10        A.     One.

11        Q.     Describe her?

12        A.     Blond, young.

13        Q.     Anything else?

14        A.     No.

15        Q.     Where were you going on this plane?

16        A.     You know, it's hard for me to remember the

17  exact destination.  I was flying around a lot from the

18  times I was with Jeffrey, but I believe it was to

19  Massachusetts, if my memory is correct.

20        Q.     Why were you flying to Massachusetts?

21        A.     Again, I don't want to -- I don't know.  I

22  just flew wherever Jeffrey wanted fly to.

23        Q.     Did you stay in a hotel in Massachusetts?

24        A.     No, we flew in and flew out the same day.

25        Q.     Who else was on the plane?

1       A.      Epstein.

2       Q.      Where were you coming from?

3       A.      I believe it was New York, but again, I

4  don't want to 100 percent say, like I said we were

5  constantly flying.

6       Q.      Was it winter time, was it summer time?

7  What do you recall about when it was?

8       A.      It wasn't snowing so I'm not too sure.

9  This is going back a long time ago.  I don't know the

10 date.

11      Q.      What's your best recollection of how you

12 were dressed?

13      A.      I don't know what I was wearing.

14      Q.      Did you have a sweater?

15      A.      I don't know what I was wearing.

16      Q.      Were you over 18?

17      A.      I don't know, I'm sorry.

18      Q.      You might have been?

19      A.      I could have been.  I could have been under

20 18, over 18.

21      Q.      The other girl, she could have been over

22 18?

23      A.      She could have been, she could have not

24 been.  Jeffrey liked having a lot of young girls around

25 him.  I'm not too sure.

1    Q.    You don't know one way or the other whether

2  the girl was a minor?

3    A.    I didn't ask her the age.

4    Q.    Other than the girl you're not sure whether

5  she was a minor, are there any girls you are sure were a

6  minor who you think had sex with Professor Dershowitz?

7    A.    Not that I know of.

8    Q.    So would it be correct that you actually

9  don't know one way or the other whether Professor

10  Dershowitz had sex with any minors other than you claim

11  yourself?

12        MS. MCCAWLEY:  Objection.  You can answer.

13    A.    Yeah, I don't know.  It would hard to say.

14  Jeffrey, like I said, had lots of young girls around all

15  the time and some of them were very young and some of

16  them were on the cusp of 18, 19.  So it's very hard to

17  speculate how old exactly she was.

18    Q.    So you don't know?

19    A.    I don't know.

20    Q.    Other than yourself, Jeffrey, Professor

21  Dershowitz and this other woman of unknown age, was

22  anybody else on the plane besides the pilot?

23    A.    Pilot.

24    Q.    That's it?

25    A.    Yes.

1     Q.     Putting aside ages, whether they were

2 minors or not, other than this one girl you say had sex

3 with Professor Dershowitz on a plane, are you aware of

4 any other girls with whom you believe Professor

5 Dershowitz had sex?

6     A.     Professor Dershowitz was around a lot and

7 there was always young girls around a lot and I

8 physically did not see him with any other girls besides

9 the ones that we're talking about right now and myself,

10 but no, I'm not too sure.

11     Q.     You don't know of any, correct?

12     A.     Not that I physically witnessed.

13     Q.     How tall is Professor Dershowitz?

14     A.     I don't know.

15     Q.     Is he closer to 5'5" or 6"?

16     A.     Goodness, 5'5", 5'6", 5'7", he's not 6".

17     Q.     Does he have any distinguishing

18 characteristics?

19     A.     Like are you asking me skin color?

20     Q.     Any distinguishing physical

21 characteristics, whatever that might mean to you?

22     A.     He's older, he's -- I don't know what you

23 mean.  Like does he have a mole in a specific place, is

24 that what you're asking me?

25     Q.     Anything that might occur to you?

CONFIDENTIAL

1    A.    No, not that I know of.

2    Q.    Did you know who he was before you met him

3 the first time?

4    A.    No.

5    Q.    Now, one of the places that you say you had

6 sex with Professor Dershowitz was in New Mexico, correct?

7    A.    Yes.

8    Q.    When was that?

9    A.    Again, it's hard for me to place exact

10 times and dates, but it wasn't snowing and it wasn't hot.

11 So it could have been fall or spring.  One thing that I

12 do remember was Jeffrey was having his pool area painted

13 and the massage room was just off the pool area.

14    Q.    What else do you remember?

15    A.    I remember the smell of paint.  I remember

16 later that evening there was a dinner party of a whole

17 bunch of academic scientists, I guess, I'm not too sure.

18 We weren't really allowed to have and make conversation

19 with the people around us.

20    Q.    How many people were at this dinner party?

21    A.    I don't know the exact number, but over

22 fifteen.

23    Q.    Anybody that you recall, anybody famous?

24    A.    No, nobody famous that I recall, I'm just

25 showing that they are distinguished in their own way, but

besides Alan Dershowitz, Jeffrey Epstein, Ghislaine

Maxwell, ███████, the house staff.

    Q.    Now, you said there was a dinner party with

████████████████████?

    A.    Yes.

    Q.    Were any of the ████████████████

that we talked about early today at that party?

    A.    Not that I remember.  They could have been,

but I was not there for anyone else.

    Q.    How did you get there?

    A.    By airplane, Jeffrey.

    Q.    You flew privately for that event?

    A.    Yes.

    Q.    How did you leave?

    A.    Privately.

    Q.    How long were you there?

    A.    Maybe anywhere between three days and a

week.

    Q.    So at least three days?

    A.    At least three days.

    Q.    Who else was on the plane with you?

    A.    Jeffrey Epstein, ████████, Ghislaine,

myself, the pilots, possibly, ████████████, I can't

remember.  He was on the plane sometimes and sometimes

not, so.

1    Q.    Can you spell ███████ last name?

2          MS. MCCAWLEY:  If you know.

3    A.    Off the top of my head, ████████████████.

4    Q.    Who is █████████████?

5    A.    ███████.

6    Q.    Was Professor Dershowitz on the plane?

7    A.    No.

8    Q.    How did you know -- well, was this the

9    first time you had met Professor Dershowitz?

10   A.    No.

11   Q.    How many times had you met him before this

12   event?

13   A.    Dershowitz was around a lot.  So I mean, I

14   couldn't count how many times I've met him.

15   Q.    What's your best recollection?

16   A.    Are you asking me to guess?

17   Q.    I'm asking for your best recollection?

18   A.    I couldn't give you a number.  I'm not too

19   sure.  He was around a lot.

20   Q.    When you say he was around, what do you

21   mean by that?

22   A.    He obviously did a lot of work with

23   Jeffrey.  I'm not too sure what that work was.

24   Q.    Did you ever talk to him?

25   A.    I was introduced to him.

1      Q.      When were you first introduced to him?

2      A.      I believe the first time I was introduced

3 to him would have been in New York.

4      Q.      Putting aside that first introduction, did

5 you ever have a conversation with Professor Dershowitz?

6      A.      Besides formalities, no?

7      Q.      Did Professor Dershowitz tell you why he

8 was in New Mexico?

9      A.      No.  I'm assuming there for the conference

10 or the get together, the politicians get together, not

11 politicians, sorry, academic get together.

12      Q.      How did you know this was an academic get

13 together?

14      A.      Because they were talking about, most of

15 the things, I can't really understand, just scientific

16 stuff.

17      Q.      Were you there for that portion of the

18 evening?

19      A.      Yes.  I ate dinner at the table.

20      Q.      Was there anything other than the dinner

21 that was going on during this three-day to one week stay

22 in New Mexico?

23      A.      Generally they're always was.  I mean, I

24 would do horseback riding, I would go for walks.  If

25 you're asking if there was another event, no, but that

1   was one of Jeffrey's places he liked to stay.

2         Q.    Where did Professor Dershowitz stay?

3         A.    Upstairs in the room.

4         Q.    How long did he stay?

5         A.    I'm not too sure.

6         Q.    What's your best recollection?

7         A.    I only remember seeing him there for a day?

8         Q.    And you didn't see him -- was this dinner

9   party at the end of the your trip there?

10        A.    The first day.

11        Q.    So then after the first day you didn't see

12  Professor Dershowitz again?

13        A.    I didn't see anyone else except for

14  obviously Epstein, Maxwell, ████, the house staff.

15        Q.    How many people other than Professor

16  Dershowitz stayed at the ranch during this trip?

17        A.    Nobody else stayed except for the people I

18  just mentioned.

19        Q.    I'm sorry, I thought that Professor

20  Dershowitz spent the night?

21        A.    He could have spent the night, but I'm

22  saying I didn't see him the next day.  I don't know if he

23  left that day or I don't know if he stayed the night, but

24  all the rooms were upstairs.  If he would have stayed, he

25  would have stayed upstairs.

1    Q.    So you don't know one way or the other

2  whether he did stay?

3    A.    No, I don't know whether he did stay.

4    Q.    What year was this?

5    A.    I don't know.  I was with Jeffrey from 1999

6  until 2002.  So it's a broad spectrum of trying to

7  remember times and dates.

8    Q.    You definitely remember this dinner party,

9  right?

10    A.    Yes.

11    Q.    You remember that there were 15 or so

12  academics and scientists, right?

13    A.    Yes.

14    Q.    And you remember that you had sex with

15  Professor Dershowitz, right?

16    A.    Yes.

17    Q.    You remember everybody left after that

18  dinner party, right?

19    A.    Yes.

20    Q.    So what would help you fix this in your

21  mind, had you already met ███████████ before this

22  dinner party?

23    A.    You know, I don't think so, but I don't

24  think so.

25    Q.    Why do you say that?

1     A.    Because ██████████ happened when I was

2  17, you know.  I can't 100 percent say if it happened

3  before or after and me trying to pin point that down just

4  wouldn't work.

5     Q.    Did you tell anybody about having sex with

6  Professor Dershowitz?

7     A.    Besides Epstein?

8     Q.    So you told Epstein?

9     A.    Yes, Epstein.

10     Q.    Did you tell anybody else?

11     A.    Maxwell.

12     Q.    Anyone else?

13     A.    I told my boyfriend at the time that I had

14  met him.

15     Q.    Who was your boyfriend at the time?

16     A.    ██████████.

17     Q.    You didn't say anything else other than you

18  had met Professor Dershowitz?

19     A.    I told him I was very upset from one of the

20  things I had to do but he didn't fully comprehend what I

21  was talking about.

22     Q.    Did you tell anybody else?

23     MR. SCAROLA:  Excuse me, can you set a time

24     frame?

25  BY MS. BORJA:

1    Q.    At any time in your entire life?

2    A.    Oh, at any time?

3          MR. SCAROLA:  Are we excluding

4          attorney/client privileged communications?

5    BY MS. BORJA:

6    Q.    Other than your attorneys, did you tell

7    anybody else?

8    A.    Yes, I told my best friend, ████████████,

9    ████████████████████████, my mother, I think that's

10   about it.

11   Q.    When did you tell your mother?

12   A.    Within the last couple of years.

13   Q.    What did you tell her?

14   A.    I didn't go into details with her.  I just

15   said that he's one of the people that abused me.

16   Q.    Did you say anything else to your mother

17   about Professor Dershowitz other than generally he abused

18   you?

19         MS. MCCAWLEY:  Objection, asked and

20         answered.

21         SPECIAL MASTER:  You can answer.

22   A.    No, just I mean, obviously characterization

23   about who he is and what he is, but I didn't go into

24   details with her, if that's what you're asking.

25   Q.    What did you tell ██████?

1       A.      That he was one of my abusers.

2       Q.      Did you say anything else?

3       A.      About Dershowitz?

4       Q.      Yes.

5       A.      In regards to what?

6       Q.      Did you say anything else about Professor

7  Dershowitz to ██████████?

8       A.      I need a little more specifics.  Did I tell

9  her about the details?

10       Q.      Anything else about Professor Dershowitz,

11  anything?  I'm not excluding or narrowing it in any way?

12              MS. MCCAWLEY:  Objection.  To the extent

13              you can answer that.

14       A.      I told her who he was, I told her -- I

15  might have told her specifics I'm not too sure.  I can't

16  recall.  We're going back make over a year ago.

17       Q.      When did you have -- how many conversations

18  did you have with ██████████ about Professor Dershowitz?

19       A.      It wouldn't be like full blown

20  conversations like long talks about it.  It would be more

21  from girlfriend to girlfriend, just, you know, this is

22  what's happening in my life.  You know, these are one of

23  the people that abused me.  These are one of the people

24  that I'd like to get brought to justice for it.  She

25  would ask me questions like, what happened?  I explained

1  to her what's going on.  I don't know how many times I've

2  had conversations with her.

3         Q.     About Professor Dershowitz?

4         A.     About Professor Dershowitz.

5         Q.     Is &#9608;&#9608;&#9608; a truthful person?

6         A.     I used to think she was.

7         Q.     You don't think that now?

8         A.     No.

9         Q.     Have you had a falling out with &#9608;&#9608;&#9608;?

10        A.     Yes.

11        Q.     Have you called &#9608;&#9608;&#9608; and told her not to

12  talk to Professor Dershowitz?

13        A.     Not in that way.  I told her, I can't

14  believe that you are talking to somebody, in my own

15  words, a pedophile.

16        Q.     Did you tell her not to talk to anyone else

17  about Professor Dershowitz?

18        A.     Did I tell her not to talk to anybody else

19  about Professor Dershowitz, like talking about her

20  husband?

21        Q.     Did you tell &#9608;&#9608;&#9608; not to talk to anybody

22  about Professor Dershowitz?

23        A.     Did I tell &#9608;&#9608;&#9608; not to talk --

24        MS. MCCAWLEY:  Objection, to the extent you

25        didn't understand the question you can ask for it

1         to be re-asked.

2         A.      Can you -- I don't understand what you're

3   asking.

4         Q.      Why did you think that ██████ was a

5   truthful person in the past?

6         A.      I've known her since I was a kid and I love

7   her like a sister.

8         Q.      In your experience in knowing her since you

9   were a kid you found her to be truthful?

10        A.      Yes, I have.

11        Q.      When did you first tell ████████████ about

12  Professor Dershowitz?

13        A.      I believe I was on the island, Jeffrey's

14  island.

15        Q.      What's your best estimate of when this was?

16        A.      I don't know.  It's always hot in the

17  Caribbean so I can't pin point a season.

18        Q.      Did you tell ██████ that Professor

19  Dershowitz, in your words, was a pedophile?

20        A.      Yes, I did.

21        Q.      Did you tell anybody else that?

22        MS. MCCAWLEY:  Outside of the comments to

23        the lawyer.

24  BY MS. BORJA:

25        Q.      Other than your lawyers?

1     A.    The people that I've told you, my mom, my

2  husband, as you said ███████████, her husband might

3  have been present on some of those conversations, but I'm

4  not too sure if he was.  Just my lawyers.

5     Q.    Did you ever tell the press that you had

6  had sex with Professor Dershowitz?

7          MS. MCCAWLEY:  Objection.  Any questions

8          regarding the press were already quashed by the

9          judge and we have an order standing on that so

10         there will be no questions regarding the press.

11         MS. BORJA:  There is no such order from the

12         Court.

13         MS. MCCAWLEY:  There is and I'll be happy

14         to pass it out.

15         SPECIAL MASTER:  Can you please share?

16         MS. MCCAWLEY:  They issued a subpoena duces

17         tecum and he quashed certain discovery requests

18         and that's included, any discovery relating to

19         press.  Here is a chart that has the request for

20         the ones that should be quashed.

21         SPECIAL MASTER:  I've read this.  I've

22         read --

23         MS. MCCAWLEY:  Those that have the numbers

24         he quashed.  He quashed certain categories of

25         discovery.

CONFIDENTIAL

1          MS. BORJA:  Can I be heard?

2          SPECIAL MASTER:  Are you finished making

3     your objection?

4          MS. MCCAWLEY:  I just want to be clear that

5     there are certain categories of discovery that he

6     quashed in response to my motion to quash this

7     deposition, and he narrowed out categories that

8     were not subject to discovery in this case for

9     this non-party witnesses.

10         SPECIAL MASTER:  Okay.  And I'm looking at

11    both the order and a chart that was provided by

12    MS. MCCAWLEY?

13         MS. BORJA:  That's a duces tecum.  The

14    judge ruled on the production of documents.  The

15    judge did not narrow the scope of testimony of a

16    fact witness in that way.  She was not required to

17    produce certain documents.  We're certainly

18    entitled to check the veracity of the witnesses'

19    testimony.

20         SPECIAL MASTER:  I'm going to overrule the

21    objection.  You can answer.

22         MS. MCCAWLEY:  Can we take a break?

23         MS. BORJA:  There's a question pending.

24    You cannot take a break while there is a question

25    pending.

CONFIDENTIAL

1          MS. MCCAWLEY:  We are going to take a break

2     because this is a judge's order and we're going to

3     determine whether we need to call Judge Lynch at

4     this time to deal with this order.  So we are

5     going to take a break at this time.

6          MS. BORJA:  I object to taking a break

7     while there's a question pending.

8          SPECIAL MASTER:  Well, I'm going to let her

9     take a break so she can make her record.  I need

10    to allow her to protect it.

11         MS. BORJA:  Can you put the time on the

12    record?

13         THE VIDEOGRAPHER:  Going off video record.

14    10:23 a.m.

15         (A recess was taken.)

16         THE VIDEOGRAPHER:  We are now back on video

17    record 10:30 a.m.

18         SPECIAL MASTER:  There was a question

19    pending.

20         THE WITNESS:  Would you like that to be

21    answered now?

22         MS. MCCAWLEY:  Really quickly I want to

23    make my record in advance of her answering that.

24    We believe that the questions, this line of

25    questioning is in violation of Judge Lynch's order

1    where he struck certain requests relating to the

2    subpoena, and we have a standing objection to that

3    that we'll take up with Judge Lynch, but at this

4    time we'll allow her to answer the question

5    subject to our ability to strike that testimony as

6    a result of it being non-applicable here because

7    of his prior ruling.

8          SPECIAL MASTER:  So you understand my

9    ruling, I've reviewed, I've had an opportunity to

10   review both the original objections made, the

11   series of objections made to the duces tecum, the

12   order, as well as the chart that was provided by

13   Ms. McCawley with respect to what was stricken on

14   the subpoena, and for the purposes of the record

15   we'll go ahead and have this marked so we can

16   preserve the record as to what I'm referring to,

17   my ruling.

18         MS. BORJA:  We can make them a compellation

19   Exhibit VR 3.

20         (Thereupon, Defendant's VR Exhibit No. 3,

21   was Marked for Identification.)

22         SPECIAL MASTER:  My ruling stands, and I

23   don't have an issue with you having a continuing

24   objection, but the witness now can answer.

25         MS. MCCAWLEY:  Do you want the question

1          read back to you?

2               THE WITNESS:  No.  Should I just go ahead

3          and say it?

4               SPECIAL MASTER:  Go ahead and read back the

5          question?

6               (Last question read back by the court

7          reporter.)

8               SPECIAL MASTER:  Subject to the continuing

9          objection, you can now answer.

10          A.    I thought the question was if I ever called

11  him a pedophile to the press.  Wasn't that the question?

12               SPECIAL MASTER:  No.

13          A.    I did point him out to a journalist as one

14  of my abusers.

15          Q.    What journalist?

16          A.    Sharon Churcher.

17          Q.    When did you do that?

18          A.    I believe it was 2011.

19          Q.    What did you tell Ms. Churcher?

20          A.    I just pointed him out.

21          Q.    What do you mean?

22          A.    I was given a picture to look at and he

23  asked me which ones that I recognized as abusers and Alan

24  Dershowitz was one of those.

25          Q.    How many pictures did you look at?

1          A.      I'm not too sure.

2          Q.      What's your best recollection?

3          A.      Over 40.

4          Q.      Did you pick out anybody else as one of

5 your abusers?

6          A.      Yes.

7          Q.      Who was that?

8          A.      Jeffrey Epstein, Ghislaine Maxwell, ▇▇▇

9 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, I believe, that's

10 all I can remember for now.

11          Q.      Was one of the pictures of ▇▇▇▇▇▇▇?

12          A.      Possibly, yes.

13          Q.      Was one of the pictures ▇▇▇▇▇▇▇▇▇

14 ▇▇▇▇▇▇▇

15          A.      Again, possibly, yes. Probably, I'm not

16 committing 100 percent to that, I can't remember exactly

17 who she showed, but if they were there I would have

18 pointed to them.

19          Q.      Was one of the pictures of ▇▇▇▇▇▇▇▇?

20          A.      Again, possibly yes. If they were there I

21 would have pointed them out.

22          Q.      Where did these pictures come from, do you

23 know?

24          A.      No.

25          Q.      Were the people that were in photos that

1 you did not identify as individuals to whom you had been

2 sexually trafficked?

3          MS. MCCAWLEY:  Objection.  You can answer.

4     A.    Yes.

5     Q.    Tell me everything you can recall telling

6 Sharon Churcher about being sexual trafficked to Alan

7 Dershowitz when you met with her in 2011?

8          MS. MCCAWLEY:  Objection.  I just want to

9          be clear that I have a standing objection to this

10         line of questioning.

11         SPECIAL MASTER:  So noted.  You can answer.

12    A.    I just identified him.  I don't think we

13 actually got into any kind of details.  It was going

14 through a book of people kind of like the FBI does and

15 pointing out.  She was more interested in ▮▮▮▮▮▮▮.

16    Q.    You met with Ms. Churcher for about a week;

17 is that correct?

18    A.    Yes.

19    Q.    During the course of that week did you give

20 Ms. Churcher any documents?

21    A.    Yes, I had given her some pages out of a

22 booklet that I had wrote concerning ▮▮▮▮▮▮▮.

23    Q.    What is this booklet that you wrote?

24    A.    She contacted me and asked me to recall the

25 times that I was with ▮▮▮▮▮▮▮ and I wrote them down

1    and I gave them to her.

2         Q.    When did Ms. Churcher first contact you?

3         A.    It would have been 2011.

4         Q.    What did she say when she first contacted

5    you?

6         A.    She introduced herself.  She asked me if I

7    was a victim of Jeffrey Epstein.  She was interested in

8    how he got away with so many counts of abusing minors,

9    and seeing that I was one of the minors she wanted to

10   talk about that; and when she came over or before she

11   came over she asked me about some of the people I had

12   been with.  I had said, well, I've got a picture of

13   myself with ███████████ and she was very interested and

14   she came over and wrote the article.

15        Q.    Now, the picture that you had of █████

16   █████ , that's an original photo that you developed,

17   correct?

18        A.    Yes.

19        Q.    Do you still have the original?

20        A.    It's been passed around a lot.  I'm not too

21   sure if mine is the original or not anymore.

22        Q.    The photographs of you in New Mexico in the

23   snow wearing your red jacket were those taken on your

24   camera?

25        A.    Yes, my camera.

1    Q.    Do you have the originals?

2    A.    Again, between the FBI and giving them to

3    my lawyers and Sharon Churcher, the circulation, I'm not

4    too sure if I have the originals.  I know I have copies.

5    So I'm not too sure if they're the originals.

6    Q.    The booklet that you gave pages from to Ms.

7    Churcher where is that booklet?

8    A.    Burned.

9    Q.    When did you burn it?

10    A.    In, I think it was 2013.  Me and my husband

11    had a bonfire.

12    Q.    What did you put in the bonfire?

13    A.    Any kind of memories that I had written

14    down about all the stuff going on.

15    Q.    Had you written anything about Professor

16    Dershowitz?

17    A.    He could have been there, yes.

18    Q.    And you burned that?

19    A.    I wanted to burn my memories.  I wanted to

20    get rid of it.  It was very painful stuff.

21    Q.    Other than what you had written down did

22    you burn anything else?  I don't mean the wood, when you

23    talk about burning your memories, what were you burning?

24    A.    I was burning like memories, thoughts,

25    dreams that I had, just everything that was kind of

1  affiliated with the abuse I endured, and there was a lot

2  of it in there.  My husband is pretty spiritual so he

3  said the best thing to do would be burn them.

4       Q.    Is there anything you decided to keep and

5  not burn?

6       A.    Just the photographs.

7       Q.    Anything else that you can think of?

8       A.    Photographs, that's it.

9       Q.    Approximately when in 2013 was this

10  bonfire?

11       A.    I don't know what month it was.

12       Q.    Did you do it outside?

13       A.    Yeah, it was outside.  I wasn't going to do

14  it in my living room.

15       Q.    Did it feel good to be close to the fire

16  because it was cold out or was it a summertime bonfire?

17       A.    I believe I had just bought my house in

18  Titusville, Florida.  I bought my house in, I think, I

19  either got it October or November of 2013.  It would have

20  been around probably November.

21       Q.    Why did you decide to keep the photos?

22       A.    They're evidence.

23       Q.    Do you have any photographs of yourselves

24  with Professor Dershowitz?

25       A.    No.

1        Q.      Do you have any photographs of yourself at

2 any of the locations at the times that you allege

3 Professor Dershowitz was there?

4        A.      Like there's not photographs of Dershowitz.

5        Q.      Showing that you were at the locations at

6 the time that you say Professor Dershowitz was there

7 regardless of whether or not he was in the photograph?

8        A.      I'm not too sure, I mean, it could have

9 been the same week. I always carried around cameras so I

10 took lots of pictures of everything. It could have been

11 the same week, but he was definitely not in the

12 photographs.

13        Q.      After you gave Ms. Churcher the pages from

14 that booklet did she give you a copy of those back?

15        A.      I don't think so. Not that I remember.

16        Q.      You gave her the original pages?

17        A.      Yes.

18        Q.      Are those the same pages that showed up in

19 Radar Online?

20        A.      Yes.

21        Q.      How did they get them?

22        A.      Not by me.

23        Q.      Did you get paid for them?

24        A.      No, not for those.

25        Q.      You got paid for Ms. Churcher's interview?

1          MS. MCCAWLEY:  Again, I just want to make

2     sure that I have a standing objection to all of

3     the testimony relating to the media.

4     A.    Specifically I got paid for the picture.

5     Q.    The picture of yourself with ████████?

6     A.    Yes.

7     Q.    Was there a contract?

8     A.    I believe so.

9     Q.    Who negotiated that?

10    A.    Just Sharon and myself maybe the place that

11 she works, I'm not too sure.

12    Q.    You told the FBI that you got $160,000 for

13 that, is that right?

14    A.    Yes.

15    Q.    And is that a correct statement?

16    A.    It was 140 and then for the articles

17 $10,000, and then $10,000.

18    Q.    So how does the picture fit into that?

19    A.    What do you mean?

20    Q.    You said it was 160 for the photo?

21    A.    No, 140 for the --

22    Q.    For the article?

23    A.    Well, for the photograph and articles and

24 then for the other articles, I don't think she just

25 printed one article, I think she printed like three

1 articles if I recall correctly, but for the other one it

2 was $10,000 and then $10,000.

3      Q.    Were you paid for any other media

4 interviews?

5      A.    No.

6      SPECIAL MASTER:  There is a standing

7      objection to all this.

8      MS. MCCAWLEY:  Yes.

9 BY MS. BORJA:

10      Q.    Did Ms. Churcher give you any documents?  I

11 know she showed you pictures, did she give you anything?

12      A.    No.

13      Q.    Did Ms. Churcher tell you anything about

14 Professor Dershowitz?

15      A.    No.

16      Q.    Other than you've named your mother, your

17 boyfriend, █████████████?

18      A.    Yes.

19      Q.    Your friend ██████ and Sharon Churcher?

20      A.    And my husband.

21      Q.    Your husband, and putting aside your

22 lawyers, did you tell anyone else that you were sexually

23 trafficked to Professor Dershowitz?

24      A.    The FBI.

25      Q.    What did you tell the FBI?

1        A.      I just remember -- my memory recalls they
2    did show me a photograph of everybody, if he was in those
3    photographs I would have pointed him out.  I'm just
4    saying I could have possibly pointed him out in the
5    pictures.
6        Q.      But do you recall doing that?
7        A.      I just know there was a lot of pictures and
8    if he was in there I would have pointed him out to them.
9        Q.      Do you recall having any discussions with
10   the FBI about Professor Dershowitz?
11       A.      I had discussions about a lot of people
12   with him and I specifically don't remember if it was just
13   -- if Alan was included in those, but if he was I would
14   have told them what I know.
15       Q.      Did you talk to the FBI more than once
16   about Professor Dershowitz?
17              MS. MCCAWLEY:  Objection, mischaracterizes
18          the testimony.
19              SPECIAL MASTER:  You can answer.
20              THE WITNESS:  Does that mean go ahead?
21              SPECIAL MASTER:  Yes.
22       A.      I only met with the FBI one time, so no.
23       Q.      When you say that if you've been shown a
24   picture you would have identified Professor Dershowitz
25   you're talking about an in-person meeting in April 2011?

1      A.      I don't recall if it was April, but yes, I
2  think it was 2011.
3      Q.      Shortly after the article in the Daily Mail
4  came out?
5      A.      I think after about two weeks.
6      Q.      What else did you tell the FBI about being
7  sexually trafficked?
8      A.      I've told them everything that I could
9  remember at the time from the period of the years I was
10  with Jeffrey Epstein.
11      Q.      Did you tell them about a prominent prime
12  minister?
13      A.      Yes.
14      Q.      Did you tell them about heads of state?
15      A.      I'm not too sure what a head of a state is.
16      Q.      Did you tell them about prominent
17  politicians?
18      A.      Yes.
19      Q.      Did you name them?
20      A.      Yes.
21      Q.      Did you tell the FBI about prominent
22  business people?
23      A.      Yes.
24      Q.      Did you name them?
25      A.      Yes.

1       Q.    What were the names of the politicians that

2 you gave to the FBI?

3       A.    The same names I've given to you.

4       Q.    What were the names?  You gave the FBI the

5 name ███████████████? 

6       A.    Yes.

7       Q.    And you gave the FBI the name ███████

8 ███████?

9       A.    Yes.

10       Q.    Which prominent businessmen names did you

11 give the FBI?

12       A.    ███████████, I mean, we're going back over a

13 list that's very hard to continually go over, but ████

14 █████████████████████.  I'm trying to remember, but I'm

15 having a blockage.  I'm sorry.

16       Q.    Did you name ███████████ to the FBI?

17       A.    Yes.

18       Q.    Did you name any academicians specifically

19 that you recall?

20       A.    I named ███████████████.  I mean, anyone

21 that they would have pointed out to me and asked me I

22 would have told them truthfully who I was with and what

23 happened.  I can't remember exactly who they showed me, I

24 can't remember exactly who I told them about, but if they

25 were there I would have told them.

1      Q.      Did the FBI ask you about ███████████ or

2  ██████?

3      A.      I do believe they did ask me about ████

4  ██████, but I cannot remember the exact conversation we

5  had about him.

6      Q.      I understand you were not sexual trafficked

7  to ███████████; is that correct?

8      A.      Correct.

9      Q.      Did Sharon Churcher ask you about ████

10  ████████████████?

11      A.      I believe they did.

12      Q.      How many times did you meet ███████████?

13      A.      Twice.

14      Q.      How many times did you meet ████████?

15      A.      Once.

16      Q.      You're meeting with ███████████ what was

17  the first one?

18      A.      I don't know the exact date.  I know it was

19  towards the end of my period with Jeffrey.  I'm sorry, I

20  can't give you a date.

21      Q.      The end of your period with Jeffrey is

22  September 2002, correct?

23      A.      That was, yeah, when I left.

24      Q.      That's the first time you meet ██████

25  ██████, towards the end of that period?

1    A.    No, it wasn't September.  I'm not saying it

2   was September.  I'm saying it was around that period.  If

3   I was going to place times around something it would be

4   towards the end of that.

5        Q.    Where were you the first time you met 

6   ▮▮▮▮▮▮?

7        A.    On Little Saint Jeff's, which is the

8   island.

9        Q.    Little Saint James?

10       A.    He used to call it Little Saint Jeff's,

11  sorry.

12       Q.    Meeting ▮▮▮▮▮▮▮▮?

13       A.    Generally or specifically about his

14  personality?

15       Q.    Where were you on the island when you met

16  him?

17       A.    We had a dinner together.

18       Q.    Who was at that dinner?

19       A.    Ghislaine, ▮▮▮▮▮▮▮, Jeffrey Epstein,

20  myself and two girls that I do not know who they are.

21       Q.    This is the meeting with ▮▮▮▮▮▮▮

22  that's been described in press articles; is that correct?

23            MS. MCCAWLEY:  Objection.  Go ahead.  You

24            can answer.

25            SPECIAL MASTER:  You can answer.

1    A.    Sorry.  Confusing legal stuff.  Yes, I
2  believe it has been circulated.
3    Q.    You had a second meeting with ███████?
4    A.    Yes.
5    Q.    When was that?
6    A.    I believe very close together, within weeks
7  if not months.
8    Q.    Where was it?
9    A.    Little Saint Jeff's.
10   Q.    What were the circumstances of your second
11 meeting with ███████?
12   A.    Very similar, I mean, there was a dinner,
13 lots of laughing, lots of joking, it was just a dinner
14 and then I didn't have to do anything with ███████,
15 he was never sexually involved with me.  I've never
16 witnessed him sexually involved with anybody else.
17 Jeffrey asked me for a massage after dinner and I went
18 off to Jeffrey's cabana.
19   Q.    Who was at that dinner?
20   A.    Ghislaine, Jeffrey Epstein, myself,
21 ██████, I believe there were -- there were some other
22 guys, they were down by the beach.  I'm not too sure who
23 they were.  I assume they were security of some sort.
24 They weren't there at the dinner.  There were two girls.
25   Q.    So each time you had dinner with ███

1    ███████ there were two girls; is that correct?

2         A.    From my recollection, yes, only two.

3         Q.    And describe the two girls at the first

4    dinner?

5         A.    Young, beautiful like every girl that's

6    generally around Jeffrey.

7         Q.    Are you able to identify them?

8         A.    Possibly if I was shown pictures, but I

9    don't know their names.  You need to understand, when I

10   was with Jeffrey we were specifically told not to make

11   friends, not to talk other than small talk.  But we

12   weren't like, hi, my name is Susan and I'm 15 or 19.  We

13   weren't like that.

14        Q.    Was there any security at this first

15   dinner?

16        A.    Not at the table, but they always stayed

17   around the beach.

18        Q.    Who were the two girls at the second

19   dinner?

20        A.    It sounds funny, but I thought that they

21   were sisters they looked so much alike.  They had -- they

22   were beautiful, they were youngish.  I don't know exactly

23   their age, but they were -- I don't know, it's hard to

24   say, anywhere between 17 and 21, but I don't know their

25   names.

1        Q.    Was it the first dinner that Ghislaine

2  Maxwell flew the helicopter with ██████████ to the

3  island?

4               MS. MCCAWLEY:  Objection.

5               SPECIAL MASTER:  You can answer if you

6        know.

7        A.    I was only told that.  I'm not too sure if

8  she actually did or not.  I never witnessed Ghislaine

9  flying him, but she said she did.

10       Q.    And did you hear ████ say that she was a

11  good pilot?

12       A.    I remember her saying he thought she was a

13  good pilot but I never witnessed it myself.

14       Q.    So it's possible she wasn't flying ████

15  ██████ in a black helicopter, that could be false?

16              MS. MCCAWLEY:  Objection.

17              SPECIAL MASTER:  You can answer.

18       A.    To my knowledge Ghislaine and Jeffrey talk

19  a lot, they say things that are sometimes hard to

20  believe.  Some are actually true, so I don't know.

21       Q.    The second dinner, how did ██████████ get

22  there?

23       A.    Either by boat or by helicopter.  There's

24  only two ways to the island.

25       Q.    So you don't know?

CONFIDENTIAL

1        A.    No.

2        Q.    Tell me the circumstances of meeting ▮

3 ▮?

4        A.    It's a little hazy at where that took

5 place.  I mean, we are going back a long time ago, but I

6 do remember one thing about him, I thought he was a

7 wonderful guy who loved his wife and they spent the

8 entire time like there was nothing else around them, it

9 was just those two.  It was a dinner table, a long dinner

10 table with people around, but they were just lovely, just

11 watching them as a couple.

12        I remember thinking, you know, he's

13 somebody that I would definitely vote for.  He's just

14 somebody that loves his wife that much.

15        Q.    What was the purpose of this dinner?

16        A.    As usual I'm not told these kind of things.

17 I'm just kind of there to sit down and look pretty and

18 keep my mouth shut.

19        Q.    Who else was there?

20        A.    I'm not too sure.

21        Q.    This was on the island, right?

22        A.    It could have been the island, but I could

23 be mistaken if it was the island.  It could have been New

24 York.  I'm not going to commit myself to saying it was

25 definitely the island.  My memory is still hazy when it

1   comes to locations or places.  We were traveling

2   everywhere a lot.

3          Q.     And I understand that at some point you

4   were using Xanax, correct?

5          A.     Correct.

6          Q.     At some point you were up to eight Xanax a

7   day, correct?

8                 MS. MCCAWLEY:  Objection.

9                 SPECIAL MASTER:  You can answer.

10         A.     I was suffering a lot mentally coping with

11  what was happening and when I took Xanax it helped me

12  forget a lot of things that I didn't want to think about

13  for that day and it did help.

14         Q.     At some point you were using eight Xanax a

15  day as part of your --

16         A.     To start with I was only taking one or two,

17  but yes, it did get up to eight in the end.

18         Q.     Did it affect your ability to recall

19  certain events?

20         A.     I would say any drug is going to do that to

21  you.  So, yes, you know, but I can tell you a thousand

22  percent that just because I might not remember a location

23  or a time doesn't mean I don't know a thousand percent

24  the people that I was with or the people that abused me.

25         Q.     You told the FBI that it affected your

1  ability to recall certain events, correct?

2         A.    Yes.

3               MS. MCCAWLEY:  Objection.  Give me a chance

4         to object.

5  BY MS. BORJA:

6         Q.    Do you know approximately when you were up

7  to eight Xanax a day?

8         A.    Towards the end.

9         Q.    What does that mean to you?

10        A.    Probably from 19 onwards or no, sorry, 18

11 onwards.

12        Q.    Were you using any other medications or

13 drugs in order to address your pain and suffering?

14        A.    I did smoke marijuana and sometimes at

15 parties I would use Ecstasy.

16        Q.    Anything else?

17        A.    No.

18        Q.    How often were you smoking marijuana?

19        A.    Considering I was with Jeffrey most of the

20 time, not then, but whenever I went back to Palm Beach to

21 see my boyfriend.  Maybe once a week out of a month.

22        Q.    How often were you using Ecstasy?

23        A.    At parties.  I don't know.  I mean, it

24 wasn't a regular basis, it was because if I was at a

25 party with a whole bunch of kids.  If it was there, I

1    would take it.

2        Q.    Did you use it during times what you were

3    being sexual trafficked?

4        A.    No.

5        Q.    How often were these parties when you were

6    taking it?

7        A.    How often were the parties?  It varies, it

8    could be -- like are we talking about yearly basis,

9    because it wasn't every month.

10       Q.    Okay.  During the time frame 1999 to 2002?

11       A.    Probably about fifteen parties.  That's a

12   rough estimate.  No way is that a certain number.

13       Q.    Other than the marijuana, the Ecstasy, and

14   the Xanax were there any other medications, or alcohol

15   that you were using?

16       A.    Oh, alcohol, yes.  I was drinking alcohol

17   at the parties.

18       Q.    Did you drink alcohol outside of parties?

19       A.    Sometimes.

20       Q.    At the dinners?

21       A.    Sometimes.

22       Q.    Anything else?

23       A.    No.

24       Q.    Did you -- you mentioned that you were

25   about one week in your apartment with ███████.  Was

1  that a consist arrangement through the period?

2        A.    No, no, I'm just roughly saying that, you

3  know, if I was home with ███, at my apartment with ███

4  and it was for a week, that would be how long I smoked

5  marijuana for.  I wasn't saying specifically I was there

6  for a week.  It could have been three days, it could have

7  been five days, it could have been seven days, I'm not

8  too sure.

9        Q.    Between 1999 and 2002 how many places did

10  you live?

11        A.    Like my own or like Jeffrey's residences?

12        Q.    Putting aside when you were staying at a

13  home, one of the mansions that Mr. Epstein owned, how

14  many places did you live?

15        A.    Just one.

16        Q.    That was an apartment building?

17        A.    Actually, let me correct that.  At first I

18  lived at my parents house and then I got an apartment.

19        Q.    You lived at that apartment the entire

20  period between 1999 and 2002?

21        MS. MCCAWLEY:  Objection.  Go ahead.

22        A.    Besides my parent's house, yes, that's the

23  only place I lived.

24        Q.    During what period did ██████████ live

25  with you?

1   A.  On and off, but from, I don't know when our

2 relationship actually started. I think I was with

3 Jeffrey before. Yes, I was with Jeffrey already.

4   Q.  So on and off between 1999 and 2002?

5   A.  Yes.

6   Q.  Is ███████████ a truthful person?

7   A.  I believe so.

8   Q.  Why did you say -- what's the basis for

9 your statement earlier that you didn't think ███████

10 understood what you were telling him about Professor

11 Dershowitz?

12      MS. MCCAWLEY: Objection.

13      SPECIAL MASTER: You can answer.

14   A.  He was my boyfriend and I didn't really get

15 into too much details with him.

16   Q.  But you specifically named Professor

17 Dershowitz as one of your abusers?

18   A.  Yes.

19   Q.  Did you name other abusers to ██████████?

20   A.  Yes.

21   Q.  Who did you tell him was sexually abusing

22 you?

23      MS. MCCAWLEY: Objection. Mischaracterized

24    the testimony.

25      SPECIAL MASTER: You can answer if you can.

1    A.    The same people that I've named to you.  He
2  wouldn't have understood some of the names, he wouldn't
3  have known who they were, but anyone prominent such
4  as ███████████, he would have recognized that.  But
5  generally I would call him every day when I was with
6  Jeffrey and tell him what happened.

7    Q.    You would say the names of the people you
8  had sex with?

9    A.    Sometimes, I mean, you know, sometimes I
10  would just say I've had a really hard day, that is what
11  I've had to do and we wouldn't get into names.  Sometimes
12  I would.

13    Q.    Tell me about the first time you met
14  Professor Dershowitz?

15    A.    Are we talking sexually or just introduced.

16    Q.    The very first time you ever met Professor
17  Dershowitz?

18    A.    I believe it was in New York in Jeffrey's
19  office.

20    Q.    What were the circumstances of you being
21  there?

22    A.    To please Jeffrey.

23    Q.    What were the circumstances of Professor
24  Dershowitz being there?

25    A.    No idea, I never asked about the business.

1   Q.   Who else was there?

2   A.   House staff, Ghislaine, ███.

3   Q.   In this office with yourself Professor

4   Dershowitz and Jeffrey Epstein?

5   A.   I don't know exactly who was in there.  I'm

6   just saying who was at the house.  I'm not too sure who

7   was in the office.  I remember being introduced to him in

8   Jeffrey's office, and no, I cannot recall anyone else

9   being there.

10   Q.   What office is there?

11   A.   In his mansion in New York.

12   Q.   Can you tell me where that office is?

13   A.   Up a flight of stairs to your left.

14   Q.   How long was this meeting?

15   A.   Short, brief.  I was already in there with

16   Jeffrey when Dershowitz walked in and I was introduced.

17   Q.   How long was this meeting?

18        MS. MCCAWLEY:  Objection, asked and

19        answered.

20        SPECIAL MASTER:  You can answer if you can.

21   A.   Ten, fifteen minutes.

22   Q.   When was the next time that you met

23   Professor Dershowitz?

24   A.   This is very hard for me to remember.  Like

25   I said, he was around a lot so I've seen him in Palm

1  Beach, I've seen him in New York.  So I mean, if we're

2  going to pin point how many times I've seen him or the

3  next time I saw him after that I don't know.

4         Q.    Then tell me -- let's do it this way, what

5  was the most recent time that you recall having sex with

6  Professor Dershowitz?

7               MS. MCCAWLEY:  Objection.

8               SPECIAL MASTER:  You can answer.

9         A.    The first time I recall having sex with

10  Professor Dershowitz was in New York.

11         Q.    My question was, the most recent time now.

12  What's the most current, most recent memory of having sex

13  with Professor Dershowitz?

14               MS. MCCAWLEY:  Objection.  Just so I'm

15         clear, you're going backward?

16               MS. BORJA:  Correct.

17               MS. MCCAWLEY:  The last time.

18         A.    The last time that I remember having sex

19  with him?  Okay.  I believe it was on an airplane.

20         Q.    Where were you going?

21         A.    On, I believe it was Massachusetts.  I

22  don't know.  It's very hard for me to remember exactly

23  where we were going, what were the circumstances.

24         Q.    So that's the time you testified about

25  earlier?

1    A.    Yes, ma'am.

2    Q.    What was the time prior to that?

3    A.    You know chronologically it's impossible

4  for me to place these in order.  I can tell you about

5  events, but if we're going to say chronologically,

6  correct, it would be impossible.

7    Q.    Well, you say there was six times, right,

8  you were very specific about that?

9         MS. MCCAWLEY:  Objection.

10        SPECIAL MASTER:  Let her get her question

11        out.  Go ahead.

12 BY MS. BORJA:

13   Q.    You're very specific about that, right?

14        MS. MCCAWLEY:  Objection.

15        SPECIAL MASTER:  You can answer.

16   A.    I am specific about the fact that I know I

17 have been with Alan Dershowitz at least six times, if not

18 more.

19   Q.    So let's talk about what you know about

20 those six times.  Let's start with, you can pick any one

21 other than the flight that we've talked about?

22   A.    Okay.  New York.

23   Q.    Okay.  Let's start with New York?

24   A.    I was upstairs in Jeffrey's room with

25 Jeffrey.

1    Q.    When you say Jeffrey's room, do you mean

2  his bedroom?

3    A.    Yes.

4    Q.    Okay.

5    A.    There's a shower in the middle of that room

6  and I had just finished having a shower with Jeffrey.

7  Jeffrey got out of the shower, got dressed and left the

8  room.  He was wearing sweat pants if I recall and while

9  I'm undressed and drying myself off and drying my hair

10  Dershowitz entered the room and there was some red velvet

11  chair that I remember -- I don't know, is there a certain

12  language you want me to use to describe these events?

13    Q.    No.

14        MS. MCCAWLEY:  Just use whatever you're

15        comfortable with, that's fine.

16    A.    We had sexual intercourse on the chair

17  while I was bent over.

18    Q.    How long did that last?

19    A.    Less than ten minutes.

20    Q.    Did you speak to the Professor?

21    A.    Just formalities, but at this time Jeffrey

22  had before trained me to do what he wanted me to do.

23    Q.    When you say just formalities, what do you

24  mean?

25    A.    Hi, nice to see you again, how are you?  I

1  mean, that could have not been exactly what was said, but

2  those are generalities of what was said.

3          Q.    Who else was in the house at this time?

4          A.    Epstein for a fact.  I'm not too sure about

5  Ghislaine and ████, they could have been.  Definitely

6  house staff.

7          Q.    Who?

8          A.    ████████  and ██████████████████████

9  ████, I'm not too sure.

10         Q.    How often were you sexual trafficked in

11 Jeffrey Epstein's private bedroom?

12               MS. MCCAWLEY:  Objection.  Which bedroom

13               are you talking about?

14 BY MS. BORJA:

15         Q.    The same bedroom in New York that you were

16 talking about?

17         A.    That's actually the only time besides with

18 Jeffrey.  I mean, Jeffrey countless, but there was no

19 other men brought to Jeffrey's room.

20         Q.    Who brought Professor Dershowitz to this

21 room?

22         A.    I have no idea, I'm assuming Epstein.

23         Q.    Help me figure this out.  Epstein had just

24 left the room?

25         A.    Epstein exits the room, Dershowitz walks

1   in.

2       Q.      Same door?

3       A.      Same door.

4       Q.      How long before Jeffrey exiting and

5   Professor Dershowitz walking in?

6       A.      Minutes, not even, approximately

7   60 seconds.

8       Q.      Ten minutes later once the sex encounter

9   ends, what happens next?

10      A.      He pulled up his pants and I put my towel

11  back on.  I went upstairs to my room -- my room was

12  downstairs, had another shower, I got dressed.  I don't

13  remember the rest of the day from there.

14      Q.      Did you see Professor Dershowitz in the

15  house again that day?

16      A.      On that day?

17      Q.      Right.

18      A.      Possibly, I mean, I don't remember.  I just

19  remember that event very clearly.

20      Q.      So it was unusual that somebody other than

21  Jeffrey to whom you would be sexual trafficked would walk

22  into Jeffrey's bedroom, is that fair?

23      A.      Yes.

24      Q.      Did you ask anybody how that came to be?

25      A.      No, it was expected of me.

1      Q.      Did you talk to Jeffrey about it?

2      A.      Yes.

3      Q.      What did you tell Jeffrey?

4      A.      Jeffrey asked me if he enjoyed it, I said

5  yes.

6      Q.      So the act was consummated?

7              MS. MCCAWLEY:  Objection.

8      A.      What does consummated mean?

9              MS. MCCAWLEY:  If you don't know you don't

10             answer.

11             SPECIAL MASTER:  Rephrase that.

12  BY MS. BORJA:

13     Q.      What do you mean by your testimony that

14  Professor Dershowitz enjoyed it?

15             MS. MCCAWLEY:  Objection.  Mischaracterizes

16             the testimony.

17             SPECIAL MASTER:  You can answer if you can.

18     A.      I don't even understand.  What do you mean,

19  did he enjoy it?

20             MS. MCCAWLEY:  Take a deep breath.  She can

21             re-ask the question.

22     A.      He enjoyed it, yes.  From what it looked

23  like, my God, yes, he enjoyed it.

24     Q.      Why do you say that?

25             MS. MCCAWLEY:  Take a deep breath.

1        A.      He ejaculated.  He was happy.

2        Q.      Tell me about the next incident that you

3    can recall of the sex?

4                MS. MCCAWLEY:  Do you want to take a break?

5                THE WITNESS:  Yes, absolutely.

6                SPECIAL MASTER:  Let's take a break, five

7            minutes.

8                THE VIDEOGRAPHER:  Going off video record,

9            11:11 a.m.

10                (A recess was taken.)

11                THE VIDEOGRAPHER:  We are now back on video

12            record 11:31 a.m., disk number 2.

13    BY MS. BORJA:

14        Q.      Is there anything else that you can recall

15    that would help you to place the time frame of this

16    sexual encounter of Professor Dershowitz in New York?

17        A.      No, not that I can remember.

18        Q.      Do you recall whether it was before or

19    after the first time you met ████████████?

20        A.      Before.

21        Q.      About how long before do you think?

22        A.      I don't know.  It was fairly early on in my

23    relationship with Jeffrey that I first met him, but it

24    was after my training so I'm not too sure.

25        Q.      And your training was about nine months, is

1 that fair?

2            MS. MCCAWLEY:  Objection.

3            SPECIAL MASTER:  You can answer.

4      A.    No, my training wasn't about nine months.

5            MR. SIMPSON:  Can you ask her to speak up

6      just a little bit?  I'm having a hard time

7      hearing.

8            MS. MCCAWLEY:  Okay.  We'll do our best,

9      but she got sick during the break.  Let's just be

10     happy that we're here and we're getting this.

11           SPECIAL MASTER:  Let's move on.  Let's move

12     on, please.

13           (Thereupon, VR Defendant's Exhibit No. 4,

14     was Marked for Identification.)

15 BY MS. BORJA:

16     Q.    Ms. Roberts, I've handed you a document

17 that's been marked as VR 4 which is dated April 7th, 2011

18 and it reflects on the top, participant Jack Scarola,

19 Brad Edwards, Virginia Roberts, and the document has a

20 bates number non-party VR 178 through 200.  Do you have

21 that?

22     A.    Yes, I do.

23     Q.    Have you seen this document before?

24     A.    Yes, I have.

25     Q.    Did you see a draft of this document before

1    this version?

2         A.    I'm sorry, I don't understand what you

3    mean.

4         Q.    Have you seen more than one version of this

5    transcript of the telephone conference?

6         A.    Not that I'm aware of.

7         Q.    Do you recall receiving a draft and making

8    any edits to it?

9         A.    Not that I'm aware of.  There's a lot of

10   documents that I've gone through so it's a possibility.

11        Q.    You say you've seen it before, correct?

12        A.    Yes.

13        Q.    When did you first see it?

14        A.    I don't know the first time I saw it.  I

15   remember seeing it recently, but I don't remember the

16   first time I saw it.

17        Q.    Did you see it shortly after your telephone

18   conversation with Jack Scarola and Brad Edwards?

19             MS. MCCAWLEY:  Objection.  Can we have a

20             time frame on this document, please?

21             SPECIAL MASTER:  Could you please recite a

22             time frame?

23   BY MS. BORJA:

24        Q.    You had a telephone conversation with Jack

25   Scarola and Brad Edwards in April 2011, do you recall

1  that?

2          A.      I recall the telephone conversation, yes.

3          Q.      And after you had that telephone

4  conversation did you see a transcript of the

5  conversation?

6          A.      I don't know.  I don't remember.

7          Q.      Have you actually read this document?

8          A.      Yes, I have.

9          Q.      Is the document accurate to the best of

10  your knowledge?

11          A.      Yes, I mean, there's a couple small things

12  like my middle name is not Louise, I wasn't living in

13  Australia for 19 years, but for the most part everything

14  else is pretty correct.

15          Q.      If you turn to page 10 of 23?

16          MS. MCCAWLEY:  They're numbered at the top,

17          at the very top in the corner.  You see there?

18          A.      Yes.

19          Q.      Do you have that page?

20          A.      Yes, I do.

21          Q.      About halfway down the page Mr. Scarola

22  asked you, okay, and how long after you first met Jeffrey

23  did he first ask you to provide services for one of his

24  friends?  You answered, about nine months I think it was.

25  It wasn't a full year, it wasn't six months, it was

1  between six months and a year which is why I'm saying

2  nine months.  Do you see where I am reading?

3          A.    Yes, I do.

4          Q.    Is that truthful and accurate?

5                MS. MCCAWLEY:  Objection.

6                SPECIAL MASTER:  You can answer.

7          A.    It's as close to what I can remember, but I

8  hadn't given it much thought at that time, but it's

9  close.

10          Q.    Well, within 60 days of this telephone call

11  you had met with Ms. Churcher, right?

12                MS. MCCAWLEY:  Objection.

13                SPECIAL MASTER:  You can answer.

14          A.    Within 60 days?  We are talking about

15  before the telephone call or after the telephone call?

16          Q.    You met with Ms. Churcher before the

17  publication of the Daily Mail article in March 2011,

18  right?

19          A.    Right.

20                MS. MCCAWLEY:  Objection.

21  BY MS. BORJA:

22          Q.    And you met with her for about a week,

23  right?

24                MS. MCCAWLEY:  Objection.  I have an

25                objection to all line of questioning relating to

1      the media.

2              SPECIAL MASTER:  I understand.  Proceed.

3      You can answer.

4      A.    Yes, and that was her, must have been March

5  if that's the date she called.

6      Q.    And during the week that you met with Ms.

7  Churcher she showed you photos of people, correct?

8      A.    Yes.

9      Q.    And you thought about whether they were

10  abusers, correct?

11             MS. MCCAWLEY:  Objection.

12  BY MS. BORJA:

13     Q.    And she talked to you --

14             MS. MCCAWLEY:  Sorry, let me have my

15             objection.  If you can pause for a moment.  Go

16             ahead.

17             SPECIAL MASTER:  You can answer.  You did

18             answer.  Move forward.

19  BY MS. BORJA:

20     Q.    And she talked to you about your time with

21  Jeffrey Epstein and being sexually trafficked; is that

22  correct?

23             MS. MCCAWLEY:  Objection.

24             SPECIAL MASTER:  You can answer.

25     A.    Yes.

1      Q.    And then an article came out about it,

2  right?

3          MS. MCCAWLEY:  Objection.

4      A.    Yes.

5      Q.    And people called you about that article,

6  correct?

7          MS. MCCAWLEY:  Objection.

8      A.    Yes.

9      Q.    And so you had a meeting for a week, you

10  looked at pictures, you talked to Ms. Churcher, an

11  article came out, you talked to people, and this is

12  happening right around February, March 2011, correct?

13         MS. MCCAWLEY:  Objection.

14         SPECIAL MASTER:  You can answer.

15      A.    Yes.

16      Q.    And now April 7th you have a telephone call

17  with Mr. Scarola and Mr. Edwards, correct?

18      A.    Yes.

19      Q.    So you had had time with Ms. Churcher, with

20  your friend calling, with the article to think about

21  these activities, correct?

22      A.    Yes.

23         MS. MCCAWLEY:  Objection.

24  BY MS. BORJA:

25      Q.    And your best recollection in April of 2011

1  was that about nine months, it wasn't a full year, it

2  wasn't six months, but between six months and a year,

3  which is why I'm saying nine months.  That it was your

4  best recollection as to the time frame at that point

5  after you first met Jeffrey when he asked you to provide

6  services for one of his friends.  Is that fair?

7              MS. MCCAWLEY:  Objection.

8       A.    As you can see in that answer I'm not even

9  sure.  It wasn't six months, but between six months and a

10  year which is why I'm saying nine months.  It was an

11  assumption.

12       Q.    Was it your recollection at the time?

13              MS. MCCAWLEY:  Objection.

14       A.    It was my best assumption.  It could have

15  been three months for all I know, it could have been six

16  months for all I know, but it's an assumption.

17       Q.    It could have been a year for all you know,

18  then, right?

19              MS. MCCAWLEY:  Objection.

20       A.    No.

21       Q.    Why is three months fair and twelve months

22  not fair?

23       A.    Because it wasn't that long.

24       Q.    But has your memory improved since 2011?

25              MS. MCCAWLEY:  Objection, argumentative.

1          Go ahead.

2          A.     Going through everything that I have gone

3     through over and over and over again, yes, it has.

4          Q.     So is your memory improving over time about

5     the events?

6          A.     It's not improving.

7                 MS. MCCAWLEY:  Objection, sorry, let me

8          just -- objection, argumentative.

9                 SPECIAL MASTER:  You can answer.

10         A.     It's not that it's improving over time, but

11    the more that I talk about it, the more I am able to

12    remember stuff.

13         Q.     Are there things that you remember now that

14    you didn't tell Ms. Churcher in your interview?

15         A.     Definitely a possibility.

16         Q.     You don't know one way or the other?

17         A.     She didn't ask me everything and I didn't

18    tell her everything.

19         Q.     Why did she call you, do you know?

20         A.     I think I've answered this previously,

21    haven't I?

22                SPECIAL MASTER:  You can answer it again.

23                MS. MCCAWLEY:  You can answer it to the

24         extent you can recall.

25         A.     She called me because she was interested in

1   the Jeffrey Epstein saga, so to speak.

2       Q.      Did Ms. Churcher tell you she had talked to

3   anybody else before she talked to you?

4       A.      Like in order to get my number or?

5       Q.      No, about the same subject matter that she

6   was asking you about?

7       A.      I'm not aware of her conversations with

8   other people.

9       Q.      I'm asking you what she told you.  Did she

10  tell you she had talked to other people?

11              MS. MCCAWLEY:  Objection, asked and

12              answered.

13      A.      I'm thinking.  I can't recall a specific

14  person that she said, but I'm sure she did talk to other

15  people about this.  I know she talked to the Daily Mail

16  to see if we could run the story.

17      Q.      After you gave the telephone interview to

18  Mr. Scarola did you call him and say anything that you

19  told him was wrong, incorrect I should say, from your

20  telephone conversation?

21      A.      No, not that I can remember, no.

22              (Thereupon, VR Defendant's Exhibit No. 5

23              was Marked for Identification.)

24              MS. MCCAWLEY:  I'm going to object to this.

25              This has pictures of Virginia's children on this

1    and we have safety concerns here.  We're not going

2    to be putting this in the record, and I think any

3    line of questioning regarding her kids or

4    identification with respect to them is absolutely

5    inappropriate.  She's a non-party witness, she's a

6    sexual abuse victim, and injecting her children

7    into this is inappropriate.

8           MS. BORJA:  I'm still going to mark this as

9    an exhibit.  This is under seal and if you want to

10   take other steps after this that's up to you.

11          THE WITNESS:  What do my children --

12          MS. MCCAWLEY:  Hang on, take a deep breath.

13   It's okay.  We'll handle it.

14          SPECIAL MASTER:  So explain to me why?

15          MS. BORJA:  I asked haven't any questions

16   yet.

17          SPECIAL MASTER:  Well, explain to me about

18   the exhibit.  You can mark it, but we're going to

19   keep it.  I'm going to tell you what, other than

20   after the lawyers see that, let's put the copies

21   here and we're going to hold those separately and

22   apart from the rest of the exhibits because I tend

23   to agree with Ms. McCawley's concern on this.  So

24   proceed with the question on that grounds.

25 BY MS. BORJA:

1        Q.      Ms. Giuffre, the document that's been

2   marked as VR Exhibit 5 is a compellation exhibit with two

3   pages from a Facebook profile.  Do you have that?

4        A.      Yes, I do.

5        Q.      Is this a Facebook profile that you

6   created?

7        A.      Yes, it is.

8        Q.      Did you input pictures into it?

9        A.      I sure did.

10        Q.      Is page 1 an accurate depiction of your

11   Facebook profile?

12        A.      Yes.

13        Q.      And the second page of this exhibit, it

14   says Virginia Giuffre, November 11, 2013.  Do you see

15   that?

16        A.      Where am I looking at?

17        Q.      At the top under the name Virginia Giuffre,

18   it says November 11, 2013.  Do you see that?

19        A.      Yes, I see that.

20        Q.      And is this an entry that you made into

21   your Facebook account?

22        A.      Yes.

23        Q.      You posted the picture?

24        A.      Yes.

25        Q.      Do you know below the first entry under the

1  photos says high buddies, we'd love to hear from our pen

2  pals across the sea.  Our new address is, and it states

3  an address there and goes on.  Do you see where I'm

4  reading?

5          A.    Yes.

6          Q.    Did you make that entry into your Facebook

7  profile?

8          A.    Yes.

9          Q.    And is this a true and accurate depiction

10 of that entry that you made?

11         A.    Yes.

12               SPECIAL MASTER:  Is that it?

13               MS. MCCAWLEY:  I'm going to ask to the

14         extent that the exhibit gets used at all that

15         every picture of her children is redacted.  If you

16         want to leave the date, that's fine.

17               THE WITNESS:  Can I also ask why --

18               SPECIAL MASTER:  Hold on one second.

19               MS. MCCAWLEY:  It's okay.

20               SPECIAL MASTER:  Do you have an objection

21         to the redaction of the children?

22               MS. BORJA:  I do in this regard, and I

23         would like to make my objection on the record

24         without the witness present.

25               SPECIAL MASTER:  Without the witness

1      present?

2              MS. BORJA:  Correct.

3              SPECIAL MASTER:  All right.  Let's hold

4       that because I don't want to lose this.  We'll go

5       back to that on the next break.  When the witness

6       takes a break we'll go ahead and put that on the

7       record, but in the meantime let's go ahead and put

8       the exhibit -- you hold yours and we'll hold the

9       rest of them there.

10             MS. BORJA:  There's several copies here.

11             SPECIAL MASTER:  Put them there.  Ms.

12      McCawley, as a officer of the Court will you take

13      those exhibits and then on a break put them in an

14      envelope and mark them and I'll seal them right

15      away so this way you can take provisions on that.

16             MS. MCCAWLEY:  Okay.

17             SPECIAL MASTER:  Thank you.  And then we

18      can go ahead at the next break you can make your

19      objection at that point.  Go ahead, proceed.

20  BY MS. BORJA:

21      Q.    Ms. Roberts, we've been talking about when

22  you claimed you were sexually trafficked to Professor

23  Dershowitz and you talk about three of the incidents that

24  are reflected in the joinder motion.  Let's go through

25  the other three.  Pick any of them?

```
 1          A.     Which ones have I told you about so far?

 2          Q.     You had mentioned on a plane, New York, and

 3  New Mexico?

 4          A.     Okay.  Let's to go Palm Beach.

 5          Q.     When was this?

 6          A.     I don't have a significant date for you.

 7          Q.     Was it before or after you met ████████

 8  ██████?

 9          A.     Before.

10          Q.     How do you know that?

11          A.     Because I hadn't met ████████████ at that

12  time.

13          Q.     What do you recall about -- that helps you

14  place the time of this meeting in Palm Beach?

15          A.     It's Florida, it's sunny, it's always hot.

16  I have no idea.

17          Q.     Do you have any idea when it was?

18          A.     No idea.

19          Q.     How do you know it's before you met ████████

20  ██████

21          A.     I hadn't met ████████████ by then.  I

22  don't know how else you want me to answer that.

23          Q.     Well, if you have no idea when it is?

24          A.     I'm telling you.

25                 MS. MCCAWLEY:  Objection, argumentative.
```

1          SPECIAL MASTER:  Let her get a question

2          out.  Let her get a question out then you can

3          object.

4    BY MS. BORJA:

5          Q.    What markers are you using to identify for

6    yourself it was before -- let's say you met ███████

7    in March 2001 how are you able to know that this event in

8    Palm Beach was before March 2, 2011?

9          MS. MCCAWLEY:  Objection, assumes facts not

10         in evidence.  You can answer.

11         SPECIAL MASTER:  You can answer.

12         A.    I recall meeting ████████ and it was a

13   very significant event and I can tell you it was before I

14   met ███████.

15         Q.    How many times after you met ████████

16   were you sexually trafficked to Professor Dershowitz?

17         A.    I don't know.

18         Q.    Were there any?

19         A.    I cannot chronologically give you the

20   answer to that, I'm sorry.  There is no way for me to do

21   that.  You know, could there have been times after █████

22   █████ that I was with Dershowitz absolutely, but do I

23   know for a fact no, I don't.

24         Q.    Is that true for all six?

25         A.    Yes, that's true for all six, I don't know.

```
1          Q.     Who else was there in Palm Beach?
2          A.     Same people, Jeffrey, Ghislaine, Juan
3    Alessi, he's the butler.  I'm trying to remember if █████
4    ████████ was there.  I'm pretty sure she would have been.
5    She was always with Ghislaine.  No one else significant
6    that I can remember.
7          Q.     So that's four instances.  What are the
8    other two?
9          A.     So I've given you Palm Beach, New Mexico,
10   there's the U.S. Virgin Islands, Little Saint Jeff's.
11         Q.     Who else was there?
12         A.     Jeffrey Epstein, Ghislaine Maxwell, I
13   possibly want to say ████████████████████████████████
14   ██████████████████, I think that's it.  I mean there's a
15   possibility that there could have been another girl
16   there, but I can't remember.
17         Q.     Who is ████████
18         A.     He's like a ████████████████.
19         Q.     What's your best recollection as to the
20   time of year this was?
21         A.     Well, like Florida the Caribbean is very
22   hot all year round so it's hard to depict what time of
23   year it was.
24         Q.     I understand it's hard.  What's your best
25   recollection as you sit here today under oath?
```

1       A.     That's what I'm trying to tell you is I

2 don't know. I don't know because it doesn't get cold in

3 the USVI so there's no way to really tell you it was

4 winter or fall or spring or summer because it's always

5 hot.

6       Q.     Where did you go next after that trip?

7       A.     I don't know.

8       Q.     How long was Professor Dershowitz down

9 there?

10       A.     I think he was there from, just from any

11 recollection two days.

12       Q.     Where did he stay?

13       A.     In one of the villas. He would have had

14 to.

15       Q.     Where did you stay?

16       A.     In another one of the separate rooms.

17       Q.     When you were in Palm Beach, the time that

18 you mentioned previously, how long was Professor

19 Dershowitz there?

20       A.     I don't know. I had my own apartment in

21 Palm Beach. I was called in for him.

22       Q.     How do you know you were called in for him?

23       MS. MCCAWLEY: Objection.

24       SPECIAL MASTER: You can answer.

25       A.     I normally got phone calls when I was in

CONFIDENTIAL

1  Palm Beach when I was at my apartment to come in to give

2  someone a massage.

3         Q.    Did any guests get massages that were not

4  sexual in nature?

5         A.    Not that I was aware of.  All the massages

6  I gave were of a sexual nature except for ████████,

7  sorry.  I'm sorry, ██████, sorry.

8         Q.    Did you ever see any male masseuses?

9         A.    Once when I was at the island.  He was

10 there helping me train.

11        Q.    Were that massages and that masseuse sexual

12 in nature?

13        A.    No, but it was a training.  Not that kind

14 of training, actual massage training.

15        Q.    Were there ever any masseuses over the age

16 of 25?

17        A.    Yes, I think her name is ██████.

18        Q.    Were there ever any over the age of 30?

19        A.    The male one that we just talked about is

20 over 30.

21        Q.    Can you recall any others?

22        A.    No.

23        Q.    Do you know one way or the other whether

24 there were any other masseuses over the age of 30?

25        A.    Do I know of any other masseuses over the

1   age of 30?

2       Q.    That were providing massages to Jeffrey

3   Epstein?

4       A.    Just the male that was teaching me on the

5   USVI and ████████, but she was also involved in sexual

6   acts.  She wasn't over the age of -- she could have been

7   around 30, but she would have been over 30.

8       Q.    Did you keep a list of the masseuses who

9   came to Epstein's properties?

10      A.    No.

11      Q.    Did some of them come only once?

12      A.    Uh-huh.

13      Q.    Are there some that came when you weren't

14  there?

15      A.    I wasn't there, how am I to know.

16      Q.    You don't know if any came as a masseuse

17  while you were not at Jeffrey Epstein's property?

18            MS. MCCAWLEY:  Objection, asked and

19            answered.

20      A.    I wasn't there so I couldn't have.

21      Q.    What's the sixth incident that you say

22  happened where you were sexually trafficked to Professor

23  Dershowitz?

24      A.    We've talked about New York, we talked

25  about Palm Beach, New Mexico, U.S. Virgin Islands, talked

1  about we took the airplane?

2          Q.      Yes.

3          A.      There was an instance in a car, but it was

4  more -- it wasn't intercourse, it was more --

5                  MS. MCCAWLEY:  Use a term you're

6          comfortable with.

7          A.      More oral is the good term to use, oral

8  sex.

9          Q.      Where were you?  Where was his car, what

10 city, what state, what jurisdiction?  Where were you?

11         A.      This was in Massachusetts.  It was a black

12 limousine.

13         Q.      Who else was in the car other than yourself

14 and Professor Dershowitz?

15         A.      Jeffrey Epstein and another young girl.

16         Q.      How many people participated in the sexual

17 activity in the car?

18         A.      Including myself?

19         Q.      Uh-huh.

20         A.      Four.

21         Q.      Where was everybody in the car?

22         A.      Sitting down.

23         Q.      Were people -- was this a town car, was

24 this a limousine?

25         A.      Like a long limousine.

1      Q.     Where was the car going?

2      A.     To Mr. Dershowitz' house.

3      Q.     Where was it coming from?

4      A.     An airport.

5      Q.     When was this?

6      A.     I don't know.

7      Q.     What's your best recollection?

8      A.     It wasn't snowing.  It wasn't hot.  So I

9 would like to say -- I'm trying to think of the trees

10 around, but I don't know, maybe spring.

11      Q.     Why were you going to Professor Dershowitz'

12 house?

13      A.     Jeffrey and him were doing some business.

14 They were doing something at his house.  Nothing sexual

15 happened at his house.

16      Q.     Did you go in Professor Dershowitz' house?

17      A.     Yes, I did.

18      Q.     How long were you there?

19      A.     Not even twenty minutes, half an hour.

20      Q.     What did you do while you were in the

21 house?

22      A.     I sat in, I don't know, a foyer with

23 another girl and Jeffrey and Dershowitz went to a

24 different part of the house.  There was a desk there and

25 we just sat, not sat, stood in the foyer.

1          Q.     Who was this other girl?

2          A.     I don't know who she is.

3          Q.     Had you ever met her before?

4          A.     No.

5          Q.     When you were coming from the airport had

6 you flown in?

7          A.     Yes, me and Jeffrey and the girl had flown

8 in, Dershowitz had not.

9          Q.     How did he get into the limousine?

10         MS. MCCAWLEY:  Objection.

11         SPECIAL MASTER:  You can answer.

12 BY MS. BORJA:

13         Q.     Where did he get into the limousine?

14         A.     At the airport.

15         Q.     He was not on a flight with Mr. Epstein?

16         A.     Not on this occasion.

17         Q.     Did you tell anybody about this incident in

18 the car?

19         A.     Like anybody that I know personally?

20         Q.     Anybody in the world?

21         MS. MCCAWLEY:  Objection to the extent you

22         relayed something to your lawyer.  You can say

23         that you told your lawyers but you can't discuss

24         what you said.

25         SPECIAL MASTER:  Other than --

1      A.      No, I told my lawyers.

2      Q.      Did you tell anybody about it closer in

3  time to the event?

4      A.      Like my boyfriend or something like that,

5  no.

6      Q.      After you left Professor Dershowitz's house

7  where did you go?

8      A.      Back to the airport.

9      Q.      Where did you fly in from?

10     A.      I believe it was New York.

11     Q.      When you went back to the airport where did

12 you go?

13     A.      I believe, see, that's the hard thing.  I

14 want to say either New York or Palm Beach.  I'm no 100

15 percent sure.

16     Q.      So I understand the time frame, did you fly

17 in on a private jet or commercial?

18     A.      Private.

19     Q.      You flew out again on private?

20     A.      Yes.

21     Q.      So the time frame is that you and Jeffrey

22 were on the plane?

23             MS. MCCAWLEY:  Objection.

24     A.      Yes.

25             MS. MCCAWLEY:  Objection, mischaracterizes

1           the testimony.  Go ahead.

2           A.      Yes, me and Jeffrey were on the plane

3    together.

4           Q.      And the girl was on the plane?

5           A.      Yes.

6           Q.      Anybody else?

7           A.      The pilots.

8           Q.      So the three of you took the flight,

9    correct?

10          A.      Yes.

11          Q.      And you flew into an airport in

12   Massachusetts?

13          A.      Yes.

14          Q.      Then you took a limousine to the

15   Professor's house and you were there for about ten

16   minutes, is that right?

17                  MS. MCCAWLEY:  Objection.  Go ahead.

18          A.      About 20, 25 minutes.  I didn't look at my

19   watch.

20          Q.      A very brief period of time?

21          A.      Very brief.

22          Q.      And then you went back to the airport and

23   you flew out?

24          A.      Yes.

25          Q.      And you flew back either to New York or to

1   Palm Beach?

2        A.    It could have yeah, it could have been

3   either-or, I'm not too sure.

4        Q.    But one or the other?

5        A.    Yes.

6        Q.    When you flew back out was anybody else on

7   the plane other than yourself, Jeffrey, and this girl?

8        A.    Actually the girl stayed behind, it was

9   just Jeffrey and I that went back.

10        Q.    Did the girl leave in the limousine with

11   you and Jeffrey back to the airport?

12        A.    No.

13        Q.    She was left at Professor Dershowitz's

14   house?

15        A.    She stayed there.

16        Q.    Do you know why she was staying there?

17        A.    I don't ask questions.

18        Q.    Did you talk to her when you were in the

19   foyer with her?

20        A.    Like I said, we basically just have not

21   real conversations, not girlfriends sitting down talking

22   to each other just, I don't know, brief conversation.

23        Q.    Did Mr. Epstein arrange for the limousine

24   or did somebody else?

25        A.    Maybe one of his assistants.  Jeffrey

1   rarely arranged everything himself, usually had somebody

2   else do it for him.

3          Q.     And was there anybody else in Professor

4   Dershowitz' house other than the people that you've

5   mentioned, Jeffrey, the girl, and yourself?

6          A.     I didn't see anybody.

7          Q.     Was this in the morning, at night, what

8   time was this?

9          A.     After noonish, like after the noon period.

10  It wasn't dark.

11         Q.     Did you have anything to eat for lunch?

12         A.     Not that I remember.  I mean, I'm sure we

13  did.  We didn't go out to lunch.  We didn't stop at any

14  restaurant or anything like that.

15         Q.     Other than Professor Dershowitz' house did

16  you stop anywhere during this trip?

17         A.     No.

18         Q.     Was this during a weekday or a weekend?

19         A.     No idea.

20         Q.     Were you able to see the driver while you

21  were in the car?

22         A.     No, there was a black, like a window.

23         Q.     Was it closed the entire time?

24         A.     That I can remember, yes.

25         Q.     Did you ever fly commercially to any of the

1  locations when you claim you were sexually trafficked to

2  Professor Dershowitz?

3       A.    I did used to have to fly commercially to

4  go service the men that Jeffrey sent me to, but I don't

5  remember having to fly commercially for Alan Dershowitz.

6       Q.    Now, other than your conversation with Ms.

7  Churcher before the first Daily Mail article came out,

8  did you talk to her again about where you mentioned Alan

9  Dershowitz?

10      A.    Before I spoke to her?

11      Q.    No, since that article came out?

12      A.    Have I talked to her again about Alan

13  Dershowitz?

14      Q.    Correct?

15      MS. MCCAWLEY:  I object to this line of

16      questioning.  I think I have a standing objection,

17      just to make that clear.

18      A.    Yes, I think we actually have.  I think she

19  read the recent, well, not so recent, about a year ago

20  the statements made in the press and she called me up and

21  I told her that I was not allowed to discuss it.

22      Q.    What did she say to you?

23      A.    She was just asking me about the ongoing

24  proceedings and I said I don't think I'm able to comment.

25  I don't think it's a wise thing to do, especially her

1 being a journalist.

2      Q.     Have you ever e-mailed with Sharon

3 Churcher?

4      A.     Yes, I have.

5      Q.     How many times?

6      A.     I don't know, a lot.

7      Q.     What does a lot mean to you?

8      A.     Over twenty.

9      Q.     When was the last time you e-mailed with

10 her?

11      A.     Probably in 2015.

12      Q.     Do you know approximately how many times

13 you e-mailed with her in 2015?

14      A.     Maybe about five.

15      Q.     Before 2015 was there a long gap in your

16 e-mail?

17      A.     Yes, there was a long gap.

18      Q.     Did you e-mail with her around the time

19 leading up to the meeting that you had before the first

20 Daily Mail article?

21      A.     I think that was actually phone

22 conversations, not e-mails.

23      Q.     After you met with her the first time did

24 you then e-mail with her?

25      A.     Yes, then we e-mailed.

1      Q.      About how many times, putting aside the

2  five or so in 2015?

3      A.      About anywhere between ten to fifteen.  I'm

4  not too sure of the exact number but --

5      Q.      Were you e-mailing with her while you were

6  living in Australia?

7      A.      Uh-huh.

8      Q.      And were you e-mailings with her while you

9  were living back in the United States?

10     A.      Uh-huh.

11     Q.      Yes?

12     A.      Yes, sorry.

13     Q.      Have you e-mailed with any other press

14  regarding Alan Dershowitz?

15     A.      No.

16     Q.      Actually did your e-mails with Ms. Churcher

17  refer to Alan Dershowitz?

18     A.      No.

19     Q.      Did your e-mails with Ms. Churcher

20  specifically identify any alleged sexual abuser other

21  than Mr. Epstein?

22     A.      ███████████████, that's it.

23     Q.      Had you had any e-mails with anybody about

24  Alan Dershowitz?

25              MS. MCCAWLEY:  I'm going to object to the

1          extent that this reveals anything that you have

2          e-mailed with your lawyer.  You don't have to

3          testify to that.

4          A.     Besides with my lawyers, no.

5          Q.     Did you ever e-mail ███████ about Professor

6   Dershowitz?

7          A.     I am pretty sure we had phone conversation,

8   actually no, face to face conversations about him and

9   maybe some comments over the phone, but I do not recall

10  sending her any e-mails regarding Alan Dershowitz except

11  for the text messages I sent to her after I learned she

12  was talking to him and I said, I don't believe you're

13  talking to a pedophile.  Other than that, no.

14         Q.     How many text messages did you send to her?

15         A.     What, from the time I've known her?

16         Q.     No, regarding Professor Dershowitz?

17         A.     Max, well, I mean the first one I sent to

18  her was about him and then, you know, the other ones were

19  quite simple like, you know, you've got two precious

20  daughters, you know.  I don't know if he was actually

21  named in any of those to be honest.  I think I referred

22  to him as the pedophile or a pedophile, but I mean I

23  would say max three.

24         Q.     Have you left her voice mail messages about

25  Professor Dershowitz?

1    A.    I have called her.  Well, first she
2  answered and then I said, please tell me it's not true
3  that you're actually doing this and then she hung up and,
4  yes, I have called her back and I have left her voice
5  mails, nothing abusive just, ██████ , what are you doing
6  you know.

7    Q.    You know what?

8    A.    What are you doing, you know, like that's
9  what I said to her.  That's how I talk, our lingo.  Not
10  you know what, like anything, but what are you doing, you
11  know.

12    Q.    Did you give her any context or is that the
13  entire message that you would have left?

14    A.    I don't know the entire message I would
15  have left, but like I said, it would not be abusive.

16    Q.    Now, I think that you mentioned in, was it
17  Palm Beach, Juan Alessi?

18    A.    Yes.

19    Q.    He was on the house staff?

20    A.    Yes, he was a butler.

21    Q.    What was the name of the fellow?

22    A.    ████████

23    Q.    What's ███████ last name?

24    A.    I have no idea.

25    Q.    Have you ever met ███████████████ ?

1      A.      I don't know.  I mean, you have to

2  understand there's lots of house staff at all of his

3  residences.  It's possible I did come across them, but

4  I'm not too sure.

5      Q.      But you don't have any specific

6  recollection ever meeting him, do you?

7              MS. MCCAWLEY:  Objection.

8      A.      No.

9              SPECIAL MASTER:  You can answer.  You

10             answered.  Go ahead.

11             THE WITNESS:  Sorry.

12             SPECIAL MASTER:  It's all right.

13 BY MS. BORJA:

14     Q.      What did you do with the your e-mails with

15 Ms. Churcher?

16     A.      What do you mean, what did I do with them?

17 Did I print them out?

18     Q.      Did you keep them in your inbox, your sent

19 box?

20     A.      Yes, they would be in my in box.  I mean,

21 after so long, I mean, I had to not just delete hers, but

22 delete a lot of files from my inbox, it was getting too

23 full.  I still have e-mails of hers in my inbox.

24     Q.      Do you still have the text messages you

25 sent to ███████?

1           A.     No, I've gone through phones and that's not

2 because of on purpose.  My kids literally break every

3 phone that I get.

4           Q.     So when was the last time that you texted

5 █████████ ?

6           A.     When I found out that she was talking to

7 Dershowitz.

8           Q.     What's that time frame?

9           A.     I have no idea.  I think it was June of

10 last year, June 2015, but that's not what I messaged her.

11 I only messaged her recently when I found out, which I

12 think was during Dershowitz' first deposition when he

13 said that he had been talking about ██████ .

14           Q.     And then you've switched phones since then?

15           A.     Yes, I have a new phone, but I have those

16 messages that I sent to her on my new phone.

17           (Thereupon, VR Defendant's Exhibit No. 6,

18           was Marked for Identification.)

19 BY MS. BORJA:

20           Q.     Ms. Giuffre, I've handed you a document

21 that's been marked VR Exhibit 6, which is a 13 page

22 document copy of an article from Radar Online.  Do you

23 have that?

24           A.     Yes, I do.

25           Q.     Is this the Radar Online article that you

1  referred to earlier in your testimony today with the

2  ripped out pages from your booklet?

3          A.      Yes.

4          Q.      Do you have any understanding of how Radar

5  Online got these pages?

6                  MS. MCCAWLEY:  Objection.

7          A.      No, not at all.

8          Q.      After these were public on Radar Online did

9  you contact that publication?

10          A.      No.  Maybe I should have, but I didn't

11  think of it.

12          Q.      Are the excerpts here things that you wrote

13  in your handwriting?

14          A.      Yes.

15          Q.      These are the pages that you gave Ms.

16  Churcher, correct?

17          A.      Uh-huh, yes.

18          Q.      Are there any pages that you gave Ms.

19  Churcher that are not reflected in the article?

20          A.      I mean, can you give me a minute to look at

21  all of them?

22          Q.      You don't have to read the comments.  I'm

23  not going to ask you about them.

24          A.      It looks like there's a little bit of

25  excerpts taken out of the pages I gave to her.

1     Q.    Were there any additional pages that you

2  gave to her that's not printed into this article?

3     A.    Yes, that's what I'm saying.  I mean, from

4  what I can tell it's like they've taken excerpts out of

5  the pages I gave to her and kind of pieced them together;

6  but if you read them closely it doesn't look like every

7  single one matches the next.

8     Q.    What was your purpose in writing those

9  pages?

10     MS. MCCAWLEY:  Objection.  You can answer.

11     A.    You know, at that time I was very let down

12  by the United States government for not prosecuting

13  Jeffrey Epstein in what I think that he deserved and what

14  all his victims deserved to get from what he's done to

15  us.  So to me this was my way of telling a small piece of

16  my story to see, you know, what we could do to re-open

17  the case to get more knowledge about Jeffrey Epstein and

18  what he's made, not just me, but a lot of other victims

19  have to go through.

20     Q.    About how much time had elapsed between the

21  time when you met   ███████████   and the time that you

22  wrote the booklet?

23     A.    Oh, many years, many years.  All three of

24  my kids had been born by then so we're talking, sorry, I

25  am horrible at math, roughly about ten years.

1        Q.      In terms of your meeting with ███████████

2   when you went to ████████, the excerpts in here said

3   the two of you had grabbed a couple of alcoholic

4   cocktails.  Do you see that?

5        A.      Is that in the first page?

6        Q.      This is at page 3 of 13.  The beginning of

7   the text gets blocked out by the advertisement, but it

8   refers generally to ███████████ where you had grabbed them

9   both an alcoholic cocktail, she wrote in the diary

10  obtained by Radar?

11       A.      I do read that.

12       Q.      How long were you at the bar with ███████

13  ████████ or at ████████████ I should say?

14       A.      I would say over an hour but not two.

15       Q.      Did you have more than one drink?

16       A.      I believe I had two drinks.  I'm not too

17  sure if -- I assumed that ████████ was drinking alcohol as

18  well, but I'm not too sure if it was.  He ordered the

19  drinks, and he ordered alcohol for me.  So I only assumed

20  that he was drinking it as well, but yes.

21       Q.      So he went up to the bar and ordered them

22  and brought them back?

23       A.      Yes.

24       Q.      And you can't say what he ordered at the

25  bar?

1        A.    I know they were both clear drinks.  I

2 don't know exactly what mine was, but it was clear and

3 was alcohol.  I didn't have a sip of his so I don't know

4 what it was.

5        Q.    Did you take Ecstasy at this club?

6        A.    No.

7        Q.    And on two drinks -- did ███████████ have

8 more than two drinks?

9        A.    I know I had two drinks.  I don't know how

10 many he had.  I'm not too sure.

11        Q.    Okay.  After these were public did you ever

12 ask for these pages back?

13        A.    As far as I knew they were properties of

14 Sharons.  I think I had a rough conversation with her

15 about it because I didn't know that these were going to

16 get public at any time.  These were more from between me

17 and her.  It really shocked me to see these in the

18 public.

19        So I honestly didn't think there was

20 anything that you could do about it, it was already out

21 there.  Thinking about it today, you're right, I should

22 have gone to Radar Online and found out why and who and

23 how.

24        Q.    I don't mean to mislead you, Sharon's name

25 is at the end of the article?

1     A.    Well, then -- I mean, that's obvious

2  without even reading that.  I mean, she's the only one

3  who had it.  So she's the only one who could have given

4  it to them.

5     Q.    Why did you think it was her property?

6     A.    Because everything that I had given her was

7  her property.

8     Q.    Why is that?

9     MS. MCCAWLEY:  Objection, asked and

10     answered.

11     A.    I mean, well --

12     SPECIAL MASTER:  You can answer.

13     MS. MCCAWLEY:  It's fine, if you know.  Say

14     what you know.

15     A.    Because everything that -- she told me

16  everything that I gave her.  So the story was her

17  property, the papers that I gave her were her property.

18  The photographs that they took of me like on the beach

19  and I think there was a pictures of me on the bridge.

20  Maybe there's a couple of other pictures, those are her

21  property as well.

22     Q.    Was that spelled out in the contract?

23     A.    I don't know.  It probably was.  It was a

24  long contract.  I didn't have lawyers read it over for me

25  so I'm not too sure.

CONFIDENTIAL

1    Q.    Did you keep a copy of that?

2    A.    No.

3    Q.    What did you do with it?

4    A.    When I moved from Australia I had a bunch

5    of paperwork I just kind of threw out, I didn't bring

6    everything with me.

7    Q.    Why did you choose to move back to the

8    United States at that time?

9    A.    I mean, there's a couple good reasons why I

10   moved back.  You know, first and foremost I haven't seen

11   my family in a long time; and secondly, I wanted to see

12   something happen with the -- I was trying to join the

13   CVRA case so I was hoping by moving back I would see that

14   progress.

15   Q.    What's the date that you moved back?

16   A.    As far as the picture that you just showed

17   me of the house that's November.  I think it only took me

18   about two weeks -- actually I can tell you the exact

19   date, it was on my anniversary, October 16th, 2013.

20          MS. MCCAWLEY:  Do you need a break or are

21      you okay?

22          THE WITNESS:  I'm okay.

23   BY MS. BORJA:

24   Q.    Other than the meeting that you talked

25   about with the FBI in 2011 shortly after the first Daily

1  Mail article came out, have you talked to any other law

2  enforcement about Jeffrey Epstein?

3          MS. MCCAWLEY:  I'm going to object to the

4          extent that it's an investigational privilege.  If

5          there's an ongoing investigation to extent it was

6          the FBI or something that happened previously you

7          can discuss that.

8          SPECIAL MASTER:  You can answer.

9     A.    Okay.  Honestly I'm trying to think, FBI --

10  I'm trying to remember when I talked to Maria Vilafana.

11  I'm just going to say I'm not to sure.  I don't want to

12  answer incorrectly.

13     Q.    Have you ever given an affidavit to law

14  enforcement?

15     A.    An affidavit?

16     Q.    Something that you signed?

17     A.    Yes, I know what it is.  I'm just trying to

18  think.  I'm not questioning you, but would the FBI have

19  an affidavit?  I don't know.  I would have signed

20  something for them.

21          MS. MCCAWLEY:  Just answer what you know.

22  BY MS. BORJA:

23     Q.    When was the first time that you told Brad

24  Edwards that you had been sexually abused by Professor

25  Dershowitz?

1          MS. MCCAWLEY:  And again, no

2     attorney/client privileged discussions, you can

3     give the date.

4     A.     I don't know the date.

5          MS. MCCAWLEY:  Or time frame.

6     A.     It would have been, I think, on -- this is

7  not attorney/client privilege?

8          SPECIAL MASTER:  Just the time frame.

9          MS. MCCAWLEY:  As long as you don't

10    describe it.  Just the time frame.

11         SPECIAL MASTER:  You can't describe the

12    conversation but you can describe the time frame.

13    A.     That's a difficult answer because there --

14         MS. MCCAWLEY:  I don't want you to go into

15    considerations.  Think about it in your mind.  So

16    don't talk about what you were discussing, but if

17    you can come up with a date in your mind or a time

18    period then you can say that.

19    A.     Let's just say the first time I mentioned

20  Alan Dershowitz I think was in 2011.

21    Q.     Did you say -- when was the first time, not

22  that you mentioned Alan Dershowitz but that you

23  identified him as a sexual abuser?

24    A.     The first time I went into detail about it

25  would have been I think in 2013, maybe early 2014.

1     Q.    Were you living in the U.S.?

2     A.    Yes.  Don't quote me 100 percent, it could

3 have been before then.  I'm just trying to remember back.

4     Q.    When was the first time, just the date,

5 that you ever told Paul Cassell that you were sexually

6 abused by Alan Dershowitz?

7     SPECIAL MASTER:  Just the date.

8     A.    It would have early 2013, 2014, same as

9 Brad.

10    Q.    Now, in the document that we previously

11 marked, the transcript of your conversation with Mr.

12 Scarola, I'm not going to ask you to read it, I'm just

13 asking you generally, you had said that Brad Edwards had

14 contacted you because he was being sued -- he was in a

15 lawsuit with Mr. Epstein.  Do you recall that?

16    MS. MCCAWLEY:  Objection.  You can answer.

17    Sorry.

18    THE WITNESS:  You're confusing me.

19    MS. MCCAWLEY:  It's part of it.  I'm sorry.

20    A.    Yes, I do remember that.

21    Q.    Do you know when that was?

22    A.    Possibly April 7, 2011.  I don't know if

23 that's the same conversation or it was before that or

24 after that, but I believe the first time me and Brad ever

25 talked was around that date.

1    Q.    He called you, right?  You didn't call him

2  out of the blue, he called you out of the blue?

3    A.    No, I might have called him, I think.  I

4  might have.  I can't honestly remember, but Sharon

5  Churcher knew how much I wanted to see this case open up

6  and get resolved which is why I talked to the FBI.  So I

7  can't remember if she introduced me to Brad.  I think

8  that's how that went.

9    Q.    Did Sharon Churcher know about Mr. Edwards'

10  litigation with Mr. Epstein?

11    MS. MCCAWLEY:  Objection.

12    SPECIAL MASTER:  You can answer if you

13      know.

14    MS. MCCAWLEY:  You can answer.

15    A.    I don't know what she knew about him, but

16  she told me he was a really good lawyer who was doing pro

17  bono work for other victims of Epstein and that if I

18  wanted talk to somebody, he would be a good person to

19  talk to.

20    Q.    That was in the --

21    A.    Same time period.

22    Q.    2011?

23    A.    Yes.

24    Q.    Okay.  So in 2011 he was going to help you?

25    A.    At that stage we hadn't established

1   anything.  It was just kind of like, hi, who are you,

2   this is me, who are you, so on so forth.

3        Q.    You wanted to identify yourself as a victim

4   of Jeffrey Epstein?

5        A.    Absolutely.

6             MS. MCCAWLEY:  Do you need a break?

7             THE WITNESS:  No.

8   BY MS. BORJA:

9        Q.    Now, in your -- that transcript towards the

10  end Mr. Scarola asks you certain names?

11            SPECIAL MASTER:  What page are you

12            referring to?

13  BY MS. BORJA:

14       Q.    At page 22 of 23?

15       A.    Yes.

16       Q.    If you go down about halfway, two-thirds of

17  the way down the page, it says -- so I'll just name a

18  name and you tell me yes if they told the truth.  I think

19  they have relevant information, or no, I don't think they

20  would or I don't know whether they would or not.  Okay,

21  you understand?

22            MS. MCCAWLEY:  I don't see where you are.

23            MR. SCAROLA:  Just below the middle of the

24            page.

25            MS. MCCAWLEY:  Here we go.  I see it, I'm

1       sorry.

2  BY MS. BORJA:

3       Q.    You see where I am reading?

4       A.    Uh-huh.

5       Q.    And then you say yes, and then Mr. Scarola

6  says, okay, ███████, do you see that?

7       A.    Yes.

8       Q.    And you said I think he has relevant

9  information, but I don't think he'll tell you the truth.

10  Do you see that?

11       A.    Yes.

12       Q.    Why did you think he wouldn't tell the

13  truth?

14       A.    Because he did things that were wrong.

15       Q.    What do you mean by that?

16       A.    He participated in sex with minors.

17       Q.    Did you tell ██████ that ████████ had

18  participated in sex with minors?

19       A.    Yes, I did.

20       Q.    Did you talk to ██████ about efforts to

21  obtain any sort of the remedy or relief or damages or

22  other way to bring██████████ to justice?

23       A.    I did talk to her about the ongoing

24  proceedings that I wanted to bring against ████████.

25       Q.    What did you tell her?

1    A.    I told her the details about what happened

2 between ▮▮▮▮ and I and, you know, I said I hope we can

3 get him in some way.  I mean, I've heard the statements

4 about the 50 billion or whatever that was, completely

5 incorrect and I honestly do not know where she pulled

6 that rabbit out of, that's absorb.  I don't know her to

7 be an untruthful person, but what her statements were are

8 a thousand percentage untrue.

9          MS. BORJA:  Can you read back the answer?

10         I can read your notes.

11 BY MS. BORJA:

12    Q.    When you said I hope we can get him in some

13 way, what did you mean by that?

14    A.    I hoped that my lawyers would prevail in

15 fighting him in court, you know.  I don't know what I'm

16 allowed to talk about.

17         MS. MCCAWLEY:  You're not allowed to

18         discuss anything that we've talked about in a

19         confidential nature.

20    A.    There was never any monetary value ever

21 discussed.

22    Q.    So you wanted to go off ▮▮▮▮ ?

23         SPECIAL MASTER:  Outside of --

24         MS. MCCAWLEY:  If you're talking about the

25         conversation with ▮▮▮▮▮▮

1           SPECIAL MASTER:  You're excluding
2      discussions with your lawyers.
3           MS. MCCAWLEY:  If you're talking about the
4      conversations with ███████ that time but don't
5      talk about anything you talked to us about.
6      A.    No, with ███████ there was no monetary
7  value ever discussed.
8      Q.    But you said you wanted to go after him in
9  court?
10     A.    Yes.
11     Q.    What did you want to have happen?
12     A.    I wanted to see him come forward.  I wanted
13 justice to happen.
14     Q.    What does that mean?
15     A.    I wanted him to own up for his wrongs.
16     Q.    Did you go to the government and say
17 prosecute him?
18          MS. MCCAWLEY:  Objection.  To the extent
19     that it reveals any current ongoing investigation
20     you can't discuss that.
21          SPECIAL MASTER:  Anything that you had
22     discussions with your lawyers and they provided on
23     your behalf, that's not to be discussed.  Do you
24     understand that.
25     A.    Did I tell ███████ that I'm going to the

1  government?

2           SPECIAL MASTER:  We're talking about

3  ███████ .

4           A.    No, I never went to ██████ and told her

5  we're going to the government.  What did the government

6  have to do with this anyways?

7           Q.    Did you want to have ████████ or anybody

8  else pay amounts to your charity?

9           A.    No.

10          Q.    Why not?  You didn't want any money for

11  your charity?

12          A.    Of course I want money for my charity.  I'd

13  love to see -- my charity is my vision, to be able to

14  help other victims out there suffering through what I

15  suffered through.  Of course that would be a dream come

16  true, but did I say that money is going to be put into

17  that by some unimaginable source, no.

18          Q.    Has the charity distributed any funds to

19  victims?

20          A.    Not as yet.  We haven't been able to go out

21  and publish, not publish, what's the word I'm looking

22  for?  We haven't been able to make it proactive the way I

23  want to make it proactive like go on TV and talk about

24  it.  You know what I mean?  It's there, it's set up, it's

25  wonderful.  It's got a list of numbers and names of

1 places you can to go to for help.

2            Right now it's just a map of every place in

3 the United States that I've called personally to be able

4 to get out of the situation that you're in if you're a

5 victim of abuse or sexually trafficked.  There's no money

6 to give to victims.

7        Q.      There's no funds currently in the charity?

8        A.      No, besides what keeps it afloat in the

9 bank, which is probably $150 or something.

10       Q.      Are the officers paid?

11       A.      The who?

12       Q.      The officers of the charity?

13       A.      No, no one is paid.

14       Q.      Has anybody applied to the charity or

15 funds?

16       A.      No, like has a victim called up and said,

17 can we get some money?  Is that what you're asking?  No.

18       Q.      That's one way?

19       A.      No.

20       Q.      Nobody has contacted the charity on line?

21       A.      No, we have had nice people call up and

22 tell us about their story and, you know, thank me for

23 coming forward and being brave.  We have had that, but we

24 have had nobody ask for money, we've just had nice fan

25 mail.

1          SPECIAL MASTER:  Now is good time to take a
2     five-minute break.
3          MS. MCCAWLEY:  Sure, I was going to let you
4     know, too, in the effort to conserve time I did
5     get lunch brought in for everybody.  I'm not sure
6     how many things are open since this is a Saturday.
7     I don't know when you're hungry.  It's your
8     deposition, unless you're ready to eat, but
9     whenever that is, I think she set it up maybe in
10    one of the rooms so we can sign them out.
11         SPECIAL MASTER:  Thank you.
12         THE VIDEOGRAPHER:  Going off --
13         SPECIAL MASTER:  The witness is excused.
14    Go ahead and step out.
15         MS. MCCAWLEY:  Meridith, why don't you take
16    her.
17         (Witness leaves the conference room.)
18         SPECIAL MASTER:  Housekeeping.  You wanted
19    to put your objection on the record outside of the
20    witness.  Go ahead.  Now would be the appropriate
21    time.
22         MS. BORJA:  The witness has testified that
23    she's afraid for her life.  Her counsel has
24    instructed her not to provide names because of
25    fears of physical retribution.  At the same time

1     the witness has posted on Facebook in a way that's

2     publically available not only the photo of her

3     house, the exact street address.  She posted her

4     children up on Facebook.

5          I didn't inject those children into this

6     case, I don't plan to, but there's no basis when a

7     witness has made a Facebook page profile available

8     to the world to say that I'm supposed to collect

9     copies of something that's on the Internet and

10    seal them.  That's not my obligation and I think

11    that is inappropriate, and this is something that

12    the witness has put out there that is inconsistent

13    with the testimony.

14         MS. MCCAWLEY:  I want to make clear, the

15    date on that is November of 2013.  She has

16    received threats to her safety since that date.

17    So it is inappropriate to put her address on the

18    record or anything with respect to her children.

19         MS. BORJA:  I did not read her address into

20    the record.

21         MR. SCAROLA:  May I make a suggestion?  I

22    understand the point that is attempted to be made

23    with regard to the relevancy of these matters, and

24    the relevancy is the suggestion that posting

25    pictures of her children and her address would

1    tend to contradict assertions that she is in fear.

2        Well, to the extent that that is a relevant

3    argument it is established by reference to the

4    fact that pictures of her children and her address

5    were posted on the Internet in a specific date,

6    there's no reason for either the pictures

7    themselves or the address to be part of any

8    record.

9        So we would join in the objection that as a

10   matter of privacy those things be excluded from

11   the public record, although referenced to the fact

12   of the posting is fair game from our perspective.

13       MS. BORJA:  Then I'm going to go in, I'm

14   going to need to re-examine the witness because I

15   avoided any mention of her children based on her

16   counsel's objections, and I will ask her on the

17   record that she has posted pictures of her own

18   children.  I didn't ask her that.

19       MR. SCAROLA:  We'll stipulate to the fact I

20   think that she said those are her children.  We'll

21   stipulate to the fact that there are photographs

22   of her children.

23       MS. BORJA:  That she posted.

24       MR. SCAROLA:  That she posted.

25       MS. MCCAWLEY:  On that date.

1           MR. SCAROLA:  On that date in 2013 and that
2       her address appears on the document posted in
3       2013.
4           SPECIAL MASTER:  Does that stipulation
5       satisfy you?
6           MR. SCOTT:  We'll consider it over lunch.
7       We'll talk.
8           MR. SCAROLA:  Over lunch.  When we take the
9       break we'll talk to the client.
10          SPECIAL MASTER:  I'm not excluding the
11      documents, should be aware.  What I want to do,
12      though, is take extra precaution to protect the
13      document from being disclosed in any form, which
14      is why we've collected all of the copies.  I will
15      put you in charge of them, Sigrid, and what we'll
16      do -- and with respect to your relevancy argument
17      or any other argument that you wish to make on
18      that it appears it's going to go in front of Judge
19      Lynch.  That document is going to be available to
20      you.  If he's going to treat it in the manner in
21      which he treats it and gives it whatever weight.
22      I'm not excluding that, but what I do want to do
23      is take the extra precaution of protecting the
24      witnesses' privacy.
25          MS. BORJA:  That's fine, but to be clear my

1    objection is not relevance.  My basis for arguing

2    this is not relevancy.  It goes to the credibility

3    of the witness.

4        SPECIAL MASTER:  I'm aware.  I will share

5    this, if you need to ask additional questions

6    beyond the stipulation, then I think we can go

7    down that road and let you ask the questions and

8    we'll see if there's an objection with respect to

9    those, but I'm going to give you that opportunity

10   if you choose to take it.  Fair enough?

11       MS. BORJA:  Yes.

12       SPECIAL MASTER:  Let's break for five

13   minutes.  Let's be back here, it is, by my watch

14   it is now what, 20 to 1.  Let's be back here at

15   quarter to one.

16       MS. MCCAWLEY:  Can we have a time check on

17   how much time we've spent?

18       THE VIDEOGRAPHER:  Two hours and 59 minutes

19   exactly.

20       SPECIAL MASTER:  It's 20 to 1.  Let's be

21   back ready to begin the deposition again at 1:00

22   o'clock.

23       (Lunch recess was taken.)

24       THE VIDEOGRAPHER:  We are now back on video

25   record, 1:16 p.m. disk number 3.

CONFIDENTIAL

1   BY MS. BORJA:

2        Q.    Mr. Giuffre, we were talking earlier today

3   about that joinder motion and I had given you a copy of

4   this document, do you still have to in front of you, Jane

5   Doe #3 and Jane Doe #4 corrected motion?

6        A.    This one?

7              MS. MCCAWLEY:  Yes.

8        A.    Yes.

9        Q.    Turn, please, to page 4 of that document.

10             MS. MCCAWLEY:  Hang on one second.  I don't

11             think I have a copy here of this for some reason.

12             I know you gave me one.  I got it.  I'm sorry.

13             Thank you.

14  BY MS. BORJA:

15       Q.    In the first full paragraph if you go six

16  lines down.  Let's start five lines down where it says,

17  the sentence begins, in addition to.  Do you see where

18  I'm reading?

19       A.    Yes.

20       Q.    In addition to being a participate in the

21  abuse of Jane Doe #3 and other minors Dershowitz was an

22  eye witness to the sexual abuse of many other minors by

23  Epstein and several of Epstein's co-conspirators.  Do you

24  see that?

25       A.    Yes.

1      Q.     Now, where it says participant in the abuse

2   of Jane Doe #3, you talked about your abuse and other

3   minors?

4      A.     I'm sorry, I don't see -- yes, participant,

5   yes.

6      Q.     Participant in the abuse of other minors?

7      A.     Yes.

8      Q.     Can you identify any of those minors?

9      A.     Specifically talking right now I'm speaking

10   about the girl on the airplane and in the limousine.

11      Q.     How do you know the age of the girl on the

12   airplane?

13      A.     Like I said before they looked young but

14   it's hard to depict exactly what age they are.

15      Q.     It's possible that neither one of them was

16   a minor?

17      A.     It's possible that they were, yes, not a

18   minor, but from what they looked like to me they did look

19   young.  Like I said, I can't tell you their ages because

20   I didn't talk to them and ask them their ages.

21      Q.     Then it says Dershowitz was an eye witness

22   to the sexual abuse of many other minors of Epstein and

23   several of Epstein's co-conspirators, do you see that?

24      A.     Yes.

25      Q.     Is that something that you personally know?

1         A.    Yes.  Dershowitz was around a lot and

2  Epstein constantly had minors around with him.  So to say

3  that he personally knew about the abuse happening with

4  the other minors, I mean, even before Dershowitz and I

5  were personally together, he walked in on -- one occasion

6  in New York he walked in on me providing oral sex to

7  Jeffrey Epstein and, I mean, I thought that was a very

8  awkward situation, somebody just knocking on the door

9  walking in continuing to have a conversation while he's

10  being serviced.  So and then as well, you know, there's

11  -- I mean, charades of, tons of young girls constantly

12  around for the only sole purpose of having sex with those

13  minors.

14         Q.    How many times would anybody have to visit

15  an Epstein property to be an eye witness to the sexual

16  abuse of many of the minors in your opinion?

17         A.    I'm sorry, can you rephrase?  I just don't

18  understand what you mean.

19         Q.    You say that Dershowitz was on eye witness?

20         A.    Yes.

21         Q.    But you never actually saw him as an eye

22  witness to the sexual abuse of many of the minors; is

23  that correct?

24         MS. MCCAWLEY:  Objection.

25         A.    Yes, I did see him as an eye witness

1   obviously on the plane and in the limousine.

2       Q.   But we don't know those were minors one way

3   or the other, right?

4       A.   Right.

5       Q.   That's your assumption, correct?

6       A.   Yes.

7            MS. MCCAWLEY:  Objection.

8       Q.   And you're speculating, right?

9            MS. MCCAWLEY:  Objection.

10           SPECIAL MASTER:  You can answer.

11           MS. MCCAWLEY:  Sorry.

12      A.   Yes.  I mean I --

13           MR. SCAROLA:  Excuse me, I don't believe

14           the witness finished her response.  You

15           interrupted her as she was still speaking.

16  BY MS. BORJA:

17      Q.   So let's leave those two instances aside?

18           MR. SCAROLA:  May we ask her to please to

19           finish her response.

20           MS. MCCAWLEY:  You can finish your answer

21           if you had anything else to say.

22           SPECIAL MASTER:  I thought you had

23           finished.  Do you have anything else to add?

24      A.   They were young girls and there was

25  constantly young girls that I know were minors around, I

1  mean, only because they were too, way too young to even

2  look like an 18 year old plus.

3          Q.    Okay.  I'm not asking about other girls

4  being around.  I'm asking about Professor Dershowitz

5  being an eye witness to sexual abuse with other minors.

6  I'm asking you from the basis of your testimony that you

7  know that he saw sexual abuse of other minors.  What's

8  the basis for your testimony?

9          MS. MCCAWLEY:  Objection.

10          SPECIAL MASTER:  You can answer.

11         A.    The only thing I can say to that is that

12  there were minors around and did Dershowitz know that

13  Jeffrey Epstein was using these minors for sexual

14  purposes, yes, he did.

15         Q.    How do you know that?

16         A.    How do I know that Dershowitz knew that?

17          MS. MCCAWLEY:  Objection.

18  BY MS. BORJA:

19         Q.    Yes, how do you know what he knew?

20         A.    How do I know what he knew, because he was

21  around Jeffrey Epstein so many times that you would have

22  to be blind to not know what Jeffrey Epstein was doing.

23         Q.    So it's your guess as to what Professor

24  Dershowitz knew or didn't know, right?

25          MS. MCCAWLEY:  Objection, argumentative.

1    A.    No, it's a fact.

2    Q.    Did you see Professor Dershowitz as a

3   witness to the sexual abuse of anybody you know to have

4   been a minor?  Did you personally witness that?

5        MS. MCCAWLEY:  Objection.

6    A.    With any other -- I'm sorry, with any other

7   minors?  Did I see him with any other minors, is that

8   what you're asking me?

9        MS. MCCAWLEY:  Objection, asked and

10       answered.

11       SPECIAL MASTER:  You can answer.

12   A.    Besides the two girls that I considered to

13  be very young, but I don't know their ages, no, I have

14  not seem him personally witness sexual abuse in that

15  circumstance.  Just the sheer fact that the girls were

16  around and he knew the purpose for the girls being

17  around.

18   Q.    What's the basis for your testimony that he

19  knew the purpose for the girls being around?

20       MS. MCCAWLEY:  Objection.  You can answer.

21       SPECIAL MASTER:  You can answer.

22   A.    Because Jeffrey used these girls -- he

23  didn't have friends that were 15, 16, 17, 18 just to hang

24  around with as friends.  And like I said, you would have

25  to be a blind person to not know what he was doing with

1   these girls.  I mean, he was arranging massages for other

2   people that I did not witness myself, for these girls,

3   and they were minors.

4            So for Dershowitz to be around on so many

5   occasions and know that there's minors around, I mean,

6   it's just common logical sense.

7       Q.    So you're making an assumption, right?

8            MS. MCCAWLEY:  Objection.

9            SPECIAL MASTER:  You can answer.

10      A.    You can call it an assumption, but like I

11  said you'd have to be blind to not know what's going on.

12      Q.    How many times did somebody to have to come

13  to an Epstein property for you to have the same

14  assumption about that person?

15           MS. MCCAWLEY:  Objection.

16           SPECIAL MASTER:  You can answer.

17      A.    I would say the first time they came to

18  that property there is nude pictures everywhere.  These

19  are salacious acts of girls, young girls doing things to

20  each other that would be considered child pornography.

21  If you walked foot into Jeffrey Epstein's house and you

22  went in there and you continued to be an acquaintance of

23  his then you would have to know what was going on there.

24      Q.    So ████████████ was in your mind you

25  believe a witness to the sexual abuse of minors?

1          MS. MCCAWLEY:  Let her finish.  Objection.

2      That mischaracterizes testimony.

3          THE WITNESS:  Thank you.

4          SPECIAL MASTER:  You can answer.

5          MS. MCCAWLEY:  You can answer.

6      A.     I don't think ██████████ participated in

7  anything.  That would have to be another assumption.  I

8  never saw or witnessed ████████ participate in those

9  acts, but was he in the house of Jeffrey Epstein.  I've

10 heard he has been, but I haven't seen him myself so I

11 don't know.

12     Q.     You've seen ████████ with Jeffrey

13 Epstein, correct?

14     A.     At parties.

15         MS. MCCAWLEY:  Objection.

16 BY MS. BORJA:

17     Q.     So is it your assumption that she's a

18 witness to sexual abuse of minors?

19         MS. MCCAWLEY:  Objection.

20         SPECIAL MASTER:  You can answer.

21     A.     I don't know if ████████ was at the house

22 of Jeffrey Epstein.  I know she was at parties with

23 Jeffrey Epstein.  So, no, I can't say she's a witness.

24     Q.     Is ████████ a witness to the sexual

25 abuse of minors?

CONFIDENTIAL

1          MS. MCCAWLEY:  Objection.  You can answer.

2          SPECIAL MASTER:  You can answer.

3          MS. MCCAWLEY:  Just what you know.

4     A.     Yes, he would be a witness because he knew

5  what my purpose there was for Jeffrey and he visited

6  Jeffrey's island.

7          MS. MCCAWLEY:  Shhh please.  Let her finish

8          her answer.

9     A.     There's pictures of nude girls all around

10  the house at all of his houses and it's something that

11  Jeffrey Epstein wasn't shy about admitting to people.

12     Q.     Is ████████████ a witness to the sexual

13  abuse of minors?

14          MS. MCCAWLEY:  Objection.

15          SPECIAL MASTER:  You can answer.

16     A.     Not that I'm aware of.  I mean, if you're

17  going to say why was I there with an older man, then I

18  guess yes, she would be, but do I believe that she took

19  presence in anything like that, absolutely not.  I can't

20  say.  I'm not on grounds to say that.

21     Q.     Some people you'll assume and some people

22  you won't?

23          MS. MCCAWLEY:  Objection.

24     A.     Some people I would say are closer to

25  Jeffrey than others.  Did I see ██████ hang around

1    Jeffrey as much as Alan Dershowitz, no, I didn't.  But

2    Alan Dershowitz was around all the time so I would

3    definitely say he was a witness to it.

4         Q.    Is ████████████ a witness to the abuse of

5    those minors?

6         A.    You'd have to tell me who ████████████ is.

7         Q.    Is ████████ a witness to the sexual abuse of

8    minors?

9         A.    Again, he wasn't around all the time.  I

10   only met him once so I can't say that he is.

11              (Thereupon, VR Defendant's Exhibit No. 7,

12              was Marked for Identification.)

13   BY MS. BORJA:

14        Q.    Ms. Giuffre, you have what's been marked as

15   VR Exhibit 7 in front of you?

16        A.    Yes.

17        Q.    This is the Daily Mail article titled

18   teenage girl recruited by pedophile, and it goes on.  Do

19   you see that?

20        A.    Yes.

21        Q.    Can you turn to page 3 of 31 of this

22   printout.  Do you have that?

23        A.    Yes.  I do.

24        Q.    Right above the photograph there it says,

25   Virginia disclosed that ████████████████████████

1       ███████████████████████ were also guests of Epstein on

2  the island.  Do you see that?

3           A.      Yes, I do.

4           Q.      Is that true statement in the article?

5           A.      It is a true statement that I did meet ██

6  ██████████████████ , but I cannot 100 percent lock down

7  that it was at the island, it could have been New York.

8           Q.      Did you tell Ms. Churcher that it was on

9  the island?

10          A.      I did tell Ms. Churcher that I thought it

11 was on the island and this is how it was printed out.

12          Q.      Is ███████████ a witness to the sexual

13 abuse of minors?

14          A.      I don't know ███████████ so I can't say

15 that he is or isn't.

16          Q.      Do you know who he is?

17          A.      I know who he is.

18          Q.      Do you know how often, if ever, he was at

19 any Epstein property?

20          A.      I was never there as an eye witness to see

21 that.

22          Q.      Now, you refer to nude pictures a second

23 ago.  Do you recall that?

24          A.      Yes.

25          Q.      Where in the -- start with the Little Saint

1  James island, where in that property were there nude

2  pictures?

3       A.     So there was nude pictures in -- I don't

4  know how to explain it, you've got a main house, I don't

5  know, have you seen pictures of the island?

6       Q.     You can just describe it as best you can?

7       A.     Well, in the main house not attached to

8  Jeffrey's room there's a, I don't know if you want to

9  call it an entertaining room, it looks like a living room

10 but it's bigger than that.  It has TV, couches and

11 everything like that in there.  There is nude photographs

12 all over that room.

13            There is nude photographs in -- adjacent to

14 the right-hand side is Ghislaine Maxwell's office,

15 there's nude photographs in there.  Away from the main

16 house in Jeffrey Epstein's private bedroom there are nude

17 photographs in there.

18       Q.     In these locations where there's nude

19 photographs is that where Epstein guests go typically?

20            MS. MCCAWLEY:  Objection.  Are you

21            referring this one house or all the houses?

22 BY MS. BORJA:

23       Q.     That's what we're talking about?

24       A.     The main house?

25            MS. MCCAWLEY:  Right.

1    A.    Right outside the main house is the main

2  dining table.  So in order for you to get to the dining

3  table, I mean, you could walk from outside, but

4  considering if you're coming from inside to outside, yes,

5  you would have to cross those.

6    Q.    So did guests of Jeffrey Epstein typically

7  see those nude photographs to the best of your

8  understanding?

9    A.    To the best of my understanding, yes.

10    Q.    Where were there nude photographs in the

11  Palm Beach house?

12    A.    As soon as you walked into the front door

13  there was a large hallway table and I would assume, my

14  assumption is there is at least 50 photographs on that

15  table, some with nude photographs, some with girls in

16  raunchy, forgive me when I say raunchy, I mean lingerie

17  photos mixed in with Jeffrey and some of the privileged

18  people he's met, such as, you know, I don't know, like

19  old girlfriends or models or ███████████ or whatever

20  the case is; but among all of those photographs would be

21  nude photographs.

22    Q.    And this is, when you say, was it the front

23  room or front table?

24    A.    Like as soon as you walked through the

25  front door of the mansion the first thing that you see is

1  is that hallway table, on that hallway table is there.

2      Q.   And that front door that you were referring

3  to is the one that guests walk in?

4      A.   Yes, and also upstairs in Jeffrey's massage

5  room there is a hidden room where nude photographs from

6  the floor to the ceiling all over, right, so there's not

7  one piece of white showing.

8      Q.   Let me ask you about that?

9      A.   And then there's boxes and boxes and boxes

10  of nude photographs.

11      Q.   You say this is a hidden room, what do you

12  mean by that?

13      A.   It's not a room that you could just walk in

14  and see.  It's something that Jeffrey would show you.  So

15  in the massage room you've got the shower, the steam

16  shower, the message table in the middle, and to your, I'm

17  bad at left and right, if I was facing this way it would

18  be my left.  It's like a closet, top to bottom with nude

19  photographs.

20      Q.   Is this a place where guests typically

21  when?

22      A.   If you were having a massage, yes.

23      Q.   Did all guests get massages in this hidden

24  room?

25      A.   I can't say that all guests did.

1     Q.     Is that where Professor Dershowitz' massage

2     was?

3     A.     Yes.

4     Q.     Where were there nude photographs in New

5     York?

6     A.     In New York, so you would have to go

7     upstairs, make a left into Jeffrey's office, all over the

8     table, sorry, can I go back to Palm Beach.  I forget

9     another place.

10          MS. MCCAWLEY:  Yes, you're allowed to

11          finish your answer.

12     A.     Back to Palm Beach there was -- so you walk

13     into the front door and I told you about that table and

14     again, I'm bad at left and right, but if I'm facing the

15     door this way you make a right and there's Jeffrey's desk

16     and then Ghislaine's desk and all over their desks were

17     nude photographs, all over the computer, like, you know

18     the screen pages that you get pop up, nude photographs on

19     that as well.  So I just wanted to mention those, and

20     outside the cabana, sounds horrible, outside by the

21     cabana by the pool there's more nude photographs.

22     Q.     And these are all locations where guests

23     would be?

24     A.     Yes.

25     Q.     And it was frequent that guests would have

1    the opportunity to see these as they were going through

2    the house?

3          A.    Yes, if you walked through Jeffrey's house

4    there is not a chance that you could not see nude

5    photographs.

6          Q.    Were the photographs ever changed or taken

7    down when guests were there?

8          A.    No.  Like I said, he was not ashamed.

9          Q.    Were there also nude photographs in New

10   Mexico?

11         A.    Yes, but more in his, like I guess you

12   would call it an office.  It's not like Florida where you

13   just walk in and you see it right there, it was more

14   you'd have to go to his office to see them.  I'm just

15   trying to recollect.  There was some by his bedside

16   table, and I honestly think that's all I can remember

17   seeing them around the New Mexico house.

18         Q.    Did guests go by Jeffrey's bedside table?

19         A.    Sometimes if there was -- something was

20   happening.

21         Q.    If you were just a visitor for a dinner

22   party for example?

23         A.    No, if you were there for a dinner party

24   you wouldn't go into his bedroom.

25         Q.    If you were just a guest for a dinner party

1   in New Mexico would you see nude photographs in getting

2   to the dining room?

3        A.    No.  I don't think we finished New York,

4   did we?

5        Q.    You tell me?

6        A.    I don't think we did.  I think I skipped

7   from telling you about New York and went back to Palm

8   Beach.  So should I touch back to New York?

9             MS. MCCAWLEY:  Finish your answer.  Yes.

10        A.    New York.  So there was pictures on his

11  desk in the office and around that room, and then there's

12  this room that I refer to as the dungeon and that had a

13  huge photograph of me and another girl, I mean huge as in

14  bigger than that wall cabinet.  There's a painting of

15  both of us doing salacious acts together.

16        Q.    Salacious acts?

17        A.    Sexual acts, you know what I'm saying?

18             MR. SCAROLA:  Could I request that the

19             camera pan to above Virginia so as to show the

20             wall cabinet and then come back down if you would,

21             please?  Thank you.

22  BY MS. BORJA:

23        Q.    Now, the█████, they visited Jeffrey

24  Epstein's property, correct?

25        A.    Yes.

1          MS. MCCAWLEY:  Objection.

2   BY MS. BORJA:

3          Q.   ████████████████████████████████

4   ████████████████████████?

5          A.   Yes, ████████████████████████.

6          Q.   And the children would see these nude

7   photographs in the property?

8          A.   Yes.

9          Q.   And both the parents would?

10         A.   Yes.

11         Q.   Were there other children that saw these

12  nude photographs?

13         A.   I mean, if you're talking about minors,

14  then yes.

15         Q.   When you saw Alan Dershowitz visiting

16  Jeffrey Epstein's properties did you ever see his wife

17  ████████?

18         A.   No.

19         Q.   Did you ever see his grandchildren?

20         A.   No.

21         Q.   Do you know whether they were there or not?

22         A.   I don't know if they were there, but I did

23  not see them.

24         Q.   Now ████████████████ is somebody who was at

25  Jeffrey Epstein's properties, correct, at least at one,

1    right?

2              A.    Yes.

3              Q.    Which property was that?

4              MS. MCCAWLEY:  It's previously -- she's a

5         childhood victim.  We're objecting to a line of

6         testimony regarding details about sexual

7         encounters with ███████████.  If you know if she

8         was in a location you can state that, but you

9         don't have to give details.

10             SPECIAL MASTER:  She's asking only the

11        location at this point.

12             A.    I'm just looking out for her.  She was a

13   victim.  Yes, she was at all of his residences.

14             Q.    Did her mother ever come to visit any of

15   these residences?

16             A.    I never met her mother.

17             Q.    Do you know whether her mother did?

18             A.    I don't know.

19             Q.    You never met ███████████?

20             A.    No.

21             Q.    How much were you paid for messages?

22             MS. MCCAWLEY:  I'm going to -- just give me

23        a moment.  This is one of the areas that Judge

24        Lynch quashed discovery on.  I know you've made a

25        ruling on that, but I want to make my record.  He

1        made a ruling that she did not have to go through

2        a remuneration of funds as a result of the

3        activities she was forced to participate in.

4        That's the request.

5        SPECIAL MASTER:  Let me take a look at

6        this.

7        MS. MCCAWLEY:  Sure.  That was question 20

8        and he quashed that.

9        MS. BORJA:  Can you tell me which duces

10       tecum request you're saying this is?

11       MS. MCCAWLEY:  I believe it's request 20.

12       All documents showing any payments or remuneration

13       of any kind made by Epstein or his agents or

14       associates to you from June 1999 to December 31,

15       2002.

16 BY MS. BORJA:

17       Q.    I'll ask another question.  You've made

18 statements that you were paid $200 a massage, correct?

19       MS. MCCAWLEY:  Objection.  Same objection.

20       He did not make her produce documents or have any

21       testimony regarding the payments she received.

22       SPECIAL MASTER:  Do you have a statement

23       particularly you're referring to?

24 BY MS. BORJA:

25       Q.    You were paid for sexual services by

1  Jeffrey Epstein, right?

2         A.    Yes.

3         Q.    Did you pay taxes on those?

4         A.    No.

5         Q.    Why not?

6         A.    It was cash payment.

7         Q.    You were a waitress at the Roadside Grill,

8  right?

9         A.    Yes, for a very short time.

10        Q.    Did you pay taxes on that?

11        A.    Not that I know of.  No, I don't think I've

12  ever paid taxes in the U.S.

13        Q.    And you haven't paid taxes since you

14  returned?

15        A.    I haven't worked here since I returned.

16        Q.    When you got the $160,000 for the media

17  deal you didn't pay taxes on that?

18              MS. MCCAWLEY:  Objection.  Go ahead.

19        A.    I did pay taxes on that in Australia.

20        Q.    But not in the U.S.?

21        A.    It was given to me in Australian money so I

22  paid for it in Australian taxes.

23        Q.    When you worked at Mar-a-Lago did you pay

24  taxes?

25        A.    No, I was only there a very short period of

1    time.  Max maybe pulled in two paychecks, so no.  I think

2    as a young age I think there's an exemption if you're 15

3    or something like that you don't have to pay tax.  That's

4    what I heard.  I'm not too sure if that's correct or not,

5    but no, I didn't pay tax on it.

6            Q.     What was the last grade that you completed

7    in school?

8            A.     I believe it was the ninth grade.

9            Q.     Did you ever complete your GED?

10           A.     I attempted to complete my GED, but I never

11   did.

12           Q.     And over what period of time did you

13   receive payment for any sexual acts?

14                  MS. MCCAWLEY:  Same objection that I had

15           before.

16                  SPECIAL MASTER:  You can answer.

17           A.     From 1999 to 2002.

18           Q.     Until when in 2002, until you left?

19           A.     Yeah, even after I left Jeffrey sent me

20   money in Thailand Western Union just to help pay for my

21   school that I was being sent to and just living expenses.

22           Q.     How long were you in Thailand?

23           A.     I believe I was there from September, I

24   can't remember the exact date in September, but let's

25   just say early September and then after I married my

1  husband we went on a honeymoon.  I think I came to

2  Australia, I think it was November.

3          MS. BORJA:  I don't want to take a lot of

4          time, I don't know why I'm not putting my hands on

5          this document right now.  I'll just have it marked

6          and give you the original.

7          (Thereupon, VR Defendant's Exhibit No. 8,

8          was Marked for Identification.)

9  BY MS. BORJA:

10         Q.    I'm going to read to you, I'll hand it to

11 you in a second, read to you the document that is marked

12 as VR Exhibit Number 8 and it says, at page 3 of 29,

13 "Epstein, a Wall Street money manager who once counted

14 ████████ and ████████ amongst his friends, became

15 the subject of an undercover investigation in 2005 after

16 the stepmother of a 14-year old girl claims she was paid

17 $200, 125 pounds sterling to give an erotic massage."  Do

18 you see that?

19         A.    What paragraph is that on?

20         Q.    Top of the page.

21         A.    However, he avoided trial.  Yes.  Yes, I

22 do.

23         MS. MCCAWLEY:  So I'm objecting as to any

24         testimony regarding payments to you if it's a

25         payment to someone else.

1          SPECIAL MASTER:  Right now the only

2     question pending is do you see that paragraph?

3  BY MS. BORJA:

4     Q.    Was that a standard payment for massages by

5  Jeffrey Epstein?

6          MS. MCCAWLEY:  You can answer that.

7     A.    Yes, it is.

8     Q.    What's the basis for your testimony in that

9  regard?

10    A.    It was the basis for my testimony?

11    Q.    How do you know that's a standard payment?

12    A.    That's -- are you trying to trick me into

13  another question?

14         MS. MCCAWLEY:  I have an objection to this

15    line of questioning, I mean I do.  I have an

16    objection based on a quash.  If the article

17    references a payment and you're familiar with that

18    payment.

19         MS. BORJA:  Counsel, speaking objections

20    are not appropriate.

21         MS. MCCAWLEY:  I'm making my objection for

22    the record.

23         SPECIAL MASTER:  Hang on.  Finish making

24    your objection.  Try not to instruct the witness

25    during the objection.  Okay.  You can answer the

1          question.

2          A.     So can you repeat that question for me?

3                 SPECIAL MASTER:  Go ahead and repeat it off

4          the record so we get the exact wording.

5                 (Last question read back by the court

6          reporter.)

7          A.     Yes, I do.

8          Q.     What's the basis for that statement?

9          A.     That's what we were given.

10         Q.     Who is we?

11         A.     Any of the girls that had to service

12    Jeffrey.  I'll speak for myself alone.

13         Q.     That's per massage?

14         A.     Yes.

15                (Thereupon, VR Defendant's Exhibit No. 9,

16         was Marked for Identification.)

17    BY MS. BORJA:

18         Q.     Ms. Giuffre, I have handed you document a

19    that's been marked as VR Exhibit 9, which is a

20    declaration of Virginia Giuffre?

21         A.     Yes.

22         Q.     You've seen this document before?

23         A.     I've seen a lot of documents, but yes I

24    have seen this.

25         Q.     On page 6, please.

1          MS. MCCAWLEY:  Is there a copy for me?

2          MS. BORJA:  Do you have one?

3          MR. SCAROLA:  No.  Thank you.  Page 6 is

4      that where we are?

5  BY MS. BORJA:

6      Q.    Yes, paragraph 20.  You say here in your

7  affidavit, Dershowitz was so comfortable with the sex

8  that was going on that on one occasion he observed me in

9  sexual activity with Epstein.  Do you see that?

10      A.    Yes.

11      Q.    And that's the same event that you

12  testified earlier where you testified that Professor

13  Dershowitz walked into Jeffrey Epstein's private bedroom?

14      A.    Yes.

15      Q.    And we talked about the six instances

16  earlier today and I believe you've indicated that they

17  were at six different locations, correct?

18      A.    At least, yes.

19      Q.    Are there any other instances that you

20  recall?

21      A.    Not off the top of my head.

22      Q.    Think about it.  I want your best testimony

23  today before we leave?

24      A.    All I can remember right now at this time

25  is these approximately six times.

1      Q.     Why didn't you mention the limousine in

2   your affidavit?

3              MS. MCCAWLEY:  Objection.  To the extent

4              that this pertains to a conversation you had with

5              your lawyers she can't reveal that, anything else

6              you can reveal.

7              SPECIAL MASTER:  You can answer.

8              MS. MCCAWLEY:  If you can answer without

9              talking about what you discussed with your

10             lawyers.

11     A.     At that time I wasn't asked about it and it

12   came to me while thinking about it later on.

13     Q.     When did it first come to you?

14     A.     I don't know the exact date or time.  Like

15   I said to you earlier it's, trust me, this is not stuff

16   you want to remember, this is stuff you want to try to

17   throw away in the back of the garbage can in your head,

18   and it took me a long time to be able to do that and move

19   on with my life.  And when Jeffrey got away with

20   everything that he had gotten away with it infuriated me

21   so then I wanted to do something about it which is why I

22   started thinking about the things more and more and more;

23   and sometimes the more and more and more I thought about

24   it, the more I would remember certain occasions.

25     Q.     But you didn't remember the limousine as of

1   the time of this affidavit?

2           MS. MCCAWLEY:  Objection.

3           SPECIAL MASTER:  You can answer.

4           MS. MCCAWLEY:  You can answer.

5     A.    Apparently not.

6     Q.    Have you ever told anybody about having sex

7   in the limousine with Alan Dershowitz?

8           MS. MCCAWLEY:  Outside of your lawyers.

9     A.    Outside of my lawyers, no.

10     Q.    Did you ever tell your lawyers?

11           MS. MCCAWLEY:  Objection.  I'm not going to

12         have her testify as to what she told the lawyers.

13           SPECIAL MASTER:  We're not going to allow

14         that.

15   BY MS. BORJA:

16     Q.    It's your privilege, the attorney/client

17   privilege.

18           MS. MCCAWLEY:  She's not waiving her

19         privilege.

20           MS. BORJA:  Counsel, can I make my record?

21           SPECIAL MASTER:  You've said -- go ahead

22         and make your record.

23   BY MS. BORJA:

24     Q.    You hold the privilege, you're the decider.

25   The attorney/client privilege belongs to you.  If you

1  would like to waive it you have that opportunity to do

2  it?

3       A.     I decide not to waive my privilege at this

4  time.  Thank you.

5            MR. SCAROLA:  She would really like to be

6       able to give you the answer to that question.

7            MS. BORJA:  Counsel, I would appreciate --

8            MR. SCAROLA:  All right.  I couldn't

9       resist.

10            MS. BORJA:  This is not a game, this is not

11       a joke to the witness or to the attorneys who are

12       here for the correct purposes.  So please don't

13       make this a joke today.

14            SPECIAL MASTER:  Let's move on.

15            MR. SCAROLA:  I absolutely agree with you.

16       It is not a joke.

17            SPECIAL MASTER:  Let's move on.  I

18       understand.  Let's move on.

19  BY MS. BORJA:

20       Q.     Did you ever tell anybody other than your

21  lawyers ever about your allegation that you had sex in

22  the limousine?

23       A.     I've spoken with my husband about the times

24  and experiences that I had with Dershowitz.

25       Q.     Including the limousine?

1        A.      Including all of the times that I can

2    remember that I've told him.  I mean, he's my best friend

3    so.

4        Q.      This affidavit was signed November 20th,

5    2015.  So around this past Thanksgiving.  So you first

6    remembered it since Thanksgiving?

7        A.      Yes.

8        Q.      So, since Thanksgiving have you had

9    conversations with anybody about the allegation?

10       A.      Other than my lawyers, no.  I mean, the

11   only other person that would know anything about this

12   would be my husband, but I mean, it's only because

13   recently we've just been dealing with a lot of this.

14       Q.      How long did that sexual activity in the

15   limousine take place?

16       A.      Not long.

17       Q.      What happened?

18       A.      You want a description?

19       Q.      I would like to know what happened in that

20   limousine that is the abuse that you're alleging

21   happened?

22       A.      Jeffrey instigated it, the men pulled out

23   their, the wording for this is just anatomy.  They pulled

24   out their anatomy, their genitals and we were told to

25   perform oral sex on them.

1    Q.    There was no discussion between the

2  gentlemen beforehand that you heard?

3    A.    You know, I don't know the exact terms that

4  they used during that time, but Jeffrey insinuated it and

5  Alan agreed to it, so yes.

6    Q.    The time on the plane where you allege that

7  you and another female participated in sexual activity,

8  was that at the same time?

9         MS. MCCAWLEY:  Objection.

10    A.    What, the girl and me and Jeffrey and

11  Dershowitz, was that like all together?

12    Q.    Tell me what happened on the plane?

13    A.    It went from --

14         MS. MCCAWLEY:  Just use the best terms you

15    can.  Take your time.

16    A.    Sorry, it wasn't from giving foot massages,

17  which is a normal thing that we would do on the plane to

18  Jeffrey again insinuating, you know, we should -- him and

19  Alan, we should kind of do this.  I don't know their

20  exact wording so I'm not going to put words in their

21  mouth.  But it went from foot messages to oral sex to

22  intercourse.

23    Q.    So who was involved, I mean, you were

24  sexually involved with Professor Dershowitz, correct?

25    A.    Yes.  It was kind of -- to be honest it

1  was --

2          MS. MCCAWLEY:  Use a term that you can use.

3          A.      It was a little bit of mix and match, it

4  sounds horrible.  So at first I went down -- oh God, I

5  can't believe I'm saying this.  At first I gave oral sex

6  to Epstein, and the other girl gave oral sex to

7  Dershowitz, and then we swapped within, I would say

8  seconds, like 60 seconds to a minute we were told, you

9  know, they wanted us to get on top so we mounted them and

10 we straddled them and we performed intercourse on a bed

11 in the airplane.

12         Q.      The foot messages, who gave who foot

13 messages?

14         A.      I believe I was giving Jeffrey a foot

15 massage and the other young lady was giving Dershowitz a

16 foot message?

17         Q.      Anything else happen during that flight?

18         A.      After the sexual experiences, which is what

19 I had been trained to do anyway, which was not out of the

20 ordinary, I went to the back of the plane, got washcloths

21 and proceeded to clean Jeffrey and Dershowitz up with a

22 warm washcloth.

23         Q.      During this activity were condoms used?

24         A.      No.

25         Q.      Were condoms ever used with Professor

1   Dershowitz?

2          A.    No, and they weren't used with any other

3   people as well.

4          Q.    Were the other people that you were sexual

5   trafficked to?

6          A.    No.

7          Q.    Did you ever ask to use a condom?

8          A.    No, I mean, Jeffrey had us tested quite

9   regularly so we knew we were clean.

10         Q.    You've never had a sexually transmitted

11  disease?

12         A.    No.

13         Q.    Where would you get tested?

14         A.    At a doctors.  To be specific a

15  gynecologist.

16         Q.    Who was your doctor?

17         A.    A gynecologist in Palm Beach.

18         Q.    Who is that?

19         A.    I have no idea.

20         Q.    Were you ever hospitalized during 1999 to

21  2002?

22         A.    Yes.

23         Q.    For what?

24               MS. MCCAWLEY:  I object to the extent that

25               this gets into private medical discussions.  I

1          don't think she has to do that in this deposition.

2                    SPECIAL MASTER:  Please answer the

3          question.

4          A.    To this day I'm actually confused about the

5    whole situation.  If you want me to get into detail about

6    it.

7                    SPECIAL MASTER:  Listen to her question.

8          Her question was --

9          A.    Yes, I was medically brought to a hospital.

10         Q.    For mental health or physical health?

11         A.    Physical.

12         Q.    It didn't have anything to do with a

13   sexually transmitted disease; is that correct?

14         A.    No, it wasn't a sexually transmitted

15   disease.

16         Q.    Do you know which hospital you were treated

17   at?

18         A.    No, but I know it was in New York.

19         Q.    Were you admitted into the hospital to stay

20   or was it you went to the emergency room and they let you

21   out the same day?

22         A.    I was admitted to the emergency room and I

23   think I stayed two days.  It could be more, it could be

24   less.  I know they heavily sedated me.  I'm not too sure.

25         Q.    Were you given any medication as a result

1   of --

2            A.      Yes.

3            Q.      What were you given?

4            A.      I don't know.  I mean, I'm a young kid, I

5   didn't know the medications or the terminology or

6   anything.  I think it was some kind of antibiotic.

7            Q.      You weren't given some sort of pain

8   reliever?

9            A.      Yes, I was given pain relief at the

10  hospital.  I think I left the hospital with the

11  antibiotics.

12           Q.      Do you have a book agent?

13           A.      What's a book agent?

14                   MS. MCCAWLEY:  Objection.

15  BY MS. BORJA:

16           Q.      Somebody to help you negotiate a book or

17  media contract?

18                   MS. MCCAWLEY:  Objection.  This is again

19                   one of the requests that Judge Lynch quashed

20                   relating to their inquiry and their subpoena as to

21                   communications with -- it's actually two of them.

22                   He quashed 9, communications with media; he

23                   quashed 17, communications relating to potential

24                   book deals, et cetera.

25                   It's absolutely relevant as to whether or

CONFIDENTIAL

1    not Professor Cassell and Mr. Edwards were defamed

2    by Professor Dershowitz is what this case is

3    about.  It's not about any media inquiries or any

4    book deals or anything of that nature.

5         SPECIAL MASTER:  And your position?

6         MS. BORJA:  This is a discovery deposition.

7    This may lead to discovery of admissible evidence,

8    and I understand that this witness doesn't want to

9    provide this information but we can pursue it from

10   third parties, and blocking us in this way is

11   inappropriate.  I simply asked for the name of an

12   agent.

13        MS. MCCAWLEY:  So they lost in front of

14   Judge Lynch and now they're trying to win here, I

15   mean, it's totally inappropriate.  He ruled in our

16   favor.  I have a motion to quash, and she

17   shouldn't have to be forced to testify as to those

18   items.

19        SPECIAL MASTER:  And your question is

20   whether she has a book agent?  That's the

21   question?

22        MS. BORJA:  Right.

23        SPECIAL MASTER:  I think you can answer

24   that question.

25   A.   Well, I don't have a book deal, but I have

1   looked into getting a book agent.

2          SPECIAL MASTER:  Do you have a book agent

3       is the question?

4       A.    Not at this time, no.  I did at one time.

5       Q.    When did you have one?

6       A.    Book in 2012, maybe the end of 2011.

7       Q.    Who was that?

8          MS. MCCAWLEY:  Again, I object to all this

9       testimony.  We had a motion to quash on this.  We

10      won that motion to quash for the reasons we argued

11      in court in front of Judge Lynch and the testimony

12      is not appropriate.

13          SPECIAL MASTER:  You can answer the

14      question if you know the person's name.

15      A.    His name is Gerad?

16      Q.    Who does he work for?

17      A.    I don't know the name of his company.  He

18 was just a small time guy.  He worked with rappers

19 before.  That's about all I know about him.  I don't know

20 if we even actually signed anything saying he was my

21 agent.  He said he was interested, he read the stuff by

22 Sharon Churcher.  I think he was going to represent me if

23 a book ever came out or if a book deal ever happened and

24 nothing ever happened, so he's not representing me.

25      Q.    Did you tell him about Professor

1 Dershowitz?

2          A.    No.

3          Q.    Why not?

4          A.    Because we didn't even talk in lengthy

5 discussion about that.  We mostly talked about -- if I

6 were going to have -- I can't say that.  I mean, it's

7 mostly about the sickening discussions, I mean, sickening

8 ordeal that Epstein got away with so many counts of

9 maliciously hurting minors and got away with it.  That's

10 more my idea if I was going to ever write a book.

11          Q.    Do you have any agreement or understanding

12 with Boise, Schiller regarding what would happen if you

13 did receive any monetary amounts from ███████████?

14          MS. MCCAWLEY:  I'm going to object to this.

15          This gets into the relationship that she has with

16          our firm and that's attorney/client privilege.

17          You don't have to respond to any of that.

18          SPECIAL MASTER:  I'm going to grant that

19          motion.

20 BY MS. BORJA:

21          Q.    Did you receive a payment of 10 or $15,000

22 after you claim that you had sex with ███████████?

23          MS. MCCAWLEY:  Objection, it gets into the

24          remuneration of which has already been quashed in

25          one of the questions.

1      MR. SCAROLA:  I also don't understand the

2      scope of the question.  From whom, for what, did

3      she ever get 10 or $15,000 in the last years

4      unrelated to this case?  The objection is

5      overbroad, vague, confusing.

6      SPECIAL MASTER:  Put a time frame on it

7      counsel and then I'll see.  Put a time frame.

8  BY MS. BORJA:

9      Q.    2011 were you paid 10 to $15,000 by or on

10  behalf of Jeffrey Epstein for having sex with █████

11  ████?

12      A.    2011.

13      Q.    I'm sorry 2001?

14      A.    Is that granted?

15      SPECIAL MASTER:  I didn't make a

16      determination yet.

17      MS. MCCAWLEY:  Same objection.

18      THE WITNESS:  Sorry.

19      SPECIAL MASTER:  I'm going to allow the

20      question.  I'm going to overrule the objection.

21      You can answer if you know.

22      A.    Yes, I did receive $15,000.  I don't know

23  what equivalent that is to pounds.  I received it in

24  American dollars.

25      COURT REPORTER:  Repeat that again.

1    A.    I did receive $15,000.  I do not know the

2  equivalent to what that is in pounds.

3    Q.    And you didn't pay taxes on that?

4    A.    No.

5    Q.    When did you first retain Paul Cassell as

6  your counsel?

7         MS. MCCAWLEY:  You can give the date but

8         can't get into discussions you had with Mr.

9         Cassell.

10        SPECIAL MASTER:  That's the question.

11   A.    I don't know the exact date, I'm sorry.

12   Q.    What's your best estimate?

13   A.    Well, I started talking to Brad in the fall

14  in 2011, but I never met them personally until 2013 I

15  think.  So I don't know when I officially became their

16  client.

17   Q.    When do you consider that you became their

18  client, was it when you first met them?

19   A.    Personally, like face to face?

20   Q.    I'm asking you that question?  I'm not

21  suggesting that's the answer.

22   A.    No, that's why I'm asking you.  When I

23  talked to them on the phone or met them face to face?

24   Q.    Do you consider when you met them face to

25  face as being the first time that you engaged them or

1    some other time?

2          A.    I believe when we first met face to face is

3    when I became their client, I think that's right.

4          Q.    When did you first meet Brad Edwards face

5    to face?

6          A.    The same time I met Paul.  I think it's

7    2013.

8          Q.    Whenever it was that's when you engaged him

9    to be your lawyer in your mind?

10         A.    Well, in my mind.  It could have been 2011

11   when we started talking.  I don't officially know.  I

12   really just trying to answer you honestly if possible.

13         Q.    But your understanding is when you met them

14   you wanted them to represent you?

15         A.    Oh yeah, I wanted them to represent me from

16   2011.  I just wanted to be a part of the CVRA case.  I

17   wanted my story to be heard and I wanted to help other

18   victims out there, so yes.

19               MR. SCAROLA:  I'm going to observe that I

20               think there are about 15 minutes left on the four

21               hour allocation and I would like some time for

22               examination of the witness.

23               SPECIAL MASTER:  There's actually how much?

24               THE VIDEOGRAPHER:  Seven.

25               MR. SCAROLA:  Seven minutes left.

1          MS. BORJA:  You did not cross notice this

2     so if counsel wants to give you time that would be

3     up to counsel.

4          MR. SCAROLA:  I don't know that it's

5     necessary for me to cross-notice the depo.

6          SPECIAL MASTER:  Hang on one second.  We

7     have seven minutes, let's spend it wisely.

8     Counsel is not finished with her examination.  So

9     she is entitled to complete her examination before

10    handing it off.

11         MS. MCCAWLEY:  I'm comfortable allowing her

12    four hours and then if you have questions we can

13    deal with that.

14         (Thereupon, VR Defendant's Exhibit No. 10

15    was Marked for Identification.)

16 BY MS. BORJA:

17    Q.    Ms. Giuffre, I've handed you a document

18 that's been marked as VR 10 which is a Federal Bureau of

19 Investigation document consisting of 12 pages.  Do you

20 have that?

21    A.    Yes, I do.

22    Q.    Have you seen that before today?

23    A.    Yes, I have.

24    Q.    When did you first see this?

25    A.    I'm not too sure if the FBI gave me a copy

1   of it.  I think it's a possibility that they did,

2   otherwise I would have seen it from my lawyers.

3        Q.    If the FBI gave you a copy of it what would

4   you have done with it?

5        A.    Probably put it in a big file in the back

6   of my closet.

7        Q.    Do you keep a big file in the back of your

8   closet with your personal papers?

9        A.    You should see my filing system, it's quite

10  horrible.

11       Q.    Do you have -- actually let's turn to page

12  10 of 12?

13            MS. MCCAWLEY:  Numbered at the top, the

14            very corner.

15       A.    Okay.

16       Q.    It says Giuffre recalled meeting, and then

17  it's redacted.  Giuffre was using Xanax, heavily at the

18  time.  Her recollection was not clear.  She remembered

19  that there were many models on the island that did not

20  speak English along with a modeling person who had an

21  unknown accent.  Do you see that?

22       A.    Yes.

23       Q.    Do you know what incident this is referring

24  to.

25       A.    With all the blanks there, that's not a

1  unusual thing because there was lots of models there.

2      Q.    Do you remember telling the FBI that you

3  couldn't remember an incident because you were using

4  Xanax heavily at the time and your recollection was not

5  clear?

6      A.    No, I remember telling them that I used

7  Xanax so of course things are going to be foggy, but some

8  things severely stick out, you just can't remember no

9  matter how much Xanax or anything else you take.

10              MR. SCAROLA:  Could you read that last

11          response back again, please?

12              MS. BORJA:  During you deposition you can

13          read back.

14              MR. SCAROLA:  No, I would like -- I'm not

15          sure that I heard it correctly.  If I could hear

16          it back now please?

17              MS. BORJA:  No, you can read it on cross

18          examination.  I'm moving on.

19              SPECIAL MASTER:  Hold on a second.  Read it

20          back so we can move on.

21              MR. SCAROLA:  Thank you.

22              (Last answer was read back by the court

23          reporter.)

24              MR. SCAROLA:  Thank you.

25              SPECIAL MASTER:  Counsel?

1    BY MS. BORJA:

2         Q.    When we started today I asked you about the

3    subpoena duces tecum that's been marked in this case do

4    you have that?

5         A.    I don't know of the subpoena.

6               MS. MCCAWLEY:  It's going to be one of the

7               exhibits here.

8               SPECIAL MASTER:  Are you talking about the

9               actual notice?

10              MS. BORJA:  I'm asking about the actual

11              notice.

12              MS. MCCAWLEY:  I don't think that was

13              marked.  I'm sorry, there is a schedule A attached

14              to the notice you marked.  If you flip this page

15              on the notice.

16              SPECIAL MASTER:  VR 1, there's a schedule

17              attached to VR 1.

18              MS. MCCAWLEY:  You can use mine.

19         A.    Which page would you like me to look at?

20         Q.    Let's start with schedule A, number 1.

21    Have you seen this document before?

22         A.    No, other than maybe you showing it to me

23    today.  It's in my pile.  It's not in my pile, is it?  I

24    don't know.  I haven't seen it.

25         Q.    Did you collect documents to give to

1  Professor Dershowitz as a part of this action?

2      A.    Did I collect documents to give to

3  Dershowitz?

4      Q.    Correct?

5      A.    Why would I do -- no.

6      Q.    Do you have -- did you ever check to see if

7  you have any original photographs in your possession?

8      A.    Unfortunately, I don't have lots of

9  photographs because I left a lot of things behind in

10 America when I moved to Australia.

11     Q.    Ms. Roberts, my questions is --

12     A.    No, I don't have any in my hand or

13 possession.

14     Q.    Did you look for any?

15     A.    I've seen the photos that I have and no, I

16 don't see any of Alan Dershowitz in there.

17     Q.    My question was, were you looking for any

18 original photographs to produce to Professor Dershowitz

19 in this case, did you look?

20     A.    No.

21          MS. MCCAWLEY:  Other than what your lawyers

22          have done for you I think is what she's asking.

23          You made a production in this case and I think she

24          may have been asking you questions about that.

25          SPECIAL MASTER:  Counsel, she's asking a

1        specific question of the witness.

2      A.    I'm sorry, that's my fault, I didn't

3 understand the question.  But no, I was not looking for

4 photographs for Dershowitz.

5      Q.    Do you have any notes of any sort

6 pertaining to Professor Dershowitz?

7      A.    I've got lots of affidavits.  I don't know

8 what these things are called, documents.  Yes, I do have

9 lots of those.

10     Q.    Do you have any drafts of those before

11 they're final and you sign them?

12     A.    No, I've got final -- I've got stuff like

13 this, declarations signed on the back.

14     Q.    You get a declaration at some point, right?

15     A.    Yes.

16     Q.    And it's not signed, correct?

17     A.    I sign it and my lawyers print it out for

18 me.

19     Q.    Do you make any changes?

20     A.    Not unless there needs to be changes, but

21 my lawyers do a great job of recording everything that I

22 say.

23     Q.    But you've never made revisions, correct?

24     A.    Not that I'm aware of.

25     Q.    Have you made any notes, personal notes on

1    scraps of paper or notepads, the booklet pertaining to --

2    other than the ones that you gave, the pages that you

3    gave to Ms. Churcher?

4         A.    I didn't give anything to Ms. Churcher

5    about Alan Dershowitz, but when I'm going through, you

6    know, my affidavits and stuff like that, if I do get a

7    memory that sticks out, yes, I will write it down, you

8    know, and think about it, but I don't have, you know,

9    notes per se that have Dershowitz written all over it,

10   no.

11        Q.    But when you think of something you write

12   it down to help you with your memory?

13        A.    Yes.

14        Q.    What do you do with those documents?

15        A.    I'm a visual person so generally I just

16   write them down and then I forget about it.  It's not

17   like -- I don't hold on to everything basically if that's

18   what you're asking me.

19        Q.    Does any of it go to the file in the back

20   of the closet?

21        A.    No, these do though.  These are always back

22   there, but, no.

23        Q.    Did you ever look to see if you had any

24   notes that related to any times that you met Professor

25   Dershowitz?

1      A.    Besides what's in these?

2      Q.    Did you ever look to see if you had any

3 personal notes in your writing that pertain to Professor

4 Dershowitz?

5      A.    Like from my old journal, the one that I

6 burned?

7      Q.    From anywhere.  Did you ever make an effort

8 to look?

9      A.    Dershowitz could have been in my journal,

10 he could have been.  We're talking about an 85 page, if

11 not more, you know, things that I had written to get my

12 story out of my head and into pages; and yes, Dershowitz

13 could have been in there, but that's up in the clouds

14 now, bonfire.

15     Q.    That's what you call your journals, what

16 you burned, right?

17     A.    Yes.

18     Q.    And you wrote that journal in order to

19 collect your thoughts?

20     A.    To get everything out of here and on to

21 paper.

22     Q.    Have you made any other notes, though,

23 since then to help you when you think of things?

24     A.    Yes, sometimes like I said, sometimes when

25 I read my affidavits and stuff like that, you know, and I

1  think of something else like a description of something

2  that I forget about, you know what I mean, then yeah,

3  I'll go back and I'll write it in the journal, you know,

4  for instance, you know, what another girl would have

5  looked like.  Even though I can't identify her name or

6  her age or anything like that, but I do remember like

7  flashes of blonde, little things like that, but nothing

8  -- I don't have any more journals.

9      Q.    But those notes, they help your memory?

10     A.    Sometimes.  I'm a very visual person.

11     Q.    And they help you with your affidavits?

12     A.    No, they don't help me with my affidavits,

13  my affidavits are already done, I just go back and it

14  helps my memory.  It helps me bring stuff out.

15     Q.    What do you do with those notes?

16     A.    Nothing, literally nothing.  They're in a

17  notebook that if I need to write it down.  I have a dream

18  notebook as well where I'll just write down my dreams and

19  stuff.  I do nothing, no one is seeing it.

20     Q.    You read it?  You keep it?

21     A.    Yeah, I keep it.

22     Q.    Okay.  Have you gone back and read that

23  recently?

24     A.    No.

25     Q.    Okay.  You continue to make entries into

1   it?

2          A.     Not so much about Dershowitz.  It's mostly

3   like feelings, dreams, you know, past things that I've

4   gone through.  Like I said, not so much pertaining to

5   Dershowitz himself.

6          Q.     And that's separate from your dream book?

7          A.     No, it's all in one.

8          Q.     Is it a spiral bound notebook?

9          A.     Yes, it's just a cheap, like, actually it's

10  in my kid's closet.

11         Q.     At this point in time are you angry with

12  Mr. Epstein?

13         A.     Furious.

14         Q.     Are you angry with Professor Dershowitz?

15         A.     Absolutely.

16         Q.     Are you angry with famous politicians?

17         A.     I'm angry with anybody who has it in their

18  mind that they can hurt and abuse a minor child and

19  continue to lie about getting away with it and that what

20  they've done is okay and they can continue to harass

21  victims, yes, I'm furious.

22         Q.     Are you angry with Professor Dershowitz for

23  his role in representing Jeffrey Epstein in the criminal

24  action?

25         A.     Do I think he played a big part getting him

1  off, absolutely.  So many other lawyers of his, I'm angry

2  with them, too.

3       Q.    Do you know what role Professor Dershowitz

4  played in the criminal prosecution of Jeffrey Epstein?

5       A.    No, by the time all the plea bargains and

6  everything had happened I was just a notified victim.  I

7  didn't know, you know, hey, ex's said this and now this

8  is going to be done.  I was already way past that point

9  and, hey, sorry, this is what you got to deal with.

10       Q.    And you don't know personally what role he

11  had in the non-prosecution agreements with Mr. Epstein,

12  is that fair?

13       A.    That's fair.  I know he played a part in

14  it, I know he was one of his lawyers.

15       Q.    What part do you know he played in it?

16            MS. MCCAWLEY:  Objection, asked and

17            answered.

18            SPECIAL MASTER:  You can answer.

19            MR. SCAROLA:  Except to the extent that the

20            information is derived from attorney/client

21            privileged communications.

22            SPECIAL MASTER:  Agreed.

23            THE WITNESS:  What does that mean?

24            SPECIAL MASTER:  Outside of what your

25            lawyers discussed if you can answer that question.

CONFIDENTIAL

1          A.      I knew he was his lawyer from what I've

2    been told.

3          Q.      But you don't know anything specific

4    regarding the non-prosecution agreements, correct?

5          A.      No.

6                  MS. MCCAWLEY:  Can we have a time check.

7                  THE VIDEOGRAPHER:  Four hours and

8          seven minutes.

9                  MS. MCCAWLEY:  We're going to wrap this up.

10         We've indulged --

11                 SPECIAL MASTER:  How much further do you

12         have in this line?

13                 MS. BORJA:  In this line?  Nothing, but I

14         do have a lot more questions.

15                 SPECIAL MASTER:  I'm sure that you do.

16         Okay.  I think it's a good place for us to break

17         because I think we've satisfied what I see as the

18         Court's order, four minutes -- four hours and

19         you've gone a little bit over, but that's actually

20         the running time, correct?

21                 THE VIDEOGRAPHER:  Yes.

22                 SPECIAL MASTER:  Based upon the Court's

23         order I think the deposition is concluded.

24                 MS. MCCAWLEY:  We're going to allow it be

25         -- because I didn't interfere with her four hours,

1      so I allowed that to happen.

2         MR. SCOTT:  We object to that.  The Court's

3      order said four hours.  The Court's order provided

4      for us to have the four hours and now all of a

5      sudden by agreement of the plaintiff's attorney

6      and the witnesses' lawyer without ever requesting

7      it from the judge, we're now going to agree to

8      extent the period?

9         SPECIAL MASTER:  Mr. Scarola?

10        MR. SCAROLA:  The Court's order provided

11     for a four-hour deposition.  I requested an

12     opportunity to have some time within that four

13     hours and we've allowed opposing counsel to use

14     more than the four-hour time.  I have probably

15     five minutes worth of questioning and I would like

16     an opportunity to be able to ask those questions.

17        MR. SCOTT:  We oppose that and if he does

18     then we want to re-direct.

19        SPECIAL MASTER:  That was exactly the

20     point.  So just understand that if I do grant the

21     extra time to Mr. Scarola of five minutes or not

22     that they're going to get an opportunity to

23     discuss the topics that he raises and we're going

24     to sit here for however how long they're satisfied

25     with those questions in the topic areas that he

1    raises.  Do you understand that?

2        MS. MCCAWLEY:  I do.  So let's take a

3    break.  It's a moment to take a break and I'll

4    discuss with these folks and we'll come back.

5        THE VIDEOGRAPHER:  Going off video record

6    2:25 p.m.

7        (A recess was taken.)

8        THE VIDEOGRAPHER:  We're now back on video

9    record 2:32 p.m.

10       SPECIAL MASTER:  Just for the record, Mr.

11   Dershowitz through counsel examined the witness

12   for four hours and seven minutes and there was a

13   request and it appears to be in agreement to

14   allow.

15       MR. SCOTT:  No agreement.

16       SPECIAL MASTER:  Hang on one second.  Hang

17   on.  Between Mr. Scarola and Ms. McCawley, to

18   allow Mr. Scarola a couple questions on

19   examination on cross and then my ruling is going

20   to be as follows:  You can go ahead and ask

21   whatever questions you want, Mr. Scarola, at which

22   time I will give opportunity for re-direct based

23   upon the topics that you've raised.

24       MR. SCAROLA:  With the understanding that

25   re-direct is going to be limited to the area of

1       inquiry that I am about to conduct.  I am about to

2       conduct an inquiry.

3           SPECIAL MASTER:  That is the understanding.

4       My understanding of my ruling, I know that Mr.

5       Dershowitz' team has objected to that.  I also

6       understand that there might be -- this is no

7       impact or their right or anybody else's right to

8       go back to Judge Lynch and ask for more time from

9       this witness based upon my ruling or my reading of

10      the original order.

11          MS. MCCAWLEY:  And there's also the motion

12      to strike the testimony that you allowed over the

13      ruling.

14          SPECIAL MASTER:  And there's a series of

15      those things that might need to be cleaned up in a

16      subsequent sitting.

17          MR. SCOTT:  It's my understanding this is

18      going to be limited to five minutes or less; is

19      that correct?

20          MR. SCAROLA:  That's what I anticipate.

21          MR. SCOTT:  Over our objection, okay.

22          SPECIAL MASTER:  Let's rock and roll.

23                  CROSS-EXAMINATION

24  BY MR. SCAROLA:

25          Q.    Virginia, has Brad Edwards ever pressured

1   you or encouraged you in any way whatsoever at any time

2   and under any circumstances to provide false information

3   about Alan Dershowitz?

4        A.    Never.

5        Q.    Has Brad Edwards ever pressured you or

6   encouraged you in any way or under any circumstances at

7   any time to provide false information about Jeffrey

8   Epstein?

9        A.    Never.

10       Q.    Has he ever pressured you or encouraged you

11   at any time or in any way, under any circumstances to

12   provide false information about anyone or anything?

13       A.    Never.

14       Q.    Has Paul Cassell ever pressured you or

15   encouraged you in any way, at any time, under any

16   circumstances to provide false information about Alan

17   Dershowitz?

18       A.    Never.

19       Q.    Has he ever pressured or encouraged you in

20   any way at any time, under any circumstances to provide

21   false information about Jeffrey Epstein?

22       A.    Never.

23       MS. BORJA:  Objection.  I couldn't follow

24       who he was.

25   BY MR. SCAROLA:

1      Q.    Mr. Cassell, Professor Cassell?  You
2  understood that I was asking you that question about
3  Professor Cassell, right?
4      A.    And he's never pressured me or encouraged
5  me in any way to talk --
6          MS. MCCAWLEY:  I don't want you to go into
7          discussions with them if you're saying something
8          didn't happen --
9          SPECIAL MASTER:  Just --
10         MS. MCCAWLEY:  I'm preserving privilege.  I
11         just want to make sure if something didn't happen
12         she can say that.
13 BY MR. SCAROLA:
14     Q.    Has Professor Cassell ever pressured you or
15 encouraged you in any way to provide false information
16 about anyone or anything at any time?
17     A.    Never.
18     Q.    Apart from any efforts made by Jeffrey
19 Epstein or agents on behalf of Jeffrey Epstein to silence
20 you or to have you refrain from providing true and
21 accurate information about the interactions that you had
22 with Jeffrey Epstein and others to whom you were
23 trafficked by Jeffrey Epstein, has anyone apart from that
24 circumstance pressured you or encouraged you to provide
25 false information about any of the topics that were

1    covered during the course of your examination?

2           MS. BORJA:  Objection.  Objection to the

3           form.  Leading, assumes facts not in evidence,

4           compound, misleading.

5           SPECIAL MASTER:  Your form objection will

6           be reserved.  You can answer.

7    A.    No.

8           MR. SCAROLA:  Thank you.  I don't have any

9           further questions.

10          MR. SCOTT:  Judge, excuse me, none of this

11          was covered on direct examination so we move to

12          exclude and strike the entire testimony because

13          none of this was covered on our direct.  But we

14          would like to request a two-minute recess because

15          these are completely new areas.

16          SPECIAL MASTER:  I'll grand your two-minute

17          recess.

18          THE VIDEOGRAPHER:  Going off video record

19          2:37 p.m.

20          (A recess was taken.)

21          THE VIDEOGRAPHER:  We are now back on video

22          record 2:41 p.m.

23          MR. SCAROLA:  Could we have a reading how

24          much time is used in my examination.

25          SPECIAL MASTER:  That's going to be

1          irrelevant at this point, but you can ask.

2               THE VIDEOGRAPHER:  It's going to be about

3          eight minutes, seven minutes of change.

4               MR. SCAROLA:  Hard for me to believe that

5          but if the counter says what the counter says.

6               SPECIAL MASTER:  The overtime got three

7          minutes, let's go.

8                    REDIRECT EXAMINATION

9    BY MS. BORJA:

10        Q.   Before you were scheduled here under oath

11   today by Mr. Scarola, did you talk to him in the break

12   before that?

13               MS. MCCAWLEY:  Objection to the extent you

14          discussed privileged information with your lawyers

15          you don't have to reveal.

16   BY MS. BORJA:

17        Q.   I'm asking what she talked about with Mr.

18   Scott?

19               MS. MCCAWLEY:  She's in a joint defense

20          agreement with Mr. Scarola.

21   BY MS. BORJA:

22        Q.   Are you in a joint defense agreement with

23   Mr. Scarola?

24               MR. SCAROLA:  I will tell you that there is

25          a joint defense, a common interest privilege

1          agreement between the witness and my clients, yes.

2          SPECIAL MASTER:  Are you asserting that

3          privilege then?

4          MR. SCAROLA:  Yes, we are asserting that

5          privilege and instructing the witness not to

6          answer on the basis of the privilege that exists

7          for Bradley Edwards and Professor Cassell.

8          SPECIAL MASTER:  So with that I'm going to

9          grant the motion similar to what I did the other

10         day when Mr. Dershowitz was testifying and under

11         the reservation that that can be dealt with later

12         in front of the judge or in front of me, whichever

13         you choose.

14    BY MS. BORJA:

15         Q.    Now, I understand from your testimony that

16    Mr. Edwards did not pressure you to give false

17    information about this matter, is that fair?

18         A.    That's fair.

19         Q.    Tell me everything that Mr. Edwards told

20    you about this matter?

21         MS. MCCAWLEY:  Objection, that's privileged

22         and she has not waived any privilege.  She's not

23         here testifying as to what she discussed with her

24         lawyers.

25         SPECIAL MASTER:  You know, it's an

1    interesting point.  I'm going to grant your motion

2    for privilege, but I'm going to suggest to you

3    that there might be a strong argument to be made

4    that those questions opened some of the door.  I'm

5    going to let the judge decide that.  But you can

6    go ahead, ask the questions, we'll put it on the

7    record for later determination, and it's going to

8    force, to be blunt, this among other things may

9    force the witness to come back and complete the

10   deposition.  Just let's be aware of that.

11        MS. BORJA:  And I can't make a proffer to

12   all of my questions because some of them will

13   depend on this witness' answers.

14        SPECIAL MASTER:  I'm aware of that.

15        MS. BORJA:  I want the record to be clear

16   that although I'm being asked for a proffer, I'm

17   constrained based on my inability to follow up.

18        SPECIAL MASTER:  I understand that, but I'm

19   sure that you have a couple questions that you'd

20   like to proffer to give the record an idea of

21   where you might have gone without restraint to

22   what the answer might be and then a subsequent

23   question might lead from the answer, I understand

24   that.

25  BY MS. BORJA:

1    Q.    Did Mr. Edwards ever suggest to you

2  anything regarding Professor Dershowitz?

3         MS. MCCAWLEY:  Objection.  Hang on, I'm

4         objecting.  She's making a proffer and I need to

5         make my objection on the record.  Do not answer.

6         Objection, attorney/client privilege.

7         SPECIAL MASTER:  So I'm going to grant

8         within the reservation it be brought back later.

9  BY MS. BORJA:

10        Q.    Did Paul Cassell ever tell you anything

11 about the topics that were covered in today's deposition?

12        MS. MCCAWLEY:  Objection, attorney/client

13        privilege.

14        SPECIAL MASTER:  Same ruling.

15 BY MS. BORJA:

16        Q.    Did anyone from Boise, Schiller ever tell

17 you anything about the topics that were covered in

18 today's deposition?

19        MS. MCCAWLEY:  Objection, privileged work

20        product.

21        SPECIAL MASTER:  Same ruling.

22 BY MS. BORJA:

23        Q.    Did Mr. Scarola ever tell you anything

24 about the topics that were covered in today's deposition?

25        MS. MCCAWLEY:  Objection, attorney/client

1        privilege.

2              SPECIAL MASTER:  Same ruling.

3  BY MS. BORJA:

4        Q.    Did the group that is Mr. Edwards, Mr.

5  Cassell, Boise, Schiller, whether it's Ms. McCawley, or

6  others or Jack Scarola ever tell you anything about

7  Professor Dershowitz at all?

8              MS. MCCAWLEY:  Objection, privileged

9              information.

10             SPECIAL MASTER:  To the extent it's

11             privileged I'll grant the motion.

12             MS. MCCAWLEY:  If you can answer that.

13             SPECIAL MASTER:  To the extent it's

14             privileged I'll grant the motion under the same

15             reservation.

16             MS. MCCAWLEY:  The question is, do you have

17             any non-privileged information?  You want to

18             re-ask question.

19       A.    I don't have any non-privileged

20  information.

21       Q.    Did they ever tell you anything before you

22  retained them as counsel?

23       A.    No.

24       Q.    Did Mr. Edwards, Mr. Cassell, Boise,

25  Schiller firm or Mr. SCAROLA ever tell you anything about

1  the circumstances of your sexual traffic, alleged sexual

2  trafficking to other individuals such as foreign

3  presidents?

4          MS. MCCAWLEY:  Objection.  That would be

5      privileged.

6          SPECIAL MASTER:  Same ruling.

7  BY MS. BORJA:

8      Q.    Did the group that includes Mr. Edwards,

9  Mr. Cassell, Boise Schiller, Mr. Scarola ever tell you

10 anything with regard to any allegations of sexual abuse

11 by Professor Dershowitz of other minors?

12         MS. MCCAWLEY:  Objection.  It would be

13     privileged.

14         SPECIAL MASTER:  I'm going to grand the

15     same thing.  Let me share with you in order to --

16     I do think it's unfair to have them proffer

17     virtually every question possible because it would

18     depend upon the potential answer.

19         MS. MCCAWLEY:  I understand.

20         SPECIAL MASTER:  If the ruling comes down

21     that this area of inquiry for whatever reason,

22     waive of privilege or for whatever reason is

23     allowed to be pursued then I'm going to provide

24     Mr. Dershowitz and his team wide latitude to

25     follow up on the questions should we re-set and

1    re-visit this.

2         MS. MCCAWLEY:  I understand.

3         MR. SCAROLA:  And we'll agree that the

4    questions that have been asked adequately --

5         MR. SCOTT:  That's what I wanted --

6         MR. SCAROLA:  Yes, adequately establish a

7    record for presentation to the Court.

8         MR. SCOTT:  As long as Mr. Scarola and you

9    agree, also, counsel?

10        MS. MCCAWLEY:  Do I agree that they

11    adequately established a record as to what you

12    ruled that can be presented here, yes.

13        MR. SCOTT:  Okay.  So with that I think

14    we're done.

15        MS. BORJA:  We just need to confirm that

16    the witness is going to following the instructions

17    of her counsel; is that correct?

18        THE WITNESS:  Yes.

19        MR. SCOTT:  Thank you, Mr. Scarola.

20        SPECIAL MASTER:  That short circuits it, I

21    appreciate it.  We're concluded.

22        MS. BORJA:  Unless I'm allowed to conduct a

23    cross examination about the pressure that her

24    lawyers gave her and the circumstances of that

25    pressure and what they told her.

1          SPECIAL MASTER:  Well, obviously that would

2     be subject to the area we just --

3          MS. BORJA:  Then if that's --

4          SPECIAL MASTER:  Anything else?

5          MS. BORJA:  No.  I just want the record to

6     be clear that we've been precluded about cross

7     examination about the exact scope of the

8     examination from Mr. Scarola regarding pressure.

9          SPECIAL MASTER:  Based upon what Mr.

10    Scarola just agreed to and counsel just agreed to,

11    I think that we have, and I think my rulings are

12    also clear on the issue.

13         MR. SCOTT:  I think we're done.

14         COURT REPORTER:  Do you need this ordered?

15         MS. BORJA:  Yes.

16         COURT REPORTER:  Mr. Scarola, do you need a

17    copy of this?

18         MR. SCAROLA:  Yes.

19         THE VIDEOGRAPHER:  That concludes the

20    videotaped deposition.  The time is 2:48 p.m.

21         (Thereupon, the deposition was concluded at

22    2:48 p.m.)

23

24

25

CONFIDENTIAL

1      C E R T I F I C A T E   O F   O A T H

2

3

4            STATE OF FLORIDA,

5            COUNTY OF DADE,

6

7            I, Deborah A. Harris, the undersigned

8   authority and Notary Public certify that VIRGINIA ROBERTS

9   GIUFFRE personally appeared before me and was duly sworn

10   on the 16th day of January, 2016.

11

12            Sworn to before me this 20th day of

13   January, 2016.

14

15

16

17

18            _____
             Deborah A. Harris, Court Reporter
19            Notary Public - State of Florida
             My Commission No. FF 246867
20            My Commission Expires: October 31, 2019
             Job No. J0277789
21

22

23

24

25

1          REPORTER'S CERTIFICATE

2

3                I, Deborah A. Harris, Florida Professional
Court Reporter and Notary Public in and for the State of
Florida at Large, do hereby certify that I was authorized
4  to and did report said deposition in stenotype; and that
the foregoing pages 1 through 216 are a true and correct
5  transcription of my shorthand notes of said deposition.

6                I further certify that said deposition was
taken at the time and place hereinabove set forth and
7  that the taking of said deposition was commenced and
completed as hereinabove set out.

8

9                I further certify that I am not an attorney
or counsel of any of the parties, nor am I a relative or
employee of any attorney or counsel of party connected
10  with the action, nor am I financially interested in the
action.

11

12                The foregoing certification of this
transcript does not apply to any reproduction of the same
by any means unless under the direct control and/or
13  direction of the certifying reporter.

14                DATED this 20th day of January, 2016.

15

16          _____
            Deborah A. Harris, Court Reporter
17          Job No. J0277789

18

19

20

21

22

23

24

25

1        DEPOSITION ERRATA SHEET

2

3  Assignment no: JO277789

4  Bradley J. Edwards and Paul G. Cassell

5  vs.

6  Alan M. Dershowitz

7                    **

8        DECLARATION UNDER PENALTY OF PERJURY

9

10          I declare under penalty of perjury that I

11  have read the entire transcript of my videotaped

12  deposition taken in the captioned matter or the same has

13  been read to me, and the same is true and accurate, save

14  and except for changes and/or corrections, if any, as

15  indicated by me on the DEPOSITION ERRATA SHEET hereof,

16  with the understanding that I offer these changes as if

17  still under oath.

18

19          Signed on the _____ day of _____,

20  20____.

21

22

23  _____

24        VIRGINIA ROBERTS GIUFFRE

25

1    DEPOSITION ERRATA SHEET

2

3    Page No.____Line No._____Change to:

4    _____

5    Reason for change: _____

6    Page No.____Line No._____Change to:

7    _____

8    Reason for change: _____

9    Page No.____Line No._____Change to:

10   _____

11   Reason for change: _____

12   Page No.____Line No._____Change to:

13   _____

14   Reason for change: _____

15   Page No.____Line No._____Change to:

16   _____

17   Reason for change: _____

18   Page No.____Line No._____Change to:

19   _____

20   Reason for change: _____

21   Page No.____Line No._____Change to:

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25             VIRGINIA ROBERTS GIUFFRE

1     DEPOSITION ERRATA SHEET

2

3  Page No.____Line No._____Change to:

4  _____

5  Reason for change: _____

6  Page No.____Line No._____Change to:

7  _____

8  Reason for change: _____

9  Page No.____Line No._____Change to:

10 _____

11 Reason for change: _____

12 Page No.____Line No._____Change to:

13 _____

14 Reason for change: _____

15 Page No.____Line No._____Change to:

16 _____

17 Reason for change: _____

18 Page No.____Line No._____Change to:

19 _____

20 Reason for change: _____

21 Page No.____Line No._____Change to:

22 _____

23 Reason for change: _____

24 SIGNATURE:_____DATE:_____

25          VIRGINIA ROBERTS GIUFFRE

**CONFIDENTIAL/SEALED DEPOSITION**
**SPECIAL TREATMENT REQUIRED**

Sigrid S. McCawley, Esq.
E-mail: smccawley@bsfllp.com

February 10, 2016

**VIA E-MAIL & FEDERAL EXPRESS**

Esquire Solutions
PRODUCTION DEPARTMENT
101 Marietta Street
Atlanta, Georgia 30303
errata@esquiresolutions.com

> Re:  **Confidential/Sealed Deposition Transcript, Job No. J02777789**
> **(Errata changes to be treated in same manner).**

To Whom It May Concern:

Attached please find the errata changes for the Videotaped Deposition of Virginia Roberts Giuffre taken January 16, 2016. This transcript has been designated as Confidential and has been sealed by the Court. Please ensure that all materials including transcript, errata changes and video tape are treated accordingly.

If you have any questions regarding the errata changes or treatment of confidential/sealed materials, please do not hesitate to contact me at (954) 356-0011.

Sincerely,

Sigrid S. McCawley

SSM:sp
Enclosures

Confidential/Sealed Transcript Pursuant to Court Order
Videotaped Deposition of Virginia Roberts Giuffre (January 16, 2016)
Job No. J0277789

215

```
 1                    DEPOSITION ERRATA SHEET
 2
 3 Assignment no: J0277789
 4 Bradley J. Edwards and Paul G. Cassell
 5  vs.
 6 Alan M. Dershowitz
 7                              **
 8          DECLARATION UNDER PENALTY OF PERJURY
 9
10                  I declare under penalty of perjury that I
11  have read the entire transcript of my videotaped
12 deposition taken in the captioned matter or the same has
13 been read to me, and the same is true and accurate, save
14 and except for changes and/or corrections, if any, as
15 indicated by me on the DEPOSITION ERRATA SHEET hereof,
16 with the understanding that I offer these changes as if
17  still under oath.
18
19                  Signed on the ___11___ day of __February__
20 20|16.
21
22
23  ___Virginia Robert Giuffre_____
24          VIRGINIA ROBERTS GIUFFRE
25
```

## DEPOSITION ERRATA SHEET

Page No. 6          Line No. 17

Change to: "Yes. I signed the subpoena duces tecum."

Reason for change: Did not initially recognize the document

------------------------------------------------------------------------

Page No. 6          Line No. 20

Change to: "No. My lawyers worked with me to collect documents and my understanding is that we turned those documents over to Dershowitz's counsel prior to the deposition."

Reason for change: Clarification of answer

------------------------------------------------------------------------

Page No. 9          Line No. 9

Change to: "Yes."

Reason for change: Did not initially recognize the document

------------------------------------------------------------------------

Page No. 11          Line No. 1

Change to: "Yes."

Reason for change: Misunderstood the question

------------------------------------------------------------------------

Page 11          Line Nos. 4-5

Change to: "I'm confused. I don't know what foreign president you're talking about."

Reason for change: Misunderstood the question

------------------------------------------------------------------------

Page No. 11          Line No. 23

Change to: "I understand well-known prime ministers and other world leaders; as far as foreign presidents, I believe so."

Reason for change: Misunderstood the question

------------------------------------------------------------------------

Page No. 12          Line No. 2

Change to: "Yes, assuming South America is considered overseas."

Reason for change: Misunderstood the question

------------------------------------------------------------------------

Page No. 12          Line No. 8

Change to: "As far as I know right now, yes, I was."

Reason for change: Misunderstood the question

----------------------------------------------------------------------------------------

Page No. 38          Line No. 11

Change to: "I'll continue with the list here. ██████████ I was not sent to her, but she was part of it with Jeff Epstein. Others on the list include ██████ and ██ "

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page 38     Line 19

Change to: "Off the top of my head, once, but it could have been more."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 38          Line No. 21

Change to: "I believe ████ was at Mexico. I may have also been with him in other places."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 41          Line No. 8

Change to: "On an airplane and in a limo."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 41          Line No. 10

Change to: "One, each time."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 41          Line No. 12

Change to: "On airplane, blond, young."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 98          Line No. 16

Change to: "As you can see in that answer I'm not even sure. It wasn't six months, but between six months and a year which is why I'm saying nine months. It was an assumption. It could have been six weeks."

Reason for change: Clarification of answer

----------------------------------------------------------------------------------------

Page No. 190          Line No. 22

Change to: "No, other than maybe you showing it to me today. It's in my pile. It's not in my pile, is it? I don't know. I haven't seen it. I was served with the subpoena, and I signed for it, and I reviewed it at that time."

Reason for change: Clarification of answer

------------------------------------------------------------------------------------------------------------

Page 191     Line 5

Change to: "Why would I do – no. I did collect documents and gave them to my lawyers in response to this subpoena. And my understanding is those documents were produced."

Reason for change: Misunderstood the question

------------------------------------------------------------------------------------------------------------

Page 191     Line 20

Change to: "Yes, but I did not have any pictures of myself with Professor Dershowitz."

Reason for change: Misunderstood the question