UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIRGINIA GIUFFRE,

                          Plaintiff,

        -against-

GHISLAINE MAXWELL,

                          Defendant.

Index No. 15 Civ. 7433 (RWS)

**REPLY DECLARATION OF
ALAN M. DERSHOWITZ IN
FURTHER SUPPORT OF
MOTION TO INTERVENE
AND UNSEAL**

        **ALAN M. DERSHOWITZ** declares under penalty of perjury that the following

is true and correct:

        1.              I am personally familiar with the facts set forth in this Reply Declaration,

which I submit in further support of my pending motion to intervene and to unseal the

"Requested Documents," as that term is defined in Paragraph 3 of my August 11, 2016

Declaration.

**<u>Introduction and Overview</u>**

        2.              Rather than offering a valid and proper basis for opposing my motion, the

papers submitted on behalf of plaintiff Virginia Roberts Giuffre—particularly, the lengthy

declaration of Paul Cassell, one of Ms. Giuffre's lawyers and a former federal judge—are little

more than an effort to revive and further the false and scurrilous allegations of sexual misconduct

that compelled me to seek the Court's assistance in the first place.  As his declaration makes

clear, Mr. Cassell has crossed the line from being a legitimate advocate for a client, to being a

lawyer who is seeking to justify his *own* conduct in the face of compelling evidence that his

client is a thoroughgoing liar.  That was, after all, the gravamen of Mr. Cassell's defamation case

against me: the assertion, now repeated at length before this Court, that Ms. Giuffre's lawyers

had a valid basis for disseminating her false, grotesque and impertinent allegations against me in a public filing. And it is that "fight," essentially, that Mr. Cassell reignites in his declaration in this matter. To be clear, this not a fight that that I started and it is certainly not one that I am asking this Court to referee or resolve in any way. I am only asking that the Court refuse to allow its Protective Order, which was entered based upon a stipulation that explicitly contemplated that the Order might be modified, from being used to prevent me from disclosing documents that reveal the truth. Having now, again, been subjected to an unfair and unwarranted false attack on my credibility and reputation for personal rectitude, I have no choice but to respond on the merits.

3.          I begin by, again, swearing under oath that I did not sexually abuse Virginia Roberts Giuffre, and that any allegation or suggestion to the contrary is categorically false. I never had sexual contact with Ms. Giuffre of any kind, and, to my knowledge, I never even met her until her deposition in 2016. By swearing to this, I am deliberately exposing myself to a perjury prosecution and disbarment if I am not telling the truth. If Ms. Giuffre were to submit an affidavit repeating her false allegations against me, I would welcome and cooperate with a criminal investigation by any prosecutorial office as to whether it is Ms. Giuffre or I who is committing perjury. It is inescapably clear that one of us is lying under oath. I know it is not me.

4.          Against this backdrop, and the facts set forth in my August 11, 2016 Declaration, Mr. Cassell, on his client's behalf, has put into the record a declaration replete with factual inaccuracies, omissions, and flat-out misrepresentations. Among other things, he misstates important elements of both the Crime Victims' Rights Act lawsuit filed by Ms. Giuffre, and others, in Florida (the "CVRA Action"), and the defamation lawsuit that he and his

colleague, Bradley Edwards, brought against me (*Edwards v. Dershowitz*, Case No. CACE 15-000072 (Cir. Ct., Broward Cnty., Fla.)). Moreover, he elides or mischaracterizes testimony gathered in those and other proceedings in order to make them appear inculpatory of me when, in fact, they are just the opposite.

5.          In doing so, Mr. Cassell seeks to accomplish two goals simultaneously: *first*, to suppress information—the Requested Documents—which exculpates me from the charges of sexual misconduct, while allowing Ms. Giuffre and her allies to publicly disseminate those selected "facts" that, they believe, support her allegations against me; and, *second*, to prove that Mr. Cassell—and , by extension, his colleague Mr. Edwards and Ms. Giuffre's current lawyers at Boies Schiller & Flexner, LLP—have a valid factual basis for continuing to press Ms. Giuffre's false allegations.  Mr. Cassell's effort is an unmitigated failure, as this declaration demonstrates.

6.          While much of the Cassell Declaration goes far beyond what is reasonably required to respond to the instant motion, and while it surely has the distinct air of "protesting too much," I cannot stand mute in the face of this continuing assault on my character.   As this declaration and the accompanying reply brief will demonstrate, the charges against me are baseless, and unsealing the Requested Document is the only proper response to Ms. Giuffre's efforts to smear me through the legal process.

7.          In its effort to block the unsealing of the Requested Documents and to justify Ms. Giuffre's lawyers' decision to represent her, the Cassell Declaration cites five sources:  (i) a Palm Beach Police Department Report dated July 19, 2006; (ii) flight logs for the aircraft owned by Jeffrey Epstein; (iii) the fact that a "very well-regarded Florida" lawyer filed a civil complaint against Mr. Epstein on Ms. Giuffre's behalf which accused "academicians"

associated with Mr. Epstein of abusing her; (iv) the testimony of Juan Alessi and ████████

███████, two household employees of Mr. Epstein; and (v) what Mr. Cassell alleges is a

"pattern of deception" by me to keep the "truth" from coming out.  I will address each of these,

in detail, in turn. As will immediately become clear, the information presented by Mr. Cassell in

no way substantiates Ms. Giuffre's claims.  To the contrary, much of the evidence contradicts

Ms. Giuffre's version of events.  In addition, I offer a few final points about matters that

demonstrate clearly that Ms. Giuffre is not a credible witness.

### *The Palm Beach Police Department Report*

8.         The Cassell Declaration cites a July 2006 Palm Beach Police Department

Report, which identified Jeffrey Epstein's home in Palm Beach as a location at which Mr.

Epstein allegedly abused minor victims.  Mr. Cassell contends that this Report supports Ms.

Giuffre's account that I abused her at the Palm Beach home.   *See* Cassell Decl., ¶ 21(a)-(b).

But, as Mr. Cassell conceded in his deposition in the *Edwards* defamation case, my name does

*not even appear* in the Palm Beach Police Department Report—much less does the Report

contain an allegation that I sexually abused someone.  *See* Ex. O at 31 (Deposition Transcript of

Paul G. Cassell, October 16-17, 2015).

9.         Mr. Cassell asserts that the Palm Beach Police Report "showed the sexual

abuse was occurring on a daily basis" at the Epstein mansion, and thus "that [it] would have

made it obvious to a visiting guest that young girls were coming to the home for sexual

purposes."  Cassell Decl., ¶ 21(b).  Putting aside the conclusory nature of the inference (For

example, by what means would it be "obvious," and to which "guests?"  I would think that if

someone were doing something illegal, such as arranging trysts with underage girls, they would

take measures to conceal their conduct), the statement is entirely irrelevant to *me*.   First, I was

not present in that home—or on Mr. Epstein's private island, or at his New Mexico ranch, or on

his airplane—during the time Ms. Giuffre was associated with him.   Dershowitz Decl.,[1] ¶ 9.

Nothing about Ms. Giuffre's relationship with Mr. Epstein, or her age, could have been

"obvious" to me, because I never met her.  Second, there is simply no evidence that Mr.

Epstein's alleged abuse of minor victims at his home in Palm Beach was "obvious" or known to

any  "visiting guests," given that the abuse took is alleged to have taken place in a separate part

of the house, namely Mr. Epstein's private bedroom.

      10.        Ms. Giuffre and her counsel have alleged that she was not the only "young

girl" that I had sexual contact with – *i.e.*, that there were others.  Of course, no such persons have

ever presented themselves to corroborate this accusation.  Nonetheless, Mr. Cassell latched on to

this allegation as a "basis" for his filing in the CRVA Action, which named me as a serial abuser.

      11.        Demonstrating how little Mr. Cassell really had to go on in this regard, I

ask the Court to consider Mr. Cassell's response to a question put to him in deposition

concerning who, other than his client, he had reason to believe was abused by me.  All Mr.

Cassell could muster was this:

> [CASSELL]: …I have 24 names in mind as possible sexual abuse
> victims that *Dershowitz may or may not have abused.* And I have
> not been able to pinpoint exactly what happened, because the
> people who would be in the best position to help me sort out what
> the names were [--] specifically Jeffrey Epstein, among others [--]
> have refused to cooperate and give me those names" (emphasis
> added).

Ex. O at 36-37.

      12.        The very idea that Mr. Cassell could claim that, without more, a mere *list*

of alleged victims that he believes that I "*may or may not have abused*" would provide a basis for

publicly accusing me of heinous crimes, well illustrates Mr. Cassell's mindset.

---

[1] Citations to "Dershowitz Decl." refer to my August 11, 2016 moving declaration.  Exhibits O through X are attached to this Reply Declaration.

13.          As the record demonstrates, I could not have abused Virginia Roberts Giuffre because, as the records establish, I was never in Mr. Epstein's Palm Beach home, private island, ranch or airplane during the two years that she was associated with Mr. Epstein.  The Palm Beach Police Department Report neither corroborates Ms. Giuffre's false accusation, nor supports the decision by Mr. Cassell, Mr. Edwards and the other lawyers for Ms. Giuffre to publicly accuse me of such pedophila.

### ***The Flight Logs***

14.          In his Declaration, Mr. Cassell suggests that the flight logs of Mr. Epstein's private jet showing Ms. Giuffre travelling to New York support the conclusion that I abused Ms. Giuffre in New York, because I was a visiting scholar at N.Y.U. and lived in N.Y.U. housing during the 2000-2001 academic year.  *See* Cassell Decl., ¶ 21(c).  This allegation, and the string of inferences necessary to make it "work," is patently absurd.  Millions of people were present in the New York City area when Ms. Giuffre travelled there; it is simply not reasonable to infer from my presence in New York at the same time, apparently, as Ms. Giuffre that I sexually abused her—there or anywhere else.

15.          In his deposition in the defamation case against me, Mr. Cassell acknowledged that my name did not appear in the aircraft flight logs during the time period in which Ms. Giuffre was associated with Mr. Epstein:

> [CASSELL]: The face of the flight logs for the relevant period of time, we can call it the hot period of time or whatever you want, did not reveal the presence of Mr. Dershowitz on those flights, yes.
>
> Q: Okay. So during the period—well, actually, there's no flight log that shows Virginia Roberts and Professor Dershowitz on the same airplane, correct?
>
> A: That's my understanding, yes.

Ex. O at 205.

16.      Desperate to draw some connection between me and young girls on the airplane, Mr. Cassell also states that the flight logs show me and "an apparently young woman named ███████ who did not appear to serve any business purpose for Epstein" flying together on Mr. Epstein's plane with Mr. Epstein and other individuals. *See* Cassell Decl. ¶ 21(g) (internal parentheses omitted). What his declaration conveniently fails to mention is that the flight in question took place on November 17, 2005, years after Ms. Giuffre's association with Mr. Epstein concededly ended. *See* McCawley Decl., Ex. 2 at GIUFFRE007135. The connection between a flight in 2005 and Ms. Giuffre's alleged abuse is, of course, non-existent: by 2005, Ms. Giuffre was living in Australia.

17.      But that is just a detail. As Mr. Cassell well knows, ███████████, the woman who flew on Mr. Epstein's plane with us and several other people in 2005, was *24 years old* at the time of the flight. During my deposition in the *Edwards* case, I was asked about and shown photos of "Tatiana"; I said that I thought she appeared to "about 25" years old. It turned out that my estimate was correct. This exchange followed:

> [DERSHOWITZ]: … I must say that during the recess, my wife Googled Tatiana and found out that she was, in fact, 24 years old in 1995 [sic - 2005][2], at the time she flew on that airplane. So that my characterization of her as about 25 years old is absolutely correct. And the implication that you sought to draw by showing me those pictures was not only demonstrably false, but you could have easily discovered that the implication you were drawing was demonstrably false by simply taking one second and Googling her name as my wife did."

Ex. P at 216-17 (Deposition Transcript of Alan M. Dershowitz, October 16, 2015).

---

[2] In fact, I meant the year 2005.   According to Wikipedia, Ms. Kovylina was born on November 4, 1981. *See* https://en.wikipedia.org/wiki/Tatiana_Kovylina.

18.         Mr. Cassell was present at my October 2015 deposition in the *Edwards* case, and he is aware of Tatiana Kovylina's actual age.  Yet, in his Declaration to this Court, he continues to suggest that her presence on Mr. Epstein's airplane in 2005 supports the inference that I was aware of Mr. Epstein's alleged abuse of Ms. Giuffre in 2000-2002, and that I participated in such conduct.  Cassell Decl., ¶ 21(g).  While Mr. Cassell cloaks this suggestion in language concerning "information [he and Mr. Edwards] relied upon in believing the truth of Ms. Giuffre's allegations," that is too clever by half.  *Id*. at 21.  The inference that he asks this Court to draw is that the presence of ████████ supports the allegations against me.  That is simply false.

### *Ms. Giuffre's Civil Complaint and Her Claim of Abuse by "Academicians"*

19.         In his Declaration, Mr. Cassell states that he believed Ms. Giuffre's allegations that I sexually abused her, in part, because Bob Josefsberg, "a very well regarded Florida lawyer," apparently believed her, having filed a civil complaint against Mr. Epstein on her behalf.  Cassell Decl., ¶21(e).  The Josefsberg-filed civil complaint did not name me.

20.         Mr. Cassell was not relieved of his professional obligation to investigate the *bona fides* of Ms. Giuffre's claims simply because a different lawyer had already decided to file a case on her behalf.  Mr. Casssell's reliance on the case filed by Mr. Josefsberg is particularly inappropriate because the Josefberg-drafted case does *not* name me as an abuser.  Moreover, Mr. Josefsberg has continued to maintain a personal and professional relationship with me, something he would not have done if he believed I had abused his client—a fact that Mr. Cassell and the other lawyers could have readily ascertained.

21.         Nor was it reasonable to accuse me of pedophila based on the fact that Ms. Giuffre alleged in the Josefsberg-drafted civil complaint that she had been trafficked by Jeffrey

Epstein to "academicians."  *Id.*  As Mr. Cassell is well aware, Jeffrey Epstein was heavily

involved in funding academic research at Harvard and kept an office there,[3]  and he was

consequently friendly with many academics, including David Gergen, Marvin Minsky, Larry

Summers, Stephen Kosslyn, Henry Rosovsky, Howard Gardner, and Stephen Jay Gould, among

others.  Many of these academics engaged in the same behavior that apparently led Mr. Cassell

to believe Ms. Giuffre's allegations that I had abused her.  According to workers at Mr. Epstein's

Palm Beach mansion, he received visits from "friends from Harvard" and other "very important

people."  Ex. U at 28 (Deposition Transcripts of Alfredo Rodriguez, July 29, 2009 and August 7,

2009).  All of the "evidence" that Ms. Giuffre and her lawyers claim implicates *me* is equally

applicable to dozens of *other* academics and public figures who were associated with Mr.

Epstein—including Larry Summers, Stephen Hawking, Henry Rosovsky, Nathan Myhrvold,

Steven Pinker, Martin Nowak, Daniel C. Dennett, David Gergen, George Church, Richard

Dawkins, Gerard 't Hooft, David Gross, Frank Wilzek, Howard Gardner, Stephen Jay Gould,

and many others.

22.          Of course, Ms. Giuffre's credibility on these matters is nil.  To cite one

example, Harvard Professor ▮▮▮▮▮▮▮ is one of the "academicians" Ms. Giuffre has

accused.  In the Manuscript that I am trying to unseal, Ms. Giuffre describes having sex with

▮▮▮▮▮▮▮▮  in great detail:

> Two weeks later, as if Jeffrey was trying to lighten my spirits, he
> told me I would be going to his island to meet a new client.  He is a

---

[3]  My relationship with Jeffrey Epstein, prior to when he was accused and I became one of his lawyers, was academic and intellectual in nature.  Along with many prominent academics, I attended seminars and other events, mostly at his office in Cambridge.  I did send him my manuscripts to review and I acknowledged his intellectual input in the acknowledgments to several of my books.  Many other academics were acquaintances of Mr. Epstein. They interacted with him on a somewhat regular basis, including during the time period in which he was allegedly abusing Ms. Giuffre, and yet, to my knowledge, they had no idea that he may have engaged in sex acts with minors, because he kept his private life completely separate from his academic life.   I have never see Mr. Epstein with an underage girl.

███████████████████████. I would be spending two days with him showing him around the island, dining with him, and treating him to a massage whenever he wanted. Without Jeffrey even verbalizing the need to have sex with him, he told me to keep him happy like I had my first client… ████████████

███… By the time dinner was served and another red wine bottle later, he seemed to get funnier. I made fun of his tousled hair and he poked at me for my skinny legs, calling me a wanna-be-anorexic. When dessert was brought out he asked if he could receive one of the delightful massages he has been hearing about from Jeffrey. I gulped more red wine down and sweetly complied with his offer, dreading the moment I'd have to see his naked body, let alone touch it… I gave the massage my earnest as I always had, and quickly got through having intercourse with him. Not wanting to make any foreplay or anything extravagant out of it, I let him think that's as good as it got, and by the smile on his face, I thought I had done enough.

Dershowitz Decl., Ex. B at GIUFFRE004192-93.

In her deposition in the *Edwards* defamation lawsuit, she later denied having sex with

██████:

"Q: Have you ever met a ███████████?

A: Possibly.

Q: Do you know one way or the other?

A: Do I know?

Q: You said possibly?

A: I was introduced to lots of political, scientific, academic, so there is a possibility I could have met him.

Q: Did you ever have sex with ███████████?

A: No.

Dershowitz Decl., Ex. G at 27.

23.     It is inconceivable that Ms. Giuffre could have forgotten about having sex with a man she described in such detail in her Manuscript.  She either lied for money in her Manuscript, or committed perjury in her deposition.

24.     The same Manuscript that names ███ and describes a sexual encounter with him in great detail *does not* mention *me* as someone with whom she claims to have had sex. To the contrary, it mentions me only as someone who had a discussion with Mr. Epstein in his bedroom after he had had sex with Ms. Giuffre.  *See* Dershowitz Decl., ¶ 37.  This entirely fabricated story was obviously inserted as the result of the email exchange between Ms. Giuffre and Sharon Churcher in which Ms. Churcher urges Ms. Giuffre to include my name in her manuscript in order to make it more marketable.  *See* Dershowitz Decl., ¶ 35.  It is imperative for me to be able to use those currently-sealed documents—the Emails and the Manuscript in particular—to refute the false allegations against me that have been repeated in public filings in this case, and to support the truth, *i.e.*, that Ms. Giuffre never accused me prior to the CVRA Action.  Indeed, because they show that the story about me is of very recent vintage, such documents corroborate the information provided to me by Ms. Giuffre's best and oldest friend: namely that Ms. Giuffre had never accused me of having had sex with her until she felt pressured to do so by her lawyers.  This point—that her accusation against me is a recent fabrication—is central to my defense against the false charges that the lawyers in this case continue to level against me, and I have a right to be able to respond to them by self-proving documents.

25.     Ms. Giuffre has also claimed to have had sex with such prominent individuals as former ███████████████████████████ ████████████████████████████████████, ████████████████████████████

███████████████████████████████████████████████

████████ among others.  *See, e.g.*, Dershowitz Decl., Ex. G at 10, 15, 18, 20, 24, 38.  She has

even claimed that all of these individuals, and me, had sex with her without using a condom.[4]

26.          To summarize: before choosing to file the Motion for Joinder in the

CVRA lawsuit that publicly accused me of pedophilia, Mr. Cassell and Mr. Edwards were aware,

or should have been aware, of several other individuals who would fit the description of

"academicians" described in the civil complaint submitted by Bob Josefsberg.  Moreover, they

were aware, or should have been aware, of glaring problems in Ms. Giuffre's credibility.  Yet,

Ms. Giuffre's lawyers decided to treat her as a credible witness, and to accuse me of a heinous

crime on the basis of her inconsistent and incoherent testimony alone.  I was the only

"academician" named as an abuser, despite the fact that Ms. Giuffre had identified other

prominent academics as sexual partners.  I believe that I was accused by her because my name—

along with that of Prince Andrew—was certain to garner international publicity.

***Mr. Epstein's Associates Plead the Fifth***

27.          In his Declaration, Mr. Cassell asserts that, because three of Epstein's

associates—████████████████████████████████—asserted their Fifth

Amendment privilege against self-incrimination when questioned about me, it was reasonable for

him to draw "adverse inference" to the effect that I "was, indeed, involved in Epstein's crimes."

---

[4]          Q. Were condoms ever used with Professor Dershowitz?

          A: No, and they weren't used with any other people as well.

          Q: Were the other people that you were sexual [sic] trafficked to?

          A: No.

Dershowitz Decl., Ex. G at 177-78.

Cassell Decl., ¶ 21(h).  Mr. Cassell's assumption would be laughable, were not so insidious and improper.

28.         In the first place, even a second-year law student knows that adverse inferences can only be drawn against a party who either invokes the Fifth Amendment in a civil case him or herself, or controls the witness who does so (as in an employer-employee relationship).  *See LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).  Obviously, I have *never* refused to answer questions about Ms. Giuffre's absurd and false allegations against me—I have repeatedly denied them outright, under oath—and I exercise no control over any of Mr. Epstein's associates who invoked their Fifth Amendment privilege.  There is absolutely no *legal* basis for an "adverse inference" to be drawn against me by virtue of the privilege invocation by people I barely know and do not control.

29.         More importantly, Mr. Cassell's "reliance" on this invocation is, itself, based on a distortion.  The fact is, the three women—Sarah Kellen, Adriana Mucinska, and Nadia Marcinkova—all asserted their Fifth Amendment privileges when answering *every single question* posed to them in their depositions, not solely in response to questions about me.  For example, here is this exchange from the deposition of Ms. Kellen:

Q: Did you ever meet Bill Clinton?

. . . .

A [Kellen]: On the instruction of my lawyer, I must invoke my Fifth Amendment right.

Q: Did you ever fly with these three gentlemen and Jeffrey Epstein to Africa on Jeffrey Epstein's 727 airplane?

. . . .

A: At the instruction of my lawyer, I must invoke my Fifth Amendment right.

Ex. R at 39-40 (Deposition Transcript of Sarah Kellen, March 24, 2010).

30.          Of course, Mr. Cassell did not draw an "adverse inference" against

███████████, nor did he accuse the ███████████ of abusing Ms. Giuffre.  It would have

been unreasonable to have done so.[5]

31.          As Mr. Cassell well knows, witnesses risk waving their Fifth Amendment

privilege by invoking it only selectively.  This is why defense attorneys generally advise their

clients to claim the Fifth as to all questions.  Therefore, the associates' invocation of their Fifth

Amendment privilege when questioned about me cannot substantiate any claim that I abused Ms.

Giuffre.   Had these individuals been asked if they knew whether I had assassinated John F.

Kennedy, they would have taken the Fifth.  It is irresponsible for Mr. Cassell, who should know

better given his experience as a federal judge, to make that absurd claim.

32.          In truth, I sincerely wish that Mr. Epstein's associates had *not* invoked the

Fifth Amendment with regard questions about me.   Had they testified fully and truthfully, I

would have been shown to have done nothing wrong.

### *The Testimony of Juan Alessi and* ███████████*.*

33.          In his Declaration, and in the CVRA filings in December 2014 and

January 2015, Mr. Cassell attempts to "place" me at Mr. Epstein's Palm Beach mansion in the

time period during which Ms. Giuffre alleges she was there, to connect me to "sex toys" alleged

---

[5]   Likewise, Ms. Kellen, Ms. Mucinska, and Ms. Marcinkova asserted their Fifth Amendment privilege when questioned about a number of celebrities, including David Copperfield, Kevin Spacey, and Les Wexner, among others.  One of the prosecuting attorneys, frustrated by this tactic observed:

> I think it's absolutely absurd that she's objecting to some for these questions or taking the Fifth to some of these questions. I mean, I want to Sid [sic] to ask her now if the sky is blue. I think she's going to take the Fifth to that question, as well.

Ex. R at 12.

to have been inside the mansion, to imply that I had received a sexual "massage" at the mansion, and to suggest that the appearance of my name, circled, in Jeffrey Epstein's address book was inculpatory—all by reference to the testimony of two of Jeffrey Epstein's "household employees," Juan Alessi and ███████████.  Cassell Decl., ¶ 21(k)-(m).  This effort fails under even cursory scrutiny.

34.     First, Mr. Cassell asserts that "Juan Alessi said that [Alan] Dershowitz visited Epstein's Palm Beach mansion four or five times a year, staying two or three days when he went there."  Cassell Decl., ¶ 21(k).  He then asserts that "Alessi was able to identify a photograph of Ms. Giuffre as someone who was at the mansion as [sic] the same time as Dershowitz."  *Id.*  Mr. Cassell's characterization of the Alessi testimony is simply false.   Juan Alessi *never* testified that Ms. Giuffre was at Epstein's home in Florida at the same time as me.

35.     Mr. Cassell's assertion is apparently based on the following portion of Juan Alessi's deposition:

> Q: Do you have any recollection of V.R. coming to the house when Prince Andrew was there?
>
> A: It could have been, but I'm not sure.
>
> Q: Not sure. When Mr. Dershowitz was visiting,--
>
> A: Uh-huh.
>
> Q: --how often did he come?
>
> A: He came pretty -- pretty often.

McCawley Decl., Ex. 6 at 73.

36.     But, as the audio recording of this testimony makes clear (and I am happy to provide it), Mr. Alessi's "uh-huh" was simply an acknowledgment that he was about to respond to a question about how often I came to the home during the many years he worked

there.  It was not, as Mr. Cassell misleadingly suggests, an affirmation that Ms. Giuffre and I were present at Mr. Epstein's house at the same time.

37.     In fact, Mr. Alessi has since provided an affidavit flatly *denying* that he saw both Ms. Giuffre and I at the Palm Beach mansion at the same time.

> "I was never asked by any attorneys if Virginia Roberts came to the house when Mr. Dershowitz was there.   If I had been asked, I would have answered that I never saw Virginia Roberts at the house when Mr. Dershowitz was there."

Ex. Q at ¶ 19 (Affidavit of Juan P. Alessi, January 13, 2016).  Indeed, in his affidavit, Mr. Alessi goes on to say, "I never saw Mr. Dershowitz do anything improper or be present while anyone else was being improper."  *Id*.

38.     Juan Alessi's affidavit also confirms that Mr. Cassell and Edwards failed to interview him as part of their supposed "investigation" into Ms. Giuffre's claims, and consequently grossly misrepresented the statements he made in his deposition:

> The following statement made by Virginia Roberts's attorneys and their own attorney in a filing on December 4, 2015 is not accurate and is a misrepresentation of what I said in my deposition: "Alessi was able to identify a photograph of Ms. Giuffre as someone who was at the mansion as [sic] the same time as Dershowitz.

> As far as I can recall, since I gave my deposition in 2009, I have never been asked by Brad Edwards or Paul Cassell about my knowledge regarding Virginia Roberts or Alan Dershowitz or about my 2009 deposition testimony.

*Id*. at ¶¶ 20-21.

39.     In an effort to "place" me in proximity to "sex toys" at the Palm Beach mansion, Mr. Cassell and Mr. Edwards also misrepresented other aspects of Juan Alessi's testimony. For example, in an affidavit, Mr. Alessi states that:

> The following statement made by Virginia Roberts's attorneys in a filing on January 21, 2015 is not accurate and is a misrepresentation of what I said in my deposition: "the private, upstairs room where Dershowitz got his 'massages' was one that contained a lot of vibrators—Maxwell had a 'laundry basket… full of those toys' in that room.'"
>
> . . . .
>
> I did not state or imply that vibrators or sex toys were found after massages in other rooms used by guests because that was not the case.  Guests having massages did not have massages in Mr. Epstein's private bedroom suite.  This area was private and off-limits to guests, which I explained to the lawyers during my deposition.

*Id.* at ¶¶ 9-10.

40.      Juan Alessi undermines numerous other elements of Ms. Giuffre's account as well.  For example, Mr. Alessi did not see "any photographs of Virginia Roberts in Mr. Epstein's house"—partially naked or otherwise.  *Id.* at ¶ 17.  And, contrary to Ms. Giuffre's description, massages were not simply a code word for sexual encounters.  Many guests at the Epstein mansion received massages from professional masseuses—and all of whom were, as Mr. Alessi testified, "overage" to "maybe mid-forties."  *Id.* at ¶ 8.  Indeed, despite working for Jeffrey Epstein for many years, Mr. Alessi was "unaware of any masseuses being under the age of 18."  *Id.*  This statement in itself completely undermines Mr. Cassell's underlying assumption—that I, at the very least, should have known of Mr. Epstein's alleged wrongdoing by virtue of visiting his Florida home on several occasions.

41.      To be clear, the only massage I recall receiving at the Epstein home was conducted by a professional masseuse—a woman in her her 30s or 40s.  This occurred well outside the timeframe when Ms. Giuffre was associated with Mr. Epstein and I acknowledged this in numerous interviews shortly after Ms. Giuffre accused me.[6]  In addition, there were never

---

[6] *See*, for example: Bob Norman, "Alan Dershowitz: 'Sex Slave' Accuser is Serial Liar, Prostitute," Local 10 News, 22 January 2015, *available at* http://www.local10.com/news/alan-dershowitz-sex-slave-accuser-is-serial-liar-

any sex toys in any room I ever stayed in, nor were there any visible pictures of naked young

women.  My children and grandchildren stayed in the rooms in question at Mr. Epstein's home

during Christmas of 2005.  I would never have allowed my family to stay in a home with such

items, nor would I have stayed in such a home.

42.　　　　　Mr. Cassell also seeks to rely upon the deposition of ███████████,

an employee of Jeffrey Epstein for the proposition that I was present in Mr. Epstein's home in

2005 at the same time as some young women—including ███████████ ███████████—and

"local girls" who gave massages.  *See* Cassell Decl., ¶ 21(l).  But Mr. Rodriguez was clear that

he did not know whether I received a massage, and did not know if I was aware that there were

young girls present in the house:

> "Q: Okay. When Alan Dershowitz was at the house I understood
> you to say that these local Palm Beach girls would come over to
> the house while he was there but you're not sure if he had a
> massage from any of those girls.
>
> A: Exactly.
>
> Q: And what would he do while those girls were at the house?
>
> . . . .
>
> A: He will read a book with a glass of wine by the pool, stay
> inside.
>
> Q: Did he ever talk to any of the girls?
>
> A: I don't know, sir.
>
> Q: Certainly he knew that they were there?
>
> . . . .

---

prostitute.  I never denied having one professional massage.  I did truthfully state that it was a lie to claim that I had
sexual massages in a room full of sex toys.

[7] Ms. Kellen was in her late 20s and to my knowledge, was a legitimate employee of Mr. Epstein.  Ms. Marcinkova
was, to my knowledge, an adult friend of Mr. Epstein.

A: I don't know sir."

Ex. U at 426-27.

43.        Mr. Rodriguez's testimony contained nothing inculpatory of me and, inasmuch as it concerned the period 2005 and later, it has absolutely no bearing on Ms. Giuffre's allegations about me, since Ms. Giuffre left Mr. Epstein's orbit in 2002.

44.        Mr. Cassell also refers to Mr. Epstein's "little black book" of contacts and phone numbers, which ████████████ had stolen.  Mr. Cassell claims that "████████████ appeared to have circled the name of Alan Dershowitz as someone who had information about Epstein['s] criminal activities."  Cassell Decl., ¶ 21(m).  Of course, what ████████ did or didn't write or circle in Mr. Epstein's address book is probative of nothing.  In fact, however, the address book contained the circled names of *many* celebrities and other individuals, including ████████████████████████████████████, among others.[8]  Even the late ████████████ name and redacted phone number was in the "black book."  And yet, Mr. Cassell seems to have falsely assumed that, among those individuals whose names were in the book circled, only I was a possible accomplice of Mr. Epstein:

> Q: Donald Trump was a friend of Jeffrey Epstein; is that not correct?
>
> A: I really don't -- my understanding is yes, but I -- I don't have a lot of information about Trump.
>
> Q: It's true also, is it not, that Mr. Trump was a frequent visitor to Mr. Epstein's residence?
>
> A: I -- I know that he visited frequent. I -- I don't have a lot of information about Trump.
>
> Q: And his name is circled in this book; is it not?

---

[8] Including Peter Soros, Joseph and Florina Rueda, Alberto Pinto, Valda Veira Cotrin, Evan Anderson, Michelle Campos, Eric Gany, Cindy Lopez, Timothy Newcombe, Douglas Schoettle, Caroline Stark, Larry Visoski, Tom and Pat Sawyers, Lynn Fontanella, Christophe Gaie, Bill Maronet, Mike Pazulo, Alan Stopek, and Bruce King.

A: I believe it is.

Q: Based on him -- assuming he's a frequent visitor to Mr. Epstein's home, and that he's a friend of Mr. Epstein's, and that his name is circled in this book, do you infer that he was engaged in criminal sexual abuse of minors?

A: No.

Ex. O at 233.

### *The Allegation That I Engaged in a "Pattern of Deception"*

45.         The Cassell Declaration asserts that "[a]ttempts had been made to depose Dershowitz or otherwise obtain information from him about his knowledge of Epstein's sexual abuse in 2009, 2011, 2013, and January 2015, and he had avoided all those efforts."  Cassell Decl., ¶ 21(o).  Mr. Cassell also claims that I did not make Epstein "available to answer questions about sex abuse of underage girls."  *Id.* ¶ 21(p).  Mr. Cassell describes this as "a pattern of deception" that was "consistent with a pattern of other persons involved in Epstein's international sex trafficking organization."  *Id.* ¶ 21(p)-(q).  Again, these assertions are false or misleading, and absurd in equal measure.

46.         During my representation of Jeffrey Epstein, I was a member of an extensive legal team, which collectively decided how Epstein should interact with law enforcement during their investigation.  Together with other members of the legal team, I, among others, communicated with the Palm Beach State Attorney's Office—including scheduling meetings to depose Epstein—at the behest of the client. This behavior does not constitute a "pattern of deception;" instead, it reflects a legal strategy, devised by a team of defense lawyers aiming to secure the best possible result for their client.

47.          Moreover, Mr. Cassell's claim that I dodged a subpoena or systematically avoided providing information to his and Mr. Edwards' lawyer, Jack Scarola, is demonstrably false.

48.          Although a legal assistant for Bradley Edwards, one of Ms. Giuffre's lawyers, once claimed that I was served with a subpoena in 2009, this was not true; I was never served with a subpoena, and contemporaneous documentary evidence proves as much.

49.          In August 2011, another attorney representing Ms. Giuffre, Jack Scarola, called me to ask that I provide information on Mr. Epstein's alleged abuse of minors, and particularly young women.  I responded on August 15th, in writing that, if Mr. Scarola were to provide me with a more detailed request, I would try to provide any relevant non-privileged information.  *See* Ex. S at SCAROLFA 016566 (Scarola Correspondence, August-September 2011).  Mr. Scarola wrote back to me on August 23rd, stating that "We . . .  have reason to believe that you have personally observed Jeffrey Epstein in the presence of underage females, and we would like the opportunity to question you under oath about those observations."  *Id* at SCAROLA 016567.  I replied that "If you in fact have such testimony it is perjurious. I have never seen Epstein in the presence of an underage female."  *Id.* at SCAROLA 016570.

50.          Despite this unambiguous answer, Mr. Edwards and Mr. Scarola attempted to subpoena me in 2013.  This time, they left a subpoena with an assistant to another faculty member at Harvard Law School—an improper form of service.   I again made it clear to them that I had no relevant non-privileged information to provide, and that I had been instructed by my client not to volunteer any information.  There was no follow up by Mr. Scarola and no attempt to serve me properly.

51.        At no point did Mr. Edwards, Mr. Scarola, or any of their associates tell me that Ms. Giuffre had accused me of sexual abuse, because, at that point, she had not.  Had I been accused at that time, I would have provided records demonstrating the falsity of any such allegations.

*Other Facts That Show that Ms. Giuffre Lacks Credibility*

52.        Inasmuch as Mr. Cassell is inviting this Court to accept Virginia Roberts Giuffre's assertions about me, other examples of her lack of credibility are relevant.

53.        In the first place, Ms. Giuffre has been demonstrated to have made up wildly implausible tales for financial gain.   In 2011, for example, Ms. Giuffre was interviewed by Sharon Churcher at *The Daily Mail*, and provided detailed accounts of an alleged encounter with Bill Clinton on Jeffrey Epstein's private island in the Caribbean.  In exchange for that interview, Ms. Giuffre was paid $160,000. Ms. Giuffre's account of meeting Clinton is both completely unbelievable on its face, and demonstrably untrue.  For example, she claims that: "Ghislaine Maxwell went to pick up Bill [Clinton] in a huge black helicopter that Jeffrey had bought her. She'd always wanted to fly and Jeffrey paid for her to take lessons, and I remember she was very excited because she got her license around the first year we met.  I used to get frightened flying with her but Bill had the Secret Service with him and I remember him talking about what a good job she did."  Ex. T at 2-3 (Daily Mail Article, March 5, 2011).  Ms. Giuffre then described, in detail, a dinner with President Clinton, Jeffrey Epstein and others on Little St. James Island, which Mr. Epstein owned.[9]

---

[9] Further demonstrating her ability to weave a vivid, yet utterly false tale, Ms. Giuffre also recounts that: "We all dined together that night.  Jeffrey was at the head of the table.  Bill was at his left.  I sat across from him. Emmy Tayler, Ghislaine's blonde British assistant sat at my right.  Ghislaine was at Bill's left and at the left of Ghislaine there were two olive-skinned brunettes who'd flown in with us from New York…. Maybe Jeffrey thought they would entertain Bill, but I saw no evidence that he was interested in them.  He and Jeffrey and Ghislaine seemed to have a very good relationship.  Bill was very funny." Ex. T at 3-4.

54.        Ms. Giuffre' entire account is fabricated out of whole cloth:  President

Clinton was never on the island during the relevant period.  A FOIA request submitted by

former FBI Director Louis Freeh for "all shift logs, travel records, itineraries, reports, and other

records for USSS personnel travelling with former President Bill Clinton to Little St. James

Island and the US Virgin Islands" revealed that "Bill Clinton did not in fact travel to, nor was he

present on, Little St. James Island between January 1, 2001, and January 1, 2003." *See*

Dershowitz Decl., Ex. I.  Moreover, the notion that the Secret Service would allow a former

president to be flown by an amateur pilot is ridiculous on its face.

55.        In that same Daily Mail article, Ms. Giuffre claimed "that Mr. Clinton's

vice-president Al Gore and his wife, Tipper, were also guests of Epstein on his island" on a

different occasion.  Ex. T at 4.  Ms. Giuffre purported to provide specific details of this

encounter: "I had no clue that anything was up. The Gores seemed like a beautiful couple when

I met them. All I knew was that Mr. Gore was a friend of Jeffrey's and Ghislaine's.  Jeffrey

didn't ask me to give him a massage. There might have been a couple of other girls there on that

trip but I could never have imagined this guy would do anything wrong.  I was planning to vote

for him when I turned 18.  I thought he was awesome." *Id.* at p. 5.

56.        This story too was made up – a fiction peddled for money.  By all

available accounts, Mr. Gore and his wife *never set foot* on Mr. Epstein's private island, nor

even met Mr. Epstein.  Ms. Giuffre' lawyers, who included David Boies, could easily have

ascertained as much.  Vice President Gore had been Mr. Boies's client and Mr. Boies could

have simply asked him whether he had ever visited Mr. Epstein's island in the Caribbean.  Had

he done so, Mr. Boies would have learned that Ms. Giuffre's account was false.

57.        Critically, Ms. Giuffre also lied about her age—specifically, the age she was during the time period in which she was associated with Jeffrey Epstein.  Contrary to previous statements that she was fifteen when she was trafficked by Mr. Epstein, Ms. Giuffre could not have even have met him until 2000, the year she turned seventeen.  There is documentary evidence, recently discovered and undisputed, that Ms. Giuffre' father—who arranged her employment at The Mar-A-Lago Club in Palm Beach—did not begin working there until April 11, 2000.   Ms. Giuffre has repeatedly stated that she first met Ghislaine Maxwell at the Mar-A-Lago where she had a summer job as a changing room assistant—indeed it is one of the few aspects of her story that has remained consistent from the outset.[10]  Ms. Giuffre turned seventeen in the summer of 2000.  By the time Mr. Epstein is alleged to have begun trafficking her to his acquaintances—six to nine months *after* their first encounter,[11] or in at least one telling *two years* later,[12] Ms. Giuffre may have been over eighteen.

58.        The issue of Ms. Giuffre's age at the time of certain events is important as a legal matter—and her lack of credibility about it is telling.  The age of consent in New York is seventeen.  As to the other locations with varying ages of consent—in Florida it is eighteen—it is impossible to know whether Ms. Giuffre is claiming to have been a minor because she has never specified—presumably even to her own lawyers—*when* the alleged acts were supposed to have occurred.  She has not even provided *the year* in which she claims specific events occurred.  So it cannot be presumed—by her lawyers or by anyone else—that she was a minor when she

---

[10] *See* for example, Zachary Davies Boren, *Virginia Roberts: Who is the woman at the centre of the Prince Andrew sex allegations?*, The Independent (Jan. 5, 2015), *available at* http://www.independent.co.uk/news/uk/home-news/virginia-roberts-what-do-we-know-about-the-woman-at-the-centre-of-the-prince-andrew-sex-allegations-9958539.html.

[11] *See* for example, Ex. V at 10 (Telephone Interview with Virginia Roberts, April 7, 2011).

[12] *See* Sharon Churcher, *Prince Andrew and the 17-year-old Girl His Sex Offender Friend Flew to Britain to Meet Him*, DailyMail.com (Mar. 2, 2011) ("'After about two years, he started to ask me to 'entertain' his friends.'"). *Available at* http://www.dailymail.co.uk/news/article-1361039/Prince-Andrew-girl-17-sex-offender-friend-flew-Britain-meet-him.html?ito=feeds-newsxml.

claims that Mr. Epstein trafficked her.  It is much more likely, in light of when she actually met

Jeffrey Epstein and when she says she began to have sex with his acquaintances, that she was *not*

a minor when she claimed to have had sex with any such people.

59.        Moreover, Ms. Giuffre has perjured herself by claiming that she was 15

when she met Ms. Maxwell and Mr. Epstein, most notably by submitting an untruthful

declaration in the *Edwards* defamation lawsuit.  On November 20, 2015 Ms. Giuffre executed

an affidavit in which she alleged that: "In approximately 1999, when I was 15 years old, I met

Ghislaine Maxwell . . . Soon after that I went to Epstein's home in Palm Beach on El Brillo

Way.  From the first time I was taken to Epstein's mansion that day, his motivations and actions

were sexual, as were Maxwell's…. Epstein and Maxwell forced me into sexual activity with

Epstein. I was 15 years old at the time."  Ex. W at ¶ 4-5 (Declaration of Virginia Roberts,

January 21, 2015).

60.        She also asserted that when she "was approximately 15 or 16 years old"

when Mr. Epstein and Ms. Maxwell began trafficking her to Epstein's acquaintances. These

statements are disproven by documentary evidence, and Ms. Giuffre has herself admitted that

they are not true.

**Conclusion**

61.        In his Declaration before this Court, Paul Cassell has provided an

accounting of the "evidence" that he claims supports the truth of Virginia Roberts Giuffre's

accusations against me.  It is a woefully inadequate presentation, as the preceding paragraphs

demonstrate.  The irony, of course, is that Mr. Cassell's accounting is in service to his and his

client's goal of keeping sealed far more compelling evidence—namely, the Requested

Documents—that undercuts the accusations against me and shows them to be a recent

fabrication.   This is part of an overarching plan by Ms. Giuffre's lawyers to cherry-pick the evidence they want to *publically* reveal while using this Court's powers to suppress evidence damaging to them.  There is a further irony as well, which is that the entire basis of Ms. Giuffre's participation in the CVRA Action was a complaint that the Government unlawfully kept secret the details of her alleged victimization at Mr. Epstein's hands.  Yet it is now Ms. Giuffre and her lawyers who are seeking to keep secret the whole truth about Ms. Giuffre's story.[13]

62.        I believe that the law and basic notion of fairness should permit me to prove the whole truth, namely, that Ms. Giuffre never accused me of misconduct until 2014, and that her belated complaint against me is, as I have always said, a fabrication from start to finish. The Requested Documents help prove those critical points.  This Court ought not allow itself to be a tool of secrecy used by Ms. Giuffre and her lawyers to keep the whole truth from coming out.

---

[13] As described in my opening Declaration, Ms. Giuffre's legal assault on me, conducted through her lawyers at Boies Schiller & Flexner LLP ("BSF"), continues in the form of a motion for sanctions in Florida state court. There, she claims that I violated a court order in the *Edwards* defamation lawsuit by testifying truthfully in a deposition about discussions that I had had with David Boies.  Prior to my testimony, my lawyers submitted an affidavit from me to the Florida court describing these discussions, and the Florida judge sealed the affidavit.  He did not direct that I refrain from testifying about the matter,  nor did he sanction me for disclosing the discussion in an affidavit, as Ms. Giuffre's lawyers requested. When asked whether he was making a ruling on the BSF motion for sanctions regarding the content of the affidavit, Judge Lynch replied "No. I'm just sealing these [the affidavit] because I think they should be sealed."  Ex. X at 24 (Transcript of Emergency Motion to Seal, December 18, 2015). Thus, contrary to the later motion for sanctions, there was no "gag order" placed in me when the affidavit was submitted, nor did I violate any court order by truthfully answering a question put to me by the opposing lawyer and offering to seal my answer.  The BSF motion for sanctions was subsequently dismissed for lack of jurisdiction and standing, and is now being appealed by Ms. Giuffre.

Dated:    September 14, 2016
          New York, New York

ALAN M. DERSHOWITZ