**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

          Plaintiff,                Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

          Defendant.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER REGARDING FINANCIAL INFORMATION

Plaintiff, Virginia Giuffre, by and through her undersigned counsel, files this Response in Opposition to Defendant's Motion for a Protective Order Regarding Financial Information (DE 370). Defendant's financial information is highly relevant to this case, particularly in light of Ms. Giuffre's punitive damages claim as well as press reports suggesting that the Defendant may be selling her assets in New York and transferring the money outside the jurisdiction. Accordingly, Defendant's motion for a protective order should be denied.[1]

## I.      PRELIMINARY STATEMENT

As recounted by Defendant (DE 370 at 1-3), Ms. Giuffre has served discovery requests on Defendant, seeking certain financial information from the Defendant. The requests are narrowly tailored to the time frame related to this case, as the requested information concerns

---

[1] Contemporaneous with the filing of this response to Defendant's motion for a protective order regarding financial information, Ms. Giuffre has also filed a motion to compel Defendant to produce the requested financial information. This parallel filing is apparently required because Ms. Giuffre does not simply seek the negative relief of denial of Defendant's requested protective order but also the affirmative relief of a Court order requiring production of the materials.

1

financial information from just the time during which Defendant has defamed Ms. Giuffre (2015 to present).

As with most of the other discovery requests she has received, Defendant has chosen not to produce *any* information.  Instead, she has filed this motion for a blanket protective order, arguing that financial discovery has no relevance whatsoever to any issue in this case.  Of course, given the broad scope of discovery, the Court can grant Defendant's motion only if no relevance exists at all.  But in fact, Defendant's financial information is highly relevant to at least three issues in this case.  First, Defendant's recent efforts to conceal assets from the reach of this Court proves consciousness of her guilt of sex trafficking.  Second, Defendant's financial affairs will show dependence on Epstein for financial support, an issue highly relevant to motive.[2]  Third, as Defendant herself appears to admit, the discovery is relevant to the size of the punitive damage award that the jury should enter in this case.  Facts relevant to each of these three points are set out in order below.

> **A.** **Discovery of Financial Information is Relevant to Show Defendant's Transfer of Assets Out of the Jurisdiction after the Commencement of Litigation and thus Her Consciousness of Guilt.**

The requested financial information is relevant to issues relating to Defendant's apparent attempt to conceal assets from the Court.  The timing of recent events is telling here.  As the Court will recall, in court pleadings filed December 30, 2014, Ms. Giuffre initially publicly alleged Defendant had sexually abused her.  On September 21, 2015, Ms. Giuffre filed her lawsuit against Defendant here in the Southern District of New York. (DE 1.)  Ms. Giuffre is seeking at least $50 million in compensatory and punitive damages from Ms. Maxwell.  Just a few months after the suit was filed, on April 28, 2016, the *New York Post* reported that

---

[2] As recently as 2005, Defendant was on Epstein's Palm Beach House bank account for Palm Beach.  Bates Number SAO FOIA disc 7 (bates Giuffre 007590) at p. 93-95.

Defendant, "the daughter of the late disgraced press baron Robert Maxwell, has sold her townhouse at 116 E. 65th St. for $15 million." *See* http://nypost.com/2016/04/28/alleged-epstein-madam-sells-16m-manhattan-townhouse/.  When questioned about the sale, Defendant's representative refused to comment.  *See id.* (broker Shari Scharfer Rollins, of Douglas Elliman, did not return calls).

The transfers of assets, likely out of the jurisdiction of this Court, provides evidence of consciousness of criminal guilt and civil liability.  Clearly, Ms. Giuffre is entitled to explore all the circumstances surrounding the timing and consummation of this sale, including whether Defendant has now secreted these assets someplace where they may be difficult to reach, such as in the United Kingdom (where, on information and belief, Maxwell is a UK citizen holding a UK passport) or elsewhere.

Maxwell's removal and apparent concealment of assets takes place against a backdrop of disregard of court orders by Maxwell and others involved in the Epstein sex trafficking organization.  In 2009, before suit was ever filed in this case, Maxwell was served with a subpoena for a deposition in a civil case against Jeffrey Epstein. After extensive discussion and coordinating a convenient time and place, as well as ultimately agreeing to a confidentiality agreement prepared by Maxwell's attorney, at the eleventh hour Maxwell's attorney informed plaintiff's counsel that Maxwell's mother was very ill and that consequently Maxwell was leaving the country with no plans to return. The deposition was cancelled. ███████████

███████████████████████████████████████████

███████████████████████████████████████

███████████

Similarly, the Court is familiar with the long (and still on-going) effort of Ms. Giuffre's efforts to take the depositions of those who participated with Defendant in sexual abuse --

including Jeffrey Epstein, Nadia Marcikova, and Sarah Kellen – depositions that have thus far been defeated by evasions of service of process and other similar maneuvers. *See* DE 160, Motion for Leave to Serve Three Deposition Subpoenas by Means Other than Personal Service, which this Court granted on June 20, 2016; DE 308, Motion for Finding Civil Contempt against Sarah Kellen for Ignoring Subpoena (pending); DE 310, Motion for Finding of Civil Contempt against Nadia Marcinkova for Ignoring Subpoena (pending). Similarly, the Court will recall that Ms. Giuffre was recently forced to resort to the Hague Convention in an effort to depose Maxwell's spokesman, Ross Gow, about statements he made on Defendant's behalf. *See* DE 306, Motion for Extension of Time to Complete Discovery to Serve and Depose Ross Gow (pending); DE 330 and 331, Application for Letters Rogatory (application granted and letter issued by the Court on August 11, 2016 (DE 358)).

Against the backdrop of these repeated evasion efforts, Defendant's sale of $15 million in assets appears even more alarming.  And, evidence of consciousness of guilt is admissible in criminal cases, even where the standard of proof is much higher than in a civil case.  *See, e.g., United States v. Amuso*, 21 F.3d 1251, 1258 (2d Cir. 1994) (recognizing admissibility of evidence from which a jury could find consciousness of guilt).  Ms. Giuffre it entitled to explore all the circumstances surrounding Ms. Maxwell's apparent efforts to hide assets.[3]

**B.    Discovery of Financial Information is Relevant to Show a Financial Link to Epstein.**

In addition to providing evidence Defendant is hiding assets, the financial information will help to establish an important link between Defendant and Jeffrey Epstein.  Drawing again

---

[3] The Court should review Defendant's reply to this pleading carefully to see if she represents to the Court that the $15 million in assets she has apparently concealed will be made available to satisfy any judgment that Ms. Giuffre might obtain in this case.  If Defendant fails to make such a representation, the Court can draw the obvious inference that Defendant is attempting to hide her assets to escape responsibility for paying any ultimate judgment here.

on a published article from the *New York Post*, it appears that Defendant's townhouse (among other assets) might be part of a covert payoff from Epstein to Defendant.  As the *Post* reports, "[a] lawyer with links to Epstein reportedly bought the townhouse for Maxwell, who has allegedly never earned enough or inherited enough to make the purchase on her own." http://nypost.com/2016/04/28/alleged-epstein-madam-sells-16m-manhattan-townhouse/.  This article suggests that Defendant is reliant upon Epstein for tremendous financial support, which certainly provides a strong motive for her to provide favors to Epstein – including providing him with underage girls for sex.  It also provides a strong motive for her to lie at trial about Epstein's (and her own) sex trafficking.   Indeed, to conceal these facts, other media reports suggest that the reason that Defendant was trying to sell her townhouse "quietly" was perhaps "to put some distance between herself and Epstein, who owns a mansion a few blocks away." http://pagesix.com/2015/02/02/accused-epstein-madam-quietly-selling-ues-townhouse/.

Again, perhaps there is some innocent explanation for these secretive efforts.  But, if so, Defendant has declined to provide it.  *See id.* (noting Defendant's "rep didn't comment").

### C.      Discovery of Financial Information is Relevant to the Issue of the Size of any Punitive Damages.

Financial information regarding Defendant is also highly relevant to Ms. Giuffre's punitive damages claim.  Of course, it is well-settled law that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270 (1981).  As explained by the Reporters of the American Law Institute's *Restatement of Torts*, when considering the size of punitive damages "[t]he wealth of the defendant is also relevant, since the purposes of exemplary damages are to punish for a past event and to prevent future offenses, and the degree of

punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." *Restatement (Second) of Torts* § 908, cmt. e (1979).

Defendant does not attempt to quarrel with the proposition that her vast wealth is relevant to Ms. Giuffre's punitive damages claim. *See, e.g.,* DE 370 at 6 (citing case allowing information about a defendant's wealth to be presented to the jury). Instead, it appears that her only argument concerns the *timing* of the disclosure of such information, an issue discussed below. For purposes of setting out the salient facts, then, it is enough to note here that even Defendant has to ultimately concede that discovery about her financial information is relevant to this case.

## II.    DISCUSSION

Because discovery regarding Defendant's financial circumstances and recent transactions is relevant to this case for multiple reasons, Ms. Giuffre is entitled to discovery regarding that information. Under Federal Rule of Civil Procedure 34(a), a party may request that another party produce documents in her possession so long as the documents are within the scope of Fed. R. Civ. P. 26(b), which allows for broad discovery regarding any non-privileged matter that is relevant to any party's claim or defense. Information within this scope of permitted discovery need not be admissible in evidence to be discoverable. Relevance is still to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or defense. *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14CIV9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (granting motion to compel). For reasons explained above, the financial information sought is relevant to issues in this case, and, accordingly Defendant's motion for a protective order should be denied. There is also no sound reason for delaying discovery on these issues.

**A.      Discovery of Financial Information is Appropriate Pre-Trial to Avoid the Need to Summon Two Separate Juries to Hear the Evidence in the Case.**

Seemingly recognizing the fact that discovery regarding her financial information is appropriate, Defendant's ultimate argument appears not to be that the discovery is improper, but rather that it should be delayed until after the trial starts.  Thus, Defendant's first specific argument section is that financial "discovery is not appropriate pre-trial."  DE 370 at 6.  In support of this proposition, Defendant's lead citation is a forty-year-old New York case, *Rupert v. Sellers*, 48 A.D.2d 265 (4th Dept. 1975).  But as much more recent authority from the Southern District of New York explains, *Rupert* is inapplicable to discovery issues because the case relates solely to the sequence with which evidence can be produced at trial:

> [Defendant's] reliance on *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904 (4th Dep't 1975), for the proposition that punitive damages discovery is not appropriate until a plaintiff has first established liability is misguided since federal law and not state law governs questions of procedure such as discoverability. *Hazeldine v. Beverage Media, Ltd.,* No. 94 Civ. 3466 (CSH), 1997 WL 362229, at *3 (S.D.N.Y. June 27, 1997) (citations omitted). Moreover, while the Second Circuit "has cited *Rupert* with approval, it has done so for the proposition that *evidence* of a defendant's wealth should not 'be brought out *at trial* unless and until the jury has brought in a special verdict that the plaintiff is entitled to punitive damages.' " *Id.* (citations omitted). It has not held that financial discovery such as that sought here may only be taken after a liability determination.

*Pasternak v. Dow Kim*, 275 F.R.D. 461, 463 (S.D.N.Y. 2011).

Defendant also cites another decision from this court, *Collens v. City of New York*, 222 F.R.D. 249, 254 (S.D.N.Y. 2004).  DE 370 at 7.  But *Collens* does not stand for the proposition that financial discovery is broadly barred, but only that on the facts of that case no such discovery was required.  As a recent case from the District of New Jersey explains in allowing pre-trial discovery of financial information for punitive damages purposes:

> Defendants assert that until there has been a finding of liability by the jury, punitive damage discovery is not appropriate. Defendants rely on *Collens,* where the court stated that because the issue of punitive damages is generally bifurcated

7

from issues of liability, and punitive damages issues thus may never arise, punitive damage discovery was not necessary at the pretrial stage. *See Collens,* 222 F.R.D. at 254. Plaintiffs assert that the same jury will decide both liability and punitive damages issues and that, as a practical matter, there is no time to conduct discovery—including depositions of the individual police officers—between the liability verdict and the charge to the jury on punitive damages. Plaintiffs' counsel represented at oral argument that if Defendants are concerned with maintaining the confidentiality of the individual police officer defendants' personal information, Plaintiffs will agree to a confidentiality order and the sealing of those portions of the deposition transcripts and documents that disclose such information until such time as there is a finding of liability, if any, as to the individual police officer defendants. . . . Insofar as Plaintiffs assert a claim under 42 U.S .C. § 1983, the Court notes that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded[.]" *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270 (1981). Therefore, interrogatories seeking information about Defendants' financial condition are reasonably calculated to lead to the discovery of admissible evidence on the issue of punitive damages.

*Graham v. Carino*, No. CIV.09-4501 JEI/AMD, 2010 WL 2483294, at *3 (D.N.J. June 4, 2010).

That pre-trial discovery on financial matters is allowed when a punitive damage issue is present in a case is confirmed by *Tillery v. Lynn*, 607 F. Supp. 399, 402-03 (S.D.N.Y. 1985).  To leave the discovery until later would be burdensome on the jury – meaning that a common approach is to allow financial discovery to proceed pre-trial and then to later bifurcate the trial itself into liability and punitive damages phases:

> Discovery as to defendant's personal assets may be undertaken by plaintiff at this time. It would be unduly burdensome to plaintiff, and most particularly a jury and the court, to delay resolution of the issue as to the amount of punitive damages, if any, which should be awarded until discovery as to defendant's personal assets had been completed. However, as the New York courts have recognized, "defendant's wealth should not be a weapon to be used by plaintiff to enable him to induce the jury to find the defendant guilty of malice, thus entitling plaintiff to punitive damages." *Rupert v. Sellers,* 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 912 (4th Dep't 1975). *Accord, Chilvers v. New York Magazine Company, Inc.,* 114 Misc.2d 996, 453 N.Y.S.2d 153 (N.Y.Co.Sup.Ct.1982). Accordingly, in the interest of justice and to avoid any undue prejudice during the liability phase of this action, the trial will be bifurcated. . . . Therefore, defendant's motions for partial summary judgment and to stay discovery as to his financial status are denied.

*Tillery v. Lynn*, 607 F. Supp. 399, 402-03 (S.D.N.Y. 1985) (Motley, J.).

The holding in *Tillery* was endorsed in *Hazeldine v. Beverage Media, Ltd.,* No. 94 CIV.

3466 (CSH), 1997 WL 362229, at *2-*3 (S.D.N.Y. 1997), which explained" *"Tillery* followed

this preferred course by bifurcating the trial, *see Simpson,* 901 F.2d at 283, but allowing pre-trial

financial discovery to proceed."  Most cases in most jurisdictions outside the Southern District of

New York have reached exactly the same conclusion and allowed pre-trial discovery of financial

information for punitive damage purposes.[4]

---

[4]  *See, e.g.*:

- *CEH, Inc. v. FV Seafarer*, 153 F.R.D. 491 (D.R.I.1994) (plaintiffs were not required to establish prima facie case on issue of punitive damages before they could obtain pretrial discovery of financial information of defendants; plaintiffs had alleged facts sufficient to make a non-spurious claim for punitive damages and that was sufficient to warrant discovery);

- *E.E.O.C. v. California Psychiatric Transitions*, 258 F.R.D. 391 (E.D.Cal.2009) (evidence of employer's current financial worth was relevant to issue of punitive damages, and thus was discoverable in Title VII action alleging sexual harassment and retaliation, where complaint sought punitive damages, deposition evidence indicated that employer may have acted in reckless disregard of female employees' federal rights, and privacy concerns could be addressed with protective order);

- *Grosek v. Panther Transp., Inc.*, 251 F.R.D. 162 (M.D. Pa. 2008) (there was no good cause to issue protective order preventing discovery of defendants' financial condition until determination was made that punitive damages were warranted; plaintiffs stated claim for punitive damages, and delaying discovery until after discovery of evidence supporting punitive damages would have been inefficient and delayed conclusion of the case);

- *Vieste, LLC v. Hill Redwood Dev.*, No. C-09-04024 JSW DMR, 2011 WL 855831, at *1 (N.D. Cal. Mar. 9, 2011) (allowing pre-trial discovery of Defendants' net worth and financial condition because it was clearly relevant to the issue of punitive damages);

- *Charles O. Bradley Trust v. Zenith Capital*, LLC, 2005 WL 1030218, at *3 (N.D.Cal. May 3, 2005) (while some federal courts have required a prima facie showing of entitlement to punitive damages before ordering discovery, the majority have not and listing cases);

- *In re Aqua Dots Products Liability Litigation*, 270 F.R.D. 322 (N.D. Ill. 2010), aff'd, 654 F.3d 748 (7th Cir. 2011) (plaintiffs' discovery regarding financial information from manufacturer and distributor of recalled children's toy was discoverable in a product liability action. Plaintiffs sought punitive damages, and the distributor and manufacturer were arguably principal actors);

- *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281 (C.D. Cal. 1998) (because defendants asserted a counterclaim seeking punitive damages, they could obtain discovery regarding

Defendant also cites a decision from Judge Cote in *Tyco Intern. Ltd. v. Walsh*, which allowed a delay in seeking discovery of financial information in that case because it was not clear if the issue would become relevant.  But that case involved peculiar circumstances, which permitted *discovery* of financial information to be bi-furcated without any burden on the Court. Specifically, that case involved a bench trial, which allowed a delay between the liability phase and punitive damages phases of the trial.  As the Court explained. "it would be premature to force the defendant to produce his net worth information at this time.  If necessary, plaintiff will have an opportunity to obtain discovery on the defendant's financial circumstances as part of any post-trial discovery. Since the trial in this matter is a bench trial, no jury will be burdened by any delay occasioned by this discovery period."  *Tyco Int'l Ltd. v. Walsh*, No. 02-CV-4633 (DLC), 2010 WL 3000179, at *1 (S.D.N.Y. July 30, 2010).

Of course, exactly the opposite situation exists here.  Defendant would apparently have the Court delay until the jury returns with its verdict in favor of Ms. Giuffre before allowing discovery to proceed on Defendant's financial circumstances.  As a practical matter, this would seem to require sending the jury empaneled to hear liability issues home and then selecting a new, second jury on punitive damages issues – a new jury which would have to somehow be shown all of the previous testimony from the liability phase.  *See Hazeldine v. Beverage Media, Ltd.*, No. 94 CIV. 3466 (CSH), 1997 WL 362229, at *2-*3 (S.D.N.Y. 1997) ("allowing pre-trial

---

plaintiffs' net worth; California limitations on such discovery did not apply in federal court);

- *Caruso v. Coleman Co.*, 157 F.R.D. 344 (E.D. Pa. 1994) ("In products liability action, plaintiffs would be allowed discovery of defendants' financial statements and total sales revenue on the ground they are relevant to the issue of punitive damages; information regarding punitive damages is as discoverable as information that relates to liability, and discovery could proceed without prior proof of prima facie case on punitive damages.").

discovery [of financial information] avoids the inefficiency of a discovery delay between the liability and damages phases of trial, as well as the need to assemble a second jury.").

Finally, Defendant relies upon *Guccione v. Flynt*, for the proposition that financial discovery is not appropriate on punitive damages issues here. But that case was *sui generis* with peculiar facts that render it inapplicable here. *See Guccione v. Flynt,* No. 83 CIV. 8020 RWS, 1985 WL 255, at *1 (S.D.N.Y. Feb. 6, 1985) ("It should be apparent to anyone forced to review these papers and the issues presented by this action that two men with ample resources are employing lawyers and occupying space and time in the justice system to continue their personal feud. Regrettably there is to date no apparent basis to avoid the unappetizing task of ruling on these motions."). Moreover, in that case, the Court in fact ordered the Defendant to produce financial information to be turned over to plaintiff's counsel at the time of trial. *See id. at* 1. While that solution may have worked well in that case, it is not satisfactory here. Defendant is not an established businessperson with regularly-kept disclosure statements reporting income and related financial information. Instead, Defendant is participant in a covert, sex trafficking organization with mysterious financial arrangements and apparent, recent efforts to conceal assets. In such circumstance, Ms. Giuffre is not required to take the Defendant's net worth statement at face value, but instead is entitled to receive it well in advance of trial so that she may investigate its accuracy.

Finally, this Court has previously rejected exactly the same arguments that are being made here. This Court explained that "[w]hile bifurcation may be the preferred method of resolving disputed issues of liability and damages, as it prevents prejudice to the defendants by keeping financial evidence out of the liability phase of the trial, this does not mean that plaintiffs should be denied pretrial financial discovery." *Hamm v. Potamkin,* No. 98 CIV. 7425 (RWS), 1999 WL 249721, at *2 (S.D.N.Y. Apr. 28, 1999). This Court explained that "[a]s far as the

11

general timing of financial disclosures is concerned, plaintiffs need not wait until after a finding

of liability or a preliminary finding of damages to obtain discoverable financial information from

defendants." *Id.*   Those conclusions were well-reasoned then, and remain well-reasoned now.

Just as the Court refused to deny pretrial financial discovery to the plaintiff in that case, it should

not deny Ms. Giuffre pretrial financial discovery here.  Pre-trial discovery is the only way to

ensure that Ms. Giuffre will be able to discover all the information that she needs for each of the

three purposes outlined in Part I above.

> **B.    Discovery of Financial Information Should Not Be Delayed until a Ruling on Defendant's Summary Judgment Motion.**

Defendant also tries to interpose one last stalling argument: That discovery of financial

information should await a ruling on her anticipated summary judgment motion.  This argument

should be rejected for two reasons:  First, any argument that Defendant might advance in a

summary judgment motion would border on frivolous given ███████████████████████

███████████████████████████  Second, because the trial is drawing near,

waiting for summary judgment motions to be decided would unreasonably compress the time

available to Ms. Giuffre's counsel to investigate Defendant's financial information.

Defendant anticipates that she will "likely" file a summary judgment motion which will

include an argument concerning the "substantial truth" of Defendant's statements. DE 370 at 9.

The Court will notice that even Defendant herself is not prepared to write that she will be able to

prove the truth of her statements – inserting the qualifying word "substantial" in front of the

word "truth," presumably, because ███████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████



███████████████████████████████ Similarly, Defendant fails to explain why a jury shouldn't be allowed to consider Mr. Rizzo's testimony about how Defendant took the passport of a 15-year-old Swedish girl and threatened her when she refused to have sex with Epstein.[6]  And certainly a reasonable jury could reach a verdict in Ms. Giuffre's favor based solely on Mr. Alessi's testimony about how Defendant brought girls over for Epstein,[7] or ███

████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Defendant makes only a half-hearted effort to suggest that she has a serious summary judgment motion based on "substantial truth."  Instead, she gamely suggests that summary judgment might be proper on grounds that Ms. Giuffre is somehow a "libel-proof" plaintiff.  DE 370 at 9.  Here, too, Defendant's argument that the facts on this issue will be so

---

[6] *See* McCawley Decl. at Composite Exhibit 2, Rinaldo Rizzo's June 10, 2016 Dep. Tr. at 52-60 (Defendant's friend's house manager, through tears, described how Defendant tried to force a 15 year old Swedish girl to have sex with Epstein through threats and stealing her passport)
[7] *See* McCawley Decl. at Composite Exhibit 3, Juan Alessi's June 1, 2016 Dep. Tr. at 28, 52-54 (Epstein's house manager, testified that Defendant was one of the people who procured the over 100 girls he witnessed visit Epstein, and that he had to clean Defendant's sex toys)

clear-cut as to deprive Ms. Giuffre of her right to jury trial borders on frivolous. Ms. Giuffre is a courageous young woman who has come forward to reveal the broad dimensions of a sex trafficking ring – a criminal conspiracy that involved Defendant. That fact, alone, is enough to send the issue of damages to Ms. Giuffre's reputation to a jury, particularly because any other approach would "require[] the Court to make factual findings regarding plaintiff's reputation for a particular trait." *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 594 (S.D.N.Y. 1996) (refusing to grant summary judgment on a libel proof plaintiff argument), *aff'd* 238 F.3d 168 (2d Cir. 2001); *see also id. citing Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563, 1568 (D.C. Cir. 1984) ("To begin with, we cannot envision how a court would go about determining that someone's reputation had already been 'irreparably' damaged—*i.e.,* that *no* new reader could be reached by the freshest libel" (Scalia, J.) (emphasis in original)), *vacated on other grounds,* 477 U.S. 242 (1986).

Defendant also predicts that Ms. Giuffre will "have a *nearly* insurmountable task to demonstrate that [Defendant] acted with the requisite degrees of malice." DE 370 at 10 (emphasis added). Of course, the qualifier gives away the game – a "nearly" insurmountable task is not one on which summary judgment is appropriate. And, in any event, once Ms. Giuffre proves at trial (as she will) that Defendant was deeply involved in Epstein's sex trafficking ring, it becomes obvious that Defendant's attacks on Ms. Giuffre's credibility were uttered with malice. Defendant knew full well, for example, that Ms. Giuffre's statements that Defendant was involved in Epstein's sex trafficking were not "obvious lies." She knew that because she had been involved in (among other things) procuring multiple underage girls for Epstein to sexually abuse[10] – including Ms. Giuffre herself.

---

[10] *See* Message Pads concerning Defendant (GIUFFRE001523; GIUFFRE001427; GIUFFRE001451; GIUFFRE001454; GIUFFRE001460; GIUFFRE001461; GIUFFRE001464;

Further proof of malice comes from Defendant's extraordinary lack of memory about her involvement in the abuse.[11]  For instance, Defendant cannot even recall a single flight on Epstein's private jet with Ms. Giuffre, even though flight logs show that Defendant had 23 flights with Ms. Giuffre while Ms. Giuffre was underage, and Epstein's ████████confirmed those records.[12]  And Defendant cannot recall the circumstances under which a photograph was taken of her, Ms. Giuffre, ███████████████████████████████████████ Based on Defendant's convenient and near total amnesia about documented incriminating events alone, a reasonable jury could find that she acted deliberately and maliciously when she arranged for false and defamatory statements about Ms. Giuffre to be transmitted (literally) around the globe.

Defendant is also less than forthcoming about the evidence that Ms. Giuffre will be able to produce at trial.  Presumably recognizing that the statements ████████████████ released to the media were false and defamatory, Defendant states that there is "no other indicia of [Defendant] authorizing any statement ████████ regarding [Ms. Giuffre."  DE 370 at 10. While there are many problems with that claim, perhaps it is enough to point out that Defendant's motion was filed on August 12, 2016 – and then, just four days later, on August 16, 2016 – defense counsel disclosed to Ms. Giuffre's counsel an email revealing quite clearly that

---

GIUFFRE001465; GIUFFRE001436; GIUFFRE001435; GIUFFRE001472; GIUFFRE001474; GIUFFRE001492; GIUFFRE001553; GIUFFRE001388; GIUFFRE001555; GIUFFRE001556; GIUFFRE001557; GIUFFRE001392; GIUFFRE001526; GIUFFRE001530; GIUFFRE001568; GIUFFRE001536; GIUFFRE001538; GIUFFRE001541; GIUFFRE001546; GIUFFRE001399; GIUFFRE001402; GIUFFRE001405; GIUFFRE001406; GIUFFRE001449; GIUFFRE001409; GIUFFRE001410; GIUFFRE001411; GIUFFRE00; etc.); *See* McCawley Dec. at Sealed

Defendant ████ had been coordinating the attacks on Ms. Giuffre.   In November 10, 2015, after this defamation suit was filed, Defendant continued █████████████, as demonstrated in her email addressed to "Ghislaine [Maxwell] █████████████ ████████, Gow forwarded a press inquiry from the *New York Times* and then asked "[p]lease advise how you wish to respond." █████████████. In addition, since Defendant filed the instant motion, Ms. Giuffre has discovered an article that refers to a ***yet another*** of Defendant's defamatory statements, not previously known to Ms. Giuffre. It is quoted in an article from The Sun (online), titled: "Prince Andrew's pal Ghislaine 'groped teen girls,'" located at https://www.thesun.co.uk/archives/news/6754/prince-andrews-pal-ghislaine-groped-teen-girls/.

Presumably, if further evidence of the linkages between Defendant █████████ are required, those will be established during █████████ – which likely explains why Defendant has refused to make her press agent available for deposition, forcing Ms. Giuffre to resort to the Hague Convention to try to obtain his testimony. *See* DE 358, this Court's Issuance of a Letter Rogatory.

Finally, waiting until any summary judgment is decided will effectively make it impossible for Ms. Giuffre to investigate financial issues. As things stand now, summary judgment motions must be filed by October 28, 2016**.**   Given the ordinary time required for a response and a reply – and then a further decision by this Court – very little time would remain for the Ms. Giuffre to evaluate and investigate any financial information that might be provided by Defendant at that time.  Clearly, the better approach is to allow that discovery now.  *See, e.g., Munoz v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11-CV-7037 JPO, 2012 WL 479429, at *2 (S.D.N.Y. Feb. 8, 2012).

### III.     DISCOVERY OF DEFENDANT'S FINANCIAL INFORMATION SHOULD NOT BE CONFINDED TO A NET WORTH STATEMENT.

Perhaps recognizing that it is inevitable that her financial information will be relevant in this case, Defendant makes one last argument that discovery of financial information should be "limited to a sworn affidavit of net worth."  DE 370 at 13.  Whatever may have been the circumstance warranting limitations in other cases, the circumstances here make that approach highly inappropriate.  Once again, it is important to remember that this is not a case involving, for example, a public-traded company with audited financial statements, or a situation involving otherwise-incontestable financial information.  *Cf. Hamm v. Potamkin*, No. 98 CIV. 7425 (RWS), 1999 WL 249721, at *3 (S.D.N.Y. Apr. 28, 1999) (for purposes of pre-trial punitive damages discovery, directing corporate defendants "to produce a financial affidavit containing a statement of its total net worth and listing its income, assets, and liabilities for the past three years").

Instead, this case involves a shadowy criminal organization, involving a kingpin with vast wealth (Jeffrey Epstein, a reported billionaire), and multi-million dollar transactions to others in the organization such as Defendant (e.g., the apparent concealed transfer, through an attorney associated with Epstein, of an apartment to Defendant worth, in 2015, $15,000,000).  Given the strong possibility of wrongdoing lurking here, a mere declaration of net worth promises to be next to worthless.  To provide a simple example, if Defendant were to testify at trial she had a net worth of only ten million dollars – and not provide information about where she had hidden the fifteen million dollars associated with the sale of her apartment – then Ms. Giuffre will have little effective way to challenge the claim. Moreover, as noted above, the record is replete with multiple examples of Defendant failing to recall obvious and highly incriminating facts. Given Defendant's amnesia about important events, it seems obvious that she may similarly be

forgetful about how many assets she has available to satisfy a judgment in this case – forgetfulness that can be easily concealed with an unelaborated net worth statement.

In addition, a net worth statement will not give Ms. Giuffre all the evidence to which she is entitled.  For example, Defendant has refused to comply with a discovery request seeking information about her connection ███████████████, claiming that such a request is "obviously intended to harass and embarrass" her.  ████████.  Nothing could be further from the truth.  It is Defendant who intends to argue at trial that Ms. Giuffre has made inaccurate statements about various interactions ████████████████  Of course, if Defendant (or any of her organizations) is receiving funding from ████████████, that would provide a clear motive for her to slant testimony on this subject.  Ms. Giuffre is entitled to explore this clear possibility of bias by obtaining information of the financial connections between Defendant █████████████.

Indeed, upon information and belief, Defendant owns and controls at least two corporations: Ellmax, LLC, and The TerraMar Project.  Ms. Giuffre lawfully served both entities with a Rule 45 Subpoena requesting documents.[13] No response was made by either entity. Defendant can use both of these entities as vehicles for hiding her assets.

Defendant makes no argument that it will be difficult for her to assemble the information in question.  And given that much of the information requested involves readily accessible information (such as a bank statement), no such claim is plausible.  Instead, her argument ultimately rests that on the claim that the inquiries involve confidential information that is unduly intrusive.  But at this discovery stage of the proceedings, all of Defendant's financial information can be provided to Ms. Giuffre's counsel under the protection of the existing Protective Order

---

[13] *See* McCawley Dec. at Composite Exhibit 9, Subpoena to Ellmax LLC; Subpoena to The TerraMar Project.

(DE 62).   As this Court has previously explained, in allowing discovery of financial information

for punitive damage purposes, "any privacy interests defendants may have in confidential

financial information produced to plaintiffs can be secured by the protective order issued by this

Court." *Hamm v. Potamkin*, No. 98 CIV. 7425 (RWS), 1999 WL 249721, at *2 (S.D.N.Y. Apr.

28, 1999).  Nothing in Defendant's motion establishes that Ms. Giuffre should be barred from the

kinds of ordinarily discovery that often accompanies cases in which the financial dealings of a

defendant are discoverable.

This argument is also belied by the fact that Defendant sought, and received, Ms.

Giuffre's personal financial information. Specifically, she sought any payment information

relating to the media. *See* Defendant's First Set of Requests for Production at No. 30.  Ms.

Giuffre provided documents responsive to this request, which included her personal bank

records. Defendant takes the contradictory and self-serving position that discovery concerning

the personal finances of Ms. Giuffre is appropriate, yet discovery concerning her own finances is

somehow inappropriate.

At the very least, the Defendant should be required to produce a "statement of [her] total

net worth and listing [her] income, assets, and liabilities for the [relevant] years," as this Court

ordered in a previous case. *Hamm v. Potamkin*, No. 98 CIV. 7425 (RWS), 1999 WL 249721, at

*3 (S.D.N.Y. Apr. 28, 1999).  But because that formulation came from an earlier case involving

reputable corporate entities with (apparently) audited financial statements, the discovery here

should be much broader – and should include all of the significant requests made by Ms. Giuffre.

For example, Defendant should also be required to identify all financial transactions involving

(directly or indirectly) Jeffrey Epstein, ███████████████, Ellmax LLC, The TerraMar

Project, and any other person listed in the Rule 26 disclosures of either side in this case.

Transactions with potential witnesses in this case are highly relevant to bias and other trial

issues.  And because of concern that the Defendant is concealing assets, she should also be required to reveal all significant (greater than $10,000) assets or other monetary transfers in since the beginning of January 1, 2015, as well as all transfers of assets or money outside of this Court's jurisdiction, including transfers overseas.

## IV.     CONCLUSION

Based upon the foregoing, Ms. Giuffre respectfully requests that this Court deny Defendant's motion for a protective order barring discovery into her financial situation.  In a contemporaneously-filed motion to compel, Ms. Giuffre also respectfully requests that the Court grant a motion to compel Defendant to answer questions about her financial information.

Dated: August 22, 2016.

Respectfully Submitted,
BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
 (954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[14]

---

[14] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 22th day of August, 2016, I electronically filed the

foregoing document with the Clerk of Court by using the CM/ECF system.  I also certify that the

foregoing document is being served this day on the individuals identified below via transmission

of Notices of Electronic Filing generated by CM/ECF.

> Laura A. Menninger, Esq.
> Jeffrey Pagliuca, Esq.
> HADDON, MORGAN & FOREMAN, P.C.
> 150 East 10th Avenue
> Denver, Colorado 80203
> Tel: (303) 831-7364
> Fax: (303) 832-2628
> Email: lmenninger@hmflaw.com
>          jpagliuca@hmflaw.com

> /s/ Sigrid S. McCawley
>      Sigrid S. McCawley