# EXHIBIT A

HIGHLY CONFIDENTIAL AEO
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------x

VIRGINIA L. GIUFFRE,

                    Plaintiff,

          v.                        Case No:
                                    15-cv-07433-RWS

GHISLAINE MAXWELL,

                    Defendant.

----------------------------x


HIGHLY CONFIDENTIAL
DEPOSITION OF SARAH RANSOME
NEW YORK, NEW YORK
Friday, February 17, 2017


Reported by:
JEREMY RICHMAN
JOB NO:  300491


MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



```
 1              HIGHLY CONFIDENTIAL AEO

 2

 3

 4                   February 17, 2017

 5                   9:00 a.m.

 6

 7              DEPOSITION of SARAH RANSOME, held

 8     at the offices of Boies, Schiller & Flexner,

 9     575 Lexington Avenue, New York, New York,

10     before JEREMY RICHMAN, a Shorthand Reporter and

11     Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                HIGHLY CONFIDENTIAL AEO
 2    APPEARANCES:
 3
 4    BOIES, SCHILLER & FLEXNER, LLP
 5    Attorneys for plaintiff
 6          401 East Las Olas Boulevard, Suite 1200
 7          Fort Lauderdale, FL 33301-2211
 8    BY:   SIGRID STONE MCCAWLEY, ESQ.
 9          (smccawley@bsfllp.com)
10
11
12    HADDON, MORGAN AND FOREMAN, P.C
13    Attorneys for Defendant
14          150 East 10th Avenue
15          Denver, CO 80230
16    BY:   LAURA A. MENNINGER, ESQ.
17          JEFFREY S. PAGLIUCA, ESQ.
18          (lmenninger@hmflaw.com)
19          (jpagliuca@hmflaw.com)
20
21
22
23
24
25
```



1                HIGHLY CONFIDENTIAL AEO

2    APPEARANCES (Continued):

3

4    J. STANLEY POTTINGER, PLLC

5    Attorneys for the witness

6          49 Twin Lakes Road, Suite 100

7          South Salem, NY 10590

8    BY:   J. STANLEY POTTINGER, ESQ.

9          (stanpottinger@aol.com)

10

11

12   MINTZ & GOLD, LLP

13   Attorneys for the witness

14          600 Third Avenue

15          New York, NY 10016

16   BY:   PETER GUIRGUIS, ESQ.

17          (guirguis@mintzandgold.com)

18

19

20   ALSO PRESENT:

21   GHISLAINE MAXWELL, via teleconference

22

23

24

25



```
 1          HIGHLY CONFIDENTIAL AEO
 2      just ask a question?  I would
 3      like to just clarify.  When you
 4      say objection, does that mean I
 5      actually have to answer the
 6      question?  Because that's
 7      irrelevant.
 8          MR. GUIRGUIS:  Right.
 9      Unless I'm telling you not to
10      answer, you need to answer.
11          THE WITNESS:  So I don't
12      need to answer?
13          MR. GUIRGUIS:  No, you do
14      need to answer this.
15      A.   Okay.  We've been together
16  almost a year.
17      Q.   And what is your current
18  occupation?
19      A.   I'm a writer.
20      Q.   And what do you write?
21      A.   Just stuff, you know?  Just
22  about factual stuff.  You know, just a
23  bit of this, bit of that.
24      Q.   Have you been paid for any
25  of your writing?
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2      A.    No.  It's more of a hobby,
 3  really.
 4      Q.    Are you employed?
 5      A.    Nope.
 6      Q.    Do you have any source of
 7  income?
 8      A.    My partner --
 9          MR. GUIRGUIS:  I'm going to
10      object to that.  Income is out.
11          You don't have to answer
12      that.
13      Q.    Do you have any source of
14  income?
15          MR. GUIRGUIS:  I just
16      objected to that.  You don't have
17      to answer.
18          MS. MENNINGER:  Is there a
19      privilege you're asserting?
20          MR. GUIRGUIS:  I'm not sure
21      what the relevance is, and I'm
22      not going to allow --
23          MS. MENNINGER:  Do you
24      believe that relevance is a
25      proper objection during a
```



```
 1       HIGHLY CONFIDENTIAL AEO
 2    deposition?
 3          MR. GUIRGUIS:  I believe
 4    that if you go far afield with
 5    this witness, that the judge is
 6    not going to appreciate it, and
 7    that I'm not going to just sit
 8    here and be a potted plant and
 9    allow her to answer any questions
10    on any subject that you see fit.
11          MS. MENNINGER:  On
12    relevance?  You're instructing
13    her not to answer on a relevance
14    objection?  Is that what you're
15    saying?
16          MR. GUIRGUIS:  I just
17    objected.
18          MS. MCCAWLEY:  I'm going to
19    object on behalf of the
20    plaintiff, Virginia Giuffre, to
21    the extent that you're requesting
22    from a nonparty financial
23    information, which is not allowed
24    under New York law.
25          MS. MENNINGER:  I have asked
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2      her whether she has any source of
 3      income, and you're going to
 4      object --
 5              MS. MCCAWLEY:  Yes.
 6              MS. MENNINGER:  -- and
 7      instruct her not to answer as
 8      well?
 9              MS. MCCAWLEY:  I'm not
10      instructing her not to answer.
11      I'm just making a record.
12              MR. GUIRGUIS:  It's
13      financial information --
14              MS. MENNINGER:  And whether
15      she has a financial motive is
16      relevant.
17      Q.    So I'm going to ask you a
18  last time:  Do you have any source of
19  income?
20              MR. GUIRGUIS:  I'm going to
21      instruct you again not to answer.
22      Q.    Has any of your writing been
23  published by anyone?
24      A.    No.
25      Q.    Have you sought to have your
```



MAGNA
LEGAL SERVICES

Highly Confidential

Page 24

```
 1          HIGHLY CONFIDENTIAL AEO
 2      A.     About 11 hours in total.
 3      Q.     When is the first time that
 4   you met Mr. Guirguis?
 5              MR. GUIRGUIS:  Objection.
 6              MS. MCCAWLEY:  You can
 7      answer.
 8              MR. GUIRGUIS:  You can
 9      answer.
10      A.     Yesterday.
11      Q.     You met Mr. Guirguis
12   yesterday?  Was that your answer?
13      A.     Yes.
14      Q.     And who is paying for
15   Mr. Guirguis's fees, if you know?
16      A.     I have a pro-bono
17   arrangement.
18      Q.     Do you know if he's
19   receiving money from anyone else in
20   exchange for representing you?
21      A.     No.
22      Q.     No, you don't know, or no,
23   he is not?
24      A.     I don't know.
25      Q.     How many hours have you
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2    spent with Ms. McCawley?
 3         A.    Can I just clarify that
 4    question?  Does that mean on the
 5    phone?  Like what are you referring
 6    to, in person or --
 7         Q.    Either one.  How many hours,
 8    how much time have you spent with
 9    Ms. McCawley in person?
10         A.    I met with Ms. McCawley for
11    the first time in person yesterday,
12    but I've spent -- yeah, we've been --
13    Ms. McCawley was the first person I
14    actually spoke to.
15         Q.    And how many hours have you
16    spent with her on the phone?
17         A.    Many, many hours.
18         Q.    Approximately how many?
19         A.    I don't know.
20         Q.    Five?
21               MR. GUIRGUIS:  Objection.
22         A.    More than five.
23         Q.    Ten?
24               MR. GUIRGUIS:  Objection.
25         Q.    Ten?
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2      A.     Well, 10, 15.  She's been
 3   with me the whole way since when I
 4   came forward, so she's been a very
 5   prominent person.
 6      Q.     And when did you first speak
 7   with her on the phone?
 8      A.     I think it was --
 9      Q.     Without telling me what you
10   said.
11      A.     I think it was November.
12      Q.     November what?
13      A.     I can't remember the date.
14      Q.     Early November?  Late
15   November?
16             MR. GUIRGUIS:  Objection.
17      A.     I can't remember.
18      Q.     Was she speaking to you on
19   your cell phone or a landline?
20      A.     Cell phone.
21      Q.     A mobile number or a
22   landline?
23      A.     A cell phone.
24      Q.     Okay.  And what's that cell
25   phone number?
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2      A.    I don't have it anymore.
 3      Q.    That's okay.  What's the
 4  cell phone number?
 5      A.    I actually don't know.  I
 6  can't remember my cell phone number.
 7  I don't have anything with me, so I
 8  can't remember that number offhand.
 9      Q.    How long did you have that
10  cell phone?
11      A.    About eight months.
12      Q.    What happened to it?
13      A.    I got rid of it.
14      Q.    Why?
15      A.    Because I fear for my life
16  because of Jeffrey Epstein and
17  Ghislaine Maxwell.
18      Q.    What did you do with it?
19      A.    I sold it.
20      Q.    When?
21      A.    November.
22      Q.    Before or after you first
23  spoke with Ms. McCawley?
24      A.    Before.
25      Q.    So then how did you speak
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2    with Ms. McCawley over the phone?
 3         A.    On my partner's cell phone.
 4         Q.    What's his cell phone
 5    number?
 6              MS. MCCAWLEY:  Objection.
 7         What's the relevance of her
 8         partner's cell phone?
 9              Again, this is irrelevant.
10         It's harassing.  It's -- you're
11         seeking information to be able
12         to -- the witness has already
13         expressed fear about her --
14         people currently going after her.
15         So we would object to that
16         intimidation of a nonparty
17         witness.
18         Q.    What is your partner's cell
19    phone number?
20              MR. GUIRGUIS:  I'm directing
21         the witness not to answer.
22         Q.    How many hours have you
23    spent speaking with Mr. Pottinger?
24         A.    I've been speaking to
25    Mr. Pottinger from November.
```



```
 1           HIGHLY CONFIDENTIAL AEO
 2    any agreements regarding writing a
 3    book --
 4        A.    No.
 5        Q.    -- about your experience?
 6              You have to wait for me to
 7    finish my question.
 8              Have you had any agreements
 9    with your lawyers about media rights
10    in any form?
11              MR. GUIRGUIS:  Objection to
12         the extent that you're asking
13         about communications with the
14         attorneys.
15              MS. MENNINGER:  I'm asking
16         about her arrangement with her
17         attorneys, which is not
18         privileged.
19        A.    Can you please repeat the
20    question.
21        Q.    Have you reached any
22    agreement with your attorneys
23    regarding media rights for your story?
24        A.    No.
25        Q.    Have you talked to anyone
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2    about publishing anything relating to
 3    your story?
 4          A.    Can you repeat the question,
 5    please.
 6                MS. MENNINGER:  Can you read
 7          it back.
 8                (Requested portion of the
 9          record was read back.)
10          A.    Yes, I have.
11          Q.    Who have spoken to?
12          A.    The New York Post.
13          Q.    Who at the New York Post?
14          A.    Maureen Callahan.
15          Q.    And when did you speak with
16    her?
17          A.    I think it was later
18    October.
19          Q.    Have you spoken with her
20    since?
21          A.    No.
22          Q.    And how long did you speak
23    to her?
24          A.    I spoke to her for, gosh,
25    about 30 minutes on the phone once.
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2      Q.    And what was -- what did you
 3  tell her in your phone call?
 4      A.    I told her what Jeffrey
 5  Epstein and Ghislaine Maxwell did to
 6  me and the other girls.
 7      Q.    Did she give you any money
 8  in exchange for that interview?
 9      A.    No.
10      Q.    Did she publish anything
11  related to that interview?
12      A.    No.
13      Q.    How did you get in touch
14  with Ms. Callahan?
15      A.    I emailed after I read an
16  article that she had written about
17  Jeffrey Epstein, and the last sentence
18  was -- it was on the 16th of October,
19  and one of the last sentences I
20  remember was, will we ever know the
21  true extent of Jeffrey Epstein's
22  victims.  And I wrote her after that
23  because, well, it still continues,
24  doesn't it.
25      Q.    Where is the email that you
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2   wrote her?
 3        A.    It's on a -- it's on my
 4   computer.
 5        Q.    Okay.  In your Yahoo
 6   account?
 7        A.    Yes.
 8        Q.    Did you have any agreement
 9   with her to have any additional
10   conversation?
11        A.    Yes.
12        Q.    And what was that agreement?
13        A.    It wasn't an agreement per
14   such.  What actually happened was I
15   came forward.  As soon as I came
16   forward, there was -- where I live in
17   Barcelona, there's quite a lot -- it's
18   quite busy traffic with people.
19             I came forward to Maureen
20   Callahan.  I wanted to tell my story,
21   and I want to run a campaign in which
22   all the girls that have been abused by
23   Ghislaine and Jeffrey can come
24   forward.  And I wanted to run a
25   campaign with the New York Post to get
```



```
 1           HIGHLY CONFIDENTIAL AEO
 2   these girls to have the courage to
 3   come forward, because I know a lot of
 4   them are frightened like myself.
 5              The email correspondence I
 6   had with Maureen Callahan, she was
 7   going away or something and she was
 8   going to write a piece in the New York
 9   Post about my story.  During that time
10   it was the elections, so there was a
11   lot more other things going on.
12              There were two people
13   following me after I came forward to
14   Maureen Callahan.  I went to -- I
15   walked downstairs.  I walked around --
16   I have a usual routine that I do.  In
17   the morning I went out, I saw the same
18   two people.  Later on that afternoon,
19   I saw the same two people again.  I
20   was frightened.  I'm frightened for my
21   life, absolutely frightened.  So there
22   you go.
23              So that's what I was --
24   communication stopped between Maureen
25   Callahan and I.  I got really angry
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2   with Maureen because she had obviously
 3   told someone.  Being the New York
 4   Post, so, you know.
 5        Q.    So you had an email to
 6   Ms. Callahan and an email back from
 7   her?
 8        A.    Yes.
 9        Q.    More than one?
10        A.    Yes.
11        Q.    How many?
12        A.    I can't remember.
13        Q.    More than ten or less than
14   ten?
15        A.    Less than ten.
16        Q.    And you had one phone call
17   with her or more than one?
18        A.    Just one.
19        Q.    And it lasted about 30
20   minutes?
21        A.    About that.
22        Q.    And was that also on the
23   cell phone that you got rid of?
24        A.    That was on my partner's
25   cell phone.
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2     Q.     And what had you read in the
 3  press that caused you to get in touch
 4  with Ms. Callahan?
 5          MS. MCCAWLEY:  Objection to
 6      form.  Go ahead.
 7     A.     You can read the article
 8  yourself.  It's on the 16th of
 9  October, there's an article in the New
10  York Post written by Maureen Callahan.
11  You can read it.  And that's what
12  inspired me to come forward.
13     Q.     What do you recall about
14  that article?
15     A.     Oh, I can't remember.  The
16  one thing I do remember is the last
17  sentence of the article, which has
18  stuck with me and quite prominent, and
19  that is, will we ever know the true
20  extent of Jeffrey Epstein's victims.
21     Q.     Do you recall anything else
22  about the article?
23     A.     It's just the same.  When I
24  read the article, the stuff that I had
25  experienced myself with Jeffrey, it's
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2   just same old stuff, just continuing.
 3   I thought he had stopped abusing
 4   girls.
 5       Q.    What do you recall reading a
 6   article that Jeffrey Epstein was
 7   doing?
 8       A.    I can't remember.
 9       Q.    Anything at all?
10       A.    You can read the article.  I
11   can't remember.
12       Q.    The question is what you
13   remember.
14       A.    I can't remember.
15       Q.    You remember nothing else
16   about the article --
17            MS. MCCAWLEY:  Asked and
18        answered objection.
19       Q.    -- except it was related to
20   Jeffrey Epstein and it ended with the
21   sentence that you've described?
22            MS. MCCAWLEY:  Objection,
23        asked and answered.
24       A.    Yes.
25       Q.    What do you know about other
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2   I had to regularly pop in to see him
 3   and Ghislaine.  And Ghislaine would
 4   often check how I was doing and blah,
 5   blah, blah, etcetera.
 6        Q.    What were you doing to
 7   prepare for your college application?
 8        A.    I had to write an essay.
 9        Q.    When did you --
10        A.    Also, I had to do -- like,
11   you know how you apply for college
12   applications; you've got your
13   application forms and such.  So it was
14   more admin.
15        Q.    And you were going to
16   Jeffrey's office to work on your
17   forms?
18        A.    Yes.  And to just say hi.  I
19   was -- well, I never went on my own
20   accord.  I was either invited or told
21   to be there by either Ghislaine or
22   Jeffrey.  I also went to the offices
23   on a number of occasions for private
24   legal matter.
25        Q.    What's the private legal
```



```
 1            HIGHLY CONFIDENTIAL AEO
 2    matter?
 3             MR. GUIRGUIS:   Objection.
 4        I'm going to direct you not to
 5        answer if it's unrelated to this
 6        case.
 7        Q.    Was there an attorney
 8    present?
 9        A.    Yes.
10        Q.    What was the name of the
11    attorney who was present?
12        A.    Alan Dershowitz.
13        Q.    So I was asking about the
14    second time you met Ghislaine.  It was
15    at Jeffrey's office in New York?
16        A.    Yes.
17        Q.    How did you come to be in
18    Jeffrey's office in New York where you
19    met Ghislaine the second time?
20        A.    I was told to be there.
21        Q.    Who told you to be there?
22        A.    I think it was Ghislaine.
23        Q.    How did Ghislaine tell you
24    to be there?
25        A.    I can't remember if it was
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2   or the specific words used.
 3            But it was surrounding my
 4   FIT application and an essay I had to
 5   write, and they both proofread my FIT
 6   application as well.
 7        Q.    And did they both read your
 8   essay?
 9        A.    Yes, they did.
10        Q.    When did you write that
11   essay?
12        A.    I can't remember.
13        Q.    Before you went to South
14   Africa?
15        A.    Yes.
16        Q.    Do you know what the
17   application deadline was?
18        A.    I don't know.  I don't know.
19   I can't remember.
20        Q.    When did you meet Alan
21   Dershowitz?
22        A.    I don't remember the
23   specific date.  It was a few months
24   after I had been here in New York.
25        Q.    Was it after you had gone to
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2    the island?
 3         A.    Yes.
 4         Q.    Do you know what time of
 5    year?
 6         A.    I mean, I think it was
 7    before winter.
 8         Q.    Well, you were here in the
 9    fall.
10         A.    Yeah.
11         Q.    And you left in the winter?
12         A.    Yeah.  I left in May.
13         Q.    So did you meet him before
14    you went to South Africa?
15         A.    Yes.
16         Q.    Well, let's be clear.  You
17    were here until you went to South
18    Africa, and you left for a while and
19    then you came back, right?
20         A.    Mm-hmm.
21         Q.    How long were you gone?
22         A.    I think about three -- about
23    three weeks.
24         Q.    So you met him before you
25    went to South Africa?
```



```
 1           HIGHLY CONFIDENTIAL AEO
 2      A.      Yes.
 3      Q.      And tell me about when you
 4  met Alan.
 5      A.      I first met Alan at the
 6  offices.
 7      Q.      And tell me what happened.
 8      A.      I can't really tell you what
 9  happened, because it's about a legal
10  matter.
11      Q.      Was he your lawyer?
12      A.      He was going to be assigned
13  to be my lawyer.
14      Q.      Assigned to be your lawyer?
15      A.      Through Jeffrey's
16  instruction.
17      Q.      Okay.  Was he your lawyer?
18           MS. MCCAWLEY:  Objection,
19      asked and answered.
20           MS. MENNINGER:  I don't know
21      if there's a privilege.
22           MR. GUIRGUIS:  There's a
23      privilege whether he was retained
24      or not, right?  I mean, if you're
25      at a cocktail party and you speak
```


MAGNA
LEGAL SERVICES

```
 1          HIGHLY CONFIDENTIAL AEO
 2     to a lawyer, you know that
 3     conversation is privileged.
 4     So...
 5          MS. MENNINGER:  Well, I
 6     don't, actually.
 7          MR. GUIRGUIS:  You're free
 8     to research it.
 9          MS. MENNINGER:  I will ask
10     questions, then, to try to
11     establish whether or not there's
12     a good-faith basis.
13     Q.     Did you approach Alan
14 Dershowitz for the purpose of seeking
15 legal advice?
16     A.     I was introduced to Alan.
17     Q.     By whom?
18     A.     Jeffrey Epstein.
19     Q.     On what day?
20     A.     I don't recall what day.
21     Q.     Was it related to some event
22 that had occurred just before that?
23     A.     Yes, that's correct.
24     Q.     Were you in touch with any
25 law enforcement authorities?
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2     A.    No.
 3     Q.    Hmm?
 4     A.    No.
 5     Q.    Was Jeffrey Epstein in the
 6  room when you were speaking with Alan
 7  Dershowitz?
 8     A.    Yes.
 9     Q.    Did Jeffrey Epstein overhear
10  your conversation with Alan
11  Dershowitz?
12     A.    Yes.
13     Q.    What did you talk about with
14  Alan Dershowitz?
15          MR. GUIRGUIS:  Objection.
16     A.    It --
17          MR. GUIRGUIS:  Objection.  I
18     direct the witness not to answer.
19          MS. MENNINGER:  A third
20     party was in the room; you've
21     heard that, Counsel.  And you
22     know that means that's a waiver.
23          MS. MCCAWLEY:  No.  I mean,
24     they would have been involved --
25     we don't know what the situation
```



```
 1           HIGHLY CONFIDENTIAL AEO
 2      is.  They could have been
 3      involved together.  There could
 4      be a number of reasons why
 5      Jeffrey had some sort of common
 6      interest with her with that.
 7      Q.    Did you sign a common
 8  interest agreement with Jeffrey?
 9           MR. GUIRGUIS:  Objection.
10      Do not answer.
11           MS. MENNINGER:  Whether she
12      had a common interest agreement
13      with Jeffrey, you're instructing
14      her not to answer; is that right,
15      Counsel?
16           MR. GUIRGUIS:  Do you have
17      realtime in front of you,
18      Counsel?
19           MS. MENNINGER:  I don't.
20           MR. GUIRGUIS:  You don't?
21      You can borrow mine.
22           MS. MENNINGER:  I don't want
23      it.  Thank you.
24           MR. GUIRGUIS:  Okay.
25      Q.    Anyone else in the room when
```



```
 1            HIGHLY CONFIDENTIAL AEO
 2            BY MS. MENNINGER:
 3       Q.    Going back to your first
 4  conversation with Alan Dershowitz, at
 5  any point in that conversation, had
 6  Mr. Dershowitz agreed to act as your
 7  lawyer?
 8       A.    Yes.
 9       Q.    Did he do anything in terms
10  of contacting anyone on your behalf?
11            MR. GUIRGUIS:   Objection.
12            Do not answer.
13       Q.    What was the specific legal
14  matter that you were seeking
15  representation for?
16            MS. MCCAWLEY:   Objection.
17            MR. GUIRGUIS:   Objection.
18            Do not answer.
19       Q.    What did you understand the
20  purpose of Jeffrey Epstein being in
21  the room for during that conversation?
22       A.    Jeffrey was there to support
23  me and Jeffrey was looking after me.
24       Q.    When you engaged in sexual
25  conduct with Alan Dershowitz, did you
```



```
 1           HIGHLY CONFIDENTIAL AEO
 2   photographs contained in Defendant's
 3   Exhibit 6?
 4        A.    Yes, I do.
 5        Q.    What are they?
 6        A.    They are photos of Jeffrey's
 7   island and the trip in December.
 8        Q.    Who took those photos?
 9        A.    ████  ████  took these specific
10   photos.
11        Q.    And when you were asked to
12   provide these to us, where did you
13   locate them?
14        A.    I had a disk that ████  ████
15   had given me as a present and memento
16   of that holiday.
17        Q.    Where is that disk now?
18        A.    In Spain.
19        Q.    Do you see in the corner
20   there are some little numbers with
21   your last name and then some --
22        A.    Oh, yeah, okay.
23        Q.    I'm only showing you that so
24   we can together go through to some.
25        A.    Okay.
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2     Q.     So is Defendant's Exhibit 7
 3 the second batch that you were
 4 referring to?
 5     A.     Yes.
 6     Q.     Okay.  So I'm just trying to
 7 help be clear.
 8            Defendant's Exhibit 6, you
 9 believe were all given to you by ████
10 ████  on a disk?
11     A.     Well, there's a lot of
12 photos here.  So I took some, I had
13 some hard copies, and they're all
14 actually all together, so...
15     Q.     Okay, that's fine.
16     A.     Yeah.  I don't want to be
17 unclear on which exhibit is which.
18 There's hundreds here.
19     Q.     So the photographs of ████
20 ██████, you're saying were taken by
21 ██████ ████, that we were looking at in
22 RANSOME 24?
23     A.     Well, I can recheck the disk
24 and then I can actually tell you
25 exactly which ones he took, but I
```



```
 1          HIGHLY CONFIDENTIAL AEO
 2    can't recall every single photo on
 3    ████ ███'s disk.  But there were
 4    multiple photos that were produced
 5    from myself as well.
 6         Q.    Okay.  I will just ask you
 7    about a few.
 8         A.    Okay.
 9         Q.    RANSOME 24 is one that you
10    said was -- of ████ ██████, was one
11    you said you thought ████ ███ had
12    taken?
13         A.    Yes.
14         Q.    If you could turn to RANSOME
15    40.  And these are in order, so
16    hopefully that will be easy.
17         A.    Okay.  Mm-hmm.
18         Q.    Who is represented in this
19    photograph?
20         A.    That's ██████.
21         Q.    And where is ██████ in this
22    photograph, if you know?
23         A.    This is by the beach.
24    There's like -- there's like a small
25    beach, like there's a beach house on
```



1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK    )

                            :

4    COUNTY OF NEW YORK)

5

6            I, Jeremy Richman, a Notary Public

7    within and for the State of New York, do hereby

8    certify:

9            THAT SARAH RANSOME, the witness

10   whose deposition is hereinbefore set forth, was

11   duly sworn by me and that such deposition is a

12   true record of the testimony given by such

13   witness.

14            I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18            IN WITNESS WHEREOF, I have hereunto

19   set my hand this 19th day of February 2017.

20

21

22                    _____

                              Jeremy Richman

23

24

25

