BSF | BOIES SCHILLER FLEXNER

January 3, 2024

**VIA ECF**

The Honorable Loretta A. Preska
District Court Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: ***Giuffre v. Maxwell*, Case No. 15-cv-7433-LAP**

Dear Judge Preska,

Pursuant to the Court's December 18, 2023, unsealing order, and following conferral with Defendant, Plaintiff files this set of documents ordered unsealed. The filing of these documents ordered unsealed will be done on a rolling basis until completed. This filing also excludes documents pertaining to Does 105 (*see* December 28, 2023, Email Correspondence with Chambers), 107, and 110 (*see* ECF No. 1319), while the Court's review of those documents is ongoing.

Respectfully,

/s/ Sigrid S. McCawley
Sigrid S. McCawley

cc: Counsel of Record (via ECF)

# EXHIBIT 4

**From:** gmax1@ellmax.com
**Sent:** Saturday, January 10, 2015 9:00 AM
**To:** Philip Barden; Ross Gow

I am out of my depth to understanding defamation and other legal hazards and don't want to end up in a law suit aimed at me from anyone if I can help it. Apparently even saying Virginia is a lier has hazard! I have never been in a suit criminal or civil and want it to stay that way.
The US lawyers for the Jane Does are filling additional discovery motions and if I speak I open my self to being part of discovery apparently. I am trying to stay out of litigation and not have to employ lawyers for years as I get lost in US legal nightmare. I stand no legal risk currently on these old charges and civil suits against Jeffrey
We need to consult with US lawyers on any statement I make and the complaints too
Perhaps we make a statement of the legal risk of saying anything for potential defamation or something that prevents a full and frank detailed rebuttal + the press not being the place for that? Regardless, Philip plse call jeffrey lawyer and see what you can understand from him and pehaps craft something in conjunction with him? Either way I think you need to speak to him to understand my risk so you can help me understand it - too may cooks in the kitchen and I can't make good decisions. Plse reach out to him today
+ I have already suffered such a terrible and painful loss over the last few days that I can't even see what life after press he'll even looks like - statements that don't address all just lead to more questions..what is my relationship to clinton ? Andrew on and on.
Let's rest till monday. I need head space

THE TERRAMAR PROJECT
FACEBOOK
TWITTER
G+
PINTEREST
INSTAGRAM
PLEDGE
THE DAILY CATCH

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.

______________________________/

**PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO ANSWER DEPOSITION QUESTIONS FILED UNDER SEAL[1]**

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this Motion to Compel Defendant to Answer Deposition Questions. During her recent deposition, Defendant refused to answer numerous questions about allegedly "adult" sexual activity related to Jeffrey Epstein. Because this activity is highly relevant to this case, Defendant should be ordered to answer questions about it.

As the Court is aware, this defamation case involves Ms. Giuffre's assertions that she and other females were recruited by Defendant to be sexually abused by Jeffrey Epstein under the guise of being "massage therapists." *See* Complaint, (DE 1), at ¶ 27 (Giuffre "described Maxwell's role as one of the main women who Epstein used to procure under-aged girls for sexual activities and a primary co-conspirator and participant in his sexual abuse and sex trafficking scheme"). In response to these assertions, Defendant has made the sweeping claim that Ms. Giuffre's assertions are "entirely false" and "entirely untrue." Complaint, DE 1, at ¶ 31.

[1] Defendant has labelled her entire deposition transcript as Confidential at this time. Counsel for the parties conferred at the deposition regarding answering questions.

Yet during her deposition, Defendant refused to answer any questions that she construed as having something to do with "consensual adult sex." Defense counsel supported that position that "frankly, [that's] none of your business and I instruct the witness not to answer." *See* Declaration of Sigrid S. McCawley ("McCawley Decl.") at Exhibit 1, Tr. of Maxwell Depo. (Apr. 22, 2016) at 21. The result was that at a number of points throughout her deposition, Defendant refused to answer questions about subjects integral to this lawsuit, including questions about what the alleged "massage therapists" were doing at Jeffrey Epstein's house and the sexual nature of those massages.

For example, Defendant refused to answer questions about whether she had given Jeffrey Epstein a massage:

> Q. Have you ever given Jeffrey Epstein a massage?
>
> MR. PAGLIUCA: Object to the form, foundation. And I'm going to instruct you not to answer that question. I don't have any problem with you asking questions about what the subject matter of this lawsuit is, which would be, as you've termed it, sexual trafficking of Ms. Roberts.
>
> To the extent you are asking for information relating to any consensual adult interaction between my client and Mr. Epstein, *I'm going to instruct her not to answer* because it's not part of this litigation and it is her private confidential information, not subject to this deposition.
>
> MS. McCAWLEY: You can instruct her not to answer. That is your right. But I will bring her back for another deposition because it is part of the subject matter of this litigation so she should be answering these questions. This is civil litigation, deposition and she should be responsible for answering these questions.
>
> MR. PAGLIUCA: I disagree and you understand the bounds that I put on it.
>
> MS. McCAWLEY: No, I don't. I will continue to ask my questions and you can continue to make your objections.
>
> Q. Did you ever participate from the time period of 1992 to 2009, did you ever participate in a massage with Jeffrey Epstein and another female?
>
> MR. PAGLIUCA: Objection. Do not answer that question. Again, to the extent you are asking for some sort of illegal activity as you've construed in

connection with this case I don't have any problem with you asking that question. To the extent these questions involve consensual acts between adults, frankly, they're none of your business and *I will instruct the witness not to answer.*

MS. McCAWLEY: This case involves sexual trafficking, sexual abuse, questions about her having interactions with other females is relevant to this case. She needs to answer these questions.

MR. PAGLIUCA: I'm instructing her not to answer.

MS. McCAWLEY: Then we will be back here again.

*See* McCawley Decl. at Exhibit 2, Tr. of Maxwell Depo. (Apr. 22, 2016) at 19-22 (emphasis added).

Defendant's participation in massages with Epstein is a central part of this case. Ms. Giuffre has explained that during her first sexual encounter with Jeffrey Epstein, it was Defendant who provided instruction on how to do it and how to turn the massage into a sexual event. Obviously, proof that Defendant had previously massaged Epstein – include massages with sexual component – would provide important corroboration for Ms. Giuffre's testimony at trial. And proof that Defendant was involved in massages will further help prove that statements to the press that Virginia's allegations were "obvious lies" was itself an obvious lie.

As another example, Defendant refused to answer questions about her knowledge that Johanna Sjoberg was hired to work for Epstein and provided massages. In the police report, Johanna admitted that Maxwell recruited her to work for Epstein. *See* McCawley Decl. at Exhibit 3, Giuffre000076-77 (police report indicating that Johanna was recruited by Maxwell). Yet during Defendant's deposition, she refused to answer questions regarding Johanna Sjoberg.

Q. Do you know what tasks Johanna was hired to performance?

A. She was tasked to answer telephones.

Q. Did you ever ask her to rub Jeffrey's feet? . . .

A. I believe that I have read that, but I don't have any memory of it.

Q. Did you ever tell Johanna that she would get extra money if she provided Jeffrey massages?

A. I was always happy to give career advice to people and I think that becoming somebody in the healthcare profession. either exercise instructor or nutritionist or professional massage therapist is an excellent job opportunity. Hourly wages are around 7, 8, $9 and as a professional healthcare provider you can earn somewhere between as we have established 100 to $200 and to be able to travel and have a job that pays that is a wonderful job opportunity. So in the context of advising people for opportunities for work, it is possible that I would have said that she should explore that as an option.

Q. Did you tell her she would get extra money if she massaged Jeffrey?

A. I'm just saying, I cannot recall the exact conversation. I give career advice and I have done that.

Q. Did you ever have Johanna massage you?

A. I did.

Q. How many times?

A. I don't recall how many times.

Q. Was there sex involved?

A. No. . . .

Q. Did you ever have sexual contact with Johanna?

MR. PAGLIUCA: Object to the form and foundation. You need to give me an opportunity to get in between the questions.
*Anything that involves consensual sex on your part, I'm instructing you not to answer.*

Q. Did you ever have sexual contact with Johanna?

A. [MR. PAGLIUCA?] Again, she is an adult --

Q. I'm asking you, did you ever have sexual contact with Johanna?

A. I've just been instructed not to answer.

Q. On what basis?

A. You have to ask my lawyer.

*See* McCawley Decl. at Exhibit 4, Tr. of Maxwell Depo. (Apr. 22, 2016) at 60-62 (emphasis added).

Here again, this information is critical to the case. Among other things, these questions are designed to show a *modus operani* ("M.O") for Epstein and Maxwell – specifically, how they recruited for a non-sexual massage than converted the massage into sexual activities.

One last illustration comes from Defendant's refusal to answer about her knowledge of Epstein's sexual interests during massages:

> Q. Does Jeffrey like to have his nipples pinched during sexual encounters?
>
> MR. PAGLIUCA: Objection to form and foundation.
>
> A. I'm not referring to any advice on my counsel. I'm not talking about any adult sexual things when I was with him.
>
> Q. When Jeffrey would have a massage, would he request that the masseuse pinch his nipples while he was having a massage?
>
> A. I'm not talking about anything with consensual adult situation.

*See* McCawley Decl. at Exhibit 5, Tr. of Maxwell Depo. (Apr. 22, 2016) at 82.

While Epstein himself might also provide answers to these questions, it appears likely that he will assert his Fifth Amendment privilege regarding his sexual activities. Accordingly, Ms. Giuffre must pursue questioning of Maxwell to obtain information on this subject. Here again, information about Epstein's sexual idiosyncrasies will provide important corroboration to Ms. Giuffre's testimony that she had sexual interactions of an identical nature with Epstein.

These refusals are not an isolated instance. Instead, similar refusals to answer questions occurred repeatedly throughout the deposition. *See, e.g.*, McCawley Decl. at Composite Exhibit 6. 52-55; 64-65; 82; 92-93; 137-38; 307-09.

The Court should compel Defendant to answer all these questions. In addition to the specific points made above, the "big picture" here reveals how vital such discovery is. At the core of Ms. Giuffre's allegations is the allegation that Defendant lured her into a sexual situation with the offer of a job making money as a massage therapist; that Epstein always habitually tried

to turn massages into sex (that was his modus operandi and plan all along); and that Maxwell recruited other females for an ostensibly proper position, such as therapeutic masseuse, with knowledge that the intent was for that person would be pressured to provide sexual gratification to Epstein. As a result, Epstein's use of massages for sexual purposes is a central part of this case.

And Defendant's role in those massages – and knowledge of the purposes of those massages – is a critical piece of evidence showing her state of mind when she attacked Ms. Giuffre's assertions as "entirely untrue." Ms. Giuffre intends to prove at trial that Defendant knew full well the sexual purpose for which she was recruiting females – including underage females like Ms. Giuffre. Ms. Giuffre is entitled to explore Defendant's knowledge of the sexual activities that took place under the guise of "massages." Otherwise Defendant will be able to portray to the jury an inaccurate picture of that what was happening at Epstein's house what nothing more than run-of-the-mill massage therapy. *See, e.g.*, McCawley Decl. at Exhibit 7, Tr. of Maxwell Depo. (Apr. 22, 2016) at 51 ("Q: Did [the pay for massage therapists] vary on what sexual acts they performed? . . . A: No, it varied depending on how much time, some massage therapists charge more and some charge less.").

Defendant's refusal to answer questions about alleged "adult" consensual sex also blocks Ms. Giuffre from seeking legitimate discovery in this case. By refusing to answer questions about her and Epstein's sexual activities with alleged "adults," Defendant is essentially given the ability to refuse to answer any sexual question she does not wish to answer. Defendant simply has to deem the question as involving "consensual adult sex" and no need be given. The result is to leave Ms. Giuffre with no way of exploring the identity of these alleged adults, the ages of these alleged adults, and indeed whether they were adults at all. This allows Defendant to claim

that she is unaware of any sexual activity involving underage females, because (she claims) the only sexual activity she was aware involved adults.

The Court should compel Ms. Maxwell to answer all questions about her knowledge relating to sexual activities with Epstein and other females while at Epstein's various homes. *See* Fed. R. Crim. P. 37(a)(3)(B)(i); *see, e.g., Kelly v. A1 Tech.*, No. 09 CIV. 962 LAK MHD, 2010 WL 1541585, at *20 (S.D.N.Y. Apr. 12, 2010) ("Under the Federal Rules, when a party refuses to answer a question during a deposition, the questioning party may subsequently move to compel disclosure of the testimony that it sought. The court must determine the propriety of the deponent's objection to answering the questions, and can order the deponent to provide improperly withheld answers during a continued deposition" (internal citations omitted)). Of course, the party objecting to discovery must carry the burden of proving the validity of its objections, particularly in light of "the broad and liberal construction afforded the federal discovery rules . . . ." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014). For purposes of a deposition, the information sought "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y. 2013) (*citing* Fed.R.Civ.P. 26(b)(1)).

Defendant cannot carry her burden of showing that the questions asked are not reasonably calculated to lead to the discovery of admissible evidence. This is a case in which sexual activities lie at the heart of the issues in dispute. As a result, it is hardly surprising to find that discovery pertains to alleged "adult" sexual activities – and questions about such subjects are entirely proper. *See, e.g., Condit v. Dunne*, 225 F.R.D. 100, 113 (S.D.N.Y. 2004) (in defamation case, "Plaintiff is hereby ordered to answer questions regarding his sexual relationships in so far

as they are relevant to a defense of substantial truth, mitigation of damages, or impeachment of plaintiff."); *Weber v. Multimedia Entm't, Inc.*, No. 97 CIV. 0682 PKL THK, 1997 WL 729039, at *3 (S.D.N.Y. Nov. 24, 1997) ("While discovery is not unlimited and may not unnecessarily intrude into private matters, in the instant case inquiry into private matters is clearly relevant to the subject matter of the suit. Accordingly, plaintiff Misty Weber shall respond to defendants' interrogatories concerning her sexual partners . . . .").

Generally speaking, instructions from attorneys to their clients not to answer questions at a deposition should be "limited to [issues regarding] privilege." *Morales v. Zondo, Inc.*, 204 F.R.D. 50, 54 (S.D.N.Y. 2001). In this case, defense counsel ranged far beyond the normal parameters of objections and sought to decide for himself what issues were relevant. That was improper and the Court should order a resumption of the Defendant's deposition so that she can answer questions about her knowledge of sexual activity relating to Jeffrey Epstein.

## CONCLUSION

Defendant should be ordered to sit for a follow-up deposition and directed to answer questions regarding her knowledge of alleged "adult" sexual activity.

Dated: May 5, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: ______________________

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP

333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[2]

[2] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 5th day of May, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley

Sigrid S. McCawley

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

VIRGINIA L. GIUFFRE,

Plaintiff,

Case No.:

-against- 15-cv-07433-RWS

GHISLAINE MAXWELL,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped deposition of GHISLAINE MAXWELL, taken pursuant to subpoena, was held at the law offices of BOIES SCHILLER & FLEXNER, 575 Lexington Avenue, New York, New York, commencing April 22, 2016, 9:04 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

\- - -

MAGNA LEGAL SERVICES
1200 Avenue of the Americas
New York, New York 10026

APPEARANCES:

BOIES SCHILLER & FLEXNER, LLP
Attorneys for Plaintiff
401 East Las Olas Boulevard
Fort Lauderdatle, Florida, 33301
BY: SIGRID McCAWLEY, ESQUIRE
MEREDITH SCHULTZ, ESQUIRE
EMMA ROSEN, PARALEGAL

FARMER JAFFE WEISSING EDWARDS FISTOS & LEHRMAN, P.L.
Attorneys for Plaintiff
425 N. Andrews Avenue
Fort Lauderdale, Florida 33301
BY: BRAD EDWARDS, ESQUIRE

PAUL G. CASSELL, ESQUIRE
Attorneys for Plaintiff
383 South University Street
Salt Lake City, Utah 84112

HADDON MORGAN FOREMAN
Attorneys for Defendant
150 East 10th Avenu
Denver, Colorado 80203
BY: JEFFREY S. PAGLIUCA, ESQUIRE
LAURA A. MENNINGER, ESQUIRE

Also Present:
James Christe, videographer

G Maxwell - Confidential

A. She was tasked to answer telephones.

Q. Did you ever ask her to rub Jeffrey's feet?

MR. PAGLIUCA: Objection to the form and foundation.

A. I believe that I have read that, but I don't have any memory of it.

Q. Did you ever tell Johanna that she would get extra money if she provided Jeffrey massages?

A. I was always happy to give career advice to people and I think that becoming somebody in the healthcare profession, either exercise instructor or nutritionist or professional massage therapist is an excellent job opportunity. Hourly wages are around 7, 8, $9 and as a professional healthcare provider you can earn somewhere between as we have established 100 to $200 and to be able to travel and have a job that pays that is a wonderful job opportunity. So in the context of advising people for opportunities for work, it is possible that I

G Maxwell - Confidential

would have said that she should explore that as an option.

Q. Did you tell her she would get extra money if she massaged Jeffrey?

A. I'm just saying, I cannot recall the exact conversation. I give career advice and I have done that.

Q. Did you ever have Johanna massage you?

A. I did.

Q. How many times?

A. I don't recall how many times.

Q. Was there sex involved?

A. No.

Q. Did you ever instruct Johanna to massage Glenn Dubin?

A. I don't believe -- I have no recollection of it.

Q. Did you ever have sexual contact with Johanna?

MR. PAGLIUCA: Object to the form and foundation. You need to give me an opportunity to get in between the questions.

G Maxwell - Confidential

Anything that involves consensual sex on your part, I'm instructing you not to answer.

Q. Did you ever have sexual contact with Johanna?

A. Again, she is an adult --

Q. I'm asking you, did you ever have sexual contact with Johanna?

A. I've just been instructed not to answer.

Q. On what basis?

A. You have to ask my lawyer.

Q. Did you ever have sexual contact with Johanna that was not consensual on Johanna's part?

MR. PAGLIUCA: You can answer nonconsensual.

A. I've never had nonconsensual sex with anybody.

Q. Not Annie Farmer?

MR. PAGLIUCA: Objection.

A. I just testified I never had nonconsensual sex with anybody ever, at any time, at anyplace, at any time, with anybody.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
VIRGINIA L. GIUFFRE,

Plaintiff,

Case No.:
-against- 15-cv-07433-RWS

GHISLAINE MAXWELL,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped deposition of GHISLAINE MAXWELL, taken pursuant to subpoena, was held at the law offices of BOIES SCHILLER & FLEXNER, 575 Lexington Avenue, New York, New York, commencing April 22, 2016, 9:04 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

\- - -

MAGNA LEGAL SERVICES
1200 Avenue of the Americas
New York, New York 10026

APPEARANCES:

BOIES SCHILLER & FLEXNER, LLP
Attorneys for Plaintiff
401 East Las Olas Boulevard
Fort Lauderdatle, Florida, 33301
BY: SIGRID McCAWLEY, ESQUIRE
MEREDITH SCHULTZ, ESQUIRE
EMMA ROSEN, PARALEGAL

FARMER JAFFE WEISSING EDWARDS FISTOS & LEHRMAN, P.L.
Attorneys for Plaintiff
425 N. Andrews Avenue
Fort Lauderdale, Florida 33301
BY: BRAD EDWARDS, ESQUIRE

PAUL G. CASSELL, ESQUIRE
Attorneys for Plaintiff
383 South University Street
Salt Lake City, Utah 84112

HADDON MORGAN FOREMAN
Attorneys for Defendant
150 East 10th Avenu
Denver, Colorado 80203
BY: JEFFREY S. PAGLIUCA, ESQUIRE
LAURA A. MENNINGER, ESQUIRE

Also Present:
James Christe, videographer

for sexual acts.

Q. I'm asking if they performed sexual acts?

MR. PAGLIUCA: Object to the form and foundation.

Q. Did any of the massage therapists who were at the home perform sexual acts for Jeffrey Epstein?

A. I don't know what you mean by sexual acts.

Q. Did any of the massage therapists who were working at the home perform sexual acts, including touching the breasts, touching the vaginal area, being touched while Jeffrey is masturbating, having intercourse, any of those things?

MR. PAGLIUCA: Objection. Form and foundation.

To the extent any of this is asking for to your knowledge any consensual sex act that may or may not have involved you, I'm instructing you not to answer the question.

Q. I'm not asking about consensual sex

G Maxwell - Confidential

acts. I'm asking whether any of the massage therapists performed sexual acts for Mr. Epstein, as I have just described?

A. I have never seen anybody have sexual intercourse with with Jeffrey, ever.

Q. I'm not asking about sexual intercourse. I'm asking about any sexual act, touching of the breast -- did you ever see -- can you read back the question?

(Record read.)

A. I'm not addressing any questions about consensual adult sex. If you want to talk about what the subject matter, which is defamation and lying, Virginia Roberts, that you and Virginia Roberts are participating in perpetrating her lies, I'm happy to address those. I never saw any inappropriate underage activities with Jeffrey ever.

Q. I'm not asking about underage. I'm asking about whether any of the masseuses that were at the home perform sexual acts for Jeffrey Epstein?

A. I have just answered the question.

Q. No, you haven't.

G Maxwell - Confidential

A. I have.

Q. No, you haven't.

A. Yes, I have.

Q. You are refusing to answer the question.

A. Let's move on.

Q. I'm in charge of the deposition. I say when we move on and when we don't.

You are here to respond to my questions. If you are refusing to answer the court will bring you back for another deposition to answer these questions.

Do you understand that?

MR. PAGLIUCA: You don't need to threaten the witness.

MS. McCAWLEY: I'm not threatening her. I'm making sure the record is clear.

MR. PAGLIUCA: Certainly can you apply to have someone come back and the court may or may not have her come back again.

Again, she is not answering questions that relate to adult consent

sex acts. Period. And that's the instruction and we can take it up with the court.

Q. Ms. Maxwell, are you aware of any sexual acts with masseuses and Jeffrey Epstein that were nonconsensual?

A. No.

Q. How do you know that?

A. All the time that I have been in the house I have never seen, heard, nor witnessed, nor have reported to me that any activities took place, that people were in distress, either reported to me by the staff or anyone else. I base my answer based on that.

Q. Are you familiar with a person by the name of Annie Farmer?

A. I am.

Q. Has Annie Farmer given a statement to police about you performing sexual acts on her?

A. I have not heard that.

Q. Has Annie Farmer given a statement to police about Jeffrey Epstein performing

G Maxwell - Confidential

Q. Did you have sex with her?

MR. PAGLIUCA: This is the same instruction about consensual or nonconsensual.

Q. Was Emmy under the age of 18 when you hired her?

A. No. I didn't hire her, as I said, Jeffrey did.

Q. Did Emmy ever have sex with Jeffrey?

MR. PAGLIUCA: Objection to the form and foundation.

A. How would I know what somebody else did.

Q. You weren't involved in the sex between Jeffrey, Emmy and yourself?

A. We already --

Q. Were you involved with sex between Jeffrey, Emmy and yourself?

MR. PAGLIUCA: Everyone is talking over each other. You heard the question.

Again, you you know what the instruction is. If there is any

G Maxwell - Confidential

consensual issue involved, I instruct you not to answer.

A. Moving on.

Q. So you are refusing to answer that question?

A. I've been instructed by my lawyer.

Q. Did you ever have sex with Jeffrey, Emmy, Virginia and yourself when Virginia was underage?

A. Absolutely not.

MR. PAGLIUCA: We've been going for about an hour. I would like to take a five-minute break, please.

MS. McCAWLEY: I'm almost done.

MR. PAGLIUCA: You are not going to allow a break.

MS. McCAWLEY: As soon as I get through my line of questioning, which is perfectly appropriate.

Q. Did Emmy Taylor travel with you and Jeffrey to Europe?

A. I'm sure she did.

Q. What is she doing today?

A. I have no idea.

G Maxwell - Confidential

Q. Did you train Virginia on how to recruit other girls to perform sexual massages?

MR. PAGLIUCA: Objection to the form and foundation.

A. No. And it's absurd and her entire story is one giant tissue of lies and furthermore, she herself has -- if she says that, you have to ask her about what she did.

Q. Does Jeffrey like to have his nipples pinched during sexual encounters?

MR. PAGLIUCA: Objection to form and foundation.

A. I'm not referring to any advice on my counsel. I'm not talking about any adult sexual things when I was with him.

Q. When Jeffrey would have a massage, would he request that the masseuse pinch his nipples while he was having a massage?

A. I'm not talking about anything with consensual adult situation.

Q. What about with underage --

A. I am not aware of anything.

Q. You are not aware of Jeffrey

G Maxwell - Confidential

Q. In your responsibilities in working for Jeffrey, would you book massages for him on any given day so that he would have a massage scheduled? Would you take a call for example and book a massage for him?

MR. PAGLIUCA: Objection to the form and foundation.

Q. You can answer.

A. Typically, that was not my responsibility. He would either book the massage himself or one of his other assistants would do that.

Q. From time to time you had to do that?

MR. PAGLIUCA: Objection to the form and foundation.

A. Like I said, typically it was somebody else's responsibility.

Q. If you were unable to book a girl for a massage on a given day, would that mean that you were responsible for giving him a sexual massage?

MR. PAGLIUCA: Objection to the form and foundation and I instruct you

not to answer any questions about any of your consensual adult sexual activity.

Q. So you are not going to answer that question?

A. You just heard my counsel.

Q. Have you ever said to anybody that recruiting other girls to perform sexual massages for Jeffrey Epstein takes the pressure off you?

MR. PAGLIUCA: Object to the form and foundation.

A. Repeat the question and break it out.

Q. Have you ever said to anybody that you recruit girls --

A. Stop right there. I never recruited girls, let's stop there. Now breakdown the question.

Q. Have you ever said to anybody --

A. By girls, we are talking about underage people -- you said girls, are you talking about underage -- we are not talking about consensual acts -- this is a defamation suit.

the flights?

A. I can't recollect having a meal with them, but just so we are clear, the allegations that Clinton had a meal on Jeffrey's island is 100 percent false.

Q. But he may have had a meal on Jeffrey's plane?

A. I'm sure he had a meal on Jeffrey's plane.

Q. You do know how many times he flew on Jeffrey's plane?

A. I don't.

Q. Do you know who Doug Band is?

A. I do.

Q. How do you know him?

A. He used to work or still works for Bill Clinton.

Q. Did you ever have a relationship with him?

A. We are talking about adult consensual relationships, it's off the record.

Q. I'm not asking what you did with him, I'm asking if you ever had a

relationship with him?

MR. PAGLIUCA: If you understand the term relationship, certainly you can answer that.

A. Define relationship.

Q. Somebody that you would have spent time together, either seeing them in a romantic relationship or --

A. You need to be, what do you mean by romantic. I was friends with Doug but you are suggesting something more so I want to be clear what you are actually asking me.

Q. You defined it. You said you were friends with him. If that's what you were that's all I need to know.

While you were on the trip with President Clinton, do you recall where you stayed at these locations, in other words, would you leave the jet and stay overnight at a hotel, do you have a recollection of this trip?

A. I recollect the trip but if you're asking me where we stayed, you can see it's a very fast paced trip. It was very tiring and

G Maxwell - Confidential

form and foundation.

A. I don't know why the name is -- I'm sorry -- I can't -- I have no idea. I recognize the name but that's it.

Q. Was Johanna Sjoberg a masseuse?

MR. PAGLIUCA: Objection to the form and foundation.

A. What are you asking me, I'm sorry?

Q. When Johanna Sjoberg worked for Jeffrey Epstein, did she perform massages?

A. I've testified that when Johanna came originally, she came to answer telephones. I believe at some point she became a masseuse. I don't recollect when and I personally had massages from Johanna.

Q. What did Johanna do for Jeffrey Epstein, did she perform massages, anything else?

MR. PAGLIUCA: Objection to the form and foundation.

A. When she came she answered phones and at some point, I believe, I don't have any firm recollection, but I believe she went to school and became a masseuse and I had

G Maxwell - Confidential

massages from her.

Q. Did you ever have any sexual interaction with her?

MR. PAGLIUCA: Object to the form and foundation and I'm going to instruct you if we're talking about any consensual adult contact, you are not allowed to answer the question.

Q. Did you have any sexual contact with her in the presence of Jeffrey Epstein?

MR. PAGLIUCA: Same instruction.

Q. Did you have any sexual contact with her in the presence of anybody other than Jeffrey Epstein?

MR. PAGLIUCA: Same instruction.

Q. How many massages did you receive from Johanna?

A. I really don't recall but a fair amount.

Q. Did the massages involve sex?

MR. PAGLIUCA: I'm going to instruct you not to answer.

Q. Have you ever engaged in sex with any female?

G Maxwell - Confidential

MR. PAGLIUCA: I'm going to instruct you not to answer.

MS. McCAWLEY: I want the record to reflect that Ms. Maxwell's attorney is directing her not to answer this series of questions.

MR. PAGLIUCA: It definitely does.

Q. Were you responsible for introducing Anuska to Jeffrey Epstein?

MR. PAGLIUCA: Objection to the form and foundation.

A. I already testified that I don't really recall Anuska.

Q. Were you responsible for introducing Johanna to Jeffrey Epstein?

MR. PAGLIUCA: Objection to the form and foundation.

A. Again, I don't like the characterization of introduction. Johanna came to answer telephones.

Q. When did you -- were you the person who brought or introduced or met Johanna for purposes of bringing her to Jeffrey Epstein's home?

# COMPOSITE EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
VIRGINIA L. GIUFFRE,

Plaintiff,

Case No.:
15-cv-07433-RWS

-against-

GHISLAINE MAXWELL,

Defendants.

- - - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped deposition of GHISLAINE MAXWELL, taken pursuant to subpoena, was held at the law offices of BOIES SCHILLER & FLEXNER, 575 Lexington Avenue, New York, New York, commencing April 22, 2016, 9:04 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
1200 Avenue of the Americas
New York, New York 10026

APPEARANCES:

BOIES SCHILLER & FLEXNER, LLP
Attorneys for Plaintiff
401 East Las Olas Boulevard
Fort Lauderdatle, Florida, 33301
BY: SIGRID McCAWLEY, ESQUIRE
MEREDITH SCHULTZ, ESQUIRE
EMMA ROSEN, PARALEGAL

FARMER JAFFE WEISSING EDWARDS FISTOS & LEHRMAN, P.L.
Attorneys for Plaintiff
425 N. Andrews Avenue
Fort Lauderdale, Florida 33301
BY: BRAD EDWARDS, ESQUIRE

PAUL G. CASSELL, ESQUIRE
Attorneys for Plaintiff
383 South University Street
Salt Lake City, Utah 84112

HADDON MORGAN FOREMAN
Attorneys for Defendant
150 East 10th Avenu
Denver, Colorado 80203
BY: JEFFREY S. PAGLIUCA, ESQUIRE
LAURA A. MENNINGER, ESQUIRE

Also Present:
James Christe, videographer

# Questions About People Under the Age of 18 at Epstein's Home

G Maxwell - Confidential

Q. You can answer.

A. I have not any idea exactly of the youngest adult employee that I hired for Jeffrey.

Q. When you say adult employee, did you ever hire someone that was under the age of 18?

A. Never.

Q. Did you ever bring someone who was under -- invite someone under the age of 18 to Jeffrey's home, any of his homes?

MR. PAGLIUCA: Object to the form foundation.

A. Can you repeat the question?

Q. Did you ever invite anybody who was under the age of 18 to Jeffrey's homes?

MR. PAGLIUCA: Same objections.

A. I have a number of friends that have children and friends of mine that have kids and in the invitation of my friends and their kids, I'm sure I may have invited some of my friend's kids to come.

Q. Anybody that is not a friend of yours.

# Questions About Meeting the Plaintiff and Massages with Plaintiff

G Maxwell - Confidential

A. Ms. Roberts held herself out --

Q. I'm not asking how she held herself out. I'm asking how she arrived at the home. Did you meet her and invite her to come to the home or how did she arrive there?

MR. PAGLIUCA: Object to the form and foundation.

A. Ms. Roberts held her to be a masseuse and her mother drove her to the house.

Q. When did you first meet Virginia Roberts?

A. I don't have a recollection of the first meeting.

Q. Do you recall meeting her at Mar-a-Lago?

A. Like I said, I don't have a recollection of meeting Ms. Roberts.

Q. So you recall Ms. Roberts being brought to the home by her mother, is that your testimony?

A. That is my testimony.

Q. And that is the first time you met her?

G Maxwell - Confidential

A. Like I said, I don't recall meeting her the first time. I do remember her mother bringing her to the house.

Q. Are you a member at Mar-a-Lago?

A. No.

Q. Have you visited Mar-a-Lago?

A. Yes.

Q. Did you visit Mar-a-Lago in the year 2000?

A. I'm pretty sure I did.

Q. When Ms. Roberts arrived at the home with her mother, what happened?

A. I spoke to her mother outside of the house and she -- what I don't recall is exactly what happened because I was talking to her mother the entire she was in the house.

Q. Did you introduce Ms. Roberts to Jeffrey Epstein?

A. I don't recall how she actually met Mr. Epstein. As I said, I spoke to her mother the entire time outside the house.

Q. Did you walk Ms. Roberts up to the upstairs location at the Palm Beach house to

absolutely everything that took place in that first meeting. She has lied repeatedly, often and is just an awful fantasist. So very difficult for anything to take place that she repeated because I was with her mother the entire time.

Q. So did you have -- did you give a massage with Virginia Roberts and Mr. Epstein during the first time Virginia Roberts was at the West Palm Beach house?

MR. PAGLIUCA: Object to the form and foundation.

Q. Yes or no?

A. No.

Q. Have you ever given a massage with Virginia Roberts in the room and Jeffrey Epstein?

MR. PAGLIUCA: Object to the form and foundation.

A. No.

Q. Have you ever given Jeffrey Epstein a massage?

MR. PAGLIUCA: Object to the form, foundation. And I'm going to instruct

# Questions About Massages with Minors

G Maxwell - Confidential

questions.

MR. PAGLIUCA: I'm instructing her not to answer.

MS. McCAWLEY: Then we will be back here again.

Q. Have you ever given a massage to Mr. Epstein with a female that was under the age of 18?

A. Can you repeat the question?

Q. Yes. Have you ever given a massage to Mr. Epstein with a female that was under the age of 18?

A. No.

Q. Have you ever observed Mr. Epstein having a massage given by an individual, a female, who was under the age of 18?

A. No.

Q. Have you ever observed females under the age of 18 in the presence of Jeffrey Epstein at his home?

MR. PAGLIUCA: Object to the form and foundation.

A. Again, I have friends that have children --

# Questions About Hiring Massage Therapists

G Maxwell - Confidential

-- just another one of Virginia's many fictitious lies and stories to make this a salacious event to get interest and press. It's absolute rubbish.

Q. Were you in charge of hiring individuals to provide massages for Jeffrey Epstein?

A. My job included hiring many people. There were six homes. As I sit here, I hired assistants, I hired architects, I hired decorators, I hired cooks, I hired cleaners, I hired gardeners, I hired pool people, I hired pilots, I hired all sorts of people.

In the course and a very small part of my job was from from time to time to find adult professional massage therapists for Jeffrey.

Q. When you say adult professional massage therapists, where did you find these massage therapists?

A. From time to time I would visit professional spas, I would receive a massage and if the massage was good I would ask that man or woman if they did home visits.

# Questions About [redacted] and Nadia Marcinkova

G Maxwell - Confidential here today I do not.

Q. Ms. Maxwell, when did you first meet [redacted]

MR. PAGLIUCA: Object to the form and foundation.

A. I have no idea when I met her.

Q. Do you know how old she was when you met her?

A. I have no idea how old she was when I met her.

Q. Is it possible she was 13 years old when you first met her?

MR. PAGLIUCA: Object to the form and foundation.

A. [redacted] may have been in the house when Jeffrey was in the house. I have no idea how old she was.

Q. I understand she was with [redacted]

I'm a [redacted] was 13 years old when you first met her?

A. I have no idea.

G Maxwell - Confidential

Q. Was she under 18 when you first met her?

A. I have no idea how old she was when I first met her.

Q. Did she look like a child when you first met her?

A. I don't remember what she looked like at the time she was in the house.

Q. How many years have you known her?

A. I can only recall the last time I saw her.

Q. When was the first time you met her?

A. Again, I just told you, I don't recall the first time I met her.

Q. Did [redacted] travel with you on Jeffrey's planes?

A. I wouldn't remember if [redacted] was on the plane or not.

Q. Did you ever have sex with [redacted]

A. No.

Q. Did you ever observe Jeffrey having sex with [redacted]

A. No.

Q. Were you aware that Jeffrey was having sexual contact with [redacted] when she was 13 years old?

MR. PAGLIUCA: Object to the form and foundation.

A. I would be very shocked and surprised if that were true.

Q. Were you in the house when [redacted] was in the house in a private area with Jeffrey Epstein?

MR. PAGLIUCA: Object to the form and foundation.

A. Can you repeat the question.

Q. Were you ever in the Palm Beach house when Jeffrey Epstein was in the house with [redacted]?

MR. PAGLIUCA: Object to the form and foundation.

A. I've already testified that I have met her and that she was there [redacted] I don't understand what your question is asking.

Q. So you have never seen [redacted]

G Maxwell - Confidential

[redacted]

MR. PAGLIUCA: Object to the form and foundation.

Q. Is that your testimony?

A. I already said I don't recall all the times I've seen her and I have no memory of that.

Q. Have you ever seen [redacted] in the house with Jeffrey Epstein [redacted]

MR. PAGLIUCA: Object to the form and foundation.

A. I just told you I don't recall seeing [redacted]

Q. Were you ever involved in an orgy with [redacted]

A. No, absolutely not.

Q. Can you tell me, do you know an individual by the name of Nadia Marcinkova?

A. I do.

Q. How did you meet Nadia Marcinkova?

A. At some point she was a friend of Jeffrey's and I recall meeting her at some point.

G Maxwell - Confidential

Q. Did Jeffrey arrange for a visa for Nadia Marcinkova?

A. I don't know what Jeffrey did. I cannot testify what Jeffrey did.

Q. Was Nadia involved in sex with Jeffrey and other girls?

MR. PAGLIUCA: Object to the form and foundation.

Q. Girls under the age of 18?

MR. PAGLIUCA: Same objection.

A. I have no idea.

Q. Was Nadia involved with sex with Jeffrey and girls over the age of 18?

MR. PAGLIUCA: Same objection.

A. I have no idea.

Q. Did Nadia recruit other girls for sex with Jeffrey?

MR. PAGLIUCA: Object to the form and foundation.

A. I have no idea.

Q. Do you still talk to Nadia?

A. No.

Q. Is she a pilot?

A. I have no idea.

# Questions About Mr. Epstein and Sex

G Maxwell - Confidential

acts. I'm asking whether any of the massage therapists performed sexual acts for Mr. Epstein, as I have just described?

A. I have never seen anybody have sexual intercourse with with Jeffrey, ever.

Q. I'm not asking about sexual intercourse. I'm asking about any sexual act, touching of the breast -- did you ever see -- can you read back the question?

(Record read.)

A. I'm not addressing any questions about consensual adult sex. If you want to talk about what the subject matter, which is defamation and lying, Virginia Roberts, that you and Virginia Roberts are participating in perpetrating her lies, I'm happy to address those. I never saw any inappropriate underage activities with Jeffrey ever.

Q. I'm not asking about underage. I'm asking about whether any of the masseuses that were at the home perform sexual acts for Jeffrey Epstein?

A. I have just answered the question.

Q. No, you haven't.

# Questions About Sarah Kellen, Glen Dubin, Plaintiff, Johanna Sjoberg, Annie Farmer and Sex

G Maxwell - Confidential

A. I have.

Q. No, you haven't.

A. Yes, I have.

Q. You are refusing to answer the question.

A. Let's move on.

Q. I'm in charge of the deposition. I say when we move on and when we don't.

You are here to respond to my questions. If you are refusing to answer the court will bring you back for another deposition to answer these questions.

Do you understand that?

MR. PAGLIUCA: You don't need to threaten the witness.

MS. McCAWLEY: I'm not threatening her. I'm making sure the record is clear.

MR. PAGLIUCA: Certainly can you apply to have someone come back and the court may or may not have her come back again.

Again, she is not answering questions that relate to adult consent

sex acts. Period. And that's the instruction and we can take it up with the court.

Q. Ms. Maxwell, are you aware of any sexual acts with masseuses and Jeffrey Epstein that were nonconsensual?

A. No.

Q. How do you know that?

A. All the time that I have been in the house I have never seen, heard, nor witnessed, nor have reported to me that any activities took place, that people were in distress, either reported to me by the staff or anyone else. I base my answer based on that.

Q. Are you familiar with a person by the name of Annie Farmer?

A. I am.

Q. Has Annie Farmer given a statement to police about you performing sexual acts on her?

A. I have not heard that.

Q. Has Annie Farmer given a statement to police about Jeffrey Epstein performing

G Maxwell - Confidential

asked and answered already.

Q. You can answer the question.

A. I have no idea what Sarah Kellen did.

Q. You never observed Sarah Kellen with girls under the age of 18 at Jeffrey's home?

MR. PAGLIUCA: Object to the form and foundation.

A. The answer is no, I have no idea.

Q. Do you know Glenn Dubin?

A. I do.

Q. What is your relationship with Glenn Dubin?

MR. PAGLIUCA: Object to the form.

A. What do you mean what is my relationship.

Q. Are you friendly with him, how do you know him?

A. He is the husband of Eva Dubin.

Q. Is Eva Dubin one of your friends?

A. Yes.

Q. Did you ever send Virginia to Glenn's condo at the Breakers to give him a

massage?

MR. PAGLIUCA: Objection to the form and foundation.

A. No.

Q. Did you ever instruct Virginia Roberts to have sex with Glenn?

MR. PAGLIUCA: Objection to the form and foundation.

A. I have never instructed Virginia to have sex with anybody ever.

Q. How old was Eva Anderson when she met Jeffrey?

MR. PAGLIUCA: Objection to the form and foundation.

A. I have no idea.

Q. What's she under the age of 18?

MR. PAGLIUCA: Objection to the form and foundation.

A. I just testified I have idea how old she was.

Q. You testified she was your friend. You don't know how old she was when she met Jeffrey?

A. That happened sometime in the '70s,

how would I know, or '80s. I have no idea. Can you testify to what your friends did 30 years ago?

Q. You don't ask the questions here, Ms. Maxwell.

What about Johanna Sjoberg, when did you first meet Johanna?

A. I don't recall the exact date.

Q. Did you hire Johanna?

A. I don't hire people, she came to work at the house to answer phones.

Q. Where did you meet her?

A. I just testified, I don't recall exactly when I met her.

Q. Was one of your job responsibilities to interview people that would be then hired by Jeffrey?

A. That was one of my responsibilities.

Q. Do you recall interviewing Johanna?

A. I don't recall the exact interview, no.

Q. Do you know what tasks Johanna was hired to performance?

G Maxwell - Confidential

A. She was tasked to answer telephones.

Q. Did you ever ask her to rub Jeffrey's feet?

MR. PAGLIUCA: Objection to the form and foundation.

A. I believe that I have read that, but I don't have any memory of it.

Q. Did you ever tell Johanna that she would get extra money if she provided Jeffrey massages?

A. I was always happy to give career advice to people and I think that becoming somebody in the healthcare profession, either exercise instructor or nutritionist or professional massage therapist is an excellent job opportunity. Hourly wages are around 7, 8, $9 and as a professional healthcare provider you can earn somewhere between as we have established 100 to $200 and to be able to travel and have a job that pays that is a wonderful job opportunity. So in the context of advising people for opportunities for work, it is possible that I

G Maxwell - Confidential

would have said that she should explore that as an option.

Q. Did you tell her she would get extra money if she massaged Jeffrey?

A. I'm just saying, I cannot recall the exact conversation. I give career advice and I have done that.

Q. Did you ever have Johanna massage you?

A. I did.

Q. How many times?

A. I don't recall how many times.

Q. Was there sex involved?

A. No.

Q. Did you ever instruct Johanna to massage Glenn Dubin?

A. I don't believe -- I have no recollection of it.

Q. Did you ever have sexual contact with Johanna?

MR. PAGLIUCA: Object to the form and foundation. You need to give me an opportunity to get in between the questions.

G Maxwell - Confidential

Anything that involves consensual sex on your part, I'm instructing you not to answer.

Q. Did you ever have sexual contact with Johanna?

A. Again, she is an adult --

Q. I'm asking you, did you ever have sexual contact with Johanna?

A. I've just been instructed not to answer.

Q. On what basis?

A. You have to ask my lawyer.

Q. Did you ever have sexual contact with Johanna that was not consensual on Johanna's part?

MR. PAGLIUCA: You can answer nonconsensual.

A. I've never had nonconsensual sex with anybody.

Q. Not Annie Farmer?

MR. PAGLIUCA: Objection.

A. I just testified I never had nonconsensual sex with anybody ever, at any time, at anyplace, at any time, with anybody.

G Maxwell - Confidential

Q. So if Johanna were to testify that she did not consent to a sexual act that you participated in --

A. I just told you I have never ever under any circumstances with anybody, at any time, in anyplace, in any form had nonconsensual relations with anybody.

Q. Did you introduce Johanna to Prince Andrew?

MR. PAGLIUCA: Objection to the form and foundation.

A. I've, again, read that Johanna claimed that she met or that she said she met Prince Andrew. I don't know if I was the one who made the introduction or not.

Q. Do you know a female by the name of Emmy Taylor?

A. I do.

Q. How do you know her?

A. Emmy was my assistant.

Q. So she worked for you?

A. Yes.

Q. Did you hire her?

A. Again, Jeffrey hired people.

# Questions About Emmy, Virginia, and Ms. Maxwell Regarding Sex

consensual issue involved, I instruct you not to answer.

A. Moving on.

Q. So you are refusing to answer that question?

A. I've been instructed by my lawyer.

Q. Did you ever have sex with Jeffrey, Emmy, Virginia and yourself when Virginia was underage?

A. Absolutely not.

MR. PAGLIUCA: We've been going for about an hour. I would like to take a five-minute break, please.

MS. McCAWLEY: I'm almost done.

MR. PAGLIUCA: You are not going to allow a break.

MS. McCAWLEY: As soon as I get through my line of questioning, which is perfectly appropriate.

Q. Did Emmy Taylor travel with you and Jeffrey to Europe?

A. I'm sure she did.

Q. What is she doing today?

A. I have no idea.

# Questions About Outfits and Sex Toys

about.

Q. So you didn't provide her with that?

A. As I just testified, I have no idea what you are talking about.

Q. I was trying to interpret whether you didn't understand what a school girl outfit was or you are saying that didn't happen?

A. I clearly know what a school girl outfit is. I have no recollection of providing anybody with a school girl outfit.

Q. Did you have a set of outfits used by the massage therapists that would include things like a school girl outfit or a black patent leather outfit or anything of that nature?

MR. PAGLIUCA: Object to the form and foundation.

A. That would be just another one of Virginia's lies.

Q. You didn't have anything like that?

A. I did not.

Q. Did you have a basket of sex toys

G Maxwell - Confidential

that you kept in the Palm Beach house?

MR. PAGLIUCA: Objection to the form and foundation.

A. First of all what do you mean.

Q. A laundry basket that contained sex toys in it?

MR. PAGLIUCA: Objection to the form and foundation.

A. Can you ask the question again?

Q. Did you have a laundry basket that contained sex toys in it, in the Palm Beach House?

MR. PAGLIUCA: Objection to the form and foundation.

Q. Did you have a laundry basket of sex toys in the Palm Beach house?

MR. PAGLIUCA: Same objection.

Q. You can answer.

A. I don't recollect anything about a laundry basket of sex toys.

Q. Do you recollect having sex toys at the Palm Beach house?

A. You have to define what are you talking about.

# Questions About Plaintiff and Epstein and Sex

G Maxwell - Confidential

Q. Do you recall having a basket full of sex toys?

A. I already told you I did not.

Q. We were talking a moment ago about Ms. Roberts and her position as a masseuse, do you know what she was paid for working as a masseuse for Jeffrey Epstein?

A. I do not.

Q. Did you ever pay her?

A. I don't ever recall paying her.

Q. Do you know what happened during the massage appointments with Jeffrey Epstein and Virginia Roberts?

MR. PAGLIUCA: Objection to the form and foundation.

A. No.

Q. Were you ever present to view a massage between Jeffrey Epstein and Virginia Roberts?

A. I don't recollect ever seeing Virginia and Jeffrey in a massage situation.

Q. Do you ever recollect seeing them in a sexual situation?

A. I never saw them in a sexual

situation.

Q. Did you ever participate in sex with Virginia Roberts and Jeffrey Epstein?

A. I never ever at any single time at any point ever at all participated in anything with Virginia and Jeffrey. And for the record, she is an absolute total liar and you all know she lied on multiple things and that is just one other disgusting thing she added.

Q. Did you help her obtain an apartment in Palm Beach to live in?

MR. PAGLIUCA: Objection to the form and foundation.

Q. Was that part of your responsibilities for Jeffrey?

A. First of all, I didn't know she had an apartment in Palm Beach. I only learned that from the many times you guys have gone to the press to sell stories, so no.

Q. Did you help her get a cell phone, was that one of your responsibilities for Jeffrey, to get her is a cell phone as part of her masseuse obligations?

# Questions About Training Plaintiff to Recruit Girls for Massages

G Maxwell - Confidential
form and foundation.
A. Like I told you, I don't recall her being at the house at all.
Q. How many homes does Jeffrey have?
MR. PAGLIUCA: Objection to the form and foundation.
A. When I was working for him, I think he had six maybe.
Q. Would Virginia stay with him in those homes?
MR. PAGLIUCA: Objection to the form and foundation.
A. I can only testify for when I was present with him and I cannot say what she did when I wasn't present with him.
Q. When you were present, would Virginia stay in the homes with him?
A. I don't recall her staying in the houses.
Q. Did you train Virginia on how to recruit other girls for massages?
MR. PAGLIUCA: Objection to the form and foundation.
A. No.

G Maxwell - Confidential

Q. Did you train Virginia on how to recruit other girls to perform sexual massages?

MR. PAGLIUCA: Objection to the form and foundation.

A. No. And it's absurd and her entire story is one giant tissue of lies and furthermore, she herself has -- if she says that, you have to ask her about what she did.

Q. Does Jeffrey like to have his nipples pinched during sexual encounters?

MR. PAGLIUCA: Objection to form and foundation.

A. I'm not referring to any advice on my counsel. I'm not talking about any adult sexual things when I was with him.

Q. When Jeffrey would have a massage, would he request that the masseuse pinch his nipples while he was having a massage?

A. I'm not talking about anything with consensual adult situation.

Q. What about with underage --

A. I am not aware of anything.

Q. You are not aware of Jeffrey

# Questions About Ms. Maxwell's Relationship with Mr. Epstein

G Maxwell - Confidential

has perpetrated, cannot tell you what is true or factual or not.

Q. You said you were in the home a very limited time, so average in the year for example, 2004, how many times would you have been in his Palm Beach home?

A. Very hard for me to state but very little.

Q. How about his New York home?

A. Same.

Q. Were you his girlfriend in that year, in 2004?

A. Define what you mean by girlfriend.

Q. Were you in a relationship with him where you would consider yourself his girlfriend?

A. No.

Q. Did you ever consider yourself his girlfriend?

A. That's a tricky question. There were times when I would have liked to think of myself as his girlfriend.

Q. When would that have been?

A. Probably in the early '90s.

# Questions About Recruiting Girls, an Underage Girl in London, and Foreign Girls

G Maxwell - Confidential

A. First of all I resent and despise the world recruit. Would you like to define what you mean by recruit and by girls, you mean underage people. I never had to do anything with underage people. So why don't you reask the question in a way that I am able to answer it.

Q. I'm asking if you ever said that to anybody. So if you don't understand the word recruit and you never used that word then the answer to that question would be no.

A. I have no memory as I sit here today having used that word.

Q. Did you ever meet an underage girl in London to introduce her to Jeffrey to provide him with a massage?

MR. PAGLIUCA: Objection to the form and foundation.

A. Run that past me one more time.

Q. Did you ever meet an underage girl in London to introduce her to Jeffrey to perform a massage?

MR. PAGLIUCA: Same objection.

A. Are you asking me if I met anybody

G Maxwell - Confidential

that was underage in London specifically to provide a massage to Jeffrey, is that your question?

Q. Yes.

A. No.

Q. Do you know who Alexander Dixon is?

A. I don't recall her right now.

Q. Do you know if -- strike that.

During the time that you were working for Jeffrey, did you ever observe any foreign females, so in other words, not from the United States, that were brought to Jeffrey's home to perform massages?

MR. PAGLIUCA: Objection to the form and foundation.

A. Females, what age are we talking?

Q. Any age.

A. Can you repeat the question?

Q. During the time you were working for Jeffrey, did you ever observe any foreign females of any age that were at Jeffrey's home to perform a massage?

MR. PAGLIUCA: Objection to the form and foundation.

G Maxwell - Confidential

A. Are you asking me if any foreigner, not an American person, gave Jeffrey a massage?

Q. Yes.

A. Well, as I sit here today, I can't think of anyone who is foreign. Certainly -- I just can't think of anybody right this second.

Q. How about any foreign girls who were under the age of 18?

A. I already testified to not knowing anything about underage girls.

Q. Were there foreign girls who were brought to Jeffrey's home by Jean Luc Brunel for the purposes of providing massages?

MR. PAGLIUCA: Objection to the form and foundation.

A. I am not aware of Jean Luc bringing girls. I have not no idea what you are talking about.

Q. You have never been around foreign girls who are under the age of 18 at Jeffrey's homes?

MR. PAGLIUCA: Objection to the

G Maxwell - Confidential

form and foundation.

A. I already testified about not knowing about underage girls.

Q. Did you provide any assistance with obtaining visas for foreign girls that were under the age of 18?

A. I've never participated in helping people of any age to get visas.

Q. Did Jeffrey, was it Jeffrey's preference to start a massage with sex?

MR. PAGLIUCA: Objection to the form and foundation.

A. I think you should ask that question of Jeffrey.

Q. Do you know?

A. I don't believe that was his preference. I think -- you have to understand, a massage -- perhaps you are not really familiar with what massage is.

Q. I am, I don't need a lecture on massage.

A. I think you do.

MR. PAGLIUCA: No question pending. She will ask you another question now.

# Questions About Underage Girls, Sex with Jon Luc Brunel, and Outfits

G Maxwell - Confidential

Q. Were you present on the island when Prince Andrew visited?

A. Yes.

Q. How many times?

A. I can only remember once.

Q. Were there any girls under the age of 18 on the island during that one visit that you remember that were not family or friends of or daughters of your friends?

MR. PAGLIUCA: Objection to the form and foundation.

A. There were no girls on the island at all. No girls, no women, other than the staff who work at the house. Girls meaning, I assume you are asking underage, but there was nobody female outside of the cooks and the cleaners.

Q. Did you, as part of your duties in working for Jeffrey, ever arrange for Virginia to have sex with John Luc Brunel?

MR. PAGLIUCA: Objection to the form and foundation.

A. Just for the record, I have never at any time, at anyplace, in any moment ever

G Maxwell - Confidential

asked Virginia Roberts or whatever she is called now to have sex with anybody.

Q. Did you ever provide Virginia Roberts with an outfit, an outfit of a sexual nature to wear for Les Wexner?

MR. PAGLIUCA: Objection to the form and foundation.

A. I think we addressed the outfit issue.

Q. I am asking you if you ever provided her with an outfit of a sexual nature to wear for Les Wexner?

A. Categorically no. You did get that, I said categorically no

Q. Don't worry I'm paying attention.

A. You seemed very distracted in that moment.

(Maxwell Exhibit 6, flight logs, marked for identification.)

A. Do you mind if I take a break for the bathroom.

Q. It's 11:08 and we are going to go off the record now.

THE VIDEOGRAPHER: It's now 11:09.

# Questions About Pictures of Naked Girls

G Maxwell - Confidential

people could use -- just like you would use if you needed to go online to get something, that people could use.

Q. Was that on a desk that you would use in your work capacity when you were at the house?

A. It was a desk, it was a room I was, I didn't really use that computer.

Q. Were there images of naked girls whether they be under the age of 18 or over the age of 18 on that computer?

A. I have no recollection of any naked people on that computer when I was there in 2003, we are talking.

Q. What about from say '99 to 2003?

A. No, I can't recollect any naked pictures.

Q. Why were the computers removed from the house before the search warrant was executed?

MR. PAGLIUCA: Objection to the form and foundation.

A. I have no knowledge of anything like that.

# Questions About Topless Females

G Maxwell - Confidential

form and foundation.

A. I mean I've been to his -- in the mid '90s, I would have communicated with people who worked for him.

Q. Have you communicated with Leslie Wexner about this case?

A. No.

Q. Have you ever seen a topless female at any one of Jeffrey Epstein's properties?

MR. PAGLIUCA: Objection to the form and foundation. You've asked this question, by the way, earlier on today.

A. Again, I testified that there are people who from time to time in the privacy of a swimming pool have maybe taken a bikini top off or something but it's not common and certainly when I was at the house I don't really recollect seeing that kind of activity.

Q. Have you ever smoked cigarettes?

A. Yes.

Q. Have you ever smoked cigarettes with Virginia Roberts?

A. I don't recall smoking cigarettes

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________/

**PLAINTIFF'S UNREDACTED REPLY IN SUPPORT OF MOTION TO COMPEL DEFENDANT TO ANSWER DEPOSITION QUESTIONS**

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this Reply in Support of her Motion to Compel Defendant to Answer Deposition Questions. Instead of allowing Ms. Giuffre to take a full and complete deposition, Defendant flatly refused to answer questions critical to the key issues in this case. Contrary to Defendant's assertions, Ms. Giuffre is not engaged in a "fishing expedition" but rather seeks to ask highly-focused questions specifically relevant to this case. In particular, Ms. Giuffre seeks to ask the Defendant questions regarding her participation in or knowledge of sexual activities connected with Jeffrey Epstein's sexual abuse of females. Such questions are entirely appropriate in the discovery phase of this case, particularly where any answers will be maintained as confidential under the Protective Order entered in this case.

As the Court is aware from previous pleadings, at the heart of this case lies the issue of Defendant's knowledge that Ms. Giuffre was sexually abused by Jeffrey Epstein. Indeed, as the Defendant boldly acknowledges in her response (at p. 2), she intends to argue at trial that (among other things) she "never arranged for or asked [Ms. Giuffre] to have sex with anyone." At trial,

Ms. Giuffre intends to strongly disprove Defendant's false assertions and to demonstrate that Defendant recruited Ms. Giuffre to be involved in massages of a sexual nature with Epstein.

To develop evidence to support her position, Ms. Giuffre recently deposed Defendant about the central subjects in her case. Defendant flatly refused to answer a number of questions, and for the majority of the others, gave varying versions of "I don't recall." For example, when faced with the police report which contains statements from approximately thirty (30) different victims during a time frame which the Defendant acknowledges she was actively working for Epstein at his various homes, Defendant challenged the veracity of the victims' reports:

> "Q. Are you saying these 30 girls are lying when they gave these reports to police officers?
>
> A. I'm not testifying to their lies. I'm testifying to Virginia's lies."

*See* Declaration of Sigrid McCawley ("McCawley Decl.") at Exhibit 1, April 22, 2016 Deposition of Defendant at p. 89-90; 83-84. While Defendant was working with Epstein during the time period when these underage girls were visiting Jeffrey's home, Defendant claimed to be at the house maybe once in 2005. *Id.* at p. 84. Yet, according to flight manifests, in that same general time period, Defendant was listed as a passenger at least eleven times either landing in or departing from West Palm Beach, Florida on Jeffrey Epstein's private plane. *See* McCawley Decl. at Exhibit 1, April 22, 2016 Depo Tr. at p. 84; *see also* McCawley Decl. at Composite Exhibit 2, Flight Logs from Jeffrey Epstein's private planes.

Moreover, again according to flight logs, Defendant was on Epstein's planes over 300 times – including 23 times with Ms. Giuffre when Ms. Giuffre was underage. Yet, quite remarkably, Defendant claimed she "couldn't recall" even one of those flights. *See* McCawley Decl. at Exhibit 1, April 22, 2016 Deposition of Defendant at p. 120-122.

Defendant even testified that she did not recall having Ms. Giuffre at her London townhome with Prince Andrew. Defendant stuck to this incredible story despite flight logs establishing her traveling to London with Ms. Giuffre and despite a photograph the three – Ms. Giuffre, Prince Andrew and Defendant – all standing together in Defendant's home. *See* McCawley Decl. at Exhibit 1, April 22, 2016 Deposition of Defendant at p. 108-111. Defendant's deposition consisted almost entirely of "I don't recalls" or "I refuse to answer that question"[1] and also included a physical outburst that knocked the court reporter's computer off the conference room table. *See* McCawley Decl. at Exhibit 1, April 22, 2016 Deposition of Defendant at 207-208.

Among the many questions that Defendant refused to answer at her deposition were a number of questions designed to show that Defendant was well aware that, for Epstein, a "massage" was actually a code word sexual activity – i.e., not a therapeutic massage but rather activity that involved sexual gratification for Epstein. Defendant refused to answer all such questions, asserting that they involved "private adult sexual relationships" which did not "relate in any way" to Ms. Giuffre's claims. *Id.* at p. 4. But Defendant's involvement in such "relationships" with Epstein would show that she knew full well the fate that was in store for Ms. Giuffre when she accepted Defendant's invitation to come and provide "massages" to Epstein. Defendant admitted that she worked for Epstein from 1992 to 2009. *See* McCawley Decl. at

---

[1] For example, when asked:

"Q. Have you ever said to anybody that you recruit girls to take the pressure off you, so you won't have to have sex with Jeffrey, have you said that?

A. ***You don't ask me questions like that.*** First of all, you are trying to trap me, I will not be trapped. You are asking me if I recruit. I told you no. Girls meaning underage, I already said I don't do that with underage people and as to ask me about a specific conversation I had with language, we talking about almost 17 years ago when this took place. ***I cannot testify to an actual conversation or language that I used with anybody at any time."***

*See* McCawley Decl. at Exhibit 1, April 22, 2016 Depo Tr. at p. 94-95.

Exhibit 1, April 22, 2016 Deposition of Defendant at p. 10-11, 410. As the Court knows, the Palm Beach Police Report demonstrates multiple incidents of "massages" being given by untrained minor children that involved sexual acts. *See* McCawley Decl. at Exhibit 3, Palm Beach Police Report. Defendant is also identified in that Palm Beach Police Report. *See* McCawley Decl. at Exhibit 3, Palm Beach Police Report at p. 75-76. And the details of Epstein's sexual activities with Defendant (for example) are highly relevant to this case, because they will help corroborate Ms. Giuffre's testimony that, while she was underage, she also engaged in sexual activity of an identical nature with Epstein.

To allow Defendant to avoid answering these questions would preclude Ms. Giuffre from getting critical evidence in this case. Consider, for example, Defendant recruiting an eighteen year-old girl to be an "assistant," bringing that girl to Epstein's home, telling her she could make more money if she would give Epstein a massage, and then instructing her to give a massage that involved sexual acts. Under Defendant's theory of discovery, Ms. Giuffre would be precluded from deposing her on that topic because the actions would culminate in "consensual adult sex." Yet, that scenario would fully validate the pattern of events that occurred with Ms. Giuffre when she was under the age of eighteen. It would obviously show a "modus operandi" by Jeffrey Epstein and Defendant, which is clearly admissible under Fed. R. Evid. 404(b).

Moreover, such inquiries are crucial to impeaching the Defendant at trial. During her deposition, Defendant attempted to characterize her work for Epstein as nothing more than a normal job handling hiring for the various mansions. *See* McCawley Decl. at Exhibit 1, April 22, 2016 Deposition Tr. of Defendant at p. 9-12. Ms. Giuffre should be able to contest that assertion by having Defendant fully answer questions about whether that alleged "job" involved

sexual activities, including orchestrating the hiring of females and converting massages into sexual encounters.

Defendant attempts to paint the picture that Ms. Giuffre somehow is interested in all sexual relationships that the Defendant may have been involved with. That is not true. Ms. Giuffre has no intention of asking unbridled questions. To be clear, Ms. Giuffre intends to ask Defendant only questions that involve the following very narrow and crucial subject areas: (1) Defendant's sexual relationship with Epstein from 1992 to 2009 – the time period in which she worked for Jeffrey Epstein and which Epstein (with the assistance of Defendant) was engaging in sexual acts with females under the cover of "massage"; (2) Defendant's sexual interactions with any person in Epstein's presence during that time period; (3) Defendant's sexual activities at Epstein's residences, including his private island "Little St. Jeff's," or his aircraft during that time period; (4) Defendant's sexual activities with identified participants in Epstein's sexual abuse during that time period; and (5) Defendant's sexual interactions that occurred during or through what began as a "massage"; and (6) Defendant's interactions with females to introduce to Jeffrey Epstein for the purpose of performing work, including sexual massages.

Defendant claims that such questions are a mere "fishing expedition" without acknowledging the fact that these questions go to critical issues in this case. Other witnesses have testified regarding Defendant's involvement in recruiting females for sex under the cover of a "massage." During the investigation of Jeffrey Epstein, certain household staff was deposed. Alfredo Rodriguez, who was Jeffrey Epstein's household manager, testified that the Defendant frequently stayed in Jeffrey Epstein's home and assisted with bringing in young girls to act as "masseuses" for Jeffrey Epstein.

> Q. "Okay. Going back to where we started here was, does Ghislaine Maxwell have knowledge of the girls that would come over to Jeffrey Epstein's house that are in

> roughly the same age group as C. and T. (minor children) and to have a good time as you put it?
>
> A. Yes.
>
> Q. And what was her involvement and/or knowledge about that?
>
> A. She knew what was going on."

*See* McCawley Decl. at Exhibit 4, Alfredo Rodriguez July 29, 2009 Dep. Tr. at 176-177. *See also* McCawley Decl. at Exhibit 4, Alfredo Rodriguez July 29, 2009 Depo Tr. at 96-101 (noting that high school age girls come to the home where Jeffrey Epstein and Ms. Maxwell reside). Juan Alessi, another household employee, also testified that young girls were regularly present at Jeffrey Epstein's home where Ghislaine Maxwell resides. *See* McCawley Decl. at Exhibit 5, Juan Alessi November 21, 2005 Sworn Statement at p. 15-16, 21. Specifically, Juan Alessi informed the Palm Beach Police Detective as follows: "Alessi stated that towards the end of his employment, the masseuses were younger and younger. When asked how young, Mr. Alessi stated they appeared to be sixteen or seventeen years of age *at most*." (emphasis added.) *See* McCawley Decl. at Exhibit 3, Palm Beach Police Report at p. 57.

During Juan Alessi's November 21, 2005 Sworn Statement taken by the Palm Beach Police Department, Mr. Alessi revealed that girls would come over to give "massages" and he observed Ms. Maxwell going upstairs in the direction of the bedroom quarters. *See* McCawley Decl. at Exhibit 5, Juan Alessi November 21, 2005 Sworn Statement at 10. He also testified that after the massages, he would clean up sex toys that were kept in "Ms. Maxwell's closet." *Id*. at 11-13. *See also* McCawley Decl. at Exhibit 6, Juan Alessi September 8, 2009 Depo Tr. at p. 76-77. He added that he and his wife were concerned with what was going on at the house (*Id.* at 14) and that he observed girls at the house, including one named "Virginia." *Id.* at 21.

Mr. Rodriguez also testified that Defendant also had naked pictures of girls performing sexual acts on her computer. *See* McCawley Decl. at Exhibit 7, Alfredo Rodriguez August 7, 2009 Dep. Tr. at 311-312; *See also* McCawley Decl. at Exhibit 6, Juan Alessi September 8, 2009

Depo Tr. at p. 40-41 ("I know she [Maxwell] went out and took pictures in the pool because later on I would see them at the desk or at the house. And nude - 99.9 percent of the time they were topless. They were European girls.").

> Q. "Did they appear to be doing any sexual?
> A. Yes, ma'am.
> Q. And in these instances were there girls doing sexual things with other girls?
> A. Yes, ma'am.
> Q. And I'm still talking about the pictures on Ms. Maxwell's computer.
> A. Yes, ma'am."

Upon leaving his employment, Rodriguez testified that Defendant threatened him that he should not tell anyone about what happened at the house:

> A. "I have to say something. Mrs. Maxwell called me and told me not to ever discuss or contact her again in a threaten(ing) way.
>
> Q. When was this?
>
> A. Right after I left because I call one of the friends for a job and she told me this, but, you know, I feel intimidated and so I want to keep her out…
>
> Q. She made a telephone call to you and what precisely did she say?
>
> A. She said I forbid you that you're going to be – that I will be sorry if I contact any of her friends again…She said something like don't open your mouth or something like that. I'm a civil humble, I came as an immigrant to service people, and right now you feel a little –I'm 55 and I'm afraid. First of all, I don't have a job, but I'm glad this is on tape because I don't want nothing to happen to me. This is the way they treat you, better do this and you shut up and don't talk to nobody and—
>
> Q. When you say this is the way they treat, who specifically are you talking about when you say that word they?
>
> A. Maxwell. "

*See* McCawley Decl. at Exhibit 4, Alfredo Rodriguez July 29, 2009 Dep. Tr. at 169 – 172.

In sum, at the core of this case are statements made by Ms. Giuffre that she was recruited, by Defendant, to be paid as a masseuse, yet was enticed or coerced into engaging in sexual acts with Epstein and Defendant for money. She has further explained that the recruitment of females through the offer of some legitimate position was the typical way in which Defendant and Epstein lured unsuspecting females to the house before converting the relationship into a sexual

one. Ms. Giuffre has described the frequency of these "massages", the sexual tendencies of the participants, the manner in which the massages became sexual in nature, and Defendant's role at each stage.

In response, Defendant has called Ms. Giuffre's entire account "untrue" and "obvious lies." Defendant has instead tried to portray her role as nothing more than an Epstein employee performing typical household management duties. Any personal knowledge Defendant has of Epstein's sexual tendencies, habits, and use of massage for sex is entirely relevant to either corroborate Ms. Giuffre's account. Likewise, Defendant's participation in any sexual acts with Epstein, in his presence, on his properties, using his mode of converting massages into sex, or with females will directly corroborate Ms. Giuffre's account. On the other hand, without access to the answers to these inquiries, Ms. Giuffre will be unable to expose the bias of Defendant, unable to thoroughly cross-examine Defendant's position that she was just a lowly employee, and most importantly unable to demonstrate through the Defendant's own admissions that Ms. Giuffre's statements about Epstein and Defendant were absolutely true – and not "obvious lies."

Finally, Defendant fails to recognize that, for the discovery purposes at issue here, relevance "is an extremely broad concept." *Am. Fed'n of Musicians of the United States & Canada v. Sony Music Entm't, Inc.*, No. 15CV05249GBDBCM, 2016 WL 2609307, at *3 (S.D.N.Y. Apr. 29, 2016). And once relevance is shown, "the party resisting discovery bears the burden of demonstrating that, despite the broad and liberal construction afforded the federal discovery rules, the requests are irrelevant, or are overly broad, burdensome, or oppressive." *Id.* Here, the requests are not "overly broad" as Ms. Giuffre's specific explanations of the targets of her questions make clear. Moreover, answering the questions is not "oppressive," particularly given the fact that Defendant has placed *all* substantive aspects of the Deposition under seal. Of

course, once Defendant answers the question – and her answers are placed under seal – the parties can file any further motions that may be required to determine whether the answers may be introduced at trial.

**CONCLUSION**

Defendant should be ordered to answer questions regarding sexual activity connected with Epstein's sexual abuse and sexual trafficking organization as specifically identified above

Dated: May 11, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[2]

[2] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 11th day of May, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JANE DOE NO. 2, Case No: 08-CV-80119
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

JANE DOE NO. 3, Case NO: 08-CV-80232

Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

JANE DOE NO. 4, Case No: 08-CV-80380

Plaintiff,

Vs.

JEFFREY EPSTEIN,

Defendant.
_______________________/
JANE DOE NO. 5, Case No: 08-CV-80381
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
_______________________/

JANE DOE NO. 6, Case No: 08-CV-80994
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

JANE DOE NO. 7, Case No. 08-CV-80993
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

C.M.A., Case No: 08-CV-80811
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

JANE DOE, Case No: 08-CV-80893
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/



JANE DOE NO. II, Case No: 08-CV-80469
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

JANE DOE NO. 101, Case No: 09-CV-80591
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

JANE DOE NO. 102, Case No: 09-CV-80656
Plaintiff,
Vs
JEFFREY EPSTEIN,
Defendant.
______________/

1031 Ives Dairy Road
Suite 228
North Miami, Florida
July 29, 2009
11:00 a.m. to 5:30 p.m.



V I D E O T A P E D
D E P O S I T I O N
of
ALFREDO RODRIGUEZ

taken on behalf of the Plaintiffs pursuant to a Re-Notice of Taking Deposition (Duces Tecum)

- - -

APPEARANCES:

MERMELSTEIN & HOROWITZ, P.A.
BY: STUART MERMELSTEIN, ESQ.
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Attorney for Jane Doe 2, 3, 4, 5, 6, and 7.

ROTHSTEIN ROSENFELDT ADLER
BY: BRAD J. EDWARDS, ESQ., and
CARA HOLMES, ESQ.
Las Olas City Centre
Suite 1650
401 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
Attorney for Jane Doe and E.W. And L.M.

PODHURST ORSECK
BY: KATHERINE W. EZELL
25 West Flagler Street
Suite 800
Miami, Florida 33130
Attorney for Jane Doe 101 and 102.



APPEARANCES:

LEOPOLD-KUVIN
ADAM J. LANGINO, ESQ.
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410
Attorney for B.B.

RICHARD WILLITS, ESQ.
2290 10th Avenue North
Suite 404
Lake Worth, Florida 33461
Attorney for C.M.A.

BURMAN, CRITTON, LUTTIER & COLEMAN, LLP
BY: ROBERT CRITTON, ESQ.
515 North Flagler Drive
Suite 400
West Palm Beach, Florida 33401
Attorney for Jeffrey Epstein.

ALSO PRESENT:

JOE LANGSAM, VIDEOGRAPHER

- - -

Page 94

A. I don't remember, sir.
Q. The next page is a message in the upper left dated January 13, 2005, from C.W. Correct?
A. Yes.
Q. That's the same C. that we've been talking about. Correct?
A. Yes.
Q. That was at 7:30 p.m. Correct?
A. Yes.
Q. And you don't recall what that particular call was about. Right?
A. No, sir.
Q. The message dated January 20, 2005, from Maria. Do you see that on the bottom right?
A. Yes.
Q. Do you know who that is?
A. I think I have a different page.
Q. You're a little ahead of me. January 20, 2005.
MR. CRITTON: I think that's page 31.
THE WITNESS: I don't remember who she was, sir.
BY MR. MERMELSTEIN:
Q. You don't recall what that message was about?

Page 95

A. No, sir.
Q. What about the next page there is a message that Eva called?
A. Yes.
Q. Dated January 21, 2005?
A. Yes.
Q. Do you know who Eva is?
A. Yes.
Q. Who is Eva?
A. The assistant comptroller from the New York office.
Q. Do you remember her last name?
A. Polish last name I guess. She was Russian. She is Russian actually.
Q. Did you ever travel to any other residences that Mr. Epstein had?
A. No.
Q. Are you aware he had a residence in the Virgin Islands?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. MERMELSTEIN:
Q. And would he sometimes travel to that residence from Palm Beach?
A. Yes.

Page 96

Q. Okay. Do you recall on any occasion who would travel with him to the Virgin Islands?
MR. CRITTON: Form.
THE WITNESS: No, sir.
BY MR. MERMELSTEIN:
Q. I think we were talking about the money before, the household account, sometimes you gave gifts?
A. Yes, I was told to buy some gifts.
Q. For whom?
A. For the guests.
Q. Okay. And what kind of gifts?
A. Shoes, sweaters, clothes.
Q. So were you instructed to buy something in particular at a particular store?
A. They would go to the store, if they like something I will go after and pay them and retrieve it.
Q. Okay. So would this be a girl who was staying at the house?
A. Yes.
Q. Okay. This was one of the girls who travelled with Mr. Epstein to Palm Beach. Correct?
A. Yes.

Page 97

Q. And so Mr. Epstein would instruct you to go shopping with this girl?
A. Yes.
Q. And instructed you to pay for whatever it is she wanted to buy?
A. Yes.
Q. Was there a price limit or anything of that nature?
A. No, sir.
Q. So when the girl decided what she wanted you would --
A. I would write them a check.
Q. In that instance you would pay by check?
A. Yes.
Q. Any other instances where you gave gifts to girls at the instruction of Mr. Epstein?
A. No. I was just told, you know, when they told me I will buy the item.
Q. I'm sorry?
A. You know, when I was told to purchase this item for them, you know, I will do that, but not on any other occasions.
Q. What do you mean not in any locations?
A. Any other occasions.
Q. Not any other occasions. Okay. Did you

Page 98

ever buy flowers for a girl?
A. Yes, sir.
Q. Tell me about that.
A. I was told to buy flowers and roses for a girl performing in high school.
Q. Which girl was that?
A. I don't remember the name, sir.
Q. What was Mr. Epstein's relationship to this girl?
MR. CRITTON: Form.
THE WITNESS: I think she was an acquaintance, friend.
BY MR. MERMELSTEIN:
Q. She was a friend?
A. Yes, sir.
Q. Now, she was performing at the high school in what capacity?
A. There was like a -- like a play in the graduation for high school.
Q. A play for graduation?
A. Yes, in the high school theatre there was some kind of performance.
Q. Was it like a theatre production?
A. Yeah, something like that. I didn't go inside so I didn't know what was going on inside.

Page 99

Q. Why do you say it was for graduation?
A. Because everybody was the graduation outside, there were parents, there were a lot of people at the school.
Q. Okay. A lot of high schools have theatre production companies and they put on plays. Correct?
MR. CRITTON: Form.
THE WITNESS: It was towards the end of the year. Well, I think I overheard that there was a graduation performance of some kind.
BY MR. MERMELSTEIN:
Q. But you didn't go in so you don't know?
A. No, sir.
Q. But this was a high school student you were bringing the flowers to. Is that correct?
A. Yes.
Q. Had you seen this girl before at the El Brillo Way property?
A. Yes, sir.
Q. You had seen her a number of times?
A. Yes, sir.
Q. Do you recall her name?
A. I don't remember her name, sir.

Page 100

Q. Now, you said you never went inside the theatre?
A. No, sir.
Q. Okay. How did you get to the flower store?
A. I called the girl to her cell and she will come to the back door and I give her the flowers.
Q. Was anyone else around at the time?
A. No, sir.
Q. And you mentioned this was a girl you had seen before?
A. Yes.
Q. Was this girl who had come to give massages to Mr. Epstein?
MR. CRITTON: Form.
THE WITNESS: I don't know if she was doing massages but she was at the house.
BY MR. MERMELSTEIN:
Q. What would she have been there for?
A. To visit him.
Q. This was a high school girl who was coming to visit Mr. Epstein at the house?
A. She came to the house, I open the door and I left, you know.

Page 101

Q. Did you take her to the kitchen like you did --
A. Yes.
Q. So you brought her to the kitchen just like you did for the girls who gave him massages. Correct?
A. Yes, sir.
Q. Did you ever pay her?
A. I don't remember, sir, but probably I did.
MR. CRITTON: Form, move to strike, speculation.
BY MR. MERMELSTEIN:
Q. Why do you say you probably did?
A. Because I was the only one paying -- well, not the only one but, you know, but chances are I paid her but I don't remember that particular instance that I gave her money.
Q. Is it fair to say that the girls who came to the Palm Beach residence, these are not the girls who are staying there, the girls who came -- were there to give massages. Correct?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. MERMELSTEIN:

written down anywhere?
A. No.
Q. It's my understanding that C. and T.
either came to his house alone to visit with Mr.
Epstein or brought other girls in their age group
to Mr. Epstein.
Were you familiar with that type of
recruitment process of girls bringing other girls?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. Can you tell me more about what you know
about girls bringing other girls that are
relatively the same age to come to Jeffrey
Epstein's house and to use your words, have a good
time?
MR. CRITTON: Form.
THE WITNESS: It's hard to know who they
knew. But I think that was -- they feel
better themselves when they're in a group
than going by themselves, but I don't know
somebody recruiting.
BY MR. EDWARDS:
Q. Okay. And you've talked about, at least
referred to yourself I believe to the police and



as well today as a human ATM machine. Right?
MR. CRITTON: Form.
THE WITNESS: Something like that. I was
supposed to carry cash at all times.
BY MR. EDWARDS:
Q. One of the primary reasons why you
carried cash was to pay the girls in this age
group of C. and T. for whatever happened at the
house. Right?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. That's a fair statement. Right?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. Okay. And when C., let's use her for
example, would bring somebody else to the house,
did you pay C. as well as whomever she brought to
the house, pay them both?
A. No, I pay only one person.
Q. Okay. My understanding, and tell me if
this is wrong or you can corroborate this, is that
Mr. Epstein would pay the girl that was actually
performing whatever was happening in the room --



for now we'll call it a massage -- as well as
anybody who brought that person over to the house,
they would both get paid cash. Are you familiar
with that?
MR. CRITTON: Form.
THE WITNESS: No.
BY MR. EDWARDS:
Q. If C. brought another girl over to the
house and C. stayed downstairs but this other girl
went upstairs with Mr. Epstein, which one would
you pay?
A. I don't know because I was told who to
pay.
Q. And Sarah Kellen always told you?
A. Sarah told me pay so and so.
Q. So if we were going to ask anybody else
about the exact method in terms of who would get
paid and for what, who would the people be? I
mean, other than Mr. Epstein who else could we ask
these questions?
A. Sarah.
Q. Sarah Kellen?
A. Yes.
Q. She would know this?
A. Yes.



Q. What about Ghislaine Maxwell?
MR. CRITTON: Form.
THE WITNESS: You're talking about the
boss. I don't know.
BY MR. EDWARDS:
Q. To your knowledge was Ghislaine Maxwell
aware of these girls that are in the age group of
C. and T. coming to Jeffrey Epstein's house to
have a good time?
MR. CRITTON: Form.
THE WITNESS: I have to say something.
Mrs. Maxwell called me and told me not to
ever discuss or contact her again in a
threaten way.
BY MR. EDWARDS:
Q. When was this?
A. Right after I left because I call one of
the friends for a job and she told me this, but,
you know, I feel intimidated and so I want to keep
her out.
Q. What exactly did she say? First of all,
was this a telephone call?
A. Yes, she was in New York.
Q. She called you on your cell phone?
A. Yes.

Page 170

Q. Is this the cell phone that was issued to you by Mr. Epstein?
A. No, it was my personal phone. I was already --
Q. Gone?
A. Yeah, this is three, four months down the road.
Q. So if you left in --
A. February, March -- it was May or June.
Q. Of 2005?
A. Yes.
Q. And you got a call from Ghislaine Maxwell out of the blue?
A. Yes.
Q. And do you know what prompted that telephone call?
A. Because I contact somebody in New York to get a job.
Q. Who was that person?
A. I contact Jean-Luc and I contact Eva, the Swedish girl, she used to be very good friends with Mr. Epstein because she asked me she need somebody in New York.
Q. What does Eva do?
A. Eva was a model many years ago and he

Page 171

married -- Eva is the mother of the girl who was on the wall.
Q. Who is on the wall of Mr. Epstein's house?
A. Yeah.
Q. All right. There is a younger girl model that's on the wall of Mr. Epstein's house and this lady Eva is her mother?
A. Yes.
Q. And at some point in time you called her in New York to get a job?
A. That's right.
Q. And you also called Jean-Luc Bernell? That's his name. Right?
A. Jean-Luc, yeah, I don't remember his last name.
Q. Does that sound familiar to you, Jean-Luc Bernell?
A. Yeah.
Q. What did Eva and/or Jean-Luc say about employing you?
A. No, they said they're going to find out and obviously the first thing they did was talk to Mrs. Maxwell.
Q. She made a telephone call to you and what

Page 172

precisely did she say?
A. She said I forbid you that you're going to be -- that I will be sorry if I contact any of her friends again.
Q. Okay. Other than you will be sorry if you contact any of my friends again did she say anything else about what you know about Mr. Epstein and/or what goes on at his house?
A. She said something like don't open your mouth or something like that. But you have to understand, I'm a civil humble, I came as an immigrant to service people, and right now you feel a little -- I'm 55 and I'm afraid. First of all, I don't have a job, but I'm glad this is on tape because I don't want nothing to happen to me. This is the way they treat you, better do this and you shut up and don't talk to nobody and --
Q. When you say this is the way they treat, who specifically are you talking about when you say the word they?
A. Maxwell.
Q. And usually when you say the word they, you're not only talking about one person --
A. Wealthy people.
Q. Are you also putting Jeffrey Epstein in

Page 173

that category?
MR. CRITTON: Form.
THE WITNESS: I didn't talk to him directly most of the time.
BY MR. EDWARDS:
Q. What's the reason why if you were his head of security that you wouldn't have more direct contact with him? Why is that?
MR. CRITTON: Form.
THE WITNESS: He wanted that way, you know, so, yeah, I have to talk to Sarah, Sarah is not available talk to Lesley in New York. He didn't want to be disturbed.
BY MR. EDWARDS:
Q. Even while you were in the same house with him he still had other people you could talk to directly but he was not one of them?
A. Yeah.
Q. When you were fired you were not fired directly by him?
A. No.
Q. It was through somebody else?
A. Ms. Maxwell.
Q. Okay. But it was for upsetting him for taking the wrong car?

44 (Pages 170 to 173)

Page 174

A. Yes.
Q. Okay. Ever since this communication that Ms. Maxwell made to you where she called you sometime in May or June of 2005, and have you felt threatened?
A. Yes.
MR. CRITTON: Form.
BY MR. EDWARDS:
Q. Have you felt reluctant to come forward and give truthful, honest, and full disclosure of all information that you know about this case?
MR. CRITTON: Form.
THE WITNESS: I said this off the record but I will say it on the record, being in the Epstein case for me resulted in two years I have -- I won't bring the names but I was in the third interview to get hired as a household manager in Palm Beach and they told me you are the Jeffrey Epstein guy. Not in the sense I did something wrong because of the scandal, so they shun the job away from me. And so I was afraid that -- this is very powerful people and one phone call and you finish, so I'm the little guy. Even I'm wearing a tie I'm a -- I'm talking

Page 175

from my heart. This is the way it is.
BY MR. EDWARDS:
Q. I feel for you, I'm sorry that you have to be in this position.
MR. CRITTON: Move to strike this.
BY MR. EDWARDS:
Q. Well, when you applied for these jobs and they turned you down and gave you the reason that you're the person involved in the Jeffrey Epstein scandal, was it that they are associated or friends with Jeffrey Epstein or is it that you have information and you have this confidentiality but you're revealing some certain information that Mr. Epstein would not like?
MR. CRITTON: Form.
THE WITNESS: Both.
BY MR. EDWARDS:
Q. Both?
A. Both.
Q. And since then given what you just told us about these people being very powerful, are you afraid for your life given the fact that you're involved to some extent in this case?
MR. CRITTON: Form.
THE WITNESS: I just start thinking about

Page 176

this. Because I went through -- the first time I went to the deposition I was in Palm Beach and I did my duty, I mean, I tell what I know, but now I know there is more digging, all I want is this to be to get on with my normal life and stuff.
BY MR. EDWARDS:
Q. So when you come here today to testify, your main objective is to get back to your normal life and get out of the spotlight of this case. Yes?
A. Yes.
Q. And in doing so have you held back some of the details that you know about that happened in this case to remove yourself from the spotlight?
MR. CRITTON: Form.
THE WITNESS: No, sir.
BY MR. EDWARDS:
Q. Okay. Have you ever talked to Ghislaine Maxwell after that telephone call where she called you and you felt threatened?
A. No.
Q. Okay. So going back to where we started here was, does Ghislaine Maxwell have knowledge of

Page 177

the girls that would come over to Jeffrey Epstein's house that are in roughly the same age group as C. and T. and to have a good time as you put it?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. And what was her involvement and/or knowledge about that?
MR. CRITTON: Form.
THE WITNESS: She knew what was going on.
BY MR. EDWARDS:
Q. You referred to her at one point in time as Jeffrey Epstein's companion. But then later on you said that if she flew she flew on a different airplane and oftentimes or sometimes she slept in a different bed from Mr. Epstein. Did that seem unusual to you?
MR. CRITTON: Form.
THE WITNESS: It was odd but, I mean, and again, everything is odd in Palm Beach.
BY MR. EDWARDS:
Q. Okay, I don't mean to laugh.
A. Mr. Epstein fly to Jet Aviation, she fly to Galaxy Aviation, but they never flew the same

Page 266

BY MR. LANGINO:
Q. Are you currently in fear of Mr. Epstein?
A. Not at this particular moment but it's something I have to be worry about, yes.
Q. Are you personally afraid of criminal prosecution?
A. No.
Q. Do you believe that you did anything illegal?
A. Illegal, no.
MR. LANGINO: I have no further questions. Thank you.
MR. CRITTON: We're going to break in about 15 minutes. Do you want to start and go for 15 minutes or do you want to -- it's up to you.
MS. EZELL: I'll start.
MR. WILLITS: When are we going to quit, folks?
MR. CRITTON: In 15 minutes.
THE VIDEOGRAPHER: Might as well change tapes.
MR. EDWARDS: Bob has to get back so we've agreed we're going to come back some other time.

Page 267

MR. WILLITS: Why don't we just stop now?
MS. EZELL: Okay.
MR. EDWARDS: Rather than you start.
MS. EZELL: Yeah, I won't get very far.
MR. EDWARDS: Sorry to do this with you, we didn't finish.
MR. CRITTON: So we're stopped?
MR. EDWARDS: We're stopped.
THE VIDEOGRAPHER: Off the record.
(Thereupon, the videotaped deposition was adjourned at 5:30 p.m.)
- - -

Page 268

THE STATE OF FLORIDA, )
COUNTY OF DADE. )

I, the undersigned authority, certify that ALFREDO RODRIGUEZ personally appeared before me on the 29th day of July, 2009 and was duly sworn.

WITNESS my hand and official seal this 31st day of July, 2009.

MICHELLE PAYNE, Court Reporter
Notary Public - State of Florida

Page 269

CERTIFICATE

The State Of Florida, )
County Of Dade. )

I, MICHELLE PAYNE, Court Reporter and Notary Public in and for the State of Florida at large, do hereby certify that I was authorized to and did stenographically report the videotaped deposition of ALFREDO RODRIGUEZ; that a review of the transcript was requested; and that the foregoing pages, numbered from 1 to 269, inclusive, are a true and correct transcription of my stenographic notes of said deposition.

I further certify that said videotaped deposition was taken at the time and place hereinabove set forth and that the taking of said videotaped deposition was commenced and completed as hereinabove set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 31st day of July, 2009.

MICHELLE PAYNE, Court Reporter

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
____________________________________/

**PLAINTIFF'S NON-REDACTED MOTION FOR LEAVE TO SERVE THREE DEPOSITION SUBPOENAS BY MEANS OTHER THAN PERSONAL SERVICE**

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this Motion for Leave to Serve Three Deposition Subpoenas by Means Other Than Personal Service. The three persons to be subpoenaed – Jeffrey Epstein, Sarah Kellen and Nadia Marcinkova – were each involved in the sexual abuse and sexual trafficking at issue in this case. It appears that all three of them have evaded attempts to personally serve them (and two of the persons, Epstein and Kellen, have attorneys who have not been authorized by their clients to accept service). Ms. Giuffre seeks leave to provide service by several alternative means that are designed to assure actual notice is provided to these persons. *See* Declaration of Sigrid McCawley ("McCawley Decl.") at Composite Exhibit 1, Subpoenas for Jeffrey Epstein, Sarah Kellen (aka Sarah Kensington and Sarah Vickers) and Nadia Marcinkova. This Court has repeatedly held that Fed. R. Civ. P. 45 permits alternative service in appropriate circumstances, and this case presents such circumstances. Accordingly, the Court should grant Ms. Giuffre leave to serve deposition subpoenas by alternative means.

## BACKGROUND

At the heart of this case lies Ms. Giuffre's allegations that that she was sexually abused by Jeffrey Epstein and the Defendant. Ms. Giuffre has also alleged that Epstein and the Defendant were aided by others who played keys roles in the sex trafficking organization, including Sarah Kellen and Nadia Marcinkova. Defendant has called Ms. Giuffre a "liar" and Ms. Giuffre is now in the process of assembling testimony and evidence to prove the truth of her allegations.

Apart from the Defendant in this case, Jeffrey Epstein is the most important person for Ms. Giuffre to depose. It was Epstein who gave the directions to Maxwell to recruit Ms. Giuffre and bring her to Epstein's mansions to be sexually abused. At several points during her recent deposition, Ms. Maxwell refused to answer Ms. Giuffre's questions about Epstein, but instead told her she should go ask Epstein about the subject. *See, e.g.,* Tr. of Depo. of Defendant (Apr. 22, 2016) at 100 ("Q: … [W]as it Jeffrey's preference to start a massage with sex? . . . A: I think you should ask that question of Jeffrey."); *id.* at 146-47 ("Q: So would [Ms. Giuffre] be brought on trips that were for the purpose of work and decorating the house? A: Like I said, I never worked with her but you would have to ask Jeffrey what he brought her on the trip for."); *id.* at 389-90 ("Q: Does [Epstein] . . . have any knowledge of any illegal activity that you've conducted? . . . A: If you want to ask Jeffrey questions about me, you would have to ask him."). *See* McCawley Decl. at Exhibit 2.

Because of Epstein's importance to this case, Ms. Giuffre has diligently tried to personally serve Epstein with a subpoena for his deposition. Epstein, however, appears to have no interest in answering questions under oath about the scope of his sex trafficking organization and he has not authorized his lawyer to accept service of the subpoena. On March 7, 2016, Ms.

Giuffre's counsel contacted counsel for Epstein to seek agreement that he would accept service of the subpoena in this matter. *See* McCawley Decl. at Composite Exhibit 3, Electronic Correspondence to Attorney Marty Weinberg. Ms. Giuffre was unable to obtain that agreement so she retained an investigative company to attempt to locate Epstein for purposes of personal service[1]. As explained in the attached affidavit, the Alpha Group Investigators commenced efforts to personally serve Epstein on April 26, 2016. *See* McCawley Decl. at Exhibit 4 Affidavit of Douglas G. Mercer, Chief Investigator Alpha Group. Those efforts have continued for weeks, and included over sixteen (16) attempts to personally serve Epstein, including as recently as May 18, 2016, at which time the investigator affixed the subpoena to the front door of Epstein's residence and mailed copies of the subpoena to both of his New York addresses along with a witness check. Counsel for Ms. Giuffre also provided a copy of the subpoena to Marty Weinberg, Epstein's attorney.

Jeffrey Epstein is not the only key witness who has been evading Ms. Giuffre's efforts to depose them. The next echelon in the sex trafficking organization below Epstein and the Defendant includes Sarah Kellen and Nadia Marcinkova. Ms. Giuffre alleges that they were heavily involved in the sex trafficking. Both Kellen and Marcinkova appear repeatedly on the flight logs of Jeffrey Epstein's aircraft. The U.S. Attorney's Office for the Southern District of Florida specifically identified both Kellen and Marcinkova as among four named "potential co-conspirators of Epstein" in the non-prosecution agreement it executed with Epstein as part of his guilty plea to Florida state sex offense charges. *See* Non-Prosecution Agreement, *In re: Investigation of Jeffrey Epstein* at 7. Additionally, both Kellen and Marcinkova previously

[1] As recently as today, Ms. Giuffre's counsel continues to attempt to negotiate acceptance of service of the subpoena for Mr. Epstein, which now includes a request that his deposition take place in the U.S. Virgin Islands but has still not received an agreement to accept service. *See* McCawley Decl. at Composite Exhibit 3, Correspondence with Marty Weinberg, counsel for Jeffrey Epstein.

invoked their 5th amendment privileges when asked about their involvement in Epstein and Defendant's sex trafficking ring. At her recent deposition, Defendant appeared to be well aware of the fact that Epstein had potential co-conspirators. *See,e.g.*, Tr. of Depo. of Defendant (Apr. 22, 2016) at 49 ("Q: Are you aware that Sarah Kellen was . . . named as a co-conspirator in the case involving Jeffrey Epstein? . . . A: I am aware."). *See* McCawley Decl. at Exhibit 2.

As with Epstein, however, Kellen and Marcinkova appear to be evading efforts to serve them. On March 31, 2016, Ms. Giuffre's counsel reached out to Sarah Kellen's counsel to seek agreement that she would accept service of the subpoena in this matter. *See* McCawley Decl. at Exhibit 5, Electronic Correspondence with Bruce Reinhart, of McDonald Hopkins, LLP in West Palm Beach, Florida. Mr. Reinhart represented that Ms. Kellen refused to allow her counsel to accept service of the subpoena, so Ms. Giuffre was forced to commence the efforts to attempt to personally serve her with the subpoena. As explained in the attached affidavit, the Alpha Group Investigators commenced efforts to personally serve Kellen on April 26, 2016. *See* McCawley Decl. at 4, Affidavit of Douglas G. Mercer, Chief Investigator Alpha Group. Those efforts have continued with over nineteen (19) attempts at service and concluded as recently as May 18, 2016, at which time the investigator affixed the subpoena to the front door of Kellen's residence and mailed copies of the subpoena to both of her New York addresses. Ms. Giuffre's counsel also provided a copy of the subpoena to Kellen's attorney.

Marcinkova has also been evading service. Ms. Giuffre has had her investigators make efforts to attempt to personally serve Marcinkova at her New York residence, and also made efforts to try to personally serve her while on a trip to California, but has been unable to obtain personal service. Ms. Giuffre's investigators made over ten (10) attempts to personally serve Marcinkova. *See* McCawley Decl. at Exhibit 4, Affidavit of Douglas G. Mercer, Chief

Investigator Alpha Group. In addition, counsel for Ms. Giuffre reached out to Ms. Marcinkova's former counsel but he indicated that he could not accept service as he no longer represents her. *See* McCawley Decl. at Exhibit 6, Electronic Correspondence with Jack Goldberger, at Atterbury, Goldberger & Weiss, P.A., in West Palm Beach, Florida.

In other litigation relating to Jeffrey Epstein, both Marcinkova and Kellen asserted their fifth amendment rights when asked questions about Defendant's recruitment of underage girls.

> Q Do you know Ghislaine Maxwell?
>
> A Fifth.
>
> Q Is that somebody who helped Jeffrey Epstein to devise the scheme to allow him access to various and a variety of underage minor females?
>
> A Fifth.
>
> Q Is Sarah Kellen somebody that was also involved in the planning of this scheme to gain access to underage minor females?
>
> A Fifth.

*See* McCawley Decl. at Exhibit 7, Nadia Marcinkova April 13, 2010 Dep. Tr. at p. 29-30 (GIUFFRE001171-1172)

> Q Isn't it true that yourself, Ghislaine Maxwell and Sarah Kellen had access to a master of list of underage minor females names and phone numbers so they could be called for the purpose of coming to Jeffrey Epstein's house to be sexually molested?
>
> A Fifth.

*See* McCawley Decl. at Exhibit 7, Nadia Marcinkova April 13, 2010 Dep. Tr. at p. 33-34 (GIUFFRE001173)

> Q Do you know Jane Doe-102 [Virginia Giuffre]?
>
> A Fifth.

*See* McCawley Decl. at Exhibit 7, Nadia Marcinkova April 13, 2010 Dep. Tr. at p. 47-48 (GIUFFRE001176)

Q Are you aware of Jeffrey Epstein and Ghislaine Maxwell's sexual interaction with Jane Doe-102 when she was a minor?

Q This is one of many underage minor females that was trafficked basically around the globe to be sexually exploited and abused; is that correct?

A Fifth.

Q Was that typical of Jeffrey Epstein and Ghislaine Maxwell to sexually abuse minors on Jeffrey Epstein's airplane?

A Fifth.

Q And also typical of Ghislaine Maxwell and Jeffrey Epstein to prostitute or pimp out underage minors to friends?

A Fifth.

*See* McCawley Decl. at Exhibit 7, Nadia Marcinkova April 13, 2010 Dep. Tr. at p. 47-48 (GIUFFRE001176)

Q Ghislaine Maxwell is somebody who you know to be bi-sexual, true?

A Fifth.

Q You know that Ghislaine Maxwell engaged in sexual acts with underage minor females, true?

A Fifth.

*See* McCawley Decl. at Exhibit 7, Nadia Marcinkova April 13, 2010 Dep. Tr. at p. 58-59 (GIUFFRE001179)

Q. Did Ghislaine Maxwell introduce you to Jeffrey Epstein for the first time?

THE WITNESS: On the instruction of my lawyer, I must invoke my Fifth Amendment right.

*See* McCawley Decl. at Exhibit 8, Sarah Kellen March 24, 2010 Dep. Tr. p.21 (GIUFFRE001676)

Q. All right. All right. Ms. Kellen, would you agree with me that there was an agreement between Jeffrey Epstein, Ghislaine Maxwell, Jean-Luc Brunel, yourself and Nadia Marcinkova to bring in girls from out of state that were underage?

THE WITNESS: On the instruction of my
lawyer, I must invoke my Fifth Amendment right.

*See* McCawley Decl. at Exhibit 8, Sarah Kellen March 24, 2010 Dep. Tr. p. 38 (GIUFFRE001680)

> Q. Would you agree with me that Ghislaine Maxwell provides underage girls to Mr. Epstein for sex?
>
> THE WITNESS: Upon the instruction of my lawyer, I must invoke my Fifth Amendment privilege.

*See* McCawley Decl. at Exhibit 8, Sarah Kellen March 24, 2010 Dep. Tr. p. 100 (GIUFFRE001695). Both Marcinkova and Kellen are key witnesses in this action because they were present with Mr. Epstein and Maxwell during the time period when Virginia Giuffre was with Epstein and Maxwell.

## ARGUMENT

### A. The Court Should Permit Alternative Service

In the unique circumstances of this case, this Court should grant Ms. Giuffre leave to serve Jeffrey Epstein, Sarah Kellen, and Nadia Marcincova via means other than personal service, because they are evading service of process and there are other means to assure actual notice. Under Rule 45(b)(1) of the Federal Rules of Civil Procedure, "[s]erving a subpoena requires delivering a copy to the named person . . . ." The purpose of "requiring delivery to a named person is to 'ensure receipt, so that notice will be provided to the recipient, and enforcement of the subpoena will be consistent with the requirements of due process.'" *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 304 (S.D.N.Y. 2009) (*quoting Med. Diagnostic Imaging, PLLC v. CareCore Nat., LLC*, Nos. 06 Civ. 7764 & 06 Civ. 13516, 2008 WL 3833238, at *2 (S.D.N.Y. Aug.15, 2008) (internal quotation marks omitted)). *See also First City, Texas-Houston, N.A. v. Rafidain Bank*, 197 F.R.D. 250, 255 (S.D.N.Y.2000) (finding that attaching a subpoena to the door, and mailing another copy to counsel of record was sufficient). Cases not only from this Court, but also from others in the Second Circuit, have interpreted that rule "liberally" to allow service so long as the "the type of

service used 'was calculated to provide timely actual notice.'" *Aristocrat Leisure Ltd.*, 262 F.R.D. at 304 (*quoting CareCore,* 2008 WL 3833238, at *2 (noting that "nothing in the word 'delivering' [in Rule 45(b)(1)] indicates personal service, and a personal service requirement can be unduly restrictive"); *see also Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 2000 WL 10268, at *2 (S.D.N.Y. Jan. 3, 2000) (holding that because "alternative service by means of certified mail reasonably insures actual receipt of the subpoena by the witness, the 'delivery' requirement of Rule 45 will be met"); *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 CIV. 9116(PGG), 2009 WL 1313259, at *2 (S.D.N.Y. May 11, 2009) ("this Court joins other courts in this District in holding that effective service [of a deposition subpoena] under Rule 45 is not limited to personal service" (internal quotation omitted).

A prerequisite for using means other than personal service is typically that the party "requesting the accommodation diligently attempted to effectuate personal service." *OceanFirst Bank v. Hartford Fire Ins. Co.*, 794 F. Supp. 2d 752, 754 (E.D. Mich. 2011) (*citing Franklin v. State Farm Afire and Casualty Co.*, 2009 WL 3152993, at *2 (E.D. Mich. 2009). Here, Ms. Giuffre has diligently attempted to make personal service on each of the three individuals, having made multiple attempts to personal service them, including going to different locations at different times on different days, and attempting to reach them through their attorneys. *See* McCawley Decl. at Exhibit 4, Affidavit of Douglas G. Mercer, Chief Investigator Alpha Group. Indeed, it appears that the only reason that personal service has been unsuccessful thus far is that the important witnesses Ms. Giuffre is attempting to serve are fully aware of her efforts and are attempting to evade service. This Court will recall that efforts to evade service are a familiar practice of Jeffrey Epstein and his colleagues. As described in earlier pleadings in this case, for example, the Defendant herself refused to comply with a deposition subpoena in an earlier case

brought by one of Jeffrey Epstein's sexual assault victims. *See* Decl. of Sigrid McCawley at Composite Exhibit 9, Maxwell Deposition Notice; Subpoena and Cancellation Payment Notice, and January 13, 2015 Daily Mail Article.

Ms. Giuffre proposes that she be permitted to serve her deposition notices by means other than personal service. Ms. Giuffre asks this Court to rule that she be permitted to serve each of the three individuals in ways that are reasonably calculated to give them actual notice. The specific means that Ms. Giuffre proposes are the means that her investigators took on May 18th of posting the subpoenas to the addresses associated with each of the witnesses and mailing the subpoenas to those addresses with the witness fee check and providing copies of the subpoenas via e-mail to the witnesses known counsel. *See* McCawley Decl. at Exhibit 4, Affidavit of Douglas G. Mercer, Chief Investigator Alpha Group.

Means such as those described above have been approved by this Court in other cases. For example, in *Medical Diagnostic Imaging, PLLC v. Carecore National, LLC*, 2008 WL 3833238 (S.D.N.Y. 2008) (Katz, J.), this Court allowed service of a deposition subpoena to be made through mailing a copy of the subpoena to the witness' place of employment along with a copy of the Court's order directing the witness to comply with the subpoena or face sanctions. *Id.* at *3. Similarly, in *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 CIV. 9116(PGG), 2009 WL 1313259, at *3 (S.D.N.Y. May 11, 2009), this Court allowed service of a deposition subpoena to be made by sending a copy of the deposition subpoena to the witness' place of business and residence by certified mail; leaving a copy of the deposition subpoena at the witness' residence and place of business with a person of suitable age and discretion; and remitting a copy of the deposition subpoena by electronic mail and certified mail to counsel for a related corporation. And, in at least two cases, this Court has found that certified mailing of a

subpoena to the witness alone satisfies Rule 45. *See Cordius Trust v.. Kummerfeld,* 1999 U.S. Dist. Lexis 19980, *5–*6 (S.D.N.Y.1999); *Ultradent Products, Inc. v. Hayman*, No. M8-85 RPP, 2002 WL 31119425, at *3 (S.D.N.Y. Sept. 24, 2002). Here, the means of service exceed those approved in those other cases and should be permitted.

## CONCLUSION

Ms. Giuffre should be granted leave to serve Jeffrey Epstein, Sarah Kellen, and Nadia Marcincova with deposition subpoenas by means other than personal service. As Ms. Giuffre has made multiple attempts at personal service, Ms. Giuffre should be granted leave to serve deposition subpoenas by the means employed by her investigators of posting the subpoenas to the known locations and also sending the subpoenas via U.S. mail.

Dated: May 25, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[2]

[2] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 25th day of May, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

Copies of this filing were also provided by e-mail to:

Marty Weinberg, counsel for Jeffrey Epstein
Bruce Reinhart counsel for Sarah Kellen

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-80736-Civ-Marra/Johnson**

**JANE DOE #1 and JANE DOE #2**

**v.**

**UNITED STATES**
**____________________________/**

**JANE DOE #3 AND JANE DOE #4'S MOTION PURSUANT TO RULE 21 FOR JOINDER IN ACTION**

COME NOW Jane Doe #3 and Jane Doe #4 (also referred to as "the new victims"), by and through undersigned counsel, to file this motion pursuant to Federal Rule of Civil Procedure 21 to join this action, on the condition that they not re-litigate any issues already litigated by Jane Doe #1 and Jane Doe #2 (also referred to as "the current victims"). The new victims have suffered the same violations of their rights under the Crime Victims' Rights Act (CVRA) as the current victims. Accordingly, they desire to join in this action to vindicate their rights as well. Because the new victims will not re-litigate any issues previously litigated by the current victims (and because they are represented by the same legal counsel as the current victims), the Government will not be prejudiced if the Court grants the motion. The Court may "at any time" add new parties to the action, Fed. R. Civ. P. 21. Accordingly, the Court should grant the motion.[1]

[1] As minor victims of sexual offenses, Jane Doe #3 and Jane Doe #4 desire to proceed by way of pseudonym for the same reasons that Jane Doe #1 and Jane Doe #2 proceeded in this

**FACTUAL BACKGROUND**

As the Court is aware, more than six years ago, Jane Doe #1 filed the present action against the Government, alleging a violation of her rights under the CVRA, 18 U.S.C. § 3771. DE1. She alleged that Jeffrey Epstein had sexually abused her and that the United States had entered into a secret non-prosecution agreement (NPA) regarding those crimes in violation of her rights. At the first court hearing on the case, the Court allowed Jane Doe #2 to also join the action. Both Jane Doe #1 and Jane Doe #2 specifically argued that the government had failed to protect their CVRA rights (inter alia) to confer, to reasonable notice, and to be treated with fairness. In response, the Government argued that the CVRA rights did not apply to Jane Doe #1 and Jane Doe #2 because no federal charges had ever been filed against Jeffrey Epstein.

The Court has firmly rejected the United States' position. In a detailed ruling, the Court concluded that the CVRA extended rights to Jane Doe #1 and Jane Doe #2 even though federal charges were never filed. DE 189. The Court explained that because the NPA barred prosecution of crimes committed against them by Epstein, they had "standing" to assert violations of the CVRA rights. *Id.* The Court deferred ruling on whether the two victims would be entitled to relief, pending development of a fuller evidentiary record. *Id.*

Two other victims, who are in many respects similarly situated to the current victims, now wish to join this action. The new victims joining at this stage will not cause any delay and their joinder in this case is the most expeditious manner in which to pursue their rights. Because the background regarding their abuse is relevant to the Court's assessment of whether to allow them to join, their circumstances are recounted here briefly.

---

fashion. Counsel for the new victims have made their true identities known to the Government.

Jane Doe #3's Circumstances

As with Jane Doe #1 and Jane Doe #2, Jane Doe #3 was repeatedly sexually abused by Epstein. The Government then concealed from Jane Doe #3 the existence of its NPA from Jane Doe #3, in violation of her rights under the CVRA. If allowed to join this action, Jane Doe #3 would prove the following:

In 1999, Jane Doe #3 was approached by Ghislaine Maxwell, one of the main women whom Epstein used to procure under-aged girls for sexual activities and a primary co-conspirator in his sexual abuse and sex trafficking scheme. In fact, it became known to the government that Maxwell herself regularly participated in Epstein's sexual exploitation of minors, including Jane Doe #3. Maxwell persuaded Jane Doe #3 (who was then fifteen years old) to come to Epstein's mansion in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children (including Jane Doe #1 and Jane Doe #2). When Jane Doe #3 began giving Epstein a "massage," Epstein and Maxwell turned it into a sexual encounter, as they had done with many other victims. Epstein then became enamored with Jane Doe #3, and with the assistance of Maxwell converted her into what is commonly referred to as a "sex slave." Epstein kept Jane Doe #3 as his sex slave from about 1999 through 2002, when she managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years. From 1999 through 2002, Epstein frequently sexually abused Jane Doe #3, not only in West Palm Beach, but also in New York, New Mexico, the U.S. Virgin Islands, in international airspace on his Epstein's private planes, and elsewhere.

Epstein also sexually trafficked the then-minor Jane Doe, making her available for sex to politically-connected and financially-powerful people. Epstein's purposes in "lending" Jane Doe

(along with other young girls) to such powerful people were to ingratiate himself with them for business, personal, political, and financial gain, as well as to obtain potential blackmail information.

One such powerful individual that Epstein forced then-minor Jane Doe #3 to have sexual relations with was former Harvard Law Professor Alan Dershowitz, a close friend of Epstein's and well-known criminal defense attorney. Epstein required Jane Doe #3 to have sexual relations with Dershowitz on numerous occasions while she was a minor, not only in Florida but also on private planes, in New York, New Mexico, and the U.S. Virgin Islands. In addition to being a participant in the abuse of Jane Doe #3 and other minors, Deshowitz was an eye-witness to the sexual abuse of many other minors by Epstein and several of Epstein's co-conspirators. Dershowitz would later play a significant role in negotiating the NPA on Epstein's behalf. Indeed, Dershowitz helped negotiate an agreement that provided immunity from federal prosecution in the Southern District of Florida not only to Epstein, but also to "any potential co-conspirators of Epstein." NPA at 5. Thus, Dershowitz helped negotiate an agreement with a provision that provided protection for himself against criminal prosecution in Florida for sexually abusing Jane Doe #3. Because this broad immunity would have been controversial if disclosed, Dershowitz (along with other members of Epstein's defense team) and the Government tried to keep the immunity provision secret from all of Epstein's victims and the general public, even though such secrecy violated the Crime Victims' Rights Act.

Ghislaine Maxwell was another person in Epstein's inner circle and a co-conspirator in Epstein's sexual abuse. She was someone who consequently also appreciated the immunity granted by the NPA for the crimes she committed in Florida. In addition to participating in the

sexual abuse of Jane Doe #3 and others, Maxwell also took numerous sexually explicit pictures of underage girls involved in sexual activities, including Jane Doe #3. She shared these photographs (which constituted child pornography under applicable federal laws) with Epstein. The Government is apparently aware of, and in certain instances possesses some of these photographs.

Perhaps even more important to her role in Epstein's sexual abuse ring, Maxwell had direct connections to other powerful individuals with whom she could connect Epstein. For instance, one such powerful individual Epstein forced Jane Doe #3 to have sexual relations with was a member of the British Royal Family, Prince Andrew (a/k/a Duke of York). Jane Doe #3 was forced to have sexual relations with this Prince when she was a minor in three separate geographical locations: in London (at Ghislaine Maxwell's apartment), in New York, and on Epstein's private island in the U.S. Virgin Islands (in an orgy with numerous other under-aged girls). Epstein instructed Jane Doe #3 that she was to give the Prince whatever he demanded and required Jane Doe #3 to report back to him on the details of the sexual abuse. Maxwell facilitated Prince Andrew's acts of sexual abuse by acting as a "madame" for Epstein, thereby assisting in internationally trafficking Jane Doe #3 (and numerous other young girls) for sexual purposes.

Another person in Epstein's inner circle of friends (who becomes apparent with almost no investigative effort) is Jean Luc Brunel. Epstein sexually trafficked Jane Doe #3 to Jean Luc Brunel many times. Brunel was another of Epstein's closest friends and a regular traveling companion, who had many contacts with young girls throughout the world. Brunel has been a model scout for various modeling agencies for many years and apparently was able to get U.S.

Case 1:15-cv-07433-LAP Document 1320-9 Filed 01/03/24 Page 7 of 10

passports for young girls to "work" as models. He would bring young girls (ranging to ages as young as twelve) to the United States for sexual purposes and farm them out to his friends, especially Epstein. Brunel would offer the girls "modeling" jobs. Many of the girls came from poor countries or impoverished backgrounds, and he lured them in with a promise of making good money. Epstein forced Jane Doe #3 to observe him, Brunel and Maxwell engage in illegal sexual acts with dozens of underage girls. Epstein also forced Jane Doe #3 to have sex with Brunel on numerous occasions, at places including Epstein's mansion in West Palm Beach, Little St. James Island in the U.S. Virgin Islands (many including orgies that were comprised of other underage girls), New York City, New Mexico, Paris, the south of France, and California.

Epstein also trafficked Jane Doe #3 for sexual purposes to many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders. Epstein required Jane Doe #3 to describe the events that she had with these men so that he could potentially blackmail them.

The Government was well aware of Jane Doe #3 when it was negotiating the NPA, as it listed her as a victim in the attachment to the NPA. Moreover, even a rudimentary investigation of Jane Doe #3's relationship to Epstein would have revealed the fact that she had been trafficked throughout the United States and internationally for sexual purposes. Nonetheless, the Government secretly negotiated a non-prosecution agreement with Epstein precluding any Federal prosecution in the Southern District of Florida of Epstein and his co-conspirators. As with Jane Doe #1, and Jane Doe #2, the Government concealed the non-prosecution agreement from Jane Doe #3 – all in violation of her rights under the CVRA – to avoid Jane Doe #3 from raising powerful objections to the NPA that would have shed tremendous public light on Epstein

and other powerful individuals and that would likely have been prevented it from being concluded in the secretive manner in which it was.

Jane Doe #4's Circumstances

If permitted to join this action, Jane Doe #4 would allege, and could prove at trial, that she has CVRA claims similar to those advanced by Jane Doe #1 and Jane Doe #2, based on the following:

As with the other Jane Does, Jane Doe #4 was repeatedly sexually abused by Epstein. In or around the summer of 2002, Jane Doe #4, an economically poor and vulnerable sixteen-year-old child, was told by another one of Epstein's underage minor sex abuse victims, that she could make $300 cash by giving an old man a massage on Palm Beach. An acquaintance of Jane Doe #4 (also a minor sexual abuse victim of Epstein) telephoned Epstein and scheduled Jane Doe #4 to go to Epstein's house to give him a massage. During that call, Epstein himself got on the phone (a means of interstate communication) with Jane Doe #4, asking her personally to come to his mansion in Palm Beach.

Jane Doe #4 then went to Epstein's mansion and was escorted upstairs to Epstein's large bathroom by one of Epstein's assistants. Shortly thereafter Jeffrey Epstein emerged and lay face down on the table and told Jane Doe #4 to start massaging him. Epstein asked Jane Doe #3 her age and she told him she had recently turned sixteen. Epstein subsequently committed illegal sexual acts against Jane Doe #4 on many occasions.

Epstein used a means of interstate communication (i.e., a cell phone) to arrange for these sexual encounters. Epstein also frequently travelled in interstate commerce (i.e., on his personal jet) for purposes of illegally sexually abusing Jane Doe #4.

January. In the meantime, however, counsel for the victims believe that it is no longer appropriate to delay filing this motion and accordingly file it at this time. Because the Government is apparently opposing this motion, Jane Doe #3 and Jane Doe #4 have described the circumstances surrounding their claims so that the Court has appropriate information to rule on the motion.

## CONCLUSION

Jane Doe #3 and Jane Doe #4 should be allowed to join this action, pursuant to Rule 21 of the Federal Rules of Civil Procedure. Their joinder should be conditioned on the requirement that they not re-litigate any issues previously litigated by Jane Doe #1 and Jane Doe #2. A proposed order to that effect is attached to this pleading.

DATED: December 30, 2014

Respectfully Submitted,

/s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
E-mail: brad@pathtojustice.com

*And*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
University of Utah
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone: 801-585-5202

Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

*Attorneys for Jane Doe #1 and Jane Doe #2*

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was served on December 30, 2014, on the following using the Court's CM/ECF system:

Dexter Lee
A. Marie Villafaña
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: Dexter.Lee@usdoj.gov
E-mail: ann.marie.c.villafana@usdoj.gov

*Attorneys for the Government*

/s/ Bradley J. Edwards

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
_____________________________________/

# PLAINTIFF'S NON-REDACTED MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT IN FEDERAL RULE CIVIL PROCEDURE 30(A)(2)(a)(ii)

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Tel: (954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Tel: (954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
Tel: (801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

I. FACTUAL BACKGROUND ..... 2

A. Depositions Taken Thus Far By Ms. Giuffre. ..... 4

1. Ghislaine Maxwell (7 Hours) ..... 4

2. Johanna Sjoberg (3 ½ Hours). ..... 9

B. Future Depositions Sought By Ms. Giuffre. ..... 11

3. Juan Alessi (3 ½ Hours). ..... 11

4. Maria Alessi (3 ½ Hours) ..... 12

5. David Rodgers (3 ½ Hours). ..... 12

6. Rinaldo Rizzo (3 ½ Hours) ..... 12

7. Jean Luc Brunel (3 ½ Hours). ..... 13

8. Ross Gow (3 ½ Hours). ..... 13

9. Dana Burns (3 ½ Hours) ..... 13

10. Jo Jo Fontanella (3 ½ Hours). ..... 13

11. Detective Joe Recarey (3 ½ Hours). ..... 14

12. Michael Reiter (3 ½ Hours) ..... 14

13. Emmy Taylor (3 ½ Hours). ..... 15

14. Alexandra Hall (3 ½ Hours). ..... 15

15. Nadia Marcinkova (3 ½ Hours) ..... 16

16. Sarah Kellen Vickers (3 ½ Hours). ..... 16

17. Jeffrey Epstein (3 ½ Hours). ..... 17

II. DISCUSSION ..... 17

CONCLUSION ....................................................................................................................22

# TABLE OF AUTHORITIES

Page

## Cases

*In re Weatherford International Sec. Litigation*,
No. 11 CIV. 1646 (LAK) (JCF), 2013 WL 5762923 (S.D.N.Y. Oct. 24, 2013) ........ 19

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997) ........ 21

*Raniola v. Bratton*,
243 F.3d 610 (2d Cir. 2001) ........ 19

*Scott v. City of Sioux City, Iowa*,
298 F.R.D. 400 (N.D. Iowa 2014) ........ 19

## Other Authorities

Federal Rule of Civil Procedure 29 ........ 17

Federal Rule of Civil Procedure 30 ........ 19

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this motion to take approximately seven additional depositions in this case beyond the presumptive ten deposition limit. Ms. Giuffre's requests is still within the total number of hours allowed by the ten deposition limit because the parties have agreed that they will split the time for all third party witnesses such that Ms. Giuffre will only be expending at most 3 ½ hours at those additional depositions. In an abundance of caution, even though Ms. Giuffre will not likely be exceeding the total number of hours allowed for depositions, she seeks leave from this Court to confirm that she may proceed with the additional depositions for the reasons stated below.

Ms. Giuffre has alleged that Defendant recruited females for Mr. Epstein, including underage females like herself, under the guise of working in a legitimate position - such as an assistant or as a massage therapist - only to almost immediately be coerced or enticed into engaging in sex for money. Defendant has challenged the veracity of Ms. Giuffre, and appears to intend to argue that Ms. Giuffre cannot support the allegation that Ms. Maxwell recruited females for Mr. Epstein or that the females were coerced or enticed into sex. The sexual abuse that lies at the heart of this case took place behind closed doors – doors of Jeffrey Epstein's various private mansions. Unsurprisingly, Ms. Giuffre must find supporting circumstantial evidence to support her claims. Moreover, because Mr. Epstein and Defendant were travelling between Mr. Epstein's numerous homes and thus many of the events relevant to this case took place more than 100 miles from the courthouse, Ms. Giuffre cannot compel most of the witnesses to appear via a trial subpoena. Accordingly, Ms. Giuffre seeks leave to take more than the standard ten depositions in this case. At this time, she seeks leave to take seven additional depositions, as articulated below.[2]

---

[2] Ms. Giuffre's counsel met and conferred with Defendant's counsel both in person and by phone in an effort to obtain agreement to proceed with these depositions but was unable to obtain an agreement. *See*

## I. FACTUAL BACKGROUND

The Court is aware of the scope of this case from earlier pleadings and numerous hearings. Initially, Ms. Giuffre anticipated the scope of discovery on this case would be narrow, because many of the events (such as flying to London on one of Epstein's planes with Maxwell) were supported by seemingly indisputable evidence, such as flight logs, and because the Defendant's counsel initially suggested that she may invoke her Fifth Amendment rights. Instead, during her recent deposition, Defendant simply failed to recall many of the most significant events in this case or refused to respond directly to many important questions. As a result, Ms. Giuffre is now in a position where she has to call multiple witnesses to establish fundamental facts in the case. For example, Defendant would not even admit that the initials "GM" which are on the private plane flight logs over 300 times, represent her initials for

---

McCawley Decl. at Exhibit 1, May 17, 2016 Email Correspondence from Sigrid McCawley to Laura Menninger and Jeff Pagliuca with proposed deposition calendar. Ms. Giuffre's ability to determine exactly which depositions would need to be taken was hamstrung by the Defendant's refusal to sit for her deposition. As the Court will recall, Ms. Giuffre made efforts to set Defendant's deposition starting in February 2016, yet Defendant did not sit for her deposition until after being ordered by the Court on April 22, 2016. During that deposition, Defendant refused to answer a number of questions and refused to acknowledge basic facts in this case, thereby causing Ms. Giuffre to have to depose a number of unanticipated witnesses. Ms. Giuffre's counsel started conferring with Defendant's counsel in February 2016 and has actively engaged in discussion about these depositions that Ms. Giuffre knew she needed to take. On May 9, 2016, the parties conferred regarding deposition scheduling and Ms. Giuffre noticed depositions in accordance with the dates and locations that Defendant's counsel said were available, and, on May 17, 2016, provided her with a calendar outlining those dates. *See* McCawley Decl. at Exhibit 1, May 17, 2016 Email Correspondence from Sigrid McCawley. Ms. Maxwell waited until one day before the first deposition scheduled to take place on May 31, 2016 to inform Ms. Giuffre's counsel that she refuses to attend the deposition of this subpoenaed witness unless Ms. Giuffre drops her request to seek additional depositions by way of this motion. "If you intend to seek more than 10 depositions or to continue the discovery cut-off post July 1, then we will not be appearing at the depositions next week…" *See* McCawley Decl. at Exhibit 2, May 27, 2016 e-mail Correspondence from Laura Menninger to Bradley Edwards. This obstruction of discovery by refusing to attend subpoenaed depositions that were noticed to her about one month ago on May 4, 2016 should not be condoned. *See* McCawley Decl. at Exhibit 3, May 4, 2016 Notice of Service and Subpoena to Juan Alessi. Defendant's counsel is also apparently refusing to appear at the other two depositions set for next week, of Maria Alessi set for Wednesday, June 1, 2016 and originally noticed on May 4, 2016 and Dave Rodgers set for Friday, June 3, 2016 and originally noticed on May 4, 2016. While Ms. Giuffre had originally hoped to be able to conclude discovery on July 1, 2016, Defendant's refusal to attend depositions and agree to scheduling is putting Ms. Giuffre in a position where she will need additional time to complete discovery. *See* McCawley Decl. at Exhibit 4, May 26, 2016 Letter from Sigrid McCawley.

Ghislaine Maxwell. Therefore, Ms. Giuffre is now required to take the deposition of pilot Dave Rodgers to authenticate his pilot logs and the identity of the individuals on various flights.

In addition, as the Court knows, this case involves allegations that Ms. Giuffre was a victim of sexual abuse when she was under the age of 18 after being recruited by Ghislaine Maxwell and Jeffrey Epstein. Ms. Giuffre has alleged that Defendant recruited her and other young females, unexperienced in massage, for sex with Jeffrey Epstein by lying to them and telling them that the job was to be her personal assistant or a massage therapist. That was a ruse. Instead, Defendant recruited these females for sex with Jeffrey Epstein and, often, with herself, and "massage" was a euphemism for sex in Defendant's household. Defendant has stated that these claims are obvious lies.

Aside from the deposition of the Defendant, Ms. Giuffre has taken the deposition of one other witness, Johanna Sjoberg, on May 18, 2016. Ms. Sjoberg testified that, while a twenty-year-old college student with no massage training, Ms. Maxwell, a stranger to her, approached her on her college campus, and told her she would hire Ms. Sjoberg as her personal assistant. After Ms. Sjoberg began to work for Defendant inside the home she shared with Epstein, Defendant revealed that Ms. Sjoberg's true "job" was to complete sex acts with Jeffrey Epstein. Defendant was explicit with her instructions, at one point scolding Ms. Sjoberg for failing to "finish [her] job" after Ms. Sjoberg massaged Epstein without completing the sex act, and because of this failure, Defendant, instead, had to "finish [her] job for her" and cause Epstein and complete the sex act. *See* McCawley Decl. at Exhibit 5, Deposition of Johanna Sjoberg. Accordingly, in this manner, Ms. Giuffre needs to depose other witnesses to show the veracity of her claim that Defendant recruited young females, unexperienced in massage, for sex with Jeffrey Epstein, proving that Defendant was lying when she called Ms. Giuffre a liar, and knew

at the time she made the defamatory statement that it was untrue. Testimony like that from Ms. Sjoberg's refutes Defendant's testimony, and goes to her credibility, and goes to the claim at the center of this case.

Additionally, to prove Ms. Giuffre's allegations, that span multiple years, on multiple continents, and multiple locations, Ms. Giuffre has arranged a series of depositions of persons with direct knowledge of the relevant issues. To prove her case, Ms. Giuffre believes that a minimum of seventeen depositions will be required. In reviewing this list of depositions, it is important to understand that only one of them – the Defendant's – will consume a full seven hours of questioning by Ms. Giuffre's counsel, as permitted under the rules. *See* Fed. R. Civ. P. 30(d)(1). Apart from the Defendant's deposition, all of the other depositions set by Ms. Giuffre have been pursuant to an agreement with Defendant's counsel that Ms. Giuffre will be given half of the seven hours to ask questions. In the descriptions below, the time Ms. Giuffre will have to ask questions (or thus far has asked questions) is indicated:

**A. Depositions Taken Thus Far By Ms. Giuffre**

1. **Ghislaine Maxwell (7 hours)**. The defendant, of course, has relevant information in this case. But when Defendant was deposed, she refused to answer numerous questions about alleged adult consensual sex. Those refusals are currently before the Court in a pending motion to compel. DE 155. And, more broadly, Defendant's deposition makes it clear that she intends to contest many of the points that earlier had appeared to be potentially uncontested. For example, in pleadings before her deposition, Defendant had suggested that she might invoke her Fifth Amendment right to remain silent during questioning. Indeed, just a week before her deposition, Defendant filed a motion seeking the alternative relief of staying further proceedings so that she could get more information about whether to take the Fifth. *See* DE 101 at 2-4.

During her deposition, however, Defendant did not take the Fifth. Instead, she testified that she suffered from a series of memory lapses and could not recall many of the key issues in dispute in this case. As a result of Defendant's inability to remember events, a variety of issues are now in dispute. For example, at her deposition, Defendant indicated that she lacked recollection of or was otherwise unable to specifically answer the following questions:

- Whether Defendant observed a female under the age of 18 at Jeffrey Epstein's home in Palm Beach. *See* McCawley Decl. at Exhibit 6, Maxwell Depo. at 29.

- Whether Defendant had meet Ms. Giuffre and introduced her to Epstein. *Id.* at 33.
- Whether Defendant, in 2011, could recall having met Ms. Giuffre at the Mar-a-Lago in Palm Beach and then writing that fact in an email. *Id.* at 35.

- Whether, when Defendant first met [redacted].

- Whether Defendant could recall being on a plane with [redacted] and Ms. Giuffre. [redacted].

- Whether the Defendant knew what Nadia Marcinkova was doing at Epstein's mansion. *Id.* at 41, 44.

- Whether Defendant knew the nature of the relationship between Epstein and Sarah Kellen. *Id.* at 47-48.

- Whether Defendant knew that Sarah Kellen recruited girls under the age of 18 to come to Epstein's mansions. *Id.* at 56-57.

- Whether massage therapists at Epstein's mansions performed sexual acts. *Id.* at 52-54.

- Whether Defendant knew the age of Eva Dubin when she (Dubin) met Epstein. *Id.* at 58-59.

- Whether Defendant advised Johanna Sjoberg that she (Sjoberg) could obtain extra money if she massaged Epstein. *Id.* at 61.

- Whether Defendant introduced Sjoberg to Prince Andrew. *Id.* at 63.

- Whether Defendant could recall Emmy Taylor brought masseuses to Epstein's mansion. *Id.* at 67.

- Whether Defendant knew what Ms. Giuffre was required to wear while providing massages to Epstein. *Id.* at 68-69.

- Whether Defendant could recall having a laundry basket of sex toys in Epstein's Palm Beach mansion, as described by Juan Alessi. *Id.* at 70-75.

- Whether Defendant could recall paying Ms. Giuffre. *Id.* at 75.

- Whether Defendant was ever present to view Ms. Giuffre massaging Epstein. *Id.* at 75.

- Whether Defendant could recall telling Ms. Giuffre that she needed a cell phone so that she could be on call regularly. *Id.* at 77.

- Whether Defendant was required to be on call to come to Epstein's mansion when he wanted her to come. *Id.* at 79.

- Whether Defendant could recall Ms. Giuffre being at Epstein's New York mansion when Prince Andrew came to visit. *Id.* at 80-81.

- Whether Defendant could recall Ms. Giuffre staying at any of Epstein's six homes. *Id.* at 81.

- Whether Defendant was aware that there were over 30 individuals who were minors who gave reports to the Palm Beach Police Department who said they were sexually assaulted by Epstein during the years that Defendant was working with him. *Id.* at 89-91.

- Whether Defendant introduced Ms. Giuffre to Prince Andrew in London. *Id.* at 108.

- Whether Ms. Giuffre ever stayed at Defendant's home in London. *Id.* at 108.

- Whether Defendant remembered taking a trip with Ms. Giuffre to travel over to Europe, including London. *Id.* at 108.

- Whether Defendant could recall Prince Andrew being present in New York for a party where Johanna Sjoberg was also present. *Id.* at 112-13.

- Whether a picture depicting Prince Andrew, Ms. Giuffre and Defendant was taken at Defendant's London town home. *Id.* at 113-14.

- Whether Defendant ever flew on one of Epstein's planes with a 17 year old. *Id.* at 121-22.

- Whether the notation "GM" on flight logs for passengers on Epstein's planes represented the Defendant (i.e., Ghislaine Maxwell). *Id.* at 122-23.

- Whether Defendant knew that the flight logs produced by Dave Rogers (one of Epstein's pilots) were accurate. *Id.* at 128-29.

- Whether Defendant could recall ever being on a flight on one of Epstein's planes with Ms. Giuffre. *Id.* at 132-33.

- Whether Defendant could recall Epstein and former President Clinton being friendly towards each other. *Id.* at 135-36.

- Whether Defendant could recall the purpose of a trip to Thailand with Epstein and former President Clinton was. *Id.* at 140.

- Whether Defendant could recall Ms. Giuffre taking pictures on trips. *Id.* at 144.

- Whether Defendant could recollect writing down messages on memo pads from various individuals at Epstein's Palm Beach mansion. *Id.* at 150-57; 159-60.

- Whether Defendant could recall receiving a message on a memo pad concerning [redacted]

- Whether Defendant could explain why a minor would be calling Epstein to say they had a female for him. *Id.* at 164.

- Whether Defendant could recall a sixteen-year-old Russian girl who came to Epstein's mansion? *Id.* at 167.

- Whether Defendant believed that Epstein sexually abused minors. *Id.* at 171-80.

- Whether Defendant was present at Epstein's Florida mansion when police executed a search warrant. *Id.* at 186.

- Whether Defendant took a picture at one of Epstein's properties of a person in either a naked or semi-naked state. *Id.* at 193.

- Whether Defendant could recall what Epstein told her about the criminal investigation of him. *Id.* at 194-95.

- Whether Epstein told Defendant that he never had sex with Ms. Giuffre. *Id.* at 197.

- Whether it was an "obvious lie" that Epstein engaged in sexual conduct with Ms. Giuffre while she was under the age of 18. *Id.* at 202-06.

- Whether Defendant knew whether Epstein had sex with a minor. *Id.* at 239.

- Whether it was a lie for Ms. Giuffre to say that Defendant approached females to bring them to Epstein. *Id.* at 244-46.

- Whether Defendant knew Epstein had a sexual preference for minors. *Id.* at 251-53.

- Whether Defendant knew that [redacted] asked girls to come over to see Epstein for purposes of sexual massage. [redacted]

- Whether Defendant could recall seeing [redacted] and Epstein together. [redacted].

- Whether Defendant was aware of any interstate or international transportation of women, aged 18 to 28, for purposes of having sex with Epstein where they would receive compensation. *Id.* at 278-79.

- Whether Defendant could recall anything about a puppet or caricature of Prince Andrew in Epstein's home when Prince Andrew was there, including whether Ms. Giuffre was sitting on Prince Andrew's lap with the puppet or caricature. *Id.* at 289-93.

- Whether Defendant could remember entering any telephone numbers into a contact book maintained by Epstein. *Id.* at 320-22.

- Whether a document with Epstein's contacts (including "massage" contacts) was located on Defendant's computer. *Id.* at 331-34.

- Whether, if Alfredo Rodriguez said that Defendant had knowledge that underage girls were coming over to Epstein's Florida mansion for purposes of sex, that would be a true statement. *Id.* at 329-30.

- Whether Defendant could recall any representative of hers informing the press that Ms. Giuffre committed grand theft. *Id.* at 344-45.

- Whether Defendant knew what her press agent, Ross Gow, was referring to when he talked in an email about "helpful leakage." *Id.* at 349-50, 406.

- Whether Defendant could recall interacting with anyone, other than Ms. Giuffre, under the age of 18 on any of Epstein's properties. *Id.* at 384.

- Whether Defendant had discussed with Prince Andrew any of the details of Ms. Giuffre's allegations against him. *Id.* at 400.

Because Defendant refused to answer those questions, Ms. Giuffre needs to depose other witnesses who have the requisite knowledge to testify concerning those issues.

2. **<u>Johanna Sjorberg (3 ½ hours)</u>**. Ms. Sjorberg's deposition was taken on May 18, 2016, in Fort Lauderdale. She testified as follows:

- Johanna confirmed that Maxwell recruited her to work as an assistant but she was almost immediately converted into a massage therapist and worked for Maxwell and Epstein from 2001 – 2006. *See* McCawley Decl. at Exhibit 5, (May 18, 2016 Deposition Tr. at p. 8-9)

- Johanna confirms that she knew Virginia was underage when she met her on the trip to NY with Jeffrey in 2001 because Virginia couldn't get into the casino and then later Johanna asked her and Virginia said she was 17. (p. 18). Johanna testified that Virginia looked young. (p. 18-19). Johanna added: "At the time I had the impression that she did not have a family or she had walked away from her family. And it seemed to me, you know, they had just sort of adopted her, not as a child, but they would take care of her." (p. 88)

- Johanna testified that Jeffrey had to have three (3) massages a day from different girls. (p. 30)

- Johanna testified that Jeffrey told her that he had three (3) massages a day because "he needed to have three orgasms a day. It was biological, like eating." (p. 32)

- Johanna testified that Maxwell "let me know that she was – she would not be able to please him as much as he needed and that is why there were other girls around." (p. 33) "She (Maxwell) said she doesn't have the time or the desire to please him as much as he needs and that's why there were other girls around." (p. 150-151)

- Johanna confirmed that she witnessed Virginia when she was seventeen (17) in Jeffrey Epstein's New York mansion with Prince Andrew and Ghislaine Maxwell. (p. 87) Johanna also testified that Prince Andrew sat with Virginia and Johanna and took a picture with a puppet in his image that had its hand and Prince Andrew's hand on their respective breasts. (p. 83)

- Johanna testified that Maxwell bought a camera for her and asked her to take naked pictures of herself for Jeffrey. (p. 145)

- Johanna testified that Maxwell would not give her the camera because Johanna "didn't finish the job" when massaging Jeffrey so Maxwell had to do it and was not happy. (p. 34) "She told me – called me after I had left and said, I have the camera for you but you cannot receive it yet because you came here and didn't finish your job and I had to finish it for you…She was implying that I did not get Jeffrey off and so she had to do it." Q When you say 'get Jeffrey off' do you mean bring him to orgasm?' A. Yes." (p. 34-35)

- Maxwell told Johanna to always act "grateful" to Jeffrey Epstein. (p. 35)

- Maxwell called Johanna and the other girls her "children" when they were on a trip to the USVI. (p. 36)

- David Copperfield was at a dinner at Epstein's and there was another girl present who looked young and Johanna asked what school she went to and Johanna did not recognize the school name as being a college and she said it was possible it was a high school aged girl. Johanna said Copperfield "questioned me if I was aware that girls were getting paid to find other girls" (p. 37-38)

- Johanna testified she heard Jeffrey call someone to try to find girls in Hawaii to send over the Fredrick Fekkai. (p. 38-39)

- Johanna testified Jeffrey told her "Clinton likes them young, referring to girls." (p. 41)

- Johanna testified that she was naked for 25 – 50% of all massages. (p. 42)

- Johanna testified that Jeffrey made her perform sexual acts during massages including sexual toys and she had intercourse with him. (p. 43, 146-147)

- Johanna testified that Nadia Marcinkova and Maxwell were both with her in the USVI in 2005. (p. 44).

- Johanna testified that Maxwell asked her to find other girls to perform massages at the house. (p. 141) She gave a name of a girl from a restaurant to Maxwell and Maxwell paid her $200.00 for the girls' name. "Did Maxwell ever ask you to bring other girls over for Jeffrey" (p. 46) A. Yes…."And I recall Ghislaine giving me money to bring her over…" (p. 141)

- Johanna testified that if a massage involved sexual acts that Jeffrey paid Johanna more than the normal $200.00. (p. 100-101)

- She testified that Defendant called Emmy Taylor her "slave." (p. 15). Later she testified that Jeffrey: "He told me one time Emmy was sleeping on the plane and they were getting ready to land and he went and woke her up and she thought that meant he wanted a [sex act], so she started to unzip his pants, and he said, No, no, no you just have to wake up for landing." (p. 143-144)

- Johanna said Defendant flew her in the helicopter from the main island to the USVI. (p. 55)

- Johanna said she believes what Virginia is saying about being abused by Jeffrey and Maxwell. "Basically that I believed her, even though she never spoke to me specifically about what was going on; that once I learned everything that happened based on reading the police report, I believed her side of the story." (p. 122-123). "Q. And what experience in the house helped you form your opinion that what Virginia is saying is true? A. You know, Jeffrey being open with me about what other girls did for him and

that I was not one of those girls. He was always trying to recruit me almost in a way that I could be one of them and travel with him and live the life of luxury if I only – if I only did this. So after five years of learning what was happening, I can look back knowing – I only knew Virginia a short time. Looking back, I can make assumptions about what was required of her." (p. 123-124)

- She said she recalls that Defendant went to dinner with Governor Bill Richardson one time when Johanna was visiting the ranch in New Mexico (p. 110).

**B. Future Depositions Sought by Ms. Giuffre**

Ms. Giuffre has also scheduled the following depositions.

3. **Juan Alessi (3 ½ hours)**. Mr. Alessi's deposition is scheduled for May 31, 2016, in Florida[3]. Mr. Alessi was one of the employees in Epstein's mansion. Mr. Alessi provided witness statements to police during the criminal investigation in Palm Beach, and was previously deposed in civil cases previously brought against Mr. Epstein. Specifically, Juan Alessi informed the Palm Beach Police Detective as follows: "Alessi stated that towards the end of his employment, the masseuses were younger and younger. When asked how young, Mr. Alessi stated they appeared to be sixteen or seventeen years of age *at most*." (emphasis added.) *See* McCawley Decl. at Composite Exhibit 7, Palm Beach Police Incident Report at p. 57.

On November 21, 2005, the Palm Beach Police Department took a sworn statement from house employee Juan Alessi in which he revealed that girls would come over to give "massages" and he observed Ms. Maxwell going upstairs in the direction of the bedroom quarters. *See* McCawley Decl. at Exhibit 8, November 21, 2005 Sworn Statement at 10. He also testified that after the massages, he would clean up sex toys that were kept in "Ms. Maxwell's closet." *Id.* at 12-13. He added that he and his wife were concerned with what was going on at the house (*Id.* at 14) and that he observed girls at the house, including one named "Virginia." *Id.* at 21. It is anticipated that he will testify consistently with that previous testimony.

[3] As explained above, as of today, Defendant's counsel sent an email refusing to attend this deposition set for Tuesday, May 31, 2016 (Monday is Memorial Day). *See* McCawley Decl. at Exhibit 2.

4. **<u>Maria Alessi (3 ½ hours)</u>.** Ms. Alessi's deposition is scheduled for June 1, 2016, in Florida. She was, with her husband, household staff for Epstein in the Palm Beach home he shared with Defendant, and, it is anticipated, will corroborate many of the observations of her husband about minor girls and massages inside of Epstein's Florida mansion. Mr. Alessi referenced during his prior deposition the things that Ms. Alessi observed with respect to the sexual massages and involvement of minor girls. Mrs. Alessi is also anticipated to testify regarding Ms. Maxwell's close association with Mr. Epstein and knowledge the visitors.

5. **<u>Dave Rodgers (3 ½ hours)</u>.** Mr. Rodgers's deposition is scheduled for June 3, 2016, in Florida. Rodgers was one of the pilots for Epstein's private jets and will, it is anticipated, authenticate his flight logs showing Defendant and Ms. Giuffre together on the same flights. Defendant refused to admit that her name is reflected in the flight logs despite her initials "GM" appearing over 300 times. Therefore, such authentication is necessary because Defendant testified at her deposition she could not remember even the most basic things about flights in the flight logs. For example, when asked if "GM" represented her initials on the flight log, Defendant responded**:** "How do you know GM is me," (*See* McCawley Decl. at Exhibit 5, Maxwell Depo. at 29 at. 122) and "GM can stand for any level, it could be Georgina, George." (*Id*. at 123). Ms. Giuffre is also seeking additional flight logs in Mr. Rodgers possession that will further corroborate Defendant's involvement with Jeffrey Epstein.

6. **<u>Rinaldo Rizzo (3 ½ hours)</u>.** Mr. Rizzo is scheduled for June 10, 2016 and will be able to testify regarding his observations of Defendant and Epstein with underage girls (girls less than 18 years of age). Mr. Rizzo was originally set for deposition on May 13, 2016 which was noticed on April 11, 2016, and Defendant requested that Ms. Giuffre reschedule that deposition just days before the scheduled date.

7. **Jean Luc Brunel (3 ½ hours).** Mr. Brunel's deposition is set for June 7, 2016, in New York. He has relevant information because he has known Maxwell and Epstein for many years and was present with Epstein and Defendant on many occasions at Epstein's homes in New York, Palm Beach and the USVI, and he has personal knowledge of the disputed issues in this case

8. **Ross Gow (3 ½ hours).** Mr. Gow is Defendant's press agent who issued the press statement at issue in this case on Defendant's behalf. He will be able to testify regarding the defamatory statement, its distribution, any other defamatory statements that were distributed, and any information he had regarding the basis for the statement. Ms. Giuffre has requested that Defendant agree to produce Mr. Gow rather than requiring the time and expense of having to serve a subpoena on Mr. Gow, located in London, under the Hague convention, but counsel for Defendant has not agreed to produce Ross Gow for deposition.

9. **Dana Burns (3 ½ hours).** Ms. Burns' deposition is set for June 8, 2016, in New York City. [redacted]

10. **Jo Jo Fontanella (3 ½ hours).** Jo Jo Fontanella is a critical witness because he has been working as Jeffrey Epstein's butler in his New York mansion for a number of years

including during the time that Ms. Giuffre was staying the night at the mansion when she was a minor child. Virginia interacted with Mr. Fontanella frequently during the time she was with Mr. Epstein and the Defendant. Mr. Fontanella will be able to testify to what he observed at the New York mansion including his observation regarding the age and number of females who visited the house each day. Mr. Fontanella will be able to testify regarding Defendant's presence at the home at various times and what he observed Defendant doing while she was at the New York mansion.

11. **Detective Joe Recarey (3 ½ hours).** During Defendant's deposition, Defendant questioned the veracity of the Palm Beach Police report containing the accounts of the numerous minor children who were also sexually abused by Jeffrey Epstein. Defendant referred to at least one of those children as a prostitute, which is false. *See* McCawley Decl. at Exhibit 5, Maxwell Deposition at 173:8-12; 359:11-18. The Palm Beach police report also includes statements about the Defendant. Detective Recarey is expected to testify regarding his investigation, what he observed, the evidence he collected from Mr. Epstein's Palm Beach mansion, the modus operandi of the Epstein organization, and the interviews he conducted with a number of females who were subject to abuse at the Palm Beach mansion. He will also testify regarding Jeffrey Epstein's, who is in a joint defense with Defendant, and his campaign to attack the credibility of the numerous minor children who reported sex offenses against him. Attacking the credibility of their victims, including Ms. Giuffre, is a part of Epstein and Defendant's modus operandi.

12. **Former Palm Beach Police Chief Michael Reiter (3 ½ hours).** Chief Reiter is scheduled for deposition on June 20, 2016. He was the Police Chief who was responsible for overseeing the Palm Beach Epstein investigation. He has made public statements about the 40

victims of Jeffrey Epstein's abuse. He has made public statements about the fact that after he started the investigation into the crimes that took place at the Palm Beach mansion, he was followed by strange men and "investigated". He also has made public statements that he sent to victims regarding the failure of the government to properly handle the matter. Reiter is relevant to many issues, among others, Defendant's claimed innocence by the fact that she was never formally charged.

13. **Emmy Taylor (3 ½ hours)**. Emmy Taylor was Defendant's "assistant" during the time Ms. Giuffre was being abused. Ms. Taylor is on flight logs to Europe with Ms. Giuffre and other locations in the United States. Johanna Sjoberg testified that Emmy Taylor was referred to by the Defendant as "my slave" and that Ms. Taylor trained Ms. Sjoberg to give massages while Ms. Sjoberg was naked. Emmy Taylor will be able to testify as to what she observed and experienced during the years she was with Defendant and Epstein. Ms. Giuffre is still attempting to locate Ms. Taylor, but she is believed to reside in London.

14. [redacted]

[redacted]

15. **<u>Nadia Marcinkova (3 ½ hours)</u>.** Ms. Marcinkova's deposition is set for June 16, 2016, in New York.[4] Ms. Marcinkova was specifically identified by the U.S. Attorney's Office for the Southern District of Florida as a "potential co-conspirator of Epstein" in the non-prosecution agreement it executed with Mr. Epstein as part of his guilty plea. She has relevant information because she observed the recruitment of underage girls for sex and, in fact, participated in sex acts with minors. She was also on numerous flights with Defendant (in contradiction to Defendant's testimony), and she can provide valuable testimony about Maxwell's role in the recruitment of females.

16. **<u>Sarah Kellen (a/k/a Sarah Kensignton or Sarah Vickers) (3 ½ hours)</u>.** Ms. Kellen's deposition is set for June 22, 2016, in New York. Ms. Kellen specifically identified by the U.S. Attorney's Office for the Southern District of Florida as a "potential co-conspirator of Epstein" in the non-prosecution agreement it executed with Mr. Epstein as part of his guilty plea. She has relevant information because she was present during the time when Virginia was with Epstein and the Defendant, and she travelled with all of them during this critical time period. It is believed that she worked at the direction of, and directly under, Ms. Maxwell and was taught by Ms. Maxwell how to recruit females for sex with Mr. Epstein.

---

[4] Marcinkova, Kellen and Epstein have not been personally served and are all subject to Ms. Giuffre's Motion for Alternative Service [D.E. 160].

17. **<u>Jeffrey Epstein (3 ½ hours)</u>.** Ms. Giuffre's counsel have been in touch with Epstein's counsel and is continuing to work to schedule his deposition. Epstein lies at the center of this case, and he can testify that Defendant recruited females for sex with him, including Mrs. Giuffre, under the offer of being a massage therapist, and ultimately paid these females for sex. He can testify that Defendant lured dozens if not hundreds of young females, including many underage females, to his residences for sexual purposes.

## II. DISCUSSION

Ms. Giuffre has attempted to conduct discrete, focused discovery in this case to limit any burdens on the Defendant and on the Court. Nonetheless, this case presents numerous challenges that require that she take more than ten depositions – not the least of which is Defendant's extraordinary lack of memory about many events that would appear to have indisputably taken place. Ms. Giuffre, however, is not seeking to exceed the allotted *hours* for depositions under Rule 45 -- only the *number* of depositions. Ms. Giuffre seeks leave of Court to 7 additional depositions, for a total of seventeen depositions.

Under the rules, each party is entitled to take ten depositions which total seven hours each. Fed. R. Civ. P. 29(d)(1). Thus, the presumptive *time* limit for depositions is a total of seventy hours (10 depositions x 7 hours per deposition). For the convenience of opposing counsel, Ms. Giuffre has stipulated that they may have half of the seven hour deposition time for each third party witness. Thus, if the Court grants Ms. Giuffre's motion, she will end up taking less than seventy hours of deposition testimony. Specifically, she will only take one deposition of seven hours (Defendant's) and sixteen depositions of three-and-a-half hours – a total of 66 and ½ hours of depositions.

In light of the accommodation she had extended to opposing counsel, Ms. Giuffre requested that opposing counsel agree that both sides could schedule additional depositions beyond the presumptive limit of ten. Defendant refused to agree and is also in disagreement about the proposed schedule for depositions, despite the fact that Ms. Giuffre scheduled depositions based on the dates Defendant's counsel represented were available for depositions in this case. At Defendant's counsel's request Ms. Giuffre scheduled depositions of witnesses who lived in the same geographical location on consecutive days to limit the travel time and expense. *See* McCawley Decl. at Exhibit 1.

Sadly, it appears that Defendant's counsel may be attempting to delay Ms. Giuffre's ability to obtain depositions because certain witnesses are avoiding service and others were difficult to locate, and the time period for the close of discovery is swiftly approaching. The Court will recall that the Defendant managed to delay her deposition until April 22, 2016, through unnecessary motion practice. And now that the need to depose other witnesses has been established, Defendant's counsel are employing other delay tactics. The Court currently has before it, for example, Ms. Giuffre's motion for leave to serve three deposition subpoenas by means other than personal service. DE 160. As recounted at greater length in that motion, three of the critical witnesses in this case – Jeffrey Epstein, Sarah Kellan, and Nadia Marcinkova – have all thus far managed to evade service of process, despite repeated, diligent, and expensive efforts at personal service. Of course, all three of these witnesses are persons who have worked very closely with Defendant in the past. Epstein is also in a joint defense agreement with Defendant.

In other situations, Ms. Giuffre has been forced to delay taking depositions because of Defense Counsel. For example, Ms. Giuffre served a subpoena on Mr. Rizzo and opposing

counsel on April 11, 2016 for a deposition a month later on May 13, 2016. Just days before the deposition, Defendant's counsel said they didn't realize the deposition was scheduled and that they could not proceed forward on that date. *See* McCawley Decl. at Exhibit 9, May 5, 2016 E-mail Correspondence Regarding Scheduled Depositions. This forced Ms. Giuffre's counsel to have to reset the witness for June 10, 2016. Of course, with each delay, Ms. Giuffre is hamstrung in identifying which further witnesses need to be deposed.

Under Rule 30(a) of the Federal Rules of Civil Procedure, any party who wishes to conduct more than ten depositions without stipulation by the opposing party must seek leave of the court. Fed.R.Civ.P. 30(a)(2)(A)(i). Once such a motion is made, "[t]he court must grant a request to exceed ten depositions unless the additional depositions would be unreasonably cumulative or duplicative, the requesting party had a prior opportunity in discovery to obtain the information sought, or the burden or expense of additional depositions would outweigh any likely benefit." *In re Weatherford Int'l Sec. Litig.*, No. 11 CIV. 1646 LAK JCF, 2013 WL 5762923, at *2 (S.D.N.Y. Oct. 24, 2013) (*citing* Fed.R.Civ.P. 26(b)(2)(C); *Raniola v. Bratton,* 243 F.3d 610, 628 (2d Cir.2001)). Given the liberal discovery allowed by the rules, the burden on the party seeking additional depositions is not great. Rule 30(a)(2)'s ten-deposition limit is "a useful and appropriate 'Stop' sign, not as a 'Road Closed' sign. Once any party has taken ten depositions, it makes perfect sense to require that party to demonstrate the need for more. But that showing need not be onerous. If the need exists, discovery should not be prevented." *Scott v. City of Sioux City, Iowa*, 298 F.R.D. 400, 402-03 (N.D. Iowa 2014).

As the Court can readily determine from the summary of anticipated testimony above, none of the anticipated testimony is unreasonably cumulative or duplicative. Rather, all of the anticipated testimony goes to central and now-disputed issues in the case. The Court should be

aware that, at every turn, Defendant appears ready to brand Ms. Giuffre as a "liar" who cannot be believed. Thus, obtaining witnesses, like Ms. Sjoberg, who can corroborate that she is telling the truth is more important in this case than it would be in many others. It is equally important that Ms. Giuffre be able to depose the witnesses who can refute Defendant's testimony.

The Court can also readily determine that Ms. Giuffre has not had any prior opportunity to obtain discovery of the witnesses she seeks to depose. The case is only now in the fact discovery phase, and she has had no opportunity to previously depose these third-party witnesses.

Finally, there is no substantial burden involved with deposing seven additional witnesses. Any assessment of burden must take into account the scope of the underlying case. Ms. Giuffre is seeking both compensatory and punitive damages that would total millions of dollars. Against that backdrop, a handful of additional depositions cannot be seen as unduly burdensome. Moreover, this is not a situation where Defendant lacks means to pay for counsel to attend the depositions. Defendant's vast wealth does not appear to be in doubt.[5]

During the meet-and-confer on this issue, the Defendant's substantive reason for not stipulating to these additional depositions is that, with regard to three of the witnesses (Epstein, Kellan, and Marcinkova), it appears likely that they will invoke their Fifth Amendment right to refuse to answer some questions about Defendant's involvement in in the sexual abuse of Ms. Giuffre. But until those witnesses actually take the Fifth, the conclusion that they will actually

---

[5]Defendant has thus far refused produce documents regarding the extent of her assets, arguing that until the punitive damages phase of this proceeding is reached the discovery is not relevant. Nonetheless, public information suggests significant assets – and the possibility that she is transferring assets outside the reach of the Court's jurisdiction. *See, e.g., Alleged Epstein Madam Sells $16M Manhattan Townhouse*, New York Post, Apr. 28, 2016 (available at http://nypost.com/2016/04/28/alleged-epstein-madam-sells-16m-manhattan-townhouse/).

take the Fifth is, at a minimum, premature.[6] The witness may, for example, answer some questions and not others. And, in any event, even if they take the Fifth when asked about Defendant's sexual abuse of minors, those invocations will quite likely be admissible against the Defendant at trial.

The Second Circuit has squarely held that a witness' invocation of Fifth Amendment rights can in proper circumstances be used against a party. The Second Circuit's seminal decision is *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997), which upheld the drawing of adverse inferences based on a non-party's invocation of a Fifth Amendment right to remain silent. The Second Circuit instructed that, the circumstances of given case, rather than status of particular nonparty witness, determines whether nonparty witness' invocation of privilege against self-incrimination is admissible in course of civil litigation. *Id.* at122-23. The Circuit also held that, in determining whether nonparty witness' invocation of privilege against self-incrimination in course of civil litigation and drawing of adverse inferences is admissible, court may consider the following nonexclusive factors:

> (1) nature of witness' relationship with and loyalty to party;
>
> (2) degree of control which party has vested in witness in regard to key facts and subject matter of litigation;
>
> (3) whether witness is pragmatically noncaptioned party in interest and whether assertion of privilege advances interests of witness and party in outcome of litigation; and
>
> (4) whether witness was key figure in litigation and played controlling role in respect to its underlying aspects.

*Id.* at 124-25.

Clearly, many of these factors are going to weigh heavily in favor of drawing an adverse inference against Defendant. For example, Jeffrey Epstein is a "pragmatically noncaptioned

---

[6] The Court should be aware that these are also the three witnesses who have been attempted to evade service of process.

party in interest" regarding issues of whether he and Defendant together sexually abused Ms. Giuffre. And Defendant is in a joint defense agreement with Epstein. Also, some of the most important events in this case took place in private bedroom where just three people were present – Ms. Giuffre, Defendant, and Epstein. With Defendant denying these events, the fact that Epstein may take the Fifth could provide decisive information to the jury.

But the Court need not make any determinations now as to precisely how these factors will play out. Instead, it is enough to note that very important and unique evidence may be secured from the deposition of each of these three individuals and therefore Ms. Giuffre should be permitted to take their deposition.

## CONCLUSION

Ms. Giuffre respectfully requests that she be allowed to take a total seventeen depositions in this case.

Dated: May 27, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.

425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[7]

[7] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 27th day of May, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v .

Ghislaine Maxwell,

Defendant.
________________________________/

**NON-REDACTED DECLARATION OF SIGRID S. McCAWLEY IN SUPPORT OF PLAINTIFF'S MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT IN FEDERAL RULE OF CIVIL PROCEDURE 30(A)(2)(a)(ii), FILED UNDER SEAL**

I, Sigrid S. McCawley, declare that the below is true and correct to the best of my knowledge as follows:

1. I am a partner with the law firm of Boies, Schiller & Flexner LLP and duly licensed to practice in Florida and before this Court pursuant to this Court's September 29, 2015 Order granting my Application to Appear Pro Hac Vice.

2. I respectfully submit this Declaration in support of Plaintiff's Motion to Exceed Presumptive Ten Deposition Limit In Federal Rule of Civil Procedure 30(A)(2)(a)(ii), Filed Under Seal.

3. Attached hereto as Composite Exhibit 1, is a true and correct copy of the May 17, 2016 Email Correspondence from Sigrid McCawley.

4. Attached hereto as Exhibit 2, is a true and correct copy of the May 27, 2016 Email Correspondence from Laura Menninger.

5. Attached hereto as Exhibit 3, is a true and correct copy of the Notice of Service

and Subpoena to Juan Alessi.

6. Attached hereto as Exhibit 4, is a true and correct copy of the May 26, 2016 Correspondence from Sigrid McCawley.

7. Attached hereto as Exhibit 5, is a true and correct copy of the May 18, 2016 Deposition Transcript of Johanna Sjoberg.

8. Attached hereto as Composite Exhibit 6, is a true and correct copy of the April 22, 2016 Deposition Transcript of Ghislaine Maxwell.

9. Attached hereto as Exhibit 7, is a true and correct copy of the Palm Beach Police Report.

10. Attached hereto as Exhibit 8, is a true and correct copy of the November 21, 2005 Sworn Statement of Juan Alessi.

11. Attached hereto as Exhibit 9, is a true and correct copy of the May 4, 2016 Email Correspondence from Laura Menninger.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Sigrid S. McCawley__________
Sigrid S. McCawley, Esq.

Dated: May 27, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies, Schiller & Flexner LLP 401 E.
Las Olas Blvd., Suite 1200 Ft.
Lauderdale, FL 33301
Tel: (954) 356-0011

David Boies
Boies, Schiller & Flexner LLP 333
Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Tel: (954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
Tel: (801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 27, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Paliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley, Esq.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 15-CV-07433-RWS

------------------------------------------x

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

------------------------------------------x

May 18, 2016
9:04 a.m.

C O N F I D E N T I A L

Deposition of JOHANNA SJOBERG, pursuant to notice, taken by Plaintiff, at the offices of Boies Schiller & Flexner, 401 Las Olas Boulevard, Fort Lauderdale, Florida, before Kelli Ann Willis, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public within and for the State of Florida.

A P P E A R A N C E S:

BOIES SCHILLER & FLEXNER, LLP
Attorneys for Plaintiff
401 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
BY: SIGRID S. McCAWLEY, ESQ. and
MEREDITH SCHULTZ, ESQ.

HADDON MORGAN & FOREMAN, P.C.
Attorneys for Defendant
150 East 10th Avenue
Denver, Colorado 80203
BY: LAURA A. MENNINGER, ESQ.

SINCLAIR LOUIS & ZAVERTNIK, P.A.
Attorneys for Deponent
40 NW Third Street
Suite 200
Miami, Florida 33128
BY: MARSHALL DORE LOUIS, ESQ.

ALSO PRESENT: Ryan Kick, Videographer

INDEX

Examination by Ms. McCawley .................... 5
Examination by Ms. Menninger .................. 50
Further Examination by Ms. McCawley ........... 138
Further Examination by Ms. Menninger .......... 147

EXHIBITS

Deposition Exhibit 1 .......................... 7
Deposition Notice

Deposition Exhibit 2 .......................... 7
Subpoena

Deposition Exhibit 3 .......................... 16
Flight log

Deposition Exhibit 4 .......................... 49
Palm Beach Police Department
Incident Report

Deposition Exhibit 5 .......................... 117
Red Ice Creations web article

THE VIDEOGRAPHER: We are now on the record. This is begins Videotape No. 1 in the deposition of Johanna Sjoberg, in the matter of Virginia Giuffre versus Ghislaine Maxwell.

Today is May 18th, 2016. The time is 9:04 a.m. This deposition is being taken at 401 East Las Olas Boulevard, Fort Lauderdale, Florida.

The videographer is Ryan Kick. The court reporter is Kelli Ann Willis. We both represent Magna Legal Services.

Will counsel and all parties present state their appearance and whom they represent.

MS. McCAWLEY: Yes. I'm Sigrid McCawley, with the law firm of Boise Schiller & Flexner, and I represent Virginia Giuffre. And I have here two colleagues of mine, Meredith Schultz and Sandra Perkins, from my firm as well.

MS. MENNINGER: Hi. I'm Laura Menninger from Haddon Morgan & Foreman, and I represent Ghislaine Maxwell.

MR. LOUIS: I'm Dore Louis from Sinclair Louis & Zavertnik. I'm here on behalf of the deponent.

Thereupon:

JOHANNA SJOBERG

a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified on her oath as follows:

E X A M I N A T I O N

BY MS. McCAWLEY:

Q. Good morning, Johanna. Thank you for coming. I'm going to talk to you a little bit about the deposition process before we get started to make sure you understand what's going to happen here today.

You just heard there's a videographer, and he's going to be taking your video during this deposition and generally what's happening in the course of the deposition.

And then you have a court reporter here who takes down the words that we say. And it's a little bit tricky because I tend to speak quickly sometimes and speak over people, and she needs to get down all of the words. So I'll try to do my best to go slower and make sure I'm not talking over you.

And, similarly, if you've got an answer to a question, make sure that you're verbally responding, not just nodding or making a gesture

because she can't get that down. We want to make sure our responses are verbal. I'll try to remind you of that if that happens.

Have you ever been deposed before?

A. No.

Q. No. Okay.

So what's going to happen is I'm going to ask questions, and you'll give answers. And like I said, everybody will be recording those.

Is there any reason, any medical reason, anything you've taken today that would cause you to not to be able to give truthful testimony today?

A. No.

Q. No. Okay.

All right. So we're going to get started, and if you have any questions during the deposition or you need to stop to take a break, you can just let me know and we'll take that break.

So what I -- the only thing I ask is if we're in the midst of a question, you finish the answer before we take a break.

A. Sure.

Q. But I'll try to make sure that I take regular breaks, as well.

You stated your name for the record. Can

you tell me your date of birth?

Q. That makes you how old now?

Q. Okay. And where are you currently living?

Q. And I'm going to show you what I'm going to mark as the first two exhibits in the matter. And I'm going to ask the court reporter if I can mark those.

(The referred-to document was marked by the court reporter for Identification as Sjoberg Exhibits 1 and 2.)

BY MS. McCAWLEY:

Q. Okay. I'm going to show you what I'm marking as Exhibit 1. It's going to be the re-notice of your videotaped deposition, which is simply a notice I'm going to show you. And then Exhibit 2 is the subpoena that we served on you.

So you're here today pursuant to our Notice of Deposition and the subpoena that we served on you.

Are you familiar with the subpoena? Have you seen that document before?

A. Yes.

Q. Okay. Great.
All right. Do you know a female by the name of Ghislaine Maxwell?
A. Yes.
Q. And when did you first meet Ms. Maxwell?
A. 2001. March probably. End of February/beginning of March.
Q. And how did you meet her?
A. She approached me while I was on campus at Palm Beach Atlantic College.
Q. And what happened when she approached you?
A. She asked me if I could tell her how to find someone that would come and work at her house. She wanted to know if there was, like, a bulletin board or something that she could post, that she was looking for someone to hire.
Q. And what did you discuss with her?
A. I told her where she could go to -- you know, to put up a listing. And then she asked me if I knew anyone that would be interested in working for her.
Q. Did she describe what that work was going to be?
A. She explained that she lived in Palm Beach and didn't want butlers because they're too stuffy.

And so she just liked to hire girls to work at the house, answer phones, get drinks, do the job a butler would do.

Q. And did she tell you what she would pay for that kind of a job?

A. At that moment, no, but later in the day, yes.

Q. And what did she say?

A. Twenty dollars an hour.

Q. Was there anybody else with Ms. Maxwell when you met her?

A. There was another woman with her. I don't recall her or what she looks like or how old she was.

Q. And what happened next?

A. And then she asked me if I would be interested in working for her. And she told me that she was -- I could trust her and that I could jump in her car and go check out the house at that moment if I wanted.

And so I said, Sure, let's do it, and went to her home with her.

Q. And where was that home?

A. In Palm Beach.

Q. And did she describe that home as being

her home?

A. She described it as being her home and alluded to the fact that it was her and Jeffrey's home and that she had homes all over the world. Yes.

Q. And what happened when you arrived at the home?

A. I believe she just showed me around.

Q. Do you recall meeting anybody at the home?

A. I don't recall if I met Jeffrey at that time or the next time that I was there.

Q. How did you meet Jeffrey? Did Maxwell introduce you to Jeffrey?

A. Yes.

Q. What do you recall of your first meeting with Jeffrey?

A. I remember him being in a bathrobe. I recall talking to him about how I was a major in psychology. And he had studied psychology, and so he spoke with me about different topics.

I remember thinking this guy is very smart. That was my first impression.

Q. And when you refer to Jeffrey, are you referring to Jeffrey Epstein?

A. Yes.

Q. How did the meeting -- you said Maxwell took you to the home. Do you remember how that meeting ended?

A. Well, she dropped me back off at campus.

Q. And did you --

A. She got my number and I took her number. And then she called me the next weekend to work.

Q. So at that point you started working for Ms. Maxwell?

A. At that time, yes.

MS. MENNINGER: Objection, leading.

Sorry.

BY MS. McCAWLEY:

Q. Did you then start working for Ms. Maxwell after that first meeting?

A. She called me and I went over to the home the next Sunday to work.

Q. And what work -- can you describe for me the first day at work, what work you performed?

A. Sure. I remember answering the phones and taking messages. And at one point, she asked me to go pick up printer ink, and I took her car to Office Depot to get ink.

She asked me to go buy some magazines, so I went to Palm Beach Daily News and bought a few

magazines.

She and I went -- she wanted to take me shopping to Worth Avenue, but it was a Sunday and Nieman Marcus was closed, so we went back to, like, a little book store. And I remember she bought, I think, five pairs of reading glasses because she thought Jeffrey would like them. He had them all over the house. On every table there was reading glasses.

And that's about it. It was a pretty simple day.

Q. Were you paid that day for that work?

A. Yes.

Q. And how much were you paid? Do you remember?

A. I don't remember how many hours I was there -- I was there. She paid me cash.

Q. So Maxwell paid you?

A. Yes.

Q. And then was she the one who trained you with what -- with respect to what you were supposed to do during the day, directed you to, like you said, go to --

A. I believe she was the one that was kind of showing me around.

Q. And how long did you work in that position answering phones and doing --
A. Just that one day.
Q. Just that one day.
And did your duties change?
A. Well, the next time she called me, she asked me if I wanted to come over and make $100 an hour rubbing feet.
Q. And what did you think of that offer?
A. I thought it was fantastic.
Q. And did you come over to the house for that purpose?
A. Yes.
Q. And when you came over to the house, was Maxwell present?
A. I don't recall.
Q. And what happened that second time you came to the house?
A. At that point, I met Emmy Taylor, and she took me up to Jeffrey's bathroom and he was present. And her and I both massaged Jeffrey. She was showing me how to massage.
And then she -- he took -- he got off the table, she got on the table. She took off her clothes, got on the table, and then he was showing

me moves that he liked. And then I took my clothes off. They asked me to get on the table so I could feel it. Then they both massaged me.

Q. So it was more than a foot massage at that point?

A. Yeah, it was mostly, like, legs and back.

Q. Was everybody in the room without clothes on?

A. When they were on the massage table, yes.

Q. Did they -- when they got off the massage table to perform the massage, did they dress or did --

A. Yes.

Q. They dressed.

And do you recall who paid you for that first day that you did the massages?

A. I don't recall.

Q. Do you recall whether Maxwell was at the house during that first day when you were doing the massage with Emmy and Jeffrey?

MS. MENNINGER: Objection, asked and answered.

BY MS. McCAWLEY:

Q. You can answer.

A. I don't recall.

Q. Who did Emmy work for?
A. Ghislaine.
Q. Did Maxwell ever refer to Emmy by any particular term?
A. She called her her slave.
Q. You said your job duties changed. Did you start to travel as part of your job with Jeffrey and Ghislaine?
A. Yes. The next time they called me, they asked me to go to New York.
Q. And did you -- do you recall when that was approximately?
A. That was Easter of 2001.
Q. And do you recall who was on the plane with you for that trip?
MS. MENNINGER: Objection, leading, form.
MS. McCAWLEY: Actually, I'm going to stop really quickly and I'm going to ask for the next exhibit, please.
MS. MENNINGER: This is 3?
MS. McCAWLEY: Yes. I'm going to mark this as Exhibit 3 for purposes of the deposition.

(The referred-to document was marked by the court reporter for Identification as Sjoberg Exhibit 3.)

BY MS. McCAWLEY:

Q. Johanna, I'm going to direct you -- I flagged some pages, but for the record, I'm going to say what pages they are before I hand you the exhibit.

A. Sure.

Q. These are Giuffre 000748 and 000758, are the two pages right now I may refer you to. The document itself is 000721 through 789.

And these are flight logs from pilot David Rogers that have been produced in this case.

MS. MENNINGER: Objection, foundation, asking the witness any questions about this document.

THE WITNESS: Can I touch it?

MS. McCAWLEY: Yes, you may.

MS. MENNINGER: I just have to say things every now and then.

THE WITNESS: Okay.

BY MS. McCAWLEY:

Q. So you mentioned that you traveled to New York. If you turn to page -- flagged page which

should be 000748, at the top of that document you're going to see a date of April 2001.

I'm just going to ask you to go down to the -- if you look at the line on the left to where it says 9 for the date, and look over where it has the names.

Do you see -- can you identify your name on that list?

A. Yes.

Q. And can you tell me -- I know there are initials there -- who else to the extent you remember was on the plane with you?

MS. MENNINGER: Objection, foundation, leading, form of question.

BY MS. McCAWLEY:

Q. Johanna, do you recall who was on the plane with you that day?

MS. MENNINGER: Objection, foundation, form, leading.

The witness is reading the document.

BY MS. McCAWLEY:

Q. You can answer.

A. Okay. JE, Jeffrey Epstein; ET, Emmy Taylor; VR, Virginia Roberts; BK, I do not recall; and myself.

MS. MENNINGER: Objection. The witness is reading the document.

BY MS. McCAWLEY:

Q. And do you recall where you flew when you went to -- when you traveled that first time with Jeffrey Epstein?

A. We left from Palm Beach and landed in Atlantic City for a few hours because there was a storm in New York, and then got back on the plane a few hours later and landed in Teterboro.

Q. And you said that you recall landing in Atlantic City. Did you go into Atlantic City?

A. Yes, went to one of Trump's casinos.

Q. Did you actually go into the casino itself?

A. Yes.

Q. Do you recall Virginia -- at the time Virginia Roberts being present with you?

A. Yes.

Q. Do you recall if she went into the casino?

A. She was underage. I did not know anything about how old you had to be to gamble legally. I just knew she could not get in because of an ID issue. So she and I did not gamble.

Q. In your opinion, did Virginia look young,

in your view?

A. Yes.

Q. Did you ever -- did you at that time wonder why she was traveling with Jeffrey?

A. At that time, I did not.

Q. Did you later wonder that?

A. Yes.

Q. And what was your impression?

MS. MENNINGER: Objection, vague, speculative.

THE WITNESS: I -- we're jumping ahead; is that okay?

BY MS. McCAWLEY:

Q. Yes, that's okay.

A. A few days later, I remember asking her questions to try to figure out her role, why she was there, and she gave me vague answers and was never specific.

And so I thought perhaps she just was an assistant, someone that did massages well. I wanted to believe that she was innocent.

Q. Did you ever refer to her as being orphan-like?

A. I did.

Q. And how did that come about?

A. No, I only -- to you, I said that to you. I just saw her as perhaps someone who may not have had a strong family, and they took her under their wing.

Q. Now, you mentioned remembering going to Atlantic City.

Did you go -- where did you go after Atlantic City?

A. Once we landed in New York, Emmy and I went in a car and drove around the city for a half hour or so, just to see some of the city.

Q. And then where did you go after doing the sightseeing?

A. We went to the townhouse on East 71st.

Q. And can you describe that location for me?

A. Sure. Between Madison and Park. I think the address might have been 9 East 71st Street.

Q. And who owned that home?

A. As far as I knew, Epstein.

Q. Can you describe for me physically what --

A. Palatial. When you walk up, it looks like a normal door to a townhouse, and when you walk in -- I thought there were four floors. I heard there were seven floors. I didn't see them all.

Q. And do you recall who, if anybody, was at

Jeffrey's home when you arrived?

A. Yes. When I first walked in the door, it was just myself, and Ghislaine headed for the staircase and said -- told me to come up to the living room.

Q. And what happened at that point, when you came up to the living room?

A. I came up and saw Virginia, Jeffrey, Prince Andrew, Ghislaine in the room.

Q. And did you meet Prince Andrew at that time?

A. Yes.

Q. And what happened next?

A. At one point, Ghislaine told me to come upstairs, and we went into a closet and pulled out the puppet, the caricature of Prince Andrew, and brought it down. And there was a little tag on the puppet that said "Prince Andrew" on it, and that's when I knew who he was.

Q. And did -- what did the puppet look like?

A. It looked like him. And she brought it down and presented it to him; and that was a great joke, because apparently it was a production from a show on BBC. And they decided to take a picture with it, in which Virginia and Andrew sat on a

couch. They put the puppet on Virginia's lap, and I sat on Andrew's lap, and they put the puppet's hand on Virginia's breast, and Andrew put his hand on my breast, and they took a photo.

Q. Do you remember who took the photo?

A. I don't recall.

Q. Did you ever see the photo after it was taken?

A. I did not.

Q. And Ms. Maxwell was present during the -- was Ms. Maxwell present during that?

A. Yes.

Q. What happened next?

A. The next thing I remember is just being shown to which room I was going to be staying in.

Q. When you exited the room that you were in where the picture was taken, do you recall who remained in that room?

A. I don't.

Q. Do you recall seeing Virginia exit that room?

A. I don't.

Q. During this trip to New York, did you have to perform any work when you were at the New York house?

A. I performed at least one massage that I recall.
Q. And who instructed you to give that massage?
A. Jeffrey.
Q. And can you describe for me what happened during that massage?
A. Near the end, he asked me to rub his nipples while he masturbated.
Q. And did that take place?
A. It did not.
Q. And why not?
A. I was not comfortable with it. And so I left the room.
Q. Did you have any -- did you say anything to him before leaving the room?
A. I believe I said, "I'm done."
Q. Do you recall what his reaction was to that?
A. I do not. At the time, at that moment, I do not.
Q. Did you recall later what --
A. Well, we had a conversation a little later, talking about his expectations, and that was the conversation where he said that the next trip

they were going on was to the island in the Virgin Islands, and I would be invited; however, there would be, quote, sex stuff happening.

Q. Can you describe for me -- can you describe for me what that -- in New York, where you massaged and what that looked like?

A. He had one room that was the massage room. It was about the size of a spa room in a spa. It had high ceilings. It had dark tapestry on the walls. It was a very dark room. There was a very large picture of a naked woman whom I don't recall. That's all I remember.

Q. In the New York home, did you observe photos around the house?

A. I don't recall.

Q. In the Palm Beach home that we were talking about earlier, did you recall seeing photos in that?

A. Yes.

Q. And did you recall seeing photos of naked females in that home?

A. Yes.

Q. Approximately -- can you tell me where you would see those in the home?

A. I definitely saw them in his bathroom.

And I can't recall if they were in the main living areas.

Q. Did you see them in the stairwell up to the second story of the house?

A. I can't recall.

Q. Do you know who -- who the people were in those photos? Were you familiar with any of them?

A. No.

Q. Were you in any of those photos?

A. At one point, yes.

Q. And were you naked in that photo?

A. Topless.

Q. Do you recall seeing any naked photos of Virginia Roberts?

A. I do not.

Q. Where did you go next, after the New York visit?

A. I went to the Virgin Islands.

Q. And who told you that you would be going to the Virgin Islands?

A. He asked me if I wanted to go, and I said I would still like to go.

Q. And do you recall who you -- who went with you to the Virgin Islands?

A. I believe -- well, I know Virginia was

with me. Ghislaine was there. Jeffrey. And there were two other women that I don't recall their names.

Q. Did you travel on Jeffrey's plane to get to the Virgin Islands?

A. Yes.

Q. I want to show you again the flight log that you have there in front of you. If you can flip to --

MS. MENNINGER: I'm going to object to the foundation again.

BY MS. McCAWLEY:

Q. It's that same page that you were on. The date is the 11th.

A. Yes.

Q. Do you see the TEB to TIST there?

A. Yes.

MS. MENNINGER: Objection, leading. The questioning is testifying now.

MS. McCAWLEY: Can you let me finish my question, please?

BY MS. McCAWLEY:

Q. Can you tell me who the initials are there that you see that were on the plane?

MS. MENNINGER: Objection, foundation,

leading.

THE WITNESS: Jeffrey Epstein; Ghislaine Maxwell; AP and PK are the two women I do not recall; Virginia Roberts; and myself.

BY MS. McCAWLEY:

Q. Do you recall how you flew back from the location in the US Virgin Islands?

A. They put me on a commercial flight. I wanted to be home in time for Easter.

Q. When you say "they," do you recall who made those arrangements for you?

A. It could have been Ghislaine.

Q. Did you -- do you recall performing massages while you were in the US Virgin Islands?

A. Yes.

Q. Who was involved in -- was there more than one?

A. Yes. I massaged Ghislaine at one point. And I massaged Jeffrey, Virginia and I, both, on the beach.

Q. Were you dressed during the massage that was on the beach?

A. Yes. Bikinis probably, most likely.

Q. Do you recall what Virginia was wearing?

A. I believe she was wearing a bathing suit,

as well.
Q. Were you paid for the massage on the beach with Virginia?
A. At the end of -- before I left and flew home, Ghislaine gave me $1,000.
Q. You mentioned that you massaged -- you recall massaging Ghislaine on the trip to the USVI.
Do you recall when that took place?
A. I don't even recall what days we were there, so...
Q. Do you recall where it took place?
A. I believe it was -- well, either in my guest cottage or one of them. There were three guest houses set up that were all similar and that I was staying in. Virginia and I stayed in one together. And it was either in there or in another one that was identical.
Q. And was that massage performed with Virginia as well or by you alone?
A. I don't recall.
Q. Were there other females in the USVI on that trip with you besides Virginia?
A. Two others.
Q. And do you recall who they were?
A. I do not.

Q. Did you ever see Ghislaine Maxwell during that trip laying out by the pool?

A. There was one time where we were all by the pool, yes.

Q. Was Ghislaine Maxwell ever nude or topless by the pool?

A. I don't recall. She was nude when she went swimming in the ocean.

Q. At that moment in the USVI home, did you observe any photos there of nude females?

A. I don't recall.

Q. Besides Virginia, who you mentioned, you observed to be young, did you observe any other females that in your view appeared to be essentially under the age of 18?

A. No.

Q. Did you observe any females who you thought looked young, younger than you?

A. No.

Q. Do you remember an individual by the name of      that you met during your time with Jeffrey Epstein?

A. In Palm Beach?

Q. Yes.

A. Yes.

Q. Did you observe her to be young when you met her?

MS. MENNINGER: Objection, vague as to time.

THE WITNESS: All of the women were generally young. I did not know the ages of really anyone, so...

BY MS. McCAWLEY:

Q. How many massages did Jeffrey receive on average in a given day?

MS. MENNINGER: Objection, foundation.

THE WITNESS: Three a day.

BY MS. McCAWLEY:

Q. Let me back up for a moment.

How long did you work for Jeffrey and Ghislaine?

MS. MENNINGER: Objection, leading and foundation.

THE WITNESS: I believe it was five years, 2001 to 2006.

BY MS. McCAWLEY:

Q. And how many massages did Epstein receive per day on average?

MS. MENNINGER: Objection, foundation.

THE WITNESS: Three.

BY MS. McCAWLEY:

Q. Were the massages performed by the same girl or different females?

A. Different.

MS. MENNINGER: Objection, foundation.

BY MS. McCAWLEY:

Q. What did the females who performed the massages look like?

MS. MENNINGER: Objection, foundation.

THE WITNESS: They all looked different. Some of them were ethnic, some were blond, some were short, some were tall. Everyone was thin.

BY MS. McCAWLEY:

Q. Were the girls who performed the massages young or old?

MS. MENNINGER: Objection, foundation.

THE WITNESS: I don't recall anyone being old.

BY MS. McCAWLEY:

Q. Do you recall anybody being over the age of, say, 25?

MS. MENNINGER: Objection, form.

THE WITNESS: Yeah, I believe there was probably a few women that were older than 25.

MS. MENNINGER: I'm sorry. I get a chance

to object and then you can still answer. No one is going to stop you from answering. I just need to get the objection on the record, in the same way she needs to be able to talk before you. My apologies. I'm not trying to cut you off, but I am supposed to get it in before you answer.

BY MS. McCAWLEY:

Q. Did Jeffrey ever tell you why he received so many massages from so many different girls?

MS. MENNINGER: Objection, hearsay.

BY MS. McCAWLEY:

Q. You can answer.

A. He explained to me that, in his opinion, he needed to have three orgasms a day. It was biological, like eating.

Q. And what was your reaction to that statement?

A. I thought it was a little crazy.

Q. And what did -- do you recall what -- when you observed the other females giving massages, do you recall what they would dress like? Did they wear scrubs or did they typically wear normal clothes?

A. Normal clothes.

MS. MENNINGER: Objection, leading.
BY MS. McCAWLEY:
Q. Do you believe that from your observations, Maxwell and Epstein were boyfriend and girlfriend?
A. Initially, yes.
Q. Did Maxwell ever share with you whether it bothered her that Jeffrey had so many girls around?
MS. MENNINGER: Objection, leading, hearsay.
THE WITNESS: No. Actually, the opposite.
BY MS. McCAWLEY:
Q. What did she say?
A. She let me know that she was -- she would not be able to please him as much as he needed and that is why there were other girls around.
Q. Did there ever come a time -- did you ever take a photography class in school?
A. Yes.
Q. And did there ever come a time when Maxwell offered to buy you a camera?
A. Yes.
MS. MENNINGER: Objection, leading.
BY MS. McCAWLEY:
Q. Did Maxwell ever offer to buy you a

camera?

MS. MENNINGER: Objection, leading.

THE WITNESS: Yes.

BY MS. McCAWLEY:

Q. Was there anything you were supposed to do in order to get the camera?

MS. MENNINGER: Objection, leading.

THE WITNESS: I did not know that there were expectations of me to get the camera until after. She had purchased the camera for me, and I was over there giving Jeffrey a massage. I did not know that she was in possession of the camera until later.

She told me -- called me after I had left and said, I have the camera for you, but you cannot receive it yet because you came here and didn't finish your job and I had to finish it for you.

BY MS. McCAWLEY:

Q. And did you -- what did you understand her to mean?

A. She was implying that I did not get Jeffrey off, and so she had to do it.

Q. And when you say "get Jeffrey off," do you mean bring him to orgasm?

A. Yes.

Q. Did Ghislaine ever describe to you what types of girls Jeffrey liked?

A. Model types.

Q. Did Ghislaine ever talk to you about how you should act around Jeffrey?

A. She just had a conversation with me that I should always act grateful.

Q. Did Jeffrey ever tell you that he took a girl's virginity?

A. He did not tell me. He told a friend of mine.

Q. And what do you recall about that?

MS. MENNINGER: Objection, hearsay, foundation.

THE WITNESS: He wanted to have a friend of mine come out who was cardio-kickboxer instructor. She was a physical trainer.

And so I brought her over to the house, and he told my friend Rachel that -- he said, You see that girl over there laying by the pool? She was 19. And he said, I just took her virginity. And my friend Rachel was mortified.

BY MS. McCAWLEY:
Q. Based on what you knew, did Maxwell know that the type of massages Jeffrey was getting typically involved sexual acts?
MS. MENNINGER: Objection, foundation, leading.
THE WITNESS: Yes.
BY MS. McCAWLEY:
Q. What was Maxwell's main job with respect to Jeffrey?
MS. MENNINGER: Objection, foundation.
THE WITNESS: Well, beyond companionship, her job, as it related to me, was to find other girls that would perform massages for him and herself.
BY MS. McCAWLEY:
Q. Did Maxwell ever refer to the girls in a particular way?
A. At one point when we were in the islands, we were all watching a movie and she called us her children.
Q. Did anybody respond to that?
A. I don't recall.
Q. Did she ever refer to herself as a mother?
A. Yes, like a mother hen.

Q. Do you recall who was present at the time that she made that comment about children?

A. This was the second trip that I took to the Virgin Islands, so, no. I don't want to speak, you know, incorrectly. I can't remember. I can't really remember.

Q. Have you ever met David Copperfield?

A. Yes.

Q. And do you recall when you initially met him?

A. Yes.

Q. Can you tell me what that was?

A. Sure. Someone called me from the house and said that he would be there, and if I wanted to come have dinner, then I could meet him.

So when I arrived at the house, he wasn't there yet, but I waited with, I believe, Sarah Kellen, and there was another girl there which I had never met and never seen. She seemed young to me.

And I asked her what school she went to, kind of prodding to see if she went to one of the area colleges, and I did not recognize the name of the school.

And so I thought she could be younger than college age, but I had to assume for my own sanity

that she was a daughter of one of his friends.

Q. But it was possible she was the school -- is it possible that the school she referred to was a high school?

A. Yes.

Q. And what happened at that dinner, if anything?

A. He did some magic tricks.

Q. Did you observe David Copperfield to be a friend of Jeffrey Epstein's?

A. Yes.

Q. Did Copperfield ever discuss Jeffrey's involvement with young girls with you?

A. He questioned me if I was aware that girls were getting paid to find other girls.

Q. Did he tell you any of the specifics of that?

A. No.

Q. Did he say whether they were teenagers or anything along those lines?

A. He did not.

MS. MENNINGER: Objection, leading, calls for hearsay.

BY MS. McCAWLEY:

Q. Did you ever hear or observe Jeffrey

talking on the phone about Frederic Fekkai?
A. Yes.
MS. MENNINGER: Objection, leading.
BY MS. McCAWLEY:
Q. What did you hear?
A. I heard him call someone, and say, Fekkai is in Hawaii. Can we find some girls for him?
Q. And what was your reaction to that?
A. Well, I was massaging and I didn't have a reaction. I tried to remain reactionless the whole five years.
Q. Did Jeffrey ever take you shopping?
A. Yes.
Q. Can you describe for me what happened?
A. Sure. He took me to Victoria's Secret. I believe he picked out everything and went into the room with me, the fitting room, which was very odd.
Q. Did he make any comments about being in the fitting room with you?
A. He joked that one time he was in there with another girl, and she said something like "Dad." But that's all I recall.
Q. Did Jeffrey ever talk to you -- let me back up a moment.
Have you ever been propositioned by anyone

to have a baby for someone?
A. Yes.
Q. And who propositioned you?
A. Jeffrey asked me.
Q. Did he ask you more than once?
A. Yes.
Q. And what did he say?
A. Basically just said, I want you to be the mother of my baby.
Q. And do you recall your response to that?
A. Um, I don't believe that I said flat-out no. I didn't agree to it. I would just say, Oh, yeah, really? Okay.
Q. Did you ever bring other girls over as Maxwell had requested?
MS. MENNINGER: Objection, leading, hearsay, form.
THE WITNESS: One time.
BY MS. McCAWLEY:
Q. Let me back up a minute, just to make it a clean question.
Did you ever bring friends over to massage Jeffrey?
A. No.
Q. And why did you not bring friends over to

massage Jeffrey?

A. I was living in secret about what I was doing during the massages, and I did not want my friends to be -- to know what I was doing. So I did not want anyone else coming into that.

Q. Was Bill Clinton a friend of Jeffrey Epstein?

MS. MENNINGER: Objection, foundation.

BY MS. McCAWLEY:

Q. Let me back up.

Do you know if Bill Clinton was a friend of Jeffrey Epstein?

A. I knew he had dealings with Bill Clinton. I did not know they were friends until I read the Vanity Fair article about them going to Africa together.

Q. Did Jeffrey ever talk to you about Bill Clinton?

A. He said one time that Clinton likes them young, referring to girls.

Q. Did you ever -- do you recall ever taking a trip to Jeffrey Epstein's home in New Mexico?

A. Yes.

Q. And do you recall who you went on that trip with?

A. Sarah Kellen was there. Ghislaine was there. That's all I recall.

Q. Do you recall why you went on the trip to New Mexico?

A. To work.

Q. Did you perform massages on that trip?

A. Yes.

Q. Did you -- do you recall whether you performed massages with Sarah Kellen on that trip?

A. No.

Q. Do you recall in the New Mexico home ever observing nude photos of females there?

A. I don't recall.

Q. When you would provide massages, would you provide those massages naked?

A. On occasion.

Q. On average, would you be naked, if it was 100 percent of the time, more than 50 percent of the time?

A. Can you repeat it?

Q. Sure. When you're performing the massages, can you tell me -- you said on occasion. Over the five years that you worked for him, how often did you perform massages naked?

A. Somewhere between 25 and 50 percent of the

time.

Q. Did Epstein try to make the massages sexual?

A. On occasion.

Q. Would Epstein have you rub his nipples?

A. Yes.

Q. Would he masturbate during the massages?

A. Yes.

Q. Did he use sex toys or vibrators on you?

A. Yes.

Q. Would he leave the sex toys or vibrators out after the massage or would he clean up after himself?

MS. MENNINGER: Objection, vague, form.

THE WITNESS: He did not ever clean up.

BY MS. McCAWLEY:

Q. Do you believe that your experience during the years you were with Jeffrey and Maxwell damaged you?

MS. MENNINGER: Objection, leading, form.

THE WITNESS: It affected me. "Damaged" is a strong word.

BY MS. McCAWLEY:

Q. And in what way did it affect you?

A. It affected future relationships with men,

trust issues, expectation issues.

Q. Did you observe Nadia Marcinkova and Ghislaine at the house at the same time?

MS. MENNINGER: Objection, leading, form.

THE WITNESS: I don't recall.

BY MS. McCAWLEY:

Q. On the USVI trip, the second trip that you took, do you recall Nadia Marcinkova being present?

A. I believe she was present at that trip.

Q. Do you recall Maxwell being present on that trip?

A. Yes.

Q. Do you know an individual by the name of ?

A. Yes.

Q. And who is ?

A. She was one of the girls that was around.

Q. Was around both Jeffrey Epstein and Ghislaine Maxwell?

A. I don't recall.

Q. Do you recall where you first met

A. In Palm Beach.

Q. At Jeffrey Epstein's home?

A. Yes.

Q. And what -- do you recall any observations about when you met her?

A. To speak with, she was a little rough around the edges, and I could see the progression of her being groomed a little. They got her braces. She had terrible posture. And with a lot of massages, she learned to stand up straight. So I just saw her become a much more confident person.

Q. Do you recall how old she was when you first met her?

A. I assumed she was 18, but I do not know her age.

MS. McCAWLEY: We're going to take a break really quickly and then we will be back. So we are going to go off the record.

THE VIDEOGRAPHER: Off the record at 9:48.

(Thereupon, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER: On the record at 9:58.

BY MS. McCAWLEY:

Q. I'm just going to resume. I have a few more questions for you.

You mentioned visiting the US Virgin Islands.

Do you recall doing any activities with

Maxwell when you were on the visit to the USVI?
MS. MENNINGER: Objection, vague as to time.
THE WITNESS: I don't recall.
BY MS. McCAWLEY:
Q. Do you recall ever going hiking with her?
A. Yes.
Q. Did Maxwell ever ask you to try to bring other girls over for Jeffrey?
A. At that time?
Q. Yes.
A. No.
Q. Any other time?
A. Well, she had asked me if I knew anyone that could perform massages that would come to the house.
Q. And what was your understanding of that request?
MS. MENNINGER: Objection.
THE WITNESS: Well --
MS. MENNINGER: Form.
THE WITNESS: -- I just wondered why they wouldn't just call me.
BY MS. McCAWLEY:
Q. And did you bring anybody else over to

perform massages?
A. I did not.
Q. When you were either in the USVI or in Palm Beach, did you ever observe any females either topless or naked out by the pool?
A. Yes.
Q. What did you observe?
A. Mostly skinny-dipping.
Q. Do you know who the individuals were that you observed?
A. Sarah Kellen and Ghislaine.
Q. Anybody else?
A. Yes, but I don't recall who.
Q. Did that happen on more than one occasion?
A. Yes.
Q. How often do you remember making those observations?
A. Three times.
Q. Do you recall giving a statement to the police regarding Jeffrey Epstein?
A. Yes.
Q. Do you recall when you gave that statement?
A. I don't recall the date.
Q. Do you recall the year?

A. I want to say it was early 2006 or late 2005.

Q. Do you recall who you met with?

A. No.

Q. Do you recall what you told the police?

A. It was similar to this. They were asking me a lot of questions that I answered. They knew a lot. They knew what the bathroom looked like. They knew that the couch had a hot pink throw on it with green tassels.

I assumed that there had been videos and they had seen me. They had seen the videos. That's what I had assumed. I didn't know that maybe people had already come forward and given them statements.

Q. Did they talk to you at all about the videos?

A. They said, Were you aware that there were video cameras in the house?

I said, No, but it would not surprise me.

MS. McCAWLEY: And I'm going to mark as Exhibit 4 -- do you have an extra -- sorry. Did you get one? Okay. Giuffre 0002 through 89.

And I'm going to direct you to page 00076, and I'm going to hand it to you.

(The referred-to document was marked by the court reporter for Identification as Sjoberg Exhibit 4.)

BY MS. McCAWLEY:

Q. I'm just going to ask that you take a look at that. As you can see, under the narrative line there, there is a name. It says, "Reported by Recarey, Joseph." Is that a name you recall meeting with, a Detective Recarey?

A. Yes. I mean, I don't recall his name, only except that he had been following me around, and he left me cards, like, on my car and in my door. I tried to avoid him for a long time.

Q. And can you just look at the text underneath there?

A. Uh-huh.

Q. Take a moment to look at that.

A. Sure.

Q. Does that refresh your recollection as to what you told the police during the investigation?

A. There are errors in here. I was not 23 when I met him. I was 21.

Q. Anything else that doesn't look correct?

A. The same error: That I had met him three years ago, and it obviously had been closer to five.

There is also the error, he obviously misunderstood me: He did not pay for my tuition at college. I'm still paying those school loans. But he did pay for me to go to massage school and to cosmetology school.

Okay. It pretty much ends here.

Q. Yes. Right. About halfway through the page.

A. Okay.

MS. McCAWLEY: So, Johanna, that concludes my initial piece. I'm going to reserve the rest of my time for redirect. I'm going to turn it over to Laura.

MS. MENNINGER: Can we take just a little break?

MS. McCAWLEY: Sure, no problem.

THE VIDEOGRAPHER: Off the record at 10:05.

(Thereupon, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER: On the record at 10:14.

E X A M I N A T I O N

BY MS. MENNINGER:

Q. Hi.

A. Hello.

Q. We've never met before today, correct?
A. Correct.
Q. Can you tell me a little bit about your current job?
A. Sure. I just purchased a salon. I'm a salon owner. I'm a hairstylist.
Q. Congratulations.
A. Thank you.
Q. How long have you been a hairstylist?
A. For 10 years.
Q. And what did you do before that?
A. I briefly did massage in a spa for about a year and a half. And before that I was a nanny, and before that I was in school.
Q. And I believe you said you studied psychology in school?
A. Correct.
Q. Did you graduate?
A. Yes.
Q. With a degree in psychology?
A. Yes.
Q. Where did you get training to be a massage therapist?
A.

Q. And when did do you that?
A. That would have been, I believe, in
Q. And how long did you study there?
A. I think it was a six-month program.
Q. And you worked in a spa thereafter?
A. I did.
Q. What was the name of the spa again?
A.
Q. And are you married?
A. No.
Q. Do you have children?
A. No.
Q. And how old are you now?
A.
Q. Can you tell me about your first meeting with Ghislaine Maxwell?
A. Sure. I was sitting on a bench [redacted]. She approached me. I was getting ready to go to a class. It was my junior year. Yes, it was the second semester of my junior year. And she and another woman approached me. The other woman didn't speak that I recall.
And she asked me about -- she had a house in Palm Beach, and she was looking for someone that she could hire to work at the house, where she could

post that she needed help.

She then asked me if I knew anyone, and I didn't know who she was, I didn't want to take the responsibility of finding someone to work for her, and so I said, Sorry, I don't.

And then she said, Well, maybe what about you?

And I was at a point in life, I was super spontaneous and willing to skip school.

So she said, Come to my house, come in my car and check it out.

And so I did.

Q. Okay. So for those of you -- of us who don't know, is this like a college campus, like a traditional college campus, or is it in a city setting?

A. It's in a city setting. I mean, Palm Beach is not a big city. So it's on the Intracoastal, and there was a big grassy area that were surrounded by buildings, so she was inside of the campus.

Q. And she was looking for a bulletin board where she could post a job?

A. Something like that, yes.

Q. Did she have any kind of flyers --

A. Not that I recall.
Q. But that's what she asked you, for directions to a bulletin board where she could post a job?
A. Yes.
MS. McCAWLEY: Objection.
BY MS. MENNINGER
Q. And it sounds like you guys got into a conversation; is that fair?
A. Yes.
Q. Can you describe Ghislaine Maxwell's personality?
A. Well, I instantly picked up on the fact that she was British. She had on, like, workout clothes. I believe she was wearing all black. And she -- I mean, she was a little snarky, but I felt comfortable enough to get in the car with her.
Q. And it sounds like you had contact with her over the next several years; is that fair?
A. Yes.
Q. And did you get to know more about her personality over those five years, four or five years?
A. Yes.
Q. And can you describe her for me, how you

observed her personality to be?

A. Sure. She definitely had a great sense of humor, she loved making jokes. I mean, in a very British way. I don't remember her ever laughing, but she was funny.

And I remember just thinking, she -- the first weekend that we flew to the Virgin Islands, she flew the helicopter from Saint, wherever we were to little Saint Jeff [sic] or whatever the name of the island was, and I just thought, wow, who is this woman.

Q. Would you say that you respected her?

A. Yes.

Q. When you ended up getting in the car with her and this other woman and going back to the house, who was driving the car?

A. She was driving.

Q. And where did she take you?

A. She took me to the house in Palm Beach.

Q. And can you describe the house in Palm Beach?

A. Sure. It's at the end of El Brillo Way, on the Intracoastal. The house was either white or pink. It was pink at one time it may have been painted. It was nothing fancy, it was large, it was

like a beach house.
Q. And when you got there, do you remember meeting other people while you were there that first time?
A. I remember other people being in the home. I don't really remember who was there.
Q. Do you remember meeting, like, a butler or --
A. Potentially, a chef. Someone in the kitchen. Maybe a house manager, yeah.
Q. What was your impression of this other woman that was with Ms. Maxwell at this time?
A. Zero. She left zero impression on me.
Q. Age, height, hair color? Nothing?
A. I want to say she was brunette. Age, 20s. Yeah.
Q. And you were going for the purposes of checking out potentially working at this job?
A. Yes.
Q. It sounds like you met Jeffrey Epstein that first time that you did go to the house, right?
MS. McCAWLEY: Objection.
THE WITNESS: I believe I either met him that time or the next time. I can't recall.

BY MS. MENNINGER:

Q. Okay. And tell me about your first meeting with him.

A. Sure. I met him, I believe it was in the hallway right beside the kitchen. There was a hallway. It was actually more like a room, a pantry type of room. That's where all of the pieces of paper with the phone messages would lay.

And I remember sitting on the counter and speaking with him, and he was in a bathrobe, and he spoke with me about me being in college and studying psychology.

Q. And did you form an opinion of him in that first meeting?

A. I -- yeah. I believed that he was smart. He was personable and could speak to anyone.

Q. Did he give off any sexual vibes in the first meeting?

A. No.

Q. And where was Ghislaine when you were speaking with Mr. Epstein?

A. I don't recall.

Q. Do you recall going to a second floor of the home during that first meeting?

A. I don't recall. Ghislaine said at one

point, You might get a massage today. That was -- sorry, that was the second time when I was in the home working. And I just thought it was crazy that I would get a massage while I was working. But it did not end up happening because the masseuse could not stay.

Q. Do you know who the masseuse was that could not stay?

A. No.

Q. But that didn't happen on the first meeting; you believe that was the second meeting?

A. Yes, that was when I was there to work.

Q. How long -- how did the first trip to the house end?

A. She gave me her phone number, and she took my phone number, and she took me back to school.

Q. And were you full-time at school at the time?

A. Yes.

Q. And how many classes were you taking, if you remember?

A. Probably four or five.

Q. How did you -- how long was it before you heard from Ms. Maxwell again?

A. Within probably three days.

Q. And how did she contact you?
A. She called me on my -- at that time I had a cell phone. It could have been on my cell phone. It could have been on my house phone. We had house phones back then.
Q. I remember.
Where were you living at the time?
A. I was in an apartment in West Palm Beach.
Q. And did you have a roommate or with family?
A. I had a roommate.
Q. So when Ms. Maxwell called you on whatever phone it was, do you remember what she said?
A. Yeah. She said, Do you want to come over and work on Sunday?
Q. And what did you say?
A. I said, Sure.
Q. And did you?
A. I did.
Q. How did you get there?
A. That I don't recall, because I did not have a car.
Q. Did you --
A. I think my roommate dropped me off, honestly. I can remember what I was wearing.

Q. You do?
A. I do.
Q. What were you wearing?
A. I had a -- I still have the shirt. It's an old, weathered, blue, North Carolina Tech Tar Heels T-shirt.
Q. Because you -- did Ms. Maxwell explain to you what you would be doing on that Sunday when you came to work or was that part of the prior conversation?
MS. McCAWLEY: Objection.
THE WITNESS: About what I was wearing?
BY MS. MENNINGER:
Q. No. About what you were going to do at work.
A. She had explained that she just wanted someone to help out around the house, answering phones, you know, grabbing drinks if someone wanted a drink, running errands.
Q. And so you dressed appropriate to what you believed --
A. I did not know how to dress properly, apparently. I should not have worn that. But I was in college.
Q. Did anyone say anything to you?

A. No.
Q. So when you got there, what happened? This is your second time to the house, but your first time working, right?
A. Yes.
I was probably introduced to a few people that were there. I mean, I was there for several hours. Do I recall every minute? No. I just recall when I would actually have to work, answer the phone, pour some drinks for people. Just water; they didn't drink alcohol. And run errands. There were a few errands that I ran.
Q. You described those errands earlier?
A. I did. In her car.
Q. You used her car?
A. Yes.
Q. What kind of car was it?
A. It was a Mercedes convertible.
Q. Did anyone go with you?
A. No.
Q. You described a shopping trip. Was that in the same car?
A. Yes.
Q. Was that a separate trip than when you went to run errands?

A. Yes. That's when Ghislaine went with me and she drove.

Q. Okay. So you ran errands, came back, more than once?

A. Twice.

Q. And then you went on a shopping trip?

A. Yes.

Q. During the time you were at the home, was there anything that made you suspicious?

A. No.

Q. Or leery?

A. No.

Q. You mentioned there may have been some discussion of a massage. Do you recall that discussion?

A. I had never had a massage before. So she just said there was a massage therapist coming and I may get one.

Q. Did she say who it was?

A. No.

Q. So when you went shopping on this trip, you said Ghislaine drove the car and you went with her. Was anyone else there?

A. No.

Q. And where did you all go?

A. We went to Worth Avenue in Palm Beach, but because it was Sunday, the stores were closed.
Bless you.
MR. LOUIS: Thank you.
THE WITNESS: So from there, we went to -- I believe it was Palm Beach Daily News, which was like a little book store. And I remember her purchasing reading glasses for Jeffrey and some magazines.
BY MS. MENNINGER:
Q. Were those things for the home?
A. Yes.
Q. And earlier on your errands, you had been purchasing things for the home or office?
A. Yes. Yes.
Q. Besides the printer cartridge, ink cartridge, do you remember anything else?
A. Well, yes. Like they wanted specific magazines. I don't know if it was, like, Scientific American or something to that effect. It was wasn't, like, Playboy.
Q. Okay. Did you ever answer phones?
A. Yes.
Q. When did you answer phones?
A. That day.

Q. Do you remember anything notable about the phone calls?
A. I just remember I always had to say, He's unavailable, can I take a message?
Q. And where did you take a message?
A. On a little notepad next to the phone.
Q. Do you recall any small children calling the house that day?
A. No.
Q. Were you speaking to anyone about their school experience or anything like that?
A. No.
Q. Did you take any messages for famous people?
A. They could have been famous and I would have been clueless.
Q. Did you take messages at any other point during the time that you worked with Jeffrey?
A. No.
Q. And you said you remember at the end of that day being paid by Ghislaine?
A. Yes.
Q. And you were paid for doing the errands and answering phones and whatever else you did?
A. Yes.

MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Did you do anything else that day in terms of errands or things around the house that you remember?
A. Not that I recall.
Q. Did you come back to answer phones and do errands any other day?
A. No.
Q. That was the only day you did it?
A. Yes.
Q. All right.
Tell me the second time -- how long was it before you got another sort of contact from anybody at the home?
A. Okay. Well, after that -- I remember actually that day of working, I sat with Ghislaine outside on this -- outside table on the patio by the pool. I told her that I was getting ready to go to Nicaragua for spring break on a mission trip. I remember her going, Why would you ever go to Nicaragua? So I was going to be gone the next week for spring break.
So she called, after I returned, and asked if I wanted to make $100 an hour rubbing feet.

Q. Was that the whole conversation?

A. That was pretty much it. I said, Okay, sure, tell me when.

Q. And were you excited about the prospect of rubbing feet and making $100?

A. I was actually with -- while I was on the trip in Nicaragua, I was rubbing feet, I was massaging people, their feet. So it just seemed kind of crazy that it all happened at the same time.

Q. How was it rubbing feet?

A. I guess I just liked doing it. I didn't know that I did, but I was massaging people's feet.

Q. Were these strangers?

A. No, no, no. They were -- it was a group of us that went on the trip. So we were all very close.

Q. What kind of trip was it?

A. It was a -- well, a PBA, you had to do these things called Workship hours, which you had to do community service, 40 hours every year. And so that was the way to do them all, and you would go on these trips and help build a school or feed children or do some sort of -- something nice.

Q. Nice.

What other trips did you take while you

were there?
A. I did a trip and worked with Habitat for Humanity in Baltimore. And then I went back to Nicaragua the next year and did the same thing.
Q. Very nice.
And you were there for a whole week?
A. Yes.
Q. All right.
So you got a call from Ghislaine after you returned?
A. Yes.
Q. And that's when she asked you about rubbing feet?
A. Yes.
Q. And did she tell you when she would like you to come over?
A. It was either that night or the next day.
Q. And do you know how you got there?
A. No.
Q. Do you know what you were wearing?
A. No, I don't remember.
Q. When you got there, I think you said you don't remember if Ghislaine was actually there the second time?
A. I want to believe that she was there

because she was my main contact, and so I would assume that she was probably at the house and greeted me; however, I do not recall if she was there.

Q. It sounds like you met Emmy Taylor?

A. Yes.

Q. How did you meet Emmy Taylor?

A. She was at the house the first day that I worked running errands. And I realized she was also a personal assistant type of person.

Q. Do you know who she worked for?

A. She, well, Ghislaine, it appeared to me that she worked for Ghislaine. Ghislaine sort of told her what to do and where to go.

Q. And I believe you mentioned she called her her slave?

A. She did. It was in a joking way, but she said, Yes, that's my slave.

Q. You did not see her in any type of slavery situation?

A. Not any chains or anything of the sort, no.

Q. So tell me what you remember about the second time you went.

A. The third time?

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. I'm sorry. You're right. Third time. The second time you went to work, but the third time you were there.

A. Correct.

So I was escorted up to the bathroom, which is where 99 percent of the massages happened. And Emmy Taylor was with me and Jeffrey. And I don't remember the order, but Emmy was on the table at one point. She took all of her clothes off, got on the table.

I remember thinking, Okay, she's just going to strip naked and get on the table. Well, that's cool. We're cool. That's what we do.

And Jeffrey was showing me how to massage on her body. And then I took my clothes off and got on the table, and then they showed me what it felt like with the both of them.

And then Jeffrey got on the table and Emmy showed me how to massage.

Q. So Ghislaine was not in the room?

A. No.

Q. You said that 99 percent of the massages took place in the bathroom.

Did you see massages take place in other places of the house at all?

A. Did I see any? No, besides us maybe hanging out on the couch and someone massaging his foot or me massaging his foot. But not, like, on a table.

Q. So just casual foot-rubbing might happen elsewhere in the home, but not a full-blown, full body massage?

MS. McCAWLEY: Objection.

THE WITNESS: Yes.

BY MS. MENNINGER:

Q. Did you see any full-blown, full body massages out by the pool?

A. Not that I recall.

Q. And do you remember ever giving any yourself?

A. By the pool?

Q. Out by the pool, yes.

A. On a table?

Q. Yes.

A. No.

Q. All right.

You said that you had subsequently been trained as a massage therapist, correct?

A. Correct.
Q. Would you describe it as normal massage protocol for a person to be naked under a towel during a massage, a regular massage?
MS. McCAWLEY: Objection.
THE WITNESS: Naked under a towel during a massage, the person getting massaged?
BY MS. MENNINGER:
Q. Yes.
A. Yes.
Q. And as a massage therapist, you're trained how to drape the person so that they're covered in the right places, correct?
A. Yes.
Q. So when you were being trained by Emmy and Jeffrey on some massage techniques, did anyone say anything sexual during that conversation?
A. Not that I recall.
Q. What was the mood like? Was it, you know, laughing?
A. Yes. Comfortable.
Q. And just to clarify, the people who were giving the massages at the various points in time were clothed while they were doing that, correct?
MS. McCAWLEY: Objection.

BY MS. MENNINGER:
Q. In this period you just described with Emmy Taylor and Jeffrey in a bathroom upstairs on your third visit to the house, people giving the massages had their clothes on, correct?
A. Correct.
Q. All right.
What was the next time you remember coming to the house there?
A. The next time was to do a massage. All by myself.
Q. Okay. And how did that one come about?
A. Hmm, someone must have called me, but I don't remember who.
Q. And to whom did you give the massage on this next visit to the house?
A. Jeffrey.
Q. Was Ghislaine present during that massage?
A. No.
Q. Did anything unusual occur during that massage?
A. After.
Q. What happened? After the massage?
A. He asked me how well do I orgasm. And I said, I don't, I'm a virgin. And he was quite

surprised.

Q. Where were you when you were having this discussion?

A. In the bathroom.

Q. Were you clothed?

A. Yes.

Q. Was he clothed?

A. I don't remember him being naked. He was probably either wrapped with a towel or in a bathrobe.

Q. Were you caught off guard by this question?

A. Yes.

Q. Was that the first time anyone had said anything sexual to you during this --

A. Ever? Yes.

Q. Did he say anything else that you recall during that conversation?

A. I mean, we had a little bit of a conversation about it, but I don't recall specifically.

Q. And how did that massage encounter end?

A. Normal. There was nothing I had to do, just normal massage.

Q. Did he pay you?

A. Yes.
Q. How much did he pay you?
A. $200.
Q. How did he pay you?
A. Cash.
Q. And where was the cash?
A. I don't recall specifically. It was either -- he brought it upstairs with him or it would have been down on his desk.
Q. And I'm assuming that you had other massages that you gave him under similar circumstances in the next years, right?
A. Many, right.
Q. So recalling this particular one is not sticking out in your mind?
A. Yes.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Do you remember the next time after that?
A. I don't. I mean, from there, it's just a blur of random invites to come over and do it. Massage was, like, I would see him maybe three days a row, and I wouldn't see him for two months. It would be kind of that irregular schedule.
Q. Do you ever recall a time where you came

over every day for three weeks in a row?

A. No.

Q. Were you paid $200 per massage?

A. Yes.

Q. And how long did the massages last?

A. Anywhere from 30 minutes to an hour and a half.

Q. Did you ever give a four-hour massage to him?

A. Good grief, no, not that I recall.

Q. Have you ever given a four-hour massage to anyone in your whole life?

A. No, I haven't.

Q. Tell me how the whole idea of traveling to New York came up.

A. I actually was not home. They called my -- my apartment. My roommate answered. When I got home, she said, You need to call Jeffrey Epstein immediately. He wants to take you to New York, but they are leaving at 4:00.

And I was excited because I had never been to New York.

Q. Are you from

A. I am.

Q. But you never went to New York?

A. Just flying over it.

Q. When you said they called, do you know who called your roommate?

A. I don't know who called my roommate.

Q. In this sort of pre-trip to New York period, do you recall discussing any of the particulars of your massages with Jeffrey, with Ghislaine?

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. If that makes sense.

A. No.

Q. So before you got this call, had anyone mentioned the idea of traveling to you?

A. No.

Q. Did you call Jeffrey immediately?

A. I did.

Q. And what conversation did you have with him?

A. Basically he said, I want to take you to -- to New York City. Can you be here quickly?

And I got to the house, and he said, Do you have your passport?

I said, No.

He said, Go get it.

So I went back and picked up my passport, and went back to the house before we went to the airport.

Q. And why did you need your passport?

A. I was ready to find out. I had no idea.

Q. This was the spontaneous phase?

A. Exactly.

Q. So you went and got your passport. You came back. And then what happened?

A. Then we went to the airport.

Q. And who is we?

A. So, I don't remember the ride to the airport, but the people that I recall being on the plane was Jeffrey, Ghislaine, Virginia and I.

Q. And when was the first time you met Virginia?

A. I believe it was that day.

Q. In your previous visits to the house, had you seen her there?

A. Not that I recall.

Q. And what was your impression the first day you met her?

A. She seemed young and blond and cute.

Q. What was her personality like?

A. I honestly don't recall her personality.

Bubbly.

Q. Did you see her in the plane or on the trip to New York engaged in any kind of affectionate or sexual contact with Jeffrey?

A. No.

Q. With Ghislaine?

A. No.

Q. How did it come to be that you were in a casino in Atlantic City?

A. We, as we were flying, Jeffrey said, Why don't you go sit in the cockpit to check out the landing?

So we were sitting there, and the pilots told me to go back and tell him that we can't land in New York and that we were going to have to land in Atlantic City.

Jeffrey said, Great, we'll call up Trump and we'll go to -- I don't recall the name of the casino, but -- we'll go to the casino.

Q. And what happened with an ID issue?

MS. McCAWLEY: Objection:

THE WITNESS: All I knew is that she was not going to be allowed to gamble, and so I spent time with her. We were just walking around. I don't remember what we did. Because

either she didn't have an ID or she was too young. I don't remember specifically why. I just knew that she could not gamble.

BY MS. MENNINGER:

Q. Okay. So you walked around with her in Atlantic City?

A. Uh-huh. In the casino. We never left the casino.

Q. Were you disappointed that you couldn't gamble?

A. No.

Q. When you were walking around and talking to her, did you learn anything about her?

A. Not that I recall.

Q. Did you have an impression about why she was on the trip?

A. At that point, no. I was so new to the whole thing, I was just trying to figure out my position and who everybody was. At that point, I had no idea -- I didn't know anything sexual was happening at all. So I just felt like she was just another visitor.

Q. Did she tell you at that time that she had been to New York with Jeffrey before?

A. Not that I recall.

Q. Did she tell you anything about Ghislaine during that walk-about?
A. No.
Q. And then you all traveled on to New York that same night?
A. Yes.
Q. How long were you in New York for that visit?
A. It was maybe two nights.
Q. And where did you sleep at night?
A. I slept in one of the guest rooms at his townhouse on 71st Street.
Q. And did you stay in the same room as Virginia?
A. No.
Q. Do you know where she stayed?
A. No.
Q. All right.
And then when you got into Manhattan, how did it come to be that you were doing some sightseeing?
A. Well, they knew that I had never been, so I believe Jeffrey asked the driver and Emmy just to drive me around to see the Empire State Building. That's all I remember. It was late. It was dark.

It wasn't long, maybe 30 minutes.
Q. When you got back to the house, what happened?
A. I walked into the front door, and Ghislaine stuck her head over the grand staircase and asked me to come upstairs into the living room.
Q. And can you describe the living room?
A. Oh, it was very large and very formal. And Jeffrey and her and Virginia and Prince Andrew were there.
Q. What were they all doing when you came in?
A. Just socializing. I don't remember them doing an activity. It was just being together.
Q. Was anyone unclothed?
A. No.
Q. Was this the same room where Jeffrey had a desk?
A. It could have been, but I can't remember.
Q. Did you go to New York more than one time?
A. Yes.
Q. How many times did you go to New York?
A. Two times.
Q. This was the only time that you met Prince Andrew in New York, though?
A. Yes.

Q. When you came upstairs, where was Virginia sitting?

A. I don't remember.

Q. Do you remember what she was wearing?

A. No.

Q. She was already there when you got back from sightseeing?

A. Yes.

Q. Tell me what happened with the caricature.

A. Ghislaine asked me to come to a closet. She just said, Come with me. We went to a closet and grabbed the puppet, the puppet of Prince Andrew. And I knew it was Prince Andrew because I had recognized him as a person. I didn't know who he was.

And so when I saw the tag that said Prince Andrew, then it clicked. I'm like, that's who it is.

And we went down -- back down to the living room, and she brought it in. It was just funny because -- he thought it was funny because it was him.

Q. Tell me how it came to be that there was a picture taken.

MS. McCAWLEY: Objection.

THE WITNESS: I just remember someone suggesting a photo, and they told us to go get on the couch. And so Andrew and Virginia sat on the couch, and they put the puppet, the puppet on her lap.

And so then I sat on Andrew's lap, and I believe on my own volition, and they took the puppet's hands and put it on Virginia's breast, and so Andrew put his on mine.

BY MS. MENNINGER:

Q. And this was done in a joking manner?

MS. McCAWLEY: Objection.

THE WITNESS: Yes.

BY MS. MENNINGER:

Q. Do you recall a photo being taken of that event?

A. Yes.

Q. You've never seen the photo?

A. No.

Q. You don't know whose camera it was?

A. No.

Q. Virginia was sitting on the couch next to Andrew, not in a big leather armchair?

A. Maybe. I'm just trying to remember how I remember it.

Q. To the best of your recollection, you went and sat on Andrew's lap, correct?

A. Yes.

Q. On his knee?

A. Yes.

Q. And Virginia was not sitting on his knee, correct?

A. I don't recall. I just remember I was -- she might have been on his other knee, like Santa. I don't remember.

Q. After that, do you remember any other pieces of that social engagement?

A. No.

Q. Do you know where you went?

A. From there, I went to bed.

Q. Were people drinking?

A. No.

Q. Did you hear Ghislaine Maxwell tell Virginia to do anything while you were in that room?

A. No.

Q. Do you recall what happened the next day in New York?

A. Bits. I mean, that was the day I went to Victoria's Secret. I went and walked around by myself and went to a souvenir shop, got a mug or

something. That's all I recall.
Q. Did you go anywhere with Virginia?
A. Oh, my gosh, yes. We went to Phantom of the Opera.
Q. Who else went?
A. I think it was just she and I. I forgot about that. Thank you for that memory.
Q. It's my job.
Anything else you remember about that day in New York?
A. No.
Q. You said you had given a massage to Jeffrey while you were there on that trip or was it a subsequent trip?
A. That trip.
Q. And how did that come to be?
A. Either he or somebody asked me to go and do it. Someone showed me to the room, but I don't remember who it was.
Q. Can you describe that room?
A. Yes. It was high ceilings, dark. There were, like, dark red walls or dark blue walls or dark blue carpeting or something. It had a massage table set up in the middle, and there was a large -- I want to say like a 15-foot photo, either photo or

painting of a naked girl.
Q. Pornographic or artistic?
A. No. No, I wouldn't say pornographic. Artistic.
Q. Artistic.
Was Ghislaine present during that massage?
A. No.
Q. Did something about that particular massage session stand out to you?
A. Yes. That was when I was first asked to squeeze and rub his nipples while he pleasured himself.
Q. And did he say that's what he was going to do?
A. He -- yes, he was just very blunt about it. He said, Rub my nipples, I'm going to jerk off.
I was like, No, done.
Q. And you walked out?
A. I did.
Q. Were there any repercussions of you walking out?
A. Amazingly, no. Knowing what I know now, I'm surprised I was ever called back. But, no, I just stood my ground and walked out. I'm not comfortable with that.

Q. Do you know personally whether anyone else had said no to him?
A. No.
Q. Did anyone ever tell you that they had been in a massage scenario and told him no?
A. No.
Q. Do you recall when in your trip the massage occurred?
A. Well, it was not the day we landed. It must have been that next day that we were there.
Q. Do you remember anything else about Virginia from that trip other than the Prince Andrew thing and Phantom of the Opera?
A. Well, we were getting ready to leave to go to the airport, and we were waiting. She and I sat on the steps in the foyer. I do remember just kind of asking a few questions to try to understand her role, because at that point now I knew what he wanted from me in the massage. And -- but she did not make it clear to me that she was participating in that. So I was prodding gently to see if there was anything happening that shouldn't have been, because I was getting the impression that she was -- she told me she was 17.
Q. She told you she was 17?

A. Uh-huh.
Q. How did that come up?
A. I asked her.
Q. Was anyone else present during this conversation?
A. No.
Q. You mentioned in your earlier testimony that she seemed orphan-like.
A. Yes.
Q. But you said that was something you had said to Ms. McCawley, correct?
A. Correct.
Q. That was not said at the time?
A. Right. No. At the time I was getting an impression that she did not have a family or she had walked away from her family. And it seemed to me, you know, they had just sort of adopted her, not as a child, but they would take care of her.
Q. Did you observe anyone speaking to her as a child, like make up your bed?
A. No.
Q. Did you observe whether she was using drugs during that trip?
A. No.
MS. McCAWLEY: Objection.

BY MS. MENNINGER:
Q. Did you ever observe her using drugs?
A. Not that I recall.
Q. Did she tell you that she was using Xanax?
A. No.
Q. Cocaine?
A. No.
Q. Ecstasy?
A. No.
Q. Heroin?
A. No.
Q. When was the second trip you took to New York?
A. Later. Maybe 2005. I don't know. I could look in the flight record.
Q. That's all right.
A. I don't remember exactly.
Q. That's all right.
You just recall it being several years or so after?
A. Yes. Several years later.
Q. And just so I'm clear, can you just list for me the places you recall traveling with Jeffrey?
A. Yes. That first trip was New York and the Virgin Islands. And then not again until around

2005, we went to New Mexico and to New York City and the Virgin Islands.

Q. So you were in New York twice and the Virgin Islands twice and New Mexico once?

A. Yes.

Q. Anywhere else?

A. No.

Q. Were those primarily on the private plane?

A. Yes.

Q. You said you flew commercially once to get back?

A. Yes.

Q. Did you recall any other commercial flights?

A. He bought a couple of flights for me when I wanted to go up to New York for personal reasons. One time I went to New York commercially, and I was there with friends, but I did go over to his house while I was in the city.

Q. And that's not the trip to New York?

A. No. Separate.

Q. Would you characterize your relationship with Jeffrey as friendly?

MS. McCAWLEY: Objection.

THE WITNESS: Yes.

BY MS. MENNINGER:

Q. If you asked him to buy a ticket to New York, that might be something that he would do?

A. I never asked him to do anything for me, but I told him I was interested in something, and he always offered.

Q. The second trip to New York, anything memorable about that? The one -- I'm sorry, the one that you mentioned that was with Jeffrey.

A. I do recall Nadia being there. While I massaged, she gave him a facial, but nothing sexual happened.

Q. And do you recall if Ghislaine was part of that trip or not?

A. I remember her being in New Mexico.

Q. What do you remember about her being in New Mexico?

A. I remember she took me to -- when they were building the ranch, they had a little three-bedroom home, just like a prefab house. She took me over there. So we went for a little walk.

I remember she had two new puppies named Max and Mini, little Yorkies. And I want to say that it was around Jeffrey's birthday when we were there, but nothing -- there was no, like,

celebration or cake with candles. It was just another day.

Q. You said that the Virgin Islands were a part of that second trip, as well?

A. Yes.

Q. And do you remember Ghislaine being part of the Virgin Islands the second time?

A. Yes. That's when she called -- went to bed and kissed us all on the head and called us her children.

Q. Who were the other participants in that session?

A. That's who -- I don't recall who was there. I want to say that Nadia was.

Q. But Virginia was not there?

A. Virginia was not there.

Q. Do you recall the point in time in which Virginia went away?

A. Sort of. After the trip to New York, I was given her phone number to call. And I remember one time I tried to get ahold of her. Her boyfriend answered. A boyfriend, I would assume, and he sounded like he was high. And I couldn't find out where she was. And then from there on, she was out of the picture.

Q. Do you recall how long after the New York trip that occurred?
A. I would say it was probably within a month or two.
Q. Did she tell you she was working elsewhere?
A. No.
Q. Did you ask her?
A. No.
Q. Did she mention that she was a waitress?
A. No.
Q. And worked at Taco Bell?
A. Huh-huh.
Q. Did you speak to her boyfriend or a boyfriend at any other time associated with her?
A. No.
Q. Did you meet her boyfriend?
A. No.
Q. Her fiancé?
A. No.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. When you were on the plane with Jeffrey during these two trips, he was present on all of those flights?

A. Yes.
Q. Did you observe any sexual behavior happening on the plane?
A. No. He told me a story of something that had happened one time.
Q. Did it involve Ghislaine Maxwell?
A. No.
Q. Did it involve Virginia Roberts?
A. No.
Q. And you didn't see anything?
A. No.
Q. You did give massages to Ghislaine Maxwell, correct?
A. Yes.
Q. On how many occasions?
A. Maybe somewhere between five and 10.
Q. Was that over the course of the five years?
A. Yes.
Q. Was there some point during that five years where Ghislaine Maxwell was not around as much?
A. Yes.
Q. Do you recall when that was?
A. In the middle.

Q. Did you know why that might be?
A. No.
Q. Is that about the time that you started seeing Nadia more frequently?
A. Yeah, I guess she was probably in the picture more. Her and Sarah both had kind of been around the most.
Q. Did you observe Nadia or Sarah appearing to act like Jeffrey's girlfriend?
A. Nadia, not Sarah.
Q. What did you observe?
A. She was just very loving, kissing him.
Q. Did you know how old she was?
A. I didn't know.
Q. So you gave massages to Ghislaine five or 10 times. Was there anything unusual about those massages?
A. No.
Q. You've been quoted in the press perhaps as saying that she wasn't very picky?
A. About massage?
Q. About her massages.
A. Not like Jeffrey, I guess. I mean, saying that meant that, you know, I would do whatever I wanted to do in the massage; whereas, Jeffrey was,

like, Do my foot, do my leg. He would kind of narrate what he wanted. She just wanted a massage. So if that makes sense.

Q. She may have been naked under a towel --

A. Definitely.

Q. -- in a regular massage fashion?

MS. McCAWLEY: Objection.

THE WITNESS: Yes. Actually, I do recall an instance where I was massaging her and Jeffrey came into the room and he did something sort of sexual to her, whether it was fondling her or slapping her butt or something, and she brushed him off like she was embarrassed.

BY MS. MENNINGER:

Q. So she never asked you to touch her in a sexual manner, correct?

A. No.

Q. And she did not rub her breasts on you, for example?

A. No.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. She did not demand that you perform oral sex on her?

A. No.

Q. Did she did not demand that you undress during your massages?
A. No.
Q. There was nothing from her that was sexual during the massages that you gave to her?
MS. McCAWLEY: Objection.
THE WITNESS: Correct.
BY MS. McCAWLEY:
Q. Do you recall when the last time you gave her a massage was?
A. I don't recall.
Q. Do you recall meeting with her in about 2006 when she was in town for some helicopter training?
A. I do recall that.
Q. Do you recall giving her some massages during that period?
A. Yes.
Q. Do you remember going out to dinner with her and to a movie?
A. I remember to a movie, and I don't remember if we went to dinner. I remember her cooking dinner. That was another way she impressed me: She knew how to cook like a chef. She had done some culinary training.

Q. And you guys had a normal type conversation?
A. Yes. It was very fun.
MS. McCAWLEY: Objection.
MS. MENNINGER: I would like to take about a 5-, to 10-minute break, if that's okay.
THE VIDEOGRAPHER: Off the record at 11:05.
(Thereupon, a recess was taken, after which the following proceedings were held:)
THE VIDEOGRAPHER: This is the beginning of Disk 2. On the record at 11:25.
BY MS. MENNINGER:
Q. Hi. I believe when we left off I was asking you about massages that you gave to Ghislaine.
Did Ghislaine pay you when she got a massage from you?
A. Yes.
Q. Do you know how much she paid you?
A. I believe it was 200. It was the going rate.
Q. The same as you were getting paid by Jeffrey, correct?
A. Yes.

Q. Ghislaine was not present when you were giving massages to Jeffrey, correct?

MS. McCAWLEY: Objection.

THE WITNESS: Correct.

BY MS. MENNINGER:

Q. At some point Jeffrey became more aggressive with you, correct?

A. Correct.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. At what point was that?

A. In the last year.

Q. And what does that mean to you, "became more aggressive"?

A. He was pressuring me to do more than I was comfortable with doing.

Q. Is that what ultimately caused you to leave working for Jeffrey?

A. What caused me to leave was when it was made public what I was doing.

Q. What do you mean by that?

A. Well, after I had spoken with the police report -- the police and there was a police report, I did not realize that was public knowledge, journalists would get a hold of. So at one point

the news channel 12 showed up at my door asking me questions.

Q. When Jeffrey was pressuring you to do more than you felt comfortable with, did you observe him being more aggressive in general? Outside of the massage context?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Do you know whether he was taking any type of steroids?

A. No.

Q. Did you ever see him wearing a patch or something like that?

A. I don't recall.

Q. Did you tell anyone that Jeffrey was becoming more aggressive with you contemporaneous with when it was happening?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. When Jeffrey asked you to do other things besides a normal massage, did he offer to pay you additionally?

A. Yes.

Q. How much?
A. One hundred dollars extra.
Can I clarify?
Q. Absolutely.
A. He didn't ever say he would pay me more, but when the massage was more than just a massage and it was sexual, then he would pay me more.
Q. It wasn't a discussion; it's just what happened?
A. Correct.
Q. Thank you for clarifying.
The things that took place with you and Jeffrey behind closed doors were when you were a consenting adult, correct?
A. Yes.
MS. McCAWLEY: Objection.
THE WITNESS: Correct.
BY MS. MENNINGER:
Q. And you did not have knowledge of what took place with other women behind closed doors and Jeffrey, correct?
MS. McCAWLEY: Objection.
THE WITNESS: Correct.
BY MS. MENNINGER:
Q. Do you recall giving an interview to a

reporter from the Mail on Sunday?
A. Yes.
Q. You told that reporter, I believe, that the police report painted a picture that it was a big orgy all the time, but it wasn't?
A. What I saw, I did not see anything out in the open sexually. Me, personally.
Q. Right. You did not see orgies happening in the pool, for example?
A. No.
Q. You did not see people engaging in sexual conduct out in the open areas of the home, correct?
A. Right.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. When you became aware of the allegations against Jeffrey, those came as a surprise to you, correct?
MS. McCAWLEY: Objection.
THE WITNESS: Correct.
BY MS. MENNINGER:
Q. And the surprise was that it involved underaged girls making that allegation, correct?
MS. McCAWLEY: Objection.
THE WITNESS: Correct.

BY MS. MENNINGER:
Q. You were asked some questions with Ms. McCawley about nude photographs that were present in the home? Homes?
A. Uh-huh.
Q. In Palm Beach, I believe you said there were some in the room where the massage table was?
A. Yes.
Q. Can you tell me what you recall seeing?
A. It wasn't candid photos. They were all, like, staged.
Q. Like a model?
A. Yes. And my -- I don't recall necessarily knowing any of the people in those photos. I remember at one point there was a photo of myself, but...
Q. Were they fully frontally nude or were they staged, like, with, you know, parts of bodies showing?
A. I really only remember topless photos. I don't remember full frontal photos.
Q. So exposing the breasts, but not exposing the genitalia?
A. Not that I recall. And Ghislaine's bathroom, I believe there was a photo of her

topless, or a painting.
Q. A painting?
A. Uh-huh.
Q. Did you see any nude or semi-clad photos of young girls?
A. No.
Q. Preteens, for example?
A. No.
Q. Something you would consider child pornography?
A. Never.
Q. Other than in the bathroom or the massage room at the Palm Beach home, do you recall any other place in the Palm Beach home where you saw any of these topless photos of women?
A. I remember there being photos everywhere, and the ones that stick out in my memory are the ones -- there was a photo of Ghislaine with the Pope. It would not surprise me if there were naked photos around. I just didn't retain them in my memory.
Q. So when you say there were photos everywhere, you mean just photos in general?
A. Yes. They had a lot of photos around the house.

MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. And Ghislaine was not topless in a photo with the Pope, just so I'm clear?
A. Correct.
Q. I just want to make sure we get that record really clear.
So you recall there being photos everywhere; you just remember a couple sticking out in your brain as being topless?
A. Yes.
Q. And the walls on the staircase to the upstairs were not just covered with nude photographs, to your recollection?
A. To my recollection, I just -- I don't remember.
Q. Did you observe what you would consider to be child pornography on any computer in the home?
A. No.
Q. Did you observe anyone taking photographs of young girls in the home?
A. No.
Q. The photograph of yourself that you saw, was that something that you had posed for?
A. Not, like, professionally. But I was just

sitting, and I believe Jeffrey took the photo. I was just sitting on a couch upstairs in the bathroom.

Q. It wasn't taken by a hidden camera?

A. No. No. I was smiling in the picture.

Q. And, likewise, in the New York home, did you see anything -- you described a large painting or a photograph that was in the massage room?

A. Yes.

Q. Do you recall any other photos of semi-clad or naked females?

A. I don't recall.

Q. Anything that you would consider to be child pornography that you saw in the New York home?

A. No.

Q. And, likewise, in New Mexico?

A. I don't recall.

Q. Do you recall seeing any semi-clad photos in New Mexico at all?

A. I do not recall.

Q. And the Virgin Islands?

A. Yes, in his bathroom, master bathroom.

Q. And what do you recall, if anything, about that photo?

A. There was a photo of me in there.

Q. And, again, was that something that you were okay with?
A. Yes.
Q. Jeffrey Epstein never told you that he knowingly had sexual contact with an underaged girl, correct?
MS. McCAWLEY: Objection.
THE WITNESS: When I asked him if the accusations were true, after I spoke with the police, he said yes, but they lied about their age.
BY MS. MENNINGER:
Q. How did that conversation come about?
A. He asked me if the police had ever spoken to me and I asked him, is it true.
Q. And you were talking about underaged girls?
A. Correct.
Q. And he said that he had been lied to by those girls?
A. Yes.
Q. Did he say anything else to you about it?
A. No.
Q. Did you ask him anything else about it?
A. No.

Q. Did you attempt to have any conversation like that with Ghislaine Maxwell?
A. No.
Q. I saw one press report that said you had met Cate Blanchett or Leonardo DiCaprio?
A. I did not meet them, no. When I spoke about them, it was when I was massaging him, and he would get off -- he would be on the phone a lot at that time, and one time he said, Oh, that was Leonardo, or, That was Cate Blanchett, or Bruce Willis. That kind of thing.
Q. So name-dropping?
A. Yes.
Q. So you had not met Cate Blanchett or Leonardo DiCaprio?
A. I have not.
Q. Would you remember if you had?
A. I would hope I would remember.
Q. Did you meet Cameron Diaz?
A. No.
Q. Bill Clinton?
A. No.
Q. Did you see Bill Clinton on the island?
A. No.
Q. Did you see Bill Clinton in a helicopter

being flown by Ghislaine Maxwell?
A. No.
Q. Did Ghislaine Maxwell ever tell you that she had flown Bill Clinton in her helicopter?
MS. McCAWLEY: Objection.
THE WITNESS: I don't recall her saying that.
BY MS. MENNINGER:
Q. Did you ever meet Senator ?
A. I don't know what he looks like. I might have.
Q. If I told you he was from Maine, would that stick out in your mind?
A. It should, but I do not recall meeting him.
Q. Do you ever remember meeting Prime Minister Ehud Barak from Israel?
A. No.
Q. Do you recall meeting any prime minister?
A. No.
Q. Any foreign president?
A. No.
Q. Nobel Prize winners?
A. Not to my knowledge.
Q. Naomi Campbell?

A. No.
Q. Al Gore?
A. No.
Q. Alan Dershowitz?
A. No.
Q. Les Wexner?
A. No.
Q. Tom Pritzker?
A. No.
Q. Kevin Spacey? I may have already asked you, but have you met Kevin Spacey?
A. No.
Q. Did you meet Governor Bill Richardson of New Mexico?
A. Hmm, I want to say that he was supposed to come to dinner when we were in New Mexico. I don't know if I met him. I believe that he and Ghislaine had dinner separate from myself.
Q. Jean Luc Brunel?
A. Yes.
Q. You did meet him?
A. Yes.
Q. Tell me about that.
A. He was just in the house at one time in Palm Beach.

Q. Socializing?
A. Yes.
Q. Did you observe him to be with underaged girls?
A. I don't recall.
Q. Did you give him a massage?
A. I don't think I did. I gave a lot of guests massages. I don't remember any of their names. So it could have been any of those people besides the movie stars.
Q. You would know?
A. Exactly.
Q. And did you engage in sexual contact with any of the guests for whom you gave a massage?
A. No. That's why he would call me for his guests, because I was not comfortable with the sexual contact. So he still wanted to employ me as a massage therapist, but it was all normal.
Q. So this was an actual conversation that you had?
A. No, but I -- I noticed. I noticed that I wasn't -- I was massaging him less and less and massaging his guests more.
Q. So there was a change in the frequency with which you were giving Jeffrey Epstein massages?

A. Right.

Q. And an increase corresponding to massages you were giving to guests, correct?

A. Yes.

Q. Did any of the guests for whom you gave a massage mention that they expected something sexual?

A. No.

Q. Did they ask you to engage in sexual contact and you refused?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Marvin Minsky?

A. I don't know that.

Q. George Lucas?

A. No.

Q. Donald Trump?

A. No.

Q. Did you ever massage Donald Trump?

A. No.

Q. Sorry, I have to ask, but did you ever have sex with Alan Dershowitz in the back of a limousine with Virginia and Jeffrey present?

MS. McCAWLEY: Objection.

THE WITNESS: Absolutely not.

BY MS. MENNINGER:

Q. Do you know who Alan Dershowitz is?

A. I do.

Q. You would remember --

A. I would remember that.

Q. Did you ever see Virginia Roberts with any of the people that I just asked you about?

A. No.

Q. Did Virginia ever talk to you about having been with any of those people?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Did she tell you that she had met any of those people?

A. No.

Q. I believe you saw in that police report a reference to a friend of Jeffrey named Glenn and his wife?

A. Uh-huh.

Q. Do you remember them?

A. Vaguely.

Q. Tell me what you remember.

A. I remember they had an apartment in -- on Breakers Row. I went up there and massaged. It may

have been more than once, but I only really remember one time. But there was nothing sexual.

Q. Neither with the wife, nor with Glenn?

A. Right.

Q. Do you remember the apartment?

A. I only remember that I had to carry my massage table up some stairs.

Q. So you actually gave the massage on a massage table?

A. Yes.

Q. Does that help you place it in time as to when that might have occurred? In other words --

A. Well --

Q. -- did you get your massage license at some point and a massage table?

MS. McCAWLEY: Objection.

THE WITNESS: Yes. He bought me my massage table around the time that I went to massage school. So it could have been any time after. If I thought really hard, I could remember when I went to school. But it -- I want to say it's around 2003.

BY MS. MENNINGER:

Q. Nothing sexual happened with Glenn?

A. No.

Q. Did Glenn ask you to give him a massage on the floor of the home?
A. I don't recall.
Q. Did you ever discuss Glenn with Virginia?
A. Not to my recollection.
Q. Did you ever go to Virginia's home?
A. No.
Q. Do you know where she lived?
A. No.
Q. Did she talk about it?
A. Not that I remember.
Q. Did you see anything in your interactions with Virginia that led you to believe that she was a sex slave?
MS. McCAWLEY: Objection.
THE WITNESS: No.
BY MS. MENNINGER:
Q. Did you see anyone forcing her to remain in the home?
A. No.
Q. Did you see her look traumatized at some point?
MS. McCAWLEY: Objection.
THE WITNESS: No.

BY MS. MENNINGER:
Q. Did you see anything that led you to believe Virginia Roberts had been trafficked, sexually trafficked to third parties?
MS. McCAWLEY: Objection.
THE WITNESS: No.
BY MS. MENNINGER:
Q. Did Virginia ever tell you that she had been trafficked?
A. No.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Did you hear anyone direct Virginia Roberts to go have sex with someone?
A. No.
Q. Did Jeffrey ever ask you to go have sex with another person?
A. No.
Q. Did Ghislaine Maxwell ever ask you to go have sex with another person?
A. No.
Q. Did Ghislaine Maxwell ever ask you to give a massage to someone else?
A. No.
Q. Did Ghislaine Maxwell ever ask you to

dress up in any outfit?
A. No.
Q. Did she ever buy you an outfit for you to wear in terms of a sexual profile?
A. No.
Q. Did she tell you what kind of clothes you should buy?
A. No.
Q. Did she direct you to go get Brazilian bikini waxes?
A. No.
Q. Did she direct you to go get your teeth whitened?
A. No.
MS. MENNINGER: I would like to mark as an exhibit -- I have no recollection what number we're on. Thank you. Exhibit 5.
(The referred-to document was marked by the court reporter for Identification as Sjoberg Exhibit 5.)
BY MS. MENNINGER:
Q. Have you seen this article before?
A. It has followed me everywhere.
MS. McCAWLEY: I'm sorry. Can I just ask you to put the Bates numbers on the record?

MS. MENNINGER: Sure. It's Bates marked Giuffre 1131 through 1138.

BY MS. MENNINGER:

Q. What do you mean it has followed you everywhere?

A. Well, if you Google me, it comes up.

Q. I wanted to just ask you a couple of questions.

On the third page, towards the bottom, there is a photograph that begins "we had a picture taken," and just to orient you, this is in the discussion around the Prince Andrew meeting you had.

Did you meet Prince Andrew any other time besides the time you already described in your testimony?

A. No.

Q. If you want to take a look at that paragraph before I ask you questions.

A. Okay.

Q. In that paragraph, it describes that Andrew -- Virginia sat on the chair, and then Andrew sat on another chair, and you sat on his lap.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. Is that what it says?

A. That's what it says.
Q. Do you recall telling that to the reporter?
A. Yes.
Q. And this was back in 2007 or so?
A. Yes.
Q. As you sit here today, does that make it -- does that refresh your recollection that Virginia was sitting in one chair and you were sitting on another, with Andrew?
A. Yeah. If I said that, then I remember it that way. I'm just trying to remember. Whether we were on a couch or a chair, I just remember the boobs part, the hand on the boobs.
Q. I understand that part stands out.
And I also completely understand if you don't remember things that happened a long time ago.
A. Right.
Q. I'm just wondering if, having looked at this news article, it refreshes your memory that Virginia was sitting in a different place?
A. In a different chair?
Q. Does it?
A. It does say that. Does it refresh my memory?

Q. Okay. That's fine.
A. Yeah, sure.
Q. If it doesn't, it doesn't. I'm just asking.
Did Virginia say anything to you about having met Prince Andrew before this time in New York?
MS. McCAWLEY: Objection.
THE WITNESS: She did not say.
BY MS. MENNINGER:
Q. Did Prince Andrew say or do anything that led you to believe that he had met Virginia prior to that time?
A. I don't recall.
Q. Did you ever see Al Gore on the island?
A. No.
Q. Did you see his wife, Tipper Gore, on the island?
A. No.
Q. What is your understanding of what the lawsuit we are here today is about?
A. I understand that Ghislaine is calling Virginia a liar, and so Ghislaine is suing Virginia. I'm sorry. Strike that. Reverse it.
Right, Virginia is suing Ghislaine for

defamation.
Q. And do you know what Virginia said about Ghislaine?
A. That Ghislaine recruited her.
Q. Do you know anything else that Virginia said about Ghislaine?
A. Only what was spoken to me.
Q. And I should clarify. Don't tell me anything your lawyer has conveyed to you.
A. Exactly. That's all I know. I've met with Virginia once last summer.
Q. Okay. Tell me about that.
A. She -- there was a moderator between us, like an investigator. And she was in Palm Beach. And it was more about Jeffrey. It was less about Ghislaine. I don't remember specifically about Ghislaine at all.
Q. So you met with Virginia and an investigator at the same time?
A. Yes.
Q. And they were what, talking to you about Jeffrey in what context?
MS. McCAWLEY: Objection.
THE WITNESS: Basically, they were trying to find people that would help her get her

story out, because this is when Dershowitz -- Dershowitz was saying nothing was happening and he was calling her a liar. And she was just trying to find people to back up her story.

BY MS. MENNINGER:

Q. And what did you understand her story to be? Did she tell you?

A. That she was recruited to give massages, sexual massages, and have sex with people such as Dershowitz and Andrew. But I knew none of that at the time.

Q. Right. Did you tell them anything -- did you tell them during that meeting that you knew of anything about her being recruited to give sex to either Jeffrey or to other people?

MS. McCAWLEY: Objection.

THE WITNESS: Can you rephrase?

BY MS. MENNINGER:

Q. Yes. That wasn't a very good question.

What did you say during this meeting with Virginia and her investigator?

A. Basically that I believed her, even though I -- she never spoke to me specifically about what was going on; that once I learned everything that happened based on reading the police report, I

believed her side of the story.

Q. And did she tell you what her side of the story was?

A. You know, just that she wasn't a liar; that, you know, she was there to have sex with men that Jeffrey wanted her to sleep with.

Q. Did she tell you in that meeting who she had sex with?

A. No.

Q. Did she name any of the famous people?

A. Only Dershowitz came up.

Q. Did you two talk about the incident in New York with the puppet?

A. I don't recall.

Q. And you formed this opinion about whether she was a liar based on things that you've read in the police report?

MS. McCAWLEY: Objection.

THE WITNESS: I formed my opinion based on my experience in the house.

BY MS. MENNINGER:

Q. Okay. And what experience in the house helped you form your opinion that what Virginia is saying is true?

A. You know, Jeffrey being open with me about

what other girls did for him and that I was not one of those girls.

He was always trying to recruit me almost in a way that I could be one of them and travel with him and live the life of luxury if I only -- if only I did this.

So after five years of learning what was happening, I can look back knowing -- I only knew Virginia for a very short time. Looking back, I can make assumptions about what was required of her.

Q. Did she tell you how old she was when she said she started working with Jeffrey?

A. She didn't.

Q. Did she tell how long she had worked with Jeffrey?

A. No.

Q. Have you read all the things that have been attributed to her in the press?

A. Many of them.

MS. McCAWLEY: Objection.

THE WITNESS: I don't know that I've read all of them, but I have read some.

BY MS. MENNINGER:

Q. In this meeting with Virginia and the investigator, you said Ghislaine Maxwell did not

come up?
A. Not that -- not that I recall.
Q. Do you know the name of the investigator?
A. Valerie Rivera.
Q. Have you read the statement that Ghislaine Maxwell issued to the press?
A. No.
Q. Do you know what it says?
A. No.
Q. You said you have read some of Virginia's statements to the press but not all of them?
A. I don't know how many there are. I know I read something. I don't know if I read all of them.
Q. Have you read her book manuscript?
A. No.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Did she tell you that she was writing a book?
A. No.
Q. Did she tell you she was trying to get a book deal?
MS. McCAWLEY: Objection.
THE WITNESS: No.

BY MS. MENNINGER:
Q. Did she tell you that he hired a ghost rider?
A. No.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Did she tell you that she hired a literary agent?
MS. McCAWLEY: Objection.
THE WITNESS: No.
BY MS. MENNINGER:
Q. Did you speak with John Connelly?
A. Yes.
Q. When did you speak with John Connelly?
A. He was first calling me around the time that everything was coming out in 2006. And I didn't say a lot to him, but I did say a few things. And I asked him not to use my name, and he used my name. And then he quoted me as saying things I never said.
Q. Do you know to whom he quoted things that you had never said?
A. I don't remember the news outlet, no.
Q. So it was published somewhere?
A. Somewhere on the Internet.

Q. Something that you said to John Connelly got twisted?
A. Yes. He put words in my mouth.
Q. And it was misreported and published?
MS. McCAWLEY: Objection.
THE WITNESS: Correct.
BY MS. MENNINGER:
Q. Have you spoken to him lately?
A. No. He called me again at the beginning of last year, around New Year's last year, but I did not return his call.
Q. Do you recall what it is he attributed to you falsely?
A. It was mostly about how I felt about certain things. I don't remember specifically what he said, but he was giving an opinion for me that I never spoke to him about.
Q. And that you did not hold?
A. Well, I can't remember what it was. Yeah.
Q. Okay. Do you know whether Virginia has lied about any of her experience?
MS. McCAWLEY: Objection.
THE WITNESS: I don't know that she has lied.

BY MS. MENNINGER:
Q. Do you know that she has told the truth?
A. As far as I know, she has.
Q. Do you know whether the press has accurately reported everything that Virginia has said?
MS. McCAWLEY: Objection.
THE WITNESS: I don't know.
BY MS. MENNINGER:
Q. Other than John Connelly and the police, who else have you spoken to about your experience?
A. Well, the woman from the Daily Mail. Her name is Wendy Leigh.
Q. And that's Defendant's Exhibit 5 -- not Defendant's Exhibit, just Exhibit 5, correct?
A. Correct.
Q. Did Wendy Leigh accurately report your statements?
A. She did a little bit of embellishment, as well, but the facts are all true.
Q. And what parts do you believe are embellished?
A. Near the end, when she was doing a summary, when she wrote, "Sure, I had a good time, but I also think it damaged me a bit." I don't

recall saying that.
And there's another part in here where she said I said that I made a deal with the devil, which I never would have said that. The words she used.
Q. On page 2 of 8, it's about -- it's about even with the hem of your skirt.
A. "I made a pack with the devil in exchange for excitement and glamour. I was only a college student. I was hard-up and foolish."
That I never said, any of that. I was a college student, that's true. "Hard-up and foolish," I would have never called myself foolish.
Q. Were you paid any money for this interview?
A. I was paid $1,500.
Q. And how long did the interview last?
A. A couple of hours.
Q. Where did it take place?
A. At Cafe Boulud in the Brazilian Court Hotel in Palm Beach.
Q. Who else besides Wendy Leigh and John Connelly and the police --
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. -- and Virginia and the investigator --

MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. -- did you talk to about your experience?
A. Family and friends.
Q. Did you speak to any other reporters?
A. I had other reporters calling me. I avoided almost all of the calls. I had someone coming at me, stalking me. I do not know who he was. He offered me $25,000 to give a story, and I turned him down.
Q. Who?
A. He showed up in my work multiple times.
Q. There were other stories printed in the Daily Mail, not by Wendy Leigh, later.
Did you see any of those stories? I'm sorry. Let me be a little clearer. That attributed comments to you.
A. I don't recall specifically, but I feel like I stayed on top of it, and I wasn't surprised when my name was brought up.
Q. Do you recall giving another interview?
A. No, never.
Q. Do you recall anything that was printed other than the John Connelly thing that you believe to be inaccurate?

A. No.

Q. Was there anybody else present when you were interviewing with Wendy Leigh?

A. No.

Q. Was she recording it on a recorder?

A. Yes.

Q. Have you ever heard that recording?

A. No.

Q. Do you know whether the police were recording their interview with you?

A. Yes.

Q. Have you ever heard that recording?

A. No.

Q. Did you ever receive notification that you were named as a victim in any of Jeffrey Epstein's criminal cases?

A. No.

Q. Other than the $1,500 from Wendy Leigh, did you receive any other money for making any statements?

A. No.

Q. Did you give an interview to Virginia's attorneys?

A. Yes. Right?

MS. McCAWLEY: You can say yes.

BY MS. MENNINGER:

Q. When was that?

A. Two weeks ago, roughly.

Q. And who was present during that meeting?

A. My lawyer and several others.

Q. Several other what?

A. Lawyers. I don't know. I don't know who they all are.

Q. So Ms. McCawley you recall being there?

A. Yes.

Q. Ms. Schultz you recall being there?

A. No. I didn't learn it, no. You weren't there.

Q. Brad Edwards?

A. Yes.

Q. Paul Cassell?

A. Maybe. I don't remember.

Q. And was that interview recorded?

A. I don't know. It may have been. I don't remember.

Q. Did anyone ask your permission to record it?

A. Maybe. I don't recall.

Q. Were you shown any documents during that meeting?

A. Flight logs.
Q. Any other documents?
A. No.
Q. What did Ms. McCawley or Mr. Edwards or any of the other lawyers say to you about Ghislaine Maxwell?
A. They just asked impressions. They never said anything about her.
Q. Were you shown a copy of any report that came out of that interview?
A. Which interview?
Q. The one with the -- Virginia's attorneys.
MS. McCAWLEY: Objection.
THE WITNESS: No.
BY MS. MENNINGER:
Q. You testified earlier about an incident with a camera that Ghislaine Maxwell had given you. I want to ask you some questions about that.
A. Sure.
Q. Do you know when that was?
A. That was in 2002.
Q. And why does that date stick out?
A. Because I was living -- where I was living specifically and where I had the phone call.
Q. Tell me what you remember about the

conversation.

A. I had been over to her house prior massaging Jeffrey. And I got a phone call from her, and she told me she had a camera for me for my photography class, but yet, she couldn't give it to me yet because during the massage I didn't finish my job and she had to finish it for me.

Q. Did she say what she meant?

A. No, but I knew.

Q. Was there any other time that you had discussed with her finishing your job?

A. Not that I recall.

Q. Any other time you just recall discussing with her anything about your sexual contact with Jeffrey?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Did she give you the camera?

A. I did get the camera.

Q. Okay. When did she give you the camera?

A. I guess the next time I went to the house.

Q. What was said at that time?

A. I honestly don't know that she handed it to me. I remember it being there for me.

Q. What kind of camera was it?
A. A Canon Rebel 35-millimeter.
Q. Do you still have it?
A. I do not. No one uses 35-millimeter anymore.
Q. What's that?
A. No one uses 35-millimeter.
Q. Back to the cell phone conversation.
A. Right.
Q. Was it your birthday?
A. It was just I was taking a photography class and I needed a camera.
Q. Do you know her to be a photographer?
A. Not a professional, but I knew she was interested in photography.
Q. Did you see her with cameras?
A. Yes.
Q. Did you see her taking photographs of nude people?
A. No.
Q. Did she ever ask you to take a photograph of you semi-clad or naked?
A. Did she ever ask to take a photo of me?
Q. Semi-clad or naked.
A. No.

Q. Did she ever ask to take a photograph of you at any point?

A. I don't remember.

Q. Did you tell anyone else about this conversation: You couldn't give it to me now because I hadn't finished my job?

A. No.

MS. MENNINGER: I think I'm going to reserve the rest of my time for recross, so you all, I guess, can take a break.

MR. LOUIS: Can I have one second?

MS. MENNINGER: Sure.

MS. McCAWLEY: We can go off the record?

THE VIDEOGRAPHER: Off the record at 12:09.

(Thereupon, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER: On the record at 12:10.

BY MS. MENNINGER:

Q. Sorry, just a couple of more questions.

It sounds like maybe there was an additional telephone conference that one might construe as a meeting with attorneys; is that true?

A. Correct.

Q. All right. Tell me about that.

A. They just wanted to -- we had met prior, and they just wanted to clarify a few things and ask a few more questions.
Q. Okay. What did they clarify?
A. Any other specific times that I had, you know, seen Ghislaine naked, or if I had, you know, had any sexual massages with her, any type of questions like that.
Q. Okay. And what did you tell them about having any sexual massages with Ghislaine?
A. That I was not asked to do -- to perform anything with her.
Q. And you did not?
A. Correct.
Q. And what did you tell them about specific times of seeing Ghislaine Maxwell naked?
A. Only when she would swim or get a massage.
Q. And that's swimming -- you mentioned earlier skinny-dipping?
A. Correct.
Q. And I think you said perhaps some other time that you saw her jump off a dock and swim --
A. Correct, yes.
Q. -- in the nude?
A. Yes.

Q. And then you saw her under a towel during massages?
A. Yes.
Q. Is there any other time that you recall seeing Ghislaine Maxwell naked?
A. No.
Q. Is there anything else about that telephone conference with the attorneys to clarify that you recall, the topics?
A. No.
MS. MENNINGER: All right. Thank you. I think we can go off the record now.
THE VIDEOGRAPHER: Off the record at 12:12.
(Thereupon, a lunch recess was taken, after which the following proceedings were held:)
THE VIDEOGRAPHER: On the record at 12:54.

F U R T H E R E X A M I N A T I O N

BY MS. McCAWLEY:
Q. Johanna, I'm going to ask you a couple of more just follow-up questions.
When Laura was talking to you, she mentioned some names of famous people that you -- most of which you had not met.

Did you ever meet anybody famous when you were with Jeffrey?
A. I met Michael Jackson.
Q. Oh, really? And where was that?
A. At his house in Palm Beach. At Jeffrey's house in Palm Beach.
Q. Did you massage him?
A. I did not.
Q. Anybody else you remember? I know you mentioned David Copperfield earlier. Anybody else?
A. No, I'd remember that.
Q. I believe you also testified that you had never had a massage before you started working with Jeffrey and Ghislaine; is that correct?
A. I don't recall having a massage before then.
Q. And I think you said on the first day, when you were doing the clerical work, Maxwell mentioned that you might be able to get a massage; is that correct?
A. Yes.
Q. Did you tell Maxwell that you had never had a massage at that point?
A. I don't remember.
Q. Did you remember telling Jeffrey that you

had never had a massage?
A. No.
Q. And then you were talking about the massage -- the first massage when you were being in the room with Jeffrey and Emmy?
A. Uh-huh.
Q. And I know you said Emmy was naked or took off her clothes at some point?
A. Uh-huh.
Q. And then laid on the table.
And then you changed positions with her; is that what happened?
A. Yes. I don't remember the sequence, but at one point she was, I was, and Jeffrey was.
Q. And in the -- in the time when there was changeover, for example, when you're on the table and Emmy is not on the table and Jeffrey is not on the table, did Emmy at that point remain naked or did she actually stop and get dressed and continue massaging?
A. I don't recall her getting dressed, but I would probably remember if she massaged naked.
Q. Do you know if Jeffrey remained naked during that massage?
A. He was never, like, naked standing up. He

always covered himself with a towel.

Q. I believe I asked this, but I just want to clarify to make sure that I did: Did Maxwell ever ask you to bring other girls over to -- for Jeffrey?

A. Yes.

Q. Yes?

A. Yes.

Q. And what did you -- did you do anything in response to that?

A. I did bring one girl named -- no. -- it was some girl named that I had worked with at a restaurant. And I recall Ghislaine giving me money to bring her over; however, they never called her to come.

Q. And then I believe you mentioned that one of your physical fitness instructors, you brought a physical fitness instructor; was that correct?

A. Correct.

Q. And what did she do?

A. She gave him a -- like a training session, twice.

Q. Twice.

Did anything sexual in nature happen during the session?

A. At one point he lifted up her shirt and

exposed her bra, and she grabbed it and pulled it down.

Q. Anything else?

A. That was the conversation that he had told her that he had taken this girl's virginity, the girl by the pool.

Q. Okay. Did Maxwell ever say to you that it takes the pressure off of her to have other girls around?

A. She implied that, yes.

Q. In what way?

A. Sexually.

Q. And earlier Laura asked you, I believe, if Maxwell ever asked you to perform any sexual acts, and I believe your testimony was no, but then you also previously stated that during the camera incident that Maxwell had talked to you about not finishing the job.

Did you understand "not finishing the job" meaning bringing Jeffrey to orgasm?

MS. MENNINGER: Objection, leading, form.

BY MS. McCAWLEY:

Q. I'm sorry, Johanna, let me correct that question.

What did you understand Maxwell to mean

when she said you hadn't finished the job, with respect to the camera?

MS. MENNINGER: Objection, leading, form.

THE WITNESS: She implied that I had not brought him to orgasm.

BY MS. McCAWLEY:

Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey?

MS. MENNINGER: Objection, leading, form, foundation.

THE WITNESS: I can answer?

Yes, I took that conversation to mean that is what was expected of me.

BY MS. McCAWLEY:

Q. And then you mentioned, I believe, when you were testifying earlier that Jeffrey told you a story about sex on the plane. What was that about?

MS. MENNINGER: Objection, hearsay.

THE WITNESS: He told me one time Emmy was sleeping on the plane, and they were getting ready to land. And he went and woke her up, and she thought that meant he wanted a blow job, so she started to unzip his pants, and he said, No, no, no, you just have to be awake for

landing.

BY MS. McCAWLEY:

Q. Do you recall witnessing any sexual acts on the plane?

A. No.

Q. Did Emmy ever talk to you about performing sexual acts on the plane?

A. No.

Q. We looked earlier at the police report, and I just want to clarify, you identified some areas where there were discrepancies in that report.

And you can take another look at it if you want, but other than the discrepancies you pointed out, is that a recollection of what you remember telling the detective?

A. Yes.

MS. MENNINGER: Objection, outside the scope of cross.

BY MS. McCAWLEY:

Q. You mentioned that there was a time when you noticed that Maxwell was around a little bit less?

A. Uh-huh.

Q. And I believe you said that was during the middle of the time you were with Jeffrey.

Do you remember approximately when that was year-wise?
A. I don't. I would say it was probably sometime between 2003 and 2004.
Q. And what made you think that?
A. I just saw her less and less at the house.
Q. Were you there more at the house during that time period?
A. No, not necessarily. It's just at the beginning, she was around a lot. And then I would see her occasionally without him. The one time we spent a few days together in 2006, she wasn't there at all.
Q. So you saw her in the -- is it fair to say that you saw her in the 2005 and 2006 time frame?
A. Yes.
Q. Then we were talking about the photography earlier and about the photographs.
Did Maxwell ever ask you to take nude photos of yourself for Jeffrey?
A. She asked me to take photos of myself for Jeffrey, yes.
Q. And did you do that?
A. I did not.
Q. And the photos that were around that were

in the bathroom, that you mentioned a couple of times places that there were photos of you, who took those?

A. He did.

Q. And when we were talking about the Palm Beach house and you were describing an area where there were just a lot of photographs, is it fair to say that there could have been nude photographs amongst those photos that you saw?

A. Yes.

Q. And earlier you testified that you don't have knowledge of what happens behind closed doors, but you also said that Jeffrey had told you what other girls did for him and that he wanted you to do those things for him.

Is it fair to say that you knew that other girls were performing sexual acts?

A. Yes.

MS. MENNINGER: Objection, foundation, form.

BY MS. McCAWLEY:

Q. And I know you mentioned previously that your relationship and the interaction with him progressed over time.

Did there come a time when you were

expected to have sexual intercourse with Jeffrey?
A. Yes.
Q. And when was that?
A. 2005.
MS. McCAWLEY: That's it. I just do want to also put on the record that we're designating the testimony as confidential under the protective order.

F U R T H E R E X A M I N A T I O N

BY MS. MENNINGER:
Q. Okay. You just testified that you have knowledge -- you had knowledge that -- of what Jeffrey was doing behind closed doors with other girls. Was that your testimony?
A. Based on what he had told me.
Q. Okay. So Jeffrey told you things that he had done with other girls?
A. Yes.
Q. You did not observe any of those things?
A. No.
Q. You did not talk to any of those girls about what they had done with Jeffrey behind closed doors?
MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. Correct?

A. No. Correct.

Q. The only source of knowledge you have is based on what Jeffrey told you he had done with other girls?

A. Correct.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. You said that there were possibly nude photos amongst the other photos that you saw on various walls at the Palm Beach house, correct?

A. Correct.

Q. None of them stood out to you?

A. Correct.

Q. None of them appeared pornographic?

A. No.

Q. You didn't see any fully frontally nude photographs, correct?

A. No, not that I recall.

Q. And you don't recall seeing any girls that appeared to be underaged, correct?

A. No.

Q. You said Ghislaine asked you to take photos of yourself for Jeffrey, correct?

A. Correct.
Q. Did she ask you to take a nude photograph of yourself or just a photograph of yourself?
A. A nude photograph of myself.
Q. What exactly did she say to you?
A. I don't remember exactly, but I know that I never felt comfortable. I would have felt fine taking photos of myself, my face, but I knew I was never comfortable with it because I had to take photos of my body. And I also didn't know how to take a photo from standing behind. You have to have someone else involved.
Q. That's my question. How would you take a nude photograph of yourself?
A. Exactly. Someone else would have to do it.
Q. Do you recall any of the particulars of what she said to you that led you to believe she wanted you to do that?
A. No, just asking for the photos.
Q. Do you know when in your time there?
A. It was near the beginning, because that's when I was interested in the photography.
Q. Was it in the context of your discussion of your photography class?

A. No.
Q. Was it in the context of anything?
A. About the camera that she had bought for me.
Q. What did she say in relationship to the camera that she bought for you and taking photographs of you?
A. Just that Jeffrey would like to have some photos of me, and she asked me to take photos of myself.
Q. What did you say?
A. I don't remember saying no, but I never ended up following through. I think I tried once.
Q. This was the pre-selfie era, correct?
A. Exactly.
Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you.
A. Okay.
Q. The first one was it would take pressure off of Maxwell to have more girls around?
A. Right.
Q. What exactly did Maxwell say to you that led you to believe that was her implication?
A. She said she doesn't have the time or

desire to please him as much as he needs, and that's why there were other girls around.

Q. And did she refer specifically to any other girls?

A. No.

Q. Did she talk about underaged girls?

A. No.

Q. Was she talking about massage therapists?

A. Not specifically.

Q. Okay. There were other girls in the house that were not massage therapists, correct?

A. Yes.

Q. Nadia is another person that was around, correct?

A. Yes.

Q. There were other people he traveled with?

A. Uh-huh.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. Correct?

A. Correct.

Q. Other girls?

A. Yes.

Q. Adults?

A. Yes.

Q. When I say "girl," I really mean women, correct?

A. Correct.

Q. There were other women around who hung out with Jeffrey, and you don't know what they did behind closed doors, correct?

A. Correct.

Q. So when you heard the implication that she wanted other girls around to take the pressure off of her sexually, in your mind that meant other adult women that he had in his life, correct?

MS. McCAWLEY: Objection.

THE WITNESS: Correct, doing what I was expected to do in a massage, you know.

BY MS. MENNINGER:

Q. Ghislaine didn't have anything to do with you bringing this woman over for a physical workout with Jeffrey, correct?

A. Correct.

Q. She asked you to bring another girl to be -- to perform massages at the home?

A. Yes. Well, she was always asking if I knew anyone else. And so I brought this one girl that I didn't even know I worked with her at a restaurant. So I didn't care what she thought of me

if anything happened. And so -- but it never turned into anything.

Q. She was an adult?

A. She was an adult.

Q. Working at a restaurant with you?

A. Yes.

Q. What restaurant was that?

A. It's a restaurant that's closed. It's called .

Q. You were asked about the famous people. You said you met Michael Jackson?

A. Yes.

Q. But you did not give him a massage?

A. No.

Q. There were other famous people, perhaps, who were around Jeffrey's home that you didn't meet, correct?

A. Correct.

Q. Do you know whether Virginia Roberts has told the truth about the age she was when she met Ghislaine Maxwell?

MS. McCAWLEY: Objection. Exceeds the scope of cross.

THE WITNESS: I don't have any idea what she told them in terms of her age.

BY MS. MENNINGER:

Q. Do you know if Virginia Roberts is telling the truth about whether she spent her sweet 16th birthday with Jeffrey and Ghislaine Maxwell?

MS. McCAWLEY: Objection.

THE WITNESS: I don't know anything about that.

BY MS. MENNINGER:

Q. Do you know whether Virginia Roberts is telling the truth about whether Ghislaine Maxwell sexually assaulted her on her first day on the job?

MS. McCAWLEY: Objection.

THE WITNESS: I have not knowledge of that.

BY MS. MENNINGER:

Q. Do you have any knowledge of whether Virginia Roberts is telling the truth about Virginia -- excuse me -- about Ghislaine Maxwell forcing Virginia Roberts to "go down" on her?

MS. McCAWLEY: Objection.

THE WITNESS: No knowledge.

BY MS. MENNINGER:

Q. Do you have any knowledge about whether Virginia Roberts is telling the truth about whether Ghislaine Maxwell forced her to participate in

orgies with other women?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Do you have any knowledge about whether Virginia Roberts is telling the truth about whether Ghislaine Maxwell directed her to have sex with Prince Andrew?

MS. McCAWLEY: Objection.

THE WITNESS: No. Only based on what I've read in the media.

BY MS. MENNINGER:

Q. And Alan Dershowitz?

MS. McCAWLEY: Objection.

THE WITNESS: The same.

BY MS. MENNINGER:

Q. Prime ministers?

MS. McCAWLEY: Objection.

THE WITNESS: No.

BY MS. MENNINGER:

Q. Do you have any knowledge about whether Virginia Roberts is telling the truth about foreign presidents?

MS. McCAWLEY: Objection.

THE WITNESS: No knowledge.

BY MS. MENNINGER:

Q. Do you know whether Virginia Roberts is telling the truth about Ghislaine Maxwell forcing her to participate in an orgy with Prince Andrew and other underaged girls on the island?

MS. McCAWLEY: Objection.

THE WITNESS: No knowledge.

BY MS. MENNINGER:

Q. Did Ghislaine Maxwell ever ask you to have her baby?

MS. McCAWLEY: Objection.

THE WITNESS: No.

MS. MENNINGER: No further questions.

MS. McCAWLEY: Thank you for your time.

THE WITNESS: We are done.

MS. McCAWLEY: We are off the record.

THE VIDEOGRAPHER: The time is 1:11. This concludes the video deposition. Off the record.

(Thereupon, the taking of the deposition was concluded at 1:11 p.m.)

AFFIDAVIT

STATE OF FLORIDA )
COUNTY OF )

I, , being first duly sworn, do hereby acknowledge that I did read a true and certified copy of my deposition which was taken in the case of GIUFFRE V. MAXWELL, taken on the 18th day of May, 2016, and the corrections I desire to make are as indicated on the attached Errata Sheet.

CERTIFICATE

STATE OF FLORIDA )
COUNTY OF )

Before me personally appeared ______________________________________, to me well known / known to me to be the person described in and who executed the foregoing instrument and acknowledged to and before me that he executed the said instrument in the capacity and for the purpose therein expressed.

Witness my hand and official seal, this ______ day of _______________, _____.

_________________________
(Notary Public)

My Commission Expires:

ERRATA SHEET

PAGE LINE REMARKS

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________________________________________

_______________________________

Signature of Witness

________________________________

(Notary Public)

Dated this __________ day of ____________, ___________.

MY Commission Expires: _______________

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, the undersigned authority, certify that JOHANNA SJOBERG personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 18th day of May, 2016.

KELLI ANN WILLIS, RPR, CRR
Notary Public, State of Florida
My Commission No. FF911443
Expires: 2/16/21

+ + + + + + + + + + + + + + + + + +

C E R T I F I C A T E

STATE OF FLORIDA )
: ss
COUNTY OF MIAMI-DADE )

I, KELLI ANN WILLIS, a Registered Professional, Certified Realtime Reporter and Notary Public within and for The State of Florida, do hereby certify:

That JOHANNA SJOBERG, the witness whose deposition is hereinbefore set forth was duly sworn by me and that such Deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of May, 2016.

____________________________

KELLI ANN WILLIS, RPR, CRR

[redacted]

[redacted]

[redacted]

[redacted]

MAGNA
LEGAL SERVICES

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 7

# PART 2

Case 1:15-cv-07433-RWS Document 1173-8 Filed 05/27/16 Page 2 of 45



Case No. . . . . : 1-05-000368 (Continued)

photographed by CSI Pavlik and then videotaped by myself. The search was concluded at approximately 3:05 p.m. whereupon Detective Recarey and I were the last two officers in the house. Upon securing the residence we met with the gentleman who identified himself to Detective Recarey as the lawyer for the defendant and he was informed that the residence was secured and that copies of the inventory return had been left on the first floor table of the personal assistant's office.

Detective Recarey and I returned to Police Headquarters and secured for the day.

************************** N A R R A T I V E # 14 **************************

A Reported By: DAWSON, MICHAEL C. 11/07/05
Entered By.: ALTOMARO, NICKIE A. 11/07/05

On October 20, 2005, I assisted Defective Recarey in the execution of a search warrant at 358 El Brillo Way, Palm Beach, Florida, 33480.

Upon the announcement of the search warrant, immediate contact was made with three white males who came out of the house or surrounding structures. Those males were identified as Janusz Banasiak, Daniel Estes, and Mark Zeff. As other members of the police department cleared the home, I kept watch over these three males. Once the house was cleared, those males were turned over to Detective Recarey.

Detective Dicks and I were assigned to assist in the search of the main house, the cabana and the servant's quarters. We started in the garage. All areas of the garage were searched to include four vehicles. These vehicles were three black Mercedes Benz cars registered to Jeffrey Epstein. The fourth vehicle was a Harley Davidson motorcycle, green in color, registered to Jeffrey Epstein. Nothing was recovered from the garage.

A towel closet and pantry located off the kitchen were searched and yielded negative results.

The kitchen was searched and taken into evidence was a phone message book that was located near a house phone.

North of the kitchen was an office room which contained a computer. The room had a closet that contained a locked gun locker. The combination was entered by Banasiak in the presence of Sgt. Frick and the safe was opened. Items were taken from the room. See the completed property receipt for a detailed list.

A green bathroom located on the first floor was searched and nothing was taken.

A closet located just west of the green bathroom was searched. Two massage tables were located in the closet along with a photo of a nude

Case No. . . . . : 1-05-000368 (Continued)

female from the waist up. See the property receipt for details.

I searched two bedrooms and their adjoining bathrooms, which were located on the second floor on the East side of the house. In the Northeast bedroom closet I found adult sex toys called Twin Torpedoes. Soap made in the shape of a penis and vagina were also found in these upstair bedrooms. See the property receipt for details.

I searched the pool cabana located on the South side of the pool. Photos were taken from the wall. See the property receipt for details.

I assisted in the search of Banasiak's living quarters. Numerous CD s along with a message book was seized. See the property receipt for details.

************************** N A R R A T I V E # 15 **************************
4 Reported By: RECAREY, JOSEPH 11/08/05
Entered By.: ALTOMARO, NICKIE A. 11/08/05

On November 1, 2005, I was contacted by Atty. Gus Fronstin, who advised he was willing to assist with the investigation. Atty. Fronstin advised he would try to have his client, Jeffrey Epstein available to be interviewed. I explained I would be interested in conducting an interview with his client as well as other employees that are employed within the house. Atty. Fronstin advised he would return my call once he received confirmation on the interviews.

On November 6, 2005, I attempted contact with [redacted] at her residence. I left a business card for her to return my call. Upon returning to the police department, I had received a telephone call from [redacted]. I returned her call at [redacted] and spoke with [redacted] She made arrangements to respond to the station to provide an interview. At approximately 3:30 pm, she arrived at the Palm Beach Police Station with her boyfriend. Her boyfriend was allowed to sit in the lobby area while Ms. [redacted] was interviewed.

I took Ms [redacted] to the Detective Bureau Interview room. I closed the door for privacy and explained to her that I appreciated her coming to the police station for the interview. During the sworn taped statement, she advised she was at Jeffrey Epstein s house one time. Approximately two months ago, she was approached by a girl, [redacted] who was dating her roommate, to make some quick money. [redacted] advised she was in need to make some quick cash to make the rent that month. She agreed to go to the house. She had been told by [redacted] that the massage would have to be done in her underwear. She advised [redacted] drove with her and brought her into the house. They walked into the kitchen area and took the stairs upstairs. [redacted] further stated she was brought into a master bedroom area. She advised she recalled seeing portraits of naked women throughout the room. A massage table was already out near the sauna/shower area in the master bedroom. Epstein entered the room wearing only a towel and

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 4 of 45



Case No. . . . . : 1-05-000368 (Continued)

introduced himself as Jeff. [redacted] advised she recalled she and [redacted] removed their clothing down to their panties, Epstein lay on his stomach area and they provided a massage on his legs and feet area. I asked [redacted] if she had any formal massage training and she replied no. [redacted] advised she was topless and the panties she wore were the boy shorts lace panties. She and [redacted] continued the massage until the last ten minutes of the massage, Epstein, told [redacted] to leave the room so that [redacted] could finish the massage.

[redacted] got dressed and Epstein turned over onto his back. Epstein then removed the towel, which had been around his waist. Epstein laid there naked and requested that [redacted] rub his chest area. [redacted] stated as she did this, Epstein, began masturbating as she rubbed his chest. [redacted] stated he pulled down her boy short panties and he produced a large white vibrator with a large head. She stated it was within a drawer in his master bathroom. He rubbed the vibrator on her vagina area. [redacted] advised he never penetrated her vagina with the vibrator.

He continued to rub her vagina with the vibrator as he continued to masturbate. [redacted] stated she was very uncomfortable during the incident but knew it was almost over. Epstein climaxed and started to remove himself from the table. He wiped himself with the towel he had on previously and went into the shower area. [redacted] got dressed and met with [redacted] in the kitchen area. Epstein came into the kitchen and provided [redacted] $200.00 for bringing [redacted] and paid $200.00 to [redacted] for providing the massage. [redacted] was told to leave her telephone number with Sarah, his assistant for future contact. [redacted] provided her cellular telephone number for future contact. [redacted] was asked if she was recently contacted about this investigation by anyone from the Epstein organization. She replied she was called but it was for work. She stated she was called by Sarah for her to return to work for Epstein. [redacted] stated work is the term used by Sarah to provide the massage in underwear. [redacted] advised she declined, as she was not comfortable in providing that type of work. The interview was concluded and the videotape was placed into evidence.

Investigation Continues..

************************** N A R R A T I V E # 16 **************************

Reported By: RECAREY, JOSEPH 11/10/05
Entered By.: ALTOMARO, NICKIE A. 11/10/05

On November 7, 2005, I made telephone contact with [redacted] who advised she would be able to meet with me at her home. Det. Sandman and I traveled to her home in [redacted] and made contact with [redacted] During a sworn taped statement, [redacted] stated she met Jeffrey Epstein through Haley Robson. Robson would approach females who wished to work for him. [redacted] stated she was asked to work for him but declined. [redacted] explained that work means give massages. She was asked about any formal training in providing massages to which she said no. [redacted] said she accompanied Robson and other females

Case No. . . . : 1-05-000368 (Continued)

who were taken to Epstein s house to provide massages. [redacted] further stated she had been to the house approximately 4 or 5 times in the past year. She accompanied Robson with [redacted] the 14-year-old victim, and [redacted]. Each time the girls were taken over, they were previously told they would have to provide a massage, possibly naked. It was also told that should Epstein require them to do anything extra and they were not comfortable just to tell him and he would stop. [redacted] stated Robson received $200.00 for each girl she brought over to massage Jeffrey Epstein. When I asked which girl appeared to be the youngest, she replied, the victim, as she stated she was fifteen years old at the most; she looked really young. [redacted] further stated each time she went to the house, she sat in the kitchen and waited with Robson until the massage was over. She further stated that the cook would make lunch or a snack for them as they waited. I asked her if there was anything that caught her attention within the home. [redacted] stated there were a lot of naked girls in photographs throughout the house. The interview was concluded and the tape was turned into evidence.

Investigation Continues..

************************** N A R R A T I V E # 17 **************************

Reported By: RECAREY, JOSEPH 11/10/05
Entered By.: ALTOMARO, NICKIE A. 11/10/05

Det. Dawson and I attempted contact with [redacted] in [redacted] I left my business card at her front door. Ms [redacted] returned my call and arranged a meeting with me at the Palm Beach Police Department for November 8, 2005. At approximately 2:00pm, [redacted] arrived at the Palm Beach Police Department. She was brought into the interview room and the door was closed for privacy. She was told that I appreciated her coming to the police station for questioning regarding an on going investigation. She was told that I was investigating a crime involving Jeffrey Epstein and knew, based on the investigation, that she had encounters with him in the past. During a sworn taped statement, [redacted] stated she had met Epstein approximately two years ago. She was first introduced to Epstein by Haley Robson. Robson approached her about working for Epstein and providing a massage to him for $200.00. The arrangements were made and as Robson could not take her the day the arrangements were made, [redacted] took [redacted] [redacted] also attended [redacted] and was familiar with Epstein.

[redacted] recalled she was brought there and entered through the back kitchen door. She had met with an assistant Sarah and another assistant Adrianna. Sarah brought her upstairs as she observed several photographs of naked females throughout the house. [redacted] stated Epstein came in the room, wearing only a towel, and laid on the table. [redacted] stated he picked out the oils he wanted her to use and requested she remove her clothing to provide the massage. [redacted] stated that on the first massage she provided she did not remove her

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 6 of 45



Case No. . . . . : 1-05-000368 (Continued)

clothing. [redacted] stated she had returned several times after that. Each time she returned more things happened. [redacted] stated that the same thing would happen. Epstein would walk into the master bedroom/bathroom area wearing only a towel. He would masturbate as she provided a massage. [redacted] stated she was unsure if he climaxed as he masturbated under the towel. Additionally she never looked blow his waist. She claimed that Epstein would convince her to remove her clothes. She eventually removed her clothes and stayed in her thong panties. On occasion, Epstein would use a massager/vibrator, which she described as white in color with a large head, on her. Every time she provided a massage he would masturbate. [redacted] added she has no formal training in providing a massage. [redacted] stated she brought two females during her visits to provide massages. [redacted] stated she brought a girl named [redacted] and [redacted] from [redacted]. [redacted] stated she received $200.00 for each girl she brought. Additionally, [redacted] was given $200.00 for taking her in the very beginning. The interview was concluded and the tape was placed into evidence.

Investigation continues...

*************************** N A R R A T I V E # 18 ***************************

A Reported By: RECAREY, JOSEPH 11/13/05
Entered By.: ALTOMARO, NICKIE A. 11/14/05

On November 8, 2005, I made telephone contact with [redacted] W/F, [redacted] at her residence. [redacted] responded to the police station for an interview reference an ongoing investigation. At approximately 2:30 pm, she arrived at the Palm Beach Police Station and was brought into the interview room for the interview. The door was closed for privacy and she was told that I appreciated her cooperation in this case. During a sworn taped statement, [redacted] stated she had met Jeffrey Epstein approximately one year ago. She was approached by a subject known to her as [redacted]. [redacted] had asked her if she wanted to make money providing massages to Epstein. [redacted] had heard that several girls from [redacted] were doing this and making money. She agreed and was taken to the house by [redacted]. [redacted] had introduced her to Sarah and Epstein and brought her upstairs to a master bedroom and Master bathroom where a massage table was prepared and the proper oils were taken out. [redacted] left the room and waited downstairs for [redacted]. [redacted] stated Epstein entered the room wearing a towel and she provided a massage wearing only her thong panties. [redacted] advised Epstein had masturbated every time she provided a massage. She stated Epstein continued to masturbate until he climaxed; once that occurred the massage was over. She felt the whole situation was weird but she advised she was paid $200.00 for providing the massage. She also stated [redacted] received $200.00 for bring [redacted] to Epstein.

[redacted] stated she had gone a total of 15 times to his residence to provide a massage and things had escalated from just providing a

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 7 of 45



Case No. . . . . : 1-05-000368 (Continued)

massage. Epstein began touching her on her buttocks and grabbed her closer to him as he masturbated. Epstein also grabbed her breasts and fondled her breast with his hands as she provided the massage. [redacted] stated on one occasion, he offered extra monies to have vaginal intercourse. She stated this all occurred on the massage table. [redacted] stated Epstein penetrated her vagina with his penis and began having intercourse with her until he reached the point of climax. Epstein removed his penis from her vagina and climaxed onto the massage table. [redacted] received $350.00 for her massage. I asked her if she had any formal training in providing massages, [redacted] stated she did not.

[redacted] continued to state on one other occasion, Epstein introduced his assistant, Nada, into the massage. Nada was brought into room with [redacted] to provide a massage. Epstein had them kiss and fondle each other around the breasts and buttocks as they provided a massage to Epstein. Epstein, watched and masturbated as this occurred. On other occasions, Epstein introduced the large white vibrator/massager during the massage. Epstein stroked the vibrator/massager on [redacted] vagina as she provided the massage.

[redacted] stated the last time she spoke with anyone at the house, was with Sarah during the weekend of October 2 or 3, 2005. [redacted] stated she had brought two people to the Epstein house. She provided the names of [redacted] and [redacted] (unknown last name). It should noted, [redacted] had been previously identified as [redacted] and had been previously interviewed. The interview was concluded and the videotape was placed into evidence via the locker system.

On November 9, 2005, Sgt Frick and I traveled to 6791 Fairway Lakes Drive in Boynton Beach, Florida in hopes to interview Juan Alessi, the former houseman of Epstein's home. As no one was home, a business card was left for him to return my call. We then traveled to 11349 SW 86th Lane in Miami in hopes to interview Alfredo Rodriguez, a former house man of Epstein. We did not locate them at home. I left a business card for him to return my call.

We then traveled to [redacted] and met with Dean of Students, Mr. [redacted]. We requested to speak with [redacted]. [redacted] was re interviewed, as she still was in possession of the rental car that Epstein had acquired for her. [redacted] stated that Sarah, Epstein's assistant, had called her on her cellular telephone and informed her that rental was extended for her. Sarah stated she had paid an additional $625.00 for her to keep the rental an extra month. [redacted] was asked if she had any additional contact with either Epstein or anyone from his organization. [redacted] stated she did not, other than the telephone call informing her that she could keep the car for an extra month. [redacted] did not provide any additional information.

On November 10, 2005, at approximately 9:47 am, Alfredo Rodriguez had telephoned reference my business card found on his door. Rodriguez stated he had worked with Epstein for approximately six months after

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 8 of 45



Case No. . . . : 1-05-000368 (Continued)

the previous houseman left. Rodriguez stated that it was his responsibility to keep the identity of the masseuses private. Mr. Epstein had a massage in the morning and one in the afternoon. Mr. Rodriguez stated he would rather speak about this in private. He advised he would come to the police station to speak with me. Rodriguez stated he would return my call on Monday, November 14, 2005.

I then made telephone contact with Juan Alessi. He advised he found my card on his door and wanted to know what I needed to speak with him about. I explained to Alessi that I was conducting an investigation on his former employer, Mr. Epstein. Alessi stated he would return my call shortly as he was in the middle of a project at his home. I received a telephone call from Attorney Donald Morrell from 686-2700. Mr. Morrell stated he represented Mr. Alessi and did not want me speaking with his client. I then made telephone contact with the State Attorney s Office and confirmed that subpoenas would be issued to the former employees to assist in the investigation.

I then made telephone contact with Attorney Guy Fronstin, attorney for Mr. Epstein. I explained to Mr. Fronstin that I would like to speak with Mr. Epstein. He stated Mr. Epstein is not in residence in Florida at this time and would check with him to ascertain if he could be here by Wednesday November 16, 2005 for an interview. Mr. Fronstin stated he would return my call should Mr. Epstein decide to come in to the police station for an interview.

Investigation continues.

************************* N A R R A T I V E # 19 *************************
Reported By: RECAREY, JOSEPH 11/15/05
Entered By.: ALTOMARO, NICKIE A. 11/16/05

On November 14, 2005, Det. Sandman and I traveled to [redacted] in [redacted] and spoke with [redacted]. She was told of the ongoing investigation involving Epstein. [redacted] advised she had gone to the house on several occasions. During a sworn taped statement, she advised she started going to the house approximately one year ago and was brought by [redacted] (Unknown last name). [redacted] stated [redacted] brought her into the house and she was introduced to a girl named Sarah. Once she met her, Sarah brought her upstairs into a master bedroom bathroom. [redacted] stated she met Jeffrey in the bathroom. He lay on the table and picked the massage oils. She provided the massage, as he lay naked on the massage bed. She stated she rubbed his calves and back area. Upon the end of the massage, Epstein removed himself from the massage table and paid her $300.00 for the massage.

[redacted] stated she had only been at the house approximately five or six times. [redacted] said each time she went to the house she was notified by Sarah, Epstein's assistant, that Epstein was in town and would like her to work. [redacted] stated she returned to the house and was again led upstairs by Sarah. She provided the massage, clothed.

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 9 of 45



Case No. . . . . : 1-05-000368 (Continued)

[redacted] advised it wasn't really weird until later on [redacted] was asked if she ever removed her clothing to provide a massage. [redacted] stated it was not until the third time she went that she removed her clothing. [redacted] stated she was notified by Sarah that Epstein wanted her to come to work. She arrived at the house and was led upstairs by Sarah. She started providing the massage when Epstein asked her to remove her clothing. [redacted] removed her pants, shirt and bra. She stayed in her thong panties and continued rubbing Epstein. Epstein turned over onto his back and she rubbed his chest area. [redacted] stated she knew he was masturbating himself as she providing the massage. [redacted] stated she believed he climaxed based on his breathing. She did not want to view either the climax or the fact that he was masturbating. [redacted] stated once the breathing relaxed he got up and told her to get dressed. She was paid $300.00 for her services.

[redacted] stated on the last time she went to provide a massage, she was notified by Sarah to come to the house and work. [redacted] stated she was now dating her current boyfriend and did not feel comfortable going. She recalled it was approximately January 2005. She said she went, already thinking that this would be the last time. She went upstairs and went into the master bathroom. She met with Epstein, who was wearing only a towel as he entered the room to lie on the table. [redacted] stated Epstein caught her looking at the clock on several occasions. Epstein asked her if she was in a hurry. [redacted] stated her boyfriend was in the car waiting for her. [redacted] further stated that Epstein got upset, as she wasn't enjoying the massage. She told him that she didn't want to continue and she would not be back. Epstein told her to leave as she was ruining his massage. I asked her if she had any contact with Epstein's organization, she stated she received $200.00 from Western Union in Royal Palm Beach and Okeechobee Blvd as a Christmas gift. [redacted] advised she had no formal training in provide any massages. [redacted] also stated she was sixteen years old when she first went to Epstein's house.

At approximately 4:22 pm, I made telephone contact with [redacted] at [redacted] She agreed to meet with me at a public place. I suggested she come to the police station for an interview. [redacted] did not want to meet at the police station. I recommended we meet at the Palm Beach Gardens Mall in the food court area. She agreed and an appointment was made for November 15, 2005 at 5:00 pm at the food court.

Investigations Continue.

************************** N A R R A T I V E # 20 **************************
Reported By: SANDMAN, JENNIFER R. 11/16/05
Entered By.: ALTOMARO, NICKIE A. 11/17/05

On 10/20/2005, I assisted executing a search warrant at 358 El Brillo Way in the Town of Palm Beach, Palm Beach County Florida under the direction of affiant Detective Joe Recarey.

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 10 of 45



Case No. . . . . : 1-05-000368 (Continued)

Detective Melnichok and I searched the pantry room that is west next to the kitchen. This room had all white cabinets with a dark grey and black counter top. We did not find anything in this room.

We searched the yellow and blue room that is west next to the pantry room. This room had a very large statue of man with a bow. Taken into evidence from this room were nine photographs in frames of various women.

We searched the main entrance foyer that is to the north of the yellow and blue room. This room contained two bamboo chairs and ottomans with cushions. It also contained a round table with numerous books.

We searched another blue room that is west of the foyer. This room had a stereo system and book shelves that were from the floor to the ceiling. Taken into evidence from this room were eight photographs in frames of various women and/or Epstein, the owner of the residence.

We searched the room to the west of the blue room that has sliding glass doors that lead out to the pool. In this room in a dresser were two DVD's and two VCR tapes. These items were taken into evidence.

We searched a 2004 black Chevy Suburban bearing Florida tag X99-EGL, registered to Jeffrey Epstein DOB 01/20/53, which was located on the east side of the driveway facing south. I found a Thrifty rental agreement between the passenger seat and the middle console. The name on the rental agreement was Johanna Sjoberg from 622 Holly Drive Palm Beach Gardens, Florida 33410. The phone number on the rental agreement was (561) 714-0546. The vehicle rented was a white 2005 Chrysler Sebring bearing Florida tag W99-FUN. The vehicle was rented on 9/25/05 at 17:58 hours and was returned on 9/26/05 at 16:52 hours. The last four numbers of the credit card used are 9821. Detective Melnichok found a piece of paper in the middle console that said I used the cash in here to fill up the tank and was signed by Johanna.

I searched the 2005 black Cadillac Escalade ESV bearing Florida tag Q29-9GT, registered to Jeffrey Epstein dob 01/20/53, which was located on the west side of the driveway facing south. I did not find anything in this vehicle.

All of the items that were taken into evidence were photographed in the place they were located and then turned over to crime scene.

************************* N A R R A T I V E # 21 *************************
Reported By: RECAREY, JOSEPH 11/17/05
Entered By.: ALTOMARO, NICKIE A. 11/17/05

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 11 of 45



ase No. . . . . : 1-05-000368 (Continued)

On November 15, 2005, Det. Sandman and I traveled to [redacted] in [redacted]. We met with [redacted], a seventeen-year old juvenile who was not in school this day due to a cold from which she was suffering. [redacted] was told that I needed to speak with her in reference to an ongoing investigation involving a subject she would know as Jeffrey Epstein. Prior to speaking with her, I explained that because of the fact that she is a minor, I needed to speak with her parents prior to speaking with her. She telephoned her father, Mr. [redacted], on his cell phone and explained to him that Det. Sandman and I were there to speak with her. I spoke with Mr. [redacted] on the telephone and informed him I needed to speak with his daughter in reference to an ongoing investigation. Mr. [redacted] advised he had no problem with us speaking with his daughter.

During a sworn taped statement, [redacted] stated she met Jeffrey Epstein over a year ago. She was sixteen years of age and was approached by [redacted] who informed her that she could make monies providing a massage to Epstein for $200.00. [redacted] had informed her that she would have to provide this massage topless. [redacted] made the arrangements with Epstein and his assistants and took [redacted] to the house. [redacted] stated [redacted] and she entered through a glass door that led into a kitchen. [redacted] took her upstairs, to a master bedroom and master bathroom. She recalled the bathroom had a large pink couch, sauna and matching shower. Epstein entered into the room wearing only a towel. [redacted] and [redacted] removed their clothing remaining only in thong underwear. She further stated that Epstein lay on his chest on the table. Epstein selected which oils to use for the massage. Both [redacted] and [redacted] provided the massage on his legs, back and feet. Forty minutes into the massage, Epstein turned over onto his back and requested [redacted] wait downstairs in the kitchen area for [redacted]. Epstein instructed [redacted] to finish the massage. As [redacted] got dressed, [redacted] starting rubbing his chest. [redacted] left the room, and Epstein began masturbating himself as [redacted] rubbed Epstein s chest. [redacted] stated he continued masturbating until he climaxed on the towel he was wearing. When asked if he had removed the towel she stated he turned the towel around so that the opening would allow him to expose himself. After he cleaned himself off with the towel, he instructed [redacted] the massage was done and to get dressed and met with him downstairs. [redacted] got dressed and met with Epstein in the kitchen area. She was paid $200.00 dollars for providing the massage. [redacted] stated she was aware that [redacted] also received monies for the same thing.

The second time she went to the house she was again approached by [redacted]. [redacted] asked if she wanted to return to the house to provide another massage; [redacted] agreed and the arrangements were made by [redacted] for her to return to the house. [redacted] stated [redacted] drove her to the house and knocked on the same glass door that leads to the kitchen area. They were allowed entry into the house by one of the staff members. [redacted]led her upstairs to the master bedroom and

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 12 of 45




master bathroom area. [redacted] left [redacted] this time to do the massage alone. Epstein entered the room again wearing only a towel. [redacted] began removing her clothing as she did the last time she was at the house. Epstein instructed her to get naked. He lay on the table on his stomach as [redacted] began massaging his legs and back.

As [redacted] finished with Epstein's back and legs, Epstein then turned over onto his back. [redacted] started to rub his chest and he began masturbating himself. As [redacted] rubbed his chest, Epstein leaned over and produced a massager/vibrator. He turned it on and began rubbing [redacted] vagina and masturbating himself at the same time. [redacted] stated she continued to rub his chest as this was occurring. She described the vibrator/massager as large, grey with a large head. Epstein rubbed her vagina for approximately two to three minutes with the massager/vibrator. He then removed the vibrator from her vaginal area and concentrated on masturbating himself. [redacted] stated he climaxed onto the towel again and informed her that the massage was done. [redacted] got dressed and met with [redacted] who was waiting in the kitchen area. She received $200.00 for the massage. [redacted] said she never returned to the house and had no desire to return to the house. [redacted] was asked if she received any formal massage training. She advised she had no formal training. [redacted] was asked if Epstein knew her real age. [redacted] stated he knew as he asked her questions about herself and high school. He was aware she attended and is still attending [redacted].

The interview was concluded. I suggested [redacted] inform her parents of what occurred at the Epstein house. [redacted] stated she would tell her father as he was unaware this had occurred. I left my business card for any questions they may have. We left the area and returned to the police station. The tape was placed into evidence.

Investigation Continues.

************************* N A R R A T I V E # 22 *************************
Reported By: RECAREY, JOSEPH 11/17/05
Entered By.: ALTOMARO, NICKIE A. 11/17/05

On November 15, 2005, Officer Munyan and I responded to the Palm Beach Gardens Mall food court section to meet with [redacted]. At approximately 5:10 p.m., [redacted] arrived and met with us at the food court. [redacted] provided a sworn taped statement in which she stated she had been at the Epstein house over fifty times. She began going to Epstein's house when she turned eighteen years old. [redacted] was asked if she knew of the on-going investigation. [redacted] stated she was aware there was an investigation as she had been told by other girls that were interviewed. Additionally, she has had several telephone conversations with Epstein's assistants as to what had been going on during the investigation.

I asked [redacted] how she was introduced to Epstein. [redacted] stated she did not want to disclose who brought her to the house but she would

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 13 of 45



Case No. . . . . : 1-05-000368 (Continued)

respond to any other questions. When I asked her what happened at the house, [redacted] stated everything happened. It all began with the massages. Each time she went more things happened. She would massage Epstein and he would masturbate and climax. She stated things escalated from there. She provided oral sex on Epstein and he provided oral sex on her. She stated he would also use a massager/vibrator on her vagina to stimulate her as she massaged him. He introduced his assistant Nadia or Nada to have vaginal intercourse with [redacted]. She stated Nada or Nadia would utilize a strap-on (synthetic penis) to have intercourse with her. She was told to masturbate herself as Epstein and Nada had sexual intercourse. All this was done at Epstein's direction.

[redacted] could not provide exact dates as she had been to the house so many times. [redacted] stated Epstein inserted his fingers in her vagina to stimulate her as she massaged him. When I asked her if there had been any vaginal intercourse with Epstein, she stated she did not have sex with him. She did admit having sex with Nada, his assistant. [redacted] stated not every time she went involved sexual favors. Sometimes she would just talk with him and get paid. I asked her how much she was paid each time she went to Epstein s residence. [redacted] stated she got paid $300.00 every time she went to the house. She was told to bring other girls to him to provide massages. [redacted] declined stating that she does what she does and did not want to introduce anyone else to do what she does. [redacted] stated she had never received any formal training in providing massages.

I showed [redacted] a photo line up in which Nada Marcinkova was placed in position six. She reviewed the six photographs and immediately identified Nada Marcinkova as the person with whom she had intercourse. Additionally, it was the same person she watched have intercourse with Epstein. She signed the photo line-up under Nada Marcinkova s photo as the person she identified. We then left the mall and returned to the police station. The photo line up and tape were placed in to evidence.

Investigation Continues...

************************* N A R R A T I V E # 23 *************************
Reported By: RECAREY, JOSEPH 11/29/05
Entered By.: ALTOMARO, NICKIE A. 12/01/05

On November 17, 2005, I received a phone message from Atty. Guy Fronstin who advised to call his cellular phone reference his client Jeffrey Epstein. I telephoned his cell phone and left a message for him to return my call. I did not receive a call back on Thursday, November 17, 2005. On Friday, November 18 2005, I retrieved another voice mail from my work phone from Mr. Fronstin advising he would not produce his client Jeffrey Epstein for any statement. Fronstin stated he had spoken with ASA Lana Belohlavek and expressed Mr. Epstein has a passion for massages. I called ASA Lana Belohlavek and confirmed that

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 14 of 45



Case No. . . . . : 1-05-000368 (Continued)

Fronstin had telephoned her reference this case. Although nothing was discussed, Mr. Fronstin did advise her that Epstein is very passionate about massages.

I also spoke with ASA Daliah Weiss reference the previous employees, Juan and Maria Alessi. She advised that they had been served through a subpoena process server. They were both scheduled to appear on Monday November 21, 2005 at 12:00 p.m.

On November 21, 2005, I met with ASA Weiss, Atty. Donnie Murrell and Juan and Maria Alessi at the State Attorney Office. ASA Weiss had requested a court reporter to be present to take the statement of the Alessi s. I spoke with Maria Alessi, in the presence of her attorney, Donnie Murrell. She advised she had worked for Epstein for eight years, from the period of 1994 through 2002. She advised she had never had any direct conversations with him. She stated it was her husband who spoke directly with Epstein. Her work consisted of doing house cleaning, shopping and other preparations when Epstein would arrive in town. Alessi stated the preparations consisted of preparing the house and bathrooms for his arrival. She advised she did view several masseuses that arrived at the house. She advised that two or three girls would come during a day and provide the massages. The girls that arrived looked young in age. Mrs. Alessi did not know any of the girls personally and were always different. She was told that when Epstein was in residence he did not want to encounter the Alessis during his stay in Palm Beach.

I then spoke with Mr. Alessi in the presence of his attorney, Donnie Murrell. Mr. Alessi stated that he was employed for eleven years with Mr. Epstein. He originally was hired as a part time employee and then moved up into a full time position. His duties included everything. Alessi stated he was the house manager, driver and house maintenance person. It was his responsibility to prepare the house for Epstein s arrival. When asked about cooks or assistants, Alessi stated they traveled with Epstein on his private plane. He remembered dealing with his girlfriend, Ms. Maxwell originally and then dealt with Epstein directly.

I asked Mr. Alessi about massages that occurred within the home. Mr. Alessi stated Mr. Epstein had up to three massages a day. Each masseuse that visited the house was different. Alessi stated that towards the end of his employment, the masseuses were younger and younger. When asked how young, Mr. Alessi stated they appeared to be sixteen or seventeen years of age at the most. The massages would occur in Epstein's bedroom or bathroom. There were times he recalled that he would set up the massage tables either in Epstein s bedroom or in his bathroom. I asked if there were things going on other than a massage. Alessi stated that there were times towards the end of his employment that he would have to wash off a massager/vibrator and a long rubber penis, which were in the sink after the massage. Additionally, he stated the bed would almost always have to be made after the massage. Alessi was never privy to what went on during the

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 15 of 45



Case No. . . . . : 1-05-000368 (Continued)

massages.

He was asked if he remembered any names of the girls that massaged Epstein. He tried to remember and was unable to provide any exact names of any girls. Alessi was asked about any contact with anyone from the Epstein organization. Alessi said he did speak with Mr. Epstein shortly after my initial contact with him to find out what was going on. Alessi also stated that approximately on November 11, 2005, he was contacted by a private investigator from the Law Office of Roy Black. The investigator had called him to meet with him to ascertain what he was going to tell the police. Alessi stated they met at the Carrabba s Restaurant in Boynton Beach and discussed the same questions I was asking him. I informed Mr. Alessi and Mr. Morrell that as this is an ongoing investigation and anything we discuss should be confidential. They both acknowledged the fact that the information would be kept confidential. It should be noted that a court reporter was present during the interviews and would be providing a copy of the statements to me when they become available.

On November 21, 2005, I received a voice mail from Mr. Fronstin who advised he would not be making Mr. Epstein available for any statements. He did have some words that he wanted to relay on behalf of Mr. Epstein. I telephoned his office and left a message for him to return my call.

On November 29, 2005, I received a call back from Mr. Fronstin who left a voice mail after hours on November 28, 2005, advising he would return my call during normal business hours to speak with me reference the case on November 29, 2005.

************************* N A R R A T I V E # 24 *************************

Reported By: RECAREY, JOSEPH 11/29/05
Entered By.: ALTOMARO, NICKIE A. 12/01/05

On November 29, 2005, at approximately 2:30 p.m. I received a telephone call on the department issued cell phone. Mr. Fronstin stated he was calling to relay information that Mr. Epstein wished he could relay. Mr. Fronstin stated that he would not allow Mr. Epstein to speak with me at this time. He further stated that Mr. Epstein is very passionate about massages. He continued that Mr. Epstein had allegedly donated over $100,000 to the Ballet of Florida for massages. The massages are therapeutic and spiritually sound for him that is why he has had many massages. Mr. Fronstin stated he appreciated the way the investigation has not been leaked out into the media. I explained to Mr. Fronstin that it is as important to protect the innocent if the allegations are not substantiated. Mr. Fronstin was told of the allegations that the private investigators assigned to the case have been portraying themselves as police officers. Additionally, I explained that my cell phone had been called by the private investigators. Mr. Fronstin advised he was not aware of that and advised they were under the direction of Attorney Roy Black in

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 16 of 45



Case No. . . . : 1-05-000368 (Continued)

Miami. Mr. Fronstin further stated Epstein had originally called Mr. Dershorwitz in Boston, who recommended Roy Black in Miami, who asked Mr. Fronstin to assist. I informed him that if and when any charges would be presented I would notify him. The call was then terminated.

Investigation continues.

*************************** N A R R A T I V E # 25 **************************

JA Reported By: RECAREY, JOSEPH 12/15/05
Entered By.: ALTOMARO, NICKIE A. 12/16/05

A review of the telephone message books, which were obtained during the search warrant, was conducted in which various messages from different dates were made to Jeffrey Epstein. The telephone message books have a duplicate copy (Carbon Copy) which, once a phone message is written into the book, the top copy is then torn on the perforated edge and the carbon copy is left in the book. First names of girls, dates and telephone numbers were on the copy of the messages. I recognized various numbers and names of girls that had already been interviewed. The body of the messages was time of the day that they called for confirmation of "work." Other names and telephone numbers were located in which the body of the messages were, "I have girls for him" or "I have 2 girls for him." These messages were taken by Sarah for Jeffrey Epstein. Based on the context of the body of the messages, I requested subpoenas for subscriber information on the telephone numbers and the time frame involved. Copies of the messages were made for evidentiary purposes.

I obtained [redacted] yearbooks for 2005, 2004 and 2003. I first reviewed the 2005 yearbook and located most of the girls I had spoken with. Additionally, I located [redacted] Based on the corrected name spelling, I was able to locate her to her residence in [redacted]. On December 8, 2005, Det. Caristo and I responded to [redacted] in [redacted] I located [redacted] at her home. She advised she is attending [redacted] and is participating in the early release program so she can maintain her part time job. As she is still a minor, I left my business card to have her mother return my call to request an interview with her daughter. We then left the area.

I also had previously researched the telephone number for [redacted] and telephone number [redacted] A subpoena had been issued for the information on [redacted] The telephone number was registered to [redacted] of [redacted] A query of [redacted] revealed that she is the daughter of [redacted] and is currently residing at [redacted] Det. Caristo and I attempted contact with [redacted] with negative results. I left my business card on her front door requesting she return my call. We then responded to [redacted] I also attempted contact with Mr [redacted] with negative results. I left my business card for him to return my call.

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 17 of 45



Case No. . . . : 1-05-000368 (Continued)

On December 9, 2005, I received a telephone call from [redacted] mother, who was made aware of the on going investigation in Palm Beach. [redacted] advised she was told of everything that occurred at Epstein's house involving Epstein and his staff. She advised she would allow me to question her daughter about what occurred and would cooperate with the investigation. [redacted] provided me with [redacted] cellular telephone number to schedule an appointment for an official interview. I telephoned her cellular telephone and made a tentative appointment for Monday, December 12, 2005.

I then received a telephone call from [redacted], father of [redacted] who stated he found the business card on his door. I explained that I was conducting an investigation and needed to speak with [redacted] as she may have information that could assist in the investigation. Mr. [redacted] stated that his daughter no longer resides with him and has her own trailer in another trailer park. He advised he would tell her to call me.

On December 12, 2005, due to a conflict with schedules, arrangements were made to meet with [redacted] on Tuesday, December 13, 2005 at 5:00 pm. On December 13, 2005, Det. Dawson and I traveled to [redacted] and met with [redacted] During a sworn taped statement, [redacted] stated that when she was sixteen years old, she was taken to Epstein's house to provide a massage for money. [redacted] stated it was before Christmas last year when [redacted] approached her and asked if she needed to make money for Christmas; [redacted] stated she did and agreed to provide a massage for money. [redacted] made arrangements to take [redacted] to the house and drove [redacted] to the house to "work." [redacted] stated she could not remember the street name but would be able to drive to the street. They drove to the last house on the street and pulled in the last house on left side. They walked up the driveway and entered through a side gate which led to a kitchen door. They knocked on the door and were encountered by an employee who [redacted] described as a "Spanish looking lady." They informed her that they were expected. They were then encountered by a white female with long blond hair. [redacted] was unable to remember the name of the white female with blond hair but knew she was Epstein's assistant. She was led upstairs by the white female who explained that there would be lotions out already and Epstein would choose the lotion he wanted her to use. She was led through a spiral staircase which led to a master bedroom and bathroom. The massage table was already set up in the bathroom. [redacted] described the bathroom as a large spacious bathroom with a steam room and shower beside it with a sink to the right. [redacted] was introduced to Jeff who was on the phone when she entered. Jeff was wearing a white towel and lay on his stomach so that [redacted] may massage his feet and calves. [redacted] started the massage with the massage oil Jeff chose and rubbed his feet and calves. Jeff got off the phone and requested she massage his back as well. [redacted] began rubbing his back and got to the small of his back. During the rubbing of his back Jeff asked her to get comfortable. He

Case 1:15-cv-07433-RWS Document 173-3 Filed 05/27/16 Page 18 of 45



Case No. . . . . : 1-05-000368 (Continued)

requested she remove her pants and shirt. [redacted] removed her shirt and pulled her pants off. [redacted] stayed in her bra and thong panties. As she finished the small of the back, Jeff then turned onto his back. He instructed she rub his chest and pinch his nipples. As she began to rub his chest, Jeff asked her questions about herself. [redacted] remembered telling him she attended [redacted]. Jeff asked her if she was sexually active. Before [redacted] could answer, he also asked what sexual positions does she enjoy. [redacted] stated she was shy didn't like talking about those things. She continued rubbing his chest. Epstein reached up and unsnapped her bra from the front. [redacted] explained the bra she used had a front snapping device. Epstein rubbed her breasts and asked her if she like having her breasts rubbed. [redacted] said "no, I don't like that." Epstein then removed his towel and lay on the bed naked exposing his penis to [redacted] He began touching his penis and masturbated as he touched her breasts. [redacted] explained Jeff then touched her vagina area by rubbing her vagina with his fingers on the outside of her thong panties. [redacted] tensed up and stated Jeff was aware that she was uncomfortable.

[redacted] stated that Jeff told her , "Relax, I'm not going inside." She further explained Jeff commented to her how beautiful and sexy she was. Jeff then moved her thong panties to one side and now was stroking her clitoris. [redacted] said "Jeff commented how hard my clit was." He then inserted two fingers in her vagina and was stroking her within her vagina. She tried pulling back to pull out his fingers from within her vagina. Jeff removed his fingers from within her vagina and apologized for putting his fingers inside her. During this time he kept his hand on her vagina area rubbing her vagina. [redacted] stated he rubbed her real hard as he was masturbating. [redacted] said he climaxed onto the towel he had been previously wearing and got up from the table. Jeff told her there was $200.00 dollars for her on the dresser within the master bathroom. Jeff also told her that there was an additional $100.00 that was to be given to [redacted] for bringing her there to massage him. Jeff told her to leave her telephone number with his assistant as he wanted to see her again. Jeff stated his assistant would contact her to work again soon.

I asked her if she ever received any formal massage training to which [redacted] stated she did not. [redacted] stated it was the only time she ever went to work for Jeff and knew what happened to her was wrong. She stated she no longer speaks to [redacted] because she was upset that [redacted] took her there. She further stated that she had never been contacted for any additional work. The interview was terminated and we left the area.

Investigation Continues...

************************** N A R R A T I V E # 26 **************************
Reported By: DICKS, ALLEN C. 12/18/05
Entered By.: ALTOMARO, NICKIE A. 12/19/05

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 19 of 45



Case No. . . . : 1-05-000368 (Continued)

On 102005 at approx 0930hrs I assisted with the execution of a search warrant at 358 El Brillo Ave, Palm Beach.

Initially I was assigned to enter the residence and conduct a sweep of the premises for safety purposes. I then accompanied CSEU tech Pavlik while she photographed the exterior of the house. Once this was complete I was assigned to search certain areas of the house with Det. Dawson as part of the search warrant.

We began in the garage, searching three Mercedes Benz vehicles, a Harley Davidson motorcycle and adjacent closets in the garage. Nothing of evidentiary value was located.

We then searched two closets off the kitchen area on the east side. These can best be described as pantry or storage closets. Nothing of evidentiary value was obtained.

A small office with adjoining bath was then searched. In the bath area I located a phone message book with recent messages. This item was seized as evidence. Please note this bath and shower area are not used as designed but are storage areas containing a variety of items to include a gun safe in the shower and assorted household items.

We then searched a bath area and closet at the base of the main stairs in the foyer. Inside the closet two massage tables were located as well as partial nude female photographs. These items were later seized as evidence. Nothing of evidentiary value was noted in the bathroom.

We then searched two bedrooms upstairs on the east side of the residence. Located in the bath room of the south bedroom was penis shaped soap. Located in the bedroom of the northern bedroom was penis and vagina shaped soap as well as an adult sex toy. These items were seized as evidence.

We then searched the pool cabana located in the south west corner of the property. Several photographs of nude females were seized as evidence.

I was then assigned to stand by with a person I believe was Douglas Schoettle. Mr. Schoettle was in the residence at the beginning of the search warrant. He was present during the warrant service and subsequent search. I stood by with him until the search was completed and I departed the residence. I had no conversation with him regarding the reason for our presence.

Regarding seized evidence, all items were photographed in place and then collected by CSEU personnel.

This concludes my involvement in this case.

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 20 of 45



************************** N A R R A T I V E # 27 **************************
IA Reported By: KRAUEL, CURTIS D. 12/21/05
Entered By.: ALTOMARO, NICKIE A. 12/21/05

On Thursday, October 20, 2005 at approximately 0936 hours, I assisted in the execution of a search warrant located at 358 El Brillo Way, Palm Beach, Florida, residence of Jeffrey Epstein. I was instructed by Case Agent Det. Joseph Recarey, to secure all computer and media related material from the residence.

Upon my arrival I was directed by Det. Recarey to a room designated as the Kitchen Staff Office. I observed a, Silver in color, CPU with the left side cover removed, exposing the CPU s hardware sitting on floor next to a glass type desk. The CPU had no discernable identifiers or features indicating a make or model. This CPU was powered off with the power cord not plugged in. The keyboard and mouse were atop the CPU. It should be noted that the CPU was not connected to a monitor, printer, or other media device. On the back Panel of the CPU, I observed an A/V card with RCA jacks attached. This type of hardware would allow audio and video to be downloaded onto the CPU s hard disk. The ends of the RCA jacks were unattached at the time of the search and no external camera was located within this room.

The CPU was located on the right side of a desk that held a flat panel LCD screen. The desk also held another keyboard and mouse, indicative of a second computer; however, no other computer was found. It appeared as though a second computer had been recently removed as the cables ends from the monitor, keyboard and mouse were in the same area. A further search of the room revealed no media storage devices, i.e. CD s, Floppy Disks, Zip Disks, etc. This type of media is commonly stored in an area where computers are placed, yet no media was found.

After completing a search of this room, I secured the CPU and turned all items over to the Evidence Custodian for future forensic analysis via a property receipt.

I was then directed by Det. Recarey to a room designated as the Garden Room, where I observed a wooden desk facing west. The desk held a flat screen LCD monitor, keyboard, mouse, media card reader and printer; however, no CPU was located. All of the cables were removed from an area where a computer had once been. A search of the desk area revealed no signs of any media devices.

Det. Recarey directed me to a third location designated as the Cabana room, which is detached from the residence and located just south of the pool. In the South East corner of the room, I observed an office type setting, with an L-shaped desk holding a flat screen LCD monitor, keyboard, mouse and printer; however, no CPU was located. All of the cables were removed from an area where a computer had once been. A search of the desk area revealed no signs of any media devices.

Case No. . . . : 1-05-000368 (Continued)

Det. Recarey directed me to a second detached structure located on the South East corner of the property. This area of this structure was assigned with single letters to identify a particular part of the room. In the office area, designated as Room B, I observed a powered on Dell Dimension 2350, attached to an LCD flat panel monitor. The screen displayed an open Microsoft Internet Explorer browser with URL address of http://home.bellsouth.net/. I observed no other active windows in the Start panel window and photographed screen. The power cord was removed from the back of the Dell CPU and I disconnected the cable modem to prevent remote access. At that time, the Dell CPU, marked with Serial Number 6WTVN21, was secured and turned over the evidence custodian for future forensic analysis via property receipt. I also located several media related items within Room B, which were recorded onto a property receipt and turned over the Evidence Custodians.

I then responded to a Bedroom designated as Room F, where I observed a white in color CPU marked Premio. The Premio CPU was in a computer desk which held a white CRT monitor, both of which were powered on. The CRT monitor displayed a message from Norton Antivirus software, warning of an expired subscription. I observed no other active windows in the Start panel window and photographed screen. I removed the power cable from the back of the Premio CPU and shutdown all other media. The Premio CPU, marked with Serial Number 2000091078, was secured and turned over the evidence custodian for future forensic analysis via property receipt. I also located several media related items within Room F, which were recorded onto a property receipt and turned over the Evidence Custodians.

This concluded my participation in the search of the residence.

*************************** N A R R A T I V E # 28 ***************************

Reported By: RECAREY, JOSEPH 12/21/05
Entered By.: ALTOMARO, NICKIE A. 12/21/05

On December 20, 2005, I contacted ASA Daliah Weiss in an attempt to subpoena the Epstein former houseman, Alfredo Rodriguez. Rodriguez, who resides in Miami, had eluded the process servers previously and was not served the investigative subpoena. A telephone message was left as she is not available during the week of 12/19/2005. I made contact with State Attorney Inv Theresa Wyatt and requested the same via telephone message.

I then researched the victim's [redacted] cellular telephone subpoena data which had been received from a previous subpoena request. I analyzed the records which depict several calls from Haley Robson. The telephone calls start on February 6, 2005 at 12:49 pm.; the same day which the victim and the victim's father stated the incident occurred at Epstein s house. The first incoming call was from Robson's residence at 561 333-0180. The second incoming call from Robson's

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 22 of 45



ase No. . . . : 1-05-000368 (Continued)

cellular phone 561-308-0282 occurred at 1:02 pm. The call durations were one minute or less. The time frame was within thirteen minutes apart. It should be noted that Robson s residence was in close proximity to the victim's. The next call occurred at 5:50 pm when the victim telephoned Robson s residence. Several calls were made after the above mentioned calls both incoming and outgoing to Robson. Further analysis showed no telephone calls to either Robson's cellular telephone or Robson's residence were registered prior to February 6, 2005.

Additionally, I also conducted an analysis on the telephone calls from 305-710-5165. The subscriber information confirmed that the number is registered to Paul A Lavery from Hialeah, Florida. The address was crossed referenced to the Office of Kiraly and Riley Private Investigators. I researched the web page www.rileykiraly.com which also showed various cases in which they assisted. I also located another web site under www.coralspringssparklandrotary.org in which Mr. Riley attended a Miami Rotary meeting and confirmed Atty. Roy Black is among his clientele.

The telephone calls revealed Lavery had telephone contact with [redacted], [redacted] and [redacted] either just after I attempted to interview them, or just prior. A background was conducted on Lavery which revealed he holds a current Private Investigator License. A criminal arrest record revealed he had been previously arrested for possession of cocaine and solicitation of prostitution.

I also researched the girls using www.myspace.com. This web site is a new social networking service that allows members to create unique personal profiles online in order to find and communicate with old and new friends. The site allows one to establish your own myspace.com page and decorate the page any way one wishes. I found the following people have myspace sites: Haley Robson, [redacted], [redacted] and [redacted]

I received a Cingular Wireless packet which contained a CD which contained the results of the subpoena request for verbatim calls on [redacted] An analysis will be conducted in the near future on the phone numbers called.

Investigation Continues.

************************* N A R R A T I V E # 29 *************************

Reported By: RECAREY, JOSEPH 12/27/05
Entered By.: ALTOMARO, NICKIE A. 12/29/05

Upon doing research on the message books recovered in the search warrant, I located the identity of [redacted] The telephone number [redacted] was registered to [redacted] She currently is seventeen years old and is attending the [redacted]. I

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 23 of 45



ase No. . . . . : 1-05-000368 (Continued)

responded to [redacted] also known as the [redacted] I located the [redacted] I located [redacted] inside the foundation and informed her that I was investigating a case against Jeffrey Epstein and knew she had been at the house. [redacted] started to cry and advised she had put that part of her life behind her. I explained that although she is seventeen years old I needed to inform her parents that she would be interviewed. She provided her home telephone number. I attempted contact and left voice mail messages at the house to speak with her parents.

Det. Caristo and I then located [redacted] at her residence located at [redacted] in [redacted] I attempted to interview her about Jeffrey Epstein. She advised she is so in love with Jeff Epstein and would do anything for him. She further explained that she would not speak with us about him either negative or positive. She asked us to leave her property. I informed her that although she did not wish to speak with us, I had sufficient information at this point in the investigation to know she was at Epstein's house and provided girls to Epstein to work. I also explained that prior to our arrival at her residence I had telephone contact with her father, [redacted] who was told she would be interviewed. [redacted] is currently seventeen years old and as a juvenile, parental notification would be required. We then left the area and returned to the police station.

While at the police station, I left another telephone message for [redacted] parents. I began an analysis of Sarah Kellen's Cellular telephone. The telephone number 917-855-3363 is assigned to Sarah Kellen and the financially responsible party is Jeffrey Epstein of 457 Madison Ave. in New York City, New York. The time frame which was subpoenaed was September 2005, through October 2005. There were eighty seven pages of calls made either to the cell phone or from the cell phone. The local (561) numbers were analyzed. A spread sheet was prepared and placed into the attachment file of who was called.

The unknown numbers were researched using FoneFinder.com and subpoenas were requested to determine subscriber information. This was done to identify additional victims or witnesses. The analysis revealed that Kellen had called the victim/witnesses frequently when Epstein was in the Town of Palm Beach to "work." This confirms what the girls interviewed had previously stated. Kellen would notify them when Epstein was in town and their willingness to "work." The CD was placed into evidence.

Investigation Continues.

************************* N A R R A T I V E # 30 **************************

Reported By: RECAREY, JOSEPH 1/03/06
Entered By.: ALTOMARO, NICKIE A. 1/03/06

On December 29, 2005, I received a facsimile from National Compliance

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 24 of 45



Case No. . . . : 1-05-000368 (Continued)

Center from Cingular Wireless for telephone number 561-308-0282. This was the telephone number for Haley Robson during the time frame when the victim, [redacted] was brought to the Epstein house to "work." An analysis of the phone records, of all incoming and outgoing calls, showed that on February 6, 2005, the day the victim, [redacted] was brought to the house, Robson first called Sarah Kellen, Epstein's assistant, at 917-855-3363at 12:50 pm (EST). The next call was made to Epstein's house in Palm Beach, at 12:52 pm (EST). The following call was made to the victim, [redacted] at 1:01 pm (EST) and at 1:02 pm (EST). This confirms the information provided by the victim and victim's father. I photo copied the records and enlarged the page 8 of 10 to show the calls made by Robson on February 6, 2005.

To this date, I have not heard from [redacted] parents. I will attempt to establish contact with them during the evening hours. I received a package from Atty. Guy Fronstin, which was hand delivered at the police station. Within the package, was a letter from Alan Dershowitz, and two www.myspace.com profiles. The profiles were that of [redacted] and [redacted] MySpace.com is a social networking service that allows members to create unique personal profiles online in order to find and communicate with old and new friends. This package was in response to a previous meeting in which Mr. Dershowitz called to assist in the investigation in providing any additional witnesses such as house employees who have been reluctant to speak with law enforcement.

I reviewed the profiles Mr. Dershowitz enclosed. [redacted] who designed her blog to be [redacted]" still attends [redacted] sends and receives messages from friends which contain some profanity. Upon reviewing her friends' comments section from Myspace, most of her good friends sent messages to establish contact and invite her to go out.

I then reviewed [redacted] web blog which was provided by Mr. Dershowitz. Ms. [redacted] designed her blog to be [redacted]' Her blog states that her interests include music, theater and weed (Marijuana). I reviewed her packet in which [redacted] declares her love for her live-in boyfriend. She also describes using marijuana with her boyfriend [redacted]

The letter Mr. Dershowitz sent advised he was looking into the allegation that one of the private investigators used by the private attorneys of Epstein, attempted to impersonate or state that they were police officers from Palm Beach. Mr. Dershowitz advised that the investigators used to interview [redacted] had "quite a distinct speech impediment", did not claim to be nor did they impersonate themselves as a police officer. This package was sent to both ASA Lana Belohlavic and ASA Daliah Weiss at the State Attorney's Office.

I made telephone contact with ASA Weiss to confirm she received the package and request an interview with Sarah Kellen, Nada Marcinkova, and Janusz Banasiak. She advised she would assist in attempting to

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 25 of 45



ase No. . . . . : 1-05-000368 (Continued)
contact Mr. Dershowitz.

On January 3, 2006, I received a telephone call from ASA Weiss who informed me that she made telephone contact with Mr. Dershowitz. She had requested the employees be available the week of January 3, 2006. Mr. Dershowitz informed her that the assistants are out of the country and would require additional time to locate them and make them available.

Investigation Continues.

************************** N A R R A T I V E # 31 **************************
Reported By: MINOT, LORI S. 1/03/06
Entered By.: ALTOMARO, NICKIE A. 1/03/06

On Thursday, 03/31/05, I started conducting surveillance at 358 El Brillo. At this point I observed at 1155 hours, a Tan Altima bearing FL tag A303AN in Roadway, Black SL bearing FL tag V55RFW in drive, Tan Honda Civic bearing FL tag X98APM in Roadway, Black Chevy Suburban in driveway and a Black Caddy Escalade in driveway. At 1325 Hours I observed Tan Honda Civic X98APM in roadway, Black Chevy Suburban in driveway, Black Caddy Escalade in drive and a White Kia car bearing FL tag D651BQ. At 1615 hours I observed a Tan Honda Civic, X98APM in roadway, Black Chevy Suburban in drive, Black Caddy Escalade in driveway and a White Kia car D651BQ in roadway.

On Friday, 04/01/05, I continued surveillance at 358 El Brillo. At 1130 hours I observed a Tan Honda Civic bearing FL tag X98APM in roadway, Black Caddy Escalade in driveway and a Tan unknown make/model bearing FL tag A303AN in roadway. At 1227 hours, I observed a Tan Honda Civic X98APM in roadway, Black Caddy Escalade in driveway and a Black Chevy SUV located behind the Escalade. At 1345 hours, I observed a Tan Honda Civic X98APM in roadway and a Black Chevy SUV in driveway. At 1558 hours, I observed a Tan Honda Civic X98APM in roadway, Black Chevy SUV in driveway, Black Caddy Escalade in driveway and a dark unknown model/make car parked in garage.

On Saturday, 04/02/05, I continued surveillance at 358 El Brillo. At 0713 hours, I observed a Red Explorer bearing FL tag J98JEI in roadway and a Black Caddy Escalade in driveway. At 0814 hours, I observed a Red Explorer J98JEI in roadway, Black Caddy Escalade in driveway and a Tan Honda Civic X98APM. At 0952 hours, I observed a Red Explorer J98JEI in roadway, Black Caddy Escalade in driveway, Tan Honda Civic X98APM in roadway and also a Grey unknown make/model with a B.M in trunk retrieving landscaping tools.

At 1155 hours, I observed a Grey Camaro bearing FL tag [redacted] parking in the roadway in front of 358 El Brillo. A W/F, blond hair, teens to early 20's, thin and tall wearing a white tank top and short blue jean shorts, exited the vehicle and walked to the rear of the house. I also observed a Red Explorer J98JEI in roadway, Tan Honda Civic X98APM in roadway and a Black Caddy Escalade in driveway. At 1310 hours, I

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 26 of 45



Case No. . . . . : 1-05-000368 (Continued)

observed a Red Explorer W/F driver leaving the area, Tan subcompact on roadway and a Red Neon bearing FL tag [redacted]. Then observed 3 W/Fs, approximately 16 to 18 years of age jogging. All 3 females ran into the driveway. There were 2 with blond hair and one brown hair.

On Sunday, 04/03/05, I continued surveillance at 358 El Brillo. At 0719 hours I observed a Tan Honda Civic X98APM in roadway and a Black Caddy Escalade. At 0934 hours, I observed a Tan Honda Civic X98APM in roadway and a Black Caddy Escalade in driveway. At 1057 hours I observed only the Tan Honda Civic X98APM.

On Tuesday, 04/05/05, I continued surveillance at 358 El Brillo. At 1052 hours, I observed a Red Explorer J98JEI in roadway, a Green Explorer, bearing FL tag F91KAK in roadway, a Grey Altima bearing FL tag A303AN in roadway, White Ford Truck H58LRA in roadway, Black Mercedes in driveway being washed by a B/M and an unknown dark car parked in the garage. At 1059 hours a Blue Chevy Suburban drove to the house of 358 El Brillo and parked in the driveway. At 1119 hours, I observed the White Fort Truck H58LRA leave the area and the drive was the pool man.

At 1126 hours, I observed a Grey unknown make/model car park in roadway. W/M got out of the car and walked to a house on the south side of El Brillo. At 1406 hours, I observed a Red Explorer parked on roadway and a large white box truck parked behind the surveillance suburban.

**************************** N A R R A T I V E # 32 **************************
Reported By: BATES, MICHAEL J. 1/03/06
Entered By.: ALTOMARO, NICKIE A. 1/03/06

On 03/31/05, at approximately 1500 hours while conducting surveillance at 358 El Brillo, I observed a Black Cadillac Escalade, unknown tag, a Black Chevrolet Suburban, unknown tag, a Black Mercedes S600 FL tag U90BQL parked in the east driveway next to the 3-car garage. There was a Tan Honda Civic FL tag X98APM parked on the street in front of the residence.

At approximately 1700 hours, I observed the Black Suburban, Black Escalade, Black Mercedes and Tan Honda Civic parked in the same place. At 1750 hours, there was no change in vehicles. At 1840 hours, I observed the Black Escalade, Black Suburban and Black Mercedes along with a Silver Hyundai Accent FL tag A136AN all parked in the east driveway and a Red Ford Explorer FL tag J98JEI parked on the street in front of the residence.

At 2000 hours, I observed the Black Escalade, Black Suburban parked in the ease driveway and the Red Explorer and Tan Civic parked on the street.

On Friday, 04/01/05 at approximately 1700 hours, I observed the Black

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 27 of 45



ase No. . . . : 1-05-000368 (Continued)

Escalade and Black Suburban parked in the east driveway and the Tan Honda Civic parked on the street in front of the residence. At 1820 hours, I observed the Suburban and Civic in the same place and a Gold Chevrolet Camaro FL tag [redacted] parked on the street in front of the residence. At 2250 there was no change. At 2330, I observed the Black Escalade parked in the driveway and the Red Explorer parked on the street in front of the residence.

On Saturday, 04/02/05 at approximately 1700 hours, I observed a Black Escalade, unknown tag, parked in the driveway and a Tan Honda Civic FL tag X98AMP parked in the street in front of the residence. At 1805 hours the Escalade and Civic were in the same position and the Black Mercedes FL tag U90BQL was also parked in the east driveway. At 1920 hours the Escalade and Civic were the only vehicles and both were in the same position. At 2030 hours and 2145 hours there were no vehicles observed.

At 2115 hours, I observed a Black Mercedes, 4-door parked in the east driveway FL tag G14CT. At 2300 hours, 2350 hours and 0045 hours, the Black Mercedes was the only vehicle observed.

************************* N A R R A T I V E # 33 *************************
Reported By: RECAREY, JOSEPH 1/05/06
Entered By.: ALTOMARO, NICKIE A. 1/05/06

I made contact with Mr. [redacted] father of [redacted] who was told that I wished to interview his daughter. Mr. [redacted] stated he was aware and had spoken with his daughter about the incident. He stated that his daughter had previously told him that she was hired to model lingerie at a Palm Beach mansion. Mr. [redacted] stated he knew nothing else about what she did when she went to "work." Mr. [redacted] advised he would cooperate with the investigation and make his daughter available for interviews. I asked if she was available for an interview, [redacted] stated she was not at home at the moment. I informed him I would make contact with her at a later time. Mr. [redacted] expressed his interest in the resolution in this matter as he stated this information has affected his daughter emotionally.

On January 4, 2005, I acquired the subpoenas from the State Attorney's Office for Cingular Wireless, Metro PCS, Verizon, Bell South Telecommunications and Sprint for the unknown telephone numbers from Sarah Kellen's cellular telephone. The subpoenas were sent to the respective telephone carriers for subscriber information.

I received a telephone call from State Attorney's Office, who informed me that the former houseman for Jeffrey Epstein, Alfredo Rodriguez, was present at the State Attorney's Office for an interview. Rodriguez was issued an investigative subpoena for an interview on the on-goings at Epstein's house during his employ. I responded to the State Attorney's Office and encountered Mr. Rodriguez waiting in the lobby. I brought Mr. Rodriguez to the interview room.

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 28 of 45



Case No. . . . . : 1-05-000368 (Continued)

During a sworn taped statement, Mr. Rodriguez stated he was employed by Jeffrey Epstein for approximately six months. He was referred by associates and his employment lasted the months of November 2004 through May 2005. His responsibilities as house manager included being the butler, chauffer, chef, houseman, run errands for Mr. Epstein and provide for Epstein's guests. Rodriguez advised he had very limited contact with Mr. Epstein. If Rodriguez needed to relay a message to Mr. Epstein, he would have to notify Epstein's secretary "Leslie" in New York City, who would then notify Epstein's personal assistant, Sarah, who would relay the message to Epstein. Rodriguez stated Epstein did not want to see or hear the staff when he was in residence.

I asked Rodriguez if Epstein received many guests during his stay in Palm Beach. Rodriguez advised he had many guests. I asked specifically about masseuses coming to the house. Rodriguez stated he would have two massages a day. Epstein would have one massage in the morning and one massage in the afternoon everyday he was in residence. Rodriguez stated he would be informed to expect someone and make them comfortable until either Sarah or Epstein would meet with them.

Rodriguez stated once the masseuses would arrive, he would allow them entry into the kitchen area and offer them something to drink or eat. They would then be encountered by either Sarah or Epstein. They would be taken upstairs to provide the massage. I asked Rodriguez if any of the masseuses appeared young in age. He advised he didn't ask their ages but felt they were very young. Rodriguez stated they ate like his own daughter who is in high school. Rodriguez stated they would eat tons of cereal and drink milk all the time. Rodriguez stated the girls that would come appeared to be too young to be masseuses. He stated one time under Epstein's direction, he delivered a dozen roses to [redacted] for one of the girls that came to provide a massage. He knew the girls were still in high school and were of high school age. I asked Rodriguez about the massages. He felt there was a lot more going on than just massages. He would clean Mr. Epstein's bedroom after the alleged massages and would discover massager/vibrators and sex toys scattered on the floor. He also said he would wipe down the vibrators and sex toys and put them away in an armoire. He described the armoire as a small wood armoire which was on the wall close to Epstein's bed.

Epstein ordered Rodriguez to go to the Dollar rent a car and rent a car for the same girl he brought the roses to, so that she could drive her self to Epstein's house without incident. Rodriguez said the girl always needed rides to and from the house. Rodriguez referred himself as a "human ATM machine" and was ordered by Epstein to maintain a minimum balance of $2,000 dollars on him at all times. When a girl would come by the house and Mr. Epstein was either not in residence or was not at home at the time, Rodriguez was to provide the girl (masseuse) several hundred dollars for their time and to notify Epstein the amount they were given. Epstein also ordered Rodriguez to

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 29 of 45



Case No. . . . : 1-05-000368 (Continued)

purchase several gifts and provide them as tips to the girls. I asked what kind of gifts. Rodriguez stated he purchased IPODS, jewelry, anything the girls would want.

Rodriguez stated the amount of girls that came to the house was approximately fifteen. Each of the girls knew each other and all seemed to know at [redacted] who Mr. Epstein was. When asked to identify these girls, Rodriguez stated he could not at the moment but knew he wrote their names down on a journal he kept during his employ with Mr. Epstein. He kept a journal in the event he needed to explain either to Mr. Epstein or his assistants what was done at the house or who visited the house as he stated he was in-charge of Mr. Epstein's personal security while in Palm Beach. I informed him I would need to view this journal to which he stated he would research the book and contact me to provide the book. The interview was concluded and left the area. I returned back to the police station where the micro cassette was placed into evidence. At approximately 7:20 pm, I was notified Rodriguez located the journal and would call me on January 5, 2005 to provide the journal.

Investigation Continuesàà

************************** N A R R A T I V E # 34 **************************
Reported By: RECAREY, JOSEPH 1/09/06
Entered By.: ALTOMARO, NICKIE A. 1/10/06

On January 5, 2006, I attempted to meet with Alfredo Rodriguez to recover the folder or journal in which he kept the notes that were given to him during his employ with Mr. Jeffrey Epstein. He kept this folder to justify what he did during his employ should the need arise to justify what occurred with the monies he had to keep or any questions as to the petty cash he withdrew from the household account from the bank. At approximately 10:00 pm, I attempted contact with Mr. Rodriguez and discovered he was assisting his wife at her place of employment and would not be able to meet with me. Mr. Rodriguez stated he would meet with me on January 6, 2006, in Broward County, in the morning hours.

On January 6, 2006, at approximately 9:00 am, I received a telephone call from Mr. Rodriguez who advised he had the file in hand and would be traveling northbound to meet with me in Broward County. At 10:50 am, I met with Alfredo Rodriguez at the parking lot of Bank of America in Boca Raton on Yamato Road and Military Trail (known as the Polo Center). Rodriguez produced a green folder which contained documents, a note with Mr. Epstein's stationary with direction to deliver a bucket of roses to [redacted] after [redacted] high school drama performance. Also in that same note was direction to rent a car for [redacted] and direction to extend the rental contract. I returned to the Palm Beach Police Station and placed the folder into evidence.

I received a fax from Verizon from the subpoena request sent on

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 30 of 45



01-04-06, for telephone number 561-302-1844. The phone number is registered to Dr Perry Bard, from West Palm Beach. Dr. Bard is a chiropractor and has an office located 4275 Okeechobee Blvd in West Palm Beach. The cellular number is Dr Bard's personal cellular number.

On January 9, 2006, Det. Caristo and I traveled to 622 Holly Drive in Palm Beach Gardens in an attempt to locate Johanna Sjoberg, who had been previously seen on the property and identified through her Florida Drivers License and Florida license Plate. A business card was left for her to return my call. We then traveled to the [redacted] and located [redacted] agreed to speak with us and in a private room within the school provided us a taped statement.

During the statement, [redacted] advised that when she was fifteen or sixteen years of age, she was taken to Jeffrey Epstein's house by her associate, [redacted] stated this occurred late May 2004 or early June 2004. She was told she could model lingerie for money for a wealthy Palm Beacher. She remembered they traveled by yellow cab from their residence in West Palm Beach to Epstein's house. She remembered encountering Epstein at the front door during the evening hours.

He introduced himself and brought them into the kitchen so that the chef could prepare something for them to eat. After having a meal, [redacted] and Epstein brought [redacted] upstairs to a master bedroom which had a large bathroom. She observed a large style shower, sauna and there was a large massage bed also in the bathroom. Epstein entered a room within the bathroom and came out wearing only a towel. [redacted] said they would provide a massage on his feet. [redacted] asked why they are doing this. [redacted] told her this was part of the routine and told her to rub his legs and calves. Epstein had told [redacted] to get comfortable. [redacted] continued rubbing Epstein's calves and feet. At Epstein's direction, [redacted] then left the room leaving [redacted] there by herself. Epstein told [redacted] to get comfortable. [redacted] removed her blouse and pants and stayed in her panties. [redacted] stated she was not wearing a bra. She believed she was wearing thong panties. Epstein turned over onto his back and began touching her. Epstein touched her breasts and began touching her in her vagina area. Epstein instructed her to rub his chest and rub his nipples. [redacted] stated the touching consisted over the panties on the first time; he stroked her vagina but stayed on top of the panties. During the first massage, she stated Epstein was stroking her and began masturbating himself at the same time. He put his hands under the towel and appeared as to masturbate himself however she never saw his penis. She continued rubbing his chest until he grabbed her and pulled her closer to him. He appeared to have climaxed because after he pulled her closer to him the massage was over. Epstein had told her that there was two hundred dollars for her on the dresser. He told her that she could not tell anyone what happened at the house or bad things could happen. [redacted] stated she went to Epstein's house three

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 31 of 45



ase No. . . . : 1-05-000368 (Continued)

or four times total. [redacted] was very scared and felt very nervous. She knew because of Epstein's money he was powerful. After the massage, Epstein ordered his houseman at the time to drive the girls home. The employee was to drop off the girls at their house and watch them go inside their house.

[redacted] could not remember who the houseman was. She stated Epstein and his assistant Sarah would call her at her father's house to arrange for her to come and "work." She advised each time she returned to the house, Epstein would do the same thing. [redacted] stated it was a routine with Epstein. She would rub his feet and calves. He would then turn over and begin to touch her on her vagina area. The only difference was that it was done without panties. Epstein's fingers would stroke her vagina area as he would masturbate and finally climax and the massage would be over. She was paid $200.00 each time she went. Each time she went she was reminded not to speak of what happened at the house and that she would be contacted again. She began to purposely miss the calls when either Sarah or Epstein would call her. She once brought a friend, [redacted] unknown last name, to work for Epstein. She was paid $200.00 for bringing [redacted] [redacted] stated she no longer retuned to work for Epstein. She also stated that she wanted to notify the police of what happened at the house. [redacted] stated she was scared of what could have happened to her or her family if she notified authorities.

On January 10, 2006, I received the results from the subpoena from BellSouth Telecommunications for telephone number [redacted] The number is assigned to Mr. [redacted], [redacted] father in [redacted] I also received the results from Western Union which confirmed the money order sent to [redacted] from Jeffrey Epstein in New York City. The "wire" was sent by Jeffrey Epstein of 457 Madison Ave in New York City on December 23, 2004 at 12:05 pm. The amount of $222.00 was charged to Epstein's credit card so that [redacted] could receive $200.00 in [redacted] The twenty-two dollars was for processing and local fees to send the money via Western Union. A copy of the check presented to [redacted] was also attached to the receipt of the wire. This confirmed what [redacted] advised she received as a Christmas bonus from Epstein.

Investigation continues.

************************** N A R R A T I V E # 35 **************************
Reported By: RECAREY, JOSEPH 1/10/06
Entered By.: ALTOMARO, NICKIE A. 1/10/06

I received and reviewed the Cingular Wireless results from the subpoena requests for subscriber information for telephone numbers 561-818-8361, 561-389-6874 and 561-309-0079. The first number, 561-818-8361, is assigned to Janusz Banasiak in care of Jeffrey Epstein of 457 Madison Ave in New York City. Banasiak is the current houseman/house manager for 358 El Brillo Way in Palm Beach, Fl 33480. The second number, 561-389-6874, is assigned to Christina Venero of

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 32 of 45



ase No. . . . . : 1-05-000368 (Continued)

1685 61st Drive in West Palm Beach. Research conducted on Venero revealed she is a licensed Massage therapist with a Florida conditional/active license number MA39723. Venero had been previously arrested for battery / unwanted touching and DUI. Requests for copies of the reports involving the arrests were requested from the Palm Beach County Sheriff's Office. The last number 561-309-0079 is assigned to Thomas Rofrano of 9850 Alt A1A in Palm Beach Gardens. Research on Mr. Rofrano, revealed that he is a Florida Chiropractic Physician.

Vehicles that were previously documented on the property while surveillance was being conducted were researched. I determined a tan Chevrolet Camaro, bearing Florida license [redacted] was seen on the property in which a young white female was seen entering the Epstein property. Research was conducted which revealed that the vehicle is registered to [redacted] of [redacted]. Mr. [redacted] has two daughters, [redacted] and [redacted] [redacted] is currently residing in Connecticut and [redacted] is residing with her father in [redacted] [redacted] Research on [redacted] revealed she was recently involved in a traffic stop in Lake Clarke Shores in May 19, 2005. A request to discover any information from the stop was requested.

I spoke with ASA Daliah Weiss who informed me that Janusz Banasiak will be available for an interview tomorrow at the State Attorney's Office in West Palm Beach at 1:30 pm. I informed her that I would be at her office for the interview.

************************* N A R R A T I V E # 36 *************************

Reported By: RECAREY, JOSEPH 1/23/06
Entered By.: ALTOMARO, NICKIE A. 1/23/06

On January 19, 2006, Det. Caristo and I met with Johanna Sjoberg at 622 Holly Drive in Palm Beach Gardens. Sjoberg was identified as a licensed massage therapist who had previously been seen on Epstein's property when physical surveillance was done. Sjoberg was told of the on going investigation and I felt she may have information pertaining to the case. During a sworn taped statement, Sjoberg stated she met Epstein three years ago when Ghaline Maxwell approached her while she was attending Palm Beach Atlantic College to work around Epstein's house. Maxwell had told her that they needed some girls to work at the house to answer phones and run errands. Sjoberg accepted the job and began working at Epstein's house on El Brillo in Palm Beach. Sjoberg stated it was a part time job during the time she went to Palm Beach Atlantic College. She continued going to Epstein's house and would be notified when Epstein would travel to Palm Beach. Sjoberg advised she would be notified by Maxwell, Epstein or Sarah, his assistant, when he would travel to Palm Beach. Sjoberg stated she began providing massages to Epstein before she became a massage therapist. She continued giving massages not only to Epstein but to Nadia Marcinkova, and Sarah, his assistant. Sjoberg was asked about what occurred during the massages. Sjoberg stated as she was twenty

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 33 of 45



ase No. . . . : 1-05-000368 (Continued)

three years old when she met Epstein, anything that happened was between two consenting adults. I explained to her that she was not in any trouble however as part of this investigation, I needed to ask certain questions. Sjoberg stated that there were times that Epstein would ask her to perform during the massage. He would instruct her to rub his nipples as he masturbated himself. Sjoberg stated she felt "grossed" about the behavior but as she was getting paid, she just continued. Sjoberg also advised she would on occasion perform the massages naked. Epstein would on occasion, utilize the vibrator/massager on her vagina area when she performed the massages. Sjoberg explained that Epstein never exposed himself to her as he maintained himself covered under the towel he would be wearing. When Epstein would masturbate he would be covered.

I asked if Sjoberg ever received any gifts, or any gratuities from Epstein. Sjoberg advised aside from being paid well, she advised Epstein took care of her tuition from Palm Beach Atlantic College. She received a rental car for a week when her scooter broke down.

Additionally she received other gifts from Epstein. Epstein also recommended her to another client who resides at Breakers Row in Palm Beach. The client she was referred to was "Glenn" unknown last name, and his wife, who she provided a massages to. The statement was concluded and placed into evidence upon our return to the Palm Beach Police Department.

While at the police station, I researched Florida tag [redacted] which was also previously seen on the property when there was physical surveillance being done at the property. The vehicle is registered to [redacted] of [redacted]. Researching Mr. [redacted] and the vehicle revealed that his daughter, [redacted] had been driving the vehicle and was cited for unlawful speed in Lake Clark Shores. The vehicle is a tan, Chevrolet Camaro, 2-door. I researched [redacted], date of birth, [redacted], resides at [redacted] in [redacted] has a my space page called www.myspace.com/[redacted]. In her web page, shows various photos of [redacted] photographed at a beach. An interview is forthcoming.

A review of the video disks which was extracted at the Palm Beach County Sheriff's Office Computer Crime Unit revealed that only one hidden camera was functional at the time. Several images of Epstein working at his office were seen. Additional footage of Sarah Kellen and Nadia Marcinkova was seen. There was other footage of females seen. The identity of the females is unknown at this time, until such time as I meet with certain females to show the video footage to confirm if, in fact, it is them on the video. At this time it appears that [redacted] and Haley Robson are seen sitting with Epstein beside his desk in the evening hours. Due to poor lighting, a direct confirmation cannot be made at this time.

Inv. Continues.

ase No. . . . : 1-05-000368 (Continued)

*************************** N A R R A T I V E # 37 ***************************

A Reported By: RECAREY, JOSEPH 1/30/06
Entered By.: ALTOMARO, NICKIE A. 1/30/06

On January 25, 2006, Det Caristo and I, responded to [redacted] in [redacted] and met with [redacted] stated last year, when she was seventeen years of age, she met Jeffrey Epstein through her former room mate [redacted] was allegedly dating Epstein at the time. [redacted] and [redacted] had once cohabitated together when they modeled. [redacted] explained [redacted] called her on her telephone and advised her that she was in Palm Beach and requested to see her. [redacted] made arrangements to meet with her at Epstein's house. [redacted] arrived and met Epstein and [redacted]. [redacted] and [redacted] went to the Palm Beach Mall together and went shopping. [redacted] advised that [redacted] and she had received money from Epstein to go to the mall. They visited Victoria's Secret and purchased undergarments from the store utilizing monies given by Epstein. [redacted] advised she purchased one item and [redacted] purchase various items. The money used to purchase the items was the money given by Epstein.

[redacted] and [redacted] continued shopping and having a day together. [redacted] stated [redacted] explained how she and Epstein have been dating each other and he has been paying all of her bills. [redacted] claimed [redacted] advised they met in New York and had been dating ever since. They later returned to Epstein's home and encountered Epstein. He had a brief conversation with [redacted] about her modeling career. He knew of her modeling career from [redacted] He requested to see her modeling portfolio and explained that he could help her with modeling jobs. [redacted] had her book with her to show [redacted] and showed the book to Epstein. He commented negatively about her photographs and portfolio. [redacted] felt uncomfortable with the comments made as she had been working with other professional modeling companies who had offered her work from her photographs. Epstein requested to see what was purchased at the mall. [redacted] took out the undergarments which were purchased. She immediately showed Epstein different sets purchased. Epstein then requested to view what [redacted] purchased. [redacted] was reluctant to show the outfit however since it was Epstein's money that purchased the item, she pulled it out of the bag. Epstein asked her to try it on. [redacted] looked at [redacted] who told her "yeah, try it on." Feeling compelled to try the undergarment outfit on; she went to another room and put on the bra and panty set. She walked out to the living room where they were sitting, and modeled the suit. She then went back into the other room and changed back into her clothes. [redacted] returned into the room and told [redacted] she would be going home. [redacted] scheduled another day for [redacted] to return for massages with her.

[redacted] stated within that same week, she returned to meet with [redacted] and have a massage. [redacted] had told her that she would be unable to stay with her as she would be going on a bike ride with Epstein. [redacted] explained she could stay at the house and take advantage of the massage.

[redacted] stated she met with an unknown massage therapist and had the table already set up in a guest room. [redacted] removed her clothing, leaving her panties on, and wrapped herself with a towel for the massage. [redacted] remembered that the door to the guest room was closed but not locked. As the therapist was working her back, the door was opened by Epstein and entered into the room. [redacted] was trying to conceal herself as Epstein was talking to her about his chiropractic session. Epstein told [redacted] turn over onto her back. [redacted] eventually turned over exposing her breasts to Epstein as he applied pressure on her shoulder and her waist. [redacted] stated Epstein "popped" her back. [redacted] removed her self from the table, got dressed and left the house. [redacted] further stated [redacted] had attempted to call her on several occasions to invite her back to Epstein's house to which [redacted] replied "I'm busy." [redacted] advised she has not had contact with either [redacted] [redacted] or Jeffrey Epstein. It should be noted that her mother, [redacted] [redacted] was present during the interview. The interview was concluded and we thanked them her for their time.

************************** N A R R A T I V E # 38 **************************

Reported By: RECAREY, JOSEPH 1/31/06
Entered By.: ALTOMARO, NICKIE A. 1/31/06

On January 27, 2006, I made telephone contact with Christina Venero, at 772-878-7280. Venero is a licensed massage therapist who had frequented the home of Jeffrey Epstein. Ms. Venero has been unable to meet with me in Palm Beach County, and because she lives and works in Port St Lucie, a telephone interview was conducted. I explained to Ms. Venero that there was an on going investigation involving Jeffrey Epstein.

Venero stated she knows Epstein and has been employed by him for approximately three years. Epstein has paid Venero to perform Swedish Massages (Deep Tissue) on him and other guests. Venero explained that approximately three year ago she met Ghislaine Maxwell and Jeffrey Epstein through a mutual friend. Epstein and Maxwell were looking for a massage therapist. Venero stated since that time, she is notified when Epstein is coming to Palm Beach. Venero stated she comes to his house and provides the massage or massages. Venero explained she has also massaged his guests and assistants. Venero continued that she is paid $100.00 and hour for the massage.

I asked Venero if anything occurred during the massage that would have made her feel uncomfortable. Venero stated she only provided massages and that was it. She never was approached for anything else. I asked if Epstein ever asked her to rub his chest she stated she would not rub his chest as that is not part of her massage. Venero explained that she was not Epstein's type. The girls she would see at Epstein's house were very thin, beautiful and without tattoos. Venero explained she has several tattoos that are visible. Maxwell and Epstein have commented negatively about her tattoos previously when she has provided massages.

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 36 of 45



ase No. . . . : 1-05-000368 (Continued)

Venero stated she only provided massages for Epstein and his associates and nothing happened during those massages. Venero stated as she does Swedish style massages, the patient is usually sore after the massages. I thanked her for her assistance and the interview was concluded at this time.

I received a facsimile from T-Mobile Cellular service on telephone number 561-317-5844, which is assigned to David Rodgers, pilot for Mr. Epstein, who resides in Lake Worth. Rodgers' telephone number was dialed on several occasions by Sarah Kellen. A background on Rodgers indicated he has a valid FAA pilot license First Class for the Southern FAA Region. Rodgers has another historical FAA license for Airline Transport Pilot.

Investigation Continues.

************************* N A R R A T I V E # 39 *************************
Reported By: RECAREY, JOSEPH 2/14/06
Entered By.: ALTOMARO, NICKIE A. 2/16/06

On Friday, February 3, 2006, I had made arrangements to meet with Joanna Harrison at the Palm Beach Police Station. At approximately 1:00pm, Harrison and her friend, Victoria Bean arrived at the police station. During an interview with Harrison, she stated she met Epstein when she turned eighteen years old and was brought to Epstein's house to provide a massage. She advised this occurred on May of 2005. She advised Haley Robson had informed her if she wanted to provide a massage for $200.00. Harrison agreed and was brought to Epstein's house to provide a massage. Harrison stated she had been to the house on many occasions during the massage sessions. Harrison also stated she would remove her clothing to provide the massage on Epstein. Harrison advised Epstein would pay her $300.00 to rub his back, legs and chest. During the massages, Epstein would masturbate himself as she rubbed his chest. I asked her if Epstein ever touched her breasts during the massages. Harrison replied. "Yes." I asked her if Epstein ever touched or massaged her vagina. Harrison stated he had on several occasions. I asked her if he ever penetrated her with either his penis or any other objects. Harrison stated that during a massage he inserted his fingers in her vagina as she massaged him. She stated this occurred one time only. Harrison stated the massage would be over when Epstein would climax onto a towel. I asked Harrison if she had any formal massage training to which she replied that she did not. Harrison was then asked if she ever brought anyone to the house to "work." Harrison stated she brought two people to the house. She advised she received money for bringing people to the house to "work." Harrison stated she brought a girl named [redacted] and her friend Tory Bean. Bean was still waiting for Harrison in the lobby of the police station. I thanked Harrison for her time and her cooperation and escorted her to the lobby.

I asked Ms Bean if I could speak with her about this investigation. I

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 37 of 45



ase No. . . . . : 1-05-000368 (Continued)

brought her to the interview room and explained to her that I was conducting an investigation on Jeffrey Epstein and felt she may have information pertaining to the investigation. Ms Bean identified herself as Victoria Bean and resides in Wellington, Florida. She advised approximately a year ago she was brought to Epstein's house to provide a massage for money. Bean stated she needed to make money and felt it was a quick way to make some money. Bean stated she was brought to the house by Harrison and was introduced to Epstein and his assistant. She was brought to his main bathroom and provided a massage. I asked her if she provided the massage naked. Bean stated she did. She rubbed Epstein's legs, back and chest. I asked Bean if Epstein touched her during the massage. She advised he did not, however he did masturbate himself as she rubbed his chest. Once he climaxed the massage was over. She was paid her money and left the area. Bean advised it occurred one time and she never returned to Epstein's house. The interview was concluded and Bean was escorted to the lobby.

I located a telephone number for [redacted] and attempted to contact her on several occasions. I called [redacted] and spoke with Ms. [redacted] who advised she would speak with me in [redacted] where she resides. Due to a scheduling conflict, we were unable to meet. I informed her I would contact her to schedule another appointment to speak with her about this investigation. I have attempted to meet with her and make telephone contact with negative results.

On February 13, 2006, I met with David Rodgers at 7318 Heathley Drive in Lake Worth. Rodgers was identified as Epstein's pilot. I spoke with Rodgers who advised he has been employed with Epstein since 1991. He flies both planes for Epstein depending where he wants to fly to. Rodgers was asked about passengers in the plane he flies. Rodgers stated unless Epstein flew to his island off of St Thomas, there would be no way of knowing who the passengers were. I mentioned a recent flight to Ohio, where Rodgers flew to Ohio to pick up [redacted] Rodgers stated he recalled flying on several occasions and did remember [redacted] Rodgers stated once he is in the cockpit, he does not know who the passengers are. When he prepares the passenger manifests, he lists Epstein and his assistants he knows by name, Sarah and Adrianna. Rodgers stated he would list either female or male passengers on the manifests only to keep a count on the passengers. Mrs. Rodgers came into the living room and recommended that her husband consult with an attorney. Mr. Rodgers agreed he would speak with the family attorney to inform him of this questioning. I explained to Mr. Rodgers that he was not the suspect in this investigation and ceased all questions. Based on the fact Rodgers could not advise who passengers were in the plane, I then left the area.

I attempted to locate [redacted] at [redacted] in [redacted]. I left my business card for her to return my call. On February 14, 2006, at 12:06 pm, I received a call back from Ms. [redacted]

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 38 of 45



ase No. . . . : 1-05-000368 (Continued)

on my voice mail. Ms [redacted] left her telephone number for a return call 561-662-3098. I left her a message to return call.

Investigation Continues..

************************* N A R R A T I V E # 40 *************************

Reported By: RECAREY, JOSEPH 2/21/06
Entered By.: ALTOMARO, NICKIE A. 2/22/06

On February 15, 2006, I made telephone contact with [redacted] who provided directions to where I could locate her. Det Caristo and I responded to 806 Old Dixie Hwy in Lake Park to meet with [redacted]. Upon my arrival, I met with [redacted] in the parking lot directly behind MAACO Auto Painting. She was advised I was there to speak with her about an ongoing investigation that concerned Jeffrey Epstein in Palm Beach. [redacted] stated she knows Epstein very well and did not want to speak with me about Mr. Epstein. She was very fond of Epstein and did not want to speak with me about anything concerning Jeffrey Epstein. I explained to her that she was seen at the house and I would like to speak with her. She stated she knew there was an investigation and that I had spoken with other people and therefore I should know what happened at Epstein's house. [redacted] ended the conversation and walked back into her boyfriends business, Blanton Automotive. Det Caristo and I left the area and returned to the police station.

Investigation continues.

************************* N A R R A T I V E # 41 *************************

Reported By: RECAREY, JOSEPH 4/10/06
Entered By.: ALTOMARO, NICKIE A. 4/10/06

A Grand Jury Session was requested during the month of February 2006, in which all the girls that had been interviewed would have been called to testify before the Grand Jury to seek an indictment against Jeffrey Epstein. Due to subsequent meetings with the State Attorney's Office and Defense Attorney Alan Dershowitz the Grand Jury was postponed until a later time. Dershowitz had provided a package of material on the main victims in this case in which they appear on myspace.com and speak about alcohol use and some marijuana use. The State Attorney's Office wanted time to review the material.

I requested additional subpoenas from the State Attorney's Office in which I requested information from Dollar Rent a Car and Jet Aviation. The information requested from Dollar Rent a Car was for the rented vehicle by Alfredo Rodriguez while under the employ of Epstein for one of the victims. The other subpoena requested was for Jet Aviation for dates and times when Epstein's planes were in Palm Beach County.

I continued to research other names that were acquired either from interviews or intelligence gathered during the investigation. I

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 39 of 45



ase No. . . . . : 1-05-000368 (Continued)

located [redacted] in [redacted]. I responded to [redacted] in [redacted] During the interview, [redacted] stated she knew I would be speaking with her. [redacted] stated she was first introduced to Epstein when she turned eighteen years old. [redacted] stated she was sure of her age as it was her senior year in [redacted] She advised she was brought there to make money and was told she would have to provide a massage to this Palm Beach guy. She remembered she met Epstein and his assistant Sarah in the kitchen area. She stated she was taken by one of her friends, [redacted] She stated she went upstairs with Sarah while Epstein got ready for the massage. He exited his bathroom naked and [redacted] turned around. Epstein asked her if being naked offended her. [redacted] stated it made her uncomfortable. Epstein then put on a towel and lay on the table. [redacted] stated she rubbed his back and feet. She stated she had no massage training or experience. [redacted] stated during the massage, Epstein attempted to touch her buttocks. [redacted] pulled away as he touched her buttocks. She told him again she was uncomfortable with him touching her. Epstein then cut the massage short and became upset with her. Epstein paid her $200.00 for the massage and told her to leave the house. [redacted] never returned to the house. She did advise of one time she went with [redacted] however she waited in the car for [redacted] as she did not want to go into the house. At the conclusion of [redacted] visit with Epstein they left the area. [redacted] stated she had heard from other girls that have gone to the house that Epstein now required them to do the massage naked and allow him to touch them in their private areas for monies. The interview was concluded as [redacted] did not have any other information to provide.

I then learned from the original victim, [redacted] the defense attorney had learned of her identity. I spoke with the father of the victim, who stated there has been a private investigator on his house photographing his family and chasing visitors who come to the house. He provided a Florida License of E79-4EH. This vehicle is registered to Ivan Robles of West Palm Beach. Robles is a private investigator intern who is licensed by the state. I informed the State Attorney's Office of the above information.

I received the Grand Jury subpoenas to be delivered to three victims for a Grand Jury session to be held on April 18, through April 20, 2006.

Investigation continues.

************************* N A R R A T I V E # 42 ***************************

Reported By: RECAREY, JOSEPH 4/14/06
Entered By.: ALTOMARO, NICKIE A. 4/18/06

The Grand Jury Subpoenas were personally served to the individuals they were issued to. On April 5, 2006, at approximately 7:30 p.m., I personally served the parents of [redacted] who had informed me that the private investigators were still photographing the family. On April

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 40 of 45



ase No. . . . . : 1-05-000368 (Continued)

10, 2006, at approximately 2:30 p.m., I served [redacted] at her residence in [redacted] The subpoena was given to her mother, [redacted]

I learned through one of the victims [redacted] that she was personally contacted through a source that has maintained contact with Epstein. The source assured [redacted] she would receive monetary compensation for her assistance in not cooperating with law enforcement. [redacted] also stated she was told, "Those who help him will be compensated and those who hurt him will be dealt with." I told [redacted] that tampering with a witness/victim is an arrestable offense and very serious. I asked her who approached her during this encounter. [redacted] originally was reluctant to provide the name of the person who approached her to offer her not to testify because she felt they were still friends.

On April 11, 2006, Det Dawson and I traveled to Tallahassee, Florida and met with the victim, [redacted] [redacted] identified [redacted] W/F, [redacted] as the person who approached her in Royal Palm Beach while she was home during Spring Break in March 2006. [redacted] also stated she did not want to pursue the intimidation charges on [redacted] [redacted] was concerned that the defense attorney was given a copy of the report as certain things she had told me in confidence were repeated to her by Beal. Prior to our departure, the victim was given a copy of her subpoena for the Grand Jury which was scheduled to commence April 18, 2006.

Upon our return from Tallahassee, I notified the State Attorney's Office of what was told to me. I also notified them that the subpoenas were delivered to the witnesses and they would be calling for arrangements for the date and time needed for the Grand Jury. I spoke with ASA Weiss and informed her of the possible intimidation by the defense.

On April 13, and April 14, 2006 I attempted contact on several occasions with ASA Weiss and ASA Belohlavic to ascertain when the victims needed to report for Grand Jury testimony. Messages were left on their voicemail. On April 17, 2006, during the hours of 9:00 am and 11:30 am, I again left messages for ASA Weiss and ASA Belohlavic for either of them to return my call as I had not heard from the State Attorney's Office as to the time and date of the Grand Jury.

At approximately 12:30 pm, I went to the State Attorney's Office and located ASA Weiss and ASA Belohlavic in their offices. I entered ASA Belohlavic's office who informed me that she was going to return my call. She explained that an offer was made to the defense, Atty Guy Fronstin and Atty Alan Dershowitz. The offer is 1 count of Agg Assault with intent to commit a felony, five years probation, with adjudication withheld. Epstein would have to submit to psychiatric/sexual evaluation and no unsupervised visits with minors. When asked about the all the other victims, ASA Belohlavic stated that was the only offer made as to one victim, [redacted] ASA Belohlavic cell phone rang and went to voice mail. She checked her voice mail and played the message on speaker. The caller identified himself as

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 41 of 45



Case No. . . . : 1-05-000368 (Continued)

Atty Guy Fronstin and acknowledged the deal made between them. Fronstein stated in the message, he spoke with his client, Jeffrey Epstein, and agreed to the deal. Fronstin asked to call off the grand jury as they would accept this deal. Belohlavic stated a probable cause would be needed to book Epstein in the county jail and would let me know as to when it would be needed. I explained my disapproval of the deal and not being consulted prior to the deal being offered. However I expressed that was only my opinion and the final approval would come from the Chief of Police. She explained to have Chief Reiter call Barry Krisher about the deal. I left the area and returned to the police station where I briefed the Chief about the deal offered.

I checked my voice mail messages and discovered a message from [redacted] stepmother for the victim [redacted] She was calling because the State Attorney's Office still had not returned any of her calls as to when they are needed for this case. I then called ASA Belohlavic's office and left messages for her to call the victims on this case and explained to them what the State Attorney's Office had done.

On April 17, 2006, at approximately 4:30 pm, State Attorney Investigator Tim Valentine called to officially notify me of the cancellation of the Grand Jury. He requested I contact the victims that had been served to appear, to notify them of the cancellation. I advised Valentine that as this Grand Jury session was called based on the State Attorney's Office decision to have the victims heard by the Grand Jury that I felt it was the States Attorney's Office responsibility to contact the victims and advise them of the reason they were no longer needed.

************************* N A R R A T I V E # 43 *************************
Reported By: RECAREY, JOSEPH 5/04/06
Entered By.: ALTOMARO, NICKIE A. 5/04/06

As I had not received any contact from anyone at the State Attorney's Office, on May 1, 2006, I prepared three arrest warrant requests and submitted them to the State Attorney's Office. The packages were delivered to the Crimes against Children Unit in care of ASA Lana Belohlavek. Jeffrey Epstein's arrest warrant was requested for 4 counts of Unlawful Sexual activity with certain minors and one count of Lewd and Lascivious Molestation. Sarah Kellen, Epstein's assistant's, arrest warrant request was for 4 counts of Principal in the 1st degree Unlawful Sexual activity with certain minors and one count of Principal in the 1st degree Lewd and Lascivious Molestation. Haley Robson's arrest warrant request was for Lewd and Lascivious Acts on a victim under 16 years of age. The receipt of delivery was signed and brought back to the records division at the police department.

On May 3, 2006, at approximately 2:54 pm, I received a telephone call from ASA Daliah Weiss on my cellular telephone. ASA Weiss advised she

ase No. . . . . : 1-05-000368 (Continued)

has been taken off the Jeffrey Epstein case because her husband is employed with Attorney Jack Goldberger. Attorney Goldberger is the attorney of record for Jeffrey Epstein. His previous attorney, Guy Fronstin, has been fired from representation. ASA Lana Belohlavek has been assigned the case. ASA Weiss stated she can no longer speak about the Epstein case with me. I thanked her for her telephone call. ASA Weiss further stated that ASA Belohlavek would be calling me.

************************** N A R R A T I V E # 44 **************************

Reported By: RECAREY, JOSEPH 5/15/06
Entered By.: ALTOMARO, NICKIE A. 5/15/06

On May 10, 2006, information was received that Epstein's associate, Leslie Wexner, The Limited Inc, CEO's, plane had arrived in West Palm Beach, PBIA. The plane, a Gulfstream 4 bearing a N900LS registration, was on the tarmac at Galaxy Aviation. As Epstein had recently acquired the services of a new attorney, and the fact that Epstein's house is currently under remodeling, it was believed that Epstein may be in Palm Beach. I conducted physical surveillance at the residence, 358 El Brillo Way. I observed a large construction crew conducting remodeling at the house. The contractor, David Norr, was observed driving a Ford Explorer, white in color. The vehicle has a Florida registration of F30QQF. Norr left Epstein's house and traveled north on County Road. Det Caristo and I conducted surveillance on Norr. Norr traveled to several construction sites and checked on certain jobs. Surveillance was discontinued on Norr and Det Caristo and I traveled to Galaxy Aviation. I observed the white plane with a blue stripe along the body and tail of the plane; the tail number was visible on the bottom of the tail, closer to the body of the plane. We maintained visual surveillance on the plane until 4:57 p.m., when a caravan of Cadillac Escalades drove onto the tarmac. We observed several people exit the vehicles and discovered that they were part of the executive team for Limited Inc. The executives were in Palm Beach County for an executive meeting for the day. They arrived in Palm Beach County on May 9, 2006 at 9:30 pm and were scheduled to leave on the 10th at 5:00 pm.

On May 12, 2006, I met with ASA Lana Belohlavek at the State Attorney's Office. She explained that her boss, Barry Krischer, was requesting this case be taken to the Grand Jury again. I explained to her I had requested arrest warrants for Jeffrey Epstein, Sarah Kellen, and Haley Robson. I asked that she either issue the warrants or direct file, as so much time has elapsed since the original request to the Grand Jury. I explained that the Palm Beach Police Department had concluded the case in December of 2005 and has been waiting for the case to go forward. Belohlavek stated the original offer was again offered to the new defense attorney. She was waiting for their answer by Friday May 19, 2006. She stated she would advise me of the answer.

************************** N A R R A T I V E # 45 **************************

Reported By: RECAREY, JOSEPH 6/05/06

Case 1:15-cv-07433-RWS Document 173-8 Filed 05/27/16 Page 43 of 45



ase No. . . : 1-05-000368 (Continued)
Entered By.: ALTOMARO, NICKIE A. 6/06/06

On May 22, 2006, I received several phone calls throughout the day from Mr. [redacted] who stated he had been followed aggressively by a private investigator. Mr. [redacted] stated that as he drove to and from work and running errands throughout the county, the same vehicle was behind him running other vehicles off the road in an attempt not to lose sight of Mr. [redacted] vehicle.

I explained to him as Mr. Epstein had retained new legal council it was possible it would be new private investigators following him to observe his daily activities. I also explained to him that there was a meeting scheduled with ASA Lana Belohlavek and Attorney Jack Goldberger at Mr. Krischer's office scheduled on June 1, 2006 at 9:00 am. I attempted to call ASA Lana Belohlavek to inform her of the private investigators following Mr [redacted] however; she was on her vacation during the week of May 22 through May 30 2006.

On May 23, 2006, I received other phone calls from Mr. and Mrs. [redacted] who advised they were able to acquire the private investigators license plate information. The subject following them was again driving very aggressively and caused Mrs. [redacted] to run off the road. Mrs. [redacted] stated the vehicle is a green Chevy Monte Carlo bearing Florida tag I35-XGA. The vehicle is registered to Zachary Bechard of Jupiter Florida. Bechard is employed with Candor Investigations from Jupiter, Florida. Bechard is a licensed Private Investigator in the State of Florida.

Since the discovery of the threat made against one of the victims in this case [redacted] I requested subpoenas for all calls made to and received from [redacted] during the month of March 2006 for her cell phone and home phone. I had confirmed with Florida State University the exact dates of Spring Break for 2006. The Spring Break was from March 4, 2006 through March 12, 2006. I received a subpoena from Sprint/Nextel with all calls made during the month of March 2006. I reviewed the 989 calls made and received during the month of March 2006. I observed on March 7, 2006, [redacted] made and received thirty five calls during that day.

| Date | Time | Seconds | In/Out | To/From |
|---|---|---|---|---|
| 7-Mar-06 | 11:03 AM | 492 | Outbound | 561XXXX |
| 7-Mar-06 | 11:16 AM | 6 | Inbound | 561XXXX |
| 7-Mar-06 | 11:22 AM | 887.2 | Inbound | 561XXXX |
| 7-Mar-06 | 11:37 AM | 48 | Outbound | 9178553363 |
| 7-Mar-06 | 11:39 AM | 28.2 | Inbound | 2125356831 |
| 7-Mar-06 | 12:02 PM | 727.2 | Inbound | 2125356831 |

The table reflects the date of the calls, time of day (EST), duration

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 44 of 45



.se No. . . . . : 1-05-000368 (Continued)

of call in seconds, inbound or outbound calls and calls made to or from [redacted] phone. On March 7, 2006, at 11:03 am, [redacted] made a call to the victim [redacted] which lasted 492 seconds (8 minutes and 2 seconds). The victim then returned the call at 11:16 am which lasted 6 seconds. The victim then made contact with [redacted] at 11:22 am for 877.2 seconds (14 minutes and 6 seconds). These sequences of calls were consistent with what the victim had described to me on the date of the intimidation. Immediately after speaking with the victim, [redacted] makes a call to Sarah Kellen, Epstein's assistant, which lasts for forty-eight seconds. A call is then immediately received, a telephone number registered to a Corporation affiliated with Jeffrey Epstein located at 457 Madison Ave in New York. An extensive computer check revealed 457 Madison Ave is a business address in which Epstein has his corporations assigned to. Epstein had corporation attorney, Darren Indyke, register the businesses and register himself as an agent. I also observed Epstein has his El Zorro Ranch Corporation, New York Strategy Group, Ghislaine Corporation, J Epstein and Company and the Financial Strategy Group registered to this same address. Finally, a third call is received by [redacted] at 12:02 pm from the same corporate number which lasts 12 minutes and 1 second. It should be noted that there is no further contact with either the victim during the month of March or April of 2006. I also noted that there was no further contact with Sarah Kellen or Jeffrey Epstein during the remainder of the month of March or April 2006.

On June 1, 2006, ASA Lana Belohlavek telephoned me to inform me of the meeting that occurred with Atty. Jack Goldberger and her reference this case. She advised she would make her determination on whether to file on this case or not by Monday June 5, 2006.

Inv Continues.

************************* N A R R A T I V E # 46 *************************
Reported By: RECAREY, JOSEPH 7/12/06
Entered By.: ALTOMARO, NICKIE A. 7/12/06

On June 29, 2006, I had spoken to ASA Lana Belohlavic who informed me that the case would be sent to the Grand Jury for charges. She informed me that the grand jury would convene on July 19, 2006 to hear the Epstein case. Belohlavic stated State Attorney Barry Krisher made the determination to go the Grand Jury to hear the case.

On July 12, 2006, I spoke with Mrs. [redacted] mother of the victim, [redacted] who inquired about the status of the case. I explained to her that I was told we would be going to the Grand Jury during the week of July 19, 2006. She stated she had not been contacted as of yet by the State Attorney's Office for any information. I provided her with the telephone numbers to the State Attorney's Office.

Investigation continues...

* * * * * * * * * * * * * * END OF REPORT * * * * * * * * * * * * * * * * *

Case 1:15-cv-07433-RWS Document 173-6 Filed 05/27/16 Page 45 of 45

Date/Time: 10/16/06 / 9:24:44

System: HTE PALM BEACH POLICE DEPARTMENT Page: 1
Progrm: CHF004P Narrative Print

Case Number: 1-05-000368

*************************** N A R R A T I V E # 47 *************************

NA Reported By: RECAREY, JOSEPH 8/03/06
Entered By.: ALTOMARO, NICKIE A. 8/03/06

On July 18, 2006, I received a Grand Jury letter to appear before the Grand Jury on July 19, 2006, reference the Jeffrey Epstein case. On July 19, 2006, I responded to the Grand Jury Room and testified before the grand jury. At the conclusion, ASA Belohlavec stated the grand jury returned with a true bill for Felony Solicitation of Prostitution.

On July 25, 2006, Epstein turned himself into the county jail and was released on a $3,000 bond. Epstein is to return for arraignment on August 25, 2006 at 8:45 am.

ATT POLICE CLERKS: Please show this case cleared by arrest with the arrest of Jeffrey Epstein W/M 01-20-1953.

** End of Report **

# EXHIBIT 1

**From:** jeffrey E. <jeevacation@gmail.com>
**Sent:** Monday, January 12, 2015 10:03 AM
**To:** Gmax

you can issue a reward to any of virginias friends acquaionts family that come forward and help prove her allegations are false the strongest is the clinton dinner, and the new version in the virgin isalnds that stven hawking partica-ted in an underage orgy

--
please note
The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of JEE
Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to jeevacation@gmail.com, and destroy this communication and all copies thereof, including all attachments. copyright -all rights reserved

EXHIBIT
PENGAD 800-631-6989
Maxwell 16
4-22-16 LF

**From:** Ross Gow <ross@acuityreputation.com>
**Sent:** Tuesday, February 24, 2015 3:36 AM
**To:** G Max; Philip Barden
**Subject:** VR cried rape - prior case dismissed as prosecutors found her 'not credible'

Ghislaine

Some helpful leakage...

In today's Daily Mail print edition and on web
www.dailymail.co.uk/news/article-2965360/Prince-Andrew-s-sex-slave-accused-two-teens-rape-three-years-joined-Jeffrey-Epstein-s-harem.html

and
www.nydailynews.com/news/world/sex-slave-prince-andrew-accused-2-men-rape-1998-article-1.2125569
Mom told a detective "about her daughter's past drug abuse and also how many kids in Royal Palm Beach are involved in drugs, witchcraft and animal sacrifice," according to a confidential report by the Palm Beach County Sheriff's Office.

best
Ross

Ross Gow
Managing Partner
ACUITY Reputation
23 Berkeley Square
London W1J 6HE

+44 (0) 777 875 5251 mob

+7 903 363 5393 Москва Мобильный

www.acuityreputation.com

The information contained in this e-mail and any attachments is confidential and may be privileged or otherwise protected from disclosure. It is intended solely for the attention and use of the named addressee(s). If you are not the intended recipient, dissemination, copying or use of this e-mail and any attachments in whole or in part is prohibited. If you have received the e-mail in error, please notify the sender and delete the e-mail and any attachments from your computer system. Whilst any attachments may have been checked for viruses, you should rely on your own virus checker and procedures. No responsibility is accepted by ACUITY Reputation Limited for loss or damage arising from the receipt or use of this e-mail.

# EXHIBIT 2

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/12/2015 6:14 | Virginia Giuffre | smccawley@bsfllp.com | | Email chain with Giuffre, Edwards and Cassell re attorney impressions and legal advice relating to deposition testimony | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 2 | 2/16/2015 1:05 | StanPottinger@aol.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 3 | 2/16/2015 15:37 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 4 | 2/16/2015 16:15 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 5 | 2/16/2015 16:24 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 6 | 2/16/2015 16:24 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 7 | 2/21/2015 16:45 | Sigrid McCawley | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu,robiejennag@y7mail.com | Smccawley@BSFLLP.com | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 2/21/2015 16:58 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of evidence among client and attorney | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 9 | 2/21/2015 17:05 | Brad Edwards | Smccawley@BSFLLP.com | StanPottinger@aol.com,cassellp@law.utah.edu,robiejennag@y7mail.com | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 10 | 2/21/2015 17:10 | Sigrid McCawley | robiejennag@y7mail.com | | Discussion of evidence among client and attorney | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 11 | 2/21/2015 17:16 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 12 | 2/23/2015 14:21 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 13 | 2/23/2015 14:29 | StanPottinger@aol.com | Smccawley@BSFLLP.com,robiejennag@y7mail.com | brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 14 | 2/23/2015 16:01 | Virginia Giuffre | Smccawley@BSFLLP.com | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 15 | 2/24/2015 17:51 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with McCawley, Giuffre, and Paralegals re seeking information to assist in legal advice, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 16 | | | | | Attached case research | AC Privilege and Work Product/joint defense/common interest | Withheld | 14 | rtf |
| 17 | 2/26/2015 12:59 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and legal assistant re legal document, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 18 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | jfif |
| 19 | 2/28/2015 17:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email with Giuffre, McCawley, Edwards and Henderson re discussion of draft statement | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 20 | 3/13/2015 17:29 | Stan Pottinger | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 21 | 3/13/2015 17:49 | Virginia Giuffre | stanpottinger@aol.com | | Email chain with Giuffre, Edwards, McCawley and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 22 | 3/13/2015 17:56 | StanPottinger@aol.com | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 23 | 3/13/2015 18:00 | Brad Edwards | StanPottinger@aol.com,robiejennag@y7mail.com | Smccawley@BSFLLP.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 24 | 3/13/2015 18:24 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 25 | 3/13/2015 18:25 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 26 | 3/13/2015 21:53 | Virginia Giuffre | brad@pathtojustice.com | Smccawley@BSFLLP.com,StanPottinger@aol.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 27 | 3/13/2015 23:38 | Brad Edwards | robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 28 | 3/13/2015 23:40 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 29 | 3/17/2015 15:20 | Virginia Giuffre | Smccawley@BSFLLP.com,brad@pathtojustice.com,stanpottinger@aol.com | | Providing information to assist in legal advice re potential legal action, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 30 | 3/17/2015 18:40 | Stan | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 31 | 3/17/2015 19:42 | Virginia Giuffre | stanpottinger@aol.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 32 | 3/20/2015 15:43 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | aortiz@BSFLLP.com,brittany@pathtojustice.com | Email chain with Giuffre, Edwards, Henderson, Pottinger, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 33 | 3/20/2015 15:57 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re potential deposition | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 34 | 3/24/2015 21:19 | Sigrid McCawley | robiejennag@y7mail.com | aortiz@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 35 | 3/24/2015 21:21 | Virginia Giuffre | Smccawley@BSFLLP.com | aortiz@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 36 | 3/24/2015 21:36 | Andres Ortiz | Smccawley@BSFLLP.com,robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 37 | 3/24/2015 22:21 | Virginia Giuffre | aortiz@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 3 | msg |
| 38 | 3/26/2015 2:00 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com,StanPottinger@aol.com,brad@pathtojustice.com,brittany@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, Pottinger, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 39 | 3/26/2015 2:21 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 40 | 3/26/2015 2:22 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 41 | 3/26/2015 3:00 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 42 | 4/1/2015 21:32 | Virginia Giuffre | Smccawley@BSFLLP.com | | Giuffre conveying information sought by attorney to assist in legal advice with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 43 | 4/2/2015 7:01 | Brittany Henderson | robiejennag@y7mail.com | eperez@BSFLLP.com | Providing draft legal document for client review, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 44 | | | | | Attached Draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 15 | pdf |
| 45 | 4/3/2015 15:32 | Brittany Henderson | robiejennag@y7mail.com | brad@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, Henderson, Edwards and legal assistant re legal document, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 46 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | | 15 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 47 | 4/8/2015 20:34 | Virginia Giuffre | Smccawley@BSFLLP.com | | Seeking legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 48 | 4/9/2015 3:23 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re advice re legal filings, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 49 | 4/9/2015 7:16 | Sigrid McCawley | StanPottinger@aol.com,brad@pathtojustice.com,robiejennag@y7mail.com | brittany@pathtojustice.com,sperkins@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 50 | 4/9/2015 9:26 | Brad Edwards | Smccawley@BSFLLP.com | robiejennag@y7mail.com | Email chain with Giuffre, Edwards, and McCawley re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 51 | 4/9/2015 9:33 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 52 | 4/9/2015 12:46 | Sigrid McCawley | robiejennag@y7mail.com | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 53 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 14 | docx |
| 54 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 12 | docx |
| 55 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | docx |
| 56 | 4/10/2015 14:59 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com | Providing legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 57 | 4/10/2015 15:37 | Virginia Giuffre | Smccawley@BSFLLP.com | | Regarding legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 58 | 4/10/2015 17:31 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com,brittany@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, McCawley, Henderson, Edwards, Pottinger and legal assistant re legal documents, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 59 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 60 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 21 | pdf |
| 61 | 4/10/2015 17:40 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 62 | 4/10/2015 19:10 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 63 | 4/10/2015 19:28 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 64 | 4/10/2015 19:33 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 65 | 4/10/2015 20:03 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 66 | 4/10/2015 20:04 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 67 | 4/10/2015 20:04 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 68 | 4/10/2015 23:46 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley legal assistant re seeking and providing information sought by attorney to assist in providing legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 69 | 4/13/2015 13:52 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com | Email chain with Giuffre, Pottinger, Edwards and McCawley re legal advice regarding potential public statements | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 70 | 4/13/2015 13:56 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Pottinger, Edwards and McCawley re legal advice regarding media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 71 | 4/14/2015 23:38 | Brad Edwards | Smccawley@BSFLLP.com,brittany@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | | Providing legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 72 | 4/16/2015 11:14 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re legal advice regarding media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 73 | 4/16/2015 11:47 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re legal advice regarding media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 74 | 4/24/2015 19:22 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re records retention, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 75 | | | | | Attached letter providing legal advice re document retention | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 76 | 4/24/2015 19:59 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re legal advice regarding potential deposition | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 77 | 4/27/2015 21:20 | Brad Edwards | robiejennag@y7mail.com | Smccawley@BSFLLP.com | Seeking information to assist in providing legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 78 | 4/30/2015 6:42 | Brittany Henderson | eperez@BSFLLP.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | Legal documents provided to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 79 | 4/30/2015 7:02 | Brittany Henderson | robiejennag@y7mail.com | | Email chain with Giuffre, Henderson and paralegal re seeking and providing information to assist in providing legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 80 | 4/30/2015 7:05 | Virginia Giuffre | brittany@pathtojustice.com | | Email chain with Giuffre, Henderson, Edwards, McCawley and legal assistant re seeking information to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 81 | 5/4/2015 20:04 | Virginia Giuffre | brittany@pathtojustice.com | | Email chain with Giuffre, Henderson, Edwards, McCawley and legal assistant re seeking information to assist in providing legal advice, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 82 | 5/11/2015 18:20 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com | Email chain with McCawley, Giuffre, Edwards, Pottinger, Henderson and Paralegal re seeking and providing information to assist in legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 83 | 5/11/2015 18:34 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and Paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 84 | 5/11/2015 18:40 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re case research, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 85 | 5/11/2015 18:45 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com | | Providing and seeking information to assist in legal advice re potential legal action, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 86 | 5/11/2015 18:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re seeking information to assist in providing legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 87 | 5/11/2015 18:56 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and Paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 88 | 5/17/2015 22:37 | Sigrid McCawley | robiejennag@y7mail.com | | Providing litigation documents to client, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 3 | msg |
| 89 | | | | | Attached draft legal agreement | AC Privilege and Work Product/joint defense/common interest | Withheld | 10 | pdf |
| 90 | 5/17/2015 22:40 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re legal agreement, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 91 | 5/18/2015 18:40 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of confidential agreement, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 92 | | | | | Attached confidential agreement page | Attorney Client/joint defense/common interest/work product | Withheld | 1 | jfif |
| 93 | | | | | Attached confidential agreement page | Attorney Client/joint defense/common interest/work product | Withheld | 1 | jfif |
| 94 | 6/5/2015 19:16 | Sigrid McCawley | robiejennag@y7mail.com | | Conveying attorney mental impression regarding hearing | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 95 | 6/6/2015 17:20 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re attorney mental impression regarding hearing | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 96 | 6/25/2015 2:26 | Sigrid McCawley | robiejennag@y7mail.com | | Providing advice re status and strategy of ongoing legal matters | Attorney Client/joint defense/common interest/work product | Withheld | 6 | msg |
| 97 | 7/17/2015 14:19 | Sigrid McCawley | robiejennag@y7mail.com | eperez@BSFLLP.com | Discussion with S. McCawley regarding file related to representation by B. Josefsberg | Attorney Client/joint defense/common interest/work product | Withheld | 4 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 98 | 7/27/2015 21:53 | Virginia Giuffre | Smccawley@BSFLLP.com | | Providing information to assist in legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 99 | 7/29/2015 19:45 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com | Conveying legal advice on media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 100 | 8/5/2015 19:51 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and paralegals re information sought to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 101 | 8/6/2015 2:14 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 102 | 8/6/2015 2:45 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com | Email chain with Giuffre, McCawley, legal intern, Edwards and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 103 | 8/6/2015 2:55 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 104 | 8/6/2015 3:48 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with McCawley, Giuffre, and Paralegals re seeking information to assist in legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 105 | 8/6/2015 3:51 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 106 | 9/1/2015 18:54 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com,brittany@pathtojustice.com | Providing and seeking information to assist in legal advice re potential legal action, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 107 | 9/7/2015 18:24 | Virginia Giuffre | brad@pathtojustice.com,smccawley@bsfllp.com,stanpottinger@aol.com | | Providing information sought by attorneys to provide legal advice, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 108 | | | | | Attached Information sought by attorneys to provide legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | docx |
| 109 | 9/7/2015 18:58 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re collection of information to assist in providing legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 110 | 9/15/2015 21:58 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 111 | 9/15/2015 22:04 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 112 | 9/15/2015 22:07 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 113 | 9/20/2015 12:15 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com | Conveying information about potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 114 | 9/20/2015 14:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 115 | 9/20/2015 19:16 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 116 | 9/20/2015 19:29 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 117 | 9/20/2015 19:30 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 118 | 9/21/2015 14:48 | Sigrid McCawley | robiejennag@y7mail.com | | Communication re initiation of lawsuit, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 119 | | | | | Attached draft legal document relating to litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 12 | pdf |
| 120 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 121 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 122 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 3 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 123 | 9/21/2015 14:51 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| | | | | | | | | | |
| 125 | Emails, letters, and other communications from 2011 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson (and other , Sigrid McCawley, Meredith Schultz, David Boies, Jack Scarola, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Jack Scarola, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: Jane Doe #1 and Jane Doe #2 v. United States ("CVRA case"), Case no. 08-80736-CIV-Marra, pending in the Southern District of Florida. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the CVRA case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the CVRA case, communications sending or attaching attorney work product related to the CVRA case, and/or communications sending or attaching client revisions to attorney work product related to the CVRA case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 126 | Emails, letters, and other communications from 9/21/15 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: Giuffre v. Maxwell ("Maxwell case"), 15-cv-07433-RWS, pending in the Southern District of New York, since the date of filing, September 21, 2015. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Maxwell case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Maxwell case, communications sending or attaching attorney work product related to the Maxwell case, and/or communications sending or attaching client revisions to attorney work product related to the Maxwell case, and communications re evidence. | AC Privilege and Work Product/joint defense/commo n interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 127 | Emails, letters, and other communications from January 2015 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: *Bradley Edwards and Paul Cassell v. Alan Dershowitz* ("Dershowitz case"), Case no. 15-000072, pending in the Seventeenth Judicial Circuit, Broward County, Florida. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Dershowitz case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Dershowitz case, communications sending or attaching attorney work product related to the Dershowitz case, and/or communications sending or attaching client revisions to attorney work product related to the Dershowitz case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 128 | Emails, letters, and other communications from 2009 - Present | Virginia Giuffre, Bob Josefsberg, Katherine W. Ezell, Amy Ederi, other Podhurst attorneys, Legal Assistants, and Professionals retained by attorneys to aid in the rendition of legal advice | Virginia Giuffre, Bob Josefsberg, Katherine W. Ezell, Amy Ederi, other Podhurst attorneys, Legal Assistants, and Professionals retained by attorneys to aid in the rendition of legal advice | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: *Jane Doe No. 102 v. Jeffrey Epstein* ("Epstein case"), Case No. 09-80656-CIV-Marra/Johnson (Southern District of Florida). Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Epstein case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Epstein case, communications sending or attaching attorney work product related to the Epstein case, and/or communications sending or attaching client revisions to attorney work product related to the Epstein case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |
| 129 | 6/10/2015 | Virginia Giuffre | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley seeking information to assist with attorney advice. | Attorney Client | Withheld | 2 | msg |
| 130 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 26 | pdf |
| 131 | 4/30/2015 | Brittany Henderson | eperez@BSFLLP.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | Communication re VRS registrations | AC Privilege and Work Product | Withheld | 1 | msg |
| 132 | 4/29/2015 | Andres Ortiz | bh699@nova.edu | Smccawley@BSFLLP.com,brad@pathtojustice.com,garvin@lclark.edu, robiejennag@y7mail.com | Email chain with McCawley, Edwards, Garvin, Henderson, Giuffre and BSF staff re legal advice re VRS communications. | AC Privilege and Work Product | Withheld | 1 | msg |
| 133 | 4/29/2015 | brittany henderson | aortiz@BSFLLP.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,garvin@lclark.edu, robiejennag@y7mail.com | Communication re legal advice re VRS communications. | AC Privilege and Work Product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 134 | 4/17/2015 | Paul Cassell | brad@pathtojustice.com | Smccawley@BSFLLP.com,brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 5 | msg |
| 135 | 4/17/2015 | Sigrid McCawley | brad@pathtojustice.com,cassellp@law.utah.edu | brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 4 | msg |
| 136 | 4/17/2015 | Brad Edwards | cassellp@law.utah.edu | Smccawley@BSFLLP.com,brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 4 | msg |
| 137 | 2/26/2015 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re non-testifying expert. | Attorney Client | Withheld | 1 | msg |
| 138 | 2/26/2015 | Sigrid McCawley | robiejennag@y7mail.com | | Communication re non-testifying expert. | Attorney Client | Withheld | 1 | msg |
| 139 | 2/11/2016 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 140 | 2/11/2016 | Sigrid McCawley | StanPottinger@aol.com,robiejennag@y7mail.com | Lcarlsen@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 141 | 2/11/2016 | StanPottinger@aol.com | robiejennag@y7mail.com | Lcarlsen@BSFLLP.com,Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 142 | 2/9/2016 | StanPottinger@aol.com | robiejennag@y7mail.com | | Email chain with Giuffre and Pottinger re media communications. | Attorney Client | Redacted | 2 | msg |
| 143 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 26 | pdf |
| 144 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 23 | docx |
| 145 | 6/10/2015 | Virginia Giuffre | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re ongoing litigation. | Attorney Client | Withheld | 2 | msg |
| 146 | 4/29/2015 | Virginia Giuffre | aortiz@BSFLLP.com | Smccawley@BSFLLP.com,bh699@nova.edu,brad@pathtojustice.com,garvin@lclark.edu | Email chain with Henderson, McCawey, Edwards, Garvin and BSF staff re VRS communications. | Attorney Client | Withheld | 2 | msg |
| 147 | 4/10/2015 | Virginia Giuffre | rebecca.boylan@yahoo.com | | Email chain with Boylan, Giuffre, McCawley, and BSF staff re legal advice re VRS registrations. | Attorney Client | Withheld | 2 | msg |
| 148 | 2/26/2015 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email confirming legal advice re non-testifying expert. | Attorney Client | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 149 | 2/11/2015 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Giuffre and Pottinger re media communications | Attorney Client | Redacted | 3 | msg |
| 150 | 2/11/2015 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 151 | 1/13/2015 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Pottinger and Giuffre re anticipated litigation. | AC Privilege and Work Product | Withheld | 1 | msg |
| 152 | Emails, letters, and other communications from January 2015 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). This categorical entry is regarding correspondence re potential legal action against entities and individuals. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to potential law suits, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the law suits, communications sending or attaching attorney work product related to potential lawsuits, and/or communications sending or attaching client revisions to attorney work product related to potential lawsuits, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 153 | Email and letter communications | The law enforcement entity, Virginia Giuffre, David Boies, Stan Pottinger, Sigrid McCawley, Paul Cassell, Brad Edwards | The law enforcement entity, Virginia Giuffre, David Boies, Stan Pottinger, Sigrid McCawley, Paul Cassell, Brad Edwards | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). This categorical entry is regarding correspondence re the currently ongoing criminal investigation of Defendant and others. | Public Interest | Withheld | approx. 57 documents | |

# EXHIBIT 3

**United States District Court**
**For The Southern District of New York**

***Giuffre v. Maxwell***
**15-cv-07433-RWS**
**Ghislaine Maxwell's Privilege Log Amended as of May 16, 2016**

*****Per Local Rule 26.2, the following privileges are asserted pursuant to British law, Colorado law and NY law.**

| Log ID | DATE | DOC. TYPE | BATES # | FROM | TO | CC | RELATIONSHIP OF PARTIES | SUBJECT MATTER | PRIVILEGE |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 2011.03.15 | E-Mails | 1000-1013 | Ghislaine Maxwell | Brett Jaffe, Esq. | | Attorney / Client | Communication re: legal advice | Attorney-Client |
| 2. | 2011.03.15 | E-Mails | 1014-1019 | Brett Jaffe, Esq. | Ghislaine Maxwell | | Attorney / Client | Communication re: legal advice | Attorney-Client |
| 3. | 2015.01.02 | E-Mails | 1020-1026 | Ross Gow | Ghislaine Maxwell | | Attorney Agent / Client | Communication re: legal advice | Attorney-Client |
| 4. | 2015.01.02 | E-Mail | 1024-1026 | Ghislaine Maxwell | Ross Gow | | Attorney Agent / Client | Communication re: legal advice | Attorney-Client |
| 5. | 2015.01.02 | E-Mail | 1027-1028 | Ross Gow | Ghislaine Maxwell | Brian Basham | Attorney Agent / Client | Communication re: legal advice | Attorney-Client |
| 6. | 2015.01.06 | E-Mail | 1029 | Ghislaine Maxwell | Jeffrey Epstein | | Common Interest | Communication re: legal advice | Common Interest |
| 7. | 2015.01.06 | E-Mail | 1030-1043 | Ghislaine Maxwell | Jeffrey Epstein,<br>Alan Dershowitz, Esq. | | Attorney / Client | Communication re: legal advice | Common Interest |
| 8. | 2015.01.10 | E-Mail | 1044 | Ghislaine Maxwell | Philip Barden, Esq.,<br>Ross Gow | | Attorney / Client | Communication re: legal advice | Attorney-Client |
| 9. | 2015.01.10 | E-Mail | 1045-1051 | Ghislaine Maxwell | Philip Barden, Esq. | | Client / Attorney | Communication re: legal advice | Attorney-Client |
| 10. | 2015.01.09<br>2015.01.10 | E-Mails | 1052-1055 | Ross Gow | Philip Barden, Esq. | G. Maxwell | Agent / Attorney / Client | Communication re: legal advice | Attorney-Client |
| 11. | 2015.01.11 | E-Mail | 1055-1058 | Ghislaine Maxwell | Jeffrey Epstein | | Common Interest | Communication re: legal advice | Common Interest |
| 12. | 2015.01.11 | E-Mail | 1055-1058 | Philip Barden, Esq. | Ross Gow | G. Maxwell | Attorney / Agent / Client | Communication re: legal advice | Attorney-Client |
| 13. | 2015.01.11 | E-Mail | 1056-1058 | Philip Barden, Esq. | Ghislaine Maxwell | Ross Gow | Attorney / Agent / Client | Communication re: legal advice | Attorney-Client |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14. | 2015.01.11 – 2015.01.17 | E-Mails | 1059-1083 | Jeffrey Epstein | Ghislaine Maxwell | | Common Interest | Communication re: legal advice | Common Interest Privilege |
| 15. | 2015.01.13 | E-Mail | 1067-1073 | Ghislaine Maxwell | Jeffrey Epstein | | Common Interest | Communication re: legal advice | Common Interest Privilege |
| 16. | 2015.01.13 | E-Mail | 1069-1073,<br><br>1076-1079 | Philip Barden, Esq. | Martin Weinberg, Esq. | | Common Interest | Communication re: legal advice | Common Interest Privilege |
| 17. | 2015.01.13 | E-Mails | 1068-1069,<br><br>1074-1076 | Philip Barden, Esq. | Ghislaine Maxwell | Mark Cohen | Attorney / Client | Communication re: legal advice | Attorney-Client |
| 18. | 2015.01.21 | E-Mail | 1088-1090 | Ross Gow | Philip Barden, Esq., Ghislaine Maxwell | | Agent / Attorney / Client | Communication re: legal advice | Attorney-Client |
| 19. | 2015.01.21 - 2015.01.27 | E-Mails | 1084-1098 | Jeffrey Epstein | Ghislaine Maxwell | | Common Interest | Communication re: legal advice | Common Interest Privilege |
| 20. | 2015.01.21-2015.01.27 | E-Mails | 1099 | Ghislaine Maxwell | Jeffrey Epstein | | Common Interest | Communication re: legal advice | Common Interest Privilege |
| 21. | 2015.04.22 | E-mail | 7 pages | Jeffrey Epstein | Ghislaine Maxwell | | Common Interest | Forwarding message from Martin Weinberg, labeled "Attorney-Client Privilege" with attachment | Common Interest Privilege |
| 22. | Various | E-mails | | Agent of Haddon, Morgan & Foreman; Laura Menninger | Agent of Haddon, Morgan & Foreman; Laura Menninger | | Agent of attorney and Attorney | Attorney work product | Attorney Work Product |
| 23. | Various | E-mails | | Mary Borja; Laura Menninger | Mary Borja; Laura Menninger | | Attorney Work Product | Attorney work product | Attorney Work Product |
| 24. | 2015.10.21 – 2015.10.22 | E-mail chain with attachmen t | | Darren Indyke; Laura Menninger | Darren Indyke; Laura Menninger | | Attorneys for parties to Common Interest Agreement | Common Interest Agreement | Attorney Work Product; Common Interest Privilege |

# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

------------------------------------------------------X

**15-cv-07433-RWS**

**DEFENDANT GHISLAINE MAXWELL'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

Defendant Ghislaine Maxwell, by and through her undersigned counsel, hereby responds to Plaintiff's Second Request for Production of Documents (the "Requests").

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

1. This response is made to the best of Ms. Maxwell's present knowledge, information and belief. Ms. Maxwell, through her attorneys of record, have not completed the investigation of the facts relating to this case, have not completed discovery in this action, and have not completed preparation for trial. Ms. Maxwell's responses to Plaintiff's requests are based on information currently known to her and are given without waiving Ms. Maxwell's right to use evidence of any subsequently discovered or identified facts, documents or communications. Ms. Maxwell reserves the right to supplement this Response in accordance with Fed. R. Civ. P. 26(e).

2. Ms. Maxwell objects to the Requests to the extent they attempt to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure, the local rules of this Court or any Orders of the Court.

3. Ms. Maxwell objects to the Requests to the extent they seek documents or information protected by the attorney/client privilege, the work-product doctrine, Rule 408 of the Federal Rules of Evidence, any common interest privilege, joint defense agreement or any other applicable privilege.

4. Ms. Maxwell objects to the Requests to the extent they seek documents or information outside of Ms. Maxwell's possession, custody or control.

5. Ms. Maxwell objects to the Requests to the extent they seek information which is not relevant to the subject matter of the litigation and/or is not reasonably calculated to lead to the discovery of admissible evidence.

6. Ms. Maxwell objects to the Requests to the extent they are overly broad, unduly burdensome and/or propounded for the improper purpose of annoying, embarrassing, or harassing Ms. Maxwell.

7. Ms. Maxwell objects to the Requests to the extent they are vague and ambiguous, or imprecise.

8. Ms. Maxwell objects to the Requests to the extent they seek information that is confidential and implicates Ms. Maxwell's privacy interests.

9. Ms. Maxwell incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or for some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request.

10. The Requests seek information that is confidential and implicates Ms. Maxwell's privacy interests. To the extent such information is relevant and discoverable in this action, Ms. Maxwell will produce such materials subject to an appropriate protective order pursuant to Fed. R. Civ. P. 26(c) limiting their dissemination to the attorneys and their employees.

## OBJECTIONS TO DEFINITIONS

11. Ms. Maxwell objects to Definition No. 1 regarding "Agent" to the extent that it purports to extend the meaning beyond those permissible by law.

12. Ms. Maxwell objects to Definition No. 3 regarding "Defendant." The Definition is overly broad and unduly burdensome to the extent it attempts to extend the scope of the Requests to documents in the possession, custody or control of individuals other than Ms. Maxwell or her counsel.

13. Ms. Maxwell objects to Definition No. 5 regarding "Employee." Ms. Maxwell is an individual, sued in an individual capacity, and therefore there is no "past or present officer, director, agent or servant" of hers. Additionally, "attorneys" and "paralegals" are not "employees" of Ms. Maxwell given that she herself is not an attorney and therefore cannot "employ" attorneys.

14. Ms. Maxwell objects to Definition No. 10 regarding "You" or "Your." The Definition is overly broad and unduly burdensome to the extent it attempts to extend the scope of the Requests to documents in the possession, custody or control of individuals other than Ms. Maxwell or her counsel.

## OBJECTIONS TO INSTRUCTIONS

15. Ms. Maxwell objects to Instruction No. 1, in particular the definition of the "Relevant Period" to include July 1999 to the present, on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. The Complaint at paragraph 9 purports to describe events pertaining to Plaintiff and Defendant occurring in the years 1999 – 2002. The Complaint also references statements attributed to Ms. Maxwell occurring in January 2015. Defining the "Relevant Period" as "July 1999 to the present" is vastly overbroad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and as to certain of the Requests, is intended for the improper purpose of annoying or harassing Ms. Maxwell and it implicates her privacy rights. Thus, Ms. Maxwell interprets the Relevant Period to be limited to 1999-2002 and December 30, 2014 - January 31, 2015, except to the extent that any the answers "relate to any activity of defendant with respect to the practice which has been alleged and the duties alleged to be performed by Defendant, 'activities' being defined as sexual abuse or trafficking of any female," in which case her answers reflect the period 2000-today. Ms. Maxwell specifically objects to production of any documents outside that period, except as specifically noted.

16. Ms. Maxwell objects to Instruction No. 3 on the grounds that it is unduly burdensome and is intended for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell cannot possibly recall the specific disposition of documents, particularly electronic documents, dating back over 16 years. However, Ms. Maxwell, prior to this litigation has long had a practice of deleting emails after they have been read.

17. Ms. Maxwell objects to Instruction Nos. 5, 8, 9, 12, 17 to the extent they seek to impose obligations to supply explanations for the presence or absence of such documents, to specifically identify persons or documents, to provide information concerning who prepared documents, the location of any copies of such documents, the identities and contact information for persons who have custody or control of such documents, the reasons for inability to produce portions of documents, and the "natural person in whose possession they were found," beyond the requirements of Rule 34. This Instruction improperly seeks to propound Interrogatories pursuant to Rule 33.

18. Ms. Maxwell objects to Instructions No. 13 on the grounds that it is unduly burdensome and is intended for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell cannot possibly recall the specific circumstances upon which a document dating back 16 years has ceased to exist.

19. Ms. Maxwell objects to Instruction No. 15 to the extent that it calls for documents or information protected by the attorney/client privilege, the work-product doctrine, or any other applicable privilege.

20. Ms. Maxwell objects to Instruction Nos. 18 & 19 to the extent they require information on any privilege log above and beyond the requirements of Local Civil Rule 26.2.

## SPECIFIC OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS

### DOCUMENT REQUEST NO. 1

Produce all documents that Your attorneys reviewed and/or relied upon in the March 21, 2016, meet and confer discussion when Mr. Pagliuca stated that (1) Plaintiff made false allegations concerning her sexual assault; (2) she made them in roughly the same time frame that Plaintiff was abused by Jeffrey Epstein; (3) that the allegations were made against a number of individuals in the area; and (4) that the allegations were found to be unfounded by local police.

**RESPONSE:** Ms. Maxwell has no knowledge of any statements made by Mr. Pagliuca during the March 21, 2016 meet and confer and hence has no documents responsive to this Request. Further, this Request inaccurately characterizes the statements of Ms. Maxwell's counsel during the March 16, 2016 meet and confer.

Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.

Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Subject to and without waiver of the foregoing, Defendant refers to the public documents and news reports regarding Plaintiff's allegations of sexual abuse and investigation of the same, which have been previously produced, are available in the public domain, or referenced in court papers. Defendant also refers Plaintiff to documents within the possession, custody and control of Plaintiff and her counsel, including without limitation Mr. Bradley Edwards, which were requested in Defendant's First Set of Discovery Requests, but were not produced despite certification of Plaintiff and Plaintiff's counsel that such Responses were truthful and complete.

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's false allegations of sexual assaults in her Second Supplemental Fed. R. Civ. P. 26(a)(1)(A) disclosures.

### DOCUMENT REQUEST NO. 2

Produce all documents concerning how any such police report, or how any such recounting, retelling, summary, or description of any such police report (as referenced in Interrogatory No. 1), came into Your possession. This request includes, but is not limited to, all documents concerning how, when, and by whom such reports (or descriptions of reports) were obtained from a minor child's sealed juvenile records and files.

**RESPONSE:** Ms. Maxwell objects to this Request in that there is no "Interrogatory No. 1" to which the Request corresponds. She further objects to the Request in that it improperly seeks to propound an Interrogatory in the form of a Request for Production of Documents and is

a contention Interrogatory barred according to Plaintiff's interpretation of the Local Rules. The Request embeds a number of assumptions that are not true and for which Plaintiff supplies no basis for assertion of their veracity.

Ms. Maxwell likewise objects to this Request because it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.

Finally, Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Defendant refers to the public documents and news reports regarding Plaintiff's allegations of sexual abuse and investigation of the same, which have been previously produced, are available in the public domain, or referenced in court papers. Defendant also refers Plaintiff to documents within the possession, custody and control of Plaintiff and her counsel, including without limitation Mr. Bradley Edwards, which were requested in Defendant's First Set of Discovery Requests, but were not produced despite certification of Plaintiff and Plaintiff's counsel that such Responses were truthful and complete.

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's false allegations of sexual assaults in her Second Supplemental Fed. R. Civ. P. 26(a)(1)(A) disclosures. Ms. Maxwell is withholding documents responsive to this request on the basis of the attorney-client and work product privileges.

**DOCUMENT REQUEST NO. 3**

Produce all documents concerning how information or knowledge of the local police's findings or opinions concerning Ms. Giuffre's allegations of sexual assault as a minor child came into Your possession, including but not limited to documents concerning any statements made by law enforcement or any state attorney, written or oral, concerning such allegations.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.

Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Subject to and without waiver of the foregoing, Defendant refers to the public documents and news reports regarding Plaintiff's allegations of sexual abuse and investigation of the same, which have been previously produced, are available in the public domain, or referenced in court papers. Defendant also refers Plaintiff to documents within the possession, custody and control of Plaintiff and her counsel, including without limitation Mr. Bradley Edwards, which were requested in Defendant's First Set of Discovery Requests, but were not produced despite certification of Plaintiff and Plaintiff's counsel that such Responses were truthful and complete.

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's false allegations of sexual assaults in her Second Supplemental Fed. R. Civ. P. 26(a)(1)(A) disclosures. Ms. Maxwell is withholding documents responsive to this request on the basis of the attorney-client and work product privileges.

**DOCUMENT REQUEST NO. 4**

Produce all documents concerning any investigations, internal or otherwise, by any law enforcement or governmental agency, regarding the illegal disclosure, illegal purchase, and/or theft of sealed juvenile police records concerning Plaintiff.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Ms. Maxwell also objects to this Request to the extent it calls information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Defendant objects to this request to the extent that it characterizes the gathering of public information as "illegal."

Subject to and without waiver of the foregoing, Defendant has been unable to locate any documents responsive to this Request.

**DOCUMENT REQUEST NO. 5**

Produce all documents concerning any rape, sexual assault, sexual intercourse, or other sexual encounter involving Plaintiff. This Request includes, but is not limited to, (1) any documents concerning any sexual assault of Plaintiff while a minor; (2) any police reports, or documents concerning any police reports, that were created concerning such claims of sexual assault; and (3) documents concerning any communications received by You (or Your agents or attorneys) by other individuals that reference any sexual assault of Plaintiff while a minor.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.

Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Subject to and without waiver of the foregoing, Defendant refers to the public documents and news reports regarding Plaintiff's false allegations of sexual abuse and investigation of the same, which have been previously produced, are available in the public domain, or referenced in court papers. Defendant also refers Plaintiff to documents within the possession, custody and control of Plaintiff and her counsel, including without limitation Mr. Bradley Edwards, which were requested in Defendant's First Set of Discovery Requests, but were not produced despite certification of Plaintiff and Plaintiff's counsel that such Responses were truthful and complete.

Defendant objects to the characterization of Plaintiff's documented false claims of sexual contact as "rape" or "sexual assault."

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's false allegations of sexual assault in her Second Supplemental Fed. R. Civ. P. 26(a)(1)(A) disclosures.

**DOCUMENT REQUEST NO. 6**

Produce any Joint Defense Agreement entered into between You and Jeffrey Epstein from 1999 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Defendant is withholding production of any such agreement on the basis of such privileges.

**DOCUMENT REQUEST NO. 7**

Produce any documents concerning any Joint Defense Agreement entered into between You and Jeffrey Epstein from 1999 to the present.

**RESPONSE**: Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Defendant is withholding documents on the basis of such privileges.

**DOCUMENT REQUEST NO. 8**

Produce any documents concerning any of Your, or Your attorneys or agent's, communications with Jeffrey Epstein's attorneys or agents from 1999 to the present relating to the issue of sexual abuse of females, or any documents concerning any of Your, Your attorneys or agent's, communications with Jeffrey Epstein's attorneys or agents from 1999 to the present relating to the recruitment of any female under the age of 18 for any purpose, including socializing or performing any type of work or services.

**RESPONSE**: Ms. Maxwell objects to this Request on the grounds that it is cumulative and duplicative. Ms. Maxwell has already produced documents related to her communications with Jeffrey Epstein in response to Plaintiff's First Requests for Production of Documents, all of which document her denial that she did "recruit[] any female under the age of 18 for any purpose."

Ms. Maxwell also objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to and without waiver of the foregoing, Defendant has been unable to locate any additional documents responsive to this Request.

**DOCUMENT REQUEST NO. 9**

Produce any Joint Defense Agreement entered into between You and Alan Dershowitz from 1999 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to and without waiver of the foregoing, Defendant has been unable to locate any documents responsive to this Request.

**DOCUMENT REQUEST NO. 10**

Produce any documents concerning any Joint Defense Agreement entered into between You and Alan Dershowitz from 1999 to the present.

**RESPONSE**: Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to and without waiver of the foregoing, Defendant has been unable to locate any documents responsive to this Request.

**DOCUMENT REQUEST NO. 11**

Produce any documents concerning any of Your attorneys' or agents' communications with Alan Dershowitz's attorneys or agents from 1999 to the present

**RESPONSE**: Ms. Maxwell objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Defendant is withholding communications between Mr. Dershowitz's counsel and Defendant's counsel which contain work product and concern joint defense or common interest matters.

**DOCUMENT REQUEST NO. 12**

Produce all documents concerning Virginia Giuffre (a/k/a Virginia Roberts), whether or not they reference her by name. This request includes, but is not limited to, all communications, diaries, journals, calendars, blog posts (whether published or not), notes (handwritten or not), memoranda, mobile phone agreements, wire transfer receipts, or any other document that concerns Plaintiff in any way, whether or not they reference her by name.

**RESPONSE:** Ms. Maxwell objects to this Request as overly broad, unduly burdensome and interposed for improper purposes. Response to this Request would literally entail defense counsel reviewing for privilege every single document in their possession related to this case.

Ms. Maxwell further objects to this Request on the grounds that it is cumulative and duplicative. Ms. Maxwell further objects to this request as exceeding the scope of this Court's March 17, 2016 Order. Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet

or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to the foregoing objections, Ms. Maxwell and her counsel are not going to review every document in their possession for any additional documents responsive to this Request.

**DOCUMENT REQUEST NO. 13**

Produce all contracts, including but not limited to indemnification agreements and employment agreements, between You and Jeffrey Epstein, or any entity associated with Jeffrey Epstein, from 1999 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is cumulative and duplicative and is overly broad. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to and without waiver of the foregoing, Defendant has been unable to locate any such documents.

**DOCUMENT REQUEST NO. 14**

Produce all documents concerning any contracts, including but not limited to indemnification agreements and employment agreements, between You and Jeffrey Epstein, or any entity associated with Jeffrey Epstein, from 1999 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is cumulative and duplicative and is overly broad. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Subject to and without waiver of the foregoing, Defendant has been unable to locate any such documents.

**DOCUMENT REQUEST NO. 15**

Produce all documents concerning the identity or identities of the individual(s) or entities paying Your legal fees concerning the above-captioned action, and all documents concerning the identity or identities of the individual(s) or entities paying Ross Gow, or any entities associated with Ross Gow, for any work he performed on Your behalf.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it seeks multiple categories of documents within a single request for production. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege. Ms. Maxwell is producing her engagement letter with her counsel in this action. Defendant has been unable to locate any additional documents responsive to this Request.

**DOCUMENT REQUEST NO. 16**

Produce all documents concerning any action or lawsuit brought against You from 1999 to the present, including, but not limited to, actions or lawsuits brought in foreign jurisdictions.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is over-broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, or any other applicable privilege. Subject to and without waiving the above objections, Ms. Maxwell has been unable to locate any documents responsive to this Request.

**DOCUMENT REQUEST NO. 17**

Produce all documents concerning any statement made by You or on Your behalf to the press or any other group or individual, including draft statements, concerning Ms. Giuffre, by You, Ross Gow, or any other individual, from 2005 to the present, including the dates of any publications, and if published online, the Uniform Resource Identifier (URL) address.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is cumulative and duplicative. Ms. Maxwell also objects to this Request to the extent it calls for information that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, or any other applicable privilege. Ms. Maxwell is not producing documents that are available in the public domain. Ms. Maxwell has been unable to locate any additional documents responsive to this Request.

**DOCUMENT REQUEST NO. 18**

Produce all documents concerning which individuals or entities You or Your agents distributed or sent any statements concerning Ms. Giuffre referenced in Request No. 18 made by You or on Your behalf.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is cumulative and duplicative. Ms. Maxwell also objects to this Request to the extent it calls for information that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, or any other applicable privilege. Ms. Maxwell is not producing documents that are available in the public domain. Ms. Maxwell has been unable to locate any additional documents responsive to this Request.

**DOCUMENT REQUEST NO. 19** Produce all documents concerning any alleged illegal activity involving Plaintiff from the Relevant Period. This request includes, but is not limited to, any documents concerning the Roadhouse Grill in Florida.

**RESPONSE:** Ms. Maxwell objects to this Request as vague and confusing. Ms. Maxwell is unaware of all illegal activities in which Plaintiff may have been engaged in during the stated time period, and documents concerning those activities are uniquely within Plaintiff's possession, custody and control.

Ms. Maxwell further objects to this Request to the extent it seeks documents or information protected by the attorney/client privilege, the work-product doctrine, the common interest privilege or any other applicable privilege.

Ms. Maxwell also objects to this Request to the extent it calls for information relating to Virginia Roberts Giuffre that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Subject to and without waiver of the foregoing, Defendant refers to the public documents and news reports regarding Plaintiff's allegations of sexual abuse and investigation of the same, which have been previously produced, are available in the public domain, or referenced in court papers. Defendant also refers Plaintiff to documents within the possession, custody and control of Plaintiff and her counsel, including without limitation Mr. Bradley Edwards, which were requested in Defendant's First Set of Discovery Requests, but were not produced despite certification of Plaintiff and Plaintiff's counsel that such Responses were truthful and complete.

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's contacts with law enforcement in her Second Supplemental Fed. R. Civ. P. 26(a)(1)(A) disclosures.

**DOCUMENT REQUEST NO. 20**

Produce all documents concerning any apartment or other dwelling occupied by Plaintiff from 1999 to the present, including but not limited to, all documents concerning the acquisition of, and payment for, such dwellings. This Request includes, but is not limited to, any dwelling paid for -in whole or in part by Defendant or Jeffrey Epstein.

**RESPONSE:** Ms. Maxwell objects to this Request to the extent it calls for information that exists within the public domain, the internet or in public court records and which are equally available to both parties and can be obtained from some other source that is more convenient, less burdensome, and less expensive. Ms. Maxwell is not producing documents that are available in the public domain. Ms. Maxwell is not re-producing documents already produced by her and produced by Plaintiff in this action, for example, in response to Defendant's First Set of Discovery Requests to Plaintiff which requested *inter alia* documents related to Plaintiff's residences since 1999.

Without waiver of any such objections, Ms. Maxwell has made available documents related to some of Ms. Giuffre's dwellings in her Second Supplemental Fed. R. Civ. P.

26(a)(1)(A) disclosures. Ms. Maxwell has been unable to locate any additional documents responsive to this Request.

## DOCUMENT REQUESTS "CONCERNING PUNITIVE DAMAGES"

### DOCUMENT REQUEST NO. 21

Produce all copies of the complaints in any lawsuits that You have filed in any court in which You seek damages or any other financial recovery from 2014 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

### DOCUMENT REQUEST NO. 22

Produce all Financial Statements prepared for or submitted to any Lender or Investor for the past three years by You personally or on Your behalf or on behalf of any entity in which You hold or held a controlling interest from January 2015 to the Present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will

Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 23**

Produce all W-2s, K-1s, and any other documents reflecting any income (including salary, bonuses, dividends, profit distributions, royalties, advances, annuities, and any other form of income), including all gross and net revenue received by You directly or indirectly from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 24**

Produce all tax returns filed with any taxing entity (either foreign or domestic) from January 2015 to the present by You or on Your behalf, or on behalf of any entity in which You hold or held a controlling interest at the time of filing.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 25**

Produce all bank statements or other financial statements which were prepared by You, on Your behalf or by or on behalf of any entity in which You held an ownership interest of 10% or more at any time from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 26**

Produce all deeds and titles to all real property owned by You or held on Your behalf either directly or indirectly at any time from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 27**

Produce all passbooks (or other documents showing account balances) with respect to all savings accounts, checking accounts, and savings and loan association share accounts owned by

You or on which You hold a right or have held a right to withdraw funds at any time from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 28**

Produce all passbooks (or other documents showing account balances) with respect to all savings accounts, checking accounts and savings loan association share accounts, owned by You in whole or in party jointly as co-owner, partner, or joint venture, in any business enterprise, or owned by an entity in which You have or have had a controlling interest at any time from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 29**

Produce all bank ledger sheets (from the internet or otherwise) concerning all bank accounts in which You have a right to withdraw funds, reflecting the highest balance in said

accounts from January 2015 to the present. .

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 30**

Produce all bank ledger sheets (from the internet or otherwise) concerning all bank accounts owned by You solely, or jointly as co-owner, partner, or joint venture, in any business enterprise, or any entity in which You have or have had a controlling interest from January 2015 to the present, reflecting het highest balance in said accounts for each month from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 31**

Produce all checkbooks for all accounts on which You were authorized to withdraw funds from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 32**

Produce the 2015 and 2016 balance sheets and other financial statements with respect to any and all business enterprises of whatever nature (including not-for-profit enterprises), either foreign or domestic, in which You possess any ownership interest of 10% or more, whether a partner, joint venture, stockholder, or otherwise.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 33**

Produce all corporate securities (stocks or bonds), foreign or domestic, directly or indirectly held by You, or held on Your behalf or for Your benefit by another individual or entity, including trusts from January 2015 to the Present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this

action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 34**

Produce all accounts receivable ledgers or other records which set forth the names and addresses of all persons or business enterprises that are indebted to You and the amounts and terms of such indebtedness from August 2016 to the Present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 35**

Produce all copies of the partnership or corporation Income Tax Returns for any partnership or corporation, either foreign or domestic, in which You do possess or have possessed any ownership interest of 4% or more whether as partner, joint venture, stockholder or otherwise, from 2014 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of

annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 36**

Produce all title certificates, registration certificates, bills of sale, and other evidences of ownership possessed by You or held for Your beneficial interest with respect to any of the following described property owned by You or held directly or indirectly for Your beneficial interest from January 2015 to the present:

a. Motor vehicles of any type, including trucks, other automobiles, and two or three-wheeled vehicles (motorcycles, ATV, etc.).

b. Aircraft of any type, including jets, propeller planes, and helicopters

c. Boats, launches, cruisers, sailboats, or other vessels of any type

d. Real estate and real property

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 37**

From January 2012 to the present, produce all documents concerning any source of funding for the TarraMar Project or any other not-for-profit entities with which You are

associated, including but not limited to, funding received from the Clinton Global Initiative, the Clinton Foundation (a/k/a William J. Clinton Foundation, a/k/a/ the Bill, Hilary & Chelsea Clinton Foundation), and the Clinton Foundation Climate Change Initiative.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 38**

Produce all memoranda and/or bills evidencing the amount and terms of all of Your current debts and obligations that exist presently.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 39**

Produce all records indicating any and all income (whether taxable or not) received by You from all sources from January 2015 to the present.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad

and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 40**

Produce all copies of any and all brokerage account statements or securities owned by You individually, jointly with any person or entity or as trustee, guardian or custodian, from January 2015 to the present, including in such records date of purchase and amounts paid for such securities, and certificates of any such securities.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 41**

Produce all records pertaining to the acquisition, transfer and sale of all securities by You or on Your behalf from January 2015 to the present, such records to include any and all information relative to gains or losses realized from transactions involving such securities.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms.

Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**DOCUMENT REQUEST NO. 42**

Produce all policies of insurance having any cash value that exist or existed from January 2015 to the present, which policies You or any entity controlled by You is the owner or beneficiary.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

**UN-NUMBERED REQUEST**

Produce all copies of any and all trust agreements that exist or existed from January 2015 to the present in which You are the settlor or beneficiary together with such documents necessary and sufficient to identify the nature and current value of the trust.

**RESPONSE:** Ms. Maxwell objects to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Maxwell objects to this Request on the grounds that it is propounded for the improper purpose of annoying or harassing Ms. Maxwell. Ms. Maxwell's personal financial information is not at issue in this matter and information relating thereto is irrelevant.

Ms. Maxwell intends to move for a Protective Order regarding her personal financial information and is refusing to respond and is withholding documents under the category of "Document Requests Concerning Punitive Damages" until the motion is resolved.

Based on the May 16, 2016 conferral, counsel for Plaintiff has agreed to hold this Request in abeyance pending either a finding of liability or resolution of dispositive motions. Plaintiff's counsel will not file a Motion to Compel a Response to this Request, nor will Defendant move for a Protective Order with regard to this Request, without further conferral.

Dated: May 16, 2016

Respectfully submitted,

*s/Laura A.Menninger*

Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice)*
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

**CERTIFICATE OF SERVICE**

I certify that on May 16, 2016, I served the attached document DEFENDANT GHISLAINE MAXWELL'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS via email to the following counsel of record:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

*s/ Laura A. Menninger*
Laura A. Menninger

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________/

**RESPONSE TO MOTION TO COMPEL ATTORNEY-CLIENT COMMUNICATIONS AND ATTORNEY WORK PRODUCT MATERIALS**


BOIES, SCHILLER & FLEXNER LLP

Sigrid McCawley (*Pro Hac Vice*)
Meredith Schultz (*Pro Hac Vice*)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i
TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
FACTUAL BACKGROUND ........ 2
The CVRA Case ........ 2
The Dershowitz case ........ 4
The Florida Court Rejects a Waiver of Attorney Clients Privilege Argument ........ 5
Ms. Giuffre's Deposition in the Defamation Case ........ 7
The Settlement of the Defamation Case ........ 7
LEGAL STANDARDS FOR WAIVER ........ 8
A. Federal Rule of Evidence 502 Controls on the Issue of Waiver ........ 8
B. Florida Law ........ 9
C. Federal Law ........ 11
DISCUSSION ........ 14
I. MS. GIUFFRE DID NOT WAIVE HER ATTORNEY-CLIENT PRIVILEGE WHEN EDWARDS AND CASSELL FILED AND PURSUED THEIR OWN DEFAMATION ACTION AGAINST ALAN DERSHOWITZ. ........ 14
A. The Florida Court Presiding over the Defamation Action Has Already Rejected the Same Waiver Claim that Defendant is Advancing Here. ........ 14
B. Actions by Cassell and Edwards Do Not Waive Ms. Giuffre's Attorney-Client Privilege. ........ 18
C. Ms. Giuffre's Confidential Communications With Her Attorneys Were Never "At Issue" in the Florida Dershowitz Litigation. ........ 19
D. Defendant Has Not Met the Other Requirements for Showing Waiver of Attorney-Client Privilege. ........ 21
E. Ms. Giuffre Will Not Seek to Use Confidential Attorney-Client Communications in her Action Here. ........ 23
II. MS. GIUFFRE DID NOT WAIVE HER ATTORNEY-CLIENT PRIVILEGE BY DENYING FABRICATED EVICENCE DURING HER DEPOSITION. ........ 25
III. EDWARDS AND CASSELL HAVE NOT WAIVED WORK-PRODUCT PROTECTION AND MAXWELL HAS NOT DEMONSTRATED NEED TO PENETRATE THE PROTECTION. ........ 27
A. Work Product Protection Has Not Been Waived. ........ 27
B. Defendant Has Not Proven "Need" to Penetrate Work-Product Protection ........ 29

IV. COMMUNICATIONS WITH ATTORNEY JACK SCAROLA ARE COVERED BY A JOINT DEFENSE AGREEMENT AND ARE THUS PROTECTED BY ATTORNEY-CLIENT AND WORK-PRODUCTION PROTECTION. ........ 31

CONCLUSION ........ 31

# TABLE OF AUTHORITIES

## Cases

*Allen v. West Point-Pepperell, Inc.*,
848 F.Supp. 423 (S.D.N.Y.1994) ... 13
*Allied Irish Banks v. Bank of Am., N.A.*,
240 F.R.D. 96 (S.D.N.Y. 2007) ... 12
*Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co.*,
40 A.D.3d 486, 837 N.Y.S.2d 616 (2007) ... 22
*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
No. 04 CIV 10014 PKL,
2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ... 14
*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
210 F.R.D. 506 (S.D.N.Y. 2002) ... 10, 13, 14
*Brookings v. State*,
495 So.2d 135 (Fla. 1986) ... 23
*Bus. Integration Servs., Inc. v. AT&T Corp.*,
No. 06 CIV. 1863 (JGK), 2008 WL 318343 (S.D.N.Y. Feb. 4, 2008) ... 18
*Butler v. Harter*,
152 So.3d 705 (Fla. 1st DCA, 2014) ... 30
*Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C.*,
191 Misc. 2d 154, 738 N.Y.S.2d 179 (Sup. Ct. 2002) ... 28
*Coates v. Akerman, Senterfitt & Eidson, P.A.*,
940 So.2d 504 (Fla. 2nd DCA 2006) ... 11, 12, 20
*Columbia Hosp. Corp. of S. Broward v. Fain*,
16 So.3d 236 (Fla. 4th DCA 2009) ... 31
*Connell v. Bernstein-Macaulay, Inc.*,
407 F.Supp. 420 (S.D.N.Y.1976) ... 13
*Coyne v. Schwartz, Gold, Cohen, Zakarin & Kotler, P.A.*,
715 So.2d 1021 (Fla. 4th DCA 1998) ... 21
*CSX Transp., Inc. v. Carpenter*,
725 So.2d 434 (Fla. 2d DCA 1999) ... 30
*Delap v. State*,
440 So.2d 1242 (Fla. 1983) ... 22
*Diaz–Verson v. Walbridge Aldinger Co.*,
54 So.3d 1007 (Fla. 2d DCA 2010) ... 20
*Dillenbeck v. Hess*,
73 N.Y.2d 278, 290, 536 N.E.2d 1126 (N.Y. 1989) ... 14
*Does 1 and 2 v. United States*,
817 F.Supp.2d 1337 (S.D. Fla. 2011) ... 2
*Does v. United States*,
749 F.3d 999 (11th Cir. 2014) ... 3
*Eastern Air Lines, Inc. v. Gellert*,
431 So.2d 329 (Fla. 3d DCA 1983) ... 28
*Elliott Associates, L.P. v. Banco de la Nacion*,
194 F.3d 363 (2d Cir. 1999) ... 18

*Falco v. N. Shore Labs. Corp.*,
866 So.2d 1255 (Fla. 1st DCA 2004)........................................................................................ 31
*Ferreira v. Capitol Specialty Ins. Corp.*,
31 Misc. 3d 1209(A),
929 N.Y.S.2d 199 (N.Y. Sup. Ct. 2011) ................................................................................... 14
*First Union National Bank v. Turney*,
824 So.2d 172 (Fla. 1st DCA 2002).......................................................................................... 10
*Ford Motor Co. v. Hall-Edwards*,
997 So.2d 1148 (Fla. 3d DCA 2008) ........................................................................................ 10
*Genovese v. Provident Life and Accident Ins. Co.*,
74 So.3d 1064 (Fla. 2011)................................................................................................ 12, 20, 29
Giuffre v. Maxwell, DE 135, 2016 WL 175918 ...................................................................... 12, 32
*Goldman, Sachs & Co. v. Blondis,*
412 F.Supp. 286 (N.D.Ill.1976) ................................................................................................. 28
*Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*,
300 F.R.D. 590 (S.D. Fla. 2014) ................................................................................... 10, 11, 21
*GUS Consulting GMBH v. Chadbourne & Parke LLP*,
20 Misc. 3d 539, 858 N.Y.S.2d 591 (Sup. Ct. 2008) ................................................................ 32
*Hagans v. Gatorland Kubota, LLC/Sentry Ins.*,
45 So.3d 73 (Fla. 1st DCA 2010) ............................................................................................. 10
*Hearn v. Rhay*,
68 F.R.D. 574 (E.D. Wash. 1975)................................................................................. 10, 13, 16
*HSH Nordbank AG New York Branch v. Swerdlow*,
259 F.R.D. 64 (S.D.N.Y. 2009) ................................................................................................ 26
*In re Bank of New York Mellon Corp. Forex Transactions Litig.*,
66 F. Supp. 3d 406 (S.D.N.Y. 2014)......................................................................................... 14
*In re Bank of New York Mellon,*
42 Misc. 3d 171, 177, 977 N.Y.S.2d 560 (Sup. Ct. 2013) ......................................................... 14
*In re Cnty. of Erie*,
546 F.3d 222 (2d Cir. 2008)........................................................................................... 12, 13, 25
*In re von Bulow*,
828 F.2d 94 (2d Cir. 1987)................................................................................................. 14, 23
Jane Doe 1 v. United States,
No. 9:08-cv-80736 (S.D. Fla. July 7, 2008)................................................................................. 2
*Jane Does 1 and 2 v. United States*,
950 F.Supp.2d 1262 (S.D. Fla. 2013) ......................................................................................... 3
*Jenney v. Airdata Wiman, Inc.*,
846 So.2d 664 (Fla. 2d DCA 2003) ......................................................................................... 22
*Jenney v. Airdata Wiman, Inc.*,
846 So.2d 664 (Fla. 2nd DCA 2003) ........................................................................................ 11
*Koon v. State*,
463 So.2d 201 (Fla. 1985)................................................................................................... 19, 22
*Lynch v. State*,
2 So.3d 47 (Fla. 2008)............................................................................................................... 23
*McCullough v. Kubiak*,
158 So. 3d 739 (Fla. 4th DCA, 2015) ....................................................................................... 22
*McWatters v. State*,
36 So.3d 613 (Fla. 2010)........................................................................................................... 12

*Mitchell v. Superior Court*,
37 Cal. 3d 591, 691 P.2d 642 (Cal. 1984)........ 26
*Montana v. United States*,
440 U.S. 147 (1979)........ 17
*Montanez v. Publix Super Markets, Inc.*,
135 So. 3d 510 (Fla. Dist. Ct. App. 2014)........ 26
*N. Broward Hosp. Dist. v. Button*,
592 So.2d 367 (Fla. 4th DCA 1992)........ 31
*Niesig v. Team I*,
76 N.Y.2d 363, 558 N.E.2d 1030 (1990)........ 23
*Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*,
62 A.D.3d 581, 880 N.Y.S.2d 617 (N.Y. App. Div. 2009)........ 25
*O'Brien v. Fed. Trust Bank, F.S.B.*,
727 So. 2d 296 (Fla. Dist. Ct. App. 1999)........ 17
*Paradise Divers, Inc. v. Upmal*,
943 So. 2d 812 (Fla. Dist. Ct. App. 2006)........ 28, 29
*Parklane Hosiery Co., Inc. v. Shore*,
439 U.S. 322 (1979)........ 17
*Pereira v. United Jersey Bank*,
Nos. 94 Civ 1565 & 94 Civ 1844, 1997 WL 773716 (S.D.N.Y. Dec.11, 1997)........ 13
*Perrignon v. Bergen Brunswig Corp.*,
77 F.R.D. 455 (N.D. Cal.1978)........ 28
*Procacci v. Seitlin*,
497 So. 2d 969 (Fla. Dist. Ct. App. 1986)........ 28
*Procter & Gamble Co. v. Swilley*,
462 So.2d 1188 (Fla. 1st DCA 1985)........ 30
*Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*,
32 F.3d 851 (3d Cir.1994)........ 13
*Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.*,
32 F.3d 851 (3d Cir. 1994)........ 11
*Rogers v. State*,
742 So.2d 827 (Fla. 2d DCA 1999)........ 12
*Rousso v. Hannon*,
146 So.3d 66 (Fla. 3d DCA 2014)........ 10
*Savino v. Luciano*,
92 So.2d 817 (Fla. 1957)........ 12, 20
*Schetter v. Schetter*,
239 So.2d 51 (Fla. 4th DCA 1970)........ 18
*Schnell v. Schnall*,
550 F. Supp. 650 (S.D.N.Y.1982)........ 19
*Southern Bell Tel. & Tel. Co. v. Deason*,
632 So.2d 1377 (Fla.1994)........ 30
*State v. T.A.*,
528 So.2d 974 (Fla. 2d DCA, 1988)........ 30
*Surf Drugs, Inc. v. Vermette*,
236 So.2d 108 (Fla. 1970)........ 28
*Swidler & Berlin v. United States*,
524 U.S. 399 (1998)........ 8

*Taylor v. State*,
855 So.2d 1 (Fla. 2003) ... 22
*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*,
1 A.D.3d 223, 767 N.Y.S.2d 228 (2003) ... 26
*Universal City Development Partners, Ltd. v. Pupillo*,
54 So.3d 612, 614 (Fla. 5th DCA, 2011) ... 28, 31
*West Bend Mutual Ins. Co.* v. *Higgins*,
9 So.3d 655 (Fla. 5th DCA 2009) ... 29
*Zirkelbach Const. Inc. v. Rajan*,
93 So.3d 1124 (Fla. 2d DCA 2012) ... 30
*Zois v. Cooper*,
268 B.R. 890 (S.D.N.Y. 2001) ... 17

## Statutes

18 U.S.C. § 3771(a)(9) ... 3
Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 ... 2
Fla. Stat. Ann. § 90.502 ... 26
Fla. Stat. Ann. § 90.502(1)(c) ... 9
Fla. Stat. Ann. § 90.502(2) ... 11, 22
Fla. Stat. Ann. § 90.502(3) ... 11
Fla. Stat. Ann. § 90.502(4) ... 26
Fla. Stat. Ann. § 90.507 ... 12
N.Y. C.P.L.R. § 4503(a) ... 14
Pub. L. 114-22, Title I, § 113(a), (c)(1), May 29, 2015, 129 Stat. 240 ... 3

## Rules

Fed. R. Evid. 502(c) ... 9, 18
Fed. R. Evid. 502(c)(1) ... 27
Fed. R. Evid. 502(c)(2) ... 27
Fed. R. Evid. 502 ... 1, 8, 27
Fla. R. Civ. P. 1.280(b)(3) ... 27

## Treatises

Charles W. Ehrhardt, 1 Fla. Prac., *Evidence* § 502.6 (2015 ed.) ... 18
Paul G. Cassell, Nathanael J. Mitchell & Bradley J. Edwards,
*Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act before Criminal Charges are Filed*, 104 J. CRIM. L. & CRIMINOLOGY 59 (2014) ... 2

## Other Authorities

N.Y. C.P.L.R. 4503 (McKinney) ... 19

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this response to Defendant's Motion to Compel All Attorney-Client Communications and Attorney Work Product Placed at Issue by Plaintiff and Her Attorneys (DE 164). The motion should be denied in its entirety.

## INTRODUCTION

Defendant argues Ms. Giuffre and two of her attorneys (Cassell and Edwards) have somehow placed "at issue" her confidential attorney-client communications and therefore have made a "sweeping waiver" of attorney-client privilege in this case. Defendant, however, fails to cite the controlling law on this issue: Federal Rule of Evidence 502. Enacted in 2008, Rule 502 was designed to block exactly the kind of argument Defendant is making. Rule 502 provides that litigants are entitled to the *most* protective law on attorney-client privilege, either state law where the disclosure was made or federal law. The alleged disclosures in this case were made in Florida, and under Florida law did not constitute any waiver of attorney-client privilege. Indeed, Defendant does not reveal to the Court that the Florida judge who handled the case during which the alleged "waivers" occurred (the Dershowitz case) has already considered – and rejected in their entirety – the very arguments that Defendant is advancing here.

In addition, none of the alleged disclosures were made by Ms. Giuffre, who as the holder of the privilege is the only individual with authority to waive it. Moreover, none of the alleged disclosures concerned the substance of confidential attorney-client communications. And finally, Ms. Giuffre will not be seeking to introduce or otherwise take advantage of any confidential attorney-client communications in this case. Accordingly, for these and other reasons, the Court should deny Defendant's motion in its entirety.

## FACTUAL BACKGROUND

The CVRA Case

The facts relevant to this issue begin in 2008, when attorney Bradley J. Edwards (soon joined by co-counsel Professor Paul Cassell) filed a *pro bono* action in the Southern District of Florida under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. Filed on behalf of Jane Doe 1 (and later Jane Doe 2) the CVRA action alleged that federal government had failed to protect the rights of Jane Doe 1 and other similarly situated victims of sex offenses committed by Jeffrey Epstein. *See* Declaration of Sigrid McCawley ("McCawley Decl.") at Exhibit 1, Complaint filed in Jane Doe 1 v. United States, No. 9:08-cv-80736 (S.D. Fla. July 7, 2008). Jane Does 1 and 2 achieved many victories in the case, including a ruling that the CVRA rights of victims could apply before charges were filed, *Does 1 and 2 v. United States*, 817 F.Supp.2d 1337 (S.D. Fla. 2011);[1] that they had standing to challenge the non-prosecution agreement reached between the Government and Epstein, *Jane Does 1 and 2 v. United States*, 950 F.Supp.2d 1262 (S.D. Fla. 2013); and that plea negotiations were not protected from disclosure by any federal rule of evidence, *Does v. United States*, 749 F.3d 999 (11th Cir. 2014). Congress has also followed the developments in the case closely, recently amending the CVRA to insure that in the future crime victims receive notice of any non-prosecution agreement entered into by the Government. *See* Pub. L. 114-22, Title I, § 113(a), (c)(1), May 29, 2015, 129 Stat. 240, 241 (adding 18 U.S.C. § 3771(a)(9) to give crime victims "[t]he right to be informed in a timely manner of any plea bargain or deferred prosecution agreement).

[1] *See generally* Paul G. Cassell, Nathanael J. Mitchell & Bradley J. Edwards, *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act before Criminal Charges are Filed*, 104 J. CRIM. L. & CRIMINOLOGY 59 (2014).

On December 30, 2014, Cassell and Edwards filed a Motion Pursuant to Rule 21 for Joinder in the Action on behalf two additional victims: Jane Doe 3 and Jane Doe 4. (Jane Doe 3, Virginia Giuffre, subsequently decided to reveal her name). The joinder motion argued that Jane Does 3 and 4 should be allowed to join the two existing plaintiffs in the action because they had suffered the same violations of their rights under the CVRA. McCawley Decl., Exhibit 2, Jane Does' 3 and 4 Joinder Motion.[2] To establish that they were "victims" of Epstein's sex crimes with standing to join the suit, Jane Does 3 and 4 alleged that they had suffered sexual abuse from Epstein. For example, Jane Doe 3 alleged that she had been forced by Epstein to have sexual relations with various persons, including Alan Dershowitz – who had been one of Epstein's defense attorneys negotiating the non-prosecution deal and arranging to keep it secret from the victims. McCawley Decl., Exhibit 2 at 4. Jane Doe 3 also alleged that Defendant (i.e., Ghislaine Maxwell) had participated in the sexual abuse of Jane Doe 3. *Id.* at 4-5.

After Dershowitz also filed a motion to intervene to contest the allegations (DE 282), Jane Doe 3 filed a response to Dershowitz's intervention motion. McCawley Decl., Exhibit 3, Response to Motion to Intervene.[3] The response explained that the allegations against Dershowitz were relevant to at least eight separate issues in the CVRA case. *Id.* at 18-26. The response also explained some of the evidence supporting the allegations against Dershowitz, including:

- sworn testimony from one of Epstein's household employees (Juan Alessi) that Dershowitz came "pretty often" to Epstein's Florida mansion and got massages while he was there;

[2] The Joinder Motion attached as an exhibit is a "corrected" motion, filed on January 2, 2015. As discussed below, several paragraphs in this motion were later stricken by Judge Marra.

[3] This document is currently restricted/under seal in the CVRA case, although an order sealing it is not found in the Court record so far as can be determined. In light of the sealing of the document, we have marked aspects of this pleading dealing with the document as confidential.

- sworn testimony from another of Epstein's household employees (Alfredo Rodriquez) that Dershowitz was present alone at the home of Epstein, without his family, in the presence of young girls;

- invocations of Fifth Amendment rights to remain silent by three of Epstein's identified co-conspirators (Sarah Kellen, Nadia Marcinkova, and Adrianna Mucinska) when asked questions about whether Dershowitz had been involved with massages by young girls;

- refusals by Jeffrey Epstein to discuss Dershowitz's involvement but instead to invoke his Fifth Amendment right.

*Id.* at 26-38.

Several months later, on April 7, 2015, the Court (Marra, J.) denied Jane Doe 3 and Jane Doe 4's motion for joinder. McCawley Decl., Exhibit. 4, Order denying Jane Doe 3's motion to join. With regard to the eight separate issues as to which the allegations against Dershowitz were relevant, the Court addressed only the first (establishing "victim" status) and found that the "factual details regarding with whom and where the Jane Does engaged in sexual activities are immaterial and impertinent to this central claim (i.e., that they were known victims of Mr. Epstein and the Government owed them CVRA duties), especially considering that these details involve non-parties who are not related to the respondent Government." *Id.* at 5.[4] Accordingly, the Court struck the factual details from the victims' pleading as unnecessary at that time. The Court specifically recognized, however, that the details could be reasserted by the parties to the action – i.e., Jane Doe 1 and Jane Doe 2 – if they could "demonstrate a good faith basis for believing that such details are pertinent to a matter presented for the Court's consideration." *Id.* at 6. Following the Court's ruling, additional litigation has proceeded in the CVRA case.

<u>The Dershowitz case</u>

[4] In asserting that the non-parties were "not related to the respondent Government," the Court did not address Jane Doe 3's argument that Dershowitz, as one of Epstein's defense counsel, had helped negotiate the non-prosecution agreement and helped to arrange to keep it secret from the victims.

While the CVRA case was moving forward in the Southern District of Florida on behalf of Jane Does 1 and 2, separate litigation developed between the *pro bono* attorneys who had filed the lawsuit (Cassell and Edwards) and Dershowitz. After the filing of the joinder motion in the CVRA case, Dershowitz took the airwaves to attack not only Jane Doe 3, but also Cassell and Edwards. Typical of these attacks was one levelled on CNN, in which Dershowitz alleged:

> If they [Cassell and Edwards] had just done an hours' worth of research and work, they would have seen she is lying through her teeth. . . . They're prepared to lie, cheat, and steal. These are unethical lawyers. . . . They can't be allowed to have a bar card to victimize more innocent people.

*Hala Gorani – CNN Live* (Jan. 5, 2015).[5]

Cassell and Edwards then filed a state law defamation action against Dershowitz in Broward County, Florida. *See* McCawley Decl., Exhibit. 5, Complaint in *Edwards and Cassell v. Dershowitz*. The complaint alleged that Dershowitz had engaged in a "massive public media assault on the reputation and character" of Cassell and Edwards. *Id.* at 4. Ms. Giuffre was *not* a party to this defamation lawsuit.

<u>The Florida Court Rejects a Waiver of Attorney Clients Privilege Argument</u>

As Cassell and Edwards' Florida defamation action moved forward, Dershowitz sought to make an argument that they had somehow waived their client's (Ms. Giuffre's) attorney-client privilege. On September 8, 2015, Dershowitz filed a motion to compel Cassell and Edwards to produce documents and additional responses to interrogatories. McCawley Decl., Exhibit. 6, Motion to Compel. In his motion, Dershowitz argued that Cassell and Edwards "have waived any privilege or protection that would otherwise attach to responsive documents and information

[5] Available at http://www.cnn.com/videos/world/2015/01/05/wrn-uk-sex-abuse-allegations-alan-dershowitz-intv.cnn.

by bringing this defamation action placing at issue the truthfulness of Jane Doe No. 3's allegations against Dershowitz . . . ." *Id.* at 3-5. In his motion and reply pleading (McCawley Decl., Exhibit 8, Reply in Support of Motion to Compel), Dershowitz argued that Cassell and Edwards' actions throughout the case constituted a waiver of attorney-client privilege.

Cassell and Edwards responded, arguing that Ms. Giuffre was not a party of the defamation action and that she was the only person who could waive her privilege. McCawley Decl., Exhibit 7 at 4-6, Response in Opposition to Motion to Compel. Cassell and Edwards also argued that there had been no waiver because confidential attorney-client communications with Ms. Giuffre were not "at issue" in the defamation case. *Id.* at 6-9. Cassell and Edwards also later filed a sur-reply, further elaborating on the argument that Ms. Giuffre had not waived any attorney-client privilege by publicly discussing her sexual abuse by Epstein and his associates. McCawley Decl., Exhibit 9, Sur-Reply in Support Opposition to Motion to Compel. Cassell and Edwards also explained that communications with Ms. Giuffre were protected not only beginning in March 2014, but even earlier than that date when Ms. Giuffre understood that she was obtaining legal services from Cassell and Edwards. *Id.* at 1.

Following this extensive briefing on waiver issues,[6] on December 8, 2015, the Florida Court (Lynch, J.) ruled, ***denying Dershowitz's argument that attorney-client privilege had been waived.*** McCawley Decl., Exhibit 10, Order Denying Motion to Compel. Specifically, the Court denied the motion to compel, explaining "Pre March 2014 communications are protected by the work product privilege and the witness has not waived the communications that were protected by the attorney-client privilege. Also, there was no waiver by the [Cassell and Edwards] by filing suit." *Id.* at 1.

[6] And following the filing of Cassell and Edwards' summary judgment motion, filed on November 26, 2015.

Ms. Giuffre's Deposition in the Defamation Case

As the defamation action moved forward, Dershowitz subpoenaed Ms. Giuffre to a deposition. McCawley Decl., Exhibit 11, Composite Exhibit of excerpts from transcript of deposition of Ms. Giuffre. During the deposition, held in Fort Lauderdale, Florida, Ms. Giuffre was represented by the undersigned legal counsel, who asserted objections to revealing attorney-client information where the questions called for revealing confidential attorney client communications. *See, e.g., id.* at 22-23; 131-32; 173-74; 183; 208. During the deposition, Ms. Giuffre specifically stated that "I decide not to waive my [attorney-client] privilege at this time." *Id.* at 174. Ms. Giuffre also denied that Cassell and Edwards had ever pressured her into identifying someone as being involved in her sexual abuse. *Id.* at 200-12

The Settlement of the Defamation Case

Ultimately, Cassell, Edwards, and Dershowitz agreed to settle their defamation case. That settlement included both a public statement and confidential monetary payments. As part of the settlement, Cassell and Edwards withdrew their allegations against Dershowitz in the defamation case contained in the then-pending summary judgment motion. McCawley Decl., Exhibit 12, Notice of Withdrawal of Summary Judgment Motion. As explained in the notice of withdrawal of this motion, "the withdrawal of the referenced filings is not intended to be, and should not be construed as being, an acknowledgement by Edwards and Cassell that the allegation made by Ms. Giuffre were mistaken. Edwards and Cassell do acknowledge that the public filing in the Crime Victims' Rights Act case of their client's allegation against Defendant Dershowitz became a major distraction from the merits of the well-founded Crime Victims' Rights Act by causing delay and, as a consequence, turned out to be a tactical mistake." *Id.* All these actions settling the Florida defamation case took place in Florida.

## LEGAL STANDARDS FOR WAIVER

### A. Federal Rule of Evidence 502 Controls on the Issue of Waiver

Defendant asks this Court to find that Ms. Giuffre has somehow waived her attorney-client privilege regarding various communications in this case. This is no small step. The attorney-client privilege is one of the "oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998)). The privilege's purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." 524 U.S. at 403 (internal quotation marks omitted).

In setting out the legal standards pertaining to waiver of attorney-client privilege, Defendant fails to cite the controlling – and protective – law on the issue. In a federal case, issues of alleged waiver of attorney-client privilege must be resolved under the new standards in Federal Rule of Evidence 502. In 2008, Congress enacted Federal Rule of Evidence 502, which is entitled "Attorney-Client Privilege and Work Product; Limitations on Waiver." New rule 502 places a number of protections in place to reduce litigation over claims that a party has somehow "waived" attorney client privilege. *See generally* Adv. Comm. Note, Rule 502. Notably, Defendant does not discuss, or even cite, Rule 502 in her motion.

The issue currently before the Court is specifically controlled by Rule 502(c), which covers situations where a disclosure in a state proceeding is alleged, in a federal proceeding, to establish waiver. Rule 502(c) provides the *greater* of protections found in federal or state law:

> (c) Disclosure Made in a State Proceeding. When the disclosure is made in a state proceeding and is not the subject of a state-court order concerning waiver, the disclosure does not operate as a waiver in a federal proceeding if the disclosure:
>
> > (1) would not be a waiver under this rule if it had been made in a federal proceeding; or
> > (2) is not a waiver under the law of the state where the disclosure occurred.

As is readily apparent from the text of the rule, there are two separate ways in which a party can prove that no waiver of attorney-client privilege has occurred: (1) by demonstrating that no waiver exists under federal law; or (2) by demonstrating that no waiver exists under the state law where the disclosure occurred. Between these two possibilities, the drafters of the rule decided to apply the ***most*** protective law that governs waiver. *See* Fed. R. Evid. 502(c), Adv. Comm. Notes ("The [Advisory] Committee [on the Federal Rules of Evidence] determined that the proper solution for the federal court is to apply the law that is ***most*** protective of privilege and work product" (emphasis added)).

**B. <u>Florida Law</u>**

C.

Florida's protective law on the attorney-client privilege provides that neither an attorney nor a client may be compelled to divulge confidential communications between a lawyer and client which were made during the rendition of legal services. Fla. Stat. Ann. § 90.502(1)(c). Communication denotes more than just giving legal advice; it also includes giving information to the lawyer to enable him to render sound and informed advice. *Hagans v. Gatorland Kubota, LLC/Sentry Ins.*, 45 So.3d 73, 76 (Fla. 1st DCA 2010).

Under Florida law, while the burden of establishing the attorney-client privilege usually rests on the party claiming it, *First Union National Bank v. Turney*, 824 So.2d 172, 185 (Fla. 1st DCA 2002), when communications appear on their face to be privileged, the burden is on the party seeking disclosure to prove facts which would make an exception to the privilege applicable. *Ford Motor Co. v. Hall-Edwards*, 997 So.2d 1148, 1153 (Fla. 3d DCA 2008); *Rousso v. Hannon*, 146 So.3d 66, 70 (Fla. 3d DCA 2014). In this case, Defendant does not appear to dispute that an attorney-client privilege exists with regard to the communications between Ms. Giuffre and her attorneys. Rather, Defendant's argument is that the privilege has somehow been

waived. *See* Motion to Compel at 1-2. Therefore, under Florida law, Defendant must shoulder the burden of overcoming the privilege. (Of course, because Defendant failed to even cite, much less discuss, Florida law, she has not carried that burden.)

Defendant asserts that she can force disclosure of the privileged communications between Ms. Giuffre and her counsel under the "at issue" doctrine. To establish this alleged waiver, Defendant's motion relies on a federal district court case – *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), which was cited in *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506. 509-10 (S.D.N.Y. 2002) (Ellis, M.J.). *See* Motion to Compel at 8. As discussed below, as a matter of controlling federal authority, these cases have been repudiated by the Second Circuit. And to the same effect, Florida law also rejects the expansive *Hearn* approach to waiver. *See Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.,* 300 F.R.D. 590, 593-95 (S.D. Fla. 2014) (discussing Florida authorities). Florida law disfavors waiver of the attorney-client privilege and will not readily find an "at issue" waiver. *See Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*, 300 F.R.D. 590, 593 (S.D. Fla. 2014) (*citing Coates v. Akerman, Senterfitt & Eidson, P.A.,* 940 So.2d 504, 508 (Fla. 2nd DCA 2006) (refusing to find waiver based on the at-issue doctrine)). In contrast to *Hearn*, under Florida law, at-issue waiver only occurs "when a party 'raises a claim that will *necessarily* require proof by way of a privileged communication.'" *Coates,* 940 So.2d at 508 (quoting *Jenney v. Airdata Wiman, Inc.,* 846 So.2d 664, 668 (Fla. 2nd DCA 2003)) (emphasis in original). Indeed, in 2014, the Southern District of Florida rejected the *Hearn* "at issue" analysis and instead, adopted the analysis of the Third Circuit as outlined in *Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.*, 32 F.3d 851 (3d Cir. 1994). *Guarantee Ins*, 300 F.R.D. at 595. The Third Circuit deemed the *Hearn* test to be of "dubious validity" because, although it "dress[es] up [its] analysis with a checklist of factors, [it] appear[s] to rest on a

conclusion that the information sought is relevant and should in fairness be disclosed." *Id.* at 864. The Third Circuit specifically rejected *Hearne* because relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged. *Rhone*, 32 F.3d at 863. Florida law tracks that of the Third Circuit. *See* 300 F.R.D. at 593-95 (citing Florida case law).

Also, under Florida law, the client – not her attorneys – holds the attorney-client privilege. *See* Fla. Stat. Ann. § 90.502(3); *see also* Fla. Stat. Ann. § 90.502(2) (a client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client). Some Florida courts have even recognized serious due process issues could be created by a procedure through which a client lost their privilege without an opportunity to be heard in the proceedings. *See, e.g., Rogers v. State*, 742 So.2d 827, 829 (Fla. 2d DCA 1999). Under Florida law, so long as a client has a reasonable expectation of privacy in the communication, under § 90.507, the privilege is protected. *McWatters v. State*, 36 So.3d 613, 636 (Fla. 2010). Also under Florida law, only the client – not her attorney – can waive attorney-client privilege. *See Savino v. Luciano*, 92 So.2d 817 (Fla. 1957), *Coates v. Akerman, Senterfitt & Edison, P.A.*, 940 So.2d 504 (Fla. 2d DCA 2006), and *Genovese v. Provident Life and Accident Ins. Co.*, 74 So.3d 1064 (Fla. 2011).

**C. Federal Law**

Rather than discuss Florida privilege law, Defendant exclusively cites federal case law. *See* Mot. to Compel at ii-iii (table of authorities citing only federal cases). Yet as this Court has previously held in ruling on an earlier privilege motion made by the Defendant, state law generally provides the rule of decision in this diversity case. *See* Giuffre v. Maxwell, DE 135 at

6, 2016 WL 175918 at * 6 (applying New York privilege law) (*citing Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 102 (S.D.N.Y. 2007) ("Because this Court's subject matter jurisdiction is based upon diversity . . . state law provides the rule of decision concerning the claim of attorney-client privilege.")). Accordingly, an argument can be made that New York *state* law applies in this case[7] – but Defendant does not explain why she jumps to federal law.

As explained above, in the particular context of a waiver argument, Federal Rule of Evidence 502 applies the *more* protective of state law or federal law in determining whether a waiver of privilege has occurred. In this case, the controlling federal law is at least as protective as Florida law. The controlling federal law here comes from the Second Circuit, including *In re Cnty. of Erie*, 546 F.3d 222 (2d Cir. 2008) – a case not even cited, much less discussed, by the Defendant. In view of the importance of the attorney-client privilege, the Second Circuit in that case held that any finding of waiver should be made with "caution." *Id.* at 228.

Rather than cite this controlling Second Circuit precedent, Defendant relies on a 2002 case from this Court applying the *Hearn* "at issue" doctrine. *See* Mot. to Compel at 8 (*citing Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506. 509-10 (S.D.N.Y. 2002) (Ellis, Magistrate Judge) (*quoting Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). Defendant goes on to argue that "courts have generally applied the *Hearn* [at issue] doctrine liberally, finding a broad waiver of attorney-client privilege where a party asserts a position 'the truth of which can only be assessed by examination of the privilege communication." Mot. to Compel at 8 (internal quotation omitted).

Defendant fails to recognize that the Second Circuit has explicitly disavowed the *Hearn* doctrine. In *In re Cnty. of Erie*, 546 F.3d 222 (2d Cir. 2008), the Second Circuit explained that "[c]ourts in our Circuit and others have criticized *Hearn* and have applied its tests unevenly." *Id.*

---

[7] As a protective matter, Ms. Giuffre will also provide citations to New York state authorities in this response.

at 227-28.[8] The Second Circuit also noted that the *Hearn* test "has been subject to academic criticism. *See, e.g.,* Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator,* 84 MICH. L. REV. 1605, 1628-29 (1986); Note, *Developments in the Law-Privileged Communications,* 98 HARV. L. REV. 1650, 1641-42 (1985) (identifying "the faults in the *Hearn* approach"). In light of these strong criticisms of *Hearn*, the Second Circuit decided that "[w]e agree with its critics that the *Hearn* test cuts too broadly and therefore conclude that the District Court erred in applying it here. . . . Nowhere in the *Hearn* test is found the essential element of *reliance* on privileged advice in the assertion of the claim or defense in order to effect a waiver." 546 F.3d at 229 (emphasis added). The Second Circuit held that, for an "at issue" waiver to occur, "a party must *rely* on privileged advice from his counsel to make his claim or defense." *Id.* (emphasis added).

In light of the Second Circuit's holding, recent cases from this Court have explained that "reliance on privileged advice in the assertion of the claim or defense is an 'essential element' of a claim of waiver." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,* No. 04 CIV 10014 PKL, 2009 WL 3111766, at *16 (S.D.N.Y. Sept. 28, 2009).[9] For the sake of completeness, it may be relevant to note that New York state privilege law applies the same

---

[8] The Second Circuit cited numerous cases, including cases from this Court – e.g., *Pereira v. United Jersey Bank,* Nos. 94 Civ 1565 & 94 Civ 1844, 1997 WL 773716, at *3 (S.D.N.Y. Dec.11, 1997) ("*Hearn* is problematic insofar as there are very few instances in which the *Hearn* factors, taken at face value, do not apply and, therefore, a large majority of claims of privilege would be subject to waiver."); *Allen v. West Point-Pepperell, Inc.,* 848 F.Supp. 423, 429 (S.D.N.Y.1994) (noting that district courts within this Circuit have reached conflicting decisions in the application of *Hearn,* and rejecting reliance "upon a line of cases in which courts have unhesitatingly applied a variation of the *Hearn* balancing test"); *Connell v. Bernstein-Macaulay, Inc.,* 407 F.Supp. 420, 422 (S.D.N.Y.1976) ("The actual holding in [*Hearn*] is not in point because the party there asserting the privilege had expressly relied upon the advice of counsel as a defense to the plaintiff's action."); *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 864 (3d Cir.1994) (deeming *Hearn* to be of "dubious validity" because, although it "dress[es] up [its] analysis with a checklist of factors, [it] appear[s] to rest on a conclusion that the information sought is relevant and should in fairness be disclosed").

[9] The *Aristocrat Leisure* case accordingly rejected a party's reliance on the same authority that Defendant relies upon here. *See Aristocrat*, 2009 WL 3111766 at *16 n.6 (discussing *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506 (S.D.N.Y. 2010), and then noting in the next sentence that the *Hearn* test relied upon by *Bank Brussels*' "recently has been criticized by the Second Circuit on this very issue.").

specific and protective standard. *See In re Bank of New York Mellon,* 42 Misc. 3d 171, 177, 977 N.Y.S.2d 560, 565 (Sup. Ct. 2013) ("'at issue' waiver occurs 'when the party has asserted a claim or defense that he intends to prove by use of the privileged materials.' An example of an affirmative act that does constitute 'at issue' waiver of privilege is a party's 'assert[ing] as an affirmative defense [its] reliance upon the advice of counsel.'").[10]

## DISCUSSION

### I. MS. GIUFFRE DID NOT WAIVE HER ATTORNEY-CLIENT PRIVILEGE WHEN EDWARDS AND CASSELL FILED AND PURSUED THEIR OWN DEFAMATION ACTION AGAINST ALAN DERSHOWITZ.

Defendant's lead argument is that Cassell and Edwards waived Ms. Giuffre's attorney-client privilege when they filed and pursued a defamation action against Alan Dershowitz. *See* Mot. to Compel at 10. This claim is meritless for numerous reasons, including the fact (not disclosed by Defendant) that this very argument has been fully litigated before the Florida court handling that defamation action, which specifically ***rejected*** any finding of waiver.

#### A. The Florida Court Presiding over the Defamation Action Has Already Rejected the Same Waiver Claim that Defendant is Advancing Here.

The claim that Cassell and Edwards somehow waived Ms. Giuffre's attorney-client by pursuing their own, personal defamation action against Dershowitz has already been the subject of extensive briefing – and, ultimately, a Florida court ruling. Defendant has scoured the docket

[10] New York and federal authorities also hold that when attorneys are not acting on the client's behalf, they cannot waive their client's privilege. N.Y. C.P.L.R. § 4503(a); *Dillenbeck v. Hess*, 73 N.Y.2d 278, 290, 536 N.E.2d 1126, 1134 (N.Y. 1989) ("[T]he sine qua non of any evidentiary privilege is that it is personal to, and can only be waived by, the privilege holder."). *See also In re von Bulow*, 828 F.2d 94, 100-01 (2d Cir. 1987) ("Of course, the privilege belongs solely to the client and may only be waived by him. An attorney may not waive the privilege without his client's consent."); *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 66 F. Supp. 3d 406, 410 (S.D.N.Y. 2014) (same); *Ferreira v. Capitol Specialty Ins. Corp.*, 31 Misc. 3d 1209(A), 929 N.Y.S.2d 199 (N.Y. Sup. Ct. 2011) ("CPLR 4503 makes clear that an attorney cannot waive the attorney-client privilege rather waiver is only effective when done by the beneficiary of the privilege or their personal representative.").

in the Dershowitz defamation case to collect every flyspeck of information that she believes support her argument that a "waiver" has taken place. *See* Mot. to Compel at 10-12 and numerous associated exhibits. But, remarkably, she has not revealed to this Court the most relevant information from the docket: that the Florida court considered the same waiver issues and rejecting the same arguments that the Defendant now advances. This Florida court ruling, applying Florida law, is controlling here.

As discussed above in the factual section of this response, in the Florida case, Dershowitz filed a motion to compel advancing legal and factual arguments identical to those the Defendant is advancing here. *See* McCawley Decl., Ex. 6 at 3, Dershowitz motion to compel (arguing that Cassell and Edwards "have waived any privilege or protection that would otherwise attach to responsive documents and information by bringing this defamation action placing at issue the truthfulness of Jane Doe No. 3's allegations against Dershowitz . . . ."). *Id.* at 3. Citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975), Dershowitz claimed that information Ms. Giuffre had confidentially provided to Cassell and Edwards as her attorneys had become "at issue" in the defamation action. McCawley Decl., Ex. 6 at 4-5. Dershowitz argued broadly that a whole host of alleged attorney-client communications were "at issue" in the case, including:

> (1) Jane Doe No. 3's allegations against Dershowitz asserted in the action captioned *Jane Doe #1, et al. v. United States of America*, Case No. 08-cv-80736 (S.D. Fla.) (the "Federal Action"); (2) [Cassell and Edwards'] investigation into Jane Doe No. 3's allegations against Dershowitz; (3) [Cassell and Edwards'] assertion in the Complaint that Dershowitz was an alleged participant in the criminal conduct committed by Jeffrey Epstein ("Epstein"); and (4) Jane Doe No. 3's whereabouts and activities during the time when she claims to have been "sex slave" for Epstein.

Ex. 6 at 3. As the briefing on the issue continued, in an October 26, 2015 response filing, Dershowitz argued that Ms. Giuffre's public statements waived the privilege,[11] along with actions by her attorneys Cassell and Edwards. Ex. 8 at 5-8.[12]

After all these arguments were fully briefed, the Florida court (Lynch, J.) ***rejected*** Dershowitz's arguments that any waiver of the attorney-client privilege had taken place. McCawley Decl., Ex. 10 at 1 ("Defendant/Counterclaim Plaintiff's Motion to Compel Production of documents and complete responses to interrogatories is hereby denied."). In a December 8, 2015, order, Judge Lynch provided a short explanation of his reasoning and entered an order denying Dershowitz's waiver motion. *Id.*

In her pending motion to compel, Defendant recycles the same arguments that Dershowitz made, such as the claim that Cassell and Edwards waived privilege by filing suit (Mot. Compel at 10), that her March 2011 interview with Scarola and Edwards was a waiver (*id.* at 10), and other similar claims (*id.* at 11-13). But Dershowitz already litigated these issues a few months ago in the Dershowitz case – and his claims were rejected by the Florida court. Defendant is now collaterally estopped from relitigating these identical issues here, because Dershowitz had a full and fair opportunity to litigate those issues and Defendant was in a "common interest" agreement with Dershowitz at the time. The doctrine of collateral estoppel protects litigants – and the courts – from relitigating identical issues and promotes efficiency by barring unnecessary litigation. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 (1979). As this Court has explained, for collateral estoppel to apply, there must have been a full

[11] Dershowitz specifically listed the following public statements by Ms. Giuffre as illustrations of how she had waived her privilege: (1) Ms. Giuffre's March 5, 2011, interview with the *Daily Mail*; (2) Ms. Giuffre's April 7, 2011, recorded telephone interview with attorneys Jack Scarola and Brad Edwards; (3) the January 2015 release of Ms. Giuffre's diary by *Radar Online*; (4) Ms. Giuffre's statements to "numerous other third parties," including former boyfriends and the FBI; and (5) Ms. Giuffre's filing of this suit against Defendant. Ex. 6 at 6-8.

[12] Dershowitz specifically argued that (among other illustrations) Cassell's answers to interrogatories and testimony at his deposition in the case had waived privilege. Ex. 6 at 11-12.

and fair opportunity to litigate the decision that now controls and the issue in the prior action must be identical to and decisive of the issue in the instant action. *Zois v. Cooper*, 268 B.R. 890, 893 (S.D.N.Y. 2001), *aff'd sub nom. In re* Zois, 73 F. App'x 509 (2d Cir. 2003). A non-party can be bound by a decision, so long as her interests were "effectively represented." *Zois*, 268 B.R. at 893.[13] As this Court can readily determine from reviewing the pleadings Dershowitz filed in the Florida case, *see* McCawley Decl. at Ex. 6 & 8, Dershowitz fully briefed identical issues to those presented here. And he was effectively representing Maxwell at the time. The elements of collateral estoppel apply.

Moreover, entirely apart from collateral estoppel doctrine, Judge Lynch's decision is highly persuasive. Judge Lynch was the presiding judge over the Dershowitz matter, so he was intimately familiar with (for example) what matters were "at issue" in that particular case. Moreover, Judge Lynch is, of course, a Florida judge skilled in applying Florida legal principles. His ruling on whether a waiver of attorney client privilege existed under Florida law should be given heavy weight here. *See Elliott Associates, L.P. v. Banco de la Nacion,* 194 F.3d 363, 370 (2d Cir. 1999). Finally, Defendant's briefing entirely ignores even the existence of Judge Lynch's ruling. In such circumstances where the Defendant has failed to offer any reason for questioning Judge Lynch's holding, this Court should follow Judge Lynch's lead and hold that no waiver of the attorney-client privilege exists under Florida law. And, because Florida law controlled when the disclosures took place, under Fed. R. Evid. 502(c), no waiver exists in this proceeding.

---

[13] *Zois* relied on New York law. Florida law is to the same effect, as is federal doctrine. *See O'Brien v. Fed. Trust Bank, F.S.B.,* 727 So. 2d 296, 298 (Fla. Dist. Ct. App. 1999) ("Collateral estoppel prevents relitigation of issues where the identical issues previously have been litigated between the parties or their privies."); *Montana v. United States*, 440 U.S. 147, 153-54 (1979).

### B. Actions by Cassell and Edwards Do Not Waive Ms. Giuffre's Attorney-Client Privilege.

Not only has Judge Lynch already ruled on the attorney-client privilege issue, but his ruling was entirely correct. Defendant's argument rests on the proposition that Cassell and Edwards had authority to waive Ms. Giuffre's privilege while they pursued ***their*** Florida defamation action. But in filing their own, personal defamation claims against Dershowitz in a lawsuit where Ms. Giuffre was not a party, Cassell and Edwards were not acting on Ms. Giuffre's behalf. Defendant never attempts to even explain, much less prove, how that defamation action could have benefitted Ms. Giuffre. And Florida law is clear that when attorneys are not acting on the client's behalf, they cannot waive their client's privilege. *See* Charles W. Ehrhardt, 1 Fla. Prac., *Evidence* § 502.6 (2015 ed.); *Schetter v. Schetter*, 239 So.2d 51, 52 (Fla. 4th DCA 1970).

To find that an attorney waived his client's privilege, a clear record must exist concerning the attorney's attorney to waive privilege. *See Bus. Integration Servs., Inc. v. AT&T Corp.*, No. 06 CIV. 1863 (JGK), 2008 WL 318343, at *2 (S.D.N.Y. Feb. 4, 2008). Here, to the contrary, the record is clear that Ms. Giuffre did ***not*** authorize any waiver of her attorney-client privilege. *See* McCawley Decl., Ex. 13, affidavit of Ms. Giuffre (Ms. Giuffre did not authorize any waiver). Accordingly, under Florida law, Cassell and Edwards' actions did not waive Ms. Giuffre's privilege.[14]

The main examples Defendant offers in support of her waiver argument come from a summary judgment motion that Cassell and Edwards filed. *See* Mot. to Compel at 16. Of

---

[14] For the sake of completeness, it is worth noting that both federal law and New York state law likewise require that a client waive attorney-client privilege. *See, e.g., Schnell v. Schnall*, 550 F. Supp. 650, 653 (S.D.N.Y.1982) (no waiver of attorney-client privilege where attorney testified at hearing without presence or authorization of client); N.Y. C.P.L.R. 4503 (McKinney) ("Unless the client waives the privilege, an attorney . . . shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof.").

course, that motion was filed on their behalf – not Ms. Giuffre's. To be sure, that motion contained (among other supporting information) a sworn affidavit from Ms. Giuffre.[15] But the routine step of submitting an affidavit is not a waiver of attorney-client protections, as discussed at greater length in Part II.D., *infra*. And, in any event, Defendant does not include that affidavit among her supporting materials to her motion, much less explain how the recitation of factual information in that affidavit constitutes a waiver by Ms. Giuffre with respect to communications with her attorneys. *See Koon v. State*, 463 So.2d 201, 203-04 (Fla. 1985) (no waiver when the client merely discloses facts which were part of the communication with the client's attorney). Ms. Giuffre has not waived ***her*** privilege.

### C. Ms. Giuffre's Confidential Communications With Her Attorneys Were Never "At Issue" in the Florida Dershowitz Litigation.

Defendant's argument that Ms. Giuffre's attorney-client privilege has been waived under the "at issue" doctrine also fails under Florida law because her confidential communications were never at issue in the Dershowitz litigation.

Florida law on when confidential attorney-client communications are at issue comes from the Florida Supreme Court's decision in *Savino v. Luciano*, 92 So.2d 817 (Fla. 1957). There, the Florida Supreme Court announced the test for determining whether confidential communications were "at issue" as whether a claim or defense would "***necessarily require*** that the privileged matter be offered in evidence." *Id.* at 819 (emphasis added); *see also Diaz–Verson v. Walbridge Aldinger Co.*, 54 So.3d 1007, 1011 (Fla. 2d DCA 2010). More recent decisions from Florida

[15] The "evidentiary support" for the summary judgment motion rested on 16 additional exhibits, including such obviously non-privileged materials as a Palm Beach Police Department report; flight logs from Epstein's jet; excerpts from deposition testimony of Epstein, Juan Alessi, Alfredo Rodriquez, and Alan Dershowitz; photographs; and Epstein's telephone directory. *See* Menninger Dec., Ex. E at 28.

have emphasized that *Savino* does not mean that a party waives attorney-client privilege merely by bringing or defending a lawsuit. *Coates v. Akerman, Senterfitt & Edison, P.A.*, 940 So.2d 504 (Fla. 2d DCA 2006). Instead, waiver occurs only when a party "must necessarily use the privilege information to establish its claim or defense." *Id.* at 510-11 (emphasis added). Most recently, in *Genovese v. Provident Life and Accident Ins. Co.*, 74 So. 3d 1064, 1069 (Fla. 2011), *as revised on denial of reh'g* (Nov. 10, 2011), the Florida Supreme Court cited both *Coates* and *Savino* to hold that the "at issue" doctrine allows discovery of privileged material only when the holder of the privilege – the client – raises the advice of counsel as a claim or defense in the action and the communication is essential to the claim or defense. *Id.*

Under these restrictive standards, Ms. Giuffre's communications were never at issue in her attorneys' personal, defamation case against Dershowitz. Consider, for example, a typical allegation Cassell and Edwards' complaint:

> Immediately following the filing of what Defendant, Dershowitz, knew to be an entirely proper and well-founded pleading, Dershowitz initiated a massive public media assault on the reputation and character of Bradley J. Edwards and Paul G. Cassell accusing them of intentionally lying in their filing, of having leveled knowingly false accusations against the Defendant, Dershowitz, without ever conducting any investigation of the credibility of the accusations, and of having acted unethically to the extent that their willful misconduct warranted and required disbarment.

McCawley Decl., Ex. 5 at 4 (¶ 17). As is immediately apparent, this allegation does not ***require*** an examination of Ms. Giuffre's confidential communications with her attorneys. Instead, it requires an assessment of Dershowitz's state of mind with regard to his knowledge of the information that Cassell and Edwards had to support the filing of the allegations. And, as supporting exhibits to the pleadings Cassell and Edwards filed made clear, the adequacy of their investigation could be readily established from many sources that did not have any connection to what Ms. Giuffre may or may not have told them in confidence. *See, e.g.,* McCawley Decl., Ex.

3 at 26-38 (recounting information supporting allegations against Dershowitz, such as sworn testimony from household employees and invocations of the Fifth Amendment by Epstein and his co-conspirators).

To be sure, Dershowitz tried to make an argument that Ms. Giuffre's communications with her attorneys might have some arguable relevance to the case. But Judge Lynch rejected that very argument – and quite properly so. Relevance is insufficient to waive privilege under Florida law. *Guarantee Ins*, 300 F.R.D. at 594 (citing *Coyne v. Schwartz, Gold, Cohen, Zakarin & Kotler, P.A.*, 715 So.2d 1021, 1022 (Fla. 4th DCA 1998)). A client does not waive the attorney-client privilege simply because her credibility could be impeached by communications with her former attorney. *See Jenney v. Airdata Wiman, Inc.,* 846 So.2d 664, 668 (Fla. 2d DCA 2003). Accordingly, under Florida law, Ms. Giuffre's confidential communications with her attorneys were never at issue in the Florida litigation.[16]

### D. Defendant Has Not Met the Other Requirements for Showing Waiver of Attorney-Client Privilege.

For the foregoing reasons, Defendant has failed to make the required showing for an "at issue" waiver of attorney-client privilege. But even more fundamentally, Defendant has failed to establish other elements necessary to find a waiver of attorney-client privilege. Defendant repeatedly refers to routine litigation actions, such as the filing of in-court affidavits, as a basis for finding some kind of waiver of privilege. *See* Mot. to Compel at 16. But it is obvious that such actions do not waive attorney-client protection. Litigation requires some limited communication to third parties — including the court and opposing counsel — of information learned in the course of the attorney-client relationship. Therefore, Florida law recognizes an

[16] The same result would obtain under New York state law. *See, e.g., Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co.*, 40 A.D.3d 486, 492, 837 N.Y.S.2d 616, 622 (2007) (the at-issue "doctrine applies where a party, through its affirmative acts, places privileged material at issue and has selectively disclosed the advice").

absolute privilege to protect attorneys' statements made in communications that are preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding. Fla. Stat. Ann. § 90.502(2); *see also McCullough v. Kubiak*, 158 So. 3d 739, 740 (Fla. 4th DCA, 2015). A waiver of the attorney-client privilege occurs only if the client voluntarily discloses in court the substance of a ***communication with her attorney.*** *See, e.g., Delap v. State*, 440 So.2d 1242, 1247 (Fla. 1983) (criminal defendant sought to use in court favorably testimony from his investigator while blocking inquiry into other testimony). No waiver occurs when the client merely discloses facts which were part of the communication with the client's attorney. *See Koon v. State*, 463 So.2d 201, 203-04 (Fla. 1985); *see also Taylor v. State*, 855 So.2d 1, 26 n.29 (Fla. 2003). Thus, the privilege attaches to the communication with counsel, not to the underlying facts. *Brookings v. State*, 495 So.2d 135, 139 (Fla. 1986); *see also Lynch v. State*, 2 So.3d 47, 66 (Fla. 2008).[17] As a result, allegations that Giuffre disclosed to third parties the same facts that she may have related to Cassell and Edwards, without any evidence that she disclosed the substance of her confidential consultation with Edwards and Cassell, cannot overcome her privilege.[18]

To hold otherwise would eviscerate the attorney-client privilege. Such a ruling would mean that every time an attorney filed a declaration by his client that contained the factual basis for the client's claim, the opposing party would have the right to examine all privileged communications. Defendant has not cited any authority either in Florida (or elsewhere) to

---

[17] New York state privilege law is to the same effect. *See, e.g., Niesig v. Team I,* 76 N.Y.2d 363, 372, 558 N.E.2d 1030, 1034 (1990) (because "the privilege applies only to confidential communications with counsel (*see,* CPLR 4503), it does not immunize the underlying factual information . . . from disclosure to an adversary").

[18] As an illustration, Defendant notes that in 2011 Ms. Giuffre gave an interview to the *Daily Mail.* Mot. to Compel at 15. But Defendant does not explain how that interview disclosed any attorney-client communications. And because any such disclosures would have been extrajudicial, they would be narrowly construed. *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987).

support his extreme assertion that Ms. Giuffre waived her privilege simply by allowing an affidavit to be filed in a court proceeding.

Defendant also claims Cassell, at his deposition in the Dershowitz case, waived attorney-client privilege by discussing factual information related to his investigation of Ms. Giuffre's allegations (for example, flight log information). Cassell's deposition testimony did not constitute a waiver of Ms. Giuffre's attorney-client privilege. Indeed, Ms. Giuffre's own separate attorney (undersigned counsel, Ms. McCawley, from the law firm of Boies, Schiller & Flexner, LLP) raised a standing objection to Cassell answering any question that would require divulging any attorney/client communications. McCawley Decl., Ex. 14, deposition excerpt of Paul Cassell, Volume I, dated Oct. 16, 2015, at 39:24 – 40:2 ("Virginia Roberts does not waive her attorney/client privilege with her lawyers, and they are not entitled to testify as to information that she intended to be confidential that she communicated to her lawyers.").[19] Defendant also argues that because Cassell said at some (unspecified) point in his deposition that he "knew" some (unidentified) information about Ms. Giuffre, he must have been revealing attorney-client communications. Mot. to Compel at 17 ("Of course, the information [Cassell and Edwards] "knew" about [Ms. Giuffre was a direct result of her attorney-client communications with them . . . ."). But Cassell knew a vast amount of information about Ms. Giuffre from the factual record in the case, such as the flight logs demonstrating flights that she took with Epstein and Defendant on Epstein's jet. Defendant's logic is simply incorrect.

### E. Ms. Giuffre Will Not Seek to Use Confidential Attorney-Client Communications in her Action Here.

For all the reasons just explained, Ms. Giuffre has not waived her attorney-client privilege through events that occurred in the Dershowitz case. But one additional point bears

[19] In her "excerpts" from Cassell's deposition, Defendant has not included this portion. *See* Menninger Dec., Ex. L.

emphasis: Defendant attempts to argue that the trial *in this case* will somehow be unfair if she does not receive access to confidential attorney-client communications that Ms. Giuffre had with her lawyers earlier. Mot. to Compel at 20-21. But regardless of what may or may not have been at issue in the Dershowitz case, confidential communications will not be at issue here. For example, Defendant writes that "[i]t would be prejudicial for [Ms. Giuffre] to be able to support her claim in this case that she is not a liar using her attorney's testimony . . . ." *Id.* at 21. To be clear, Ms. Giuffre has no intention of calling, for example, Cassell and Edwards to testify at trial in an attempt to support her claims. Thus, this will not be a case where it will be "misleading to the court or any jury to hear testimony from [Ms. Giuffre's] counsel about all the factual basis, work product and thought process on which they relied in making the allegations in the Joinder Motion," Mot. to Compel at 22, for the simple reason that that Ms. Giuffre's counsel will not be witnesses in the case. Nor will Ms. Giuffre be presenting a "state of mind" defense that might require a more extensive inquiry into attorney-client communications. *See In re Cty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (noting absence of good faith or state of mind issues as a reason for not finding "at issue" waiver of privilege); *Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 62 A.D.3d 581, 582, 880 N.Y.S.2d 617, 618-20 (N.Y. App. Div. 2009) (finding no waiver where plaintiff disavowed any intention to use confidential attorney-client communications; relevance alone insufficient to put privileged materials "at issue" because, "if that were the case, a privilege would have little effect").

To be sure, at trial Ms. Giuffre will present factual testimony supporting her version of events – just as, no doubt, Defendant will try to present testimony supporting her version. But such testimony (from both sides) does not create any waiver of attorney-client privilege. Instead, such testimony is simply the presentation of competing facts, from which the jury can decide

who is telling the truth. None of this creates any need for Defendant to force Ms. Giuffre to reveal confidential communications.

## II. MS. GIUFFRE DID NOT WAIVE HER ATTORNEY-CLIENT PRIVILEGE BY DENYING FABRICATED EVICENCE DURING HER DEPOSITION.

Defendant spends significant time arguing that Ms. Giuffre's answers to several deposition questions about the *absence* of any communications from Cassell and Edwards that she provide false information constituted a waiver of attorney client privilege. Mot. to Compel at 11 (arguing that "never" answer to the question "Has Brad [Edwards] ever pressured you or encouraged you in any way or under any circumstances at any time to provide false information about Jeffrey Epstein" constituted a waiver of attorney-client privilege). While the arguments above are sufficient to dispose of this claim, it is worth emphasizing several additional points about this specific testimony.

First, disclosing the *absence* of communication is not the same as exposing any communication. It is a fundamental requirement of a waiver argument that a communication be exposed, *see* Fla. Stat. Ann. § 90.502 (extending privilege to a "communication between lawyer and client"), not the absence of such a communication. *See Montanez v. Publix Super Markets, Inc.,* 135 So. 3d 510, 512-13 (Fla. Dist. Ct. App. 2014) (rejecting argument that client waived her attorney-client privilege by stating that an interrogatory answer was not "her" answer because this did not disclose the substance of her communications with her attorney). *Cf. Mitchell v. Superior Court*, 37 Cal. 3d 591, 602, 691 P.2d 642, 647 (Cal. 1984) ("Relevant case law makes it clear that mere disclosure of the fact that a communication between client and attorney had occurred does *not* amount to disclosure of the specific content of that communication, and as such does not necessarily constitute a waiver of the privilege.").

Second, the questions highlighted by Defendant asked Ms. Giuffre whether she had ever communicated with her attorneys Cassell and Edwards for purposes of committing a crime or fraud. *See* Mot. to Compel at 11 (recounting questions). If such a communication involving perjury had existed, it would not have been covered by the attorney-client privilege in the first instance because it would have involved an on-going crime or fraud. *See* Fla. Stat. Ann. § 90.502(4) ("There is no lawyer-client privilege under this section when . . . [t]he services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud.").[20] Answering those questions by denying the existence of a crime or fraud accordingly did not constitute waiver of confidentiality over any otherwise-protected communication. Indeed, any other conclusion would essentially abolish the attorney-client privilege. A party could simply accuse the opposing side of fabricating evidence and, when that accusation was denied, argue that attorney-client privilege had been waived. This is not the law.

Finally, it is important to note that throughout her deposition, Ms. Giuffre's attorney strenuously objected to any effort by Dershowitz to obtain attorney-client information. *See* McCawley Decl., Exhibit 11, Composite Exhibit of Deposition Excerpts from the Deposition of Virginia Giuffre at 131-32; 173-74; 183; 200-12.[21] Clearly, at her deposition, Ms. Giuffre did not voluntarily waive any attorney-client privilege she held.

---

[20] Again, for sake of completeness, it is worth noting that federal and New York state law also contain a crime-fraud exception to the attorney client privilege. *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 73 (S.D.N.Y. 2009); *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 1 A.D.3d 223, 224, 767 N.Y.S.2d 228 (2003) (attorney-client privilege "may not be invoked where it involves client communications that may have been in furtherance of a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct").

[21] Once again, these objections are not included in Defendant's excerpts from the deposition.

## III. EDWARDS AND CASSELL HAVE NOT WAIVED WORK-PRODUCT PROTECTION AND MAXWELL HAS NOT DEMONSTRATED NEED TO PENETRATE THE PROTECTION.

### A. Work Product Protection Has Not Been Waived.

For many of the same reasons that Ms. Giuffre has not waived her attorney-client privilege, the work-product protection has not been waived. Fed. R. Evid. 502's protections against waiver apply not only to the attorney-client privilege but also to the work-product doctrine. On the facts of this case, Rule 502 thus extends all work-product protections that exist "under the law of the state where the disclosure occurred," Fed. R. Evid. 502(c)(2) – i.e., Florida law – as well as the protection that exists under federal law, Fed. R. Evid. 502(c)(1).

Florida law provides that work-product protections extend to "documents and tangible things otherwise discoverable" if a party prepared those items "in anticipation of litigation or for trial." Fla. R. Civ. P. 1.280(b)(3). The rationale supporting the work-product doctrine is that one party is not entitled to prepare his case through the investigative work product of his adversary where the same or similar information is available through ordinary investigative techniques and discovery procedures. *Universal City Development Partners, Ltd. v. Pupillo*, 54 So.3d 612, 614 (Fla. 5th DCA, 2011). The work-product of the litigant, his attorney or agent, cannot be examined, absent rare and exceptional circumstances. *Surf Drugs, Inc. v. Vermette*, 236 So.2d 108, 112 (Fla. 1970).

In Florida (as elsewhere), a party "can make a limited waiver of its . . . work product privilege." *Paradise Divers, Inc. v. Upmal*, 943 So. 2d 812, 814 (Fla. Dist. Ct. App. 2006). A waiver by disclosure only includes "other unrevealed communications only to the extent that they are relevant to the communication already disclosed." *Id.* (*citing Eastern Air Lines, Inc. v. Gellert*, 431 So.2d 329, 332 (Fla. 3d DCA 1983)). Waiver by disclosure does "not mean . . . that

voluntary disclosure of confidential information effectively waives the privilege as to all conversations, or the whole breadth of discussion which may have taken place." *Procacci v. Seitlin*, 497 So. 2d 969, 969-70 (Fla. Dist. Ct. App. 1986) (*citing Goldman, Sachs & Co. v. Blondis,* 412 F.Supp. 286, 288 (N.D.Ill.1976)). Instead, waiver by disclosure is confined to "that specific subject during that particular conversation." *Procacci*, 497 So. 2d at 970 (*quoting Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 461 (N.D. Cal.1978)).[22]

As with her attorney-client privilege argument, Defendant has not even cited Florida law on waiver of work-product protection, much less explained how she meets its demanding requirements. Moreover, the illustrations she provides do not prove any general waiver of work-product protection. For example, Defendant relies on the claim that Cassell and Edwards have waived work-product protection by disclosing a transcript of a portion of a 2011 telephone interview with Ms. Giuffre by attorneys Jack Scarola and Brad Edwards. But that recorded interview was never a confidential communication between Mr. Giuffre and the lawyers, but rather (as the transcript of the call itself makes clear) a communication that could be presented ***"to any jury that might ultimately have to hear these facts.*** " McCawley Decl., Ex. 15 at 1, transcript of Scarola/Edwards interview on April 7, 2011 (emphasis added). In other words, the recorded call was simply the functional equivalent of an affidavit – and affidavits are routinely disclosed with waiving work product protections, under the law of Florida and elsewhere.

Defendant also argues that Cassell and Edwards waived work-product protection by filing a summary judgment motion in the Dershowitz case which contained supporting exhibits (e.g., flight logs, sworn testimony by third-party witnesses, and other evidence). Mot. to Compel

---

[22] New York state law is to the same effect. *See Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C.*, 191 Misc. 2d 154, 159, 738 N.Y.S.2d 179, 186 (Sup. Ct. 2002) (" The disclosure of a document protected by the work-product rule does not result in a waiver of the privilege as to other documents.").

at 16. But providing information in support of a summary judgment motion is a routine step that attorneys take every day. While the materials produced are obviously not subject to work product protection, other materials and communications do not somehow become subject to discovery. *Paradise Divers, Inc.*, 943 So. 2d at 814.

**B. Defendant Has Not Proven "Need" to Penetrate Work-Product Protection.**

Defendant's argument on work product protection also simply assumes that it is the same as the attorney-client privilege and can be waived under an "at issue theory." But the "at issue" legal theory Defendant relies on to argue (incorrectly) that attorney-client privilege has been waived applies only to that privilege. The work product doctrine is quite distinct from attorney-client privilege, and application of the privileges and exceptions to them differ. *See West Bend Mutual Ins. Co*. v. *Higgins,* 9 So.3d 655, 656 (Fla. 5th DCA 2009); *Genovese v. Provident Life & Accident Ins. Co.*, 74 So. 3d 1064, 1068 (Fla. 2011), *as revised on denial of reh'g* (2011). The function of the work product doctrine is to protect counsel's mental impressions. *West Bend Mutual*, 9 So.3d at 656. To pierce the privilege, Defendant must show "that the substantial equivalent of the material cannot be obtained by other means." *Southern Bell Tel. & Tel. Co. v. Deason,* 632 So.2d 1377, 1385 (Fla.1994). Defendant has not even identified any specific work-product she claims to need, much less shown why she cannot get the underlying information from other sources.

Under the law of Florida (and elsewhere[23]), to establish "need," a party must present testimony or evidence demonstrating the material requested is critical to the theory of the

---

[23] Both federal and New York state law extend work product protections similar to those found in Florida law. *See, e.g., Hickman v. Taylor,* 329 U.S. 495, 511 (1947); N.Y. Civ. Practice Law & Rules § 3101(c) (McKinney). Indeed, New York state law may go even further than Florida's and extends "absolute" work-product protection. *See Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C.*, 191 Misc. 2d 154, 159, 738 N.Y.S.2d 179, 185 (Sup. Ct. 2002) (section 3101(c) "affords absolute immunity from disclosure of attorney's work product.").

requestor's case, or to some significant aspect of the case. *Zirkelbach Const. Inc. v. Rajan*, 93 So.3d 1124, 1130 (Fla. 2d DCA 2012). "[W]ell established in Florida is the principle that the unsworn analysis of a party's attorney and/or a bare assertion of need and undue hardship to obtain the substantial equivalent [is] insufficient to satisfy this showing." *Butler v. Harter*, 152 So.3d 705, 712 (Fla. 1st DCA, 2014); *see Procter & Gamble Co. v. Swilley*, 462 So.2d 1188, 1194 (Fla. 1st DCA 1985); *State v. T.A.*, 528 So.2d 974, 975 (Fla. 2d DCA, 1988) ("[R]epresentations by counsel not made under oath and not subject to cross-examination, absent a stipulation, are not evidence). Further, Florida courts have held that "the showing of need encompasses a showing of diligence by the party seeking discovery of another party's work product." *Butler v. Harter*, 152 So.3d 705, 712 (Fla. 1st DCA, 2014); *see also CSX Transp., Inc. v. Carpenter*, 725 So.2d 434, 435 (Fla. 2d DCA 1999) (quashing order granting motion to compel discovery because the record did not contain affidavits supporting plaintiff's argument that it was unable to obtain the substantially equivalent information by other means without undue hardship); *Falco v. N. Shore Labs. Corp.,* 866 So.2d 1255, 1257 (Fla. 1st DCA 2004) (holding that need and undue hardship "must be demonstrated by affidavit or sworn testimony"); *N. Broward Hosp. Dist. v. Button*, 592 So.2d 367, 368 (Fla. 4th DCA 1992), ("[T]he unsworn assertions of plaintiff's counsel were insufficient to constitute a showing of need and undue hardship."), *called into doubt on other grounds as stated in Columbia Hosp. Corp. of S. Broward v. Fain*, 16 So.3d 236 (Fla. 4th DCA 2009).

Here, Defendant has ample information from which she can present her case. At the core of this case is whether Ms. Giuffre "lied" when she said that the Defendant recruited her to be sexually abused by Jeffrey Epstein. Defendant can, of course, testify to her interactions with Ms. Giuffre, as well as call other witnesses regarding the circumstances of those interactions.

Defendant can also get information from her close friend, Epstein, about the circumstances of the interactions. Defendant and Epstein are not only good friends but they have a "common interest agreement" that facilitates transfer of information between the two of them. Finally, to make her showing that she is unable to obtain "equivalent information" from other sources, Defendant would have to explain in detail what other steps she has taken to secure information from other sources, including not only Epstein but other witnesses present at Epstein's mansion. Having failed to do any of this, Defendant has not made a sufficient showing to obtain work-product information. *Pupillo*, 54 So.3d at 614.

## IV. COMMUNICATIONS WITH ATTORNEY JACK SCAROLA ARE COVERED BY A JOINT DEFENSE AGREEMENT AND ARE THUS PROTECTED BY ATTORNEY-CLIENT AND WORK-PRODUCTION PROTECTION.

As a tag-along argument at the end of her motion, Defendant argues that Ms. Giuffre has not established the existence of a common interest or joint defense agreement that embraces Jack Scarola, the attorney for Cassell and Edwards in the Dershowitz litigation. Mot. to Compel at 23-24. Disclosure of that agreement involved notice to the parties to the agreement. Now that appropriate notice has been provided, the agreement can be – and has been – disclosed. *See* McCawley Decl., Ex. 16, common interest agreement. In view of the existence of the valid agreement, it is clear that the referenced communications involving Scarola are protected. *See, e.g.*, *Guiffre v. Maxwell,* No. 15 CIV. 7433 (RWS), 2016 WL 1756918, at *6 (S.D.N.Y. May 2, 2016) (noting common interest agreement protection) (*citing GUS Consulting GMBH v. Chadbourne & Parke LLP*, 20 Misc. 3d 539, 542, 858 N.Y.S.2d 591, 593 (Sup. Ct. 2008)).

## CONCLUSION

Defendant's motion to compel should be denied in its entirety.

Dated: June 1, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[24]

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 1st day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.

[24] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# *GIUFFRE*

# *VS.*

# *MAXWELL*

**Deposition**

## *VIRGINIA GIUFFRE*

*05/03/2016*

---

***Agren Blando Court Reporting & Video, Inc.***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

A I believe this is when I was hoping to join the CVRA case.

Q All right. And do you know when this document was filed?

And actually, just to be clear, about halfway there's actually a second document that was filed. So this is a composite exhibit. Let me be very clear.

So after page 14 -- I'm sorry, 13, there's a second document that is styled Jane Doe #3 and Jane Doe #4's Corrected Motion Pursuant to Rule 21 for Joinder In Action.

Do you see that?

A Did you say page 14?

Q It is on the 14th page of this document.

Do you see that?

A I do.

Q And so this composite Exhibit 2 has both a motion and a corrected motion.

Do you see that?

A Yes.

Q And were both of those pleadings authorized by you to be filed?

A Yes.

Q In other words, you wanted to join the

CVRA action in or about December 30th, 2014, correct?
A I -- I'm not aware of the exact dates. There's no dates on this. But I did try to join the motion, yes.
Q All right. If you can look at the top line of the document.
A Yes.
Q Does it say, Entered on FLSD --
A Oh, it does, too, I'm sorry, yes.
Q That's all right. So does that refresh your memory as to about when you first sought to join the CVRA action?
A Yes.
Q December 30th, 2014, correct?
A Yes.
Q And the corrected motion was filed a few days later, correct?
A Yes, correct.
Q If I could turn to Defendant's Exhibit 3, which was January 21st.
(Exhibit 3 marked.)
MR. EDWARDS: Thank you.
Q (BY MS. MENNINGER) Do you recognize this document?
A Yes, I do.

physical features of Ghislaine Maxwell?

A I can tell you that she had very large natural breasts. I can tell you that her pubic hair was dark brown, nearly black. I don't remember any specific birthmarks or moles that I could point out that would be relevant.

Q Any scar?

A I don't remember any scars.

Q Any tattoos?

A No tattoos.

Q When did you next go to the El Brillo house?

A I believe it would have been the next day.

Q You believe it would have been or was it?

MR. EDWARDS: Form.

A I know that it was consecutive, that I continued to go there after my first -- the first time that the abuse took place there. It was consecutive that I was there, I believe, over the next course of weeks.

Q (BY MS. MENNINGER) What day of the week was the first time you went?

A I don't know.

Q Do you know whether you went the very next day or not?

A I believe I did.
Q All right. How did you get there the very next day?
MR. EDWARDS: Form.
A I believe my dad dropped me off again.
Q (BY MS. MENNINGER) When you say you believe, do you recall him doing that or are you guessing?
A I don't -- well, this is how I figure this. I don't remember Ghislaine picking me up from Mar-a-Lago. I didn't have my own car. So the only way I could have really gotten there would have been my dad picking me up -- I mean, sorry, dropping me off.
Q Do you have a distinct recollection of your father dropping you off there more than one day in a row?
A Yes.
Q You do not recall the car he was driving?
A Like I said, he always drove trucks. That's as good as I can get.
Q And so -- and you worked on weekends as well at Mar-a-Lago or no?
A No.
Q So the second day would have had to be

A I wouldn't say directly.
Q How --
A I'd say I stayed with my parents for -- like, I think I finished school at Crestwood. So I would have been in, I don't know, I guess eighth grade, finished eighth grade. And then -- I don't know. I really don't know. Around eighth grade.
Q You went to Growing Together?
A I think -- I think it was then.
Q And how many years did you live at Growing Together?
A Over a year.
Q Were you ever in foster care?
A What Growing Together was, was like a group home that sent you away to foster parents every night.
Q So you lived in other people's homes during the period of time you were assigned to Growing Together?
A Well, you stayed at Growing Together during the day and then at night you get sent home with parents.
Q Did you go to school while you were at Growing Together?
A Yeah, they offer education there.

Q So the education was at Growing Together?

A Yeah.

Q You did not attend a Palm Beach County --

A I did, but you had to earn your levels up to be able to go outside. So I don't remember what level you have to get up to, to go out to another school. I think there was like seven levels or something. And you had to make it to, like, level 4 to be able to go to outside school.

Q So for some period of time you were assigned to Growing Together and you were going to school at Growing Together. And for some period of time you were going to other schools and coming back to Growing Together?

A Correct.

Q And then when you came back to Growing Together, you were sent to spend the night at a family's home?

A Yes.

Q So you never slept at Growing Together?

A No.

Q Did you live -- other than living at or staying at Growing Together during the day and sleeping at these other homes at night, is there anywhere else that you recall living in the period

a 3. I think it's [redacted]. I really can't make out the telephone number.

Q Okay. Do you see Relationship? Can you read that?

A Friend.

Q Okay. Do you see just below that there's a line that says number 21?

A Do not stop -- sorry, Do not sign application until requested to do so by administrating an oath.

Q Okay.

A Applicant's signature age 13 or older.

Q Oh, it's by the signature line?

A Yeah.

Q And that's your signature?

A Yes.

Q All right. And this is the document that you recall filling out for your first passport?

A I don't recall doing it, but yes, it's in my handwriting and it's got all of my information on it.

Q Okay. And on line -- box 23 it's got your driver's license checked off, right?

A July 23. Yeah, I really can't make out

And when they say massage, that means erotic, okay? That's their term for it. I think there are plenty of other witnesses that can attest to what massage actually means.

And I'm telling you that Ghislaine told me to go to Glenn Dubin and give him a massage, which means sex.

Q Okay. So Glenn -- Ghislaine Maxwell told you to go give a massage to Glenn Dubin?

A Correct.

Q That's your testimony?

A That is my testimony.

Q All right. Ghislaine Maxwell told you to go give a massage to [redacted], correct?

A Correct.

Q Ghislaine Maxwell told you to give a massage to Prince Andrew, correct?

A Correct.

Q Ghislaine Maxwell told you to give a massage to Bill Richardson, correct?

A Correct.

Q When did Ghislaine Maxwell tell you to give a massage to Bill Richardson?

A I don't know dates.

Q Where were you?

A When it happened?

Q When Ghislaine Maxwell used the words, Go give a massage to Bill Richardson, where were you?

MR. EDWARDS: Object to the form. Mischaracterizes her testimony.

A I can't tell you where we were. I know where I was sent to. I don't know where we were when she told me to do that.

Q (BY MS. MENNINGER) Where were you sent to --

A New Mexico.

Q -- by Ghislaine Maxwell?

MR. EDWARDS: Object to the form. Mischaracterizes her testimony again.

A Are you smiling at me because --

Q (BY MS. MENNINGER) No, I'm asking you to answer the question.

A I have answered the question. I was sent to New Mexico.

Q Okay. Where were you sent from?

A I already answered that. I don't know where I was sent from.

Q Okay.

A I was flying everywhere with these people.

Q Where were you sent by Ghislaine Maxwell

to have sex with Jean Luc Brunel?

MR. EDWARDS: Object to the form. Mischaracterized her testimony.

A Many places.

Q (BY MS. MENNINGER) Ghislaine Maxwell sent you to many places to have sex with Jean Luc Brunel?

MR. EDWARDS: Object to the form.

A It happened at many places, yes.

Q (BY MS. MENNINGER) You had sex with Jean Luc Brunel at many places is what you're saying, correct?

A I was sent to Jean Luc Brunel at many places to have sex with him.

Q When did Ghislaine Maxwell send you to a place to have sex with Jean Luc Brunel?

A You are asking --

MR. EDWARDS: Form.

A -- me to answer the impossible.

Q (BY MS. MENNINGER) All right. When did Ghislaine Maxwell send you to have sex with the owner of a large hotel chain?

MR. EDWARDS: Object to the form. Mischaracterization.

A I'm going to keep answering the questions the same way that I keep answering them. I don't

know where it was when she said to go do this.

Q (BY MS. MENNINGER) Okay. Where were you sent to have sex with the owner of a large hotel chain by Ghislaine Maxwell?

MR. EDWARDS: Object to the form.

A I believe that was one time in France.

Q (BY MS. MENNINGER) Which time in France?

A I believe it was around the same time that Naomi Campbell had a birthday party.

Q Where did you have sex with the owner of a large hotel chain in France around the time of Naomi Campbell's birthday party?

A In his own cabana townhouse thing. It was part of a hotel, but I wouldn't call it a hotel.

Jeffrey was staying there. Ghislaine was staying there. Emmy was staying there. I was staying there. This other guy was staying there. I don't know his name.

I was instructed by Ghislaine to go and give him an erotic massage.

Q She used the words erotic massage?

A No, that's my word. The word massage is what they would use. That's their code word.

Q Was she in the room when you gave this erotic massage to the owner of a large hotel chain?

A No, she was not in the room. She was in another cabana.

Q And other than telling you to go give the owner of this large hotel chain a massage, do you remember any other words she used to you to direct you in what you should do?

A Not at the time, no.

Q Where did -- where were you and where was Ms. Maxwell when she directed you to go have sex with Marvin Minsky?

MR. EDWARDS: Object to the form.

A I don't know.

Q (BY MS. MENNINGER) Where did you go to have sex with Marvin Minsky?

A I believe it was the U.S. Virgin Islands, Jeff's -- sorry, Jeffrey Epstein's island in the U.S. Virgin Islands.

Q And when was that?

A I don't know.

Q Do you have any time of year?

A No.

Q Do you know how old you were?

A No.

Q Other than Glenn Dubin, [redacted], Prince Andrew, Jean Luc Brunel, Bill Richardson,

another prince, the large hotel chain owner and Marvin Minsky, is there anyone else that Ghislaine Maxwell directed you to go have sex with?

A I am definitely sure there is. But can I remember everybody's name? No.

Q Okay. Can you remember anything else about them?

A Look, I've given you what I know right now. I'm sorry. This is very hard for me and very frustrating to have to go over this. I don't -- I don't recall all of the people. There was a large amount of people that I was sent to.

Q Do you have any notes of all these people that you were sent to?

A No, I don't.

Q Where are your notes?

A I burned them.

Q When did you burn them?

A In a bonfire when I lived at Titusville because I was sick of going through this shit.

Q Did you have lawyers who were representing you at the time you built a bonfire and burned these notes?

A I've been represented for a long time, but it was not under the instruction of my lawyers to do

this. My husband and I were pretty spiritual people and we believed that these memories were worth burning.

Q So you burned notes of the men with whom you had sex while you were represented by counsel in litigation, correct?

MR. EDWARDS: Object to the form.

A This wasn't anything that was a public document. This was my own private journal, and I didn't want it anymore. So we burned it.

Q (BY MS. MENNINGER) When did you write that journal?

A Just over time. I started writing it probably in, I don't know, I can't speculate, 2012, 2011.

Q So you did not write this journal at the time it happened?

A No.

Q You started writing this journal approximately a decade after you claim you finished being sexually trafficked, correct?

A Yes.

Q And you started writing a journal after you had a lawyer, correct?

A Correct.

Q Including Mr. Edwards, who is sitting right here, correct?

A Correct.

Q What did that journal look like?

A It was green.

Q And what else?

A It was just a spiral notebook.

Q Okay. And what did you put into that green spiral notebook?

A Bad memories. Things that I've gone through, lots of things, you know. I can't tell you. There was a lot of pages. It was over 300 pages in that book.

Q Did you ever show that book to your lawyers?

A No.

Q Did you show that book to anyone?

A My husband.

Q Did you show it to anyone else besides your husband?

A No.

Q Did you tear out pages and give them to Sharon Churcher?

A No, I wrote -- those pages that you're talking about, I wrote for her specifically. She

wanted to know about the Prince Andrew incident.

Q So that's a different piece of paper?

A Yeah, that's just random paper.

Q So you had a green spiral notebook that you began sometime in 2011 or 2012 in which you wrote down your recollections about what had happened to you, and you burned that in a bonfire in 2013.

Did I get that right?

A You got that right.

Q And do you have no other names of people to whom you claim Ghislaine Maxwell directed you to have sex, correct?

A At this time, no.

Q Is there any document that would refresh your recollection that you could look at?

A If you have a document you'd like to show me, I would be glad to look at it and tell you the names I recognize off of that.

Q I'm just asking you if there's a document you know of that has this list of names in it?

A Not in front of me, no.

Q Where is the original of the photograph that has been widely circulated in the press of you with Prince Andrew?

A I probably still have it. It's not in my

possession right now.

Q Where is it?

A Probably in some storage boxes.

Q Where?

A In Sydney.

Q Where in Sydney?

A At some family's house. We got the boxes shipped to Australia, and they were picked up off the porch by my nephews and brought to their house.

Q Which is where?

A In Sydney.

Q Where in Sydney?

A [redacted]

Q And who lives in that house?

A Well, it's owned by my mother-in-law and father-in-law, but my nephews live in the house.

Q What are their names?

A I'm not giving you the names of my nephews.

Q What's the address of the house?

A Why would you want that?

Q I want to know where the photograph is. I'm asking you where the photograph is. And you've just told me it's somewhere in [redacted]?

A Yes.

Q So where in [redacted] is the photograph located?

A If I can't 100 percent say that the photograph is there, it could be at my house that I presently live in. I'm not going to give you the address of my nephews' residence.

Q When is the last time you saw the photograph in person?

A When I packed and left America.

Q Colorado?

A Yes.

Q All right. So you had that photograph here with you in Colorado?

A Yes.

Q What's on the back of the photograph?

A I'm sorry?

Q Is there anything on the back of the photograph?

A There's like the date it was printed, but no writing or anything.

Q Okay. Does it say where it was printed?

A I don't believe so. I think it just -- I don't remember. I just remember there's a date on it.

Q Whose camera was it taken with?

A My little yellow Kodak camera.
Q Who took the picture?
A Jeffrey Epstein.
Q And where did you have it developed?
A I believe when I got back to America.
Q So where?
A I don't know.
Q Palm Beach?
A I don't know.
Q What is the date the photograph was printed?
A I believe it's in March 2001.
Q Okay.
A But that's just off of my photographic memory. I don't -- it could be different, but I think it's March 2001.
Q You have a photographic memory?
A I'm not saying I have a photographic memory. But if I'd look at the back of the photo and I remember what it says, I believe it was March 2001.
Q Did the photograph ever leave your possession for a while?
A I gave it to the FBI.
Q Okay. And when did you get it back?
A When they took copies of it.

Q When was that?

A 2011.

Q When they came to interview you?

A Yes.

Q So from 2011 until you left Colorado it was in your personal possession?

A Yes.

Q What other documents related to this case are in that, storage boxes in Australia?

MR. EDWARDS: Object to the form.

A Documents related to this case -- there -- I don't know. I really can't tell you. I mean, there's seven boxes full of Nerf guns, my kids' toys, photos. I don't know what other documents would be in there.

Q (BY MS. MENNINGER) Did anyone search those documents after you received discovery requests from us in this case?

A I haven't been able to obtain those boxes. I can't get them sent back up to me. It's going to cost me a large amount of money. And right now I'm trying to look after my family, so I'm not able to afford to get them up.

Q You live in Australia, correct?

A I do.

read it.

MS. MENNINGER: We're going off the record.

MR. EDWARDS: Yeah, that's fine. She'll read.

THE VIDEOGRAPHER: That concludes today's proceedings. We're off the record at 5:28.

(Proceedings concluded at 5:28 p.m.)

* * * * * * *

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT**

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
East 10th Avenue
Denver, CO 80203
303.831.7364

Defendant Ghislaine Maxwell ("Ms. Maxwell") files this Response in Opposition to Plaintiff's Motion to Exceed Presumptive Ten Deposition Limit, and states as follows:

## INTRODUCTION

Despite having taken only three depositions to date, Plaintiff prematurely requests permission to exceed the presumptive ten deposition limit imposed by Fed. R. Civ. P. 30(a)(2)(A)(i) and to conduct 17 separate depositions, almost twice the limit. Without legal support, Plaintiff attempts to conflate the presumptive time limitation for each deposition of seven hours with a right to take a total of 70 hours of depositions. This is an absurd reading of the Federal Rules. The presumptive ten deposition limitation is an independent limitation, and speaks to the number of separate deponents, not deposition time. Indeed, the two independent limitations do not even appear in the same section of the rules.

The heart of Plaintiff's argument is that Ms. Maxwell inconveniently testified and denied Plaintiff's claims, rather than invoking the Fifth Amendment. This dashed Plaintiff's apparent hope to obtain an adverse inference, rather than actually having to prove her case against Ms. Maxwell. Instead, Ms. Maxwell fully testified for the entire 7 hours, responded to all questions posed to her,[1] and testified based on her actual knowledge. Ms. Maxwell's testimony simply bears no relevance to Plaintiff's request to take more than 10 depositions of non-party witnesses.

Conspicuously absent from Plaintiff's motion are (a) any actual information she believes these witnesses may provide which is neither cumulative nor duplicative of other information already disclosed in this case, (b) the fact the information can be obtained from other sources,

---

[1] Plaintiff flatly mis-represents to the Court that Ms. Maxwell "refused" to answer the questions posed to her, as the actual transcript amply demonstrates. Ms. Maxwell did not avoid any questions and answered all questions to the best of her recollection relating to alleged events 15 years ago. The majority of the bullet point "summary" of the matters about which Ms. Maxwell could not testify were based either on a lack of any personal knowledge or the fact that the events claimed by Plaintiff did not actually happen.

and (c) facts demonstrating that the burden and expense of the discovery is justified by the needs of this case. Indeed, she has not established that the testimony is even relevant to the actual issues in this matter. Plaintiff's inability to establish these factors requires denial of the motion.

## I. PLAINTIFF'S REQUEST IS PREMATURE

First, the request to exceed the presumptive ten-deposition limit is premature. "[C]ourts generally will not grant leave to expand the number of depositions until the moving party has exhausted the ten depositions permitted as of right under Rule 30(a)(2)(A) or the number stipulated to by the opposing party." *Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*, No. 3:06-CV-232 (CFD), 2006 WL 1525970, at *2 (D. Conn. May 25, 2006).

This guideline makes sense because a "moving party must not only justify those depositions it wishes to take, but also the depositions it has already taken." *Id.* (*citing Barrow v. Greenville Indep. Sch. Dist.,* 202 F.R.D. 480, 482 (N.D.Tex. 2001)). This rule is in place because "a party could indirectly circumvent the cap on depositions by exhausting the maximum allotted number to those that she could not justify under the Rule 26(b)(2) standards, and then seek[ ] leave to exceed the limit in order to take depositions that she could substantiate." *Id.* at 483.

Here, Plaintiff seeks a pre-emptive determination that she should be permitted 17 depositions, almost twice the presumptive limit, yet her proposed depositions are not calculated to lead to admissible evidence in this case. By way of example, Plaintiff identifies Nadia Marcinkova, Sarah Kellen (a/k/a Sarah Kensignton or Sarah Vickers), and Jeffrey Epstein as alleged "co-conspirators" with each other. She requests the depositions of each. Plaintiff anticipates each will invoke the Fifth Amendment – in other words, she will not obtain any discoverable information from them.

Plaintiff makes a bizarre argument that somehow this testimony can be used to create an adverse inference against Ms. Maxwell,[2] despite the fact that Ms. Maxwell did not invoke the Fifth Amendment and she testified fully and answered every question posed to her with the only exception the irrelevant and harassing questions Plaintiff posed to her concerning her adult, consensual sexual activities. In other words, depositions of Marcincova, Kellen and Epstein would serve Plaintiff's goal to make a convoluted legal argument, not to actually seek discoverable information. In light of this, the "burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Atkinson v. Goord*, No. 01 CIV. 0761 LAKHBP, 2009 WL 890682, at *1 (S.D.N.Y. Apr. 2, 2009); Fed. R. Civ. P. 26(b)(1). If Plaintiff chooses to use her depositions in this manner, she risks utilizing three of her available 10 depositions for an illegitimate purpose. She should not be rewarded with a pre-emptive carte blanche in advance to take additional depositions.

## II. THE PROPOSED DEPOSITIONS ARE CUMULATIVE, DUPLICATIVE, AND NOT RELEVANT TO THE CENTRAL ISSUES OF THE DISPUTE

Plaintiff has not met the requisite showing to permit in excess of 10 depositions. In *Sigala v. Spikouris*, 00 CV 0983(ILG), 2002 WL 721078 at *3 (E.D.N.Y. Mar. 7, 2002), the Court set forth the general principles relevant to a party's application to conduct more than ten depositions:

---

[2] Invocation of the Fifth Amendment by a third party witness cannot be used to create an adverse inference against a party in a civil action. *See United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, No. 90 CIV. 5722 (CSH), 1993 WL 159959, at *5 (S.D.N.Y. May 12, 1993) ("the general rule [is] that an individual's claim of Fifth Amendment protection is personal, and does not give rise to adverse inferences against others."); *Brenner v. World Boxing Council,* 675 F.2d 445, 454 n. 7 (2d Cir.), *cert denied,* 459 U.S. 835 (1982) ("Furthermore, since King was a non-party witness, no adverse inference against appellees could have been drawn from his refusal to testify.").

> The Federal Rules presumptively limit the number of depositions that each side may conduct to ten. *See* Fed.R.Civ.P. 30(a)(2) (A) ("A party must obtain leave of court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2), if ... a proposed deposition would result in more than ten depositions being taken ...."); *accord Universal City Studios v. Reimerdes,* 104 F.Supp.2d 334, 342 (S.D.N.Y.2000); *Landry v. St. James Parish Sch. Bd.,* No. Civ. A 99-1438, 2000 WL 1741886, at *2 (E.D.La. Nov. 22, 2000). The purpose of Rule 30(a)(2)(A) is to "enable courts to maintain a 'tighter rein' on the extent of discovery and to minimize the potential cost of '[w]ide-ranging discovery' . . . ." *Whittingham v. Amherst Coll.,* 163 F.R.D. 170, 171-72 (D.Mass.1995) (citation omitted). Accordingly, "[t]he mere fact that many individuals may have discoverable information does not necessarily entitle a party to depose each such individual." *Dixon v. Certainteed Corp.,* 164 F.R.D. 685, 692 (D.Kan.1996).

"The factors relevant to determining whether a party should be entitled to more than ten depositions are now set forth in Fed.R.Civ.P. 26(b)(2)(C)[3] and include whether (1) the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less extensive, (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, and (3) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Atkinson*, 2009 WL 890682, at *1 (S.D.N.Y. Apr. 2, 2009) (internal quotations omitted).

---

[3] Rule 26(b)(1) has since been modified to read "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." The scope of discovery permitted by 26(b)(1) is "non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Thus, the factors to be considered have simply been moved to a new number with cross reference.

Weighing these factors, there is no basis for permitting more than the presumptive ten deposition limit. First, as highlighted by the motion, the information purportedly sought is cumulative and duplicative. By way of example, Plaintiff has already deposed Johanna Sjoberg (a former Epstein employee), Juan Alessi (a former Epstein employee), and David Rodgers[4] (former Epstein Pilot). She further seeks to depose Maria Alessi and Jo Fontanella (former Epstein household employees), as well as [redacted] and Emmy Taylor (identified as assistants to Ms. Maxwell or Mr. Epstein). The information Plaintiff claims each of the witnesses may have is identical to that of each other – what they observed while working for Epstein. Plaintiff goes so far as to state that Maria Alessi's deposition is expected to "corroborate" the observations of her husband's.

Plaintiff admits that the purpose in seeking the additional depositions is "obtaining witnesses, like Ms. Sjoberg, who can corroborate that [Plaintiff] is telling the truth." Yet, Ms. Sjoberg did not "corroborate that [Plaintiff] is telling the truth." Instead, she testified that she was hired as an adult by Jeffrey Epstein to provide professional massages, that Ms. Maxwell never asked her for any type of sexual massage, that she never saw Plaintiff giving a massage to Ms. Maxwell nor did she see Ms. Maxwell receive a massage from any underage girl, indeed, in her 5 plus years working for Mr. Epstein, she never saw any person underage at his home. Regardless, Plaintiff is looking in vain for more testimony of exactly the same character, precisely the type of testimony the presumptive limit is intended to prevent.

Similarly, the expected deposition testimony of former Palm Beach Detective Joe Recarey and former Palm Beach Police Chief Michael Reiter are duplicative of each other.

[4] Mr. Rodgers deposition, held last Friday and requiring a separate trip to Florida for Colorado counsel after the scheduled court hearing on Thursday, served simply to authenticate flight logs. There are far more convenient, less burdensome, and less expensive methods by which such information could have been obtained, such as a verifying affidavit, yet Plaintiff chose to unnecessarily burden counsel, the witness and counsel for the witness with a 3 hour deposition to accomplish the same end.

Putting aside the admissibility of this testimony, it appears that both men were involved in the investigation of Mr. Epstein and are expected to testify about their investigation. Plaintiff's allegations were not a part of their investigation, which took place years after Plaintiff left the country. Moreover, their investigation did not involve Ms. Maxwell. Again, such duplicative and irrelevant deposition testimony speaks to the intended purpose of the ten-deposition limit, not a reason to exceed that limit.

The same holds true for Nadia Marcinkova, Sarah Kellen (a/k/a Sarah Kensignton or Sarah Vickers) and Jeffrey Epstein, each of whom Plaintiff anticipates will not respond to questions and invoke their Fifth Amendment right. As discussed above, such invocation has no bearing on the issues in this matter. Moreover, it is obviously cumulative and duplicative.

Plaintiff also identifies Rinaldo Rizzo and Jean Luc Brunel but fails to provide any information from which Ms. Maxwell or the Court could identify the subject matter of their expected testimony. Thus, it is unclear how these individuals have information that differs from or would add to the other proposed deponents. It is the Plaintiff's burden to explain to the Court why these depositions should be permitted if they exceed the presumptive limit, why the information would not be cumulative, and its relevance to the important issues in the action, or the importance of the discovery in resolving those issues. She simply fails to provide any information by which the Court can assess these factors, and thus should not be permitted to exceed the deposition limit based on her proffer.

## III. THE TESTIMONY SOUGHT IS IRRELEVANT TO THIS SINGLE COUNT DEFAMATION CASE

This case is a simple defamation case. Plaintiff, through her counsel, filed a pleading making certain claims regarding "Jane Doe No. #3" – the Plaintiff – and her alleged

"circumstances." *See* Complaint. Ms. Maxwell denied the allegations made stating they were "untrue" and "obvious lies." Plaintiff claims these statements are defamatory because she has been called a "liar."

"A public figure claiming defamation under New York law must establish that 'the statements ... complain[ed] of were (1) of and concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir. 2015), and *aff'd,* 622 F. App'x 67 (2d Cir. 2015).

If Ms. Maxwell's statements are essentially true – Plaintiff lied – Plaintiff cannot establish her claim, and it is an absolute defense.[5] Further, if Plaintiff cannot prove actual malice by Ms. Maxwell, her claim fails. *See Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) (limited purpose public figure must establish by clear and convincing evidence that the defendant published the alleged defamatory statement with actual malice, "that is, with knowledge that it was false or with reckless disregard of whether it was false or not") (*quoting New York Times,* 376 U.S. 241, 280 (1964)). That is, Plaintiff must prove that Ms. Maxwell permitted the publication of the statement knowing it to be untrue.

None of the witnesses identified are listed as having discoverable information regarding any of the elements of this claim. None is claimed to have direct knowledge to confirm the truth of Plaintiff's claims about what happened *to her*, that the acts she claims *she* participated in

---

[5] There is only one public statement that existed on January 2, 2015 to which Ms. Maxwell was responding in the statement by her press agent. The document is the Joinder Motion filed in the Crime Victims' Rights Act case on behalf of Plaintiff by her attorneys, Bradley Edwards and Paul Cassell. Menninger Decl., Ex. A, p. 4. The very first line describing Jane Doe #3 Circumstances is false, as Plaintiff now concedes. It read: "In 1999, Jane Doe #3 was approached by Ghislaine Maxwell," and continuing that "Maxwell persuaded Jane Doe # 3 (who was only fifteen years old) to come to Epstein's mansion . . ." Plaintiff now concedes that she did not meet Ms. Maxwell or Mr. Epstein in 1999, and she was not 15 years old. Menninger Decl., Ex. A at 26-29. No amount of "circumstantial evidence" can overcome the fact that Ms. Maxwell's statement was correct and that statements in the Joinder Motion were untrue.

occurred or that they occurred with the people *she* claims to have been involved. Rather, each witness identified as being able to provide their observations regarding "other" allegedly underage girls, their own personal experience,[6] or beliefs about Plaintiff's credibility. None of this is relevant. This is not a case about Jeffery Epstein or the alleged "modus operandi of the Epstein organization." This is a simple case of if Ms. Maxwell's denial of the allegations made *by Plaintiff* about *Plaintiff's* own interactions with Maxwell was defamatory, and if Ms. Maxwell acted with actual malice in issuing the denial. Plaintiff's attempt to amplify this proceeding into something broader should not be condoned.

Because the evidence sought is nothing more than extraneous inadmissible "circumstantial evidence"[7] irrelevant to proving the essential elements of the claim, "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Atkinson*, 2009 WL 890682, at *1. As such, the request for the additional depositions should be denied.

WHEREFORE, Ms. Maxwell requests that the Motion to permit in excess of the presumptive ten deposition limit be denied; <u>alternatively</u>, if in excess of ten depositions are permitted, Ms. Maxwell requests that Plaintiff be required to pay all costs and attorney's fees

---

[6] The information sought is also inadmissible. Plaintiff seeks testimony from witness who she claims will testify to experience similar to her stories and this will "corroborate Ms. Giuffre's account description of the motive, way in which Epstein and his co-conspirators created opportunity, intent, plan, knowledge, and to the specifics that make up the criminal signature of Epstein and his co-conspirators." *Motion* at 15-16. Such evidence is prohibited by FRE 404(b), which states "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Furthermore, no other witness has claimed as Plaintiff does that Ghislaine Maxwell sexually abused them, sexually trafficked them, or that she partook in daily sex with any underage girls. Plaintiff's claim stands in isolation because it is fictional.

[7] This "circumstantial evidence" has no bearing on the truthfulness of the stories published by Plaintiff. It is equally likely to show that Plaintiff became aware of the allegations of others and decided to hop on the band wagon. She then made up similar claims for the purpose of getting paid hundreds of thousands of dollars by the media for publicizing her allegations and identifying well know public figures whose names she has seen documents that she reviewed or other stories she had read.

associated with attending any deposition occurring outside 100 miles of the Courthouse for the Southern District of New York pursuant to S.D.N.Y L.Civ.R. 30.1.

Dated: June 6, 2016.

Respectfully submitted,

*/s/ Laura A. Menninger*

Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

**CERTIFICATE OF SERVICE**

I certify that on June 6, 2016, I electronically served this *Defendant's Response in Opposition to Motion to Exceed Presumptive Ten Deposition Limit* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________/

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT**

Sigrid McCawley
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

**TABLE OF CONTENTS**

Page

I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE. ........ 1

II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY. .................. 6

III. MS. GIUFFRE'S REQUEST IS TIMELY. ........................................................................ 9

# TABLE OF AUTHORITIES

Page

**Cases**

*Atkinson v. Goord*,
No. 01 CIV. 0761 LAKHBP, 2009 WL 890682 (S.D.N.Y. Apr. 2, 2009)................................3

*Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*,
No. 3:06-CV-232 (CFD), 2006 WL 1525970 (D. Conn. May 25, 2006)..................................9

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997)......................................................................................8

**Rules**

Fed. R. Evid. 404(b)......................................................................................7

Fed. R. Evid. 415(a)......................................................................................7

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this reply in support of her Motion to Exceed Presumptive Ten Deposition Limit. The motion should be granted because Ms. Giuffre has shown good cause for needing to exceed the ten deposition limit and in light of recent developments, Ms. Giuffre has streamlined her request, and now seeks only a total of three additional depositions. Notably, while Defendant contests Ms. Giuffre's motion, Defendant has herself unilaterally – **and without seeking any Court approval –** set ***twelve*** witnesses for deposition in this matter. In contrast to Defendant's unilateral action, Ms. Giuffre has properly sought this Court's permission. The Court should grant her motion and allow her to take the three additional depositions.

## I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE.

Defendant argues that the depositions Ms. Giuffre seeks to take are somehow "duplicative" of each other. Even a quick reading of the Defendant's pleading makes clear this is untrue. Defendant repeatedly gives her own narrow view of what existing witnesses have said. For example, Defendant argues that Ms. Sjoberg "did not corroborate that [Ms. Giuffre] is telling the truth." Defendant's Response at 5. Defendant's characterization is untrue.[1] But, as the mere

[1] Defendant wholly mischaracterized Ms. Sjoberg's testimony as involving "professional massages." Defendant's Resp. at 5. In fact, Ms. Sjoberg testified that, when she was a twenty-one-year-old college student, Defendant (not Jeffrey Epstein) recruited and hired her under the pretext of being a personal assistant to provide sexual massages. As one example of this testimony, Sjoberg testified that Defendant became angry with her for not "finishing your job" when Defendant was the one who ended up having to bring Epstein to orgasm when Ms. Sjoberg did not. *See* McCawley Dec at Exhibit 1, Sjoberg Dep. Tr. at 142:25-143:14(Q. What did you understand Maxwell to mean when you said that you hadn't finished the job, with respect to the camera? A. She implied that I had not brought him to orgasm. Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey? A. I can answer? Yes, I took that conversation to mean that it what was expected of me.) Ms. Sjoberg's testimony also shows that Defendant was a predator of young women and girls, and that her business was to provide girls for Jeffrey Epstein to have sex with. *Id*. at 141:3-5; 150:16-151:2 (Q. Did Maxwell ever ask you to bring other girls over to – for Jeffrey? A. Yes. Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you. A. Okay. Q. The

fact of this dispute confirms, this case is going to be hotly contested and the weight of the evidence on each side is going to be vitally important. The Court is well aware of many other civil cases where the parties have taken far more than ten depositions by mutual agreement. Defendant's refusal to agree to a few more depositions here is simply an effort to keep all the relevant facts from being developed.

Since Ms. Giuffre filed her initial motion seeking seven additional deposition, she has worked diligently to try to streamline the necessary depositions and has discovered new information concerning witnesses and their knowledge of the claims in this case. Accordingly, Ms. Giuffre currently brings before this Court a significantly shorter list[2] of witnesses she needs to depose to prove her claim, with some alterations. To be clear, Ms. Giuffre has narrowed her request and is now only seeking an additional three depositions from the Court as follows:

For descriptions concerning the depositions already taken (Defendant; Ms. Sjoberg; Mr. Alessi; Mr. Rodgers; and Mr. Rizzo), and those yet to be taken (Mr. Epstein; Mr. Gow; [redacted] Ms. Kellen; Ms. Marcinkova; Mr. Recarey; and Mr. Brunel), Ms. Giuffre references and incorporates her descriptions in the moving brief. The only remaining witness is William Jefferson Clinton. His deposition is necessary for the following reason:

---

first one was it would take pressure off of Maxwell to have more girls around? A. Right. Q. What exactly did Maxwell say to you that led you to believe that was her implication? A. She said she doesn't have the time or desire to please him as much as he needs, and that's why there were other girls around.).
That Ms. Sjoberg never saw Ms. Giuffre give a massage to Ms. Maxwell is immaterial. Ms. Sjoberg was with Defendant and Epstein when Ms. Giuffre was a minor child, and corroborates Ms. Giuffre's accounts concerning her being trafficked to Prince Andrew. *Id*. at 21-22. Ms. Giuffre refers the Court to Ms. Sjoberg's deposition testimony in its entirety (DE 173-5). It is depositions like this - verifying Ms. Giuffre's account of being recruited by Defendant for sex with Epstein – that Defendant is trying avoid. However, multiple other witnesses have testimony that supports Ms. Giuffre's claims, in different and various ways, and Ms. Giuffre needs that testimony to prove her defamation claim against Defendant.

[2] Ms. Giuffre is no longer seeking the deposition testimony of Emmy Taylor, [redacted], Jo Jo Fontanella, and Michael Reiter.

- In a 2011 interview, Ms. Giuffre mentioned former President Bill Clinton's close personal relationship with Defendant and Jeffrey Epstein. While Ms. Giuffre made no allegations of illegal actions by Bill Clinton, Ms. Maxwell in her deposition raised Ms. Giuffre's comments about President Clinton as one of the "obvious lies" to which she was referring in her public statement that formed the basis of this suit. Apart from the Defendant and Mr. Epstein, former President Clinton is a key person who can provide information about his close relationship with Defendant and Mr. Epstein and disapprove Ms. Maxwell's claims.

Ms. Giuffre is still working diligently with opposing counsel, these witnesses, and their attorneys on scheduling, as well as identifying other witnesses who may have factual information about the case. But, at this time, she seeks this Court's approval for an additional three depositions – depositions that will not consume the full seven hours presumptively allotted.

All three prongs of the three-factor test to evaluate a motion for additional depositions strongly support granting the motion. *Atkinson v. Goord*, No. 01 CIV. 0761 LAKHBP, 2009 WL 890682, at *1 (S.D.N.Y. Apr. 2, 2009). First, as reviewed in detail on a witness-by-witness basis above, the discovery sought is not duplicative. The proposed deponents include the individual who assisted in making the defamatory statement, women Defendant Maxwell hired to recruit girls for Jeffrey Epstein, an individual with intimate knowledge of Defendant and Epstein's sexual trafficking ring, other victims of Jeffrey Epstein (including a then underage victim), Mr. Epstein himself, and other witnesses who can corroborate important pieces of Ms. Giuffre's statements or refute Ms. Maxwell's statements and positions. These witnesses' testimony will corroborate Ms. Giuffre's account of Defendant being a recruiter of females for Epstein and corroborate the type of abuse she and others suffered. Sadly, Ms. Giuffre is far from the only one of Defendant's victims, and there are other witnesses whose testimony is necessary in order to demonstrate the truth of Ms. Giuffre's claims and the falsity of the statements made by Defendant.

Second, if Ms. Giuffre is denied these depositions, she will not have had the opportunity to obtain the information by other discovery in this case. The Court will recall from Ms. Giuffre's opening motion that Defendant's surprising lack of memory has, in no small part, caused the need for additional depositions. *See* Motion at 5-8 (listing 59 examples of memory lapses during Ms. Maxwell deposition, including inability to remember events recorded on aircraft flight logs or a photograph). Defendant offers no explanation for her convenient forgetfulness. Moreover, evidence of being recruited by Defendant and being sexually assaulted is not something Ms. Giuffre can obtain through requests for production or through interrogatories. The only way of obtaining such evidence is from witness testimony by those who were victimized, those who assisted Defendant in recruiting and abuse, and those who observed the recruiting or the abuse. For example, Rinaldo Rizzo, an estate manager for a friend of Defendant and Epstein's, testified about an episode where Defendant had threatened a terrified 15 year old girl and confiscated her passport to try to make her have sex with Epstein on his private island: *See* McCawley Decl. at Exhibit 2, Rizzo Deposition [3] Mr. Rizzo testified about another episode where Defendant gave instructions to, and presided over, a group of eleven girls

---

[3] [redacted]

as young as 14 years old playing a "kissing game" with and for Jeffrey Epstein.[4] Finally, the Defendant appears to be concealing critical evidence of the sexual abuse that other witnesses have testified she possesses. [redacted]. Yet Defendant has failed to produce a single photo in this case. *See* McCawley Decl. at Exhibit 3, Alessi Deposition at 36-41. Document discovery and interrogatories are not helpful in obtaining this type of evidence: depositions are needed.

Third, the burden and expense of this proposed discovery is limited to three additional depositions. Defendant in this case is a multi-millionaire with able counsel. Three depositions will not cause her undue burden, expense, or inconvenience. These depositions are important to resolving issues in this case. Given that very few witnesses reside within 100 miles of the courthouse and therefore cannot be compelled to trial, this request for only three additional depositions is a reasonable request.

While Defendant opposes Ms. Giuffre's request for Court approval of more than ten depositions, she has unilaterally noticed more than ten depositions without bothering to seek approval. As of the date of this filing, Defendant's counsel has issued ***twelve*** subpoenas for

4 [redacted]

deposition testimony – the almost the exact same number Ms. Giuffre is seeking.[5] Defendant cannot credibly oppose Ms. Giuffre's additional depositions while she, herself, is trying to take more than ten without leave of court.[6]

It is plain why Defendant does not want these depositions to go forward. Ms. Sjoberg, Mr. Alessi, and Mr. Rizzo's testimony was harmful to Defendant's case, and the additional depositions will provide further evidence that Defendant acted as Jeffrey Epstein's madam, proving the truth of Ms. Giuffre's statements that Defendant proclaimed publically as "obvious lies."

## II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY.

All of the people Ms. Giuffre seeks to depose have discoverable and important information regarding the elements of Ms. Giuffre's claims. Ms. Giuffre stated that Defendant recruited her and other young females for sex with Jeffrey Epstein. The people she now seeks to depose are all witnesses who can testify to Defendant working essentially as a madam for Jeffrey Epstein, recruiting young females for Epstein, or corroborate other important aspects of her statements. The fact that Defendant recruited girls, some of which were underage, for Epstein makes Ms. Giuffre's claim that she was also recruited by Defendant to ultimately have sex with Epstein and others more credible – and that Defendant's denials of any involvement in such recruiting is a bald-faced lie. Witnesses will testify that Defendant's recruitment and management of the girls for Jeffrey Epstein was a major aspect of Defendant's job, and that Ms.

---

[5] Defendant's counsel has taken the deposition testimony of (1) Ms. Giuffre; (2) Ms. Giuffre's mother (Lynn Miller); (3) Ms. Giuffre's father (Sky Roberts); and (4) Ms. Giuffre's physician (Dr. Olson). Defendant's counsel has noticed the following witnesses for deposition: (5) Mr. Austrich; (6) Mr. Figueroa; (7) Ms. Degorgieou; (8) a known victim of Jeffrey Epstein; (9) Mr. Weisfield; (10) Ms. Churcher; (11) Ms. Boylan; and (12) the 30(b)(6) witness for Victims Refuse Silence.

[6] Defendant has unilaterally scheduled - without consulting counsel for Ms. Giuffre - at least two of these depositions for days when depositions of Ms. Giuffre's witnesses have been set.

Giuffre's account of her sexual abuse and Defendant's involvement accords perfectly with other witnesses' accounts of what Defendant's job was for Epstein.[7]

That other young females were similarly recruited by the Defendant is evidence that Ms. Giuffre is telling the truth about her experiences – and thus direct evidence that Defendant defamed her when calling her a liar. Clearly, if Ms. Giuffre can establish that Defendant's modus operandi was to recruit young females for Epstein, that helps corroborate Ms. Giuffre's own testimony that Defendant recruited her for the same purposes and in the same manner. Although the Court need not make a final ruling on this evidentiary issue now, Rule 404(b) itself makes such testimony admissible. *See* Fed. R. Evid. 404(b) (other act "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). Indeed, even more specifically than the general provisions of Rule 404(b), Rule 415 makes these other acts admissible, due to the fact that those involved in sexual abuse of minors have a strong propensity for repeating those crimes. *See* Fed. R. Evid. 415(a)( ("In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation.").

Entirely apart from corroborating Ms. Giuffre's own individual abuse, however, Defendant fails to recognize that in calling Ms. Giuffre a "liar", she was attacking all aspects of Ms. Giuffre's account – including Ms. Giuffre's statements that Defendant served generally as a recruiter of girls for Epstein and that Epstein sexually abused the underage girls that were

---

[7] Defendant's specious suggestion that Ms. Giuffre heard about the other girls whom she recruited for sexual purposes and then decided to "hop on the band wagon" (Defendant's Resp. at 8 n.7) tacitly admits that Defendant procured a "band wagon" of girls for Jeffrey Epstein to abuse. Moreover, Defendant cannot refute the documentary evidence that she was on Epstein private jet with Ms. Giuffre over 20 times while Ms. Giuffre was a minor – flights that Defendant is, quite conveniently, now unable to recall. Motion at 5-8.

brought to him. Thus, in this defamation case, the testimony of these witnesses are admissible not only to bolster Ms. Giuffre's testimony about her individual abuse, but because they are simply part of the body of statements whose truth or falsity is at issue in this case.

In addition, one of the witnesses that Ms. Giuffre seeks to depose is registered sex offender Jeffrey Epstein, who stands at the center of the case. Indeed, some of the most critical events took place in the presence of just three people: Ms. Giuffre, defendant Maxwell, and Epstein. If Epstein were to tell the truth, his testimony would fully confirm Ms. Giuffre's account of her sexual abuse. Epstein, however, may well attempt to support Defendant by invoking the Fifth Amendment to avoid answering questions about his sexual abuse of Ms. Giuffre. Apparently privy to her former boyfriend Epstein's anticipated plans in this regard,[8] Defendant makes the claim that it would be a "convoluted argument" to allow Ms. Giuffre to use those invocations against her. Defendant's Resp. at 3. Tellingly, Defendant's response brief cites no authority to refute that proposition that adverse inference can be drawn against co-conspirators. Presumably this is because, as recounted in Ms. Giuffre's opening brief (at pp. 20-22), the Second Circuit's seminal decision of *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997), squarely upheld the drawing of adverse inferences based on a non-party's invocation of a Fifth Amendment right to remain silent. The Second Circuit instructed that, the circumstances of given case, rather than status of particular nonparty witness, determines whether nonparty witness' invocation of privilege against self-incrimination is admissible in course of civil litigation. *Id*. at122-23. The Second Circuit also held that, in determining whether nonparty witness' invocation of privilege against self-incrimination in course of civil litigation and

[8] In discovery, Defendant Maxwell has produced several emails between Epstein and herself discussing Ms. Giuffre.

drawing of adverse inferences is admissible, court may consider the following nonexclusive factors:

> (1) nature of witness' relationship with and loyalty to party;
> (2) degree of control which party has vested in witness in regard to key facts and subject matter of litigation;
> (3) whether witness is pragmatically noncaptioned party in interest and whether assertion of privilege advances interests of witness and party in outcome of litigation; and
> (4) whether witness was key figure in litigation and played controlling role in respect to its underlying aspects.

*Id*. at 124-25. Ms. Giuffre will be able to establish that all these factors tip decisively in favor of allowing an adverse inference. Accordingly, her efforts to depose Epstein, Marcinkova, and Kellen seek important information that will be admissible at trial.

## III. MS. GIUFFRE'S REQUEST IS TIMELY.

Defendant also argues that this motion is somehow "premature." Defendant's Resp. at 2-3. Clearly, if Ms. Giuffre had waited to file her motion until later, Defendant would have argued until the matter came too late. The motion is proper at this time because, as of the date of this filing, fact discovery closes in 17 days (although Ms. Giuffre has recently filed a motion for a 30-day extension of the deadline). In order to give the Court the opportunity to rule as far in advance as possible – thereby permitting counsel for both side to schedule the remaining depositions – Ms. Giuffre brings the motion now. She also requires a ruling in advance so that she can make final plans about how many depositions she has available and thus which depositions she should prioritize. [9]

---

[9] Defendant tries to find support for her prematurity argument in *Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*, No. 3:06-CV-232 (CFD), 2006 WL 1525970, at *2 (D. Conn. May 25, 2006). However, in that case, the Court found a motion for additional depositions to be premature, in part, because "[d]iscovery has not even commenced" . . . and the moving party "ha[d] not listed with specificity those individuals it wishes to depose." Of course, neither of these points applies in this case at hand: the parties are approaching the close of fact discovery, and Ms. Giuffre has provided detailed information about each individual she has deposed already and still seeks to depose.

An additional reason this motion is appropriate now is that, despite Ms. Giuffre's diligent pursuit of depositions, many witnesses have cancelled their dates, failed to appear, or wrongfully evaded service. These maneuvers have frustrated Ms. Giuffre's ability to take their depositions in a logical and sequential fashion, complicating the planning of a deposition schedule. For example, on April 11, 2016, Ms. Giuffre served notice on Defendant's counsel for the deposition of Rinaldo Rizzo, setting it for May 13, 2016. Nearly a month later, just a few days before that properly noticed deposition, Defendant's counsel requested that it be rescheduled, and, therefore, that deposition did not take place until June 10, 2016. Additionally, three other important witnesses evaded Ms. Giuffre's repeated efforts to serve them. It took Ms. Giuffre's motion for alternative service (DE 160) to convince Jeffrey Epstein to allow his attorney to accept service of process. The Court also has before it Ms. Giuffre's motion to serve Sarah Kellen and Nadia Marcinkova by alternative service. These witnesses' evasion of service delayed the taking of their depositions, and, as of the date of this filing, none have been deposed yet.

## CONCLUSION

For all these reasons, Ms. Giuffre should be allowed to take three more depositions than the presumptive ten deposition limit – a total of thirteen depositions.

Dated: June 13, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP

333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[10]

[10] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 13th day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.

______________________________/

**DECLARATION OF SIGRID S. McCAWLEY IN SUPPORT OF PLAINTIFF'S REPLY TO MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT**

I, Sigrid S. McCawley, declare that the below is true and correct to the best of my knowledge as follows:

1. I am a partner with the law firm of Boies, Schiller & Flexner LLP and duly licensed to practice in Florida and before this Court pursuant to this Court's September 29, 2015 Order granting my Application to Appear Pro Hac Vice.

2. I respectfully submit this Declaration in Support of Plaintiff's Reply to Motion to Exceed Presumptive Ten Deposition Limit.

3. Attached hereto as Exhibit 1 is a true and correct copy of Johanna Sjoberg's Deposition Transcript excerpts dated May 18, 2016.

4. Attached hereto as Exhibit 2 is a true and correct copy of Rinaldo Rizzo's Rough Deposition Transcript excerpts dated June 10, 2016.

5. Attached hereto as Exhibit 3 is a true and correct copy of Juan Alessi's Deposition Transcript excerpts dated June 1, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Sigrid S. McCawley
Sigrid S. McCawley, Esq.

Dated: June 13, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 13th day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# EXHIBIT 1

(Filed Under Seal)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 15-CV-07433-RWS

------------------------------------------x

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

------------------------------------------x

May 18, 2016
9:04 a.m.

C O N F I D E N T I A L

Deposition of JOHANNA SJOBERG, pursuant to notice, taken by Plaintiff, at the offices of Boies Schiller & Flexner, 401 Las Olas Boulevard, Fort Lauderdale, Florida, before Kelli Ann Willis, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public within and for the State of Florida.

Jeffrey's home when you arrived?

A. Yes. When I first walked in the door, it was just myself, and Ghislaine headed for the staircase and said -- told me to come up to the living room.

Q. And what happened at that point, when you came up to the living room?

A. I came up and saw Virginia, Jeffrey, Prince Andrew, Ghislaine in the room.

Q. And did you meet Prince Andrew at that time?

A. Yes.

Q. And what happened next?

A. At one point, Ghislaine told me to come upstairs, and we went into a closet and pulled out the puppet, the caricature of Prince Andrew, and brought it down. And there was a little tag on the puppet that said "Prince Andrew" on it, and that's when I knew who he was.

Q. And did -- what did the puppet look like?

A. It looked like him. And she brought it down and presented it to him; and that was a great joke, because apparently it was a production from a show on BBC. And they decided to take a picture with it, in which Virginia and Andrew sat on a

couch. They put the puppet on Virginia's lap, and I sat on Andrew's lap, and they put the puppet's hand on Virginia's breast, and Andrew put his hand on my breast, and they took a photo.

Q. Do you remember who took the photo?

A. I don't recall.

Q. Did you ever see the photo after it was taken?

A. I did not.

Q. And Ms. Maxwell was present during the -- was Ms. Maxwell present during that?

A. Yes.

Q. What happened next?

A. The next thing I remember is just being shown to which room I was going to be staying in.

Q. When you exited the room that you were in where the picture was taken, do you recall who remained in that room?

A. I don't.

Q. Do you recall seeing Virginia exit that room?

A. I don't.

Q. During this trip to New York, did you have to perform any work when you were at the New York house?

always covered himself with a towel.

Q. I believe I asked this, but I just want to clarify to make sure that I did: Did Maxwell ever ask you to bring other girls over to -- for Jeffrey?

A. Yes.

Q. Yes?

A. Yes.

Q. And what did you -- did you do anything in response to that?

A. I did bring one girl named [redacted] -- no. [redacted] -- it was some girl named [redacted] that I had worked with at a restaurant. And I recall Ghislaine giving me money to bring her over; however, they never called her to come.

Q. And then I believe you mentioned that one of your physical fitness instructors, you brought a physical fitness instructor; was that correct?

A. Correct.

Q. And what did she do?

A. She gave him a -- like a training session, twice.

Q. Twice.

Did anything sexual in nature happen during the session?

A. At one point he lifted up her shirt and

exposed her bra, and she grabbed it and pulled it down.

Q. Anything else?

A. That was the conversation that he had told her that he had taken this girl's virginity, the girl by the pool.

Q. Okay. Did Maxwell ever say to you that it takes the pressure off of her to have other girls around?

A. She implied that, yes.

Q. In what way?

A. Sexually.

Q. And earlier Laura asked you, I believe, if Maxwell ever asked you to perform any sexual acts, and I believe your testimony was no, but then you also previously stated that during the camera incident that Maxwell had talked to you about not finishing the job.

Did you understand "not finishing the job" meaning bringing Jeffrey to orgasm?

MS. MENNINGER: Objection, leading, form.

BY MS. McCAWLEY:

Q. I'm sorry, Johanna, let me correct that question.

What did you understand Maxwell to mean

when she said you hadn't finished the job, with respect to the camera?

MS. MENNINGER: Objection, leading, form.

THE WITNESS: She implied that I had not brought him to orgasm.

BY MS. McCAWLEY:

Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey?

MS. MENNINGER: Objection, leading, form, foundation.

THE WITNESS: I can answer?

Yes, I took that conversation to mean that is what was expected of me.

BY MS. McCAWLEY:

Q. And then you mentioned, I believe, when you were testifying earlier that Jeffrey told you a story about sex on the plane. What was that about?

MS. MENNINGER: Objection, hearsay.

THE WITNESS: He told me one time Emmy was sleeping on the plane, and they were getting ready to land. And he went and woke her up, and she thought that meant he wanted a blow job, so she started to unzip his pants, and he said, No, no, no, you just have to be awake for

A. No.
Q. Was it in the context of anything?
A. About the camera that she had bought for me.
Q. What did she say in relationship to the camera that she bought for you and taking photographs of you?
A. Just that Jeffrey would like to have some photos of me, and she asked me to take photos of myself.
Q. What did you say?
A. I don't remember saying no, but I never ended up following through. I think I tried once.
Q. This was the pre-selfie era, correct?
A. Exactly.
Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you.
A. Okay.
Q. The first one was it would take pressure off of Maxwell to have more girls around?
A. Right.
Q. What exactly did Maxwell say to you that led you to believe that was her implication?
A. She said she doesn't have the time or

desire to please him as much as he needs, and that's why there were other girls around.
Q. And did she refer specifically to any other girls?
A. No.
Q. Did she talk about underaged girls?
A. No.
Q. Was she talking about massage therapists?
A. Not specifically.
Q. Okay. There were other girls in the house that were not massage therapists, correct?
A. Yes.
Q. [redacted] is another person that was around, correct?
A. Yes.
Q. There were other people he traveled with?
A. Uh-huh.
MS. McCAWLEY: Objection.
BY MS. MENNINGER:
Q. Correct?
A. Correct.
Q. Other girls?
A. Yes.
Q. Adults?
A. Yes.

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, the undersigned authority, certify that JOHANNA SJOBERG personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 18th day of May, 2016.

KELLI ANN WILLIS, RPR, CRR
Notary Public, State of Florida
My Commission No. FF911443
Expires: 2/16/21

\+ + + + + + + + + + + + + + + + + +

# United States District Court
# Southern District of New York

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________________/

## PLAINTIFF'S CORRECTED[1] REPLY IN SUPPORT OF MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT

Sigrid McCawley
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

[1] On June 13, 2016, Ms. Giuffre filed her Reply in Support of her Motion to Exceed the Presumptive Ten Deposition Limit (DE 203). This brief contained excerpt from Rinaldo Rizzo's "rough" deposition transcript, as the final transcript had not yet been completed by the stenographer. On June 14, 2016, the stenographer issued the "final" deposition transcript, and Ms. Giuffre hereby files the final transcript citations and excerpts to replace the "rough" transcript that accompanied her supporting Declaration (DE 204-2). There are no other changes to this document.

**TABLE OF CONTENTS**

Page

I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE. ........ 1

II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY. .................. 6

III. MS. GIUFFRE'S REQUEST IS TIMELY. ........................................................................ 9

# TABLE OF AUTHORITIES

Page

**Cases**

*Atkinson v. Goord*,
No. 01 CIV. 0761 LAKHBP, 2009 WL 890682 (S.D.N.Y. Apr. 2, 2009)................................3

*Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*,
No. 3:06-CV-232 (CFD), 2006 WL 1525970 (D. Conn. May 25, 2006) ..................................9

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997)..........................................................................................8

**Rules**

Fed. R. Evid. 404(b)..........................................................................................................7

Fed. R. Evid. 415(a) .........................................................................................................7

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this reply in support of her Motion to Exceed Presumptive Ten Deposition Limit. The motion should be granted because Ms. Giuffre has shown good cause for needing to exceed the ten deposition limit and in light of recent developments, Ms. Giuffre has streamlined her request, and now seeks only a total of three additional depositions. Notably, while Defendant contests Ms. Giuffre's motion, Defendant has herself unilaterally – **and without seeking any Court approval –** set ***twelve*** witnesses for deposition in this matter. In contrast to Defendant's unilateral action, Ms. Giuffre has properly sought this Court's permission. The Court should grant her motion and allow her to take the three additional depositions.

## I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE.

Defendant argues that the depositions Ms. Giuffre seeks to take are somehow "duplicative" of each other. Even a quick reading of the Defendant's pleading makes clear this is untrue. Defendant repeatedly gives her own narrow view of what existing witnesses have said. For example, Defendant argues that Ms. Sjoberg "did not corroborate that [Ms. Giuffre] is telling the truth." Defendant's Response at 5. Defendant's characterization is untrue.[2] But, as the mere

---

[2] Defendant wholly mischaracterized Ms. Sjoberg's testimony as involving "professional massages." Defendant's Resp. at 5. In fact, Ms. Sjoberg testified that, when she was a twenty-one-year-old college student, Defendant (not Jeffrey Epstein) recruited and hired her under the pretext of being a personal assistant to provide sexual massages. As one example of this testimony, Sjoberg testified that Defendant became angry with her for not "finishing your job" when Defendant was the one who ended up having to bring Epstein to orgasm when Ms. Sjoberg did not. *See* McCawley Dec at Exhibit 1, Sjoberg Dep. Tr. at 142:25-143:14(Q. What did you understand Maxwell to mean when you said that you hadn't finished the job, with respect to the camera? A. She implied that I had not brought him to orgasm. Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey? A. I can answer? Yes, I took that conversation to mean that it what was expected of me.) Ms. Sjoberg's testimony also shows that Defendant was a predator of young women and girls, and that her business was to provide girls for Jeffrey Epstein to have sex with. *Id*. at 141:3-5; 150:16-151:2 (Q. Did Maxwell ever ask you to bring other girls over to – for Jeffrey? A. Yes. Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you. A. Okay. Q. The

fact of this dispute confirms, this case is going to be hotly contested and the weight of the evidence on each side is going to be vitally important. The Court is well aware of many other civil cases where the parties have taken far more than ten depositions by mutual agreement. Defendant's refusal to agree to a few more depositions here is simply an effort to keep all the relevant facts from being developed.

Since Ms. Giuffre filed her initial motion seeking seven additional deposition, she has worked diligently to try to streamline the necessary depositions and has discovered new information concerning witnesses and their knowledge of the claims in this case. Accordingly, Ms. Giuffre currently brings before this Court a significantly shorter list[3] of witnesses she needs to depose to prove her claim, with some alterations. To be clear, Ms. Giuffre has narrowed her request and is now only seeking an additional three depositions from the Court as follows:

For descriptions concerning the depositions already taken (Defendant; Ms. Sjoberg; Mr. Alessi; Mr. Rodgers; and Mr. Rizzo), and those yet to be taken (Mr. Epstein; Mr. Gow; [redacted] Ms. Kellen; Ms. Marcinkova; Mr. Recarey; and Mr. Brunel), Ms. Giuffre references and incorporates her descriptions in the moving brief. The only remaining witness is William Jefferson Clinton. His deposition is necessary for the following reason:

---

first one was it would take pressure off of Maxwell to have more girls around? A. Right. Q. What exactly did Maxwell say to you that led you to believe that was her implication? A. She said she doesn't have the time or desire to please him as much as he needs, and that's why there were other girls around.).

That Ms. Sjoberg never saw Ms. Giuffre give a massage to Ms. Maxwell is immaterial. Ms. Sjoberg was with Defendant and Epstein when Ms. Giuffre was a minor child, and corroborates Ms. Giuffre's accounts concerning her being trafficked to Prince Andrew. *Id*. at 21-22. Ms. Giuffre refers the Court to Ms. Sjoberg's deposition testimony in its entirety (DE 173-5). It is depositions like this - verifying Ms. Giuffre's account of being recruited by Defendant for sex with Epstein – that Defendant is trying avoid. However, multiple other witnesses have testimony that supports Ms. Giuffre's claims, in different and various ways, and Ms. Giuffre needs that testimony to prove her defamation claim against Defendant.

[3] Ms. Giuffre is no longer seeking the deposition testimony of Emmy Taylor, [redacted] Jo Jo Fontanella, [redacted]

- In a 2011 interview, Ms. Giuffre mentioned former President Bill Clinton's close personal relationship with Defendant and Jeffrey Epstein. While Ms. Giuffre made no allegations of illegal actions by Bill Clinton, Ms. Maxwell in her deposition raised Ms. Giuffre's comments about President Clinton as one of the "obvious lies" to which she was referring in her public statement that formed the basis of this suit. Apart from the Defendant and Mr. Epstein, former President Clinton is a key person who can provide information about his close relationship with Defendant and Mr. Epstein and disapprove Ms. Maxwell's claims.

Ms. Giuffre is still working diligently with opposing counsel, these witnesses, and their attorneys on scheduling, as well as identifying other witnesses who may have factual information about the case. But, at this time, she seeks this Court's approval for an additional three depositions – depositions that will not consume the full seven hours presumptively allotted.

All three prongs of the three-factor test to evaluate a motion for additional depositions strongly support granting the motion. *Atkinson v. Goord*, No. 01 CIV. 0761 LAKHBP, 2009 WL 890682, at *1 (S.D.N.Y. Apr. 2, 2009). First, as reviewed in detail on a witness-by-witness basis above, the discovery sought is not duplicative. The proposed deponents include the individual who assisted in making the defamatory statement, women Defendant Maxwell hired to recruit girls for Jeffrey Epstein, an individual with intimate knowledge of Defendant and Epstein's sexual trafficking ring, other victims of Jeffrey Epstein (including a then underage victim), Mr. Epstein himself, and other witnesses who can corroborate important pieces of Ms. Giuffre's statements or refute Ms. Maxwell's statements and positions. These witnesses' testimony will corroborate Ms. Giuffre's account of Defendant being a recruiter of females for Epstein and corroborate the type of abuse she and others suffered. Sadly, Ms. Giuffre is far from the only one of Defendant's victims, and there are other witnesses whose testimony is necessary in order to demonstrate the truth of Ms. Giuffre's claims and the falsity of the statements made by Defendant.

Second, if Ms. Giuffre is denied these depositions, she will not have had the opportunity to obtain the information by other discovery in this case. The Court will recall from Ms. Giuffre's opening motion that Defendant's surprising lack of memory has, in no small part, caused the need for additional depositions. *See* Motion at 5-8 (listing 59 examples of memory lapses during Ms. Maxwell deposition, including inability to remember events recorded on aircraft flight logs or a photograph). Defendant offers no explanation for her convenient forgetfulness. Moreover, evidence of being recruited by Defendant and being sexually assaulted is not something Ms. Giuffre can obtain through requests for production or through interrogatories. The only way of obtaining such evidence is from witness testimony by those who were victimized, those who assisted Defendant in recruiting and abuse, and those who observed the recruiting or the abuse. For example, Rinaldo Rizzo, an estate manager for a friend of Defendant and Epstein's, testified about an episode where Defendant had threatened a terrified 15 year old girl and confiscated her passport to try to make her have sex with Epstein on his private island: *See* McCawley Decl. at Exhibit 2, Rizzo Deposition [4] Mr. Rizzo testified about another episode where Defendant gave instructions to, and presided over, a group of eleven girls

---

[4] *See* McCawley Decl. at Exhibit 2, Rizzo *Final Dep. Tr. *52:6-7; *55:23-57:23. "Q. How old was this girl? A. 15 years old." "What did she say? A. She proceeds to tell my wife and I that, and this is not – this is blurting out, not a conversation like I'm having a casual conversation, that quickly I was on an island, I was on the island and there was Ghislaine, there was Sarah, she said they asked me for sex, I said no. . . . And she says no, and she says Ghislaine took my passport. And I said what, and she says Sarah took her passport and phone and gave it to Ghislaine Maxwell, and at that point she said that she was threatened. And I said threatened? She says yes, I was threatened by Ghislaine not to discuss this. . . And she said that before she got there, she was threatened again by Jeffrey and Ghislaine not to talk about what I had mentioned earlier, about – again, the word she used was sex. Q. And during this time that you're saying she is rambling, is her demeanor continues to be what you described it? A. Yes. Q. Was she in fear? A. Yes".

as young as 14 years old playing a "kissing game" with and for Jeffrey Epstein.[5] Finally, the Defendant appears to be concealing critical evidence of the sexual abuse that other witnesses have testified she possesses. For example, Mr. Alessi testified that Defendant kept a large book of naked photos that she took of young girls. Yet Defendant has failed to produce a single photo in this case. *See* McCawley Decl. at Exhibit 3, Alessi Deposition at 36-41. Document discovery and interrogatories are not helpful in obtaining this type of evidence: depositions are needed.

Third, the burden and expense of this proposed discovery is limited to three additional depositions. Defendant in this case is a multi-millionaire with able counsel. Three depositions will not cause her undue burden, expense, or inconvenience. These depositions are important to resolving issues in this case. Given that very few witnesses reside within 100 miles of the courthouse and therefore cannot be compelled to trial, this request for only three additional depositions is a reasonable request.

While Defendant opposes Ms. Giuffre's request for Court approval of more than ten depositions, she has unilaterally noticed more than ten depositions without bothering to seek approval. As of the date of this filing, Defendant's counsel has issued ***twelve*** subpoenas for

[5] *See* McCawley Decl. at Exhibit 2, Rizzo *Final Dep. Tr. "Q. So in the house, tell me if I am wrong, you have Jeffrey Epstein, Ghislaine Maxwell and approximately 11 girls? A. Yes, somewhere between 11 and 12. Q. Can you describe the 11 to 12 girls to your memory? A. In my recollection, various of ages. They could have been from as young as 14, 15 to 18 maybe, 19 . . . very girlish." *32:8-24; "Q. Once inside the house, what happens next? A. I showed Ghislaine and Jeffrey into the living room, and Ghislaine was the one that instructed the girls, pointing that they needed to come to the living room." *34:5-10. "Q. What happens next? A. . . . it was getting very perogative [sic], nothing I would want my children to see. The girls were grinding on each other, lifting up their tops, it was very inappropriate." *37:11-38:6. "Q. What did you see next? A.. . . From what I knew, Jeffrey was with Ghislaine and now I have all these girls acting very inappropriate …." *38:22-39:7. "Q. When the girls are kissing either Jeff or other girls where was Ghislaine Maxwell? A. Sitting right next to Jeffrey." *40:24-41:3. "Q. Is there something you remember vividly? A. . . . I did pull the nanny aside and I was really, my wife and I were dumbfounded, profound of the situation, and she mentioned this was an occurrence that had happened before, and they called it the kissing game." *41:8-17."

deposition testimony – the almost the exact same number Ms. Giuffre is seeking.[6] Defendant cannot credibly oppose Ms. Giuffre's additional depositions while she, herself, is trying to take more than ten without leave of court.[7]

It is plain why Defendant does not want these depositions to go forward. Ms. Sjoberg, Mr. Alessi, and Mr. Rizzo's testimony was harmful to Defendant's case, and the additional depositions will provide further evidence that Defendant acted as Jeffrey Epstein's madam, proving the truth of Ms. Giuffre's statements that Defendant proclaimed publically as "obvious lies."

## II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY.

All of the people Ms. Giuffre seeks to depose have discoverable and important information regarding the elements of Ms. Giuffre's claims. Ms. Giuffre stated that Defendant recruited her and other young females for sex with Jeffrey Epstein. The people she now seeks to depose are all witnesses who can testify to Defendant working essentially as a madam for Jeffrey Epstein, recruiting young females for Epstein, or corroborate other important aspects of her statements. The fact that Defendant recruited girls, some of which were underage, for Epstein makes Ms. Giuffre's claim that she was also recruited by Defendant to ultimately have sex with Epstein and others more credible – and that Defendant's denials of any involvement in such recruiting is a bald-faced lie. Witnesses will testify that Defendant's recruitment and management of the girls for Jeffrey Epstein was a major aspect of Defendant's job, and that Ms.

---

[6] Defendant's counsel has taken the deposition testimony of (1) Ms. Giuffre; (2) Ms. Giuffre's mother (Lynn Miller); (3) Ms. Giuffre's father (Sky Roberts); and (4) Ms. Giuffre's physician (Dr. Olson). Defendant's counsel has noticed the following witnesses for deposition: (5) Mr. Austrich; (6) Mr. Figueroa; (7) Ms. Degorgieou; (8) a known victim of Jeffrey Epstein; (9) Mr. Weisfield; (10) Ms. Churcher; (11) Ms. Boylan; and (12) the 30(b)(6) witness for Victims Refuse Silence.

[7] Defendant has unilaterally scheduled - without consulting counsel for Ms. Giuffre - at least two of these depositions for days when depositions of Ms. Giuffre's witnesses have been set.

Giuffre's account of her sexual abuse and Defendant's involvement accords perfectly with other witnesses' accounts of what Defendant's job was for Epstein.[8]

That other young females were similarly recruited by the Defendant is evidence that Ms. Giuffre is telling the truth about her experiences – and thus direct evidence that Defendant defamed her when calling her a liar. Clearly, if Ms. Giuffre can establish that Defendant's modus operandi was to recruit young females for Epstein, that helps corroborate Ms. Giuffre's own testimony that Defendant recruited her for the same purposes and in the same manner. Although the Court need not make a final ruling on this evidentiary issue now, Rule 404(b) itself makes such testimony admissible. *See* Fed. R. Evid. 404(b) (other act "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). Indeed, even more specifically than the general provisions of Rule 404(b), Rule 415 makes these other acts admissible, due to the fact that those involved in sexual abuse of minors have a strong propensity for repeating those crimes. *See* Fed. R. Evid. 415(a)( ("In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation.").

Entirely apart from corroborating Ms. Giuffre's own individual abuse, however, Defendant fails to recognize that in calling Ms. Giuffre a "liar", she was attacking all aspects of Ms. Giuffre's account – including Ms. Giuffre's statements that Defendant served generally as a recruiter of girls for Epstein and that Epstein sexually abused the underage girls that were

[8] Defendant's specious suggestion that Ms. Giuffre heard about the other girls whom she recruited for sexual purposes and then decided to "hop on the band wagon" (Defendant's Resp. at 8 n.7) tacitly admits that Defendant procured a "band wagon" of girls for Jeffrey Epstein to abuse. Moreover, Defendant cannot refute the documentary evidence that she was on Epstein private jet with Ms. Giuffre over 20 times while Ms. Giuffre was a minor – flights that Defendant is, quite conveniently, now unable to recall. Motion at 5-8.

brought to him. Thus, in this defamation case, the testimony of these witnesses are admissible not only to bolster Ms. Giuffre's testimony about her individual abuse, but because they are simply part of the body of statements whose truth or falsity is at issue in this case.

In addition, one of the witnesses that Ms. Giuffre seeks to depose is registered sex offender Jeffrey Epstein, who stands at the center of the case. Indeed, some of the most critical events took place in the presence of just three people: Ms. Giuffre, defendant Maxwell, and Epstein. If Epstein were to tell the truth, his testimony would fully confirm Ms. Giuffre's account of her sexual abuse. Epstein, however, may well attempt to support Defendant by invoking the Fifth Amendment to avoid answering questions about his sexual abuse of Ms. Giuffre. Apparently privy to her former boyfriend Epstein's anticipated plans in this regard,[9] Defendant makes the claim that it would be a "convoluted argument" to allow Ms. Giuffre to use those invocations against her. Defendant's Resp. at 3. Tellingly, Defendant's response brief cites no authority to refute that proposition that adverse inference can be drawn against co-conspirators. Presumably this is because, as recounted in Ms. Giuffre's opening brief (at pp. 20-22), the Second Circuit's seminal decision of *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997), squarely upheld the drawing of adverse inferences based on a non-party's invocation of a Fifth Amendment right to remain silent. The Second Circuit instructed that, the circumstances of given case, rather than status of particular nonparty witness, determines whether nonparty witness' invocation of privilege against self-incrimination is admissible in course of civil litigation. *Id*. at122-23. The Second Circuit also held that, in determining whether nonparty witness' invocation of privilege against self-incrimination in course of civil litigation and

[9] In discovery, Defendant Maxwell has produced several emails between Epstein and herself discussing Ms. Giuffre.

drawing of adverse inferences is admissible, court may consider the following nonexclusive factors:

> (1) nature of witness' relationship with and loyalty to party;
> (2) degree of control which party has vested in witness in regard to key facts and subject matter of litigation;
> (3) whether witness is pragmatically noncaptioned party in interest and whether assertion of privilege advances interests of witness and party in outcome of litigation; and
> (4) whether witness was key figure in litigation and played controlling role in respect to its underlying aspects.

*Id*. at 124-25. Ms. Giuffre will be able to establish that all these factors tip decisively in favor of allowing an adverse inference. Accordingly, her efforts to depose Epstein, Marcinkova, and Kellen seek important information that will be admissible at trial.

## III. MS. GIUFFRE'S REQUEST IS TIMELY.

Defendant also argues that this motion is somehow "premature." Defendant's Resp. at 2-3. Clearly, if Ms. Giuffre had waited to file her motion until later, Defendant would have argued until the matter came too late. The motion is proper at this time because, as of the date of this filing, fact discovery closes in 17 days (although Ms. Giuffre has recently filed a motion for a 30-day extension of the deadline). In order to give the Court the opportunity to rule as far in advance as possible – thereby permitting counsel for both side to schedule the remaining depositions – Ms. Giuffre brings the motion now. She also requires a ruling in advance so that she can make final plans about how many depositions she has available and thus which depositions she should prioritize. [10]

---

[10] Defendant tries to find support for her prematurity argument in *Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*, No. 3:06-CV-232 (CFD), 2006 WL 1525970, at *2 (D. Conn. May 25, 2006). However, in that case, the Court found a motion for additional depositions to be premature, in part, because "[d]iscovery has not even commenced" . . . and the moving party "ha[d] not listed with specificity those individuals it wishes to depose." Of course, neither of these points applies in this case at hand: the parties are approaching the close of fact discovery, and Ms. Giuffre has provided detailed information about each individual she has deposed already and still seeks to depose.

An additional reason this motion is appropriate now is that, despite Ms. Giuffre's diligent pursuit of depositions, many witnesses have cancelled their dates, failed to appear, or wrongfully evaded service. These maneuvers have frustrated Ms. Giuffre's ability to take their depositions in a logical and sequential fashion, complicating the planning of a deposition schedule. For example, on April 11, 2016, Ms. Giuffre served notice on Defendant's counsel for the deposition of Rinaldo Rizzo, setting it for May 13, 2016. Nearly a month later, just a few days before that properly noticed deposition, Defendant's counsel requested that it be rescheduled, and, therefore, that deposition did not take place until June 10, 2016. Additionally, three other important witnesses evaded Ms. Giuffre's repeated efforts to serve them. It took Ms. Giuffre's motion for alternative service (DE 160) to convince Jeffrey Epstein to allow his attorney to accept service of process. The Court also has before it Ms. Giuffre's motion to serve Sarah Kellen and Nadia Marcinkova by alternative service. These witnesses' evasion of service delayed the taking of their depositions, and, as of the date of this filing, none have been deposed yet.

## CONCLUSION

For all these reasons, Ms. Giuffre should be allowed to take three more depositions than the presumptive ten deposition limit – a total of thirteen depositions.

Dated: June 14, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
Sigrid McCawley (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP

333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[11]

[11] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 14th day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.

______________________________/

**CORRECTED[1] DECLARATION OF SIGRID S. McCAWLEY IN SUPPORT OF PLAINTIFF'S REPLY TO MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT**

I, Sigrid S. McCawley, declare that the below is true and correct to the best of my knowledge as follows:

1. I am a partner with the law firm of Boies, Schiller & Flexner LLP and duly licensed to practice in Florida and before this Court pursuant to this Court's September 29, 2015 Order granting my Application to Appear Pro Hac Vice.

2. I respectfully submit this Declaration in Support of Plaintiff's Reply to Motion to Exceed Presumptive Ten Deposition Limit.

3. Attached hereto as Exhibit 1 is a true and correct copy of Johanna Sjoberg's Deposition Transcript excerpts dated May 18, 2016.

4. Attached hereto as Exhibit 2 is a true and correct copy of Rinaldo Rizzo's **Final** Deposition Transcript excerpts dated June 10, 2016.

---

[1] On June 13, 2016, Ms. Giuffre filed her Reply in Support of her Motion to Exceed the Presumptive Ten Deposition Limit (DE 203). This brief contained excerpts from Rinaldo Rizzo's "rough" deposition transcript, as the final transcript had not yet been completed by the stenographer. On June 14, 2016, the stenographer issued the "final" deposition transcript, and Ms. Giuffre hereby files the final transcript citations and excerpts to replace the "rough" transcript that accompanied her supporting Declaration (DE 204-2). There are no other changes to this document.

5. Attached hereto as Exhibit 3 is a true and correct copy of Juan Alessi's Deposition Transcript excerpts dated June 1, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Sigrid S. McCawley
Sigrid S. McCawley, Esq.

Dated: June 14, 2016.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[2]

[2] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 14th day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

# EXHIBIT 1

(Filed Under Seal)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 15-CV-07433-RWS

-------------------------------------------x

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

-------------------------------------------x

May 18, 2016
9:04 a.m.

C O N F I D E N T I A L

Deposition of JOHANNA SJOBERG, pursuant to notice, taken by Plaintiff, at the offices of Boies Schiller & Flexner, 401 Las Olas Boulevard, Fort Lauderdale, Florida, before Kelli Ann Willis, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public within and for the State of Florida.

Jeffrey's home when you arrived?

A. Yes. When I first walked in the door, it was just myself, and Ghislaine headed for the staircase and said -- told me to come up to the living room.

Q. And what happened at that point, when you came up to the living room?

A. I came up and saw Virginia, Jeffrey, Prince Andrew, Ghislaine in the room.

Q. And did you meet Prince Andrew at that time?

A. Yes.

Q. And what happened next?

A. At one point, Ghislaine told me to come upstairs, and we went into a closet and pulled out the puppet, the caricature of Prince Andrew, and brought it down. And there was a little tag on the puppet that said "Prince Andrew" on it, and that's when I knew who he was.

Q. And did -- what did the puppet look like?

A. It looked like him. And she brought it down and presented it to him; and that was a great joke, because apparently it was a production from a show on BBC. And they decided to take a picture with it, in which Virginia and Andrew sat on a

couch. They put the puppet on Virginia's lap, and I sat on Andrew's lap, and they put the puppet's hand on Virginia's breast, and Andrew put his hand on my breast, and they took a photo.

Q. Do you remember who took the photo?

A. I don't recall.

Q. Did you ever see the photo after it was taken?

A. I did not.

Q. And Ms. Maxwell was present during the -- was Ms. Maxwell present during that?

A. Yes.

Q. What happened next?

A. The next thing I remember is just being shown to which room I was going to be staying in.

Q. When you exited the room that you were in where the picture was taken, do you recall who remained in that room?

A. I don't.

Q. Do you recall seeing Virginia exit that room?

A. I don't.

Q. During this trip to New York, did you have to perform any work when you were at the New York house?

always covered himself with a towel.

Q. I believe I asked this, but I just want to clarify to make sure that I did: Did Maxwell ever ask you to bring other girls over to -- for Jeffrey?

A. Yes.

Q. Yes?

A. Yes.

Q. And what did you -- did you do anything in response to that?

A. I did bring one girl named Francesca -- no. Florence -- it was some girl named Florencia that I had worked with at a restaurant. And I recall Ghislaine giving me money to bring her over; however, they never called her to come.

Q. And then I believe you mentioned that one of your physical fitness instructors, you brought a physical fitness instructor; was that correct?

A. Correct.

Q. And what did she do?

A. She gave him a -- like a training session, twice.

Q. Twice.

Did anything sexual in nature happen during the session?

A. At one point he lifted up her shirt and

exposed her bra, and she grabbed it and pulled it down.

Q. Anything else?

A. That was the conversation that he had told her that he had taken this girl's virginity, the girl by the pool.

Q. Okay. Did Maxwell ever say to you that it takes the pressure off of her to have other girls around?

A. She implied that, yes.

Q. In what way?

A. Sexually.

Q. And earlier Laura asked you, I believe, if Maxwell ever asked you to perform any sexual acts, and I believe your testimony was no, but then you also previously stated that during the camera incident that Maxwell had talked to you about not finishing the job.

Did you understand "not finishing the job" meaning bringing Jeffrey to orgasm?

MS. MENNINGER: Objection, leading, form.

BY MS. McCAWLEY:

Q. I'm sorry, Johanna, let me correct that question.

What did you understand Maxwell to mean

when she said you hadn't finished the job, with respect to the camera?

MS. MENNINGER: Objection, leading, form.

THE WITNESS: She implied that I had not brought him to orgasm.

BY MS. McCAWLEY:

Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey?

MS. MENNINGER: Objection, leading, form, foundation.

THE WITNESS: I can answer?

Yes, I took that conversation to mean that is what was expected of me.

BY MS. McCAWLEY:

Q. And then you mentioned, I believe, when you were testifying earlier that Jeffrey told you a story about sex on the plane. What was that about?

MS. MENNINGER: Objection, hearsay.

THE WITNESS: He told me one time Emmy was sleeping on the plane, and they were getting ready to land. And he went and woke her up, and she thought that meant he wanted a blow job, so she started to unzip his pants, and he said, No, no, no, you just have to be awake for

A. No.
Q. Was it in the context of anything?
A. About the camera that she had bought for me.
Q. What did she say in relationship to the camera that she bought for you and taking photographs of you?
A. Just that Jeffrey would like to have some photos of me, and she asked me to take photos of myself.
Q. What did you say?
A. I don't remember saying no, but I never ended up following through. I think I tried once.
Q. This was the pre-selfie era, correct?
A. Exactly.
Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you.
A. Okay.
Q. The first one was it would take pressure off of Maxwell to have more girls around?
A. Right.
Q. What exactly did Maxwell say to you that led you to believe that was her implication?
A. She said she doesn't have the time or

desire to please him as much as he needs, and that's why there were other girls around.

Q. And did she refer specifically to any other girls?

A. No.

Q. Did she talk about underaged girls?

A. No.

Q. Was she talking about massage therapists?

A. Not specifically.

Q. Okay. There were other girls in the house that were not massage therapists, correct?

A. Yes.

Q. Nadia is another person that was around, correct?

A. Yes.

Q. There were other people he traveled with?

A. Uh-huh.

MS. McCAWLEY: Objection.

BY MS. MENNINGER:

Q. Correct?

A. Correct.

Q. Other girls?

A. Yes.

Q. Adults?

A. Yes.

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MIAMI-DADE )

I, the undersigned authority, certify that JOHANNA SJOBERG personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 18th day of May, 2016.

KELLI ANN WILLIS, RPR, CRR
Notary Public, State of Florida
My Commission No. FF911443
Expires: 2/16/21

\+ + + + + + + + + + + + + + + + + +

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________________/

**PLAINTIFF'S AMENDED[1] CORRECTED[2] REPLY IN SUPPORT OF MOTION TO EXCEED PRESUMPTIVE TEN DEPOSITION LIMIT**

Sigrid McCawley
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200

[1] Pursuant to conferral with opposing counsel, Plaintiff has revised the first paragraph of this brief, as well as the second-to-last paragraph of Section I of this brief out of a concern Defendant raised with the use of the term "set" when referring to depositions. In an abundance of caution, to avoid unnecessary disputes and waste of this Court's time, the undersigned agreed to revise the brief to remove the language in question. The remainder of this brief is unchanged.

[2] On June 13, 2016, Ms. Giuffre filed her Reply in Support of her Motion to Exceed the Presumptive Ten Deposition Limit (DE 203). This brief contained excerpt from Rinaldo Rizzo's "rough" deposition transcript, as the final transcript had not yet been completed by the stenographer. On June 14, 2016, the stenographer issued the "final" deposition transcript, and Ms. Giuffre hereby files the final transcript citations and excerpts to replace the "rough" transcript that accompanied her supporting Declaration (DE 204-2). There are no other changes to this document.

Ft. Lauderdale, FL 33301
(954) 356-0011

# TABLE OF CONTENTS

Page

I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE. ........ 1

II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY. .................. 6

III. MS. GIUFFRE'S REQUEST IS TIMELY. ........................................................................ 9

# TABLE OF AUTHORITIES

Page

**Cases**

*Atkinson v. Goord*,
No. 01 CIV. 0761 LAKHBP, 2009 WL 890682 (S.D.N.Y. Apr. 2, 2009)....3

*Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*,
No. 3:06-CV-232 (CFD), 2006 WL 1525970 (D. Conn. May 25, 2006)....9

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997)....8

**Rules**

Fed. R. Evid. 404(b)....7

Fed. R. Evid. 415(a)....7

Plaintiff Virginia Giuffre, by and through her undersigned counsel, hereby files this reply in support of her Motion to Exceed Presumptive Ten Deposition Limit. The motion should be granted because Ms. Giuffre has shown good cause for needing to exceed the ten deposition limit and in light of recent developments, Ms. Giuffre has streamlined her request, and now seeks only a total of three additional depositions. The Court should grant her motion and allow her to take the three additional depositions.

## I. THE PROPOSED DEPOSITIONS ARE IMPORTANT TO THE FUNDAMENTAL CLAIMS AND DEFENSES IN THIS CASE, AND NONE ARE DUPLICATIVE.

Defendant argues that the depositions Ms. Giuffre seeks to take are somehow "duplicative" of each other. Even a quick reading of the Defendant's pleading makes clear this is untrue. Defendant repeatedly gives her own narrow view of what existing witnesses have said. For example, Defendant argues that Ms. Sjoberg "did not corroborate that [Ms. Giuffre] is telling the truth." Defendant's Response at 5. Defendant's characterization is untrue.[3] But, as the mere

---

[3] Defendant wholly mischaracterized Ms. Sjoberg's testimony as involving "professional massages." Defendant's Resp. at 5. In fact, Ms. Sjoberg testified that, when she was a twenty-one-year-old college student, Defendant (not Jeffrey Epstein) recruited and hired her under the pretext of being a personal assistant to provide sexual massages. As one example of this testimony, Sjoberg testified that Defendant became angry with her for not "finishing your job" when Defendant was the one who ended up having to bring Epstein to orgasm when Ms. Sjoberg did not. *See* McCawley Dec at Exhibit 1, Sjoberg Dep. Tr. at 142:25-143:14(Q. What did you understand Maxwell to mean when you said that you hadn't finished the job, with respect to the camera? A. She implied that I had not brought him to orgasm. Q. So is it fair to say that Maxwell expected you to perform sexual acts when you were massaging Jeffrey? A. I can answer? Yes, I took that conversation to mean that it what was expected of me.) Ms. Sjoberg's testimony also shows that Defendant was a predator of young women and girls, and that her business was to provide girls for Jeffrey Epstein to have sex with. *Id*. at 141:3-5; 150:16-151:2 (Q. Did Maxwell ever ask you to bring other girls over to – for Jeffrey? A. Yes. Q. I want to go back to this: You testified to two things just now with Sigrid that you said were implied to you. A. Okay. Q. The first one was it would take pressure off of Maxwell to have more girls around? A. Right. Q. What exactly did Maxwell say to you that led you to believe that was her implication? A. She said she doesn't have the time or desire to please him as much as he needs, and that's why there were other girls around.).

That Ms. Sjoberg never saw Ms. Giuffre give a massage to Ms. Maxwell is immaterial. Ms. Sjoberg was with Defendant and Epstein when Ms. Giuffre was a minor child, and corroborates

fact of this dispute confirms, this case is going to be hotly contested and the weight of the evidence on each side is going to be vitally important. The Court is well aware of many other civil cases where the parties have taken far more than ten depositions by mutual agreement. Defendant's refusal to agree to a few more depositions here is simply an effort to keep all the relevant facts from being developed.

Since Ms. Giuffre filed her initial motion seeking seven additional deposition, she has worked diligently to try to streamline the necessary depositions and has discovered new information concerning witnesses and their knowledge of the claims in this case. Accordingly, Ms. Giuffre currently brings before this Court a significantly shorter list[4] of witnesses she needs to depose to prove her claim, with some alterations. To be clear, Ms. Giuffre has narrowed her request and is now only seeking an additional three depositions from the Court as follows:

For descriptions concerning the depositions already taken (Defendant; Ms. Sjoberg; Mr. Alessi; Mr. Rodgers; and Mr. Rizzo), and those yet to be taken (Mr. Epstein; Mr. Gow; [redacted] Ms. Kellen; Ms. Marcinkova; Mr. Recarey; and Mr. Brunel), Ms. Giuffre references and incorporates her descriptions in the moving brief. The only remaining witness is William Jefferson Clinton. His deposition is necessary for the following reason:

- In a 2011 interview, Ms. Giuffre mentioned former President Bill Clinton's close personal relationship with Defendant and Jeffrey Epstein. While Ms. Giuffre made no allegations of illegal actions by Bill Clinton, Ms. Maxwell in her deposition raised Ms. Giuffre's comments about President Clinton as one of the "obvious lies" to which she was referring in her public statement that formed the basis of this suit. Apart from the

---

Ms. Giuffre's accounts concerning her being trafficked to Prince Andrew. *Id*. at 21-22. Ms. Giuffre refers the Court to Ms. Sjoberg's deposition testimony in its entirety (DE 173-5). It is depositions like this - verifying Ms. Giuffre's account of being recruited by Defendant for sex with Epstein – that Defendant is trying avoid. However, multiple other witnesses have testimony that supports Ms. Giuffre's claims, in different and various ways, and Ms. Giuffre needs that testimony to prove her defamation claim against Defendant.

[4] Ms. Giuffre is no longer seeking the deposition testimony of Emmy Taylor, [redacted] Jo Jo Fontanella, and Michael Reiter.

> Defendant and Mr. Epstein, former President Clinton is a key person who can provide information about his close relationship with Defendant and Mr. Epstein and disapprove Ms. Maxwell's claims.

Ms. Giuffre is still working diligently with opposing counsel, these witnesses, and their attorneys on scheduling, as well as identifying other witnesses who may have factual information about the case. But, at this time, she seeks this Court's approval for an additional three depositions – depositions that will not consume the full seven hours presumptively allotted.

All three prongs of the three-factor test to evaluate a motion for additional depositions strongly support granting the motion. *Atkinson v. Goord*, No. 01 CIV. 0761 LAKHBP, 2009 WL 890682, at *1 (S.D.N.Y. Apr. 2, 2009). First, as reviewed in detail on a witness-by-witness basis above, the discovery sought is not duplicative. The proposed deponents include the individual who assisted in making the defamatory statement, women Defendant Maxwell hired to recruit girls for Jeffrey Epstein, an individual with intimate knowledge of Defendant and Epstein's sexual trafficking ring, other victims of Jeffrey Epstein (including a then underage victim), Mr. Epstein himself, and other witnesses who can corroborate important pieces of Ms. Giuffre's statements or refute Ms. Maxwell's statements and positions. These witnesses' testimony will corroborate Ms. Giuffre's account of Defendant being a recruiter of females for Epstein and corroborate the type of abuse she and others suffered. Sadly, Ms. Giuffre is far from the only one of Defendant's victims, and there are other witnesses whose testimony is necessary in order to demonstrate the truth of Ms. Giuffre's claims and the falsity of the statements made by Defendant.

Second, if Ms. Giuffre is denied these depositions, she will not have had the opportunity to obtain the information by other discovery in this case. The Court will recall from Ms. Giuffre's opening motion that Defendant's surprising lack of memory has, in no small part,

caused the need for additional depositions. *See* Motion at 5-8 (listing 59 examples of memory lapses during Ms. Maxwell deposition, including inability to remember events recorded on aircraft flight logs or a photograph). Defendant offers no explanation for her convenient forgetfulness. Moreover, evidence of being recruited by Defendant and being sexually assaulted is not something Ms. Giuffre can obtain through requests for production or through interrogatories. The only way of obtaining such evidence is from witness testimony by those who were victimized, those who assisted Defendant in recruiting and abuse, and those who observed the recruiting or the abuse. For example, Rinaldo Rizzo, an estate manager for a friend of Defendant and Epstein's, testified about an episode where Defendant had threatened a terrified 15 year old girl and confiscated her passport to try to make her have sex with Epstein on his private island: *See* McCawley Decl. at Exhibit 2, Rizzo Deposition [5] Mr. Rizzo testified about another episode where Defendant gave instructions to, and presided over, a group of eleven girls as young as 14 years old playing a "kissing game" with and for Jeffrey Epstein.[6] Finally, the

---

[5] *See* McCawley Decl. at Exhibit 2, Rizzo *Final Dep. Tr. *52:6-7; *55:23-57:23. "Q. How old was this girl? A. 15 years old." "What did she say? A. She proceeds to tell my wife and I that, and this is not – this is blurting out, not a conversation like I'm having a casual conversation, that quickly I was on an island, I was on the island and there was Ghislaine, there was Sarah, she said they asked me for sex, I said no. . . . And she says no, and she says Ghislaine took my passport. And I said what, and she says Sarah took her passport and phone and gave it to Ghislaine Maxwell, and at that point she said that she was threatened. And I said threatened? She says yes, I was threatened by Ghislaine not to discuss this. . . And she said that before she got there, she was threatened again by Jeffrey and Ghislaine not to talk about what I had mentioned earlier, about – again, the word she used was sex. Q. And during this time that you're saying she is rambling, is her demeanor continues to be what you described it? A. Yes. Q. Was she in fear? A. Yes".

[6] *See* McCawley Decl. at Exhibit 2, Rizzo *Final Dep. Tr. "Q. So in the house, tell me if I am wrong, you have Jeffrey Epstein, Ghislaine Maxwell and approximately 11 girls? A. Yes, somewhere between 11 and 12. Q. Can you describe the 11 to 12 girls to your memory? A. In my recollection, various of ages. They could have been from as young as 14, 15 to 18 maybe, 19 . . . very girlish." *32:8-24; "Q. Once inside the house, what happens next? A. I showed Ghislaine and Jeffrey into the living room, and Ghislaine was the one that instructed the girls, pointing that they needed to come to the living room." *34:5-10. "Q. What happens next? A. . . . it was getting

Defendant appears to be concealing critical evidence of the sexual abuse that other witnesses have testified she possesses. [redacted] Yet Defendant has failed to produce a single photo in this case. *See* McCawley Decl. at Exhibit 3, Alessi Deposition at 36-41. Document discovery and interrogatories are not helpful in obtaining this type of evidence: depositions are needed.

Third, the burden and expense of this proposed discovery is limited to three additional depositions. Defendant in this case is a multi-millionaire with able counsel. Three depositions will not cause her undue burden, expense, or inconvenience. These depositions are important to resolving issues in this case. Given that very few witnesses reside within 100 miles of the courthouse and therefore cannot be compelled to trial, this request for only three additional depositions is a reasonable request.

It is plain why Defendant does not want these depositions to go forward. Ms. Sjoberg, Mr. Alessi, and Mr. Rizzo's testimony was harmful to Defendant's case, and the additional depositions will provide further evidence that Defendant acted as Jeffrey Epstein's madam, proving the truth of Ms. Giuffre's statements that Defendant proclaimed publically as "obvious lies."

## II. MS. GIUFFRE IS SEEKING HIGHLY RELEVANT TRIAL TESTIMONY.

All of the people Ms. Giuffre seeks to depose have discoverable and important information regarding the elements of Ms. Giuffre's claims. Ms. Giuffre stated that Defendant

---

very perogative [sic], nothing I would want my children to see. The girls were grinding on each other, lifting up their tops, it was very inappropriate." *37:11-38:6. "Q. What did you see next? A.. . . From what I knew, Jeffrey was with Ghislaine and now I have all these girls acting very inappropriate …." *38:22-39:7. "Q. When the girls are kissing either Jeff or other girls where was Ghislaine Maxwell? A. Sitting right next to Jeffrey." *40:24-41:3. "Q. Is there something you remember vividly? A. . . . I did pull the nanny aside and I was really, my wife and I were dumbfounded, profound of the situation, and she mentioned this was an occurrence that had happened before, and they called it the kissing game." *41:8-17."

recruited her and other young females for sex with Jeffrey Epstein. The people she now seeks to depose are all witnesses who can testify to Defendant working essentially as a madam for Jeffrey Epstein, recruiting young females for Epstein, or corroborate other important aspects of her statements. The fact that Defendant recruited girls, some of which were underage, for Epstein makes Ms. Giuffre's claim that she was also recruited by Defendant to ultimately have sex with Epstein and others more credible – and that Defendant's denials of any involvement in such recruiting is a bald-faced lie. Witnesses will testify that Defendant's recruitment and management of the girls for Jeffrey Epstein was a major aspect of Defendant's job, and that Ms. Giuffre's account of her sexual abuse and Defendant's involvement accords perfectly with other witnesses' accounts of what Defendant's job was for Epstein.[7]

That other young females were similarly recruited by the Defendant is evidence that Ms. Giuffre is telling the truth about her experiences – and thus direct evidence that Defendant defamed her when calling her a liar. Clearly, if Ms. Giuffre can establish that Defendant's modus operandi was to recruit young females for Epstein, that helps corroborate Ms. Giuffre's own testimony that Defendant recruited her for the same purposes and in the same manner. Although the Court need not make a final ruling on this evidentiary issue now, Rule 404(b) itself makes such testimony admissible. *See* Fed. R. Evid. 404(b) (other act "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). Indeed, even more specifically than the general provisions of Rule 404(b), Rule 415 makes these other acts admissible, due to

---

[7] Defendant's specious suggestion that Ms. Giuffre heard about the other girls whom she recruited for sexual purposes and then decided to "hop on the band wagon" (Defendant's Resp. at 8 n.7) tacitly admits that Defendant procured a "band wagon" of girls for Jeffrey Epstein to abuse. Moreover, Defendant cannot refute the documentary evidence that she was on Epstein private jet with Ms. Giuffre over 20 times while Ms. Giuffre was a minor – flights that Defendant is, quite conveniently, now unable to recall. Motion at 5-8.

the fact that those involved in sexual abuse of minors have a strong propensity for repeating those crimes. *See* Fed. R. Evid. 415(a)( ("In a civil case involving a claim for relief based on a party's alleged sexual assault or child molestation, the court may admit evidence that the party committed any other sexual assault or child molestation.").

Entirely apart from corroborating Ms. Giuffre's own individual abuse, however, Defendant fails to recognize that in calling Ms. Giuffre a "liar", she was attacking all aspects of Ms. Giuffre's account – including Ms. Giuffre's statements that Defendant served generally as a recruiter of girls for Epstein and that Epstein sexually abused the underage girls that were brought to him. Thus, in this defamation case, the testimony of these witnesses are admissible not only to bolster Ms. Giuffre's testimony about her individual abuse, but because they are simply part of the body of statements whose truth or falsity is at issue in this case.

In addition, one of the witnesses that Ms. Giuffre seeks to depose is registered sex offender Jeffrey Epstein, who stands at the center of the case. Indeed, some of the most critical events took place in the presence of just three people: Ms. Giuffre, defendant Maxwell, and Epstein. If Epstein were to tell the truth, his testimony would fully confirm Ms. Giuffre's account of her sexual abuse. Epstein, however, may well attempt to support Defendant by invoking the Fifth Amendment to avoid answering questions about his sexual abuse of Ms. Giuffre. Apparently privy to her former boyfriend Epstein's anticipated plans in this regard,[8] Defendant makes the claim that it would be a "convoluted argument" to allow Ms. Giuffre to use those invocations against her. Defendant's Resp. at 3. Tellingly, Defendant's response brief cites no authority to refute that proposition that adverse inference can be drawn against co-conspirators. Presumably this is because, as recounted in Ms. Giuffre's opening brief (at pp. 20-

---

[8] In discovery, Defendant Maxwell has produced several emails between Epstein and herself discussing Ms. Giuffre.

22), the Second Circuit's seminal decision of *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997), squarely upheld the drawing of adverse inferences based on a non-party's invocation of a Fifth Amendment right to remain silent. The Second Circuit instructed that, the circumstances of given case, rather than status of particular nonparty witness, determines whether nonparty witness' invocation of privilege against self-incrimination is admissible in course of civil litigation. *Id*. at122-23. The Second Circuit also held that, in determining whether nonparty witness' invocation of privilege against self-incrimination in course of civil litigation and drawing of adverse inferences is admissible, court may consider the following nonexclusive factors:

> (1) nature of witness' relationship with and loyalty to party;
> (2) degree of control which party has vested in witness in regard to key facts and subject matter of litigation;
> (3) whether witness is pragmatically noncaptioned party in interest and whether assertion of privilege advances interests of witness and party in outcome of litigation; and
> (4) whether witness was key figure in litigation and played controlling role in respect to its underlying aspects.

*Id*. at 124-25. Ms. Giuffre will be able to establish that all these factors tip decisively in favor of allowing an adverse inference. Accordingly, her efforts to depose Epstein, Marcinkova, and Kellen seek important information that will be admissible at trial.

**III. MS. GIUFFRE'S REQUEST IS TIMELY.**

Defendant also argues that this motion is somehow "premature." Defendant's Resp. at 2-3. Clearly, if Ms. Giuffre had waited to file her motion until later, Defendant would have argued until the matter came too late. The motion is proper at this time because, as of the date of this filing, fact discovery closes in 17 days (although Ms. Giuffre has recently filed a motion for a 30-day extension of the deadline). In order to give the Court the opportunity to rule as far in advance as possible – thereby permitting counsel for both side to schedule the remaining depositions – Ms. Giuffre brings the motion now. She also requires a ruling in advance so that

she can make final plans about how many depositions she has available and thus which depositions she should prioritize. [9]

An additional reason this motion is appropriate now is that, despite Ms. Giuffre's diligent pursuit of depositions, many witnesses have cancelled their dates, failed to appear, or wrongfully evaded service. These maneuvers have frustrated Ms. Giuffre's ability to take their depositions in a logical and sequential fashion, complicating the planning of a deposition schedule. For example, on April 11, 2016, Ms. Giuffre served notice on Defendant's counsel for the deposition of Rinaldo Rizzo, setting it for May 13, 2016. Nearly a month later, just a few days before that properly noticed deposition, Defendant's counsel requested that it be rescheduled, and, therefore, that deposition did not take place until June 10, 2016. Additionally, three other important witnesses evaded Ms. Giuffre's repeated efforts to serve them. It took Ms. Giuffre's motion for alternative service (DE 160) to convince Jeffrey Epstein to allow his attorney to accept service of process. The Court also has before it Ms. Giuffre's motion to serve Sarah Kellen and Nadia Marcinkova by alternative service. These witnesses' evasion of service delayed the taking of their depositions, and, as of the date of this filing, none have been deposed yet.

**CONCLUSION**

For all these reasons, Ms. Giuffre should be allowed to take three more depositions than the presumptive ten deposition limit – a total of thirteen depositions.

Dated: June 14, 2016.

[9] Defendant tries to find support for her prematurity argument in *Gen. Elec. Co. v. Indem. Ins. Co. of N. Am.*, No. 3:06-CV-232 (CFD), 2006 WL 1525970, at *2 (D. Conn. May 25, 2006). However, in that case, the Court found a motion for additional depositions to be premature, in part, because "[d]iscovery has not even commenced" . . . and the moving party "ha[d] not listed with specificity those individuals it wishes to depose." Of course, neither of these points applies in this case at hand: the parties are approaching the close of fact discovery, and Ms. Giuffre has provided detailed information about each individual she has deposed already and still seeks to depose.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[10]

[10] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 14th day of June, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**DEFENDANT'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO EXTENDING DEADLINE TO COMPLETE DEPOSITIONS AND MOTION FOR SANCTIONS FOR VIOLATION OF RULE 45**

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
East 10th Avenue
Denver, CO 80203
303.831.7364

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

LEGAL AUTHORITY ..... 5

I. PLAINTIFF'S LACK OF DILIGENCE ..... 6

A. President Bill Clinton ..... 6

B. Ross Gow ..... 9

C. Jean Luc Brunel ..... 10

D. Jeffrey Epstein ..... 12

E. Nadia Marcincova and Sarah Kellen ..... 14

II. FIFTH AMENDMENT BY EPSTEIN, KELLEN OR MARCINCOVA NOT ADMISSIBLE IN THIS CASE AGAINST MS. MAXWELL ..... 15

III. PLAINTIFF'S BAD FAITH DISCOVERY TACTICS SHOULD NOT BE REWARDED WITH EXTRA TIME ..... 18

1. Plaintiff's Rule 26 Revolving Door ..... 18

2. Plaintiff's Recurrent Rule 45 Violations ..... 19

IV. MS. MAXWELL'S GOOD FAITH EFFORTS TO CONDUCT DISCOVERY ..... 20

V. GOOD CAUSE EXISTS TO TAKE RE-DEPOSE PLAINTIFF AND TO DEPOSE SHARON CHURCHER EXISTS ..... 23

VI. ALTERNATIVELY, ALL OTHER DEADLINES NEED TO BE EXTENDED ..... 24

CERTIFICATE OF SERVICE ..... 26

## TABLE OF AUTHORITIES

*Carlson v. Geneva City School Dist.*, 277 F.R.D. 90 (W.D.N.Y. 2011); *compare Reese v. Virginia Intern. Terminals, Inc.,* 286 F.R.D. 282 (E.D. Va. 2012) .......... 6

*Fox Industries, Inc. v. Gurovich,* No. 03–CV–5166, 2006 WL 2882580, *11 (E.D.N.Y. Oct. 6, 2006) .......... 19

*Grochowski v. Phoenix Const.,* 318 F.3d 80, 86 (2d Cir.2003). .......... 5

*Iantosca v. Benistar Admin. Svcs., Inc.*, 765 F.Supp.2d 79 (D. Mass. 2011) .......... 6

*LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) .......... 16

*Murphy v. Board of Educ.,* 196 F.R.D. 220, 222 (W.D.N.Y.2000) .......... 19

*Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.,* 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) .......... 5

*Sokol Holdings, Inc. v. BMD Munai, Inc.,* 05 Civ. 3749 (KMW)(DF), 2009 WL 2524611 at *7 (S.D.N.Y. Aug. 14, 2009) .......... 5

*Usov v. Lazar*, 13-cv-818 (RWS), 2014 WL 4354691, at *15 (S.D.N.Y. Sept. 2, 2014) .......... 20

Defendant Ghislaine Maxwell ("Ms. Maxwell") files this Combined Response ("Response") in Opposition to Plaintiff's Motion to Extend Deadline to Complete Depositions ("Motion") and Motion for Sanctions For Violation of Rule 45, and states as follows:

## INTRODUCTION

Apparently, Plaintiff seeks to take six (6) depositions beyond the scheduling order deadline of July 1, yet has failed to demonstrate good cause or diligence as to any.[1] The witnesses include (1) President Bill Clinton, a witness that Plaintiff initiated informal attempts to depose on June 9, and (2) Ross Gow, who Plaintiff began steps to depose under the Hague Convention in London last Friday, June 17. Plaintiff also seeks to untimely depose (3) Jean Luc Brunel, a witness she had noticed for a mid-June deposition, who apparently did not appear on that date with agreement and consent of Plaintiff's counsel.

The remaining three witnesses Plaintiff seeks to untimely depose are ones who repeatedly have expressed their intention to take the Fifth Amendment as to all questions posed. Counsel for (4) Jeffrey Epstein, offered to accept service on or about April 11 but Plaintiff ignored that offer for more than six weeks. Plaintiff only began on June 12 any attempt to schedule that deposition in the Virgin Islands. Last week, Mr. Epstein's counsel filed a Motion to Quash his deposition subpoena. The final untimely depositions sought by Plaintiff are for witnesses (5) Sarah Kellen and (6) Nadia Marcincova, about whom Plaintiff has made no public claims and thus, have no testimony relevant to this defamation action concerning whether Plaintiff's public

[1] In her Amended Corrected Reply In Support of Motion to Exceed Ten Depositions, Plaintiff represents that she only seeks to take three depositions beyond the limit of ten and that she no longer seeks depositions of witnesses Emmy Taylor, Dana Burns, JoJo Fontanilla, and Michael Reiter. (Doc. #224 at 2 n.4) She does not state her intentions with respect to other witnesses, like Maria Alessi, that she noticed but never deposed. However, comparing that Reply with her other motions, counsel has deduced the remaining witnesses from whom Plaintiff apparently seeks to secure deposition testimony in July. Plaintiff has already taken 6 depositions and another scheduled tomorrow. Thus by the close of discovery she will have taken 7 of her allotted 10 depositions.

allegations about Ghislaine Maxwell are – or rather are not – true. The attempted service of subpoenas on Epstein, Kellen and Marcincova all violated Rule 45(a)(4) and should be sanctioned by this Court.

As to all of these witnesses, Plaintiff has fallen far short of the "good cause" required by Rule 16(b)(4) to modify the Scheduling Order. In fact, for the most part, her failures to actively pursue depositions with these witnesses qualifies as in-excusable neglect: She frittered away seven of the eight months of the discovery period and now has placed Ms. Maxwell, this Court, and the witnesses in the untenable position of trying to accommodate her last-minute scramble. In the absence of any acceptable excuses, and for the limited evidentiary value that most of the requested witnesses can provide, this Court should deny the request for the extra time to take these six depositions.

The only witnesses for whom depositions should be permitted following the discovery cut-off are: (1) Ms. Sharon Churcher, Plaintiff's friend, advocate and former journalist with the *Daily Mail*, who filed a Motion to Quash her subpoena on the day before her scheduled deposition,[2] and (2) Plaintiff, who refused to answer questions at her deposition concerning highly relevant, non-privileged information.[3]

Alternatively, if the Court is to grant additional time for Plaintiff to take depositions, Ms. Maxwell will be unduly prejudiced without sufficient additional time to (a) secure any witnesses to rebut testimony gleaned from these witnesses, (b) conduct discovery of Plaintiff's retained experts, (c) submit a summary judgment motion which includes facts learned from these late depositions, and (d) prepare for trial. Thus, if the Court grants Plaintiff's motion, the remaining deadlines in the Scheduling Order ought to be extended accordingly.

[2] Ms. Churcher's motion to quash will be heard this Thursday by the Court.
[3] Ms. Maxwell is filing simultaneously with this Response a Motion to Re-Open Plaintiff's Deposition.

**BACKGROUND**

To divert attention away from her own lack of diligence, Plaintiff characteristically devotes much of her Motion blaming Ms. Maxwell and her counsel for her own problems with depositions. Not only is Plaintiff's account factually inaccurate, none of it matters to whether she could timely complete the six depositions at issue.

For example, the scheduling of Ms. Maxwell's deposition (which depended, among other things, on an historic snowstorm, a disputed protective order, Plaintiff's failure to timely produce documents, and counsel's conflicting calendars, all of which have been amply documented with this Court)[4] does not inform any analysis regarding Plaintiff's lack of diligence in pursuing depositions of these six witnesses. *See* Rule 26d)(3) ("Unless the parties stipulate or the court orders otherwise for the parties' and witnesses' convenience and in the interests of justice: (A) methods of discovery may be used in any sequence, and (B) discovery by one party does not require any other party to delay its discovery."). Likewise, receipt of Ms. Maxwell's Rule 26 disclosures in February also had nothing to do with these witnesses. *Id.* Notably, each of the witnesses who Plaintiff now seeks to depose were known to her from the outset; all but President Clinton were included in her initial Rule 26 disclosures served on November 11, 2015 and two of the six were specifically mentioned in Plaintiff's Complaint.

Finally, the fact that witness Rinaldo Rizzo had a deposition re-scheduled from April until June does not have any bearing on the issue presented by this motion. Mr. Rizzo was deposed on June 14 and he has nothing to do with the remaining depositions. Mr. Rizzo, in fact, was practically gleeful to be a witness: he was the one who initiated contact with Brad Edwards after reading about the lawsuit, asked to be a witness in this case, hopes to make money from this

[4] Doc. #62 & Tr. of Hearing of Mar. 24 at 4.

case, already has sued Glenn Dubin, Epstein's friend, had counsel who was totally cooperative in the rescheduling and reported fanciful and never-before heard claims about Ms. Maxwell, the Dubins and others that he has never reported to any law enforcement even though he claims that he witnessed potential kidnappings and sexual assaults on children.[5] Plaintiff's claim that Mr. Rizzo is an "example of delay that has harmed [her] ability to obtain all depositions in a timely manner" (Mot. at 3) is specious.

Contrary to Plaintiff's assertion, discovery began in this case on October 23, 2015, following the parties' Rule 26(f) conferral. *See* Fed.R.Civ.P. 26(d)(1). At the Rule 16(b) scheduling conference on October 28, 2015, this Court directed the parties to complete all fact discovery by July 1, 2016. (Doc. #13) On November 30, 2015, contemporaneous with the filing of her Rule 12(b) Motion to Dismiss, Ms. Maxwell also requested of this Court a stay of discovery pursuant to Rule 26(c). (Doc. #17) That motion was denied on January 20, 2016, with an additional two-week period granted to respond to Plaintiff's First Request for Production of Documents.[6] The discovery was thus never stayed.

Plaintiff erroneously asserts that that discovery "did not commence in this matter until" February 8. What she means is that she neglected to seek any non-witness depositions until then; nothing in the Rules of Civil Procedure, this Court's Orders, or the law prevented Plaintiff from doing so at any point after October 23, 2015.[7] Plaintiff has had over eight months to subpoena

---

[5] *See,* Menninger Declaration, Ex. A (Rizzo deposition transcript excerpts). Of course, Plaintiff's counsel has engaged in their own last-minute "unavailability" for a deposition scheduled by Ms. Maxwell, as to Plaintiff's former fiancé, a witness who is hostile, required numerous service attempts at great cost and inconvenience, and who then (because of Plaintiff's last minute unavailability) had to be re-served by a process server who swam through a swamp to get to his home, at additional cost and inconvenience.

[6] By agreement of the parties, the time to respond was extended an additional six days because defense counsel was in a jury trial at the time the Court's Order was handed down.

[7] *See, e.g.,* Pltf's Opp'n to Mot. to Stay (Doc. #20) at 17 n.8 ("As of the date of this filing, zero (0) disposition [sic] notices have been propounded on the Defendant.").

witnesses, schedule depositions and conduct them. Instead, she waited until the last minute and now complains of lack of time. Any lack of time is a product of her own bad faith and negligent litigation tactics and should not be sanctioned by this Court.

The failure to timely secure the depositions of the remaining six witnesses is through no fault of Ms. Maxwell or her counsel. As to these witnesses, Ms. Maxwell and her counsel have played no role in hindering Plaintiff's ability to depose the witnesses; in fact, as to four of the six Plaintiff attempted to serve subpoenas on the witnesses before ever providing notice to the defense, in clear violation of Rule 45(a)(4).

## LEGAL AUTHORITY

Rule 16(b) permits modification of a scheduling order only upon a showing of "good cause." To satisfy the good cause standard "the party must show that, ***despite its having exercised diligence***, the applicable deadline could not have been reasonably met." *Sokol Holdings, Inc. v. BMD Munai, Inc.,* 05 Civ. 3749 (KMW)(DF), 2009 WL 2524611 at *7 (S.D.N.Y. Aug. 14, 2009) (emphasis added) (*citing Rent-A-Center Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 104 (S.D.N.Y. 2003) (McMahon, J.)); *accord Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir. 2000) (" '[G]ood cause' depends on the diligence of the moving party."); *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.,* 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (Engelmeyer, J.) ("To show good cause, a movant must demonstrate that it has been diligent, meaning that, despite its having exercised diligence, the applicable deadline could not have been reasonably met.").

Good cause depends on the *diligence* of the moving party in seeking to meet the scheduling order. *Grochowski v. Phoenix Const.,* 318 F.3d 80, 86 (2d Cir.2003). The Oxford Dictionary defines "diligence" as "careful and persistent work or effort." *See* "diligence" at http://www.oxforddictionaries.com/us/definition/american_english/diligence (last accessed on

June 18, 2016). "Good cause" and diligence were not shown when a party raised the prospect of a deposition nine days prior to the discovery deadline. *Carlson v. Geneva City School Dist.*, 277 F.R.D. 90 (W.D.N.Y. 2011); *compare Reese v. Virginia Intern. Terminals, Inc.,* 286 F.R.D. 282 (E.D. Va. 2012) (depositions noticed very early in discovery period and movant engaged in continuing meet-and-confer dialogue with defendants throughout five month discovery period); *Iantosca v. Benistar Admin. Svcs., Inc.*, 765 F.Supp.2d 79 (D. Mass. 2011) (correspondence indicated that the plaintiffs had tried on numerous occasions to schedule the depositions and to extend the discovery schedule but that the defendants had either refused or failed to respond, good cause found).

## ARGUMENT

### I. PLAINTIFF'S LACK OF DILIGENCE

Plaintiff has demonstrated an extreme lack of diligence in securing the remaining six depositions that she seeks.

#### A. President Bill Clinton

Plaintiff's Motion failed to mention any desire to take the deposition of former President Clinton. No Notice of Deposition has been served and no scheduling of his deposition has commenced. Indeed, President Clinton first appeared on Plaintiff's Third Revised Rule 26 Disclosures two weeks ago on June 1. Then, last week, in her Reply In Support of Motion to Exceed Ten Depositions filed on June 13 ("Reply"), Plaintiff averred that President Clinton's deposition is "necessary" because Ms. Maxwell "in her deposition [on April 25] raised Ms. Giuffre's comments about President Clinton as one of the 'obvious lies' to which she was referring in her public statement that formed the basis of this suit." Reply at 3. This is utter nonsense and nothing more than a transparent ploy by Plaintiff to increase media exposure for her sensational stories through deposition side-show. This witness has nothing relevant to add

to this case and Plaintiff has made no effort, much less one in good faith to timely secure his testimony.

Plaintiff admits she has "made not allegations of illegal actions by Bill Clinton." *Id.* But Plaintiff has asserted that she spent time with President Clinton on the island of Little St. James, US Virgin Islands and that she flew there with the President in a helicopter piloted by Ms. Maxwell. In one article, authored by Sharon Churcher, Plaintiff related:

> "On one occasion, she adds, Epstein did invite two young brunettes to dinner which he gave on his Caribbean island for Mr. Clinton shortly after he left office. But as far as she knows, the ex-President did not take the bait. 'I'd have been about 17 at the time,' she says. 'I flew to the Caribbean with Jeffrey and then Ghislaine Maxwell went to pick up Bill in a huge black helicopter that Jeffrey bought her. She'd always wanted to fly and Jeffrey paid for her to take lessons, and I remember she was very excited because she got her license around the first year we met. I used to get frightened flying with her but Bill had the Secret Service with him and I remember him talking about what a good job she did. I only met Bill twice but Jeffrey told me they were good friends.'
>
> 'We all dined together that night. Jeffrey was at the head of the table. Bill was at his left. I sat across from him. Emmy Taylor, Ghislaine's blonde British assistant, sat at my right. Ghislaine was at Bill's left and at the left of Ghislaine there were two olive-skinned brunettes who'd flown in with us from New York. I'd never met them before. I'd say they were no older than 17, very innocent-looking. They weren't there for me. They weren't there for Jeffrey or Ghislaine because I was there to have sex with Jeffrey on the trip. Maybe Jeffrey thought they would entertain Bill, but I saw no evidence that he was interested in them. He and Jeffrey and Ghislaine seemed to have a very good relationship. Bill was very funny. He made me laugh a few times. And he and Jeffrey and Ghislaine told blokey jokes and the brunettes listened politely and giggled. After dinner I gave Jeffrey an erotic massage. I don't remember seeing Bill again on the trip but I assume Ghislaine flew him back."

*See* Sharon Churcher, "Teenage girl recruited by peadophile Jeffrey Epstein reveals how she twice met Bill Clinton," DAILY MAIL (Mar. 5, 2011) (attached to Declaration of Sharon Churcher, Ex. 3 (Doc. #216-3). Similarly, in Plaintiff's unpublished and un-dated book manuscript, *The Billionaire Playboys' Club*, she writes:

> "The next big dinner party on the island had another significant guest appearance being the one and only, Bill Clinton. He is the only president in the world to be

> dismissed from his role as a world leader because he was caught with his trousers around his ankles and had the stain to prove it. Publicly humiliating his wife and himself he retired from his title but not from his lifestyle. This wasn't a big party as such, only a few of us eating at the diner table. There was Jeffrey at the head of it all, as always. On the left side was Emmy, Ghislaine and I sitting across the table from us was Bill with two lovely girls who were visiting from New York. Bill's wife, Hillary's absence from the night made it easy for his apparent provocative cheeky side to come out. Teasing the girls on either side of him with playful pokes and brassy comments, there was no modesty between any of them. We all finished our meals and scattered in our own different directions."

Menninger Decl. Ex. B at 110.

Each and every part of Plaintiff's claims regarding President Clinton has conclusively been proven false. Former FBI Director Louis Freeh submitted a report wherein he concluded that President Clinton "did not, in fact travel to, nor was he present on, Little St. James Island between January 1, 2001 and January 1, 2003." Menninger Decl., Ex. C. Further, if any Secret Service agents had accompanied Clinton to that location, "they would have been required to make and file shift logs, travel vouchers, and related documentation relating to the visit," and there was a "total absence" of any such documentation. *Id.* Remarkably, Plaintiff now even denies telling Churcher that she ever witnessed Ms. Maxwell flying President Clinton or his Secret Service anywhere, or joking with Clinton about "what a good job she did." Menninger Decl., Ex. D. Plaintiff's counsel remarkably instructed Plaintiff not to answer any additional questions about the other things Sharon Churcher inaccurately reported. *Id.* Lending even more incredulity to Plaintiff's story, Ms. Maxwell only received her pilot's license in mid-1999 casting insurmountable doubt that a recently retired president and his staff would be permitted to fly with her at the helm.

With the record thus, Plaintiff's claims about Clinton's presence on the Island and the fully concocted story about the dinner party that occurred thereon totally debunked by the former head of the FBI and with Plaintiff now disclaiming she ever witnessed the Secret Service or

President Clinton being flown in a helicopter by Ghislaine Maxwell, the relevance of any testimony he might add (*i.e.,* confirm that he was, as Louis Freeh determined, never on the Island) is non-existent. The only purpose for seeking this deposition is for the calculated media strategy that Plaintiff and her publicity-seeking attorneys have devised.

Plaintiff failed to disclose President Clinton as a witness until June 1, failed to notice his deposition, failed to diligently pursue a subpoena on him and he has no relevant testimony to offer. Accordingly, Plaintiff's leave to modify the scheduling order to permit his deposition should be denied.

**B. Ross Gow**

As the Court likely recalls, Ross Gow actually issued the statement pertinent to this defamation suit. Plaintiff has known about Ross Gow and his role in this lawsuit since the outset: She referenced him repeatedly by name in the Complaint filed on September 21, 2015. *See, e.g.,* Complaint paragraph 29 ("As part of Maxwell's campaign, she directed her agent, Ross Gow, to attack Giuffre's honesty and truthfulness and to accuse Giuffre of lying."). Plaintiff also has been well aware throughout that Mr. Gow resides in London. *See, e.g.,* Plaintiff's Motion to Compel Improper Privileges, at 8 (Doc. #33).

After filing that Complaint in September and litigating the Motion to Compel based on privileges related to Mr. Gow in March, Plaintiff took exactly zero steps to depose Mr. Gow until she filed this Motion. Now, nine months after filing her Complaint, Plaintiff contends there is "not sufficient time" for her to "go through the Hague Convention for service on Mr. Gow" so as to "complete this process before the June 30, 2016 deadline." Mot. at 4. Indeed, Plaintiff only initiated that process three days ago, on Friday, June 17, two weeks shy of the discovery cut-off.

Plaintiff, once again, tries to blame Ms. Maxwell for her own lack of diligence by misrepresenting to this Court that "Ms. Giuffre asked that Defendant produce her agent, Mr.

Gow, for a deposition but Defendant has refused…despite acknowledging that Defendant plans to call Mr. Gow for testimony at trial." *Id.* In truth, Plaintiff sent a letter on May 23 which read in its entirety, "This letter is to seek your agreement to produce Ross Gow for deposition, as the agent for your client, Ms. Maxwell. We can work with Mr. Gow's schedule to minimize inconvenience. Please advise by Wednesday, May 25, 2016, whether you will produce Mr. Gow or whether we will need to seek relief from the Court with respect to his deposition." Menninger Decl. Ex. E. That was the first communication regarding any deposition of Mr. Gow. Two days later, defense counsel requested any "legal authority that would allow Ms. Maxwell to 'produce' Ross Gow for a deposition" or "any rule or case that would either enable or require her to do so." *Id.* Plaintiff never responded. She also has not explained when or how Ms. Maxwell "acknowledged" her "plans to call Mr. Gow for testimony at trial," nor why that is relevant to whether Plaintiff has demonstrated good cause for her own failure to take steps to depose a foreign witness deposition until June 17, for a witness she was aware before even filing the Complaint.

During the hearing on March 24, this Court stated that it would consider expect to see "good faith showing" of efforts to comply with the schedule and "an inability because of Hague Convention problems," before it would consider changing the Scheduling Order. Ms. Maxwell submits that waiting until June 17, two weeks before the end of discovery, to even begin the Hague Convention process falls far short of any such good faith showing and the request for leave to take Mr. Gow's testimony beyond July 1 should be denied.

**C. Jean Luc Brunel**

With regard to Jean Luc Brunel, Plaintiff simply asserts that he was "subpoenaed," and "set for mid-June deposition[]," but "through counsel" has "requested we change the dates of [his] deposition." Mot. at 4. That is her entire argument. She omits key facts that would,

instead, demonstrate her lack of diligence in securing Mr. Brunel's testimony and also show that she has waived any right to seek an out-of-time deposition.

Plaintiff first issued a Notice of a Rule 45 subpoena for documents from Mr. Brunel on February 16, at an address "c/o" attorney, Joe Titone. No documents were ever produced pursuant to that subpoena. Menninger Decl., Ex. F. Then, on May 23, 2016, Plaintiff issued a new "Notice of Subpoena Duces Tecum," attached to which was actually a subpoena for deposition testimony to occur on June 8, at 9:00 a.m. in New York. *Id.* Again, the subpoena was addressed "c/o" attorney Robert Hantman. Then, on June 2, Plaintiff's counsel sent an email that they had received "an email yesterday from Mr. Brunel's attorney saying he needs to reschedule. I believe he is trying to get us new dates today or tomorrow." *Id.* The "scheduled date" of June 8 came and went without any indication of any new dates provided by Mr. Brunel's counsel. The following week, Plaintiff's counsel stated in a phone conversation that Mr. Brunel's counsel said his client had gone to France and it was unclear when he would be returning to the United States.

Following the filing of the instant motion, counsel for Ms. Maxwell requested copies of the certificates of service for all of Plaintiff's Rule 45 subpoenas in this case. Plaintiff's counsel provided certificates on June 14. Notably absent was any certificate of service for Mr. Brunel. Thus, either Mr. Brunel was never served, or he was served and Plaintiff unilaterally extended his compliance date to an unscheduled time in the future. Either way, the time to complain about a witness's non-compliance is at or near the time it occurs. Failure to timely complain regarding non-compliance with a subpoena constitutes a waiver. In any event, whether served or not, Mr. Brunel apparently promised to provide new dates before his deposition date came and went, did not do so, has left the country and not indicated a present intention to return. Given Plaintiff's

role in failing to compel him to attend a deposition, no "good cause" has been demonstrated to take the deposition of Mr. Brunel after July 1.

**D. Jeffrey Epstein**

As with the other witnesses, Plaintiff has failed to demonstrate "good cause" for seeking to depose Jeffrey Epstein out of time. Plaintiff claims that she was unable to secure service on Mr. Epstein until May 27, 2016, because his counsel "refused to accept service" until she filed her motion for alternative service. The documents reflect the opposite: Mr. Epstein's attorney agreed to accept service on April 11, 2016, and it was only on May 27, 2016, that *Plaintiff* agreed. *See* Poe Declaration in Support of Motion to Quash Epstein Deposition, Ex. 3 (Doc. # 223-3). Plaintiff fails to explain her strategic decision, or negligence, in failing to respond for over six weeks to Mr. Weinberg's email offering to accept service. Indeed, in another failure of candor, Plaintiff's counsel also neglected to tell this Court about the email offer from Mr. Weinberg either in the instant motion or in her motion to serve Mr. Epstein by alternate means. Mot. at 2; Doc. # 160.[8]

Plaintiff apparently now claims that she never received that email from Martin Weinberg. All of the preceding communications, however, indicate that Mr. Weinberg promptly responded to Ms. McCawley's inquiries. *See, e.g.,* Poe Declaration, Ex. 2 (email of April 6 from Weinberg to McCawley (offering to let her know regarding acceptance of service on April 7)); email of McCawley in response ("That works fine – thank you.")). Thus, if Ms. McCawley received no follow up response from Mr. Weinberg, as she now claims, when he had been corresponding

[8] In another glaring omission from Plaintiff's submissions to the Court on the topic of the service of Mr. Epstein, Plaintiff's own counsel have strenuously litigated in other cases that Mr. Epstein is a <u>resident of Florida</u>, over his objection that he is a resident of the <u>U.S. Virgin Islands</u>. *See, e.g.,* Menninger Decl., Ex. G (Motion to Quash Subpoena on Jeffrey Epstein, Broward County, Florida, 15-000072). Yet, all of Plaintiff's purported attempts at service on Mr. Epstein were in <u>New York</u>.

with her previously theretofore, she had a duty to follow up on that inquiry. A failure to do so is plain vanilla neglect.

Even after agreeing to the terms proposed by Epstein's counsel on May 27, that is, location of the deposition in the U.S. Virgin Islands and subject to right to oppose the subpoena, Plaintiff then waited an *additional three weeks* until June 12, to even attempt to schedule Epstein's deposition. Epstein Memorandum in Support of Mot. to Quash at 2 (Doc. # 222). Agreeing to take a deposition in the Virgin Islands on May 27, then waiting until June 12, to try to schedule a date for that deposition, when numerous other depositions had already been scheduled in New York, Florida, and California for the balance of June, is either neglect or strategic posturing by Plaintiff. Either way, it does not amount to "good cause" for such a deposition to take place beyond July 1.

Finally, Plaintiff suggests, without factual foundation, that Ms. Maxwell played some role in Mr. Epstein's counsel's refusal to accept service. *See* Mot. at 2 ("forced to personally serve the Defendant's former boyfriend, employer, and co-conspirator"). As the timeline and documents now reveal, however, Plaintiff failed to provide notice to Ms. Maxwell that she was attempting to serve a Rule 45 subpoena on Mr. Epstein for more than 7 weeks! *Id.* Plaintiff states that she began her service attempts on March 7, 2016. The very first Notice of Subpoena and Deposition served on Ms. Maxwell, however, is dated April 27. Menninger Decl. Ex. H. Thus, between March 7 and April 27, Ms. McCawley engaged in repeated attempts to serve Mr. Epstein a Rule 45 subpoena (including a request for documents) without providing the proper notice to the parties pursuant to Rule 45(a)(4) ("If the subpoena commands the production of documents… , then *before it is served* on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party.") (emphasis added). As detailed below, this was

not an isolated incident and merits sanction. In any event, it is difficult to imagine how it is Ms. Maxwell's fault that Plaintiff could not serve Mr. Epstein when she was never put on notice of any attempt to do so.

Given that Plaintiff knew as of April 11 the conditions pursuant to which Mr. Epstein would accept service through counsel, yet waited until May 27 to agree to those terms, and then waited another nearly three weeks to attempt to schedule Mr. Epstein's deposition on a date available for his counsel and Ms. Maxwell's counsel, Plaintiff has fallen far short of demonstrating "good cause" for taking Mr. Epstein's deposition beyond the end of the fact discovery cut-off.

**E. Nadia Marcincova and Sarah Kellen**

Finally, Plaintiff seeks the depositions of two other witnesses – Sarah Kellen and Nadia Marcincova -- who, she complains, "despite being represented by counsel, have refused to accept service."[9] Mot. at 3. Plaintiff claims that her process servers tried for three weeks (from April 25 until May 18) to personally serve Ms. Kellen and Ms. Marcincova with subpoenas *duces tecum*. She did not explain, however, why she waited until April to try to serve these two witnesses, about whom her attorneys have known since 2008. She also has not explained to this Court any legally relevant or admissible evidence that either possess, nor how she intends to introduce that evidence in a trial of this defamation claim between Plaintiff and Ms. Maxwell.

Apart from these witnesses stated intent to take the Fifth Amendment which renders their testimony inadmissible, as discussed more fully below, neither witness has any relevant testimony to offer because Plaintiff never made a public statement about either one of them.

[9] Actually, in Plaintiff's Motion for Leave to Serve Three Deposition Subpoenas by Means Other than Personal Service, Plaintiff details that Ms. Marcincova's counsel stated he no longer represents her. (Doc. #161 at 5) ("counsel for Ms. Giuffre reached out to Ms. Marcinkova's former counsel but he indicated that he could not accept service as he no longer represents her"). It is unclear then, why Plaintiff persists in representing to this Court that Ms. Marcincova instructed her counsel not to accept service, or why Plaintiff seeks to serve Ms. Marcincova through her *former* counsel.

Plaintiff did not include either woman in her Sharon Churcher-paid interviews, nor were they mentioned in Plaintiff's Joinder Motion of December 30, 2014. Thus, neither Plaintiff's allegations about Ms. Maxwell, nor Ms. Maxwell's denial of the same based on her personal knowledge, are implicated by anything that Ms. Kellen or Ms. Marcincova may have done with anyone else. Their testimony cannot corroborate Plaintiff's account, nor can it shed light on whether Ms. Maxwell's denial of that account is accurate, because Plaintiff's account did not mention either of them.

Finally as to these witnesses, Plaintiff once again documented her own failure to comply with Rule 45 in regard to attempts to serve these two witnesses. Six of the service attempts occurred on April 25 and April 26. Yet Plaintiff only provided Notice to Ms. Maxwell of her intent to serve the subpoenas on April 27. Menninger Decl. Ex. I.

## II. FIFTH AMENDMENT BY EPSTEIN, KELLEN OR MARCINCOVA NOT ADMISSIBLE IN THIS CASE AGAINST MS. MAXWELL

The depositions of Epstein, Kellen and Marcincova do not constitute "good cause" to modify the scheduling order in this case for the additional reason that they all have represented to Plaintiff their intention to assert the Fifth Amendment protection as to *all* questions and such assertion will not be admissible evidence in this trial. Indeed, counsel for Mr. Epstein recently filed a Motion to Quash his subpoena based on the same legal principle that his deposition is unduly burdensome in light of the fact that it will not lead to admissible evidence. (Doc. # 221, 222, 223) The Court should consider this additional factor to decline a finding of "good cause" for extending the discovery deadline.

Plaintiff wrongfully contends that any assertion of the Fifth Amendment during the depositions of Epstein, Kellen and Marincova will be admissible in the trial of this defamation matter (where none of those individuals are parties) based on an "adverse inference" that can be

drawn against Ms. Maxwell. *See LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997). In fact, none of the *LiButti* factors support her argument. While noting that Ms. Maxwell anticipates more extensive briefing on this issue in support of Mr. Epstein's Motion to Quash, a few facts bear mentioning here:

- Ms. Maxwell was the employee of Mr. Epstein --in the 1990s -- not the other way around. Mr. Epstein has never worked for or been in control of Ms. Maxwell.

- Ms. Maxwell and Mr. Epstein have had no financial, professional or employment relationship in more than a decade, many years before 2015 when the purportedly defamatory statement was published. Ms. Maxwell testified that she has not spoken to Mr. Epstein in 2 years.

- Maxwell has not vested any control in Mr. Epstein "in regard to key facts and subject matter of litigation." As the Court is well aware from review of emails submitted *in camera* (and later produced to Plaintiff):

    - Mr. Epstein and his counsel gave advice to Maxwell regarding whether she should issue a statement *after* January 2, 2015. In one, Mr. Epstein even suggested what such a statement might say. Maxwell never issued any additional statement.

    - Maxwell had her own counsel who operated independently of Mr. Epstein and his counsel.

- Epstein is not "pragmatically a non-captioned party in interest" in this litigation nor has he "played controlling role in respect to its underlying aspects." Epstein is not, despie Plaintiff's suggestion, paying Ms. Maxwell's legal fees. Plaintiff sought by way of discovery any "contracts," "indemnification agreements," "employment agreements" between Ms. Maxwell and Epstein or any entity associated with Epstein, from 1999 to the present. Ms. Maxwell responded under oath that there are no such documents. Epstein played no role in the issuance of the January 2 statement, nor has he issued any public statement regarding Plaintiff. Indeed, Plaintiff and Epstein fully resolved any claims against one another by way of a confidential settlement in 2009, another action in which Ms. Maxwell had no role.

- Assertion of the privilege by Epstein does not advance any interest of Ms. Maxwell's. Quite to the contrary, Epstein would be a key witness in her support, exonerating her from Plaintiff's allegations regarding sex abuse, sexual trafficking and acting as his "madam" to the stars. As proof, one need look no further than emails already reviewed by this Court. In an email sent by Epstein to Ms. Maxwell on January 25, 2015, while the media maelstrom generated by Plaintiff's false claims continued to foment, he wrote: "You have done nothing wrong and I would urge you to start acting like it. Go outside, head high, not as an escaping convict. Go to parties. Deal with it." Menninger Decl. Ex. J

- Likewise, Epstein drafted a statement for Ms. Maxwell to issue (though she never did). In that statement, Epstein wrote (presumably what his testimony would reflect, should he not take the Fifth):

  "Since JE was charged in 2007 for solicitation of a prostitute I have been the target of outright lies, innuendo, slander, defamation and salacious gossip and harassment; headlines made up of quotes I have never given, statements I have never made, trips with people to places I have never been, holidays with people I have never met, false allegations of impropriety and offensive behavior that I abhor and have never ever been party to, witness to events that I have never seen, living off trust funds that I have never ever had, party to stories that have changed materially both in time place and event, depending on what paper you read, and the list goes on.

  I have never been a party in any criminal action pertaining to JE.

  For the record:

  At the time of Jeffrey's plea, I was in a very long-term committed relationship with another man and no longer working with Jeffrey. Whilst I remained on friendly terms with him up until his plea, I have had limited contact since. Every story in the press innuendo and comment has been taken from civil depositions against JE, which were settled many years ago. None of the depositions were ever subject to cross examination, not one. Any standard of truth and were used for those who claimed they were victims to receive financial payment to be shared between them and their lawyers. One firm created and sold fake cases against Mr. Epstein – the firm subsequently imploded and the (sic) Rothstein, the owner of the firm was sent to jail for 50 years for his crime. The lawyer who is currently representing Virginia (Brad Edwards) was his partner. Need I say more.

  These so called 'new revelations' stem from an alleged diary from VR that reads like the memoirs she is purporting to be selling. Also perhaps pertinent – in a previous complaint against others, her claims were rejected by the police 'due to ..VR..lack of credibility."

  The new interest in this old settled case results from lawyers representing some of JE victims filed a suit against the US government, not JE. They contend that the US govt violated their rights. The documents and deal that JE negotiated with the government was given to the lawyers 6 years ago and is a public document.

  I am not a part of, nor did you have anything to do with, JE plea bargain. I have never even seen the proceedings nor any of the depositions. I reserve my right to file complaint and sue for defamation and slander."; *Id.*

These correspondences demonstrate that Ms. Maxwell has no control over Mr. Epstein in regards to the alleged defamation statement, he had no role in issuance of the statement, he has no benefit in the outcome of this litigation and he played no controlling role in its respect.

Similarly, there is not any evidence at all to support an adverse inference to be drawn from either Sarah Kellen nor Nadia Marcincova's assertion of the Fifth. Ms. Maxwell hardly knows either woman, never worked with them, they have had nothing to do with this litigation and do not stand to benefit from it, especially as Plaintiff has never made any allegations about her involvement with either of the two of them, they are simply irrelevant to this defamation action.

## III. PLAINTIFF'S BAD FAITH DISCOVERY TACTICS SHOULD NOT BE REWARDED WITH EXTRA TIME

### 1. Plaintiff's Rule 26 Revolving Door

Plaintiff's army of lawyers (who collectively have been litigating matters related to Jeffrey Epstein since 2008) served their Rule 26 initial disclosures on November 11, 2015. Those disclosures listed 94 individual witnesses with knowledge regarding the facts of this case, yet provided addresses (only of their counsel) as to just two, Jeffrey Epstein and Alan Dershowitz. Plaintiff then also listed categories of witnesses such as "all other then-minor girls, whose identities Plaintiff will attempt to determine" and "all pilots, chauffeurs, chefs, and other employees of" Ms. Maxwell or Jeffrey Epstein. Plaintiff claimed as to her Rule 26 disclosures that "only a fraction of those individuals will actually be witnesses in this case, and as discovery progresses, the list will be further narrowed." (Doc. #20 at 17) The opposite has happened.

Between November 11 and March 11, Plaintiff trimmed her Rule 26 list of persons with knowledge from 94 to 69, inexplicably removing 34 names, but adding 12 more. She removed,

for example, witnesses Andrea Mitrovich and Dara Preece, but added Senators George Mitchell, Bill Richardson and Les Wexner.

Then between March 11 and June 1, a few weeks before the discovery cut-off, Plaintiff added 20 more witnesses, including President Clinton, Palm Beach officers Recarey and Reiter, and purported "victims of sexual abuse" including a client of Mr. Edwards, who he has clearly known about for years.[10] As to several of these newly added witnesses, in particular [redacted] Recarey and Reiter, Plaintiff promptly scheduled their depositions in June, despite having just disclosed their names on June 1. And last Friday, on the business day just before the depositions of [redacted] and Recarey, Plaintiff disclosed 623 new documents, including for the first time the "unredacted" police reports from Palm Beach, that Plaintiff clearly has had in her possession, or her counsel's possession, for years. Menninger Decl. Ex. K.

This is precisely the type of hide-and-seek that Rule 26 is designed to prevent. While Ms. Maxwell anticipates filing in the near future a separate motion concerning Plaintiff's latest Rule 26 violations and seeking sanctions for the same, this Court can and should consider this behavior in determining whether Plaintiff has "good cause" to extend the discovery cut-off so that she can continue her gamesmanship.

### 2. Plaintiff's Recurrent Rule 45 Violations

As this Court has previously held:

> Rule 45(b)(1) requires a party issuing a subpoena for the production of documents to a nonparty to "provide prior notice to all parties to the litigation," which has been interpreted to "require that notice be given prior to the *issuance* of the subpoena, not prior to its return date." *Murphy v. Board of Educ.,* 196 F.R.D. 220, 222 (W.D.N.Y.2000). At least one court in this circuit has held that notice provided on the same day that the subpoenas have been served constitutes inadequate notice under Rule 45. *See, e.g., Fox Industries, Inc. v. Gurovich,* No. 03–CV–5166, 2006 WL 2882580, *11 (E.D.N.Y. Oct. 6, 2006). … The

[10] Rather than list his client's address in the custody of the U.S. Marshal's Office, Mr. Edwards said her address is "c/o" himself.

> requirement that prior notice "must be given has important underpinnings of fairness and efficiency." *Cootes Drive LLC v. Internet Law Library, Inc.,* No. 01–CV–9877, 2002 WL 424647, *2 (S.D.N.Y. Mar. 19, 2002). Plaintiff fails to provide an adequate explanation or argument for how a same-day notification satisfies Rule 45's requirements. *See, e.g., id.* ("[C]ounsel for the [offending party] offered no explanation or excuse for their failure to comply with the rule's strictures. They did not attempt to defend the timeliness of their notice. The [offending party's] admitted violation ... cannot be countenanced.").

*Usov v. Lazar*, 13-cv-818 (RWS), 2014 WL 4354691, at *15 (S.D.N.Y. Sept. 2, 2014) (granting motion to quash the subpoenas where notice given on the same day and served beyond 100 mile limitation of Rule 45). In that case, Plaintiff had provided *same day notice* of the issuance of a subpoena. Here, we have repeated attempts to serve a subpoena over the course of days before any notice was given to Ms. Maxwell. As described previously, Plaintiff has amply documented her own violations of the Rule by detailing her attempts to serve subpoenas *duces tecum* before ever providing notice to Ms. Maxwell with regards to witnesses Epstein, Kellen and Marcincova.

Likewise, with respect to witness, Alexandra Hall, Plaintiff served the subpoena prior to providing notice. *See* Menninger Decl. Ex. L. Served subpoenas <u>before</u> providing Notice under Rule 45. Accordingly, Plaintiff moves to quash the subpoenas on Epstein, Kellen and Marcincova as violations of Rule 45's notice provision. Ms. Maxwell further requests sanctions pursuant to Rule 37 for these documented violations.

With respect to Ms. Hall, who was deposed already earlier today, Ms. Maxwell believes that she did not offer any admissible testimony at her deposition. If Plaintiff's seek to introduce her testimony, the defense reserves the right to exclude such testimony both on evidentiary grounds as well as in violation of Rule 45's notice provision.[11]

## IV. MS. MAXWELL'S GOOD FAITH EFFORTS TO CONDUCT DISCOVERY

[11] Counsel for Ms. Maxwell only learned of the Rule 45 violation this past weekend after reviewing certificates of service provided by Plaintiff's counsel last week, without sufficient time to file a motion to quash the subpoena on Ms. Hall.

As already documented in previous pleadings, Ms. Maxwell's counsel has engaged in significant and repeated efforts to conduct discovery in this case in a professional, civil manner, especially as it relates to the depositions of non-parties. On February 25, 2016, counsel for Ms. Maxwell requested that the lawyers confer by telephone to arrange a schedule for the non-party depositions to occur in various states and countries.[12] Plaintiff ignored that request, and requests of the same ilk made on at least 6 different occasions in March and April. It was only on two and ½ months later, on May 5, 2016, when Plaintiff's counsel finally responded with "as is becoming clear, both sides are going to be needing to be coordinating a number of depositions."[13] She then proposed a calendar which scheduled 13 additional depositions for Plaintiff and only 2 days (actually ½ days) for defendant to depose her remaining witnesses.[14] Defendant provided a calendar which allowed for both sides to take remaining depositions, but Plaintiff ignored it and continued to schedule depositions on dates for witnesses without consulting defense counsel for their availability first. Menninger Decl., Ex. M.

Because of the breakdown in communications, defense counsel was left with little choice but to (a) show up at each of Plaintiff's noticed depositions, in Florida and New York, and (b) issue subpoenas for witness depositions on other dates in June. For example, Plaintiff issued a

---

[12] McCawley Decl. in Support of Request to Exceed Ten Deposition Limit, Exhibit 1 (Doc. # 173-1) at 28 (Letter of Menninger to McCawley (Feb. 25, 2015) ("I would suggest that rather than repeated emails on the topic of scheduling the various depositions in this case, or the unilateral issuance of deposition notices and subpoenas, you and I have a phone conference wherein we discuss which depositions are going to be taken, where, and a plan for doing them in an orderly fashion that minimizes travel and inconvenience for counsel and the witnesses. As you are well aware from your own practice of law, attorneys have other clients, other court dates and other commitments to work around. The FRCP and Local Rules contemplate courtesy and cooperation among counsel in the scheduling and timing of discovery processes. This rule makes even more sense in a case such as this spanning various parts of the country where counsel must engage in lengthy travel and the attendant scheduling of flights, hotels and rental cars.")).

[13] *Id.* at 19.

[14] *Id.* at 1-3.

Notice of Deposition for Juan Alessi on May 31, 2016, without any conferral with counsel, in Florida, fully aware that defense counsel would be traveling from Colorado. Defense counsel, in fact, did have to travel on Memorial Day to Florida for the 9:00 a.m. May 31 deposition. Mr. Alessi, however, did not appear on that date, believing that his deposition was for June 1, the same day that his wife had been subpoenaed to appear and because he and his wife live an hour away from Ft. Lauderdale. Thus, despite defense counsel's herculean efforts, no deposition occurred on May 31. On June 1, Mr. Alessi appeared, but there was insufficient time to take his wife's deposition, who presumably made the one hour drive for naught. Also, defense counsel then had to travel to New York for the June 2 hearing and back to Florida for a deposition of another witness, Mr. Rogers, that had been scheduled without input from defense counsel.

Counsel for Plaintiff makes much of her efforts to serve witnesses Epstein, Marcincova and Kellen. She fails to advise the Court that Ms. Maxwell has been "forced" to expend great time, money and resources to serve Plaintiff's *own mother, father, former fiancé and former boyfriend*. As described before, the defense even re-scheduled the deposition of Plaintiff's former fiancé due to the last minute unavailability of Plaintiff's counsel, although all counsel were already in Florida and had expended hundreds of dollars to serve him. Plaintiff made no effort to help serve those closest to her, including her own family members. Unlike Plaintiff, however, Ms. Maxwell and her counsel are fully aware that such are the difficulties of litigation. We do not ascribe to Plaintiff the blame.

Having flown to Florida a total of four separate times to attend depositions of five of Plaintiff's noticed witnesses, defense counsel has borne the brunt of Plaintiff's mismanagement of counsel and witness time. Defense counsel scheduled their own Florida depositions of three witnesses to occur during two of the four trips. Defense counsel offered to, and did, schedule the

two Colorado non-party witnesses the same week in May, so as minimize Plaintiff's counsel's travel obligations. Plaintiff, however, rescheduled the deposition of Mr. Rizzo in New York for a week after this Court had a hearing, rather than accommodating any attempt to have the New York deposition occur when all counsel were already present in NY.

To the extent the Court wishes to consider the good faith efforts of defense counsel in conducting depositions when deciding whether to grant Plaintiff additional time, defense has more than met their burden.

## V. GOOD CAUSE EXISTS TO TAKE RE-DEPOSE PLAINTIFF AND TO DEPOSE SHARON CHURCHER EXISTS

In contrast to the lack of good cause to extend discovery for Plaintiff's six witnesses, Ms. Maxwell seeks leave of the Court to take depositions beyond June 30. First, Ms. Maxwell properly served a deposition subpoena (and provided appropriate notice to Plaintiff's counsel) on Plaintiff's friend, confidante and former-Daily Mail journalist, Sharon Churcher for a deposition to occur in New York on June 16. Menninger Decl. Ex. N. On June 15, the day before her scheduled deposition, Ms. Churcher's counsel filed a Motion to Quash. That motion is to be heard by this Court on June 23. Should the Court deny the Motion to Quash, Ms. Churcher's deposition would need to be re-scheduled. Dates in early July would be sufficient for counsel.

Similarly, Ms. Maxwell is filing simultaneously with this Motion a request to re-open the deposition of Plaintiff on the grounds, *inter alia*, that she failed to provide numerous documents (ordered to be produced by this Court) until after her deposition (and still has failed to provide others)[15], she materially changed substantive and significant portions of her testimony after the

---

[15] For example, Ms. Giuffre testified that she had approximately 8 boxes, which included documents pertinent to this case, which she shipped from her home in Colorado to Australia in October 2015 to an undisclosed location (at her deposition, she would not testify where in Australia the boxes were located), and that the boxes had not been searched for responsive documents. Menninger Decl. Ex. D. In repeated conferrals following her deposition, on May 19, her counsel finally agreed to secure the boxes. As of today's date, the boxes still have not arrived,

fact through her *errata* sheet on May 31, and she refused to answer material questions at her deposition on the advice of counsel, including for example, which of Ms. Churcher's many quotes attributed to her were incorrect. *See,e g.,* Menninger Decl. Ex. D, referenced *supra*. As with Ms. Churcher's deposition, the re-opened deposition of Plaintiff could occur in early July, assuming she provides the Court-ordered documents timely.

## VI. ALTERNATIVELY, ALL OTHER DEADLINES NEED TO BE EXTENDED

Finally, Plaintiff glibly asserts that she seeks only 30 extra days to conduct her depositions, but does not want any other dates moved. Of course, that inures to her benefit and to Ms. Maxwell's detriment. July already was scheduled for expert disclosures (Plaintiff has yet to disclose her retained expert, and thus the defense has been unable to secure a rebuttal expert). Likewise, should any new information be learned in these late depositions that requires rebuttal, Ms. Maxwell will be unable to secure such evidence on a timely basis.

Further, summary judgment motions are due in this case on August 3. If depositions continue throughout August, Ms. Maxwell's ability to include any late-learned information in her anticipated motion will be jeopardized. Finally, the trial is scheduled for October, continuing fact discovery until August seriously impinges on Ms. Maxwell's ability to prepare for that trial, including preparing witnesses, exhibits and testimony.

WHEREFORE, Ms. Maxwell requests that the Motion to Extend the Deadline to Complete Depositions be denied; alternatively, if the deadline is extended for any of the listed six witnesses, Ms. Maxwell requests that the dates for expert discovery, dispositive motions and the trial date by extended as well. Further, Ms. Maxwell requests sanctions for Plaintiff's failures to comply with the notice provisions of Rule 45(a)(4).

---

apparently having been put on the slow boat to the US. One can only imagine where on the high seas the boxes may be located now. Of course, there were many alternative methods to search the boxes. The unknown custodians in Australia for example could have simply looked in them to see whether they contained any responsive documents.

Dated: June 20, 2016.

Respectfully submitted,

*/s/ Laura A. Menninger*

Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

**CERTIFICATE OF SERVICE**

I certify that on June 20, 2016, I electronically served this *DEFENDANT'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO EXTENDING DEADLINE TO COMPLETE DEPOSITIONS AND MOTION FOR SANCTIONS FOR VIOLATION OF RULE 45* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**Declaration Of Laura A. Menninger In Support Of Defendant's Response in Opposition to Extending Deadline to Complete Depositions and Motion for Sanctions for Violations of Rule 45**

I, Laura A. Menninger, declare as follows:

1. I am an attorney at law duly licensed in the State of New York and admitted to practice in the United States District Court for the Southern District of New York. I am a member of the law firm Haddon, Morgan & Foreman, P.C., counsel of record for Defendant Ghislaine Maxwell ("Maxwell") in this action. I respectfully submit this declaration in support of Defendant's Response in Opposition to Extending Deadline to Complete Depositions and Motion for Sanctions for Violations of Rule 45.

2. Attached as Exhibit A (filed under seal) is a true and correct copy of excerpts from the Deposition of Rinaldo Rizzo on June 10, 2016, and designated by Plaintiff as Confidential under the Protective Order.

3. Attached as Exhibit B (filed under seal) is a true and correct copy of The Billionaire Playboys Club book manuscript drafted by Plaintiff, designated by Plaintiff as Confidential under the Protective Order

4. Attached as Exhibit C is a report by former FBI director, Louis Freeh.

5. Attached as Exhibit D (filed under seal) is a true and correct copy of excerpts of Plaintiff's deposition on May 3, 2016, and designated by Plaintiff as Confidential under the Protective Order.

6. Attached as Exhibit E are true and correct copies of May 23, 2016 correspondence from Meredith Shulz and May 25, 2016 correspondence from myself.

7. Attached as Exhibit F are true and correct copies of Notices of Subpoena with attachments for Jean Luc Brunel, served on February 16, 2016 and May 23, 2016, as well as correspondence regarding Mr. Brunel's deposition from counsel, Bradley Edwards.

8. Attached as Exhibit G is a Motion to Quash filed by counsel for Jeffrey Epstein in Broward County, Florida in *Edwards and Cassell v. Dershowitz*, Case No. 15-0000072 on September 10, 2015.

9. Attached as Exhibit H is a true and correct copy of the Notice of Deposition and Subpoena for Jeffrey Epstein, served on counsel on April 27, 2016.

10. Attached as Exhbit I are true and correct copies of the Notices of Deposition and Subpoena for Sarah Kellen and Nadia Marcincova, served on counsel on April 27, 2016.

11. Attached as Exhibit J (filed under seal) are true and correct copies of correspondence produced in this case between Ms. Maxwell and Jeffrey Epstein from January 2015, and designated as Confidential by Defendant under the Protective Order.

12. Attached as Exhibit K (filed under seal) are Notices of Deposition and Subpoena for [redacted], Joe Recarey and Michael Reiter and a letter of production from Sigrid McCawley of June 17, 2016, designated as Confidential by Plaintiff under the Protective Order.

13. Attached as Exhibit L (filed under seal) is the certificate of service for [redacted]

14. Attached as Exhibit M is a true and correct copy of my correspondence to Plaintiff's counsel of May 25, 2016.

15. Attached as Exhibit N is a Notice of Subpoena and Deposition for Sharon Churcher on June 16, and the certificate of service dated June 4.

By: */s/ Laura A. Menninger*
Laura A. Menninger

**CERTIFICATE OF SERVICE**

I certify that on June 20, 2016, I electronically served this *Declaration Of Laura A. Menninger In Support Of Defendant's Response in Opposition to Extending Deadline to Complete Depositions and Motion for Sanctions for Violations of Rule 45* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x

VIRGINIA L. GIUFFRE,

Plaintiff,

-against-

Case No.: 15-cv-07433-RWS

GHISLAINE MAXWELL,

Defendant.

- - - - - - - - - - - - - - - - - - - - x

**CONFIDENTIAL**

Videotaped deposition of RINALDO RIZZO, taken pursuant to subpoena, was held at the law offices of Boies Schiller & Flexner, 333 Main Street, Armonk, New York, commencing June 10, 2016, 10:06 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

MAGNA LEGAL SERVICES
1200 Avenue of the Americas
New York, New York 10026
(866) 624-6221

APPEARANCES:
FARMER JAFFE WEISSING EDWARDS FISTOS & LEHRMAN, P.L.
Attorneys for Plaintiff
425 N. Andrews Avenue
Fort Lauderdale, Florida 33301
BY: BRAD EDWARDS, ESQUIRE

HADDON MORGAN FOREMAN
Attorneys for Defendant
150 East 10th Avenue
Denver, Colorado 80203
BY: JEFFREY S. PAGLIUCA, ESQUIRE

FREEMAN LEWIS LLP
Attorneys for the Witness
228 East 48th Street
New York, New York 10017
BY: ROBERT LEWIS, ESQ.

Also Present:

RODOLFO DURAN, Videographer



THE VIDEOGRAPHER: This is DVD No. 1 in the video-recorded deposition of Rinaldo Rizzo, in the matter of Virginia Giuffre versus Ghislaine Maxwell, in the United States District Court, Southern District of New York. This deposition is being held at 333 Main Street in Armonk, New York, June 10, 2016, at approximately 10:06 a.m.

My name is Rodolfo Duran. I am the legal video specialist. The court reporter is Leslie Fagin, and we're both in association with Magna Legal Services.

Will counsel please introduce themselves.

MR. EDWARDS: Brad Edwards. I represent the plaintiff, Virginia Giuffre.

MR. PAGLIUCA: Jeff Pagliuca, appearing on behalf of Ms. Maxwell.

MR. LEWIS: Robert Lewis, with the firm of Freeman Lewis, LLP, representing the deponent, Rinaldo





Rizzo.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

R I N A L D O R I Z Z O,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. EDWARDS:

Q. Mr. Rizzo, can you tell us your full name for the record?
A. Rinaldo A. Rizzo.
Q. And what is your date of birth?
A. [redacted]
Q. What is your address?
A. [redacted].
Q. What is your educational background?
A. I have a management degree with a minor in business law from Texas A&M University, and I have a degree in applied science in hospitality and culinary arts from the Culinary Institute of America.





Q. Are you married?
A. Yes.
Q. Who are you married to?
A. Debra Rizzo.
Q. How long have you been married?
A. We've been together 27 years, so 22.
Q. And do you have children?
A. Yes.
Q. How many?
A. One.
Q. Since graduating, what has been your profession?
A. It is called private service or domestic service.
Q. What does that mean?
A. My role is to work within a family as a desired position that's offered to me, and most of it's been in management or support of household staff.
Q. Was there a time when you worked in the household of Glenn Dubin and Eva Anderson Dubin?
A. Yes.



MAGNA LEGAL SERVICES

R. Rizzo - Confidential
fired abruptly at this point, right?
A. Correct.
Q. You went and retained counsel to sue the Dubins, their entity and [redacted], all of them, right?
A. Correct.
Q. I take it you were deposed in connection with that litigation, correct?
A. Correct.
Q. Now, during that litigation, that litigation meaning the reference in Exhibit 3, 13-cv-8864, did you ever tell anyone about the interactions with Mr. Epstein that you described here today?
A. No, I did not.
Q. That was not a part of your lawsuit, correct?
A. Could you restate the question? I don't understand what --
Q. You didn't raise that as an issue as to why you were suing the Dubins in 2013, right?
A. No, I did not.
THE VIDEOGRAPHER: The time is



R. Rizzo - Confidential
12:41. We are going off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 12:47 p.m. We are back on the record. This begins DVD No. 3.
BY MR. PAGLIUCA:
Q. I just have a few more questions. I'm going to finish off with your employment.
So after this lawsuit was concluded, referenced in Exhibit 3, have you worked since then?
A. No, I have not.
Q. Has your wife worked since then?
A. On and off, yes.
Q. How is it that you are currently supporting yourself?
A. I'm on disability.
Q. That's as a result of your back injury?
A. Yes, and my hip injury.
Q. I didn't realize you had a hip injury, I'm sorry. Is that Social Security disability?
A. Yes, it is.



R. Rizzo - Confidential
Q. The lawsuit with the Dubins referenced in Exhibit 3 was settled, I take it?
A. Correct.
Q. That was pursuant to a confidential settlement agreement?
A. Correct.
Q. And I am assuming that you received a sum of money to settle that litigation, is that correct?
A. Correct.
Q. And I'm not going to ask you the details about that, but in case I need to do something, let me put it this way. If I choose to subpoena that settlement agreement from the Dubins, are you going to have any objection to that, or is it all right if we do that as far as you are concerned?
A. I would have to discuss it with my lawyer.
MR. PAGLIUCA: I can talk to you about that, if we decide to do it.
Q. I just want to turn now, and this is the last series of questions I have, what



R. Rizzo - Confidential
you did in advance of coming here today.
Have you talked to Mr. Edwards before?
A. Yes.
Q. And when have you talked to Mr. Edwards?
A. I don't recall the exact date and time.
Q. Did Mr. Edwards call you or did you call Mr. Edwards first?
A. I called him.
Q. When did you call Mr. Edwards?
A. I don't recall the exact date and time.
Q. Years ago, days ago, months ago?
A. It's been at least over a year.
Q. Why did you call Mr. Edwards?
A. At the time I was having a very hard time with my attorney. My wife and I had discussed the issue. As my wife put it, we needed an attorney with balls and she had been keeping track of the Jeffrey Epstein issue, and basically in our conversation --
MR. LEWIS: Let me stop you there.



MAGNA LEGAL SERVICES

Page 130

R. Rizzo - Confidential
There is a privilege of spousal privilege, so please don't disclose conversations you had with your wife.
THE WITNESS: Sorry.
MR. LEWIS: You can answer the question why you called, but you don't need to disclose anything about conversations with your wife.
A. I was looking for an attorney that basically could handle this kind of situation, and I felt like, from what I had read, that Mr. Edwards was probably someone I needed to attain, if I could.
Q. And so the, you referenced dissatisfaction with an attorney. I'm assuming that was the attorney that filed this 13-cv-8664 action, is that correct?
A. Correct.
Q. So you weren't happy with that lawyer and you were looking for a more aggressive lawyer?
A. Correct, or someone that could work with my lawyer.
Q. The point being you were looking to

Page 131

R. Rizzo - Confidential
recover some form of compensation, I take it, from the Dubins or Mr. Epstein?
A. I was hoping -- how does Mr. Epstein --
Q. I don't know. I'm asking the question.
A. That's incorrect.
Q. You were seeking to get compensation from the Dubins, though?
A. Correct.
Q. And that was the point of you calling Mr. Edwards is that, however you learned it, you learned about the Epstein litigation and you knew Mr. Edwards was involved in the Epstein litigation?
A. Correct.
Q. The point of you contacting Mr. Edwards was to see if he could represent you in some litigation involving the Dubins in which you would collect money, is that right?
A. Correct.
Q. And so when you called Mr. Edwards, what do you recall telling him?
MR. LEWIS: At this point, I object

Page 132

R. Rizzo - Confidential
on attorney/client privilege grounds. The conversation is privileged for the purpose of seeking legal advice.
MR. PAGLIUCA: I don't understand. Mr. Edwards is the lawyer for the witness.
MR. LEWIS: I am the lawyer for the witness.
MR. PAGLIUCA: I know, I'm not asking about you.
MR. LEWIS: He called Mr. Edwards for the purpose to determine whether Mr. Edwards could represent him in some capacity in that other lawsuit, so the conversations is privileged.
MR. PAGLIUCA: I'm going to disagree, and you know we may need to revisit that issue respectfully.
MR. LEWIS: Fair enough.
MR. PAGLIUCA: Let me put some parameters on this that don't ask for communications.
MR. LEWIS: Ask a question and I will object or not.

Page 133

R. Rizzo - Confidential
Q. I think you said you called Mr. Edwards about a year ago?
A. More or less, correct.
Q. I didn't print out the docket sheet, but do you recall when you settled the 13-cv-8664 case?
A. To the best of my recollection, I think it was in December.
Q. Of?
A. I don't recall. I mean, it's last year.
Q. Without telling me what you told Mr. Edwards, what was the purpose of your calling -- I think you already told me this, so I won't reask it. Never mind.
Did you just speak with Mr. Edwards over the phone?
A. Correct, yes.
Q. And I take it Mr. Edwards did not become your lawyer in connection with any litigation against the Dubins, correct?
MR. LEWIS: You may answer that.
A. Correct.
Q. And Mr. Edwards in some fashion

Page 134

R. Rizzo - Confidential
indicated to you that he wasn't going to be your lawyer in connection with litigation, correct?
MR. LEWIS: Objection. Do not answer that on privilege grounds.
Q. Mr. Edwards never became your lawyer, is that right?
A. Correct.
Q. After that conversation, did you have any -- after you understood that Mr. Edwards was not your lawyer, did you have further conversations with Mr. Edwards?
A. No, I did not.
Q. You may object to this, but I need to ask this question. In the first conversation that you had with Mr. Edwards, did you tell Mr. Edwards the things that you've told us here today?
MR. LEWIS: Objection. Do not answer.
MR. PAGLIUCA: Privilege?
MR. LEWIS: Yes.
MR. PAGLIUCA: So just so the record is clear, it seems to me this

Page 135

R. Rizzo - Confidential
would be a subject matter waiver of everything that he has talked about. I don't know why it makes a difference if he is talking about it now and he told Mr. Edwards, I think he can talk about what he said to Mr. Edwards. It seems to me there is a waiver here.
MR. LEWIS: You are presuming what he said to Mr. Edwards. And secondly, just because, even if that were the case, I'm not saying it is, just because you testify to incidents which you tell your attorney about doesn't mean the disclosures to your attorney are not privileged.
MR. PAGLIUCA: Fair enough. We can argue about this later if we need to.
BY MR. PAGLIUCA:
Q. Other than Mr. Edwards and your wife and your current attorney, have you talked to anyone else about the things that you've talked about here today?
A. No, I have not.
Q. I think you answered this question,

Page 136

R. Rizzo - Confidential
but I want to make sure.
After that first conversation with Mr. Edwards, did you speak with Mr. Edwards again in advance of this deposition today?
MR. LEWIS: You may answer that.
A. No, I have not.
Q. Do you know, did Mr. Edwards provide a list of questions to your lawyer, who is here today, for you to provide those answers to your lawyer to give to Mr. Edwards?
MR. LEWIS: I advise the witness to only answer that question to the extent he knows it outside of any conversations that he might have had with me, which are privileged.
A. No.
Q. So let me explain that question, and here is my issue with that, and I don't know if this happened or didn't happen, but if there are questions that are given proposed to you by Mr. Edwards and you give them to the client with the expectation he is going to give that information to you to give

Page 137

R. Rizzo - Confidential
to Mr. Edwards, it's not privileged.
MR. LEWIS: I can represent that didn't happen.
MR. PAGLIUCA: That solves the problem.
Q. I'm just closing the loop on this and then we are done.
Have you spoken to anyone who is affiliated with Mr. Edwards, either another lawyer in his office, paralegal, an investigator, about the things that you've talked about here today?
A. No, I have not.
MR. PAGLIUCA: That's all I have.
MR. EDWARDS: I don't have any questions. I appreciate you taking the time. Sorry about your injury.
THE VIDEOGRAPHER: The time is 12:58 p.m. and we are going off the record.
(Recess.)
THE VIDEOGRAPHER: Back on the record.
MR. PAGLIUCA: The parties have


MAGNA LEGAL SERVICES

# EXHIBIT D

# *GIUFFRE*

# *VS.*

# *MAXWELL*

**Deposition**

## *VIRGINIA GIUFFRE*

*05/03/2016*

---

***Agren Blando Court Reporting & Video, Inc.***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 15-cv-07433-RWS

---

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
VIRGINIA GIUFFRE May 3, 2016

---

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

---

APPEARANCES:

FAMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
By Brad Edwards, Esq.
425 N. Andrews Avenue
Suite 2
Fort Lauderdale, FL 33301
Phone: 954.524.2820
brad@pathtojustice.com
Appearing on behalf of the Plaintiff

BOIES, SCHILLER & FLEXNER LLP
By Sigrid S. McCawley, Esq. (For Portion)
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301-2211
Phone: 954.356.0011
smccawley@bsfllp.com
Appearing on behalf of the Plaintiff

APPEARANCES: (Continued)

HADDON, MORGAN AND FORMAN, P.C.
By Laura A. Menninger, Esq.
Jeffrey S. Pagliuca, Esq.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
lmenninger@hmflaw.com
jpagliuca@hmflaw.com
Appearing on behalf of the Defendant

Also Present:
Brenda Rodriguez, Paralegal
Nicholas F. Borgia, CLVS Videographer

Pursuant to Notice and the Federal Rules of Civil Procedure, the VIDEOTAPED DEPOSITION OF VIRGINIA GIUFFRE, called by Defendant, was taken on Tuesday, May 3, 2016, commencing at 9:00 a.m., at 150 East 10th Avenue, Denver, Colorado, before Kelly A. Mackereth, Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter and Notary Public within Colorado.

* * * * * * *

I N D E X


| EXAMINATION | PAGE |
|---|---|
| MS. MENNINGER | 8 |

PRODUCTION REQUEST(S):

(None.)

wanted to know about the Prince Andrew incident.

Q So that's a different piece of paper?

A Yeah, that's just random paper.

Q So you had a green spiral notebook that you began sometime in 2011 or 2012 in which you wrote down your recollections about what had happened to you, and you burned that in a bonfire in 2013.

Did I get that right?

A You got that right.

Q And do you have no other names of people to whom you claim Ghislaine Maxwell directed you to have sex, correct?

A At this time, no.

Q Is there any document that would refresh your recollection that you could look at?

A If you have a document you'd like to show me, I would be glad to look at it and tell you the names I recognize off of that.

Q I'm just asking you if there's a document you know of that has this list of names in it?

A Not in front of me, no.

Q Where is the original of the photograph that has been widely circulated in the press of you with Prince Andrew?

A I probably still have it. It's not in my

possession right now.

Q Where is it?

A Probably in some storage boxes.

Q Where?

A In Sydney.

Q Where in Sydney?

A At some family's house. We got the boxes shipped to Australia, and they were picked up off the porch by my nephews and brought to their house.

Q Which is where?

A In Sydney.

Q Where in Sydney?

A Bass Hill.

Q And who lives in that house?

A Well, it's owned by my mother-in-law and father-in-law, but my nephews live in the house.

Q What are their names?

A I'm not giving you the names of my nephews.

Q What's the address of the house?

A Why would you want that?

Q I want to know where the photograph is. I'm asking you where the photograph is. And you've just told me it's somewhere in Bass Hill?

A Yes.

Q So where in Bass Hill is the photograph located?

A If I can't 100 percent say that the photograph is there, it could be at my house that I presently live in. I'm not going to give you the address of my nephews' residence.

Q When is the last time you saw the photograph in person?

A When I packed and left America.

Q Colorado?

A Yes.

Q All right. So you had that photograph here with you in Colorado?

A Yes.

Q What's on the back of the photograph?

A I'm sorry?

Q Is there anything on the back of the photograph?

A There's like the date it was printed, but no writing or anything.

Q Okay. Does it say where it was printed?

A I don't believe so. I think it just -- I don't remember. I just remember there's a date on it.

Q Whose camera was it taken with?

A My little yellow Kodak camera.
Q Who took the picture?
A Jeffrey Epstein.
Q And where did you have it developed?
A I believe when I got back to America.
Q So where?
A I don't know.
Q Palm Beach?
A I don't know.
Q What is the date the photograph was printed?
A I believe it's in March 2001.
Q Okay.
A But that's just off of my photographic memory. I don't -- it could be different, but I think it's March 2001.
Q You have a photographic memory?
A I'm not saying I have a photographic memory. But if I'd look at the back of the photo and I remember what it says, I believe it was March 2001.
Q Did the photograph ever leave your possession for a while?
A I gave it to the FBI.
Q Okay. And when did you get it back?
A When they took copies of it.

Q When was that?

A 2011.

Q When they came to interview you?

A Yes.

Q So from 2011 until you left Colorado it was in your personal possession?

A Yes.

Q What other documents related to this case are in that, storage boxes in Australia?

MR. EDWARDS: Object to the form.

A Documents related to this case -- there -- I don't know. I really can't tell you. I mean, there's seven boxes full of Nerf guns, my kids' toys, photos. I don't know what other documents would be in there.

Q (BY MS. MENNINGER) Did anyone search those documents after you received discovery requests from us in this case?

A I haven't been able to obtain those boxes. I can't get them sent back up to me. It's going to cost me a large amount of money. And right now I'm trying to look after my family, so I'm not able to afford to get them up.

Q You live in Australia, correct?

A I do.

Q Okay. How far away are the boxes from where you live in Australia?

A Sydney is down here at the bottom. Cairns is up here at the top.

Q Okay.

A It's probably a six-day drive.

Q Did you fly here through Sydney?

A No.

Q Have you been to Sydney since you've moved back to Australia?

A I flew into Sydney with my three kids, but it was a connecting flight to Brisbane.

Q Did you ask your nephews or anyone else to search those boxes in response to discovery requests that we issued in this case?

A They are my nephews. I would never let them look at those.

Q Other than your green spiral notebook, what else did you burn in this bonfire in 2013?

A That was it.

Q That's the only thing?

A Yes.

Q Did you use wood?

A Yes.

Q Charcoal?

A My husband built the bonfire out of wood and I don't know what else he put in it. He's the one who always makes the fires, not me.
Q Who else was present?
A Just him and I.
Q Were your kids there?
A No. They were inside sleeping.
Q And what beach was this?
A It wasn't a beach. It was in my backyard.
Q What's your address?
A At that time?
Q Um-hum.
A [redacted]
Q [redacted]
A Yes.
Q Who were your neighbors?
A Sweet people. Ray and -- I could look on my phone if you want.
Q No, thank you. Do they still live there?
A Yes.
Q Do you keep in touch with them?
A Last time I talked to them was a few months ago.
Q Did they see the fire?
A They've seen many fires that we've had.

Orlando Court Reporting & Video, Inc.

We've had lots of bonfires there.

Q Did you ever ride in a helicopter with Ghislaine Maxwell acting as pilot of the helicopter?

A Yes.

Q Who else was on the flight?

A I've been on the helicopter with her plenty of times. I can't mention how many people were on the -- on the helicopter at the same time.

Q How many times?

A I don't know. Do you have helicopter records that you could show me?

Q I'm asking you how many times you were on the helicopter with Ghislaine Maxwell acting as the pilot --

A It's impossible for me to answer the question without having the actual physical records in front of me.

Q I'm asking you to look into your memory and tell me how many times you recall being on a helicopter with Ghislaine Maxwell at the pilot seat?

A There is no number I can give you. There's plenty of times I've been on her helicopter.

Q Where did you go from and to on a helicopter?

A I believe it was -- don't quote me on this

because I get confused on the islands there. I want to say it was St. John's. It could have been St. Barts. St. John or St. Barts, and then we would fly straight to Jeffrey's island.

Q Okay. Did you ever go anywhere else on the helicopter?

A No.

Q Were you ever on the helicopter with Bill Clinton and Ghislaine Maxwell as the pilot of the helicopter?

A No.

Q Were you ever on the helicopter with Bill Clinton's Secret Service and Ghislaine Maxwell as the pilot?

A No.

Q Do you recall telling Sharon Churcher that you were?

A No.

Q Did you see the press article in which Sharon Churcher reported that you were?

MR. EDWARDS: Objection. I'd just ask that if you're going to ask this witness about a specific article I'd like for her to see the article. Otherwise she's not going to testify about it.

If you have something to show her, then,

please.

Q (BY MS. MENNINGER) Do you recall seeing a press article in which Sharon Churcher reported that you were on a helicopter with Bill Clinton and Ghislaine Maxwell as the pilot?

MR. EDWARDS: Again, I'll let you answer the question once she's looking at the document that you're being asked about.

MS. MENNINGER: You're not letting her answer a question about whether she recalls a particular press statement?

MR. EDWARDS: I will let her answer every question about the press statement as long as she sees the press statement. I'm okay with that. She can answer all of them.

MS. MENNINGER: No, there is a rule of civil procedure that allows you to direct a witness not to answer a question when there's a claim of privilege.

What privilege are you claiming to direct her not to answer this question?

MR. EDWARDS: I thought that you wanted accurate answers from this witness. If the --

MS. MENNINGER: I asked her if she recalled something --

MR. EDWARDS: If the sole purpose is to just to harass her --

MS. MENNINGER: I asked her if she recalled something --

MR. EDWARDS: Then that's just not going to be what's happening today.

Q (BY MS. MENNINGER) All right. So you're refusing to answer a question about whether you recall a particular press statement --

MR. EDWARDS: She's --

Q (BY MS. MENNINGER) -- is that true?

MR. EDWARDS: She is not refusing to answer any questions. She --

A I'm not refusing to answer. I just want to see the article you're talking about so I can be clear in my statement.

Q (BY MS. MENNINGER) Do you recall seeing a press article written by Sharon Churcher reporting that you flew on a helicopter with Bill Clinton and Ghislaine Maxwell as the pilot?

A No, I do not recall reading a press article saying that I was on a helicopter with Bill Clinton as Ghislaine is the pilot.

Q Do you recall telling Sharon Churcher that you had conversations with Bill Clinton regarding him

flying on a helicopter with Ghislaine Maxwell?

A I believe that it was taken out of context. Ghislaine told me that she flew Bill Clinton in. And Ghislaine likes to talk a lot of stuff that sounds fantastical. And whether it's true or not, that is what I do recall telling Sharon Churcher.

Q So you told Sharon Churcher that Ghislaine Maxwell is the one who told you that she flew Bill Clinton in the helicopter?

A I told Sharon Churcher that Ghislaine flew Bill Clinton onto the island, based upon what Ghislaine had told me.

Q Not based upon what Bill Clinton had told you, correct?

A Correct.

Q Did you ever ask Sharon Churcher to correct anything that was printed under her name, concerning your stories to Sharon Churcher?

A I wasn't given those stories to read before they were printed.

Q After they were printed did you read them?

A I tried to stay away from them. They were very hard. You have to understand it was a very hard time for me and my husband to have to have this

public -- we didn't think it was going to be this publicly announced and that big. So we turned off the news and we stopped reading so many things.

Q You didn't read the articles about your stories to Sharon Churcher --

A I've read some articles --

Q Let me just finish. You did not read the articles published by Sharon Churcher about your stories to Sharon Churcher?

A I have read some articles about what Sharon Churcher wrote. And a lot of the stuff that she writes she takes things from my own mouth and changes them into her own words as journalists do.

And I never came back to her and told her to correct anything. What was done was done. There was nothing else I can do.

Q So even if she printed something that were untrue you didn't ask her to correct it, correct?

A There was things that she printed that really pissed me off, but there was nothing I could do about it. It's already out there.

Q She printed things that were untrue, correct?

MR. EDWARDS: Objection to the form. Mischaracterization.

A I wouldn't say that they were untrue. I would just say that she printed them as journalists take your words and turn them into something else.

Q (BY MS. MENNINGER) She got it wrong?

MR. EDWARDS: Object to the form. Mischaracterization.

A In some ways, yes.

Q (BY MS. MENNINGER) Did she print things in her articles that you did not say to her?

MR. EDWARDS: I object and ask that the witness be given the opportunity to see the document so that she can review it and answer that question accurately. Otherwise she's unable to answer the question. I'm not going to allow her to answer.

MS. MENNINGER: You know the civil rules tell you not to suggest answers to your client.

Q (BY MS. MENNINGER) And you understand your lawyer is now directing you to not all of a sudden remember what your answer is. That's what he's suggesting that you say. So you're not supposed to listen to him suggest that to you. You're supposed to tell me from your memory.

MR. EDWARDS: That is not what I'm --

Q (BY MS. MENNINGER) Did you --

MR. EDWARDS: That's not what I'm doing.

You don't get to just talk over me and tell my client when not to listen to me. All you have to do to get answers is show her the document you're talking about, and I'll let her answer every question. I don't know why we're so scared of the actual documents.

MS. MENNINGER: I don't know why you're scared of your client's recollection, Mr. Edwards. But anyway --

MR. EDWARDS: Why would you do this to her?

Q (BY MS. MENNINGER) Did Sharon Churcher print things that you did not say?

MR. EDWARDS: I'm going to instruct my client not to answer unless you give her what it is that you're talking about that was printed. And she will tell you the answer, the accurate answer to your question. Just without the document to refresh her recollection and see it, she's not going to answer the question.

Q (BY MS. MENNINGER) Did Sharon Churcher print things that you did not say?

MR. EDWARDS: Same objection. Same instruction not to answer.

I think I've made a very clear record as

to why I want my client to answer all of these questions, but I want her to have the fair opportunity to see this document.

Q (BY MS. MENNINGER) Did Sharon Churcher print things that you felt were inaccurate?

MR. EDWARDS: Same objection. Same instruction. If she sees the document, she's going to answer every one of these questions.

Q (BY MS. MENNINGER) Did any other reporter print statements that you believe are inaccurate?

MR. EDWARDS: Same objection. Same instruction.

Q (BY MS. MENNINGER) Did any reporter print statements about Ghislaine Maxwell that were inaccurate?

MR. EDWARDS: Same objection. Same instruction.

This is harassing. This is harassing a sexual abuse victim. And all I'm asking is for fairness, that we just let her see the document so she can answer this.

MS. MENNINGER: Mr. Edwards, please stop saying anything other than an objection, what the basis is, or instructing your client not to answer.

MR. EDWARDS: I will do that.

Orlando Court Reporting & Video, Inc.

MS. MENNINGER: That's what the Federal Rules of Civil Procedure provide.

MR. EDWARDS: I hear you. They also provide for fairness and civility. And all I'm asking, very calmly, is for her to see this.

MS. MENNINGER: Mr. Edwards, this is not your deposition. I'm asking your client what she remembers. If she doesn't want to talk about what she remembers, then let her not answer. But you cannot instruct her not to answer unless there's a privilege.

What privilege --

MR. EDWARDS: I am instructing her not to answer.

Q (BY MS. MENNINGER) All right. You are refusing to answer questions about whether statements to the press about Ghislaine Maxwell attributed to you were inaccurate?

MR. EDWARDS: She's not refusing not to answer.

A You are refusing to show me these documents so I could answer properly. I would give you an answer if you were to show me some documents.

Q (BY MS. MENNINGER) You can't say without looking at a document whether the press attributed to

you is accurate or inaccurate?
A Please show me the document.
Q You can't say from the top of your head whether any inaccurate statement has been attributed to you in the press?
A Please show me a document and I will tell you.
Q Are you refusing to answer my questions about your knowledge of whether inaccurate statements have been attributed to you in the press?
A Are you refusing to give me the documents to look at?
Q Are you refusing to answer the question?
A I am refusing to answer the question based upon the fact that you are not being fair enough to let me see the document in order to give you an honest answer.
Q Ms. Giuffre --
A Yes.
Q -- we are talking about press that has been published on the Internet, correct?
A Yes.
Q Do you have access to the Internet?
A Yes.
Q Have you looked on the Internet and read

articles that attribute statements to you about Ghislaine Maxwell?

A Yes.

Q Do you know any statement that has been attributed to you in a press article on the Internet about Ghislaine Maxwell that is untrue?

MR. EDWARDS: Same objection. Same instruction.

A Please show me a specific document.

Q (BY MS. MENNINGER) Do you know of any such statement about Ghislaine Maxwell attributed to you by the press that is inaccurate?

A If you could please show me a specific document.

Q Tell me what Sharon Churcher asked you to write for her.

A Any knowledge that I had about my time with Prince Andrew.

Q And did you write it?

A Um-hum.

Q What did you write it in or on?

A Paper.

Q What kind of paper?

A Lined paper.

Q Was it in a book or single sheets?

A Single sheets.

Q And did you write a long document or a short document? What was it?

A I can't recall how long the document was, but I would say it would be a few pages.

Q And other than asking you to write whatever you remember about Prince Andrew, did she give you any other directions about what you should write?

A She was interested in two things, really. How Epstein got away with so many counts of child trafficking for sex and how Prince Andrew was involved in it. Those were her two main inquiries.

Q What did she ask you to write?

A She asked me to write about Prince Andrew.

Q Did she tell you to put it in your own handwriting?

A No, she just asked me to write down what I can remember.

Q Did you give her everything that you wrote?

A Did I give her the whole entire pages that I wrote?

Q Yes.

A Yeah, I wrote pages for her specifically.

Q In your own handwriting?
A In my own handwriting.
Q And what you wrote, was that true?
A Yes.
Q And did you get paid for those pieces of paper?
A Not for the papers, I don't believe.
Q Okay. Have you gotten paid when they've been reprinted?
A No.
Q Have you negotiated any deal with Radar Online?
A No.
Q Have you negotiated any deal with Sharon Churcher for the purpose of publishing those pieces of paper?
A Not those pieces of paper.
Q When did you write those pieces of paper?
MR. EDWARDS: Object to the form.
A A week before she came out.
Q (BY MS. MENNINGER) And when did you give them to her?
A When she came out.
Q When was that?
A Sometime, I believe, in early 2011.

Q What did you get paid for, if not for those pieces of paper?

MR. EDWARDS: Object to the form.

A I was paid for the picture with Prince Andrew with his arm around me, Ghislaine in the background. And I was paid for the, I guess, the print of the stories.

Q (BY MS. MENNINGER) Anything else?

A No.

Q You were not paid for those pieces of paper?

A No.

Q All right. And how many pieces of paper did you write?

A Like I said, I'm rounding it around three.

Q Three pieces of paper?

A That's what I -- I don't remember to be exact on a number. I'm sorry. But over three pages.

Q And you wrote those sometime in 2011?

A The week that she was coming out to see me.

Q And you gave them to her, right?

A I gave them to her.

Q Did you keep a copy of that?

A No.

# EXHIBIT F

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff,

Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.

_______________________________/

**NOTICE OF SERVICE OF RULE 45 SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES UPON JEAN LUC BRUNEL**

**PLEASE TAKE NOTICE THAT,** pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff, Virginia Giuffre, hereby provides Notice of Service of Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises upon Jean Luc Brunel. A copy of the Subpoena is attached to this Notice as Exhibit A.

Dated: February 16, 2016

By: /s/ Sigrid McCawley
Sigrid McCawley (Admitted Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Ellen Brockman
Boies Schiller & Flexner LLP
575 Lexington Ave
New York, New York 10022
(212) 446-2300

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 16, 2016, I served the foregoing document on the individuals identified below via email.

Laura A. Menninger, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

Virginia L. Giuffre
*Plaintiff*
v.
Ghislaine Maxwell
*Defendant*

Civil Action No. 15-CV-07433-RWS

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: JEAN LUC BRUNEL, c/o Joe Titone, 621 South East 5th Street, Pompano Beach, Florida 33060

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

PLEASE SEE ATTACHED EXHIBIT A.

| Place: Boies, Schiller & Flexner LLP<br>575 Lexington Avenue<br>New York, NY 10022 | Date and Time:<br>03/01/2016 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 02/16/2016

*CLERK OF COURT*

_________________________
*Signature of Clerk or Deputy Clerk*

OR

[signature]
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Virginia Giuffre, who issues or requests this subpoena, are:

Sigrid S. McCawley, BSF, LLP, 401 E Las Olas Blvd, #1200, Ft. Lauderdale, FL 33301 (954)356-0011 smccawley@bsfllp.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 15-CV-07433-RWS

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❐ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________________________________ on *(date)* ______________ ; or

❐ I returned the subpoena unexecuted because: ______________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

**DEFINITIONS**

Wherever they hereafter appear the following words and phrases have the following meanings:

1. "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting, or purporting to act, at the discretion of or on behalf of another.

2. "Correspondence" or "communication" shall mean all written or verbal communications, by any and all methods, including without limitation, letters, memoranda, and/or electronic mail, by which information, in whatever form, is stored, transmitted or received: and, includes every manner or means of disclosure, transfer or exchange, and every disclosure, transfer or exchange of information whether orally or by document or otherwise, face-to-face, by telephone, telecopies, e-mail, text, modem transmission, computer generated message, mail, personal delivery or otherwise.

3. "Defendant" shall mean the defendant Ghislaine Maxwell and her employees, representatives or agents.

4. "Document" shall mean all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form. It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, advertisements, photographs, videos, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, film negatives, film slides, memory sticks, checks, statements, receipts, summaries, computer printouts, computer programs, text messages, e-mails, information kept in computer hard drives, other computer drives of any kind, computer tape back-up, CD-ROM, other computer disks of any kind, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic "writings" and "recordings" as set forth in the Federal Rules of Evidence, including but not limited to, originals or copies where originals are not available. Any document with any marks such as initials, comments or notations of any kind of not deemed to be identical with one without such marks and is produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

5. "Employee" includes a past or present officer, director, agent or servant, including any attorney (associate or partner) or paralegal.

6. "Including" means including without limitations.

7. "Jeffrey Epstein" includes Jeffrey Epstein and any entities owned or controlled by Jeffrey Epstein, any employee, agent, attorney, consultant, or representative of Jeffrey Epstein.

8. "Ghislaine Maxwell" includes Ghislaine Maxwell and any entities owned or controlled by Ghislaine Maxwell, any employee, agent, attorney, consultant, or representative of Ghislaine Maxwell.

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

9. "Person(s)" includes natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations or any other legal or business entity.

10. "You" or "Your" hereinafter means Jean Luc Brunel and any employee, agent, attorney, consultant, related entities or other representative of Jean Luc Brunel.

**INSTRUCTIONS**

1. Production of documents and items requested herein shall be made at the offices of Boies Schiller & Flexner, LLP, 575 Lexington Avenue, New York, New York.

2. Unless indicated otherwise, the Relevant Period for this Request is from 1996 to the present. A Document should be considered to be within the relevant time frame if it refers or relates to communications, meetings or other events or documents that occurred or were created within that time frame, regardless of the date of creation of the responsive Document.

3. This Request calls for the production of all responsive Documents in your possession, custody or control without regard to the physical location of such documents.

4. If any Document requested was in your possession or control, but is no longer in its possession or control, state what disposition was made of said Document, the reason for such disposition, and the date of such disposition.

5. For the purposes of reading, interpreting, or construing the scope of these requests, the terms used shall be given their most expansive and inclusive interpretation. This includes, without limitation the following:

a) Wherever appropriate herein, the singular form of a word shall be interpreted as plural and vice versa.

b) "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any

TO: JEAN LUC BRUNEL

EXHIBIT A

information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

c) "Any" shall be understood to include and encompass "all" and vice versa.

d) Wherever appropriate herein, the masculine form of a word shall be interpreted as feminine and vice versa.

e) "Including" shall mean "including without limitation."

6. If you are unable to answer or respond fully to any document request, answer or respond to the extent possible and specify the reasons for your inability to answer or respond in full. If the recipient has no documents responsive to a particular Request, the recipient shall so state.

7. Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation.

8. The words "relate," "relating," "relates," or any other derivative thereof, as used herein includes concerning, referring to, responding to, relating to, pertaining to, connected with, comprising, memorializing, evidencing, commenting on, regarding, discussing, showing, describing, reflecting, analyzing or constituting.

9. "Identify" means, with respect to any "person," or any reference to the "identity" of any "person," to provide the name, home address, telephone number, business name, business address, business telephone number and a description of each such person's connection with the events in question.

10. "Identify" means, with respect to any "document," or any reference to stating the "identification" of any "document," provide the title and date of each such document, the name and address of the party or parties responsible for the preparation of each such document, the name and address of the party who requested or required the preparation and on whose behalf it

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

was prepared, the name and address of the recipient or recipients to each such document and the present location of any and all copies of each such document, and the names and addresses of all persons who have custody or control of each such document or copies thereof.

11. In producing Documents, if the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

12. Any copy of a Document that is not identical shall be considered a separate document.

13. If any requested Document cannot be produced in full, produce the Document to the extent possible, specifying each reason for your inability to produce the remainder of the Document stating whatever information, knowledge or belief which you have concerning the portion not produced.

14. If any Document requested was at any one time in existence but are no longer in existence, then so state, specifying for each Document (a) the type of document; (b) the types of information contained thereon; (c) the date upon which it ceased to exist; (d) the circumstances under which it ceased to exist; (e) the identity of all person having knowledge of the circumstances under which it ceased to exist; and (f) the identity of all persons having knowledge or who had knowledge of the contents thereof and each individual's address.

15. All Documents shall be produced in the same order as they are kept or maintained by you in the ordinary course of business.

16. You are requested to produce all drafts and notes, whether typed, handwritten or otherwise, made or prepared in connection with the requested Documents, whether or not used.

17. Documents attached to each other shall not be separated.

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

18. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found, and business address of each Document's custodian(s).

19. If any Document responsive to the request is withheld, in all or part, based upon any claim of privilege or protection, whether based on statute or otherwise, state separately for each Document, in addition to any other information requested: (a) the specific request which calls for the production; (b) the nature of the privilege claimed; (c) its date; (d) the name and address of each author; (e) the name and address of each of the addresses and/or individual to whom the Document was distributed, if any; (f) the title (or position) of its author; (g) type of tangible object, e.g., letter, memorandum, telegram, chart, report, recording, disk, etc.; (h) its title and subject matter (without revealing the information as to which the privilege is claimed); (i) with sufficient specificity to permit the Court to make full determination as to whether the claim of privilege is valid, each and every fact or basis on which you claim such privilege; and (j) whether the document contained an attachment and to the extent you are claiming a privilege as to the attachment, a separate log entry addressing that privilege claim.

20. If any Document requested herein is withheld, in all or part, based on a claim that such Document constitutes attorney work product, provide all of the information described in Instruction No. 19 and also identify the litigation in connection with which the Document and the information it contains was obtained and/or prepared.

21. Plaintiff does not seek and does not require the production of multiple copies of identical Documents.

22. This Request is deemed to be continuing. If, after producing these Documents, you obtain or become aware of any further information, Documents, things, or information

**TO: JEAN LUC BRUNEL**

**EXHIBIT A**

responsive to this Request, you are required to so state by supplementing your responses and producing such additional Documents to Plaintiff.

**DOCUMENTS TO BE PRODUCED PURSUANT TO THIS SUBPOENA**

1. All video tapes, audio tapes, photographs, including film negatives or film slides, CD's, or any other print or electronic media taken that relate to: (1) Alan Dershowitz; (2) Virginia Roberts; (3) Alan Dershowitz in the presence of Virginia Roberts; and (4) Alan Dershowitz in the presence of Jeffrey Epstein and and/or any female agent or employee of Jeffrey Epstein.

2. All video tapes, audio tapes, photographs, including film negatives or film slides, CD's, or any other print or electronic media taken that relate to: (1) Ghislaine Maxwell; (2) Ghislaine Maxwell in the presence of Virginia Roberts; (3) Ghislaine Maxwell in the presence of Jeffrey Epstein and and/or any female agent or employee of Jeffrey Epstein; and (4) Ghislaine Maxwell in the presence of any female under the age of eighteen (18) years old.

3. All video tapes, audio tapes, photographs, including film negatives or film slides, CD's, or any other print or electronic media taken that relate to: (1) Jeffrey Epstein; (2) Jeffrey Epstein in the presence of Virginia Roberts; and (3) Jeffrey Epstein in the presence of any female under the age of eighteen (18) years old.

4. All video tapes, audio tapes, photographs, including film negatives, film slides, CD's, or any other print or electronic media taken that relates to Emmy Taylor, Sarah Kellen, or Nadia Marcinkova.

5. All documents that relate to: (1) Alan Dershowitz; (2) Virginia Roberts; (3) Alan Dershowitz in the presence of Virginia Roberts; and (4) Alan Dershowitz in the presence of Jeffrey Epstein and/or any female agent or employee of Jeffrey Epstein.

6. All documents relating to models or females that you employed who also worked for or interacted with Jeffrey Epstein or Ghislaine Maxwell.

7. All documents relating to Jeffrey Epstein from 1996 – present.

8. All documents relating to Ghislaine Maxwell from 1996 – present.

9. All documents relating to communications with any of the following individuals from 1999 – present: Emmy Taylor, Sarah Kellen and Nadia Marcinkova.

10. All video tapes, audio tapes, photographs or any other print or electronic media taken at a time when you were with Jeffrey Epstein or Ghislaine Maxwell.

11. All video tapes, audio tapes, photographs or any other print or electronic media taken at a time when you were at, or nearby, Jeffrey Epstein or Ghislaine Maxwell's residences, hotel rooms/suites, automobiles, or aircraft.

11. All documents relating to your travel from the period of 1996 – 2008, when that travel was either with Ghislaine Maxwell or Jeffrey Epstein, or to meet Ghislaine Maxwell or Jeffrey Epstein, including but not limited to commercial flights, helicopters, passport records, records indicating passengers traveling with you, hotel records, and credit card receipts.

12. All documents relating to payments made from Jeffrey Epstein, Ghislaine Maxwell, or any related entity to you from 1996 – present.

13. All documents relating to or describing any work you performed with Jeffrey Epstein, Ghislaine Maxwell, or any affiliated entity from 1996 – 2008.

14. All documents relating to any credit cards used that were paid for by Jeffrey Epstein, Ghislaine Maxwell, or any related entity from 1996 – present.

15. All telephone records associated with you, including cell phone records, from 1996 – present, that show any communications with either Jeffrey Epstein or Ghislaine Maxwell.

16. All documents relating to calendars, schedules or appointments for you from 1996 – 2008 that relate to visits with, or communications with, either Jeffrey Epstein or Ghislaine Maxwell.

17. All documents identifying any individuals to whom Virginia Roberts provided a massage.

18. All documents relating to any employee lists or records associated with you, Jeffrey Epstein, Ghislaine Maxwell, or any related entity.

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
__________________________________/

## PLAINTIFF'S NOTICE OF TAKING VIDEOTAPED DEPOSITION OF JEAN LUC BRUNEL

**PLEASE TAKE NOTICE THAT**, pursuant to the subpoena we served counsel, the undersigned counsel provides this Notice of Taking the Videotaped Deposition of the below-named individual on the date and hour indicated.

| | |
|---|---|
| **NAME:** | Jean Luc Brunel |
| **DATE AND TIME:** | June 7, 2016 at 9:00 a.m. |
| **LOCATION**: | Boies Schiller & Flexner, LLP<br>575 Lexington Avenue<br>New York, NY 10022 |

The videotaped deposition will be taken upon oral examination before Magna Legal Services, or any other notary public authorized by law to take depositions. The oral examination will continue from day to day until completed.

The video operator shall be provided by Magna Legal Services. This deposition is being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the rules of this Court.

Dated: May 23, 2016.

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 23rd day of May, 2016, I served the attached document PLAINTIFF'S NOTICE OF TAKING VIDEOTAPED DEPOSITION OF JEAN LUC BRUNEL via Email to the following counsel of record.

Robert Hantman, Esq.
Hantman & Associates
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Tel: (212) 684-3933
Email: rhantman@hantmanlaw.com

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
Email: jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________/

**NOTICE OF SERVICE OF RULE 45 SUBPOENA DUCES TECUM UPON JEAN LUC BRUNEL**

**PLEASE TAKE NOTICE THAT**, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff, Virginia Giuffre, hereby provides Notice of Service of Subpoena upon Jean Luc Brunel. A copy of the Subpoena is attached to this Notice.

Dated: May 23, 2016

By: /s/ Sigrid McCawley______________

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies, Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[1]

---

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

Virginia L. Giuffre
*Plaintiff*
v.
Ghislain Maxwell
*Defendant*

Civil Action No. 15-cv-07433

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Jean Luc Brunel, c/o Robert Hantman, Esq., Hantman & Associates
1120 Avenue of the Americas, 4th Floor, New York, NY 10036

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time: |
|---|---|
| ~~Boies Schiller & Flexner, LLP~~ 575 Lexington Ave., 7th Floor New York, NY 10022; 954-365-0011 | June 7, 2016 at 9:00 a.m. |

The deposition will be recorded by this method: stenography and videography

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Virgina Giuffre, who issues or requests this subpoena, are:
Sigrid S. McCawley, BSF, LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301; 954-365-0011; smccawley@bsfllp.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 15-cv-07433

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________
______________________________________________
______________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**From:** Brad Edwards
**To:** Laura Menninger; Jeff Pagliuca
**Cc:** Smccawley@BSFLLP.com; cassellp@law.utah.edu; mschultz@BSFLLP.com
**Subject:** Depositions next week
**Date:** Thursday, June 02, 2016 9:23:30 AM

---

We got an email yesterday from Mr. Brunel's attorney saying he needs to reschedule. I believe he is trying to get us new dates today or tomorrow.

We got a similar email from Mr. Fontanella's lawyer yesterday saying that he is also not available next week. His email said he is available the week of the 27th. I told him I would call him to coordinate a new date once I had spoken with you.

I have not heard from anyone representing [redacted] yet. I was hoping you could tell me whether she is represented and whether next week works for her or will also need resetting.

As of right now, the only confirmed depo for next week is that of Mr. Rizzo.

Laura, can you talk later this afternoon to see what we can do about a deposition schedule that makes sense for everyone going forward? I figure Jeff will be flying.

If we don't connect today then I will try to make time to talk with him after the deposition tomorrow. I understand that the hearing did not go forward this morning which is unfortunate as it gives us a little guidance where the court stands on the deposition issues. Maybe you and I can talk and try to figure out some plan that works in the meantime.

Brad

Sent from my iPhone

# EXHIBIT L

Civil Action No. 15-cv-07433-RWS

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* [redacted]
on *(date)* 5/16/16 .

☒ I served the subpoena by delivering a copy to the named individual as follows: [redacted]

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ 88.28

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: 5/17/16

_Server's signature_

DON CORASMIN Process Server
*Printed name and title*

3020 HAMBLIN WAY, Wellington, FL 33414
*Server's address*

Additional information regarding attempted service, etc.:

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
_______________________________/

**NOTICE OF SERVICE OF RULE 45 SUBPOENA DUCES TECUM UPON [redacted]**

**PLEASE TAKE NOTICE THAT**, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff, Virginia Giuffre, hereby provides Notice of Service of Subpoena upon [redacted] A copy of the Subpoena is attached to this Notice as Exhibit A.

Dated: May 16, 2016

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies, Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| Virginia L. Giuffre<br>*Plaintiff*<br>v.<br>Ghislaine Maxwell<br>*Defendant* | ) | Civil Action No. 15-cv-07433-RWS |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: [redacted]

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Boies, Schiller & Flexner LLP<br>401 E. Las Olas Blvd., Suite 1200<br>Ft. Lauderdale, FL 33301 | Date and Time:<br>06/04/2016 9:00 am |
|---|---|

The deposition will be recorded by this method: Videography and Stenography

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Please see attached Schedule A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/13/2016

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Virginia Giuffre, who issues or requests this subpoena, are:

Sigrid McCawley, Esq. of Boies, Schiller & Flexner LLP, 401 E. Las Olas Blvd., Suite 1200, Ft. Lauderdale, FL 33301, Tel: (954) 356-0011; smccawley@bsfllp.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 15-cv-07433-RWS

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________________
__________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

[redacted]

**EXHIBIT A**

**DEFINITIONS**

Wherever they hereafter appear the following words and phrases have the following meanings:

1. "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting, or purporting to act, at the discretion of or on behalf of another.

2. "Correspondence" or "communication" shall mean all written or verbal communications, by any and all methods, including without limitation, letters, memoranda, and/or electronic mail, by which information, in whatever form, is stored, transmitted or received; and, includes every manner or means of disclosure, transfer or exchange, and every disclosure, transfer or exchange of information whether orally or by document or otherwise, face-to-face, by telephone, telecopies, e-mail, text, modem transmission, computer generated message, mail, personal delivery or otherwise.

3. "Document" shall mean all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form. It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, advertisements, photographs, videos, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews

or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, text messages, e-mails, information kept in computer hard drives, other computer drives of any kind, computer tape back-up, CD-ROM, other computer disks of any kind, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic "writings" and "recordings" as set forth in the Federal Rules of Evidence, including but not limited to, originals or copies where originals are not available. Any document with any marks such as initials, comments or notations of any kind of not deemed to be identical with one without such marks and is produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

4. "Employee" includes a past or present officer, director, agent or servant, including any attorney (associate or partner) or paralegal.

5. "Including" means including without limitations.

6. "Jeffrey Epstein" includes Jeffrey Epstein and any entities owned or controlled by Jeffrey Epstein, any employee, agent, attorney, consultant, or representative of Jeffrey Epstein.

7. "You" or "Your" hereinafter means David Rodgers (a/k/a Dave Rodgers) and any employee, agent, attorney, consultant, related entities or other representative of David Rodgers (a/k/a Dave Rodgers).

## INSTRUCTIONS

1. Production of documents and items requested herein shall be made at the offices of Boies Schiller & Flexner, LLP, 401 East Las Olas Blvd., Suite 1200, Ft. Lauderdale, FL, 33301, no later than five (5) days before the date noticed for your deposition, or, if an alternate date is agreed upon, no later than five (5) days before the agreed-upon date.

2. Unless indicated otherwise, the Relevant Period for this Request is from 1996 to the present. A Document should be considered to be within the relevant time frame if it refers or relates to communications, meetings or other events or documents that occurred or were created within that time frame, regardless of the date of creation of the responsive Document.

3. This Request calls for the production of all responsive Documents in your possession, custody or control without regard to the physical location of such documents.

4. If any Document requested was in your possession or control, but is no longer in its possession or control, state what disposition was made of said Document, the reason for such disposition, and the date of such disposition.

5. For the purposes of reading, interpreting, or construing the scope of these requests, the terms used shall be given their most expansive and inclusive interpretation. This includes, without limitation the following:

a) Wherever appropriate herein, the singular form of a word shall be interpreted as plural and vice versa.

b) "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

c) "Any" shall be understood to include and encompass "all" and vice versa.

d) Wherever appropriate herein, the masculine form of a word shall be interpreted as feminine and vice versa.

e) "Including" shall mean "including without limitation."

6. If you are unable to answer or respond fully to any document request, answer or respond to the extent possible and specify the reasons for your inability to answer or respond in full. If the recipient has no documents responsive to a particular Request, the recipient shall so state.

7. Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation.

8. The words "relate," "relating," "relates," or any other derivative thereof, as used herein includes concerning, referring to, responding to, relating to, pertaining to, connected with, comprising, memorializing, evidencing, commenting on, regarding, discussing, showing, describing, reflecting, analyzing or constituting.

9. "Identify" means, with respect to any "person," or any reference to the "identity" of any "person," to provide the name, home address, telephone number, business name, business address, business telephone number and a description of each such person's connection with the events in question.

10. "Identify" means, with respect to any "document," or any reference to stating the "identification" of any "document," provide the title and date of each such document, the name and address of the party or parties responsible for the preparation of each such document, the name and address of the party who requested or required the preparation and on whose behalf it was prepared, the name and address of the recipient or recipients to each such document and the present location of any and all copies of each such document, and the names and addresses of all persons who have custody or control of each such document or copies thereof.

11. In producing Documents, if the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

12. Any copy of a Document that is not identical shall be considered a separate document.

13. If any requested Document cannot be produced in full, produce the Document to the extent possible, specifying each reason for your inability to produce the remainder of the Document stating whatever information, knowledge or belief which you have concerning the portion not produced.

14. If any Document requested was at any one time in existence but are no longer in existence, then so state, specifying for each Document (a) the type of document; (b) the types of information contained thereon; (c) the date upon which it ceased to exist; (d) the circumstances under which it ceased to exist; (e) the identity of all person having knowledge of the circumstances under which it ceased to exist; and (f) the identity of all persons having knowledge or who had knowledge of the contents thereof and each individual's address.

15. All Documents shall be produced in the same order as they are kept or maintained by you in the ordinary course of business.

16. You are requested to produce all drafts and notes, whether typed, handwritten or otherwise, made or prepared in connection with the requested Documents, whether or not used.

17. Documents attached to each other shall not be separated.

18. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found, and business address of each Document's custodian(s).

19. If any Document responsive to the request is withheld, in all or part, based upon any claim of privilege or protection, whether based on statute or otherwise, state separately for each Document, in addition to any other information requested: (a) the specific request which calls for the production; (b) the nature of the privilege claimed; (c) its date; (d) the name and address of each author; (e) the name and address of each of the addresses and/or individual to whom the Document was distributed, if any; (f) the title (or position) of its author; (g) type of tangible object, *e.g.,* letter, memorandum, telegram, chart, report, recording, disk, etc.; (h) its title and subject matter (without revealing the information as to which the privilege is claimed); (i) with sufficient specificity to permit the Court to make full determination as to whether the claim of privilege is valid, each and every fact or basis on which you claim such privilege; and (j) whether the document contained an attachment and to the extent you are claiming a privilege as to the attachment, a separate log entry addressing that privilege claim.

20. If any Document requested herein is withheld, in all or part, based on a claim that such Document constitutes attorney work product, provide all of the information described in Instruction No. 19 and also identify the litigation in connection with which the Document and the information it contains was obtained and/or prepared.

21. Plaintiff does not seek and does not require the production of multiple copies of identical Documents.

22. This Request is deemed to be continuing. If, after producing these Documents, you obtain or become aware of any further information, Documents, things, or information responsive to this Request, you are required to so state by supplementing your responses and producing such additional Documents to Plaintiff.

## DOCUMENTS TO BE PRODUCED PURSUANT TO THIS SUBPOENA

1. All documents related to Jeffrey Epstein.

2. All documents relating to Ghislaine Maxwell.

3. All documents related to Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington.

4. All documents related to Nadia Marcinkova, a/k/a Nadia Marcinko.

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
_________________________________/

**NOTICE OF SERVICE OF RULE 45 SUBPOENA DUCES TECUM UPON JOE RECAREY**

**PLEASE TAKE NOTICE THAT**, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff, Virginia Giuffre, hereby provides Notice of Service of Subpoena upon Joe Recarey. A copy of the Subpoena is attached to this Notice as Exhibit A.

Dated: May 17, 2016

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies, Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[1]

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

Virginia L. Giuffre
*Plaintiff*
v.
Ghislaine Maxwell
*Defendant*

Civil Action No. 15-cv-07433-RWS

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Joe Recarey

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Boies, Schiller & Flexner LLP<br>401 E. Las Olas Blvd., Suite 1200<br>Ft. Lauderdale, FL 33301 | Date and Time:<br>06/21/2016 9:00 am |
|---|---|

The deposition will be recorded by this method: Videography and Stenography

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Please see attached Schedule A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/13/2016

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Virginia Giuffre, who issues or requests this subpoena, are:

Sigrid McCawley, Esq. of Boies, Schiller & Flexner LLP, 401 E. Las Olas Blvd., Suite 1200, Ft. Lauderdale, FL 33301, Tel: (954) 356-0011; smccawley@bsfllp.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 15-cv-07433-RWS

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❐ I served the subpoena by delivering a copy to the named individual as follows: ______________
______________________________________________
______________________________ on *(date)* ______________ ; or

❐ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

To: Joe Recarey

## EXHIBIT A

## DEFINITIONS

Wherever they hereafter appear the following words and phrases have the following meanings:

1. "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting, or purporting to act, at the discretion of or on behalf of another.

2. "Correspondence" or "communication" shall mean all written or verbal communications, by any and all methods, including without limitation, letters, memoranda, and/or electronic mail, by which information, in whatever form, is stored, transmitted or received; and, includes every manner or means of disclosure, transfer or exchange, and every disclosure, transfer or exchange of information whether orally or by document or otherwise, face-to-face, by telephone, telecopies, e-mail, text, modem transmission, computer generated message, mail, personal delivery or otherwise.

3. "Document" shall mean all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form. It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, advertisements, photographs, videos, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews

or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, text messages, e-mails, information kept in computer hard drives, other computer drives of any kind, computer tape back-up, CD-ROM, other computer disks of any kind, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic "writings" and "recordings" as set forth in the Federal Rules of Evidence, including but not limited to, originals or copies where originals are not available. Any document with any marks such as initials, comments or notations of any kind of not deemed to be identical with one without such marks and is produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

4. "Employee" includes a past or present officer, director, agent or servant, including any attorney (associate or partner) or paralegal.

5. "Including" means including without limitations.

6. "Jeffrey Epstein" includes Jeffrey Epstein and any entities owned or controlled by Jeffrey Epstein, any employee, agent, attorney, consultant, or representative of Jeffrey Epstein.

7. "You" or "Your" hereinafter means David Rodgers (a/k/a Dave Rodgers) and any employee, agent, attorney, consultant, related entities or other representative of David Rodgers (a/k/a Dave Rodgers).

## INSTRUCTIONS

1. Production of documents and items requested herein shall be made at the offices of Boies Schiller & Flexner, LLP, 401 East Las Olas Blvd., Suite 1200, Ft. Lauderdale, FL, 33301, no later than five (5) days before the date noticed for your deposition, or, if an alternate date is agreed upon, no later than five (5) days before the agreed-upon date.

2. Unless indicated otherwise, the Relevant Period for this Request is from 1996 to the present. A Document should be considered to be within the relevant time frame if it refers or relates to communications, meetings or other events or documents that occurred or were created within that time frame, regardless of the date of creation of the responsive Document.

3. This Request calls for the production of all responsive Documents in your possession, custody or control without regard to the physical location of such documents.

4. If any Document requested was in your possession or control, but is no longer in its possession or control, state what disposition was made of said Document, the reason for such disposition, and the date of such disposition.

5. For the purposes of reading, interpreting, or construing the scope of these requests, the terms used shall be given their most expansive and inclusive interpretation. This includes, without limitation the following:

a) Wherever appropriate herein, the singular form of a word shall be interpreted as plural and vice versa.

b) "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

c) "Any" shall be understood to include and encompass "all" and vice versa.

d) Wherever appropriate herein, the masculine form of a word shall be interpreted as feminine and vice versa.

e) "Including" shall mean "including without limitation."

6. If you are unable to answer or respond fully to any document request, answer or respond to the extent possible and specify the reasons for your inability to answer or respond in full. If the recipient has no documents responsive to a particular Request, the recipient shall so state.

7. Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation.

8. The words "relate," "relating," "relates," or any other derivative thereof, as used herein includes concerning, referring to, responding to, relating to, pertaining to, connected with, comprising, memorializing, evidencing, commenting on, regarding, discussing, showing, describing, reflecting, analyzing or constituting.

9. "Identify" means, with respect to any "person," or any reference to the "identity" of any "person," to provide the name, home address, telephone number, business name, business address, business telephone number and a description of each such person's connection with the events in question.

10. "Identify" means, with respect to any "document," or any reference to stating the "identification" of any "document," provide the title and date of each such document, the name and address of the party or parties responsible for the preparation of each such document, the name and address of the party who requested or required the preparation and on whose behalf it was prepared, the name and address of the recipient or recipients to each such document and the present location of any and all copies of each such document, and the names and addresses of all persons who have custody or control of each such document or copies thereof.

11. In producing Documents, if the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

12. Any copy of a Document that is not identical shall be considered a separate document.

13. If any requested Document cannot be produced in full, produce the Document to the extent possible, specifying each reason for your inability to produce the remainder of the Document stating whatever information, knowledge or belief which you have concerning the portion not produced.

14. If any Document requested was at any one time in existence but are no longer in existence, then so state, specifying for each Document (a) the type of document; (b) the types of information contained thereon; (c) the date upon which it ceased to exist; (d) the circumstances under which it ceased to exist; (e) the identity of all person having knowledge of the circumstances under which it ceased to exist; and (f) the identity of all persons having knowledge or who had knowledge of the contents thereof and each individual's address.

15. All Documents shall be produced in the same order as they are kept or maintained by you in the ordinary course of business.

16. You are requested to produce all drafts and notes, whether typed, handwritten or otherwise, made or prepared in connection with the requested Documents, whether or not used.

17. Documents attached to each other shall not be separated.

18. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found, and business address of each Document's custodian(s).

19. If any Document responsive to the request is withheld, in all or part, based upon any claim of privilege or protection, whether based on statute or otherwise, state separately for each Document, in addition to any other information requested: (a) the specific request which calls for the production; (b) the nature of the privilege claimed; (c) its date; (d) the name and address of each author; (e) the name and address of each of the addresses and/or individual to whom the Document was distributed, if any; (f) the title (or position) of its author; (g) type of tangible object, *e.g.,* letter, memorandum, telegram, chart, report, recording, disk, etc.; (h) its title and subject matter (without revealing the information as to which the privilege is claimed); (i) with sufficient specificity to permit the Court to make full determination as to whether the claim of privilege is valid, each and every fact or basis on which you claim such privilege; and (j) whether the document contained an attachment and to the extent you are claiming a privilege as to the attachment, a separate log entry addressing that privilege claim.

20. If any Document requested herein is withheld, in all or part, based on a claim that such Document constitutes attorney work product, provide all of the information described in Instruction No. 19 and also identify the litigation in connection with which the Document and the information it contains was obtained and/or prepared.

21. Plaintiff does not seek and does not require the production of multiple copies of identical Documents.

22. This Request is deemed to be continuing. If, after producing these Documents, you obtain or become aware of any further information, Documents, things, or information responsive to this Request, you are required to so state by supplementing your responses and producing such additional Documents to Plaintiff.

**DOCUMENTS TO BE PRODUCED PURSUANT TO THIS SUBPOENA**

1. All documents related to Jeffrey Epstein.

2. All documents relating to any investigation of Jeffrey Epstein.

3. All documents relating to Ghislaine Maxwell.

4. All documents relating to any investigation of Ghislaine Maxwell.

5. All documents related to Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington.

6. All documents related to any investigation of Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington.

7. All documents related to any victims or alleged victims of Jeffrey Epstein, Ghislaine Maxwell, or Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington.

8. All communications regarding Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington.

9. All documents or communications regarding any investigator, police officer, prosecutor, or other government employee that had any involvement in the investigation, arrest, or prosecution of Jeffrey Epstein, including, but not limited to, Barry Kirshner.

10. All documents or communications regarding any agent of Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, a/k/a Sarah Vickers, a/k/a Sara Kensington, including, but not limited to, private investigators and attorneys.

11. Any documents or communications regarding any persons or entities who may have conducted any type of surveillance on you.

BOIES, SCHILLER & FLEXNER LLP

401 EAST LAS OLAS BOULEVARD • SUITE 1200 • FORT LAUDERDALE, FL 33301-2211 • PH. 954.356.0011 • FAX 954.356.0022

Sigrid S. McCawley, Esq.
E-mail: smccawley@bsfllp.com

June 17, 2016

**VIA E-MAIL**

Laura A. Menninger, Esq.
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
lmenninger@hmflaw.com

**Re:** ***Giuffre v. Maxwell***
**Case No. 15-cv-07433-RWS**

Dear Ms. Menninger:

On behalf of the Plaintiff, Virginia Giuffre, documents, Bates-stamped GIUFFRE005614 through GIUFFRE006279, are being produced pursuant to Defendant's Request for Production. All of the documents within this production have been designated as CONFIDENTIAL in accordance with the Protective Order. Please treat these documents accordingly.

This production consists of the March 19, 2010 deposition of Detective Joseph Recarey with exhibits, and an unredacted version of the Police Incident Report that was used in redacted form as Exhibit 2 in that deposition.

If you have any questions concerning the foregoing, or if there are any issues with the media, please do not hesitate to contact me at (954) 356-0011.

Sincerely,

Sigrid S. McCawley

SSM:dk
Enclosures

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**DEFENDANT'S MOTION FOR RULE 37(b) &(c) SANCTIONS FOR FAILURE TO COMPLY WITH COURT ORDER AND FAILURE TO COMPLY WITH RULE 26(a)**

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
East 10th Avenue
Denver, CO 80203
303.831.7364

# TABLE OF CONTENTS

CERTIFICATE OF CONFERRAL ..................... 1

INTRODUCTION ..................... 1

BACKGROUND FACTS ..................... 2

I. SANCTIONS AVAILABLE FOR FAILURE TO COMPLY WITH DISCOVERY ORDER OR PROVIDE RULE 26(A) DISCLOSURES ..................... 6

A. Rule 37(b) Factors for Failure to Comply With Court Order ..................... 8

1. Plaintiff's actions were willful ..................... 8

2. Lesser sanctions will be insufficient and Ms. Maxwell has been prejudiced ..................... 10

3. Plaintiff has been non-compliant since the outset of discovery ..................... 11

4. Plaintiff and her counsel are fully aware of sanctions for non-compliance with Court orders ..................... 14

B. Additional Rule 37(c) Factors for Failure to Comply With Initial Disclosure Requirements ..................... 15

1. The information withheld is critically important ..................... 15

2. Ms. Maxwell would require an extension of the discovery period ..................... 17

II. STRIKING CLAIMS FOR MEDICAL AND EMOTIONAL DISTRESS DAMAGES IS CONSISTENT WITH THE PURPOSE OF RULE 37, COMMENSURATE WITH THE INFORMATION WITHHELD, AND LESS HARSH THAN THE AVAILABLE DISMISSAL SANCTION..................... 18

CONCLUSION..................... 19

CERTIFICATE OF SERVICE ..................... 21

Defendant Ghislaine Maxwell ("Ms. Maxwell") files this Motion for Rule 37(b) &(c) Sanctions for Failure to Comply with Court Order and Failure to Comply with Rule 26(a), stating as follows:

**CERTIFICATE OF CONFERRAL**

The undersigned has conferred with Plaintiff's counsel on multiple occasions in an attempt to obtain records and interrogatory responses Ordered by the Court, including by letter dated April 25, 2016, outlining the expected productions and information. Menninger Decl., Ex. L. As set forth below, Plaintiff has not produced the documents and did not provide complete or accurate information.

**INTRODUCTION**

Plaintiff is playing a game of catch and release. She is withholding information the Court ordered be produced and only releasing that information when she is caught in her deception.

At the April 21, 2016 hearing on Ms. Maxwell's Motion to Compel, the Court clearly Ordered Plaintiff to disclose all of her treating health care providers since 1999 and produce their records. Plaintiff did not do so, and still has not provided this information to date. It is only through deposition testimony that Ms. Maxwell became aware of at least five – if not more – treating health care providers who were never previously identified. Yet, Plaintiff has never supplemented her discovery responses to include these health care providers. Plaintiff has also failed to provide records, or has provided incomplete records, of several of the health care professionals, both disclosed and newly discovered, despite her counsel's assurances to this Court that all records have been produced. Further, Plaintiff has still failed to provide an actual computation of her damages, or any documentation supporting those claims.

These discovery abuses cannot be condoned. All of this information is directly relevant to, and necessary to defend against, Plaintiff's damages claims for "psychological and psychiatric injuries and resulting medical expenses" and "past, present and future pain and suffering, mental anguish, humiliation, embarrassment, loss of self-esteem." Plaintiff's claims for these categories of damages must be stricken or evidence as to these damages precluded from trial under Fed. R. Civ. P. 37(b)(2)(A)(ii)&(iii) and Fed. R. Civ. P. 37(c)(1)(C).

## BACKGROUND FACTS

On February 12, 2016, Ms. Maxwell served Interrogatories on Plaintiff for the identities and locations of any Health Care Provider from whom she has "received any treatment for any physical, mental or emotional condition, including addiction to alcohol, prescription or illegal drugs, that You suffered from *subsequent to* the Alleged Defamation by Ghislaine Maxwell" (Interrogatory No. 12) and "*prior to* the Alleged Defamation." Interrogatory No. 13 (emphasis added). As to both, Ms. Maxwell provided releases for Plaintiff's signature.

On March 16, 2016, Plaintiff refused to provide the names of any of Plaintiff's treating physicians, nor the requested releases, claiming "privilege." Menninger Decl., Ex. A.

On March 22, 2016, Plaintiff served Supplemental Responses & Objections and then Amended Supplemental Responses & Objections. Menninger Decl., Ex. B. Neither contained responses as to Plaintiff's health care providers. On March 22, 2016, Plaintiff also provided an Addendum to Plaintiff's Rule 26 Initial Disclosures in which she listed as potential witnesses, Dr. Steven Olson and Dr. Carol Hayek. Menninger Decl., Ex. C.

In her Initial Disclosures, Plaintiff included medical records as documents that she intends to use to establish her damages claims. Menninger Decl., Ex. D. On March 22, 2016,

Ms. Maxwell was forced to file a Motion to Compel Plaintiff to Disclose Pursuant to Fed. R. Civ. P. 26(a)(1). Docket Entry ("DE") 64.[1]

On March 31, 2016, Ms. Maxwell was forced to file a Motion to Compel Plaintiff, *inter alia*, to properly respond to Interrogatory Nos. 12 and 13. Docket Entry ("DE") 75.

On April 21, 2016, Plaintiff's counsel represented to the Court during oral argument that "We have disclosed the names. She has those names. We have also disclosed the records, the more recent records. We have not contested that…. But we have disclosed the names of the providers." (Tr. at 21-22) Plaintiff's counsel stated the only missing doctors were "in the past…. years and years ago." (Tr. at 22-23) attached to Menninger Decl., Ex. E.

At the April 21, 2016 hearing, the Court ordered Plaintiff to produce the records from Ms. Giuffre's medical doctors (apart from pre-1999) and to respond fully to the interrogatories concerning all of her treating physicians after 1999. *Id.* (Tr. 20-21).

On April 29, 2016, Plaintiff served Second Amended Supplemental Responses & Objections. Menninger Decl., Ex. F. As to Interrogatory No. 12 (seeking the names of treatment providers <u>subsequent to the Alleged Defamation</u>). Plaintiff listed:

- Dr. Steven Olson
- Dr. Chris Donahue
- Dr. John Harris and Dr. Majaliyana
- Dr. Wah Wah
- Dr. Sellathuri
- Royal Oaks Medical Center
- Dr. Carol Hayek
- NY Presbyterian Hospital
- Campbelltown Hospital
- Sydney West Hospital
- Westmead Hospital
- Dr. Karen Kutikoff
- Wellington Imaging Associates
- Growing Together.

[1] That motion remains open.

For some providers, Plaintiff provided records, and the nature of treatment was identified by reference to the records. For other providers, no records were produced. Where no documents were produced, Plaintiff failed to identify the dates and nature of the treatment received, as requested in the Interrogatory. *Id.* Plaintiff failed therein to identify any treatment providers *prior to* the alleged defamation, despite the Court's order concerning 1999-2015.

At Plaintiff's deposition on May 3, 2016, she described receiving treatment from Dr. Donahue and a Dr. Judith Lightfoot from October 2015 to the present. Menninger Decl., Ex. G at 308-14 & 328-331. Plaintiff also described obtaining prescriptions from Dr. Donahue [redacted] from Dr. Olson. She claimed she was not treated by any other physicians that had not been previously listed. *Id.*

During the deposition of Plaintiff's mother, Lynn Miller, on May 24, 2016, Ms. Maxwell learned that [redacted]. Menninger Decl., Ex. H at 144.

On June 1, 2016, Plaintiff produced additional documentation from Centura Health for treatment received by Plaintiff in March 2015 ([redacted]) and May 2015. These documents identify three *additional* health care professionals who treated Plaintiff, including Dr. Scott Robert Geiger, Dr. Joseph Heaney, and Donna Oliver P.A. Menninger Decl., Ex. I at 144.

On May 25, 2016, Plaintiff sent Ms. Maxwell additional records obtained from Plaintiff's treatment at Centura in June 2015. Those documents identify another medical provider, Dr. Michele Streeter. Menninger Decl., Ex. J at144.

Further, during the deposition of Dr. Olson on May 26, 2016, Ms. Maxwell learned that he had additional records in his laptop that had not been produced prior to his deposition.[2] Menninger Decl., Ex. K, p. 36.

As of today's date, more than four months after Ms. Maxwell first sought the identities of Plaintiff's health care providers and the records concerning the same, more than a month and a half since the Court ordered Plaintiff to produce such identities and records, and 10 days before the end of fact discovery in this case, Ms. Maxwell has learned of at least five additional doctors who have treated Plaintiff since the time of the alleged defamatory statement: Dr. Lightfoot, Dr. Geiger, Dr. Heaney, Donna Oliver P.A and Dr. Streeter. In each case, documents relating to these doctors were not provided *until after* their identities became known through deposition or other independent investigation by Ms. Maxwell.

Plaintiff still has failed to produce any records from: (a) Dr. Donahue, (b) Dr. Hayek, (c) Dr. Kutikoff, (d) Wellington Imaging Assocs., (e) Growing Together, (f) post 2011 records from Dr. Lightfoot, and (g) the remaining documents for treatment by Dr. Olson.

With respect to Dr. Donahue, Dr. Hayek, Dr. Kutikoff, Wellington Imaging Assocs., Growing Together and Dr. Olson, Plaintiff has failed to provide complete responses to the Interrogatories including the dates and nature or treatment. Menninger Decl., Ex. F.

Plaintiff has alleged the following categories of damages:

(A) "Physical, psychological and psychiatric injuries and resulting medical expenses—in the approximate amount of $102,200 present value";
(B) "Past, present and future pain and suffering, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of standing in the community, loss of dignity, and invasion of privacy in her public and private life not less than $30,000,000.00"; and
(C) Estimated lost income of $180,000 annually. Present value $3,461,000 to $5,407,000"

[2] At the deposition, copies were produced that were difficult to read. Despite requests, legible copies have not been provided.

Pl's Supp. Discl., at 15-18, Menninger Decl., Ex. D.

## I. SANCTIONS AVAILABLE FOR FAILURE TO COMPLY WITH DISCOVERY ORDER OR PROVIDE RULE 26(A) DISCLOSURES

Federal Rule of Civil Procedure 37(b)(2) sets forth the sanctions for a party's failure to comply with a Court's discovery order, providing in relevant part:

> (A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f),35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>
> > (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> >
> > (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> >
> > (iii) striking pleadings in whole or in part;
> >
> > (iv) staying further proceedings until the order is obeyed;
> >
> > (v) dismissing the action or proceeding in whole or in part;
> >
> > (vi) rendering a default judgment against the disobedient party; or
> >
> > (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
>
> (C) *Payment of Expenses.* Instead of or in addition to the orders above, the court ***must*** order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

These same sanctions are available for Plaintiff's failure to provide required disclosures under Fed. R. Civ. Procedure 26(a).[3] Specifically, Rule 37(c) provides:

[3] Rule 26(a)(iii) requires the Plaintiff to provide "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, *including materials bearing on the nature and extent of injuries suffered*.

(1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be hear

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

"Under Rule 37(b)(2), courts enjoy broad discretion to sanction parties that fail to obey discovery orders. This discretion includes, but is not limited to, the power to issue an order 'dismissing the action or proceeding in whole or in part.'" *Naguib v. Pub. Health Sols.*, No. 12-CV-2561 ENV LB, 2014 WL 3695965, at *3 (E.D.N.Y. July 24, 2014), *appeal dismissed* (Nov. 5, 2014). In "exercise [ ] its broad discretion to order sanctions under Rule 37," a court may consider a number of factors in issuing sanctions for failure to comply with a Court Order, "including: (1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the noncompliant party had been warned of the consequences of his non-compliance." *Nieves v. City of New York,* 208 F.R.D. 531, 535 (S.D.N.Y.2002); *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (same). This list is not exclusive, and many courts also consider the prejudice to the opposing party in determination of the sanction that should be awarded. *See id.* (factors not exclusive)*; Labib v. 1141 Realty LLC*, No. 10 CIV. 8357 MHD, 2013 WL 1311002, at *7 (S.D.N.Y. Mar. 29, 2013)(examining the prejudicial impact of the non-compliance).

The factors considered in evaluation precluded as a sanction for non-disclosure under rule 26(a) are: "(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of ... the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Mikulec v. Town of Cheektowaga*, 302 F.R.D. 25, 29-30 (W.D.N.Y. 2014) (*quoting Ritchie Risk–Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC,* 280 F.R.D. 147, 157 (S.D.N.Y. 2012)).

The examination of these factors demonstrates that preclusion of Plaintiff's claims regarding physical and emotional distress damages is the appropriate sanction for Plaintiff's failure to comply with the Court's April 21, 2015 discovery order and failure to provide medical information that bear directly on her damages claims under Rule 26(a)(iii).

**A. Rule 37(b) Factors for Failure to Comply With Court Order**

**1. Plaintiff's actions were willful**

"Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control." *Davidson v. Dean*, 204 F.R.D. 251, 255 (S.D.N.Y. 2001) (*citing Davis v. Artuz,* 96 Civ. 7699(GBD), 2001 WL 50887 at *3 (S.D.N.Y. Jan. 19, 2001)).

The Court's Order at the April 21, 2016 hearing was entirely clear – Plaintiff was required to fully respond to the Interrogatory identifying all of her medical providers from 1999 to present, including the dates of treatment, reasons for treatment, and costs of treatment, as well as providing records relating to her treatment. Menninger Decl., Ex. E. For avoidance of doubt, undersigned counsel sent a confirming letter to Plaintiff's counsel setting forth the precise information required, and requesting that it be produced in advance of Plaintiff's deposition to so that Plaintiff could be fully examined on these issues. Menninger Decl., Ex. L.

At the hearing, Plaintiff's counsel represented to undersigned counsel and this Court that the identities and all medical records for Plaintiff's treatment providers after the alleged defamation had been provided. Menninger Decl., Ex. E at 21-23. This was simply false. At this point, there are at least five treatment providers that had not been disclosed. None of their records were disclosed until after their identities were uncovered through depositions.

Plaintiff was and is capable of *at a minimum* identifying the physicians and psychologists who have treated her – the matter is fully in her control. Yet, she completely failed to identify at least five health care providers. These were providers who she is currently seeing or has seen in the recent past, who have prescribed her medication, and are treating her for emotional and mental issues – the very things for which she is seeking damages. There can be no argument that the failure to identify and produce records from these doctors was anything but an intentional and willful violation.

Additionally, at her deposition, Plaintiff intentionally concealed other treating physicians who treated her [redacted] *See* Menninger Decl., Ex. I. As fully briefed, the existence of other or intervening physical and emotional distress damages was the primary purpose for requesting medical information and treatment providers. *See* Motion to Compel at 18-19 (DE 75). [redacted].

Plaintiff's intentional refusal to obey this Court's Order, including failure to disclose her treating psychologist she is still seeing to this day for the very injuries she claims in this lawsuit, is ground for precluding her damage claims for physical and emotional distress.

**2. Lesser sanctions will be insufficient and Ms. Maxwell has been prejudiced**

Plaintiff's pattern of discovery abuses and failure to disclose necessary and required information makes clear that no lesser sanction will deter Plaintiff's continuing discovery abuses. "[T]he purposes of Rule 37 sanctions, [is] "to 'ensure that a party will not benefit from its own failure to comply,' to 'obtain compliance with a particular order issued,' and to 'serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.'" *Szafrankowska v. AHRC Home Care Servs., Inc.,* 2008 WL 186206, *1 (S.D.N.Y. Jan. 22, 2008) (*quoting Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 71 (2d Cir.1988)); *see also S. New England,* 624 F.3d at 149.

Ms. Maxwell has been severely prejudiced by Plaintiff's failure to provide the required identifying information and documents from her health care providers. One health care provider identified by Plaintiff in her deposition is a psychiatrist, Judith Lightfoot, who is located in Australia. Plaintiff's specifically claims [redacted] Obviously, Dr. Lightfoot has relevant information concerning Plaintiff's emotional state both before and after the alleged defamatory statement. Indeed, her testimony could conclusively prove that Plaintiff's mental state has been unaffected by the alleged defamation. Despite this, Plaintiff purposefully omitted Dr. Lightfoot from her

sworn interrogatory responses and has not produced any records from Dr. Lightfoot's recent treatment of Plaintiff.[4] With less than ten days left in discovery, arranging for and taking the deposition of Dr. Lightfoot – a person living in a foreign county, is nearly impossible.

Likewise, Plaintiff has seen another doctor, Dr. Donahue, [redacted]. She has met with him [redacted] on two occasions, both after the alleged defamatory statement. Yet, Plaintiff failed to identify this as the nature of Dr. Donahue's treatment in her Interrogatory Reponses. Nor did she identify the time frame in which she was treated by Dr. Donahue. She has never provided his records. Obviously, Dr. Donahue also has relevant information, which was entirely unclear from the Interrogatory response provided. [redacted] This information is all relevant, discoverable, and was purposefully hidden by Plaintiff.

Any action short of precluding claims for physical, psychological and emotional distress damages will fall short of serving Rule 37's purpose to "ensure that a party will not benefit from its own failure to comply" with court orders. *S. New England,* 624 F.3d at 149. To permit Plaintiff to get away with her purposeful non-compliance would reward her by allowing her to conceal relevant discoverable information that might fully disprove causation between Ms. Maxwell's statement and Plaintiff's alleged physical symptoms and emotional distress.

**3. Plaintiff has been non-compliant since the outset of discovery**

From the initiation of discovery, Plaintiff has played hide the ball. Starting with the service of Rule 26(a) disclosures, Plaintiff has simply refused to turn over required and necessary

[4] After Plaintiff revealed Dr. Lightfoot's identity in her deposition, Plaintiff belatedly produced a single document from Dr. Lightfoot concerning Plaintiff's initial consultation with her in 2011. No records from her more recent treatment have been produced.

information. In her initial Rule 26(a) disclosures in November 2015, Plaintiff failed to provide any information on the calculation of or supporting evidence for her damages claim. When she supplemented her Rule 26(a) disclosures, she provided none of the necessary information or an actual computation of damages, relying on other people's alleged earning potential and average damage awards in other cases with completely different claim types. *See* Motion to Compel Rule 26(a) Disclosure at 5-6 (DE 64).[5] To date, over six months after her Rule 26(a) disclosures were required and with less than 10 days left in discovery, Plaintiff has failed and refused to provide any supporting documentation for her damages claims or an actual computation of her damages based on her alleged injury as required by Fed. R. Civ. P. 26(a)(iii). At a minimum, reliance on any calculation, information or evidence that has not been provided as of this filing of this motion must be precluded.

Plaintiff's Rule 26 failures do not end with the damages calculations. It has now become clear that Plaintiff failed to disclose witnesses with relevant information based on the subpoenas she has served in this matter. Plaintiff repeatedly has issued subpoenas to witnesses for depositions and document production <u>before</u> including them on her Rule 26 disclosures. To wit,

- Allyson Chambers – subpoena February 12; disclosed March 11
- Aviation Insurance – subpoena April 27; never disclosed
- [redacted] – subpoena notice May 16; disclosed June 1
- Joe Recarey – subpoena notice May 17; disclosed June 1
- Michael Reiter – subpoena notice May 17; disclosed June 1
- Shopper's Paradise – subpoena notice April 26; never disclosed

How many other witnesses are there with relevant information that Plaintiff has hidden?

[5] No ruling had been made on this Motion.

Plaintiff has been equally evasive in responding to written discovery. Until Ms. Maxwell was forced to file a Motion to Compel, Plaintiff failed to give even the most basic relevant and fully discoverable information, including the identities of Plaintiff's physicians, information on her work and education history, and even the identity of her counsel and the matters on which they represent her. *See* DE 75. After being ordered to provide this information, Plaintiff continued her strategy of providing made up or false information, or simply refusing to provide the ordered information.

First, despite being ordered to produce all documents relating to alleged law enforcement inquiries *other than* Plaintiff's own statements (which would be provided for *in camera* review), she simply provided *all* documents relating to alleged law enforcement inquires for *in camera* review, attempting to re-litigate the issue instead of complying with the Court's order. *See* DE 139. Second, she and her attorneys have fabricated and backdated a string of engagement letters attempting to substantiate their privilege claims, as fully detailed in Ms. Maxwell's Reply in Support of Motion to Compel Non-Privileged Documents. *See* DE 191, p. -9. As shown above, Plaintiff only selectively and belatedly turned over medical records and the identity of her medical providers, and only after Ms. Maxwell uncovered their existence. Similarly, Plaintiff was specifically asked for photographs of Plaintiff with certain individuals (including Prince Andrew), and production of those photographs in native format. Plaintiff claimed she produced documents she had, but did not possess any native format pictures. Menninger Decl., Ex. E at 26-27. In Plaintiff's deposition, she revealed that she had a box of documents that included pictures, including perhaps a photograph of herself and Prince Andrew, but that she did not look through the box or provide any of its contents. Menninger Decl., Ex. G at 208-13. Shortly thereafter, Plaintiff's counsel produced 60 pages of pictures previously withheld. Menninger

Decl., Ex. M. Plaintiff still not provided the native versions of these photographs. This pattern was repeated again in just the past few days when Plaintiff turned over additional relevant documents from Plaintiff's iCloud account, but only did so after Ms. Maxwell's counsel ferreted out that account through detailed review of documents produced showing that the account was used by Plaintiff including in her correspondence with her counsel. Plaintiff failed to disclose the account, the identity of which was requested discovery. *Compare* Menninger Decl., Ex. F at 8-9 *with* Menninger Decl., Ex. G at 277; Menninger Decl., Ex. N (letter re: iCloud account).

While Ms. Maxwell has been able to unearth some of the information Plaintiff has purposefully withheld, there is simply no telling what else she is still hiding. "The sanctions imposed by Rule 37 for obstructing or failing to comply with discovery procedures would be hollow indeed if they could be imposed only on those whose efforts at concealment proved to be successful. Plaintiff may not properly escape the consequences of [plaintiff's] own wrongful conduct because the defendants were diligent and persistent enough to overcome the obstacles which [plaintiff] placed in their path." *Nittolo v. Brand*, 96 F.R.D. 672 (S.D.N.Y. 1983). Put simply, Plaintiff's discovery abuses have been rampant since the beginning of this case. In the case of withholding required documents and information regarding health care providers that are central to the defense claimed damages, these abuses necessitate preclusion of the claims.

**4. Plaintiff and her counsel are fully aware of sanctions for non-compliance with Court orders**

"Although formal warnings often precede the imposition of serious sanctions, this court has never considered warning an absolute condition precedent." *Davidson v. Dean*, 204 F.R.D. 251, 257 (S.D.N.Y. 2001). Plaintiff is represented by no less than four law firms and has seven attorneys of record in this case. Each should be fully aware, without need for warning, that the failure to comply with this Court's orders can result in Rule 37 sanctions. "[I]t is an elementary

fact and expectation of legal practice that an attorney who fails to abide by a court rule or order may be subject to sanctions or other adverse consequences." *In re Payne*, 707 F.3d 195, 206 (2d Cir. 2013); s*ee also Gurvey v. Cowan, Liebowitz & Lathman, P.C.*, No. 06 CIV. 1202 LGS HBP, 2014 WL 715612, at *6 (S.D.N.Y. Feb. 25, 2014) ("Although [the offending party] was not expressly warned of the consequences of disobeying my Orders, she is an attorney and is chargeable with knowing the consequences of violating a court order." (footnote omitted)).

**B. Additional Rule 37(c) Factors for Failure to Comply With Initial Disclosure Requirements**

The factors considered under Rule 37(b) and (c) largely overlap, and the issues of willfulness and prejudice are addressed above. The two additional factors considered in imposing the sanctions for failure to provide required Rule 26(a) damages calculations and documents -- the importance of the information withheld and possibility of continuance – also warrant imposition of striking the claims for physical and emotional distress damages.

**1. The information withheld is critically important**

As fully explained in the Motion to Compel Rule 26(a) disclosures, to date Plaintiff still has not provided an actual computation of the physical and emotional distress damages she claims. Despite specific discovery requests, Plaintiff failed to provide the information about her most current physical and mental health treatment providers – those people whom she saw after the alleged defamation. This information is critical to the defense against Plaintiff's damages claims. The undisclosed records demonstrate that Plaintiff did not seek any treatment immediately following the alleged defamatory statement on January 2, 2015. The first treatment she sought thereafter was on March 5, 2015 and was *unrelated* to any physical or emotional distress caused by the alleged defamatory statement. Instead, she was treated at a hospital for a domestic violence incident in which her husband strangled and punched her. This highly

[redacted]. Yet, Plaintiff did not report this treatment or identify these health care providers in her Initial Disclosures or Interrogatory Reponses. She also purposefully left this information out of her testimony relating to doctors she has seen after January 2, 2015. [redacted]. Plaintiff is obviously trying to hide this very serious other intervening cause of her damages – and she almost got away with it.

[redacted] Dr. Lightfoot is perhaps the most relevant health care provider, yet her name appears nowhere in the Disclosures or in the Interrogatory Reponses. Plaintiff still has not produced a single record from Dr. Lightfoot for any treatment after the alleged defamatory statement.

A third doctor, Dr. Donahue, may have been named, but the nature and dates of the treatment he provided were never disclosed. [redacted]. No records have been produced. [redacted]. Menninger Decl., Ex. G, p. 336. There is a clear need to depose Dr. Donahue regarding this failure to mitigate damages. Yet, his records have not been produced, and his role in Plaintiff's treatment was not disclosed until Plaintiff's deposition.

One can only assume Dr. Carol Hayek has relevant information – she was actually included in Plaintiff's Second Supplemental Responses & Objections. Plaintiff nevertheless fails to identify the nature of Dr. Hayek's treatment of her and no records have been produced. Plaintiff cannot be permitted to identify people with relevant information that she plans on relying on and yet refuse to inform the defense the content of the information.

The information that was withheld and only produced after Ms. Maxwell's counsel discovered its existence is of paramount importance to the damages claims. It is likely that the still undisclosed evidence is equally compelling.

**2. Ms. Maxwell would require an extension of the discovery period**

Ms. Maxwell does not wish to extend the discovery deadlines in this matter and has diligently worked to meet all deadlines so that this case can proceed on the schedule set out in the Scheduling Order. Ms. Maxwell obtained the deposition testimony of the one treatment provider Plaintiff did initially identify[6] – Dr. Olsen – who has provided valuable information that disproves any physical or emotional distress damages caused by the alleged defamation. Now, on the eve of discovery closing, Ms. Maxwell has learned of at least five other medical treatment providers in the most relevant timeframe – people providing medical and mental health services post the alleged defamatory statement in January 2015. Plaintiff's discovery failures in hiding relevant treating physician information have prevented Ms. Maxwell from obtaining what now appears to be critical information. Two of these providers – Drs. Lightfoot and Donahue -- are located in Australia, requiring significant travel to obtain their deposition, and potentially requiring service of process through other means. Four other treatment providers – Dr. Geiger,

[6] Plaintiff also originally disclosed a Dr. Carol Hayek as a treatment provider. However, no information has been provided on what Dr. Hayek treated Plaintiff for or when she was treated, and no medical records have been produced.

Dr. Heaney, Donna Oliver P.A and Dr. Streeter – reside in Colorado. Because they are outside of the jurisdiction, they are not subject to be compelled to appear at trial, requiring that their depositions be taken to present their testimony.

Ms. Maxwell does not wish to drag this case out, and should not be forced to incur the time and expense that would be required to obtain discovery from these hidden health care providers, especially at this late stage.

## II. STRIKING CLAIMS FOR MEDICAL AND EMOTIONAL DISTRESS DAMAGES IS CONSISTENT WITH THE PURPOSE OF RULE 37, COMMENSURATE WITH THE INFORMATION WITHHELD, AND LESS HARSH THAN THE AVAILABLE DISMISSAL SANCTION.

Under Rule 37, Ms. Maxwell could certainly request the more severe sanction of dismissal of the case.[7] This most severe sanction would be appropriate in this circumstance. Dismissal is consistent with the sanctions imposed by many courts in this district and throughout New York in similar situations where medical records have been withheld despite a court order to produce, and those medical records are central to the issue in the case. *See Nittolo v. Brand*, 96 F.R.D. 672 (S.D.N.Y. 1983) (dismissing plaintiff's claims under Rule 37 for providing false and evasive answers concerning material facts including medical history); *Skywark v. Isaacson*, No. 96 CIV. 2815 JFK, 1999 WL 1489038, at *1 (S.D.N.Y. Oct. 14, 1999), *aff'd,* No. 96 CIV. 2815 (JFK), 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000) (dismissal of Plaintiff's claims for failure to turn over medical records relevant to claims, and withholding Court ordered information until uncovered by defendant); *In re Consol. RNC Cases*, No. 127, 2009 WL 130178, at *13 (S.D.N.Y. Jan. 8, 2009) (dismissal of emotional distress claims under Rule 37 for failure to turn over relevant medical records despite Court Order); *Witharana v. Dorsey*, No. 13-CV-3102 ENV

[7] Obviously, the Court has the power to elect this sanction on its own should it so choose.

MDG, 2015 WL 4510273, at *5 (E.D.N.Y. July 24, 2015) (dismissal of claims under Rule 37 for failure to provide Court Ordered medical releases relevant to claims).

Here, Ms. Maxwell seeks the lesser sanction of striking the claim or precluding evidence only on the damages that relate to the withheld documents and information. The information being withheld – medical and psychological providers and their records – related directly to the claims for physical, psychological and emotional distress damages. The sanction sought is commensurate with and directly related to Plaintiff's violation of the Court's Order. Given the ten days left in discovery Ms. Maxwell cannot adequately get discovery on this newly disclosed evidence. In light of Plaintiff's continuing and persistent discovery misconduct, the punishment fits.

## CONCLUSION

WHEREFORE, Ms. Maxwell requests that this Court enter an Order:

1) Striking Plaintiff Damages Claims for psychological pain and suffering, mental anguish and emotional distress (Complaint ¶ 19), Physical, psychological and psychiatric injuries and resulting medical expenses (Rule 26(a) Disclosures, Paragraph (C)(1)) and "Past, present and future pain and suffering, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of standing in the community, loss of dignity and invasion of privacy in her public and private life" (Rule 26(a) Disclosures, Paragraph (C)(1));

2) For attorneys' fees and costs incurred in filing this Motion; and

3) Warning Plaintiff that further violation of this Court orders or the discovery rules may result in the sanction of dismissal of her claims.

Dated: June 20, 2016

Respectfully submitted,

*/s/ Laura A. Menninger*

Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice)*
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

**CERTIFICATE OF SERVICE**

I certify that on June 20, 2016, I electronically served this *Defendant's Motion for Rule 37(B) &(C) Sanctions for Failure to Comply with Court Order and Failure to Comply with Rule 26(A)* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**Declaration Of Laura A. Menninger In Support Of Defendant's Motion For Rule 37(B) &(C) Sanctions For Failure To Comply With Court Order And Failure To Comply With Rule 26(A)**

I, Laura A. Menninger, declare as follows:

1. I am an attorney at law duly licensed in the State of New York and admitted to practice in the United States District Court for the Southern District of New York. I am a member of the law firm Haddon, Morgan & Foreman, P.C., counsel of record for Defendant Ghislaine Maxwell ("Maxwell") in this action. I respectfully submit this declaration in support of Defendant's Motion for Rule 37(b) &(c) Sanctions for Failure to Comply with Court Order and Failure to Comply with Rule 26(a).

2. Attached as Exhibit A is a true and correct copy of excerpts from Plaintiff's Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff, served March 16, 2016.

3. Attached as Exhibit B is a true and correct copy of excerpts from Plaintiff's Amended and Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff, served March 22, 2016.

4. Attached as Exhibit C is a true and correct copy of Addendum to Plaintiff's Rule 26 Initial Disclosures, served March 22, 2016.

5. Attached as Exhibit D is a true and correct copy of Plaintiff, Virginia Giuffre's Revised Disclosure Pursuant to Fed. R. Civ. P. 26, served March 11, 2016.

6. Attached as Exhibit E is a true and correct copy of the transcript of the hearing held before this Court on April 21, 2016.

7. Attached as Exhibit F is a true and correct copy of Plaintiff's Second Amended Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff, served April 29, 2016.

8. Attached as Exhibit G (filed under seal) is a true and correct copy of excerpts from the Deposition of Virginia Giuffre taken in the above captioned matter on May 3, 2016, and designated by Plaintiff as Confidential under the Protective Order.

9. Attached as Exhibit H (filed under seal) is a true and correct copy of excerpts from the Deposition of Lynn Trude Miller taken in the above captioned matter on May 24, 2016, and designated by Plaintiff as Confidential under the Protective Order.

10. Attached as Exhibit I (filed under seal) is a true and correct copy of medical records bates labeled GIUFFRE005498-005569, produced by Plaintiff on June 1, 2016.

11. Attached as Exhibit J (filed under seal) is a true and correct copy of medical records bates labeled GIUFFRE005492-5496, produced by Plaintiff on May 25, 2016.

12. Attached as Exhibit K (filed under seal) is a true and correct copy of excerpts from the Deposition of Dr. Steven Olsen taken in the above captioned matter on May 26, 2016, and designated by Plaintiff as Confidential under the Protective Order.

13. Attached as Exhibit L is a true and correct copy of a letter from Laura A. Menninger to Sigrid McCawley dated April 25, 2016 concerning discovery.

14. Attached as Exhibit M is a true and correct copy of a letter from Sigrid McCawley to Laura A. Menninger and documents produced by Plaintiff bates labeled GIUFFRE005370-5430, produced by Plaintiff on May 12, 2016.

15. Attached as Exhibit N is a true and correct copy of a letter from Sigrid McCawley to Laura A. Menninger enclosing documents based labeled GIUFFRE005607-5613, produced by Plaintiff on June 14, 2016.

By: */s/ Laura A. Menninger*
Laura A. Menninger

## CERTIFICATE OF SERVICE

I certify that on June 20, 2016, I electronically served this *Declaration Of Laura A. Menninger In Support Of Defendant's Motion For Rule 37(B) &(C) Sanctions For Failure To Comply With Court Order And Failure To Comply With Rule 26(A)* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

# EXHIBIT G

# *GIUFFRE*

# *VS.*

# *MAXWELL*

**Deposition**

## *VIRGINIA GIUFFRE*

*05/03/2016*

---

***Agren Blando Court Reporting & Video, Inc.***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**another prince, the large hotel chain owner and Marvin Minsky, is there anyone else that Ghislaine Maxwell directed you to go have sex with?**

A I am definitely sure there is. But can I remember everybody's name? No.

**Q Okay. Can you remember anything else about them?**

A Look, I've given you what I know right now. I'm sorry. This is very hard for me and very frustrating to have to go over this. I don't -- I don't recall all of the people. There was a large amount of people that I was sent to.

**Q Do you have any notes of all these people that you were sent to?**

A No, I don't.

**Q Where are your notes?**

A I burned them.

**Q When did you burn them?**

A In a bonfire when I lived at Titusville because I was sick of going through this shit.

**Q Did you have lawyers who were representing you at the time you built a bonfire and burned these notes?**

A I've been represented for a long time, but it was not under the instruction of my lawyers to do



this. My husband and I were pretty spiritual people and we believed that these memories were worth burning.

**Q So you burned notes of the men with whom you had sex while you were represented by counsel in litigation, correct?**

MR. EDWARDS: Object to the form.

A This wasn't anything that was a public document. This was my own private journal, and I didn't want it anymore. So we burned it.

**Q (BY MS. MENNINGER) When did you write that journal?**

A Just over time. I started writing it probably in, I don't know, I can't speculate, 2012, 2011.

**Q So you did not write this journal at the time it happened?**

A No.

**Q You started writing this journal approximately a decade after you claim you finished being sexually trafficked, correct?**

A Yes.

**Q And you started writing a journal after you had a lawyer, correct?**

A Correct.



**Q Including Mr. Edwards, who is sitting right here, correct?**

A Correct.

**Q What did that journal look like?**

A It was green.

**Q And what else?**

A It was just a spiral notebook.

**Q Okay. And what did you put into that green spiral notebook?**

A Bad memories. Things that I've gone through, lots of things, you know. I can't tell you. There was a lot of pages. It was over 300 pages in that book.

**Q Did you ever show that book to your lawyers?**

A No.

**Q Did you show that book to anyone?**

A My husband.

**Q Did you show it to anyone else besides your husband?**

A No.

**Q Did you tear out pages and give them to Sharon Churcher?**

A No, I wrote -- those pages that you're talking about, I wrote for her specifically. She



wanted to know about the Prince Andrew incident.

**Q So that's a different piece of paper?**

A Yeah, that's just random paper.

**Q So you had a green spiral notebook that you began sometime in 2011 or 2012 in which you wrote down your recollections about what had happened to you, and you burned that in a bonfire in 2013.**

**Did I get that right?**

A You got that right.

**Q And do you have no other names of people to whom you claim Ghislaine Maxwell directed you to have sex, correct?**

A At this time, no.

**Q Is there any document that would refresh your recollection that you could look at?**

A If you have a document you'd like to show me, I would be glad to look at it and tell you the names I recognize off of that.

**Q I'm just asking you if there's a document you know of that has this list of names in it?**

A Not in front of me, no.

**Q Where is the original of the photograph that has been widely circulated in the press of you with Prince Andrew?**

A I probably still have it. It's not in my

possession right now.
**Q Where is it?**
A Probably in some storage boxes.
**Q Where?**
A In Sydney.
**Q Where in Sydney?**
A At some family's house. We got the boxes shipped to Australia, and they were picked up off the porch by my nephews and brought to their house.
**Q Which is where?**
A In Sydney.
**Q Where in Sydney?**
A [redacted]
**Q And who lives in that house?**
A Well, it's owned by my mother-in-law and father-in-law, but my nephews live in the house.
**Q What are their names?**
A I'm not giving you the names of my nephews.
**Q What's the address of the house?**
A Why would you want that?
**Q I want to know where the photograph is. I'm asking you where the photograph is. And you've just told me it's somewhere in** [redacted]
A Yes.



**Q So where in** [redacted] **is the photograph located?**
A If I can't 100 percent say that the photograph is there, it could be at my house that I presently live in. I'm not going to give you the address of my nephews' residence.
**Q When is the last time you saw the photograph in person?**
A When I packed and left America.
**Q Colorado?**
A Yes.
**Q All right. So you had that photograph here with you in Colorado?**
A Yes.
**Q What's on the back of the photograph?**
A I'm sorry?
**Q Is there anything on the back of the photograph?**
A There's like the date it was printed, but no writing or anything.
**Q Okay. Does it say where it was printed?**
A I don't believe so. I think it just -- I don't remember. I just remember there's a date on it.
**Q Whose camera was it taken with?**



A My little yellow Kodak camera.
**Q Who took the picture?**
A Jeffrey Epstein.
**Q And where did you have it developed?**
A I believe when I got back to America.
**Q So where?**
A I don't know.
**Q Palm Beach?**
A I don't know.
**Q What is the date the photograph was printed?**
A I believe it's in March 2001.
**Q Okay.**
A But that's just off of my photographic memory. I don't -- it could be different, but I think it's March 2001.
**Q You have a photographic memory?**
A I'm not saying I have a photographic memory. But if I'd look at the back of the photo and I remember what it says, I believe it was March 2001.
**Q Did the photograph ever leave your possession for a while?**
A I gave it to the FBI.
**Q Okay. And when did you get it back?**
A When they took copies of it.



**Q When was that?**
A 2011.
**Q When they came to interview you?**
A Yes.
**Q So from 2011 until you left Colorado it was in your personal possession?**
A Yes.
**Q What other documents related to this case are in that, storage boxes in Australia?**
MR. EDWARDS: Object to the form.
A Documents related to this case -- there -- I don't know. I really can't tell you. I mean, there's seven boxes full of Nerf guns, my kids' toys, photos. I don't know what other documents would be in there.
**Q (BY MS. MENNINGER) Did anyone search those documents after you received discovery requests from us in this case?**
A I haven't been able to obtain those boxes. I can't get them sent back up to me. It's going to cost me a large amount of money. And right now I'm trying to look after my family, so I'm not able to afford to get them up.
**Q You live in Australia, correct?**
A I do.

Page 213

**Q Okay. How far away are the boxes from where you live in Australia?**

A Sydney is down here at the bottom. Cairns is up here at the top.

**Q Okay.**

A It's probably a six-day drive.

**Q Did you fly here through Sydney?**

A No.

**Q Have you been to Sydney since you've moved back to Australia?**

A I flew into Sydney with my three kids, but it was a connecting flight to Brisbane.

**Q Did you ask your nephews or anyone else to search those boxes in response to discovery requests that we issued in this case?**

A They are my nephews. I would never let them look at those.

**Q Other than your green spiral notebook, what else did you burn in this bonfire in 2013?**

A That was it.

**Q That's the only thing?**

A Yes.

**Q Did you use wood?**

A Yes.

**Q Charcoal?**

Page 214

A My husband built the bonfire out of wood and I don't know what else he put in it. He's the one who always makes the fires, not me.

**Q Who else was present?**

A Just him and I.

**Q Were your kids there?**

A No. They were inside sleeping.

**Q And what beach was this?**

A It wasn't a beach. It was in my backyard.

**Q What's your address?**

A At that time?

**Q Um-hum.**

A [redacted]

**Q** [redacted]

A Yes.

**Q Who were your neighbors?**

A Sweet people. Ray and -- I could look on my phone if you want.

**Q No, thank you. Do they still live there?**

A Yes.

**Q Do you keep in touch with them?**

A Last time I talked to them was a few months ago.

**Q Did they see the fire?**

A They've seen many fires that we've had.

Page 215

We've had lots of bonfires there.

**Q Did you ever ride in a helicopter with Ghislaine Maxwell acting as pilot of the helicopter?**

A Yes.

**Q Who else was on the flight?**

A I've been on the helicopter with her plenty of times. I can't mention how many people were on the -- on the helicopter at the same time.

**Q How many times?**

A I don't know. Do you have helicopter records that you could show me?

**Q I'm asking you how many times you were on the helicopter with Ghislaine Maxwell acting as the pilot --**

A It's impossible for me to answer the question without having the actual physical records in front of me.

**Q I'm asking you to look into your memory and tell me how many times you recall being on a helicopter with Ghislaine Maxwell at the pilot seat?**

A There is no number I can give you. There's plenty of times I've been on her helicopter.

**Q Where did you go from and to on a helicopter?**

A I believe it was -- don't quote me on this

Page 216

because I get confused on the islands there. I want to say it was St. John's. It could have been St. Barts. St. John or St. Barts, and then we would fly straight to Jeffrey's island.

**Q Okay. Did you ever go anywhere else on the helicopter?**

A No.

**Q Were you ever on the helicopter with Bill Clinton and Ghislaine Maxwell as the pilot of the helicopter?**

A No.

**Q Were you ever on the helicopter with Bill Clinton's Secret Service and Ghislaine Maxwell as the pilot?**

A No.

**Q Do you recall telling Sharon Churcher that you were?**

A No.

**Q Did you see the press article in which Sharon Churcher reported that you were?**

MR. EDWARDS: Objection. I'd just ask that if you're going to ask this witness about a specific article I'd like for her to see the article. Otherwise she's not going to testify about it.

If you have something to show her, then,

A Oh, like I said, I don't recognize it, but it obviously comes from --
**Q Your e-mail address?**
A Yes.
**Q Now, what e-mail address is that, exactly, on the first page of this exhibit?**
A @icloud.com, that must be from a phone.
**Q So that's different from the other e-mail address?**
A Yeah, I don't actually know about that e-mail address. I obviously used it. It has my husband's name on it, Robert Giuffre.
**Q And is the e-mail signed by your husband?**
A No, it's signed by me.
**Q Okay. And in the subject line you wrote Virginia Roberts (Jane Doe 102), correct?**
A Subject line?
**Q The very top line of that page.**
A Oh, yeah, I see.
**Q Okay. And it was to jason.richards2@ic.fbi.gov, correct?**
A Correct.
**Q And is that Jason Richards we were just referring to?**
A Yes.



**Q All right. And you had some e-mails with Jason Richards over time; is that fair?**
A Sure.
**Q These ones that came from your computer, right?**
A Sure, yes.
**Q Okay. You talk about having spoken with Judge Paul Cassell in this first page, correct?**
A I am here to get this BS non-prosecution agreement thrown out and speaking with Judge Paul Cassal (sic). He suggested trying to get ahold of any photos or video recordings released by the FBI to assist our case further in providing (sic) how much pedophilia occurred by Jeffrey and the many other monsters he obliged with underage girls.
**Q Okay.**
A If this is a possibility, please let me know so I can give you Brad Edwards (my attorney) his contact details. Many thanks for your time and I hope we should meet again.
**Q Okay. And so you were going back to Jason and trying to get any evidence that the FBI had about your case, right?**
A Correct. Any photographs pertaining to what -- myself, not of anyone else.



**Q Right.**
A But anything they had of me.
**Q And Brad Edwards, who is sitting right here, was your attorney at the time and you identified him as such in the e-mail, correct?**
A Correct.
**Q You did not identify Mr. -- Judge Cassell as your attorney in this e-mail, correct?**
A I knew him as a former judge, and I just wrote down, Judge Paul Cassal (sic) as it looks. But he was my attorney -- I don't know if he was my attorney at that time. But yes -- he's always -- he's been with me since the beginning, so --
**Q So he's representing you in this case now, correct?**
A Yes.
**Q But at that time you don't know if he was your attorney?**
A I think he was. I mean, I've been talking with him since the beginning. And this is dated 2014. So I believe at this time he was my attorney at the time as well.
**Q Okay. When do you recall first speaking with him?**
A Speaking with Paul, I'm not too sure. I



can't remember if I spoke to Paul in the phone in Australia or if I met him in person in Florida.
**Q Do you remember when you signed any kind of fee agreement with him?**
MR. EDWARDS: Object to the form.
A Um, the -- well, the first time I would have signed an agreement would have been in Florida.
**Q (BY MS. MENNINGER) When you were living [redacted]?**
A As far as my knowledge reminds me. I mean, I'm looking at e-mails that I can't even remember sending. It's a possibility I could have signed earlier, but as far as I remember.
**Q Okay. Do you recall ever having e-mail communications with Sharon Churcher about her publishing the first serial of your book?**
A Serial, what does that mean? I'm sorry.
**Q Like a sequel.**
A A sequel to my book?
**Q Um-hum.**
A My book has never been published.
**Q Right. Do you remember ever e-mailing with Sharon about her being the one who would publish any subsequent follow-up book?**
A If you have something in front of you to

Page 305

answered. Lacks predicate.
A I have been suffering from Ghislaine Maxwell and Jeffrey Epstein since the summer of 2000. So hearing again in 2011 that she's denied it, of course, it's going to hurt me.
Did I hear about this in 2011? I can't tell you I honestly have.
In 2015 is when I know that she denied it. And again, I haven't stopped suffering from the repercussions that they put me through.
**Q (BY MS. MENNINGER) And I'm asking you to separate, if you can, any symptoms that you experienced anew in March of 2015 -- I mean, excuse me, March of 2011, as a consequence of this statement being issued, which I believe you said you don't recall seeing at the time; is that fair?**
A But you're asking me now about 2015?
**Q Nope. March of 2011. Sorry, I misspoke there.**
A You're still on 2011?
**Q Yes. Did you start taking any new medications in March of 2011?**
**Let me ask you that.**
A I've been taking medication to control my [redacted] since 2002.

Page 306

**Q Okay. So did you take any new medications or any additional amounts of medications in March of 2011?**
A I have been taking the same medication since 2002.
**Q Okay.**
A And that's due to [redacted] caused from the pain that I suffered at the hands of Ghislaine Maxwell and Jeffrey Epstein.
**Q Did you -- do you recall any neighbors or other moms at the school or anybody in 2011 referencing to you in any way the fact that Ghislaine Maxwell had issued a denial of the allegations about her that had been published in the media in March of 2011?**
A No. I didn't speak to any -- I didn't speak to any moms about what I had gone through. I mean, when it came out in the press, I don't think any -- like, Australians don't pay attention to news, number one.
Number two, the first time that my friends contacted me they were shocked. And this was, I believe in -- when the press picked it up again, I think, was 2014/2015. And I got a whole bunch of like Facebook texts from them saying, Oh, my God, I

Page 307

can't believe you've been through this. I never knew. I'm so sorry. You know, that kind of stuff. So they never -- I never spoke to anybody about this except for my husband.
**Q All right. So the first time you recall any sort of people in your community referencing things to you is when the press picked up on it in 2014 or 2015?**
A Yeah, I think it may be end of 2014, early 2015.
**Q All right. And so in March of 2011 you don't recall any neighbors or anybody saying anything to you about this?**
A No, I don't recall.
**Q Did anyone tell you in March of 2011 about Defendant's Exhibit 26, the statement on behalf of Ghislaine Maxwell?**
A No, otherwise I would have been able to recall it.
**Q Okay. Do you remember anyone in 2011 ridiculing you because of Defendant's Exhibit 26?**
A Well, because nobody knew me as Virginia, everybody knows me as Jenna, no one probably put two and two together. And like I told you, I didn't tell anybody. So there was nobody there to ridicule me in

Page 308

2011 over this.
**Q Where were you living in 2011 when Shaza came to see you --**
A Oh, [redacted]
**Q Do you recall applying for any job in or around 2011 and someone referencing Defendant's Exhibit 26 and denying you a job?**
A I don't -- I don't think I applied for a job in 2011.
**Q Okay. Did you go see a doctor and talk to any doctor about Defendant's Exhibit 26?**
A Not about this. Not about this paper right here. But I have talked to doctors about my abuse at the hands of Ghislaine and Jeffrey.
**Q Have you talked to a doctor about any statements in the press made by Ghislaine Maxwell?**
A Recent statements, yes.
**Q Which doctor did you speak to about that?**
A Her name is Judith Lightfoot.
**Q And where is she?**
A She's in Australia.
**Q Where in Australia?**
A She's in Sydney, but we do phone conversations.
**Q Have you ever met her in person?**

A Yes.

**Q When?**

A In 2011.

**Q All right. And is she affiliated with an office or a hospital or what?**

A She's a psychiatrist.

**Q All right. Have you seen her in person since 2011?**

A No, because I've lived so far away and she's kind of the only person that -- like, I've seen a lot of doctors. And I can honestly tell you -- it's really hard for them to break down the walls and be comfortable enough to talk to them about this stuff. Judith is different. She's somebody that I feel I can trust. She's 76 and she's just a very lovely lady.

And she offers me other ways to deal with my pain and suffering. And I continue to see her over the phone because I can't see her in person.

**Q Do you recall ever discussing with her Defendant's Exhibit 26?**

A I can't recall ever seeing this exhibit. So --

**Q Okay.**

**(Exhibit 27 marked.)**



**Q (BY MS. MENNINGER) I'm going to give you Defendant's Exhibit 27.**

A Yes.

**Q All right. Have you seen this document before?**

A Yes.

**Q And what do you understand it to be?**

A Ross@acuityreputation sounds like a PR, if I'm not right -- if I'm not wrong. Sent -- or subject is Ghislaine Maxwell. I don't know [redacted], [redacted]

It says: To whom it may concern, Please find attached credible statement on behalf of Ms. Maxwell.

And then it goes on, to hear about that she is saying: Each time the story is retold it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts that Alan Dershowitz is involved in having sexual relations with her, which he denies.

Ms. Roberts' claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory. Ghislaine Maxwell's original response to the lies and defamatory claims remains



the same. Maxwell strongly denies -- excuse me. Excuse me -- strongly denies allegations of an unsavory nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

**Q All right. Have you seen this statement before?**

A I've seen it recently, yes.

**Q All right. What -- have you discussed this statement with Ms. Lightfoot? I don't know if she's a doctor or what.**

A Psychiatrist, yeah.

**Q Is she an MD?**

A I don't know what her levels of credential are. I'm sure she is.

**Q Okay. When is the first time that you saw the statement?**

A This full statement I have only seen through discovery. The original statement that I saw in the press was, Ms. Roberts' claims are obvious lies and so on, so forth. I don't remember seeing this in the press.

**Q Okay. So the part that you remember seeing in the press is Ms. Roberts' claims are**



**obvious lies?**

A Yes.

**Q Anything else about this?**

A I can't remember what else she printed in the press. It's a very horrible thing for her to do, turn around and call me a liar after everything that she knows she's done. And I didn't expect her to come out and be truthful.

Jeffrey Epstein hasn't even issued a statement.

**Q Sorry. I'm sorry if you misunderstood my question.**

A Yes.

**Q Was there anything else within this statement that you recall seeing in the press besides the line, Ms. Roberts' claims are obvious lies?**

A Without saying 100 percent, I think that the original allegations are not new and have been fully responded to be shown to be untrue. I don't know if that's in the press or not, but I've read this before.

So I don't know if I'm confusing this with what I've read out of this or what I've read in the press. The main thing is, I know she called me a liar, and that's what she publicized.

**Q And when you say she called you a liar, that's the Ms. Roberts' claims are obvious lies part?**

A Yes.

**Q Okay. When is the first time that you saw this whole document?**

A I guess when you guys handed it over for discovery.

**Q Okay. And who showed it to you?**

A It was sent to me by e-mail.

**Q Okay. Just through the course of communicating with your attorneys?**

A Yes.

**Q You've never seen it published?**

A Not this whole e-mail, no.

**Q All right. Did you -- I'm sorry, did you discuss this publication of what you saw in the press with Judith Lightfoot?**

A Yes.

**Q All right. And when did you discuss it with her?**

A When I got back to Australia, Judith and I started seeing each other again. Before then, I spoke with a doctor in Colorado about this. His name is Dr. Olsen. And it was causing me a lot of distress to have to deal with being called a liar all



over again, when I know I'm standing up doing the right thing. And the doctor prescribed me [redacted] And, yeah.

**Q Okay. So my question was, when did you discuss it with Judith Lightfoot?**

**I think I now understand you did that after you returned to Australia in November or so of 2015; is that right?**

A I returned to Australia in October, and that's when I picked up talking to her again.

**Q All right. And you're saying that at another point in time you talked to another doctor, Dr. Olsen, in Colorado, correct?**

A Correct.

**Q And when did you meet with Dr. Olsen?**

A I don't know the first date that I met with him.

**Q Did you meet with him more than once?**

A I believe so.

**Q And you believe you spoke with him about Ghislaine Maxwell's published statement in the press that Ms. Roberts' claims are obvious lies.**

**That's what you believe you spoke with Dr. Olsen about?**

A I spoke with Dr. Olsen about being called



a liar from the people that abused me.

**Q Okay. Do you recall specifically mentioning to him Ghislaine Maxwell's statement to the press?**

A I mentioned a lot of names to him.

**Q Okay. What new symptoms did you experience following January 2nd, 2015?**

A I think it's one thing to be a victim of sexual abuse and survive it and come out trying to tell the world my story, and then another thing for it to be shut down because these people, Ms. Maxwell and others are calling me liars (sic).

**Q And I asked you what symptoms had you experienced --**

MR. EDWARDS: She's going to finish her answer to this question. You cut her off so many times.

MS. MENNINGER: It has nothing to do with this.

MR. EDWARDS: It absolutely does. Because this is a psychological damages claim, and she is trying to explain to you what those damages are.

**Q (BY MS. MENNINGER) Okay. What are your symptoms that you experienced since January 2nd, 2015 that are new?**



A Very strong anxiety attacks, bad panic attacks. My throat closes up, I can't breathe. I vomit when I have anxiety attacks. My -- this is personal, but my sex life has suffered. My marriage has suffered. Psychologically, it's just hurt me all over again. I mean, they've hurt me before, and now they've hurt me again by doing this.

And I felt like I was in the process of healing before this came out because I had opened up this wonderful charity called Victims Refuse Silence. And then my aim was to heal by helping other girls get out of the situations that I was in before.

And my lawyers were nice enough to help me. I have this beautiful website where you can click on in any state and you can find a place. I have personally called all of them and they will help you get out of the situation that you're in. They will get you medical help. They will get you legal advice. I think I was in the really good process of healing. And when this came out, it just ruined me all over again.

**Q (BY MS. MENNINGER) All right. Tell me all of the damages that you claim occurred to you because of Defendant's Exhibit 27.**

A My reputation, my psychological abuse,

**Q And that hurt your feelings?**
A Badly.
**Q Did Buckingham Palace issue a denial of your allegation?**
A Yes, that's another one.
**Q Did Prince Andrew make a public statement in which he denied your allegations?**
MR. EDWARDS: Form.
A I think he did.
**Q (BY MS. MENNINGER) How do you know which harm you've suffered is attributable to Ghislaine Maxwell's denial versus Alan Dershowitz's denial or Prince Andrew's denial?**
A Ghislaine Maxwell brought me into the sex trafficking industry. She's the one who abused me on a regular basis. She's the one that procured me, told me what to do, trained me as a sex slave, abused me physically, abused me mentally.
She's the one who I believe, in my heart of hearts, deserves to come forward and have justice happen to her more than anybody. Being a woman, it's disgusting.
**Q So you cannot delineate what harm you have suffered in terms of all of the psychological damage you just disclosed?**



A Oh, of course.
**Q -- if that is attributable to Ghislaine Maxwell's statement on January 2nd versus Alan Dershowitz calling you a serial liar on Good Morning America?**
A Of course, it all hurts. Okay? I know Alan Dershowitz is lying himself. I know Prince Andrew is lying himself. Of course those hurt. It doesn't feel good to have people who have done something to you deny something that's happened, when I'm actually brave enough to come forward and talk about it.
What hurts me the worst is that Ghislaine Maxwell brought me into this. Not only has she hurt me once, but she's hurt me twice coming forward and saying, This is not true, this is categorically untrue and obvious lies.
That to me is a stick in the mud and that to me is what caused the most harm to me.
**Q Okay. And so can you point to any person who has referenced Ghislaine Maxwell's denial in the press or to your face or anywhere?**
A Can I point to a person?
**Q Can you point to any time that someone has referenced Ghislaine Maxwell's denial to you in any**



**context?**
MR. EDWARDS: Object to the form of the question.
A Can I point to a person -- I'm sorry. I don't understand. Can you rephrase it for me --
**Q (BY MS. MENNINGER) All right.**
A -- so I can understand what you mean?
**Q Where you live in Australia now, has anyone referenced the name Ghislaine Maxwell to you?**
A After all of the news hits, after the press hits in 2015 and, you know, everyone is calling me a liar, all of my friends in Australia called me and talked to me and said, I can't believe this. I can't believe what you went through.
That was very embarrassing for something that I tried to keep separate from my other life where I would like to help victims. I didn't want the friends of my kids parents knowing about that stuff. You know, and of course they all felt sorry for me. And you know, like I said. I didn't know anybody in Penrose. So there's nobody that could have come up to me and talked to me about it. My mom.
**Q This question was about Australia, sorry.**
A Oh, sorry, I thought you were talking



about pointing out people.
**Q No.**
A Okay, well in Australia, yes, at least a dozen friends.
**Q They came up and they mentioned Ghislaine Maxwell's denial to the press to you?**
A They couldn't believe what I had been through and, you know, that these were, you know, being denied, and they felt sorry for me. And, you know, it was the whole circumference of things.
**Q So the people in Australia that came up to you had sympathy for you and believed you, correct?**
A Yes.
**Q All right. And when you spoke to Dr. Olsen you recall specifically mentioning Ghislaine Maxwell's press release?**
MR. EDWARDS: Object to the form.
A Yes, I remember mentioning her, as well as the press release, as well as other press releases. And the abuse that I had occurred (sic) from the hands of Jeffrey and Ghislaine.
**Q (BY MS. MENNINGER) Okay. When have you been diagnosed with a mental health condition, first?**
A I don't know. I mean, I've been told that I've [redacted] You know --

**Q When were you first told that?**
A Well, early in -- early in 2003, I believe is the first time that I was suffering from [redacted] And then my doctor, Judith Lightfoot, has in 2011 [redacted]
And, you know, I've recently seen another doctor who said that I've got the exact same symptoms that Judith Lightfoot mentioned, which is [redacted]
**Q Which doctor is that?**
A You know, I don't honestly know his name.
**Q When did you see this new doctor?**
A Um --
MR. EDWARDS: Sorry. If you're referring to a doctor that's been sent to you by one of your lawyers --
THE DEPONENT: Yes.
MR. EDWARDS: -- at this time, I'm instructing you not to answer.
THE DEPONENT: Okay.
MS. MENNINGER: Wait. What is it? You've seen a doctor and you're not going to answer what doctor you've seen?



MR. EDWARDS: Sure. If it's a consulting witness in this case that has seen her at the direction of an attorney, that has not yet been disclosed per any expert witness disclosure, then I'm instructing her not to answer that question.
If that's what you're referring to. I don't know if that's what you're referring to.
THE DEPONENT: That's what I'm referring to.
**Q (BY MS. MENNINGER) All right. So you recall seeing Dr. Lightfoot. You recall seeing Dr. Olsen. And you recall seeing a new unnamed doctor recently.**
**Anyone else you've seen since January 2nd, 2015?**
A Dr. Olsen, Dr. Lightfoot. Oh, Dr. Donahue.
**Q Where is Dr. Donahue located?**
A He's in my suburb or he's a suburb next to me in Australia.
**Q And is that a psychiatric-type doctor, a medical-type doctor?**
A He's medical.
**Q And what did you see him for or her for?**
A I didn't have anybody to basically -- I



just got to Australia and Judith Lightfoot was helping me. [redacted] And I told him the reason.
**Q And this is since you returned to Australia?**
A Correct.
**Q And this is the first time you had seen that doctor?**
A I've seen that doctor twice now.
**Q I'm sorry, what was the name again? I know you already said it, but I just --**
A Dr. Donahue.
**Q Donahue, all right.**
**This doctor that you haven't yet disclosed, where did you see that person? In what country?**
A United States.
**Q And in what state?**
A San Francisco.
**Q And when did you see that doctor?**
A Um, Friday. Last Friday.
**Q And how many times have you seen that doctor?**
A Once. Well, twice actually. I saw him



the next day, too.
**Q All right. Did you suffer from anxiety before meeting Jeffrey Epstein?**
A I was never prescribed anything for anxiety before I met Jeffrey Epstein.
**Q That wasn't my question.**
A Did I --
**Q Were you suffering from anxiety before you met Jeffrey Epstein?**
A I think a person who has gone through as much trauma as I have in my life would suffer from quite a few problems. But like I said, I was never prescribed anything until I met Jeffrey Epstein.
**Q Did you suffer from panic attacks before meeting Jeffrey Epstein?**
A Nowhere near as bad, no.
**Q So you did suffer from [redacted] They just weren't as severe; is that what your testimony is?**
A No, what I'm trying to say is I did have [redacted] I did have [redacted] I had lived a very hard life prior to meeting Jeffrey Epstein as well.
After meeting Jeffrey Epstein and Ghislaine Maxwell, everything escalated. That's when I started to take Xanax and smoke marijuana to help

Page 333

calm the anxiety and everything down.

**Q Before you met Jeffrey Epstein, had you used any drugs?**

A Sure, yes.

**Q Which drugs had you used prior to meeting Jeffrey Epstein?**

A I smoked pot. I've taken Ecstasy.

**Q Cocaine?**

A Yeah, I would have snorted cocaine, um-hum.

**Q Did you ever abuse alcohol before meeting Jeffrey Epstein?**

A No, I was -- I wasn't even of age to be able to buy it. I mean, if there was alcohol at parties I would have drank it, but I wouldn't say I abused it.

**Q Okay. Were there ever occasions upon which you were observed to be drunk by other people, prior to meeting Jeffrey Epstein?**

A If you're drinking, the possibility of getting drunk is always there. I don't -- I can't recall exact situation where that was the case, but --

**Q Were you diagnosed as a drug addict prior to meeting Jeffrey Epstein?**

Page 334

A No, I was not diagnosed as a drug addict.

**Q Were you sent to live at a rehabilitation facility because of your use of drugs?**

A No, that was more of a group home. Yes, it was also a rehab facility, but it wasn't because I was a drug addict. I wasn't coming off of anything.

**Q Had you abused drugs prior to meeting Jeffrey Epstein?**

A I took drugs. I didn't abuse them, but I took them.

**Q Okay.**

A Recreationally.

**Q How often do you see Dr. Lightfoot?**

A Once a week every Monday. I've skipped this week because I've been over here and it's expensive to call back home right now, unless you FaceTime, but --

**Q Has Dr. Lightfoot recommended that you see a treating doctor in person?**

A No, she's -- she knows my history pretty well. And she's a very wonderful woman and I honestly wouldn't -- Dr. Donahue wants me to go see another psychiatrist in person, but I prefer to stay with Judith because she's someone I can personally relate to.

Page 335

**Q How much does it cost you every time you talk to Dr. Lightfoot?**

A Her normal fee is $200.

**Q And how much do you pay?**

A She doesn't charge me anything anymore.

**Q When did she stop charging you?**

A Since I got back to Australia.

**Q So before you left for Titusville, Florida, you saw her and you were paying $200 per session?**

A Yes.

**Q And what has Dr. Lightfoot recommended that you do in order to get better?**

A She loves what I'm doing with speaking out. She thinks the more that I speak out about it, the stronger I'll become. She recommends that I write my book, I tell my story. She thinks not only will it help me, but by helping me it'll help others find a way to get out of the situation and to know that there's other girls who have gone through what I've gone through and what they're going through.

She recommends meditation, breathing techniques, focus techniques.

**Q Does she prescribe medications for you?**

A No, she doesn't. She's a spiritual

Page 336

doctor.

**Q Is there anything that she's recommended that you do that you're not doing?**

A Is there anything that I do that she recommends I don't? Sorry, say that one more time.

**Q That's okay. Is there anything that Dr. Lightfoot has recommended that you do that you are not actually doing?**

**Are you following her advice?**

A Yes, I am.

**Q Okay. And what has Dr. Donahue recommended that you do?**

[redacted]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

15-cv-07433-RWS

**Declaration Of Laura A. Menninger In Support Of Defendant's Motion to Reopen Deposition of Plaintiff Virginia Giuffre**

I, Laura A. Menninger, declare as follows:

1. I am an attorney at law duly licensed in the State of New York and admitted to practice in the United States District Court for the Southern District of New York. I am a member of the law firm Haddon, Morgan & Foreman, P.C., counsel of record for Defendant Ghislaine Maxwell ("Maxwell") in this action. I respectfully submit this declaration in support of Defendant's Motion to Reopen Deposition of Plaintiff Virginia Giuffre.

2. Attached as Exhibit A is a true and correct copy of the transcript of the hearing held before this Court on April 21, 2016.

3. Attached as Exhibit B is a true and correct copy of a letter from Laura A. Menninger to Sigrid McCawley dated April 25, 2016 concerning discovery.

4. Attached as Exhibit C is a true and correct copy of Plaintiff's Second Amended Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff, served April 29, 2016.

5. Attached as Exhibit D (filed under seal) is a true and correct copy the Deposition of Virginia Giuffre taken in the above captioned matter on May 3, 2016, and designated by Plaintiff as Confidential under the Protective Order.

6. Attached as Exhibit E (filed under seal) is a true and correct copy of medical records bates labeled GIUFFRE005431-5438, produced by Plaintiff on May 12, 2016.

7. Attached as Exhibit F (filed under seal) is a true and correct copy of medical records bates labeled GIUFFRE005492-5496, produced by Plaintiff on May 25, 2016.

8. Attached as Exhibit G (filed under seal) is a true and correct copy of excerpts from the Deposition of Lynn Trude Miller taken in the above captioned matter on May 24, 2016, and designated by Plaintiff as Confidential under the Protective Order.

9. Attached as Exhibit H (filed under seal) is a true and correct copy of medical records bates labeled GIUFFRE005498-005569, produced by Plaintiff on June 1, 2016.

10. Attached as Exhibit I (filed under seal) is a true and correct copy of excerpts from the Deposition of Dr. Steven Olsen taken in the above captioned matter on May 26, 2016, and designated by Plaintiff as Confidential under the Protective Order.

11. Attached as Exhibit K (filed under seal) is a true and correct copy of a letter from Sigrid McCawley to Laura A. Menninger enclosing documents bates labeled GIUFFRE005607-5613, produced by Plaintiff on June 10, 2016.

12. Attached as Exhibit L is a true and correct copy of a letter from Laura A. Menninger to Sigrid McCawley and Meredith Shultz dated June 13, 2016 concerning discovery.

13. Attached as Exhibit M (filed under seal) is a true and correct copy of the Errata Sheet served relating to the Deposition of Virginia Giuffre taken in the above captioned matter, served on June 1, 2016.

14. Attached as Exhibit N (filed under seal) is a true and correct copy of Plaintiff, Virginia Giuffre's Third Revised Disclosure Pursuant to Fed. R. Civ. P. 26, served June 1, 2016.

By: */s/ Laura A. Menninger*
Laura A. Menninger

**CERTIFICATE OF SERVICE**

I certify that on June 20, 2016, I electronically served this *Declaration Of Laura A. Menninger In Support Of Defendant's Motion* to *Reopen Deposition of Plaintiff Virginia Giuffre* via ECF on the following:

Sigrid S. McCawley
Meridith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

# EXHIBIT C

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

Plaintiff, Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

Defendant.
______________________________/

**PLAINTIFF'S SECOND AMENDED SUPPLEMENTAL RESPONSE AND OBJECTIONS TO DEFENDANT'S FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFF**

Plaintiff hereby serves her second amended supplemental responses and objections to Defendant's First Set of Discovery Requests.

**GENERAL OBJECTIONS**

Defendant's First Set of Discovery Requests violates Local Civil Rule 33.3. Defendant has served interrogatories that are in direct violation of that Rule because the interrogatories are not "restricted to those seeking names of witnesses with knowledge of information relevant to the subject matter of the action, the computation of each category of damage alleged, and the existence, custodian, location and general description of relevant documents, including pertinent insurance agreements, and other physical evidence, or information of a similar nature." Local Civil Rule 33.3(a). Instead, they seek information under subsections (b) and (c) of Local Civil Rule 33.3, and therefore, they should not be served because they are not "a more practical method of obtaining the information sought than a request for production or a deposition," and because they were served in advance of the period "30 days prior to the discovery cut-off date."

Local Civil Rule 33.3(b), (c). The interrogatories you served violate Local Rule 33.3 and we ask that you immediately withdraw those interrogatories. *See* Rule 33.3, Local Rules for the Southern District of New York; *see also Shannon v. New York City Transit Auth.*, No. 00 CIV. 5079 (Sweet, J.), 2001 WL 286727, at *3 (S.D.N.Y. Mar. 22, 2001); accord *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, No. 08 CIV. 1533 BSJ JCF, 2011 WL 1642381, at *4 (S.D.N.Y. Apr. 26, 2011). Specifically, Rule 33.3 provides:

> (a) Unless otherwise ordered by the Court, at the commencement of discovery, interrogatories will be restricted to those seeking names of witnesses with knowledge of information relevant to the subject matter of the action, the computation of each category of damage alleged, and the existence, custodian, location and general description of relevant documents, including pertinent insurance agreements, and other physical evidence, or information of a similar nature.
>
> (b) During discovery, interrogatories other than those seeking information described in paragraph (a) above may only be served (1) if they are a more practical method of obtaining the information sought than a request for production or a deposition, or (2) if ordered by the Court.
>
> (c) At the conclusion of other discovery, and at least 30 days prior to the discovery cut-off date, interrogatories seeking the claims and contentions of the opposing party may be served unless the Court has ordered otherwise.

Similarly, Requests for Production numbers 1, 2, 4, 6(i), 9, 12, 30, 35 and 37 also violate Local Rule 33.3 in that they rely on the offending interrogatory requests. The Rule provides that a party must first try to obtain discovery through document production and testimony. Discovery does not close in this case until July 1, 2016, and Defendant has not yet noticed a deposition. As such, these interrogatories violate Local Rule 33.3 and are premature.

Defendant's First Set of Discovery Requests also violates Rule 33, Fed. R. Civ. P., which provides "a party may serve on any other party no more than 25 interrogatories, including all discrete subparts" – in that Defendant has served a total of 59 interrogatories, including subparts,

in violation of Rule 33. We ask that you immediately withdraw those interrogatories that exceed the 25 interrogatory limit set by Rule 33.

Ms. Giuffre objects to Defendant's First Set of Discovery Requests to the extent they seek information that is protected by any applicable privilege, including but not limited to, attorney client privilege, work product privilege, joint defense/common interest privilege, public interest privilege, and any other applicable privilege.

Ms. Giuffre objects to the requests to the extent Defendant's First Set of Discovery Requests call for the production of documents or information that is already in the possession, custody, or control of the Defendant. Ms. Giuffre further objects to the requests to the extent that Defendant's First Set of Discovery Requests is duplicative of documents and information that can equally or more readily be obtained by the Defendant.

Ms. Giuffre objects to the requests to the extent that they seek documents that are not relevant, material, or necessary to this action and, thus, are not reasonably calculated to lead to the discovery of admissible evidence. Many of the requests in the Defendant's First Set of Discovery seek documents that are in no way limited to their relation to this case. Indeed, they seek documents that are not important to resolving the issues; documents that are not relevant to any party's claim or defense; and documents that are not proportional to the needs of the case. Such requests create a heavy burden on Ms. Giuffre that outweighs any benefit. Such discovery is prohibited by the Federal Rules of Civil Procedure, particularly under the 2015 amendments to Rule 26(b)(1), Fed. R. Civ. P., and is wholly inappropriate.

Ms. Giuffre objects to the requests to the extent that they are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are overly

broad under Rule 26(b)(1), Fed. R. Civ. P. Specifically, Ms. Giuffre objects to the requests as overly burdensome to the extent that they would require logging voluminous and ever-increasing privileged communications between Ms. Giuffre and her counsel after the date litigation commenced on September 21, 2015. Ms. Giuffre objects to the requests as overly burdensome to the extent that they would require logging voluminous privileged documents between Ms. Giuffre and her counsel related to *Jane Doe #1 and Jane Doe #2 v. United States*, Case no. 08-80736-CIV-Marra, pending in the Southern District of Florida; *Bradley Edwards and Paul Cassell v. Alan Dershowitz*, Case no. CACE 15-000072, pending in the Seventeenth Judicial Circuit, Broward County, Florida; and *Jane Doe No. 102 v. Jeffrey Epstein*, Case No. 09-80656-CIV-Marra/Johnson (Southern District of Florida). Accordingly, due the undue burden of individually logging responsive privileged documents related to Defendant's overly broad requests, Plaintiff has employed categorical logging of such privileged responsive documents pursuant to Local Civil Rule 26.2(c).

Ms. Giuffre objects to the requests in that they seek to invade her privacy for the sole purpose of harassing and intimidating Ms. Giuffre who was a victim of sexual trafficking. Ms. Giuffre objects to the requests to the extent they are overly broad and unduly burdensome.

Ms. Giuffre objects to Defendant's definition of "your attorneys" because it includes names of attorneys that do not represent her, including Spencer Kuvin and Jack Scarola.

Ms. Giuffre's responses to Defendant's First Set of Discovery Requests are being made after reasonable inquiry into the relevant facts, and are based only upon the information and documentation that is presently known to her. Ms. Giuffre reserves the right to modify and/or supplement her responses. Ms. Giuffre is producing documents and information herewith, and she will continue to review and produce relevant documents until completion.

Ms. Giuffre incorporates her above-listed general objections in the responses herein.

## INTERROGATORIES

1. State:

   a. Your present residential address;

   b. Each residential address You have had since 1998, including any residential treatment facilities;

   c. the dates You lived at each address;

   d. the other Persons who lived with You at each address and for what period of time they lived at such address.

**Response to Interrogatory One**:

Ms. Giuffre objects to this interrogatory in part because it violates Rule 33.3. Ms. Giuffre objects to this interrogatory in that it seeks information that is sought by Defendant only to harass and intimidate Ms. Giuffre who was a victim of sexual trafficking. Per the Plaintiff's First Responses and Objections, and per our representations during the March 21, 2016 meet and confer phone call, we are working diligently to find information to supplement the below information with regard to address and dates, and once that information is obtained, Plaintiff will serve supplemental responses. Additionally, per the March 21, 2016 meet and confer phone call, we are addressing with the Plaintiff whether she will reveal here address to Defendant's counsel confidentially and we will update you with her response.

   a. Due to safety concerns with respect to Ms. Giuffre and her minor children, she is not at liberty to reveal her present residential location. To ensure that Defendant is not prejudiced by the failure to provide information about Ms.

Giuffre's specific residential location, Ms. Giuffre agrees to have her attorney's accept service on her behalf of any necessary communication or filings in this matter to be addressed to: Sigrid McCawley, Esq. Boies Schiller & Flexner LLP, 401 East Las Olas Blvd., Suite 1200, Fort Lauderdale, FL 33316.

b. Ms. Giuffre can recall living at the following addresses during the period of 1998 to the present. Ms. Giuffre may have lived at other locations for which she does not presently have the address. Ms. Giuffre is providing the information she has presently to the best of her recollection and review of documents and will supplement to the extent she obtains additional information responsive to this interrogatory.

c. Ms. Giuffre believes she has lived at the following residences:

- In January 1998, Ms. Giuffre was 14 years old. Ms. Giuffre recalls one facility named "Growing Together" that was located in or around Palm Beach, but she does not recall the dates when she resided at the facility.
  - From 2000-2002, Ms. Giuffre lived and travelled with Jeffrey Epstein and stayed at his various mansions in New York (9 E. 71st Street, New York, NY 10021-4102), Palm Beach (358 El Brillo Way, Palm Beach, Florida 33480, New Mexico (Zorro Ranch, 49 Zorro Ranch Rd., Stanley, New Mexico 87056), U.S.V.I. (Little St. James, 6100 Red Hook Quarters, Suite B3,

St. Thomas, Virgin Islands 00802), and Paris (22 Avenue Foch Apt 2DD, Paris, France 75116).

- Jeffrey Epstein also rented a residence for Ms. Giuffre in Royal Palm Beach, the exact address and dates of rental are in the possession, custody and control of Jeffrey Epstein. Tony Figueroa, James Michael Austrich and a few other individuals for whom Ms. Giuffre cannot recall the names of, stayed with her from time to time at the residence that Jeffrey Epstein rented.
- Ms. Giuffre's parents' address was 12959 Rackley Road, Loxahatchee, Florida 33470, and she lived there from time to time with her mother, her father, and her brothers.
- 2C Quentin St. Basshill NSW in approximately 2003, but she is not certain of that date. At this location, Ms. Giuffre lived with Robert Giuffre.
- N. Paramentata, NSW from approximately 2003 - 2005, but she is not certain of those dates. At this location, Ms. Giuffre lived with Robert Giuffre.
- Blue Bay, NSW from approximately 2005 - 2008 but is not certain of those dates. At this location, Ms. Giuffre lived with Robert Giuffre.
- 3 Elk St., NSW from approximately 2008 - 2009 but is not certain of those dates. At this location, Ms. Giuffre lived with Robert Giuffre.
- 50 Robertson Road, Basshill, NSW, from 2009 through January of 2010. At this location, Ms. Giuffre lived with Robert Giuffre.

- 50 Bundeena Rd., Glenning Valley, NSW from approximately January of 2010 through October 13, 2013. At this location, Ms. Giuffre lived with Robert Giuffre.
- 5035 Winchester Drive, Titusville, FL from approximately November 6, 2013 to October of 2014. At this location, Ms. Giuffre lived with Robert Giuffre.
- 1270 J. Street, Penrose, CO 81240, from approximately October of 2014 through October of 2015. At this location Ms. Giuffre lived with Robert Giuffre.

2. Identify any email address, email account, cellphone number and cellphone provider, social media account and login or screen name, text or instant messaging account name and number, that You have used, applied for or been supplied between 1998 and the present.

**Response to Interrogatory No. 2**

Ms. Giuffre objects to this request in that it violates Rule 33.3. Ms. Giuffre objects to this request in that it is overly broad and seeks information solely to harass and intimidate Ms. Giuffre.

For the period of 1998 to the present Ms. Giuffre provides the following information. During the time period that she was sexually trafficked by Jeffrey Epstein and the defendant, the defendant provided Ms. Giuffre with a cellphone so that she could be reached by the Defendant and Jeffrey Epstein at any time. Defendant is in possession of the information relating to this cellphone that she provided to Ms. Giuffre. Ms. Giuffre is responding with the information she can presently recall, but to the extent she obtains additional information she will supplement this response. Ms. Giuffre's e-mail address is robiejennag@y7mail.com. She can recall having the following cell numbers (321) 271-4948, +61414651273**,** 0407.433.252**.** Ms. Giuffre had a

Facebook account for a short time but it is no longer active. Per our representations during the March 21, 2015 meet and confer phone call, we are working diligently to find information to supplement the above information, and once that information is obtained, Plaintiff will serve supplemental responses.

3. Identify each attorney who has represented you from 1998 to the present, the dates of any such representation, and the nature of the representation.

**Response to Interrogatory No. 3**

Ms. Giuffre objects to this interrogatory as it seeks privileged information relating to her representation by attorneys.

- Ms. Giuffre responds as follows: Bob Josefsberg, Katherine W. Ezell, Amy Ederi (among other possible Podhurst Orseck, P.A. attorneys) represented Ms. Giuffre as a party in the litigation styled as *Jane Doe No. 102 v. Jeffrey Epstein, Case No. 09-80656-CIV-Marra/Johnson*, starting on January 27, 2009.

- Stan Pottinger, David Boies, and Sigrid McCawley (along with other Boies Schiller & Flexner LLP ("Boies Schiller") attorneys) represented Ms. Giuffre as a non-party in the litigation styled as *Bradley Edwards and Paul Cassell v. Alan Dershowitz*, Case no. 15-000072, Seventeenth Judicial Circuit, Broward County, Florida, starting in February, 2015.

- Brad Edwards (along with other Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L. ("Farmer Jaffe") attorneys), Paul Cassell, Stan Pottinger, David Boies and Sigrid McCawley (along with other Boies Schiller attorneys) represent Ms. Giuffre as a party in the litigation styled *Giuffre v. Maxwell*, 15-cv-07433-RWS in the Southern District of New York, the complaint of which was filed in September, 2015.

- Paul Cassell represents Ms. Giuffre as a non-party in the litigation styled as *Jane Doe #1 and Jane Doe #2 v. United States*, Case No. 08-80736-CIV-Marra, Southern District of Florida, starting in May of 2014.

- Brad Edwards (along with other Farmer, Jaffe attorneys) represents Ms. Giuffre as a non-party in the litigation styled as *Jane Doe #1 and Jane Doe #2 v. United States*, Case No. 08-80736-CIV-Marra, Southern District of Florida, starting in 2011.

- Brad Edwards provided Ms. Giuffre with legal advice concerning media inquiries Ms. Giuffre had received starting in 2011.

- Paul Cassell, Brad Edwards (along with other Farmer, Jaffe, attorneys), Stan Pottinger, David Boies (along with other Boies Schiller attorneys) represented Ms. Giuffre regarding investigations into potential legal action starting in the second half of 2014.

- Paul Cassell, Brad Edwards (along with other Farmer, Jaffe, attorneys), Stan Pottinger, David Boies, and Sigrid McCawley (along with other Boies Schiller attorneys) represent Ms. Giuffre as a cooperating witness with regard to a law enforcement investigation, starting in May, 2015.

- Paul Cassell provided Ms. Giuffre with legal advice concerning potential legal action starting in early 2011.

- Paul Cassell and Brad Edwards (along with other Farmer, Jaffe, attorneys) represented Ms. Giuffre and Victims Refuse Silence, giving advice regarding Victims Refuse Silence, starting in October, 2014.

- Meg Garvin (law professor at Lewis & Clark Law School, and the Executive Director of the National Crime Victim Law Institute ) represented Ms. Giuffre and Victims Refuse Silence, giving advice regarding Victims Refuse Silence, starting in October, 2014.

- Sigrid McCawley (along with other Boies Schiller attorneys) represented Ms. Giuffre and Victims Refuse Silence, giving advice regarding Victims Refuse Silence, starting in February 2015.

4. Identify each Communication, including the transmission of any Document, that You or Your Attorneys have had with any local, state or federal law enforcement agent or agency, whether in the United States or any other country, whether in Your capacity as a purported victim, witness, or perpetrator of any criminal activity, and whether as a juvenile or as an adult, including without limitation:

a. the date of any such Communication;

b. the form of any such Communication, whether oral or written and if written, the format of any such Communication;

c. the identities of all persons involved in the Communication, including the identity of the law enforcement agency with whom the agent is or was affiliated;

d. the case number associated with any such Communication;

e. the subject matter of any such Communication;

f. the disposition of any case associated with any such Communication, irrespective of whether the matter was sealed, expunged or later dismissed.

**Response to Interrogatory No. 4**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects to this interrogatory in that it seeks protected information regarding confidential investigations. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to the extent this seeks information regarding sexual assaults that occurred prior to her involvement with the Defendant and Jeffrey Epstein. Ms. Giuffre responds as follows: Ms. Giuffre, in accordance with the Court's direction at the hearing on April 21, 2016, has submitted documents to the Court for *In Camera* review. Ms. Giuffre met with the FBI on or about March 17, 2011. Ms. Giuffre also corresponded with Maria Villafano from the U.S. Attorney's office and that correspondence has been produced.

5. Identify each Communication that You or Your Attorneys have had with any author, reporter, correspondent, columnist, writer, commentator, investigative journalist,

photojournalist, newspaper person, freelance reporter, stringer, or any other employee of any media organization or independent consultant to the same, including:

a. the date of any such Communication;

b. the form of any such Communication, whether oral or written and if written, the format of any such Communication;

c. the identities of all persons involved in such Communication, including the identity of the media organization with whom the agent is or was affiliated;

d. the article title, date of publication, and means of publication of any article, report, or re-printing of any such Communication made by You or Your Attorneys;

e. the amount of Income that You and/or Your Attorneys received in exchange for any such Communication;

f. the dates on which You and/or Your Attorneys received any such Income for any such Communication.

**Response to Interrogatory No. 5**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects in that this request is overly broad and unduly burdensome.

6. Identify any "false statements" attributed to Ghislaine Maxwell which were "published globally, including within the Southern District of New York" as You contend in paragraph 9 of Count 1 of Your Complaint, including:

a. the exact false statement;

b. the date of its publication;

c. the publishing entity and title of any publication containing the purportedly false statement;

d. the URL or internet address for any internet version of such publication; and

e. the nature of the publication, whether in print, internet, broadcast or some other form of media.

**Response to Interrogatory No. 6**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre further objects because the information requested above is in the possession of Defendant who has failed to comply with her production obligations in this matter.

7. State whether You believe that You have ever been defamed by anyone other than Ghislaine Maxwell. If so, as to each alleged act of Defamation, state

a. the exact false statement;

b. the date of its publication;

c. the publishing entity and title of any publication containing the purportedly false statement;

d. the URL or internet address for any internet version of such publication; and

e. the nature of the publication, whether in print, internet, broadcast or some other form of media.

**Response to Interrogatory No. 7**

Ms. Giuffre objects to this request in that it violates Local Rule 33.3. Ms. Giuffre objects to this request in that it seeks information protected by the attorney client and work product privileges. Ms. Giuffre objects to this interrogatory in that it is not limited in time or to the subject nature of this litigation.

8. Identify the individuals referenced in Your pleadings filed in the U.S. District Court for the Southern District of Florida, *Jane Doe 1 and Jane Doe 2 v. United States of America*, 08-cv-80736-KAM, as the "high-profile non-party individuals" to whom Mr. Jeffrey Epstein sexually trafficked You, "including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders," including as to each episode of alleged sexual trafficking:

a. the date of any such sexual trafficking;

b. the location of any such sexual trafficking;

c. any witnesses to any such sexual trafficking;

d. any Income You received in exchange for such sexual trafficking; and

e. any Documents You have to support or corroborate Your claim of such sexual trafficking.

**Response to Interrogatory No. 8**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work

product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Additionally, Ms. Giuffre objects to this interrogatory because naming some such individuals would jeopardize her physical safety based on credible threats to the same. Ms. Giuffre refers to the list of witnesses identified in her Revised Rule 26 Disclosures.

9. Identify any Employment You have had from 1996 until the present, including without limitation, the name of Your employer or the name of any Person who engaged You for such Employment, the address and telephone number for any such Employment, the beginning and ending dates of any such Employment, Your job title in such Employment, and Your Income from such Employment.

**Response to Interrogatory No. 9**

Ms. Giuffre objects to this request in that it is overly broad and unduly burdensome, and seeks information that is not relevant to this case.

Ms. Giuffre responds as follows:

- Ms. Giuffre worked at Mar a Lago as a locker room attendant for the spa area. Records produced in this case identify the date of employment as 2000, and she recalls being there in the summer. Ms. Giuffre previously attempted to gather employment records from Mar-A-Lago. *See* Giuffre002726. She earned approximately $9 per hour. The address is 1100 South Ocean Boulevard, Palm Beach, Florida 33480, with the telephone number of 561-832-2600
- Ms. Giuffre worked at Roadhouse Grill as a waitress in approximately 2002, but Ms. Giuffre is unsure of the exact dates of employment. Her wages primarily consisted of tips. Ms. Giuffre does not recall the location of Roadhouse Grill. A Google search for

the same yields an address at 8865 Southern Blv., West Palm Beach, FL 33411 and a telephone number of 561-651-0400.

- Ms. Giuffre worked at Employment Training and Recruitment Australia from approximately 2005 through January of 2006, but Ms. Giuffre is unsure of the exact dates of employment. Ms. Giuffre was a receptionist earing approximately $15 per hour to the best of her recollection. Upon information and belief, this corporation is currently located in a different location from the location at which Ms. Giuffre was employed. Upon information and belief, based on an internet search, the new location of this entity is 123 Donniforn Street, Gofford NSW 2250, with a telephone number of 02-4323-1233
- Ms. Giuffre worked at Gemma Catering/Wedding Receptions in approximately 2004. She received approximately $10/hr. She does not recall the name of the proprietor nor its location.
- Ms. Giuffre worked at Manway Logistics in approximately 2003. Ms. Giuffre recalls it located in or around Sydney, Australia. An internet search yielded an address of 246 Miller Road, Villawood NSW 2163, and a phone number of 02-8707-2300. Ms. Giuffre worked as a receptionist and earned approximately $20/hr.

10. Identify any Income from any source other than Your Employment that You have received from January 1, 1996 until the present, including the Person or entity providing such Income, the amount of the Income, the dates on which any such Income was received, and the nature of the Income, whether a loan, investment proceeds, legal settlement, asset sale, gift, or other source.

**Response to Interrogatory No. 10**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects to this request in that it is overly broad and seeks confidential financial information. Ms. Giuffre objects to this interrogatory in that it seeks information covered by confidentiality provisions. Ms. Giuffre objects to this information in that any payment information for the sexual trafficking she endured at the hands of Jeffrey Epstein and Ghislaine Maxwell is in the possession, custody and control of the Defendant and Jeffrey Epstein.

Ms. Giuffre is in possession of a responsive document that contains a confidentiality provision. If Defendant obtains, and produces to Ms. Giuffre, a written waiver from her co-conspirator, Mr. Epstein, of the confidentiality provision, freeing Ms. Giuffre from any liability whatsoever under the confidentiality provision, she will produce the document.

11. Identify any facts upon which You base Your contention that You have suffered as a result of the Alleged Defamation by Ghislaine Maxwell "past and future lost wages and past and future loss of earning capacity and actual earnings – precise amounts yet to be computed, but not less than $5,000,000."

**Response to Interrogatory No. 11**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects to this interrogatory in that it prematurely seeks expert witness disclosures. Ms. Giuffre incorporates by reference herein her Revised Rule 26 disclosures, which includes her computation of damages.

12. Identify any Health Care Provider from whom You received any treatment for any

physical, mental or emotional condition, that You suffered from subsequent to any Alleged Defamation by Ghislaine Maxwell, including:

a. the Health Care Provider's name, address, and telephone number;

b. the type of consultation, examination, or treatment provided;

c. the dates You received consultation, examination, or treatment;

d. whether such treatment was on an in-patient or out-patient basis;

e. the medical expenses to date;

f. whether health insurance or some other person or organization or entity has paid for the medical expenses; and

g. for each such Health Care Provider, please execute the medical and mental health records release attached hereto as Exhibit A.

**Response to Interrogatory No. 12**

Pursuant to this Court's Order, Ms. Giuffre will provide information for health care providers from 1999 through the present. Ms. Giuffre continues to search for medical providers that appear in documents.

- Dr. Steven Olson, St. Thomas More Hospital, 1338 Phay Avenue, Canon City, CO 81212, treated Ms. Giuffre as described in the medical records produced at GIUFFE005342-5346.
- Dr. Mona Devansean, 11476 Okeechobee Blvd., Royal Palm Beach, FL. It appears Dr. Devansean is retired. We produced the letter we sent her as well as a document indicating the practice was closed at GIUFFRE005335-GIUFFRE0005338.

- Dr. Chris Donahue, 12 Clifton Village Shopping Centre, Captain Hook Hwy, Clifton Beach, QLD 4879 is believed to have treated Ms. Giuffre. Ms. Giuffre has sent a release to Dr. Donahue, and is awaiting a response.
- Dr. John Harris and Dr. Darshanee Majaliyana at The Entrance Medical Centre, 120 The Entrance Road, The Entrance 2261, 43321300, treated Ms. Giuffre as described in the records produced at GIUFFRE005315-5322.
- Dr. Wah Wah, Central Coast Family Medicine, Unit 2, 17 Anzac Rd., Tuggerah 2259, 0243518777 treated Ms. Giuffre as described in the medical records produced at GIUFFRE005339-5341.
- Dr. M. Sellathurai (a/k/a Dr. Sella), Buss Hill Plaza, Medical Center, 753 Hume Highway, Bass Hill NSW 2197, 02297555292 treated Ms. Giuffre as described in the medical records produced at GIUFFRE005089-5091.
- Royal Oaks Medical Center, 1855 Knox McRae Dr., Titusville, FL 32780, was believed to have possibly treated Ms. Giuffre, but Medical Center responded stating that they have no records for Ms. Giuffre, *see* GIUFFRE005347-5349.
- Dr. Carol Hayek, Denison Road, Dulwich Hill, NSW 2203. Records have been requested, but thus far have been denied. Another medical release was sent and is pending.
- New York Presbyterian Hospital treated Ms. Giuffre as described in the medical records produced at Giuffre003258-3298.
- Campbelltown Hospital, 8 Moncrleff [illegible] Close, St. Helens treated Ms. Giuffre as described in the medical records produced at Giuffre003193-3257.

- Sydney West Hospital treated Ms. Giuffre as described in the medical records produced at Giuffre003291-3298.
- Westmead Hospital treated Ms. Giuffre on as described in the medical records produced at GIUFFRE003291-003298.
- As Defendant requested, Medical releases have been provided for:
  - Dr. Karen Kutikoff
  - Wellington Imaging Associates, PA
  - Growing Together

13. Identify any Health Care Provider from whom You received any treatment for any physical, mental or emotional condition, including addiction to alcohol, prescription or illegal drugs, that You suffered from prior to the Alleged Defamation by Ghislaine Maxwell, including:

a. the Health Care Provider's name, address, and telephone number;

b. the type of consultation, examination, or treatment provided;

c. the dates You received consultation, examination, or treatment;

d. whether such treatment was on an in-patient or out-patient basis;

e. the medical expenses to date;

f. whether health insurance or some other person or organization or entity has paid for the medical expenses; and

g. For each such Health Care Provider, please execute the medical and mental health records release attached hereto as Exhibit A.

**Response to Interrogatory No. 13**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects to this request in that it is overbroad and seeks confidential medical information of a sex

abuse victim and is not limited in scope to the issues in this case. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that it is not limited in scope to the medical information relating to the abuse she suffered from Defendant and Jeffrey Epstein.

14. Identify any Person who You believe subjected You to, or with whom You engaged in, any illegal or inappropriate sexual contact, conduct or assault prior to June 1999, including the names of the individuals involved, the dates of any such illegal or inappropriate sexual contact, conduct or assault, whether Income was received by You or anyone else concerning such event, whether a police report was ever filed concerning such event and the outcome of any such case, as well as the address and location of any such event.

**Response to Interrogatory No. 14**

Ms. Giuffre objects to this interrogatory in that it violates Local Rule 33.3. Ms. Giuffre objects to this request in that it is overbroad and seeks confidential medical information of a sex abuse victim. Ms. Giuffre objects to this request in that it seeks sexual assault information for a period prior to the sexual abuse at issue in this matter for a period when she was a minor child from the time Ms. Giuffre was born until she was 15. Ms. Giuffre objects to this request in that it is sought solely to harass, and intimidate Ms. Giuffre who is a victim of sexual abuse by the defendant.

## REQUESTS FOR PRODUCTION

1. **All Communications and Documents identified in Interrogatories 1-14, above**.

**Response to Request No. 1**

Ms. Giuffre objects to this request in that Defendant's interrogatories violate Local Rule 33.3. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request on the grounds that it is overly broad and unduly burdensome, incorporating the interrogatories that total 59 subparts, and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that it seeks to invade the privacy rights of a sex abuse victims, and is meant for the improper purpose of harassing and intimidating this victim.

Subject to and without waving the above objections, Ms. Giuffre is withholding production of documents that are privileged pursuant to the attorney-client privilege, the work product privilege, and the public interest privilege. Ms. Giuffre is also withholding electronic renditions of photographs that depict the faces of her minor children, including school portraits and other photographs taken that reveal the faces of her minor children.

Subjection to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request limited to documents that do not depict images of her minor children as described *supra* and will continue to supplement her production.

**2. All Documents reviewed or relied upon in answering Interrogatory Nos. 1-14 above.**

**Response to Request No. 2**

Ms. Giuffre objects to this request in that defendant's interrogatories violate Local Rule 33.3. Ms. Giuffre objects to this request in that it seeks information that is protected by the attorney client, work product, and public interest, and other applicable privileges. Ms. Giuffre objects to this request in that it is overly broad incorporating the interrogatories that total 59 subparts. Ms. Giuffre objects to this request in that it seeks to invade the privacy rights of a sex abuse victims and is meant for the improper purpose of harassing and intimidating this victim.

Subject to and without waving the above objections, Ms. Giuffre is withholding production of documents that are privileged pursuant to the attorney-client privilege, the work product privilege, and the public interest privilege. Ms. Giuffre is also withholding electronic renditions of photographs that depict the faces of her minor children, including school portraits and other photographs taken that reveal the faces of her minor children.

Subjection to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request limited to documents that do not depict images of her minor children as described *supra* and will continue to supplement her production.

**3. All Documents from any law enforcement agency, whether local, state or federal, whether in the United States or elsewhere, which concern or relate to You in any way. These Documents should include, without limitation, any witness statements, including statements made by You.**

**Response to Request No. 3**

Ms. Giuffre objects to this request in that it seeks information that is protected by the attorney client, work product, public interest privilege and other applicable privileges. Ms. Giuffre objects to this request in that it is not limited in time period.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request and will continue to supplement her production. Ms. Giuffre is withholding documents that concern or relate to any currently ongoing investigation by any law enforcement agency under the public interest privilege and other applicable privileges.

**4. All Documents reflecting any letter of engagement, any fee agreement, or any other type of writing reflecting an engagement of any attorney identified in response to Interrogatory No. 3.**

**Response to Request No. 4**

Ms. Giuffre objects to this request in that it seeks information that is protected by the attorney client, work product, joint defense and other applicable privileges. Ms. Giuffre is withholding documents based on this objection. Specifically, Ms. Giuffre is withholding documents reflecting the engagements between herself and her attorneys she has engaged in relation to the above-captioned action and other actions as those documents involve privileged communications.

**5. All Documents relating to any Communications occurring from 1998 to the present with any of the following individuals or with their attorneys, agents or representatives:**

**a. Jeffrey Epstein;**

**b. Ghislaine Maxwell**

**c. Any witness disclosed in Plaintiff's Rule 26(a) disclosures;**

**d. Any witness identified by You in response to Interrogatory No. 8 and No. 14;**

**e. Sky Roberts;**

**f. Lynn Roberts;**

**g. Kimberley Roberts;**

**h. Daniel LNU, half-brother of Plaintiff;**

**i. Carol Roberts Kess;**

**j. Philip Guderyon;**

**k. Anthony Valladares;**

**l. Anthony Figueroa;**

**m. Ron Eppinger**

**Response to Request No. 5**

Ms. Giuffre objection to this request on the grounds that it is overly broad and unduly burdensome, particularly as it seeks documents relating to over 60 individuals, and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects because compliance with this request is unduly burdensome. Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents to Ms. Giuffre's request seeking communications between the Defendant and Ms.

Giuffre and between Jeffrey Epstein and Ms. Giuffre. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, public interest or any other applicable privilege. Ms. Giuffre objects to this request in that it is sought solely to harass and intimidate Ms. Giuffre, and invade her privacy, by seeking her private communications with her various family members, including aunts, uncles and parents and siblings.

Subject to and without waving the above objections, Ms. Giuffre is withholding production of documents that are privileged pursuant to the attorney-client privilege, the work product privilege, and the public interest privilege. Ms. Giuffre is also withholding electronic renditions of photographs that depict the faces of her minor children, including school portraits and other photographs taken that reveal the faces of her minor children.

Subjection to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request limited to documents that do not depict images of her minor children as described *supra* and will continue to supplement this production.

**6. All photographs or video containing any image of You and the following individuals. To the extent You have such photographs and video in their original, native format, please produce them in that format (not a paper copy).**

**a. Ghislaine Maxwell**

**b. Alan Dershowitz**

**c. Jeffrey Epstein**

**d. Andrew Albert Christian Edward, the Duke of York (aka Prince Andrew)**

e. **Ron Eppinger**

f. **Bill Clinton**

g. **Stephen Hawking**

h. **Al Gore**

i. **Any of the individuals identified by You in response to Interrogatory No. 8 and No. 14.**

**Response to Request No. 6**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents to Ms. Giuffre's request seeking communications between the Defendant and Ms. Giuffre and between Jeffrey Epstein and Ms. Giuffre.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request and will continue to supplement her production. Ms. Giuffre does not have "original, native format," as requested so she is producing the paper copies she has in her possession, custody and control.

7. **All photographs and video of You in any of Jeffrey Epstein's properties, including, but not limited to: his home in Palm Beach, Florida; his home in New York City, New York; his ranch in Santa Fe, New Mexico; and Little Saint James Island in the U.S. Virgin Islands. To the extent You have such photographs and video in their original, native format, please produce them in that format (not a paper copy).**

**Response to Request No. 7**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents to Ms. Giuffre's request seeking communications between the Defendant and Ms. Giuffre and between Jeffrey Epstein and Ms. Giuffre.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce documents responsive to this Request and will continue to supplement her production. Ms. Giuffre does not have "original, native format," as requested so she is producing the paper copies she has in her possession, custody and control. The Defendant has documents responsive to this request that she should produce.

8. **All photographs or video of You in any of Ms. Maxwell's properties, including her home in London, England and her home in New York City, New York. To the extent You have such photographs or video in their original, native format, please produce them in that format (not a paper copy).**

**Response to Request No. 8**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents to Ms. Giuffre's request seeking communications between the Defendant and Ms. Giuffre and between Jeffrey Epstein and Ms. Giuffre.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request and will continue to supplement her production. Ms. Giuffre does not have "original, native format," as requested so she is producing the paper copies she has in her possession, custody and control. The Defendant has documents responsive to this request that she should produce.

9. **Any Documents reflecting rental agreements or purchase agreements for the residential addresses identified by You in response to Interrogatory No. 1**.

**Response to Request No. 9**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that it seeks confidential financial information that is irrelevant to this action. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, public interest or any other applicable privilege. Ms. Giuffre objects to this request in that the information regarding rental agreements for the apartments that Defendant and Jeffrey Epstein rented for her are in the Defendant's possession, control and custody.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement this production.

**10. All Documents relating to Your Employment and/or association with the Mar-a-Lago Club located in Palm Beach, Florida, including any application for Employment**.

**<u>Response to Request No. 10</u>**

Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, public interest or any other applicable privilege.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement this production.

**11. Any Document reflecting any confidentiality agreement by and between, or concerning, You and the Mar-a-Lago Club.**

**<u>Response to Request No. 10</u>**

Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, public interest or any other applicable privilege.

Ms. Giuffre has been unable to locate any such documents.

**12. All Documents concerning any Employment by You from 1998 to the present or identified by You in response to Interrogatory No. 9, including any records of Your Employment at the Roadhouse Grill in Palm Beach, Florida**.

**<u>Response to Request No. 12</u>**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not

reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, public interest or any other applicable privilege.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement this production.

**13. All Documents concerning any allegations of theft by You from the Roadhouse Grill in Palm Beach, Florida from 1999 – 2002.**

**Response to Request No. 13**

Ms. Giuffre objects to this request in that it seeks information solely to harass, embarrass, and intimidate Ms. Giuffre. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that it wrongfully characterizes a "theft by You". Ms. Giuffre objects to this request as it seeks documents of sealed juvenile records, and the only means of obtaining such records are either through court order or illegal means.

Ms. Giuffre has been unable to locate any such documents.

**14. A copy of Your federal, state or local tax returns for the years 1998 to the present, whether from the United States or any other country.**

**Response to Request No. 14**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not

reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that it seeks confidential financial information that is irrelevant to this action. Ms. Giuffre objects to this request in that it seeks financial information from her when she was a minor child starting at age 14. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the accountant client privilege, and any other applicable privilege.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement this production.

**15. All Documents concerning Your attendance at or enrollment in any school or educational program of whatever type, from 1998 to the present**.

**Response to Request No. 15**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that her school records from when she was a minor child are an invasion of privacy, and sought only to harass and embarrass her.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-

privileged documents responsive to this Request, and will continue to supplement this production.

**16. Any diary, journal or calendar concerning Your activities between 1996 – 2002.**

**Response to Request No. 16**

Ms. Giuffre objections to this Request on the grounds that the time period is overly broad and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request to the extent it seeks proprietary and copyright protected materials. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that it seeks highly personal and sensitive material from a time when she was being sexually trafficked.

Ms. Giuffre has been unable to locate any such documents.

**17. All Documents relating to Your travel from the period of 1998 to the present, including, but not limited to a copy of Your passport that was valid for any part of that time period, any visa issued to You for travel, any visa application that You prepared or which was prepared on Your behalf, and travel itinerary, receipt, log, or Document (including any photograph) substantiating Your travel during that time period.**

**Response to Request No. 17**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not

reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that it is overly broad and not limited to travel records relevant to the abuse she suffered. Ms. Giuffre objects to this request in that it seeks information that is wholly irrelevant to this lawsuit.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement this production. Per the agreements made in the March 21, 2016 meet and confer, we will attempt to locate and make copies of Plaintiff's current passport book.

**18. All Documents showing any payments or remuneration of any kind made by Jeffrey Epstein or any of his agents or associates to You from 1999 until the present.**

**<u>Response to Request No. 18</u>**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege.

At this point in time, Ms. Giuffre has been unable to locate any such documents, but continues to search for responsive documents.

**19. Any Document reflecting a confidentiality agreement, settlement agreement, or any contractual agreement of any kind, between You and Jeffrey Epstein, or any attorneys for You and/or Mr. Epstein.**

**<u>Response to Request No. 19</u>**

Ms. Giuffre objects to this request in that the documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein with whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre is in possession of a responsive document that contains a confidentiality provision. As discussed during the March 21, 2016 meet and confer, If Defendant obtains, and produces to Ms. Giuffre, a written waiver from her co-conspirator, Mr. Epstein, of the confidentiality provision, releasing Ms. Giuffre from any liability whatsoever under the confidentiality provision, she will produce the document.

**20. Any Document reflecting Your intent, plan or consideration of, asserting or threatening a claim or filing a lawsuit against another Person, any Document reflecting such a claim or lawsuit, including any complaint or draft complaint, or any demand for consideration with respect to any such claim or lawsuit against any Person.**

**<u>Response to Request No. 20</u>**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms.

Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense or any other applicable privilege. Ms. Giuffre objects because this request is overly broad and unduly burdensome in that it seeks wholly privileged communications from other cases the logging of which on a privilege log would be unduly burdensome. As such, Ms. Giuffre is providing categorical privilege entries relating to those matters.

At this point in time, Ms. Giuffre has not found any non-privileged documents responsive to this request, but continues to search for responsive documents.

**21. All Documents relating to Your driver's license from 1998 – 2002.**

**Response to Request No. 21**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein for whom she claims a joint defense privilege and defendant has refused to produce responsive documents.

At this point in time, Ms. Giuffre has not found any documents responsive to this request, but continues to search for responsive documents.

**22. A copy of Your marriage license(s) from 1999 to the present.**

**Response to Request No. 22**

Ms. Giuffre objections to this Request on the grounds that it is irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre

objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this request, and will continue to supplement this production.

**23. All documents concerning Your naturalization application to Australia from 1999 to the present.**

**Response to Request No. 23**

Ms. Giuffre objections to this Request on the grounds that it is irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege.

Ms. Giuffre has been unable to locate any such documents.

**24. All Documents concerning Your Employment in Australia, including, but not limited to employment applications, pay stubs, Documents reflecting Your Income including any tax Documents.**

**Response to Request No. 24**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that it seeks confidential financial information Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, joint defense, or

any other applicable privilege. Ms. Giuffre objects to this request in that it seeks overly broad financial information not tailored to the sexual abuse and defamation issues in this case.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this request, and will continue to supplement this production.

**25. All Documents concerning any massage therapist license obtained by You, including any massage therapy license issued in the United States, Thailand and/or Australia**.

**<u>Response to Request No. 25</u>**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein for whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege.

At this point in time, Ms. Giuffre has not found any non-privileged documents responsive to this request, but continues to search for responsive documents.

**26. All Documents concerning any prescription drugs taken by You, including the prescribing doctor, the dates of said prescription, and the dates of any fulfillment of any such prescription**.

**<u>Response to Request No. 26</u>**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms.

Giuffre objects to this request in that it is not limited in date range in any way; therefore if she was on a prescription drug **when she was 2 years old**, she would have to produce that document. Ms. Giuffre also objects to this request in that it is not limited to prescription drugs she has taken as a result of the abuse she endured. Ms. Giuffre objects to this request to the extent it seeks confidential medical records that are not relevant to this action. Ms. Giuffre objects to this request to the extent is seeks documents protected by the attorney client, work product, or any other applicable privilege.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and is producing non-privileged documents responsive to the Request limited to documents relating to prescription drugs relating to her treatment for sexual abuse she suffered at the hands of the Defendant and Jeffrey Epstein, and relating to conditions or symptoms arising after Defendant's defamatory statement, and will continue to supplement this production.

**27. All Documents, written or recorded, which reference by name, or other description, Ghislaine Maxwell.**

**Response to Request No. 27**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-

privileged documents responsive to this Request, and will continue to supplement her production.

**28. All Documents reflecting notes of, or notes prepared for, any statements or interviews in which You referenced by name or other description, Ghislaine Maxwell.**

**Response to Request No. 28**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials.

At this point in time, Ms. Giuffre has not found any non-privileged documents responsive to this request, but continues to search for responsive documents.

**29. All Documents concerning any Communications by You or on Your behalf with any media outlet, including but not limited to the *Daily Mail, Daily Express,* the *Mirror*, *National Enquirer, New York Daily News, Radar Online,* and the *New York Post*, whether or not such communications were "on the record" or "off the record."**

**Response to Request No. 29**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will

produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**30. All Documents concerning any Income received by You from any media outlet in exchange for Your statements (whether "on the record" or "off the record") regarding Jeffery Epstein, Alan M. Dershowitz, Prince Andrew, Bill Clinton or Ghislaine Maxwell or any of the individuals identified by You in response to Interrogatory Nos. 8 and 14.**

**Response to Request No. 30**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials. Ms. Giuffre objects to this request in that it seeks confidential financial information.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**31. All Documents concerning any actual or potential book, television or movie deals concerning Your allegations about being a sex slave, including but not limited to a potential book by former New York Police Department detective John Connolly and writer James Patterson**.

**Response to Request No. 31**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials. Ms. Giuffre objects to this request in that it seeks confidential financial information.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**32. All manuscripts and/or other writings, whether published or unpublished, created in whole or in part by or in consultation with You, concerning, relating or referring to Jeffrey Epstein, Ghislaine Maxwell or any of their agents or associates**.

**Response to Request No. 32**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials. Ms. Giuffre objects to this request in that it seeks confidential financial information.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**33. All Documents concerning or relating to Victims Refuse Silence, the organization referred to in the Complaint, including articles of incorporation, any financial records for the organization, any Income You have received from the organization, and any Documents reflecting Your role within the organization or any acts taken on behalf of the Organization**.

**<u>Response to Request No. 33</u>**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent it seeks proprietary or copyright protected materials. Ms. Giuffre objects to this request in that it seeks confidential financial information.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**34. To the extent not produced in response to the above list of requested Documents, all notes, writings, photographs, and/or audio or video recordings made or recorded by You or of You at any time that refer or relate in any way to Ghislaine Maxwell**.

**<u>Response to Request No. 34</u>**

Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein for whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work

product privilege, and any other applicable privilege. Ms. Giuffre objects to this request to the extent is seeks proprietary and copyright protected material.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

**35. All phone records, including text messages, emails, social media Communications, letters or any other form of Communication, from or to You or associated with You in any way from 1998 to the present, which concern, relate to, identify, mention or reflect Ghislaine Maxwell, Jeffrey Epstein, Alan Dershowitz, Prince Andrew, Bill Clinton, or any of the individuals identified in response to Interrogatory Nos. 8 and 14**.

**Response to Request No. 35**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request to the extent it seeks documents from "anyone associated with you" as that is vague and ambiguous. Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein for whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, the public interest privilege, and any other applicable privilege.

Ms. Giuffre objects to this request to the extent is seeks proprietary and copyright protected material.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production. While Ms. Giuffre has produced her documents, Ms. Giuffre's response does not include documents "from anyone associated with you" based on the above referenced objection.

**36. All Documents relating to massages, including but not limited to any Documents reflecting the recruiting or hiring of masseuses, advertising for masseuses, flyers created for distribution at high schools or colleges, and records reflecting e-mails or calls to Persons relating to massages**.

**Response to Request No. 36**

Ms. Giuffre objections to this Request on the grounds that it is overly broad and unduly burdensome and calls for the production of documents that are irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Giuffre objects to this request in that it is not time limited in any way. Ms. Giuffre objects to this request in that documents responsive to this request are within the possession, custody and control of the defendant and Jeffrey Epstein for whom she claims a joint defense privilege and defendant has refused to produce responsive documents. Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, public interest privilege, and any other applicable privilege.

Ms. Giuffre has been unable to locate any such documents.

**37. Statements or records from any bank into which You deposited money received from Jeffrey Epstein, any Person identified in Interrogatory No. 8 or 14, any witness disclosed in Your Rule 26(a) disclosures, any media organization or any employee or affiliate of any media organization.**

**Response to Request No. 37**

Ms. Giuffre objects in that it seeks information protected by the attorney-client privilege, the attorney work product privilege, joint defense/common interest privilege, the public interest privilege, and any other applicable privilege. Ms. Giuffre objects to this request in that it seeks personal financial information. Ms. Giuffre objects to this request in that it is overly broad as it has no time limitation.

Subject to and without waiving the above objections, Ms. Giuffre has already produced documents Bates labelled GIUFFRE000001 to GIUFFRE005353, and will produce non-privileged documents responsive to this Request, and will continue to supplement her production.

Dated: April 29, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley

Sigrid McCawley (Pro Hac Vice)
Meredith Schultz (Pro Hac Vice)
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

**CERTIFICATE OF SERVICE**

I certify that on April 29, 2016, I electronically served *Plaintiff Virginia Giuffre's Second Amended Supplemental Responses and Objections to Defendant's First Set of Discovery Requests* on the following:

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
jpagliuca@hmflaw.com

By: /s/ Sigrid McCawley______
Sigrid McCawley

# EXHIBIT D

# *GIUFFRE*

# *VS.*

# *MAXWELL*

**Deposition**

## *VIRGINIA GIUFFRE*

*05/03/2016*

---

***Agren Blando Court Reporting & Video, Inc.***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 15-cv-07433-RWS

---

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
VIRGINIA GIUFFRE May 3, 2016

---

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

---

APPEARANCES:

FAMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
By Brad Edwards, Esq.
425 N. Andrews Avenue
Suite 2
Fort Lauderdale, FL 33301
Phone: 954.524.2820
brad@pathtojustice.com
Appearing on behalf of the Plaintiff

BOIES, SCHILLER & FLEXNER LLP
By Sigrid S. McCawley, Esq. (For Portion)
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301-2211
Phone: 954.356.0011
smccawley@bsfllp.com
Appearing on behalf of the Plaintiff



APPEARANCES: (Continued)

HADDON, MORGAN AND FORMAN, P.C.
By Laura A. Menninger, Esq.
Jeffrey S. Pagliuca, Esq.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
lmenninger@hmflaw.com
jpagliuca@hmflaw.com
Appearing on behalf of the Defendant

Also Present:
Brenda Rodriguez, Paralegal
Nicholas F. Borgia, CLVS Videographer



Pursuant to Notice and the Federal Rules of Civil Procedure, the VIDEOTAPED DEPOSITION OF VIRGINIA GIUFFRE, called by Defendant, was taken on Tuesday, May 3, 2016, commencing at 9:00 a.m., at 150 East 10th Avenue, Denver, Colorado, before Kelly A. Mackereth, Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter and Notary Public within Colorado.

* * * * * * *

I N D E X



| EXAMINATION | PAGE |
|---|---|
| MS. MENNINGER | 8 |

PRODUCTION REQUEST(S):

(None.)




INDEX OF EXHIBITS



| DESCRIPTION | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Complaint and Demand for Jury Trial re Jane Doe No. 102 v. Jeffrey Epstein | 17 |
| Exhibit 2 | Jane Doe #3 and Jane Doe #4's Motion Pursuant to Rule 21 for Joinder in Action | 21 |
| Exhibit 3 | Declaration of Virginia L. Giuffre re Jane Doe #1 and Jane Doe #2 vs. United States of America | 23 |
| Exhibit 4 | Declaration of Jane Doe 3 re Jane Doe #1 and Jane Doe #2 vs. United States of America | 31 |
| Exhibit 5 | Declaration of Virginia Giuffre re Bradley J. Edwards and Paul G. Cassell vs. Alan M. Dershowitz | 33 |
| Exhibit 6 | FBI documentation, date of entry 7/5/13 | 36 |
| Exhibit 7 | Document titled Telecon, Participants Jack Scarola, Brad Edwards, Virginia Roberts, Re Edwards adv. Epstein, 4/7/11, (23 pages of transcription) | 39 |
| Exhibit 8 | The Billionaire's Playboy Club, By Virginia Roberts | 41 |
| Exhibit 9 | Plaintiff's Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff re Giuffre v. Maxwell | 44 |

| DESCRIPTION | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 10 | Plaintiff's Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff | 46 |
| Exhibit 11 | Undated Declaration of Virginia Giuffre re Plaintiff's Supplemental Response and Objections to Defendant's First Set of Discovery Requests served on March 22, 2016 | 46 |
| Exhibit 12 | Plaintiff's Second Amended Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff | 47 |
| Exhibit 13 | Mrs. Virginia Giuffre resume | 67 |
| Exhibit 14 | Compilation of e-mails re Open Position - Virginia Giuffre | 68 |
| Exhibit 15 | Virginia Lee Roberts passport application | 180 |
| Exhibit 16 | Composite of e-mail strings | 251 |
| Exhibit 17 | Compilation of e-mails between Giuffre and Silva and others | 259 |
| Exhibit 18 | Compilation of e-mails between Virginia Giuffre and Sandra White | 265 |
| Exhibit 19 | Compilation of e-mails between Marianne Strong and Virginia Giuffre | 269 |
| Exhibit 20 | Compilation of e-mails between Virginia Roberts and Jason Richards | 276 |



| DESCRIPTION | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 21 | Compilation of e-mails between Sharon Churcher and Virginia Giuffre | 284 |
| Exhibit 22 | Compilation of e-mails among Sharon Churcher, Michael Thomas, Virginia Giuffre and others | 287 |
| Exhibit 23 | Compilation of May 2011 e-mails among Sharon Churcher, Virginia Giuffre, Paulo Silva and others | 288 |
| Exhibit 24 | Compilation of June 2011 e-mails between Virginia Giuffre and Sharon Churcher | 289 |
| Exhibit 26 | PR Hub Statement on Behalf of Ghislaine Maxwell article | 300 |
| Exhibit 27 | 1/2/15 e-mail from Ross Gow to To Whom It May Concern | 309 |



* * * * * * *

P R O C E E D I N G S

THE VIDEOGRAPHER: We're on the record at 9 a.m. Today is May 3rd, 2016. This begins the videotaped deposition of Virginia Giuffre in the matter of Virginia L. Giuffre versus Ghislaine Maxwell.

We're located at 150 East 10th Street -- excuse me, 10th Ave., in Denver, Colorado.

Our court reporter is Kelly Mackereth. The videographer is Nicholas F. Borgia, CLVS.

Will counsel please introduce yourselves for the record.

MR. EDWARDS: Sure. Brad Edwards and Sigrid McCawley on behalf of the plaintiff, Ms. Giuffre.

MS. MENNINGER: Laura Menninger and Jeffrey Pagliuca on behalf of the defendant, Ghislaine Maxwell.

THE VIDEOGRAPHER: And will our court reporter please swear in the deponent.

VIRGINIA GIUFFRE,

being first duly sworn in the above cause, was examined and testified as follows:

MR. EDWARDS: Just before we get started,



I just wanted to make sure that we're clear, and I think that we are, that this deposition in total will be treated as confidential until such time as we are able to review and de-designate.

MS. MENNINGER: Yes.

MR. EDWARDS: Okay.

EXAMINATION

BY MS. MENNINGER:

**Q Good morning, Ms. Giuffre.**

A Good morning, Laura.

**Q Can you please state your full name?**

A Virginia Lee Giuffre.

**Q And where do you live right now, Ms. Giuffre?**

A [redacted].

**Q All right. And who lives with you there?**

A My son, my other son, my daughter, my husband and my in-laws.

**Q And when did you return to the U.S. for this visit?**

A I believe it was around Thursday, the 29th, I think.

**Q Okay. And who traveled with you?**

A Myself.

Page 9

Q Yourself?
A Yes.
Q Are you able to travel freely between the U.S. and Australia?
A Yes.
Q Are you married?
A Yes.
Q To whom?
A Robert Giuffre.
Q All right. And did Mr. Giuffre travel with you back to the U.S.?
A No.
Q All right. Have you taken any medications in the last 24 hours?
A I have taken -- I have a cold, but I have taken non-drowsy cold tablets and some DayQuil.
Q All right. Anything else?
A No.
Q All right. And what is your current profession, Ms. Giuffre?
A I'm a housewife.
Q All right. And how long have you been a housewife?
A For the last ten years, since I've had kids.

Page 10

Q All right. And what was your profession in 2014?
A A housewife.
Q All right. Any other profession?
A No.
Q All right. You understand that you're under oath today?
A Yes.
Q And you understand that if you don't understand a question, you need to let me know that.
A Okay.
Q And ask for clarification.
A Um-hum.
Q Do you understand?
A Yes.
Q You also understand, I'm assuming, that you have to say yes or no in answer to a question, or you have to make a verbal response and not just shake your head or something --
A Yes.
Q -- so the court reporter can get it.
You have -- you have been deposed before, correct?
A Yes.
Q Do you understand what it means to be

Page 11

under oath?
A Yes.
Q What does it mean to you?
A To tell the truth, the whole truth and nothing but the truth.
Q All right. And what does the word truth mean to you?
A To be honest.
Q Is there more than one truth?
A Is there more than -- no, there's no more than one truth.
Q If you are confused by a question, you need to let me know that so I can clarify the question, okay?
A Okay.
Q For example, if I asked you the question were you sexually trafficked to foreign presidents, do you understand what that question means?
A Yes.
Q What does it mean?
A Was I lent out for the purposes of sex to a foreign person -- president.
Q All right. And what is the answer to that question?
A Yes.

Page 12

Q And if I ask you have you met any foreign presidents, do you understand what that question means?
A Yes.
Q And what is the answer to that question?
A Yes.
Q All right. And if I asked you which foreign presidents have you met, do you understand what that question means?
A Yes.
Q What is the answer to that question?
A What is the name of the person?
Q Yes. Who are the foreign presidents that you have met?
A I honestly can't remember his name at this time. I'm a very visual person so --
Q All right. Can you describe him, then?
A Yes. He's Spanish.
Q Okay.
A Tall, dark hair.
Q All right. Anything else?
A And he's got a foreign tongue, accent.
Q And what age, approximately?
A Was I or was he?
Q Was he.

A I'd say in his 40s.

**Q Okay. And where did you meet him?**

A I believe it was New Mexico.

**Q New Mexico?**

A Possibly New Mexico. I'm sorry. It's really hard to go back and remember lots of different events with lots of different people.

**Q Okay. And is that the only foreign president that you have met?**

A I've met a lot of very high, powerful people and I wasn't just introduced to them as who they were. It's only going back through photos in time to be able to realize who they are and what they are now. So it's hard for me to distinguish who I've actually met and when and where I've met them.

**Q So to your knowledge, you have only met one foreign president?**

A To my knowledge at this time, yes.

**Q And is there anything that might change your knowledge at a different time?**

A If I were to see more photos of other people. I mean, I've been able to distinguish the majority of the people I've been lent out to, but who's to say there's not more.

**Q All right. If I were to ask you the**



**question how many times have you had sex with Tom Pritzker, do you know what that question means?**

A I believe so.

**Q All right. And what is the answer to that question?**

A I believe I was with Tom once.

**Q Okay. I would like to ask you about your prior sworn statement.**

**You understand you're under oath today, correct?**

A Yes.

**Q All right. You've previously made statements under oath, correct?**

A Yes.

**Q And you've previously authorized pleadings to be filed on your behalf, correct?**

A Yes.

**Q By various attorneys, right?**

A Yes.

**Q All right. You have included in your sworn statement allegations about my client, Ghislaine Maxwell, correct?**

A Yes.

**Q And did you review any of those prior sworn statements before appearing here today?**



A Yes.

**Q And which ones did you review?**

A I'd have to see which ones you're specifically talking about. There's quite a lot of statements I've made.

**Q Right. And which ones do you recall having reviewed before you attended this deposition today?**

A I've reviewed my affidavit. I'm not a lawyer so I really don't know legal terms to half of the, you know, legal jargon of statements, which they are. If you showed me, I'd be able to tell you if I've seen it or not.

**Q Okay. So to your knowledge, can you identify any sworn statement you reviewed before attending the deposition today?**

A Could I name what the statement is?

**Q Right.**

A The actual piece of paper that has the title at the top?

**Q Right.**

A No, I don't.

**Q Can you describe it in any other fashion?**

A I don't understand. I'm sorry.

**Q That's all right. You have to tell me if**



**you don't.**

**Do you have any reason to believe that any of your previous sworn statements that you have made are not true?**

A No.

MR. EDWARDS: I just object and ask that if we're going to ask the witness questions about any of her statements in whole or in part that the witness be allowed to see the statement, review the statement and then answer your questions.

**Q (BY MS. MENNINGER) You may answer the question.**

A Can you reask the question? I'm sorry.

**Q Do you have any reason to believe that any of your prior sworn statements are untrue?**

A I have no reason to believe that my prior statements are untrue.

**Q Has anyone told you to say something that was not true in connection with this case?**

A No, ma'am.

**Q All right. I'd like to start with a lawsuit that you filed under the caption Jane Doe versus Jeffrey Epstein.**

**Do you recall that lawsuit?**

A I believe so.

Page 17

(Exhibit 1 marked.)

**Q (BY MS. MENNINGER) I'm going to show you an exhibit that we are marking as Defendant's Exhibit 1.**

MR. EDWARDS: Can I see that for a second? I'd just like to make an objection on the record for the misidentification of this document.

While there was a lawsuit filed under the style of Jane Doe versus Jeffrey Epstein, Jane Doe was not Virginia Giuffre. And the lawsuit that's now being handed to this witness is Jane Doe 102 versus Jeffrey Epstein.

Is that the document we're talking about?

MS. MENNINGER: Counsel, if you have an objection, you should state the basis for your objection in a non-leading, non-suggestive manner.

If you have any other record to make, you can do so in a pleading filed with the Court.

MR. EDWARDS: Sure. My objection is you've misrepresented what you've handed the witness. I want to make sure that the witness is holding what you actually want her to be holding as opposed to the lawsuit you said that you were going to hand her.

That's it.

MS. MENNINGER: Counsel, I will ask the

Page 18

witness questions about the document. I did not ask you any questions about the document.

**Q (BY MS. MENNINGER) Ms. Giuffre, could you please take a look at what we have marked as Defendant's Exhibit 1.**

**Do you recognize that document, Ms. Giuffre?**

A I believe so. Yes. Yes, I do.

**Q And do you see that the counsel on the last page -- I'm sorry, not the last page, but the third from the last page are Mr. Josefsberg and Ms. Ezell from Podhurst Orseck?**

A Yes.

**Q Were those your lawyers?**

A Yes, they were.

**Q And did you authorize them to file Jane Doe 102 versus Epstein on your behalf?**

A Yes, I did.

**Q And is that this complaint that's been marked as Defendant's Exhibit 1?**

A I believe so.

**Q In that document, if I could ask you to turn to page -- well, I'll turn to page 9 and paragraph 23.**

A Would you like me to read it?

Page 19

**Q No. I'm just -- did you find it?**

A I can see paragraph 23.

**Q Okay. And do you see that there are allegations about a Ms. Maxwell contained in that complaint?**

A Yes, I do.

**Q All right. And do you understand that to be Ghislaine Maxwell, my client?**

A Yes.

**Q All right. And Ms. Maxwell was not sued as a part of this case, correct?**

MR. EDWARDS: Object to the form.

THE DEPONENT: Does that mean I can answer?

MR. EDWARDS: Sure, you can answer.

MS. MENNINGER: Right.

MR. EDWARDS: If you understand the question, answer it.

A Yes, Ms. Maxwell -- sorry, repeat the question.

**Q (BY MS. MENNINGER) Was Ms. Maxwell sued in this --**

A No, she wasn't.

**Q -- in the case that's represented by Defendant's Exhibit 1?**

Page 20

A No, she wasn't. I'm sorry for interrupting you. But no, she was not sued at this time, no.

**Q And why not?**

MR. EDWARDS: I'd object and ask the witness not answer that question because that would be privileged, attorney-client privileged, information that was between Ms. Giuffre and the Podhurst Orseck firm at that time.

So I'm instructing you not to answer.

**Q (BY MS. MENNINGER) All right. Ms. Giuffre, did you make a decision yourself whether or not to sue Ms. Maxwell as a part of this lawsuit against -- Jane Doe 102 versus Jeffrey Epstein?**

A I think I've been advised not to answer that question.

**Q This is a different question.**

A Oh, okay.

**Q So your counsel can assert a privilege, but that question did not call for privileged information.**

MR. EDWARDS: I --

**Q (BY MS. MENNINGER) I'm asking about what -- what you decided to do. Whether you decided to sue Ms. Maxwell or not at the time Jane Doe 102**

Page 21

**versus Epstein was filed?**

MR. EDWARDS: And I disagree. And I object to this invading the attorney-client privilege.

And I'm instructing you not to answer.

**Q (BY MS. MENNINGER) Can you answer that question without revealing any attorney-client communications, whether you made a decision to file a lawsuit or not?**

A I'm going to have to listen to my attorney and not answer the question.

**Q All right. I would like to show you some documents that were filed in what we'll call the CVRA case, the Crime Victims' Rights Act case.**

**Do you know what I mean by that reference?**

A I am familiar with that.

**Q Okay. I'm going to start with one on or about December 30th, 2014. We will mark it as Defendant's Exhibit 2.**

**(Exhibit 2 marked.)**

MR. EDWARDS: Thank you.

**Q (BY MS. MENNINGER) All right. Ms. Giuffre, do you recognize Defendant's Exhibit 2?**

A Yes.

**Q And what do you understand it to be?**

Page 22

A I believe this is when I was hoping to join the CVRA case.

**Q All right. And do you know when this document was filed?**

**And actually, just to be clear, about halfway there's actually a second document that was filed. So this is a composite exhibit. Let me be very clear.**

**So after page 14 -- I'm sorry, 13, there's a second document that is styled Jane Doe #3 and Jane Doe #4's Corrected Motion Pursuant to Rule 21 for Joinder In Action.**

**Do you see that?**

A Did you say page 14?

**Q It is on the 14th page of this document.**

**Do you see that?**

A I do.

**Q And so this composite Exhibit 2 has both a motion and a corrected motion.**

**Do you see that?**

A Yes.

**Q And were both of those pleadings authorized by you to be filed?**

A Yes.

**Q In other words, you wanted to join the**

Page 23

**CVRA action in or about December 30th, 2014, correct?**

A I -- I'm not aware of the exact dates. There's no dates on this. But I did try to join the motion, yes.

**Q All right. If you can look at the top line of the document.**

A Yes.

**Q Does it say, Entered on FLSD --**

A Oh, it does, too, I'm sorry, yes.

**Q That's all right. So does that refresh your memory as to about when you first sought to join the CVRA action?**

A Yes.

**Q December 30th, 2014, correct?**

A Yes.

**Q And the corrected motion was filed a few days later, correct?**

A Yes, correct.

**Q If I could turn to Defendant's Exhibit 3, which was January 21st.**

**(Exhibit 3 marked.)**

MR. EDWARDS: Thank you.

**Q (BY MS. MENNINGER) Do you recognize this document?**

A Yes, I do.

Page 24

**Q What do you understand this document to be?**

A It's a rough background of the years that I was abused by Ghislaine and Jeffrey.

**Q All right. And this is something I believe that you on page 15 signed; is that true?**

A Just let me have a look.

**Q Sure.**

A I think I'm actually missing page 15. Oh, here we go.

**Q Sorry. I'm looking at the numbers on the top right. I apologize. I believe there was some cover page or something that was excluded.**

MR. EDWARDS: And just for the record, I'm going to object to the relevance of this document. I'm going to allow the witness to answer the question, but I want my objection on the record.

MS. MENNINGER: Okay. Simple objection, relevance.

A Are we talking about this page?

**Q (BY MS. MENNINGER) Yes, the one with the black box, yes. Do you believe that to have contained your signature?**

A Yes.

**Q All right. And you executed that on**

**January 19th, 2015?**
A At the very top of the page it says January 21st, 2015.
**Q The date it was filed. Is there a date just above the signature block?**
A Oh, yes, sorry. Yes, there is.
**Q And what date -- what date was that?**
A The 19th day of January, 2015.
**Q Okay. And this document is something that you believe contains the truth, correct?**
A To the best of my knowledge at the time, yes.
**Q All right. Did something change between the time then and today that makes you believe that it's not all accurate?**
A Well, as you can see, in line 4 on page 1, I wasn't aware of my dates. I was just doing the best to guesstimate when I actually met them.
Since then I've been able to find out that through my Mar-a-Lago records that it was actually the summer of 2000, not the summer of 1999.
**Q Oh, I'm sorry. Are you back on page 1?**
A On the first page.
**Q Okay.**
A Yes.



**Q And you're talking about line 4?**
A Line 4.
**Q Paragraph 4 or line 4?**
A Oh, sorry. Number 4, the paragraph number 4.
**Q Okay. And what part of paragraph 4 do you now believe to be untrue?**
A In approximately --
MR. EDWARDS: Object to the form.
You can answer.
A In approximately 1999 when I was 15 years old I met Ghislaine Maxwell.
**Q (BY MS. MENNINGER) Okay.**
A I now know that it was 2000, that I was 16 years old when I met Ghislaine Maxwell.
**Q So when you signed this document under penalty of perjury stating that it was true, you no longer believe that to be true, correct?**
A It was an honest mistake. We had no idea how to pinpoint without any kind of records or dates or anything like that. I was just going back chronologically through time. And that's the best time that I thought it was. And now I know the facts, so it's good to know.
**Q So you now believe that a document you**



**filed under oath is no longer true, correct?**
MR. EDWARDS: Object to the form.
A I wouldn't say that it wasn't true. I was just unaware of the times and the dates.
**Q (BY MS. MENNINGER) Again, is there more than one truth, Ms. Roberts?**
A No, there's no more than one truth.
**Q All right. So a document in which you swore that you were 15 years old when you met Ms. Ghislaine Maxwell is an untrue statement, correct?**
MR. EDWARDS: Object to the form.
A It's not that it's an untrue statement. It was a mistake. So it wasn't intentionally trying to say something that wasn't true. It was to my best knowledge that I thought it was 1999. And when I got my records from Mar-a-Lago I was able to find out that it was 2000. And this was entered before I found out the actual dates that I did work at Mar-a-Lago.
**Q (BY MS. MENNINGER) Okay. So a document that you filed under oath --**
A Um-hum.
**Q -- is now, you believe to be untrue, correct?**



MR. EDWARDS: Objection. Asked and answered.
**Q (BY MS. MENNINGER) You may answer.**
MR. EDWARDS: Answer again.
A Again, I wouldn't say it's untrue. Untrue would mean that I would have lied. And I didn't lie. This was my best knowledge at the time. And I did my very best to try to pinpoint time periods going back such a long time ago.
It wasn't until I found the facts that I worked at Mar-a-Lago in 2000 that I was able to figure that out.
**Q (BY MS. MENNINGER) And approximately when did you learn those facts about the dates you worked at Mar-a-Lago?**
A I would say it was mid-2015.
**Q Mid-2015 is the first time you became aware of the dates --**
A I don't know the exact --
**Q If you could just let me finish.**
A I'm sorry.
**Q That's all right. Approximately mid-2015 when you learned the true dates that you had worked at Mar-a-Lago?**
A That's correct. Sorry.

**Q And based on the fact that you learned the fact you had worked at Mar-a-Lago in 2000 -- you became aware in mid-2015 --**

A Um-hum.

**Q -- that you had met Ms. Maxwell in 2000, correct?**

A That's --

MR. EDWARDS: Object to the form.

A That's correct.

**Q (BY MS. MENNINGER) All right. And you became aware in mid-2015 that you were not 15 years old when you met Ghislaine Maxwell, correct?**

MR. EDWARDS: Object to the form.

A That's correct.

**Q (BY MS. MENNINGER) Okay. And who provided you those Mar-a-Lago records in approximately mid-2015?**

MR. EDWARDS: I'm going to object.

And to the extent that this invades the attorney-client privilege, if it was your attorneys that you spoke to and learned this information or received this information from, then you're instructed not to answer.

A I cannot answer that question.

**Q (BY MS. MENNINGER) Did you yourself look**



**at records in the middle of 2015 regardless of who showed them to you?**

MR. EDWARDS: Objection. And to the extent that they were showed to you or shared by any of your lawyers, you're instructed not to answer the question. It invades the attorney-client privilege.

**Q (BY MS. MENNINGER) Did you look at Mar-a-Lago records in the middle of 2015 yourself?**

MR. EDWARDS: She's not answering the question.

MS. MENNINGER: On what grounds is she not answering the question?

MR. EDWARDS: I just told you it invades the attorney-client privilege. If she learned --

I will instruct her if she learned by some other way than her attorneys sharing the information with her, then she can answer the question.

**Q (BY MS. MENNINGER) I'm asking you not to tell me whether your attorneys showed you the record. I'm asking you not to tell me the source of the record.**

**I'm asking you if you personally in the middle of 2015 looked at Mar-a-Lago records?**

MR. EDWARDS: Same objection. Same instruction.



**Q (BY MS. MENNINGER) I'm going to show you an exhibit filed on, I believe on or about February 6th of 2015. Defendant's Exhibit 4.**

**(Exhibit 4 marked.)**

MR. EDWARDS: Thank you.

**Q (BY MS. MENNINGER) And drawing your attention to the heading line that says, Entered on the docket February 6th, 2015.**

**Do you see that?**

A Yes.

**Q All right. And Declaration of Jane Doe 3, do you see that on the first page?**

A Yes.

**Q And it's in the CVRA case, correct, Jane Doe 1 and Jane Doe 2 versus United States of America?**

A Yes.

**Q All right. And do you recognize this document?**

A Yes.

**Q And what do you understand this document to be?**

A I believe it's more reason to why I should have been added to the CVRA case.

MR. EDWARDS: Objection to the relevance, Counsel.



**Q (BY MS. MENNINGER) Okay. And again, if you look to the last page of the document, paragraph 67 --**

A The last page?

**Q Yes, the very last.**

A 67, yes.

**Q All right. It says in paragraph 67: I declare under penalty of perjury that the foregoing is true and correct, right?**

A Yes.

**Q And it was executed on or about the 5th day of February, 2015, correct?**

A It's a bit smudged, but it kind of looks like a 5.

**Q All right. And then there's a signature block that's redacted that says Jane Doe 3, correct?**

A Correct.

**Q Do you believe that you signed this document and it was later covered up by that block?**

A Yes.

**Q All right. And again, is there anything in this document that you believe today to not be true?**

MR. EDWARDS: I just ask that you read through the entire document and answer the question.

Page 33

**Q (BY MS. MENNINGER) Have you seen this document before, Ms. Giuffre?**
A I'm sure I have, but it's always good to refresh your memory just looking over something.
**Q All right.**
**(Pause.)**
A Thank you for giving me time to read that over.
**Q Certainly. So have you had a chance to read it now?**
A Yes.
**Q All right. And what parts of this document sworn by you under penalty of perjury are not true?**
A Again, the only thing that I see is the mistake that I made, I first met Epstein when I was 15 years old.
**Q Okay. And that's in paragraph 5?**
A That's in paragraph 5 on the first page.
**Q All right. And everything else you believe to be true?**
A Yes.
**Q Okay. If I could now turn to what I'll mark as Defendant's Exhibit 5.**
**(Exhibit 5 marked.)**

Page 34

THE DEPONENT: Thank you.
MR. EDWARDS: Thank you.
MS. MENNINGER: I think I have one more.
MS. McCAWLEY: It's okay if you don't.
MS. MENNINGER: I don't think I have all of them.
**Q (BY MS. MENNINGER) All right. Do you recognize Defendant's Exhibit 5?**
A Yes.
**Q What is the title of that document?**
A Declaration of Virginia Giuffre.
**Q And that's you, correct?**
A Yes.
**Q And do you recognize which case this declaration was filed in?**
A Yes. Bradley Edwards and Paul Cassell, Plaintiff versus Alan Dershowitz, Defendant.
**Q All right. And who do you understand Mr. Edwards and Mr. Cassell to be?**
A Mr. Edwards is my lawyer sitting next to me.
**Q All right.**
A And Mr. Cassell is another one of my lawyers.
**Q All right. And they are in a lawsuit**

Page 35

**against Mr. Dershowitz; is that your understanding?**
**It's your understanding. You don't have to look at your lawyer if you don't understand. You don't have to --**
A No, I just don't know if I'm allowed --
**Q That's all right.**
A -- to say certain things about that. But, yes, I believe they were in a lawsuit.
**Q Okay. And that's against Mr. Dershowitz, right?**
A Correct.
MR. EDWARDS: Object to the form. I object to the relevance of the document.
**Q (BY MS. MENNINGER) All right. Ms. Giuffre, again, if you could turn to the last page of this document. And do you see a signature on that page?**
A I do.
**Q Whose signature is that?**
A That is mine.
**Q And approximately when did you sign that document?**
A Executed this 20th day of November, 2015.
**Q All right. So you signed that on November 20th, 2015, correct?**

Page 36

A Correct.
**Q All right. And that was under penalty of perjury, correct?**
A Correct.
**Q All right. If I could now turn to what we'll mark as Defendant's Exhibit 6.**
**(Exhibit 6 marked.)**
MR. EDWARDS: Thank you.
MS. McCAWLEY: Thanks.
**Q (BY MS. MENNINGER) Do you recognize this document, Ms. Giuffre?**
A I do.
**Q All right. What do you believe this document to be?**
A I believe this is when I spoke to the FBI.
**Q Okay. And do you remember about when you spoke to the FBI?**
A It says, Date of entry July 5th, 2013.
**Q Do you believe that you spoke to the FBI in 2013?**
A I thought it was 2011 when I talked to them.
**Q Okay. I'm going to direct your attention to the bottom of that page.**
A Yes.

**Q The first page. Do you see that?**
A Yes.
**Q The last few lines there have another date.**
A Oh, yes, investigation of, yes.
**Q All right.**
A So that makes sense, okay.
**Q Okay. What do you understand that to be? And if it refreshes your recollection about when you spoke to the FBI, just let us know.**
A Yeah, March 17th, 2011 sounds more right than 2013.
**Q Okay. And where did you speak to them?**
A I believe this was in the office of the consulate, American Consulate, in Sydney.
**Q Sydney, Australia?**
A Sydney, Australia.
**Q Okay. And you were there in person with these FBI agents?**
A Correct.
**Q And were they taking notes when they spoke to you?**
A Yes.
**Q Were they recording the interview, to your knowledge?**



A I believe they were.
**Q Okay. Have you had a chance to review this report?**
**And I will make note for the record that there are obviously many places that are blacked out --**
A Yeah.
**Q -- or whited out. Is that fair?**
A Yes.
**Q All right. Have you had a chance to review this one with whited-out portions of it before today?**
A Yes.
**Q All right. And you understood when you were speaking to the FBI that they were federal agents, correct?**
A Yes.
**Q And that you were supposed to tell them the truth, correct?**
A Absolutely.
**Q And do you believe that you did, in fact, tell them the truth?**
A To the best of my knowledge. Again, when it comes to dates and times, I was obviously off. But everything else is absolutely 100 percent true.



**Q Okay. And have you reviewed any -- have you at any time reviewed this document without those portions whited out?**
A I don't believe I've seen this document without the portions.
**Q Okay. So you don't know, for example, what's behind those, other than what you recall --**
A No.
**Q -- having told the FBI at the time, correct?**
A That's correct.
**Q Okay. I'm going to show you a new document.**
A Okay.
**Q You can just put that to the side. Defendant's Exhibit 7.**
**(Exhibit 7 marked.)**
**Q (BY MS. MENNINGER) All right.**
MR. EDWARDS: Thanks.
**Q (BY MS. MENNINGER) And do you recognize this document?**
A Yes.
**Q And what do you understand it to be?**
A This was a phone conversation that I had between Jack Scarola and Brad Edwards.



**Q Okay. And do you see a date reflected on the front page?**
A April 7, 2011.
**Q Is that when you had that phone conversation with them?**
A If it's dated like that, it must be, yes.
**Q Well, I just need you to say from your memory, does that sound about right in terms of what you recall having been the phone conversation?**
A I'm sure it's correct.
**Q Okay.**
A I don't have a good calendar in my brain. So, yes, I'm sure that that's the correct date.
**Q Did you understand it was being recorded, correct?**
A Yes.
**Q Okay. Have you listened to the recording of that phone call?**
A I don't believe I listened to the recording, but I have seen the document.
**Q All right. And again, you were speaking the truth at the time you were speaking to them as lawyers and officers of the court, correct?**
A Yes. And again, to the best of my knowledge when it comes to dates.

**Q Okay. And then the last -- the last document, I hope, is --**

MS. MENNINGER: The big one.

(Exhibit 8 marked.)

**Q (BY MS. MENNINGER) All right. Do you recognize -- I'm going to -- I'm sorry, if I didn't say it already. This is Defendant's Exhibit 8.**

**Do you recognize this document?**

A Yes, I do.

**Q And what is this document?**

A This is a manuscript that I was writing, I believe, back in 2011 regarding some of my life story. And just to make it known, this is a based on true events. But I wouldn't say fictional, but just based on true events.

Not everything in it is -- not everything is in there and not everything is, you know, correct. So there's a few mistakes in there.

**Q Okay. Off the top of your head, do you recall any mistakes that are in there now without reading the 140-page document?**

MR. EDWARDS: We're going to be here a long time.

A Yeah, we could be here a very long time. I mean, I'd like to say a majority of it is correct.



Some names have been changed in order to protect other people.

**Q (BY MS. MENNINGER) Protect their privacy?**

A Protect their privacy, yeah, I would say, just not getting them involved in, if this were to ever go public.

**Q Well, again, without rereading the whole manuscript --**

A Reading it, yeah. I'm trying to see if I can -- see something in here.

**Q Let me narrow my question and maybe that will help.**

A Yes.

**Q Is there anything -- well, first of all, did you author that entire manuscript?**

A Yes, I did.

**Q Did anyone else author part of that manuscript?**

A Do you mean did anyone else write this with me?

**Q Right.**

A No.

**Q That's all your writing?**

A This is my writing.

**Q Okay. To the best of your recollection,**



**as you sit here right now, is there anything in that manuscript about Ghislaine Maxwell that is untrue?**

A I don't believe so. Like I said, there is a lot of stuff that I actually have left out of here.

**Q Um-hum.**

A So there is a lot more information I could put in there. But as far as Ghislaine Maxwell goes, I would like to say that there is 99.9 percent of it would be to the correct knowledge.

**Q All right. Is there anything that you -- and I understand you're doing this from memory. Is there anything that you recall, as you're sitting here today, about Ghislaine Maxwell that is contained in that manuscript, that is not true?**

A You know, I haven't read this in a very long time. I don't believe that there's anything in here about Ghislaine Maxwell that is not true.

MR. EDWARDS: I'd just ask, Counsel, if you have anything specific to show her about Ghislaine Maxwell --

MS. MENNINGER: I'll ask questions.

MR. EDWARDS: -- I'll have her look at it.

MS. MENNINGER: I'll ask questions.

MR. EDWARDS: I know, but I want the record clear that if she hasn't read it in a long



time, she --

MS. MENNINGER: She made the record very clear. Thank you. She doesn't need you to make a record.

MR. EDWARDS: I'm not making records, but you're making this last longer. There's no need for this. This doesn't have to be an unpleasant process. I want her to help you.

MS. MENNINGER: I don't find it unpleasant. I'm sorry if you do.

MR. EDWARDS: Okay. Well, then, I object to that last series of questions to the extent that she was unable to look at what you wanted her to look at.

**Q (BY MS. MENNINGER) I would like to next turn to a document filed on March 16th of this year. Or actually, let me rephrase that. A document dated March 16th of this year, which we will mark as Defendant's Exhibit 9.**

**(Exhibit 9 marked.)**

**Q (BY MS. MENNINGER) Do you recognize this document, Ms. Giuffre?**

A Yes, I do.

**Q All right. And what is your understanding of what this document represents?**

A Based upon the title, it is Plaintiff's Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff.

**Q And are you the plaintiff?**

A I am the plaintiff, yes.

**Q All right. So it's your response to Ms. Maxwell's discovery request, correct?**

A Correct.

**Q All right. And if you look at the last page -- or, I'm sorry, it would be the second to last page -- you might see signatures of your attorney, correct?**

A I see printed names.

**Q Printed. Electronic signature --**

A Okay.

**Q -- will have a little S in front of it.**

A All right.

**Q Do you see that?**

A I can see the, yeah the printed names. So if it's electronic signature, then yes.

**Q All right. And the date on that is March 16th of 2016?**

A Correct.

**Q All right. And so without revealing the content of your conversations, you assisted in**



**preparing responses to discovery requests, correct?**

A Yes.

**Q All right. I'm going to show you a subsequent one marked Defendant's Exhibit 10 and dated March 22nd.**

**(Exhibit 10 marked.)**

**Q (BY MS. MENNINGER) If you can take a look at that.**

A Thank you.

**Q And while we're at it, I'm going to give you Defendant's Exhibit 11 so you can look at them together.**

**(Exhibit 11 marked.)**

**Q (BY MS. MENNINGER) All right.**

A Thank you.

**Q All right. So looking at Defendant's Exhibit 10, do you recognize that document?**

A Plaintiff's Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff.

I've seen a lot of documents, and they all look the same. But I'm sure I've seen it.

**Q All right. And looking, again, at the last page -- or I'm sorry, this time it will be the third to last page.**



**Do you see your attorney's signature and the date, March 22nd, 2016, correct?**

A I do.

**Q All right. And then looking at Defendant's Exhibit 11, that's your declaration, correct?**

A Yes, it is.

**Q And declaring under penalty of perjury as of March 22nd, 2016 that the supplemental response and objections are true and correct, right?**

A Correct.

**Q And you -- that's your signature?**

A That is mine.

**Q And you are swearing under penalty of perjury that Defendant's Exhibit 10 is true and correct?**

A Yes.

**Q As of March 22nd, 2016, right?**

A Yes.

**Q All right. And then one more on that. Defendant's Exhibit 12.**

**(Exhibit 12 marked.)**

**Q (BY MS. MENNINGER) And do you recognize this document?**

A Yes.



**Q Okay. And what is this document?**

A Plaintiff's Second Amended Supplemental Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff.

**Q All right. And again, turning to the very rear section, I think you'll see your attorney's signatures again and the date of April 29th, 2016?**

A I do see that.

**Q All right. And again, you authorized this document to be filed, correct?**

A Correct.

**Q And the statements contained therein are true, to the best of your knowledge, correct?**

A Correct.

**Q And that's -- April 29th is just a few days ago, correct?**

A Yes.

**Q All right. Did you review this April 29th document before it was filed or served?**

A Like I said, I've seen a lot of documents and they all look alike, but I'm sure I've seen this one.

**Q Okay. And if it's something that was served last Friday, does that refresh your recollection that you reviewed it before it was**

**served on April 29th, 2016?**

A I believe I have seen this.

**Q And you were here in the U.S. last Friday?**

A Yes.

**Q So you saw it in person, correct?**

A Yes, I was looking at a lot of documents on Friday.

**Q Okay.**

A I believe this could definitely be one I looked at.

**Q All right. If I could direct your attention to -- let me see, in that document --**

MR. EDWARDS: Exhibit 12?

MS. MENNINGER: Um-hum, Defendant's Exhibit 12.

**Q (BY MS. MENNINGER) -- to page -- sorry. You're not the only one who's seen a lot of documents.**

**Well, without asking you to look at a page, can you tell me what your -- between 1996 and -- well, in 1996 to 2002, what was the first job that you held?**

A I believe the first job that I held was in the year 2000, and that was at Mar-a-Lago.

**Q Okay. And is that the first job you held**



**as a teenager or at any point in time, that you recall?**

A Yes, that I recall.

**Q All right. Did you ever work at Taco Bell?**

A My ex-boyfriend used to work there and I would help him out. I was never really -- I don't think I was employed there. He was my boyfriend so I stayed there with him all the time.

**Q What was his name?**

A I called him Michael, but I think his real name was James.

**Q Okay. And so he was employed there, but you were not employed there?**

A I used to go there and help him out.

**Q Did you have a uniform?**

A I would have to wear a shirt when I was there, yes. He was the manager, so --

**Q Oh, a Taco Bell shirt?**

A Yes.

**Q Okay. And did you get a paycheck from them?**

A I believe Michael paid me.

**Q How did he pay you?**

A With a check.



**Q Written from Taco Bell?**

A You know, I don't know, sorry. I just -- I remember he asked me to come in and help him out, and that's -- I didn't really consider myself an employee there, but --

**Q Just wearing the shirt and getting a paycheck didn't cause you to think you were an employee?**

A Well --

MR. EDWARDS: Object to the form. Mischaracterizes her testimony.

A Yeah, I know. I mean, it was my boyfriend. I was helping him out. So that's the way I looked at it.

**Q (BY MS. MENNINGER) Is there any other place that you wore a uniform and got a check from in the years from '96 to 2000?**

A I did work at Publix as a bag girl, but that was only for a couple weeks, I think.

**Q Which Publix was that?**

A I believe it was in Loxahatchee.

**Q Okay. Do you remember the street?**

A No.

**Q All right. Anywhere else you wore a uniform and got a paycheck?**



A I volunteered at a bird aviary.

**Q What was the name of that?**

A I don't know the name of it. But it was -- I'm an animal lover. So --

**Q Okay.**

A -- it's something I enjoyed doing.

**Q Okay. Did you get a check from them?**

A I volunteered. I think they eventually put me on some kind of payroll. I don't think it was much, though.

**Q Okay. So what year were you in helping out in a Taco Bell wearing the uniform and getting a check?**

A I have no idea when it comes to years.

**Q Was it before or after Mar-a-Lago?**

A Before Mar-a-Lago.

**Q Okay. And how --**

A Mar-a-Lago was my first real job so --

**Q What's that?**

A Mar-a-Lago was like my first real job.

**Q What do you mean by real job?**

A Like, you know, fully employed, sit down for an interview and, you know.

**Q Okay. So Taco Bell, was Taco Bell the first place you got a paycheck from?**

MR. EDWARDS: Object to the form.
A Uhm, I don't know, to be honest.
**Q (BY MS. MENNINGER) And in what order did Taco Bell, Publix and Mar-a-Lago go, and the aviary, sorry?**
A Oh, I would have to guess. Do you want me to guess?
**Q Sure.**
A Um, I would say Publix. And then, I think that's when I helped my boyfriend out at Taco Bell and then I think the aviary.
**Q And where was the Taco Bell?**
A I was living in Fort Lauder -- I think it was Fort Lauderdale. Don't quote me on that, but somewhere in Florida, Broward County, something like that.
**Q And who were you living with at that time?**
A Michael. His name is James, but Michael.
**Q So you were living with Michael when you worked at the Taco Bell, right?**
A Yes, I was living with him.
**Q And you worked with Michael when you worked at the Publix, correct?**
A No.
**Q Okay. So Publix came after Taco Bell or before?**



A I think it came -- like I said, don't quote me on it, but I think Publix came before it.
**Q And who were you living with when you worked at Publix?**
A My mom and my dad.
**Q And who were you living with when you worked at the aviary?**
A My mom and my dad.
**Q Anywhere else that you got a paycheck from before 2000?**
A No, not that I can think of.
**Q Okay. Anywhere else you wore a uniform?**
A Besides Mar-a-Lago and -- yeah, that's it.
**Q Okay. And so how long was it between working at any of those three places and the time that you worked at Mar-a-Lago?**
A I have no idea. I'm sorry. Um --
**Q Years? Months?**
A Oh, we're going to go back chronologically. I was trying to get my GED and I -- there was a summer break. And that's when I started working for Mar-a-Lago. So that Mar-a-Lago we know now is in the year 2000. So I would have to say a month.



**Q Months. And what was the job you believe you had immediately prior to Mar-a-Lago?**
A If I were correct, it would be the aviary that I volunteered at.
**Q Okay. And you believe you were living with your parents at the time you worked at the aviary?**
A Yes.
**Q Okay. And not living with Michael?**
A Michael might have been living with me and my parents.
**Q Okay. So you recall Michael was living with you and your parents at the time you worked at the aviary?**
A Yes.
MS. McCAWLEY: Objection. Mischaracterizes testimony.
**Q (BY MS. MENNINGER) And was Michael living with you and your parents at the time you started at Mar-a-Lago?**
A Yes.
**Q And what address was Michael living with you and your parents at the time you started at Mar-a-Lago?**
A My parents' address?



**Q Whatever address you were living at, at the time you started at Mar-a-Lago.**
A [redacted], Loxahatchee, Florida 33470.
**Q How is it that you came to work at Mar-a-Lago?**
A My dad is a maintenance manager or supervisor, I don't know what you call it. But he worked in the maintenance department, mostly on tennis courts, working on the air conditioning, helping set up for functions. And he got me a summer job there.
**Q Okay. And you said you were on a break?**
A Yes.
**Q What were you on a break from?**
A I think like -- this is going back so long now, but I was attempting to get my GED. And it, summer came, so school stops during the summertime here in America, and I got a summer job.
**Q All right. And where were you in school?**
A I don't actually know the name of the place. It's -- yeah, I know.
**Q A GED place?**
A Yeah, it was, like, I was previously in Royal Palm Beach High School, but, I mean, because of

a lot of the circumstances that I had been subjected to, I decided I wanted to get my GED.

**Q Okay. So you were going to an actual school to get your GED, that's what you're saying?**

A Yes.

**Q And that school, whatever it was, where you were getting your GED was not Palm Beach High School, right?**

A No.

**Q And it -- whatever the school was where you were getting your GED took a summer break?**

A I believe so, yes.

**Q And that was in 2000?**

A Now that we know the right dates, yes.

**Q And that's when your dad helped you get a quote-unquote summer job?**

A Yes.

**Q All right. And that summer job was Mar-a-Lago?**

A Yes.

**Q Okay. Now tell me how you sort of came into Mar-a-Lago for the first time? He asked you to come? They called you? What happened?**

A My dad was very liked there. So I think he talked to the people who were in HR. And then



they said for me to come in for an interview.

**Q Um-hum.**

A To be interviewed for a locker room assistant.

**Q Um-hum.**

A They liked me. I had to go through a series of drug tests, polygraph tests. I mean, it was a very extensive regime to get a job there.

**Q Yeah.**

A And when all those came back good, I started the job.

**Q So how long do you think it took for you to go through that extensive series of drug tests and polygraph tests and --**

A I did them both in the same day.

**Q Okay. When was the interview? Was it on the same day or a different day?**

A I believe it was like a few days beforehand.

**Q Okay. And do you remember who you interviewed with?**

A No.

**Q Do you remember the title of the job for which you were interviewing?**

A Locker room attendant.



**Q Locker room attendant was the name?**

A Of the position?

**Q Yes.**

A Yes.

**Q And did they give you any training?**

A No.

**Q Did they show you how to work the lockers?**

A Well, I mean, there was a girl who already worked there at the front desk. I think she helped make appointments and greeted people, and then she just told me my duties in the locker room were to, you know, make tea. I had never made tea before, so that was -- that was fun. Learn how to make tea. Clean up after the ladies who had been in the locker room. Make sure the bathrooms were kept nice and tidy. You fold the toilet paper into a little triangle every time anyone went to the toilet. Clean up the sink area. It was a very crazy job.

**Q Do you remember the names of any of your coworkers who you worked with at Mar-a-Lago?**

A I believe the head of the spa area was Adriana or Adrienne. I can't remember exactly.

**Q Okay.**

A And the girl who trained me, I have a very clear picture of her face, but I can't remember her



name.

**Q All right. What did she look like?**

A She had blonde hair, probably to her shoulders, and it was curly.

**Q And how old was she?**

A I'd say in her 20s.

**Q All right. Did they check your identification when you went in for your job interview or your --**

A It was very extensive. I'm sure they would have had to check and make sure I was who I was.

**Q And so you had a driver's license, right?**

A I believe so.

**Q All right. And, let's see. Did you move to a different position while you were there or did you always stay as a locker room --**

A I wasn't there very long. So I just --

**Q Just one second. Did you always stay as a locker room attendant?**

A Yes.

**Q Okay. I just need to finish my question for the court reporter.**

A I know, I'm sorry. I have a tendency of jumping in.

Page 61

Q Okay. If I can direct your attention back to Defendant's Exhibit 12 at page 15. And under the heading Response to Interrogatory Number 9, do you see that where it says --
A Yes.
Q -- Ms. Joffrey (pronouncing) -- Giuffre, excuse me, responds as follows?
A Yes.
Q Okay. It says you worked as a locker room attendant for the spa area, correct?
A Yes.
Q And it says records produced in this case identify the date of employment as 2000, correct?
A Yes.
Q What records that were produced in this case cause you to believe that the employment began in 2000?
A Uhm, is this going back to another question that I'm not allowed to answer?
Q No.
A I have seen the documents, and I know that my employment now was in 2000.
Q What documents did you see that caused you to make that answer?
A The Mar-a-Lago employment documents.

Page 62

Q Are they your Mar-a-Lago employment documents?
A Um --
MR. EDWARDS: Object to the form.
A My name is on there.
Q (BY MS. MENNINGER) Okay. Do you believe them to be your Mar-a-Lago employment documents?
A As far as I can tell.
Q Okay. So you were able to review your Mar-a-Lago employment documents --
MR. EDWARDS: Object to the form.
Q (BY MS. MENNINGER) -- and respond to the question, as it says right there that you respond, correct?
A Yes.
Q When did you review the documents that you reviewed to cause you to respond to that answer that way?
A I don't think I found out till sometime mid -- mid last year, I believe.
Q Okay.
A I'm really not too sure. You know, I'm sorry, dates and documents, there's too many to remember. But --
Q Okay. You do admit that you filed in many

Page 63

documents that you met Ghislaine Maxwell in '98 or '99, correct?
A Yes.
Q And you do admit that you told members of the media that you met Ghislaine Maxwell in '98 or '99, correct?
MR. EDWARDS: Form.
A That was my closest approximation to what I could actually remember, so --
Q (BY MS. MENNINGER) You told the media that you met her in '98 or '99?
MR. EDWARDS: Form.
A Again, yes, as close as I can remember.
Q (BY MS. MENNINGER) And the media published in the newspapers that you met Ghislaine Maxwell in '98 or '99, correct?
MR. EDWARDS: Form.
A Yes, they did.
Q (BY MS. MENNINGER) And the news media published in the newspapers what you told them, which is that you were 15 when you met Ghislaine Maxwell, correct?
MR. EDWARDS: Form.
A Which is what I truly thought at the time, yes.

Page 64

Q (BY MS. MENNINGER) Okay. And it is not true that you were 15 when you met Ghislaine Maxwell, correct?
A It was a mistake that I made, yes.
Q So that the printing in the newspaper that you met Ghislaine Maxwell when she was -- when you were 15 is not a true statement of fact, correct?
A It is an incorrect statement as I have now found out, that my employment started in 2000.
Q All right. And to the best of your recollection, you found that out in the middle of 2015, correct?
MS. McCAWLEY: Objection.
A To the best of my recollection. I mean, I can't pinpoint an exact date I found out. But, yes.
Q (BY MS. MENNINGER) About a year ago?
MR. PAGLIUCA: Are we all participating in this deposition or just --
MS. McCAWLEY: Same way you guys did.
MR. PAGLIUCA: We did not.
MS. MENNINGER: I did not.
MS. McCAWLEY: You both objected.
MS. MENNINGER: No.
MR. PAGLIUCA: No, we didn't.
MS. McCAWLEY: We can go back through the

record.

MR. PAGLIUCA: We sure can.

So if we're all participating, maybe I'll have a few questions at the end of this. I think we should limit this to one lawyer. And your statement about two lawyers participating in the last deposition is wrong.

MS. McCAWLEY: Well, I recall that she got a microphone because she said she was going to be objecting. So --

MR. PAGLIUCA: I know. She put on a microphone and didn't speak through the whole thing.

MS. McCAWLEY: Well, we can take a look back at the record. You know, it's not a problem. Brad can make the objections.

MR. PAGLIUCA: Okay. Let's take care of it that way, then.

MR. EDWARDS: Can you tell me when you're at a good stopping point?

MS. MENNINGER: I was about to say it's been an hour.

MR. EDWARDS: Yeah.

MS. MENNINGER: So this would be a good time to take a break.

MR. EDWARDS: Okay. Thanks.



THE VIDEOGRAPHER: We're off the record at 10:12.

(Recess taken from 10:12 a.m. to 10:27 a.m.)

THE VIDEOGRAPHER: We're back on the record at 10:27.

**Q (BY MS. MENNINGER) All right. Ms. Giuffre, you testified that you first became aware that you -- your employment at Mar-a-Lago began in 2000, in mid-2015, correct?**

MR. EDWARDS: Object to the form. Mischaracterizes her testimony.

A I don't know exactly when. It could be towards the end of 2015. It could be towards the beginning of 2016. I just know that I've learned about it recently. I'm not too sure exactly what date I did learn about it.

**Q (BY MS. MENNINGER) Okay. But to your mind, it's been within the last 6 to 12 months; is that fair?**

A I wouldn't say 12 months, no. I would just say up until -- I don't know when I was shown that, when I actually first saw it, but it wasn't a year ago.

**Q Saw your employment records from**



**Mar-a-Lago?**

A Correct.

**Q Okay. I'm going to show you an exhibit marked as Defendant's Exhibit 13.**

**(Exhibit 13 marked.)**

**Q (BY MS. MENNINGER) Okay. All right, Ms. Giuffre, do you recognize this document?**

A Yes, I do.

**Q What is this document?**

A This is a resume that I created myself.

**Q All right. And what address did you put at the top of your resume?**

A [redacted]

**Q And when did you live at that address?**

A I believe from 2013 to 2014.

**Q Okay. And you said you created this document, correct?**

A Yes.

**Q And did you send it out to any employers?**

A Do you have any attachments that this goes with to say that I have? Because I'm not too sure. I've created a lot of resumes.

**Q Okay. And hold on, I'll see if we do.**

MS. MENNINGER: All right. I'll mark this



next as Defendant's Exhibit 14.

(Exhibit 14 marked.)

A Thank you.

**Q (BY MS. MENNINGER) All right. Do you recognize this document?**

A Yes.

**Q What is this document?**

A This is me replying to ads for jobs.

**Q Okay. And you were communicating with -- by your e-mail, correct?**

A Yes.

**Q All right. And I apologize. This one actually has the resume attached to an e-mail.**

A Um-hum.

**Q Do you see that, towards the back of the document?**

A Yes, I do.

**Q Okay. So --**

A Sorry.

**Q To whom -- to whom -- with whom were you communicating about a job at this time?**

A Well, on the very top, Phil or Gary, and that was for a bartending position.

**Q Okay.**

A Um --

**Q Was that something your brother had recommended or your father? I don't know who.**

A You know, I just looked at that, that's kind of why I giggled. I don't know why my brother -- that's my brother. That's the way we talk to each other: Hi, stupid head. Good luck, smelly, XOXOXO, sissie.

He's my little brother so you have to understand we kind of play around. But subject to my resume for hospitality, I'm not too sure why he would have gotten it, but apparently he did.

**Q Okay. And you see that your resume was attached to an e-mail communication you had with your brother?**

A Yes, I do.

**Q Right. And that's also your brother was part of the e-mail chain with respect to an ad placed on craigslist for a position, correct?**

A He was on -- let me just check the dates, then.

**Q Sure.**

A 1/20/2014, 1/21, so just within a day of each other, yes.

**Q All right. And then the resume that's attached is the address you were living at in**



**January --**

A Yes.

**Q -- of 2014, correct?**

A Correct.

**Q All right. So you believe you created the resume that's attached to Defendant's Exhibit 14, correct?**

A Correct.

**Q And you sent it out with respect to this employment you saw on craigslist, correct?**

A Correct.

**Q And you are the one who put into this document the contents of the resume, right?**

A Yes.

**Q All right.**

MR. EDWARDS: We're talking about the resume that's attached to Exhibit 14, right?

MS. MENNINGER: We are.

MR. EDWARDS: Okay. Got it.

MS. MENNINGER: Thank you for clarifying.

MR. EDWARDS: Got it.

MS. MENNINGER: Although, I don't know there are any differences with Defendant's Exhibit 13.

**Q (BY MS. MENNINGER) But just to be safe,**



**you believe the one attached to Defendant's Exhibit 14 is the one that you sent?**

A There are differences, isn't there? Yes, there is.

**Q Okay. What are the differences that you know?**

A It starts -- I mean, let me see. The very top introduction is the same.

**Q Um-hum.**

A After the experience.

**Q Um-hum.**

A That changes. The dates change. And then underneath Employment Training Recruitment is Indigo Bar & Grill on Exhibit 14. On Exhibit 13 it's Mannway Logistics underneath Employment Training Recruitment.

And then underneath Mannway Logistics on Exhibit 13 is Mar-a-Lago Resort and Spa. And on Exhibit 14 is Gemma Catering/Wedding Receptions. So there is quite a few differences.

**Q Okay. Great. Do you have any idea when you sent out Defendant's Exhibit 13, or if you did, to an employer?**

A Unless you have something that's attached to it, I can't be sure that I did.



**Q Okay. Is the content in Defendant's Exhibit 14, that you believe you sent out to an employer, correct?**

A Unfortunately, I have to tell you that they are not correct. Through my experience I was in the mind-set that I was unemployable. I had been abused for many years and I was told by a job agency that I need to show that I've consistently worked at various places and given experience. So it's not something that I'm proud of, but I have had to plump up my resumes to make it look as though I could be employed.

**Q What do you mean by plump up your resume?**

A Well, I couldn't -- I didn't feel that I could go to an employer and tell them that I had held, you know, one job in the last 10 to 12 years and before that I was trafficked for the purpose of sex. And that's definitely something you don't want to put down on your resume, which makes you quite highly unemployable.

So I did add places in, such as Indigo Bar & Grill, Calmao Flamenco Bar & Restaurant.

**Q Wait, wait. Which one?**

A On Exhibit 14.

**Q Um-hum.**

A Underneath Experience, the dates are all incorrect, as well. It's just to show that I was consistently working, which I was not. And I needed a job to help my family. I've got a family of five. So like I said, it's not something proud that I had to do, but I felt it was the only way that I could actually get employed.
**Q You lied on your resume?**
A I made it look as though I had continuously worked throughout the years so that way an employer would see me as a potential candidate.
**Q Okay. Well, let's start with Employment Training and Recruitment, ET Australia.**
**Did you work at that place of employment?**
A I did work there.
**Q What dates did you actually work there?**
A I know I finished working for -- we call it ET Australia, so if you don't mind me abbreviating it.
**Q However you want.**
A I know I finished there in January of 2006 right before my son was born, my first son was born. And I believe I worked there for a year, I believe so. It might have been a little bit over a year, but just around a year.



**Q All right. So you worked at a place for about a year. And on your resume you typed that you worked there for nine years, correct?**
A Correct.
**Q And you did that, correct?**
A I did.
**Q Nobody else typed that for you?**
A No, I did it myself.
**Q All right. And the next employment you list here -- well, is your job description accurate?**
A Yes, that is actually accurate.
**Q Okay. And everything in there is what you actually did?**
A Yes, for ET Australia.
**Q Okay. Indigo Bar & Grill, did you type that in?**
A I did type that in.
**Q And did you actually work at Indigo Bar & Grill?**
A No, I did not.
**Q All right. So the dates that you put on your resume are not true, correct?**
A That's correct.
**Q The title of your job at that place was not correct; you didn't work there, right?**



A I never worked there.
**Q The description that you typed out about the things that you did at that Indigo Bar & Grill is made up, correct?**
A Well, it's -- it's generally what you would do if you were a server or a waitress. But, like I said, I did not work at Indigo Bar & Grill.
**Q So when you represented to an employer that you were applying for a job that you had done these things, you had not actually done these things at Indigo Bar & Grill, correct?**
A Not at Indigo Bar & Grill, no.
**Q All right. Can you read the first sentence of your job description?**
A For Indigo Bar & Grill?
**Q Right.**
A At this restaurant located inside of an RSL, we were never slow.
**Q Okay. So when you said, "We were never slow," you just made that up, correct?**
MR. EDWARDS: Form.
A I tried to give as much information to my potential employer to show that I could handle a large amount of pressure and guests. So, yes, I put that in there.



**Q (BY MS. MENNINGER) But you represented you were there working as a server or waitress and that we were never slow. That is not true, correct?**
A Well, I never worked there, so it's -- again, I was very highly unemployable, given my past. So I did whatever I could to make it look as though my potential employer could hire me.
**Q Okay. You described your duties that were not -- those were fictional duties, correct?**
A They were duties that a waitress and a server would do.
**Q But you did not do at Indigo Bar --**
A But I did not do them at Indigo Bar & Grill.
**Q Okay. You described your energetic service and your service with a smile to the guests. That was not true, correct?**
A Everything in Indigo Bar & Grill is not correct.
**Q And you created that entire description, correct?**
A For the sole purpose of being able to obtain employment, yes.
**Q To get money?**
MR. EDWARDS: Form.

A To make a wage for my family.
**Q (BY MS. MENNINGER) All right. The next job, Gemma Catering and Wedding Receptions, did it -- is that a job that you actually held?**
A I did actually work there. I don't know the dates, but I was a server, waitress and bartender.
**Q March of 2003 to April 2004, is that about when you worked there?**
A It could be very close to it. I'm not too sure.
**Q You're not sure?**
A No, I'm not sure.
**Q Did you have children -- had you already had children at the time you worked there?**
A No, I do not believe I did. I became a stay-at-home mom when I had my first child.
**Q And what year was that?**
A 2006.
**Q Okay. So you believe you worked at Gemma Catering and Wedding Receptions before 2006?**
A I believe so.
**Q And other than that, you can't recall what dates you worked there?**
A I'm sorry, I couldn't help, no.



**Q All right. And then what were your actual -- is that your actual job that you had there?**
A The description of it?
**Q The title, server, waitress, bartender?**
A Yes.
**Q All right. Is the description accurate?**
A To a T.
**Q What's that?**
A To a T.
**Q Okay. The next job you list is Mannway Logistics, Logistics Receptionist.**
**Is that a job you actually held?**
A It is a job I held.
**Q And when did you hold it?**
A Again, I'm very bad at dates. I'm not too sure.
**Q All right. Approximately when did you have it?**
A I don't want to speculate and give you the wrong answer, so I'm not too sure.
**Q Did you have children at the time you worked there?**
A No.
**Q So before 2006?**
A Yes.



**Q And after you moved to Australia, which was what year?**
A I moved to Australia at the end of 2002, I believe.
**Q All right. Do you recall going to work shortly after you got to Australia?**
A Yes.
**Q How --**
A I had to obtain my -- my ability to work there. So I think that took a couple months. You can get a temporary visa that allows you to work while you're waiting for your permanent resident status, and that's what we did.
**Q All right. Were you able to apply for that temporary job permission before you actually got married in Australia?**
A I got married in Aus -- we were married in Thailand, really, but we made it official in January of 2003. And within a couple of weeks, I was granted the permission to work in Australia legally.
**Q Okay. So to the best of your recollection, you got permission to work in Australia sometime in the spring of 2003?**
MR. EDWARDS: Form.
A That's actually summer over there.



**Q (BY MS. MENNINGER) Fair enough. The first quarter of the year, calendar year --**
A Yes.
**Q -- 2003?**
A If we're going to be politically correct, yes.
**Q That's what you recall?**
A (Indicating.)
I'm sorry, yes.
**Q And is your description of Mannway Logistics correct?**
A Yes.
**Q All right. And how long did you work there?**
A I think that was less than a year that I worked there. I would approximate about six, seven months.
**Q Can you name one coworker you had or boss or anybody else that worked there?**
A I know her name started with an M, but I can't remember. I remember what she looks like. I just don't remember her name.
**Q Okay. And how much did you make there?**
A I don't remember the exact amount. Approximately about $20 an hour, I think.

Page 81

**Q And how many hours per week were you working for that six months to a year?**
A I believe that was full time.
**Q And is full time the same in Australia?**
A Yeah it's a 40-hour week.
**Q Okay.**
A Well, 38 because you get two hours of lunch, so, yes.
**Q All right. Have you been in touch with anyone from that employment in a while?**
A No.
**Q All right. The next job listed there is what?**
A Calmao Flamenco Bar & Restaurant.
**Q Is that someplace you actually worked?**
A No, it's not.
**Q Is that a place that actually exists?**
A I don't really know.
**Q All right.**
A I mean, I think I looked on the Internet and found something similar to what the description I was needing to fill, and that was it.
**Q Okay. So when you were creating this document in 2013/2014, right, that's when you had the Titusville address?**

Page 82

A Yes.
**Q All right. You went on the Internet and you searched for a place that would be like the job you were looking for?**
A Correct.
**Q And you found the name of an actual place, Calmao Flamenco Bar & Restaurant.**
**Did I get that right?**
A I'm not 100 percent on that, but I think so.
**Q Okay. And you did that in order to impress the employer you were applying for here in the e-mail, correct?**
A Correct.
**Q All right. And you did that in order to get money from a job that you hoped to get from this employer in the e-mail, correct?**
A I was hoping to gain employment. And not having much experience, I put in there that I had experience.
**Q Okay. And you said that you had been advised to plump up your resume by a job agency; is that right?**
A Yes.
**Q What was the name of that job agency?**

Page 83

A Before I worked at ET Australia, I was actually a job seeker there. And a job seeker, I don't know if you're familiar with the term.
Somebody who is looking for work and you go to a job agency, and you go look on the computer. And you actually have somebody who helps you find employment. And they are the ones who recommend that you show that you've continuously worked throughout your years. They ended up really liking me, so that's how I got the job there.
**Q Okay. Was it a particular person there that gave you the advice to plump up your resume?**
A It would have been one of the counselors.
**Q Which one?**
A I don't know.
**Q Okay. Do you remember the names of any of the counselors?**
A I only remember the name of one of the girls I worked with, but I don't remember -- I don't remember anyone else's name.
**Q When did you first become a job seeker at ET Australia?**
A Well, if I finished there in 2006 and I worked there for approximately a year, it would have been 2005 -- late 2004, 2005. I'm not too sure.

Page 84

**Q Okay. So you were a job seeker there first and then got employment there, right?**
A Yes.
**Q Okay. So the advice to plump up your resume was while you were seeking a job or while you were employed there?**
A While I was seeking a job.
**Q All right. And you were assigned a counselor?**
A Yes.
**Q One or more than one?**
A It changes on a daily basis. There's somebody who comes into the office and they sit with you and they help you with your resume. And then they help you go on the computer and look for open vacancies.
**Q So someone in approximately 2005 gave you the advice to plump up your resume. That's what you're saying?**
A To make it look like I've continuously worked, yes.
**Q Okay. So back to Calmao Flamenco Bar & Restaurant, which is a place you found on the Internet but did not actually work. Is that, the dates for your employment there, December 2001 to**

**February 2003, not true, correct?**

A Obviously, yes. At that time I was -- during 2001 I was with Jeffrey and Ghislaine being trafficked.

**Q Um-hum. So you were not working at Calmao Flamenco Bar --**

A Obviously not, yes.

**Q And you said you got to Australia in late '02 and did not work there between late '02 and February of ' 03, correct?**

A I've never worked at Calmao Flamenco Bar & Grill, period.

**Q All right. And the job description that you crafted there is also fictional, correct?**

A Yes.

**Q All right. And Mar-a-Lago Resort and Spa you put down as a place you had worked, correct?**

A Correct.

**Q And you typed in August 2000 to September 2001, correct?**

A Correct.

**Q And you created your job description there, correct?**

A Correct.

**Q All right. And then turning to the last**



**page you have your education, correct?**

A Can I just make a statement to say that, again, with the Mar-a-Lago Resort and Spa, I did have to add dates to make it look as though I had continuously worked. So those, again, are incorrect dates.

**Q But it is a date that you typed into a resume in 2013 or 2014 --**

A That is the date that --

**Q If you could just let me finish my question.**

A Sure.

**Q That is a date that you typed into your resume in 2013 or 2014, correct?**

A That is the date that I did type in, but those are incorrect dates.

**Q All right.**

A And, as well as the -- the position, organizing, making and canceling appointments for massage therapists.

**Q All right.**

A I mean, I was their locker room attendant. I just wanted it to sound like I had more receptionist experience than I did.

**Q You wanted it to look like you had more**



**experience than you had had, correct; that's what you just said?**

A Correct, I mean given that my past had not enabled me to be able to look for work or I wasn't able to put down what I actually had -- had to do in my past. So I made it look as though I was able to be employed.

**Q You did not have the past that you thought the employer was looking for, right?**

A I couldn't put down on there that I was sex trafficked for a couple years and did not have the experience to be able to apply for jobs and provide for my family.

So this is something that I said. Again, I am not proud of, but I felt was necessary to do to be able to gain employment.

**Q All right. So you were applying for a job at a restaurant, right?**

A At this -- according to the front e-mail, yes.

**Q All right. And you did not put down Taco Bell on this resume, correct?**

A No. The only jobs on here are the ones that we have mentioned.

**Q Right. And so why did you choose August**



**of 2000 as your start date for Mar-a-Lago?**

A It just looks as though I've given them a longstanding history of employment.

**Q You chose a month. Why did you choose that month?**

A I chose months and dates for every single position on that resume. There is no specific reason why I chose that month. It was just purely to show that I was continuously employed.

**Q On the last page it has some education. Which part of that is untrue?**

MR. EDWARDS: Object to the form.

A I have received my business admin cert 3 from ET Australia. I've never held responsible service of alcohol and gambling.

**Q (BY MS. MENNINGER) Do you understand that to be a licensing of some sort or a class? Or what do you understand that --**

A In Australia you have to have something called an RSA and RCG to be able to work as a waitress or bartender or anything. And I didn't know if it was the same out here in America. So I put down that I had.

I had taken a CPR and first aid. I don't remember when, but it's not current.

And I did go to Royal Palm Beach High School and I didn't put down a degree there or anything.

**Q So is it fair to say you never worked as a waitress in Australia. Is that what you just said?**

A I did work as a waitress at Gemma Catering.

**Q Oh, okay.**

A I don't believe I needed my RSA to work there. I'm not too sure.

**Q All right. And if I could just ask you one other question about Gemma Catering. In the last line of the job description it says: This job was a second job. I would work in the evenings and weekends for saving extra cash.**

**What was it a second job to?**

A If my time period is right, it would be my second job to Mannway Logistics because they were both -- Gemma Catering and Mannway Logistics were both in Sydney, whereas ET Australia was on the central coast.

**Q All right. ET Australia is on the central coast?**

A Correct.

**Q And Gemma and Mannway are in Sydney?**



A In Sydney, yeah.

**Q All right. Got it.**

**Do you know if those two organizations still exist?**

A Mannway, I would definitely say, it's a -- it's a large logistic company. I would say it still does exist.

Gemma Catering, I'm not too sure if that exists anymore or not.

**Q Okay. All right. So did you spend your 16th birthday with Ghislaine Maxwell and Jeffrey Epstein?**

A No. I was 16 when I met them, now that I know the correct dates. So I would have spent my 17th birthday with them.

**Q So when you represented that you spent your 16th birthday with Ghislaine Maxwell and Jeffrey Epstein, that was not true, correct?**

A At my ability at the time, that's what I believed to be true. It wasn't until I found the Mar-a-Lago records stating the year 2000. Me being born in 1983 would make me turning 17 that year.

**Q So please describe for me your 17th birthday that you claim you spent with Ghislaine Maxwell and Jeffrey Epstein.**



A I remember spending a birthday with them on Jeffrey Epstein's island called Little Saint Jeff's. I wouldn't say it was a party. It was just Ghislaine, me, Jeffrey. I believe Emery Taylor was there. I got some presents from them.

**Q What presents did you get?**

A Ghislaine gave me a whole bunch of makeup, like boxes of different kinds of eye shadows and lipsticks and just makeup altogether.

Jeffrey gave me a bracelet and, I think earrings.

**Q What kind of earrings?**

A They were what I believed to be diamonds. I don't know what they exactly were. I think Jeffrey was talking about, they could have been passed off as good knock-offs. But they appeared to be diamonds.

**Q Any other presents?**

A I remember the makeup and the jewelry. I don't remember much else.

**Q And that was your 17th birthday, you said?**

MR. EDWARDS: Form.

A It's hard for me to really pinpoint exactly which birthday it was.

**Q (BY MS. MENNINGER) So it could have been your 18th or your 19th?**



A I don't want to lock down on which exact birthday it could have been without knowing.

**Q You don't know which birthday it was; is that what you're saying?**

A The one that I'm specifically telling you about?

**Q Right. You don't know which one?**

A No.

**Q All right. Do you remember spending more than one birthday with Jeffrey Epstein and Ghislaine Maxwell?**

A Yes.

**Q Okay. Tell me about the other ones that you remember.**

A Well, I know my 19th birthday. I can't remember, really, my 18th birthday. But my 19th birthday we celebrated it early, earlier than my actual date of birth. And that's when he surprised me with tickets to Thailand.

**Q What do you mean he surprised you with tickets to Thailand?**

A He told me that the tickets for Thailand were for my birthday.

**Q Did he hand you something that looked like a ticket to Thailand? What do you mean?**

Page 93

A He didn't hand me the tickets at that time, but he told me that he had booked me in for massage training at an institute in Chiang Mai.

**Q And he told you he had booked you tickets to a massage training in Chiang Mai, Thailand sometime before your actual 19th birthday?**

MR. EDWARDS: Form.

**Q (BY MS. MENNINGER) Did I get that right?**

A Yes.

**Q Okay. Did he hand you --**

A Excuse me.

**Q -- hand you anything at that time?**

A No, I don't think so.

**Q And where were you located when he told you this about the Thailand massage training?**

A Jeffrey, Ghislaine and I had just gone scuba -- not scuba diving, not with the big tanks, but snorkeling with just the mask and the two-piece, and on Jeffrey's island, by the way.

And we had gone out for a while. And we had come back. And he's got a pier where it's got a ladder and you climb up. And we were wearing wet suits. So we were taking off our flippers and our wet suits and all of our gear.

And they said they wanted to sit down and

Page 94

talk to me, just the three of us. And he -- first, he told me about the --

**Q If I could just stop you. I think I asked where were you --**

A Oh, I'm sorry.

**Q -- when you had this conversation about the --**

A Just the island. I'm just trying to describe the instance that he gave it to me.

**Q Oh, okay.**

A It was on the island, on the pier in the Caribbean.

**Q Okay. And it was sometime before your 19th birthday?**

A Correct.

**Q How much time before?**

A I don't know. A couple -- six weeks, a couple of months. I don't know. Close to my birthday. It was my birthday present, that's what he told me.

**Q Okay. So you don't know when you had this conversation?**

MR. EDWARDS: Form.

A I mean, I -- no, I didn't record the time and the date, so I can only speculate. It was

Page 95

shortly before my birthday, but not my birthday.

**Q (BY MS. MENNINGER) Okay. And he told you he had booked you tickets to go to Thailand, right?**

A Correct.

**Q All right. So you remember one birthday at which you received makeup, bracelet and earrings and one birthday at which you received tickets to Thailand.**

**Do you remember any other birthdays that you spent with Jeffrey Epstein and/or Ghislaine Maxwell?**

A I'm sure there is, but I honestly can't remember what I did for my 18th birthday.

**Q Okay. Well, I'm sorry, did you know for sure that the bracelet, earrings and makeup were from your 17th birthday, or do you know?**

A I don't know.

**Q But you know they were not for your 16th birthday, right?**

A Correct.

**Q All right. If I could have you go back to Defendant's Exhibit 1, I think.**

A Defendant's, sorry, Exhibit 1?

**Q Um-hum. Page 9, either at the bottom or in the upper right-hand corner.**

Page 96

**Do you see that page?**

A Page 9 of 27, yes.

**Q All right. And paragraph 23, do you see that paragraph?**

A I see the paragraph.

**Q All right.**

A I was just going to read it over quickly.

**Q By all means.**

A I've read it.

**Q And the sentence, Defendant and Ms. Maxwell acknowledged and celebrated plaintiff's 16th birthday, is not a true statement, correct?**

A Only upon learning about the fact that I just found out my records. I assumed at the time it was my 16th birthday. But now we know different.

**Q You admit, as you sit here today, that defendant and Ms. Maxwell did not celebrate your 16th birthday with you, correct?**

A Correct, based upon the records.

**Q Which you don't know when you saw?**

A I know it was, you know, it wasn't -- it wasn't a year ago, but it wasn't that long ago either. So I'm not too sure. I can't tell you the date that I actually saw them.

**Q All right. Last year you lived in**

Page 97

**Colorado for part of the year, correct?**
A For part of the year, yes.
**Q And then you moved to Australia, correct?**
A Yes.
**Q You did not live in Florida at any point in time during 2015, correct?**
A I believe I left Titusville at the end of 2014.
**Q Okay. So you did not live in Florida during 2015, correct?**
A I believe so.
**Q All right. So when you reviewed these records sometime in 2015 that caused you to know the real date of when you worked at Mar-a-Lago, where were you physically located?**
MR. EDWARDS: Object to the form and mischaracterized her testimony.
A I don't remember where I saw these records, when I saw these records. I know it wasn't a year ago. I know it was more recent. I can't pinpoint the date that I actually saw them, but I recently, I believe -- I don't know. I don't want to sit here and speculate and then give you the wrong answer. It's just new knowledge for me.
**Q (BY MS. MENNINGER) All right. Did you**

Page 98

**receive the records by e-mail?**
A I believe so.
**Q Okay. Did you use any e-mail address other than** [redacted]
A No.
**Q That's the only e-mail address that you've used?**
A That's correct.
**Q And the Mar-a-Lago records that you reviewed you received by e-mail at that e-mail address?**
A Possibly. I mean, I can't say 100 percent. I could have been told about them. I could have seen them on a piece of paper. I really don't know. This is a very hazy subject. All I know is that I found out and that was able to clarify a lot of dates for us.
**Q Okay. What other dates were clarified?**
MR. EDWARDS: I object and instruct the witness not to answer if any of your knowledge is based on any privileged communication that you had between yourself and any of your lawyers.
**Q (BY MS. MENNINGER) Okay. You just said you reviewed records yourself, correct?**
MR. EDWARDS: Object. That

Page 99

mischaracterized her testimony. She actually just testified that she may have heard that.
MS. MENNINGER: No, you're not testifying. I've asked her --
MR. EDWARDS: I'm clearing the record up right now, though.
MS. MENNINGER: You can object based on form. That's a valid objection. You've made your record.
**Q (BY MS. MENNINGER) Did you review records that clarified dates for you?**
A I've either reviewed them or I've been told about -- I can't remember. I'm sorry. I know -- I know now that the dates are what they are, but I don't remember.
**Q You don't know when you learned that the dates are what they are?**
A No, I don't.
**Q And your best guess is what?**
MR. EDWARDS: Objection.
If any of your answer is based on attorney-client privilege, I'm instructing you not to answer.
A I can't answer, then.
**Q (BY MS. MENNINGER) Okay. So have your**

Page 100

**attorneys told you to change your dates?**
MR. EDWARDS: Objection.
Do not answer that question. This is a question intentionally devised to invade the attorney-client privilege.
She's not going to answer those questions.
**Q (BY MS. MENNINGER) You can answer a question about whether your attorneys had told you to lie. Because that would be a crime, and I'm sure --**
A I will --
**Q -- I'm sure you want to tell me that your attorneys did not tell you to lie, correct?**
A I can tell you for a fact my attorneys have never told me to lie.
**Q All right. And did your attorneys tell you to change a date?**
MR. EDWARDS: Objection. She's not answering any questions about communications between her lawyers and herself, period.
**Q (BY MS. MENNINGER) So if I could also direct your attention to Defendant's Exhibit 8. It's the manuscript. If you could turn to page 40.**
THE VIDEOGRAPHER: I just have a quick request, Counsel.
Ms. Giuffre, would you mind bringing the

mic higher up on your jacket, please?
THE DEPONENT: Sure.
THE VIDEOGRAPHER: Thank you.
THE DEPONENT: Tell me if that's okay. Better?
A Okay. Page 40?
**Q (BY MS. MENNINGER) Right. Do you see the first full paragraph on that page?**
A I do.
**Q The first line begins: I spent my sweet 16th birthday on his island in the Caribbean next to Little (sic) St. James Isle. He liked to call it Little St. Jeff's. His ego was enormous as his appetite for fornicating.**
**Do you see that sentence?**
A I do.
**Q That is not true, correct? You were not spending your sweet 16th birthday on Little St. James Isle, correct?**
A Based on my knowledge at the time that I wrote this manuscript, I thought I did spend my 16th birthday there. And so I put it down in there as that. Now I know that it wasn't my 16th birthday.
**Q Or your sweet 16th birthday?**
A Well, we --



MR. EDWARDS: Object to the form. Harassing.
**Q (BY MS. MENNINGER) Was it your sweet 16th birthday?**
A Is it not custom to call your 16th birthday sweet? Have you never heard that saying before?
**Q Was it your sweet 16th birthday, Ms. Giuffre?**
A As we --
MR. EDWARDS: She's answered the question. It's been asked and answered.
MS. MENNINGER: She asked me a question, actually. You're not testifying here.
**Q (BY MS. MENNINGER) Was it your sweet 16th birthday?**
A As I thought, in the manuscript when I wrote it, I thought it was my sweet 16th birthday.
**Q Okay. Now that you know it wasn't, where did you spend your sweet 16th birthday?**
A Well, I don't know.
**Q Well, just give us your best guess.**
MR. EDWARDS: Objection. And she's not going to guess today. She's going to tell you the answers as she remembers them.



If you remember the answer, please tell her the answer.
A I don't know the answer, where I spent my sweet 16th birthday.
**Q (BY MS. MENNINGER) Do you know who you were with on your sweet 16th birthday?**
A No, I don't.
**Q Do you know where you lived on your sweet 16th birthday?**
A No, I don't.
**Q Were you living with your parents on your sweet 16th birthday?**
A I don't know.
**Q Were you living with Michael on your sweet 16th birthday?**
A I don't know. I was a runaway a lot. I don't know where I lived at the time.
**Q Okay. Were you working at Taco Bell on your sweet 16th birthday?**
A I don't think so. I don't know.
**Q Were you working at Publix on your sweet 16th birthday?**
A I don't know.
**Q Were you working at an aviary on your sweet 16th birthday?**



A Again, I don't know.
**Q Do you recall any present you actually got on your sweet 16th birthday?**
A No, I don't. I don't know where I spent it, who I spent it with or what I got. I'm sorry.
**Q How long did you work at Mar-a-Lago?**
A Best of my recollection, it was a summer job. I believe I started in June. And I think I only worked there approximately two weeks, two, three weeks.
**Q How many hours a week did you work?**
A I want to say it was a -- I want to say it's a full-time job.
**Q Do you recall it being a full-time job?**
A It was a summer job, but just thinking back, my dad used to bring me in and bring me home. So he worked full time, all day. So -- and I didn't lounge around Mar-a-Lago so, yes, I think it would have been a full-time job.
**Q And how much did you make per hour?**
A Approximately, I think I remember making $9 an hour.
**Q The bracelet and earrings you got for your birthday, some birthday, on Little -- or where was that birthday party, at Little St. James?**

Page 105

MR. EDWARDS: Object to the form.
**Q (BY MS. MENNINGER) Where was it?**
A At Little Saint Jeff's.
**Q Okay. Where are those bracelet and earrings now?**
A I left everything behind me when I went to Thailand.
**Q Where did you leave them, exactly?**
A I had a storage facility and my apartment that I lived in.
**Q So where were they, in the storage facility or in the apartment?**
A Most likely in the apartment.
**Q Okay. What apartment was that?**
A Royal Palm Beach. I don't know the address, I'm sorry.
**Q You don't know the address at all?**
A Not at all.
**Q Okay. Where was it roughly located in Royal Palm Beach?**
A I don't know. It's been a long time since I've been back to Royal Palm. I don't remember street names or anything.
**Q Did it have one or two bedrooms?**
A It was two bedrooms.

Page 106

**Q Was it on the first or second floor?**
A The second floor.
**Q Who lived there with you?**
A Michael first lived there with me. Michael and I broke up shortly after living there. And Tony lived there with me.
**Q Okay. And that's the apartment that you left when you went to Thailand?**
A Yes.
**Q Did you live at more than one apartment with Michael?**
A When I was a runaway, he let me stay at his apartment.
**Q Was that a different apartment?**
A Yes.
**Q All right. So you lived at Michael's apartment when you were a runaway?**
A Correct.
**Q And did you live anywhere else other than those two apartments with Michael?**
A We stayed at Michael's parents' house, I think for a few weeks before the apartment.
**Q Okay. The apartment that you rented?**
A The apartment that Michael rented. I think I was too young to go on a lease.

Page 107

**Q Well, all right. We'll come back to that in a minute. But the apartment that you left in 2002 was the one in Royal Palm Beach that you lived at originally with Michael and then after breaking up with Michael, Tony lived there? That's the one we're talking about?**
A Correct.
**Q That's the apartment we're talking about?**
A That's not the one that --
**Q Okay.**
A Sorry. I'm confused. Could you please reask the question?
**Q All right. I asked you where you left your bracelet or earrings. You think you --**
A Okay, yes.
**Q -- left them in an apartment, correct?**
A Okay. Yes. Yeah, not the one -- not the first one. The one where Tony eventually moved into.
**Q That's the apartment you left the bracelet and earrings at?**
A I believe so, yes.
**Q So when you were working at Mar-a-Lago, you rode with your father every day?**
A Yes.
**Q What car did he drive at the time?**

Page 108

A I don't know.
**Q Okay. Did you have a vehicle of your own at the time?**
A No.
**Q Did you have a driver's license at the time?**
A Yes. I got my permit when I was 15 and my driver's license when I was 16.
**Q Okay. And how were you paid, by cash or check or some other method?**
A I don't remember.
**Q Did you have a bank account at that time?**
A I don't think I've ever had a bank account -- well, up until recently, living here. I don't remember having a bank account.
**Q So you believe you got paid by unknown means and you did not deposit it into a bank?**
A Correct.
**Q What was your uniform when you worked there?**
A At Mar-a-Lago?
**Q Right.**
A It was a white miniskirt with a little white polo top with the emblem of Mar-a-Lago on it.
**Q Did they give you more than one?**

A I don't know, maybe.
**Q Did you wear it to and from work every day?**
A Yes.
**Q Did you get new ones when you arrived that were clean or did you launder them at home?**
A I would have had to wash them when I got home, I suppose.
**Q And you think you had more than one or you don't recall?**
A I don't recall.
**Q All right. Was that something you purchased or did they give it to you?**
A They gave it to me.
**Q And who else was wearing that uniform?**
A The other locker -- the lady that did the front desk next to the locker rooms.
**Q She had the same one?**
A Yes.
**Q Was that Adriana?**
A I don't think Adriana wore a uniform. I think she just dressed professional.
**Q Okay. And what other employees did you see there at the spa at the time when you worked there?**



A There were -- well, this is in the massage area and there's also like a fitness area. So there's spa and fitness. So there would be the masseuses and then there would be the trainers. And that was just located in that one area away from the main house and stuff.
**Q And is that the area in which you worked?**
A Yes.
**Q In the spa area or the fitness area?**
A The spa and the fitness area were in the same complex.
**Q Okay. What did the other people who worked in the spa area wear?**
A I don't remember what they wore.
**Q All right. And what did the people in the fitness area wear?**
A I don't remember. I know it was -- we had our own uniforms. Everyone else had their own.
**Q Who is we?**
A Well, the girls that worked in the meet and greet area. Me and the other girl with the curly hair I told you about --
**Q Um-hum.**
A -- had our own uniforms. And then the fitness people had their own uniforms. And the



masseuses had their own uniforms.
**Q What did the masseuses' uniform look like?**
A I don't remember.
**Q No recollection at all?**
A None whatsoever.
**Q Color?**
A No, sorry. I remember mine.
**Q Okay. How did it come to pass that you were no longer working at Mar-a-Lago in two to three weeks?**
A I was approached by Ghislaine Maxwell.
**Q Okay. And how long had you been working at Mar-a-Lago when you were approached by Ghislaine Maxwell?**
A Roughly two to three weeks.
**Q Okay. Where in the spa were you when you were approached by Ghislaine Maxwell?**
A Just outside the locker room, sitting where the other girl that works there usually sits. She was away from the desk. I was reading a book on massage therapy.
**Q Was that indoors or outdoors?**
A Outdoors.
**Q Okay. And what -- were you in the sun or in the shade?**



A In the shade underneath a -- I don't know what you'd like to call it, but, you know, underneath the complex, the building.
**Q All right. And what was Ghislaine Maxwell wearing when she approached you?**
A I don't remember what she was wearing.
**Q Any recollection, color of clothing or anything?**
A No.
**Q Okay. Any details about her? Was she carrying a purse or anything?**
A No. She looked like, from my memory, she looked like she was either there for a massage or fitness. I remember she had a British accent. She was very interested in the book that I was reading.
I mean, we can get into some more details later if you'd like, but I don't remember any more about what she was wearing that day.
**Q Did you have a cell phone at that time?**
A No.
**Q Where were you living at that time?**
A At my parents'.
**Q And who else was living there with you at the time?**
A My mother and my dad and my brother.

**Q Which brother?**
A Sky.
**Q What about your other brother?**
A I think he had moved out by then.
**Q What forms of communication did you have? Just a home phone number, or what?**
A Yeah, there was a home phone.
**Q When do you recall ever getting a cell phone?**
A The first cell phone I ever got was the one that Ghislaine gave to me.
**Q So you never had -- your parents, did they have ones when you were working at Mar-a-Lago?**
A No, my dad used to -- like, we had phones in the spa and maintenance area and so on, so forth. And you could, so to speak, page people from around the courts.
**Q Okay. So tell me what you recall of the first conversation that you had with Ghislaine Maxwell.**
A I'm sitting there reading my book about massage therapy, as I'm working in the spa. And I'm getting my GE -- well, I was in the process of getting my GED before I went to my summer job. I decided that I would like to become a massage



therapist one day. And the body really intrigued me, you know, reading this massage was a lot about anatomy, blood flow. Everything to do with, you know, touching somebody somewhere and then triggering a result somewhere else. I just was very intrigued by the whole anatomy thing.
She came up, Ghislaine, sorry. Ghislaine came up and approached me at the desk that I was sitting at. And my book was like this (indicating) and she said, Oh, you're reading a book about massage. You want to do massage? And I told her, Yes, you know, I'm very interested in it. One day I would like to become a masseuse.
**Q All right. Where did you get the book on massage?**
A Maybe the library.
**Q Maybe or do you recall?**
A I don't think I purchased it. So I'd have to say the library.
**Q Okay. What library was that?**
A Whichever library was close to my house.
**Q Do you remember a library being close to your house?**
A There's one in Wellington that I used to go to. Oh, no, there's one in Royal Palm. Yeah,



there's one in Royal Palm and Wellington, and I used to go to both.
**Q Did you have a card for both?**
A Did I have a card?
**Q A library card?**
A Yeah.
**Q For both places?**
A To be able to rent out a book, yeah.
**Q Okay. So the best of your recollection is you used one of your library cards at one of those two libraries to check out a book on massage and anatomy?**
A Correct.
**Q And when did you do that relative to starting at Mar-a-Lago?**
A Probably within the first week. I mean, I saw what the massage therapists got to do. I mean, their jobs were so relaxing. The music, like the atmosphere, they always had happy clients. It just seems like an ideal job.
**Q And so you were spurred to go to the library and check out a book?**
A Well, I had been talking with the other massage therapists and they're the ones who first intrigued me about what they do. And, you know, I



wanted to aim for something higher than being a locker room attendant one day. And. Yeah.
**Q What was the name of the massage therapist that you were speaking with?**
A Oh, I have no idea.
**Q Can you give me any physical description of any of them?**
A Um, there was one who had blonde short hair. There was -- I would say there's probably about four massage therapists that work in there. So, I mean, I don't remember all of them.
**Q Okay. What time of day was it?**
MR. EDWARDS: Object to the form.
A Afternoon.
**Q (BY MS. MENNINGER) How late?**
A Anywhere between 2 to 4.
**Q And what time did you get off of work?**
A I believe I got off at 5.
**Q And what was the rest of your conversation with Ms. Maxwell?**
**I'm sorry, I don't think you finished.**
A Thank you. Well, she noticed I was reading the massage book. And I started to have chitchat with her just about, you know, the body and the anatomy and how I was interested in it. And she

Page 117

told me that she knew somebody who was looking for a traveling masseuse.

And I said, Well, I don't have any accreditations. This is the first book I've ever read. She goes, That's okay. I know somebody. We can train you. We can get you educated. You know, we can help you along the way if you pass the interview.

If the guy likes you, then, you know, it will work out for you. You'll travel. You'll make good money. You'll be educated, and you'll finally get accredited one day.

**Q Okay.**

A She finished off by, you know, giving me her number. And I told her I'd have to ask my dad. And I called my dad. I ran over, actually, to see my dad, talked to him. He said it would be okay. I used the phone from Mar-a-Lago to call her and tell her that I was allowed to come over.

And she said, Great. Meet me here at -- I don't remember the exact address, but it was El Brillo Way in Palm Beach -- after you get off. And my dad drove me.

**Q Did you write down her add -- the address that she gave?**

Page 118

A Yes.

**Q Did you write down her phone number?**

A Yes.

**Q So did you go run and talk to your dad while she was still there?**

A No, I believe she left. And she told me to ask my dad and then to give her a phone call.

**Q Okay. Did she ask you your age when she had that conversation with you?**

A No, she did not.

**Q Did you tell her your age?**

A No, I did not.

**Q And so somewhere you wrote down a phone number to call her back at?**

A Um-hum.

**Q All right. And where did you write that down?**

A Probably just a piece of paper lying around the desk.

**Q Okay. But you don't remember?**

A I mean, no, I don't have that piece of paper anymore, so no.

**Q Okay. And did you write down an address?**

A Yes.

**Q And what number do you think you called?**

Page 119

**A cell phone or a home phone, or do you have any idea?**

A I have no idea. Ghislaine answered. So if it was a home phone, the butlers probably would have answered. So most likely it was her cell phone.

**Q All right. And what happened when you got off of work?**

A My dad drove me to El Brillo Way.

**Q Um-hum.**

A We arrived at a very large pink mansion. And we knocked on the door. My dad got out of the car and we knocked on the door.

**Q Do you recall which car this was?**

A I don't know what he was driving at the time. My dad always drives trucks. So it would have been some kind of truck.

**Q But you don't know which kind?**

A I don't know if it was a Ford or a Dodge or --

**Q What kind of car does your mom drive?**

A Right now?

**Q No, in 2000.**

A Oh, I have no idea. I don't remember. They change cars quite often. They like getting different cars.

Page 120

**Q When did you get your first car?**

A After my trip to London to meet Prince Andrew.

**Q Okay. What kind of car did you get?**

A A Dodge Dakota.

**Q And did you purchase that yourself?**

A Yes, I did.

**Q And how much did it cost?**

A I don't remember off the top of my head how much it cost.

**Q Who did you buy it from?**

A My dad helped me bargain with it. I don't remember where we bought it from.

**Q And was the title put in your name or your dad's name?**

A I think the title was put in my name. I think. I mean, my dad was with me. I've never registered a car or anything like that before. So --

**Q So that was your first time?**

A Yes.

**Q Memorable, right?**

A Yes.

**Q When you got there, a butler or someone answered the door, is that what you said?**

A No, Ghislaine answered the door.

**Q Okay. And then what happened?**

A She shook hands with my dad. Like, she briefly opened the door. She stepped out, shook hands with my dad. Told her (sic) she'd look after me and she'd make sure I get a ride home. And just very briefly, that was it. And my dad left, and I went inside with Ghislaine.

**Q Did Ghislaine and your dad have any discussion about what it was you were doing there, in your presence?**

A You know, I can't recall exactly what was said. But I had already told my dad what was -- what the interview was for. So --

**Q What did you tell your dad?**

A That a very nice lady approached me and told me that she would offer me an education to become a massage therapist. And it was a great -- it would be great experience for me to be able to get educated and trained and eventually be accredited. So he was very happy for me as well.

**Q You told him that outside of the presence of Ghislaine?**

A Yes, when I first ran to the tennis courts where he was at.

**Q And then, in your presence at the home,**



**did your dad and Ms. Maxwell have any conversation -- further conversation about what you were doing there?**

A I don't recall. I think they probably would have chatted for approximately -- maybe 30 seconds. It really wasn't a long chat.

The things that stick out in my mind were, We will take good care of her and we'll be bringing -- we will make sure she gets a ride home.

**Q And how far away did you live?**

A Approximately 30 minutes.

**Q And that's with your parents' house, right?**

A That was my parents' house.

**Q Did you see any other employees or any other people inside the house on that day?**

A Yes.

**Q Who else did you see?**

A Juan Alessi.

**Q Um-hum.**

A And Maria. But Jeffrey and Ghislaine like to call them John and Mary.

**Q Okay. Where did you see John?**

A Downstairs after the whole ordeal.

**Q Um-hum. Which room?**

A The kitchen.



**Q All right. Where did you see Mary?**

A The same place, kitchen.

**Q Were they talking to one another?**

A No. Mary was doing something with the dishes. They were always either cleaning up or doing stuff, so --

**Q And you saw them in the kitchen?**

A In the kitchen area. I mean, you have to understand there's like three parts to that kitchen. So it's very large.

**Q All right. What part did you see John in?**

A In the corner, left hand. And Mary was in the same vicinity but not right next to him. They weren't chatting.

**Q What is also contained in the corner, left hand of the room?**

A There's like a -- like shelves with -- I don't know. Just shelves that I remember, you know, open door pantry stuff.

**Q What was Ms. Maxwell wearing when you arrived at the home?**

A I don't remember what she was wearing.

**Q The book that you were reading at the spa that day, do you recall the name of it?**

A No. I just know it was -- it said the



word massage on the front of it. I don't know the title or the author.

**Q Do you know the color of the book?**

A It was -- it was dark. It was a, like plastic covering.

**Q All right. And how big was it, if you can just demonstrate for the video?**

A Smaller than that. Maybe -- I don't -- maybe a little bit less than that.

**Q Can you hold it sideways for the video?**

A (Complied.)

**Q So you're saying the book size was a little bit less than half of --**

A Right. I mean, the book was a little bit bigger. The pages were -- you know, this is very small print. This is printed A4 longways, whereas, I think. It wasn't A4 that way. I don't know. It was just a book. And I don't know how many pages it had either. I mean, approximately, maybe 100 pages.

**Q Okay. So maybe my question wasn't a very good question.**

**How big was the outside of the book, not the thickness, but the length and the width?**

A Maybe like here (indicating).

**Q So a little bit bigger?**

Page 125

A Longer than this, yeah. We're going to fold it in half again, and then like that (indicating).

**Q So larger than an 8 and a half and 11 piece of paper?**

MR. EDWARDS: Form.

A I don't know what 8 and a half and 11 inches is. If this is 8 and a half and 11 inches, then yes. It's (indicating).

**Q (BY MS. MENNINGER) So when you fold it in half, is that a little bit smaller, folded in half, than the book --**

A Yeah, if I were going to hold the book like this, if I were going to sit there and read the book like this, in my mind it would be a little bit bigger than what I'm holding right here.

**Q All right. So you're demonstrating the book as it's opened that way?**

A Yeah, let's just say I'm reading it like this.

**Q Okay. Got it.**

MS. MENNINGER: I'm going to suggest we take a short break. We can --

MR. EDWARDS: Order --

MS. MENNINGER: -- order lunch for you

Page 126

guys and then do a little bit more before the lunch gets here --

MR. EDWARDS: Okay.

MS. MENNINGER: -- if that works for everybody.

MR. EDWARDS: Yeah, that's great.

MS. MENNINGER: All right. Let's do that.

THE VIDEOGRAPHER: We're off the record at 11:38.

(Recess taken from 11:38 a.m. to 11:57 a.m.)

THE VIDEOGRAPHER: We're back on the record at 11:57.

**Q (BY MS. MENNINGER) How long were you at the El Brillo home on that first day you went?**

A Over two hours.

**Q Okay. And who took you home?**

A Juan Alessi.

**Q And what car was he driving?**

A I believe it was a black Suburban.

**Q Did anyone else ride in the car with you?**

A Just Juan.

**Q What time approximately did you get home?**

A 8:30, approximately.

**Q Was it dark?**

Page 127

A Yes.

**Q Who else was at home when you got home?**

A My mom, my dad and my brother.

**Q Which brother?**

A Sky.

**Q And anyone else who was there at the time?**

A I believe Michael might have been living with me at that time. So he might have been there.

**Q Do you recall if he was there when you got home?**

A I don't really remember. I remember what I did when I got home, that I basically made a beeline for the bathroom.

**Q Let me ask you a question. Michael was living with you at that home, at your parents' home at the time, is your best recollection today; is that right?**

A That's my best recollection, yes.

**Q When you say living with you, were you guys staying in the same room?**

A Yes.

**Q Were you engaged at that time to him?**

A That was a really weird relationship. He was a friend who looked after me, and he did propose to me and I did say yes. But my heart was never in

Page 128

it.

He was somebody that helped me off the streets so I felt compelled to say yes to him.

**Q Okay. So when he proposed to you and you said yes, did that take place before you started working at Mar-a-Lago or after you started working at Mar-a-Lago?**

A Before.

**Q And so if he were living with your parents at that time, you were living in the same room; is that correct?**

A I believe so.

**Q And your parents understood him to be your fiance?**

A I don't think they agreed with it, but I think they understood it as that. I mean --

**Q I mean, you communicated to them that he had proposed and you had accepted?**

A Yeah, in not such a pretty way. I mean, they obviously weren't very happy about it. And it wasn't my true intentions to ever marry him.

**Q Okay.**

A But I did it to make him feel okay. I didn't want to be mean.

**Q What did your mom say about your**

**engagement to Michael?**
A Oh, they never thought it was going to go forward either.
**Q When you got home, you said you made a beeline for the bathroom?**
A Correct.
**Q And what did you do in the bathroom?**
A I showered.
**Q Okay. Did you have a conversation with anyone prior to going to the bathroom?**
A My mom came into the bathroom and -- and she, you know, she asked me how it went. And I told her I'd rather not talk about it. And she didn't push me any further for any more conversation.
**Q Okay. And then she left the bathroom?**
A She left the bathroom.
**Q Did anyone overhear that conversation?**
A No, the door was closed.
**Q Was your dad at home?**
A Yes.
**Q Did you have a conversation with your dad that night?**
A Not that I remember, no.
**Q And did you have any other conversation with your mother that night?**



A No.
**Q Did you have any conversation with your brother that night?**
A No. He's -- he's five years younger than me. It's not something I'd talk to him about.
**Q And did you have any conversation with Michael that night?**
A I could have. I don't remember having one, but I could have.
**Q Did you call any of your friends that night?**
A No.
**Q Who were your good friends at that time?**
A Rebecca Boylan (phonetic). That was really it. I didn't really have many friends. I kept to myself a lot.
**Q Did you call Tony Figueroa that night?**
A I don't think Tony and I were -- we were on and off friends from middle school. And no reason on and off like we had an argument or something. We just got out of touch.
**Q Um-hum.**
A So, no, at that time I don't think I was talking to him.
**Q Are you aware of any distinguishing**



**physical features of Ghislaine Maxwell?**
A I can tell you that she had very large natural breasts. I can tell you that her pubic hair was dark brown, nearly black. I don't remember any specific birthmarks or moles that I could point out that would be relevant.
**Q Any scar?**
A I don't remember any scars.
**Q Any tattoos?**
A No tattoos.
**Q When did you next go to the El Brillo house?**
A I believe it would have been the next day.
**Q You believe it would have been or was it?**
MR. EDWARDS: Form.
A I know that it was consecutive, that I continued to go there after my first -- the first time that the abuse took place there. It was consecutive that I was there, I believe, over the next course of weeks.
**Q (BY MS. MENNINGER) What day of the week was the first time you went?**
A I don't know.
**Q Do you know whether you went the very next day or not?**



A I believe I did.
**Q All right. How did you get there the very next day?**
MR. EDWARDS: Form.
A I believe my dad dropped me off again.
**Q (BY MS. MENNINGER) When you say you believe, do you recall him doing that or are you guessing?**
A I don't -- well, this is how I figure this. I don't remember Ghislaine picking me up from Mar-a-Lago. I didn't have my own car. So the only way I could have really gotten there would have been my dad picking me up -- I mean, sorry, dropping me off.
**Q Do you have a distinct recollection of your father dropping you off there more than one day in a row?**
A Yes.
**Q You do not recall the car he was driving?**
A Like I said, he always drove trucks. That's as good as I can get.
**Q And so -- and you worked on weekends as well at Mar-a-Lago or no?**
A No.
**Q So the second day would have had to be**

Page 133

**another weekday or was it on a weekend?**
MR. EDWARDS: Form.
A I don't know.
**Q (BY MS. MENNINGER) Do you know if you went after work at Mar-a-Lago?**
A Yes.
**Q So you went to work the very next day at Mar-a-Lago?**
A Yes.
**Q Did you have a conversation with anyone at Mar-a-Lago about the day before at El Brillo?**
A No.
**Q You didn't talk to any of your coworkers about it?**
A No.
**Q Who was your boss at the time?**
A No.
**Q Did you have a boss at the time?**
A I think Adriana or Adrienne. I don't remember the exact pronunciation of her name, but it's along those lines. I believe she was my boss.
**Q And you did not talk to her about it?**
A No.
**Q You surmise that your father dropped you off because you can't think of another way you would**

Page 134

**have gotten there, correct?**
A Correct.
**Q And when you came the second day, did your father come to the door?**
A I don't think he came to the door that time. I think I was just dropped off.
**Q All right. And what did you do when you got there?**
A Knocked on the door and --
**Q Who answered the door?**
A Juan Alessi.
**Q Okay. Was anyone else there besides Juan Alessi?**
A Jeffrey, Ghislaine and Emmy Taylor.
**Q Okay. And where did you see Emmy Taylor?**
A She was downstairs.
**Q Did you speak to her?**
A Just introductions.
**Q Tell me what you mean by introductions.**
A My name is Virginia. Nice to meet you. Her name, she introduced herself as Emmy. And she told me she was Ghislaine's personal assistant.
**Q Did you call yourself Virginia at the time?**
A No, I think I've gone by Jenna for a long

Page 135

time.
**Q So did you introduce yourself as Virginia or as Jenna?**
A Most likely Jenna.
**Q Do you recall this or is this something that you're guessing about?**
A Well, considering that everybody knew me as Jenna, I think I would have introduced myself as Jenna.
**Q You don't recall it?**
MR. EDWARDS: Form.
A I don't recall the exact answer to that, no, but just knowing I had everybody pretty much call me Jenna.
**Q (BY MS. MENNINGER) I'm just trying to make a clear record about what you do remember and what you're guessing about. So when you say I think I would have, it leads me to believe you don't recall it.**
**If you mean something different by that --**
A I --
**Q -- please feel free to clarify. I'm just trying to explain to you what I'm asking.**
A Yes. And I'm doing the very best that I can tell you exactly what it is. But it's just hard

Page 136

for me to remember so long ago. And knowing that I introduced myself as Jenna to everybody leads me to assume that I would have introduced myself to them as Jenna as well.
**Q All right. But if we were to speak to Emmy Taylor, she might have a different recollection, fair to say?**
MR. EDWARDS: Form.
A She could.
**Q (BY MS. MENNINGER) How is it that you knew to come there on this second day?**
A I was asked to come back.
**Q When were you asked to come back?**
A The day before, after the encounter they told me to come back at the same time after work.
**Q Who is they?**
A Jeffrey and Ghislaine.
**Q Okay. Did they both simultaneously say that or did one of them say it?**
A It was like a conversation that they both had with me separately. Jeffrey told me upstairs after the whole entire abuse had happened that he really liked me and he'd like me to come back.
When I went downstairs --
**Q Let me just stop you there. Did he say, I**

**want you to come back tomorrow?**
A Yes.
**Q Okay. Did he tell you what time tomorrow he wanted you to come back?**
A No, he just said he wants me to come back tomorrow.
**Q Okay. And then you went downstairs and what happened?**
A Ghislaine told me I did a really good job and she wants me to come back tomorrow after work.
**Q That's what she said, I want you to come back tomorrow after work?**
A Yes.
**Q You recall those words being used by her?**
A Yes.
**Q Did you ask them for a ride to get there the next day?**
A No.
**Q You just said, I'll come back tomorrow.**
A Yeah. I agreed to come back the next day.
**Q How did you agree?**
A Verbally.
**Q Okay. Was anyone else present when Ghislaine said that to you and you responded, I'll come back tomorrow?**



A I believe Juan Alessi was pretty much within ear distance.
**Q Could you see him?**
A Yes.
**Q Okay.**
A Like I said, in ear distance, when I mean ear distance like hearing, in the hearing vicinity. And it was in the same time that she was asking him to drop me off at home.
**Q Okay. When you were driving home the first night with Juan Alessi, did you have any conversation with him?**
A No. I had told him my address. It was a very quiet ride.
**Q Did you ride in the front or the back?**
A The front.
**Q It is your contention that, Ghislaine Maxwell had sex with underage girls virtually every day when I was around her, correct?**
A Yes.
**Q All right. With whom did Ghislaine Maxwell have sex in your presence?**
A Well, there's a lot of girls that were involved. We weren't on a first name basis with each other. I wouldn't be able to give you lists of names



of girls. It was continuous.
**Q It was continuous. Name one girl that Ghislaine Maxwell had sex with in your presence.**
A Emmy Taylor. I mean, that's a name that I know well because Emmy was always around.
I'm trying to think of her name, sorry. Sarah. Her name used to be Sarah Kellen. I think she's changed it now that she's married.
[redacted] (phonetic) -- I can't pronounce her last name properly, but it's around those lines.
There were a lot of other girls that I honestly can't remember their names. I'm sorry. I wish I could help out more because I really would like to provide more witnesses for this, but I can't remember a lot of girls' names.
**Q So those are the three names of females that you observed Ghislaine Maxwell have sex with --**
MR. EDWARDS: Object to the form. Mischaracterizes testimony.
**Q (BY MS. MENNINGER) -- is that what I understand your answer to be?**
MR. EDWARDS: Objection. Mischaracterizes her testimony.
A Those are -- those are some three of the



names that I know very well. Like I said, there was a lot more.
**Q (BY MS. MENNINGER) Okay. Do you know the names of any other girl that you personally observed Ghislaine Maxwell have sex with?**
A Do you mind me taking a minute to just try to reflect?
**Q No.**
A Um, her name is on the tip of my tongue. Her last name is [redacted]. I don't remember her first name off the top of my head. I normally could remember it.
**Q Okay.**
A There's just a blur of so many girls. It's really hard for me to remember. And you have to understand we weren't introduced to each other on a first name basis half the time. A lot of these girls would come and go and you'd never see them again.
So, no, it's very difficult for me to pinpoint exactly who they were. But those four that I've given you are 100 percent.
**Q Okay. Did you observe Ghislaine Maxwell forcing any of those four girls to have sexual contact with her?**
MR. EDWARDS: Form.

Page 141

A I don't believe that any of the girls involved were truly willing participants doing it out of their own wanting. I believe we were all there for one purpose, and that was to keep Jeffrey and Ghislaine happy and to do our jobs, which was giving them erotic massages and keeping them pleased sexually.

**Q (BY MS. MENNINGER) Okay. Do you know what the word force means, physical force?**

A If you mean like held down or a gun put to the head, then no.

**Q Okay.**

A But force in a word -- like a way of coercion. There was definitely indirect threats that you knew these people were powerful. They had a lot of contacts. They were very wealthy. They were people you did not want to cross lines with on a bad way.

**Q Okay. What threats did you hear Ghislaine Maxwell state to you?**

A Just the reminders of the prominent people that she knows personally.

**Q When did Ghislaine Maxwell remind you about the prominent people that she knows personally?**

A It was on a constant basis. I mean, there

Page 142

was no just one time that she said it. It was like a reminder, you know. And Jeffrey did a lot more of that than she did. But she definitely made it aware that we shouldn't cross boundaries with them.

**Q Or what would happen?**

A Like I said, it was more of an indirect threat. And it doesn't take an intellect to figure out what they mean when they say that they're powerful people and they're very wealthy and they know a lot of people.

**Q I need you to be very clear. You just used the word "they." I've asked you about Ghislaine Maxwell.**

A Okay.

**Q So I just want to make sure you understand the question.**

A Correct.

**Q Because I don't want to have you, you know, misunderstand the question.**

A Correct.

**Q So I'm asking you, what did Ghislaine Maxwell say would happen in regards to crossing a line with respect to her knowledge of famous people?**

A In a --

MR. EDWARDS: Object to the form.

Page 143

Mischaracterizes her testimony.

You can answer.

A You wouldn't want to piss us off. You wouldn't want to piss me and Jeffrey off. I mean that's one way of saying it. Other than --

**Q (BY MS. MENNINGER) Did she say, I don't want -- you would not want to piss me off?**

A Piss me off is probably my word, using piss, but it was along those lines. I don't remember the exact word that she used.

**Q And do you remember a specific occasion on which she said that to you?**

A I remember very early on.

**Q Where were you?**

A I believe it was during my, what I call the training period with Jeffrey and Ghislaine.

**Q Okay. And where were you?**

A For a specific -- and like I said, it happened a lot. But for one specific, I remember being out on the balcony in the house at El Brillo, sitting outside with her. This is when I thought that -- I didn't know that I worked for Jeffrey immediately. I thought I worked for Ghislaine because she was the one who brought me in. And she was the one offering the majority of the training to

Page 144

me.

So, yeah, it was on the balcony, outside, I believe the yellow room.

**Q She said, You would not want to piss me off because I know powerful people, or words to that effect?**

A Words to that effect, yes.

**Q And did she say what would happen if you pissed her off because she knows powerful people?**

A That statement alone was enough to let me know. I was scared and I didn't want to -- I didn't want to push any further into that question. I seemed like I would obey.

**Q Up until that point in your life, had you met any powerful people?**

MR. EDWARDS: Form.

A I do believe that I've been put in very dangerous situations, being a runaway and having a lot of bad things happen to me. Understanding the word powerful people and things that could happen, I've put two and two together and knew what she meant.

**Q (BY MS. MENNINGER) Okay. So you had met powerful people before the day that Ghislaine Maxwell said this to you; is that your testimony?**

A Nowhere near as powerful as Jeffrey and Ghislaine, nowhere near. But people that did scare me, yes.

**Q Okay. And you had met those people at what age?**

A I don't know what age I was. I'm sorry. I was young. I was -- before I met Jeffrey and Ghislaine.

**Q Is there any girl who you personally observed to have sexual contact with Ghislaine Maxwell when she was under the age of 18?**

A It's very hard to tell how many girls were under the age of 18. My instruction from them was the younger the better.

**Q And, again, them, who told you that?**

A Them, both of them. They both -- Ghislaine did the majority of my training in the beginning. Jeffrey also insinuated and told me lots of things as well.

**Q Okay. So you don't know the age of any other female that you saw have sexual contact with Ghislaine Maxwell --**

MR. EDWARDS: Object --

**Q (BY MS. MENNINGER) -- is that true?**

MR. EDWARDS: Object to the form of the



question. Mischaracterized her testimony. She wasn't finished with her answer.

MS. MENNINGER: I wasn't finished with my question when you objected. And at the end of my question I said, "Is that true?" She can now restate it without you suggesting to her the answer.

MR. EDWARDS: I have no idea what the question is to even object to at this point.

Do you know the question?

A Do I know any underage girls that Ghislaine slept with.

MS. MENNINGER: Can you please read back the question?

(Record read as requested.)

MR. EDWARDS: Hold on. She wasn't finished with her question, she told me. So that's not the finished question.

MS. MENNINGER: You interrupted it. I finished my question. She just read it to her.

**Q (BY MS. MENNINGER) Can you please answer the question?**

MR. EDWARDS: Then I object to that question as a mischaracterization of her testimony. And she wasn't finished with her answer.

A It is impossible for me to know the ages



of all the girls that were sent to Jeffrey and Ghislaine. That is my answer.

**Q (BY MS. MENNINGER) I did not ask you about the girls who were sent to Jeffrey and Ghislaine. I asked you about any girl that you personally saw have sexual contact with Ghislaine Maxwell.**

**Do you understand that question?**

A Do I know the ages of them?

**Q Do you know the age of any girl that you saw have sexual contact with Ghislaine Maxwell?**

A Well, for instance, I mean, Sarah Kellen was, I think, a year older than me. That's one way of putting it. Emmy, I think was like a few years older than me. [redacted] again, a few years older than me. I mean, those are the girls that I can actually name.

Without, not knowing the other girls' names, there's no way for me to identify what age they actually were.

**Q Okay. Describe for me any other girl other than the ones that you've named who you say you saw have sexual contact with Ghislaine Maxwell with your own two eyes.**

A There's so many I don't know where you



want me to start. I find it impossible to answer that question with the amount of girls that I have witnessed. And without being able to give you specific names, I don't think I'm able to answer that question.

**Q Okay. I asked you to describe them, so you could give me a height, a hair color, anything else that comes to mind?**

A There were blondes, there were brunettes, there were redheads. They were all beautiful girls. I would say the ages ranged between 15 and 21.

**Q And why do you believe the ages ranged from 15 to 21?**

A Some of them looked really young. Some of them, I wouldn't say 21 looks old or anything like that, but it's hard to gauge another person's age without really asking them. But some of them looked younger than me and some of them looked older than me.

**Q And in what physical locations did you see Ghislaine Maxwell have sexual contact with any girl?**

A 100 percent, the U.S. V.I.

**Q Where?**

A Jeffrey's island.

**Q Where?**

Page 149

A In cabanas. Do you know what I mean by cabana?

**Q I do, thank you.**

A In cabanas, in Jeffrey's room.

**Q Describe Jeffrey's room on U.S. V.I. for me.**

A So can I use this as an idea? Like if this is the island -- can I do that?

**Q I'm asking you to describe the inside of a room.**

A Oh, the inside of a room. I thought you meant located.

**Q Um-hum.**

A Okay. Large, stony. He had a king size bed with posts on it. There was a large door, I think it's called a door, where you put your clothes. There was an adjacent bathroom with a more stony look, giant tub.

**Q What color was the paint on the wall?**

A It was stone.

**Q What color was the bedspread?**

A White.

**Q What color were the sheets?**

A White.

**Q And you saw Ghislaine Maxwell have sexual contact with an unknown, unnamed female in that room, correct?**

Page 150

A Absolutely.

**Q All right. When were you there that you saw this happen?**

A This happened on so many occasions. The island was a place where orgies were a constant thing that took place. And again, it's impossible to know how many. And, like I said, it wasn't just Jeffrey's room. It was outside and, you know. It was --

**Q When you were outside did you see Ghislaine Maxwell have sexual contact with a female?**

A When you say sexual contact does that mean fornicating or down to taking explicit photos or what -- can you define what you mean by sexual contact?

**Q Sure. It generally, in my mind, means placing either mouth or intimate parts or hands on the breasts, buttocks, or pubic area of another person for sexual gratification.**

A Sure.

**Q Did you see Ghislaine Maxwell have sexual contact with a woman outside on the U.S. Virgin Islands?**

A I would say a female. I wouldn't define them as a woman. A woman is someone who is older. But, yes, outside by the pool, down by the beach there's these -- they're little -- I wouldn't call it a hut. Little tiny wooden room that only could fit a bed in it.

Page 151

**Q I'm talking about outside.**

A That's outside.

**Q So let's start with by the pool.**

A Yes.

**Q Is that a different occasion than the hut?**

A I'm talking about many occasions.

**Q Okay.**

A Over time.

**Q Let's just talk about the ones that you saw happen outside, out of doors.**

A Okay.

**Q Okay?**

A Yeah.

**Q Do you recall any such specific occasion or is it just a big blur in your mind?**

A No, I mean, one occasion stands out. Models were -- I think they were models -- were flown in. There were orgies held outside by the pool. That's one occasion.

**Q All right. Let's stick with that occasion.**

Page 152

A Okay.

**Q What sexual contact did you observe Ghislaine Maxwell have with a female by the pool at an orgy on the U.S. Virgin Islands?**

A Well, there was quite a few girls and it was -- excuse me, if I'm saying this in an inexplicit way, but I don't know how else to say it. So if you don't understand, please let me know -- girl-on-girl action. So there was a lot of -- what's the word for it? Licking, licking vaginas, breasts.

**Q Okay. Which --**

A Fingers being used. She was involved with that. I remember specifically I had to go down -- do you know what I mean by go down?

**Q It's your testimony. Go ahead.**

A I had to go down on Ghislaine. Jeffrey was there as well.

**Q And this is -- we're still by the pool?**

A We're still by the pool with lots of girls.

**Q Can you name any of those girls that were there?**

A They didn't even speak English. But this was --

**Q Can you describe them physically?**
A Beautiful, tall, some were blonde, some were sandy brown. They had a foreign tongue.
**Q What -- what language were they speaking?**
A I'm not too sure. It could have been Russian. It could have been Czechoslovakian. It could have been -- I think it's between those two, to be honest. It could have been something else but, I mean, I don't speak any other language other than English, so I don't really know.
**Q All right. Any other time you saw Ghislaine Maxwell have sexual contact with another female outdoors in the U.S. Virgin Islands other than this, models with the unknown language?**
A Are we talking about besides with me as well?
**Q I don't know if you participated. I'm asking if you observed her have sexual contact with another female?**
A Another female other than myself?
**Q You can answer it however you want.**
A Well, and the list keeps going on. Ghislaine and I and Jeffrey and Emmy Taylor participated in, I guess what you would call a foursome in the living room in the main house.



**Q Okay. I was asking about outdoors. Sorry.**
A Oh. Well, I don't know if you'd consider this outdoors, but on the beach where those -- it's basically an outdoor setting. It's like a little wooden house. It's not a house, only a bed can fit in there. It's right on the beach. It's open.
**Q Um-hum.**
A Would you consider that outdoors?
**Q I have never been there. So I don't know whether it's outdoors or not.**
A I would consider it outdoors. And --
**Q How old were you at that time?**
A I don't know.
**Q Okay.**
A I have no idea. Again, Ghislaine, myself, Jeffrey, another girl in this blue, outdoor -- I don't know what you want to call it. Cabana, that a house -- just a bed could fit in.
**Q How many times did you visit the island?**
A I wouldn't be able to say. Lots of times.
**Q More than five?**
A Definitely more than five.
**Q More than ten?**
A More than ten.



**Q More than 20?**
A I would say more than 20.
**Q More than 50?**
A I don't think more than 50, but --
**Q Did --**
A I don't have an exact number. I mean, if -- I think if you look at the flight logs, you know, that helps, but then they're not fully complete. We only have flight logs to one plane and then there's a time I was flown commercially into the island.
**Q Um-hum.**
A So it's really hard for me to gauge a number.
**Q Okay. Do you have any photographs of yourself on the island?**
A I know I used to, but they would be left in that apartment.
**Q What other locations did you participate in sexual contact with Ghislaine Maxwell, other than the island?**
A Everywhere. New York, Palm Beach.
**Q Where in New York?**
A The mansion, Jeffrey's mansion.
**Q Okay. Anywhere else in New York?**



A Not at her townhouse.
**Q Anywhere else in New York?**
A No.
**Q In Palm Beach?**
A At the house in Palm Beach.
**Q Anywhere else in Palm Beach?**
A No.
**Q In New Mexico?**
A The house in New Mexico.
**Q Anywhere else in New Mexico?**
A No.
**Q What other countries?**
A France, uhm, England. Um -- we also -- I mean, if we're going to talk about other countries we've got to talk about international travel space or plane space or whatever you want to call it because it happened all the time on the planes.
**Q Okay.**
A Going from different country to country.
**Q Where in France did you have sexual contact with Ghislaine Maxwell?**
A There's a couple places in France that we used to go to.
**Q When you say you used to go to, how many times did you go to France?**

A I think I've been to France three times.
**Q All right. How old were you when you went to France?**
A I don't know.
**Q Did you have a passport when you went to France?**
A I would have had to, yes.
**Q You did have a passport when you went to France?**
A Yes.
**Q And you went to France three times, you believe?**
A Yes.
**Q And when you were in France those three times, how many of those three times did you have sexual contact with Ghislaine Maxwell?**
A Every time.
**Q And in what locations in France did you have sexual contact with Ghislaine Maxwell?**
A The first time that I remember, we stayed at a really fancy hotel.
**Q In what city?**
A Paris.
**Q Okay.**
A And it was within the view of the Champs-



Elysees.
**Q Did you have your own room or a separate room?**
A We all stayed in the same room, but that room had adjoining rooms to it. So, you know, one hotel room but with different rooms in it.
**Q Okay. And anywhere else on that one trip that you went?**
A She brought in a redheaded French girl. She walked up to her in Paris and, you know --
**Q In your presence?**
A In my presence.
**Q Um-hum.**
A And she walked up to this French girl to show me how easy it was for her to procure girls. I wasn't very good at it. And, you know, it was part of my training was to bring in other girls. So she walked up to her. Within five minutes she had her number and that girl came over later that night to the hotel and serviced Jeffrey. I didn't see Ghislaine with her. I just know she told me what happened and Jeffrey told me what happened.
**Q So you were not there?**
A I did not see it.
**Q Okay. When did you have sexual contact with Ghislaine Maxwell at this hotel room overlooking the Champs-Elysees?**



A Before she picked up the redhead.
**Q And was that just you and Ghislaine or was anyone else a participant in that?**
A Jeffrey and Emmy.
**Q And where else in France did you have sexual contact with Ghislaine Maxwell?**
A The south of France.
**Q Where?**
A I wouldn't call it so much a hotel. I don't know what you'd call it. It had like big townhouse kind of things that you could rent out.
**Q Was this on the same trip or a different trip?**
A Different trip.
**Q Okay. Who else was present for that?**
A Well, we were going to Naomi Campbell's birthday party. It wasn't at the birthday party.
**Q Right.**
A It was before the birthday party.
**Q Oh, you had sexual contact with Ghislaine Maxwell before you went to Naomi Campbell's birthday party?**
MR. EDWARDS: Form.



A That's correct.
**Q (BY MS. MENNINGER) And who else was present during your supposed sexual contact with Ghislaine Maxwell on this occasion?**
MR. EDWARDS: Object to the form of the question.
A It wasn't supposed. It actually happened. And Ghislaine was present, Jeffrey was present. I believe Emily Taylor was present as well.
**Q (BY MS. MENNINGER) Anyone else?**
A There was someone else on that trip with us, but they weren't involved with the sexual activity at that time.
**Q Okay. And what was the other location in France?**
A I believe the same exact place. I mean, we stayed there for a few days.
**Q Okay. So the three locations are hotel in Paris, same place, same place?**
A Correct.
**Q And the second and third same places were on the same trip?**
A Same trip.
**Q Okay. And then you had a third trip to France where you did not have sexual contact with**

**Ghislaine Maxwell?**

MR. EDWARDS: Form.

A I believe -- it's hard for me to remember. I remember going to quite a few different countries on that trip. I don't know if it was -- I don't know if we did it in Paris or not, to be honest. We did it in other places. But I've been to Paris three times -- or not Paris, sorry, France.

**Q (BY MS. MENNINGER) Okay. All right. When did you first tell your parents that you would be traveling with Jeffrey Epstein?**

A I'm not too sure when I actually told them.

**Q How long after you were working with Jeffrey Epstein did you travel with him?**

A Well, I know my first trip was to New York. I would say anywhere between six weeks -- I would say after six weeks.

**Q You were -- you had known Jeffrey Epstein for six weeks before you started traveling with him --**

A I believe.

**Q -- am I understanding that correct?**

A I believe so. I mean, that's an approximate answer.



**Q And your first trip was to New York?**

A Yes.

**Q And did you just go to New York and come back or did you go somewhere else?**

A I think I just went to New York, but I can't remember if we went somewhere else.

**Q Okay. And did you tell your parents you were going to New York?**

A Yes.

**Q And do you recall any part of your conversation with your parents about going to New York?**

A I didn't get into details about what I was having to do with Ghislaine and Jeffrey. I didn't tell them that, but I told them I was going to New York.

**Q And you don't recall telling them anything else about it?**

A I don't know. I mean, I might have called them from New York and told them it was cold and, you know, just simple stuff. But I can't really recall what I spoke to them about.

MS. MENNINGER: As I understand it, the food is here. So I'm going to suggest that now is a good time to take a break.



MR. EDWARDS: Sounds good.

MS. MENNINGER: All right.

THE VIDEOGRAPHER: We're off the record at 12:42.

(Recess taken from 12:42 p.m. to 1:21 p.m.)

THE VIDEOGRAPHER: We're back on the record at 1:21.

**Q (BY MS. MENNINGER) All right. Ms. Giuffre, I want to talk to you about where you were living in the late '90s. Do you recall -- you testified earlier, I believe, that you were living at your parents' house and you gave us an address at the time you started at Mar-a-Lago.**

A Yes.

**Q Do you remember where you lived previous to living at your parents' house at that time?**

A Like I said, I was a runaway, so there was a lot of different places I lived. One of the places I lived was, like I told you earlier, with Michael's parents. That was somewhere around Fort Lauderdale, I believe, maybe a little bit outside of it.

**Q Okay.**

A Michael got an apartment and I lived in Michael's apartment for a short period.



**Q And where do you recall that being?**

A Somewhere in Fort Lauderdale, again.

**Q Okay. And then you were living with your parents or was there another place in between?**

A Then I lived with my parents.

**Q Okay. And then where is the next place that you moved?**

A An apartment that Jeffrey got for me in Royal Palm Beach.

**Q Okay. And you don't know the address of that?**

A No, I wish I could give it to you. I don't know it.

**Q And you stayed in that apartment until you left for Thailand in the fall, later in the year in 2002, correct?**

A Yes.

**Q Right?**

A Yes.

**Q All right. And when did you first stop living with your parents? How old were you when you first stopped living with your parents?**

MR. EDWARDS: Object to the form.

A The very first time?

**Q (BY MS. MENNINGER) Um-hum.**

A I believe I was 11.
**Q Okay. What caused you to stop living with your parents when you were 11?**
A I just had some trouble and my parents thought it would be better if they sent me to California.
**Q Okay. What trouble did you have?**
A It's very hard for me to talk about. There was stuff that went on in my life that, you know, made me so I -- I couldn't live with my parents anymore.
**Q What went on in your life that caused you to not be able to live with your parents at the age of 11?**
A Do I have to answer this?
**Q Well, did you talk to Sharon Churcher about being molested as a child?**
A I did.
**Q And you authorized Sharon Churcher to publish that in a newspaper, correct?**
A I don't think I authorized her to do it. I think she -- I wouldn't say she did it on her own accord. But I talked to her about it and I wasn't aware of exactly what she was going to publish and what she wasn't.



**Q So you were able to talk to a reporter for the Mail On Sunday about this, correct?**
A I did tell her a little bit about my past and where I came from.
**Q All right. So what caused you to be sent away from your parents' home at the age of 11 to California?**
A Some of the prior abuse which led me to be a very troubled young teenager. I mean, I guess you wouldn't call 11 a teenager yet, but led me to running away a lot and -- and my family just thought it was best that I get out of the area and move somewhere else.
**Q Okay. You had run away prior to being the age of 11?**
A Yes.
**Q All right. Was that reported to the authorities?**
A That I ran away?
**Q Yes.**
A Yes.
**Q And where were your parents living at the age of 11?**
A The same address I gave you earlier.
**Q Okay. So the authorities associated with**



**Loxahatchee, Florida were made aware that you had run away from home at the age of 11?**
A Yes.
**Q And what abuse had you suffered prior to the age of 11?**
A There was a very close family friend who was a very sick man. And he took advantage.
**Q What's his name?**
A Forest.
**Q Forest what?**
A Jones.
**Q And where is Forest Jones today?**
A I don't know where he is.
**Q Does anyone in your family keep in contact with him?**
A No.
**Q What did he do to you?**
A Um, he touched me places I shouldn't be touched. He sexually abused me.
**Q For how long?**
A I don't know how long.
**Q Did you tell that to your parents?**
A They know.
**Q How do they know?**
A I told them.



**Q Did you tell them when you were under the age of 11 or at the age of 11?**
A I told them later.
**Q When did you tell them?**
A It took me a long time to forgive my parents for sending me away. I didn't feel like anybody understood me. So not until later in my life did I feel like I was able to talk to anyone about it.
**Q Okay. Was it reported to the authorities?**
A No. I went too late to talk to anybody about it.
**Q Did the event of you being molested cause your parents to split up?**
A I think Sharon reported that, but I don't think that's the case, no. My parents split up because they were really messed up.
**Q Your parents split up because they were really messed up?**
A Oh, they just didn't get along. There were a lot of marital problems.
**Q When did they split up?**
A I don't really remember what year it was.
**Q How old were you?**
A I believe I was living with Jeffrey at the

Page 169

time.
Q **With whom did you live in California?**
A My Aunt Carol.
Q **And who else?**
A Uncle Mike.
Q **And with who else?**
A That's it.
Q **And for how long did you live with them?**
A I don't really know how long, maybe over a year, maybe two years.
Q **And then what caused you to not live with them anymore?**
A I kept running away from them, too.
Q **And where did you live in California?**
A I'm sorry?
Q **Where in California did you live?**
A Where did they live?
Q **Where did you live with them?**
A Salinas.
Q **And do you know the address?**
A No.
Q **Do they still live there?**
A No.
Q **When did they stop living there?**
A I don't know. I haven't kept in contact

Page 170

with them.
Q **And you believe you lived with them for a little more than a year?**
A Maybe a year, maybe two years. I'm not too sure.
Q **Did you go to school there?**
A Yes.
Q **Where did you go to school?**
A Somewhere near Salinas, I'm assuming.
Q **What grade were you in?**
A Middle school.
Q **Sixth grade, seventh grade?**
A I think sixth grade.
Q **And did you go there for more than one year or just one year?**
A Maybe -- I don't know. I'm sorry, I don't know.
Q **Were the authorities in Salinas alerted to the fact that you ran away from home there?**
A Yes.
Q **How long was the longest you were away from home in Salinas, California?**
A Two weeks.
Q **And you were in middle school?**
A (Indicating.)

Page 171

THE REPORTER: I'm sorry, your --
Q **(BY MS. MENNINGER) Yes? Yes or no?**
A Oh. Yes.
Q **And then when did you go back to Florida?**
A I don't know.
Q **Was your younger brother living with your parents in Florida while you were in California?**
A Um-hum, yes.
Q **And was your older brother living with your parents in Florida while you were in California?**
A I don't think so.
Q **How much older than you is he?**
A Five years.
Q **And when you went back to Florida, where did you go to school, when you got back?**
A I believe I went to Crestwood Middle School.
Q **And did you complete your studies at Crestwood Middle School?**
A Did I get out of middle school there, yes.
Q **Okay. What grades were middle school?**
A Six, seven and eight.
Q **Okay. And when you went back to live with your parents again, that was at the same address in Loxahatchee?**

Page 172

A Yes.
Q **And you don't believe your older brother was in the home at the time?**
A No, he was sent to boarding school.
Q **Where did he go to boarding school?**
A Washington.
Q **State or city?**
A Washington above California.
Q **When was the next time you stopped living with your parents?**
A They sent me to a group home called Growing Together.
Q **Why?**
A Because I kept running away.
Q **Were the authorities alerted when you ran away?**
A Yes.
Q **And how old were you when you went to live at Growing Together?**
A I don't know. It's hard for me to piece back dates. Off the top of my head -- I don't want to guess. I don't think I should guess. I don't know.
Q **But you moved directly from living with your parents to living at Growing Together?**

Page 173

A I wouldn't say directly.

**Q How --**

A I'd say I stayed with my parents for -- like, I think I finished school at Crestwood. So I would have been in, I don't know, I guess eighth grade, finished eighth grade. And then -- I don't know. I really don't know. Around eighth grade.

**Q You went to Growing Together?**

A I think -- I think it was then.

**Q And how many years did you live at Growing Together?**

A Over a year.

**Q Were you ever in foster care?**

A What Growing Together was, was like a group home that sent you away to foster parents every night.

**Q So you lived in other people's homes during the period of time you were assigned to Growing Together?**

A Well, you stayed at Growing Together during the day and then at night you get sent home with parents.

**Q Did you go to school while you were at Growing Together?**

A Yeah, they offer education there.

Page 174

**Q So the education was at Growing Together?**

A Yeah.

**Q You did not attend a Palm Beach County --**

A I did, but you had to earn your levels up to be able to go outside. So I don't remember what level you have to get up to, to go out to another school. I think there was like seven levels or something. And you had to make it to, like, level 4 to be able to go to outside school.

**Q So for some period of time you were assigned to Growing Together and you were going to school at Growing Together. And for some period of time you were going to other schools and coming back to Growing Together?**

A Correct.

**Q And then when you came back to Growing Together, you were sent to spend the night at a family's home?**

A Yes.

**Q So you never slept at Growing Together?**

A No.

**Q Did you live -- other than living at or staying at Growing Together during the day and sleeping at these other homes at night, is there anywhere else that you recall living in the period between the ages of eighth grade and when you started working at Mar-a-Lago?**

Page 175

A Besides the ones I've told you about, you know, I did run away from Growing Together quite often. And I did end up being -- being abused by another older guy who I stayed with for I don't know how long.

**Q How old were you then?**

A I don't know. I'm sorry. I really wish I could pinpoint dates. I don't know dates.

**Q Okay. What was that man's name?**

A Ronald Effinger.

**Q And how long were you living -- were you living with Ronald Effinger?**

A Yes.

**Q And for how long were you living with him?**

A I don't know.

**Q Days? Weeks? Months?**

A I don't know. I mean, it wasn't days. I don't think it was weeks. It would have been close to maybe a few months.

**Q Okay. And was Ronald Effinger prosecuted by federal authorities in South Florida?**

A Yes.

**Q And you were located by the FBI, I believe?**

Page 176

A Yes.

**Q And you gave an interview to the FBI concerning your time with Ronald Effinger, correct?**

A Yes.

**Q Did you ever get a victim's notification letter regarding your status as a victim in Ronald Effinger's federal criminal prosecution?**

A I don't know. My parents handled everything.

**Q Do you know if your parents received such a letter?**

A I don't know.

**Q Have you ever asked them?**

A No, I've never really brought it up with them. It really pissed them off a lot, so I never brought it up with them.

**Q It pissed them off that you were living with Ronald Effinger?**

A Yes.

**Q Why did it piss them off, if you know?**

A Well, I think they were just disgusted, you know, that this happened to me again. And they didn't want to talk about it. They didn't want to talk about it.

Q **But they were aware of it?**
A Yes.
Q **Your dad came and picked you up from the police station?**
A Yes.
Q **And your dad would not let you come home?**
A Well, I think it was more my mom didn't want me to come home.
Q **Did she say why?**
A She just probably thought I was just going to keep running away again. And --
Q **Did she say that to you?**
A Well, I asked my dad at the police station if I could come home instead of going back to Growing Together. And he said my mom didn't want me to come home. And I told him if he didn't get me out within a week, I'd run away again and he'd never hear from me again.
Q **And how is it that you came back to be living at their house, then?**
A I ran away again and I called him up and I said, This is your final chance. And they came and picked me up and they let me live there.
Q **And when did you go live with Michael?**
A Not long after that.



Q **And when did you live with Michael's parents?**
A Well, I lived with Michael's parents before I lived with Michael in his apartment.
Q **And that was an apartment that Michael rented?**
A Michael and his friend. I can't remember his friend's name. Mario, I think his friend's name was.
Q **When did you live with Tony and Crystal Figueroa as parents?**
A That was just a brief stint. I didn't really stay there very long, but it was -- I was a runaway. That's in between times of -- I don't know.
Q **How old were you?**
A I don't know.
Q **I just want to be clear. Michael rented an apartment that you moved into that he had rented, correct?**
A Correct.
Q **And that was after you had lived with Michael and his parents, correct?**
A Yes.
Q **And that was prior to you and Michael living with your parents when you started working at**



**Mar-a-Lago, correct?**
A Yes.
Q **Do I have that sequence right?**
A So far, yes.
Q **And when did you stop living at your parents' at the time you started working at Mar-a-Lago? How long after you started at Mar-a-Lago do you stop living with your parents?**
A I don't know exact dates. I was traveling with Jeffrey a lot, and I was making -- he was giving me lots of money for the sex that I had with him and Ghislaine.
And after, I would say, a short time -- I'm not too sure, darling, I don't know.
Q **All right. Can you --**
MS. MENNINGER: I have no recollection of which number we're on in terms of exhibit.
MS. RODRIGUEZ: 15.
Q **(MS. MENNINGER) Okay. I'd like to mark as Defendant's Exhibit 15 a document and see if you can identify it.**
**Actually, before I do that, when do you recall ever getting a passport?**
A I got my passport in New York. I don't know what age I was.



Q **Okay. And did you -- how did you get it? Did you go somewhere or what happened?**
A Jeffrey had me fill out paperwork and go to a Kodak shop or something similar of a Kodak shop and get my picture taken. I gave him my picture and my paperwork. He sent it away. And I think a week later he said he got it expedited.
Q **Did you physically go to an office in New York?**
A Jeffrey's office.
Q **An office associated with Immigration or Homeland Security or whatever it was called back then?**
A Not that I recall.
Q **And do you know how old you were?**
A No. I don't know how old you have to be to get a passport, so I'm not too sure.
(Exhibit 15 marked.)
Q **(BY MS. MENNINGER) Okay. I'm going to show you Defendant's Exhibit 15.**
**Do you recognize this document?**
A Yes.
Q **Is this document the passport application that you filled out?**
A Yes.

Page 181

**Q Is it in your handwriting?**
A Yes.
**Q All right. What did you put down as your address at this time to mail the passport to? It's about the second line -- third line.**
A Number 13?
**Q Well, the third line says, Mail passport to. What address did you put down?**
A Are we talking about number 13, Permanent address, do not list P.O. box, street?
**Q No, I'm talking about the third line in the entire thing that says, Mail passport to.**
A Oh, I'm sorry, up here, the [redacted]
**Q All right. So you asked to have the passport mailed to you at your parents' address, right?**
A I don't know if it was mailed to my parents' house, but that's the address I sent -- put down, yes.
**Q Okay. And if you look a little bit further to the right, roughly equal with that line, do you see a date that's stamped on there?**
A Yeah, January 12th, 2001.

Page 182

**Q Okay. And then if you go down a little bit further, as you pointed out, line number 13, you gave your permanent address as your parents' address, again, correct?**
A Correct.
**Q If you look at box number 12 where it asks for occupation, what did you write down?**
A Masseuse.
**Q Okay. If you look at line number 18, Have you ever been issued a U.S. passport before, what did you put down?**
A No.
**Q All right. And if you go down a little bit further than that, emergency contact, who did you put down?**
A James Austrich, who is Michael.
**Q Okay. So is that the fiancé you were talking about earlier?**
A Yes.
**Q In January of 2001 were you still his affianced?**
A Looks like it, yes.
**Q And what address did you put down for James Austrich?**
A It's kind of hard to read. I think that's

Page 183

a 3. I think it's [redacted]. I really can't make out the telephone number.
**Q Okay. Do you see Relationship? Can you read that?**
A Friend.
**Q Okay. Do you see just below that there's a line that says number 21?**
A Do not stop -- sorry, Do not sign application until requested to do so by administrating an oath.
**Q Okay.**
A Applicant's signature age 13 or older.
**Q Oh, it's by the signature line?**
A Yeah.
**Q And that's your signature?**
A Yes.
**Q All right. And this is the document that you recall filling out for your first passport?**
A I don't recall doing it, but yes, it's in my handwriting and it's got all of my information on it.
**Q Okay. And on line -- box 23 it's got your driver's license checked off, right?**
A July 23. Yeah, I really can't make out

Page 184

numbers and stuff, though.
**Q But the box, Driver's License is checked off?**
A Yes.
**Q Okay. And then if you look in the lower right-hand corner of the page, do you see what we call a Bates stamp number? I don't know if you know what that means.**
A No.
**Q Just the lower right-hand corner of the document.**
A Giuffre 004721?
**Q Okay. Thank you.**
**So at January 2001 was James Austrich living at Bent, I think you said, Cak Circle?**
A Well, he would have had to have been if I put it down there.
**Q Okay. Was that the apartment that he had rented?**
A No, it's in Royal Palm Beach. The apartment he rented was in Fort Lauderdale. So this could be my apartment that he lived at with me.
**Q Okay. So his apartment where he lived with you was in Royal Palm Beach?**
A Yes.

**Q And he rented that apartment?**
MR. EDWARDS: Object to the form. Mischaracterization.
A He lived there with me for a short period. I don't -- I don't know how long he lived there with me for.
**Q (BY MS. MENNINGER) And who rented the apartment?**
A Well, Jeffrey paid for the apartment. I was the occupant, and he was an occupant.
**Q Did you ever see the lease?**
A Yes, I believe I had to sign the paperwork saying that I was living there.
**Q So you were living at -- is it [redacted]**
A I can't honestly read it. It looks like a C-a-c (sic), but that doesn't make sense.
**Q So January of 2001 you signed a document under oath putting James Austrich's address at Bent something Circle, right?**
A Yes.
**Q And you put your permanent address and your mail your passport to at your parents' address --**
A Yes.



**Q -- is that right?**
**And it's your position that that is the apartment that Jeffrey paid for and you signed a lease?**
A Yes, Jeffrey paid for it and I think I had to sign something that said I was going to occupy it. I don't know if James ever did.
**Q Okay. And you stayed at that apartment from at least January 2001 until you left in the fall of 2002, right?**
A I would say before then, yes. Like I said, I can't really tell you the exact date that I moved there, but --
**Q Why did you have your passport sent to your parent's house if you weren't living at your parents' house?**
A Um, I don't know. I guess a fail-safe. I'm not too sure.
**Q When was the next passport that you got?**
A I think I had to reapply for one in -- well, this one expired in 2002. So I would have had to apply for another one.
**Q I'm asking do you remember when you got another passport?**
A This expired January 10th, 2002.



**Q Let me have you put the paper down.**
A Yes.
**Q Do you recall applying for another passport?**
A No.
**Q Okay. Do you recall ever applying for another passport, ever?**
A Well, yeah, when I got to Australia I had to -- I don't have it on me right now, but I could tell you it's -- I had to apply for another one because the other one ran out as expiree.
**Q So whenever one expired, you applied for another one from the U.S.?**
A (Indicating.)
**Q Have you ever gotten --**
**Is that right?**
A Yeah.
**Q Have you ever gotten a passport from Australia?**
A An Australian passport?
**Q Right.**
A No.
**Q Have you ever lost a passport and had to get one replaced?**
A I don't think so.



**Q When was the first time that you came back to the U.S. from Australia?**
A October 16th, 2013.
**Q And did you come back before that?**
A No.
**Q Did you ever tell Sharon Churcher or Sharon White or Marianne Strong that you were going on a trip to New York in 2011?**
A No.
**Q Is it your contention that Ghislaine Maxwell sexually trafficked you to famous people?**
A If you have a document in front of you that you could show me so I could see what you're talking about, yes.
**Q I'm asking you, is it your contention that Ghislaine Maxwell sexually trafficked you to famous people?**
A Could you be more specific, like are we talking about rock stars or royalty or --
**Q Politically connected and financially powerful people.**
A Yes.
**Q Okay. To whom did Ghislaine Maxwell sexually traffic you?**
A You have to understand that Jeffrey and

Page 189

Ghislaine are joined hip by hip, okay? So they both trafficked me. Ghislaine brought me in for the purpose of being trafficked. Jeffrey was just as a part of it as she was. She was just as a part of it as he was. They trafficked me to many people. And to be honest, there is people I could name and then there's people that are just a blur. There was so much happening.

**Q Okay. Please name a person that Ghislaine Maxwell directed you to go have sex with?**

A Prince Andrew.

**Q Okay. Who else?**

A As a whole, they both trafficked me to people. It was under both of their direction. So it's not easy just to say Ghislaine. When I say they, I mean both of them.

**Q Okay. Well, I need you to say a time when Ghislaine Maxwell directed you to go have sex with another person. So can you please tell me to whom Ghislaine Maxwell asked you to go have sex with another person?**

MR. EDWARDS: Object to the form.

A Glenn Dubin.

**Q (BY MS. MENNINGER) Who else?**

A I'm going to continue to tell you that

Page 190

they both directed me to do it. It was part of my training. They both told me, you've got tickets to go here. This is who you're meeting, and this is what you're doing.

So [redacted] is another one.

**Q Ghislaine Maxwell directed you to go have sex with [redacted]?**

MR. EDWARDS: Object to the form to the extent it mischaracterized her testimony.

A I'm trying to tell you that they both did, Ghislaine and Jeffrey both directed me. They both paid me and they both directed me.

**Q (BY MS. MENNINGER) All right. When did Ghislaine Maxwell direct you to go have sex with [redacted]?**

MR. EDWARDS: Object to the form. Same objection.

A I don't know the time. I don't -- you know, I could tell you the place. I don't know the time.

**Q (BY MS. MENNINGER) What words did Ghislaine Maxwell use in talking to you and asking you to go have sex with [redacted]?**

A We're sending you to a gentleman. We want you to show him a good time. We want you to do

Page 191

exactly what you would do for Jeffrey to him. Keep him happy. I can't remember her exact words, and I'm not going to put words in my mouth to make it sound like what she said. But it was all along those lines.

**Q Those are words that Ghislaine Maxwell used to you in directing you to go have sex with [redacted]**

MR. EDWARDS: Object to the form. Mischaracterized her testimony.

A Along those lines, yes.

**Q (BY MS. MENNINGER) Okay. Where were you located when she used those words with you?**

A It could have been Palm Beach. It could have been New York.

**Q You don't recall?**

A I don't recall.

**Q Okay. How old were you when she used those words to you?**

MR. EDWARDS: Object to the form. Mischaracterizes her testimony.

A I don't know. I would think I was 17.

**Q (BY MS. MENNINGER) But you're not sure?**

A Well, it was in the beginning, like after my training. Glenn Dubin and [redacted] were

Page 192

the two first people I was sent out to.

**Q Okay. Well, I was asking about [redacted] okay?**

A Right. That's what I'm saying. If you want me to categorically tell you when it happened and why I think I was 17, because those were the two first people I was sent to.

**Q So you don't actually recall the conversation regarding [redacted]? You don't recall where you were, right?**

A I can't picture if it was New -- I know it was either New York or Palm Beach. I don't remember exactly which one.

**Q You don't recall exactly what words were used by Ghislaine Maxwell in speaking to you, correct?**

A I remember the tone that she used, the type of words that she used. I can't word for word replay what she said.

**Q All right. And so when in time was [redacted] relative to Prince Andrew?**

A [redacted] was months, six months, I'm not too sure.

**Q Six months what?**

A Before Prince Andrew. I don't know, I

think I met Prince Andrew in 2001. And Glenn Dubin and Stephen Kaufmann were, like I said, the first people I was sent out to after my training. So I don't know. I'm not going to give you an exact time if I don't know it.

**Q I asked you the relative order.**

A And I'm trying to give you it.

**Q And where does Alan Dershowitz fit into that group of people?**

A Same. I can't tell you piece by piece by piece who -- I know Glenn Dubin was first.

**Q Okay.**

A And I know Stephen Kaufmann was one of the first I was sent to. Alan Dershowitz could have been between there. Between, sorry, between Glenn and Stephen. The first time I was with Alan Dershowitz was in New York, so I wasn't actually sent to him. It actually happened at one of Jeffrey's residences.

(Ms. McCawley left the deposition.)

A So it's very hard for me to chronologically give you each person individually.

**Q (BY MS. MENNINGER) Okay. Name the other politically connected and financially powerful people that Ghislaine Maxwell told you to go have sex with?**

A Again, I'm going to tell you "they"



because that's how it went. They instructed me to go to George Mitchell, Jean Luc Brunel, Bill Richardson, another prince that I don't know his name. A guy that owns a hotel, a really large hotel chain, I can't remember which hotel it was. Marvin Minsky.

There was, you know, another foreign president, I can't remember his name. He was Spanish. There's a whole bunch of them that I just -- it's hard for me to remember all of them. You know, I was told to do something by these people constantly, told to -- my whole life revolved around just pleasing these men and keeping Ghislaine and Jeffrey happy. Their whole entire lives revolved around sex.

They call massages sex. They call modeling sex. They call --

**Q I asked you the names for people. Are you going to tell me any other names or is that all of them?**

A I'm trying to think. That's the answer I'm trying to give to you. It's that it's so hard to just keep naming and naming and naming.

**Q All right.**

A A lot of times I would be introduced to them. I didn't know --



**Q If you're going to tell me more names, please continue your answer.**

A I'm trying to think.

**Q If you're just going to talk --**

A I'm sorry. I'm trying to think.

**Q Okay. Let's take a break and then you can think over the break.**

THE VIDEOGRAPHER: We're off the record at 2:01.

(Recess taken from 2:01 p.m. to 2:09 p.m.)

THE VIDEOGRAPHER: We're back on the record at 2:09.

**Q (BY MS. MENNINGER) Ms. Giuffre, you have filed a lawsuit against Ghislaine Maxwell, correct?**

A Yes.

**Q You understand her to be my client, correct?**

A Yes.

**Q I'm here today to talk to you about your allegations against Ghislaine Maxwell.**

**Do you understand that?**

A Yes.

**Q I want you to tell me a single time that you recall Ghislaine Maxwell using words to you and directing you to go have sex with another person --**



MR. EDWARDS: Object.

**Q (BY MS. MENNINGER) -- not anybody else, Ghislaine Maxwell?**

MR. EDWARDS: Objection. Asked and answered.

To the extent that she can answer the question, I'd ask that she answer the question.

A I have answered the question. The question that you're asking me is Ghislaine. And Ghislaine and Jeffrey worked together. They were one and the same of persons. They both directed me to do this. They both directed me to report back to them. They were both the same.

**Q (BY MS. MENNINGER) You cannot recall a single instance in which Ghislaine --**

A I have to --

**Q Excuse me.**

**-- in which Ghislaine Maxwell alone directed you to have sex with another person --**

A I have to --

**Q -- correct?**

A -- believe --

MR. EDWARDS: Object.

MS. MENNINGER: I am going to finish my question.

**Q (BY MS. MENNINGER) Correct?**

MR. EDWARDS: Are you finished with your question?

MS. MENNINGER: Now you may make your objection. And then she may answer.

MR. EDWARDS: Okay. Objection. Argumentative. Harassing for absolutely no reason. Mischaracterizing the witness's testimony.

Answer, if you can.

A I have given you the names of the people that Ghislaine herself has told me to go be sex trafficked to, along with Jeffrey Epstein, okay?

She's the one who brought me to Jeffrey Epstein to be trafficked in the fucking first place.

So I have given you as much information as I possibly can to let you know what she was about, who she told me to go with, what she wanted me to do. That is what I am stating and that's what I previously stated to you.

**Q (BY MS. MENNINGER) And these names that you have just given are people to whom Ghislaine Maxwell alone told you to go have sex?**

MR. EDWARDS: Objection. Mischaracterization.

A Ghislaine and Jeffrey, I don't know how



many times you want me to keep answering this question. Both told me to do this, okay? They both sent me to these people.

How many times do you want me to answer this?

**Q (BY MS. MENNINGER) I think you're answering a different question so that's why I'm going to ask you again. I am not asking you anything about a time when Jeffrey and Ghislaine together told you to go do something. I'm asking you to name a single time during which Ghislaine Maxwell acting alone directed you to go have sex with another person?**

MR. EDWARDS: Objection. Asked and answered. Harassing. Argumentative.

A I've given you the names of the people that Ghislaine instructed me to go have sexual relations with. I am not discluding (sic) the fact that Jeffrey also told me.

Ghislaine told me from her mouth to do these things. Jeffrey told me from his mouth to do these things with these people. Ghislaine instructed me to do the things that I did with Jeffrey Epstein on the very first meeting that I had with him. She brought me there under the preclusion (sic) that I



was going to be trained as a masseuse and that she instructed me to take off my clothes and to give oral sex to Jeffrey Epstein.

**Q (BY MS. MENNINGER) Excuse me. I've asked you for the names.**

A I've just given you a name. Jeffrey Epstein is a big name.

**Q All right.**

A She instructed me on that one.

**Q So you're saying --**

MR. EDWARDS: The witness is finishing her answer right now. She's in the process of explaining one of the people Ghislaine told her to have sex with.

**Q (BY MS. MENNINGER) So you're saying Ghislaine Maxwell directed you to have sex with Jeffrey Epstein?**

A Correct.

**Q Ghislaine Maxwell directed you to have sex with Glenn Dubin?**

A Correct.

**Q What words did Ghislaine Maxwell tell you to go have sex with Glenn Dubin?**

A It was the same all the time, all right? They want me to go provide these men with a massage.



And when they say massage, that means erotic, okay? That's their term for it. I think there are plenty of other witnesses that can attest to what massage actually means.

And I'm telling you that Ghislaine told me to go to Glenn Dubin and give him a massage, which means sex.

**Q Okay. So Glenn -- Ghislaine Maxwell told you to go give a massage to Glenn Dubin?**

A Correct.

**Q That's your testimony?**

A That is my testimony.

**Q All right. Ghislaine Maxwell told you to go give a massage to [redacted], correct?**

A Correct.

**Q Ghislaine Maxwell told you to give a massage to Prince Andrew, correct?**

A Correct.

**Q Ghislaine Maxwell told you to give a massage to Bill Richardson, correct?**

A Correct.

**Q When did Ghislaine Maxwell tell you to give a massage to Bill Richardson?**

A I don't know dates.

**Q Where were you?**

Page 201

A When it happened?
**Q When Ghislaine Maxwell used the words, Go give a massage to Bill Richardson, where were you?**
MR. EDWARDS: Object to the form. Mischaracterizes her testimony.
A I can't tell you where we were. I know where I was sent to. I don't know where we were when she told me to do that.
**Q (BY MS. MENNINGER) Where were you sent to --**
A New Mexico.
**Q -- by Ghislaine Maxwell?**
MR. EDWARDS: Object to the form. Mischaracterizes her testimony again.
A Are you smiling at me because --
**Q (BY MS. MENNINGER) No, I'm asking you to answer the question.**
A I have answered the question. I was sent to New Mexico.
**Q Okay. Where were you sent from?**
A I already answered that. I don't know where I was sent from.
**Q Okay.**
A I was flying everywhere with these people.
**Q Where were you sent by Ghislaine Maxwell**

Page 202

**to have sex with Jean Luc Brunel?**
MR. EDWARDS: Object to the form. Mischaracterized her testimony.
A Many places.
**Q (BY MS. MENNINGER) Ghislaine Maxwell sent you to many places to have sex with Jean Luc Brunel?**
MR. EDWARDS: Object to the form.
A It happened at many places, yes.
**Q (BY MS. MENNINGER) You had sex with Jean Luc Brunel at many places is what you're saying, correct?**
A I was sent to Jean Luc Brunel at many places to have sex with him.
**Q When did Ghislaine Maxwell send you to a place to have sex with Jean Luc Brunel?**
A You are asking --
MR. EDWARDS: Form.
A -- me to answer the impossible.
**Q (BY MS. MENNINGER) All right. When did Ghislaine Maxwell send you to have sex with the owner of a large hotel chain?**
MR. EDWARDS: Object to the form. Mischaracterization.
A I'm going to keep answering the questions the same way that I keep answering them. I don't

Page 203

know where it was when she said to go do this.
**Q (BY MS. MENNINGER) Okay. Where were you sent to have sex with the owner of a large hotel chain by Ghislaine Maxwell?**
MR. EDWARDS: Object to the form.
A I believe that was one time in France.
**Q (BY MS. MENNINGER) Which time in France?**
A I believe it was around the same time that Naomi Campbell had a birthday party.
**Q Where did you have sex with the owner of a large hotel chain in France around the time of Naomi Campbell's birthday party?**
A In his own cabana townhouse thing. It was part of a hotel, but I wouldn't call it a hotel.
Jeffrey was staying there. Ghislaine was staying there. Emmy was staying there. I was staying there. This other guy was staying there. I don't know his name.
I was instructed by Ghislaine to go and give him an erotic massage.
**Q She used the words erotic massage?**
A No, that's my word. The word massage is what they would use. That's their code word.
**Q Was she in the room when you gave this erotic massage to the owner of a large hotel chain?**

Page 204

A No, she was not in the room. She was in another cabana.
**Q And other than telling you to go give the owner of this large hotel chain a massage, do you remember any other words she used to you to direct you in what you should do?**
A Not at the time, no.
**Q Where did -- where were you and where was Ms. Maxwell when she directed you to go have sex with Marvin Minsky?**
MR. EDWARDS: Object to the form.
A I don't know.
**Q (BY MS. MENNINGER) Where did you go to have sex with Marvin Minsky?**
A I believe it was the U.S. Virgin Islands, Jeff's -- sorry, Jeffrey Epstein's island in the U.S. Virgin Islands.
**Q And when was that?**
A I don't know.
**Q Do you have any time of year?**
A No.
**Q Do you know how old you were?**
A No.
**Q Other than Glenn Dubin, Stephen Kaufmann, Prince Andrew, Jean Luc Brunel, Bill Richardson,**

**another prince, the large hotel chain owner and Marvin Minsky, is there anyone else that Ghislaine Maxwell directed you to go have sex with?**
A I am definitely sure there is. But can I remember everybody's name? No.
**Q Okay. Can you remember anything else about them?**
A Look, I've given you what I know right now. I'm sorry. This is very hard for me and very frustrating to have to go over this. I don't -- I don't recall all of the people. There was a large amount of people that I was sent to.
**Q Do you have any notes of all these people that you were sent to?**
A No, I don't.
**Q Where are your notes?**
A I burned them.
**Q When did you burn them?**
A In a bonfire when I lived at Titusville because I was sick of going through this shit.
**Q Did you have lawyers who were representing you at the time you built a bonfire and burned these notes?**
A I've been represented for a long time, but it was not under the instruction of my lawyers to do



this. My husband and I were pretty spiritual people and we believed that these memories were worth burning.
**Q So you burned notes of the men with whom you had sex while you were represented by counsel in litigation, correct?**
MR. EDWARDS: Object to the form.
A This wasn't anything that was a public document. This was my own private journal, and I didn't want it anymore. So we burned it.
**Q (BY MS. MENNINGER) When did you write that journal?**
A Just over time. I started writing it probably in, I don't know, I can't speculate, 2012, 2011.
**Q So you did not write this journal at the time it happened?**
A No.
**Q You started writing this journal approximately a decade after you claim you finished being sexually trafficked, correct?**
A Yes.
**Q And you started writing a journal after you had a lawyer, correct?**
A Correct.



**Q Including Mr. Edwards, who is sitting right here, correct?**
A Correct.
**Q What did that journal look like?**
A It was green.
**Q And what else?**
A It was just a spiral notebook.
**Q Okay. And what did you put into that green spiral notebook?**
A Bad memories. Things that I've gone through, lots of things, you know. I can't tell you. There was a lot of pages. It was over 300 pages in that book.
**Q Did you ever show that book to your lawyers?**
A No.
**Q Did you show that book to anyone?**
A My husband.
**Q Did you show it to anyone else besides your husband?**
A No.
**Q Did you tear out pages and give them to Sharon Churcher?**
A No, I wrote -- those pages that you're talking about, I wrote for her specifically. She



wanted to know about the Prince Andrew incident.
**Q So that's a different piece of paper?**
A Yeah, that's just random paper.
**Q So you had a green spiral notebook that you began sometime in 2011 or 2012 in which you wrote down your recollections about what had happened to you, and you burned that in a bonfire in 2013.**
**Did I get that right?**
A You got that right.
**Q And do you have no other names of people to whom you claim Ghislaine Maxwell directed you to have sex, correct?**
A At this time, no.
**Q Is there any document that would refresh your recollection that you could look at?**
A If you have a document you'd like to show me, I would be glad to look at it and tell you the names I recognize off of that.
**Q I'm just asking you if there's a document you know of that has this list of names in it?**
A Not in front of me, no.
**Q Where is the original of the photograph that has been widely circulated in the press of you with Prince Andrew?**
A I probably still have it. It's not in my

Agren Blando Court Reporting & Video, Inc.



possession right now.
**Q Where is it?**
A Probably in some storage boxes.
**Q Where?**
A In Sydney.
**Q Where in Sydney?**
A At some family's house. We got the boxes shipped to Australia, and they were picked up off the porch by my nephews and brought to their house.
**Q Which is where?**
A In Sydney.
**Q Where in Sydney?**
A [redacted]
**Q And who lives in that house?**
A Well, it's owned by my mother-in-law and father-in-law, but my nephews live in the house.
**Q What are their names?**
A I'm not giving you the names of my nephews.
**Q What's the address of the house?**
A Why would you want that?
**Q I want to know where the photograph is. I'm asking you where the photograph is. And you've just told me it's somewhere in [redacted]?**
A Yes.



**Q So where in [redacted] is the photograph located?**
A If I can't 100 percent say that the photograph is there, it could be at my house that I presently live in. I'm not going to give you the address of my nephews' residence.
**Q When is the last time you saw the photograph in person?**
A When I packed and left America.
**Q Colorado?**
A Yes.
**Q All right. So you had that photograph here with you in Colorado?**
A Yes.
**Q What's on the back of the photograph?**
A I'm sorry?
**Q Is there anything on the back of the photograph?**
A There's like the date it was printed, but no writing or anything.
**Q Okay. Does it say where it was printed?**
A I don't believe so. I think it just -- I don't remember. I just remember there's a date on it.
**Q Whose camera was it taken with?**



A My little yellow Kodak camera.
**Q Who took the picture?**
A Jeffrey Epstein.
**Q And where did you have it developed?**
A I believe when I got back to America.
**Q So where?**
A I don't know.
**Q Palm Beach?**
A I don't know.
**Q What is the date the photograph was printed?**
A I believe it's in March 2001.
**Q Okay.**
A But that's just off of my photographic memory. I don't -- it could be different, but I think it's March 2001.
**Q You have a photographic memory?**
A I'm not saying I have a photographic memory. But if I'd look at the back of the photo and I remember what it says, I believe it was March 2001.
**Q Did the photograph ever leave your possession for a while?**
A I gave it to the FBI.
**Q Okay. And when did you get it back?**
A When they took copies of it.



**Q When was that?**
A 2011.
**Q When they came to interview you?**
A Yes.
**Q So from 2011 until you left Colorado it was in your personal possession?**
A Yes.
**Q What other documents related to this case are in that, storage boxes in Australia?**
MR. EDWARDS: Object to the form.
A Documents related to this case -- there -- I don't know. I really can't tell you. I mean, there's seven boxes full of Nerf guns, my kids' toys, photos. I don't know what other documents would be in there.
**Q (BY MS. MENNINGER) Did anyone search those documents after you received discovery requests from us in this case?**
A I haven't been able to obtain those boxes. I can't get them sent back up to me. It's going to cost me a large amount of money. And right now I'm trying to look after my family, so I'm not able to afford to get them up.
**Q You live in Australia, correct?**
A I do.

**Q Okay. How far away are the boxes from where you live in Australia?**
A Sydney is down here at the bottom. Cairns is up here at the top.
**Q Okay.**
A It's probably a six-day drive.
**Q Did you fly here through Sydney?**
A No.
**Q Have you been to Sydney since you've moved back to Australia?**
A I flew into Sydney with my three kids, but it was a connecting flight to Brisbane.
**Q Did you ask your nephews or anyone else to search those boxes in response to discovery requests that we issued in this case?**
A They are my nephews. I would never let them look at those.
**Q Other than your green spiral notebook, what else did you burn in this bonfire in 2013?**
A That was it.
**Q That's the only thing?**
A Yes.
**Q Did you use wood?**
A Yes.
**Q Charcoal?**



A My husband built the bonfire out of wood and I don't know what else he put in it. He's the one who always makes the fires, not me.
**Q Who else was present?**
A Just him and I.
**Q Were your kids there?**
A No. They were inside sleeping.
**Q And what beach was this?**
A It wasn't a beach. It was in my backyard.
**Q What's your address?**
A At that time?
**Q Um-hum.**
A [redacted].
**Q** [redacted]
A Yes.
**Q Who were your neighbors?**
A Sweet people. Ray and -- I could look on my phone if you want.
**Q No, thank you. Do they still live there?**
A Yes.
**Q Do you keep in touch with them?**
A Last time I talked to them was a few months ago.
**Q Did they see the fire?**
A They've seen many fires that we've had.



We've had lots of bonfires there.
**Q Did you ever ride in a helicopter with Ghislaine Maxwell acting as pilot of the helicopter?**
A Yes.
**Q Who else was on the flight?**
A I've been on the helicopter with her plenty of times. I can't mention how many people were on the -- on the helicopter at the same time.
**Q How many times?**
A I don't know. Do you have helicopter records that you could show me?
**Q I'm asking you how many times you were on the helicopter with Ghislaine Maxwell acting as the pilot --**
A It's impossible for me to answer the question without having the actual physical records in front of me.
**Q I'm asking you to look into your memory and tell me how many times you recall being on a helicopter with Ghislaine Maxwell at the pilot seat?**
A There is no number I can give you. There's plenty of times I've been on her helicopter.
**Q Where did you go from and to on a helicopter?**
A I believe it was -- don't quote me on this



because I get confused on the islands there. I want to say it was St. John's. It could have been St. Barts. St. John or St. Barts, and then we would fly straight to Jeffrey's island.
**Q Okay. Did you ever go anywhere else on the helicopter?**
A No.
**Q Were you ever on the helicopter with Bill Clinton and Ghislaine Maxwell as the pilot of the helicopter?**
A No.
**Q Were you ever on the helicopter with Bill Clinton's Secret Service and Ghislaine Maxwell as the pilot?**
A No.
**Q Do you recall telling Sharon Churcher that you were?**
A No.
**Q Did you see the press article in which Sharon Churcher reported that you were?**
MR. EDWARDS: Objection. I'd just ask that if you're going to ask this witness about a specific article I'd like for her to see the article. Otherwise she's not going to testify about it.
If you have something to show her, then,

please.
**Q (BY MS. MENNINGER) Do you recall seeing a press article in which Sharon Churcher reported that you were on a helicopter with Bill Clinton and Ghislaine Maxwell as the pilot?**
MR. EDWARDS: Again, I'll let you answer the question once she's looking at the document that you're being asked about.
MS. MENNINGER: You're not letting her answer a question about whether she recalls a particular press statement?
MR. EDWARDS: I will let her answer every question about the press statement as long as she sees the press statement. I'm okay with that. She can answer all of them.
MS. MENNINGER: No, there is a rule of civil procedure that allows you to direct a witness not to answer a question when there's a claim of privilege.
What privilege are you claiming to direct her not to answer this question?
MR. EDWARDS: I thought that you wanted accurate answers from this witness. If the --
MS. MENNINGER: I asked her if she recalled something --



MR. EDWARDS: If the sole purpose is to just to harass her --
MS. MENNINGER: I asked her if she recalled something --
MR. EDWARDS: Then that's just not going to be what's happening today.
**Q (BY MS. MENNINGER) All right. So you're refusing to answer a question about whether you recall a particular press statement --**
MR. EDWARDS: She's --
**Q (BY MS. MENNINGER) -- is that true?**
MR. EDWARDS: She is not refusing to answer any questions. She --
A I'm not refusing to answer. I just want to see the article you're talking about so I can be clear in my statement.
**Q (BY MS. MENNINGER) Do you recall seeing a press article written by Sharon Churcher reporting that you flew on a helicopter with Bill Clinton and Ghislaine Maxwell as the pilot?**
A No, I do not recall reading a press article saying that I was on a helicopter with Bill Clinton as Ghislaine is the pilot.
**Q Do you recall telling Sharon Churcher that you had conversations with Bill Clinton regarding him**



**flying on a helicopter with Ghislaine Maxwell?**
A I believe that it was taken out of context. Ghislaine told me that she flew Bill Clinton in. And Ghislaine likes to talk a lot of stuff that sounds fantastical. And whether it's true or not, that is what I do recall telling Sharon Churcher.
**Q So you told Sharon Churcher that Ghislaine Maxwell is the one who told you that she flew Bill Clinton in the helicopter?**
A I told Sharon Churcher that Ghislaine flew Bill Clinton onto the island, based upon what Ghislaine had told me.
**Q Not based upon what Bill Clinton had told you, correct?**
A Correct.
**Q Did you ever ask Sharon Churcher to correct anything that was printed under her name, concerning your stories to Sharon Churcher?**
A I wasn't given those stories to read before they were printed.
**Q After they were printed did you read them?**
A I tried to stay away from them. They were very hard. You have to understand it was a very hard time for me and my husband to have to have this



public -- we didn't think it was going to be this publicly announced and that big. So we turned off the news and we stopped reading so many things.
**Q You didn't read the articles about your stories to Sharon Churcher --**
A I've read some articles --
**Q Let me just finish. You did not read the articles published by Sharon Churcher about your stories to Sharon Churcher?**
A I have read some articles about what Sharon Churcher wrote. And a lot of the stuff that she writes she takes things from my own mouth and changes them into her own words as journalists do.
And I never came back to her and told her to correct anything. What was done was done. There was nothing else I can do.
**Q So even if she printed something that were untrue you didn't ask her to correct it, correct?**
A There was things that she printed that really pissed me off, but there was nothing I could do about it. It's already out there.
**Q She printed things that were untrue, correct?**
MR. EDWARDS: Objection to the form. Mischaracterization.

Page 221

A I wouldn't say that they were untrue. I would just say that she printed them as journalists take your words and turn them into something else.

**Q (BY MS. MENNINGER) She got it wrong?**

MR. EDWARDS: Object to the form. Mischaracterization.

A In some ways, yes.

**Q (BY MS. MENNINGER) Did she print things in her articles that you did not say to her?**

MR. EDWARDS: I object and ask that the witness be given the opportunity to see the document so that she can review it and answer that question accurately. Otherwise she's unable to answer the question. I'm not going to allow her to answer.

MS. MENNINGER: You know the civil rules tell you not to suggest answers to your client.

**Q (BY MS. MENNINGER) And you understand your lawyer is now directing you to not all of a sudden remember what your answer is. That's what he's suggesting that you say. So you're not supposed to listen to him suggest that to you. You're supposed to tell me from your memory.**

MR. EDWARDS: That is not what I'm --

**Q (BY MS. MENNINGER) Did you --**

MR. EDWARDS: That's not what I'm doing.

Page 222

You don't get to just talk over me and tell my client when not to listen to me. All you have to do to get answers is show her the document you're talking about, and I'll let her answer every question. I don't know why we're so scared of the actual documents.

MS. MENNINGER: I don't know why you're scared of your client's recollection, Mr. Edwards. But anyway --

MR. EDWARDS: Why would you do this to her?

**Q (BY MS. MENNINGER) Did Sharon Churcher print things that you did not say?**

MR. EDWARDS: I'm going to instruct my client not to answer unless you give her what it is that you're talking about that was printed. And she will tell you the answer, the accurate answer to your question. Just without the document to refresh her recollection and see it, she's not going to answer the question.

**Q (BY MS. MENNINGER) Did Sharon Churcher print things that you did not say?**

MR. EDWARDS: Same objection. Same instruction not to answer.

I think I've made a very clear record as to why I want my client to answer all of these questions, but I want her to have the fair opportunity to see this document.

Page 223

**Q (BY MS. MENNINGER) Did Sharon Churcher print things that you felt were inaccurate?**

MR. EDWARDS: Same objection. Same instruction. If she sees the document, she's going to answer every one of these questions.

**Q (BY MS. MENNINGER) Did any other reporter print statements that you believe are inaccurate?**

MR. EDWARDS: Same objection. Same instruction.

**Q (BY MS. MENNINGER) Did any reporter print statements about Ghislaine Maxwell that were inaccurate?**

MR. EDWARDS: Same objection. Same instruction.

This is harassing. This is harassing a sexual abuse victim. And all I'm asking is for fairness, that we just let her see the document so she can answer this.

MS. MENNINGER: Mr. Edwards, please stop saying anything other than an objection, what the basis is, or instructing your client not to answer.

MR. EDWARDS: I will do that.

Page 224

MS. MENNINGER: That's what the Federal Rules of Civil Procedure provide.

MR. EDWARDS: I hear you. They also provide for fairness and civility. And all I'm asking, very calmly, is for her to see this.

MS. MENNINGER: Mr. Edwards, this is not your deposition. I'm asking your client what she remembers. If she doesn't want to talk about what she remembers, then let her not answer. But you cannot instruct her not to answer unless there's a privilege.

What privilege --

MR. EDWARDS: I am instructing her not to answer.

**Q (BY MS. MENNINGER) All right. You are refusing to answer questions about whether statements to the press about Ghislaine Maxwell attributed to you were inaccurate?**

MR. EDWARDS: She's not refusing not to answer.

A You are refusing to show me these documents so I could answer properly. I would give you an answer if you were to show me some documents.

**Q (BY MS. MENNINGER) You can't say without looking at a document whether the press attributed to**

Page 225

**you is accurate or inaccurate?**
A Please show me the document.
**Q You can't say from the top of your head whether any inaccurate statement has been attributed to you in the press?**
A Please show me a document and I will tell you.
**Q Are you refusing to answer my questions about your knowledge of whether inaccurate statements have been attributed to you in the press?**
A Are you refusing to give me the documents to look at?
**Q Are you refusing to answer the question?**
A I am refusing to answer the question based upon the fact that you are not being fair enough to let me see the document in order to give you an honest answer.
**Q Ms. Giuffre --**
A Yes.
**Q -- we are talking about press that has been published on the Internet, correct?**
A Yes.
**Q Do you have access to the Internet?**
A Yes.
**Q Have you looked on the Internet and read**

Page 226

**articles that attribute statements to you about Ghislaine Maxwell?**
A Yes.
**Q Do you know any statement that has been attributed to you in a press article on the Internet about Ghislaine Maxwell that is untrue?**
MR. EDWARDS: Same objection. Same instruction.
A Please show me a specific document.
**Q (BY MS. MENNINGER) Do you know of any such statement about Ghislaine Maxwell attributed to you by the press that is inaccurate?**
A If you could please show me a specific document.
**Q Tell me what Sharon Churcher asked you to write for her.**
A Any knowledge that I had about my time with Prince Andrew.
**Q And did you write it?**
A Um-hum.
**Q What did you write it in or on?**
A Paper.
**Q What kind of paper?**
A Lined paper.
**Q Was it in a book or single sheets?**

Page 227

A Single sheets.
**Q And did you write a long document or a short document? What was it?**
A I can't recall how long the document was, but I would say it would be a few pages.
**Q And other than asking you to write whatever you remember about Prince Andrew, did she give you any other directions about what you should write?**
A She was interested in two things, really. How Epstein got away with so many counts of child trafficking for sex and how Prince Andrew was involved in it. Those were her two main inquiries.
**Q What did she ask you to write?**
A She asked me to write about Prince Andrew.
**Q Did she tell you to put it in your own handwriting?**
A No, she just asked me to write down what I can remember.
**Q Did you give her everything that you wrote?**
A Did I give her the whole entire pages that I wrote?
**Q Yes.**
A Yeah, I wrote pages for her specifically.

Page 228

**Q In your own handwriting?**
A In my own handwriting.
**Q And what you wrote, was that true?**
A Yes.
**Q And did you get paid for those pieces of paper?**
A Not for the papers, I don't believe.
**Q Okay. Have you gotten paid when they've been reprinted?**
A No.
**Q Have you negotiated any deal with Radar Online?**
A No.
**Q Have you negotiated any deal with Sharon Churcher for the purpose of publishing those pieces of paper?**
A Not those pieces of paper.
**Q When did you write those pieces of paper?**
MR. EDWARDS: Object to the form.
A A week before she came out.
**Q (BY MS. MENNINGER) And when did you give them to her?**
A When she came out.
**Q When was that?**
A Sometime, I believe, in early 2011.

**Q What did you get paid for, if not for those pieces of paper?**
MR. EDWARDS: Object to the form.
A I was paid for the picture with Prince Andrew with his arm around me, Ghislaine in the background. And I was paid for the, I guess, the print of the stories.
**Q (BY MS. MENNINGER) Anything else?**
A No.
**Q You were not paid for those pieces of paper?**
A No.
**Q All right. And how many pieces of paper did you write?**
A Like I said, I'm rounding it around three.
**Q Three pieces of paper?**
A That's what I -- I don't remember to be exact on a number. I'm sorry. But over three pages.
**Q And you wrote those sometime in 2011?**
A The week that she was coming out to see me.
**Q And you gave them to her, right?**
A I gave them to her.
**Q Did you keep a copy of that?**
A No.



**Q Did you rip them out to make them look like they came out of a journal?**
A No.
**Q Were you directed to make them look like they came out of a journal?**
A No.
**Q Do you know why your lawyer would have told the federal judge in New York that that's what you did?**
MR. EDWARDS: Object to the form.
A My lawyer in New York?
**Q (BY MS. MENNINGER) Um-hum.**
A Ripped them out of a journal?
**Q Said that you had. Do you know why she would have said that?**
A Maybe she thought that I did.
**Q But you didn't?**
A They were just pieces of paper written for Sharon Churcher's purpose.
**Q And not directed to look like they came from a journal?**
A Nobody told me to make them look like they came from a journal. They were just pieces of paper that I wrote down for Sharon Churcher.
**Q Did Ghislaine Maxwell tell Prince Andrew**



**that you were 16 years old?**
A No. I think -- I think they had played the guessing game and I was 17.
**Q And so Ghislaine Maxwell did not tell Prince Andrew that you were only 16?**
MR. EDWARDS: Object to the form. Speculation.
**Q (BY MS. MENNINGER) In your presence?**
A I don't remember the exact conversation. I just remember they liked to play the guessing game a lot.
**Q And so you don't recall Ghislaine Maxwell telling Prince Andrew in your presence that you were quote, only, really only 16, right?**
A Correct, I don't remember that.
**Q And if that were in the paper, that would be untrue, correct?**
A Correct.
MS. MENNINGER: I think now might be a good time for a break.
THE DEPONENT: Thank you.
MR. EDWARDS: Okay. Sounds good.
THE VIDEOGRAPHER: We're off the record at 2:45.
(Recess taken from 2:45 p.m. to 2:55 p.m.)



THE VIDEOGRAPHER: We're back on the record at 2:55.
**Q (BY MS. MENNINGER) Do you have any photographs of yourself either nude or in a sexually compromising position that you claim were taken by Ghislaine Maxwell?**
A I do not have any of those in my evidence. But if you ask Ghislaine Maxwell, she would have plenty.
**Q Do you have any in your storage boxes in Sydney?**
A No.
**Q Do you know whether your attorneys have any such photographs that you claim were taken by Ghislaine Maxwell?**
A No.
**Q You don't know or they don't have them?**
A I don't know. And I don't think they have them. If they had them, they would have told me. You should ask your client. She's got plenty of them.
**Q What type of camera did Ghislaine Maxwell use?**
A It was a black camera. And it had a, I don't know the types and names of them, but the lens

Page 233

that goes out.
**Q Was it digital or single reflex?**
A Again, I don't know types of cameras. I mean, I use my phone for using a camera. So it's a black camera and it had a lens that you could put out further or bring back.
**Q Did you ask her to take any photographs of you?**
A No. She asked to take photographs of me.
**Q Was it a film or a digital camera?**
A I never saw how she printed them out.
**Q What's the first time you told anybody that you had been sexually trafficked?**
MR. EDWARDS: Form.
A Tony Figueroa, my ex-boyfriend, knew some of the stuff that was happening, though I did not go in great detail to him, being that he's my boyfriend. And then the first person I really opened up to about everything was my husband.
**Q (BY MS. MENNINGER) Did you tell Tony Figueroa that you were forced to have sex with Jeffrey Epstein?**
A Yes.
**Q Did you tell Tony Figueroa you were forced to have sex with Ghislaine Maxwell?**

Page 234

A Yes.
**Q Did you tell Tony Figueroa that Ghislaine Maxwell sent you to have sex with famous people?**
A Yes.
**Q When did you tell Tony Figueroa that?**
A During conversations. Like, I'd call him from places that I was at and just talk to him. And like I said, I wouldn't get into great detail about things. But, you know, I had to be with this person or that person today and --
**Q Did you tell Tony Figueroa not to call the police?**
A No. Tony enjoyed his lifestyle with me. So he wouldn't have gone to the police.
**Q Did you tell James Michael Austrich that you were sexually trafficked?**
A You know, I don't know what I told Michael at the time. I know he asked me and I think I told him, but I didn't get into detail with him.
**Q What do you think you told him?**
A That I wasn't just massaging these people.
**Q Did you tell him what you were doing with Jeffrey Epstein?**
A Yes.
**Q Did you tell James Michael Austrich what**

Page 235

**you were doing with Ghislaine Maxwell?**
A Yes.
**Q Did you tell him what you were doing to other people?**
A I don't think I told him about many other people, no.
**Q What people did you tell him about?**
A Mainly Ghislaine and Jeffrey.
**Q When did you tell him that?**
A From the start.
**Q When was the start that you told him?**
A From, I wouldn't say the first meeting, but I told him around that time.
**Q And what did Michael Austrich tell you to do?**
A He didn't mind what I had to do. Again, he was another guy that used me because I made lots of money, and he didn't tell me to do anything.
**Q Did he tell you not to tell the police?**
A No, he didn't tell me not to do anything.
**Q Did he tell you to tell the police?**
A Again, he told me not -- he didn't tell me to do anything.
**Q When did you tell your parents that you were sexually trafficked by Jeffrey Epstein?**

Page 236

A After I had my kids.
**Q When did you tell your parents that you were sexually trafficked by Ghislaine Maxwell?**
A I told them the same time about Jeffrey and Ghislaine. So sometime after I had my children.
**Q After you had had all three children or after you had your first child?**
A I think after I had all three of my children.
**Q What was the last year in which you had a child?**
A 2010.
**Q So you believe you told your parents sometime after 2010 that you had been sexually trafficked?**
A Yes.
**Q You didn't tell your parents that you had a lawsuit entitled Jane Doe 102 versus Jeffrey Epstein in 2009?**
A I wasn't very close with my parents.
**Q Why not?**
A We just had a hard relationship.
**Q Why?**
A Because we did. I don't know why. Some people just don't get along.

**Q Do you get along with your parents now?**
A I get along with my parents now, yes.
**Q Okay. Have you ever told anyone that you were a sex slave for four years?**
A Under the assumption that I got my dates wrong, yes, I probably have.
**Q And that's not true, correct?**
A Not because I didn't mean it to be true. Just because I didn't know my dates.
**Q So four years is not two years, correct?**
MR. EDWARDS: Object to the form.
A Four years is not two years.
**Q (BY MS. MENNINGER) What did your parents say when you told them that you had been sexually trafficked by Jeffrey Epstein and Ghislaine Maxwell?**
A I believe they were disgusted.
**Q What did they tell you to do or to not do?**
A I don't remember the exact conversations that we had, but they weren't happy.
**Q Were they both on the phone at the same time?**
A No.
**Q Who was on the phone first?**
MR. EDWARDS: Object to the form.
A I don't know.



**Q (BY MS. MENNINGER) You were in Australia at the time, correct?**
A Yes.
**Q They were not?**
A Yes.
**Q Have they ever been to see you in Australia?**
A My dad has.
**Q Has your mom ever been to see you in Australia?**
A No, my mom is afraid of flying.
**Q When did your dad come to see you in Australia?**
A The birth of my son, my first one in 2006. And then, I believe in 2010 when my daughter was born.
**Q And did you have this conversation with your dad about this in person or on the phone?**
A I've had conversations with him about it since.
**Q I'm talking about the first time you had a conversation with your dad.**
A On the phone.
**Q What caused you to tell him in 2010?**
A I was just starting to accept what I had



been through. I think for ten, however long many years, I mean, over ten years, I had tried to start a new life, become a new person. And I wanted to put all that stuff behind me and not think about it. But after you have children, something changes in you and you just want to stand up and do the right thing and protect any other children from having to go through this.
**Q Did you tell your parents how much money you received from your settlement with Jeffrey Epstein?**
A No. That is a -- I think there's like a non-disclosure statement. I don't know exactly what the legal term is, but --
**Q Did you send any money to your parents?**
A No, I don't -- no. No, I've never sent money to my parents.
**Q Who is Anthony Valladares?**
A One of Tony's shady friends.
**Q Did you talk to Anthony Valladares about your involvement with Jeffrey Epstein?**
A No.
**Q Did you ever live with Anthony Valladares?**
A No, he used to come over to my house.
**Q Between 2000 and 2002 did you ever have**



**any interactions with law enforcement?**
A Yes.
**Q When?**
A When I tried to break away from Jeffrey and Ghislaine, I started making myself unavailable. And I got a job at Road House Grill. And Tony used to come pick me up in the afternoons, at nighttime, and he'd sit at the bar. And there's this big cup that's got tips in it.
I was in the back room. And I had to -- first you have to sign out and you have to take off your aprons, put your aprons away. And there's a whole bunch of cleaning up stuff you have to do.
In that time period, Tony grabbed money from a cup that had money in it. That was for the bartenders for their tips. My boss called me the next day. He told me that I had stolen the money, which I hadn't. And I came back and I returned the money after I confronted Tony about it. Gave the money back to him and he said, I'm sorry, but it's just law that I have to call the police. So he called the police.
And knowing that Jeffrey has got the Palm Beach Police Department in his pocket, I went to Jeffrey Epstein and I told him what had happened.

And Jeffrey said, Don't worry about it. Let me take care of it for you.
**Q Okay. I'm sorry. When did you have interaction with law enforcement, then?**
A What year?
**Q Did you speak with a law enforcement officer?**
A I don't believe I spoke to them. Jeffrey handled everything.
**Q Okay. And you said that you had finished your shift at -- this is at the Road House Grill, correct?**
A Correct.
**Q You had finished your shift?**
A Yeah, it was the end of the shift.
**Q Okay. And you had cleaned up and were checking out, correct?**
A Yeah, it's a completely separate part of the -- it's like back of the house. Do you know what that means, like in waitering terms?
**Q (Indicating.)**
A Yeah, back of the house.
**Q And what was -- who was this boss that you spoke to?**
A I can't remember his name.



**Q Okay.**
A But, I mean, he was very nice. He didn't want to but he just had to because it's just the law. You know, the money was returned to him, but he still had to do what he had to do.
**Q You paid him back the money the next day?**
A Very next day.
**Q And did you ever speak with the Palm Beach County Sheriff's Office about it?**
A You know, I don't know if they called me or not, but I know that since my boss told me he had to call the police, I went to Jeffrey. And Jeffrey said he'd handle it.
**Q How old were you at the time?**
A I don't know, 18, maybe 19.
**Q You weren't a juvenile, were you?**
A Well, juvenile being under 18, no.
**Q Is that the only interaction with law enforcement that you had between 2000 and 2002?**
A Correct.
**Q Were you, in fact, charged with theft based on that case?**
A No charges were ever brought to me.
**Q Do you know if they were filed?**
A No. Jeffrey told me he'd handle it, and I



never heard anything about it ever again.
**Q Did you ever check to see if you had a warrant out?**
A No. Jeffrey told me that he took care of it.
**Q Do you think it's a problem to leave the country when you have an outstanding warrant?**
MR. EDWARDS: Object to the form. Foundation. Lack of predicate.
A I don't think I have an outstanding warrant. Why would I -- do you have a document that says I have an outstanding warrant?
**Q (BY MS. MENNINGER) I'm just asking you if you believe it's a bad thing to leave the country when you have an outstanding warrant?**
A Absolutely.
**Q And you would never assist someone in doing that, correct?**
A Correct.
**Q During the year 2015, have you spoken to law enforcement about any topic other than Ghislaine Maxwell?**
A In 2015?
**Q Um-hum.**
A Did I talk to any law enforcement about



Ghislaine Maxwell?
**Q About anything other than Ghislaine Maxwell?**
MR. EDWARDS: And I would just object at this point in time and instruct the witness not to convey any answers as to who she has or who she has not disclosed until such time as the Court rules on the current outstanding motion.
I know that we have some obligations to fulfill by the 4th. We intend to do that. And I also recognize we may be back to answer some of these questions. But for today, she's not going to answer those questions.
MS. MENNINGER: Well, I'm just going to ask them and --
MR. EDWARDS: I understand.
**Q (BY MS. MENNINGER) Have you spoken to any law enforcement in Colorado since the beginning of January 2015?**
A I can't answer that question right now.
MR. EDWARDS: Hold on one second. I may be able to get you an answer to that question. Can I take -- can I just take a quick break, and I think I can answer that particular question for you?
MS. MENNINGER: I'm not asking you to

answer any questions --
MR. EDWARDS: Fine.
MS. MENNINGER: -- Mr. Edwards.
MR. EDWARDS: Fine.
MS. MENNINGER: I appreciate it, but I'm asking the witness to answer these questions.
MR. EDWARDS: I know, I'm just trying to help you today.
For today, don't answer the questions.
THE DEPONENT: I don't mind explaining.
MR. EDWARDS: I know, but you --
THE DEPONENT: Okay.
MR. EDWARDS: I wanted to help.
THE DEPONENT: Okay.
**Q (BY MS. MENNINGER) So have you spoken to any law enforcement officers in Colorado since January of 2015 until today?**
A I am not answering that question.
**Q Have your attorneys spoken to any law enforcement officers in Colorado since the beginning of 2015 until today?**
A I'm not answering that question.
**Q Have you been living with your husband in Australia since October of 2015?**
A Yes.



[redacted]



**other terms of his probationary period?**
A No. He went to everything that he was supposed to go to.
**Q Has he paid his fines?**
A Yes, as far as I know.
**Q Describe for me the contract that you had with the Mail On Sunday?**
A Could you be a little bit more specific? Like --
**Q Have you had more than one contract with the Mail On Sunday?**
A Well, there was one contract for the picture. And that was to pay me 140,000 for the picture. And then two stories were printed after that for the amount of 10,000 each.
**Q Is that the only money that you received from the Mail On Sunday?**
A Correct.
**Q Did you receive any money for syndication of the photograph?**
A Isn't that what the 140 was for?
**Q I'm asking you.**
A Well, I don't really know what syndication means.
**Q Did you have a written contract with the**



**Mail on Sunday?**
A Yes.
**Q Where is that contract right now?**
A I don't know. I've moved that many times. I -- I lose paperwork wherever I go.
**Q Is it possible it's in the boxes in Sydney?**
A I don't think I kept it, to be honest.
**Q Did you ever refer back to it after you signed it?**
A I know I kept it for a short while, but I mean, like I said, I've moved countries twice in the last two years and three different houses. So the paper trail is lost. I don't know where it would be.
**Q Did you receive it via e-mail?**
A No. I received it -- Sharon Churcher handed it to me by paper.
**Q And you signed it?**
A I signed it.
**Q And then did you make a copy of it?**
A No.
**Q You never had a copy of it?**
A Well, I had my own copy. I'm sure she has hers.
**Q Do you recall there being a period of**

Page 249

**exclusivity?**
A Yes.
**Q What was that period?**
A I believe it was like a three-month period or something.
**Q Okay. And what other terms of the contract, do you recall?**
A I couldn't talk to any other news publication about the story.
**Q Anything else?**
A Not that I know of.
**Q Were you happy when the period was up?**
A Well, I mean, at that time I wanted to write about my story. So I guess, yes, I was happy when that period was up.
**Q And you were actively writing a book at that time, correct?**
A My manuscript. I've never published it.
**Q You were writing the manuscript at the time of your period of exclusivity with Sharon Churcher, correct?**
A Those three months were just craziness. I think I started after that.
**Q You think you started writing the book after the 90 days were up?**

Page 250

A Yeah.
**Q And then you attempted to sell that manuscript, correct?**
A I didn't attempt to sell it. I went to other publications, like, what do you call them? People -- I'm trying to think of the name of the word. People who publish books, not like a newspaper or anything. And I inquired about what they thought of my manuscript and if they thought it was, you know, a good story. And, yeah.
**Q So you sent the manuscript to these people for the purposes of trying to publish the book, correct?**
A Some people, yes.
**Q And you were trying to get money from the book publication, correct?**
A Well, I wasn't going to sell it to them for free.
**Q But you were unsuccessful in finding someone to publish it, correct?**
A Well, I was always on the fence with it. I wasn't too sure if I wanted to or didn't want to. I was more seeking judgment based upon these people who have done this plenty and plenty of times.
Still to this day, I mean, I've had people

Page 251

who have been interested in it and I still don't know if I want to do it yet. I mean, I think there's a lot more that can go into it, you know.
**Q You were actively sending the manuscript to people for purposes of having them reach a deal with you and publish it, correct?**
A No deal was ever talked about. What we talked about was the possibility of publishing it, is it publishing-worthy, would I need to get a ghostwriter. You know, this is the first time I've ever written a manuscript so I didn't know what I was doing.
**Q Okay. You contacted Jarred Weisfeld, correct?**
A Correct.
**Q I'm going to mark a document as Defendant's Exhibit 16. It is a composite exhibit.**
**(Exhibit 16 marked.)**
MR. EDWARDS: Thank you.
**Q (BY MS. MENNINGER) I'm not going to ask you to read every single page of this, but if you look at the first page.**
A Um-hum.
**Q Can you tell what this is in terms of what type of document?**

Page 252

A It's an e-mail from me to Jarred.
**Q Okay. And there's also e-mails from Jarred to you on the same page, correct?**
A Yes.
**Q And can you tell -- I just presume that you know that you have turned over documents in this case; is that true?**
A Yes.
**Q All right. And do you see at the bottom it's got your name and some page numbers in the bottom right-hand corner?**
A Giuffre 003529?
**Q Right.**
A Yes.
**Q So you understood that your lawyers sought from you e-mails, for example?**
A Yes.
**Q And searched your computer, correct?**
A Correct.
**Q And printed out e-mails, correct?**
A Yes.
**Q And these look like some of the e-mails?**
A Yes.
**Q Okay. Do you have any reason to believe that e-mails produced by your lawyers with your name**

Page 253

**on the e-mail address line are anything other than your e-mail?**

A No, they're my e-mails.

**Q Okay. Did anyone else use your e-mail account?**

A No.

**Q Okay.**

A I mean, well, my husband uses it sometimes. My kids use it for games.

**Q Okay.**

A But that's about it.

**Q So if an e-mail is signed XOXO Jenna --**

A Yes.

**Q -- is that you?**

A Correct.

**Q All right. And do you believe anyone else in your family was communicating with [redacted]?**

A No, no one else.

**Q All right. What was the purpose of you communicating with Jarred?**

A We were trying to figure out if my book was -- my manuscript was ever published or publishable. And this was at a time where there was a lot of controversy about what's going on around JE.

Page 254

And when I say JE, I mean Jeffrey Epstein. It was a very scary thing for a lot of publishers to even consider taking it on because Jeffrey is a very powerful person.

**Q Did you send your manuscript to Jarred?**

A I believe I did.

**Q All right. Did you ask Jarred to send it on to other people like Tony?**

MR. EDWARDS: Object to the form.

A I can't -- I can't recall. I believe I met Tony through Jarred.

**Q (BY MS. MENNINGER) Okay. I'm going to ask you to turn -- well, on the first page, the second e-mail says, is Epstein too big for Tony?**

**Does that refresh your recollection that Jarred and Tony had something to do with one another?**

A Yes.

**Q Okay. And on the second page in the middle of the page, just to be clear, is that an indication that, Tony definitely does not want the book, XOXO Jenna.**

**Is that what you wrote?**

A Yes.

**Q And these first e-mails are in 2000 -- July of 2012, correct?**

Page 255

A Yes.

MR. EDWARDS: I object just to the apparent mischaracterization.

MS. MENNINGER: Of 2012?

MR. EDWARDS: Being the first e-mails.

MS. MENNINGER: I only meant the first pages of this composite exhibit.

MR. EDWARDS: Okay.

MS. MENNINGER: But I appreciate your clarification.

MR. EDWARDS: Okay.

**Q (BY MS. MENNINGER) The first e-mails of this composite exhibit are dated July of 2012, correct?**

A Correct.

MR. EDWARDS: The first page. As opposed to the first in the chronological timeline.

MS. MENNINGER: Yes.

MR. EDWARDS: Okay.

**Q (BY MS. MENNINGER) If you flip sort of anywhere towards the back, can you also see that you -- there are e-mails between yourself and Jarred in 2011?**

A Excuse me. And which page?

**Q Really, you can take your pick anywhere**

Page 256

**from the back of that exhibit?**

A Yeah, yeah, I see what you're talking about.

**Q Here. Why don't I direct you to the bottom right is Giuffre 3563. Now, it's going to be a little tricky to find, but it's about eight pages -- I'm sorry, six pages from the back of the composite exhibit.**

A Yes.

**Q Do you see on that page an e-mail from yourself to Jarred from June 7th of 2011?**

A Yes.

**Q And in that e-mail you write: Dear Jarred Weisfeld, We spoke on the phone going back a couple months regarding the story I am writing called, The Billionaires Playboy Club.**

**Right?**

A Correct.

**Q I am no longer under any contract and would like to ask you to review my synopsis and if you are interested I would love for you to represent me as my literary agent.**

**Correct?**

A Correct.

**Q I've included some of the press that has**

**covered the ongoing case of Jeffrey Epstein, the world's richest pedophile. And my good friend and journalist Sharon Churcher has a few from her articles that she has written to send to you as well.**
**Correct?**
A Correct.
**Q I am very serious about getting my book published and believe this story will cover many genres of interest, not only by those following the lengthy case, but it is also a woman's story of glitz, glamour, sorrow, compassion, and true love. I hope you enjoy.**
**Correct?**
A Correct.
**Q Signed, yourself?**
A Yes.
**Q So in about June you sent to Jarred Weisfeld a synopsis and were asking him to represent you as your literary agent to sell the book, correct?**
A Yes.
**Q And you characterized Sharon Churcher as your good friend, correct?**
A Well, at that time -- you have to understand, Jarred and Sharon are very close. Sharon is the one who introduced me to Jarred. And that's



just being nice.
**Q Do you disagree that Sharon Churcher was your good friend at that time?**
A Well, at that time I did trust her a lot more than what I do now.
**Q Why did you change your opinion of Sharon Churcher?**
A You know, I -- I just -- I think -- I think talking to some journalists can be very dangerous, especially sometimes how words can get taken out of context. And I'm not saying that she's a bad person. I'm just saying that just, I wouldn't call her up and ask her what she's cooking for dinner tonight or how the family is doing.
**Q Did you ever introduce her to your hair stylist?**
A No.
**Q All right.**
A Oh, actually, yes, I did. She did get a haircut where I was at.
**Q All right.**
MS. MENNINGER: So if I could have the e-mails with Paulo Silva, please. I'm going to mark these Defendant's Exhibit -- 18 -- 17.
Oh, I don't know if that's -- is that just



one? All right.
MR. EDWARDS: What are we on now, 17?
MS. MENNINGER: 17.
(Exhibit 17 marked.)
**Q (BY MS. MENNINGER) Very similarly, can you take a look at this exhibit? It is a composite of documents produced by your attorneys with various Bates ranges, Bates numbers in between Giuffre 2750 and 3928.**
A 2750 and --
**Q I think -- I think the last page is 3927, but it does not contain all of -- I'm sorry, 3928. But it does not contain all of the pages in between, just to let you know.**
A Okay. Is there one specific that you want me to look at?
**Q No, if you can just take a look at the first page.**
A Okay.
**Q And tell me if you know who this person is?**
A Paulo Silva is somebody who works for the Mail On Sunday. And he was the one in charge of paying me.
**Q Paying you for what?**



A The 140 plus the 10 and the 10.
**Q Okay. And did he also pay you on an ongoing basis for further sales of the photograph of yourself and Prince Andrew?**
A No, it was a set fee of 140 plus the 10 and 10. But they broke it up for some reason. So as you can see here, Thanks for transferring the money. I will let you know when it reaches my bank account but just a little bit confused as I have a previous e-mail with the amount owed at 4100. Is there still an outstanding amount yet to be paid.
So they broke it up into quite a lot of different fractions but it still equaled the 140 plus the 10 and the 10.
**Q Okay. If I could ask you to flip back to Giuffre 2758. They're in sequential order, so it should be about eight pages back.**
A Yes.
**Q All right. Do you see -- do you see that that's an e-mail from Paulo Silva to your e-mail account?**
A Yes.
**Q On or about March 28th, 2011?**
A Yes.
**Q All right. And it appears to be his**

**introductory e-mail to you. Is that a fair characterization of it?**

A It would be hard to say. Like, I'd have to look at the first one. That's June 24th. This is March 28th. I suppose so, if he's introducing himself as Paulo Silva.

**Q All right. And in this e-mail he introduces himself by name and tells you that he works for Solo Syndication and represents they are the official syndication agency for Daily Mail and Mail On Sunday and that he's been overseeing the syndication of your image, correct?**

A Correct.

**Q All right. And then he tells you that with regard to your image with Prince Andrew he can confirm that they've been able to sell it frequently over the last couple of weeks. And he listed the names of various news agencies to whom they had sold the image, correct?**

A Correct.

**Q And then he tells you what the sales were as of last Friday and then what your share of it is, correct?**

A Correct.

**Q And your share of it was approximately**



**half of whatever the sales were, correct?**

A Yes, it looks that way.

**Q All right. And so then he gave you their general payment terms, correct?**

A (Deponent perused document.)

Yes. Yep.

**Q And is that syndication deal separate and apart from your deal with the Mail On Sunday to get paid for the stories and a chunk --**

A Yes.

**Q -- for the image?**

A So I will have to correct my previous statement.

**Q Okay.**

A So I forgot completely about the fact that I received 4,487.50 for -- for the pictures that got sold.

**Q And is it possible it was sold some more after this date, for which you received some money, correct?**

A I don't believe so. I -- I didn't even remember this one, to be honest. So if there's any others that you can show me, I'd be happy to look at them.

**Q Well, I'm just asking you if you remember**



**what the terms of your agreement were with this syndication, Solo Syndication?**

A Well, like you said, it looks like half of --

In regards to your image with Prince Andrew, I can confirm we've been able to sell it quite frequently over the last few weeks. So far we've been able to sell it to the following clients. It lists names.

So far the total sales, as of last Friday, is the number listed there.

Therefore, your share is 4,487.

**Q So let me be clear. I guess I'm asking, do -- do you recall what your deal was with Solo Syndication?**

A No, I do not recall it. I just remember Sharon writing up the contract saying 140 plus the 10 and the 10. I completely forgot about the syndication for $4,000 and 487 cents (sic).

**Q Okay. I'm going to ask you to turn back to 2754.**

A 2754?

**Q Correct.**

A Okay.

**Q And it's a document with the heading Solo**



**Syndication Limited. Is that the right page you're on?**

A Yes.

**Q Dated May 23rd, 2011, correct?**

A Yes.

**Q All right. And there's some handwriting in the middle of the page towards the bottom.**

A Not my handwriting.

**Q It's not your handwriting?**

A No.

**Q Do you know whose it is?**

A No.

**Q All right.**

A I don't even know what it says. Does it say Chai canceled and something mode? I have no idea what it even says.

**Q Okay. And it's not your handwriting?**

A No.

**Q It was produced by your attorneys, correct?**

A I'm sorry?

**Q It was produced to us by your attorneys, correct?**

A Yes. They went through and gave you guys everything you asked for.

**Q All right. Since these e-mails come from your e-mail address to and from Paulo Silva, do you have any reason to doubt that they are your e-mails?**

A I have no reason to doubt.

**Q All right. Do you recall a Sandra White?**

A Yes. She was a possible ghostwriter that I was going to use. Sharon recommended that I got a ghostwriter to be involved. And we nearly settled on some kind of agreement, but I wasn't really happy with the agreement in the end, so I decided not to use her.

**Q You weren't happy with the terms of her price, if you will?**

A Yes.

**Q And so you didn't come to an agreement with her, correct?**

A We nearly did, but we in the end did not.

**Q All right. If I can show you Defendant's Exhibit -- whew -- 18.**

MR. EDWARDS: You did kill a tree there.

**Q (BY MS. MENNINGER) Take a look at that.**

**(Exhibit 18 marked.)**

THE DEPONENT: So put this one away?

MR. EDWARDS: Put these in some sort of order. They don't have to be perfect, but just so



you know what you're looking at.

This is 18?

**Q (BY MS. MENNINGER) All right. Again, do you recognize that the e-mail address --**

A Is mine.

**Q -- is yours and it's from and to Sandra White, correct?**

A Correct.

**Q And the date is in or around May 25th, June 5th, something like that?**

A It's Australian so it's backwards. So it's the 6th of May, 2011.

**Q Well, I would have thought that except the bottom e-mail is May 24th, the middle one is May 25th and then the most recent one says 6/5. So I don't -- I don't know. I didn't write the document.**

A Yeah.

**Q But I'm asking if you believe it was in or around the end of May?**

A The only reason I can tell you that is because if you look here, 24/5/11 is the way that we actually do our dates in Australia, whereas in America you would do 5/24/11.

So right here where it's written makes it nice and clear but just to be clear, the dates are



backwards.

**Q Right. So if an e-mail is responding to May 25th, is it more or less likely that it was written on June 5th or May 6th?**

MR. EDWARDS: Object to the form.

A I would say May 6th.

**Q (BY MS. MENNINGER) So when responded to a May 25th --**

A Oh, no, you're right. No, I'm sorry, I'm going backwards because it's going up, isn't it? Okay. Yes.

**Q All right.**

A I'm confused, too.

**Q Anyway. In the last e-mail it says: I'm very sad we won't be able to work together as I've been very excited about the project. As you know, I do not sell synopsis or individual chapters, and especially not for those amounts. I'm merely intrigued about where you were getting advice from. Rest assured what we have worked on is confidential. If you change your mind, let me know.**

**So that was around June 5th?**

A 2011.

**Q 2011, right?**

A Yes.



**Q All right. So you had been trying to reach an agreement with Sandra White prior to June 5th?**

A Correct.

**Q And were unable to do so?**

A Yes.

**Q And not that you need to read every page, but is it fair to say that you exchanged some portions of your synopsis with Sandra during the course of your interactions with her?**

A Yes. And she rewrote some portion of it as well, which I don't even know, it might be in here. It might not be in here. I don't know what I've kept or not kept.

**Q Okay. And did you get advice from Sharon Churcher with respect to the terms upon which you should be looking for the ghostwriting agreement?**

A Sharon is the one who introduced me to Sandra. I can't remember who was giving me the advice. It's going back so long ago, you know, I don't want to pinpoint somebody and say it was definitely them if it wasn't.

So, yeah, I'm just not going to comment on that one without knowing.

**Q Okay. You probably have e-mails, though,**

Page 269

**do you think, perhaps?**
A I haven't seen these e-mails since 2011. So --
**Q Okay. I'm going to show you Defendant's Exhibit 19.**
**(Exhibit 19 marked.)**
**Q (BY MS. MENNINGER) Who is Marianne Strong?**
A She's my literary agent.
**Q All right. And can you identify Defendant's Exhibit 19?**
A I'm sorry?
**Q Can you identify what Defendant's Exhibit 19 is?**
A Defendant's Exhibit 19, like the number at the bottom?
**Q No, do you know what kind of document this is?**
A Oh, it's an e-mail from me to Marianne Strong.
**Q All right. And at roughly what time frame?**
A February 20th, 2014.
**Q All right. And what were you speaking with Marianne or writing with Marianne Strong about?**

Page 270

A Can I just read it real quick and I'll tell you?
**Q Sure.**
**(Pause.)**
A Sure.
**Q Do you remember now the topic upon which you and Marianne Strong were exchanging communication?**
A I don't recall talking about Lord Colin Campbell or the Duke of Argyll or Colin. And Lord Colin is Scottish. I don't know who Emily is. But I do understand what she's saying. If I win, then my story would be a much better story to write.
**Q And what case was she referring to, if you know?**
A I think this was regarding probably the time when I was in -- trying to get involved with the CVRA case.
**Q In February of 2014?**
A Correct.
**Q Okay. And at the bottom of the page there's an e-mail from you to her, correct?**
A I haven't read that part yet. Give me one moment.
**Q Yeah.**

Page 271

A Thank you.
So it cuts off after that, does it?
**Q Um-hum.**
A Oh, sorry. (Pause.)
Yep, I've read it.
**Q All right. Do you remember that e-mail now?**
A It's going back a long time ago, but it's definitely my kind of writing.
**Q Okay. So in the -- on the bottom of the first page, 3417 --**
A Um-hum.
**Q -- you represented to Marianne Strong that you had served four years as Jeffrey Epstein's personal and abused sex slave, correct?**
A Correct.
**Q That is not true, correct?**
A Since we have now found out the actual dates, it is not correct.
**Q Okay. I want to turn the page, the second page. On the first line, the first full sentence that begins on the first line:**
**Even though there is over 40 women that were once vulnerable girls that looked like the sweet girl next door but now that they have been taken**

Page 272

**advantage of by this disgusting Wall Street tyrant, most of them have led a very unhealthy lifestyle since having served Jeffrey, such as drug addictions and prostitution and do not hold accreditation to talk.**
**You wrote that, correct?**
A Correct.
**Q Who are the 40 women that you are talking about here?**
A When I spoke to the FBI, they told me that there were -- and this is maybe just a guesstimate, maybe there was more, maybe there was less that they said. But they had told me that there was a lot of other victims involved in this case. And this is when I believed that after the FBI came to see me that they were willing to reopen the case and do something about it.
**Q Okay. So the FBI is the one that told you that there were 40 women?**
A It could be less than 40. It could be more than 40. I think I just summed it up to 40.
**Q You came up with 40?**
A Well, I didn't just come out with 40. I think it was around that number. It could be 46. It could be 39. I'm not too sure to be exact.

Page 273

**Q All right. But you based it on --**
A On my speaking --
**Q -- what?**
A -- with the FBI.
**Q Okay. And --**
MR. EDWARDS: Just let her finish her question before you answer.
THE DEPONENT: Okay.
MR. EDWARDS: I just want the record clear.
**Q (BY MS. MENNINGER) Who at the FBI did you speak with?**
A I can't think of his name. I spoke to -- oh, God, I can't even think of his name right now. I spoke to a male and a female. And I also spoke to Marie Villafana about everything that was happening.
**Q Is it Jason Richards?**
A Jason Richards, yes.
**Q Did Jason Richards tell you that the FBI was reopening their case?**
A He wanted to reopen the case. And the last conversation that I had with him, I can't remember when it was, he said that he was having trouble doing it from the people above him.
**Q Okay. When was that?**

Page 274

A Like I said, I don't know.
**Q Was it like a year ago or two years ago or three years ago?**
A I don't remember the last time I talked to him. I think I was in Florida the last time I spoke to him.
**Q And was that on the phone or in person?**
A On the phone.
**Q Hmm?**
A On the phone.
**Q On the phone. Where was he located, if you know, when you spoke to him?**
A I don't know.
**Q Do you have his phone number?**
A I have his card somewhere. Probably not on me anymore. Like I told you, my paper trail is (indicating).
**Q Okay. So in the fourth line you say: Miraculously since I came to light with the truth in speaking out against him in 2011, the FBI have reopened the case. Which as you know, has current proceedings in which I am involved in.**
**So what current proceeding were you involved in on February 19th, 2014?**
A Well, just speaking with the FBI, I was in

Page 275

the assumption that the case was being reopened, that they still were investigating.
**Q Okay. Did you believe that the FBI had reopened their case in 2011?**
A I believe that's when they first started to reinvestigate and reopen it.
**Q And then sometime when you were in Florida Jason Richards told you that they were not actually going to continue investigating the case?**
A I believe I was in Florida, yes. And he didn't say that -- he just said his hands were tied and up above, I don't know, chain of command, it just -- it didn't look like it was going anywhere. There was no definite no and a definite yes. It was just, right now there's really nothing that we can do.
**Q All right. In the third paragraph from the top, you said there's another major paper that has followed the story for a while that has worked with me before and they were asking you for the exclusive story but updated and obviously the end outcome from the judicial decision.**
**Who was the other major paper that had followed the story for a while and was asking you for an exclusive story?**

Page 276

A That would -- that, just coming to mind must be the Daily Mail. If I said I've worked with them before, the only other -- the only other, what do you call them, press, that I had worked with was the Daily Mail, so --
**Q Okay. But you said you had held out on them because Marianne had told you about her contact with Emily at the New York City Post, right?**
A I have held out because you told me about your contact with Emily with the New York Post, and I appreciate you trying to make big headlines for the story and hopefully one day the book. Yes.
**Q Okay. And then the last line of that paragraph you say: I would also like to know that I'm going to profit from this as well, correct?**
A Correct. I'm not going to give it for free.
**Q Right. All right.**
**(Exhibit 20 marked.)**
MS. MENNINGER: Defendant's Exhibit 20.
**Q (BY MS. MENNINGER) Do you recognize these documents -- this document, which is another composite exhibit?**
A Yes.
**Q Do you recognize it?**

A Oh, like I said, I don't recognize it, but it obviously comes from --
**Q Your e-mail address?**
A Yes.
**Q Now, what e-mail address is that, exactly, on the first page of this exhibit?**
A @icloud.com, that must be from a phone.
**Q So that's different from the other e-mail address?**
A Yeah, I don't actually know about that e-mail address. I obviously used it. It has my husband's name on it, Robert Giuffre.
**Q And is the e-mail signed by your husband?**
A No, it's signed by me.
**Q Okay. And in the subject line you wrote Virginia Roberts (Jane Doe 102), correct?**
A Subject line?
**Q The very top line of that page.**
A Oh, yeah, I see.
**Q Okay. And it was to jason.richards2@ic.fbi.gov, correct?**
A Correct.
**Q And is that Jason Richards we were just referring to?**
A Yes.



**Q All right. And you had some e-mails with Jason Richards over time; is that fair?**
A Sure.
**Q These ones that came from your computer, right?**
A Sure, yes.
**Q Okay. You talk about having spoken with Judge Paul Cassell in this first page, correct?**
A I am here to get this BS non-prosecution agreement thrown out and speaking with Judge Paul Cassal (sic). He suggested trying to get ahold of any photos or video recordings released by the FBI to assist our case further in providing (sic) how much pedophilia occurred by Jeffrey and the many other monsters he obliged with underage girls.
**Q Okay.**
A If this is a possibility, please let me know so I can give you Brad Edwards (my attorney) his contact details. Many thanks for your time and I hope we should meet again.
**Q Okay. And so you were going back to Jason and trying to get any evidence that the FBI had about your case, right?**
A Correct. Any photographs pertaining to what -- myself, not of anyone else.



**Q Right.**
A But anything they had of me.
**Q And Brad Edwards, who is sitting right here, was your attorney at the time and you identified him as such in the e-mail, correct?**
A Correct.
**Q You did not identify Mr. -- Judge Cassell as your attorney in this e-mail, correct?**
A I knew him as a former judge, and I just wrote down, Judge Paul Cassal (sic) as it looks. But he was my attorney -- I don't know if he was my attorney at that time. But yes -- he's always -- he's been with me since the beginning, so --
**Q So he's representing you in this case now, correct?**
A Yes.
**Q But at that time you don't know if he was your attorney?**
A I think he was. I mean, I've been talking with him since the beginning. And this is dated 2014. So I believe at this time he was my attorney at the time as well.
**Q Okay. When do you recall first speaking with him?**
A Speaking with Paul, I'm not too sure. I



can't remember if I spoke to Paul in the phone in Australia or if I met him in person in Florida.
**Q Do you remember when you signed any kind of fee agreement with him?**
MR. EDWARDS: Object to the form.
A Um, the -- well, the first time I would have signed an agreement would have been in Florida.
**Q (BY MS. MENNINGER) When you were living in Titusville?**
A As far as my knowledge reminds me. I mean, I'm looking at e-mails that I can't even remember sending. It's a possibility I could have signed earlier, but as far as I remember.
**Q Okay. Do you recall ever having e-mail communications with Sharon Churcher about her publishing the first serial of your book?**
A Serial, what does that mean? I'm sorry.
**Q Like a sequel.**
A A sequel to my book?
**Q Um-hum.**
A My book has never been published.
**Q Right. Do you remember ever e-mailing with Sharon about her being the one who would publish any subsequent follow-up book?**
A If you have something in front of you to

see and show me I would look at it. Like I said, there's a million e-mails here. I mean, there's a whole dead tree with e-mails I don't remember sending. So --

**Q So you don't remember that e-mail chain, as you sit here?**

A Yes.

**Q Okay. You have signed contingency fee agreements with Boies, Schiller, correct?**

A Yes.

**Q You've signed contingency fees with Mr. Cassell, correct?**

A Correct.

**Q Mr. Edwards and his firm?**

A Correct.

**Q Stan Pottinger; is that correct?**

A Correct.

**Q And pursuant to those fee agreements you understand that you would get a recovery of any money that you won in this case, correct?**

A Correct.

**Q And what percent is that?**

A I don't know off the top of my head. I think it's 40 percent. I'm not too sure, to be honest.



**Q Do you remember having any conversations with Rebecca Boylan about money that you hoped to obtain from this case or from any other source related to this?**

A I remember talking to Rebecca Boylan as a girlfriend telling her what cases I was involved with. I don't believe we ever spoke about any monetary settlements. There was no number that was ever mentioned. I told her that I was involved in these cases. And, you know, it was just girlfriend talk between girlfriends. I never expected her to turn around and consort with the enemy.

**Q Well, it's fair to say you do hope to make money from bringing this lawsuit, correct?**

MR. EDWARDS: Form.

A I hope to win, but that's not the only reason I want to win. I want to see justice come through.

**Q (BY MS. MENNINGER) Is money one of the reasons you want to win?**

MR. EDWARDS: Same objection.

A More than the money, I want to see Ghislaine and Jeffrey own up to what they have done and pay for the price, yes.

**Q (BY MS. MENNINGER) Is money tight in your family?**



A We've been doing well.

**Q You've been doing well?**

A Yes.

**Q What is your source of income right now?**

A My husband is the main income -- he's the breadwinner and I'm a stay-at-home mom.

**Q And what is his job?**

A [redacted].

**Q And how long has he had that job?**

A He got that job, I believe, in December or January. December 2015 or January 2016. I know he got the job and then we had to go through all these preliminary tests and everything to make sure you qualify. So --

**Q And what is the last paid employment that you had?**

A The last paid employment that I had was -- there was that -- do you remember going back through the e-mails where I had that resume and I sent it and they said, What time do you want to come for an interview?

I ended up getting the job there for two



days because the place was disgusting and the boss was just horrible.

I didn't get paid from them, but I got employed by them. And other than that, the last time I worked was in -- ended in 2006 for ET Australia.

**Q Did you quit that job after two days because the place was disgusting?**

A It was vile. Okay. They had the -- the whole place was closed down. The restaurant was closed down for a period of, like, six months. And he wanted me to go into this freezer area that had a dead rat in it and like this thick (indicating) layer of mold at the bottom. And he wanted me to clean it.

**Q All right.**

A And I was just like, No.

**Q Just checking, did you quit or did he fire you?**

A No, I definitely walked out of that one, hands up.

**Q Okay. I'm going to do one more document I have, quickly.**

**(Exhibit 21 marked.)**

**Q (BY MS. MENNINGER) I'll show you Defendant's Exhibit 21, another composite exhibit. Do you recognize the to and froms on this e-mail?**

A To Sharon Churcher from myself, yes.
**Q And this is the Sharon Churcher from Mail On Sunday we were discussing earlier?**
A That's correct.
**Q And these are from February of 2011, correct?**
A Yes.
**Q Okay.**
A I mean, it's just assuming that we're not looking at Australian backwards dates.
**Q Okay. Well, a few pages back, where it says 2/19/2011.**
A Oh, yeah, yeah.
**Q All right. If I could direct your attention to one of the pages, it's 3676 in the lower right-hand corner.**
A 3676.
**Q Now, these are in sequential order. They're not in Bates stamp order so you might have to look at the dates on the top to find one that's February 19th of 2011.**
THE DEPONENT: Do you know which page it is?
MR. EDWARDS: Well --
MS. MENNINGER: It's almost in the middle.



MR. EDWARDS: It's like what she's saying is that --
MS. MENNINGER: If you look at the date at the top --
MR. EDWARDS: If you look at the top it says 2/19/2011. That's not it. It's like half a page. Keep going.
A 2/13, 2/17, 2/18, 2/19 -- 2/19/2011.
**Q (BY MS. MENNINGER) If it says 3676 in the lower right-hand corner?**
A Yes.
**Q Okay. Is that an e-mail that you sent to Sharon Churcher in response to an e-mail that Sharon Churcher sent to you?**
A To Sharon Churcher from Jenna, Subject R-E, received, yes.
I tried to call the line was busy. Could you call concerning the question you asked?
**Q All right. And that was in response to an e-mail just below it you received from Sharon Churcher, correct?**
A Yes.
**Q And what did Sharon Churcher write to you on February 19th of 2011?**
A Do you know a Nadia Marcinkova?



Supposedly JE purchased her at age 14 from her family.
**Q Okay. And then you asked her to call to discuss that, correct?**
A I tried to call. The line was busy. Could you call concerning the question you asked?
**Q Right.**
A Yes.
**Q All right. Defendant's Exhibit 22.**
**(Exhibit 22 marked.)**
THE DEPONENT: Thank you.
**Q (BY MS. MENNINGER) Okay. Do you recognize these series of e-mails?**
A So far. I mean, it's definitely from me to her. Or actually, Michael Thomas is the photographer that worked with her, just to be clear.
**Q And is she one of the two -- the recipients of the first-page e-mail? You and she received an e-mail from Michael Thomas; is that right?**
A Yes.
**Q Okay.**
MR. EDWARDS: I think she wants you to look and make sure you recognize them.
**Q (BY MS. MENNINGER) Yeah, do you recognize**



**the document, the e-mails?**
A Like I said, these are back in 2011, but it's from my e-mail address. I recognize that. I recognize Sharon's name and I recognize Michael Thomas.
**Q Do you have any reason to doubt that the e-mails from March of 2011 --**
A I don't have any --
**Q -- from yourself and Ms. Churcher are accurately reflected from the documents taken from your computer here?**
A I have no reason to doubt that.
**Q Okay.**
**(Exhibit 23 marked.)**
**Q (BY MS. MENNINGER) Defendant's Exhibit 23. Again, e-mails between your e-mail address and Sharon Churcher from May of 2011.**
**Do you recognize your e-mail address?**
A Yes.
**Q And Sharon Churcher's e-mail address?**
A Yes.
**Q And you're signing your e-mails to her, Much love, XOXO Jenna. And she's signing her e-mails to you, Love Shaza, correct?**
A Correct.

**Q And Shaza is a name that you call her?**
A In Australia we kind of shorten the names of people and put z-a on the end, so yes.
**Q So she became Shaza?**
A She became Shaza, correct.
**Q And do you recall having e-mail communications with her in which you referred to her as Shaza and --**
A Yes.
**Q -- she referred to herself as Shaza?**
A She's the same person we're talking about, yes.
**Q All right. So it's coming from her e-mail address as Sharon Churcher, right?**
A Yes.
**Q All right. And I think the last --**
MR. EDWARDS: Are you at a stopping point?
MS. MENNINGER: Almost.
MR. EDWARDS: Okay. Okay. I just have to a make a quick call, but I can wait a while so --
MS. MENNINGER: I understand. Almost done.
MR. EDWARDS: Okay.
(Exhibit 24 marked.)
**Q (BY MS. MENNINGER) This is Exhibit 24,**



**e-mails between yourself and Sharon Churcher from June of 2011?**
A Um-hum. Yes, sorry.
**Q And, again, Shaza and Jenna, Shaza, Jenna, Jenna, Shaza, right?**
A Yes.
**Q And at the bottom of this first page, is Sharon Churcher giving you advice regarding the purchase by Vanity Fair of your picture with Prince Andrew?**
A May I have time to read it, please?
**Q Please.**
A Are we talking about the very bottom one or the one in the kind of middle bottom?
**Q The very bottom one.**
A I would let VF buy your picture via Brad. The big gamble would be to let him also give them a statement.
**Q Right.**
A (Deponent perused document, sotto voce.)
The reason this is a gamble is Jeffrey knows some of the most powerful people in publishing and, once altered, will inevitably try to scare off potential buyers. But the upside is it should help you get a good agent. I would have Brad use the



phrase sex trafficked as that is a heads up about the book revealing more than be printed.
**Q All right. So is Sharon Churcher writing to you about -- actually, it's cc'd to Brad, correct?**
A Yes.
**Q And I only use Brad, not his last name because it's brad@pathtojustice.com, correct?**
A Yes.
**Q All right. And that's Brad Edwards, who is sitting here, right?**
A Yes.
**Q All right. And so in the e-mail from Sharon Churcher to you regarding whether or not you should let Vanity Fair buy your picture, she's also recommending in the last line that you should have Brad use the phrase sex trafficked, correct?**
A If a statement is made, yes. I don't think Vanity Fair ever did, anyway.
**Q And the picture that they're talking about there is the one with Prince Andrew, correct?**
A That's -- yeah, the big one.
**Q The one that was previously sold?**
A Yes.
**Q And Paulo Silva was syndicating that one, correct?**



A Yes. Yeah.
**Q And on that second page there's a redaction. Who is -- who is in that redaction?**
A I have no idea.
**Q You don't know?**
A No, I don't know.
**Q So who are the two world's most respected politicians? [redacted] and who?**
A I don't know.
**Q Do you recall ever telling Sharon Churcher that you were trafficked to two of the world's most respected politicians, [redacted] and somebody else?**
MR. EDWARDS: Object to form.
A Is that her wording? This is from her. So this is her wording.
**Q (BY MS. MENNINGER) Right.**
A If she considered them to be the world's most respected politicians, that would be her opinion, not mine.
**Q Okay. But you received this e-mail and responded to it, correct?**
A Is the top one above that what I responded to? Sorry. It just confuses me because it goes upwards, doesn't it, not downwards. We're not

Page 293

reading chronologically down, are we?

**Q You can probably look at the dates and figure it out. I need you to do that, not me?**

A Okay the 30th of the fifth, 31st of the fifth, 6th of the first. Right. So I still don't know who she's talking about there.

**Q You don't know if you received this e-mail?**

A No, I received this e-mail, obviously, but I don't know who's redacted there.

**Q Okay. And in the e-mail that you responded to, you're talking about -- you used B. Clinton, correct?**

A It does concern me what they could want to write about me considering that B. Clinton walked into VF and threatened them not to write sex trafficking articles about his good friend JE.

**Q Right. Does that refresh your memory that when you got this e-mail unredacted Bill Clinton was included as well as [redacted]?**

MR. EDWARDS: Object to the form.

**Q (BY MS. MENNINGER) In the line referred to as two of the world's most respected politicians?**

A It could be. But, again, I would be making an assumption because I don't know who that

Page 294

name is.

**Q I don't either.**

A Okay.

**Q Maybe our lawyers can tell us.**

MS. MENNINGER: All right. Last one, and then you can get your break.

(Exhibit 25 marked.)

**Q (BY MS. MENNINGER) Defendant's Exhibit 25. Again, e-mails to and from yourself and Sharon Churcher, correct?**

A Yes.

**Q And in this e-mail, it's dated 4/12/2015 on the first page of this composite e-mail?**

A Yes.

**Q She is encouraging you to do a book, correct?**

A As she has from the beginning, yes.

**Q Right. And she suggested a roman a clef. Do you know what that means?**

A No.

**Q On the third page back, she wrote you to compliment you about David Boies taking your case, correct?**

A (Deponent perused document sotto voce.)

Just reading about David Boies taking your

Page 295

case. How fantastic, Jenna! Have you asked him how he'd feel about reviving your book? It would be an incredible shame if the other project lifts your story, which it could at least somewhat. Jarred is still very keen to represent you. I'm afraid I screwed you by steering you to Mimi.

I just had a great weekend in LA on a celebrity story. Got to go to Rodeo Drive!!!

Much love, Shaza.

Yes.

**Q So she's encouraging you to have David Boies also help you in the book writing department, right?**

MR. EDWARDS: Object to the form. Mischaracterizes the exhibit.

A Is the question pending?

**Q (BY MS. MENNINGER) Yes.**

A She -- yeah, she encouraged me to -- I mean, once she saw that, you know, there was more litigation going on, she thought -- like she says, How fantastic. And up until recently she's still been trying to get me to get the book out.

**Q And in May of 2015, do you have -- did you have any active agreement to publish your book?**

A In May of 2015, no. Jarred wanted to do

Page 296

something again, but his only thing was, he wanted Sharon to be in on it as like a ghostwriter. And I said, Look, Sharon is all well and good, but I don't want a journalist, you know, as they can twist things around writing my story.

So he was like, Well, I'm sorry, I don't want to work with you then. And I said, Well, that's fine. No problem.

**Q Do you, as you sit here today, have any agreement to publish your story in written form?**

A No, we have no agreement.

**Q Do you have an agreement for anyone else to write your story?**

A No.

**Q Have you got any ghostwriter in the book?**

A Besides Sandra, who I didn't like, no.

MS. MENNINGER: All right. I think now is a good time for a break. And then --

MR. EDWARDS: Okay.

THE VIDEOGRAPHER: We are off the record at 4:12.

(Recess taken from 4:12 p.m. to 4:22 p.m.)

THE VIDEOGRAPHER: We are back on the record at 4:22.

**Q (BY MS. MENNINGER) When you were**

**e-mailing and speaking with Sharon Churcher in 2011 about the Vanity Fair possibly purchasing your photograph --**

A Um-hum.

**Q -- do you recall whether you shared with Sharon Churcher anything that you had discussed with your attorney, Mr. Edwards?**

A In relationship to what? Like, have I identified people to her?

**Q Right.**

A Yes.

**Q Okay. So you -- you identified people to her and you then looped back to her about your conversations with Mr. Edwards, correct?**

MR. EDWARDS: Object to the form.

A I'm sorry, can you rephrase? I don't understand.

**Q (BY MS. MENNINGER) All right. So you were e-mailing with her --**

A Um-hum.

**Q -- getting her advice about whether or not to sell your Prince Andrew picture to Vanity Fair?**

A Right.

**Q She asked you to run some information by Brad --**



A Yes.

**Q -- Edwards. And you said that you were going to do that?**

A Um-hum.

**Q And then you spoke to Mr. Edwards, correct?**

A I don't know if I spoke to him or if I e-mailed him.

**Q Okay. And then did you report back to Sharon Churcher what you had discussed with Mr. Edwards?**

A I'm not too sure. Like I said, going back to the 2011 e-mails, look at this pile here. It's impossible for me to know.

**Q So you were having a lot of communications with Sharon Churcher in 2011?**

A In 2011, yes.

**Q All right. And Mr. Edwards was your attorney in 2011, correct?**

A Yes.

**Q And did you ever have Sharon Churcher draft for you e-mail to send to Mr. Edwards?**

A Yes, I believe -- I believe she did.

**Q And why did she draft e-mails for you to send to Mr. Edwards?**



A I believe there was -- and this is just going off my recollection.

**Q Um-hum.**

A I believe there was a time when she was -- oh, God, I can't remember. I really can't remember and don't want to say anything without looking at that exact e-mail. Do you have it to show me?

**Q Well, I'm sure it's probably in there but I don't want to take the time to look for it now.**

A Okay.

**Q So I understand you're just repeating what you recall from your memory.**

A Yes.

**Q And it may not be accurate because you're not looking at the document. I've got that caveat.**

**What do you recall, just as you're sitting there?**

A I know there was e-mails that Sharon sent to me suggesting to say to Brad Edwards, I know that. I don't remember or recall exactly what was in those statements.

**Q Okay. And did you send those e-mails to Mr. Edwards, as you recall today?**

A I don't know. I'm sorry.

**Q And do you know if you went back to Sharon**



**Churcher and told her about the conversations or e-mails you had with Mr. Edwards?**

A Some of them, I'm sure, yes.

**Q Because you were in fairly regular contact with Sharon Churcher at that time, correct?**

A Right, at that time.

**Q All right. I want to introduce to you Defendant's Exhibit 26.**

**(Exhibit 26 marked.)**

**Q (BY MS. MENNINGER) Have you seen this document before?**

A I don't know if I've seen this specific document before, but I've seen something close to it, I think.

**Q All right. Do you see the date on the document?**

A March 10th, 2011.

**Q March 9th?**

A I see March 10th, sorry.

**Q Hmm.**

A London, March 10th, 2011.

MR. EDWARDS: Both dates are there.

MS. MENNINGER: I'm sure they are. I'm just not seeing the one that you're seeing.

THE DEPONENT: Oh, I'm sorry.

MS. MENNINGER: That's okay.
THE DEPONENT: Yeah. Sorry about that.
MS. MENNINGER: Okay.
MR. EDWARDS: One is right on top of the other.
**Q (BY MS. MENNINGER) I don't doubt you. I was just looking for it.**
A Okay.
**Q All right. So after the word London, March 10th, 2011, correct?**
A Correct.
**Q And above that is a title, Statement on behalf of Ghislaine Maxwell, right?**
A Yes.
**Q By Devonshires Solicitors, PRNE, correct?**
A Correct.
**Q And then Wednesday, March 9th, 2011, correct?**
A Correct.
**Q And you understand that March 9th or March 10th, 2011 is roughly the time your original stories were published in the press --**
A Correct.
**Q -- internationally, correct?**
A Correct.



**Q And this statement issued by Ghislaine Maxwell or issued by Devonshires Solicitors on her behalf denied allegations about her that have appeared recently in the media, correct?**
A Correct.
**Q It says, These allegations are all entirely false, correct?**
**Did I read that properly?**
A Ghislaine Maxwell denies the various allegations about her -- oh, yeah, right -- yeah, right below that. These allegations are entirely false.
**Q All right. In 2011, were you aware that Ghislaine Maxwell issued a statement denying the allegations about her that had appeared in the media?**
A I'm not too sure what I recall from 2011 about Ghislaine Maxwell denying it. I know that she denied it recently in 2015. I know that for a fact.
**Q So you don't know whether she denied it in 2011?**
A I can't recall back to 2011, if I do remember that.
**Q And you don't know whether she put out a press statement that said these allegations are all entirely false, correct?**



A It doesn't surprise me, but I don't remember reading this. I know that, you know, there was a lot of stories in press going on and a lot of them I decided I just didn't want to read. There was a lot of stuff in there that just, I didn't want to go through.
**Q Okay. Were you harmed on March 10th or March 11th, 2011 by the issuance of a statement on behalf of Ghislaine Maxwell?**
A I am harmed by Ghislaine Maxwell denying anything that has ever happened between us, whether it's in 2002 or 2011 or 2015. I think that she knows what she did, and she should be held accountable for them. And not only has she hurt me once, but she's hurt me apparently twice and now three times.
**Q So on March 11th, 2011, say, how were you harmed by the issuance of this press statement?**
A She's denied that she had any involvement in the procuring of me and other young girls.
**Q Um-hum.**
A And she tries to make herself look like she had no partake in it.
**Q Did you suffer any physical symptoms on March 11th, 2011 after this statement was issued, as a consequence of this statement being issued?**



A Not being able to remember reading this in 2011, it's hard to say. But it's the same thing that I'm going through right now. I mean, she's denied it again. And it is painful. It's physically painful. I am taking medication to help me deal with this. And --
**Q Okay. I'm just limiting you right now to March of 2011.**
MR. EDWARDS: I would just ask that she's able to finish her answer, though, please.
MS. MENNINGER: Well, the answer is nonresponsive, so --
MR. EDWARDS: In your opinion it's not responsive.
**Q (BY MS. MENNINGER) I want you to understand that the question is related to any physical symptoms you suffered in March of 2011 as a consequence of Defendant's Exhibit 26 being issued.**
A If I would have seen this in March 10th, 2011, this would have been harmful to me.
**Q Okay. Do you recall, as you sit here today, experiencing any physical symptoms as a consequence of Defendant's Exhibit 26 being issued to the press?**
MR. EDWARDS: Objection. Asked and

answered. Lacks predicate.
A I have been suffering from Ghislaine Maxwell and Jeffrey Epstein since the summer of 2000. So hearing again in 2011 that she's denied it, of course, it's going to hurt me.
Did I hear about this in 2011? I can't tell you I honestly have.
In 2015 is when I know that she denied it. And again, I haven't stopped suffering from the repercussions that they put me through.
**Q (BY MS. MENNINGER) And I'm asking you to separate, if you can, any symptoms that you experienced anew in March of 2015 -- I mean, excuse me, March of 2011, as a consequence of this statement being issued, which I believe you said you don't recall seeing at the time; is that fair?**
A But you're asking me now about 2015?
**Q Nope. March of 2011. Sorry, I misspoke there.**
A You're still on 2011?
**Q Yes. Did you start taking any new medications in March of 2011?**
**Let me ask you that.**
A I've been taking medication to control my [redacted] since 2002.



**Q Okay. So did you take any new medications or any additional amounts of medications in March of 2011?**
A I have been taking the same medication since 2002.
**Q Okay.**
A And that's due to [redacted] caused from the pain that I suffered at the hands of Ghislaine Maxwell and Jeffrey Epstein.
**Q Did you -- do you recall any neighbors or other moms at the school or anybody in 2011 referencing to you in any way the fact that Ghislaine Maxwell had issued a denial of the allegations about her that had been published in the media in March of 2011?**
A No. I didn't speak to any -- I didn't speak to any moms about what I had gone through. I mean, when it came out in the press, I don't think any -- like, Australians don't pay attention to news, number one.
Number two, the first time that my friends contacted me they were shocked. And this was, I believe in -- when the press picked it up again, I think, was 2014/2015. And I got a whole bunch of like Facebook texts from them saying, Oh, my God, I



can't believe you've been through this. I never knew. I'm so sorry. You know, that kind of stuff. So they never -- I never spoke to anybody about this except for my husband.
**Q All right. So the first time you recall any sort of people in your community referencing things to you is when the press picked up on it in 2014 or 2015?**
A Yeah, I think it may be end of 2014, early 2015.
**Q All right. And so in March of 2011 you don't recall any neighbors or anybody saying anything to you about this?**
A No, I don't recall.
**Q Did anyone tell you in March of 2011 about Defendant's Exhibit 26, the statement on behalf of Ghislaine Maxwell?**
A No, otherwise I would have been able to recall it.
**Q Okay. Do you remember anyone in 2011 ridiculing you because of Defendant's Exhibit 26?**
A Well, because nobody knew me as Virginia, everybody knows me as Jenna, no one probably put two and two together. And like I told you, I didn't tell anybody. So there was nobody there to ridicule me in



2011 over this.
**Q Where were you living in 2011 when Shaza came to see you --**
A Oh, [redacted].
**Q Do you recall applying for any job in or around 2011 and someone referencing Defendant's Exhibit 26 and denying you a job?**
A I don't -- I don't think I applied for a job in 2011.
**Q Okay. Did you go see a doctor and talk to any doctor about Defendant's Exhibit 26?**
A Not about this. Not about this paper right here. But I have talked to doctors about my abuse at the hands of Ghislaine and Jeffrey.
**Q Have you talked to a doctor about any statements in the press made by Ghislaine Maxwell?**
A Recent statements, yes.
**Q Which doctor did you speak to about that?**
A Her name is Judith Lightfoot.
**Q And where is she?**
A She's in Australia.
**Q Where in Australia?**
A She's in Sydney, but we do phone conversations.
**Q Have you ever met her in person?**

A Yes.
**Q When?**
A In 2011.
**Q All right. And is she affiliated with an office or a hospital or what?**
A She's a psychiatrist.
**Q All right. Have you seen her in person since 2011?**
A No, because I've lived so far away and she's kind of the only person that -- like, I've seen a lot of doctors. And I can honestly tell you -- it's really hard for them to break down the walls and be comfortable enough to talk to them about this stuff. Judith is different. She's somebody that I feel I can trust. She's 76 and she's just a very lovely lady.
And she offers me other ways to deal with my pain and suffering. And I continue to see her over the phone because I can't see her in person.
**Q Do you recall ever discussing with her Defendant's Exhibit 26?**
A I can't recall ever seeing this exhibit. So --
**Q Okay.**
**(Exhibit 27 marked.)**



**Q (BY MS. MENNINGER) I'm going to give you Defendant's Exhibit 27.**
A Yes.
**Q All right. Have you seen this document before?**
A Yes.
**Q And what do you understand it to be?**
A [redacted] sounds like a PR, if I'm not right -- if I'm not wrong. Sent -- or subject is Ghislaine Maxwell. I don't know [redacted].
It says: To whom it may concern, Please find attached credible statement on behalf of Ms. Maxwell.
And then it goes on, to hear about that she is saying: Each time the story is retold it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts that Alan Dershowitz is involved in having sexual relations with her, which he denies.
Ms. Roberts' claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory. Ghislaine Maxwell's original response to the lies and defamatory claims remains



the same. Maxwell strongly denies -- excuse me. Excuse me -- strongly denies allegations of an unsavory nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.
**Q All right. Have you seen this statement before?**
A I've seen it recently, yes.
**Q All right. What -- have you discussed this statement with Ms. Lightfoot? I don't know if she's a doctor or what.**
A Psychiatrist, yeah.
**Q Is she an MD?**
A I don't know what her levels of credential are. I'm sure she is.
**Q Okay. When is the first time that you saw the statement?**
A This full statement I have only seen through discovery. The original statement that I saw in the press was, Ms. Roberts' claims are obvious lies and so on, so forth. I don't remember seeing this in the press.
**Q Okay. So the part that you remember seeing in the press is Ms. Roberts' claims are**



**obvious lies?**
A Yes.
**Q Anything else about this?**
A I can't remember what else she printed in the press. It's a very horrible thing for her to do, turn around and call me a liar after everything that she knows she's done. And I didn't expect her to come out and be truthful.
Jeffrey Epstein hasn't even issued a statement.
**Q Sorry. I'm sorry if you misunderstood my question.**
A Yes.
**Q Was there anything else within this statement that you recall seeing in the press besides the line, Ms. Roberts' claims are obvious lies?**
A Without saying 100 percent, I think that the original allegations are not new and have been fully responded to be shown to be untrue. I don't know if that's in the press or not, but I've read this before.
So I don't know if I'm confusing this with what I've read out of this or what I've read in the press. The main thing is, I know she called me a liar, and that's what she publicized.

**Q And when you say she called you a liar, that's the Ms. Roberts' claims are obvious lies part?**
A Yes.
**Q Okay. When is the first time that you saw this whole document?**
A I guess when you guys handed it over for discovery.
**Q Okay. And who showed it to you?**
A It was sent to me by e-mail.
**Q Okay. Just through the course of communicating with your attorneys?**
A Yes.
**Q You've never seen it published?**
A Not this whole e-mail, no.
**Q All right. Did you -- I'm sorry, did you discuss this publication of what you saw in the press with Judith Lightfoot?**
A Yes.
**Q All right. And when did you discuss it with her?**
A When I got back to Australia, Judith and I started seeing each other again. Before then, I spoke with a doctor in Colorado about this. His name is Dr. Olsen. And it was causing me a lot of distress to have to deal with being called a liar all



over again, when I know I'm standing up doing the right thing. And the doctor prescribed me [redacted]. And, yeah.
**Q Okay. So my question was, when did you discuss it with Judith Lightfoot?**
**I think I now understand you did that after you returned to Australia in November or so of 2015; is that right?**
A I returned to Australia in October, and that's when I picked up talking to her again.
**Q All right. And you're saying that at another point in time you talked to another doctor, Dr. Olsen, in Colorado, correct?**
A Correct.
**Q And when did you meet with Dr. Olsen?**
A I don't know the first date that I met with him.
**Q Did you meet with him more than once?**
A I believe so.
**Q And you believe you spoke with him about Ghislaine Maxwell's published statement in the press that Ms. Roberts' claims are obvious lies.**
**That's what you believe you spoke with Dr. Olsen about?**
A I spoke with Dr. Olsen about being called



a liar from the people that abused me.
**Q Okay. Do you recall specifically mentioning to him Ghislaine Maxwell's statement to the press?**
A I mentioned a lot of names to him.
**Q Okay. What new symptoms did you experience following January 2nd, 2015?**
A I think it's one thing to be a victim of sexual abuse and survive it and come out trying to tell the world my story, and then another thing for it to be shut down because these people, Ms. Maxwell and others are calling me liars (sic).
**Q And I asked you what symptoms had you experienced --**
MR. EDWARDS: She's going to finish her answer to this question. You cut her off so many times.
MS. MENNINGER: It has nothing to do with this.
MR. EDWARDS: It absolutely does. Because this is a psychological damages claim, and she is trying to explain to you what those damages are.
**Q (BY MS. MENNINGER) Okay. What are your symptoms that you experienced since January 2nd, 2015 that are new?**



A Very strong anxiety attacks, bad panic attacks. My throat closes up, I can't breathe. I vomit when I have anxiety attacks. My -- this is personal, but my sex life has suffered. My marriage has suffered. Psychologically, it's just hurt me all over again. I mean, they've hurt me before, and now they've hurt me again by doing this.
And I felt like I was in the process of healing before this came out because I had opened up this wonderful charity called Victims Refuse Silence. And then my aim was to heal by helping other girls get out of the situations that I was in before.
And my lawyers were nice enough to help me. I have this beautiful website where you can click on in any state and you can find a place. I have personally called all of them and they will help you get out of the situation that you're in. They will get you medical help. They will get you legal advice. I think I was in the really good process of healing. And when this came out, it just ruined me all over again.
**Q (BY MS. MENNINGER) All right. Tell me all of the damages that you claim occurred to you because of Defendant's Exhibit 27.**
A My reputation, my psychological abuse,

physical ailments. My marriage has suffered, my family life has suffered. I'm constantly battling depression. I feel like I've taken 10 steps forward and 12 steps back since this all happened.

**Q Okay. And by since this all happened, do you mean since January 2nd, 2015?**

A That's correct.

**Q All right. Have you lost any income since January 2nd, 2015 as a consequence of Defendant's Exhibit 27?**

A Well, I believe that my charity that was going to go forward and help other victims was going to not only bring in income but also be able to provide women with shelters and food and assistance that I wanted to help them with.

I haven't been able to get a job or work or anything like that. You know, financially, my husband brings home the money for me. But as myself goes, I couldn't work right now with everything going on.

**Q How much income were you making prior to December 30th, 2014?**

A Well, I've been a stay-at-home mom since 2006.

**Q So how much income have you lost as a**



**result of Defendant's Exhibit 27?**

A I could only imagine, you know, being the head of a corporation, a charity, I would be earning a decent wage. It's hard to say how much I would be earning because it is a non for-profit.

But because of these statements telling everybody in the world that I'm a liar, my charity has not been able to take off. And as a consequence of that, I have missed out on the results of not being able to go forward with it.

**Q Okay. Have you applied for any job that you've been denied since January 2nd, 2015?**

A I haven't been denied a job. I haven't -- I've just -- I thought about applying for jobs, but I mean, the second that you Google my name, people are going to know exactly who I am. And these days, employers Google everything, and it makes me fearful that if I do go apply for a job, which I would like to. I mean, my kids are all at school now. I'd like to get back into the work force.

But I'm afraid if I do, my past is going to stop me from being able to do that. No one wants to hire a sex slave.

**Q How has your reputation been harmed by Defendant's Exhibit 27?**



A Well, number one, my charity. I mean, that's -- that was my voice for other people to get help. And I don't think that people want to get help from somebody who's being called a liar in the press, somebody who is claiming to be a victim that isn't. I mean, I wouldn't want to get help from somebody who did that, you know.

And I know when I introduce myself to people these days, I don't introduce myself as Virginia anymore. I introduce myself as another name because I'm afraid that if people read papers or if people Google or find out who I am that they'll think differently of me.

**Q What do you introduce yourself as?**

A I tell everybody my name is Jenna.

**Q In what country or location has your reputation been damaged as a consequence of Defendant's Exhibit 27?**

A Considering this is worldwide publication, I would saying England, America, Australia. You know, friends in Australia were seeing my face on national TV. Like I said, I can't remember if it was 2014 or 2015. And I have since not been in contact with those friends. I thanked them for their sympathies, but it's not something I want people to



know about. You know, especially people close to me.

I mean, I want to go out there and I want to help other victims. But being called a liar and people having to sit there and second guess if I'm telling the truth or not doesn't really give me much incentive to want to make friends.

**Q Did anyone in Penrose, Colorado approach you and mention Ghislaine Maxwell's name?**

A We have reporters at our door.

**Q Did anyone in Penrose, Colorado approach you and mention Ghislaine Maxwell's name?**

A What, reporters? Yes, plenty of them.

**Q Did anyone who lives in Penrose, Colorado approach you and mention Ghislaine Maxwell's name?**

A Have you ever been to Penrose? It's -- it's in the middle of nowhere. So you really -- I didn't have friends in Penrose. There was nobody that I knew there.

**Q All right. And which reporters mentioned you and Maxwell's name to you in Penrose, Colorado?**

A We have reporters chasing us down the street, in car parks, taking my kids to the doctor's, going to the grocery store. You know, asking me all kinds of questions about it. And I didn't talk to any journalists or reporters about it.

**Q And what do you recall any reporter saying to you that included the name Ghislaine Maxwell?**
A Asking me -- I don't remember what they asked me, to be honest. There was regarding Ghislaine and Alan Dershowitz and Jeffrey Epstein. I mean, it was an array -- you know how reporters can be when they're hashing at you.
**Q Okay. So no one in Penrose, Colorado who lived there mentioned Ghislaine Maxwell by name to you?**
A Besides reporters?
**Q Right. People who live in Penrose, Colorado.**
A Right. I didn't know anyone in Penrose, except for my mom.
**Q Okay. Now, in March or April of 2015 did you fly to New York?**
A I'm sorry, what date?
**Q March or April of 2015, did you fly to New York?**
A It's a possibility.
**Q Did you stay at the Ritz-Carlton?**
A It's definitely a possibility.
**Q Were you there with Mr. Edwards and Mr. Cassell and Sigrid McCawley?**



A I've been to New York quite a few times. So I'd have to refresh my memory. But I have been to New York with Brad Edwards and Paul Cassell and Sigrid McCawley.
**Q Was that after January 2nd, 2015?**
A Definitely could be.
**Q Did you give an interview to ABC News on camera?**
A I did.
**Q And that was after January 2nd, 2015?**
A I did.
**Q Did you give an interview to Good Morning America?**
A No.
**Q All right. Did you correspond at all with Good Morning America about the publication of your story?**
A I can't remember if ABC and Good Morning America wanted to do something together. I can't -- all I know is I was interviewed by one person at ABC. I never was interviewed by anyone from Good Morning America. Maybe they were going to show the same airing in the same show, but powers that be, of course, wouldn't let it go forward.
**Q Did you give a lecture to the Human**



**Trafficking Coalition sometime after January 2nd, 2015?**
A I did give -- I did go for a speaking engagement. I don't remember when.
**Q Was there any speaking engagement you had booked that was canceled after January 2nd, 2015?**
A I can't remember off the top of my head.
**Q All right. You founded Victims Refuse Silence in February of 2014, correct?**
A It was -- it was a process because, obviously, you have to go through all the bylaws and everything. I think we started it in October of 2014, but it wasn't official until January, I think.
**Q Okay. So in the period it was in operations before January 2nd, 2015, had you gotten any -- had you been paid any salary by Victims Refuse Silence?**
A No, I hadn't.
**Q Had --**
A I mean, it was just up and running. So there was no --
**Q Had any contributions been made to Victims Refuse Silence before January 2nd, 2015?**
A I can't recall. You know, we've only had a few contributions. I don't know what dates they



were put in.
**Q Has anyone else called you a liar in the press?**
A Yes.
**Q Who?**
A Alan Dershowitz.
**Q Anyone else?**
A Ghislaine Maxwell, obviously.
**Q Anyone else?**
A Not that I know of.
**Q Has anyone else publicly denied your allegations?**
A From what Ghislaine Maxwell said?
**Q Have you seen any press in which another person has denied your allegations?**
MR. EDWARDS: Objection. Vague.
A I've seen allegations denied by Ms. Maxwell. And I've seen the allegations denied by Alan Dershowitz.
**Q (BY MS. MENNINGER) And Alan Dershowitz actually went on TV and called you a serial liar, correct?**
A Very correct.
**Q You saw that, correct?**
A Yes.

**Q And that hurt your feelings?**
A Badly.
**Q Did Buckingham Palace issue a denial of your allegation?**
A Yes, that's another one.
**Q Did Prince Andrew make a public statement in which he denied your allegations?**
MR. EDWARDS: Form.
A I think he did.
**Q (BY MS. MENNINGER) How do you know which harm you've suffered is attributable to Ghislaine Maxwell's denial versus Alan Dershowitz's denial or Prince Andrew's denial?**
A Ghislaine Maxwell brought me into the sex trafficking industry. She's the one who abused me on a regular basis. She's the one that procured me, told me what to do, trained me as a sex slave, abused me physically, abused me mentally.
She's the one who I believe, in my heart of hearts, deserves to come forward and have justice happen to her more than anybody. Being a woman, it's disgusting.
**Q So you cannot delineate what harm you have suffered in terms of all of the psychological damage you just disclosed?**



A Oh, of course.
**Q -- if that is attributable to Ghislaine Maxwell's statement on January 2nd versus Alan Dershowitz calling you a serial liar on Good Morning America?**
A Of course, it all hurts. Okay? I know Alan Dershowitz is lying himself. I know Prince Andrew is lying himself. Of course those hurt. It doesn't feel good to have people who have done something to you deny something that's happened, when I'm actually brave enough to come forward and talk about it.
What hurts me the worst is that Ghislaine Maxwell brought me into this. Not only has she hurt me once, but she's hurt me twice coming forward and saying, This is not true, this is categorically untrue and obvious lies.
That to me is a stick in the mud and that to me is what caused the most harm to me.
**Q Okay. And so can you point to any person who has referenced Ghislaine Maxwell's denial in the press or to your face or anywhere?**
A Can I point to a person?
**Q Can you point to any time that someone has referenced Ghislaine Maxwell's denial to you in any**



**context?**
MR. EDWARDS: Object to the form of the question.
A Can I point to a person -- I'm sorry. I don't understand. Can you rephrase it for me --
**Q (BY MS. MENNINGER) All right.**
A -- so I can understand what you mean?
**Q Where you live in Australia now, has anyone referenced the name Ghislaine Maxwell to you?**
A After all of the news hits, after the press hits in 2015 and, you know, everyone is calling me a liar, all of my friends in Australia called me and talked to me and said, I can't believe this. I can't believe what you went through.
That was very embarrassing for something that I tried to keep separate from my other life where I would like to help victims. I didn't want the friends of my kids parents knowing about that stuff. You know, and of course they all felt sorry for me. And you know, like I said. I didn't know anybody in Penrose. So there's nobody that could have come up to me and talked to me about it. My mom.
**Q This question was about Australia, sorry.**
A Oh, sorry, I thought you were talking



about pointing out people.
**Q No.**
A Okay, well in Australia, yes, at least a dozen friends.
**Q They came up and they mentioned Ghislaine Maxwell's denial to the press to you?**
A They couldn't believe what I had been through and, you know, that these were, you know, being denied, and they felt sorry for me. And, you know, it was the whole circumference of things.
**Q So the people in Australia that came up to you had sympathy for you and believed you, correct?**
A Yes.
**Q All right. And when you spoke to Dr. Olsen you recall specifically mentioning Ghislaine Maxwell's press release?**
MR. EDWARDS: Object to the form.
A Yes, I remember mentioning her, as well as the press release, as well as other press releases. And the abuse that I had occurred (sic) from the hands of Jeffrey and Ghislaine.
**Q (BY MS. MENNINGER) Okay. When have you been diagnosed with a mental health condition, first?**
A I don't know. I mean, I've been told that I've got [redacted]. You know --

**Q When were you first told that?**
A Well, early in -- early in 2003, I believe is the first time that I was suffering from [redacted]. And then my doctor, Judith Lightfoot, has in 2011 [redacted]
And, you know, I've recently seen another doctor who said that I've got the exact same symptoms that Judith Lightfoot mentioned, which is [redacted]
**Q Which doctor is that?**
A You know, I don't honestly know his name.
**Q When did you see this new doctor?**
A Um --
MR. EDWARDS: Sorry. If you're referring to a doctor that's been sent to you by one of your lawyers --
THE DEPONENT: Yes.
MR. EDWARDS: -- at this time, I'm instructing you not to answer.
THE DEPONENT: Okay.
MS. MENNINGER: Wait. What is it? You've seen a doctor and you're not going to answer what doctor you've seen?



MR. EDWARDS: Sure. If it's a consulting witness in this case that has seen her at the direction of an attorney, that has not yet been disclosed per any expert witness disclosure, then I'm instructing her not to answer that question.
If that's what you're referring to. I don't know if that's what you're referring to.
THE DEPONENT: That's what I'm referring to.
**Q (BY MS. MENNINGER) All right. So you recall seeing Dr. Lightfoot. You recall seeing Dr. Olsen. And you recall seeing a new unnamed doctor recently.**
**Anyone else you've seen since January 2nd, 2015?**
A Dr. Olsen, Dr. Lightfoot. Oh, Dr. Donahue.
**Q Where is Dr. Donahue located?**
A He's in my suburb or he's a suburb next to me in Australia.
**Q And is that a psychiatric-type doctor, a medical-type doctor?**
A He's medical.
**Q And what did you see him for or her for?**
A I didn't have anybody to basically -- I



just got to Australia and Judith Lightfoot was helping me. [redacted] And I told him the reason.
**Q And this is since you returned to Australia?**
A Correct.
**Q And this is the first time you had seen that doctor?**
A I've seen that doctor twice now.
**Q I'm sorry, what was the name again? I know you already said it, but I just --**
A Dr. Donahue.
**Q Donahue, all right.**
**This doctor that you haven't yet disclosed, where did you see that person? In what country?**
A United States.
**Q And in what state?**
A San Francisco.
**Q And when did you see that doctor?**
A Um, Friday. Last Friday.
**Q And how many times have you seen that doctor?**
A Once. Well, twice actually. I saw him



the next day, too.
**Q All right. Did you suffer from anxiety before meeting Jeffrey Epstein?**
A I was never prescribed anything for anxiety before I met Jeffrey Epstein.
**Q That wasn't my question.**
A Did I --
**Q Were you suffering from anxiety before you met Jeffrey Epstein?**
A I think a person who has gone through as much trauma as I have in my life would suffer from quite a few problems. But like I said, I was never prescribed anything until I met Jeffrey Epstein.
**Q Did you suffer from panic attacks before meeting Jeffrey Epstein?**
A Nowhere near as bad, no.
**Q So you did suffer from [redacted]. They just weren't as severe; is that what your testimony is?**
A No, what I'm trying to say is I did have [redacted]. I did have [redacted]. I had lived a very hard life prior to meeting Jeffrey Epstein as well.
After meeting Jeffrey Epstein and Ghislaine Maxwell, everything escalated. That's when I started to take Xanax and smoke marijuana to help

calm the anxiety and everything down.
**Q Before you met Jeffrey Epstein, had you used any drugs?**
A Sure, yes.
**Q Which drugs had you used prior to meeting Jeffrey Epstein?**
A I smoked pot. I've taken Ecstasy.
**Q Cocaine?**
A Yeah, I would have snorted cocaine, um-hum.
**Q Did you ever abuse alcohol before meeting Jeffrey Epstein?**
A No, I was -- I wasn't even of age to be able to buy it. I mean, if there was alcohol at parties I would have drank it, but I wouldn't say I abused it.
**Q Okay. Were there ever occasions upon which you were observed to be drunk by other people, prior to meeting Jeffrey Epstein?**
A If you're drinking, the possibility of getting drunk is always there. I don't -- I can't recall exact situation where that was the case, but --
**Q Were you diagnosed as a drug addict prior to meeting Jeffrey Epstein?**



A No, I was not diagnosed as a drug addict.
**Q Were you sent to live at a rehabilitation facility because of your use of drugs?**
A No, that was more of a group home. Yes, it was also a rehab facility, but it wasn't because I was a drug addict. I wasn't coming off of anything.
**Q Had you abused drugs prior to meeting Jeffrey Epstein?**
A I took drugs. I didn't abuse them, but I took them.
**Q Okay.**
A Recreationally.
**Q How often do you see Dr. Lightfoot?**
A Once a week every Monday. I've skipped this week because I've been over here and it's expensive to call back home right now, unless you FaceTime, but --
**Q Has Dr. Lightfoot recommended that you see a treating doctor in person?**
A No, she's -- she knows my history pretty well. And she's a very wonderful woman and I honestly wouldn't -- Dr. Donahue wants me to go see another psychiatrist in person, but I prefer to stay with Judith because she's someone I can personally relate to.



**Q How much does it cost you every time you talk to Dr. Lightfoot?**
A Her normal fee is $200.
**Q And how much do you pay?**
A She doesn't charge me anything anymore.
**Q When did she stop charging you?**
A Since I got back to Australia.
**Q So before you left for Titusville, Florida, you saw her and you were paying $200 per session?**
A Yes.
**Q And what has Dr. Lightfoot recommended that you do in order to get better?**
A She loves what I'm doing with speaking out. She thinks the more that I speak out about it, the stronger I'll become. She recommends that I write my book, I tell my story. She thinks not only will it help me, but by helping me it'll help others find a way to get out of the situation and to know that there's other girls who have gone through what I've gone through and what they're going through.
She recommends meditation, breathing techniques, focus techniques.
**Q Does she prescribe medications for you?**
A No, she doesn't. She's a spiritual



doctor.
**Q Is there anything that she's recommended that you do that you're not doing?**
A Is there anything that I do that she recommends I don't? Sorry, say that one more time.
**Q That's okay. Is there anything that Dr. Lightfoot has recommended that you do that you are not actually doing?**
**Are you following her advice?**
A Yes, I am.
**Q Okay. And what has Dr. Donahue recommended that you do?**
[redacted]

[redacted]



[redacted]



[redacted]

Q **All right.**

MS. MENNINGER: I'm going to ask that we take just a brief break and that I can hopefully then come back and just ask a few final follow-up questions, okay?

THE DEPONENT: Okay.

THE VIDEOGRAPHER: We are off the record at 5:16.

(Recess taken from 5:16 p.m. to 5:25 p.m.)

THE VIDEOGRAPHER: We're back on the record at 5:25.



[redacted]

Page 341

**Q When was it?**
A I don't know the exact date.
**Q What's your best recollection?**
A I don't know. I would have to have dates in front of me. If you've got something that has a date on there, I'm happy to look at it and tell you it's right or wrong.
**Q It was a few months ago or many months ago?**
A Um, to my best recollection, it was about a year ago.
MS. MENNINGER: I have no further questions for you at this time. As you know, there are some questions that you refused to answer and other questions that your attorney directed you not to answer. So we will take those up with the Court and may see you again.
THE DEPONENT: Okay.
MR. EDWARDS: And just as a matter of clarification, I don't believe that there's anything she's refused to answer. There may be things that I've instructed her not to answer because I believe that they were privileged or for whatever reason I instructed her not to answer but she hasn't refused to answer them.

Page 342

Either way, the record is what it is.
MS. MENNINGER: I was going to say, do you dispute that the court reporter has been taking down what was said this entire time?
MR. EDWARDS: I'll read it. She'll read.
MS. MENNINGER: Actually, that's a good question.
**Q (BY MS. MENNINGER) Do you have any questions that I've asked you today that you don't feel like you understood?**
A No, I don't think that there's questions that you've asked me that I don't think I've understood. But, you know, I really just want to state something for my own piece of mind, if that's okay, if I'm allowed to do that.
**Q No, that's not really what this forum is about.**
A Okay.
**Q There are other forums.**
MR. EDWARDS: That will only be good for them. There is no reason to say that.
THE DEPONENT: Okay.
MR. EDWARDS: You get a chance to talk later.
Do you have an order form? And she'll

Page 343

read it.
MS. MENNINGER: We're going off the record.
MR. EDWARDS: Yeah, that's fine. She'll read.
THE VIDEOGRAPHER: That concludes today's proceedings. We're off the record at 5:28.
(Proceedings concluded at 5:28 p.m.)

* * * * * * *

Page 344

I, VIRGINIA GIUFFRE, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

______________________________
Signature of Deponent
( ) No Amendments
( ) Amendments Attached

Acknowledged before me this
______ day of ________________, 2016.

Notary Public: ___________________________
Address: ________________________________
________________________________
My commission expires ___________________
Seal:

KAM

STATE OF COLORADO)
) ss. REPORTER'S CERTIFICATE
COUNTY OF DENVER )

I, Kelly A. Mackereth, do hereby certify that I am a Registered Professional Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 11th day of May, 2016.

My commission expires April 21, 2019.

______________________________
Kelly A. Mackereth, CRR, RPR, CSR
216 - 16th Street, Suite 600
Denver, Colorado 80202



AGREN BLANDO COURT REPORTING & VIDEO, INC.
216 - 16th Street, Suite 600
Denver, Colorado 80202
4450 Arapahoe Avenue, Suite 100
Boulder, Colorado 80303

May 11, 2016

Sigrid S. McCawley, Esq.
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301-2211

Re: Videotaped Deposition of VIRGINIA GIUFFRE
Giuffre v. Maxwell
Case No. 15-cv-07433-RWS

The aforementioned deposition is ready for reading and signing. Please attend to this matter by following BOTH of the items indicated below:

______ Call 303-296-0017 and arrange with us to read and sign the deposition in our office.

_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached.

______ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached.

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

______ By _______ due to a trial date of ________

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to Agren Blando for filing with the original deposition. A copy of these changes should also be forwarded to counsel of record. Thank you.

AGREN BLANDO COURT REPORTING & VIDEO, INC.

cc: All Counsel



AGREN BLANDO COURT REPORTING & VIDEO, INC.
216 - 16th Street, Suite 600
Denver, Colorado 80202
4450 Arapahoe Avenue, Suite 100
Boulder, Colorado 80303

VIRGINIA GIUFFRE
May 3, 2016
Giuffre v. Maxwell
Case No. 15-cv-07433-RWS

The original videotaped deposition was filed with Laura A. Menninger, Esq., on approximately the 11th day of May, 2016.

______ Signature waived.

______ Unsigned; signed signature page and amendment sheets, if any, to be filed at trial.

______ Reading and signing not requested pursuant to C.R.C.P. Rule 30(e).

_XXX_ Unsigned; amendment sheets and/or signature pages should be forwarded to Agren Blando to be filed in the envelope attached to the sealed original.

Thank you.

AGREN BLANDO COURT REPORTING & VIDEO, INC.

cc: All Counsel

- AMENDMENT SHEET -

Videotaped Deposition of VIRGINIA GIUFFRE
May 3, 2016
Giuffre v. Maxwell
Case No. 15-cv-07433-RWS

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Should Read | Reason |
|---|---|---|---|
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |
| ____ | ____ | ______________________________ | ______ |

Signature of Deponent: ____________________

Acknowledged before me this ____ day of ______________, 2016.
Notary's signature ________________
(seal)

My commission expires ____________.

# EXHIBIT K

BOIES, SCHILLER & FLEXNER LLP

401 EAST LAS OLAS BOULEVARD • SUITE 1200 • FORT LAUDERDALE, FL 33301-2211 • PH. 954.356.0011 • FAX 954.356.0022

Sigrid S. McCawley, Esq.
E-mail: smccawley@bsfllp.com

June 10, 2016

**VIA E-MAIL**

Laura A. Menninger, Esq.
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
lmenninger@hmflaw.com

**Re:** ***Giuffre v. Maxwell***
**Case No. 15-cv-07433-RWS**

Dear Ms. Menninger:

On behalf of the Plaintiff, Virginia Giuffre, documents, Bates-stamped GIUFFRE005607 through GIUFFRE005613, are being produced pursuant to Defendant's Request for Production. Certain of the documents within this production have been designated as CONFIDENTIAL in accordance with your proposed Protective Order. Please treat these documents accordingly.

This production consists solely of all data that is responsive to Defendant's various requests for production from Ms. Giuffre's iCloud account.

Attached to this letter, please also find an updated privilege log.

If you have any questions concerning the foregoing, or if there are any issues with the media, please do not hesitate to contact me at (954) 356-0011.

Sincerely,

Sigrid S. McCawley

SSM:dk
Enclosures

**From:** Richards, Jason R.
**To:** Robert Giuffre
**Subject:** RE: Hi There
**Date:** Wednesday, August 27, 2014 10:44:32 AM

---

Hi Jenna,

My suggestion is for you to do a Freedom of Information Act request (www.foia.gov) for the information you are looking for because I am not able to release information (should there be any) from FBI records. You need to include as many details as possible so they can focus and narrow the search. Explain that you are looking for information related to your recovery as a victim of Ron Eppinger. The process may take some time but it is the appropriate method for you to obtain any possible records regarding your recovery. Hope this helps.

Best wishes,

Jason

-----Original Message-----
From: Robert Giuffre [mailto:robiejennag@icloud.com]
Sent: Wednesday, August 27, 2014 9:49 AM
To: Richards, Jason R.
Subject: Hi There

G'day Jason,

I know I am a pain in your rear right now and I don't want to be but I am so close to wrapping up an era, just need a couple dates confirmed is all.

If you aren't sure about the dates which you have already said that's fine. I have turned the Wilton Manors police dept upside down looking through records and come up w nada. What was your acquaintance's name that took my statement about Ron Eppinger? Is it possible that it wasn't Wilton Manors and maybe it was somewhere else?

I'm really racking my brain about this!! It would be a personal favor to me and I am so very much appreciative of anything you might know!!

Thanks a lot mate!!

Jenna

Sent from my iPhone

**From:** Richards, Jason R.
**To:** "robiejennag@icloud.com"
**Subject:** Re: Hi There
**Date:** Wednesday, August 27, 2014 10:50:27 AM

---

Feel free to reach out to me any time.
Take care.

Jason

----- Original Message -----
From: Robert Giuffre <robiejennag@icloud.com>
To: Richards, Jason R.
Sent: Wed Aug 27 10:46:50 2014
Subject: Re: Hi There

Thank you Jason. I hope all has been well for you and yours!

All the best, I won't bother you again.

Jenna

Sent from my iPhone

> On Aug 27, 2014, at 10:44 AM, "Richards, Jason R." <Jason.Richards2@ic.fbi.gov> wrote:
>
> Hi Jenna,
>
> My suggestion is for you to do a Freedom of Information Act request (www.foia.gov) for the information you are looking for because I am not able to release information (should there be any) from FBI records. You need to include as many details as possible so they can focus and narrow the search. Explain that you are looking for information related to your recovery as a victim of Ron Eppinger. The process may take some time but it is the appropriate method for you to obtain any possible records regarding your recovery. Hope this helps.
>
> Best wishes,
>
> Jason
>
> -----Original Message-----
> From: Robert Giuffre [mailto:robiejennag@icloud.com]
> Sent: Wednesday, August 27, 2014 9:49 AM
> To: Richards, Jason R.
> Subject: Hi There
>
> G'day Jason,
>
> I know I am a pain in your rear right now and I don't want to be but I am so close to wrapping up an era, just need a couple dates confirmed is all.
>
> If you aren't sure about the dates which you have already said that's fine. I have turned the Wilton Manors police dept upside down looking through records and come up w nada. What was your acquaintance's name that took my statement about Ron Eppinger? Is it possible that it wasn't Wilton Manors and maybe it was somewhere else?
>
> I'm really racking my brain about this!! It would be a personal favor to me and I am so very much appreciative of anything you might know!!

>
> Thanks a lot mate!!
>
> Jenna
>
> Sent from my iPhone

| | |
|---|---|
| **From:** | Robert Giuffre |
| **To:** | Jason.Richards2@ic.fbi.gov |
| **Subject:** | Virginia Roberts(Jane doe 102) |
| **Date:** | Tuesday, April 15, 2014 9:50:31 AM |

Hi Jason,

Long time, no talk. I hope all has been well for you and yours!! I am now back in the USA, not too many people know about that and I'd like to keep it that way as my case against Jeffrey Epstein has intensified!! I am here to get this BS non- prosecution agreement thrown out and speaking w Judge Paul Cassal he suggested trying to get ahold of any photos and/or video recordings released by the FBI to assist our case further in proving how much pedophilia occurred by Jeffrey and the many other monsters he obliged w underage girls. If this is a possibility please let me know so I can give you Brad Edwards( my attorney) his contact details. Many thanks for your time and I hope we should meet again.

Kindest Regards,
Virginia Roberts
Phone 321-271-4948

Sent from my iPhone

| | |
|---|---|
| **From:** | Robert Giuffre |
| **To:** | christina.pyror@ic.fbi.gov |
| **Subject:** | Virginia Roberts re: Jeffrey Epstein Case |
| **Date:** | Wednesday, April 16, 2014 1:52:05 PM |

Hi Christina,

I was wondering if you remember me from Sydney Consulate, I am a victim in the investigation from the Jeffrey Epstein case and was wondering if you could tell me if I would be able to get ahold of any of the pics and/or videos that the FBI might have confiscated from any of Epstein's residences? Also can I ask if you might have any of the flight logs that include my name in them to be sent to me as well. It's all for evidential purposes and would prove a many of things to help my case.

Kindest Regards,
Virginia Roberts
321-271-4948 cell

Sent from my iPhone

| | |
|---|---|
| **From:** | sharonrikard@gmail.com on behalf of Sharon Rikard |
| **To:** | Virginia Giuffre |
| **Subject:** | Re: Victims Refuse Silence |
| **Date:** | Saturday, March 28, 2015 9:49:55 AM |

Hi Virginia,
So sorry for the late response. Our organization currently works with survivors of sex trafficking provided continuing education, life skills and counseling. We will help with transportation and their basic necessities. Our ultimate goal is a home for domestic minor sex trafficking survivors.
Our contact information is:
doorstofreedom.com
infor@doorstofreedom.com
843-817-0740

I am going to forward your information to our Attorney Generals office as Marie Sazehn has compiled a list of organizations in our state of people/organizations and their involvement in helping survivors.

Thanks for all you are doing to help others!

Blessings,
Sharon Rikard

**From:** Virginia Giuffre
**To:** sharon@doorstofreedom.com
**Subject:** Victims Refuse Silence
**Date:** Wednesday, March 18, 2015 12:19:06 PM

---

Hi Sharon,

This is Virginia, we spoke earlier and I just wanted to say thank you for your time and what your doing to help the victims in your area. The mentality has to be changed!! Good luck!!

Kindest Regards,
Virginia Roberts

Sent from my iPhone

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/12/2015 6:14 | Virginia Giuffre | smccawley@bsfllp.com | | Email chain with Giuffre, Edwards and Cassell re attorney impressions and legal advice relating to deposition testimony | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 2 | 2/16/2015 1:05 | StanPottinger@aol.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 3 | 2/16/2015 15:37 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 4 | 2/16/2015 16:15 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 5 | 2/16/2015 16:24 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 6 | 2/16/2015 16:24 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Pottinger and Edwards re information provided by client to assist in legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 7 | 2/21/2015 16:45 | Sigrid McCawley | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu,robiejennag@y7mail.com | Smccawley@BSFLLP.com | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 2/21/2015 16:58 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of evidence among client and attorney | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 9 | 2/21/2015 17:05 | Brad Edwards | Smccawley@BSFLLP.com | StanPottinger@aol.com,cassellp@law.utah.edu,robiejennag@y7mail.com | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 10 | 2/21/2015 17:10 | Sigrid McCawley | robiejennag@y7mail.com | | Discussion of evidence among client and attorney | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 11 | 2/21/2015 17:16 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of evidence among client and attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 12 | 2/23/2015 14:21 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 13 | 2/23/2015 14:29 | StanPottinger@aol.com | Smccawley@BSFLLP.com,robiejennag@y7mail.com | brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 14 | 2/23/2015 16:01 | Virginia Giuffre | Smccawley@BSFLLP.com | StanPottinger@aol.com,brad@pathtojustice.com,cassellp@law.utah.edu | Discussion of thoughts and impressions of attorneys | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 15 | 2/24/2015 17:51 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with McCawley, Giuffre, and Paralegals re seeking information to assist in legal advice, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 16 | | | | | Attached case research | AC Privilege and Work Product/joint defense/common interest | Withheld | 14 | rtf |
| 17 | 2/26/2015 12:59 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and legal assistant re legal document, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 18 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | jfif |
| 19 | 2/28/2015 17:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email with Giuffre, McCawley, Edwards and Henderson re discussion of draft statement | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 20 | 3/13/2015 17:29 | Stan Pottinger | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@paththojustice.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 21 | 3/13/2015 17:49 | Virginia Giuffre | stanpottinger@aol.com | | Email chain with Giuffre, Edwards, McCawley and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 22 | 3/13/2015 17:56 | StanPottinger@aol.com | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 23 | 3/13/2015 18:00 | Brad Edwards | StanPottinger@aol.com,robiejennag@y7mail.com | Smccawley@BSFLLP.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 24 | 3/13/2015 18:24 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 25 | 3/13/2015 18:25 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 26 | 3/13/2015 21:53 | Virginia Giuffre | brad@pathtojustice.com | Smccawley@BSFLLP.com,StanPottinger@aol.com | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 27 | 3/13/2015 23:38 | Brad Edwards | robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |
| 28 | 3/13/2015 23:40 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, Edwards, McCawley, Henderson and Pottinger re legal advice on media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 29 | 3/17/2015 15:20 | Virginia Giuffre | Smccawley@BSFLLP.com,brad@pathtojustice.com,stanpottinger@aol.com | | Providing information to assist in legal advice re potential legal action, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 30 | 3/17/2015 18:40 | Stan | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 31 | 3/17/2015 19:42 | Virginia Giuffre | stanpottinger@aol.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 32 | 3/20/2015 15:43 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | aortiz@BSFLLP.com,brittany@pathtojustice.com | Email chain with Giuffre, Edwards, Henderson, Pottinger, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 33 | 3/20/2015 15:57 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re potential deposition | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 34 | 3/24/2015 21:19 | Sigrid McCawley | robiejennag@y7mail.com | aortiz@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 35 | 3/24/2015 21:21 | Virginia Giuffre | Smccawley@BSFLLP.com | aortiz@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 36 | 3/24/2015 21:36 | Andres Ortiz | Smccawley@BSFLLP.com,robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 37 | 3/24/2015 22:21 | Virginia Giuffre | aortiz@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 3 | msg |
| 38 | 3/26/2015 2:00 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com,StanPottinger@aol.com,brad@pathtojustice.com,brittany@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, Pottinger, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 39 | 3/26/2015 2:21 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 40 | 3/26/2015 2:22 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 41 | 3/26/2015 3:00 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 42 | 4/1/2015 21:32 | Virginia Giuffre | Smccawley@BSFLLP.com | | Giuffre conveying information sought by attorney to assist in legal advice with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 43 | 4/2/2015 7:01 | Brittany Henderson | robiejennag@y7mail.com | eperez@BSFLLP.com | Providing draft legal document for client review, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 44 | | | | | Attached Draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 15 | pdf |
| 45 | 4/3/2015 15:32 | Brittany Henderson | robiejennag@y7mail.com | brad@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, Henderson, Edwards and legal assistant re legal document, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 46 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | | 15 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 47 | 4/8/2015 20:34 | Virginia Giuffre | Smccawley@BSFLLP.com | | Seeking legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 48 | 4/9/2015 3:23 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re advice re legal filings, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 49 | 4/9/2015 7:16 | Sigrid McCawley | StanPottinger@aol.com,brad@pathtojustice.com,robiejennag@y7mail.com | brittany@pathtojustice.com,sperkins@BSFLLP.com | Email chain with Giuffre, Edwards, Henderson, McCawley and BSF staff re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 50 | 4/9/2015 9:26 | Brad Edwards | Smccawley@BSFLLP.com | robiejennag@y7mail.com | Email chain with Giuffre, Edwards, and McCawley re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 51 | 4/9/2015 9:33 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 52 | 4/9/2015 12:46 | Sigrid McCawley | robiejennag@y7mail.com | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 53 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 14 | docx |
| 54 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 12 | docx |
| 55 | | | | | Conveying legal advice re draft legal documents to client, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | docx |
| 56 | 4/10/2015 14:59 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com | Providing legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 57 | 4/10/2015 15:37 | Virginia Giuffre | Smccawley@BSFLLP.com | | Regarding legal advice re media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 58 | 4/10/2015 17:31 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com,brittany@pathtojustice.com,eperez@BSFLLP.com | Email chain with Giuffre, McCawley, Henderson, Edwards, Pottinger and legal assistant re legal documents, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 59 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 60 | | | | | Attached draft legal document | AC Privilege and Work Product/joint defense/common interest | Withheld | 21 | pdf |
| 61 | 4/10/2015 17:40 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 62 | 4/10/2015 19:10 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 63 | 4/10/2015 19:28 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 64 | 4/10/2015 19:33 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 65 | 4/10/2015 20:03 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 66 | 4/10/2015 20:04 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 67 | 4/10/2015 20:04 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and BSF staff regarding legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 68 | 4/10/2015 23:46 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley legal assistant re seeking and providing information sought by attorney to assist in providing legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 69 | 4/13/2015 13:52 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com,brad@pathtojustice.com | Email chain with Giuffre, Pottinger, Edwards and McCawley re legal advice regarding potential public statements | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 70 | 4/13/2015 13:56 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, Pottinger, Edwards and McCawley re legal advice regarding media issues | AC Privilege and Work Product/joint defense/common interest | Withheld | 3 | msg |
| 71 | 4/14/2015 23:38 | Brad Edwards | Smccawley@BSFLLP.com,brittany@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | | Providing legal advice related to VRS | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 72 | 4/16/2015 11:14 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re legal advice regarding media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 73 | 4/16/2015 11:47 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re legal advice regarding media issues | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 74 | 4/24/2015 19:22 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re records retention, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 75 | | | | | Attached letter providing legal advice re document retention | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 76 | 4/24/2015 19:59 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re legal advice regarding potential deposition | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 77 | 4/27/2015 21:20 | Brad Edwards | robiejennag@y7mail.com | Smccawley@BSFLLP.com | Seeking information to assist in providing legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 78 | 4/30/2015 6:42 | Brittany Henderson | eperez@BSFLLP.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,robiejennag@y7mail.com | Legal documents provided to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 79 | 4/30/2015 7:02 | Brittany Henderson | robiejennag@y7mail.com | | Email chain with Giuffre, Henderson and paralegal re seeking and providing information to assist in providing legal advice | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 80 | 4/30/2015 7:05 | Virginia Giuffre | brittany@pathtojustice.com | | Email chain with Giuffre, Henderson, Edwards, McCawley and legal assistant re seeking information to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 81 | 5/4/2015 20:04 | Virginia Giuffre | brittany@pathtojustice.com | | Email chain with Giuffre, Henderson, Edwards, McCawley and legal assistant re seeking information to assist in providing legal advice, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 82 | 5/11/2015 18:20 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com | Email chain with McCawley, Giuffre, Edwards, Pottinger, Henderson and Paralegal re seeking and providing information to assist in legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 83 | 5/11/2015 18:34 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and Paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 84 | 5/11/2015 18:40 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re case research, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 85 | 5/11/2015 18:45 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com | | Providing and seeking information to assist in legal advice re potential legal action, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 86 | 5/11/2015 18:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re seeking information to assist in providing legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 87 | 5/11/2015 18:56 | Virginia Giuffre | brad@pathtojustice.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and Paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 88 | 5/17/2015 22:37 | Sigrid McCawley | robiejennag@y7mail.com | | Providing litigation documents to client, with attachments | Attorney Client/joint defense/common interest/work product | Withheld | 3 | msg |
| 89 | | | | | Attached draft legal agreement | AC Privilege and Work Product/joint defense/common interest | Withheld | 10 | pdf |
| 90 | 5/17/2015 22:40 | Sigrid McCawley | robiejennag@y7mail.com | | Providing legal advice re legal agreement, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 91 | 5/18/2015 18:40 | Virginia Giuffre | Smccawley@BSFLLP.com | | Discussion of confidential agreement, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 92 | | | | | Attached confidential agreement page | Attorney Client/joint defense/common interest/work product | Withheld | 1 | jfif |
| 93 | | | | | Attached confidential agreement page | Attorney Client/joint defense/common interest/work product | Withheld | 1 | jfif |
| 94 | 6/5/2015 19:16 | Sigrid McCawley | robiejennag@y7mail.com | | Conveying attorney mental impression regarding hearing | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 95 | 6/6/2015 17:20 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re attorney mental impression regarding hearing | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 96 | 6/25/2015 2:26 | Sigrid McCawley | robiejennag@y7mail.com | | Providing advice re status and strategy of ongoing legal matters | Attorney Client/joint defense/common interest/work product | Withheld | 6 | msg |
| 97 | 7/17/2015 14:19 | Sigrid McCawley | robiejennag@y7mail.com | eperez@BSFLLP.com | Discussion with S. McCawley regarding file related to representation by B. Josefsberg | Attorney Client/joint defense/common interest/work product | Withheld | 4 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 98 | 7/27/2015 21:53 | Virginia Giuffre | Smccawley@BSFLLP.com | | Providing information to assist in legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 99 | 7/29/2015 19:45 | Sigrid McCawley | robiejennag@y7mail.com | StanPottinger@aol.com | Conveying legal advice on media issues | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 100 | 8/5/2015 19:51 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley and paralegals re information sought to assist in providing legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 101 | 8/6/2015 2:14 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 102 | 8/6/2015 2:45 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com | Email chain with Giuffre, McCawley, legal intern, Edwards and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 103 | 8/6/2015 2:55 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 104 | 8/6/2015 3:48 | Sigrid McCawley | robiejennag@y7mail.com | Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with McCawley, Giuffre, and Paralegals re seeking information to assist in legal advice, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 105 | 8/6/2015 3:51 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, legal intern and paralegal re seeking information to assist in providing legal advice re potential litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 106 | 9/1/2015 18:54 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com,brittany@pathtojustice.com | Providing and seeking information to assist in legal advice re potential legal action, with attachment | AC Privilege and Work Product/joint defense/common interest | Withheld | 2 | msg |
| 107 | 9/7/2015 18:24 | Virginia Giuffre | brad@pathtojustice.com,smccawley@bsfllp.com,stanpottinger@aol.com | | Providing information sought by attorneys to provide legal advice, with attachment | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 108 | | | | | Attached Information sought by attorneys to provide legal advice | AC Privilege and Work Product/joint defense/common interest | Withheld | 4 | docx |
| 109 | 9/7/2015 18:58 | Sigrid McCawley | brad@pathtojustice.com,robiejennag@y7mail.com,stanpottinger@aol.com | | Email chain with Giuffre, Edwards, Pottinger and McCawley re collection of information to assist in providing legal advice re potential litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 110 | 9/15/2015 21:58 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 111 | 9/15/2015 22:04 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 112 | 9/15/2015 22:07 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 113 | 9/20/2015 12:15 | Sigrid McCawley | robiejennag@y7mail.com | brad@pathtojustice.com | Conveying information about potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 114 | 9/20/2015 14:47 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 115 | 9/20/2015 19:16 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| 116 | 9/20/2015 19:29 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 117 | 9/20/2015 19:30 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 2 | msg |
| 118 | 9/21/2015 14:48 | Sigrid McCawley | robiejennag@y7mail.com | | Communication re initiation of lawsuit, with attachments | AC Privilege and Work Product/joint defense/common interest | Withheld | 1 | msg |
| 119 | | | | | Attached draft legal document relating to litigation | AC Privilege and Work Product/joint defense/common interest | Withheld | 12 | pdf |
| 120 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 121 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 2 | pdf |
| 122 | | | | | Attached draft legal document relating to litigation | Attorney Client/joint defense/common interest/work product | Withheld | 3 | pdf |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 123 | 9/21/2015 14:51 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre and McCawley re potential legal action. | Attorney Client/joint defense/common interest/work product | Withheld | 1 | msg |
| | | | | | | | | | |
| 125 | Emails, letters, and other communications from 2011 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson (and other , Sigrid McCawley, Meredith Schultz, David Boies, Jack Scarola, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Jack Scarola, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: Jane Doe #1 and Jane Doe #2 v. United States ("CVRA case"), Case no. 08-80736-CIV-Marra, pending in the Southern District of Florida. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the CVRA case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the CVRA case, communications sending or attaching attorney work product related to the CVRA case, and/or communications sending or attaching client revisions to attorney work product related to the CVRA case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 126 | Emails, letters, and other communications from 9/21/15 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: Giuffre v. Maxwell ("Maxwell case"), 15-cv-07433-RWS, pending in the Southern District of New York, since the date of filing, September 21, 2015. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Maxwell case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Maxwell case, communications sending or attaching attorney work product related to the Maxwell case, and/or communications sending or attaching client revisions to attorney work product related to the Maxwell case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 127 | Emails, letters, and other communications from January 2015 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and representation | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice and | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: *Bradley Edwards and Paul Cassell v. Alan Dershowitz* ("Dershowitz case"), Case no. 15-000072, pending in the Seventeenth Judicial Circuit, Broward County, Florida. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Dershowitz case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Dershowitz case, communications sending or attaching attorney work product related to the Dershowitz case, and/or communications sending or attaching client revisions to attorney work product related to the Dershowitz case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 128 | Emails, letters, and other communications from 2009 - Present | Virginia Giuffre, Bob Josefsberg, Katherine W. Ezell, Amy Ederi, other Podhurst attorneys, Legal Assistants, and Professionals retained by attorneys to aid in the rendition of legal advice | Virginia Giuffre, Bob Josefsberg, Katherine W. Ezell, Amy Ederi, other Podhurst attorneys, Legal Assistants, and Professionals retained by attorneys to aid in the rendition of legal advice | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). Correspondence re: *Jane Doe No. 102 v. Jeffrey Epstein* ("Epstein case"), Case No. 09-80656-CIV-Marra/Johnson (Southern District of Florida). Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to the Epstein case, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the Epstein case, communications sending or attaching attorney work product related to the Epstein case, and/or communications sending or attaching client revisions to attorney work product related to the Epstein case, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K docs overlapping with other cases | |
| 129 | 6/10/2015 | Virginia Giuffre | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley seeking information to assist with attorney advice. | Attorney Client | Withheld | 2 | msg |
| 130 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 26 | pdf |
| 131 | 4/30/2015 | Brittany Henderson | eperez@BSFLLP.com | Smccawley@BSFLLP.com,brad@paththojustice.com,robiejennag@y7mail.com | Communication re VRS registrations | AC Privilege and Work Product | Withheld | 1 | msg |
| 132 | 4/29/2015 | Andres Ortiz | bh699@nova.edu | Smccawley@BSFLLP.com,brad@pathtojustice.com,garvin@lclark.edu, robiejennag@y7mail.com | Email chain with McCawley, Edwards, Garvin, Henderson, Giuffre and BSF staff re legal advice re VRS communications. | AC Privilege and Work Product | Withheld | 1 | msg |
| 133 | 4/29/2015 | brittany henderson | aortiz@BSFLLP.com | Smccawley@BSFLLP.com,brad@pathtojustice.com,garvin@lclark.edu, robiejennag@y7mail.com | Communication re legal advice re VRS communications. | AC Privilege and Work Product | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 134 | 4/17/2015 | Paul Cassell | brad@pathtojustice.com | Smccawley@BSFLLP.com,brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 5 | msg |
| 135 | 4/17/2015 | Sigrid McCawley | brad@pathtojustice.com,cassellp@law.utah.edu | brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 4 | msg |
| 136 | 4/17/2015 | Brad Edwards | cassellp@law.utah.edu | Smccawley@BSFLLP.com,brittany@pathtojustice.com,eperez@BSFLLP.com,robiejennag@y7mail.com | Email chain with Cassell, McCawley, Edwards, Garvin, Beloof, Henderson, Giuffre and BSF staff re legal advice re VRS registrations. | AC Privilege and Work Product | Withheld | 4 | msg |
| 137 | 2/26/2015 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re non-testifying expert. | Attorney Client | Withheld | 1 | msg |
| 138 | 2/26/2015 | Sigrid McCawley | robiejennag@y7mail.com | | Communication re non-testifying expert. | Attorney Client | Withheld | 1 | msg |
| 139 | 2/11/2016 | Sigrid McCawley | robiejennag@y7mail.com | | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 140 | 2/11/2016 | Sigrid McCawley | StanPottinger@aol.com,robiejennag@y7mail.com | Lcarlsen@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 141 | 2/11/2016 | StanPottinger@aol.com | robiejennag@y7mail.com | Lcarlsen@BSFLLP.com,Smccawley@BSFLLP.com,brad@pathtojustice.com | Email chain with Giuffre, McCawley, Edwards, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 142 | 2/9/2016 | StanPottinger@aol.com | robiejennag@y7mail.com | | Email chain with Giuffre and Pottinger re media communications. | Attorney Client | Redacted | 2 | msg |
| 143 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 26 | pdf |
| 144 | | | | | Letter from Virginia Giuffre to David Boies conveying requested information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 23 | docx |
| 145 | 6/10/2015 | Virginia Giuffre | robiejennag@y7mail.com | | Email chain with Giuffre and McCawley re ongoing litigation. | Attorney Client | Withheld | 2 | msg |
| 146 | 4/29/2015 | Virginia Giuffre | aortiz@BSFLLP.com | Smccawley@BSFLLP.com,bh699@nova.edu,brad@pathtojustice.com,garvin@lclark.edu | Email chain with Henderson, McCawey, Edwards, Garvin and BSF staff re VRS communications. | Attorney Client | Withheld | 2 | msg |
| 147 | 4/10/2015 | Virginia Giuffre | rebecca.boylan@yahoo.com | | Email chain with Boylan, Giuffre, McCawley, and BSF staff re legal advice re VRS registrations. | Attorney Client | Withheld | 2 | msg |
| 148 | 2/26/2015 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email confirming legal advice re non-testifying expert. | Attorney Client | Withheld | 1 | msg |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 149 | 2/11/2015 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Giuffre and Pottinger re media communications | Attorney Client | Redacted | 3 | msg |
| 150 | 2/11/2015 | Virginia Giuffre | Smccawley@BSFLLP.com | | Email chain with Giuffre, McCawley, Pottinger and BSF staff re media communications. | Attorney Client | Redacted | 3 | msg |
| 151 | 1/13/2015 | Virginia Giuffre | StanPottinger@aol.com | | Email chain with Pottinger and Giuffre re anticipated litigation. | AC Privilege and Work Product | Withheld | 1 | msg |
| 152 | Emails, letters, and other communications from January 2015 - Present | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice | Virginia Giuffre, Brad Edwards, Paul Cassell, Brittany Henderson, Sigrid McCawley, Meredith Schultz, David Boies, Stephen Zach, Stan Pottinger, Ellen Brockman, Legal Assistants, Professionals retained by attorneys to aid in the rendition of legal advice | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). This categorical entry is regarding correspondence re potential legal action against entities and individuals. Documents withheld pursuant to the privileges asserted included communications from Ms. Giuffre to the attorneys listed seeking legal advice related to potential law suits, communications from the attorneys to Ms. Giuffre giving legal advice or giving attorney mental impressions related to the law suits, communications sending or attaching attorney work product related to potential lawsuits, and/or communications sending or attaching client revisions to attorney work product related to potential lawsuits, and communications re evidence. | AC Privilege and Work Product/joint defense/common interest | Withheld | Approx. 1.3K overlapping with other cases | |

| Log ID | Email Sent Date | Email From | Email To | CC Address | Subject Matter | Type of Privilege | Privilege Action | Page Count | Doc Type |
|---|---|---|---|---|---|---|---|---|---|
| 153 | Email and letter communications | The law enforcement entity, Virginia Giuffre, David Boies, Stan Pottinger, Sigrid McCawley, Paul Cassell, Brad Edwards | The law enforcement entity, Virginia Giuffre, David Boies, Stan Pottinger, Sigrid McCawley, Paul Cassell, Brad Edwards | | Plaintiff has objected that Defendant's requests are overly broad and unduly burdensome, as individually logging all privileged responsive documents would be overly burdensome. Plaintiff contends that requests targeting such privileged information are not reasonably calculated to lead to the discovery of admissible evidence, are not important to resolving the issues, are not relevant to any party's claim or defense, are not proportional to the needs of the case, and creates a heavy burden on Plaintiff that outweighs its benefit. Therefore, Plaintiff has employed categorical logging pursuant to Local Civil Rule 26.2(c). This categorical entry is regarding correspondence re the currently ongoing criminal investigation of Defendant and others. | Public Interest | Withheld | approx. 57 documents | |
| 154 | 8/27/2014 | Virginia Giuffre | Brad Edwards | | Email chain discussing efforts to obtain assistance from FBI agent in obtaining information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 1 | msg |
| 155 | 8/27/2014 | Virginia Giuffre | Brad Edwards | | Email chain discussing efforts to obtain assistance from FBI agent in obtaining information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 1 | msg |
| 156 | 8/27/2014 | Virginia Giuffre | Brad Edwards | | Email chain discussing efforts to obtain assistance from FBI agent in obtaining information to assist in providing legal advice. | AC Privilege and Work Product | Withheld | 1 | msg |

# EXHIBIT N

United States District Court
Southern District Of New York

--------------------------------------------------X

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

--------------------------------------------------X

**15-cv-07433-RWS**

**DEFENDANT GHISLAINE MAXWELL'S**
**THIRD SUPPLEMENTAL F.R.C.P. 26(A)(1)(A) DISCLOSURES**

Pursuant to F.R.C.P. 26(a)(1)(A), Defendant Ghislaine Maxwell makes the following disclosures:

## I. IDENTITIES OF INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION RELEVANT TO DISPUTED FACTS ALLEGED WITH PARTICULARITY IN THE PLEADINGS

1. Ghislaine Maxwell
c/o Laura A. Menninger, Esq.
Haddon, Morgan & Foreman, P.C.
150 E. 10th Ave.
Denver, CO 80203
303-831-7364
LMenninger@HMFLaw.com

Ms. Maxwell is the Defendant and may have knowledge concerning matters at issue, including the events of 1999-2002 and the publication of statements in the press in 2011-2015.

2. Virginia Lee Roberts Giuffre
c/o Sigrid S. McCawley, Esq.
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 1200

Miami, Florida 33301
(954) 356-0011
smccawley@bsfllp.com

Ms. Giuffre is the Plaintiff and has knowledge concerning the matters at issue in her Complaint, including the events of 1996-2015 and the publication of statements in the press in 2011-2015.

3. Kathy Alexander
Address unknown at this time
Telephone number unknown at this time

Ms. Alexander has knowledge about matters at issue, including Plaintiff's whereabouts during 2000-2002 and her false claims concerning Defendant and others.

4. Miles Alexander
Address unknown at this time
Telephone number unknown at this time

Mr. Alexander has knowledge about matters at issue, including Plaintiff's whereabouts during 2000-2002 and her false claims concerning Defendant and others.

5. James Michael Austrich
10108 NW 261 Terrace
High Springs, Florida, 32643

Mr. Austrich has knowledge concerning matters at issue in the Complaint, including events of 1996-2002.

6. Philip Barden
Devonshires Solicitors LLP
30 Finsbury Circus
London, United Kingdom
EC2M 7DT
DX: 33856 Finsbury Square
(020) 7628-7576
Philip.Barden@devonshires.co.uk

Mr. Barden has knowledge concerning press statements by Plaintiff and Defendant in 2011-2015 at issue in this matter.

7. [redacted]

[redacted]

8. David Boies
   Boies, Schiller, Flexner LLP
   575 Lexington Ave.
   New York, NY 10022
   (212) 446-2300

   Mr. Boies has knowledge concerning matters at issue in the Complaint and in Plaintiff's pleadings and sworn statements in other litigations, including in particular her publicly filed allegations concerning Defendant and Alan Dershowitz.

9. Laura Boothe
   The Mar-a-Lago Club, LC.
   1100 South Ocean Boulevard,
   Palm Beach, FL 33480

   Ms. Boothe has knowledge concerning matters at issue, including the date that Sky Roberts began working at the Mar-a-Lago Club, and the human resources department at Mar-A-Lago.

10. Evelyn Boulet
    Address unknown at this time
    Telephone number unknown at this time

    Ms. Boulet may have knowledge concerning Plaintiff's false claims against Defendant.

11. Rebecca Boylan
    Address unknown at this time
    Telephone number unknown at this time

    Ms. Boylan has knowledge concerning Plaintiff during the relevant time period including claims for damages, motive and bias.

12. Joshua Bunner
    Address unknown at this time

    Joshua Bunner has knowledge concerning Plaintiff's credibility, including false claims of sexual assault.

13. Carolyn Casey
    Address unknown at this time
    Telephone number unknown at this time

Ms. Casey may have knowledge concerning Plaintiff's false claims against Defendant.

14. Paul Cassell
    383 South University Street
    Salt Lake City, UT 84112
    801-585-5202
    paul.cassell@law.utah.edu

    Mr. Cassell has knowledge concerning press statements by Plaintiff, Plaintiff's court pleadings, and Plaintiff's sworn testimony.

15. Sharon Churcher
    3 Deveau Road
    N. Salem, NY 10560

    Ms. Churcher has knowledge concerning matters at issue, including Plaintiff's statements regarding Defendant and others.

16. Alexandra Cousteau
    Address unknown at this time
    Telephone number unknown at this time

    Ms. Cousteau may have knowledge concerning Plaintiff's false claims against Defendant and others.

17. Alan Dershowitz
    c/o Richard A. Simpson, Esq.
    WILEY REIN, LLP
    1776 K Street NW
    Washington, D.C. 20006
    (202) 719-7000

    Mr. Dershowitz has knowledge concerning Plaintiff's false statements to the press, in court pleadings, and in sworn testimony, at issue in this matter.

18. Dr. Mona Devanesan
    PO Box 3250
    601 E. Delmonte Avenue
    Clerwiston, FL 33440
    (561) 254-2502
    modev358@aol.com

    Dr. Devanesan has knowledge about matters at issue, including Plaintiff's whereabouts during 2001 and her claimed damages.

19. [redacted]
Address unknown at this time Telephone number unknown at this time

[redacted]

20. Bradley Edwards
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
425 N. Andrews Ave., Suite 2
Ft. Lauderdale, FL 33301
(954) 524-2820
brad@pathtojustice.com

Mr. Edwards has knowledge concerning Plaintiff's false statements to the press, in court pleadings, and in sworn testimony at issue in this matter. Mr. Edwards also has knowledge concerning "Victim's Refuse Silence, Inc."

21. Amanda Ellison
Address unknown at this time
561-628-4338

Ms. Ellison has knowledge concerning Plaintiff's false allegations concerning Defendant.

22. Cimberly Espinosa
1113 West Columbine Ave.
Santa Ana, CA 92707

Ms. Espinosa has knowledge concerning Plaintiff's false allegations concerning Defendant.

23. Jeffrey Epstein
c/o Tonja Haddad Coleman, Esq.
315 SE 7th Street, Suite 301
Fort Lauderdale, FL 33301
(954) 467-1223

Mr. Epstein has knowledge concerning Plaintiff's false statements to the press and in court pleadings, as well as the events of 1999-2002 concerning Plaintiff and Defendant.

24. Annie Farmer
Address unknown at this time
Telephone number unknown at this time

Ms. Farmer may have knowledge concerning Plaintiff's false claims against Defendant.

25. Marie Farmer
Address unknown at this time
Telephone number unknown at this time

Ms. Farmer may have knowledge concerning Plaintiff's false claims against Defendant.

26. Alexandra Fekkai
Address unknown at this time
Telephone number unknown at this time

Ms. Fekkai may have knowledge concerning Plaintiff's false claims against Defendant and others.

27. Crystal Figueroa
Address unknown at this time

Ms. Figueroa may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002

28. Anthony Figueroa
38 Bunker View Drive
Palm Coast, FL

Mr. Figueroa has knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

29. Louis Freeh
Address unknown at this time
(202) 215-8321
Freeh@FreehGroup.com

Mr. Freeh may have knowledge concerning travel of Bill Clinton.

30. Eric Gany
Address unknown at this time
Telephone number unknown at this time

Mr. Gany may have knowledge concerning Plaintiff whereabouts during 2000-2002 and her false claims against Defendant.

31. Meg Garvin
Lewis & Clark Law School

10015 S.W. Terwilliger Boulevard MSC 51
Portland, Oregon 97219

Ms. Garvin has knowledge concerning matters at issue including Victims Refuse Silence and Plaintiff's damages.

32. Sheridan Gibson-Butte
Address unknown at this time
Telephone number unknown at this time
Ms. Gibson-Butte may have knowledge concerning Plaintiff's false claims against Defendant.

33. Robert Giuffre
Queensland, Australia

Mr. Giuffre is may have knowledge concerning matters at issue, including Plaintiff's activities during 2002-2016 and her damages allegations.

34. Ross Gow
Acuity Representation
23 Berkeley Square
London W1J 6HE
44 (0) 777 875 5251
ross@acuityreputation.com

Mr. Gow may have knowledge concerning matters at issue, including the publication of statements in the press in 2011-2015 concerning Plaintiff and Defendant.

35. Fred Graff
Address unknown at this time
Telephone number unknown at this time

Mr. Graff may have knowledge concerning Plaintiff's false claims against Defendant.

36. Philip Guderyon
Address unknown at this time
Telephone number unknown at this time

Mr. Guderyon may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

37. [redacted]

[redacted]

[redacted] may have knowledge concerning matters at issue.

38. Shannon Harrison
Address unknown at this time
Telephone number unknown at this time

Ms. Harrison may have knowledge concerning Plaintiff's false claims against Defendant.

39. Victoria Hazel
Address unknown at this time
Telephone number unknown at this time

Ms. Hazel may have knowledge concerning Plaintiff's false claims against Defendant.

40. Brittany Henderson
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
425 N. Andrews Ave., Suite 2
Ft. Lauderdale, FL 33301

Ms. Henderson has knowledge concerning matters at issue including Victims Refuse Silence and Plaintiff's damages.

41. Brett Jaffe
Address unknown at this time
Telephone number unknown at this time

Mr. Jaffe has knowledge concerning Plaintiff's false claims concerning Ms. Maxwell including her compliance with any deposition subpoena in the CVRA matter.

42. Carol Roberts Kess
Address unknown at this time
Telephone number unknown at this time

Ms. Kess may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

43. Dr. Karen Kutikoff
12957 Palms W Drive #101

Loxahatchee, FL 33470

Dr. Kutifkoff may have knowledge concerning matters at issue, including Plaintiff's whereabouts during 1998-2002 and Plaintiff's damages.

44. Peter Listerman
Address unknown at this time
Telephone number unknown at this time

Mr. Listerman may have knowledge concerning Plaintiff's false claims against Defendant.

45. Tony Lyons
Skyhorse Publishing, Inc.
307 West 36th Street, 11th Floor
New York, NY 10018

Mr. Lyons may have knowledge concerning matters at issue, including Plaintiff's false allegations concerning Defendant and others.

46. Bob Meister
101 Seminole Avenue,
Palm Beach, FL 38480
(561) 650-0083

Mr. Meister may have knowledge concerning Plaintiff's false claims against Defendant.

47. Jamie A. Melanson
5280 NW 53rd Ave.
Coconut Creek, FL 33073

Mr. Melanson has knowledge concerning Plaintiff's honesty and truthfulness.

48. Lynn Miller
936 O Street
Penrose, CO 81240

Ms. Miller may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

49. Marvin Minsky
Address unknown at this time
Telephone number unknown at this time

Mr. Minsky may have knowledge concerning Plaintiff's false claims against Defendant and others.

50. [redacted]

51. David Mullen
Address unknown at this time
Telephone number unknown at this time

Mr. Mullen may have knowledge concerning Plaintiff's false claims against Defendant.

52. Joe Pagano
Address unknown at this time
Telephone number unknown at this time

Mr. Pagano may have knowledge concerning Plaintiff's false claims against Defendant.

53. Mary Paluga
Address unknown at this time
Telephone number unknown at this time

Ms. Paluga may have knowledge concerning Plaintiff's false claims against Defendant.

54. J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
914-763-8333

Mr. Pottinger may have knowledge concerning matters at issue, including Plaintiff's attempts to sell her story to the media and her contacts with the media.

55. Joseph Recarey
2753 Misty Oaks Circle
Royal Palm Beach, FL 33441
Telephone number unknown at this time

Mr. Recarey may have knowledge concerning Plaintiff's false claims against Defendant.

56. Michael Reiter
    2335 So. Ocean Blvd., Apt. 15
    Palm Beach, FL 33480
    Telephone number unknown at this time

    Mr. Reiter may have knowledge concerning Plaintiff's false claims against Defendant.

57. Jason Richards
    Federal Bureau of Investigations
    Address unknown at this time

    Mr. Richards has knowledge concerning matters at issue, including Plaintiff's statements concerning Defendant, Alan Dershowitz and other individuals.

58. Bill Richardson
    Address unknown at this time
    Telephone number unknown at this time

    Mr. Richardson may have knowledge concerning Plaintiff's false claims against Defendant and others.

59. Sky Roberts
    15020 SE 47th Ave
    Summerfield, FL 34491-5141

    Mr. Roberts may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

60. Scott Rothstein
    U.S. Bureau of Prisons

    Mr. Rothstein has knowledge concerning Plaintiff's civil claims against Jeffrey Epstein.

61. Forest Sawyer
    Address unknown at this time
    Telephone number unknown at this time

    Mr. Sawyer may have knowledge concerning Plaintiff's false claims against Defendant.

62. Doug Schoetlle
    Address unknown at this time
    Telephone number unknown at this time

Mr. Schoettle may have knowledge concerning Plaintiff's false claims against Defendant.

63. Cecilia Stein
    Address unknown at this time
    Telephone number unknown at this time

    Ms. Stein may have knowledge concerning Plaintiff's false claims against Defendant.

64. Mark Tafoya
    Address unknown at this time
    Telephone number unknown at this time

    Mr. Tafoya may have knowledge concerning Plaintiff's false claims against Defendant.

65. Brent Tindall
    Address unknown at this time
    Telephone number unknown at this time

66. Kevin Thompson
    Address unknown at this time

    Kevin Thompson has knowledge concerning Plaintiff's credibility, including false claims of sexual assault.

67. Ed Tuttle
    Address unknown at this time
    Telephone number unknown at this time

    Mr. Tuttle may have knowledge concerning Plaintiff's false claims against Defendant.

68. Emma Vaghan
    Address unknown at this time
    Telephone number unknown at this time

    Ms. Vaghan may have knowledge concerning Plaintiff's false claims against Defendant.

69. Kimberly Vaughan-Edwards
    Address unknown at this time
    Telephone number unknown at this time
    Believed to be in the UK

Ms. Vaughan-Edwards has knowledge concerning facts relevant to this dispute and Ms. Maxwell's character.

70. Cresenda Valdes
Address unknown at this time
Telephone number unknown at this time

Ms. Valdes may have knowledge concerning Plaintiff's false claims against Defendant.

71. Anthony Valladares
Address unknown at this time
Telephone number unknown at this time

Mr. Valladares may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

72. Maritza Vazquez
Address unknown at this time
Telephone number unknown at this time

Ms. Vazquez may have knowledge concerning Plaintiff's false claims against Defendant.

73. Vicky Ward
Address unknown at this time
Telephone number unknown at this time

Ms. Ward may have knowledge concerning Plaintiff's false claims against Defendant.

74. Jarred Weisfeld
Address unknown at this time

Mr. Weisfeld may have knowledge concerning matters at issue, including Plaintiff's attempted publication of false allegations concerning Defendant and others.

75. Courtney Wild
Pinellas County Jail

Ms. Wild may have knowledge concerning Plaintiff's false claims against Defendant.

76. Daniel Wilson
Address unknown at this time

Telephone number unknown at this time

Mr. Wilson may have knowledge concerning matters at issue, including Plaintiff's activities during 1996 – 2002.

77. Andrew Albert Christian Edwards, Duke of York
Address unknown at this time
Telephone number unknown at this time

The Duke has knowledge concerning Plaintiff's false statements to the press, in court pleadings, and in sworn testimony as well as the events of 1999-2002.

78. Witnessed identified by Plaintiff in any of the various versions of her Rule 26 disclosures.

79. Witnesses whose identities and contact information can be identified in law enforcement reports disclosed herein.

80. Any other witness learned through the discovery process.

Defendant Ghislaine Maxwell reserves her right to supplement these disclosures as additional witnesses are learned through the discovery process, or endorsed by Plaintiff.

## II. DOCUMENTS, DATA, COMPILATIONS AND TANGIBLE THINGS IN POSSESSION, CUSTODY OR CONTROL OF DEFENDANT THAT MAY BE USED TO SUPPORT DEFENDANT'S CLAIM OR DEFENSES

1. Documents received from any other party through disclosures and/or in discovery, including any deposition exhibits, will not be identified or produced, though they technically may fall within this category "II", and Defendant reserves the right to utilize such documents at any hearing or trial on this matter.

2. News articles from the internet:

   a. "Sordid friends and why he isn't fit for the job: Duke of York risks losing ambassador role," *Daily Mail Online* (Feb. 28, 2011).

   b. "Prince Andrew and the 17-year-old girl his sex offender friend flew to Britain to meet him," *Daily Mail Online* (corrected Mar. 2, 2011).

   c. "Unsavoury association: How Robert Maxwell's daughter 'procured young girls' for Prince Andrew's billionaire friend," *Daily Mail Online* (Mar. 5, 2011).

d. "Virginia Roberts' account of the explosive Prince Andrew 'sex slave' drama," *Daily Mail Online* (Jan. 3, 2015).

e. "Court papers put daughter of Robert Maxwell at centre of 'sex slave' scandal," *The Guardian* (Jan. 4, 2015).

f. "Prince Andrew denies sexual abuse allegations in unprecedented Buckingham Palace statement: The Duke of York denies having relations with alleged 'sex slave,'" *The Independent* (Jan. 4, 2015).

g. "Prince Andrew story runs and runs - but editors should beware," *The Guardian* (Jan. 5, 2015).

h. "US lawyer sues in Prince Andrew sex claims case," *Time* (Jan 6, 2015).

i. "Harvard professor Alan Dershowitz denies charges of sex with underage girl," *Boston Globe* (Jan. 22, 2015).

j. "Virginia Roberts's Aunt Reveals Jeffrey Epstein Girl Says I Am In Fear for My Life," *Daily Mail Online*, (Jan. 10, 2015).

k. "EXCLUSIVE: Alleged 'sex slave' of Jeffrey Epstein, Prince Andrew accused two men of rape in 1998, but was found not credible," *NY Daily News* (Feb. 23, 2015).

l. "Jeffrey Epstein accuser was not a sex slave, but a money-hungry sex kitten, her former friends say," *NY Daily News* (Mar. 1, 2015).

m. "Twat Claims She Was Underage Sex Slave Bedding Prince Andrew," http://www.mgtowhq.com/viewtopic.php?f=2&t=6676 (Jan. 5, 2015).

n. "Exclusive: Prince Andrew at Heidi Klum's 'Hookers and Pimps' party with the New York socialite accused of procuring underage girls for his billionaire pedophile friend" *Daily Mail Online* (May 10, 2016).

3. Email from Ross Gow to various news organizations, Subject: "Ghislaine Maxwell," (Jan. 2, 2015).

4. "Lawyers Acknowledge Mistake In Filing Sexual Misconduct Charges Against Professor Dershowitz," Joint Statement of Brad Edwards, Paul Cassell and Alan Dershowitz (Apr. 8, 2016).

5. *Edwards and Cassell v. Dershowitz,* In the Circuit Court of the Seventeenth Judicial District In and For Broward County Florida to include:

   a. Deposition testimony of Paul G. Cassell, dated October 16, 2015 and October 17, 2015.

6. *Jane Doe #1 and #2 v. United States,* U.S. District Court for the Southern District of Florida, 08-cv-80736-KAM pleadings to include:

   a. Motion for Limited Appearance, Consent to Designation and Request to Electronically Receive Notices of Electronic Filing (July 28, 2008) (Doc. # 16)

   b. Notice of Change of Address and Firm Affiliation (Apr. 9, 2009) (Doc. # 37)

   c. Order Denying Petitioners' Motion to Join Under Rule 21 and Motion to Amend Under Rule 15 (Apr. 7, 2015) (Doc. #324)

   d. Order Scheduling Settlement Conference Before the Magistrate Judge, U.S. District Court (Mar. 31, 2016) (Doc. #378)

7. *Epstein v. Scott Rothstein and Bradley J. Edwards*, In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, 09-ca-040800, pleadings to include:

   a. Complaint (Dec. 7, 2009).

8. Law enforcement records obtained from the Palm Beach County (Florida) Sheriff's Office, the Royal Palm Beach (Florida) Police Department, the County Court in and for Palm Beach County (Florida), the Greenacres (Florida) Department of Public Safety, and the Fremont County (Colorado) Sheriff's Office.

9. Employment records obtained from ET Employment Training and Recruiting Australia.

10. Education records obtained from Royal Palm Beach Community High School and Forest Hills High School.

11. Documents received from Palm Beach County Library System.

12. Documents received from any other party through disclosures and/or in discovery, including any deposition exhibits, will not be identified or produced, though they technically may fall within this category "II", and Defendant reserves the right to utilize such documents at any hearing or trial on this matter.

Defendant reserves the right to identify additional documents, data, compilations and tangible things as discovery continues and to supplement this list accordingly.

## III. DESCRIPTION OF CATEGORIES OF DAMAGES SOUGHT AND COMPUTATION OF ECONOMIC DAMAGES CLAIMED BY THE DISCLOSING PARTY

Not applicable at this time Ms. Maxwell reserves her right to supplement these disclosures as necessary.

## IV. INSURANCE AGREEMENT UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY A PART OR ALL OF A JUDGMENT

Ms. Maxwell's AIG Homeowners and Excess Liability insurance policies. Coverage has been denied by AIG, as their letter of April 18, 2016 to Ms. Maxwell, copied to Ms. McCawley, attests.

Dated: June 17, 2016.

Respectfully submitted,

*s/ Laura A. Menninger*

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com
jpagliuca@hmflaw.com

*Attorneys for Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2016, I electronically served this *DEFENDANT GHISLAINE MAXWELL'S THIRD SUPPLEMENTAL F.R.C.P. 26(A)(1) DISCLOSURES* via e-mail on the following:

Sigrid S. McCawley
Meredith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*s/* ______________________________