**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------X
                                                    ⋮
VIRGINIA L. GIUFFRE,                                ⋮
                                                    ⋮
        Plaintiff,                                  ⋮
                                                    ⋮
v.                                                  ⋮          **15-cv-07433-RWS**
                                                    ⋮
GHISLAINE MAXWELL,                                  ⋮
                                                    ⋮
        Defendant.                                  ⋮
                                                    ⋮
---------------------------------------------------X


**RESPONSE TO NON-PARTY SHARON CHURCHER'S**
**<u>MOTION TO QUASH SUBPOENA</u>**


Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
East 10th Avenue
Denver, CO 80203
303.831.7364

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.  CHURCHER IS A MATERIAL FACT WITNESS AND WAS NOT ACTING AS A
    JOURNALIST ............................................................................................................. 2

    A.  Churcher was acting as a friend and advisor to help Plaintiff publish her  book, not as
        journalist ............................................................................................................... 3

    B.  Churcher prompted Plaintiff to fabricate stories regarding Prince Andrew ....................... 4

    C.  Churcher prompted Plaintiff to invent stories regarding Alan Dershowitz ........................ 6

    D.  Churcher's communications with Plaintiff's Counsel and Law Enforcement are not news-
        gathering activities ............................................................................................... 7

II.  THE ABSOLUTE PRIVILEGE OF THE SHIELD LAW IS NOT APPLICABLE
     BECAUSE THERE WAS NO EXPECTATION OF CONFIDENTIALITY ................... 9

III.  THERE IS A COMPELLING NEED FOR CHURCHER'S DOCUMENTS AND
      TESTIMONY ........................................................................................................... 10

    A.  The Information Sought from Churcher is Highly Material and Directly Relevant .......... 11

    B.  Churcher's documents and testimony are critical to Ms. Maxwell's truth defense and
        Plaintiff's claims ................................................................................................ 15

    C.  Churcher's information cannot be obtained from an alternative source. ........................... 16

IV.  MS. MAXWELL'S COUNSEL AGREED TO EXTEND THE RETURN DATE FOR
     COMPLIANCE WITH THE SUBPOENA ................................................................... 17

CERTIFICATE OF SERVICE ........................................................................................... 19

i

Defendant Ghislaine Maxwell files this Response to Non-Party Sharon Churcher's
Motion to Quash Subpoena, and states as follows:

### INTRODUCTION

Ms. Maxwell seeks documents and testimony from Sharon Churcher ("Churcher") that
are critical to the defense of this single count defamation case.  Churcher is the only person with
much of the information that will prove the truth defense.

The alleged defamatory press release at issue in this case states:

"Each time the story is re told it changes with new salacious details about public
figures and world leaders and now it is alleged by Ms. Roberts that Alan
Dershowitz is involved in having sexual relations with her, which he denies.

Ms. Roberts claims are obvious lies and should be treated as such and not publicized as
news, as they are defamatory."

Churcher is the sole source of information regarding the original story told by Plaintiff,
and was the author of the first articles publishing Plaintiff's claims.  She was actively and
personally involved in changing those stories over time and in the creation and addition of new
salacious details about public figures, including the fabrication of Alan Dershowitz's alleged
sexual relations with Plaintiff.

Sharon Churcher's attempt to avoid the subpoena for deposition and production of
documents based on the journalist Shield Law must fail for three reasons.  First, much of the
discovery sought is unrelated to any news gathering activities.  Rather, Churcher was acting as a
friend and advisor to Plaintiff in Plaintiff' efforts to write and publish a book, sensationalizing her
story in a manner that would best boost the publicity, publication and sales of that work of
fiction.  In that role, she helped manufacture some of the stories that have been denied and that
are the central issues in this case.

1

Second, in certain instances, Churcher was also acting as a source for information to Plaintiff's counsel and law enforcement agencies, specifically stating that she was not acting in her capacity as a journalist.  In these instances, she was not gathering news for publication, she was providing information she had already gathered.  Providing this information to third parties waived any qualified privilege that ever arguably existed.

Finally, to the extent that any information sought is covered by the qualified protection of Civil Rights Law § 79–h(c)[1], Ms. Maxwell provides a clear and specific showing that the information is highly material or relevant, critical or necessary to the Ms. Maxwell's truth defense, and not obtainable from any alternative source.  As such, the Shield Law requires compliance with the subpoena.

For these reason, the Motion to Quash should be denied, and Churcher should be compelled to comply with the Subpoena, as modified herein.

## ARGUMENT

## I.   CHURCHER IS A MATERIAL FACT WITNESS AND WAS NOT ACTING AS A JOURNALIST

The New York Shield law relied on by Churcher is *only* applicable where a professional journalist is asked to disclose information they have received "*in the course of gathering or obtaining news for publication*." 79-h(b) &(c).  Much of the information sought from Churcher has nothing to do with information she gathered or collected in the course of gathering news for publication.  Rather, it relates to advice, information and communications that she had with Plaintiff in her capacity as a friend and advisor.  "Section 79-h is not applicable where the journalist is called upon, as other citizens, to testify with respect to personal observations"

---

[1] As discussed in detail below, the undersigned has informed Churcher's counsel that the Subpoena is not intended to cover any information from confidential sources.  Thus, the absolute privilege found in Civil Rights Law § 79–h(c) is inapplicable

*Solargen Elec. Motor Car Corp. v. Am. Motors Corp.*, 506 F. Supp. 546, 551 (N.D.N.Y. 1981);

*People v. Dupree*, 88 Misc. 2d 791, 796, 388 N.Y.S.2d 1000, 1003 (Sup. Ct. 1976) ("the

privilege does not exist if the newsman is called on to testify what he personally observed.").

In this single count defamation action, Churcher is being called as a witness to testify

regarding events that she personally observed and ***in which she participated***.  This case is about

whether the information included in the December 2014 Joinder Motion that Ms. Maxwell called

obvious lies were, in fact, lies.  These included allegations about Plaintiff's alleged sexual

interactions with Alan Dershowitz and Prince Andrew, specifically referenced in Ms. Maxwell's

denial statement.  Not only is Churcher aware that the allegations were false, she helped Plaintiff

concoct the stories.

### A.   Churcher was acting as a friend and advisor to help Plaintiff publish her book, not as journalist

As set out in Churcher's Declaration, she first met with Plaintiff in early 2011 and

conducted a weeks-long series of extensive interviews in person with Plaintiff, leading to a string

of publications in March of 2011.  As Churcher stated, her focus in these articles was Prince

Andrew.  After the interviews and the publication of the March 2011 stories, Churcher continued

regular contact with Plaintiff as her friend and business advisor.  *See* Menninger Decl. Ex. A, p.

5-7, 10, 12, 19, 24-25, 30, 32, 35, 37-38, 48, 51, 61 & 68.  Churcher encouraged Plaintiff to write

a book and to begin pursing publishing contracts as soon as her exclusivity with the Mail on

Sunday was over in May 2011.  Menninger Decl. Ex. A, p. 2, 5.  Churcher recommended a

variety of ghost writers and agents to Plaintiff for this purpose, all as Plaintiff's friend, advisor

and advocate.  *See* Menninger Decl. Ex. A, p. 5, 9, 10, 12, 15, 25, 30, 32, 35, 37, 38, 42, 48, 50

&60.  Churcher also initiated contact with the US Attorney's office and FBI on behalf of

Plaintiff, setting up their initial meeting where Churcher planned to be present at that meeting "for support," not in her capacity as a journalist. Menninger Decl. Ex. A, p. 3.

Plaintiff did begin writing her book and sent versions of her manuscript to Churcher for her review and comment – again, in her capacity as a friend, not as a journalist. Menninger Decl. Ex. A, p. 59. Churcher also had extensive discussion with Plaintiff on the best strategies for getting interest in her book, including determining when to "name names" Menninger Decl. Ex. A, p. 63. She strategized with Plaintiff and Plaintiff's counsel, Brad Edwards, on how to use a potential Vanity Fair article as book publicity by dropping names of famous politicians, claiming she was sex trafficked, but refusing to provide additional information because she was writing a book. Menninger Decl. Ex. A, p. 51-58.

Through some of these communications between Plaintiff and Churcher, it is obvious that stories in the book – later to become allegation in the Joinder Motion – were created and supported based on the suggestions of Churcher. They were not reported by Plaintiff in her initial interview, or in Churcher's initial publications, because they did not occur.

**B.      Churcher prompted Plaintiff to fabricate stories regarding Prince Andrew**

In 2011, when Churcher first reported on Plaintiff's story after having just spent weeks interviewing Plaintiff in Australia, and with a particular focus on reporting Plaintiff's meeting Prince Andrew, Churcher specifically reported:  "[t]here is no suggestion that there was any sexual contact between Virginia and Andrew, or that Andrew knew that Epstein paid her to have sex with his friends." Churcher Decl., Ex. 2, p, 6/34. Shortly thereafter, on March 20, 2011, Churcher emailed Plaintiff explaining to her how she can corroborate a story to tell the FBI – that she was "given to" Prince Andrew. Menninger Decl., Ex. A, p. 8. Churcher provided an explanation for how Plaintiff can substantiate the claim – a claim not previously made by Plaintiff.

The December 2014 Joinder Motion is the first publication of alleged sexual interaction between Plaintiff and Prince Andrew.  At some point between March 2011 and January 2015, Churcher requested that Plaintiff handwrite a diary describing her alleged sexual encounters with Prince Andrew.  Attached to the Churcher Declaration at Exhibit 7 is an Article subtitled "Diary Entries Of 'Teen Sex Slave' Detail Sorted Hook-Up With Prince Andrew – In Her Own Handwriting."  The article claims to print excerpts of a contemporaneous journal kept by Plaintiff when she was 17, stating "In a bombshell world exclusive, RadarOnline.com has exclusively obtained the secret journal of the then 17-year-old employed to have sex with billionaire pedophile Jeffrey Epstein and his rich and powerful pals — and it's packed with scandalous claims about her illicit trysts, including with Andrew, the fifth in line to the British throne."  Churcher Decl. Ex. 7.  This alleged 24 page "diary" or "journal" was a completely fabricated document handwritten by Plaintiff at the request and direction of Churcher.  *See* Menninger Decl. Ex. B, p. 207-208; 226-231[2]  Plaintiff maintains she did not keep a copy of this handwritten "diary," leaving the only source of the complete document and information about its creation with the person who asked for the document's fabrication – Churcher.[3]

If there was no suggestion of sexual contact with Prince Andrew as of March 2, 2011, how and when was this story first created?  From the email correspondence, it appears that Churcher was directly involved in inventing this story during the course of creating stories for a book – stories that would generate the interest of publishers.  Churcher's testimony on how the Prince Andrew allegation was first created is direct evidence in this case.

---

[2] In actuality, the only journal Plaintiff ever maintained that might contain relevant information was purposefully destroyed by Plaintiff in a bonfire in 2013, at a time when she was represented by counsel and actively trying to insert herself as a Plaintiff in the CVRA case.  Menninger Decl., Ex. B, p. 205-209.

[3] To the extent Churcher argues that the creation of this "diary" was somehow part of the news "gathering" process, it was clearly not confidential, and the test requiring production of the non-published potions, discussed below, is met – the information is highly relevant, critical to the defense, and available form no other source.

### C.        Churcher prompted Plaintiff to invent stories regarding Alan Dershowitz

Churcher's direct involvement in creating the allegations in the Joinder Motion regarding Plaintiff's alleged sexual interactions with Alan Dershowitz – or even the knowledge of Alan Dershowitz' name – is even more apparent.  Prior to the December 2014 joinder Motion, there is not a single mention of Mr. Dershowitz in any pleading related to Plaintiff.  In Churcher's March 2011 publications, directly after she interviewed Plaintiff, there was not a single mention of Mr. Dershowitz.  It is quite apparent that Plaintiff had never met Mr. Dershowitz or reported that he was a person with whom she had had sexual relations.

In the May/June 2011 timeframe, Plaintiff and Churcher's communications relate primarily to Plaintiff's draft of her novel, hiring a ghostwriter, and requests for advice on how to manage agent and book publication deals.  Menninger Decl. Ex. A.  As a part of those communications, on May 10, 2011, Plaintiff writes Churcher:

> "Hello gorgeous, I hope this message comes to you on a bright, sunny day!!! I took your advice about what to offer Sandra [a ghostwriter] and she accepted. We're drawing up a contract through her agent right now and getting busy to meet my deadline. Just wondering if you have any information on you from when you and I were doing interviews about the J.E. story. I wanted to put the names of these assholes, oops I meant to say, pedo's, that J.E. sent me to. With everything going on my brain feels like mush and it would be a great deal of help!..."[4]

In an e-mail dated May 11, 2011, Churcher replies to Plaintiff:

> "Don't forget Alan Dershowitz... JE' s buddy and lawyer -good name for your pitch as he repped Claus von Bulow and a movie was made about that case ... title was Reversal of Fortune. We all suspect Alan is a pedo and tho no proof of that, you probably met him when he was hanging put w JE"

Menninger Decl. Ex. A, p. 26-28.

---

[4] This email raises its own issues.  If Plaintiff was providing her own personal information regarding what allegedly happened to her, why would she require information from Churcher from their interviews about whom she had been 'trafficked" to.  What information did Churcher provide to Plaintiff that was the basis for Plaintiff's various allegations, as opposed to being factual information based on events that happened to Plaintiff?

Sometime thereafter, Plaintiff did insert Mr. Dershowitz's name in her book manuscript but she did not allege therein that she had any sexual relations with him, rather she simply referred to him as a business acquaintance of Mr. Epstein's.  It was not until the Joinder Motion in December 2014 that she claimed she engaged in sexual relations with Mr. Dershowitz, something he adamantly and publicly denied.

At the heart of this case is the question of whether Ms. Maxwell defamed Plaintiff by calling her a liar.  Of course, if Plaintiff is a liar, then there is no defamation.  Churcher had direct and actual knowledge that Plaintiff is a liar and helped orchestrate specific and incredible public lies in concert with Plaintiff relating to Prince Andrew and Alan Dershowitz. In both of these instances, Churcher is not acting as a journalist – she is acting as a friend and advisor to Plaintiff on how to drop names – truth be damned – to try to sell Plaintiff's book.  As Churcher puts it, the only incentives are "deadlines and/or cash".  Menninger Decl., Ex. A, p. 12. Churcher is not a journalist; she is a co-conspirator in Plaintiff's publication of false statements regarding numerous people including Prince Andrew, Alan Dershowitz and Ms. Maxwell.  It is the denial of the defamatory claims Churcher helped create that is the basis of this defamation suit.  There is no reporter shield over these factual matters that are not related to new gathering.

### D. Churcher's communications with Plaintiff's Counsel and Law Enforcement are not news-gathering activities

Churcher also admits to communicating regularly with Bradley Edwards, now Plaintiff's counsel, and other agents for Plaintiff, which communications continue through the present day.  *See* Churcher Decl., ¶¶ 9-10.  Churcher is the person who initially put Plaintiff in contact with Edwards.  *See* Menninger Decl., Ex A, p. 7.  Churcher coached Plaintiff on how to use Edwards to provide information to reporters in a manner that would best help her book sales.  *See* Menninger Decl., Ex A, p. 51-58.  According to Plaintiff, she regularly shared information from

7

Edwards with Churcher, although she could not specify the attorney-client privileged information she shared.  Menninger Decl. Ex. B, p. 297-300.  None of the communications or correspondence with Edwards, or any of Plaintiff's other attorneys, are in a news gathering capacity, and are not covered by the Shield Law.

Likewise, Churcher apparently corresponded with the FBI and US Attorney's office regarding Plaintiff, and specifically states she is not acting in her journalistic capacity. Menninger Decl. Ex A, 3.  Communications that occurred that were not forwarded or copies to Plaintiff have not been produced.  Churcher specifically states that she would like to be treated as a confidential *source* of information.  *Id.*, p. 8.  She is not *gathering* news, she is attempting to assist law enforcement and providing them with information she has gathered.  First, this is not news gathering activity, and clearly not related to confidential source.  Even if there was some claim of qualified privilege, having shared information with the FBI or other law enforcement, there is a waiver of any protection of the Shield Law.  *See Guice-Mills v. Forbes*, 12 Misc. 3d 852, 857, 819 N.Y.S.2d 432, 436 (Sup. Ct. 2006) (professional journalist waived the exemption of the Shield Law if they voluntarily disclose or consent to disclosure of otherwise covered information to third parties).

None of the documents or information described above is covered by the New York Shield Law because Churcher was not engaged in the news-gathering process.  Regardless, there is no proof that *any* of the information sought by Ms. Maxwell in the subpoena is confidential information from a confidential source, nor was it intended kept confidential.  The requested information must be produced and Churcher deposed as her testimony is critical to the truth defense in this case.

## II.   THE ABSOLUTE PRIVILEGE OF THE SHIELD LAW IS NOT APPLICABLE BECAUSE THERE WAS NO EXPECTATION OF CONFIDENTIALITY

As with all attempts to block the discovery of relevant information "[t]he burden rests upon the [party invoking privilege] to demonstrate that the material is privileged." *People v. Wolf*, 39 A.D.2d 864, 864, 333 N.Y.S.2d 299, 301 (1972).  "To successfully raise a claim of privilege under this statute, the information must be imparted to the reporter under a 'cloak of confidentiality'. There had to be an understanding, express or implied, that the information will not be disclosed" *People v. Bova*, 118 Misc. 2d 14, 19, 460 N.Y.S.2d 230, 233 (Sup. Ct. 1983); *Hennigan v. Buffalo Courier Express Co., Inc.,* 85 A.D.2d 924, 446 N.Y.S.2d 767 ("The confidential relationship with the source must first be established in order to determine the interest to be balanced against that of a civil litigant. Full disclosure is the general rule and the burden of showing immunity from disclosure is on the party asserting it"); *People v. LeGrand,* 67 A.D.2d 446, 415 N.Y.S.2d 252; *Matter of WBAI–FM v. Proskin,* 42 A.D.2d 5, 344 N.Y.S.2d 393; *Matter of Wolf,* 39 A.D.2d 864, 333 N.Y.S.2d 299; *Davis v. Davis,* 88 Misc.2d 1, 386 N.Y.S.2d 992).

Churcher admits that her conversations and communications with Plaintiff were not made with any expectation of confidentiality.  Indeed, quite the opposite.  The express reason for the communication was to obtain press coverage and to cause the publications of the series of articles written and published by Churcher.  Plaintiff was paid over $140,000 to go "on record."

With respect to any other "source" of information over which Churcher claims an "absolute" privilege, there is no issue.  Ms. Maxwell is not seeking this information.  Ms. Maxwell recognizes that there are occasions in which Churcher attributes information to a confidential source.  Ms. Maxwell does not seek to compel documents relating to these limited individuals, to the extent the information and source was not later revealed, and will not question

Churcher on these sources except to determine if they have later been identified with their permission. The undersigned informed Ms. Churcher's counsel in their conferral that she would not seek information relating to confidential sources.

Respecting identified sources, Churcher fails to carry the burden of showing that there was an expectation of confidentiality, which is her burden to carry. Indeed, in her declaration she admits that she had conversations with Plaintiff's attorney, Bradly Edwards, and law enforcement agencies *that were not intended to be kept confidential*. *See* Churcher Decl. ¶¶ 9 & 11. In her articles, she specifically identifies the sources of her information, demonstrating the lack of confidentiality. Plaintiff simply cannot carry the burden of claiming any absolute privilege under 79-h(b).

## III.   THERE IS A COMPELLING NEED FOR CHURCHER'S DOCUMENTS AND TESTIMONY

Having failed to establish the essential element of confidentiality, Churcher attempts to claim a qualified protection. *Matter of Sullivan*, 167 Misc. 2d 534, 538, 635 N.Y.S.2d 437, 440 (Sup. Ct. 1995) (source "had no understanding or expectation of confidentiality with either Mr. Hurley or the police detectives regarding the viewing of the interrogation. Consequently, there is no *absolute* privilege which protects the movant's materials, *see* Civil Rights Law § 79–h(b), and therefore any protection that might be afforded to the journalistic material can only be of a qualified nature."). Churcher relies on qualified protection relating to non-published news gathering information, which requires Ms. Maxwell make a clear and specific showing that the information is: (1) highly material and relevant; and (2) critical or necessary to the litigant's claim or defense; and (3) not obtainable from any alternative source. *Matter of Sullivan*, 167 Misc. 2d 534, 537-38, 635 N.Y.S.2d 437, 440 (Sup. Ct. 1995); Civil Rights Law 79–h (c). As discussed above, this provision is only applicable where a journalist is acting in a news gathering

capacity.  Ms. Maxwell proffers the following clear and specific showing establishing each of these elements, requiring production of the information sought and deposition of Churcher.

A.    **The Information Sought from Churcher is Highly Material and Directly Relevant**

This is a case about whether or not allegations in the Joinder Motion were lies, in particular the claims about Ms. Maxwell, Prince Andrew and Alan Dershowitz, which are the specific items that were denied in Ms. Maxwell's press release.  The information sought from Churcher is highly material in proving that that each time the story is told, new salacious details are added – the alleged defamatory statement.  Indeed, it could be the most probative evidence in this case.

"In determining whether the defendant has made a clear and specific showing that the information sought is critical or necessary to [her] defense, this court should not 'substitute its judgment for a defendant's on the question whether such evidence is 'necessary and critical' to a defense." *Matter of Sullivan*, 167 Misc. 2d 534, 540, 635 N.Y.S.2d 437, 441 (Sup. Ct. 1995) (quoting *United States v. Sanusi,* 813 F.Supp. 149, 160 (U.S.Dist.Ct.E.D.1992)).

Starting with Ms. Maxwell, Churcher's articles directly conflict with the allegations in the Joinder Motion and Plaintiff's testimony in this case.  First, Churcher's original article reports the following regarding Plaintiff's first visit to Mr. Epstein's mansion:

> "I'd get training and be paid well. Virginia's father gave his blessing, believing his daughter was being handed the opportunity to learn a skill and to work for a wealthy and respectable employer.
> He drove her to Epstein's pink mansion on the Palm Beach waterfront . . .
>
> Virginia says: 'Ghislaine said I was to start immediately and that someone would drive me home.
>
> My father left and I was told to go upstairs.' ***She was led by another woman*** through Epstein's bedroom into a massage room where he lay face down naked on a table.

He started to interview Virginia. This was unconventional, but Virginia had no suspicions. Presumably, she thought, this was how the wealthy conducted their business.

Epstein elicited the information that Virginia had been a runaway, and was no longer a virgin. Virginia was then told to start massaging Epstein, ***under the instructions of the woman who had shown her in***. The massage quickly developed into a sexual encounter.

Churcher Decl., Ex. 2, p. 4/34; See also Churcher Decl., Ex. 5, p. 3/13.

Churcher later reports that Ms. Maxwell hired girls for Epstein.  In this story, she alleges Ms. Maxwell escorted Plaintiff to meet Mr. Epstein, but nowhere claims that Ms. Maxwell engaged in any sexual interaction with Plaintiff at any time.  See Churcher Decl., Ex. 4, p.1-6.

The Joinder Motion alleges that it was Ms. Maxwell that took Plaintiff to Mr. Epstein's room on her first visit to the mansion, and allegedly participated in a sexual interaction – a claim never before made. Ex. C.  Obviously, Churcher's notes, interviews and recordings are directly relevant to Plaintiff's original story about Ms. Maxwell, and how it has changed and morphed over time, as well as the motivation for those changes.

The next allegation that has mutated with time in Churcher's stories and in the Joinder Motion relates to Plaintiff's age when she first met Epstein and the amount of time she spent working for him.  In Churcher's first story, she published that Plaintiff first met Epstein in 1998, soon after her 15th birthday, and worked for him for four years.  Churcher Decl., Ex. 1, p. 3/34; Ex. 5, p. 2/31.  The Joinder Motion alleges that Plaintiff met Epstein in 1999, when she was 15. Both the year and the time of year are material to this case.

Plaintiff now admits that she did not meet Epstein in 1999, but rather met him in 2000 which was the year she worked at the Mar-A-Lago.  Plaintiff's claims about meeting Epstein in 1998 or 1999, and her claim of being 15, are lies.  Plaintiff still claims, however, that she was 16 years old at the time she met Epstein.  Menninger Decl., Ex. B, p. 104.  Despite efforts to obtain

records from the Mar-A-Lago, they have no records of Plaintiff's dates of employment to establish the timeframe. Churcher is a witness with information fixing the month when Plaintiff claims to have met Epstein, i.e. soon after her birthday in August. In light of the now admitting year – 2000 – Plaintiff would have been 17 at the time.

Other highly relevant information in Churcher's sole possession is the identification of what documents and information Plaintiff was shown *by Churcher*, including flight logs, pictures, or other witness statements. For instance, based on email correspondence, it appears that Churcher was in possession of Epstein's flight logs. There is no indication that Plaintiff had seen those flight logs prior to meeting Churcher. Plaintiff never mentions certain names that appear in the flight logs prior to Churcher's meeting with her in February 2011. By way of example, Bill Clinton is referenced in the flight logs. Before 2011, Plaintiff never mentioned or references President Clinton. Yet, suddenly and out of thin air, Plaintiff allegedly reports to Churcher in 2011 that she met Bill Clinton twice, and that Ms. Maxwell flew President Clinton on a helicopter to Mr. Epstein's Island – a story which has since been fully discredited as a lie. This is simply one example of names and stories that were mysteriously added to Plaintiff's story, likely through Churcher's suggestive questioning and presentation of documents to Plaintiff. The only person who can testify on this highly relevant matter, including what documents were shown to Plaintiff, is Churcher.

Churcher also reported that Plaintiff was sent by Epstein (and Epstein alone) to meet with men including "a well-known businessman (whose pregnant wife was asleep in the next room), a world-renowned scientist, a respected liberal politician and a foreign head of state." Churcher Decl., Ex. 2, p. 5/34. By contrast, the Joinder Motion alleges "Epstein also trafficked Jane Doe #3 [Plaintiff] for sexual purposes to many other powerful men, including numerous prominent

American politicians, powerful business executives, foreign presidents, a well-known Prime

Minister, and other world leaders." Menninger Decl., Ex. C. Notably, Plaintiff has not identified

*any* foreign presidents, a prime minister, a foreign head of state, a world-renowned scientist or

numerous "prominent American Politicians" in her Rule 26 disclosures in this case. So the

question is, who did Plaintiff identify to Churcher in 2011, and how has that list changed and

expanded over time. Only Churcher can provide this information.

Churcher's publications in March of 2011 were the first publication containing the now

widely publicized picture of Plaintiff with Prince Andrew. Plaintiff was well paid for this picture,

and continued to get royalties on the reprints. Despite multiple requests, Plaintiff has not been

able to produce or provide the actual native version of the picture, or identify the specific date it

was taken. Given that Churcher was the first news source to print the picture, and later worked

with the FBI to provide information, she is likely the person who has the photo, or knows the

chain of custody of the picture. Either way, information including the date and location where

the picture was taken are relevant. Churcher is the only person who may be able to provide the

information to track down the picture, or may have it herself.

The interview notes, recordings, memos and other documentation in Churcher's

possession regarding Plaintiff are highly probative, material and directly relevant to Plaintiff's

fabrication and expansion of claims. For instance, if Plaintiff specifically told Churcher that she

only met, but did not have sexual relations with, Prince Andrew in early 2001, the statement in

the Joinder Motion is a lie. Given that Churcher reported that there is "no indication of sexual

interaction with Prince Andrew," in 2011 only Churcher can provide testimony or notes

reflecting the basis for that published statement.

**B.      Churcher's documents and testimony are critical to Ms. Maxwell's truth defense and Plaintiff's claims**

As stated in the Motion to Quash, the "highly relevant" and "critical or necessary to the litigant's claim or defense" prongs of the test for overcoming a qualified privilege largely overlap.  In this single count defamation action, this is particularly true.  As can be seen by the clear and specific showing above, all of the information sought from Churcher is critical to the defense of substantial truth.

It is well settled that truth is an absolute defense to a claim of defamation.  "Under New York law, it is well-settled that truth is an absolute, unqualified defense to a civil defamation action. It is an equally fundamental concept that substantial truth suffices to defeat a charge of libel." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (internal quotations and citations omitted). In examining the role of Churcher's testimony and documents to this defense, it is important to look at the actual text of that press statement::

> Each time the story is re told it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts that Alan Dershowitz is involved in having sexual relations with her, which he denies.
>
> Ms. Roberts claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory.

Ex. D

As demonstrated above, Ms. Churcher's documents and testimony are critical to establishing the fact that each time Plaintiff has told her story it changes and new salacious details are added.

Likewise, Churcher admits that her testimony is relevant to Plaintiff's credibility.  While a journalist testimony relating to impeachment or credibility of a party may not *normally* be critical, it is here.  Plaintiff's credibility, or lack thereof, is the central issue in the case.  This is not merely impeachment evidence, it is the crux of the case. If Plaintiff is a "liar" defense of

15

truth is established.  Likewise, it establishes that there can be no damages caused by the alleged

defamatory statement.  Again, Churcher's documents and testimony are central to this issue.

### C.    Churcher's information cannot be obtained from an alternative source.

Churcher claims that there are other sources for the information sought, citing almost

exclusively the Plaintiff as the potential source of information.  This argument is flawed for two

reasons.  First, Plaintiff claims that she does not have much of the information sought, or simply

can't remember.  In her deposition, she said she cannot remember where the photograph is,

where the contract is, what she told Churcher, and she refused upon advice of counsel, to state

what stories Churcher "got wrong."  *See* Motion to Re-Open Deposition of Plaintiff.  Second, as

the direct adversary in this case, Plaintiff is not a reliable source for information, and thus cannot

be deemed an alternative source.  *Matter of Sullivan*, 167 Misc. 2d 534, 541, 635 N.Y.S.2d 437,

442 (Sup. Ct. 1995) (compelling journalist notes, records, and videotapes of interrogation where

claimed alternative source of information – detectives conducting the interrogation – were

adversaries and thus could not be deemed the reliable source for information)

For most information, Churcher is the ***only*** source of the information sought.  She is the

only person who can provide the following information and documents:

- The 24 page fabricated diary, and testimony on when and why it was created[5]
- Notes, transcriptions, tape recordings, and memorandum from her interviews with Plaintiff, including her week long interviews in Australia;[6]
- Churcher's communications with law enforcement or the FBI concerning Plaintiff;[7]

---

[5] Plaintiff contends that she gave the original to Churcher, and did not maintain a copy. Ex B, p. 229.

[6] Plaintiff has produced some email communications with Churcher, although in light of Plaintiff's statements concerning the regular deletion of emails, there are likely email communications that were not captured by Plaintiff in Ms. Churcher's possession or control.  Nevertheless, to minimize the burden, Ms. Maxwell will voluntarily limit documents containing communication with Plaintiff by eliminating email communications between Plaintiff and Churcher using Plaintiff's ███████████████████ address.  Because Plaintiff did not produce documents from her hotmail account and only recently produced documents from her iCloud account, Ms. Maxwell requests that Churcher search for documents to or from Plaintiff at these two email address.

[7] Ms. Maxwell has filed a FOIA request and had not received a response.

- Plaintiff's contract with the Mail on Sunday, which Plaintiff claims she no longer has;[8]
- The original Prince Andrew picture, or information on its chain of custody;
- Communications with Brad Edwards and other attorneys for Plaintiff[9]

From a testimonial standpoint, only Churcher can testify about the deviations in the stories she has heard from Plaintiff because only Churcher was there.  Plaintiff herself claims she cannot remember what she told Churcher at various points in time, and herself asked Churcher for the notes from her interview so Plaintiff could remember what she said.  Menninger Decl., Ex. A, p. 26.  Plaintiff further refused to testify about what information Churcher printed that was untrue or varied from what Plaintiff told Churcher.  Menninger Decl., Ex. B, p. 215-226.  Thus, the only person who can testify or provide documentary evidence about Plaintiff's stories to Churcher is Churcher.

In light of the critical nature of the documents and testimony in establishing the truth defense and the fact that the information simply is not available from other sources, Churcher is not entitled to claim qualified privilege over her news-gathering materials or non-published non-confidential information.

## IV.   MS. MAXWELL'S COUNSEL AGREED TO EXTEND THE RETURN DATE FOR COMPLIANCE WITH THE SUBPOENA

Churcher's final argument for a Protective Order – that there was not a reasonable time to respond – is defeated by the admission in her own pleading.  It is true that the original response date was twelve days after service – two days less than is considered presumptively "reasonable."  Ms. Maxwell's counsel readily agreed that if Churcher intended to respond and comply with the subpoena rather than moving to quash, that the response date would be extended

---

8  Ex. 247-248
9  This information had been requested in discovery to Plaintiff, but no documents have been produced.  Ms. Maxwell has also subpoenaed the information from Plaintiff's attorneys, each of whom has moved to quash.  There can be no question that Ms. Maxwell has exhausted every possible source for obtaining this information.

and the deposition would be scheduled at a mutually agreeable time.  As such, there is no basis

for quashing the subpoena based on the "unreasonable time" argument, as Churcher was on

notice that she would be given the time needed to obtain the documents requested.  In light of the

discovery cut-off in this case, however, if a motion to quash was forthcoming, the matter needed

to be resolved to permit completion of discovery.

WHEREFORE, for the forgoing reasons, Ms. Maxwell requests that the Court deny the

Motion to Quash, and compel deposition and the Production of Documents by Sharron Churcher

pursuant to the subpoena, as modified by footnote 6 herein.

Dated: June 22, 2016

Respectfully submitted,

/s/ Laura A. Menninger
Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone:   303.831.7364
Fax:        303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

18

## CERTIFICATE OF SERVICE

I certify that on June 22, 2016, I electronically served this *RESPONSE TO NON-PARTY SHARON CHURCHER MOTION TO QUASH SUBPOENA* via ECF on the following:

Sigrid S. McCawley
Meredith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS,
FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu


J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com


*/s/ Nicole Simmons*
Nicole Simmons

19