# EXHIBIT A

# *GIUFFRE*

# *VS.*

# *MAXWELL*

### Deposition

# *VIRGINIA GIUFFRE*

*05/03/2016*

_____

# *Agren Blando Court Reporting & Video, Inc.*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

Page 25

1 January 19th, 2015?
2 A At the very top of the page it says
3 January 21st, 2015.
4 Q The date it was filed. Is there a date
5 just above the signature block?
6 A Oh, yes, sorry. Yes, there is.
7 Q And what date -- what date was that?
8 A The 19th day of January, 2015.
9 Q Okay. And this document is something that
10 you believe contains the truth, correct?
11 A To the best of my knowledge at the time,
12 yes.
13 Q All right. Did something change between
14 the time then and today that makes you believe that
15 it's not all accurate?
16 A Well, as you can see, in line 4 on page 1,
17 I wasn't aware of my dates. I was just doing the
18 best to guesstimate when I actually met them.
19 Since then I've been able to find out that
20 through my Mar-a-Lago records that it was actually
21 the summer of 2000, not the summer of 1999.
22 Q Oh, I'm sorry. Are you back on page 1?
23 A On the first page.
24 Q Okay.
25 A Yes.

Page 26

1 Q And you're talking about line 4?
2 A Line 4.
3 Q Paragraph 4 or line 4?
4 A Oh, sorry. Number 4, the paragraph
5 number 4.
6 Q Okay. And what part of paragraph 4 do you
7 now believe to be untrue?
8 A In approximately --
9 MR. EDWARDS: Object to the form.
10 You can answer.
11 A In approximately 1999 when I was 15 years
12 old I met Ghislaine Maxwell.
13 Q (BY MS. MENNINGER) Okay.
14 A I now know that it was 2000, that I was 16
15 years old when I met Ghislaine Maxwell.
16 Q So when you signed this document under
17 penalty of perjury stating that it was true, you no
18 longer believe that to be true, correct?
19 A It was an honest mistake. We had no idea
20 how to pinpoint without any kind of records or dates
21 or anything like that. I was just going back
22 chronologically through time. And that's the best
23 time that I thought it was. And now I know the
24 facts, so it's good to know.
25 Q So you now believe that a document you

Page 27

1 filed under oath is no longer true, correct?
2 MR. EDWARDS: Object to the form.
3 A I wouldn't say that it wasn't true. I was
4 just unaware of the times and the dates.
5 Q (BY MS. MENNINGER) Again, is there more
6 than one truth, Ms. Roberts?
7 A No, there's no more than one truth.
8 Q All right. So a document in which you
9 swore that you were 15 years old when you met
10 Ms. Ghislaine Maxwell is an untrue statement,
11 correct?
12 MR. EDWARDS: Object to the form.
13 A It's not that it's an untrue statement.
14 It was a mistake. So it wasn't intentionally trying
15 to say something that wasn't true. It was to my best
16 knowledge that I thought it was 1999. And when I got
17 my records from Mar-a-Lago I was able to find out
18 that it was 2000. And this was entered before I
19 found out the actual dates that I did work at
20 Mar-a-Lago.
21 Q (BY MS. MENNINGER) Okay. So a document
22 that you filed under oath --
23 A Um-hum.
24 Q -- is now, you believe to be untrue,
25 correct?

Page 28

1 MR. EDWARDS: Objection. Asked and
2 answered.
3 Q (BY MS. MENNINGER) You may answer.
4 MR. EDWARDS: Answer again.
5 A Again, I wouldn't say it's untrue. Untrue
6 would mean that I would have lied. And I didn't lie.
7 This was my best knowledge at the time. And I did my
8 very best to try to pinpoint time periods going back
9 such a long time ago.
10 It wasn't until I found the facts that I
11 worked at Mar-a-Lago in 2000 that I was able to
12 figure that out.
13 Q (BY MS. MENNINGER) And approximately when
14 did you learn those facts about the dates you worked
15 at Mar-a-Lago?
16 A I would say it was mid-2015.
17 Q Mid-2015 is the first time you became
18 aware of the dates --
19 A I don't know the exact --
20 Q If you could just let me finish.
21 A I'm sorry.
22 Q That's all right. Approximately mid-2015
23 when you learned the true dates that you had worked
24 at Mar-a-Lago?
25 A That's correct. Sorry.

Page 217

1   please.
2   Q   (BY MS. MENNINGER) Do you recall seeing a
3   press article in which Sharon Churcher reported that
4   you were on a helicopter with Bill Clinton and
5   Ghislaine Maxwell as the pilot?
6       MR. EDWARDS: Again, I'll let you answer
7   the question once she's looking at the document that
8   you're being asked about.
9       MS. MENNINGER: You're not letting her
10  answer a question about whether she recalls a
11  particular press statement?
12      MR. EDWARDS: I will let her answer every
13  question about the press statement as long as she
14  sees the press statement. I'm okay with that. She
15  can answer all of them.
16      MS. MENNINGER: No, there is a rule of
17  civil procedure that allows you to direct a witness
18  not to answer a question when there's a claim of
19  privilege.
20      What privilege are you claiming to direct
21  her not to answer this question?
22      MR. EDWARDS: I thought that you wanted
23  accurate answers from this witness. If the --
24      MS. MENNINGER: I asked her if she
25  recalled something --

Page 218

1       MR. EDWARDS: If the sole purpose is to
2   just to harass her --
3       MS. MENNINGER: I asked her if she
4   recalled something --
5       MR. EDWARDS: Then that's just not going
6   to be what's happening today.
7   Q   (BY MS. MENNINGER) All right. So you're
8   refusing to answer a question about whether you
9   recall a particular press statement --
10      MR. EDWARDS: She's --
11  Q   (BY MS. MENNINGER) -- is that true?
12      MR. EDWARDS: She is not refusing to
13  answer any questions. She --
14  A   I'm not refusing to answer. I just want
15  to see the article you're talking about so I can be
16  clear in my statement.
17  Q   (BY MS. MENNINGER) Do you recall seeing a
18  press article written by Sharon Churcher reporting
19  that you flew on a helicopter with Bill Clinton and
20  Ghislaine Maxwell as the pilot?
21  A   No, I do not recall reading a press
22  article saying that I was on a helicopter with Bill
23  Clinton as Ghislaine is the pilot.
24  Q   Do you recall telling Sharon Churcher that
25  you had conversations with Bill Clinton regarding him

Page 219

1   flying on a helicopter with Ghislaine Maxwell?
2   A   I believe that it was taken out of
3   context. Ghislaine told me that she flew Bill
4   Clinton in. And Ghislaine likes to talk a lot of
5   stuff that sounds fantastical. And whether it's true
6   or not, that is what I do recall telling Sharon
7   Churcher.
8   Q   So you told Sharon Churcher that Ghislaine
9   Maxwell is the one who told you that she flew Bill
10  Clinton in the helicopter?
11  A   I told Sharon Churcher that Ghislaine flew
12  Bill Clinton onto the island, based upon what
13  Ghislaine had told me.
14  Q   Not based upon what Bill Clinton had told
15  you, correct?
16  A   Correct.
17  Q   Did you ever ask Sharon Churcher to
18  correct anything that was printed under her name,
19  concerning your stories to Sharon Churcher?
20  A   I wasn't given those stories to read
21  before they were printed.
22  Q   After they were printed did you read them?
23  A   I tried to stay away from them. They were
24  very hard. You have to understand it was a very hard
25  time for me and my husband to have to have this

Page 220

1   public -- we didn't think it was going to be this
2   publicly announced and that big. So we turned off
3   the news and we stopped reading so many things.
4   Q   You didn't read the articles about your
5   stories to Sharon Churcher --
6   A   I've read some articles --
7   Q   Let me just finish. You did not read the
8   articles published by Sharon Churcher about your
9   stories to Sharon Churcher?
10  A   I have read some articles about what
11  Sharon Churcher wrote. And a lot of the stuff that
12  she writes she takes things from my own mouth and
13  changes them into her own words as journalists do.
14      And I never came back to her and told her
15  to correct anything. What was done was done. There
16  was nothing else I can do.
17  Q   So even if she printed something that were
18  untrue you didn't ask her to correct it, correct?
19  A   There was things that she printed that
20  really pissed me off, but there was nothing I could
21  do about it. It's already out there.
22  Q   She printed things that were untrue,
23  correct?
24      MR. EDWARDS: Objection to the form.
25  Mischaracterization.

Page 221

1  A  I wouldn't say that they were untrue. I
2  would just say that she printed them as journalists
3  take your words and turn them into something else.
4  Q  (BY MS. MENNINGER) She got it wrong?
5     MR. EDWARDS: Object to the form.
6  Mischaracterization.
7  A  In some ways, yes.
8  Q  (BY MS. MENNINGER) Did she print things
9  in her articles that you did not say to her?
10    MR. EDWARDS: I object and ask that the
11 witness be given the opportunity to see the document
12 so that she can review it and answer that question
13 accurately. Otherwise she's unable to answer the
14 question. I'm not going to allow her to answer.
15    MS. MENNINGER: You know the civil rules
16 tell you not to suggest answers to your client.
17 Q  (BY MS. MENNINGER) And you understand
18 your lawyer is now directing you to not all of a
19 sudden remember what your answer is. That's what
20 he's suggesting that you say. So you're not supposed
21 to listen to him suggest that to you. You're
22 supposed to tell me from your memory.
23    MR. EDWARDS: That is not what I'm --
24 Q  (BY MS. MENNINGER) Did you --
25    MR. EDWARDS: That's not what I'm doing.

Page 222

1  You don't get to just talk over me and
2  tell my client when not to listen to me. All you
3  have to do to get answers is show her the document
4  you're talking about, and I'll let her answer every
5  question. I don't know why we're so scared of the
6  actual documents.
7     MS. MENNINGER: I don't know why you're
8  scared of your client's recollection, Mr. Edwards.
9  But anyway --
10    MR. EDWARDS: Why would you do this to
11 her?
12 Q  (BY MS. MENNINGER) Did Sharon Churcher
13 print things that you did not say?
14    MR. EDWARDS: I'm going to instruct my
15 client not to answer unless you give her what it is
16 that you're talking about that was printed. And she
17 will tell you the answer, the accurate answer to your
18 question. Just without the document to refresh her
19 recollection and see it, she's not going to answer
20 the question.
21 Q  (BY MS. MENNINGER) Did Sharon Churcher
22 print things that you did not say?
23    MR. EDWARDS: Same objection. Same
24 instruction not to answer.
25    I think I've made a very clear record as

Page 223

1  to why I want my client to answer all of these
2  questions, but I want her to have the fair
3  opportunity to see this document.
4  Q  (BY MS. MENNINGER) Did Sharon Churcher
5  print things that you felt were inaccurate?
6     MR. EDWARDS: Same objection. Same
7  instruction. If she sees the document, she's going
8  to answer every one of these questions.
9  Q  (BY MS. MENNINGER) Did any other reporter
10 print statements that you believe are inaccurate?
11    MR. EDWARDS: Same objection. Same
12 instruction.
13 Q  (BY MS. MENNINGER) Did any reporter print
14 statements about Ghislaine Maxwell that were
15 inaccurate?
16    MR. EDWARDS: Same objection. Same
17 instruction.
18    This is harassing. This is harassing a
19 sexual abuse victim. And all I'm asking is for
20 fairness, that we just let her see the document so
21 she can answer this.
22    MS. MENNINGER: Mr. Edwards, please stop
23 saying anything other than an objection, what the
24 basis is, or instructing your client not to answer.
25    MR. EDWARDS: I will do that.

Page 224

1     MS. MENNINGER: That's what the Federal
2  Rules of Civil Procedure provide.
3     MR. EDWARDS: I hear you. They also
4  provide for fairness and civility. And all I'm
5  asking, very calmly, is for her to see this.
6     MS. MENNINGER: Mr. Edwards, this is not
7  your deposition. I'm asking your client what she
8  remembers. If she doesn't want to talk about what
9  she remembers, then let her not answer. But you
10 cannot instruct her not to answer unless there's a
11 privilege.
12    What privilege --
13    MR. EDWARDS: I am instructing her not to
14 answer.
15 Q  (BY MS. MENNINGER) All right. You are
16 refusing to answer questions about whether statements
17 to the press about Ghislaine Maxwell attributed to
18 you were inaccurate?
19    MR. EDWARDS: She's not refusing not to
20 answer.
21 A  You are refusing to show me these
22 documents so I could answer properly. I would give
23 you an answer if you were to show me some documents.
24 Q  (BY MS. MENNINGER) You can't say without
25 looking at a document whether the press attributed to

Page 225

1 you is accurate or inaccurate?
2  A  Please show me the document.
3  Q  You can't say from the top of your head
4 whether any inaccurate statement has been attributed
5 to you in the press?
6  A  Please show me a document and I will tell
7 you.
8  Q  Are you refusing to answer my questions
9 about your knowledge of whether inaccurate statements
10 have been attributed to you in the press?
11  A  Are you refusing to give me the documents
12 to look at?
13  Q  Are you refusing to answer the question?
14  A  I am refusing to answer the question based
15 upon the fact that you are not being fair enough to
16 let me see the document in order to give you an
17 honest answer.
18  Q  Ms. Giuffre --
19  A  Yes.
20  Q  -- we are talking about press that has
21 been published on the Internet, correct?
22  A  Yes.
23  Q  Do you have access to the Internet?
24  A  Yes.
25  Q  Have you looked on the Internet and read

Page 226

1 articles that attribute statements to you about
2 Ghislaine Maxwell?
3  A  Yes.
4  Q  Do you know any statement that has been
5 attributed to you in a press article on the Internet
6 about Ghislaine Maxwell that is untrue?
7     MR. EDWARDS:  Same objection.  Same
8 instruction.
9  A  Please show me a specific document.
10  Q  (BY MS. MENNINGER)  Do you know of any
11 such statement about Ghislaine Maxwell attributed to
12 you by the press that is inaccurate?
13  A  If you could please show me a specific
14 document.
15  Q  Tell me what Sharon Churcher asked you to
16 write for her.
17  A  Any knowledge that I had about my time
18 with Prince Andrew.
19  Q  And did you write it?
20  A  Um-hum.
21  Q  What did you write it in or on?
22  A  Paper.
23  Q  What kind of paper?
24  A  Lined paper.
25  Q  Was it in a book or single sheets?

Page 227

1  A  Single sheets.
2  Q  And did you write a long document or a
3 short document?  What was it?
4  A  I can't recall how long the document was,
5 but I would say it would be a few pages.
6  Q  And other than asking you to write
7 whatever you remember about Prince Andrew, did she
8 give you any other directions about what you should
9 write?
10  A  She was interested in two things, really.
11 How Epstein got away with so many counts of child
12 trafficking for sex and how Prince Andrew was
13 involved in it.  Those were her two main inquiries.
14  Q  What did she ask you to write?
15  A  She asked me to write about Prince Andrew.
16  Q  Did she tell you to put it in your own
17 handwriting?
18  A  No, she just asked me to write down what I
19 can remember.
20  Q  Did you give her everything that you
21 wrote?
22  A  Did I give her the whole entire pages that
23 I wrote?
24  Q  Yes.
25  A  Yeah, I wrote pages for her specifically.

Page 228

1  Q  In your own handwriting?
2  A  In my own handwriting.
3  Q  And what you wrote, was that true?
4  A  Yes.
5  Q  And did you get paid for those pieces of
6 paper?
7  A  Not for the papers, I don't believe.
8  Q  Okay.  Have you gotten paid when they've
9 been reprinted?
10  A  No.
11  Q  Have you negotiated any deal with Radar
12 Online?
13  A  No.
14  Q  Have you negotiated any deal with Sharon
15 Churcher for the purpose of publishing those pieces
16 of paper?
17  A  Not those pieces of paper.
18  Q  When did you write those pieces of paper?
19     MR. EDWARDS:  Object to the form.
20  A  A week before she came out.
21  Q  (BY MS. MENNINGER)  And when did you give
22 them to her?
23  A  When she came out.
24  Q  When was that?
25  A  Sometime, I believe, in early 2011.