UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIRGINIA GIUFFRE,

                Plaintiff,

      -against-

GHISLAINE MAXWELL,

                Defendant.

No. 15 Civ. 7433 (RWS)

**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED INTERVENOR ALAN M. DERSHOWITZ'S MOTION FOR PERMISSIVE INTERVENTION AND UNSEALING OF JUDICIAL DOCUMENTS, OR IN THE ALTERNATIVE MODIFICATION OF PROTECTIVE ORDER**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES .................................................................................iii-v

PRELIMINARY STATEMENT ..............................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................4

   I.     MS. GIUFFRE'S ALLEGED RELATIONSHIP WITH
         JEFFREY EPSTEIN AND BELATED ACCUSATIONS
         AGAINST PROFESSOR DERSHOWITZ...............................................4

   II.    MS. GIUFFRE AND HER ATTORNEYS' CONTINUING
         INSISTENCE ON, AND REPETITION OF, ACCUSATIONS
         AGAINST PROFESSOR DERSHOWITZ...............................................5

   III.   THE EXCULPATORY EMAILS, REPLY BRIEF,
         AND MANUSCRIPT ...........................................................................6

   IV.   THE REVELATION OF THE EXCULPATORY DOCUMENTS TO
         PROFESSOR DERSHOWITZ ...........................................................11

ARGUMENT .......................................................................................................11

   I.     PROFESSOR DERSHOWITZ SHOULD BE PERMITTED TO INTERVENE
         UNDER FEDERAL RULE OF CIVIL PROCEDURE 24(B) .............................11

         A.    There Is Significant Overlap Between the Subject Matter
              of the Original Action and This Motion ....................................................12

         B.    There Is No Risk of Undue Delay or Prejudice .........................................12

         C.    Professor Dershowitz Has a Compelling Interest in Access
              That Is Not Represented by Any Existing Party........................................13

   II.    THE FIRST AMENDMENT AND THE COMMON LAW REQUIRE
         PUBLIC ACCESS TO THE REQUESTED DOCUMENTS...............................14

         A.    Legal Standard .........................................................................................14

              1.    The Common Law Test ............................................................15

              2.    The First Amendment Test .......................................................15

          B.    The Requested Documents Are Judicial Documents.................................16

          C.    The Common Law Right of Access Applies to the Requested
              Documents ...............................................................................................17

1.      The Weight of the Presumption of Access Is Strong.....................17

2.      There Are No Countervailing Interests That Outweigh the Right of Access ......................................................................19

D.     The First Amendment Guarantees Access to the Requested Documents .................................................................................20

III.    ALTERNATIVELY, THE PROTECTIVE ORDER SHOULD BE MODIFIED TO PERMIT DISCLOSURE OF THE REQUESTED DOCUMENTS...............22

CONCLUSION....................................................................................................26

TABLE OF AUTHORITIES

PAGE NO(s).

**Cases**

*Alexander Interactive, Inc. v. Adorama, Inc.*,
    No. 12 Civ. 6608, 2014 WL 4346174 (S.D.N.Y. Sept. 2, 2014) ..................................... 16

*Anderson v. Cryovac, Inc.*,
    805 F.2d 1 (1st Cir. 1986) .......................................................................................... 16

*Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*,
    263 F.3d 1304 (11th Cir. 2001) ................................................................................. 16

*Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086, 2012 WL 6217646 (S.D.N.Y. Dec. 3, 2012)..................................... 16

*Diversified Grp., Inc. v. Daugerdas*,
    217 F.R.D. 152 (S.D.N.Y. 2003) ................................................................................ 11

*Gambale v. Deutsche Bank AG*,
    377 F.3d 133 (2d Cir. 2004)....................................................................................... 22

*Gucci Am., Inc. v. Guess?, Inc.*,
    No. 09 Civ. 4373, 2010 WL 1416896 (S.D.N.Y. Apr. 8, 2010)..................................... 16

*In re EPDM Antitrust Litig.*,
    255 F.R.D. 308 (D. Conn. 2009)........................................................................... 23, 24

*In re Gushlak*,
    No. 11-MC-0218, 2012 WL 3683514 (E.D.N.Y. July 27, 2012) ............................. 17, 19

*In re N.Y. Times Co.*,
    828 F.2d 110 (2d Cir. 1987)....................................................................................... 18

*In re Newsday, Inc.*,
    895 F.2d 74 (2d Cir. 1990)......................................................................................... 19

*In re Omnicom Grp., Inc. Secs. Litig.*,
    No. 02 Civ. 4483, 2006 WL 3016311 (S.D.N.Y. Oct. 23, 2006) ............................ 17, 19

*In re September 11 Litig.*,
    262 F.R.D. 274 (S.D.N.Y. 2009) ............................................................................... 23

*Jane Doe #1 v. United States of America*,
    No. 08 Civ. 80736 (S.D. Fla.) ................................................................................. 4, 21

*Jessup v. Luther*,
    227 F.3d 993 (7th Cir. 2000) ..................................................................................... 12

*Lenart v. Coach Inc.*,
    131 F. Supp. 3d 61 (S.D.N.Y. 2015) ............................................................................... 19

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
    998 F.2d 157 (3d Cir. 1993) ............................................................................................ 16

*Long Island Lighting Co. v. Barbash*,
    779 F.2d 793 (2d Cir. 1985) ............................................................................................ 18

*Louissier v. Universal Music Grp., Inc.*,
    214 F.R.D. 174 (S.D.N.Y. 2003) ................................................................................... 22

*Lugosch v. Pyramid Co. of Onodaga*,
    435 F.3d 110 (2d Cir. 2006) ..................................................................................... *passim*

*Mills v. Alabama*,
    384 U.S. 214 (1966) ........................................................................................................ 14

*Mokhiber v. Davis*,
    537 A.2d 1100 (D.C. Ct. App. 1988) ........................................................................ 19, 21

*Newsday LLC v. Cnty. of Nassau*,
    730 F.3d 156 (2d Cir. 2013) ............................................................................................ 14

*Nixon v. Warner Commc'ns, Inc.*,
    435 U.S. 589 (1978) ........................................................................................................ 13

*S.E.C. v. Oakford Corp.*,
    No. 00 Civ. 2426, 2001 WL 266996 (S.D.N.Y. Mar. 16, 2010) .................................... 17

*S.E.C. v. TheStreet.com*,
    273 F.3d 222 (2d Cir. 2001) ...................................................................................... 22, 24

*Schiller v. City of N.Y.*,
    No. 04 Civ. 7922, 2006 WL 2788256 (S.D.N.Y. Sept. 27, 2006) .............................. 13, 17

*Skyline Steel, LLC v. PilePro, LLC*,
    No. 13 Civ. 8171, 2015 WL 556545 (S.D.N.Y. Feb. 9, 2015) ........................................ 19

*Tradewinds Airlines, Inc. v. Soros*,
    No. 08 Civ. 5901, 2016 WL 3951181 (S.D.N.Y. July 20, 2016) .............................. 23, 24

*U.S.P.S. v. Brennan*,
    579 F.2d 188 (2d Cir. 1978) ............................................................................................ 11

*United States v. Amodeo (Amodeo I)*,
    44 F.3d 141 (2d Cir. 1995) .............................................................................................. 14

*United States v. Amodeo (Amodeo II)*,
    71 F.3d 1044 (2d Cir. 1995) ...................................................................................... 14, 17

*United States v. Bryan*,
    339 U.S. 323 (1950)......................................................................................... 18

*United States v. Erie Cnty.*,
    763 F.3d 235 (2d Cir. 2014)................................................................. 15, 20, 21

*United States v. Erie Cnty.*,
    No. 09 Civ. 849, 2013 WL 4679070 (W.D.N.Y. Aug. 30, 2103)................... 12

*United States v. Graham*,
    257 F.3d 143 (2d Cir. 2001)........................................................................... 15

*United States v. Martoma*,
    No. S1 12 Cr. 973, 2014 WL 164181 (S.D.N.Y. Jan. 9, 2014) ..................... 20

*United States v. Sattar*,
    471 F. Supp. 2d 380 (S.D.N.Y. 2006)............................................................ 16

*Vazquez v. City of N.Y.*,
    No. 10 Civ. 6277, 2014 WL 11510954 (S.D.N.Y. May 2, 2014).................... 22

*Westmoreland v. CBS, Inc.*,
    752 F.2d 16 (2d Cir. 1984)............................................................................. 14

**Rules & Statutes**

Fed. R. Civ. P. 24 ................................................................................................. 11, 14

Fed. R. Civ. P. 26 .......................................................................................... 22, 24, 25

Fed. R. Civ. P. 45 ..................................................................................................... 18

**Other Authorities**

Casey Sullivan, *Alan Dershowitz Extends Truce Offer to David Boies Amid Bitter Feud*,
    BLOOMBERG LAW (Apr. 11, 2016), https://bol.bna.com/alan-dershowitz-extends-
    truce-offer-to-david-boies-amid-bitter-feud/ ...................................................... 6

## PRELIMINARY STATEMENT

At nearly 78 years of age, Alan M. Dershowitz, the highly regarded Harvard Law professor, criminal defense lawyer, and author, is entitled to enjoy the reputation for strict personal rectitude that he has earned.  Unfortunately, however, over the course of the last year and a half, that reputation has been unfairly sullied, tainted by false and grotesque allegations of pedophilia and rape peddled to the press by Virginia Giuffre, the plaintiff in this lawsuit, and republished all over the world.  Professor Dershowitz has done everything in his power to combat this assault on his reputation, from proclaiming his innocence in public, to marshalling every bit of information within his control to demonstrate that the allegations cannot be true, to submitting to a full investigation of the charges by former federal judge and FBI Director Louis Freeh, who exonerated him.  And still the stories keep coming.

Now, having been named as a witness in this action by both plaintiff and defendant, Professor Dershowitz has been granted access to certain materials subject to this Court's stipulated Protective Order and filed under seal—and those materials, some of them in Ms. Giuffre's own words, confirm his absolute innocence.  They demonstrate that Ms. Giuffre did not accuse Professor Dershowitz of sexual misconduct until years after she first named *other* prominent men who she claimed had abused her; that there was "no proof" that Professor Dershowitz had ever done anything wrong; and that Ms. Giuffre concocted her malicious allegations against Professor Dershowitz, and used his name in her statements and book proposal, not because he abused her—he didn't—but because he is famous and she believed that his name would help sell the book.

In this application, Professor Dershowitz seeks to intervene in this case for the limited purpose of obtaining relief that is modest and narrowly tailored:  the unsealing of portions of a brief filed in connection with a motion to quash a subpoena ("Reply Brief"), and certain emails

submitted as part of that same motion ("Emails"), as well as a draft of Ms. Giuffre's memoir ("Manuscript") that was filed in connection with a motion to extend the parties' deadline for deposition discovery.  Unsealing of these three documents (the "Requested Documents") is required because they are all judicial documents to which a presumption of public access applies. In the alternative, if the Court declines to unseal the Requested Documents on the basis that they are judicial documents, Professor Dershowitz seeks modification of the Court's March 18, 2016 stipulated Protective Order to permit the dissemination of the Requested Documents.  The Requested Documents concern allegations by Ms. Giuffre whose substance has already been widely aired in public—including, apparently, on camera to ABC News—and which have been widely circulated for sale to publishers and journalists.  Ms. Giuffre's efforts to gain publicity and a book deal based on public interest in her claims should forfeit any asserted right to maintain the confidentiality of these documents.

Separately and together, the Requested Documents demonstrate that the allegations of sexual misconduct against Professor Dershowitz—which were lodged by Ms. Giuffre in public court filings and repeated worldwide in the press—are nothing more than a recent fabrication, a made up story designed to increase commercial interest in Ms. Giuffre's book and promote its sale to a publisher and eventually to readers.  Accessing these materials without restriction, and making them public, is essential to Professor Dershowitz's ability to defend himself.

There is no basis for the Requested Documents to remain secret, much less for their secrecy to be maintained by court order.  Ms. Giuffre has done everything in her power to publicize her false allegations against Professor Dershowitz: through her lawyers, she publicly filed the accusations in a federal court proceeding; she and her lawyers stood by her claims, in both court filings and public statements to the media, even after her lawyers had issued a public statement acknowledging that filing them had been a "mistake;"  she shopped a book manuscript

to agents, publishers, and the press with the goal of maximizing the public attention paid to her slanderous story; and she even sought and obtained a lengthy interview with ABC News with the intent that it be broadcast on national television news programs.  Ms. Giuffre and her attorneys cannot credibly argue that documentary evidence undermining the accusations she has spent years working to make public are "secret" and should be kept so under the authority of this Court.

Disclosing the Requested Documents would violate no right of privacy.  By publicly leveling false accusations against Professor Dershowitz in graphic detail and seeking to publicize those accusations in the media, Ms. Giuffre has forfeited any claim that her own (defamatory) words are somehow confidential.  Indeed, what Ms. Giuffre's own counsel have referred to as the "strong current media interest in the case"—which Ms. Giuffre has worked to sustain, including by selling her story—bolsters the public's right to access the Requested Documents. Were Ms. Giuffre to prevail in her efforts to suppress these documents of high public interest, the result would be absurd and unfair: Ms. Giuffre's false allegations would remain in the public record, while the innocent victim of her slanders would be barred from using her own words to disprove them.  No one should be permitted to game the legal system so perversely.

The law recognizes Professor Dershowitz's right to the Requested Documents under the First Amendment, the common-law right of access to judicial documents, and governing Second Circuit jurisprudence, which forbids sealing and secrecy for their own sake.  Here, having waived any privacy interest she may have had by both disseminating the allegations against Professor Dershowitz and by filing this lawsuit against Ghislaine Maxwell, Ms. Giuffre should not be heard to say that her own words, and the words of those with whom she communicated, are somehow "confidential."  They are not.  This Court should grant Professor Dershowitz the right to intervene in this action and unseal the Requested Documents.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    MS. GIUFFRE'S ALLEGED RELATIONSHIP WITH JEFFREY EPSTEIN AND BELATED ACCUSATIONS AGAINST PROFESSOR DERSHOWITZ**

In 2006, Professor Dershowitz was retained by financier Jeffrey Epstein to join a team of lawyers hired to defend Epstein against accusations that he had solicited sex workers and had inappropriate sexual encounters with underage girls.[1]  Declaration of Alan M. Dershowitz ("Dershowitz Decl.") ¶¶ 6-7.  In 2008, Epstein pleaded guilty to certain offenses involving sex with minors.  *Id.* ¶ 7.  Ms. Giuffre has alleged that she was one of Epstein's victims, although Epstein was neither charged nor convicted of any conduct toward her.  *Id.* ¶ 8.  Ms. Giuffre claims that she was held as a "sex slave" and trafficked by Epstein, who she alleges facilitated sexual encounters with a number of men.  *Id.*

In the period from 2006 through 2014, Ms. Giuffre submitted to interviews with law enforcement, told her story to the media, drafted a tell-all memoir, and filed a lawsuit alleging that Mr. Epstein had trafficked her to many of his prominent associates.  *Id.* ¶¶ 10-14.  During this period, Ms. Giuffre never once claimed to have had any sexual contact with Professor Dershowitz, much less that he had sexually abused her.  *Id.*  Then, in December 2014, Ms. Giuffre—represented by attorneys Bradley Edwards and Paul Cassell—filed a motion to join an action (the "CVRA Action") that had been initially filed in the United States District Court for the Southern District of Florida in 2008 by another of Mr. Epstein's alleged victims, who was designated as "Jane Doe."  *Jane Doe #1 v. United States of America*, No. 08 Civ. 80736 (S.D. Fla.) (hereinafter, *Doe v. USA*); Dershowitz Decl. ¶ 16.  In late 2014 and early 2015, Ms. Giuffre's lawyers alleged in public court filings in the CVRA Action that Mr. Dershowitz had had sex with Ms. Giuffre on numerous occasions while she was a minor, including in Florida, on

---

[1] Professor Dershowitz had been acquainted with Mr. Epstein through academic events for a number of years prior to his retention as Mr. Epstein's counsel, but had neither witnessed nor heard about allegations of sexual misconduct by Mr. Epstein before being hired to represent him.  Dershowitz Decl. ¶ 6.

Mr. Epstein's private planes, in the British Virgin Islands, in New Mexico, and in New York. Dershowitz Decl. ¶ 17.  Unlike much of the record in the CVRA Action, these allegations were not sealed; instead, they were filed publicly without any evidence to support them and without affording Professor Dershowitz an opportunity to dispute them.  *Id.*  Although Ms. Giuffre elaborated these false allegations in subsequent filings, eventually, the presiding judge in the CRVA Action struck them as a sanction against the lawyers who had filed them.  But the damage to Professor Dershowitz's reputation had been done—and it would persist.  *Id.* ¶¶ 18-19.

In the wake of the grotesque allegation that he is a pedophile and a sex criminal, Professor Dershowitz loudly and publicly defended himself.  In January 2015, Ms. Giuffre's attorneys, Mr. Edwards and Mr. Cassell, sued Professor Dershowitz for defamation, citing comments he made in his own defense.  *Id.* ¶ 21.  During discovery in that action, Ms. Giuffre never produced the Emails or the Manuscript despite a court order requiring her to provide all statements referencing Professor Dershowitz by name; she also falsely testified under oath in her deposition that she never exchanged emails with Sharon Churcher or other members of the press about Professor Dershowitz.  *Id.* ¶¶ 22-23.  The defamation action ultimately settled in April 2016, and the parties released a joint statement in which attorneys Cassell and Edwards admitted that it was a mistake to accuse Professor Dershowitz of sexual misconduct in their filings in the CVRA Action and withdrew those allegations.  *Id.* ¶ 24 & Ex. H.  Also in April 2016, Professor Dershowitz released the results of a thorough investigation led by former FBI Director and federal judge Louis Freeh, which found that "the totality of the evidence" "refutes the allegations made against" Professor Dershowitz by Ms. Giuffre.  *Id.* ¶ 25 & Ex. I.

## II.   MS. GIUFFRE AND HER ATTORNEYS' CONTINUING INSISTENCE ON, AND REPETITION OF, ACCUSATIONS AGAINST PROFESSOR DERSHOWITZ

Despite the settlement of the defamation case and the resulting joint statement, the court order striking the "lurid" allegations against Professor Dershowitz in the CVRA Action, and the

results of Judge Freeh's investigation, Ms. Giuffre and her counsel have republished Ms. Giuffre's allegations against Professor Dershowitz. *Id.* ¶ 26. For example, on April 8, 2016, just after the settlement of the defamation case, Mr. Cassell and Mr. Edwards made a court filing that stated that Ms. Giuffre "reaffirms" her allegations against him, and that their mistake in filing those allegations in the CVRA Action was merely "tactical." *Id.* ¶ 26 & Ex. J. David Boies, another of Ms. Giuffre's attorneys in this case, was described as saying that Ms. Giuffre "stands by her allegations" against Professor Dershowitz. *See* Casey Sullivan, *Alan Dershowitz Extends Truce Offer to David Boies Amid Bitter Feud*, BLOOMBERG LAW (Apr. 11, 2016), https://bol.bna.com/alan-dershowitz-extends-truce-offer-to-david-boies-amid-bitter-feud/. These statements—which falsely imply that Professor Dershowitz is guilty of sexual misconduct—are highly injurious to his reputation, especially when they come from otherwise-credible lawyers. *Id.* ¶ 26. The claim that Professor Dershowitz engaged in sexual misconduct with Ms. Giuffre has also continued to receive attention in the press. *See id.* ¶ 27 & Ex. K. Professor Dershowitz has learned that Ms. Giuffre sat for an interview with ABC News, presumably as part of her efforts to increase public interest in (and the commercial value of) her "story." *Id.* ¶ 27. The interview was announced on social media by an organization with which Mr. Edwards is associated and was said to be slated to appear on ABC's Good Morning America, World News Tonight, and Nightline programs. *Id.* While the ABC News interview apparently has not yet run, there is no assurance that it will not run in the future. *Id.*

## III.     THE EXCULPATORY EMAILS, REPLY BRIEF, AND MANUSCRIPT

Each of the Requested Documents corroborates Professor Dershowitz's claims of innocence and undermines both Ms. Giuffre's credibility generally and the veracity of her accusations against Professor Dershowitz specifically.

First, the Emails, consisting of one exchange dated May 10-11, 2011 and another dated June 8, 2011, discuss, among other topics, Ms. Giuffre's Manuscript, which purports to recount her experiences with Epstein and other prominent people.   *Id.* ¶ 34.  Within the May 2011 exchange, Ms. Giuffre writes to Ms. Churcher on May 10, 2011:

> "Hello gorgeous, I hope this message comes to you on a bright, sunny day!!! I took your advice about what to offer Sandra and she accepted. Were drawing up a contract through her agent right now and getting busy to meet my deadline. Just wondering if you have any information on you from when you and I were doing interviews about the J.E. story. I wanted to put the names of these assholes, oops, I meant to say, pedo's, that J.E. sent me to. With everything going on my brain feels like mush and it would be a great deal of help!..."

Dershowitz Decl., Ex. A at GIUFFRE004096-97.  In an e-mail dated May 11, 2011, Ms. Churcher replies to Mrs. Giuffre, urging her to use Professor Dershowitz's name in her book proposal despite the lack of any evidence of his involvement in wrongdoing:

> Don't forget Alan Dershowitz...JE's buddy and lawyer..good name for your pitch as he repped Claus von Bulow and a movie was made about that case...title was Reversal of Fortune. We all suspect Alan is a pedo and tho no proof of that, you probably met him when he was hanging put [sic] w JE."

*Id.* at GIUFFRE004096.[2]

The June 8, 2011 exchange shows Ms. Churcher corresponding with a book agent to promote Ms. Giuffre's book; Ms. Giuffre is copied on the message.  Ms. Churcher mentions Professor Dershowitz as one of Epstein's lawyers, together with Kenneth Starr, but not as an abuser:

> Hi Jarred
>
> Hopefully you have Virginia' s book pitch by now.
>
> She has some amazing names which she can share with you in confidence and I think she also has a human interest story that

---

[2] The relevant excerpts of the Requested Documents are reproduced herein without any alterations or corrections to spelling, grammar, or typographical errors.

could appeal to the Oprah/female set as well as the Wall Streeters who follow Epstein — a hedge fund king.

Here are a few of our stories about Virginia, plus some examples of the massive US and other international media pickup. Vanity Fair are doing a piece I believe in their August issue. The FBI have reopened the Epstein case due to Virginia's revelations. I also am attaching a link to a NY Magazine profile of Epstein.....written before his world combusted. The FBI believe he was essentially running a private — and mobile -- brothel for some of the world's richestand most influential men.

He got off the first time round after retaining Kenneth Starr (who witchhunted Bill Clinton) and Alan Dershowitz (von Bulow's appeal lawyer, who inspired the movie Reversal of Fortune). The US Justice Dept is investigating corruption allegations against at least one prosecutor involved in the case.

Best regards,

Sharon

*Id.* at GIUFFRE004028-29.

The Emails were filed under seal in connection with Ms. Churcher's motion to quash her deposition subpoena.  Dershowitz Decl. ¶ 38.  The Reply Brief, also filed under seal in pertinent part, characterizes these emails from Ms. Churcher's perspective, asserting as follows:

Churcher makes no suggestion that [Ms. Giuffre] had sexual contact with Dershowitz.  To the contrary, she states that there was '*no proof*' that he was a 'pedo'—which directly contradicts such a suggestion in itself—but only that [Ms. Giuffre] 'probably met him when he was hanging out with [Jeffrey Epstein]'.

Dershowitz Decl., Ex. M at 8.

Finally, the Manuscript—which was filed in connection with Ms. Maxwell's opposition to Ms. Giuffre's request for an extension of the deposition discovery deadline—further corroborates that Ms. Giuffre's allegations against Professor Dershowitz are a recent fabrication. The draft mentions Professor Dershowitz only once, claiming, falsely, that he once walked into a room while Ms. Giuffre was in bed after a sexual encounter with Jeffrey Epstein:

> Jeffrey's business was running well from the looks of his attentiveness the office he owned in the Upper East Side of Manhattan. Alan Dershowitz, his colleague in finances and personal solicitor, a bird of the same feather, I had seen hanging around the island and Jeffrey's Manhattan mansion, more and more these days. Alan's taste for the young and beautiful was a bias for a blooming business relationship between him and Jeffrey. After an explicit session of Jeffrey's vulgar pilgrimage into my body, we were interrupted by a knock at the door by Jeffrey's good friend, Alan. I wrapped myself up in Jeffrey's pink bed sheets, which is the color preference he chose to sleep in because it reminded him of the same color of his own words " Pussy", and covered my face from the unexpected intrusion. Jeffrey got up and wrapped a towel around his loins and answered the door completely calm. Opening the bedroom door and letting Alan inside they began to converse about business immediately, right in front of me. Jeffrey started to tell Alan what needed to be done while he jostled some notes down quickly. I peeked my head from underneath the covers thinking they were too wrapped up in their work to notice me get up and dressed, and Jeffrey turned back to me and told me to just stay there this would only take a second. Going back to Alan he turned his focus back into work and hustled out a few more orders before letting Alan out of the door and returning his attention to me.

Dershowitz Decl., Ex. B at 112.  Putting aside that this account is a complete fabrication—Professor Dershowitz had no business dealings with Mr. Epstein and was not his lawyer at the time in question—the Manuscript contains no mention anywhere of any sexual contact between Professor Dershowitz and Ms. Giuffre, or between Professor Dershowitz and any other person. Indeed, though the Manuscript describes sexual encounters Ms. Giuffre allegedly had with a *different* member of the Harvard faculty—whom she identifies by name and physical characteristics—it levels *no* such accusation against Professor Dershowitz.  Dershowitz Decl. ¶ 37.

The Requested Documents, taken together with other evidence currently in the public record, prove the following:

- Before her email correspondence with Sharon Churcher in 2011, Ms. Giuffre did not in any way accuse Professor Dershowitz of sexual abuse,

even though she had accused other prominent people of abusing her and had plenty of opportunity to do so.

- In an exchange of emails in 2011, Ms. Churcher, who was advising Ms. Giuffre about how to maximize her payments for selling her story, first raised the idea of mentioning Professor Dershowitz in connection with the alleged abuse, despite the fact that there was "no proof" that he was involved.

- After receiving this email, Ms. Giuffre did in fact put Mr. Dershowitz in her book draft, but she conspicuously did *not* accuse him of sexual abuse or even any sexual contact, even though she explicitly named others who she claimed had abused her.

- In a subsequent email exchange between Ms. Churcher, Ms. Giuffre, and Mr. Weisfeld, Ms. Churcher described several categories of prominent individuals with whom Ms. Giuffre claimed to have had sexual encounters. Professor Dershowitz's name, along with that of Kenneth Starr, is mentioned in the email, but *only* as one of the lawyers who negotiated Mr. Epstein's plea agreement, not as one the "amazing names" of those who allegedly abused Ms. Giuffre.

- Ms. Giuffre lied during her deposition in the defamation case brought by her lawyers against Professor Dershowitz, testifying  that there were no emails between herself and Ms. Churcher that mentioned Professor Dershowitz by name.  Her lawyers did not correct this testimony.

- In her Reply Brief, Ms. Churcher has confirmed that Professor Dershowitz was not among the prominent individuals that Ms. Giuffre was accusing of sexual misconduct.  The Reply Brief affirmatively argues that Ms. Churcher was "not suggesting" that Professor Dershowitz had sex with Ms. Giuffre, but merely mentioned him to remind Ms. Giuffre that Epstein and Professor Dershowitz knew each other.

*Id.* ¶ 43.

The Requested Documents strongly corroborate Professor Dershowitz's denials of Ms. Giuffre's malicious and false allegations against him, and undermine her credibility by showing that she has lied under oath about him before.  *Id.* ¶ 44.  Because Ms. Giuffre and her lawyers continue to publicly stand by Ms. Giuffre's accusations against Professor Dershowitz, he has a compelling need to use the Requested Documents in defending his reputation.  *Id.* ¶ 47.

## IV.   THE REVELATION OF THE EXCULPATORY DOCUMENTS TO PROFESSOR DERSHOWITZ

In or about May 2016, Professor Dershowitz was named as a witness in this case by both plaintiff and defendant.  *Id.* ¶ 29.  Thereafter, he was contacted by defense counsel Ms. Laura Menninger, in anticipation of his possible future testimony.  *Id.* ¶ 30.  After Professor Dershowitz agreed to abide by the terms of the stipulated Protective Order in this case (the "Protective Order"), Ms. Menninger sent Professor Dershowitz the Requested Documents to review pursuant to a provision permitting documents produced confidentially in discovery to be shown to potential witnesses.  *See id.* ¶¶ 30, 32; Ex. L.  Professor Dershowitz was previously unaware that the Requested Documents existed.  *Id.* ¶¶ 40-41.

## ARGUMENT

## I.   PROFESSOR DERSHOWITZ SHOULD BE PERMITTED TO INTERVENE UNDER FEDERAL RULE OF CIVIL PROCEDURE 24(B)

"On timely motion, the court may permit anyone to intervene," Fed. R. Civ. P. 24(b)(1), provided the proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact," *id.* R. 24(b)(1)(B).  The decision to permit intervention under Rule 24(b) is discretionary, *U.S.P.S. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978), though the Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3).  "Additional relevant factors include the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."  *Diversified Grp., Inc. v. Daugerdas*, 217 F.R.D. 152, 157 (S.D.N.Y. 2003) (internal quotation marks and alteration omitted).

"It is well-settled that intervention pursuant to Rule 24(b) is the proper procedure for a third party to seek to modify a protective order in a private suit."  *Id.* (collecting authorities).

Likewise, permissive intervention "has generally been found to be most appropriate for a non-party to intervene in order to assert the right to public access" for judicial documents. *United States v. Erie Cnty.*, No. 09 Civ. 849, 2013 WL 4679070, at *5 (W.D.N.Y. Aug. 30, 2103) (collecting authorities), *rev'd on other grounds*, 763 F.3d 235 (2d Cir. 2014). Here, all relevant considerations support granting Professor Dershowitz's motion for permissive intervention.

### A.    There Is Significant Overlap Between the Subject Matter of the Original Action and This Motion

Many courts have held that a non-party's assertion of a right to access sealed or confidential litigation materials itself presents a question of law common among the parties and the proposed intervenor, satisfying the prerequisites for permissive intervention. "[W]hen a district court enters a closure order, the public's interest in open access is at issue and that interest serves as the necessary legal predicate for intervention." *Jessup v. Luther*, 227 F.3d 993, 998 (7th Cir. 2000). "Because an intervenor asserting the right of public access is not becoming a party to the underlying merits of a case, further specificity is not required." *Erie Cnty.*, 2013 WL 4679070, at *5. Even if a more particularized showing of factual or legal commonality were needed, Professor Dershowitz could easily make it. This lawsuit concerns the veracity of Ms. Giuffre's allegations of sexual abuse—allegations of which Professor Dershowitz has been a repeated target. The Requested Documents are relevant to the credibility both of Ms. Giuffre's claims generally and of her allegations against Professor Dershowitz specifically. Both parties have listed Professor Dershowitz as a key witness in this case, Dershowitz Decl. ¶ 29, and he is likely to provide testimony as the litigation proceeds.

### B.    There Is No Risk of Undue Delay or Prejudice

Professor Dershowitz's motion seeks extremely narrow and tailored relief: the unsealing of a small number of already-filed documents or the modification of a blanket Protective Order as to one discovery document. Dershowitz Decl. ¶ 3. In the context of this complex case, where

a number of discovery disputes and other applications have been submitted to the Court in just the last few weeks, this modest request is unlikely to appreciably affect the schedule of the litigation or to delay its ultimate disposition. *See Schiller v. City of N.Y.*, No. 04 Civ. 7922, 2006 WL 2788256, at *3 (S.D.N.Y. Sept. 27, 2006) (noting that intervention "for the limited purpose of challenging strictures on the dissemination of information should not impede the progress of the litigation").

### C.   Professor Dershowitz Has a Compelling Interest in Access That Is Not Represented by Any Existing Party

As the Supreme Court has recognized, the public's right to access judicial proceedings and documents extends well beyond those with direct interests in the subject matter of the litigation at issue:  "American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (noting that "the citizen's desire to keep a watchful eye on the workings of public agencies" is a sufficient basis to compel access).    Even if a more concrete stake were needed, Professor Dershowitz has a compelling interest in obtaining and disclosing the Requested Documents, which corroborate his denials of Ms. Giuffre's heinous allegations against him and undermine her credibility.  He also plans to rely on them to defend against a request for sanctions against him that is pending on appeal in a Florida court.  Dershowitz Decl. ¶ 46.  Although Professor Dershowitz has valiantly fought to clear his name—by, among other efforts, marshaling incontrovertible proof of his innocence, asserting defamation claims in court, and commissioning a thorough investigation led by a respected former federal judge that exonerated him—he has found himself unable to stem the tide of media reports and public statements by Ms. Giuffre and her lawyers labeling him a pedophile and sexual abuser.  Professor Dershowitz seeks to intervene here to assert his First Amendment and

federal common-law rights to access information he needs to defend his hard-earned reputation. That interest is more than a sufficient basis to permit intervention under Rule 24(b).

## II. THE FIRST AMENDMENT AND THE COMMON LAW REQUIRE PUBLIC ACCESS TO THE REQUESTED DOCUMENTS

### A. Legal Standard

"Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013). "Underlying that First Amendment right of access is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Westmoreland v. CBS, Inc.*, 752 F.2d 16, 22 (2d Cir. 1984) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). Similarly, the common law right of access, which "is said to predate the Constitution," *United States v. Amodeo (Amodeo I)*, 44 F.3d 141, 145 (2d Cir. 1995), rests on "the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice," *United States v. Amodeo (Amodeo II)*, 71 F.3d 1044, 1048 (2d Cir. 1995).

Both the First Amendment and common law rights of access create a presumption against secrecy for "judicial documents." *See Newsday*, 730 F.3d at 164 (First Amendment); *Amodeo I*, 44 F.3d at 145-46 (common law). The Second Circuit has explained that "the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *Amodeo I*, 44 F.3d at 145. Once an item's status as a "judicial document" has been established, the common law and the First Amendment demand distinct analyses to determine whether the presumption of access is overcome.

14

### 1.     The Common Law Test

In determining the applicability of the common-law right of access to a given document, courts are charged with determining the *weight* of the presumption of access under the particular circumstances presented.  The presumption applies to *all* judicial documents, but the strength of the presumption varies according to the importance of a given document in the judicial process. The weight afforded to the presumption of access is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Lugosch v. Pyramid Co. of Onodaga*, 435 F.3d 110, 119 (2d Cir. 2006).  The Second Circuit has explained that "documents that directly affect an adjudication and play a significant role in determining litigants' substantive rights receive the benefit of a relatively strong presumption, while the public interest in other documents is not as pressing." *United States v. Graham*, 257 F.3d 143, 153 (2d Cir. 2001) (internal quotation marks and citations omitted).  "Finally, after determining the weight of the presumption of access, the court must balance competing considerations against it."  *Lugosch*, 435 F.3d at 120 (internal quotation marks omitted).  "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure."  *Id.* (internal quotation marks omitted).

### 2.     The First Amendment Test

Even where the common law right of access is found to be inapplicable, the First Amendment may still require disclosure of judicial documents.  The First Amendment right of access is "stronger than its common law ancestor and counterpart."  *United States v. Erie Cnty.*, 763 F.3d 235, 239 (2d Cir. 2014).  In deciding First Amendment access claims, the Second Circuit considers "(a) whether the documents have historically been open to the press and general public (experience) and (b) whether public access plays a significant positive role in the

functioning of the particular process in question (logic)." *Id.* (internal quotation marks omitted). "Once a First Amendment right of access to judicial documents is found, the documents may be sealed only if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (internal quotation marks and alteration omitted).

### B.    The Requested Documents Are Judicial Documents

For a document to appropriately be deemed a "judicial document," "[i]t is sufficient that the document was submitted to the Court for purposes of seeking or opposing an adjudication." *United States v. Sattar*, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006).  Here, the Emails and the Reply Brief have been submitted to the Court in connection with Ms. Churcher's efforts to quash her deposition subpoena and Defendant's opposition to those efforts, while the Manuscript was submitted to the Court in connection with a motion to extend the deposition discovery deadline. Accordingly, all qualify as "judicial documents."

Courts in this district[3] have repeatedly held that documents submitted in support of or opposition to a discovery motion are judicial documents.  *See, e.g.*, *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 4346174, at *2 (S.D.N.Y. Sept. 2, 2014) ("Here, the documents to be submitted are in support of a motion to compel discovery and presumably will be necessary to or helpful in resolving that motion.  They are, therefore, judicial documents."); *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2012 WL 6217646, at *2 (S.D.N.Y. Dec. 3, 2012) (applying presumption of public access to papers filed in connection with a motion for reconsideration of a discovery order); *Gucci Am., Inc. v. Guess?, Inc.*, No. 09 Civ. 4373, 2010 WL 1416896, at *2 (S.D.N.Y. Apr. 8, 2010) (holding that "declarations and a

---

[3] Some federal Courts of Appeals have suggested that the presumption of access does not apply to documents filed in connection with discovery motions. *See, e.g.*, *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 11 (1st Cir. 1986).  But the Second Circuit has never adopted such a rule, and the weight of district court authority in the Southern District of New York rejects this approach.

memorandum of law" seeking to limit discovery "clearly constitute 'judicial documents'"); *In re Omnicom Grp., Inc. Secs. Litig.*, No. 02 Civ. 4483, 2006 WL 3016311, at \*2 (S.D.N.Y. Oct. 23, 2006) (holding that letter briefs and attached exhibits submitted to the court in connection with a privilege dispute were "submitted in this case to request the court to exercise its adjudicative powers in favor of the parties' respective views of a discovery dispute" and therefore were judicial documents); *Schiller*, 2006 WL 2788256, at \*5 (holding that briefs and supporting papers submitted in connection with a dispute over the confidentiality of discovery materials were "created by or at the behest of counsel and presented to a court in order to sway a judicial decision" and were therefore "judicial documents that trigger the presumption of public access"); *S.E.C. v. Oakford Corp.*, No. 00 Civ. 2426, 2001 WL 266996, at \*1 (S.D.N.Y. Mar. 16, 2001) (applying presumption of access to judicial documents to motion papers filed in connection with a discovery dispute); *see also  In re Gushlak*, No. 11-MC-0218, 2012 WL 3683514, at \*3 (E.D.N.Y. July 27, 2012) (holding that documents filed in support of and opposition to a motion for discovery assistance, including motions to quash, were judicial documents).  The Requested Documents were submitted to the Court to influence its adjudication of the motion to quash and the motion to extend the deposition deadline, and they are therefore judicial documents.

### C.    The Common Law Right of Access Applies to the Requested Documents

#### 1.    The Weight of the Presumption of Access Is Strong

Treating materials submitted in connection with a discovery motion as judicial documents that the public may presumptively access gives effect to the purposes of the common law right, which is to facilitate public monitoring of the exercise of judicial power.  "Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior." *Amodeo II*, 71 F.3d at 1048.

The motion in connection with which the Emails and the Reply Brief were submitted concerns whether the Court should overrule a claim of privilege and compel testimony on pain of contempt.  *See* Fed. R. Civ. P. 45(g) (providing that the court "may hold in contempt a person who, having been served, fails without adequate excuse to obey [a] subpoena or an order related to it").  Compelling testimony is a quintessential exercise of coercive judicial power that the public is entitled to monitor.  *See United States v. Bryan*, 339 U.S. 323, 331-32 (1950) (elaborating the importance of balancing "the great power of testimonial compulsion" against exemptions "grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth").  Just as disclosure of pretrial suppression proceedings in criminal cases "enhances the basic fairness of the judicial process and the appearance of fairness that is essential to public confidence in the system," *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987), affording access to proceedings concerning the permissibility of civil discovery provides an important check on the exercise of Article III power.

Likewise, the Court should afford a strong presumption of access to the Manuscript, which was submitted as part of Defendant's opposition to a request to extend a discovery deadline.  The Second Circuit has recognized that a district court's decisions concerning the scope and timing of discovery may "affect a party's substantial rights."  *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985).  As one court has aptly explained:

> The discovery process is clearly an important element of civil litigation.  The manner in which it proceeds may prove decisive to the outcome of particular disputes, and the availability of mandatory discovery has greatly affected the way in which our courts do justice.  Moreover, discovery procedures have become a continuing focus of controversy and reform within the judiciary and the legal community. This debate has arisen precisely because discovery is so important in trial practice. If we take as our standard that the public's right of access attaches to decisions 'of

> major importance to the administration of justice, then discovery
> motions and hearings fall within the ambit of this right.

*Mokhiber v. Davis*, 537 A.2d 1100, 1112 (D.C. Ct. App. 1988) (internal quotation marks and

citations omitted).   Courts in this district have repeatedly recognized that filings submitted in

connection with a motion to alter the pace or schedule of litigation are subject to public access.

*See, e.g.*, *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 72 (S.D.N.Y. 2015) (applying presumption of

public access to "papers filed in connection with [a] motion to stay"); *Skyline Steel, LLC v.*

*PilePro, LLC*, No. 13 Civ. 8171, 2015 WL 556545, at *4 (S.D.N.Y. Feb. 9, 2015) (same).

"While adjudication of the ultimate merits of the case arguably triggers the highest

degree of protection against sealing, this does not imply that motion papers addressed to a

discovery dispute do not trigger the public-access presumption." *In re Omnicom Grp.*, 2006 WL

3016311, at *4.  Because the Requested Documents were submitted by the parties in connection

with discovery motions to be adjudicated by the Court, "those documents are entitled to the

strongest presumption of public access." *In re Gushlak*, 2012 WL 3683514, at *4.

### 2.      There Are No Countervailing Interests That Outweigh the Right of Access

The limited unsealing Professor Dershowitz seeks threatens none of the harms courts

have recognized as sufficient to outweigh the right of access to judicial documents.  As an initial

matter, Professor Dershowitz seeks to reveal unflattering (and false) statements *about himself*.

Thus, the general rule "that the common law right of access is qualified by recognition of the

privacy rights of the persons whose intimate relations may thereby be disclosed," *In re Newsday,*

*Inc.*, 895 F.2d 74, 79 (2d Cir. 1990), has no application.  Nor does Ms. Giuffre possess any claim

to privacy concerning the information Professor Dershowitz seeks to unseal.  The Requested

Documents discuss her allegations against a number of public figures, and relate to the

preparation of a book manuscript with the goal of international publication and distribution.

Nothing could be less private.  Indeed, both Ms. Giuffre's relationship with Ms. Churcher and the nature of her allegations against Professor Dershowitz have been the subject of publicly available court filings in this and other actions and of numerous media stories.  Dershowitz Decl. ¶¶ 15-20, 26-27; Ex. K.  Any claim to confidentiality has been waived.  *See infra* Part III.

In short, the Requested Documents contain none of the kinds of information that give courts pause in granting public access to judicial documents.  "The information at issue . . . does not involve the type of medical, health-related, family, or personal financial matter to which courts grant the greatest protection."  *United States v. Martoma*, No. S1 12 Cr. 973, 2014 WL 164181, at *6 (S.D.N.Y. Jan. 9, 2014).  It involves only contemporaneous evidence of a scheme to cook up false and defamatory allegations against Professor Dershowitz.  He is entitled to access and use that evidence to defend himself.

### D.    The First Amendment Guarantees Access to the Requested Documents

Even if the common law did not compel the conclusion that the Requested Documents must be made public, the First Amendment would supply an alternative basis for their disclosure.  The First Amendment presumption of access to judicial documents applies when "experience and logic" indicate that "the documents have historically been open to the press and general public," and that "public access plays a significant positive role in the functioning of the particular process in question."  *Lugosch*, 435 F.3d at 120 (internal quotation marks omitted).

With respect to the experience prong, the Second Circuit has held that "the notion of public access to judicial documents is a capacious one: the courts of this country have long recognized a general right to inspect and copy public records and documents, including judicial records and documents," in order to facilitate public monitoring.  *Erie Cnty.*, 763 F.3d at 241 (internal quotation marks omitted).  Discovery motions and the documents supporting them are routinely filed in courts across the country without sealing and with the understanding that such

documents are publicly accessible.  And while the relatively recent history of modern civil

discovery practice means there is no ancient common-law analogue to the contemporary

discovery motion, "[t]his absence, of course, is not surprising, for compelled discovery is a child

of the first Federal Rules of Civil Procedure adopted in 1938."  *Mokhiber*, 537 A.2d at 1111.  "It

would make little sense to shut off access for what is, practically speaking, a new kind of judicial

process just because that particular procedure did not exist at common law. Instead, the public

should enjoy the right to view new kinds of proceedings when they are like traditional ones in

this significant respect: that access will serve the same values and policies which underlie" the

public right of access.  *Id.* at 1112.

As to the logic prong of the Second Circuit's test, it is clear that public monitoring has an

important role to play here.  Ms. Giuffre's allegations against Professor Dershowitz have been

the subject of significant public interest and have been discussed at length in an array of

international news stories.  Indeed, in the CVRA Action, Ms. Giuffre's own counsel cited

"strong current media interest in the case" to *oppose* sealing the pleadings, pointing to Ms.

Churcher's stories among others as examples.  *Doe v. United States*, No. 08 Civ. 80736 (S.D.

Fla.), ECF No. 51, at 7.  "The issues involved are manifestly ones of public concern and

therefore ones which the public has an interest in overseeing."  *Erie Cnty.*, 763 F.3d at 242.

Because experience and logic dictate that the First Amendment right of access applies to

the Requested Documents, their continued sealing would only be permissible on the basis of

"specific, on-the-record findings that higher values necessitate a narrowly tailored sealing."

*Lugosch*, 435 F.3d at 126.  Here, no such findings have ever been made; indeed, the Court has

granted boilerplate sealing applications with no findings or judicial scrutiny whatsoever.  *See,

e.g.*, ECF No. 254.  There would be no basis to find that continuing secrecy is warranted, let

alone "essential to preserve higher values."

## III.    ALTERNATIVELY, THE PROTECTIVE ORDER SHOULD BE MODIFIED TO PERMIT DISCLOSURE OF THE REQUESTED DOCUMENTS

Even where discovery materials are found not to be judicial documents, that does not automatically entitle them to confidential treatment.  *See Vazquez v. City of N.Y.*, No. 10 Civ. 6277, 2014 WL 11510954, at *1 (S.D.N.Y. May 2, 2014).  Here, although Professor Dershowitz is in rightful possession of the Requested Documents, he is prohibited from disseminating them by the parties' stipulated, blanket Protective Order.  *See* Dershowitz Decl. Ex. L.  That order permits the parties to designate documents as confidential without particularized judicial scrutiny, which is how the Requested Documents became subject to a protective order in the first instance.  Because there is no basis for judicial protection of the Requested Documents, the Protective Order should be modified to permit its disclosure.

Federal Rule of Civil Procedure 26(c) permits issuance of a protective order only upon "good cause shown," and requires that such orders issue only "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  "[I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection."  *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (internal quotation marks omitted).  A protective order requires "particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements" showing the harm that would result from disclosure.  *Louissier v. Universal Music Grp., Inc.*, 214 F.R.D. 174, 177 (S.D.N.Y. 2003).

The Second Circuit's general rule that a protective order should not be modified "absent a showing of improvidence in the grant of the order or some extraordinary circumstance or compelling need," *S.E.C. v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001), applies only when the parties have *reasonably* relied on the protective order in producing discovery.  That is not the case here, where the protective order is a sweeping and generic stipulation permitting the parties,

and not the Court, to set the standards for access.  "A blanket protective order is more likely to

be subject to modification than a more specific, targeted order because it is more difficult to

show a party reasonably relied on a blanket order in producing documents or submitting to a

deposition."  *In re EPDM Antitrust Litig.*, 255 F.R.D. 308, 319 (D. Conn. 2009).

"*Stipulated* blanket orders are even less resistant to a reasonable request for modification."  *Id.*

      "An examination of Second Circuit case law reveals the following factors are relevant

when determining whether a party has reasonably relied on the protective order[:] (1) the scope

of the protective order; (2) the language of the order itself; (3) the level of inquiry the court

undertook before granting the order; and (4) the nature of reliance on the order."  *In re*

*September 11 Litig.*, 262 F.R.D. 274, 277 (S.D.N.Y. 2009) (internal quotation marks omitted).

Here, all four factors weigh against a finding of reasonable reliance.  First, the Protective Order

contains "expansive language granting the parties broad latitude to self-designate materials" as

confidential, making it unreasonable for any party to rely on the prospect of indefinite and

ironclad confidentiality protections in producing discovery.  *See EPDM*, 255 F.R.D. at 320.

Second, the Protective Order allows challenges to confidentiality designations, *see* Dershowitz

Decl., Ex. L ¶ 11, and permits the Court to modify the order "at any time" for good cause, *id.* ¶

14.  "Given this provision, it is difficult to see how the [parties] can reasonably argue that they

produced documents in reliance on the fact that the documents would always be kept secret."

*Lugosch*, 435 F.3d at 126.

      Third, "[t]he level of inquiry undertaken before the Order was entered also weighs in

favor of modification because the Court 'so ordered' the parties' stipulation without having

cause to determine whether all the documents covered actually warranted protection."

*Tradewinds Airlines, Inc. v. Soros*, No. 08 Civ. 5901, 2016 WL 3951181, at *2 (S.D.N.Y. July

20, 2016).  While this practice can be salutary to the extent it preserves judicial resources and

promotes efficiency in complex civil discovery, it strongly weakens the parties' claim to a reasonable expectation that every document marked confidential will remain subject to a Rule 26(c) order indefinitely.  *See EPDM*, 255 F.R.D. at 319.  "Finally, the nature of the reliance on the Order weighs in favor of modification because there is no indication that the [parties] relied on the Order to produce documents they would not have otherwise disclosed."  *Tradewinds Airlines*, 2016 WL 3951181, at *2.  Indeed, Ms. Giuffre could not reasonably have believed that she could avoid disclosing her own descriptions of, and communications about, the very subject matter of this lawsuit, which *she commenced.  See Lugosch*, 435 F.3d at 125.

Even if the parties' reliance on the Protective Order could be deemed reasonable, which it cannot, Professor Dershowitz would handily satisfy *TheStreet.com*'s requirement of a compelling need or extraordinary circumstance.  First, as one Court in this district explained recently, "courts within this circuit have found there to be a 'compelling need' or 'extraordinary circumstance' warranting modification where a blanket protective order is entered without a showing of good cause."  *Tradewinds Airlines*, 2016 WL 3951181, at *2 (collecting authorities).  More importantly, under the circumstances, Professor Dershowitz's need for the Requested Documents is undeniable.   They strongly corroborate his denials of the sexual abuse allegations Ms. Giuffre belatedly levied against him, which were themselves first presented in documents filed publicly on a federal court docket.  Dershowitz Decl. ¶ 43.  Professor Dershowitz has a compelling need to use all available evidence to defend himself against Ms. Giuffre's allegations, which have persisted despite a thorough investigation exonerating him and continue to be republished in the media.  Dershowitz Decl. ¶¶ 16, 18, 45.  Professor Dershowitz will also use the Requested Documents to defend against a sanctions motion that is pending in a state court in Florida, providing an independent basis to modify the Protective Order.  *See id.* ¶ 46.

In contrast, there is no basis for a finding of good cause to protect the content of the Requested Documents, all of which concern Ms. Giuffre's own allegations. She cannot credibly claim that disclosure will cause her "annoyance, embarrassment, oppression, or undue burden or expense," *see* Fed. R. Civ. P. 26(c). Indeed, Ms. Giuffre has waived any claimed to confidentiality. She has publicly filed her accusations of sexual misconduct against an array of individuals, including Professor Dershowitz, in at least two lawsuits besides this one. Dershowitz Decl. ¶¶ 10-12, 15-20. She has sold her story to the media and sat for extensive interviews with Ms. Churcher and other reporters about the very same allegations that are the subject of the Requested Documents. *Id.* ¶¶ 13, 26-27. She even "agreed to waive her anonymity" in order to disseminate her story publicly. Sharon Churcher, *Exclusive: Girl at Center of Underage Sex Procurement Case That Scandalised America Describes How She Was Introduced to the Prince*, MAIL ON SUNDAY, Feb. 27, 2011. More recently, Ms. Giuffre sat for an interview with ABC News, hoping to increase public interest in her allegations. Dershowitz Decl. ¶ 27. Although the interview has not yet aired, it could be broadcast at any time, likely repeating once again the same allegations for which Ms. Giuffre has claimed confidentiality in the context of litigation discovery. *See id.* And her lawyers have continued to give interviews insinuating Professor Dershowitz's guilt even after reaching a settlement with him and agreeing to release a public statement withdrawing their own public filing of the accusations against him. *See* Dershowitz Decl., Ex. H.

In short, disseminating the information contained in the Requested Documents, which she has designated "confidential" in the context of this lawsuit, has been Ms. Giuffre's life's work for years. Having made every effort to publicize these allegations for personal and commercial gain, Ms. Giuffre should not be permitted now to make an abrupt about-face and claim that they are entitled to this Court's protection from public dissemination.

## CONCLUSION

For the foregoing reasons, Professor Dershowitz respectfully requests that the Court grant his motion for permissive intervention and unseal the Requested Documents, or in the alternative modify the Protective Order to permit their dissemination.

Dated: August 11, 2016
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


_____/s/_____
Andrew G. Celli, Jr.
David A. Lebowitz

600 Fifth Avenue, 10th Floor
New York, New York 10020

(212) 763-5000

*Attorneys for Proposed Intervenor*
*Alan M. Dershowitz*