United States District Court
Southern District of New York

Virginia L. Giuffre,

      Plaintiff,               Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

      Defendant.

_____/

### PLAINTIFF'S MOTION TO COMPEL DATA FROM DEFENDANT'S UNDISCLOSED EMAIL ACCOUNT AND FOR AN ADVERSE INFERENCE INSTRUCTION

Plaintiff, Virginia Giuffre, by and through her undersigned counsel, files this Motion to Compel Data from Defendant's Undisclosed Email Account and for An Adverse Inference Instruction regarding the data from that account, and states as follows. Defendant has not disclosed, nor produced data from, the email account she used while abusing Ms. Giuffre from 2000-2002 in violation of this Court's Order [DE 352]. Ms. Giuffre hereby moves to compel Defendant to produce this data, and requests that this Court enter an adverse inference jury instruction for this willful violation of this Court's orders.

**I.    BACKGROUND**

The earliest-dated email Defendant has produced in this litigation is from July 18, 2009. (GM_00069). Ms. Giuffre is aware of two email addresses that appear to be the email addresses Defendant used while Ms. Giuffre was with Defendant and Epstein, namely, from 2000 - 2002. Defendant has denied that she used those accounts to communicate, but she has not disclosed the account she did use to communicate during that time, nor produce documents from it.

Importantly, Defendant has never denied using an email account for communication from 1999-2009, and the facts and circumstances show that it is exceedingly unlikely that Defendant did not use an email account to communicate those years.[1]

For example, according to United States Department of Commerce, "eighty-eight percent of adult Internet users sent or received e-mail" in 2000. *See* Eric C. Newburger, "Home Computers and Internet Use in the United States: August 2000," U.S. DEPARTMENT OF COMMERCE, ECONOMICS AND STATISTICS ADMINISTRATION, U.S. CENSUS BUREAU, September 2001. Additionally, the Pew Research Center published findings that certain demographics have higher internet usage, including many demographics to which Defendant belongs. For example, higher rates of internet usage are found among younger adults (Defendant was 38 in 1999); those with college educations (Defendant has a master's degree); those in households earning more than $75,000 (Defendant was in a household headed by a billionaire during that time, and that household had its own private email server and account); whites or English-speaking Asian-Americans (Defendant is white); and those who live in urban areas (Defendant lived in Palm Beach and Manhattan). *See* Andres Perrin and Maeve Duggan, 'Americans' Internet Access: 2000-2015," PEW RESEARCH CENTER, June 26, 2015.

Additionally, her boyfriend, Jeffrey Epstein, with whom she shared a household from 1999-2002 (and other years), implemented an entire, private email system to communicate with his household and employees, including Defendant. Accordingly, given Defendant's extraordinary economic resources, her high-level social connections, and her elaborate residential email/internet configuration she had during that time, it is extraordinarily unlikely that she would not employ an almost ubiquitous communication tool, nor has she denied it.

---

[1] On Friday, September 23, 2016, counsel for Ms. Giuffre sent a letter to Defendant inquiring about the undisclosed account. As of the date of this motion, Defendant has made no response.

2

A. The ▓▓▓▓▓▓▓▓ Account

Ms. Giuffre has knowledge of the ▓▓▓▓▓▓▓▓ account because it was listed as part of Defendant's contact information (including phone number) on documents gathered by the police from Epstein's home, and turned over to the Palm Beach County State Attorney as part of the investigation and prosecution of Epstein.

Ms. Ghislaine Maxwell    Email ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*See* (DE 280-2), Palm Beach County State Attorney's Office, Public Records Request No.: 16-268, Disc 7 at p. 2305 (GIUFFRE007843). Despite the fact that this account was listed as her contact information in the home she shared with Epstein, and despite the fact that ***the username bears her initials***, Defendant claims she does not recognize the account, and has no access to it.

B. The ▓▓▓▓▓▓▓▓ Account

The mindspring account is also listed as part of Defendant's contact information gathered by the police. In her filing with this Court, Defendant represented that this was merely a "spam" account "to use when registering for retail sales notifications and the like," and that it contains no relevant documents. (DE 345 at pg. 8). However, it appears that Jeffrey Epstein created the mindspring.org accounts to communicate with his household and with his employees, and did, in fact, communicate with them this way.

As previously recounted, Jeffrey Epstein's house manager, Juan Alessi testified that MindSpring account was in daily use by the Epstein household to send and receive messages, a household to which Defendant belonged:

> Q. So when there would be a message from one of them while they were out of town, they would call you, call you on the telephone?
>
> A. I haven't spoken to Ghislaine in 12 years.

3

Q. Sorry. I'm talking about when you worked there and you would receive a message that they were coming into town, would that be by way of telephone?

A. Telephone, and also, there was a system at the house, that it was MindSpring, MindSpring I think it's called, that it was like a message system that would come from the office.

Q. What is MindSpring?

A. It was a server. I think it was -- the office would have, like, a message system between him, the houses, the employees, his friends. They would write a message on the computer. There was no email at that time.

Q. Okay. So what computer would you use?

A. My computer in my office.

Q. And so was part of your daily routine to go to your computer and check to see if you had MindSpring messages?

A. No. That was at the end of my stay. That was the very end of my stay. I didn't get involved with that too much. But it was a message system that Jeffrey received every two, three hours, with all the messages that would have to go to the office in New York, and they will print it and send it faxed to the house, and I would hand it to him.

Q. Did it look like the message pads that we've been looking at?

A. No, no, nothing like that.

Q. Was it typed-out messages?

A. Yes, typed-out messages.

Q. Just explain one example of how it would work. Let's say that Ghislaine wanted to send him a message on MindSpring. How would that work?

A. An example?

Q. Sure.

A. It got so ridiculous at the end of my stay, okay? That Mr. Epstein, instead of talking to me that he wants a cup of coffee, he will call the office; the office would type it; they would send it to me, Jeffrey wants a cup of coffee, or Jeffrey wants an orange juice out by the pool.

Q. He would call the office in New York. They would then type it in MindSpring?

4

> A. Send it to me.
>
> Q. How would you know to check for it? How would you know to look for this MindSpring?
>
> A. Because I was in the office. I was there. I was there. And we have a signal when it come on and says, Hey, you've got mail.
>
> Q. Okay.
>
> A. Every day. Every day it was new things put in. That's why I left, too.
>
> Q. Do you know who set up the mind spring system?
>
> A. It was a computer guy. It was a computer guy who worked only for Jeffrey. Mark. Mark Lumber.
>
> Q. Was he local to Palm Beach?
>
> A. No. He was in New York. Everything was set up from New York. And Mark Lumber, I remember he came to Palm Beach to set up the system at the house.

Alessi Dep. Tr. at 223:5-225:17. (June 1, 2016) (McCawley Decl. at Sealed Exhibit 1). Accordingly, mindspring was a domain name set up for Jeffrey Epstein and his household to communicate with one another, and was, in fact, used in this manner.

The sworn testimony of Janusz Banasiak, another of Epstein's house managers, from the case *L.M. v. Jeffery Epstein and Sarah Kellen*,[2] gives a fuller representation of how Defendant, and others in Epstein's sex-trafficking ring, used their accounts on Epstein's mindspring server:

> Q. Okay. Were you aware that Mr. Epstein used a Citrix program to link various computers? Did you know that?
>
> A. Yeah. I use Citrix too in my computer for exchanging e-mails and get through Internet.

***

---

[2] Case No.: 502008CA028051XXXXMB AB, In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

Q. That's not something that you were, you were privy to? You weren't, you weren't in the loop of the sharing of information in the house in terms of the computers being connected through any server?

A. I don't really know what, how, how to answer your question because Citrix is for the whole organization to exchange e-mail between employees.

Q. All right. You used the term?

A. So, even my computer is connected to Citrix. I can receive mail and I can e-mail information to employee within organization. But I don't know if you can see to each computer what is going on on another computer.

***

Q. You have used the term organization; you can share within the organization. What do you -- just so I can understand what you're calling the organization, what do you mean by that word?

A. People employed by Jeffrey Epstein. There are a few groups of people, his office in New York and I guess --

***

Q. Okay. The other people mentioned as co-conspirators are Sarah Kellen, Adriana Ross, and Nadia Marcinkova. So we'll get to them in a minute but first just so we stay on the track of who was in the organization, is Sarah Kellen, Adriana Ross and Nadia Marcinkova all people that you would also consider within the organization?

A. Yes.

Q. Okay. So, we just added three more names to it. **Who else would you consider, Ghislaine Maxwell?**

**A. Yes.**

Banasiak Deposition at 56:13-17; 57:2-14; 58:1-7; 60:21-61:7 (February 16, 2010) (Emphasis added) (McCawley Decl. at Sealed Composite Exhibit 2).

     As Defendant was a member of Epstein's household, and claims to have been his employee (See McCawley Decl. at Sealed Exhibit 3, Maxwell's April 22, 2016 Dep. Tr. at 10:7-11:3), it is unlikely that her mindspring account was merely a "spam account" from 1999-2002. It is much more likely that this account has - or *had* - Defendant's communications with co-

6

conspirators Sarah Kellen, Nadia Marcinkova, and Epstein. However, it is Defendant's representation that this account does not presently have responsive documents and was merely used for "spam."

### C. Defendant's Non-Disclosed Email Account

If the Court accepts Defendant's claim that she used neither the earthlink.net account nor the mindspring.org "spam" account to communicate, logic dictates that Defendant must have had another email account - one that she actually used - from 2000 - 2002. Despite the Court's orders that Defendant produce responsive documents from **all** her email accounts from 1999 to the present, Defendant has neither disclosed nor produced from the email account that she actually used to communicate from 2000-2002. This refusal violates this Court's orders. Ms. Giuffre issued requests to Defendant on October 27, 2015. Nearly a year later, after this Court has specifically ordered Defendant to produce her responsive email from **all** her accounts, Defendant has produced none from this account. Not only has Defendant failed to produce emails from the account she actually used from 1999-2002, and she has not even disclosed what account it is.

## II. ARGUMENT

### A. An Adverse Inference Instruction is Appropriate

An adverse inference instruction is appropriate regarding documents from the email account Defendant actually used from 1999-2002. In light of this clear and persistent pattern of recalcitrance, the Court should instruct the jury that it can draw an adverse inference that the Defendant has concealed relevant evidence. Even if Defendant were, at this late date, to run Ms. Giuffre's proposed search terms over the data from the email account she used from 1999 - 2002 (which she refuses to disclose), such a production would be both untimely and prejudicial. Fact discovery has closed. Numerous depositions have already been taken by Ms. Giuffre without the benefit of these documents. The window for authenticating the documents through depositions

has shut. Expert reports have been exchanged, so Ms. Giuffre's experts did not have the benefit of reviewing these documents. Late production of this information robs Ms. Giuffre of any practical ability to use the discovery, and, importantly, it was incumbent on Defendant to identify this account.

The Second Circuit has stated, "[w]here documents, witnesses, or information of any kind relevant issues in litigation is or was within the exclusive or primary control of a party and is not provided, an adverse inference can be drawn against the withholding party. Such adverse inferences are appropriate as a consequence for failure to make discovery." *Bouzo v. Citibank, N.A.*, 1993 WL 525114, at *1 (S.D.N.Y. 1993) (internal citations omitted). The Defendant's continued systemic foot-dragging and obstructionism – even following the Court's June 20 Sealed Order and August 10, 2016 Order [DE 352] – makes an adverse inference instruction with regard to Defendant's documents appropriate. An adverse inference instruction is appropriate when a party refuses to turn over documents in defiance of a Court Order. *See Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 2005 WL 1026461, at *1 (S.D.N.Y. May 2, 2005) (denying application to set aside Magistrate Judge Peck's order entering an adverse inference instruction against defendant for failure to produce documents that the Judge Peck had ordered Defendant to produce). Accordingly, because a "party's failure to produce evidence within its control creates a presumption that evidence would be unfavorable to that party" an adverse inference should be applied with respect to Defendant's failure to produce data from the email account she used from 1999 -2002 "in order to ensure fair hearing for [the] other party seeking evidence." *Doe v. U.S. Civil Service Commission*, 483 F. Supp. 539, 580 (S.D. N.Y., 1980) (*citing International Union v. NLRB*, 148 U.S. App. D.C. 305, 312-317, 459 F.2d 1329, 1336-41 (D.C.Cir.1972)).

"An adverse inference serves the remedial purpose of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013) (granting an adverse inference when defendants refused to produce documents pursuant to the District Court's order). Where "an adverse inference ... is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id*. (citing *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).

Furthermore, as discussed in detail in Ms. Giuffre's Motion for an Adverse Inference Instruction (DE 315) and Supplement Motion for Adverse Inference Instruction (DE 338), an adverse inference is appropriate regarding the documents that Defendant is withholding under the Second Circuit's test set forth in *Residential Funding*. Defendant has admitted to deleting emails as this Court noted in its Order. An adverse inference is equally appropriate if the non-compliance was due to Defendant's destruction of evidence. *See Brown v. Coleman*, 2009 WL 2877602, at *2 (S.D.N.Y. Sept. 8, 2009) ("Where a party violates a court order—either by destroying evidence when directed to preserve it or by failing to produce information because relevant data has been destroyed—Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306

F.3d 99, 106–07 (2d Cir.2002)"). *See also Essenter v. Cumberland Farms, Inc.*, 2011 WL 124505, at *7 (N.D.N.Y. Jan. 14, 2011); and Rule 37(e), Fed. R. Civ. P. ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it . . . the court: (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (b) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."). Failure to disclose the email account Defendant actually used from 1992-2002 warrants an adverse inference instruction.

### III.    CONCLUSION

For the reasons set forth above, Ms. Giuffre respectfully requests that this Court compel Defendant to disclose what email account she actually used from 2009-1999, and that the court give the jury an adverse inference jury instruction concerning the documents from the undisclosed email account.

October 14, 2016

               Respectfully Submitted,

               BOIES, SCHILLER & FLEXNER LLP

By: /s/ Sigrid McCawley
    Sigrid McCawley (Pro Hac Vice)
    Meredith Schultz (Pro Hac Vice)
    Boies Schiller & Flexner LLP
    401 E. Las Olas Blvd., Suite 1200
    Ft. Lauderdale, FL 33301
    (954) 356-0011

    David Boies
    Boies Schiller & Flexner LLP
    333 Main Street
    Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
 (954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[3]

---

[3] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 14, 2016, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served to all parties of record via transmission of the Electronic Court Filing System generated by CM/ECF.

    Laura A. Menninger, Esq.
    Jeffrey Pagliuca, Esq.
    HADDON, MORGAN & FOREMAN, P.C.
    150 East 10th Avenue
    Denver, Colorado 80203
    Tel: (303) 831-7364
    Fax: (303) 832-2628
    Email: lmenninger@hmflaw.com
           jpagliuca@hmflaw.com

                                        /s/ Meredith Schultz
                                           Meredith Schultz