# EXHIBIT 3

# (File Under Seal)

Page 270

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JANE DOE NO. 2, CASE NO: 08-CV-80119

Plaintiff,

Vs.

JEFFREY EPSTEIN,

Defendant.
______________________/

JANE DOE NO. 3, CASE NO: 08-CV-80232

Plaintiff,

CONDENSED

Vs.

JEFFREY EPSTEIN,

Defendant.
______________________/

JANE DOE NO. 4, CASE NO: 08-CV-80380

Plaintiff,

Vs.

JEFFREY EPSTEIN,

Defendant.
______________________/

JANE DOE NO. 5, CASE NO: 08-CV-80381

Plaintiff,

Vs

JEFFREY EPSTEIN,

Defendant.
______________________/

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

NON PARTY (VR) 000315

GIUFFRE001004

Page 271

JANE DOE NO. 6, CASE NO: 08-CV-80994
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 7, CASE NO: 08-CV-80993
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

C.M.A., CASE NO: 08-CV-80811
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE, CASE NO: 08-CV-80893
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

Page 272

JANE DOE NO. II, CASE NO: 08-CV-80469
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 101 CASE NO: 08-CV-80591
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

JANE DOE NO. 102, CASE NO: 08-CV-80656
Plaintiff,
Vs.
JEFFREY EPSTEIN,
Defendant.
_____________________/

Page 273

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 502008CA037319XXXXMB AB

B.B.,
Plaintiff,
Vs.
JEFFREY EPSTEIN.
Defendant.
_____________________/

1031 Ives Dairy Road
Suite 228
North Miami, Florida
August 7, 2009
1:15 p.m. to 5:30 p.m.

CONTINUED
VIDEOTAPED
DEPOSITION
of
ALFREDO RODRIGUEZ

taken on behalf of the Plaintiffs pursuant to a Re-Notice of Taking Continued Videotaped Deposition (Duces Tecum)

- - -

Page 274

APPEARANCES:

MERMELSTEIN & HOROWITZ, P.A.
BY: ADAM HOROWITZ, ESQ.
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Attorney for Jane Doe 2, 3, 4, 5, 6, and 7.

ROTHSTEIN ROSENFELDT ADLER
BY: BRAD J. EDWARDS, ESQ., and CARA HOLMES, ESQ.
Las Olas City Centre
Suite 1650
401 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
Attorney for Jane Doe and E.W. And L.M.

PODHURST ORSECK
BY: KATHERINE W. EZELL, ESQ.
25 West Flagler Street
Suite 800
Miami, Florida 33130
Attorney for Jane Doe 101 and 102.

LEOPOLD-KUVIN
BY: ADAM J. LANGINO, ESQ.
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, Florida 33410
Attorney for B.B.

A. I don't remember, Ma'am. He came from New Albany, Ohio.
Q. From New --
A. New Albany, Ohio.
Q. New Albany, Ohio. Did he have his own business?
A. No, he worked for Mr. Epstein. He will maintain all the computers.
Q. Was he there everyday?
A. No, ma'am.
Q. Do you know whether at that time Mr. Epstein had an office in Palm Beach?
A. Not outside the house, no.
Q. Do you have any knowledge of whether or not the video equipment was -- and I don't know the technical term, forgive me, but was it the kind of equipment that would record for a certain amount of time and then record over that film?
A. I don't know.
MR. CRITTON: Form.
BY MS. EZELL:
Q. You don't know?
A. No, ma'am.
MR. CRITTON: Just for clarification, I may have misunderstood, but I thought he

said he didn't even know the video equipment existed until he read the FBI report.
MS. EZELL: He said he didn't know that it was upstairs and downstairs, I believe.
MR. CRITTON: I thought he said he didn't know that it even existed.
MS. EZELL: I may be wrong.
BY MS. EZELL:
Q. Did you know it existed before you read the FBI report?
A. No, ma'am.
Q. I'm sorry, then I was wrong.
How did you know then that the young technician from Ohio maintained the computers and the video equipment?
A. Because we used to request -- there were always problems with the computers so he came to the house and he was the programmer. It was very sophisticated.
MR. CRITTON: Form to the last question, move to strike the answer as nonresponsive.
BY MS. EZELL:
Q. How did you know then that he maintained the video equipment as well?
A. Because he was in charge of computers,

video, even phones.
Q. Would he also repair the televisions if they needed work?
A. No.
Q. No. Did you have any kind of intercom system in the house?
A. Yes, ma'am.
Q. And what kind of system was that?
A. It was standard office equipment, Lucid Technologies maybe, but it was an intercom like we using right now.
MS. EZELL: Just let the record reflect that the witness pointed to the telephone on the table that has a speaker phone.
THE WITNESS: Yes, ma'am.
BY MS. EZELL:
Q. And did you use that in your work?
A. Yes, ma'am.
Q. And what did you use it for?
A. Mr. Epstein used to page me when he needed me.
Q. Did you have one of those phones in the kitchen?
A. Yes, ma'am.
Q. And was there one out in the staff house

as well?
A. Yes, ma'am.
Q. Do you know where others were in the house?
A. Probably have like 15 phones. We used to have three in the staff house, one in the cabana, two in the master bedroom, one in each room, kitchen, dining room, Mrs. Maxwell's office, the garage.
Q. Where was Mrs. Maxwell's office?
A. Under the stairs next to the kitchen.
Q. Can you give me some idea of what size space that was?
A. It was probably -- we change the floor. Twelve by five, something like that.
Q. And was the computer equipment in that space?
A. Yes, ma'am.
Q. Do you know whether Ms. Maxwell kept the names and telephone numbers of the girls who came to do massages?
A. Yes, ma'am.
MR. CRITTON: Form.
BY MS. EZELL:
Q. Do you know that because you saw the

Page 303

names and phone numbers?
MR. CRITTON: Form.
THE WITNESS: Yes, ma'am.
BY MS. EZELL:
Q. Do you know if she kept pictures of the girls on the computer?
A. Yes, she did.
Q. And you know that as well because you happen to see them?
A. Yes, ma'am.
MR. CRITTON: Form to the last two questions.
BY MS. EZELL:
Q. Were they similar to the pictures that Ms. Kellen had on her computer?
MR. CRITTON: Form.
THE WITNESS: Yes, ma'am.
BY MS. EZELL:
Q. Did the pictures that they kept there look like pictures that were posed?
A. They were more casual.
Q. Did they look as though the person being photographed knew that they were being photographed?
MR. CRITTON: Form.

Page 304

THE WITNESS: No, ma'am.
BY MS. EZELL:
Q. And what can you tell me about that, what lead you to draw that conclusion?
A. They were probably taken in parties in big reception or banquet.
MR. CRITTON: Let me offer as a suggestion, not that you have to accept or that you would, you're using the term young girls generically, he has probably seen many, many young girls, there was no -- you've used it interchangeably with just young girls versus young girls who may have come to -- purported to give a massage and, therefore, that may be a different answer, so that's part of my form objection.
MS. EZELL: Okay, thank you.
BY MS. EZELL:
Q. When I asked you about Ms. Kellen whether she had a list of the girls and telephone numbers, I think I asked about those girls that came to give massages, but let me go back and just ask it that way.
Did you notice that Ms. Kellen had a list of the girls that came to give massages on her

Page 305

computer?
MR. CRITTON: Form.
THE WITNESS: Yes, ma'am.
BY MS. EZELL:
Q. And did she generally have phone numbers for those girls?
A. Yes, ma'am.
Q. And were they generally pictures of the girls?
MR. CRITTON: Form.
THE WITNESS: No, ma'am.
BY MS. EZELL:
Q. And did Ms. Maxwell have a list of the girls who came to give massages?
MR. CRITTON: Form.
THE WITNESS: Yes, ma'am.
BY MS. EZELL:
Q. Did she have telephone numbers generally?
A. Yes, ma'am.
MR. CRITTON: Form.
BY MS. EZELL:
Q. Were there pictures on her computer of the girls who came to give massages?
MR. CRITTON: Form.
BY MS. EZELL:

Page 306

Q. Ms. Maxwell I'm talking about.
A. Yes, ma'am.
Q. And were those pictures the more casual ones that you described when I asked whether or not the subject looked as though she knew she was being photographed?
MR. CRITTON: Form.
THE WITNESS: I'm sorry, can you repeat?
BY MS. EZELL:
Q. Yeah. The pictures of the young girls who came to the house to give massages that were on Ms. Maxwell's computer, did they appear to have been taken when the girls knew they were being photographed?
MR. CRITTON: Form.
THE WITNESS: I don't think they knew they were being photographed.
BY MS. EZELL:
Q. I believe you said they were more casual pictures.
A. Yes, ma'am.
Q. Did you notice any nude photographs in those pictures?
A. Yes, ma'am.
MR. CRITTON: Form for the last question.

Q. Do you remember whether she came to the house on more than one occasion?
A. I heard her name several times from Sarah, sir, but beyond that I cannot say anything else.
Q. Okay. Who have you talked to about your knowledge of Mr. Epstein in the last year?
A. My wife.
Q. Anyone else?
A. No, sir.
Q. Well, you talked to Mr. Critton.
A. We have a conversation in West Palm Beach.
Q. Yes. So you talked to your wife, you talked to Mr. Critton?
A. Yes.
Q. Had you talked to anyone else in the last year about Epstein?
A. No.
Q. Did you talk to Mr. Goldberger?
A. Yeah, I called Mr. Goldberger first before I talked to Mr. Critton.
Q. Okay. So we have your wife, we have Mr. Critton, and we have Mr. Goldberger.
Do we have anyone else that you talked to

in the last year?
A. No, sir.
Q. How about Mr. Epstein of course?
A. No.
Q. Where did you usually keep the journal with the names of the girls, in what part of the house?
A. In the staff house.
Q. Sorry?
A. The staff house, the guest house.
Q. Right. But you said you had a journal at your own residence with the names of the girls.
A. I give the whole journal and all the information regarding this case, sir, to Detective Joe Recarey, sir.
Q. Okay. And the materials that you gave to the Detective, were they kept -- were any of them kept at your own personal residence?
A. Yes, they were with me, sir.
Q. Okay. When you gave the materials to the Detective, did all of the materials you gave to him come from your residence?
A. Yes.
Q. Do you remember exactly what you gave to him?

A. I give him a list of notes that I used to take from frequent people -- I mean, people who used to frequent the house and -- I'm sorry, it's been a few years, I don't remember, but it was those years, like it was a file with my personal notes because he told me it was very important and he kind of said can I borrow this from you, and he still has those documents, sir.
Q. So even though they pertain to Mr. Epstein you kept those notes at your residence?
A. Yes, sir.
Q. Okay. Where in your residence did you keep those notes before you gave them to the Detective?
A. In my bedroom.
Q. Did you have a file cabinet or --
A. No.
Q. -- chester drawers or something?
A. No, they were laying next to some other papers that I have.
Q. Did the other papers pertain to Mr. Epstein?
A. No, no, nothing else related to Mr. Epstein.
Q. I'm just confused as to why you told us

before that you had a journal at home and today you say that you gave everything to the Detective.
MR. CRITTON: Form. You also may have missed a portion of his earlier testimony if you couldn't hear something, but go ahead.
MR. WILLITS: Most likely.
THE WITNESS: What I said was I thought I had some information, and then I look with my daughter and we couldn't find anything, and I remember now that I put everything in the file that I give to Detective Recarey.
BY MR. WILLITS:
Q. Did anyone help you assemble those papers to give to the Detective?
A. No, sir.
MR. WILLITS: I don't have any other questions.

CROSS EXAMINATION

BY MR. CRITTON:
Q. Mr. Rodriguez, my name is Bob Critton and I represent Mr. Epstein as you're aware, I have a few questions for you.
What I would like to remind you at the start of this is if you know something, tell us, if you don't know something tell us that.

You're not required to speculate, you're not required to guess, you're not required to assume because some lawyers ask you a leading question or suggested in a report or like the police report like Mr. Mermelstein and Mr. Edwards did, that did you tell the police officers X, Y, or Z without showing you the statement. You're not required to guess, I want personal knowledge, not speculation. Do you understand?

A. Yes, I do.

Q. All right. Now, when Mr. Edwards and -- Mr. Horowitz is here today for Mr. Mermelstein, but you remember a lawyer asked you some questions last time you were here?

A. Yes.

Q. That is he started and he went on for a few hours. Do you recall that?

A. Yes, I remember.

Q. He asked you do you remember telling the police officer Y, X, or Z.

Do you remember that? Do you remember that's how he phrased his question?

A. Yes, yes.

Q. He never showed you a statement that you made to the police department; did he?

A. I'm sorry?

Q. He didn't show you a document that said, question, you know, what is your name; answer, my name is Alfredo Rodriguez --

MR. WILLITS: Object to the form of the question.

MR. CRITTON: You need to let me finish it first.

MR. WILLITS: I'm sorry, I thought you were.

BY MR. CRITTON:

Q. He never showed you a statement of what the question was and the answer that you gave. True?

MR. WILLITS: Object to the form of the question.

THE WITNESS: I don't exactly understand your question.

BY MR. CRITTON:

Q. Do you know what a deposition is?

A. Yes, I am.

Q. That's what you're doing here.

MR. CRITTON: Could I borrow your deposition for just a minute?

MR. HOROWITZ: The transcript? It's

marked up, no, you can't.

MR. CRITTON: I just want to show him. Thank you, Cathy.

BY MR. CRITTON:

Q. This is the first what Ms. Ezell was kind enough to provide is the first part of your deposition, it was transcribed by the court reporter and provided by all counsel.

Do you understand that?

A. Yes, I understand that.

Q. And no one has provided that to you yet today; have they?

A. No.

Q. Now, I think you told us that with the police officers you gave a taped statement.

Did I understand you correctly?

A. Yes.

Q. And the only conversation that you had with the police officers, and it may have been a state attorney, it was somebody named Ms. Weiss who I think was referenced in the questions, the only time that you talked with at least Officer Recarey and the State Attorney's Office from Palm Beach County was in a taped statement.

Is that correct?

A. No.

Q. Did you talk with them separate and apart from that?

A. Yes, I did.

Q. Okay. Did they tape that statement?

A. No.

Q. You told us you also spoke with representatives of the FBI?

A. Yes.

Q. Okay. And you distinguished between the FBI and between Officer Recarey?

A. Yes.

Q. So how many times did Officer Recarey, or Detective Recarey, I think he's from the Palm Beach Police Department speak with you?

A. Like three or four times.

Q. But he only took one statement?

A. One taped.

Q. I'm sorry, one taped statement?

A. Yes.

Q. All right. So as to whether or not if you said something to Officer Recarey or not that you would be able to confirm, that would only have been in a taped statement, one taped statement out of the three, approximately three times he spoke

with you.
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
BY MR. CRITTON:
Q. Is that correct?
A. Yes, correct.
MR. WILLITS: Object to the form.
MR. HOROWITZ: Join.
BY MR. CRITTON:
Q. And when we were here, I think it was last week or the last ten days anyway -- I could tell you. On July 29th of this year, and Mr. Mermelstein started with your deposition and then others asked questions, when Mr. Mermelstein and I think Mr. Edwards asked questions about did you tell Officer Recarey X, Y, or Z, they didn't show you a statement, they didn't give you like a transcript like this and say see what the question and see what the answer is?
A. No.
MR. EDWARDS: Form.
MR. WILLITS: Object to the form of the question.
BY MR. CRITTON:
Q. And you haven't had an opportunity to see

your taped statement since you gave it many years ago?
A. No, sir.
Q. Would you agree that your taped statement would probably be a little more accurate than your testimony today because of the time period that has transpired?
A. That's correct.
MR. HOROWITZ: Object to the form.
MR. WILLITS: Object to the form of the question.
BY MR. CRITTON:
Q. When you spoke with the FBI over at Greens -- I think it was Greens Pharmacy?
A. Yes.
Q. Did they take a statement from you, that is, did they have a tape recorder or did they just make notes?
A. They took notes.
Q. All right. Did you sign anything?
A. No, sir.
Q. That is like did they take notes of what you said and then you signed it to say yep, that accurately reflects what I said?
A. No, I didn't sign anything.

Q. When Officer Recarey took -- spoke with you on those approximately two times when he did not take a taped statement, did he ever present anything for you, anything in writing that he had written to say, Mr. Rodriguez, I would like you to review this to make certain that I took down correctly what you said?
A. No, sir.
Q. If he had offered to do that would you have read what he wrote down to determine whether or not he took down that which you had said or told him?
MR. EDWARDS: Object to the form.
THE WITNESS: Probably I will read it first.
BY MR. CRITTON:
Q. All right. And if in fact he had recorded something incorrectly or recorded in a particular way that he wanted it phrased and it was not accurate, would you have told him that?
MR. EDWARDS: Object to the form.
THE WITNESS: No, I never told him that.
BY MR. CRITTON:
Q. Listen to my question.
If he, Officer Recarey, had taken down

what you said and it was not accurate, that is, he put his interpretation of what you said, would you have told him that's not accurate, Officer Recarey?
MR. HOROWITZ: Form.
MR. EDWARDS: Object to the form.
THE WITNESS: I will tell him.
MR. CRITTON: Go ahead and change. We're going to change the tape. We do have time.
Cathy, could I borrow back the photographs, please?
While you're giving me those back, would it be correct that you're going to keep -- you took as you did with photograph number four you took back five, six, seven, and eight, and you're going to keep those and not allow me or anyone else to have a copy of them?
MS. EZELL: Yes.
MR. CRITTON: You're going to be equally restrictive; right?
MS. EZELL: Right.
MR. CRITTON: All right. Thank you.
BY MR. CRITTON:
Q. You were shown photograph five of a lady,

Page 347

F.E., and I think you told us that you had seen her, you recognized her photograph.
A. Yes, I did.
Q. On how many occasions did you ever see her at the Epstein home?
A. More than three times.
Q. More than three?
A. Yes, sir.
Q. That's as accurate as you can be?
A. Yes.
Q. More than three?
A. More than three.
Q. Whether it was four or five you don't know, but more than three?
A. More than three, sir.
Q. In terms of F.E.'s age, did you ever ask her what her age was?
A. No, sir.
Q. Did she appear to you to be someone at least from seeing her and recalling her that she appeared at least to you to be while a young woman appeared to be someone who was 18 or older?
A. No, sir.
Q. Okay. Well, did you ever say anything to the police or did you ever -- were you ever

Page 348

concerned about that such that you told someone?
A. No, sir.
Q. Haven't you told the police, sir -- let me strike that, let me ask it this way.
In your taped statement that you gave to the police did you not tell them that all of the girls appeared to you to be 18 or above?
A. Sir, as far as when all these actions that were taking place I was under an environment that I thought I was going to be -- in other words, I was afraid of any reprisal Mr. Epstein and Mrs. Maxwell if I say something that is any idea of me because I have this confidentiality agreement. What I saw that they were very young, but I cannot say that they were 18 and old.
Q. Right. Let me just take you back to my question again and see if you can answer my question.
MR. CRITTON: Could you please read it back?
(Thereupon, a portion of the record was read by the reporter.)
THE WITNESS: I think I told the police that.
BY MR. CRITTON:

Page 349

Q. I'm sorry?
A. Yes, I did, I told the police.
Q. And at the time that you spoke with the police and gave them a statement, isn't it true, Mr. Rodriguez, that you were no longer employed by Mr. Epstein?
A. Yes.
Q. And you understood that you were required to tell the police officers the truth at that time?
A. Yes.
Q. And if I understood your testimony I believe from July 29th through today, you at no time asked any of these girls how old they were. True?
A. No.
Q. And as to whether the girls were under 18 or 18 or over 18, you really didn't know one way or the other at the time. Would that be a fair statement?
A. Yes.
MR. WILLITS: Object to the form of the question.
BY MR. CRITTON:
Q. On Exhibit 6 there is a person who's

Page 350

covered, the lady that Ms. Ezell asked you about I believe was on the right-hand side of the photograph. There is a young lady on the left-hand side with a black hat on.
Do you recognize her at all?
A. No, I don't recognize her.
Q. Okay. Thank you. With regard to the photograph four that you saw that you think possibly might be [redacted] I think you told us that you recall seeing that woman in the sauna at Mr. Epstein's house on one occasion and she was naked.
A. Yes.
Q. Was that near the end of your employment or the middle or the front end?
A. I saw her on January 2005, sir, and I was terminated in March, so that was two months prior.
Q. And did you ever tell anyone that you had seen her naked in the sauna?
A. I told Louella.
Q. Okay. And what did Louella say?
A. She was surprised.
Q. Okay. Did you wake the young lady up in the sauna?
A. No.
Q. And do you know how old the young lady

was at that time?
A. No, I didn't know.
Q. If I was to tell you she was born in December of '86 which would have made her 18 at the time, and you would say, not surprised?
MS. EZELL: Objection, form.
MR. WILLITS: Object to the form of the question.
MR. HOROWITZ: Join.
THE WITNESS: I would say I wouldn't know.
BY MR. CRITTON:
Q. Other than telling Louella did you say anything to anyone else when you saw ████, the lady you believe was ████ naked in the sauna?
A. I believe I mentioned that to my wife.
Q. All right. Anyone else?
A. No.
Q. And did ████ continue -- assuming it was ████, did she continue to sleep in the sauna, that is, she didn't know you were there?
A. She never knew that I was there.
Q. She didn't at least acknowledge that she knew. Correct?
A. Yes, correct.

Q. You were asked by Ms. Ezell -- I'm just going to cover a couple of things as long as I'm staying with Cathy here -- whether Louella, you had told us something about the picture of the Pope near a picture of a naked person, naked woman. That's what Louella told you, you never saw those photos. Correct?
A. I did saw the pictures.
Q. You did see the pictures?
A. Yes.
Q. And the photos that you saw of the naked woman that was near the Pope's photograph, was that someone that you knew or just a picture of a naked woman?
A. It was somebody -- somebody that was a visitor in the house, but I don't know her name.
Q. And the visitors, that would have been one of the plane women, you described the women who came in on planes, or that they came with Mr. Epstein from time to time?
A. They came with Mr. Epstein from time to time.
Q. All right. And those are women that I think you testified at your last deposition all appeared to be in their 20's or older. Is that

correct?
A. I think so, sir.
Q. All right. I assume that in over the course of your life separate and apart from your wife you've seen a naked woman before.
A. Yes.
Q. And I assume that in your 50 some odd years -- how old are you, sir?
A. 55.
Q. In your 55 years you've seen pictures of naked women both photographs, paintings, statutes. Would that be a fair statement?
A. Yes.
Q. And in terms of at least in this particular case there is all sorts of -- as you know there is testimony, and you've been asked a number of questions about sex related issues, that is whether you saw in photographs or whether you saw anyone engaged in any type of sexual activity. Correct?
A. Correct.
Q. And I assume that you understand that men and women -- we'll start there first, that men and women actually do have sex in this world?
A. Yes.

Q. That comes as no grand surprise to you?
A. No.
Q. And you understand that people actually enjoy sex from time to time?
A. Yes.
Q. Are you familiar with that concept at least?
A. Yes.
Q. All right. And what may be typical sexual activity for one man and woman, or whatever the permutation might be, another couple, or another man and woman, or another man or woman may consider to be unusual or overly aggressive.
MS. EZELL: Objection to form.
BY MR. CRITTON:
Q. True?
A. It depends on your point of view.
Q. That's what I mean. Everyone has a different point of view about sex and what may be considered typical sexual activity for someone, someone else may consider that's a bit adventurous?
MR. EDWARDS: Object to the form.
THE WITNESS: Yes.
BY MR. CRITTON:

Page 355

Q. I'm not trying to make you a sex expert.
Also, I assume that when you've been in CVS or Walgreens, for that matter Publix or Winn Dixie I assume that you've -- I don't want to assume anything.
Have you ever been in an aisle where you've actually seen condoms being sold?
A. Yes.
Q. And where lubricants are being sold?
A. Yes.
Q. And as well as massage oils and other types of oils actually are sold in those kinds of stores?
A. Yes.
Q. And they're available so that someone walking through Walgreens or Publix or CVS could actually take it off the shelf, put it in their cart, go up and pay for it and take it home?
A. Yes.
Q. All right. In the photographs that you talked about, and if I understood you correctly, at least during the time that you were there, Mr. Rodriguez, in '04 and '05 there were -- you said that there were -- I think you said downstairs -- and I'm talking about really from the kitchen area

Page 356

up the back stairway, or what would be the kitchen stairway to the upper floor, there was I think you said, but correct me if I'm wrong, please, that you don't recall seeing there being any pictures or photographs of any nude women. Is that correct?
A. They were not nude women in the staircase.
Q. That's all I'm talking about right now. In that area you never saw any pictures, or photographs, paintings, any type of depiction of a nude woman on that staircase going upstairs. Correct?
A. Correct.
Q. All right. And I think you said downstairs you saw a picture of -- the only picture that you saw of I'd say of a younger child that displayed some form of -- I don't want to say nudity because it's probably not that, but of some portion of their body that was exposed, and I think you described it as her cheek.
A. Yes, that's upstairs.
Q. That's upstairs?
A. Upstairs.
Q. And that was -- was it Eva; is that how

Page 357

you say her name?
A. Yes, her mother.
Q. Okay. It's Eva's daughter, there was a picture where someone it looked like was pulling on their swimsuit?
A. Yes.
Q. Do you recall ever seeing the old Coppertone --
A. Yes.
Q. Let me ask the question. I know you know what this is.
Have you ever seen the old Coppertone commercials and billboards that used to be plastered all over certainly Florida and other places where there is a cute little girl who appears to be two, three, four years old and someone is pulling down at least a portion of her swimsuit so she's exposing a small portion of her cheek is exposed?
A. Yes.
Q. Okay. Is that what the picture of the young girl looked like that is Mr. Epstein's God daughter?
A. More or less, yes.
Q. All right. And downstairs in the kitchen

Page 358

were there any pictures of women in any stage of undress?
A. No.
Q. And then I think you said as you walk upstairs, or as you walked up the stairway from the kitchen at the top of the landing, I think you described -- did you describe it as the foyer?
A. Yes.
Q. Okay. But it's really the landing, the upstairs landing?
A. Yes.
Q. I think you said there were -- there was -- were or was a three by five picture or pictures?
A. Yes.
Q. Of women in some stage of undress?
A. Yes.
Q. Okay. And when you say three by five, I assume you meant three feet?
A. Three feet.
Q. By five feet?
A. Yes.
Q. Were they photographs?
A. Yes, they were photographs.
Q. And I think you also told us that you

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

didn't recognize who those people were. Is that correct?
MR. EDWARDS: Object to the form.
THE WITNESS: I knew this particular girl because it was the daughter of Mrs. Eva.
BY MR. CRITTON:
Q. Okay. And is that the picture you're talking about?
A. This is the picture I'm talking about.
Q. Okay. And that was a three by five?
A. Yes.
Q. All right. And the only thing that you could see was a portion, that is of her other than say her waist or her shoulders or her arms or something, that's one where you could see kind of like the Coppertone commercial, a picture of her cheek?
A. Yes. Part of her buttocks.
MR. LANGINO: Object to the form.
BY MR. CRITTON:
Q. Okay. And was there another picture at the top of the foyer, large one, or is that the only one that you can recall?
A. There were two of the same girl in different poses.

Q. But showed the same thing?
A. Yes.
Q. Okay. As you walked through into -- then if I understood it correctly, you go to the pretty much to the end of the hallway, then you go through another small vestibule, double doors, two sets of double doors, and as you go straight ahead then you make a left around the bed and then you end up in the bathroom.
A. Yes.
Q. In the bathroom -- in the bathroom or in that location were there any pictures of any women in any stage of undress?
A. Yes.
Q. All right. And were any of those pictures, did they involve -- or were they of any of the girls that have been described as women who came over to give Mr. -- purportedly to give Mr. Epstein a massage?
A. Yes.
Q. And do you remember who any of the names of any of those people were?
A. No.
Q. And the pictures you saw, where were they located?

A. Inside his closet, the walk-in closet.
Q. And those pictures, I think you called it a mosaic?
A. Yes.
Q. And of the mosaic, approximately how many pictures were in the mosaic?
A. 16 or 20.
Q. Okay. And of those pictures how many did you recognize?
A. About three or four.
Q. All right. Were they -- as to who those people were, you don't know, you just recognized three or four of them?
A. Mr. Epstein when he was younger, and then different girlfriends, but I didn't recognize except the ones --
Q. Okay. You said three or four of those were pictures of the girls who came over to give a massage?
A. Yes.
Q. Okay. But as to who those girls were you don't know as you sit here today?
A. No, sir.
Q. And as to what their ages were you don't know?

A. No, sir.
Q. That's correct?
A. That's correct.
Q. And as to what they depicted in the photographs of the girls were they in different stages of undress?
A. Yes.
Q. Was everyone undressed to some degree, that is, they were described as nude, or at least the questions asked were these people nude? Were they actually nude or someone may have had their top off?
A. There were two girls completely naked in a shower in a sexual act.
Q. Is that the one when Ms. Ezell asked you questions, that's one of the photographs that you were talking about?
A. No, sir.
Q. That was a different --
A. Different one.
Q. Okay. And the mosaic that you saw where you saw two girls involved in a sexual act, do you know where that photograph was taken?
A. I think it was taken in one of the rooms in the house because there is an oval bathtub, but

I don't know which room, sir.
Q. Okay. Did you recognize both the girls or just one of the girls?
A. The two girls.
Q. Then there were -- there was one or two other photographs of girls that you recognized?
A. Yes.
Q. Okay. And were they fully unclothed or did they have some degree of clothes on and/or off?
A. They were naked.
Q. All right. And all of the remaining pictures at least within that mosaic were of individuals that you did not know?
A. No, sir.
Q. And that you did not recognize as having been at the house. Is that correct?
A. Yes, that's correct.
Q. You were also asked about some -- let me switch for just a minute.
You were asked about a vibrator that you saw, and I think you described it as a back massager that was approximately 18 inches long that had a couple of rotating heads on it.
A. Yes.

Q. And I think you ultimately came up with the idea as it was something you had seen at like a Sharper Image store.
A. Yes, sir.
Q. Have you ever seen one of those types of devices, that is a back massager with the rotating heads also sold -- well, let me ask you this. Strike that last question.
Have you ever been to Brookstone?
A. Yes.
Q. Okay. Have you ever seen a massager like that at Brookstone?
A. Yes.
Q. Okay. You were asked whether Ms. Maxwell kept the names of any of the girls who came to give massages on -- let me ask it this way.
I think you were asked whether Ms. Maxwell ever kept the names of any of the girls who came to give massages and I think your response was yes.
A. Yes.
Q. Okay. Did she keep them on a pad of paper, did she keep them in a notebook, did she keep them in a computer?
A. We used to have internal books for

pilots, masseuses, chefs, so she have a copy of the black book with herself and as well as the computer.
Q. Did you ever go on Ms. Maxwell's computer to see what she had in it?
A. Yes.
Q. And was that something you were allowed to do?
A. No.
Q. Okay. You actually went in her office?
A. Yes.
Q. And was her computer on so that you didn't need to access the password?
A. It was off.
Q. Okay. So you just turned it on?
A. Yes, sir.
Q. And then you were able to access her computer?
A. Exactly.
Q. And what possessed you to go in and to access her personal computer?
A. I needed to send some documents to the New York office and it was the only computer working in the house.
Q. Okay. And how many occasions did you use

her computer?
A. Several times.
Q. Was she ever aware that you used her computer?
MR. LANGINO: Form.
THE WITNESS: I don't think so.
BY MR. CRITTON:
Q. Did you ever ask Ms. Maxwell for permission to use her computer?
A. I was the house manager, I believe I was supposed to use everything in the house to accomplish my duties, in that case sending financial reports or e-mails.
Q. So would you have been -- did you ever use Mr. Epstein's computer?
A. No.
Q. Okay. But you used Ms. Maxwell's computer?
A. Yes.
Q. Did you ever use Ms. Kellen's computer?
A. Yes.
Q. In looking at Ms. Maxwell still, you went into Ms. Maxwell's computer with at least the idea of sending some documents?
A. Yes.

Q. Up to New York?
A. Yes.
Q. Were you going to pdf them?
A. Yes.
Q. And did she have a fax machine -- not a fax machine, a copy machine in her office as well?
A. Yes.
Q. Okay. So how would you generally do that? Would you do that through a Microsoft program?
A. Through Citrix.
Q. Through Citrix. All right. With Citrix, and that is, if you said you saw some names of individuals on her computer if you were just going to pdf some documents up to New York why would you of -- what would of caused you to have seen any names on her computer?
MS. EZELL: Objection to form.
THE WITNESS: All the calls that came to 358 El Brillo, they came through the telephone, they have a transcript somehow that they connect to the computer, so you can pull it and you register the time, who called, who didn't call, and you can pull this at your request. So I used to use that

to go back to some calls that they were requesting, especially when the hurricane season happened.
BY MR. CRITTON:
Q. Okay. So if I understand, even the computer you used would have had that same feature?
A. No, no, it was totally different. Mine was slower and all the time was breaking down that's why we have the guy from Ohio came and fixed the computers.
Q. Okay. Were there other computers that you used that had that feature, that is that --
A. Only Sarah, Mrs. Maxwell, and the staff house.
Q. Staff house being yours?
A. The guest house, yes, my office.
Q. So you could go out to your guest house then and look for the same information?
A. No.
Q. All right. I don't understand but why don't we take a break because we're almost out of tape.
(Thereupon, a recess was had.)
THE VIDEOGRAPHER: We're back on the

record with tape number three.
BY MR. CRITTON:
Q. Mr. Rodriguez, I was asking you about Ms. Maxwell's computer and you told me how you went on the computer.
If she was out of town would she take her computer with her?
A. No.
Q. It was something she left there?
A. Yes.
Q. All right. And when you went on to pdf, I think you said it was really one time that you saw the names of some of these girls?
A. Yes.
Q. And if I understand it correctly, it was -- did it have the name and then a phone number?
A. Yes.
Q. And was that something that was automatically downloaded from the system?
A. Yeah, from the phone system to the computer so we have a transcript.
Q. When you say a transcript, the fact that Sally Jones, phone number 561, whatever it was, called.
A. It was a transcript of the phone calls of

the house, we can get it from the computer.
Q. Okay. And I'm distinguishing, transcript, it would tell you the name and phone number, it wouldn't tell you what was said?
A. It was the message also.
Q. Okay. Now I understand. And so Ms. Maxwell when you said she had the names of some of these girls who may have given massages, or at least were what you called earlier girls that gave massages, or females that gave massages, she would have had it because that was information that was downloaded from the Citrix system into her computer?
A. Yes.
MS. EZELL: Objection, form.
BY MR. CRITTON:
Q. Okay, I understand. Now, you said she also had some pictures. Is that that one time you also saw pictures?
A. Yes.
Q. And were you going through her computer at that time?
A. No.
Q. The question is, if all you were going to do was try to pdf some financial information to

New York what were you doing getting to names and phone numbers and then pictures of girls?
A. I was trying to get some information. I was working the computer and I just happen -- they have the icon of the file and I open and it was right there, so I was not looking but, you know, it was already accessible to me.
Q. And how many photographs did you then scroll through to look at?
A. Probably 30.
Q. Okay. And why?
A. Just curiosity, sir.
Q. So again, you never told anyone other than your wife?
A. No.
Q. Correct?
A. Yes, correct.
Q. Of the pictures that you saw, if I understood it correctly, some of those were pictures of -- well, I think you said some of them reflected parties or banquets?
A. Yes.
Q. I think you described some of the pictures gatherings that appeared to be either in Russia or Eastern Europe?

A. Yes.
Q. All right. And then you talked about a picture of two girls in the shower that you didn't know the girls. Correct?
A. Yes.
Q. That's correct?
A. That's correct.
Q. All right. And that in all of the photographs that you saw the individuals seemed to be having a good time?
A. Yes.
Q. All right. Would it be a correct statement that in none of the photographs did anyone seem to be distressed or disturbed or show any type of negative emotion, at least from what you observed?
A. That's correct.
MS. EZELL: Objection, form.
BY MR. CRITTON:
Q. And in terms of the photographs that you did see, were any of the photographs that you saw, did they appear -- did they appear to have been of women that you had seen fly in with Mr. Epstein on his plane?
A. Yes.

Q. Okay. Were any of the photographs that were in -- again, I'm talking about Ms. Maxwell's computer now, were those photographs of individuals who were any of the girls or ladies that came over to give massages?
A. No. They stay at the house.
Q. Okay. So the photographs that you saw on Ms. Maxwell's computer of females in any state of undress or at parties or at banquets, those were all of individuals who would fly in with Mr. Epstein at various periods of time that had traveled with him?
A. That's correct.
Q. Okay. Those are the girls that you told us I think at your last deposition and reaffirmed here today, those girls all appeared to be in their 20's?
A. Yes, sir.
Q. All right. Now, you were also asked some questions, a lot of questions about surveillance. And if I understood your testimony, and this is where it goes back to what do you know, what don't you know, what were you speculating on, what did you know at the time, what do you know now, at least I need you to distinguish that for me so

that I know what you knew at the time, and as distinct from what you may have read in the newspaper or been told by some lawyer or someone else that may not be accurate. Okay?
A. Yes, sir.
Q. With regard to the -- with regard to surveillance equipment, if I understood your testimony today is you were completely unaware of the existence of any surveillance equipment in the house during the 2004/2005 time period that you worked there. Is that correct?
A. Yes.
Q. And therefore, where it was, what may have existed, whether it in fact actually did exist, whether anyone maintained it, you have no personal knowledge whatsoever. Is that true?
A. That's true.
MR. WILLITS: Object to the form.
BY MR. CRITTON:
Q. You talked about pictures of two women who you saw in the house who were nude, one was Nadia?
A. Yes.
Q. And you knew Nadia was someone who was in her 20's?

Page 375

A. Yes.
Q. All right. And then you saw another picture of a Brazilian woman who had traveled or flown on the plane before?
A. Yes.
Q. All right. And she also appeared to be a woman to you not only in the photograph but from your having seen her who appeared to be in her 20's?
A. Yes.
Q. Excuse me. Thank you. You talked about Sarah Kellen's computer. Was she hooked into your main system?
A. Not to my office in the staff house but she was hooked into the main house.
Q. Okay. The same Citrix system?
A. Yes.
Q. And you said that Sarah had pictures of women on her computer that you saw. Is that correct?
A. Yes.
Q. Okay. And were those the same types of pictures that Ms. Maxwell had, that is, females, pictures of females who had traveled in with Mr. Epstein from his plane?

Page 376

A. This were different pictures.
Q. Okay. Were any of hers of any of the girls who came in on the plane, or the ladies or women?
A. No.
Q. What were her pictures of?
A. They were young women modeling, you know. I don't remember seeing nudity on Sarah's computer.
Q. All right. Hers, when I say hers, the photographs that Sarah Kellen had on her computer were all of individuals who appeared -- or not appeared, but were dressed and appeared to be modeling?
A. Yes.
Q. Would it be a correct statement that none of the women that you saw, that is the pictures of the women that you saw on Sarah's computer were any of the girls, women, whoever came to give massages? Is that correct?
MR. EDWARDS: Object to the form.
MS. EZELL: Form.
THE WITNESS: That's correct.
BY MR. CRITTON:
Q. You said that Sarah you thought also had

Page 377

names and addresses of -- let me start over. Strike that.
If I understood your testimony, you said that Sarah had pictures -- start again.
You said that Sarah had the names and phone numbers of some of the massage girls.
A. Yes.
Q. Or at least of the people that you thought may have been called to give massages.
A. Yes.
MS. EZELL: Form.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. And was that in the same format that you saw on Ms. Maxwell's computer?
A. No.
Q. Okay. What occasion would you have been -- have had to use Sarah Kellen's computer?
A. She will instruct me to get some information from her desk or telephone numbers, so I will.
Q. And that's where you would have seen it?
A. Yes.
Q. I think you testified at your last deposition, or the start of your deposition that

Page 378

the number of women that you remember came over to give massages was something eight to ten, twelve, I don't remember, what's your best recollection?
A. Can you repeat that, please?
Q. Of the women, of different women that you knew came over to give massages during the time that you worked for Mr. Epstein, '04 to '05, during that time period, approximately how many women were there?
MR. EDWARDS: Object to the form.
THE WITNESS: To give massages?
BY MR. CRITTON:
Q. Yes, sir.
A. Fifteen, yeah.
Q. So something between one and fifteen of the names you would have seen on Ms. Kellen's computer along with a phone number?
MR. EDWARDS: Form.
THE WITNESS: Yes.
BY MR. CRITTON:
Q. Do you remember how many you would have seen?
A. Fifteen.
Q. Okay. You also told us earlier today that you saw Sarah Kellen from time to time taking

Page 379

pictures in the dining room and the library.
A. Yes.
Q. Photographs.
A. Yes.
Q. Okay. Was she taking -- the pictures she took were people who were clothed?
A. Yes.
Q. And were any of the pictures that she took of any of the girls that you ever -- let me strike that.
If I understood your original testimony -- I don't want to say original. If I understood your testimony from July 29th to what you told us today as to the women who did come to give massages they'd knock or somehow you would be aware that they were at the back door, you would punch the security code and lead them into the kitchen.
A. Yes.
Q. Okay. When you brought them into the kitchen you would say, hi, they would say hi back to you, or something to that, short greeting, you'd offer them water, there was never any alcohol in the whole house other than I think you said for one person at one time. Is that a fair

Page 380

statement?
A. Yes.
Q. All right. You left the kitchen, you understood Sarah Kellen came down, and what happened thereafter you don't have any personal knowledge whatsoever?
A. That's correct.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. At some point in time Ms. Kellen might contact you and say pay such and such X amount of dollars, she is now getting ready to leave.
A. Yes.
Q. That maybe one. Another set of circumstances might be you use the word commotion, you might hear a commotion, I assume you don't mean -- well, let me ask you, when you say commotion, do you mean a disturbance, something that was seriously like raised voices or merely you just heard some people talking?
A. Conversation of people leaving.
Q. Okay. Not a commotion in the form of a disturbance but a commotion in the sense that you heard people talking?
A. Yes.

Page 381

Q. Regular conversation?
A. Yes.
Q. And, therefore, you might interject yourself back in because you've been asked to pay someone or to let them out?
MR. LANGINO: Form.
THE WITNESS: Yes, I was called to pay them.
BY MR. CRITTON:
Q. All right. And when you hear that conversation that would be another way that you would know that the women were leaving?
A. Yes.
Q. And sometimes they'd leave without you even being involved, if I understood it correctly?
A. That's correct.
Q. So, the only places that you ever saw the women who came to give massages would be -- of the some fifteen women during the time you were there would be either when you let them into the house and escorted them into the kitchen or as they were leaving?
A. Yes.
Q. And I think you described one instance earlier today is that you may have had ███ in the

Page 382

car, in the Suburban?
A. Yes.
Q. And that's the only person that you can remember having driven any place, that is, of the women who were described as having given massages?
MR. EDWARDS: Objection.
MS. EZELL: Objection, form.
THE WITNESS: Sir, I have to clarify that. I drove a lot of girls, but I don't remember the names associated with the faces. But this particular girl A., or others, C., whatever, I remember driving in the Suburban, but I cannot say this was --
BY MR. CRITTON:
Q. Let me clarify because what I want to be clear is, is I do remember you testifying that when some of the 20 plus year old models or females would fly in with Mr. Epstein they might want to go shopping, they might want to go to the store, they may want to go to the drug store, they may want to go to the beach, wherever they wanted to go and you would drive them.
A. Yes.
Q. All right. And then I remember in response to Ms. Ezell's questions today she asked

Page 383

you about having driven [redacted] and you recalled having had her in the Suburban specifically.
A. Yes.
Q. Do you remember any of the other girls, women who came to give massages ever having driven them, or is [redacted] the only one that you remember?
MR. EDWARDS: Form.
THE WITNESS: I only remember [redacted] right now for the fact that I was driving by the airport and I showed her Mr. Epstein's plane.
BY MR. CRITTON:
Q. All right. Which really takes me back to really where I started with this series of questions.
You saw the girls, the women who came in to give the massages, when they came in if you were advised or if you heard conversation and you saw them you would see them when they left?
A. Yes.
Q. And you saw [redacted] because she was in the Suburban on at least one occasion?
A. Yes.
Q. And, therefore, you never saw these girls, these women who gave the massages in the

Page 384

dining room or the library. Would that be a fair statement?
A. That's correct.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. All right. So, therefore, the pictures that you saw Sarah Kellen taking of girls, women, either in the dining room or library, those were other individuals other than those who may have given or who came for massages. Is that correct?
MS. EZELL: Form.
MR. EDWARDS: Form.
THE WITNESS: It's confusing, sir, because there were a bunch of girls. I don't know which one they were but I saw her taking pictures of the groups.
~~BY MR. CRITTON:~~
Q. As to whether they were people who came in on the planes or there may have been a massage girl or more than one woman who gave a massage, you just don't know as you sit here, you'd just be speculating. Is that correct?
MR. EDWARDS: Form.
THE WITNESS: I don't know.
BY MR. CRITTON:

Page 385

Q. All right. Ms. Ezell asked you about Mr. Dershowitz being present in Mr. Epstein's home, and I think she asked -- and I think that you said Mr. Epstein was a -- and he and Mr. Dershowitz were friends?
A. Yes.
Q. She also I think asked was Mr. Dershowitz ever there when one of the women who gave a massage was present in the home?
A. I don't remember that.
Q. That's what I want to clear up. Is it your testimony that Mr. Dershowitz was there when any of the women came to Mr. Epstein's home to give a massage?
A. Yes.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. As to whether any of those women were ever associated with Mr. Dershowitz would it be a correct statement that you have absolutely no knowledge?
A. I don't know, sir.
Q. You don't know?
A. I don't know, sir.
MS. EZELL: Form.

Page 386

BY MR. CRITTON:
Q. Okay. Were you in any way attempting in your response to Ms. Ezell to imply that Mr. Dershowitz had a massage by one of these young ladies?
A. I don't know, sir.
Q. You have no knowledge?
A. No, sir.
Q. And you certainly weren't implying that that occurred, you just have no knowledge. Correct?
MR. EDWARDS: Form.
THE WITNESS: I don't know.
BY MR. CRITTON:
Q. Sorry?
A. I don't know.
~~Q. I think in response to one of Ms. Ezell's~~ questions you responded that -- let me ask it this way.
You never saw Mr. Epstein ever take photographs of anyone. Would that be a correct statement?
A. Yes.
Q. Would it be a correct statement you never saw Mr. Epstein initiate a phone call to anyone?

Page 387

A. To place a phone call?
Q. Yeah. Did you ever see him place a phone call?
A. Yes.
Q. If in fact, maybe it was this way, is that you never saw him call someone to schedule a massage appointment. Correct?
A. That's correct.
Q. I think you said that Ms. Kellen told you that Mr. Epstein would take photographs. Did I understand you correctly?
A. I'm sorry, can you repeat that?
Q. Did Ms. Kellen ever tell you that Mr. Epstein took a photograph of anyone?
A. No, she said to me Mr. Epstein is like he's an amateur photographer.
Q. Okay. I may have misunderstood you then. Let me clarify that testimony.
It's your testimony that Ms. Kellen told you that Mr. Epstein is an amateur photographer?
A. Yes.
Q. She never told you that -- or let me strike that.
Is it correct that she never told you that Mr. Epstein took photographs of any of the

Page 388

girls, women, who came over to give him a massage?
A. That's correct.
Q. All right. Mr. Rodriguez, other than Mr. Epstein I think you told us you had worked for a lady named Ms. Hammond?
A. Yes.
Q. And you had worked for a gentleman --
A. Sidney Bowman.
Q. Is he the gentleman from Fisher Island?
A. No, Arturo Torres.
Q. All right. In addition to Ms. Hammond up in Palm Beach you worked for other individuals as well?
A. I did it part-time but I don't have her name right now, sir.
Q. During your career as a -- let me strike ~~that.~~
Had you worked other than those places, Mr. Arturo --
A. Arturo Torres, yes.
Q. Arturo Torres, Ms. Hammond, the other individual you can't remember, and Mr. Epstein, have you worked for other individuals as an estate manager or general house manager?
A. No, sir.

Page 389

Q. Of the time that you've done that approximately how many years does that include in your working life?
A. Eight years, ten years.
Q. All right. And have you worked for -- have you been in other circumstances where you have worked around -- well, let me step back.
With all of the individuals that you mentioned, estate manager, house manager, has this been for individuals who have or at least appear to have substantial wealth?
A. Yes.
Q. And as part of your duties, or not duties but as part of being a house manager or general manager for an estate do you interact with other estate managers?
A. Yes.
Q. And do you assist each other from time to time if someone needs help?
A. That's correct.
Q. And I assume that you've been in other estates in Palm Beach and probably in Fort Lauderdale and other locations?
A. Yes.
Q. As part of during your working career did

Page 390

you ever work in restaurant or a personal services type business where you would provide like catering or something like that to other wealthy individuals?
A. I did.
Q. Give us a little of your background if you could then, Mr. Rodriguez.
A. I work in Long Island, Montauk Lake Club and Marina, a very exclusive country club where Mr. Nixon used to spend his summers, Richard Nixon. I worked for Leona Helmsley in New York. Very demanding lady. And then Mr. Torres in Texas in his ranch and as well as Fisher Island. And I was a general manager of one of his restaurants in San Antonio, Texas. This is the most high profile people that I worked for.
~~Q. Okay. When you worked for Ms. Helmsley,~~ Leona Helmsley, she used to have the Helmsley Palace and she with her husband, Harry Helmsley, I think they owned a number of real estate in addition to hotel properties.
A. That's correct.
Q. When you would -- I think you described her as a demanding person?
A. Yes.

Page 391

Q. All right. In terms of these wealthy people that you've worked for, these individuals, do they all have, that is at least in terms of Mr. Epstein, the way that his household was managed, was it similar to other set of circumstances that you've been involved with?

MR. HOROWITZ: Object to form.

THE WITNESS: They have a common ground, yes.

BY MR. CRITTON:

Q. All right. And in terms of you talked about Mr. Epstein that there was some sort of a manual or a procedure book with regard to his house.

A. House manual, yes.

Q. A house manual. Did other houses have house manuals as well? Is that reasonably -- I mean not common but it's something that you've seen before?

MR. EDWARDS: Form.

THE WITNESS: I know a lot of houses do but that was the only estate that we have a house manual.

BY MR. CRITTON:

Q. And other individuals like where you've

Page 392

worked similar to Mr. Epstein -- now, Mr. Epstein was single?

A. Yes.

Q. All right. And him having a lot of -- or bringing a lot of attractive women and other people to his house, I assume that didn't offend you in any way?

MR. EDWARDS: Object to the form.

THE WITNESS: No, sir.

BY MR. CRITTON:

Q. At least based upon your experience in dealing with other individuals either of some notoriety like Ms. Helmsley or when you said the club that you worked up is in Montauk --

A. Montauk Lake Club and Marina.

Q. Right. You ran into separate and apart ~~from Richard Nixon were there a lot of people,~~ corporate people, business people?

A. Yes.

Q. People of substantial resources and wealth?

A. Yes.

Q. Have you found at least in your experience that most of those people are pretty discreet about -- when I say discreet, private

Page 393

about what they do?

MR. HOROWITZ: Object to the form.

THE WITNESS: Yes.

BY MR. CRITTON:

Q. And have you worked at other locations, that is, in the other houses that you've worked where they have massage tables?

A. Yes.

Q. And in those other locations where they had a massage table, were they similar to the massage table that was in Mr. Epstein's home?

A. Yes, sir.

Q. All right. Almost same make and model?

A. Same type, yes.

Q. And did other individuals in houses that you worked at and other places where you helped out other estate managers, would those individuals have massages from time to time?

A. Yes.

Q. So having a massage or a massage table in someone's house that you might -- that lives in Palm Beach or Montauk or New York or something, would you consider that unusual?

MR. HOROWITZ: Form.

THE WITNESS: No.

Page 394

BY MR. CRITTON:

Q. I think you told me at least in Mr. Epstein's home other than for one guest he didn't have any type of alcohol in the house. Is that correct?

A. That's correct.

Q. Was that basically you understood that that was one of the policies and procedure, no alcohol in the house?

A. Yes.

Q. And did you ever see any type of illegal or inappropriate drugs?

A. No, sir.

Q. And was that another policy or procedure, absolutely no drugs of any kind?

A. No smoking in the house.

~~Q. All right. So no drugs, no smoking, no~~ alcohol?

A. Yes.

Q. Was that pretty typical for other Palm Beach places that you were familiar with?

A. No.

Q. All right. And other places you'd always find alcohol?

A. Yes.

Q. All right. And you might find drugs?
A. Yes.
Q. And some pretty wild parties?
A. Yes.
Q. Now, with regard to the women who came to give massages, of those women, of those approximately fifteen that you described, how many of them came more than one -- more than one occasion?
MR. HOROWITZ: Form.
THE WITNESS: I'd say more than half.
BY MR. CRITTON:
Q. So maybe seven, eight, nine, ten?
A. Yes.
Q. Of those people that came on -- of those seven to ten that came on more than one occasion, did those individuals come on many occasions?
A. Yes.
Q. And as to the women who were -- who you understood were coming to give the massages --
MR. EDWARDS: Form.
MR. CRITTON: I'm not done yet.
THE VIDEOGRAPHER: I need to go off the record for a second.
(Thereupon, an interruption was had.)

THE VIDEOGRAPHER: We're back on the record.
BY MR. CRITTON:
Q. Mr. Rodriguez, I want to turn to the -- stay with the women who came to give or at least were called to give the massages.
You were shown a number of message pads, I think Mr. Mermelstein who represents a number of -- or at least certainly Jane Doe 2 and some others, you were identified or shown a bunch of message pads that had I think in most instances your initials, A.R. Do you recall that?
A. Yes, I do.
Q. I think one of the individuals that you identified that called often was C.W.?
A. Yes.
~~Q. Which is one of Mr. Edwards' clients.~~
This lady called on a regular basis, or at least from looking at your pad she would call on a pretty regular basis. Is that true?
A. Yes.
Q. And she and others who are reflected on those message pads, they were calling to come to give massages. Correct?
A. Yes.

MR. EDWARDS: Object to the form.
BY MR. CRITTON:
Q. And I don't know whether he asked, do you remember a person named T.M.?
A. Yes.
Q. And would she call from time to time asking if she could come to give a massage just like C.W.?
MR. EDWARDS: Object to the form.
THE WITNESS: Yes.
BY MR. CRITTON:
Q. So at least those two individuals, they were overtly, that is, they were asking whether they could come to give Mr. Epstein a massage. Correct?
A. They will call and they will say I need to talk to Sarah, and Sarah fifteen minutes later will tell, Alfredo, we're going to have a massage with so and so.
Q. So either C.W. or T.M. would call to ask if they could come and then a massage would be set then they would show up?
A. That's correct, sir.
Q. Okay. And from time to time they would bring other people as well?

A. That's correct.
Q. Both C.W. and T.M.?
A. Yes.
Q. Of the females that -- the women that came to the house, did you ever see anyone force any of these women onto the property?
A. No, sir.
Q. Did you ever see anyone force them into the house?
A. No.
Q. Did you ever see anyone force them into the kitchen?
A. No, sir.
Q. Did you ever use any force, any type of intimidation or coercion to bring them into the house and get them into the kitchen?
~~A. No, sir.~~
Q. Did you ever observe Ms. Kellen using any force or intimidation or coercion --
A. No, I did not.
Q. -- with any of these individuals?
A. I did not.
MR. EDWARDS: Object to the form.
BY MR. EDWARDS:
Q. Did Ms. M. -- let me use the initials

Page 399

that way it will show up correctly.
Did T.M. ever use from what you saw, did she ever use any force or coercion or intimidation with any of the women that she brought to the house?
MR. HOROWITZ: Form.
MR. EDWARDS: Object to the form.
THE WITNESS: No, sir.
BY MR. CRITTON:
Q. Okay. I'm just talking about what you observed during the time. And you know what I mean by force?
A. Yes.
Q. You know what I mean by intimidation?
A. Yes.
Q. Could to be verbal intimidation or coercion, either verbally or using some form of her body, or their bodies.
A. Yeah, I understand that.
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
MS. EZELL: Objection, form.
BY MR. CRITTON:
Q. When C.W. brought individuals to the house, did you ever see her use any force or

Page 400

intimidation or coercion from what you could observe with those women who had come to give a massage?
A. No.
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
MS. EZELL: Form.
BY MR. CRITTON:
Q. With any of the fifteen women that you observed who came to the home to give massages during the time period '04 through I think you said February of '05, the time period I think was it August, Mr. Rodriguez --
A. August.
Q. -- August of '04 through February of '05?
A. March of '05.
~~Q. Through the beginning of March '05?~~
A. Yes.
Q. Okay. That's the time period I'm focussing on.
Of the approximately fifteen women that you came to see to give massages that you let in the back door after punching the security code, did any of them ever appear to be scared?
A. No.

Page 401

Q. Did any of them ever appear to be frightened?
MR. HOROWITZ: Form.
THE WITNESS: No.
BY MR. CRITTON:
Q. Did any of the women appear to be fearful?
A. No.
Q. Did any of them appear to be uncomfortable in coming into the house?
MR. EDWARDS: Form.
THE WITNESS: No.
BY MR. CRITTON:
Q. At any time did any of them express to you verbally that they were in fear when they came into the house?
A. No, sir.
Q. Did any one of the fifteen girls that came to the back door, then into the kitchen, and prior to your leaving them in the kitchen say, Mr. Rodriguez, or Alfredo, or sir, could you get me out of here?
A. No, sir.
Q. Did any of them tell you verbally that they were uncomfortable?

Page 402

A. No.
Q. Did anyone say help me or I'm scared?
A. No.
Q. Did all of them appear to be at least when they came to the back door in a reasonably good mood?
A. Yes.
Q. They all appeared to be happy?
A. Yes.
Q. Smile, I'd say interact with you verbally in your greetings?
A. That's correct.
Q. Did any one of the fifteen girls that you observed during the August '04 through March 2005 time period from your personal observation appear to be there -- appear to be at the Epstein home ~~not voluntarily?~~
MR. EDWARDS: Object to the form.
MR. HOROWITZ: Object to the form.
THE WITNESS: No.
BY MR. CRITTON:
Q. Did any one of the fifteen women who came to give the massage ever tell you that they had been forced to come to the house or coerced into coming to the house?

Page 403

A. No.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. For those women -- I think I need -- let me strike that.
On some occasions you'd see the women come down from upstairs because you would either let them out of the house or you might give them an envelope that had money in it. Is that correct?
A. Yes.
Q. Did any of those -- Mr. Edwards asked you some questions -- I think it was Mr. Edwards, whether they had sat down and had anything to eat, whether they had cereal or anything like that.
A. Yes.
Q. Did you ever observe any of those women before they went upstairs eating anything at the house?
A. Sometimes.
Q. And I think he used -- he meaning Mr. Edwards, used cereal and ice cream.
A. Yes.
Q. And he said, if I recall from the last deposition, kids like ice cream.

Page 404

A. Yes.
Q. Do you remember him asking you that?
A. Yes.
Q. Are you familiar that teenagers like ice cream?
A. Yes.
Q. Are you familiar that people who are 20 and 30 years old like ice cream?
A. Yes.
Q. Are you familiar that older people, even our age, Mr. Rodriguez, like ice cream too?
A. Yes.
Q. Okay. And when the individuals would sit there, and that is these women who would come over to give a massage and they would -- you would observe them eating, did they appear to be ~~comfortable?~~
A. Yes.
MR. HOROWITZ: Form.
BY MR. CRITTON:
Q. Did they appear to be interacting with either you or the chef?
A. Yes.
Q. When any of those women would come over to give massage came downstairs, did you ever see

Page 405

them stop and have anything to eat or did you always see them at the end, that is they're ready to go?
A. I didn't know, they came from downstairs, they went to the kitchen, but I didn't know they were there because I was in the guest house.
Q. Okay, that's my question. You only observed them either if you heard conversation or Sarah had called you and said would you pay such and such?
A. Yes.
Q. At which time you would give them the envelope with money?
A. Yes.
Q. In that set of circumstances they were on their way basically to leave?
A. Yes.
Q. When you saw them leave did any of them at any time, any of the ones that you saw during August of '04 through March of '05 appear to you to be scared?
A. No, sir.
Q. Did any girls, women ever appear to have been injured in any way?
MR. EDWARDS: Form.

Page 406

THE WITNESS: No, sir.
BY MR. CRITTON:
Q. Did anyone appear to be in shock?
A. No, sir.
Q. Was anyone ever crying?
A. No, sir.
Q. Was anyone disheveled or appeared to be unhappy?
A. No, sir.
Q. Did all of them appear, that is the ones that you saw leave the house that you had an opportunity to observe during that time period, did they appear to be approximately the same personality, same demeanor that they had had when they came into the house?
MR. HOROWITZ: Form.
~~THE WITNESS: Yes.~~
BY MR. CRITTON:
Q. Did anyone ever tell you when they came down the stairs that they had been injured?
A. No.
Q. I'm talking about the young lady, the women who had given the massages that you saw actually leave the house, that is you had some interaction with, either some interaction as they

Page 407

were leaving the house, did anyone ever tell you that they had been injured?
A. No, sir.
Q. Did they ever tell you that they had been forced to do something against their will?
A. No.
Q. Did they ever tell you that they had been forced to do something inappropriate?
A. No.
Q. Did they ever tell you that they had been assaulted in any way?
A. No.
Q. Did they ever tell you that they had been inappropriately touched?
A. No.
MR. HOROWITZ: Form. This is a cumulative. He's already told you the limited contact he had. This is totally inappropriate line of questions.
MR. CRITTON: Is that a form objection?
MR. HOROWITZ: You're exceeding the scope of the direct because nobody asked him --
MR. CRITTON: Form, you get form in federal court, that's what you get. Give me your form.

Page 408

MR. HOROWITZ: Form, cumulative.
MR. CRITTON: Great. Why don't you let me finish the question and then you can object to it.
Could you give me back what my last question was, please?
(Thereupon, a portion of the record was read by the reporter.)
THE WITNESS: No.
BY MR. CRITTON:
Q. Did they ever tell you that they had been sexually assaulted in any way?
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
THE WITNESS: No.
BY MR. CRITTON:
~~Q. I'm sorry?~~
A. No.
Q. At any time did you hear anyone -- strike that.
As to the women who came to give a massage, did you ever hear anyone scream?
A. No, sir.
Q. Did you ever hear anyone cry out what sounded like to you help?

Page 409

MR. EDWARDS: Form.
THE WITNESS: No.
BY MR. CRITTON:
Q. Did you ever hear anyone yell rape or assault or battery?
MR. HOROWITZ: Form.
THE WITNESS: No.
BY MR. CRITTON:
Q. Did you ever hear anyone yell out in anger?
A. No.
Q. You've gone online, Mr. Rodriguez, and looked at various articles or postings that have been made regarding these cases. Is that a fair statement?
A. I'm sorry?
Q. If I understood your testimony from July 29th and a little bit today, is that you've gone online and read some articles and/or what the police report may have said, that is, you've read information that you've -- about these lawsuits after the time that you left Mr. Epstein's employment.
A. Yes.
Q. Correct?

Page 410

A. Yes.
Q. And, therefore, you have at least seen certain allegations and what people say occurred, or at least their recitation of what may have occurred at Mr. Epstein's home.
A. Yes.
Q. You have no personal knowledge one way or the other.
MR. HOROWITZ: Object to the form.
MR. EDWARDS: Form.
BY MR. CRITTON:
Q. Correct?
A. That's correct.
Q. Are you also aware that the individuals who have filed lawsuits want in some instance millions of dollars?
~~A. Yes.~~
Q. Okay. Are you aware that some of them are now claiming that they were sexually assaulted?
A. Yes.
Q. And battered?
A. Yes.
Q. And you have no information, no personal knowledge in that regard. Is that true?

Page 411

A. Yes.
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
BY MR. CRITTON:
Q. All right. Were you aware of the backgrounds of any of these women who came over to give massages?
MR. HOROWITZ: Form.
THE WITNESS: No, sir.
BY MR. CRITTON:
Q. Well, have you -- did any one of the females who ever came to give massages, did they ever tell you that they were prostitutes?
A. No, sir.
Q. Did they ever tell you that they had been lead into a life of prostitution?
MR. HOROWITZ: Form.
THE WITNESS: No.
BY MR. CRITTON:
Q. Did they ever tell you about their family life, whether it involved prostitution, abuse, prior posttraumatic stress syndrome, drugs, alcohol, abuse by individuals, physical abuse as well as verbal abuse?
A. No, they didn't tell me.

Page 412

Q. And, obviously, you have no personal knowledge one way or the other --
A. No, sir.
Q. -- with regard to what their backgrounds were before they ever met or came in contact with Mr. Epstein?
A. No, sir.
Q. Did any person, female, who came to give a massage at the Epstein home, did anyone ever come downstairs and say, Mr. Rodriguez, or sir, call the police?
MR. EDWARDS: Form.
MR. HOROWITZ: Form.
THE WITNESS: No, sir.
BY MR. CRITTON:
Q. I think you said on one occasion you saw someone parked in a vehicle inside the gate that you didn't recognize.
A. Exactly.
Q. You called the police?
A. Yes, I did.
Q. Did you go to the police or you called the police and they came?
A. I went to the police department.
Q. So how did you -- did you actually leave

Page 413

the property in your car?
A. I was pulling over from Publix so I turned around and I went to the police and say --
Q. Okay. You were coming back to the home when you saw that car there?
A. Exactly.
Q. And they sent -- they, the police, sent a police car with you to come there?
A. Yes.
Q. Did you and the police officer walk up to the car?
A. The police went first.
Q. All right. And if I understand that, that was in January of '05?
A. Yes.
Q. And when you did that then did you follow behind the police officer to see who was in the car?
A. Yes.
Q. And then you recognized that as ████?
A. Yes.
Q. And ████ said she had come back or was there to get some money?
A. Yes.
Q. And did you in fact give her money?

Page 414

A. Yes, I did.
Q. And I think you said you told the police officer you recognized her?
A. Yes.
Q. Did you have to get permission to pay her or did you just pay her?
A. No, because Sarah told me already but I forgot she was going to be that late, so that was my concern in calling the police.
Q. Okay. And that person who came, do you have any idea what her age was at that time?
A. That night?
Q. Right, January of '08.
A. No, no.
Q. I'm sorry, January of '05.
A. No.
Q. You mentioned some conversations that you had had with Louella who was I think she was one of the house -- the main housekeeper.
A. Yes.
Q. And Louella told you a number of thoughts that she had. Is that correct?
A. Yes.
Q. And as to Louella what she told you about -- let me strike that.

I think you told us, you were asked questions about sex toys, I think you certainly described the back massagers. Correct?

A. Yes.

Q. I think you said the only sex toys that you ever saw were in the armoire at the end of Mr. Epstein's bed.

A. Yes.

Q. Okay. And whatever other sex toys that to which there was a reference, that's something that Louella told you. Is that correct?

A. That's correct.

Q. You were asked at the last deposition, I don't remember who asked the question, but whether you had ever seen pornography on any computer. I think one of your responses was you saw some photos of a naked woman who appeared to you to be a model.

A. Yes.

Q. Okay. Do you consider every photograph, picture, painting of a naked nude woman to be pornography?

MR. HOROWITZ: Form.

MS. EZELL: Objection, form.

THE WITNESS: I consider -- well, if it's

a frontal picture it's pornography, I will look at my way.

BY MR. CRITTON:

Q. In your view?

A. Yes.

Q. So if you looked at -- I don't remember whether Playboy still has -- say a Playboy that has a frontal nudity shot of a woman, you would in essence say that Playboy is selling pornography?

A. Yes.

Q. Therefore, every person who buys a Playboy that has over the last umpteen tens of years that has a frontal picture of a woman in the nude would be purchasing pornography whether it's from CVS, or Walgreens, or Eckerd as they existed, or any grocery store that sells them?

A. Yes.

MS. EZELL: Objection, form.

MR. EDWARDS: Form.

MR. HOROWITZ: Form.

BY MR. CRITTON:

Q. The photographs -- I'm sorry, the pictures that you saw in the computer, I think you were able to draw those up or bring those up from your own computer.

A. To bring the pictures from my computer?

Q. Let me rephrase the question. I thought what you said last time was that as to the pictures that you did see of naked women -- of a naked woman or naked women on the computer, that you've looked at those photographs through your computer.

A. No.

Q. Okay. Then I may have misunderstood you. Was your reference to Ms. Maxwell's computer that you made at the last deposition?

A. Yes.

Q. Okay. Your computer that you had either in the staff house or that you --

A. Didn't access.

Q. You couldn't access those files?

A. That's correct.

Q. All right, now I'm with you. So the photographs you've talked of the nude individuals, or the naked women, were the photographs that we've already talked about with both, i.e., in Ms. Maxwell's computer?

A. Yes.

Q. Thank you for clearing that up.

I'm going to ask you to assume that C.W.

who you've described as having come to Mr. Epstein's house on three or four times a week for a period of time, one of her claims in this case is that she has been emotionally traumatized by her contact with Mr. Epstein. Just assume that to be true for purposes of this question.

Did you ever observe any what you would have seen as emotional trauma or any type of disturbance with C.W. on the many times she came to your house?

MR. EDWARDS: Form.

THE WITNESS: I didn't see any.

BY MR. CRITTON:

Q. Does it make sense to you that a person who claims emotional trauma would continue to come back to the house, does that make sense to you, sir?

MR. EDWARDS: Form.

MR. HOROWITZ: Form.

MR. WILLITS: Object to the form of the question.

THE WITNESS: I'm not a psychologist.

MR. EDWARDS: Can you state your answer, I didn't hear it?

THE WITNESS: Yeah, I'm not a

Page 419

psychologist, I don't know.
MR. CRITTON: I have no further questions.

REDIRECT EXAMINATION

BY MR. EDWARDS:
Q. Mr. Rodriguez, I don't know if we covered this last time, I think that we did not, but can you tell us during the period of time when you worked at that house at El Brillo, Mr. Epstein's, what cars did he own or were in the driveway?
A. We have two Suburbans, two Mercedes 600, and a Cobra, and a motorcycle.
Q. And which, if any, did he drive?
A. He preferred the Mercedes or any of the Suburbans.
Q. All right. Do you know where he owns homes?
A. Yes.
Q. Where?
MR. CRITTON: Form.
THE WITNESS: Paris, New York City, El Brillo, Saint James Island -- I'm sorry, an Island in the Caribbean, and a ranch in New Mexico.
BY MR. EDWARDS:

Page 420

Q. Have you been to any of the other properties?
A. No.
Q. Do you know the house managers at any of the other properties?
A. Yes.
Q. And who are they?
A. Balsone in Paris, good friend of mine from Brazil. And the people in New York give me the briefing when I came aboard. There is a couple from the Philippines. And I talked to the couple that used to own the Island -- I mean who used to manage the Island, a couple from South African. Balsone was closer to me.
Q. Have you talked to Balsone about whether ~~or not Mr. Epstein has massages when he is at that~~ place?
A. Yes, I did.
Q. And what did he say about that?
A. That he had a lot of massages over there too.
MR. CRITTON: Mr. Balsone was which one?
THE WITNESS: Baslone was the house manager of Paris, 22 Foch Avenue.
BY MR. EDWARDS:

Page 421

Q. What's the address?
A. 22 Foch Avenue, Paris. F-O-C-H.
Q. Okay. Do you know a telephone number for Balsone?
A. No, I don't remember, sir.
Q. All right. How did it come up that you talked to him about whether or not Mr. Epstein had massages at that house?
A. He came on two occasions and stay with me for a week because Mr. Epstein wanted me to get into his style of running the house, and he was good enough to give me some inside information, what he likes and doesn't like, so he told me the same thing was in Paris.
Q. And I think that you described Mr. Epstein usually had about two massages a day, or at least we were calling them massages.
A. Yes, sir.
MR. CRITTON: Form.
BY MR. EDWARDS:
Q. And did Mr. Balsone describe it in a similar fashion --
A. Yes.
Q. -- in Paris?
And did he also tell you that the girls

Page 422

were very young in age that he was receiving these massages from?
MR. CRITTON: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. Did he indicate whether or not -- or how old these girls were?
A. No, he didn't told me.
Q. Just that the age group was similar to the age group that he was interested in in Palm Beach?
MR. EDWARDS: Form.
THE WITNESS: Yes.
BY MR. EDWARDS:
Q. And did you talk to any of the house ~~managers in New York?~~
A. No.
Q. Who was the house manager in New York at the time when you were the house manager at El Brillo?
A. His nickname was Jo-Jo, but I don't remember. Jo-Jo and his wife, but I don't remember his name, sir.
Q. Do you know whether Mr. Epstein would have massages when he was in New York at his New

39 (Pages 419 to 422)

Kress Court Reporting, Inc. 305-866-7688
7115 Rue Notre Dame, Miami Beach, FL 33141

NON PARTY (VR) 000353

GIUFFRE001043