COMPOSITE

EXHIBIT 1

(FILE UNDER SEAL)

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

               Plaintiff,                    Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

               Defendant.

_____/

## PLAINTIFF'S MOTION TO COMPEL DATA FROM DEFENDANT'S UNDISCLOSED EMAIL ACCOUNT AND FOR AN ADVERSE INFERENCE INSTRUCTION

      Plaintiff, Virginia Giuffre, by and through her undersigned counsel, files this Motion to Compel Data from Defendant's Undisclosed Email Account and for An Adverse Inference Instruction regarding the data from that account, and states as follows. Defendant has not disclosed, nor produced data from, the email account she used while abusing Ms. Giuffre from 2000-2002 in violation of this Court's Order [DE 352].  Ms. Giuffre hereby moves to compel Defendant to produce this data, and requests that this Court enter an adverse inference jury instruction for this willful violation of this Court's orders.

## I.      BACKGROUND

      The earliest-dated email Defendant has produced in this litigation is from July 18, 2009. (GM_00069). Ms. Giuffre is aware of two email addresses that appear to be the email addresses Defendant used while Ms. Giuffre was with Defendant and Epstein, namely, from 2000 - 2002. Defendant has denied that she used those accounts to communicate, but she has not disclosed the account she did use to communicate during that time, nor produce documents from it.

Importantly, Defendant has never denied using an email account for communication from 1999-2009, and the facts and circumstances show that it is exceedingly unlikely that Defendant did not use an email account to communicate those years.[1]

For example, according to United States Department of Commerce, "eighty-eight percent of adult Internet users sent or received e-mail" in 2000. *See* Eric C. Newburger, "Home Computers and Internet Use in the United States: August 2000," U.S. DEPARTMENT OF COMMERCE, ECONOMICS AND STATISTICS ADMINISTRATION, U.S. CENSUS BUREAU, September 2001. Additionally, the Pew Research Center published findings that certain demographics have higher internet usage, including many demographics to which Defendant belongs. For example, higher rates of internet usage are found among younger adults (Defendant was 38 in 1999); those with college educations (Defendant has a master's degree); those in households earning more than $75,000 (Defendant was in a household headed by a billionaire during that time, and that household had its own private email server and account); whites or English-speaking Asian-Americans (Defendant is white); and those who live in urban areas (Defendant lived in Palm Beach and Manhattan). *See* Andres Perrin and Maeve Duggan, 'Americans' Internet Access: 2000-2015," PEW RESEARCH CENTER, June 26, 2015.

Additionally, her boyfriend, Jeffrey Epstein, with whom she shared a household from 1999-2002 (and other years), implemented an entire, private email system to communicate with his household and employees, including Defendant. Accordingly, given Defendant's extraordinary economic resources, her high-level social connections, and her elaborate residential email/internet configuration she had during that time, it is extraordinarily unlikely that she would not employ an almost ubiquitous communication tool, nor has she denied it.

---

[1] On Friday, September 23, 2016, counsel for Ms. Giuffre sent a letter to Defendant inquiring about the undisclosed account. As of the date of this motion, Defendant has made no response.

### A.   The ███████████ Account

Ms. Giuffre has knowledge of the ████████████ account because it was listed as part of Defendant's contact information (including phone number) on documents gathered by the police from Epstein's home, and turned over to the Palm Beach County State Attorney as part of the investigation and prosecution of Epstein.



See (DE 280-2), Palm Beach County State Attorney's Office, Public Records Request No.: 16-268, Disc 7 at p. 2305 (GIUFFRE007843). Despite the fact that this account was listed as her contact information in the home she shared with Epstein, and despite the fact that *the username bears her initials*, Defendant claims she does not recognize the account, and has no access to it.

### B.   The ███████████ Account

The mindspring account is also listed as part of Defendant's contact information gathered by the police. In her filing with this Court, Defendant represented that this was merely a "spam" account "to use when registering for retail sales notifications and the like," and that it contains no relevant documents. (DE 345 at pg. 8). However, it appears that Jeffrey Epstein created the mindspring.org accounts to communicate with his household and with his employees, and did, in fact, communicate with them this way.

As previously recounted, Jeffrey Epstein's house manager, Juan Alessi testified that MindSpring account was in daily use by the Epstein household to send and receive messages, a household to which Defendant belonged:

Q. So when there would be a message from one of them while they were out of town, they would call you, call you on the telephone?

A. I haven't spoken to Ghislaine in 12 years.

Q. Sorry. I'm talking about when you worked there and you would receive a message that they were coming into town, would that be by way of telephone?

A.   Telephone, and also, there was a system at the house, that it was MindSpring, MindSpring I think it's called, that it was like a message system that would come from the office.

Q.   What is MindSpring?

A.  It was a server.  I think it was -- the office would have, like, a message system between him, the houses, the employees, his friends.  They would write a message on the computer.  There was no email at that time.

Q.   Okay.  So what computer would you use?

A.   My computer in my office.

Q.   And so was part of your daily routine to go to your computer and check to see if you had MindSpring messages?

A.   No.  That was at the end of my stay.  That was the very end of my stay.  I didn't get involved with that too much.  But it was a message system that Jeffrey received every two, three hours, with all the messages that would have to go to the office in New York, and they will print it and send it faxed to the house, and I would hand it to him.

Q.   Did it look like the message pads that we've been looking at?

A.   No, no, nothing like that.

Q.   Was it typed-out messages?

A.   Yes, typed-out messages.

Q.   Just explain one example of how it would work.  Let's say that Ghislaine wanted to send him a message on MindSpring.  How would that work?

A.   An example?

Q.   Sure.

A.   It got so ridiculous at the end of my stay, okay?  That Mr. Epstein, instead of talking to me that he wants a cup of coffee, he will call the office; the office would type it; they would send it to me, Jeffrey wants a cup of coffee, or Jeffrey wants an orange juice out by the pool.

Q.   He would call the office in New York. They would then type it in MindSpring?

4

A.   Send it to me.

Q.   How would you know to check for it?  How would you know to look for this MindSpring?

A.   Because I was in the office.  I was there. I was there.  And we have a signal when it come on and says, Hey, you've got mail.

Q.   Okay.

A.   Every day.  Every day it was new things put in.  That's why I left, too.

Q.   Do you know who set up the mind spring system?

A.   It was a computer guy.  It was a computer guy who worked only for Jeffrey.  Mark.  Mark Lumber.

Q.   Was he local to Palm Beach?

A.   No.  He was in New York.  Everything was set up from New York.  And Mark Lumber, I remember he came to Palm Beach to set up the system at the house.

Alessi Dep. Tr. at 223:5-225:17. (June 1, 2016) (McCawley Decl. at Sealed Exhibit 1).

Accordingly, mindspring was a domain name set up for Jeffrey Epstein and his household to communicate with one another, and was, in fact, used in this manner.

The sworn testimony of Janusz Banasiak, another of Epstein's house managers, from the case *L.M. v. Jeffery Epstein and Sarah Kellen*,[2] gives a fuller representation of how Defendant, and others in Epstein's sex-trafficking ring, used their accounts on Epstein's mindspring server:

Q. Okay. Were you aware that Mr. Epstein used a Citrix program to link various computers? Did you know that?

A. Yeah. I use Citrix too in my computer for exchanging e-mails and get through Internet.

*** 

_____

[2] Case No.: 502008CA028051XXXXMB AB, In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

Q. That's not something that you were, you were privy to? You weren't, you weren't in the loop of the sharing of information in the house in terms of the computers being connected through any server?

A. I don't really know what, how, how to answer your question because Citrix is for the whole organization to exchange e-mail between employees.

Q. All right. You used the term?

A. So, even my computer is connected to Citrix. I can receive mail and I can e-mail information to employee within organization. But I don't know if you can see to each computer what is going on on another computer.

***

Q. You have used the term organization; you can share within the organization. What do you -- just so I can understand what you're calling the organization, what do you mean by that word?

A. People employed by Jeffrey Epstein. There are a few groups of people, his office in New York and I guess --

***

Q. Okay. The other people mentioned as co-conspirators are Sarah Kellen, Adriana Ross, and Nadia Marcinkova. So we'll get to them in a minute but first just so we stay on the track of who was in the organization, is Sarah Kellen, Adriana Ross and Nadia Marcinkova all people that you would also consider within the organization?

A. Yes.

Q. Okay. So, we just added three more names to it. **Who else would you consider, Ghislaine Maxwell?**

**A. Yes.**

Banasiak Deposition at 56:13-17; 57:2-14; 58:1-7; 60:21-61:7 (February 16, 2010) (Emphasis added) (McCawley Decl. at Sealed Composite Exhibit 2).

As Defendant was a member of Epstein's household, and claims to have been his employee (See McCawley Decl. at Sealed Exhibit 3, Maxwell's April 22, 2016 Dep. Tr. at 10:7-11:3), it is unlikely that her mindspring account was merely a "spam account" from 1999-2002. It is much more likely that this account has - or *had* - Defendant's communications with co-

conspirators Sarah Kellen, Nadia Marcinkova, and Epstein. However, it is Defendant's representation that this account does not presently have responsive documents and was merely used for "spam."

### C. Defendant's Non-Disclosed Email Account

If the Court accepts Defendant's claim that she used neither the earthlink.net account nor the mindspring.org "spam" account to communicate, logic dictates that Defendant must have had another email account - one that she actually used - from 2000 - 2002. Despite the Court's orders that Defendant produce responsive documents from *all* her email accounts from 1999 to the present, Defendant has neither disclosed nor produced from the email account that she actually used to communicate from 2000-2002. This refusal violates this Court's orders. Ms. Giuffre issued requests to Defendant on October 27, 2015. Nearly a year later, after this Court has specifically ordered Defendant to produce her responsive email from *all* her accounts, Defendant has produced none from this account. Not only has Defendant failed to produce emails from the account she actually used from 1999-2002, and she has not even disclosed what account it is.

## II.  ARGUMENT

### A. An Adverse Inference Instruction is Appropriate

An adverse inference instruction is appropriate regarding documents from the email account Defendant actually used from 1999-2002. In light of this clear and persistent pattern of recalcitrance, the Court should instruct the jury that it can draw an adverse inference that the Defendant has concealed relevant evidence.  Even if Defendant were, at this late date, to run Ms. Giuffre's proposed search terms over the data from the email account she used from 1999 - 2002 (which she refuses to disclose), such a production would be both untimely and prejudicial. Fact discovery has closed. Numerous depositions have already been taken by Ms. Giuffre without the benefit of these documents. The window for authenticating the documents through depositions

7

has shut. Expert reports have been exchanged, so Ms. Giuffre's experts did not have the benefit of reviewing these documents. Late production of this information robs Ms. Giuffre of any practical ability to use the discovery, and, importantly, it was incumbent on Defendant to identify this account.

The Second Circuit has stated, "[w]here documents, witnesses, or information of any kind relevant issues in litigation is or was within the exclusive or primary control of a party and is not provided, an adverse inference can be drawn against the withholding party. Such adverse inferences are appropriate as a consequence for failure to make discovery." *Bouzo v. Citibank*, N.A., 1993 WL 525114, at *1 (S.D.N.Y. 1993) (internal citations omitted).  The Defendant's continued systemic foot-dragging and obstructionism – even following the Court's June 20 Sealed Order and August 10, 2016 Order [DE 352] – makes an adverse inference instruction with regard to Defendant's documents appropriate.  An adverse inference instruction is appropriate when a party refuses to turn over documents in defiance of a Court Order. *See Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 2005 WL 1026461, at *1 (S.D.N.Y. May 2, 2005) (denying application to set aside Magistrate Judge Peck's order entering an adverse inference instruction against defendant for failure to produce documents that the Judge Peck had ordered Defendant to produce). Accordingly, because a "party's failure to produce evidence within its control creates a presumption that evidence would be unfavorable to that party" an adverse inference should be applied with respect to Defendant's failure to produce data from the email account she used from 1999 -2002 "in order to ensure fair hearing for [the] other party seeking evidence." *Doe v. U.S. Civil Service Commission*, 483 F. Supp. 539, 580 (S.D. N.Y., 1980) (*citing International Union v. NLRB*, 148 U.S. App. D.C. 305, 312-317, 459 F.2d 1329, 1336-41 (D.C.Cir.1972)).

"An adverse inference serves the remedial purpose of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013) (granting an adverse inference when defendants refused to produce documents pursuant to the District Court's order). Where "an adverse inference ... is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id*. (citing *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).

Furthermore, as discussed in detail in Ms. Giuffre's Motion for an Adverse Inference Instruction (DE 315) and Supplement Motion for Adverse Inference Instruction (DE 338), an adverse inference is appropriate regarding the documents that Defendant is withholding under the Second Circuit's test set forth in *Residential Funding*. Defendant has admitted to deleting emails as this Court noted in its Order. An adverse inference is equally appropriate if the non-compliance was due to Defendant's destruction of evidence. *See Brown v. Coleman*, 2009 WL 2877602, at *2 (S.D.N.Y. Sept. 8, 2009) ("Where a party violates a court order—either by destroying evidence when directed to preserve it or by failing to produce information because relevant data has been destroyed—Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306

F.3d 99, 106–07 (2d Cir.2002)"). *See also Essenter v. Cumberland Farms, Inc.*, 2011 WL

124505, at *7 (N.D.N.Y. Jan. 14, 2011); and Rule 37(e), Fed. R. Civ. P. ("If electronically stored

information that should have been preserved in the anticipation or conduct of litigation is lost

because a party failed to take reasonable steps to preserve it . . . the court: (2) only upon finding

that the party acted with the intent to deprive another party of the information's use in the

litigation may: (A) presume that the lost information was unfavorable to the party; (b) instruct

the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss

the action or enter a default judgment."). Failure to disclose the email account Defendant actually

used from 1992-2002 warrants an adverse inference instruction.

## III.    CONCLUSION

For the reasons set forth above, Ms. Giuffre respectfully requests that this Court compel

Defendant to disclose what email account she actually used from 2009-1999, and that the court

give the jury an adverse inference jury instruction concerning the documents from the

undisclosed email account.

October 14, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Sigrid McCawley
    Sigrid McCawley (Pro Hac Vice)
    Meredith Schultz (Pro Hac Vice)
    Boies Schiller & Flexner LLP
    401 E. Las Olas Blvd., Suite 1200
    Ft. Lauderdale, FL 33301
    (954) 356-0011

    David Boies
    Boies Schiller & Flexner LLP
    333 Main Street
    Armonk, NY 10504

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[3]

---

[3] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 14, 2016, I electronically filed the foregoing

document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing

document is being served to all parties of record via transmission of the Electronic Court Filing

System generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
        jpagliuca@hmflaw.com


/s/ Meredith Schultz
Meredith Schultz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

VIRGINIA L. GIUFFRE,

      Plaintiff,

v.                                                                                      **15-cv-07433-RWS**

GHISLAINE MAXWELL,

      Defendant.

---------------------------------------------------X

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL
DATA FROM DEFENDANT'S (NON-EXISTENT) UNDISCLOSED EMAIL
ACCOUNT AND FOR AN ADVERSE INFERENCE INSTRUCTION**

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
303.831.7364

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

I.     PLAINTIFF HAS FAILED TO CONFER UNDER RULE 37(A)(1) OR THIS COURT'S
       ORDER............................................................................................................... 1

II.    MS. MAXWELL HAS DISCLOSED AND SEARCHED ALL EMAIL ACCOUNTS ........ 3

III.   SANCTIONS AGAINST MS. MAXWELL NOT WARRANTED, RATHER COSTS
       OUGHT TO BE AWARDED TO HER ........................................................................ 7

CONCLUSION ................................................................................................................. 13

CERTIFICATE OF SERVICE ............................................................................................. 15

Defendant Ghislaine Maxwell ("Ms. Maxwell") files this Response to Plaintiff's Motion To Compel Data From Defendant's (Non-Existent) Undisclosed Email Account and For an Adverse Inference Instruction and states as follow:

## INTRODUCTION

Plaintiff continues in her course of re-litigating issues, multiplying these proceedings and misstating the record.  In what amounts to the fourth Motion on forensic examination of Ms. Maxwell's computers and email accounts, Plaintiff now trumps up a claim that some unidentified and "undisclosed" email account should have been searched and was not.  To the contrary, Ms. Maxwell has spent thousands of dollars to forensically image all of her devices, searching every account to which she has access, conducting extremely broad and over-reaching searches for the search terms Plaintiff requested and in complying with this Court's Orders.  The result of these exercises proved, as Ms. Maxwell has always maintained, that all non-privileged relevant and responsive documents in her possession, custody and control had already been searched for and produced prior to the excessive and redundant briefing on these issues, resulting in no additional production.  Plaintiff's Motion must be denied because no "undisclosed" email account exists and Ms. Maxwell has fully complied with this Court's Orders.

## ARGUMENT

### I.  PLAINTIFF HAS FAILED TO CONFER UNDER RULE 37(A)(1) OR THIS COURT'S ORDER

Despite the clear requirements of Rule 37(a)(1) requiring a certificate of conferral prior to filing any motion to compel, and this Court's standing order regarding conferral on all discovery issues prior to Motions practice, the sum total of Plaintiff's stated conferral attempt is a footnote stating that a letter was sent on September 23, 2016 "inquiring about the undisclosed account" – a letter not included in the exhibits to the Motion.  Ms. Maxwell has been clear that she has

1

searched all accounts that she can access.  Had Plaintiff bothered to follow up on this alleged communication, Ms. Maxwell would have reaffirmed that there is no "undisclosed" email account.  Instead, Plaintiff filed this frivolous and vexatious motion to waste both the Court and Ms. Maxwell's time and needlessly multiply these proceedings.

Courts in this district routinely deny motions based on failure to confer prior to the motion when such conferral is required by the Rules or Court Order.  *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,* No. 96 Civ. 7590 (DAB) JCF, 1998 WL 67672, at *3 (S.D.N.Y. 1998) ("Under ordinary circumstances,..., the failure to meet and confer mandates denial of a motion to compel."); *Excess Ins. Co. v. Rochdale Ins. Co.*, No. 05 CIV. 10174, 2007 WL 2900217, at *1 (S.D.N.Y. Oct. 4, 2007) (Sweet, J.) (denying motion and cross motion based on failure to confer, noting "[m]ere correspondence, absent exigent circumstances not present here, does not satisfy the requirement"); *Myers v. Andzel*, No. 06 CIV. 14420 (RWS), 2007 WL 3256865, at *1 (Sweet, J.) (S.D.N.Y. Oct. 15, 2007) (denying motion based on failure to confer).

The Court has been abundantly clear on the necessity for conferral prior to motions practice.  In the March 17, 2016 hearing, the Court ordered that prior to motions practice, the parties were to set an agenda on the disputed issue in writing and have a meeting of substance prior to filing a motion.  "So I would say exchange writing as to what it's going to be and have a meeting.  It doesn't have to be in person, but it certainly has to be a significant meeting; it can't be just one ten-minute telephone call. So that's how I feel about the meet and confer."  Tr. p. 3. As shown in the Plaintiff's motion, no such call has occurred.

Based on Plaintiff's failure to confer as required by both the Federal Rules and this Court's standing order, Ms. Maxwell requests that the Motion be denied and attorneys' fees and costs of responding be awarded to Ms. Maxwell.

## II.      MS. MAXWELL HAS DISCLOSED AND SEARCHED ALL EMAIL ACCOUNTS

### a.   All Devices Have Been Forensically Searched for Responsive Emails

As requested by Plaintiff and Ordered by the Court, Ms. Maxwell's computer and all of her electronic devices have been forensically imaged, searched for the search terms requested by Plaintiff, and all responsive documents produced.  This expensive, costly and time consuming exercise in futility simply confirmed that all responsive documents, including all responsive emails, were produced in March and April 2016.

Most significantly, the devices were searched for all emails—whether saved or deleted – and irrespective of which account they came from; not a single responsive email was located from any Mindspring account and no emails were located from Earthlink or any other secret, hidden, "undisclosed" email account, as Plaintiff speculates must exist.

### b.   The MindSpring account

The first two accounts discussed in the Motion have already been fully discussed in prior briefings and at length in conferral conferences.[1]  *See* DE 320.  In addition to the search of Ms. Maxwell's computer and devices, the first account, ████████████ was forensically searched on its server using the search terms proposed by Defendants and as required by the Court.  The search uncovered no responsive documents from any time period.  *See* DE 320.  This included both emails in the account, deleted emails, and any other information relating to the account retained on the MindSpring server.  There can simply be no claim for an adverse inference where Plaintiff has already received exactly what she requested – a forensic search of the account for her own defined terms.  It resulted in nothing.

---

[1] Plaintiff conveniently omits the fact that the EarthLink and MindSpring accounts were in an address book purportedly recovered from Mr. Epstein's home by the Palm Beach Police in 2005.  Thus, there is no indication or inference that either of these accounts were created or used in the 2000 to 2002 time frame as Plaintiff claims.

### c. *The EarthLink account*

The second account, ████████████████ is, as Ms. Maxwell has repeatedly explained

to Plaintiff's counsel, an account that she does not recognize, that she does not recall having ever

logged onto, and for which she has no password. *See* DE 320. Ms. Maxwell tried every avenue

available online through EarthLink to reset the password or otherwise access the account. In

fact, when one attempts to recover a password for that account, the system states "The email

address you entered is not an EarthLink email address or ID." According to *Plaintiff*, such a

message means the account has been permanently deleted by the host company. Plaintiff's

counsel, Meredith Shultz, wrote on May 17, 2016, regarding an account of Plaintiff's (that she

claims she cannot access but for which relevant and responsive emails were located on her

computer):

> "Regarding her live.com address, it appears that the account has been
> permanently deleted by the host Company. One method of telling if an account
> still exists for live.com (**and for most web mail systems**) is to perform an
> account password recovery. When you enter the e-mail address and enter the
> captca code and hit Next, the website states that it does not recognize the email
> address. This means that the account has been permanently deleted from
> live.com's system."

Menninger Decl., Ex. A.

Plaintiff does not, and cannot, explain why she thinks that her own live.com email

address has been permanently deleted by the host company, yet based on the exact same set of

data, she thinks that an email account that Ms. Maxwell does not recall ever using (and from

which no documents exist on her devices) from Earthlink still remains on its system. If there is

some way to access the account, Plaintiff hasn't said what it is. Ms. Maxwell simply has no way

to access this account and has no information, save Plaintiff's rank speculation.[2]

---

[2] Plaintiff has an account from which actual documents *have* been produced – proving she did use the
account (unlike Ms. Maxwell's EarthLink account) and it contains relevant information. Yet Plaintiff claims she

Because Plaintiff claimed she cannot access her Microsoft account, Ms. Maxwell subpoenaed Microsoft for the documents.  Plaintiff moved to quash the subpoena to obtain the information contained in the account and has refused to sign the release provided to her that would allow the production of that information under the terms of a subpoena issued to Microsoft.  Menninger Decl,. Ex. B.  Tellingly, Plaintiff did not issue a subpoena to EarthLink regarding this account to see if it existed, has content or could be accessed.  Instead, she seeks the drastic and improper sanction of an adverse inference knowing that it is far more beneficial to her than actually receiving information from EarthLink which would reveal nothing exists.

### d.  *There is no "Undisclosed" Account*

Plaintiff next argues that she is entitled to an adverse inference based on the failure to search a phantom e-mail account that she presumes (without support and based on pure speculation) must have existed, which she has never asked about in discovery, claiming that such an account was improperly "undisclosed" and not searched.  Plaintiff bases her absurd argument on statistics suggesting that someone like Ms. Maxwell "likely" had an email account in the 2000 to 2002 timeframe and a specious claim that Ms. Maxwell has never *denied* having an email account from 2000 to 2002.  Motion at 2.  Notably absent from the Motion is a single interrogatory, request for admission, or deposition question in which Ms. Maxwell was asked to provide all email addresses she has used *or* asked if she ever had an email account in 2000 to 2002.  No such question was ever posed to Ms. Maxwell on this issue.[3]  How could she possibly deny the existence of an account when she was never asked the question?

---

cannot access her Microsoft account because she does not remember the password and does not have sufficient personal information to provide to gain access to the account.  DE 207; DE 441.  This is not dissimilar to Ms. Maxwell who does not even remember the account let alone the password.

[3] By contrast, Ms. Maxwell requested that Plaintiff identify all email and social media accounts which she had used since 1998.  Plaintiff provided false information, and purposefully omitted accounts that have since been discovered, one of which Plaintiff still has failed to forensically search and disclose its responsive documents.

Plaintiff asks this Court to infer the existence of an undisclosed "email" account for Ms. Maxwell in the 2000-2002 timeframe based on witness accounts that Jeffrey Epstein had a "messaging system" on a private server.  Of course, there is a big difference between having a private email account (gmail, aol, yahoo, etc.) and communicating through a private messaging system on an employer's sever, as described by Mr. Alessi ("It was a server. I think it was --the office would have, like, a message system between him, the houses, the employees, his friends. They would write a message on the computer. **There was no email at that time.**").[4]   To the extent there was a private messaging system used by Mr. Epstein's household employees maintained on a private server by Mr. Epstein, information from that system is not available to Ms. Maxwell.  Ms. Maxwell has not been employed by Mr. Epstein for over 10 years and has not had any access to Mr. Epstein's server through Citrix or otherwise since at least the end of her employment with him.

"Whether a party subject to a document request can be compelled to comply depends on two preliminary questions: (1) assuming the requested documents exist, does the party have possession, custody or control over them, and (2) if the party has such possession, custody or control, can the party be compelled to conduct a reasonable search for and, if found, to produce the documents."  *Gross v. Lunduski*, 304 F.R.D. 136, 142 (W.D.N.Y. 2014).  Ms. Maxwell is not in the possession, custody or control of the server or any information it may contain.  "Where

---

[4] It appears this is what was also being described by Mr. Banasiak in the deposition from another case, a full copy of which has never been produced in this litigation.  Indeed, Mr. Banasiak has not been identified as a person with relevant or discoverable information in any of the last three of Plaintiff's Rule 26 Disclosures.  In the cited testimony, Mr. Banasiak appears to have discussed accessing a private messaging system maintained on Mr. Epstein's private server using Citrix, a program that allows such access to authorized users.  Because Plaintiff has failed to disclose the transcript being quoted, Ms. Maxwell cannot fully decipher the obviously edited testimony quoted in the Motion, does not know what timeframe Mr. Banasiak was referring to regarding the computers or using Citrix, and cannot respond to the claims made regarding the nature of any inference that could be drawn from Mr. Banasiak's selected testimony.  The entire argument and reference to the transcript must be ignored and stricken based on Plaintiff's failure to produce in discovery the transcript she relies on.

control is contested, the party seeking production of documents bears the burden of establishing

the opposing party's control over those documents." *Alexander Interactive, Inc. v. Adorama, Inc.*,

No. 12 CIV. 6608 (PKC) (JCF), 2014 WL 61472, at *3 (S.D.N.Y. Jan. 6, 2014).  Plaintiff has

made no showing that Ms. Maxwell has any control over the hypothetical documents she

suspects may be on Mr. Epstein's private server.  As has been made clear by Mr. Epstein's

refusal to produce any documents in this matter or provide any testimony, instead invoking his

Fifth Amendment privilege, there is no manner in which Ms. Maxwell could require Mr. Epstein

to provide any information on Mr. Epstein's private server.  Notably, no such "messages" were

located on any of Ms. Maxwell's devices or within her email accounts.

Simply put, there are no emails from any accounts, systems or electronic storage devices

over which Ms. Maxwell has possession, custody or control that have not been searched and

from which responsive non-privileged documents produced.

## III. SANCTIONS AGAINST MS. MAXWELL NOT WARRANTED, RATHER COSTS OUGHT TO BE AWARDED TO HER

Plaintiff completely fails to identify which, if any, of the Rules of Civil Procedure she

relies on to claim any right to request sanctions, let alone to receive an adverse inference

instruction.  The argument appears premised on a claim that Ms. Maxwell has not complied with

the Court's Order – a completely inaccurate claim:

On June 20, 2016, this Court ordered:

Defendant is ordered to collect all ESI by imaging her computers and collecting all email and text messages on any devices *in Defendant's possession or to which she has access* that Defendant used between the period of 2002 to present. Defendant is further directed to run mutually- agreed upon search terms related to Plaintiff's requests for production over the aforementioned ESI and produce responsive documents within 21 days of distribution of this opinion.

This was done.  Plaintiff then expanded her request, imposed additional search terms, and

added conditions concerning the manner in which she wanted devices searched. On August 9,

2016, the Court entered an Order adopting Plaintiff's expanded request and methodology. All accessible email accounts and devices, including deleted files and emails, were searched – again – at significant expense. Again, no additional non-privileged responsive documents were located. There is no non-compliance and no basis for any sanctions, let alone the draconian sanction of an adverse inference.

### a. Plaintiff Fails to Identify or Prove the Factors Required for Sanctions Based on Alleged Violation of a Court Order

Absent from Plaintiff's motion is the actual legal standard required for imposition of sanctions, and certainly no argument or citation exist in this case to carry the burden of establishing the factors. In light of the fact that Ms. Maxwell has complied, Plaintiff has failed to demonstrate the minimum hurdle for any sanction. Thus, the factors are not addressed here, nor can they be addressed on Reply. What is clear is that the sanction of an adverse inference is not identified as a sanction that should or could be considered under the rules concerning the failure to comply with a Court Order. *See* Fed. R. Civ. P. 37(b)(2)(A).

### b. Controlling Law Prohibits an Adverse Inference Instruction

An adverse inference instruction is considered an "extreme sanction" that "should not be given lightly." *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 220 (S.D.N.Y. 2003). More importantly Plaintiff completely ignores the 2015 changes to Fed. R. Civ. P 37(e)(2), which now permits an adverse inference instruction only when the court finds that a spoliating party purposefully and willfully destroys evidence and that party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The new Rule 37 "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99

(2d Cir. 2002)[5], that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." Fed. R. Civ. P. 37(e)(2) Advisory Committee's Note to 2015 Amendment; *see also Thomas v. Butkiewicus*, No. 3:13-CV-747 (JCH), 2016 WL 1718368, at *7 (D. Conn. Apr. 29, 2016) (recognizing abrogation of *Residential Funding*).  There is no claim of spoliation – no information has been lost or destroyed since the threat or initiation of litigation when there would have been a duty to preserve.  There is no bad faith.  Ms. Maxwell has completely complied with all Court Orders and there are no accessible accounts or electronic devices that have not been searched.

> i. *The cases cited by Plaintiff are not the controlling standards, and Plaintiff fails to establish the elements required for an adverse inference*

Plaintiff relies heavily on her previously briefed motion requesting an adverse inference relying on factors in a single case, *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2nd Cir. 2002).  This case sets forth the standard for an adverse inference based on the inherent powers of the Court (not under Rule 37(b)) where the party failed to produce relevant documents prior to the commencement of trial.  *Id.* ("where, as here, an adverse inference instruction is sought on **the basis that the evidence was not produced in time for use at trial**, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense").  By contrast, however, courts have repeatedly noted that an adverse inference, and application of the *Residential Funding* test, are not appropriate for a mere delay in production, especially when all documents are produced prior to depositions and trial.  *See*

---

[5] This is the primary case relied on by Plaintiff in support of both of her Motions for an adverse inference.

*Psihoyos v. John Wiley & Sons, Inc.*, No. 11CV01416, 2012 WL 3601087 (S.D.N.Y. June 22, 2012) (refusing to grant adverse inference instruction where Plaintiff did not confer to obtain requested discovery, and noting "Plaintiff does not cite to a single case where an adverse inference instruction was ordered based on the late production of a document").[6]  Here, there was no delay in production – there was and is nothing additional to produce.  All documents were produced well in advance of trial, prohibiting an adverse inference.

Even if the *Residential Funding* factors were applicable, Plaintiff fails to carry her burden of proving those factors are present in this case.  Defendant does not contest that she is obligated to comply with this Court's Orders.  She has done so.  She has collected all of her electronically stored information, and run all agreed upon search terms – and then re-run the searches when Plaintiff further expanded her demands.  The result of the application of these search terms is proof that she has been compliant with her discovery obligations all along.  No new non-privileged documents were captured through utilization of the process demanded by Plaintiff.  As Ms. Maxwell previously stated in response to the Motion for forensic examination, she had run comprehensive search terms, thoroughly reviewed her records and previously produced all responsive documents in her possession.[7]

The second factor, that "the party that failed to timely produce the evidence had 'a culpable state of mind'" is likewise lacking.  There is no claim of Defendant acting with a

---

[6] *See also Phoenix Four, Inc.,* No. 05 CIV. 4837(HB), 2006 WL 1409413, at *7 (S.D.N.Y. May 23, 2006) (holding that a sanction as severe as an adverse inference was not warranted where defendants came forward with the evidence, even though it was after the close of discovery); *Williams v. Saint–Gobain Corp.,* No. 00 Civ. 502, 2002 WL 1477618, at *2 (W.D.N.Y. June 28, 2002) (holding that no basis for adverse inference instruction existed where defendant failed to produce emails until the eve of trial and there was no evidence of bad faith); *In re A & M Florida Properties II, LLC*, No. 09-15173 (AJG), 2010 WL 1418861, at *6 (Bankr. S.D.N.Y. Apr. 7, 2010) (declining to impose adverse inference instruction where documents were belatedly produced, but there was no bad faith).

[7] Plaintiff's argument that she has been or will be prejudiced is illogical given that there are no documents that have not been produced, and there never have been any responsive documents missing from production.

culpable state of mind, nor is any argued.  How can one have a culpable state of mind where

there are no additional accounts to search or documents to be produced?

Finally, and perhaps most importantly, Plaintiff fails to provide a shred of evidence that

"the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense."  *Residential Funding Corp.*, 306 F.3d

at 108.  As discussed, completion of the multiple levels of forensic searches resulted in no

responsive non-privileged documents.  The hypothetical "undisclosed" email account does not

exist.  There can simply be no claim that there are any "missing" documents, let alone that they

are relevant to Plaintiff's claims or defenses. *Giarrizzo v. Holder*, No. 07-CV-0801 MAD/GHL,

2012 WL 716189, at *3 (N.D.N.Y. Mar. 5, 2012) (refusing request for adverse inference where

Plaintiff failed to demonstrate relevance prong stating "Plaintiff only identifies the alleged

missing documents and speculates, without proof, that the documents support his claim. Indeed,

plaintiff has not proven that the aforementioned documents exist"); *Sovulj v. United States*, No.

98 CV 5550FBRML, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005) (plaintiff could not

meet the requirements for obtaining an adverse inference because assertion that missing evidence

was relevant was pure speculation); *see also Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271

F.R.D. 429, 439 (S.D.N.Y. 2010) (collecting spoliation cases holding that an adverse inference is

inappropriate without proof beyond mere speculation allegedly lost information was relevant).

"Without proof that defendant's actions, 'created an unfair evidentiary imbalance, an adverse

inference charge is not warranted.'" *Giarrizzo*, 2012 WL 716189, at *2 (*citing Richard Green*

*(Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (S.D.N.Y. 2009)).  Here, Plaintiff cannot

demonstrate that there *is any* missing or non-produced information.  She hypothecates a non-

existent email account and speculates that it must have discoverable relevant evidence.  She has

made no attempt to provide any proof or even proffer of relevance beyond mere speculation.

Thus, an adverse inference is impermissible.

ii. *Ms. Maxwell has never deleted any relevant emails*

Ms. Maxwell has never "admitted" to deleting any emails that 1) might have any

relevance to this case, or 2) after she was under a preservation obligation.[8]  Rather, she has a

regular practice of deleting spam emails, as do most people.  Specifically, she testified:

> A. I have not deleted anything that you have asked me for in discovery.  I have given
> you everything that I have.

---

[8] By contrast, Plaintiff admits that in 2013 while she was in the process of trying to implead herself into the CVRA case and under a preservation obligation, she and her husband had a bonfire and purposefully burned her journal that she had kept for years containing relevant information.  Specifically, she testified;

Q. The booklet that you gave pages from to Ms. Churcher where is that booklet?
A. Burned.
Q. When did you burn it?
A. In, I think it was 2013. Me and my husband had a bonfire.
Q. What did you put in the bonfire?
A. Any kind of memories that I had written down about all the stuff going on.
Q. Had you written anything about Professor Dershowitz?
A. He could have been there, yes.
Q. And you burned that?
A. I wanted to burn my memories. I wanted to get rid of it. It was very painful stuff.
Q. Other than what you had written down did you burn anything else? I don't mean the wood, when you talk about burning your memories, what were you burning?
A. I was burning like memories, thoughts, dreams that I had, just everything that was kind of 1 affiliated with the abuse I endured, and there was a lot of it in there. My husband is pretty spiritual so he said the best thing to do would be burn them.
Q. Is there anything you decided to keep and not burn?
A. Just the photographs.
Q. Anything else that you can think of?
A. Photographs, that's it.
. . .
Q. Did you ever look to see if you had any personal notes in your writing that pertain to Professor Dershowitz?
A. Like from my old journal, the one that I burned?
Q. From anywhere. Did you ever make an effort to look?
A. Dershowitz could have been in my journal, he could have been. We're talking about an 85 page, if not more, you know, things that I had written to get my story out of my head and into pages; and yes, Dershowitz could have been in there, but that's up in the clouds now, bonfire.
Q. That's what you call your journals, what you burned, right?
A. Yes.
Q. And you wrote that journal in order to collect your thoughts?
A. To get everything out of here and on to paper.

Menninger Decl., Ex. D at 64-65; 194-21.

Q.   That is not my question, my question is, did you ever delete emails in January of 2015?

A.   In the normal course of my work, there are emails from spam that I delete. That is the type of email I've deleted. Anything that is material to what you want, I have not deleted.

Q.   How do you know that?

A.   Well, anybody that's to do with Jeffrey or Alan or women or anything of which I know you were interested in, of which I have anything I would not have done because I don't want to subject myself to... [cut off by Plaintiff's counsel]

Menninger Decl., Ex. C at 370.

This Court permitted the forensic examination of all on Ms. Maxwell's electronic devices to ensure that there were no deleted emails or files that might contain relevant information. In that forensic examination, the entire devices and accounts were searched, including all deleted emails and files. Again, as stated, no relevant non-privileged documents resulted from this extensive and exhaustive examination. Plaintiff received the relief that she requested – a forensic examination – to ensure that no information had been lost or destroyed. It has not. Plaintiff cannot now claim that the non-existent hypothetical emails she suspected existed can form the basis for the severe and improper sanction of an adverse inference.

## CONCLUSION

Plaintiff has now litigated this issue on four separate occasions, received a complete and exhaustive forensic examination, and the result is exactly what Ms. Maxwell has always contended – there is no relevant non-privileged information that was not originally produced. Having failed to find the smoking gun – because there is none – Plaintiff now weaves a convoluted argument attempting to get an adverse inference instruction because she cannot prove her case based on the actual law and facts. Such an inference is contrary to law, the rules of evidence, and the very notion of a fair trial. It is impermissible and must be denied.

**WHEREFORE**, Defendant Ghislaine Maxwell request that this Court 1) **DENY** Plaintiff's Motion To Compel Data From Defendant's Undisclosed Email Account and For an

Adverse Inference Instruction, and 2) for attorneys' fees and costs associated with responding to this Motion pursuant to 37(a)(5)(B), and such other and further relief as this Court deems just.

Dated: October 24, 2016

Respectfully submitted,

/s/ Laura A. Menninger
Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone:   303.831.7364
Fax:      303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I certify that on October 24, 2016, I electronically served this *Defendant's Response to Plaintiff's Motion to Compel Data from Defendant's (Non-Existent) Undisclosed Email Account and for an Adverse Inference Instruction* via ECF on the following:

Sigrid S. McCawley
Meredith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS,
FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

15

**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

              Plaintiff,                  Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

              Defendant.

_____/

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO COMPEL DATA FROM DEFENDANT'S UNDISCLOSED EMAIL ACCOUNT AND FOR AN ADVERSE INFERENCE INSTRUCTION

      Plaintiff, Virginia Giuffre, by and through her undersigned counsel, hereby files this Reply in Support of her Motion to Compel Data from Defendant's Undisclosed Email Account and for Adverse Inference Instruction.

      This Court Ordered Defendant to search for and produce documents from *all* her email accounts from 1999-present, but she has produced no email prior to 2009, and still refuses to disclose the email accounts she used prior to that date. Defendant represents to the Court that there is no undisclosed email address, yet in the following sentence, she begins a three-page description of her undisclosed email account on Epstein's server that she says she cannot access. Accordingly, there is an undisclosed account, but Defendant, still, does not produce from it, nor even reveal its name. Defendant's willful and continued refusal to obey this Court's Orders regarding her electronic discovery obligations warrants an adverse inference instruction to the jury, or at a minimum, warrants allowing an independent third party to conduct a forensic review of all of Defendant's electronic data as explained further herein.

### I.    DEFENDANT'S UNDISCLOSED ACCOUNT

1

### A.  The Defendant had a Duty to Search from and Produce All Accounts

In her continued refusal to disclose the email account she used from 1999-2002, Defendant offers a red herring argument, stating: "notably absent from the Motion is a single interrogatory, request for admission, or deposition question in which Ms. Maxwell was asked to provide all email addresses she has ever used." Resp. Br. at 5. Defendant did not need a specific instruction to search within and produce from ***all*** of her accounts - such a request is presumed by the use of the terms "all" or "any," in the interrogatories and the requests for production. It is also presumed by the absence of any limiting language, or restrictions to certain accounts. For example, Ms. Giuffre's first Request sought "[a]ll documents relating to communications with Jeffrey Epstein from 1999 – present."

More important, however, it was ***this Court's own Order*** that required Defendant to search for, and produce from, all accounts from 1999 through the present. *See* Schultz Dec. at Exhibit 1, August 9, 2016, DE 352 at p. 1-2, Order directing Defendant to "capture all of the sent/received emails from Defendant's multiple email accounts, including . . . ***any other email accounts Defendant has used*** in the past or currently uses." (Emphasis added).  There can be no excuse for failure to do so and no excuse for continuing to refuse to disclose all of her email accounts.

### B.  Substantial Data is Missing from the Defendant.

Significant data is missing from the Defendant.  Tellingly, Defendant still does not deny that she had a personal email account before 2002 that she used to communicate. And, tellingly, she still does not disclose what it is. Instead, Defendant has produced a miniscule amount of emails in this case and has not produced any e-mail dated prior to July 18, 2009.  The Court should direct Defendant to disclose the e-mail account she was using and disclose whether the

account still exists.

Consider what the Defendant could have said in her response – but did not say.  Defendant could have said that she used an email account from 1999-2002 and could have provided the identity of the account. She did not say that. Though implausible, she could have said that she did not use any email account whatsoever from 1999-2002. She did not say that either. She could have disclosed the domain name of that account. She did not. She could have explained that she deleted her account; that her account had been destroyed by the provider; or that she can no longer access her account for various other reasons. She did not say any of those things. As a result, Defendant offers no accounting whatsoever for her email communications from 1999-2002.

Defendant spills a lot of ink in subsection (d), describing what she refers to as Jeffrey Epstein's "'messaging system' on a private server" (Resp. Br. at 5). Defendant does not forthrightly state that the Epstein Server Account is distinct from the Mindspring account, which she discusses in a different section, but the language she uses - "there is a big difference between having a private email account (gmail, aol, yahoo, etc.) and communicating through a private messaging system on an employer's sever" - suggests that she is describing a different, undisclosed email account on Epstein's private server.

If the Epstein Server Account is, indeed, a different account from the Mindspring email account, and she did use it to communicate from 1999- July 18, 2009,[1] she should have disclosed this account. Yet, even in her latest response, Defendant does not disclose what the email address is.  She fails even to disclose the "local part" or the name of the mailbox that comes before the "@" symbol, as well as the domain name, which follows. Further, she fails to

---

[1] July 18, 2009 is the earliest-dated email Defendant has produced in this litigation. (GM_00069)

disclose how she, herself, used the email account. All she says is that "it is not available to Ms. Maxwell."  (Resp. Br. at 6).[2]

Defendant, apparently, has done nothing to recover her still-undisclosed email account hosted on the private server of her long-time boyfriend and joint defense partner, Jeffrey Epstein. A blanket statement of "unavailability" is incredible – particularly without any description of the steps she has taken to make the emails available.   Without taking any efforts to recover her emails on Epstein's private server, she offers a bland conclusory statement that "there is no manner in which Ms. Maxwell could require Mr. Epstein to provide any information on Mr. Epstein's private server." (Resp. Br. at 7).  Yet Defendant and Epstein are currently both parties to a joint defense agreement and her own e-mails demonstrate she is communicating regularly with Epstein.  Notably, Defendant does not produce any proof of her efforts to try to gain access to the account from Epstein so she can comply with her discovery obligations in this case.

Whether or not it is ultimately unavailable, it should not have taken a motion to compel to prod Defendant into even suggesting that she used another email account from 1999-2002 to communicate. And, importantly, her brief is *only a suggestion* of that fact. Nowhere in her brief does Defendant actually state that she had an account on Epstein's private server. Despite pages of protestations that she cannot access the documents on Epstein's private server, she never actually discloses to the Court whether or not she had an account on Epstein's server in the first place. Defendant cannot have it both ways: she cannot seek be absolved of for failure to produce from an inaccessible account while continuing to refuse to admit that such an account even exists.

Additionally, Defendant claims to have performed a forensic exam on her Mindspring

---

[2] Ironically, Defendant's intimation that there is an undisclosed account is directly beneath a heading that states: "There is no 'Undisclosed' Account."

account. According to testimony, the Mindspring email account is hosted by Epstein's private server. Defendant's brief offers no explanation as to why she could access one email account from Epstein's private server, but not her other account from Epstein's private server. No details are offered. Accordingly, Defendant fails to meet her burden under Rule 26(b)(2)(B), Fed. R. Civ. P., to show that the information is not reasonably accessible because of undue burden or cost.

## II.   AN ADVERSE INFRERENCE INSTRUCTION IS WARRANTED

In this litigation as the Court will recall, Defendant first refused to produce any documents at all - Ms. Giuffre had to litigate for Defendant to commence discovery (DE 28). Defendant then refused Ms. Giuffre's proposed ESI protocol, and refused to negotiate an alternative. Defendant then proceeded to make her production, which consisted of *only two documents* (DE 33 and 35). All the while, Defendant was refusing to sit for her deposition until ultimately directed to do so by the Court (DE 106). Even more egregious, Defendant's counsel did not collect Defendant's electronic documents or run search terms, but allowed Defendant to pick and choose what documents she wanted to produce, which explains the fact that Defendant's initial production consisted of merely two documents. *See* May 12, 2016, Sealed Hearing transcript at 5-9 (Mr. Pagliuca: "After we went through the RFPs, Ms. Maxwell went through two email accounts, the email account at the Terramar and her personal email account Gmax. Those are the only two email accounts that she had access or has access to." . . . Ms. Schultz: "It should be an attorney's judgment whether or not a document is responsive, not at the discretion of the party defendant to look through her computer with absolutely no attorney supervision or any accountability for her search process, especially one that is done completely in secret . . . [t]he fact that defendant has shown so much recalcitrance in even discussing the discovery process is in itself telling that this

hasn't been completed correctly.")

Ms. Giuffre had to then litigate, extensively, to force Defendant to perform a proper collection and search, and, correctly, in response to the Motion to Compel, this Court directed Maxwell to gather all of her electronic data and run designated search terms. *See* August 9, 2016, Order (DE 352) directing Defendant to gather her electronic data and run search terms. Ms. Giuffre also had to litigate for documents Defendant withheld on a wrongful claim of privilege, many of which were not privileged on their face. Ultimately this Court directed Defendant to produce these documents.  (April 15, 2016, Sealed Order granting in part Motion to Compel for Improper Claim of Privilege).

Remarkably, Defendant complains in her brief about the inconvenience caused by the Court ordering her to search her electronic documents (Resp. Br. at 3).  But such a routine search is merely Defendant's basic obligation under Rule 26 and Rule 34.  Ms. Giuffre should not have been forced to seek a Court Order to get such obviously relevant materials from Defendant.  The Federal Rules of Civil Procedure are designed in such a way as to disallow parties to hide relevant information, including the non-disclosure of potential sources of discoverable information, like Defendant's email address on Epstein's private server. As noted by Magistrate Judge Francis, "The overriding theme of recent amendments to the discovery rules has been open and forthright sharing of information by all parties to a case with the aim of expediting case progress, minimizing burden and expense, and removing contentiousness as much as practicable.... If counsel fail in this responsibility—willfully or not—these principles of an open discovery process are undermined, coextensively inhibiting the courts' ability to objectively resolve their clients' disputes and the credibility of its resolution." *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 1728933, at *7 (S.D.N.Y.,2013) (Internal citations and quotations

omitted).

Even today, Defendant claims that after running over 200 key search terms, some of which include the names of her admitted close friends and boyfriend, she has not located a single responsive document.  The only conclusion that can reasonably be drawn is that she has deleted relevant documents – not simply her "spam" documents, as she would have the Court believe.  It is implausible that she would not have any responsive documents after running these search terms. Courts allow a forensic review of the electronic data including e-mail accounts to determine whether a deletion program has been run and to show the number of hits yielded by the search terms, and to provide a sampling to the Court to evaluate whether there indeed are responsive documents within the search term hits. Of course, by refusing to disclose even the name of her account on the Epstein server, let alone attempt to collect it, any such exercise would be futile.[3]

Defendant has set a course of failure to meet her discovery obligations, and with this Response Brief,[4] she continues that tack: she fails to even identify what email addresses she used

---

[3] Defendant should be required to provide access to her accounts and her electronic data to an independent third party forensic reviewer to perform these searches to determine, among other things, the date range of the accounts, whether deletion programs have been utilized on the accounts, and whether there are search term hits in the e-mail accounts and electronic data.  Ms. Giuffre, at the Court's direction, can submit a forensic review protocol for the Court's consideration.

[4] *See, e.g.*: Plaintiff's Response in Opposition to Defendant's Motion to Stay Discovery (DE 20); Defendant's Motion to Stay - Denied (DE 28); Plaintiff's February 26, 2016 Letter Motion to Compel Defendant to Sit for Her Deposition (DE 63) - Granted (DE 106); Plaintiff's Motion to Compel Documents Subject to Improper Claim of Privilege (DE 33), Granted in Part (DE 73); Plaintiff's Motion to Compel Documents Subject to Improper Objections (DE 35), Granted in part (106); Plaintiff's Response in Opposition to Defendant's Motion for a Protective Order Regarding Defendant's Deposition (DE 70) - Defendant's Motion Denied (DE 106); Plaintiff's Motion for Forensic Examination (DE 96) - Granted in part (June 20, 2016 Sealed Order); Plaintiff's Motion to Compel Defendant to Answer Deposition Questions (DE 143), Granted (June 20, 2016 Sealed Order); Plaintiff's Motion for Adverse Inference Instruction (DE 279), Pending; Plaintiff's Motion to Enforce the Court's Order and Direct Defendant to Answer

starting in 1999, in contravention of this Court's Order (DE 352).  This behavior, combined with

all of the previous refusals to search for and produce documents (which, after litigation, resulted

in this Court's Order to Defendant to search for and produce documents), is sufficient grounds

for this Court to give an adverse inference instruction under prevailing case law, as detailed in

the moving brief. At some point, Defendant should be held accountable for her gamesmanship.

Ms. Giuffre respectfully submits that time is now.[5]  The Court should deliver to the jury an

adverse inference instruction.[6]

### III.   MS. GIUFFRE MADE EFFORTS TO CONFER THAT WERE DISREGARDED BY DEFENDANT

Rather than explain why she has failed to produce all relevant emails, Defendant spends

much of her opposition suggesting to the Court – quite incorrectly – that Ms. Giuffre did not try to

confer with Defendant on this discovery issue.  But the only failure to confer here is on the part of

Defendant. As explained in the moving brief, Ms. Giuffre sent a letter to Defendant conferring on

this very issue. Defendant wholly failed to respond to this letter. Sadly, this is not an isolated

occurrence.  Defendant has simply failed to respond to a number of conferral letters Ms. Giuffre's

counsel have sent. Indeed, as the Court is aware from previous filings (DE 290, July 18, 2016,

Letter Response in opposition to Motion to Strike), Defendant has made a habit of ignoring

---

Deposition Questions (DE 315), and Pending; Plaintiff's Motion to Reopen Defendant's
Deposition (DE 466), Pending.

[5]  Defendant also has the temerity to seek attorneys' fees and costs from Ms. Giuffre.  Of course,
for the reasons articulated here, that request is frivolous.
[6] Ms. Giuffre proposes the following instruction: Defendant had a duty to collect and produce
relevant data from her email accounts from 1999 to the present. Defendant failed to collect and
produce relevant emails from some of those accounts. You may consider that this evidence
would have been unfavorable to Defendant on the issue of her defense that her alleged
defamatory statements were true.

counsel's repeated, written requests to meet and confer on various issues.[7] The undersigned's September 23, 2016, letter was simply another conferral letter that Defendant chose to ignore.

Defendant's implicitly concedes this pattern of ignoring conferral letters in her response. To support her claim that Ms. Giuffre had somehow failed to confer, Defendant writes that "[h]ad [Ms. Giuffre] bothered to *follow up* on this *alleged* communication, Ms. Maxwell would have reaffirmed that there is no 'undisclosed' email account." Defendant's Resp. Br. at 2 (emphasis added). Defendant has it exactly backwards. It is Defendant's responsibility to be "bothered" to answer Ms. Giuffre's initial conferral letter. Ms. Giuffre should not be expected to "follow up" with subsequent letters on the same subject, waiting for Defendant to deign to respond.  Simply put, Ms. Giuffre did attempt to confer on this issue, and Defendant refused. Three weeks went by while Defendant sat on Ms. Giuffre's letter, refusing to engage on this subject.

Rather than explain why she failed to respond to (yet another) of Ms. Giuffre's conferral letters, Defendant slyly suggests that Ms. Giuffre never sent the letter. Defendant describes the letter as an "alleged" communication, and further tells the Court that the "alleged" letter "was not included in the exhibits to the Motion." (Resp. Br. at 1.) Yet there is no doubt that the communication was sent to, and received by, Defendant. First, the email transmittal is attached hereto at Schultz Dec. at Exhibit 2. Second, the letter itself is attached hereto at Schultz Dec. at Exhibit 3.  Third, Defendant sent Ms. Giuffre a letter, dated October 17, 2016, that included multiple, ***word-for-word excerpts*** from Ms. Giuffre's September 23, 2016, letter - an "alleged" letter that the Defendant suggests to the Court does not exist. (Defendant's mimicking letter is

---

[7] The following examples are some conferral letters sent by Ms. Schultz, counsel for Ms. Giuffre, that Defendant's counsel have chosen to ignore, including: a May 20, 2016, letter regarding confidentiality designations (*See* DE 201); a June 8, 2016, letter regarding deficiencies in Defendant's production; a June 13, 2016, letter regarding the same; a June 30, 2016, letter regarding search terms; and a July 14, 2016, letter regarding the same.

attached hereto at Schultz Dec. at Exhibit 4.)  Sadly, Defendant's innuendo is not confined to her most recent response, as throughout this litigation, Defendant has repeatedly made deliberately misleading statements to the Court[8] and some explicitly false claims.[9]  For present purposes, the key point is that Ms. Giuffre fully fulfilled her conferral obligation.

## IV.   CONCLUSION

For the foregoing reasons, the Court should direct Defendant to disclose both the local part and the domain name of **<u>all</u>** her email accounts, including those from 1999-2009, and allow a neutral third-party expert to recover responsive data from those accounts (based upon the search terms this Court previously ordered) and allow a forensic review of all of Defendant's electronic data to ensure compliance with this Court's Order.  In addition, in view of the pattern of obstructive behavior, the Court should give to the jury an adverse inference instruction.

October 28, 2016

---

[8] For example, Defendant intimated to the court that she wanted to depose Judith Lightfoot, complaining that there was not sufficient time to arrange the deposition, in attempt to appear to be prejudiced before this Court, when, really, Defendant had **_absolutely no interest_** in taking Judith Lightfoot's deposition and could not be prejudiced. (DE 257). For another example, Defendant represented to the Court that Dr. Olson's records were not produced until after Ms. Giuffre was deposed - that was a distortion as Defendant already had those documents from Dr. Olsen himself, and they were re-issued by Ms. Giuffre after the deposition with Bates labels. *See* Plaintiff's Response in Opposition to Defendant's Motion to Reopen Deposition (DE 259).  For another example, Defendant represented to the Court that Ms. Giuffre's rape (where the presence of blood and semen was noted by the police report) was a "simulated sex act" (DE 335).  For another example, Defendant put forth to the Court a misleading tally of questions posed to Defendant that included all of the times questions were repeated due to Defendant's refusal to answer, including questions that were asked 15 times without eliciting a response. (DE 368, Plaintiff's Reply in Support of Motion to Enforce the Court's Order and Direct Defendant to Answer Deposition Questions). For another example, Defendant represented to the Court that Ms. Giuffre's privilege log contained un-identified third parties, when it did not. (DE 155).
[9] Defendant clearly and falsely told the Court that Ms. Giuffre has an "opioid addiction" (Reply ISO Motion for Sanctions DE 303), when there is no evidence - documentary or testimonial- that even remotely supports that false and calumnious claim.

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Sigrid McCawley
     Sigrid McCawley (Pro Hac Vice)
     Meredith Schultz (Pro Hac Vice)
     Boies Schiller & Flexner LLP
     401 E. Las Olas Blvd., Suite 1200
     Ft. Lauderdale, FL 33301
     (954) 356-0011
     David Boies
     Boies Schiller & Flexner LLP
     333 Main Street
     Armonk, NY 10504

     Bradley J. Edwards (Pro Hac Vice)
     FARMER, JAFFE, WEISSING,
     EDWARDS, FISTOS & LEHRMAN, P.L.
     425 North Andrews Avenue, Suite 2
     Fort Lauderdale, Florida 33301
     (954) 524-2820

     Paul G. Cassell (Pro Hac Vice)
     S.J. Quinney College of Law
     University of Utah
     383 University St.
     Salt Lake City, UT 84112
     (801) 585-5202[10]

---

[10] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

11

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on October 28, 2016, I electronically filed the foregoing

document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing

document is being served to all parties of record via transmission of the Electronic Court Filing

System generated by CM/ECF.

> Laura A. Menninger, Esq.
> Jeffrey Pagliuca, Esq.
> HADDON, MORGAN & FOREMAN, P.C.
> 150 East 10th Avenue
> Denver, Colorado 80203
> Tel: (303) 831-7364
> Fax: (303) 832-2628
> Email: lmenninger@hmflaw.com
>         jpagliuca@hmflaw.com

> /s/ Meredith Schultz
> Meredith Schultz