# EXHIBIT 3

## (File Under Seal)

GBAQGIUc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     VIRGINIA L. GIUFFRE, et al.,
3                 Plaintiffs

4          v.                          15 Civ. 7433 (RWS)
     GHISLAINE MAXWELL, et al.,
5                 Defendants
     ------------------------------x
6                                      New York, N.Y.
                                       November 10, 2016
7                                      12:30 p.m.

8    Before:

9                    HON. ROBERT W. SWEET

10                                     District Judge

11                        APPEARANCES
     S. J. QUINNEY COLLEGE OF LAW
12   AT THE UNIVERSITY OF UTAH
             Attorney for Plaintiff Giuffre
13   PAUL G. CASSELL

14   BOIES SCHILLER & FLEXNER LLP
             Attorney for Plaintiff Giuffre
15   MEREDITH L. SCHULTZ

16   HADDON MORGAN & FOREMAN
             Attorney for Defendant Maxwell
17   JEFFREY S. PAGLIUCA

18   MARTIN G. WEINBERG PC
             Attorney for Respondent Epstein
19   MARTIN G. WEINBERG

20   ATTERBURY GOLDBERGER & WEISS PA
             Attorney for Respondent Epstein]
21   JACK A. GOLDBERGER

22   DAVIS WRIGHT TREMAINE LLP
             Attorney for Non-Respondent Churcher
23   ERIC J. FEDER

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

GBAQGIUc

```
 1              (In open court)
 2              THE COURT:  OK.  Where we were was to consider the
 3    Churcher request with respect to the opinion.  Is there any
 4    problem with the opinion or the redacted opinion?
 5              MR. CASSELL:  Not from the plaintiff, your Honor.
 6              MR. PAGLIUCA:  I am leaving that completely up to you,
 7    your Honor.
 8              THE COURT:  Have you given me an order or how do we do
 9    this?
10              MR. FEDER:  Your Honor, Eric Feder for non-party
11    Sharon Churcher.  We submitted on September 20, it's document
12    number 440, an agreed notice of filing the redacted opinion,
13    which attached a copy of the redacted opinion.  So all we are
14    asking is that the Court sort of issue it as its own docket
15    entry that says opinion or memorandum and opinion, however the
16    Court wants to denominate it, because if we wanted to cite it
17    later, an exhibit would be hard for another court to swallow.
18              THE COURT:  Your motion to publish the redacted
19    opinion is granted, and I will file a docket entry to that
20    effect.
21              MR. FEDER:  Thanks, your Honor.
22              THE COURT:  So that does that.
23              The testimony of Epstein.
24              MR. CASSELL:  Your Honor, I think the matters we are
25    getting into now are sealed matters, so I would move that the
```

GBAQGIUc

1    courtroom be closed at this point.

2          MR. WEINBERG:  We agree, your Honor.

3          THE COURT:  That's fine.  You have to police the

4    people who are present.

5          MR. CASSELL:  I believe one attorney who is with

6    Mr. Epstein, and there are several other persons here.

7          THE COURT:  Well, obviously, Epstein is --

8          MR. CASSELL:  Right, Epstein would be permitted, but

9    there are several spectators here.

10         THE COURT:  All right.  Yes.

11         (The remainder of the hearing (pages 4-41) was sealed)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XGAQGIUc                          SEALED

1          (The following was held in a sealed courtroom)

2          MR. CASSELL:  Your Honor, we would move to compel the

3     testimony of Epstein.  I know you've read the pleadings.  I

4     could just highlight a couple of small matters for you.

5          Paul Cassell for plaintiff, Virginia Giuffre.  Our

6     motion to compel breaks down into three very narrow pieces, as

7     you know, from the pleadings.  Let me highlight a couple of

8     things that we think are foregone conclusions in the language

9     of the case law.

10          Cell phone records.  We've established, and, for

11     example, in our reply brief, we have an exhibit that gives you

12     not just general descriptions of phone records but very

13     particular information about the phone records, even the ten

14     digits that belong to the phone numbers.  We've given you line

15     one in Palm Beach County, line three in Palm Beach County.

16     We've given you two phone numbers on Epstein's Gulfstream jet.

17     We've given you two phone numbers on his 727.

18          The existence of telephone records for those

19     specifically identified numbers is a foregone conclusion.  And

20     with regard to authenticating them, obviously the phone company

21     can authenticate those.  So we haven't heard any argument that

22     provides any basis for his refusal to produce those phone

23     records.  And, remember, it isn't my job to convince you.  It's

24     their job to convince you that they have a valid Fifth

25     Amendment privilege to not answering what are obviously very

1    valid discovery requests.

2            Similar points could be made -- and I know you've seen

3    the briefing on bank records.  Again, we've given you not just

4    the theory that there are bank records.  We've given you the

5    bank.  We've given you account numbers.  Remember, the Palm

6    Beach Police Department executed a search warrant and actually

7    got some of the bank records.  So, the idea that he can now

8    assert a Fifth Amendment privilege over bank records that are

9    in the hands of the government strikes us as, to put it mildly,

10   farfetched.

11           We've also asked for production of photographs.  And,

12   there again, in our exhibits filed along with the reply brief,

13   we've actually given you photographs of the photographs we

14   want.  The existence of those photographs is a foregone

15   conclusion.  The cops went into Epstein's mansion executing a

16   search warrant, saw photographs, and we simply want him to

17   produce those photographs.

18           Finally, we think we've made a compelling case for

19   those three particular areas of documents, but at a minimum,

20   we're entitled to a privilege log.  The defendant wants to

21   litigate, or Mr. Epstein wants to litigate, this motion to

22   compel in the abstract, but that's not the way it's done.  The

23   local court rules, the Federal Rules of Civil Procedure, all

24   cited in our brief, say you have to provide a privilege log if

25   you're going to establish the privilege.  Again, I'm a little

1    frustrated because it's not my job to prove we're entitled to

2    the documents.  We served valid discovery requests.  It's

3    Epstein's attorney's job to show that he has a valid privilege.

4    That's our first point.

5           As you know, our second point is we have 49

6    specifically identified questions that we think he has no basis

7    for asserting a Fifth Amendment privilege to.  Ten of those

8    questions relate to Professor Dershowitz.  And the reason we

9    are obviously entitled, in our view, to answers to those

10   questions is he was deposed in 2010, and this was a case that

11   he initiated.  So the defense attorney said, "Do you know

12   Mr. Dershowitz?"

13          "Yeah, he's a friend of mine.  He's my attorney."  He

14   has waived privilege over Dershowitz-related questions, at

15   least in the ambit of that answer.

16          So, obviously, in our view, questions 23 through 31

17   are no-brainers because he's waived privilege over that, and

18   I'm not sure they have ever really responded to that.

19          With regard to the other questions, some of these are

20   pretty straightforward:  Do you know the defendant in this

21   case, Ms. Maxwell?  I mean, you know, they lived together for

22   ten years, and he's asserting a Fifth Amendment privilege over

23   that?

24          Without going into the substance of any communication

25   you've had, you've communicated with Maxwell in the last year.

XGAQGIUc                    SEALED

1    Again, that is not the kind of thing that can raise a realistic

2    prospect of incrimination.

3          Here is another question.  This is question 8 in our

4    brief.  In June 2008 in open court, you pled guilty to two

5    Florida felonies.  Well, that is on the record in Florida

6    court.  It's an open event with the government, by the way,

7    who's prosecuting him, and he refused to even answer that

8    question.

9          As you know, he refused to answer any question other

10   than what's your name?  So we have tried to be very selective.

11   We've given you a list of 45 specific questions where we're

12   entitled to the information.

13         Our third point, as you know, is this issue about

14   Epstein being compelled to testify that he saw Maxwell, his

15   girlfriend, before 2011 in foreign countries standing next to

16   girls under the age of 18.  And in response, he said, look,

17   there's a lifetime statute of limitations for sexual abuse

18   crimes, so I face a realistic risk of prosecution.  The

19   lifetime statute is an unusual statute, and that statute

20   applies only to some of the most serious crimes in the federal

21   criminal code:  Sexual abuse of a child.  But the only statute

22   that was cited by Mr. Epstein was the traveler statute, which

23   forbids traveling in foreign commerce to go someplace for

24   nefarious purposes.

25         That is not covered by the lifetime statute.  That's

1   covered by the standard five-year statute of limitations in

2   federal court.  If you look at the elements of that crime, it

3   involves simply traveling for sexual purposes.  It's not the

4   kind of crime that would warrant a lifetime statute of

5   limitations.  Again, that lifetime statute of limitation is

6   reserved for very narrow offenses.

7           So we're entitled to force him -- again, we're not

8   trying to force him to testify to everything under the sun.  We

9   want him to testify to events before 2010, so that's outside

10  the five-year statute of limitations.  And we're not even

11  asking him to testify about events concerning him.  We're

12  asking him to say, well, when you were in Thailand, did you see

13  Maxwell in the presence of underage girls.  So, we've come up

14  with three narrowly crafted requests, and we believe we're

15  entitled to have Epstein compelled to answer the questions in

16  those three areas.

17          Thank you, your Honor.

18          MR. PAGLIUCA:  Your Honor, Jeff Pagliuca on behalf of

19  Ms. Maxwell.  I have also filed a motion to compel

20  Mr. Epstein's testimony before your Honor.

21          I take a little bit of a different approach here,

22  Judge, because in my view there has been no showing by

23  Mr. Epstein that there is any reasonable possibility of

24  criminal prosecution.  I've not seen one document, I've not

25  seen any letter from a police agency, I've not seen any target

XGAQGIUc                    SEALED

1   letter from the government, I've not seen any phone calls from

2   anyone to Mr. Epstein.  There has been no showing that there's

3   any grand jury convened.  There's no summons to Mr. Epstein to

4   appear in any criminal matter.  And all we have is this

5   unsubstantiated assertion of "I may be prosecuted somewhere for

6   something."

7          The law is very clear that it's Mr. Epstein's burden

8   to establish some reasonable possibility of prosecution.  That

9   hasn't happened.  And unless that happens, I believe

10  Mr. Epstein should be forced to answer all questions put to

11  him.

12          . It's very difficult in my view to litigate this issue

13  in that vacuum, your Honor, because I don't know what statute

14  of limitations we're talking about because I don't know what

15  crime is being proffered as what Mr. Epstein may be in jeopardy

16  of facing.

17          So I think that that should be the Court's order, in

18  that there's been a failure to demonstrate any reasonable

19  possibility of prosecution.  Mr. Epstein should answer all

20  questions.

21          I do think it's a little difficult to piecemeal this

22  out, your Honor, because when I listen to Mr. Cassell, he says,

23  I want to narrowly ask questions about what did you see

24  Ms. Maxwell do.  Well, I think the Court knows and Mr. Cassell

25  knows, certainly, if there were a prosecution that were

XGAQGIUc                    SEALED

1   reasonable, all of those things would be used under a

2   complicity theory or 404(b) theory.  So if there were the

3   establishment of a reasonable likelihood of prosecution,

4   certainly all of those kinds of questions would fall within the

5   Fifth Amendment, but my view is different in that there is no

6   Fifth Amendment privilege that's been demonstrated as

7   applicable here.

8           There's been discussion about Mr. Epstein somehow

9   being in jeopardy in Florida, I guess.  The evidence that I am

10  aware of is that Mr. Epstein pled guilty as part of a joint

11  state/federal investigation, and my view is that as a result of

12  that guilty plea, along with the non-prosecution agreement,

13  there is no reasonable possibility of prosecution.  And that

14  plea agreement seemed to encompass dozens, I believe, of

15  alleged victims, and I am unaware of any alleged victims

16  outside of the ambit of that prosecution.  Certainly none has

17  been proffered to the Court.

18          As cited in the papers, my view of the law is fairly

19  clear that that operates as a bar to further prosecution, and,

20  again, I do not see how Mr. Epstein is subject to any

21  reasonable possibility of criminal prosecution.  So that is my

22  position on that issue, your Honor.  Thank you.

23          MR. WEINBERG:  Martin Weinberg on behalf of

24  Mr. Epstein.  Thank you, your Honor.

25          Let me start where the defendant left off.

1    Mr. Epstein has a sufficient and reasonable fear of

2    self-incrimination were he to be compelled by court order to

3    answer the questions that were proposed to him.  The fear comes

4    in part from proceedings in the Southern District of Florida.

5    He pled guilty to two very narrow state offenses that dealt

6    with two women.  That gives him no protection against a federal

7    prosecution, no protection against any other allegation, no

8    protection against the specific allegations that are front and

9    center in the complaint in this case, where Ms. Giuffre says

10   that Mr. Epstein with Ms. Maxwell committed a whole universe of

11   criminal offenses against her in places, including Florida, but

12   also in New Mexico, in New York, in the Virgin Islands in

13   France and England and on planes.  So there is no protection

14   from the state plea for any of the allegations made by

15   Ms. Giuffre in this case.

16          There is a risk that whatever limited protections

17   Mr. Epstein has as a result of his signing and performing under

18   a federal non-prosecution agreement he entered with the U.S.

19   Attorney's Office in the Southern District of Florida, that

20   protection is limited, and it's at risk.  It's at risk largely

21   because of the efforts of Mr. Cassell.  And I don't mean to be

22   critical.  He is representing two other clients in this case.

23   It's a crime victims rights case brought before District Court

24   Marra starting in 2008.  Still existing.  Mr. Cassell has made

25   it very clear he testified in a deposition in a different case

1    in Florida that the "ultimate aim of the action in Florida is

2    to invalidate a non-prosecution agreement and allow criminal

3    prosecution."

4          Our position, as we tried to articulate it for over

5    seven years, and this is testimony from Mr. Cassell in a

6    related case that he was a party to and gave a deposition in,

7    and he goes on and says that "The action CVRA, the crime

8    victims action, is ancillary to a contemplated criminal

9    prosecution of Jeffrey Epstein for women who were resisting him

10   in international sex trafficking.

11         So that's the goal of the plaintiff's counsel in this

12   case while representing two other young women in a different

13   case down in Florida.  They want to nullify the limited

14   protection Mr. Epstein has.  It's protection in Florida, but

15   again, Ms. Giuffre's allegations are that the offenses were

16   committed by both the defendant and Mr. Epstein in four or five

17   other locations, some foreign, some domestic.

18         Mr. Cassell -- even though we strongly believe that

19   Mr. Epstein who went to jail, served time, was on probation and

20   lived up to all his conditions of this non-prosecution

21   agreement, we strongly believe it would be unconstitutional to

22   invalidate it, but the truth is that Judge Marra in the

23   June 19, 2003 opinion, we cited it to your Honor, it's docket

24   entry 189 in that case, and it now has a West citation that I

25   believe is 950 F. Supp.2d, has said that he believes that the

1    rescission remedy is a potential remedy.  He has not dismissed

2    Mr. Cassell's arguments.  Instead, he has made it very clear in

3    this opinion that he is strongly considering them, and if the

4    violations, even though they were government violations of the

5    CVRA, are proven, that he is going to consider rescinding

6    Mr. Epstein's protections.

7         Again, those are limited protections to the Southern

8    District of Florida, but even those are in peril as a result of

9    the resourcefulness and arguments made by Mr. Cassell.  So

10   clearly, Mr. Epstein has a reasonable fear that if he is being

11   asked to testify about the allegations made by Ms. Giuffre,

12   whether it's directly or indirectly, by being asked, well, did

13   Ms. Maxwell -- was she ever in the presence of underage women

14   and you, the allegation is Ms. Maxwell helped Mr. Epstein have

15   massages, erotic massages, sexual massages from underage women.

16        Any questions, whether they're in a document request,

17   whether they're for testimony about Ms. Maxwell, about

18   Ms. Giuffre are squarely within heartland of the Supreme

19   Court's 1951 eight-to-one decision *Hoffman v. U.S.*  I learned

20   about that in law school back a long time ago.  It is still the

21   compelling precedent.  It says any testimony that could be a

22   link in the chain of evidence that has a reasonable risk to

23   you, you are not compelled to testify about.  It talks about,

24   yes, we're going to give up having full testimony, whether it's

25   in grand juries or civil trials because we are going to honor

XGAQGIUc                          SEALED

 1    this historic privilege.  I think Mr. Cassell in a very

 2    creative way has tried to ask the Court to essentially

 3    invalidate a privilege of somebody who is at risk.

 4            In part, even in this case, Ms. Schultz's co-counsel,

 5    Ms. McCawley said when she was offering investigative records

 6    of another agency about an ongoing investigation, that's the

 7    word she used on April 21, 2016 at pages 18 and 19, and your

 8    Honor granted their right to provide your Honor in camera

 9    without disclosure whatever efforts were being made currently

10    by Ms. Giuffre to motivate prosecutions or prosecutors against

11    Ms. Maxwell, but the case against Ms. Maxwell is a case against

12    Mr. Epstein.  So he has a legitimate and principal concern that

13    either the protections he has are too limited or they're going

14    to be invalidated down in Florida.  So that's the response to

15    Ms. Maxwell's argument that he has no Fifth Amendment because

16    he has no risk.  He's at the epicenter of risk.

17            Directing myself more specifically to Professor

18    Cassell's arguments, the Fifth Amendment is an issue that

19    they've briefed, we've briefed, without agreeing that there is

20    no statute of limits; that it's the life of a child.

21    Ms. Giuffre is still a child.  There is an interplay between

22    questions that ask Mr. Epstein, was Ms. Maxwell with an

23    underage woman.  You know, were you with underage women and

24    questions like that, whether it's Thailand or France or

25    England, that if they relate to the travel, then certainly what

XGAQGIUc                    SEALED

1   occurred at the end of the travel is relevant to the travel.

2   Likewise, the travel is relevant to what happened afterwards.

3           We have a statute now that makes it a crime, whether

4   it's an adult or whether you're having illegal sex with

5   somebody for money, whether it's with somebody underage, if

6   you're having it in Thailand, if you're having it in France,

7   and you're an American, you are now subject to federal criminal

8   prosecution under the statute that we gave your Honor.

9           There are other statutes.  There's man acts statutes.

10  There's travel statutes.  There's a whole variety of statutes

11  that Congress has put in to cause a legitimate risk that

12  questions about Ms. Giuffre or Ms. Maxwell, whether the

13  questions are fixed to a foreign location or a domestic

14  location, could be the corroboration of Ms. Giuffre's otherwise

15  uncorroborated allegations.

16          We have to look no farther than the Bill Cosby case.

17  Nobody prosecuted him based on the allegation of one of the

18  alleged victims; but when he gave a deposition, that was

19  voluntary and made statements, that became the corroboration

20  that led to his prosecution for events that occurred 20 or 25

21  years ago.

22          In terms of Professor Dershowitz, yes, Mr. Epstein did

23  testify at a prior deposition about four or five years ago.  At

24  the time nobody had made any allegations connecting Professor

25  Dershowitz to any of the allegations against Mr. Epstein except

XGAQGIUc                         SEALED

1    that he was his lawyer.  In the meantime, Ms. Giuffre made

2    allegations first in Florida that Professor Dershowitz was

3    involved in some of these alleged offenses, and so that

4    triggers a Fifth Amendment right.  Mr. Epstein is not saying

5    Professor Dershowitz did anything, but to testify about

6    Professor Dershowitz, has he ever been to your home, again, has

7    the potential to corroborate the allegations made by

8    Mr. Cassell's client.

9            In terms of the waiver argument, the law is very clear

10   that in contrast to an attorney-client privilege, if I was to

11   disclose a privilege in one case, it's disclosed for all cases,

12   but the law is very clear that you can testify in one

13   proceeding and plead the Fifth Amendment in a separate and

14   distinct proceeding.  This was an issue that emerged in their

15   reply brief.  And if your Honor doesn't mind, I can either send

16   in a supplement --

17           THE COURT:  Sure.

18           MR. WEINBERG:  -- which lists the cases.  They're very

19   clear.  The Fifth Amendment is proceeding by proceeding.

20           MR. CASSELL:  If we could just have permission to

21   submit parallel responses.

22           MR. WEINBERG:  In terms of the subpoena, the documents

23   subpoenaed, Mr. Cassell focuses on three different categories

24   of requests.  One is cell records, and he says because we know

25   that Mr. Epstein had phone records back in 2005 when he was the

XGAQGIUc                          SEALED

1   subject of the Florida search warrant, that, therefore, it's a

2   foregone conclusion that he has records in 2016.  And the

3   specific request is not all telephone records.  It's all

4   telephone records associated with you, including cell records

5   from 1999 to the present that show any communications with

6   Ghislaine Maxwell.  So he, Mr. Epstein, has to -- to answer

7   this paragraph, it's not just dump cell records in a document

8   response; it's go through cell records to determine from your

9   state of mind whether any particular record matches this

10  subpoena request, which is a record of a communication with

11  Ms. Maxwell.  Well, in this case given the allegations made by

12  Ms. Giuffre about Mr. Epstein and Ms. Maxwell, he's got a Fifth

13  Amendment against even admitting that he knows Ms. Maxwell;

14  that he's spoken to Ms. Maxwell.  He has a Fifth Amendment

15  against producing a record that he spoke to her during the time

16  period of these allegations.

17              Second is that there is no foregone conclusion that a

18  record that existed in 2005 is still controlled by Mr. Epstein

19  in 2016.  And we cited to the Second Circuit's August 1 opinion

20  that addressed just this issue, and they said, "Whether it is a

21  foregone conclusion that documents remained in Greenfield's

22  control through the issuance of the summons in 2013 is the

23  issue.  Only if the retention of a record that could be shown

24  to exist many years before, only if they can show that it's

25  still retained on the date of the subpoena is it a foregone

XGAQGIUc                    SEALED

1    conclusion," which is an exception to the Fifth Amendment.   And

2    the Greenfield case says there needs to be proof that the

3    record is still in the control and possession of Mr. Epstein,

4    otherwise, his producing it is an admission.   This is my phone.

5    I still have the record.   This month's record shows a call with

6    Ms. Maxwell.   It's akin to testimony.   They could not ask

7    Mr. Epstein under oath "Did you communicate with Ms. Maxwell

8    during the date and time that Ms. Giuffre says you and her were

9    committing illegal acts?"   Just like they can't get it by

10   testimony, they can't get it through a subpoena request that

11   requires as its predicate an admission that this is a call with

12   Ms. Maxwell.

13        The case cited even by the plaintiffs says, "The

14   touchstone of whether an act of production is testimonial,"

15   which would be compelled testimony "is whether the government

16   compels the individual to use the contents of his own mind to

17   explicitly or implicitly communicate a statement of fact."

18   Going through phone records, picking out a month and saying to

19   the plaintiff, this is a record of a call I had with

20   Ms. Maxwell is a communication, a selection by Mr. Epstein that

21   the Fifth Amendment in decisions like *Hubbell v. United States*,

22   discussing *Greenfield*, the Second Circuit recent opinion,

23   cannot be the basis of a subpoena request.

24        The same thing with bank records.   There is no

25   subpoena request for bank records.   What there is, is all

XGAQGIUc                    SEALED

1   documents relating to payments, you, Epstein, made to

2   Ms. Maxwell or any related entity.  So, again, he has to go

3   through any financial record and select a record, use his state

4   of mind, select a record that relates to Ms. Maxwell.  And by

5   producing it, it's akin to testifying this record is a record

6   between Mr. Epstein and Ms. Maxwell.  That's implied testimony.

7   That's an act of production.  That's akin to testimony, and

8   that's an admission that this record is the record that is

9   sought by the subpoena.  There is no request for bank records.

10  That would be an overbroad request.  But they can't ask

11  Mr. Epstein to use his mind to select a document, the

12  production of which is the same as testifying to an event.

13          Photographs.  They have photographs from 2005 seized

14  in a search and seizure in Florida.  Again, under *Greenfield*,

15  the issue is not whether they existed in 2005.  It's do you

16  currently have photographs of nude women.  And the act of

17  producing a photograph of a nude would, one, corroborate

18  allegations against Mr. Epstein that there were these pictures;

19  and, two, require him to admit the existence of this evidence,

20  which they don't know whether he still has or not.  And that

21  again goes back right to the heart of the *Greenfield* opinion.

22          Finally, the allegation about a privilege log.  There

23  is no privilege log that was required in a case that I provided

24  your Honor, *SEC v. Foster*, because the issue here is not

25  whether any specific document is privileged or not.  It's

1   whether the category of documents that are asked for in this

2   subpoena are all privileged because they all ask Mr. Epstein to

3   supply a document related to Virginia Giuffre, provide all

4   documents providing relating to Ms. Maxwell, provide payments

5   to Ms. Susue (ph), provide payments through credit cards that

6   show Ms. Maxwell and Ms. Giuffre.  In other words, all of the

7   requests that would require him to use his mind, make a

8   selection, and produce a record that when matched against the

9   request would be incriminating testimony.

10            · The cases are clear, including the *Hoffman* case from

11  1951, that you don't have to incriminate yourself, whether it's

12  through a log or through testimony to raise the Fifth

13  Amendment.

14            I'll end with a quote from Judge Learned Hand that was

15  cited in a <u>Yale Law Journal</u> article called, "The Conjures

16  Dilemma," which is the Fifth Amendment in civil cases where

17  Judge Learned Hand says, "Obviously, a witness may not be

18  compelled to do more than show that the answer is likely to be

19  dangerous to him, else he will be forced to disclose those very

20  facts which the privilege protects."  To do a lie, to set out

21  pictures of Virginia Giuffre 2001, the subpoena at paragraph 19

22  page 6 of the subpoena wants a log by date and by the content

23  of a document that you're raising a privilege to.  That has the

24  same perils as the production of the document.  It would be

25  Mr. Epstein going through documents, listing them, naming them

21

1   and saying that he still eleven years later or 12 years later

2   has a document that matches the subpoena.  The Fifth Amendment

3   protects him.  He should not, respectfully, be compelled to

4   testify to produce documents.

5           MR. CASSELL:  Let me just start at the outset by

6   noting a point of agreement.  We agree that Epstein with

7   Maxwell traveled to Florida, New York, the Virgin Islands and

8   elsewhere to sexually abuse children, and he remains at risk

9   for criminal prosecution in some of those cases.  So we start

10  from the same premises that there are those crimes that are out

11  there.

12          MR. PAGLIUCA:  Your Honor, I object to this colloquy

13  because this is improper.  Ms. Maxwell denies any of what

14  Mr. Cassell is saying, and this is just another attempt to

15  inject this inflammatory rhetoric into the record.  So I

16  object.

17          MR. CASSELL:  This is our complaint.  I don't know

18  that -- I am reiterating what's in our complaint and explaining

19  how it applies to this case is inflammatory.  I just want to

20  point out that we agree with that premise.  Starting from that

21  premise, the issue that is in three narrow areas are we

22  entitled to produce or force Epstein to produce some

23  information.  We hear from Mr. Weinberg that the 1951 *Hoffman*

24  case recognizes a Fifth Amendment privilege, and of course it

25  does.  More recently -- and I don't know if this was after he

XGAQGIUc                    SEALED

1    went to law school -- *Fisher* case of 1976 recognized that even

2    defendants who have committed serious crimes can be forced to

3    produce information so long as the act of producing that

4    information is not incriminating.  And I believe Mr. Epstein

5    has agreed that all of the documents do not have a Fifth

6    Amendment privilege to which he's entitled to assert.  The only

7    question is whether the mere act of producing those documents

8    is incriminating.

9             THE COURT:  Just a second.

10            (Pause)

11            MR. CASSELL:  Thank you, your Honor.

12            So I think we generally agree on the case law.  The

13   issue then is whether producing cell phone records -- let's

14   take cell phone records.  He says we would have to go through

15   and pick out particular records, and that act of pulling out

16   particular records is in and of itself incriminating.

17            We would ask our subpoena then to be construed to

18   avoid constitutional objections.  Just give us all his cell

19   phone records.  There is no picking and choosing at that point.

20   The only reason that some of our requests were initially

21   narrowed was to avoid a burdensomeness objection.  If that's

22   the a problem, we would ask leave to have our subpoena

23   construed to request all the records so that isn't the problem,

24   and we've tried to highlight in our brief areas where he is not

25   being required to pick and choose.

23

XGAQGIUc                    SEALED

1     He talks about the situation of, well, will these

2     records still remain in his control years later?  Of course our

3     subpoena extends through 2016, and obviously this month's cell

4     phone records remain in his control, not to mention records

5     that would extend back at least some period of time.

6         He cites the *Greenfield* case, which the Second Circuit

7     decided this summer.  *Greenfield* though involved a situation

8     where there was a tax scam going on, I don't know, offshore

9     movement of monies and so forth.  And the issue there was,

10    well, could the government authenticate the records from these

11    tax shelters and places like that.  Here, we're talking about

12    AT&T and cell phone companies that are not fly-by-night

13    operations, so *Greenfield* is an entirely different situation.

14        With regard to bank records, again, he's talking about

15    picking and choosing.  Simply construe our subpoena then or

16    give us leave to amend our subpoena so that it includes all

17    records.  He doesn't have to pick and choose.

18        Photographs.  He says that, well, who's to say whether

19    he has them today.  It would be incriminating to admit that I

20    have those photographs today.  But it has to be that the act of

21    producing the photograph is incriminating.  If we were asking

22    him to produce child pornography, he would have a point because

23    pulling out of your pocket a child pornography would in and of

24    itself be incriminating.  We are asking him to pull out though

25    pictures of adult women, non-pornographic pictures of children

XGAQGIUc                    SEALED

1   under the age of 18 and give those to us.  The act of producing

2   those photographs -- and remember, we have in the record

3   photographs of the photographs we are asking him to produce.

4   So that can't be incriminating to the government.  And, by the

5   way, some of the information was information that was obtained

6   when the state authorities were searching his house, so this

7   isn't a situation where the government is unaware of the

8   information.  They have it.

9        At the very least, we're entitled to a privilege log

10  on all of this.  He cites the *Foster* case.  The *Foster* case is

11  not a privilege log case.  If you look at our reply brief, I

12  think we have seven or eight cases in very recent years where

13  district courts have said, yes, produce a privilege log.  We're

14  entitled to a privilege log so we can know what the documents

15  are.

16       That's our first point.  Give us the documents or at

17  the very least, give us a privilege log.

18       The second set of issues swirls around 49 specifically

19  enumerated questions.  I noted, once again, it's Mr. Weinberg's

20  burden to show each and every one of those questions is

21  incriminating.  He hasn't done that in his pleadings, and he

22  hasn't done that here this afternoon.

23       I gave you just a couple of illustrations.  I thought

24  Mr. Weinberg would at least try to respond to those

25  illustrations.  He did not.  The only one he did respond to was

25

XGAQGIUc                          SEALED

1    Dershowitz.

2         Dershowitz has already been let out of the bag.  The

3    cat is out of the bag on that one.  He says, well, don't worry,

4    Judge, I'm going to give you legal authorities to show that on

5    Monday, my client can stand up and tell the government all

6    about Mr. Dershowitz, and then on Tuesday he can say, oh, no, I

7    don't want to answer those same questions when propounded by

8    Ms. Giuffre.

9         That's not the way a privilege log works.  Once you

10   waive privilege over the material, it's waived.  He waived it

11   in 2010.  We're entitled to answers of the ten questions

12   dealing with Dershowitz, and we're entitled to, what is it, 39

13   other answers to questions that are not reasonably

14   incriminating.

15        The third area is the traveler statute.  He said,

16   look, if my client went to Thailand and then sexually abused

17   girls with Maxwell, that's incriminating, so I'm entitled to

18   assert the Fifth.  There are a couple problems with that

19   argument.  Remember, crimes committed in foreign countries are

20   not the proper subject of a Fifth Amendment privilege because

21   the Fifth Amendment privilege only applies to American crimes.

22   So now we have to get down to what American crime did Epstein

23   commit or would Epstein be incriminating himself in if he said

24   that in 2010 I saw Maxwell with an underage girl in Thailand.

25        There is only one statute that's been cited by

XGAQGIUc                        SEALED

1    Epstein, and that's the traveler statute, but the traveler

2    statute does not involve sexual abuse.  It involves traveling

3    for illicit sexual conduct.  The reason that is significant is,

4    is there a lifetime statute of limitations for the traveler

5    statute, or is it just a standard issue five-year statute of

6    limitations?  The standard issue five-year statute of

7    limitations applies to all crimes presumptively, including,

8    like Mr. Pagliuca was talking about conspiracy or something,

9    that's a five-year statute of limitations.  The only crimes

10   that are outside the standard issue five-year statute of

11   limitations are sexual abuse of children.  The traveler statute

12   does not involve sexual abuse of children, at least at an

13   elemental level.  You can commit a violation of the traveler

14   statute if you just travel for certain prostitution purposes,

15   and as a result -- and there was no case law that's been cited

16   by Epstein -- only a five-year statute of limitations applies

17   to the traveler crimes.

18          So even assuming arguendo that there is some

19   incrimination about the traveler statute, it only exists for

20   five years.  I'm only going to ask Epstein questions from 2010

21   and earlier.  Of course, the significant events in this case

22   took place in '99 to 2001, making any possibility of

23   prosecution even more remote.

24          For those very specific questions, we believe we're

25   entitled to have Epstein compelled to answer.

27

XGAQGIUc                    SEALED

1          Thank you, your Honor.

2          MR. WEINBERG:  Could I have one minute to respond,

3    your Honor?  I'm sorry, Jeff.

4          MR. PAGLIUCA:  Thank you.

5          This is a whipsaw here for Ms. Maxwell.  This is a

6    perfect illustration of the whipsaw and the problem that we

7    have.

8          Mr. Cassell stands up and says we agree with

9    Mr. Epstein's counsel that Maxwell sexually assaulted people

10   here, sexually assaulted people there with Mr. Epstein.  Well,

11   none of that actually ever happened, your Honor.  So they feel

12   free to say whatever they want to say because they know that

13   Mr. Epstein is going to say, well, I'm asserting the Fifth

14   Amendment privilege to whatever it is that you just said.  So

15   they can make up whatever they want to make up and implicate

16   Ms. Maxwell, and Ms. Maxwell has no ability to get to the

17   source of the information to use it to exonerate herself in

18   this case.  That's the whipsaw that's going on here, your

19   Honor.

20          There is another am problem that I want to -- well,

21   the other problem here is this is a whipsaw that's created by

22   the plaintiff and her counsel because the plaintiff and her

23   counsel are trying to undo this non-prosecution agreement that

24   then forms the basis of Mr. Epstein's Fifth Amendment privilege

25   assertion.  So to the extent that I can try to get to evidence

1    that would be helpful to Ms. Maxwell, I'm prevented by the

2    actions of the plaintiff and the actions of Mr. Epstein, and

3    that's a problem in my view.

4            When Mr. Cassell talks about, well, these are these

5    questions that I want to ask, well, all of those questions have

6    follow-up questions from me, your Honor, which is, Ms. Maxwell

7    didn't do this, and you weren't with Ms. Maxwell doing

8    anything, and so we get into this, you know, descending into

9    madness questioning with no good answer.

10           The other issue that I would like the Court to address

11   is this reference to what was given to the Court in camera by

12   the plaintiff that I've never seen, your Honor.  This is some

13   document that was apparently provided to the Court that I

14   objected to, and I asked the Court to produce, that somehow

15   implicates Mr. Epstein's Fifth Amendment privilege.  So I would

16   ask again, your Honor, that that document be produced to

17   Ms. Maxwell because we've never seen it.  So to the extent the

18   Court is going to rely on that information, I don't believe

19   that it's proper because we've never seen the document that was

20   produced ex-parte in camera, and we've never had an opportunity

21   to respond to it.

22           If indeed the basis of this Fifth Amendment assertion

23   is the plaintiff's attempt to undo the non-prosecution

24   agreement, there's an easy fix here.  The plaintiff can agree

25   not to undo the non-prosecution agreement.  The plaintiff can

XGAQGIUc                    SEALED

 1   agree that they will not be seeking rescission of Mr. Epstein's
 2   non-prosecution agreement as part of that action, which I might
 3   add, your Honor, that Jane Doe No. 3 was Ms. Giuffre who
 4   attempted to intervene in that action and still has an interest
 5   in the outcome of that action through her lawyers.  So that can
 6   be agreed to by the plaintiff in this case which would then
 7   take us out from under this problem.
 8           But I am caught in the middle of trying to get helpful
 9   evidence for my client, which I believe if Mr. Epstein was
10   allowed to testify would support her position fully between
11   Mr. Cassell and his argument and Mr. Epstein and his Fifth
12   Amendment privilege.
13           THE COURT:  Thank you all.
14           MR. WEINBERG:  Can I briefly have a minute, Judge?
15           THE COURT:  No.  Thank you.
16           The next order of business is the reopening of the
17   defendant's testimony.
18           MS. SCHULTZ:  This is Meredith Schultz for
19   Ms. Giuffre.
20           This Court has already ruled that it's appropriate to
21   reopen a party deposition when that party produces documents
22   after she's been deposed.  Cases such as *Wesley v. Muhammad*
23   support that ruling, and pursuant to your ruling, plaintiff is
24   having her deposition taken again next week to answer questions
25   about the documents she produced after her deposition.

1    Here, defendant failed to produce two important

2    documents until after her deposition and after the close of

3    discovery.  These documents are communications with Jeffrey

4    Epstein, her co-conspirator and convicted pedophile, as well as

5    with Ross Gow, her press agent who assisted her in issuing the

6    defamation statement that is at issue in this case.  As this

7    Court will recall, defendant and her attorney, Phil Barden,

8    wrongfully refused to produce her agent Ross Gow and forced

9    Ms. Giuffre to spend tens of thousands of dollars to secure his

10   deposition, finally taking place next week.

11   If Ms. Giuffre is not afforded the opportunity to ask

12   defendant question about these documents, she will be

13   prejudiced and defendant will be rewarded for her failure to

14   make a timely production.  Not only are these documents

15   communications with key witnesses, your Honor, they're about a

16   central topic to this case, defaming Ms. Giuffre through the

17   media.  These are not emails about the weather or anything like

18   that.  They're discussing further public statements about

19   Ms. Giuffre.  And importantly, your Honor, these communications

20   took place after the original defamatory statement and one

21   after the commencement of this litigation.

22   Defendant has argued that because Ms. Giuffre asked

23   her questions about other communications she's had with these

24   two individuals, it's unnecessary to ask about these documents.

25   That argument is just unsupported by the facts, and defendant

XGAQGIUc                    SEALED

1    cites no case law to support that argument either.  None of the

2    questions posed to defendant at her previous deposition were

3    about these two emails.  They don't go to her state of mind

4    when she was writing them, when she was communicating, and we

5    don't have an opportunity to ask her what she was doing with

6    those or use them to cross her prior testimony where she tries

7    to walk away from any involvement in issuing the defamatory

8    statement at issue here.

9            Reopening defendant's deposition is not only necessary

10   for Ms. Giuffre to ask about these documents.  Despite being

11   directed by this Court to answer questions that she refused to

12   answer in her first deposition, defendant again refused to

13   answer questions in her second deposition in direct violation

14   of this Court's order.  For example, she refused to answer

15   questions asking whether she could remember identifying the

16   girls who were victims of Jeff Epstein during the time she was

17   living and working with him and recruiting girls for her.  For

18   another example, she refused to answer questions about Johanna

19   Sjoberg, who defendant recruited for sex with Epstein under the

20   pretense of answering telephones for her.  So, Ms. Giuffre has

21   a motion pending concerning defendant's behavior in her second

22   deposition in which she violated the Court's order by refusing

23   to answer those questions.

24           Now, she's produced two more documents, important

25   pieces of evidence, and accordingly this Court should reopen

XGAQGIUc                SEALED

1    the deposition both to ask questions about the lately produced

2    evidence, as well as the ones she refused to answer in

3    violation of the order.

4         MR PAGLIUCA:  Your Honor, let me start with the

5    reference to plaintiff's conduct during her deposition, which

6    is wholly different than the issue before the Court now.

7         At the direction of her lawyers, Ms. Giuffre refused

8    to answer multiple relevant questions throughout the course of

9    the deposition.  The conduct in that deposition after we filed

10   a motion to compel, her lawyers agreed that she needed to sit

11   for a second deposition, and the only issue was whether it was

12   going to be done by video conference or in person.  Because of

13   the egregious nature of the conduct, they knew that they had no

14   chance at defeating that motion to compel.  Here, your Honor,

15   we are talking about two emails that were inadvertently not

16   included in the production.  We thought they had been produced,

17   and when we went back through the documents, it appeared that

18   they hadn't, so we produced them, as is our obligation under

19   Rule 26.

20        The first email, your Honor, is an email from Mr. Gow

21   to Mr. Barden and Ms. Maxwell that is forwarding an email from

22   The New York Times and simply it says, you know, please advise

23   how you wish to respond.  That's it.  That's the entirety of

24   this email.  There is no response from Ms. Maxwell.  So what

25   we're talking about here is an email that Mr. Gow forwarded

XGAQGIUc                    SEALED

1    saying please advise how you wish to respond.   That's it.

2               This is virtually identical to other emails that are

3    in the same time frame that were produced that Ms. Maxwell

4    was -- they either had the opportunity to ask her these

5    questions or in fact asked her these questions.  So it is

6    repetitive, and there is no evidentiary value to this

7    particular email as opposed to the other emails that deal with

8    exactly the same thing.  That is, simply somebody saying what

9    would you like me to do, if anything, about this thing that I

10   got from somebody else.  The appropriate person to ask about

11   that email is Mr. Gow, and they're going to do that.

12              I also find it very curious, your Honor, that

13   throughout the papers and argument there is some assertion, I

14   think, that either Ms. Maxwell or her lawyers have done

15   something wrong relative to Mr. Gow and then having to go take

16   his deposition.  I don't represent Mr. Gow.  I don't control

17   Mr. Gow, who is a citizen of the United Kingdom.  I can't make

18   him come here, and I can't make him sit for a deposition.  If

19   they want to go take his deposition, that's what they need to

20   do and not complain about it or blame it on Ms. Maxwell, which

21   is what they seem to be doing here.

22              The other email they're talking about, your Honor, is

23   an April 22 email, which is, again, similar to other emails

24   that were produced from the same time frame, and they asked or

25   had the opportunity to ask questions about the exact same

34

XGAQGIUc                    SEALED

1    subject matter in Ms. Maxwell's deposition.  So this is really,

2    I think, much ado about nothing here, your Honor, and this

3    motion should be denied.

4            MS. SCHULTZ:  Your Honor, the emails are certainly

5    about a very similar subject matter as emails she was already

6    questioned about, and that is defaming Ms. Giuffre.  The timing

7    is different though.  These emails occurred after the

8    defamatory statement was released.  The fact that she is still

9    using the same press agent has evidentiary value because she

10   didn't fire him.  She didn't throw him out.

11           THE COURT:  Ms. Maxwell will be deposed with respect

12   to the emails.  The deposition will be limited to two hours.

13           MS. SCHULTZ:  Thank you, your Honor.

14           THE COURT:  Anything else on that subject?  OK.

15           The last motion.

16           MS. SCHULTZ:  Thank you, your Honor.

17           Defendant has turned a simple and straightforward

18   discovery process into an unnecessary cat-and-mouse game.  My

19   next point is very --

20           THE COURT:  Now, I really would appreciate -- look, I

21   understand this case to a degree, at any rate.  I understand

22   that there are emotional values at stake, but, you know, we

23   don't need the categorizations.  Let's just deal with the

24   issues.

25           MS. SCHULTZ:  Sure.  Yes, your Honor.

XGAQGIUc                        SEALED

1       THE COURT:  And we don't need to beat everybody up.

2   Let's just get to the point.

3       MS. SCHULTZ:  This concerns electronically stored

4   information, a very dry subject.  Defendant has --

5       THE COURT:  Let me see if I understand it.  You're

6   saying that there are email accounts that you believe existed

7   and as to which there has been no data produced.  Is that it?

8       MS. SCHULTZ:  That's part of it.  Your Honor, let me

9   see if I can cut to the quick.  Defendant hasn't denied that

10  she used email to communicate during the critical time period

11  2000 through 2002.  She hasn't denied that.  She has merely

12  said, oh, the email addresses you know about are not ones that

13  I used.  I think we have a lot of unanswered questions here

14  today, specifically what email accounts did she use those

15  years, what email did she use in 2000, 2001, and another thing,

16  your Honor, is new evidence --

17      THE COURT:  Wait.  We're talking about a request for

18  documents, right?  And have you not requested all emails during

19  the relevant period?

20      MS. SCHULTZ:  Yes, your Honor, and this Court's order

21  directs the defendant to search from and produce from all email

22  accounts and this is where I'm --

23      THE COURT:  Now, and you're telling me that you have

24  reason to believe that there are accounts as to which she has

25  not done this.

XGAQGIUc                    SEALED

1              MS. SCHULTZ:  Yes, your Honor, for two reasons, and if

2    I can get into that.  The first reason is that, like I said,

3    defendant hasn't denied that she used an email account during

4    those years, but she hasn't disclosed what it was.  She's

5    merely said, oh, it's not the ones you know about.  I don't

6    think it's a very plausible argument for defendant to say I

7    didn't use emails during those years.  So we want to know what

8    email she used and whether or not those accounts still exist or

9    if they're archived somewhere.  I think under her obligations

10   under the federal rules and under this Court's order, she

11   should be made to disclose what email she used in 2000, in 2001

12   in 2002.  I think that's a very basic elemental part of her

13   discovery.

14              The secondary problem, your Honor, is defendant has

15   represented to this Court that the Mindspring.com email account

16   that we discovered from the police reports, she said that that

17   is a spam account that she uses to register at retail stores.

18              THE COURT:  I'm sorry, to register?

19              MS. SCHULTZ:  At retail stores.  When you go shopping

20   at retail location.  She said she uses it for spam.  Publicly

21   available information that we've gathered shows that defendant

22   used that account not just for spam.  She used it for her

23   Dropbox account, which is an online file sharing account where

24   you can exchange files and photographs.  She's used it for her

25   Linked In account, which is a professional networking website

37

1   that has inbox and messaging capabilities where messages from

2   your professional contacts are routed to the email you sign up

3   with, so in her case the Mindspring.  We also found evidence

4   that she used it for her Tumblr account.  That is a social

5   media website that also has inbox and messaging where over

6   22 percent of the content on this social website is

7   pornographic and over 16 percent of the accounts created

8   therein contain exclusively pornographic material.

9          So, here we have three examples that are not retail

10  stores.  These are user created, user driven and user

11  controlled accounts, and social media accounts and file sharing

12  accounts.  It's not a spam account.  Defendant's counsel has

13  had plenty of time to ascertain how she used various email

14  addresses and which ones she used, but we don't have that

15  information.

16         Throughout the process there are still some basic and

17  fundamental questions that have not been answered.  What email

18  account did she use in 1999, in 2000, and 2001?  Are they still

19  active?  Are they archived somewhere?  What communications does

20  she have in her social media accounts?  What documents and

21  files does she have in Dropbox?  The fact that we don't have

22  answers to these questions 12 months into this litigation is

23  troubling.  Withholding information of these documents is

24  contrary to our obligations, and it's contrary to this Court's

25  order.  If you will note, your Honor, nowhere in the response

XGAQGIUc                    SEALED

1   brief does it say, oh, I didn't have an email account during

2   these years.  It's a vague statement suggesting she has

3   something that's unavailable to her on Epstein's private

4   server.

5          THE COURT:  Thank you.

6          MR. PAGLIUCA:  Your Honor, so first so the record is

7   clear Ms. Maxwell has never been asked the question please

8   identify all of your email accounts for these years.  There has

9   never been an interrogatory to that request.  There has never

10  been a request in a deposition like that.  And so this motion

11  practice is now seemingly turning into some sort of grand jury

12  query here.

13         We produced, your Honor, all of the responsive emails,

14  and we spent many hours and thousands of dollars looking for

15  these things.  It is mind-boggling to me, frankly, that I'm

16  arguing about this because we have searched every device that

17  she has, it's been searched, and there are no responsive emails

18  that we have not produced.  I don't know what else to say other

19  than we did it, and we don't have anything to produce to you.

20  That's number one.

21         THE COURT:  Well, what you are in effect saying to me,

22  I think, is that you have answered the inquiry as to what

23  accounts she has because you have searched the computers.  So

24  am I wrong?

25         MR. PAGLIUCA:  Well, there's this argument that she

XGAQGIUc                    SEALED

1    must have had another account, and she has never said whether

2    she does or she doesn't that I don't know how to address, quite

3    frankly, and that relates back to the fact that nobody ever

4    asked her did you have this account or did you have that

5    account.

6            I can tell you what we did, and I think that answers

7    the question, but what we did was, we collected the devices, we

8    had them forensically searched.  This is a long and involved

9    process because, first of all, it was done once and that wasn't

10   good enough.  And then it was done again with a giant set of

11   search terms which apparently wasn't good enough.  And then it

12   was done a third time with more expansive search terms.  The

13   third time resulted in the production of thousands of pages

14   because there were words in there like "passport" and so on

15   Ms. Maxwell's Terra Mar email, for example, every single email

16   says "passport to the ocean" which is one of her catch phrases.

17   I had to read all of those, thousands of these pages because

18   the word passport was in there.  So what I'm telling you is all

19   of these things have been searched and everything that is

20   responsive has been produced.

21           The Mindspring account, first of all, I take exception

22   to what Ms. Schultz just said to the Court about somehow this

23   is used pornographically, whatever she said.  This is new

24   information to me, which leads back to another point that is

25   problematic on this motion.  They've never conferred about any

40

XGAQGIUc                    SEALED

1   of this.  If somebody said to me, oh, we found X, Y and Z, go

2   look at it.  I would go look at it and be concerned about it,

3   but nobody has ever given me that information, and they tell it

4   to you here without me having any opportunity to look into it

5   and rebut it because I believe that I certainly will be able to

6   because I believe what they're telling you is not true, period.

7            THE COURT:  OK.  The motion to compel additional data

8   is denied at this time.  The parties will meet and confer.

9   After that meet and confer, you can then advise me of any

10  issues that remain.

11           MS. SCHULTZ:  Your Honor, can I serve an interrogatory

12  asking for the email --

13           THE COURT:  I'm sorry?

14           MS. SCHULTZ:  I'd like to serve an interrogatory

15  asking for what email addresses were used.

16           MR PAGLIUCA:  And I object, your Honor.

17           MS. SCHULTZ:  Discovery is closed.  So while we're in

18  front of you, I'm asking for permission to serve that because I

19  don't know how to get --

20           THE COURT:  Well, that where are we?  Actually,

21  correct me if I'm wrong, fact discovery is closed?

22           MR. PAGLIUCA:  Yes, for months now.

23           THE COURT:  And if we open it up for an interrogatory

24  here, an interrogatory there -- I think we are stuck with

25  whatever the record is at the moment.  So you can meet and

XGAQGIUc                    SEALED

1   confer on this Mindsprung or spring or whatever and see where

2   you come out.  And I would be pleased to hear you again if it

3   is necessary.

4           MR. PAGLIUCA:  Happy to do that, your Honor.

5           MS. SCHULTZ:  Thank you, your Honor.

6           MR. WEINBERG:  Judge, since this matter is under seal,

7   may I send the supplemental letter regarding the Fifth

8   Amendment waiver issue?

9           THE COURT:  Sure, of course.

10          MR. CASSELL:  And I --

11          THE COURT:  Yes, you may respond.

12          (Adjourned)