# EXHIBIT 1
# (FILE UNDER SEAL)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

VIRGINIA L. GIUFFRE,

    Plaintiff,

v.                                                   15-cv-07433-RWS

GHISLAINE MAXWELL,

    Defendant.

---------------------------------------------------X

### Declaration of Philip Barden

I, Philip Barden, declare as follows:

1. I am a Solicitor of the Senior Courts of England & Wales based in London, England.

2. I am submitting this Declaration in support of Ghislaine Maxwell's motion for summary judgment in this action.

3. I am not authorised to and do not waive Ms. Maxwell's attorney-client privilege.

4. I have represented Ms. Maxwell since 2011 regarding the allegations made by Plaintiff Virginia Giuffre and as published in the United Kingdom. I continue to be retained in this regard. I am familiar generally with the subject matter of this action.

5. I first represented Ms. Maxwell in this matter over the weekend of 5th and 6th March 2011, about the time when various UK national newspapers, in hard copy and on line, published numerous and provocative allegations made by the Plaintiff Virginia Giuffre against Ms. Maxwell. The articles by Sharon Churcher were among those published in this time frame.

6. I instructed British press agent Ross Gow to assist me in representing Ms. Maxwell.

1

7. I caused to be prepared a statement to respond to the articles that appeared in the British Press over the weekend—March 5 and 6, 2011, and thereafter. I directed Mr. Gow to distribute the statements to various media outlets that had published articles.

8. On December 30, 2014, Ms. Giuffre made numerous salacious and improper allegations against Ms. Maxwell in a joinder motion publicly filed in a civil case involving Jeffrey Epstein. Shortly afterward, the British media gained access to the motion and began inquiring about Ms. Maxwell's response.

9. I continued to represent Ms. Maxwell at that time and I coordinated the response to the media. I again instructed Mr. Gow to assist me.

10. In liaison with Mr. Gow and my client, on January 2, 2015, I prepared a further statement denying the allegations, and I instructed Mr. Gow to transmit it via email to members of the British media who had made inquiry about plaintiff's allegations about Ms. Maxwell. Attached as Exhibit A1 is an email containing a true and correct copy of this statement. The statement was issued on my authority. Although it is possible others suggested or contributed content, I prepared the vast majority of the statement and ultimately approved and adopted all of the statement as my work.

11. As is evident from the timing and the typographical errors in the statement, I prepared the statement in haste. I was not in the office on 2nd January 2015 as it was the Friday immediately after New Years day which is a public holiday. Most people took 2nd January off and many business closed that day. I don't now recall where I was that day but I was hard to reach and that indicates I was out with my family. I therefore would have prepared the statement in a hurry. I recall that I wanted to get a statement out as a matter of urgency.

12. I recall that immediately after Ms. Giuffre's motion was filed, media representatives began contacting Mr. Gow and requesting Ms. Maxwell's response to Ms. Giuffre's allegations

of criminal and other misconduct by Ms. Maxwell. I believed an immediate response was imperative, even though this was happening in the midst of the holidays in the United Kingdom. My communications with Mr. Gow and with Ms. Maxwell were sporadic, delayed and hurried because of my and their own holiday schedules. I worked while on vacation and on Friday, January 2, 2015, to ensure that the statement was issued as soon as possible after receiving the media inquiries.

13.   I did not ask Ms. Maxwell to respond point by point to Ms. Giuffre's factual allegations in the CVRA joinder motion. What we needed to do was issue an immediate denial and that necessarily had to be short and to the point. It should have been obvious to the media that Ms. Giuffre's new and significantly more salacious allegations had no credibility because they differed so substantially from her previous allegations, when she had the opportunity and incentive to disclose all relevant facts about being a victim of alleged sexual abuse and sex trafficking at the hands of the rich and powerful. I prepared the January 2015 statement based on my knowledge of Ms. Giuffre's past statements and her most recent statements in the joinder motion, and made the point to the media-recipients that she and her new statements, which differed so substantially from her former ones, were not credible—specifically, that the new allegations were patently false—i.e., "obvious lies."

14.   By way of example I recall that prior to the December 2014 filing of the joinder motion and the subsequent press reports that Ms. Guiffre clearly stated she had not had sex with Prince Andrew. Yet in her joinder motion she claimed she did have sex with Prince Andrew and that the sex occurred in what can only be described as a very small bathtub, too small for a man of Prince Andrew's size to enjoy a bath in let alone sex. So as of December 2014 it was clear Ms. Guiffre had made polar opposite statements. She was either lying when she said they did not have sex or when she said they did. I made the inescapable inference that she is a liar, as clearly

she is, since both statements cannot as a matter of fact be true. When someone says she did not have sex and then says she did, in other words, there is an obvious lie.

15. I did not intend the January 2015 statement as a traditional press release solely to disseminate information to the media. This is why I intentionally did not request that Mr. Gow or any other public relations specialist prepare or participate in preparing the statement. Instead, Mr. Gow served as my conduit to the media representatives who had requested a response to the joinder motion allegations and who I believed might republish those allegations.

16. My purpose in preparing and causing the statement to be disseminated to those media representatives was twofold. First, I wanted to mitigate the harm to Ms. Maxwell's reputation from the press's republication of plaintiff's false allegations. I believed these ends could be accomplished by suggesting to the media that, among other things, they should subject plaintiff's allegations to inquiry and scrutiny. For example, I noted that plaintiff's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicised as news."

17. Second, I intended the January 2015 statement to be "a shot across the bow" of the media, which I believed had been unduly eager to publish plaintiff's allegations without conducting any inquiry of their own. This was the purpose of repeatedly stating that plaintiff's allegations were "defamatory." In this sense, the statement was very much intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct.

18. It is important to understand that any story involving a member of the Royal Family, especially a senior member such as Prince Andrew, gains huge media attention in the UK and a story alleging he had a sex with the Plaintiff caused a feeding frenzy for the press. I wanted the

4

press to stop and think before publishing, to cease and desist, and that if they continued then they faced higher damages for ignoring my clear warning.

19.   Consistent with those two purposes, Mr. Gow's emails prefaced the statement with the following language: "Please find attached a *quotable statement* on behalf of Ms Maxwell" (italics supplied). The statement was intended to be a single, one-time-only, comprehensive response—quoted in full, if it was to be used—to plaintiff's December 30, 2014, allegations that would give the media Ms. Maxwell's response. The purpose of the prefatory statement was to inform the media-recipients of this intent.

20.   Selective and partial quotation and use of the statement would disserve my purposes. It was intended to address Plaintiff's behavior and allegations against Ms. Maxwell on a broad scale, that is to say, Plaintiff's history of making false allegations and innuendo to the media against Ms. Maxwell. This is why the statement references Plaintiff's "original allegations" and points out that her story "changes"—i.e. is embellished—over time including the allegations "now" that Professor Dershowitz allegedly had sexual relations with her. This is why I distinguished in the statement between Plaintiff's "original" allegations and her "new," joinder-motion allegations, which differed substantially from the original allegations. And this is why I wrote, "Each time the story is *re told* [sic] it *changes* with *new* salacious details about public figures and world leaders and *now* it is alleged by [Plaintiff] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies." (Emphasis supplied.) Having established the dramatic difference between Plaintiff's two sets of allegations, which suggested she was fabricating more and more-salacious allegations as she had more time to manufacture them, I added the third paragraph: "[Ms. Giuffre's] claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory." (Emphasis supplied.) I believed then, and believe now, that it was and remains a fair inference and conclusion that her claims

5

were and are "obvious lies." As noted, her claims not to have slept with Prince Andrew and to have slept with Prince Andrew are a classic example of an obvious lie. One or other account is on the face of it a lie.

21. As an example of her lack of credibility, the Plaintiff made allegations against Professor Dershowitz, which I understand she has now withdrawn. Professor Dershowitz has credibility because his story, insofar as I am familiar with it, has been consistent; Ms. Giuffre has no credibility because her story has shifted and changed.

22. Further the Plaintiff's account has become more salacious, for example, regarding Prince Andrew. The Plaintiff clearly has been seeking publicity for her story and it is clear to me that she understands retelling the same story doesn't feed the media and generate publicity and so each time she appears to create new allegations to generate media interest.

23. I understand the Plaintiff alleged in her Complaint in this action that the following statements are defamatory. She alleges it was defamatory in the first paragraph of the January 2015 statement to state that "the allegations made by [the Plaintiff] against [Ms.] Maxwell are untrue." For the reasons stated above, it was and is my considered and firm opinion that, in fact, her allegations are untrue. She alleges it was defamatory to state in the same paragraph that the "original allegations" have been "shown to be untrue." For the reasons stated above, it was and is my considered and firm opinion that, in fact, her allegations are untrue. Finally, she alleges that it was defamatory in the third paragraph to state that her claims are "obvious lies." For the reasons stated above, it was and is my considered and firm opinion that, in fact, her claims are obvious lies.

24. Both Mr. Gow and I understood that once the January 2015 statement was sent to the media-representatives, we had no ability to control whether or how they would use the statement and we made no effort to control whether or how they would use the statement.

6

25. It is my understanding that some of the media-recipients of the January 2015 statement did not publish any part of the statement. I am unaware of any media-recipient publishing the statement in full.

26. The issuance of the statement fully complied with my ethical obligations as a lawyer. Indeed it was duty in representing my client's interests to ensure that a denial was immediately issued. I would have been remiss if I had sat back and not issued a denial, and the press had published that Ms. Maxwell had not responded to enquiries and had not denied the new allegations; the public might have taken the silence as an admission there was some truth in the allegations.

27. The content of the statement was entirely based on information I acquired in connection with my role as counsel for Ms. Maxwell.

28. At the time I directed the issuance of the statement, I was contemplating litigation against the press-recipients as an additional means to mitigate and prevent harm to Ms. Maxwell. Whilst the limitation period for a pure defamation claim has now expired, claims are still being considered for example for publishing a deliberate falsehood, conspiracy to inure and other tortious acts.

29. In any such UK defamation, or other related, action Ms. Giuffre would be a defendant or a witness.

30. I directed that the statement indicate Ms. Maxwell "strongly denie[d] the allegations of an unsavoury nature," declare the allegations to be false, give the press-recipients notice that the publications of the allegations "are defamatory," and inform them that Ms. Maxwell was "reserv[ing] her right to seek redress."

7

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January **6**, 2017.

_____
Philip Barden

8