**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

                 Plaintiff,              Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

                 Defendant.

_____/

**<u>REPLY IN SUPPORT OF NON-PARTY'S MOTION FOR PROTECTIVE ORDER AND OPPOSITION TO DEFENDANT'S COMBINED MOTION TO COMPEL NON-PARTY WITNESS TO PRODUCE DOCUMENTS AND RESPOND TO DEPOSITION</u>**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...........................................................................................................ii

BACKGROUND ........................................................................................................................ 1

ARGUMENT ........................................................................................................................... 12

I.     NON-PARTY RANSOME HAS PRODUCED DOCUMENTS OF AND DOES NOT
       HAVE DOCUMENTS FOR A NUMBER OF REQUESTS. ..........................................15

II.    DEFENDANT'S SUBPOENA SEEKS DOCUMENTS SOLELY FOR THE
       PURPOSE OF INTIMIDATING AND HARASSING THIS NON-PARTY
       WITNESS REQUEST 10 (CURRENT PASSPORT/CURRENT VISAS):.....................17

III.   DEFENDANT SHOULD BE PRECLUDED FROM ASKING ANY ADDITIONAL
       DEPOSITION QUESTIONS THAT ARE SOLELY MEANT TO EMBARRASS,
       INTIMIDATE AND HARASS THIS NON-PARTY........................................................18

IV.    NON-PARTY MS. RANSOME SHOULD NOT BE FORCED TO INCUR THE
       BURDEN AND EXPENSE OF PRODUCING A PRIVILEGE LOG............................20

V.     NON-PARTY MS. RANSOME HAS PRODUCED DOCUMENTS RELEVANT TO
       *JANE DOE 43.* ................................................................................................................22

CONCLUSION ........................................................................................................................ 23

CERTIFICATE OF SERVICE ................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

Page

**<u>Cases</u>**

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
   300 F.R.D. 406 (C.D. Cal. 2014) ................................................................................ 12

*Blodgett v. Siemens Industry, Inc.*,
   2016 WL 4203490 (E.D.N.Y. 2016) .......................................................................... 12

*Buck v. Indian Mountain Sch.*,
   2017 WL 421648 (D. Conn. Jan. 31, 2017) ............................................................... 22

*City of Pontiac Gen. Employee's Ret. Sys. v. Lockheed Martin Corp.*,
   2012 WL 4202657 (S.D.N.Y. Sept. 18, 2012) .......................................................... 22

*DaCosta v. City of Danbury*,
   298 F.R.D. 37 (D. Conn. 2014) ............................................................................ 13, 18

*Dart Industries Co., Inc. v. Westwood Chemical Co.*,
   649 F.2d 646 (9th Cir. 1980) ..................................................................................... 12

*Gerber v. Down E. Cmty. Hosp.*,
   266 F.R.D. 29 (D. Me. 2010) ..................................................................................... 22

*Hickman v. Taylor*,
   329 U.S. 495, 67 S. Ct. 385, 91 L.Ed. 451 (1947) ................................................... 22

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,
   984 F.2d 422 (Fed.Cir.1993) ..................................................................................... 12

*Liz Claiborne, Inc., v. Mademoiselle Knitwear, Inc.*,
   No. 96 CIV 2064 (RWS), 1997 WL 53184 ............................................................... 22

*Medical Components, Inc. v. Classic Medical, Inc.*,
   210 F.R.D. 175 (M.D.N.C. 2002) .............................................................................. 21

*Night Hawk Limited v. Briarpatch Limited*,
   No. 03 CIV. 1382 (RWS), 2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) ............. 23

*S.E.C. v. NIR Grp., LLC*,
   283 F.R.D. 127 (E.D.N.Y. 2012) .............................................................................. 22

*Smartix International LLC v. Garrubbo, Romankow & Capese*,
   No. 06 CIV 1501 (JGK), 2007 WL 41666035 (S.D.N.Y. Nov. 20, 2007) ............... 12

*Solarex Corp. v. Arco Solar, Inc.*,
121 F.R.D. 163 (E.D.N.Y. 1988) ............................................................................. 21

*Tucker v. Am. Int'l Grp., Inc.*,
281 F.R.D. 85 (D. Conn. 2012) .......................................................................... 20, 21

*United States v. Jacques Dessange, Inc.*,
2000 WL 310345 (S.D.N.Y. Mar. 27, 2000) ............................................................ 22

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ................................................................................................. 22

*Wells Fargo Bank, N.A. v. Konover*,
2009 WL 585434 (D. Conn. Mar. 4, 2009) .............................................................. 20

*William A. Gross Const., Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
262 F.R.D. 354 (S.D.N.Y. 2009) ............................................................................. 21

## **Rules**

Fed. R. Civ. P. 37 .......................................................................................................... 12

Non-party, Sarah Ransome, by and through her undersigned counsel, hereby files this Reply in Support of Her Motion for Protective Order (DE 640) and Opposition to Defendant's Combined Motion to Compel Non-Party Witness to Produce Documents and Respond to Deposition (DE 655).

## BACKGROUND

Non-party Sarah Ransome has already provided significant discovery in this case. She previously flew from Barcelona to New York, sat for a ten-hour deposition, and produced many relevant documents. Indeed, witness Ms. Ransome has provided more significant evidence, including photographic evidence and electronic communications, than Defendant has produced in the two years she has been litigating this matter. Defendant has not produced a **single** document prior to 2009 and not a **single** photograph, despite testimony that she was an avid photographer of the young girls at Epstein's mansions, including taking nude photographs.

Specifically, and by way of example, non-party Ms. Ransome produced the following types of highly relevant information about Defendant's involvement in the sex trafficking and abuse:



Ransome_00069

*Jeffrey Epstein in 2006 on Little*
*St. James Island*



Ransome_000128

*Various females on Island in 2006 including Nadia.*
*Marcinkova*

1



Ransome_000131

*Various females on Island in 2006 including Nadia Marcinkova*



Ransome_000135

*Various females on Island in 2006 including Nadia Marcinkova*



Ransome_000138

*Defendant on Little St. James Island in 2006*



Ransome_000141

*Defendant on Little St. James Island in 2006*



Ransome_000142                    Ransome_000148

*Defendant on Little St. James Island in 2006    Defendant with Jean Luc Brunel in 2006*



Ransome_000152                    Ransome_000154

*Various females on Little St. James in 2006    Jeffrey Epstein and male friend in 2006 on Island*

3



Ransome_000218
*Non-Party Sarah Ransome in 2006 on Little St. James Island*

| From: | Sarah Ransome ███████████ |
|-------|---------------------------|
| Sent: | Thursday, February 08, 2007 2:43 PM |
| To: | ██████ |
| Subject: | RE: FIT website |

Hi Lesely

I will fax my application to you later on today as I am not able to email it. Could you also please tell Jeffery to phone me on the number i gave asap as I am not prepared to go under 56kg in order to study at FIT. I also need a flight booked back to New York so could you please check with Jeffery. The date that I would like to fly back is the 27th Feb.

Thanks very much

Sarah

Be a PS3 game guru.
Get your game face on with the latest PS3 news and previews at Yahoo! Games.

Ransome_000176

| From: | ████████████████ |
|-------|------------------|
| Sent: | Thursday, December 28, 2006 8:37 PM |
| To: | ██████████ |
| Subject: | flight |

Here is your flight details..
You will be going with a girl named Simona and a guy named Valdson. THey will both be staying at 301 E. 66 as well. I have a car picking you all up at 6:45am if you want to meet in the lobby... Please let me know you got this.. thanks!

Traveler(s) Frequent flier details
SARAH RANSOME

Saturday, December 30, 2006
Continental Airlines 1884
Depart: 9:25am
morning Newark, NJ
Newark Liberty Int'l (EWR)
Arrive: 2:43pm
afternoon St Thomas Island, Virgin Islands (U.S.)
St Thomas Island Cyril E King (STT)

Economy | Boeing 737-700 Passenger (73G) | 4hr 18min | 1635 miles

Seat: 20F

Seat is confirmed.

Ransome_000203

5

Moreover, Ms. Ransome sat for ten hours of deposition and gave critical testimony showing

Defendant's direct involvement in Epstein's sex abuse and sex trafficking conspiracy:

| Key Testimony | Transcript Citation |
|---|---|
| Maxwell provided Ms. Ransome with massaging training. | Ransome Dep. Tr. at 331 (Q. What did Ghislaine say to you?  A. I can't remember the specific conversation. But the fact that she helped me refine my massage skills to satisfy Jeffrey, I think it's pretty self-explanatory. ) |
| Massage was a key word for sex. | Ransome Dep. Tr. at 330 (Q. Does that have something to do with body massages?  A. Can you repeat -- let me read the question again. So I would just like to clarify, body massages meant sex, okay?  That's like a key word for sex. So as soon as you stop having sex with Jeffrey and his friends and his girls, you're out, because otherwise there's no reason for you to be associated with Jeffrey, because you're just there to have sex with him, so...) |
| The girls were on rotation for the purpose of giving Epstein sexual massages each day. | Ransome Dep. Tr. at 152 (Q. Did you see Natalya having any type of sexual relations with Jeffrey during the trip? A. Yes, I did. Q. When did you see that? A. I didn't see it in the bedroom, but we were called on, like, a rotation visit for Jeffrey throughout the day and evening.) |
| Maxwell was Epstein's main right-hand woman in 2006-2007; Maxwell ran the house like a brothel with girls on rotation for the purpose of giving Epstein sexual massages each day. | Ransome Dep. Tr. at 290-292 (Q. So we have Sarah Kellen having a discussion with Ghislaine about girls. *** There was a constant influx of girls. There were so many girls. There were girls in Miami. There were guests coming. There were -- It's like, I'm sure if you go into a hooker's brothel and see how they run their business, I mean, it's just general conversation about who's going to have sex with who and, you know -- what do you talk about when all you do is have sex every day on rotation? I mean, what is there to talk about? *** Q. Apart from general conversation, do you recall any specifics of any female reporting to Ghislaine? A. Yes, I saw. And with my own eyes, I saw how Ghislaine and Lesley Groff and the other girls reported to them. *** And we were told by Jeffrey Epstein to listen to Ghislaine. So Ghislaine was the main right-hand woman of Jeffrey Epstein. We were told by Jeffrey Epstein to listen to Ghislaine.) <br> *** <br> Ransome Dep. Tr. at 311-312 (Q. And when you say you were on rotation, you mean you were having sex with Jeffrey multiple times per day? A. No. As in when I was finished, another girl was called by Ghislaine. And when they had finished, another girl was called. Q. How do you know that another girl was called by Ghislaine? A. Because I was there, and I saw it and heard it with all my senses. I saw Ghislaine call another girl, and she called me herself, to go give Jeffrey Epstein a sexual massage. Q. What do you mean by call?  I guess I'm thinking like telephone. That may be my --  A. No. As in going up to the person and going, Jeffrey wants to see you in his bedroom, which meant it's your turn to be abused. That kind of thing. Q. And this is on the island? A. This is |

| Key Testimony | Transcript Citation |
|---|---|
| | on the island. Q. You heard -- as soon as you were done with Jeffrey, you heard Ghislaine go up to another girl and say, it's your turn with Jeffrey? A. So every single day *** So, I mean, our rotation changed every day that specific trip we had in December. So, for example, I would be called. Maybe a couple hours when Jeffrey had a little, you know, break, another girl was called, ▓▓▓. Then another girl was called. Every single day. We tried to hide on different -- like, so we wouldn't have to get called. We'd generally have to sit in the main area. There was like a big pool, the main seating area. There was a big table. We'd sit there and do kind of art on the table, and we always had to be around. We weren't allowed to go very far on the island. We always had to report to Ghislaine and Jeffrey and tell them if we were going down to the beach to swim because they had an inflatable trampoline. So they -- I mean, we always had to tell Ghislaine and Jeffrey where we were at all times. |
| Kellen reported to Maxwell. | Ransome Dep. Tr. at 289 (A. everyone was afraid of Ghislaine. All the girls were afraid of her, so everyone -- Sarah Kellen reported to her.) |
| All the girls providing sexual massages to Epstein reported to Maxwell; Maxwell "called the shots." | Ransome Dep. Tr. at 288-290 (Q. You said that the girls reported to Ghislaine. What did you see or hear that caused you to say that? A. Well, it's pretty obvious. I mean, Ghislaine called the shots. *** So, for example, there was one occasion where Jeffrey didn't like my hair and Ghislaine told me to change it. So there was -- everyone was afraid of Ghislaine. All the girls were afraid of her, so everyone -- Sarah Kellen reported to her. Lesley Groff reported to her. I don't know how to tell you. So when I say reporting, I witnessed with my own two eyes Sarah Kellen reporting to Ghislaine in front of me, but I can't remember specifics. They were talking about girls. I can't remember the specific conversation. But every single person 100 percent, 200 percent reported to Ghislaine. 100 percent.) |
| Girls were paid to recruit other girls; Maxwell was the main lady. | Ransome Dep. Tr. at 387 (Q. Apart from what Ms. Malyshev told you, do you have any other basis for knowing that Malyshev reported to Kellen, Groff and Maxwell and was paid for her recruitment of young females, including you? A. What she told me. Q. Apart from what she told you, do you have any other basis for that? A. Well, I saw it with my own eyes. I was a witness. Q. What did you witness? A. I witnessed the same thing all the other girls did, the same thing I had to do, was go and report to Sarah Kellen, Lesley Groff and Ghislaine. Ghislaine was the main lady…) |
| Maxwell recruited girls to the island; Maxwell was the "mamma bear." | Ransome Dep. Tr. at 287-288 (Q. You said, "Watching her interact with the other girls on the island, it became clear to me that she recruited all or many of them to the island." What do you mean that? A. That she recruited a lot of the girls. Q. What did you see? A. I saw how she interacted with all the girls. You know, if you walk into any -- I mean, common sense wise, if you walk into a firm, you kind of know who the boss is. You know, all the girls kind of reported to Ghislaine. Ghislaine was like the mama bear, if you know what I mean. She called the shots; we had to listen to Ghislaine. And Ghislaine was Jeffrey's right-hand |

| Key Testimony | Transcript Citation |
|---|---|
| | woman, so, you know, whatever Jeffrey wanted went through Ghislaine and then filtered through.) |
| Ms. Ransome witnessed Epstein having sex with Marcinkova on his plane in plain view. | Ransome Dep. Tr. at 121-123 (Q. Describe for me what happened on the plane ride? A. Nadia walked in, sat down in front of me, Nataly. We all buckled up, we took off. The rest of the passengers in the -- I think it's towards the front of the plane where all the seats are -- we all -- all the guests were -- fell asleep. I pretended to be asleep. Jeffrey then went -- Jeffrey went to his -- was in his bed on the plane, having open sex with Nadia for everyone to see, on display. ***Q. What types of sexual relationship did Jeffrey and Nadia have on the plane in your presence? A. Well, Nadia was straddling Jeffrey for quite some time. I watched them both ejaculate with each other. They were having quite a good time together.) |
| Maxwell and Epstein used promises to assist Ms. Ransome in getting into FIT and paying for her in return for being Epstein's sex slave. | Ransome Dep. Tr. at 234-235 (Q. Did you apply for any financial aid for FIT? A. No. Jeffrey was covering FIT. Q. That's what Jeffrey told you? A. Multiple, multiple times. Q. Did Ghislaine Maxwell say anything to you with regards to FIT? A. It was various conversations. It was known among everyone that I was going to FIT, and Jeffrey -- everyone knew he was helping me to get into FIT. It was common knowledge. Q. You described earlier that Ghislaine was helping review your application and your essay. Was there something else that she was doing to help you? A. Well, she said she would, but whether she did, I have no idea. She said she would. Whether she made calls, I doubt, because I didn't end up at FIT. So...) |
| Maxwell bullied the girls if they didn't comply with Epstein's sexual demands. | Ransome Dep. Tr. at 332 (A. Well, the fact that she used to personally call me herself to give Jeffrey sexual massages. Not body massages; sexual massages. It should be rephrased. I mean, it was pretty obvious. I mean, the whole weight thing. I tried to swim off the island. I tried to escape from an island during the evening to try and escape from her because if I didn't lose weight, they would cut me out of their -- financially off. I would lose the place that I was staying at. I would lose my education. You name it. They bullied me with everything, just like they did with the other girls.) |
| | Ransome Dep. Tr. at 333-334 (Q. … What was the threat that was made to you by Maxwell?  A. The fact that I would lose everything that they promised me. They -- they were really naughty. You know, they took girls from very underprivileged families. They gave them accommodation, they gave them food, gave them money for transportation, you know, private planes, etcetera, etcetera. So if I didn't have sex with Jeffrey, I would be homeless and starving in New York, so -- and my dream of getting a full-time education at one of the top fashion institutes in the world would be diminished. And that's what he held over my head, exactly like he did with ▮▮▮ and the other girls. He was paying for all of their educations. Q. How do you know that? A. Because they were telling me. It was common knowledge amongst all the girls. No other girl would be there |

8

| Key Testimony | Transcript Citation |
|---|---|
| | willingly just to have sex with Jeffrey.) |
| Victoria Secret outfits were provided to the girls on the Island. | Ransome Dep. Tr. at 350 (Q. They were supplied to you?   A. Yes. All of the outfits -- there were clothes that were provided on the island by Jeffrey Epstein, which were all Victoria's Secret clothing:  bikinis, nightwear. ) |
| Ms. Ransome testified that she is fearful for her life after coming forward. | Ransome Dep. Tr. at 40 (There were two people following me after I came forward to Maureen Callahan. I went to – I walked downstairs. I walked around -- I have a usual routine that I do. In the morning I went out, I saw the same two people. Later on that afternoon, I saw the same two people again. I was frightened. I'm frightened for my life, absolutely frightened. So there you go.) |

Ms. Ransome provided clear testimony as a non-party victim of sex trafficking that her motivating factor for testifying is to hold her traffickers accountable:

> Q. I'm just asking your understanding.
> A. Nothing's been promised to me about money.
> Q. Were you seeking money when you authorized this complaint to be filed on your behalf?
> A. No. I just wanted a pedophile behind bars, really, and for him to stop abusing young girls. Seeing as I'm going to be a parent myself, I can't really live with myself, knowing that there's a pedophile with my kids on the planet. So as a responsible human being, I thought that I would come forward.

*See* Pottinger Dec. at Exhibit 1, Ransome Dep. Tr. at 324:10 - 325:21.

Non-party Ms. Ransome further testified during her deposition about her motivation in coming forward and speaking openly: "I wanted to tell my story, and I want to run a campaign in which all the girls that have been abused by Ghislaine and Jeffrey can come forward. And I wanted to run a campaign with the New York Post to get these girls to have the courage to come forward, because I know a lot of them are frightened like myself." *See* Pottinger Dec. at Exhibit 1, Ransome Dep. Tr. at 39:19 to 40:22.

Despite this straightforward and commonsense explanation, Defendant uses her briefing to repeatedly suggest that non-party Ms. Ransome is motivated by "money" and that she "fabricated"

her story. From this dubious premise, Defendant then argues that Ms. Ransome should therefore be

punished by having to make burdensome and invasive disclosures of such things as *her boyfriend's*

*cell phone number and information from her current bank account*. Unwilling to confine her attacks

to Ms. Ransome, Defendant then levels attacks on the professionalism of Ms. Giuffre's legal counsel,

stating in her brief:  "One can hardly imagine a better motive to fabricate testimony that the type of

lottery win. To make it even better, there is no purchase price for the ticket, because the people who

want the testimony are willing to front the cost of the litigation either on a contingency or pro-bono

basis."  Defendant's Combined Motion at 7. Any suggestion of "fabrication" is directly refuted by

the multiple pictures and e-mails non-party Ms. Ransome produced – documentary evidence that

Defendant fails to discuss in her brief. Moreover, non-party Ms. Ransome is identified as a passenger

on Epstein's own flight logs:



Non-party Ms. Ransome's fulsome production included items such as multiple e-mails with

Sarah Kellen, a known key conspirator and recruiter of females, and Leslie Groff, Defendant's other

co-conspirator who was also named in the non-prosecution agreement. These e-mails are direct

evidence of the trafficking of females for the purpose of sex, and the use of fraud and manipulation to

accomplish that purpose. Ms. Ransome also produced numerous photographs of her travels to

Epstein's Little Saint James Island, which unequivocally establish Defendant's presence during the

years that she swore under oath that she was hardly around. Ms. Ransome's testimony proves that

what little Defendant did say during her deposition was far from the truth.

10

These documents do not lie, and moreover make it abundantly clear that Defendant was far from truthful during her deposition when she denied being a part of Epstein's sexual abuse conspiracy. Rather than engage Ms. Ransome's allegations on the merits, Defendant responds with technicalities. For example, Defendant attempts to suggest that Ms. Giuffre's counsel was not diligent in disclosing Ms. Ransome. Yet if there was any failure of disclosure here, it was entirely Defendant's failure. Clearly, witness Ms. Ransome is someone who has relevant evidence in this case, as her many photographs, e-mails, and other documents undoubtedly establish. And yet Defendant failed to disclose Ms. Ransome's existence not only in her Rule 26 disclosures, but also through (to put it mildly) her inaccurate testimony during her deposition. As a result, Ms. Giuffre's legal counsel did not learn of Ms. Ransome's existence and whereabouts until November. Furthermore, as Ms. Giuffre's counsel informed the Court, it was not until the first week in January that non-party Ms. Ransome was able to meet with counsel in person in Barcelona. Ms. Giuffre's counsel was not going to petition to bring a new witness before this Court without conducting complete due diligence to assure that her testimony was credible. As soon as that in-person meeting was accomplished in early January, Ms. Giuffre filed the appropriate papers with this Court and immediately offered to make Ms. Ransome available to Defendant for a deposition. After first delaying in taking that deposition, Defendant then made this victim of sex trafficking, who had flown to the United States from Barcelona, sit for ten hours at a deposition and be subject to harassing questions.

## ARGUMENT

In light of non-party Ms. Ransome's diligent efforts to satisfy Defendant's needs for discovery, the Court should enter a protective order against further discovery (DE 640) and deny Defendant's Combined Motion to Compel[1] (DE 655).

As explained in Non-Party Ransome's Motion for Protective Order, Defendant should not be allowed to use the discovery process as a means of intimidating and harassing a non-party. Counsel is not permitted to intentionally harass or embarrass a non-party witness during a deposition. *See Smartix International LLC v. Garrubbo, Romankow & Capese*, No. 06 CIV 1501 (JGK), 2007 WL 41666035 at *2 (S.D.N.Y Nov. 20, 2007) (court protecting deponent from annoyance, embarrassment and harassment by denying party's attempt to obtain personnel records relating to non-party).

Courts are more vigilant with these protections when the discovery is being sought from a non-party. "[T]he fact of non-party status may be considered by the Court in weighing the burdens imposed in the circumstances." *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed.Cir.1993); *accord Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409 (C.D. Cal. 2014); *see also Dart Industries Co., Inc. v. Westwood*

---

[1] In her Motion to Compel, Defendant failed to comply with Local Rule 37.1 and only inserted selected text from certain objections. Rule 37.1 requires: "upon any motion or application involving discovery or disclosure requests or responses under Fed. R. Civ. P. 37, the moving party shall specify and quote or set forth verbatim *in the motion papers* each discovery request and response to which the motion or application is addressed." For all of the discovery items upon which Defendant moves, Defendant has wholly failed to do this. Upon a motion to compel, a court is called upon to evaluate the discovery requests *as well as the responses and objections*. Local Rule 37.1 is designed to protect against the exact type of self-serving omission of the responding party's objections that Defendant has done in her brief. Accordingly, the Court should deny Defendant's motion in its entirety for failure to comply with Local Rule 37.1. *See Blodgett v. Siemens Industry, Inc.*, 2016 WL 4203490, at *1 (E.D.N.Y. 2016) (denying motion without prejudice for failure to comply with Local Rule 37.1 (which is the same rule in the Eastern District of New York)); *see also* Pottinger Dec. at Exhibit 2, Non-Party Sarah Ransome's Responses and Objections to Defendant's Subpoena Requests.

*Chemical Co.*, 649 F.2d 646 (9th Cir. 1980) ("While discovery is a valuable right and should not be unnecessarily restricted, the 'necessary' restriction may be broader when a non-party is the target of discovery.").

Courts have routinely denied the discovery of non-parties when it is clear that the purpose is to obtain personal information for intimidating or harassing the witness. *See DaCosta v. City of Danbury*, 298 F.R.D. 37 (D. Conn. 2014) (protective order granted with respect to personal information of nonparties, including home addresses, email addresses, phone numbers, dates of birth, children's names, financial account numbers, and social security numbers).

Despite Ms. Ransome's robust production, Defendant comes before this Court to seek additional information solely for the purpose of harassing and intimidating this witness. Defendant's onerous subpoena contained thirty (30) separate categories of requests. Nevertheless, Ms. Ransome produced the documents she had and sat in a deposition for over ten hours with Defendant's counsel. In fact, Ms. Ransome testified that she had produced all of the photographs and documents that she has that relate to Defendant and Epstein.

| Ransome 02/17/17 Dep. Tr. at 364:17 to 367:6 | |
|---|---|
| Q. Okay. If I could have you turn to the last three pages, where it says "Documents to be Produced." | A. Mm-hmm. |
| Q. Have you seen that list before? | A. Yes, I have. |
| Q. Did you conduct a search of your records to produce documents? | A. Yes, I believe that I produced every single document I can. |
| Q. After looking at this list, did you go back and look through your photographs in Barcelona? | A. As I said, I looked at everything I had during that time frame and I produced everything I can during that time frame that I was with Jeffrey. |
| Q. Just tell me what you did in order to make sure you had produced everything that was called for in this list. | A. Okay. So I went through a box of about over 5,000 photos that I had, and I went through every single photo, every single disk, everything that I had. I went through all my emails. I tried to look for the BlackBerry sim card, which I had hoped that I had kept, which had all Ghislaine's messages on and Jeffrey's and Lesley's, and stupidly I misplaced that, which is really annoying. But I myself, you know, considering my objective is to |

13

| | get these people and get justice for the abuse that Ghislaine caused me – and Jeffrey -- I have given as sufficient evidence that I have. |
|---|---|
| Q. Did you look for all photographs taken by you or containing any image of you at or near any home, business, private vehicle or any other property owned or controlled by Jeffrey Epstein, as indicated in paragraph 7? | A. Yes. |
| Q. Likewise in paragraph 8, did you look for any photographs that depict any home, business, private vehicle or any other property owned or controlled by Jeffrey Epstein? | A. Yes. |
| Q. And you did that after reviewing this list of documents? | A. Yeah, I mean, **I received the list and I've complied with everything. I have given absolutely everything that I can to you guys.** |
| Ransome 02/17/17 Dep. Tr. at 370:16 to 370:18 | |
| Q. Where are these photographs? | A. I have given all the photographs to my lawyers. |
| Ransome 02/17/17 Dep. Tr. at 371:9 to 371:13 | |
| Q. Were there photographs of other people taken around the same time that you have? | **A. I have given all the photos that I have.** |
| Ransome 02/17/17 Dep. Tr. at 371:14 to 371:19. | |
| Q. In other words, if you were messing around with Simona at this time and there's a photo of Simona that you have, did you provide that? | A. I provided every single photograph that I have. |

| Ransome 02/17/17 Dep. Tr. at 379:9 to 380:13. | |
|---|---|
| Q. Okay. So you believed that you produced six emails of conversation between yourself and Natalya Malyshev? | *** |
| *** | A. Yeah, I collected all -- all -- everything I had, I gave to my lawyers. |
| Q. Okay. So you believe you gave six emails between yourself and Natalya Malyshev to your attorneys? | A. Yes, I gave all my evidence. |

14

| Ransome 02/17/17 Dep. Tr. at 382:14 to 386:16. | |
|---|---|
| Q. So did you produce the February '04, '07, 4:01 p.m. email from yourself to Nataly Malyshev to your attorneys? | A. I've given all my email correspondence to my lawyers. |
| Q. Did you give that email to your lawyer? | A. I've given all my emails to my lawyers. |
| Q. Okay. The next email down says "Sarah Ransome, February 5, 2007, at 10:09 p.m." - Can you read the text of that email on this document? | A. Mm-hmm. |
| Q. What does the 10:09 p.m. email say? | A. As I've specified before, this is a screenshot[2], okay, of the actual Yahoo email. This is a screenshot. So technically I can't read that anyways, seeing as it's a screen shot. |
| *** | |
| Q. Did you search your Inbox for documents responsive to the subpoena that I showed you a little while ago? | A. I did. I wanted to be thorough with my research, so I, during that time frame, went through every single email. |
| Q. You went through each one? | A. I went through all of my emails to make sure I gave all my evidence to my lawyers. |
| Q. Did you search for keywords or did you just read each email? | A. I read each email. |
| Q. And did you print out each email? | A. I didn't print out. I saved them to a USB stick. |
| Q. All of them or just the ones that you thought were needed? | A. Just the ones that were for -- just anything related to Jeffrey, I sent over. |

I.    **NON-PARTY RANSOME HAS PRODUCED DOCUMENTS OF AND DOES NOT HAVE DOCUMENTS FOR A NUMBER OF REQUESTS.**

Defendant's Motion to Compel[3] is misleading because it suggests that non-party Ms. Ransome

refused to produce documents in response to all thirty categories in the subpoena. That is

---

[2] Ms. Ransome produced both screen shots and the associated emails. Defendant asked about the screenshots during the deposition, rather than about the supplemental production of the actual emails. Defendant also requested additional pieces of the email chains which non-party Ransome has provided the Defendant the additional pieces of the email chains to the extent they were responsive to the Defendant's subpoena.

[3] Defendant also requested a copy of the CD of photographs that non-party Ms. Ransome already produced in hard copy. A copy of said CD has been made and sent to Defendant.

incorrect. To be clear, Ms. Ransome produced documents, or responded that no documents exist, to Requests 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 13, 14, 20, 23. Request 24 was withdrawn by Defendant and non-party Ransome does not have any documents responsive to Request 26. As to the remaining requests:

- Request 12 – Ms. Ransome testified that she does not have any credit card receipts, cancelled checks, or documents reflecting travel from 2006-2007, other than what she has already produced. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 367, 402-403.

- Request 15 - She testified that she does not have any documents reflecting the money paid to her by Jeffrey Epstein (she was paid in cash). *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 151-152, 415.

- Request 16 - She testified that she was given cash by Epstein during the years 2006-2007 while she was being trafficked by Defendant and Epstein. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 415-416.

- Request 17 - She testified that she lived in Epstein's apartment and thereafter lived with a male friend, but she does not have any leases, deeds, or rental agreements for 2006-2007.. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 76-78, 228-229.

- Request 19 – Ms. Ransome produced a copy of her FIT essay but testified that she does not believe she has the application but Jeffrey Epstein or the Defendant likely have a copy because they claimed to be assisting her with the application and submission process for FIT). *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 171-172, 179-180.

- Request 21 – Ms. Ransome testified she did very little modeling because she wasn't successful at it and has no documents relating to her modeling) *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 82, 85, 112-113, 216, 415.

- Request 25 - She testified she has not had any communication with law enforcement. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 183-184, 189.

- Request 27 - She testified that she has never written a book or any similar writings about her time with Defendant. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 9, 12-13, 35-38.

- Request 28 - Defendant already has her civil complaint in *Jane Doe 43*, and Ms. Ransome already testified that she is involved in that litigation.

- Request 30 – Ms. Ransome testified that she does not have a current account on Twitter or any other social media platform, and does not have the information for any for the years 2006-2007. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 61.

16

## II.   DEFENDANT'S SUBPOENA SEEKS DOCUMENTS SOLELY FOR THE PURPOSE OF INTIMIDATING AND HARASSING THIS NON-PARTY WITNESS

### Request 10 (Current Passport/Current Visas):

As to Request 10, Ms. Ransome produced her passport during the time that she was being trafficked by Defendant and Epstein. She does not have Visas from that time period, as she testified. Non-party Ms. Ransome should not have to produce her current passport, and Defendant has given no good faith reason for why she should have to.

The remainder of Request 10 is overly broad, seeking "all communications regarding any of Your passports, visas, visa applications or to her permissions to live, work or study in a foreign country for the years 2005 – present." What is responsive and relevant to this case - the passport she held during the years 2006 and 2007 - has been produced. The reminder is simply being sought in order to learn the patterns of Ms. Ransome's travel for purposes of harassing and intimidating her.

### Request 18 (Current Driver's License):

Despite non-party Ransome having produced her passport showing her travel during the period she was being trafficked by Defendant and Epstein, Defendant seeks a "copy of her current driver's license." Non-party Ransome is already fearful for her life and has been followed at least once since she disclosed the abuse she endured at the hands of Defendant and Epstein. Obtaining a copy of this non-party's current driver's license is solely for the purpose of harassing and intimidating her and should not be permitted. The evidence that is relevant to the claims from 2006-2007 has already been produced, including the copy of her passport.

### Request 29 (Current Bank Statement, Paycheck, Credit Card Statements):

Non-party Ransome testified that she is presently unemployed and is living with her boyfriend. Nevertheless, Defendant insists on moving to compel highly personal financial

information from this non-party as set forth in Request 29: "A copy of your most recent paycheck, paycheck stub, earnings statement and any bank statement, credit card statement and any document reflecting any money owed by you to anyone." This type of current financial information is only being sought for the improper purpose of embarrassing, intimidating, and harassing this non-party. *See DaCosta v. City of Danbury*, 298 F.R.D. 37 (D. Conn. 2014) (protective order granted with respect to personal information of nonparties, including home addresses, email addresses, phone numbers, dates of birth, children's names, financial account numbers, and social security numbers).

### Request 22 (All Modeling Contracts Signed or Entered into By You):

Non-party Ransome provided testimony that she did very little modeling while in New York because she was not successful at it, and she also testified that it was mostly freelance modeling. *See* Pottinger Dec. at Exhibit 1, Ransome Tr. at 82, 85, 112-113, 216, 415. Despite receiving this testimony, Defendant is now insisting that she conduct a search for any modeling contract that Ms. Ransome has signed and produce them. This search is solely for the improper purpose of embarrassing, harassing, and intimidating this non-party witness, and should be precluded.

Accordingly, non-party Ransome objects to these Requests which are only being sought for the purpose of harassing and intimidating this non-party witness, and requests that the Court protect her from this clearly, highly personal and harassing discovery.

### III.   DEFENDANT SHOULD BE PRECLUDED FROM ASKING ANY ADDITIONAL DEPOSITION QUESTIONS THAT ARE SOLELY MEANT TO EMBARRASS, INTIMIDATE AND HARASS THIS NON-PARTY.

Defendant had Ms. Ransome present for a deposition for over ten hours with breaks, ensuring that Defendant got a full seven (7) hours of tape time as provided by the Rules. Despite this, Defendant seeks to compel Ms. Ransome to sit for additional questions. The following are

the categories of deposition testimony that Defendant seeks for which non-party Ms. Ransome

contends are sought only for the purpose of harassment and intimidation:

- Current paycheck records and other banking records. Defendant has now added to this that she wants her boyfriend's current income and financial position since non-party Ms. Ransome testified that she is living with her boyfriend. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 8-9, 13-14.

- Boyfriend's cell phone number. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 27-28.

- Her parent's current address information. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 14.

- Communications that non-party Ms. Ransome testified she recalls having with a reporter in the fall of 2016. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 37-43, 386-388.

- Privileged communications with Alan Dershowitz when he was meeting with Ms. Ransome about a legal matter. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 182-186.

- Her partner's occupation. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 13-14.

- What hotel Ms. Ransome was staying at in New York for her deposition. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 30-34.

- Whether Alan Dershowitz contacted anyone on Ms. Ransome's behalf. *See* Pottinger Dec at Exhibit 1, Ransome Dep. Tr. at 199.

- Her stepmother's phone, e-mail address and physical address – despite the fact that non-party Ms. Ransome already gave testimony at her lengthy deposition that she does not have her stepmother's contact information. *See* Pottinger Dec. at Exhibit 1, Ransome Dep. Tr. at 239-240.

- When Ms. Ransome provided her photos to her lawyer. *See* Pottinger Dec. at Exhibit 1, Ransome Dep. Tr. at 363.

Ms. Ransome testified that she believed that Alan Dershowitz had been retained to be her

lawyer in a legal matter that she was having. Accordingly, counsel objected on privilege grounds

when Defendant's counsel attempted to obtain specifics about those meetings. In addition,

Defendant attempted to obtain privileged and work product information about Ms. Ransome's

meetings with her counsel in this matter. As the Court can see, the other questions relate to a number of personal family information that a non-party witness should not be required to disclose, particularly when she has a justified fear of Defendant and Jeffrey Epstein. Defendant also requests documents relating to Ms. Ransome's testimony that she recently had conversations with a reporter when she was trying to encourage other victims of Defendant and Epstein to come forward with their stories. After giving fulsome testimony on this topic, Defendant is now demanding that Ms. Ransome conduct a search for documents relating to this reporter. Again, non-party Ms. Ransome has produced a significant amount of discovery and has given her testimony and she should not be forced to undertake an additional burden. Finally, prying into her current personal financial information or her boyfriend's personal financial information should not be condoned. Simply put, all of these categories above for which Defendant seeks additional testimony have nothing to do with this action and are being sought solely to embarrass, harass, and intimidate this non-party, which should not be condoned.

## IV.  NON-PARTY MS. RANSOME SHOULD NOT BE FORCED TO INCUR THE BURDEN AND EXPENSE OF PRODUCING A PRIVILEGE LOG.

Despite being given less than seven days to respond to Defendant's subpoena and produce documents, Defendant also wrongly demands that this non-party undertake the burden and expense of producing a privilege log. New York law protects non-parties from the significant burden and expense of producing a privilege log. "The burden on the party from which discovery is sought must, of course, be balanced against the need for the information sought." *Wells Fargo Bank, N.A. v. Konover*, 2009 WL 585434, at *5 (D. Conn. Mar. 4, 2009) (denying Rule 45 motion to compel production of documents from non-party). "In performing such a balance, courts have considered the fact that discovery is being sought from a third or non-party, which weighs against permitting discovery." *Tucker v. Am. Int'l Grp., Inc.*, 281

F.R.D. 85, 92 (D. Conn. 2012) (finding request for production on non-party - including creation of privilege log - too burdensome); *see also Medical Components, Inc. v. Classic Medical, Inc.*, 210 F.R.D. 175, 180 n.9 (M.D.N.C. 2002) ("the court should give special weight to the unwanted burden thrust upon non-parties when evaluating the balance of competing needs.")). "Within this [Second] Circuit, courts have held nonparty status to be a 'significant' factor in determining whether discovery is unduly burdensome." *Tucker*, 281 F.R.D. at 92 (citing *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) (status as non-party "significant" factor in denying defendant's discovery demand)).

Ms. Ransome is a victim of sex trafficking who bravely came forward to help another victim of abuse. She is not a large corporation with a team of in-house lawyers. In these circumstances, imposing the burden of producing a privilege log on this non-party is inherently unfair. A non-party is not required to undertake the burden of filing a privilege log**.** Defendant is only seeking to try to have this Court force non-party Ms. Ransome to produce a privilege log in this matter to impose additional burden on Ms. Ransome.

In addition, Defendant wrongly argues that she is entitled to any communications and witness interviews between Ms. Giuffre's lawyers and non-party Ms. Ransome. It is well settled that documents relating to witness interviews are protected by the work product privilege. In addition, Defendant wrongly argues that she is entitled to any communications and witness interviews between Ms. Giuffre's lawyers and non-party Ms. Ransome. *See William A. Gross Const., Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354, 359 (S.D.N.Y. 2009) (upholding work-product privilege, finding doctrine "'extends to notes, memoranda, ***witness interviews***, and other material'" created in preparation for litigation and trial (emphasis added) (internal citation omitted)). Indeed, "protection of witness interviews has been one of the focuses of the attorney

work-product privilege since its inception in American law." *Gerber v. Down E. Cmty. Hosp.*, 266 F.R.D. 29, 31 (D. Me. 2010) (citing *Hickman v. Taylor*, 329 U.S. 495, 497, 510–11, 67 S. Ct. 385, 91 L.Ed. 451 (1947)). Courts have continuously found an attorney's communications and notes of witness interviews to be privileged work product. *See, e.g.*, *City of Pontiac Gen. Employee's Ret. Sys. v. Lockheed Martin Corp.*, 2012 WL 4202657, at *1 (S.D.N.Y. Sept. 18, 2012) (denying motion to compel, upholding work-product privilege with respect to witness interviews and accompanying notes, emails, and memoranda); *United States v. Jacques Dessange, Inc.*, 2000 WL 310345, at *3 (S.D.N.Y. Mar. 27, 2000) (finding notes of witness interviews to be core work product); *S.E.C. v. NIR Grp., LLC*, 283 F.R.D. 127, 134 (E.D.N.Y. 2012) (work product privilege applied to interviews – along with accompanying notes and memoranda - conducted by attorney); *Buck v. Indian Mountain Sch.*, 2017 WL 421648, at *7 (D. Conn. Jan. 31, 2017) ("the disclosure of witness interviews and documents related thereto, is 'particularly disfavored'" (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981))).

## V.   NON-PARTY MS. RANSOME HAS PRODUCED DOCUMENTS RELEVANT TO *JANE DOE 43.*

Defendant also claims that non-party Ms. Ransome has not produced all documents covered in the subpoena that relate to *Jane Doe 43 v. Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, Lesley Groff and Natalya Malesheve*, Case Number 1:17 – cv-0016-JGK, which involves a claim under the sexual trafficking statute. Regarding the *Jane Doe 43* documents, Ms. Ransome testified that she produced everything that she had that relates to Defendant. *See* Chart *supra*. The case law is clear that a party cannot use the subpoena power in this litigation to gather discovery for a different litigation which is exactly what Defendant is trying to do here. *See Liz Claiborne, Inc., v. Mademoiselle Knitwear, Inc.*, No. 96 CIV 2064 (RWS), 1997 WL 53184 at *5 (Sweet, J.) (S.D.N.Y. Feb. 10, 1997) (this Court limiting deposition questioning of party because

relevance of the questions were tenuous at best and appeared to be directed at improperly gathering information for a different lawsuit); *Night Hawk Limited v. Briarpatch Limited*, No. 03 CIV. 1382 (RWS), 2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003). Irrespective of this case law that says a party should not wrongfully seek a non-party's documents for use in a different matter, non-party Ms. Ransome did produce the documents that she has that relate directly to Defendant and Epstein as she testified.

<u>**CONCLUSION**</u>

Non-party Ms. Ransome respectfully requests that this Court grant her protection from having to produce any additional discovery or sit for any additional deposition testimony (DE 650). Non-party Ms. Ransome also respectfully requests that the Court deny Defendant's Combined Motion to Compel (DE 655).

Dated:  March 7, 2017

Respectfully Submitted,

By: /s/ J. Stanley Pottinger

J. Stanley Pottinger (Pro Hac Vice)
*Counsel for Sarah Ransome*

23

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 7th of March, 2017, I electronically filed the

foreground document with the Clerk of Court by using the CM/ECF system. I also certify that the

foregoing document is being served this day on the individuals identified below via transmission

of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
          jpagliuca@hmflaw.com

Sigrid McCawley, Esq.
Meredith Schultz, Esq.
BOIES SCHILLER & FLEXNER, LLP
401 E. Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 956-0022
smccawley@bsfllp.com
mschultz@bsfllp.com

David Boies
BOIES SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
dboies@bsfllp.com

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820
brad@pathtojustice.com

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[4]
cassellp@law.utah.edu

Peter Guirguis, Esq.
MINTZ & GOLD, LLP
600 Third Avenue
New York, NY 10016
(212) 696-4848
guirguis@mintzandgold.com

/s/ J. Stanley Pottinger
J. Stanley Pottinger

---

[4] This daytime business address is provided for identification and correspondence purposes only
and is not intended to imply institutional endorsement by the University of Utah for this private
representation.