## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

VIRGINIA L. GIUFFRE,

      Plaintiff,

v.

GHISLAINE MAXWELL,

      Defendant.

**15 Civ. 7433 (LAP)**

-------------------------------------------------X

## MS. MAXWELL'S RESPONSE TO THE UNITED STATES' MOTION FOR LIMITED UNSEALING OF CERTAIN DOCUMENTS [DKT. 1353]

Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
945 North Pennsylvania Street
Denver, CO 80203
Tel 303.831.7364
lmenninger@hmflaw.com
jpagliuca@hmflaw.com

# INTRODUCTION

The criminal case against Ghislaine Maxwell arose directly from this defamation action, which Boies Schiller Flexner LLP filed against Ms. Maxwell on behalf of one of the firm's former clients, Virginia Giuffre. *Giuffre v. Maxwell*, Case No. 15-cv-7433 (LAP) (S.D.N.Y). The protective order in the defamation case prohibited the parties and their lawyers from sharing confidential discovery material (including the transcripts of Ms. Maxwell's two depositions) with anyone else, including with the Government and law enforcement. [Dkt. 62.] Faced with the protective order, the Government issued a grand jury subpoena for Boies Schiller's file and instituted an *ex parte* proceeding before then-Chief Judge McMahon to modify the protective order issued by this Court. By proceeding *ex parte,* the Government ensured that no one before Judge McMahon would be able to contest the accuracy of its representations in support of its modification application and that Ms. Maxwell would have neither notice nor an opportunity to participate, contrary to *Martindell v. Int'l Tel. & Tel.,* 594 F.2d 291 (2d Cir. 1979).

The Government then took full advantage. Judge McMahon, citing the decision in *Chemical Bank v. Affiliated FM Ins.,* 154 F.R.D. 91 (S.D.N.Y. 1994), asked the Government, point blank, whether Southern District prosecutors had met with the Boies Schiller firm or otherwise "collu[ded]" with that firm in arranging the discovery request. The Government lawyer assured Judge McMahon that the prosecutors had no idea what was in Boies Schiller's file. Indeed, he insisted, there had been no contact whatsoever between Boies Schiller and United States Attorney's Office before the Government began its investigation. Nor, said the prosecutor, did Boies Schiller have any role instigating the inquiry of Ms. Maxwell.

To paraphrase Mary McCarthy's philippic about Lillian Hellman, every word of the Government's representation was untrue, "including 'and' and 'the.'"[1] The Government knew what was in the Boies Schiller file; the law firm had provided that information well before the investigation began. The Government did indeed have previous contact with the firm. And Boies Schiller was *instrumental* in fomenting Ms. Maxwell's prosecution.

The record is surpassingly clear: But for the Government's misrepresentation, witting or not, Judge McMahon never would have permitted the circumvention of this Court's protective order, on which Ms. Maxwell relied in agreeing to sit for her depositions and to settle this case.

Events have now taken on a life of their own. Public interest in Jeffrey Epstein caused Congress to pass the Epstein Files Transparency Act, Pub. L. No. 119-38, 139 Stat. 656 (Nov. 19, 2025) (the "Epstein Act"). The Government, in turn, now seeks to "comply" with this Act by releasing the documents it secured in an unlawful, *ex parte* proceeding, conducted apparently behind this Court's back.

This Court should not allow the Government to absolve itself of its improper conduct by sheltering under an Act that cannot constitutionally compel the unsealing of these unlawfully obtained documents. The Government's Motion should be denied.

## Factual Background

### I.  The protective order in *Giuffre v. Maxwell*.

Boies Schiller filed this civil defamation case against Ms. Maxwell in 2015. The complaint alleged that Ms. Maxwell defamed Ms. Giuffre when Ms. Maxwell's attorney-hired press agent denied as "untrue" and "obvious lies" Ms. Giuffre's numerous allegations, over the

---

[1] *See* Norman Mailer, "An Appeal to Lillian Hellman and Mary McCarthy," 5/11/80 New York Times.

span of four years, that Ms. Maxwell had participated in a scheme to cause Ms. Giuffre to be "sexually abused and trafficked" by Epstein.

Ms. Giuffre had an uphill battle—even she was constrained to acknowledge that many of her public statements were false. Using a time-honored if unfortunate litigation tactic, her lawyers at Boies Schiller therefore sought to turn the lawsuit into a proxy prosecution of Epstein. Not surprisingly, discovery in the case was bitter, hard-fought, and wide-ranging. It spanned more than a year and included large document productions, many responses to interrogatories, and thirty-some depositions, including depositions of Ms. Giuffre and Ms. Maxwell, as well as several third parties. *See Brown v. Maxwell*, 929 F.3d 41, 46, 51 (2d Cir. 2019) (explaining that discovery was "hard-fought" and "extensive" and noting that the court file, which includes only some of the documents created during discovery, totals in the "thousands of pages").

Ms. Giuffre sought and obtained a wide variety of private and confidential information about Maxwell and others, including information about financial and sexual matters. *Brown*, 929 F.3d at 48 n.22. Given the intimate and highly confidential nature of the discovery exchanged between the parties, this Court entered a stipulated protective order. [Dkt. 62.][2] The protective order included a mechanism for one party to challenge another party's confidentiality designation (such a challenge never occurred) and provided that it did not apply to any information or material disclosed at trial. (Because the case settled before trial, that sole exception to the protective order was never triggered.)

Boies Schiller had sought to add a "law enforcement" exception to the protective order, doubtless because the firm was eager to enlist the Government in its campaign against Ms. Maxwell. In particular, Boies Schiller proposed to include a provision stating that

---

[2] The protective order was entered by Judge Sweet, who later passed away. Judge Preska took over this case after Judge Sweet's death.

"CONFIDENTIAL information shall not be disclosed or used for any purpose except the preparation and trial of this case *and any related matter, including but not limited to, investigations by law enforcement*." EXHIBIT 1, ¶ 1(a)(4) (emphasis supplied). Ms. Maxwell rejected this proposal, and it was never included in the protective order. [Dkt. 62.]. To the contrary, the order strictly limited the parties' disposition of Confidential Material, including at the end of the case. In particular, paragraph 12 of the order provided that:

> [a]t the conclusion of this case, unless other arrangements are agreed upon, each document and all copies thereof which have been designated as CONFIDENTIAL shall be returned to the party that designated it CONFIDENTIAL, or the parties may elect to destroy CONFIDENTIAL documents. Where the parties agree to destroy CONFIDENTIAL documents, the destroying party shall provide all parties with an affidavit confirming destruction.

[Dkt. 62 ¶ 12].

## II.    Ms. Maxwell's April and July 2016 depositions.

Relying on the confidentiality protections of the protective order, Ms. Maxwell declined to invoke her privilege against compulsory self-incrimination and agreed to testify at her April 2016 deposition.

Following the deposition, Boies Schiller moved to compel Ms. Maxwell to answer additional intimate and personal questions that she had previously declined to answer. In support of the motion, Boies Schiller assured this Court that "[s]uch questions are entirely appropriate in the discovery phase of this case, particularly where any answers will be maintained as confidential under the Protective Order in this case."

This Court granted the motion. In requiring Ms. Maxwell to answer highly intrusive questions "relating to [her] own sexual activity" and "her knowledge of the sexual activity of others," the Court held that Ms. Maxwell's "privacy concerns are alleviated by the protective order in this case."

Secure in the belief that the protective order would be honored, Ms. Maxwell appeared at a second deposition in July 2016 and answered hundreds of pages worth of questions about her own sexual activity and her knowledge of the sexual activities of others.

### III. The Settlement and Boies Schiller's refusal to comply with the protective order.

In 2017, the parties settled the defamation claim, and the case was dismissed. *Giuffre v. Maxwell*, 325 F. Supp. 3d 428, 436 (S.D.N.Y. 2018), *vacated and remanded sub nom. Brown*, 929 F.3d 41. As this Court found, "a significant, if not determinative, factor" in reaching a settlement was its confidentiality. *Id*. at 446.

After the case was settled and concluded, Ms. Maxwell repeatedly invoked Paragraph 12 of the protective order and demanded that Boies Schiller either return or destroy all confidential information, including her deposition transcripts. Boies Schiller refused. Instead, and unbeknownst to Ms. Maxwell, Boies Schiller produced some 90,000 pages of discovery material to the Government, including both of Maxwell's deposition transcripts.

### IV. The Government's false statements to Judge McMahon.

Only in August 2020, after she was indicted in the criminal case, did Ms. Maxwell finally learn that the Government had obtained the Boies Schiller file by grand jury subpoena. Ms. Maxwell also learned that, to overcome the strictures of the protective order, the Government filed an application in an *ex parte* proceeding before Judge McMahon, Case No. 19-Misc.-149 (CM) (S.D.N.Y). EXHIBIT 2. Neither Ms. Maxwell nor her attorneys were given the opportunity to oppose that application or to contest the Government's representations in support of the application. This was all in direct violation of Paragraph 14 of the protective order, which provides that the order could be modified by the court only "for good cause shown *following notice to all parties and an opportunity to be heard*." [Dkt. 62 ¶ 14 (emphasis added).]

In its *ex parte* application, the prosecutors professed that they had sought out Boies Schiller's file only because "publicly available information regarding the [*Giuffre v. Maxwell*] Litigation, including the complaint and other docketed filings . . . appear[ed] to make reference to certain subjects relating to the Investigation." That "publicly available information," the Government claimed, suggested that the Boies Schiller file might "contain information relevant to the ongoing Investigation" of Jeffrey Epstein. Ex. 2, ¶ 4. Nowhere did the Government acknowledge that Boies Schiller had in fact approached the prosecutors well before the grand jury subpoena was issued.

In March 2019, in the first appearance before Judge McMahon, the Assistant U.S. Attorney continued this refrain, professing ignorance about what was in Boies Schiller's file or who was deposed in the case. The AUSA defended the subpoena's breadth—which sought all "copies of discovery and related materials" in *Giuffre v. Maxwell*—on the ground that the Government simply had too little knowledge of what was in the law firm's files to craft a more narrowly tailored subpoena:

> Here, we are essentially unable to significantly narrow the request for information in part for exactly the reasons that you describe. We have either little or no additional information than the Court does in terms of what materials there are, who was deposed, and that is in marked contrast to some of the other cases.

EXHIBIT 3, p 17. For all the Government knew, what it was seeking was "page after page of people taking the Fifth." Ex. 3, p 19.

The Government appeared a second time before Judge McMahon in April 2019. EXHIBIT 4. Judge McMahon held that conference for one reason: to learn "about contacts between the United States Attorney's Office and the Boies Schiller law firm prior to the issuance of the subpoena." Ex. 4, p 2. The same AUSA told Judge McMahon that the Government's

investigation began on either November 30 or December 3, 2018, omitting mention of any

contacts between Boies Schiller and the Government before that time:

> In the initial days and weeks of the investigation, we endeavored to identify information about the subject of the investigation, including, among other things, possible victims who we should speak to. In the process of doing so, we identified certain counsel that were identified as representing victims or witnesses either in public filings or in media reports. Boies Schiller was among those plaintiff attorneys. So following the opening of the investigation, we were in touch with Boies Schiller, among other plaintiff and witness counsel, in connection with their representation of witnesses or victims.
>
> With respect to Boies Schiller in particular, we quickly came to learn during the investigation that they had at the time either active or recently completed civil litigation and so asked them, as is our standard practice, told them, I should say, that we expected to make document requests. They generally advised us that they believed there was a protective order that would govern at least some of the materials, and that is why we ultimately made the application to the Court.

Ex. 4, pp 2–3.

Those representations were false. At the time the Government claims it began the

investigation (late November or early December 2018), its knowledge of the civil case was *not*

based exclusively on public filings. It knew that Boies Schiller possessed relevant information

because the firm had come to the Government asking it to open an investigation. In particular, on

February 29, 2016, an AUSA met with attorneys from Boies Schiller, who "urged [the

Government] to open an investigation of" Epstein and Ms. Maxwell.[3] Then, after Ms. Maxwell's

two depositions, David Boies himself apparently approached the Government in the summer of

2016, asking "if the Southern District would consider charging Maxwell with perjury."[4] Said Mr.

Boies:

---

[3] Stephen Rex Brown, *Manhattan federal prosecutors declined to pursue Jeffrey Epstein and Ghislaine Maxwell case in 2016*, New York Daily News (Oct. 13, 2020), https://www.nydailynews.com/new-york/ny-jeffrey-epstein-maxwell-case-20201013-jmzhl7zdrzdgrbbs7yc6bfnszu-story.html. (last visited Feb. 20, 2026).

[4] *Id.*

> "We were saying to anyone who would listen: We've got clients who were abused. Some of them were underage. We have the evidence. There's a whole record that's been developed. We can establish beyond any reasonable doubt there was a massive sex trafficking ring going on."

*Id*.

At that time, however, the Government did not act. Boies "was particularly frustrated by the failure to pursue a perjury charge [against Ms. Maxwell]," reported one person, who recalled him saying, "We have her dead to rights." *Id*. All of this contradicts the Government's representations to Judge McMahon, who specifically asked if the Government had any contact with Boies Schiller before it issued the subpoena.

Reassured by the Government that no contact had occurred, Judge McMahon modified the protective order so that Boies Schiller could comply with the subpoena. EXHIBIT 5. Judge McMahon found that Ms. Maxwell could not have reasonably relied on the protective order to prohibit Boies Schiller from cooperating with the Government. In making this finding, Judge McMahon relied on the Government's misrepresentations, and she distinguished the Government's subpoena to Boies Schiller from the subpoena at issue in *Chemical Bank*. Said Judge McMahon:

> [T]he only thing on which Maxwell or anyone else might reasonably have relied is that Giuffre or her lawyers would not do what the defendant in *Chemical Bank* did—that is, forward discovery materials in their possession to prosecutors for the purpose of fomenting an investigation. But I am not faced with that situation. Nothing in this record suggests to me that Giuffre or Boies Schiller had anything to do with the Government's decision to convene a grand jury to look into the matters that were the subject of the *Giuffre* Action. On the contrary—the Government has advised the Court that it contacted Boies Schiller as part of its search for parties who might have been victims in its investigation; and that Boies Schiller told the Government that it could not consensually produce at least some documents in its files because of the existence of the Protective Order. There is no evidence of "collusion," to invoke a term of the moment, and it is quite clear that Boies Schiller did not foment the Government's investigation. Moreover, the Assistant United States Attorney has represented to this Court that he has no idea what is in Boies Schiller's files, and that for all he knows every witness who was deposed stood on his/her Fifth Amendment rights and refused to answer questions.

EXHIBIT 6, p 21.

Contrary to the Government's misrepresentations, Boies Schiller *did* foment the investigation (or at least it tried to). And the evidence of "collusion" between the Government and Boies Schiller was ample, tracing to at least early 2016 and precisely designed to have Ms. Maxwell indicted. Had Judge McMahon known the truth, she likely would have denied the Government's application to modify this Court's protective order, and the Government would have been unable to secure a copy of Boies Schiller's 90,000-page file, including Ms. Maxwell's two deposition transcripts.

## V. Judge Netburn separately rejects an identical gambit by the Government.

Around the same time that Judge McMahon granted the Government's *ex parte* request, Magistrate Judge Netburn rejected the same request from the Government in a different civil case, *Jane Doe 43 v. Epstein*, Case No. 17-cv-616 (JGK) (SN). Judge Netburn recognized the Government's conduct for what it was: an attempt to deprive Ms. Maxwell of notice and an opportunity to be heard. EXHIBIT 7. Indeed, Judge Netburn rebuffed the Government even after it alerted her to Judge McMahon's order. EXHIBIT 8. As Judge Netburn found, the Government's "abstract concern" about the "secrecy" of its investigation could not overcome the parties' reasonable reliance on the protective order or justify the Government's secret, *ex parte* application. Ex. 7, p 6. Judge Netburn also implicitly recognized what Judge McMahon never knew—that Boies Schiller was all too eager for the Government to investigate and prosecute Maxwell:

> [T]he extraordinary posture of the case requires the Court to police carefully government intrusions into areas of protections agreed to by civil litigants and so-ordered by the Court. The Government is attempting to side-step these protections by serving a subpoena only upon a party who is willing (and perhaps eager) to comply with the Government's investigation.

Ex. 7, p 6.

## VI.  The Government's current Motion to unseal.

Until the Government filed the instant Motion to unseal, [Dkt. 1353], it had never appeared in this civil case or moved to intervene. Nor, apparently, had it disclosed to this Court how it went behind the Court's back to have another judge modify this Court's protective order, all without notice to Ms. Maxwell or an opportunity for her to be heard on the Government's request.

Now, however, the Government has to come clean. Because the Government apparently wants to release all of Boies Schiller's file, it has to acknowledge that the entirety of that file is still subject to this Court's protective order. And it also has to acknowledge that it promised Judge McMahon it would keep the material secret. That promise is apparently no longer in the Government's interest, so it asks this Court to once again modify the protective order. But since Ms. Maxwell has been convicted and her convictions affirmed on appeal, the Government is finally (but belatedly) content to give Ms. Maxwell notice and an opportunity to be heard.

Even so, the Government's Motion is deficient in several ways. As elaborated below, this Court should deny the Government's request.

## ARGUMENT

## I.  This Court should deny the Government's Motion because the Government is not a party to this case and has not moved to intervene.

Unlike the criminal cases against Epstein and Ms. Maxwell, *United States v. Epstein*, No. 19 Cr. 490 (RMB), *United States v. Maxwell*, No. 20 Cr. 330 (PAE), the Government is not a party to this case. And because it isn't a party, the Government has no right to ask this Court to modify the protective order and to unseal any document. *Giuffre v. Maxwell*, No. 15 Civ. 7433 (LAP), 2020 WL 6947435, at *2 (S.D.N.Y. Nov. 25, 2020) ("Where a non-party . . .'seeks to modify a protective order in a private suit, the proper procedure is to seek permissive

intervention under Rule 24(b).'" (quoting *Daniels v. City of New York*, 200 F.R.D. 205, 207 (S.D.N.Y. 2001) (citing *Martindell,* 594 F.2d at 294))); *Giuffre*, 325 F. Supp. 3d at 437 (same), *vacated and remanded sub nom. Brown*, 929 F.3d 41. Rather, "permissive intervention is the proper method for a nonparty to seek a modification of a protective order." *AT & T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) (citing *Martindell*, 594 F.2d at 293–94).

Here, the Government hasn't moved to intervene. Unless and until it does so, and unless this Court grants intervention, the Government's unsealing motion is premature. For that reason alone, it should be denied.

In fact, it's not at all clear the Government is still pursuing relief in this Court. For one thing, the Government never responded to Ms. Maxwell's counsel when they attempted to confer about a one-week extension of time to respond to the Motion. [Dkt. 1356, p 2.] For another thing, on February 14—two weeks after the Government filed its Motion—the Deputy Attorney General submitted a letter to Congress representing that the Department of Justice had "complet[ed]" its duty under the Epstein Act to release the relevant records. EXHIBIT 9, p 1. That letter made no mention of its Motion pending in this case. *Id.* at 1–6.

Either the Government does not intend to pursue the Motion, or it hasn't "complet[ed]" its duty under the Epstein Act. This Court should require the Government to say which it is. And if it intends to pursue the Motion further, the Government must first move to intervene.

## II.    The Epstein Files Transparency Act does not override the Fed. R. Crim. P. 6(e).

The Government asks for permission to release 90,000 pages of material Boies Schiller surrendered to a grand jury under a grand jury subpoena. There is no dispute that this material is subject to the secrecy requirements of Fed. R. Crim. P. 6(e). Even so, the Government contends that the Epstein Act overrides Rule 6's secrecy provisions. Although two other judges in this

11

district have accepted that argument, *United States v. Epstein,* No. 19 Cr. 490 (RMB) (S.D.N.Y. Dec. 10, 2025) [Dkt. 92]; *United States v. Maxwell*, __ F. Supp. 3d __, 2025 WL 3522378 (S.D.N.Y. Dec. 9, 2025), this Court is not bound by those decisions, neither of which is persuasive.

Absent a clear statement from Congress, courts do not presume the implied repeal of longstanding privileges or rules, like the requirement of grand jury secrecy. *E.g.*, *Jones v. Hendrix*, 599 U.S. 465, 492 (2023) ("[C]lear-statement rules [are] appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly."). As the Second Circuit has recognized, there is a "strong judicial policy disfavoring the inference that a statute has been repealed sub silentio by subsequent legislation." *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 300–01 (2d Cir. 2006) (quotation omitted).

For its part, the Government *agrees* with this rule, and it concedes that the rule applies to the Epstein Act. In its February 14 letter to Congress, the DOJ justified some of its redactions by reference to the deliberative-process privilege, the work-product privilege, and the attorney-client privilege. Ex. 9, p 3. The Epstein Act, the Government explained, did not override any of these privileges, since Congress did not include "clear statutory language" to that effect. *Id.* ("Given the presumption against repeal of common-law principles, the Supreme Court has recognized that such "privilege[s] should not be held to have been abrogated or limited unless Congress has at least used clear statutory language." (quoting *FBI v. Fazaga*, 595 U.S. 344, 355 (2022))); (citing *Bassett v. United States,* 137 U.S. 496, 505–06 (1890) ("[B]efore any departure from the rule affirmed through the ages of the common law—a rule having its solid foundation in the best interests of society—can be adjudged, the language declaring the legislative will should be so clear as to prevent doubt as to its intent and limit.")).

The same is true for the longstanding grand jury secrecy requirements embodied in Fed. R. Crim. P. 6(e). The Epstein Act doesn't cite Rule 6(e) or even mention a grand jury. This silence is striking because of this Country's long and consistent tradition of grand jury secrecy. Rule 6(e) and its animating policies exemplify the sort of "historically . . . grounded norms" that courts "would not expect Congress to unsettle lightly." *Jones*, 599 U.S. at 492.

Congress's silence is even more significant given that Judge McMahon invoked Rule 6(e)'s secrecy mandate when she granted the Government's *ex parte* motion to allow Boies Schiller to comply with the grand jury subpoena. It was the Government's promise to honor the secrecy mandate that prompted Judge McMahon to modify the protective order in the first place. [Dkt. 1353, p 3].[5]

## III. The Epstein Files Transparency Act does not apply to this case, but if it does, this Court should deny the Government's Motion because the Act violates the U.S. Constitution's separation of powers.

### A. Assuming the Epstein Files Transparency Act applies to this case, it violates the separation of powers.

The Government argues that the Epstein Act requires this Court to modify the protective order to allow the unsealing of 90,000 pages of materials Boies Schiller surrendered to a grand

---

[5] The Government's attempt to retreat from its promise is hardly the only anomaly in this case. When the Government moved Judge McMahon *ex parte* to modify this Court's protective order, it violated the Second Circuit's decision in *Martindell*, which required notice to Ms. Maxwell and the opportunity to move to quash. 594 F. 2d at 294. It also violated the terms of the protective order itself, which provided that its terms could be modified by the court only "for good cause shown *following notice to all parties and an opportunity to be heard*." [Dkt. 62 ¶ 14]. Finally, the Government filed its *ex parte* motion with Judge McMahon on February 5, 2019. Judge McMahon granted the *ex parte* motion on April 9, 2019. But the Government did not inform this Court that another judge had modified its protective order. And when Ms. Maxwell asked Judge Nathan—who presided over the criminal case—for permission to alert this Court to the Judge McMahon's order and the grand jury subpoena, Judge Nathan refused. Why? Because the criminal discovery was secret under a separate protective order.

jury under a grand jury subpoena. If that's right, then the Epstein Act violates the U.S. Constitution's separation of powers.

*First*, the Constitution prohibits Congress from requiring federal courts to reopen individual final judgments. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226–27 (1995). The judgment in this case is final, except as to three categories of documents the Second Circuit directed this Court to review on remand. By purporting to require reconsideration of this Court's sealing decisions about documents in categories other than those three, the Epstein Act contravenes the Constitution's separation of powers.

*Second*, the Constitution denies Congress the power to "prescribe rules of decision to the Judicial Department of the government in cases pending before it." *United States v. Klein*, 13 Wall. 128, 146 (1872). Here, the Epstein Act targets Ms. Maxwell specifically—by name—and section (2)(b)(1) provides that "[n]o record shall be withheld, delayed, or redacted on the basis of embarrassment, reputational harm, or political sensitivity. . . ." 139 Stat. 656, 657. This legislative proscription conflicts with binding Supreme Court and Second Circuit case law *permitting* sealing and redaction of records when, on balance, a person's reputational or privacy interests outweigh whatever presumption of access might apply. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978); *Brown* 929 F.3d at 50–51. The Epstein Act thus conflicts with the separation of powers.

*Finally*, the Constitution prohibits Congress from vesting in officials of the Executive Branch the power to review decisions of Article III courts. *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792). The Epstein Act requires the Department of Justice to unseal and release documents this Court and the Second Circuit have conclusively allowed to remain sealed or redacted. This, too, violates the separation of powers.

### 1. Congress cannot require Article III courts to reconsider individual final judgments.

Articles I, II, and III of the United States Constitution "enumerate[] and separate[] the powers of the three branches of Government." *Miller v. French*, 530 U.S. 327, 341 (2000). This "very structure," the U.S. Supreme Court has explained, "exemplifies the concept of separation of powers." *Id.* (citing *INS v. Chada*, 462 U.S. 919, 946 (1983)). At its core, this separation of powers "prohibits one branch from encroaching on the central prerogatives of another." *Id.* (citing *Loving v. United States*, 517 U.S. 748, 757 (1996); *Buckley v. Valeo,* 424 U.S. 1, 121–22 (1976) (*per curiam*)).

Article III of the Constitution vests the "judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. The judicial power is the "power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy." *Plaut*, 514 U.S. at 218–19 (emphasis in original). It is, in short, the power "to render dispositive judgments" that "conclusively resolve[] [a] case." *Id.* (quotation omitted). Congress violates the separation of powers when it retroactively "commands the federal courts to reopen final judgments." *Id.*

In *Plaut v. Spendthrift Farm, Inc.*, the Supreme Court held that Congress exceeded its powers and improperly encroached on the judicial power when it passed legislation requiring lower federal courts to reopen claims that were time-barred under § 10(b) of the Securities Exchange Act. 514 U.S. at 225. The district court in *Plaut* dismissed the securities claims as untimely, and the plaintiff did not appeal. *Id.* at 214. After Congress amended the Securities Act to permit reinstatement of time-barred claims, the plaintiff returned to district court and asked to reopen the case. *Id.* at 215. The district court declined to do so, concluding that the amendment

to the Securities Act was unconstitutional. *Id*. at 215. The Sixth Circuit affirmed, as did the U.S. Supreme Court. *Id.* at 215, 240.

Justice Scalia explained that judicial power is the power to conclusively resolve cases—to put the dispute to bed once and for all. *Id.* at 218-19. That power, Justice Scalia elaborated, prevented Congress from interfering with final judgments of Article III courts. *Id.* at 223. As "one representative example from a multitude," Justice Scalia pointed to a case from Vermont (*Bates v. Kimball*, 2 Chipman 77 (Vt. 1824)), in which the Legislature "authorized a party to appeal from the judgment of a court even though, under the general law, the time for appeal had expired." *Id.* at 224. By "annul[ing] a final judgment," the Legislature had unconstitutionally "assum[ed] [the] Judicial power." *Id.*

*Plaut* and the cases it cites prove the Epstein Act violates the separation of powers by requiring this Court to reconsider what are otherwise final judgments. The unsealing portion of this case[6] is final in all respects except as to the three categories of documents this Court is considering on remand. As to every other document this Court has kept under seal or released subject to redaction, either: (1) the Second Circuit has affirmed or reversed that decision without any party seeking review in the U.S. Supreme Court, *e.g.*, 28 U.S.C. § 1254(1) (providing Supreme Court with jurisdiction to review by writ of certiorari the decisions of the federal courts of appeal); 28 U.S.C. § 2101(c) (90-day time limit for filing a writ of certiorari from decisions of the federal courts of appeal); *Giuffre v. Maxwell*, 146 F.4th 165, 183 (2d Cir. 2025) (no petition for writ of certiorari filed); *Doe 171 v. Giuffre*, No. 22-3050, 2023 WL 4926196, at *2 (2d Cir. Aug. 2, 2023) (same); *Doe 107 v. Giuffre*, No. 22-3042, 2023 WL 4926195, at *1 (2d Cir. Aug. 2, 2023) (same); *Brown*, 929 F.3d at 54 (same); or (2) the time to appeal that decision to the

---

[6] Not to mention the underlying defamation claim, which was dismissed with prejudice in 2017.

Second Circuit has expired, 28 U.S.C. § 2107(a) (30-day time limit for appeal to federal court of appeals). At this point, therefore, no party can appeal any prior sealing decision by this Court. Each decision is "last word of the judicial department" on the particular matter. *See Plaut*, 514 U.S. at 227.

Because the "time for appeal ha[s] expired" as to every sealing decision except those this Court has yet to make, the Epstein Act cannot "annul" those judgments or command this Court to reopen them. To the extent the Epstein Act dictates otherwise, it violates the separation of powers by encroaching on the judicial power of Article III courts.

### 2. Congress cannot dictate a rule of decision in a case before an Article III court.

There's a second way in which the Epstein Act violates the separation of powers—it unconstitutionally "prescribe[s] rules of decision to the Judicial Department of the government in cases pending before it." *Klein*, 13 Wall. at 146; *see Plaut*, 514 U.S. at 218.

As to the three categories of documents at issue in this limited remand, this Court remains bound by the law set forth by the U.S. Supreme Court and the Second Circuit governing the permissibility and scope of permitted sealing and redaction. Those courts have long held that district courts have inherent power to protect their own files from "becom[ing] a vehicle for improper purposes." *Brown*, 929 F.3d at 47 (quoting *Nixon*, 435 U.S. at 598). As the Second Circuit recognized *in this very case*:

> Our legal process is already susceptible to abuse. Unscrupulous litigants can weaponize the discovery process to humiliate and embarrass their adversaries. Shielded by the "litigation privilege," bad actors can defame opponents in court pleadings or depositions without fear of lawsuit and liability. Unfortunately, the presumption of public access to court documents has the potential to exacerbate these harms to privacy and reputation by ensuring that damaging material irrevocably enters the public record.

*Id.* (footnote omitted).

To guard against these risks, this Court—like all Article III courts—possesses the inherent power to "protect[] the integrity of the judicial process" by shielding from public dissemination that might "gratify private spite or promote public scandal" or that "serve as reservoirs of libelous statements for press consumption." *Id.* at 51 (quoting *Nixon*, 435 U.S. at 598). "This supervisory function," in fact, "is not only within a district court's power;" it is "also among its responsibilities." *Id.* And this supervisory function *requires* sealing or redaction when privacy or reputational interests outweigh the applicable presumption of public access. *Id.* at 51-52.

The Epstein Act conflicts with this supervisory power, which is inherent in this Court under Article III. Whereas this Court has a "*responsibility*" to seal or redact information that improperly infringes on a person's privacy or reputational interests, *id.*, the Epstein Act purports to forbid this Court from sealing or redacting information "on the basis of embarrassment [or] reputational harm." Congress cannot, by statute, strip this Court of the power or relieve it of the responsibility to protect its files from misuse.[7] To do so violates the separation of powers.

### 3. Congress cannot vest in the Executive Branch the power to review the decision of an Article III court.

But there's more. The Epstein Act also unconstitutionally vests in Executive Branch officials the power to review and reverse this Court's unsealing decisions in violation of *Hayburn's Case*, 2 Dall. 409 (1792).

"*Hayburn's Case* arose out of a 1792 statute that authorized pensions for veterans of the Revolutionary War." *Miller v. French*, 530 U.S. 327, 342–43 (2000). "The statute provided that

---

[7] For this reason, the Epstein Act contravenes *Klein* as applied to every document this Court has redacted or allowed to remain sealed, as well as applied to the three categories of documents this Court must evaluate on remand. In either case, *Klein* prevents Congress from dictating the rule of decision.

the circuit courts were to review the applications and determine the appropriate amount of the pension, but that the Secretary of War had the discretion either to adopt or reject the courts' findings." *Id.* The Court rejected the statute, and *Hayburn's Case* which now "'stands for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch.'" *Id.* (quoting *Plaut*, 514 U.S. at 218) (citing *Morrison v. Olson*, 487 U.S. 654, 677 n.15 (1988)). Congress's effort to "annul a final judgment" was "an assumption of Judicial power and therefore forbidden." *Plaut*, 514 U.S. at 224 (quotation omitted).

The Epstein Act is similarly unconstitutional. As explained above, *supra* Part III.A.1, this Court has already (and finally) decided to keep various documents entirely under seal and to release other documents with targeted redactions. But under the Epstein Act, officials in the Executive Branch will review those sealed or redacted documents and release them despite this Court's final orders if the "basis of" those orders was "embarrassment [or] reputational harm. . ." 139 Stat. 656, 657. The Epstein Act empowers Executive Branch officials to review and overrule this Court's final decisions. "Such revision and control [is] radically inconsistent with the independence of that judicial power which is vested in the courts," *Hayburn's Case*, 2 Dall. At 411; *see Plaut*, 514 U.S. at 226, and it violates the separation of powers.

* * *

Under the Constitution's separation of powers, neither Congress nor the Executive Branch may intrude on the judicial power. That power includes the power to definitively and finally resolve cases and disputes.

The Epstein Act flouts the Constitution's separation of powers. It purports to require this Court to reopen and reconsider numerous otherwise final unsealing decisions, to prescribe a rule of decision that conflicts with binding Supreme Court and Second Circuit case law, and to vest in the Executive Branch the power to review and revise this Court's final unsealing decisions.

It's irrelevant that the Epstein case is highly publicized, or that Congress passed the Epstein Act with only one "no" vote. To paraphrase Justice Scalia,

> The [separation of powers] is violated when an individual final judgment is legislatively rescinded for even the very best of reasons, such as the legislature's genuine conviction (supported by [all the media]) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved.

*Plaut*, 514 U.S. at 228.

## B. The Epstein Files Transparency Act does not clearly apply to this case.

If the Epstein Act applies to this case, it raises serious constitutional problems, as just described. Accordingly, this Court might construe the Act not to apply to this defamation dispute between two private parties so as "to avoid the need even to address serious questions about [the statute's] constitutionality." *United States v. Davis,* 588 U.S. 445, 463 n.6 (2019).

Like the Act's failure to cite Rule 6(e) or mention a grand jury, the Act also does not refer to this lawsuit, even as it specifically mentions "*Epstein's* . . . civil settlements." 139 Stat. 656, 657, § (2)(a)(4). If Congress had intended the Act to apply to this case, it could have referred to "Ms. Maxwell's civil settlements" just as it referred to Epstein's civil settlements. But Congress didn't do that. If this Court concludes, therefore, that the Act does not apply to materials produced as part of this case, it could deny the Government's Motion on that basis and avoid entirely the profound separation of powers issues identified above.

## IV. This Court should deny the Government's Motion because the Epstein Files Transparency Act violates due process.

"It is not within the power of a legislature to take away rights which have been once vested by a judgment." *McCullough v. Virgina*, 172 U.S. 102, 123 (1898). The "vested-rights doctrine" is analogous to the separation-of-powers rule that Congress may not mandate the reopening of final judgments. *See Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 83–84 (2d Cir. 1993). The doctrine recognizes that "rights fixed by judgment are, in essence, a form of

property over which legislatures have no greater power than any other property." *Id.* at 83 (internal citations and quotations omitted). In other words, final judgments are property interests that may not be unilaterally amended by Congress without depriving litigants due process of law.

Here, the final sealing decisions not at issue in this remand are "rights fixed by judgment" and a "form of property over which" Congress has no power to amend. The Epstein Act cannot exercise any effect over these final judgments without violating due process. To the extent the Epstein Act dictates otherwise, it violates the Due Process Clause.

## V.    This Court should deny the Government's Motion under the law-of-the-case doctrine and the mandate rule.

"[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus.,* 486 U.S. 800, 816 (1988) (citation omitted). Generally, this requirement obligates a court to adhere "to its own decision at an earlier stage of the litigation." *United States v. Tenzeer,* 213 F.3d 34, 39 (2d Cir. 2000) (citation and quotation omitted). The "mandate rule" is a subsidiary of this doctrine. *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001). It "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Id.* (citation and quotation omitted).

Here, a majority of this Court's sealing decisions are final. They are either (1) unappealed or uncontested sealing orders, or (2) sealing orders upheld by the Second Circuit. The time for further appeal of these decisions has expired, and, as a result, these documents cannot be unsealed. They remain sealed under either the law of the case (uncontested sealing orders) or the mandate rule (affirmed sealing orders).

The mandate rule also requires this Court to apply the "three-step inquiry" used to decide whether to unseal judicial documents. *Giuffre*, 146 F.4th 165 at 175, 178. By making no attempt

to apply this three-part test, the Government implies that the Epstein Act obviates the Second Circuit's decision. However, the Second Circuit mandated this Court to consider "undecided motions and attendant materials" under the applicable three-part test. *Id.* The Government's citation to the Epstein Act does not change this mandate, and this Court has to follow the law dictated by the Second Circuit.

## VI.  The Court should deny the Government's Motion because the Government should not have the documents it seeks to release.

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause, but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr.,* 339 U.S. 306, 313 (1950). In the Government's secret and one-sided end run around Ms. Maxwell's privacy and confidentiality rights, Ms. Maxwell received neither. To this day, Ms. Maxwell has had no opportunity to be heard regarding the *ex parte* proceedings that precipitated the Government's accessing of Boies Schiller's file. This proceeding and its result were unlawful. To further permit the Government to profit from its improper conduct would work a further constitutional wrong.

The All Writs Act, 28 U.S.C. § 1651—on which the Government relied to secure its *ex parte* modification of this Court's protective order—authorizes necessary writs only if "agreeable to the usages and principles of law." This mandate requires that any usage of the All Writs Act comply with "traditional legal protections," including the Due Process Clause's traditional notice and hearing guarantees. *United States v. IBT*, 948 F.2d 98, 104 (2d Cir. 1991). "[T]he requirements of the All-Writs Act are satisfied if the parties whose [rights are affected] have actual notice . . . an opportunity to seek relief from [the orders] in the district court." *In re Baldwin-United Corp.*, 770 F.2d 328, 340 (2d Cir. 1985). This requirement complies with the

fundamental, due process mandate that a litigant be given "the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 425 U.S. 319, 333 (1976) (internal quotations and citations omitted).

Here, the Government instituted a secret and "procedural[ly] irregular[]" proceeding under the All Writs Act. *In re Grand Jury Subpoena*, No. 19 Misc. 149 (CM) ("*In re Grand Jury Subpoena*"), Dkt. 14 at 6 (S.D.N.Y. Mar. 23, 2021); Ex. 6,  p. 6. In this proceeding, it ignored the minimum "traditional protections" guaranteed by the All Writs Act and the Due Process Clause. It neither provided notice to Ms. Maxwell nor gave her an opportunity to respond to its application. It also misrepresented the facts to Judge McMahon, manipulating the secrecy and one-sidedness of the proceeding to twist the factual record. There was no provision made for Ms. Maxwell to protect her interests other than the Court "assum[ing]" Ms. Maxwell would object. *Id.* at 16. Unsurprisingly, this one-sided and manicured process secured the Government an expansive exception to the protective order.

But the Government didn't stop there. After securing an indictment against Ms. Maxwell based on documents it never should have had in the first place, it concealed its conduct from this Court until it was too late for Ms. Maxwell to do anything to protect her rights. This concealment prohibited Ms. Maxwell from seeking redress or having her day in court. Only in the pending Motion has the Government finally come clean to this Court.

However, the Government makes no mention of its earlier unlawful conduct, which gained it access to the Boies Schiller files in the first place. Instead, it characterizes its Motion as asking this Court "make[] it clear that the Government may produce documents under the [Epstein] Act." [Dkt. 1353, p 5.] Having denied the most basic due process to Ms. Maxwell for years, it proposes a final turn of the screw—its proposes to share publicly the fruits of its improper conduct, without ever justifying its behavior in an adversarial proceeding.

23

The Due Process Clause, of course, is made of sterner stuff. The Government cannot avoid the original sin of its Motion. Due process mandates that whatever benefit the Government secured from its trampling of Ms. Maxwell's rights is remedied. This means, at the very least, that the Government may not publish the fruits of a fundamentally unfair proceeding that denied Ms. Maxwell our "deep-rooted historic tradition that everyone should have [her] own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1991).

## VII. The Court should deny the Government's Motion because it fails to comply with and apply binding Second Circuit law governing unsealing.

### A. The Government fails to apply the Second Circuit's settled test for unsealing documents.

The Second Circuit remanded this matter so this Court could conduct the Second Circuit's mandatory "three-step inquiry" used to decide whether to unseal three narrow categories of documents. *Giuffre*, 146 F.4th 165 at 175, 178. This inquiry is the final hurdle in a multiyear process of careful work by the parties, this Court, and numerous Does. At no point during this litigation has any litigant suggested that the Second Circuit's "three-step inquiry" did not apply to this Court's task. That is, no litigant until the Government.

In its Motion, the Government makes no attempt to justify its requested unsealing under the controlling test. *See Stafford v. Int'l Bus. Machs.*, 78 F.4th 62, 69–70 (2d Cir. 2023). It does not, for example, propose a "weight" that should attach to the "presumption of access" applicable to the various documents. *See Stafford*, 78 F.4th at 70. It further fails to identify any—let alone all—"the factors that legitimately counsel against disclosure" of the documents. *See id.* It does not even satisfactorily identify which court files it seeks to unseal. Gov.'s Mot. p. 5 (seeking an order permitting the Government to produce "any and all documents that it received from Bois Schiller & Flexner LLP, in response to a grand jury subpoena" notwithstanding the protective order).

The Government's excuse is the Epstein Act. But the Government identifies nothing in the Act that would require this Court to abandon the "largely settled" law regarding sealing. *Brown*, 929 F.3d at 47. Even if the Act's language could carry this substantial burden, it would raise grave questions about its constitutionality because it would "prescribe" this Court's decision regarding the unsealing controversy remanded to it by the Second Circuit. *See Klein*, 13 Wall. at 146. Given these fundamental barriers, the Government's single-shot at wholesale unsealing is lacking. If it wished to seek unsealing, the Government should have applied the Second Circuit's well-established and controlling sealing test. The Government's Motion—untethered from the applicable standard—should be denied.

### B. The Government does not address the enforceable promises it made to Judge McMahon.

#### 1. The Government cannot abandon promises it made to secretly undermine Ms. Maxwell's reasonable reliance on a protective order.

The Government also fails to cite *Martindell,* which guarantees Ms. Maxwell the enforceability of the protective order implicated by this remand and the promises the Government made to secretly undermine Ms. Maxwell's reliance on this protective order. "It is . . . presumptively unfair for courts to modify protective orders which assure confidentiality and upon which the parties have reasonably relied." *SEC v. TheStreet.com,* 273 F.3d 222, 229 (2d Cir. 2001). Under *Martindell*, a litigant is "entitled to rely upon the enforceability of a protective order against any third parties . . . [and] such an order should not be vacated or modified" absent "extraordinary circumstances" or "compelling need." 594 F.2d at 296.

The Government secured the documents it seeks to release through a secret, *ex parte* application before Judge McMahon to modify this Court's protective order. During these proceedings, the Government made assurances to Judge McMahon that the materials for which it sought modification of the protective order's confidentiality provisions would "be used solely in

connection with" the grand jury investigation. *In re Grand Jury Subpoena*, Dkt. 11 at 4. This promise of secrecy and limited use was essential to Judge McMahon's decision to modify the protective order. In applying *Martindell* to the Government's Motion, Judge McMahon concluded that grand jury secrecy gave "[Ms.] Maxwell the degree of protection that could reasonably be expected in the context of a criminal investigation." *In re Grand Jury Subpoena*, Dkt. 14 at 6–9; Ex. 6, p 25. In other words, Judge McMahon—based on the Government's assurances—modified the protective order because the modification still vindicated Ms. Maxwell's reasonable reliance on the confidentiality it guaranteed.

The Government's current Motion—though styled exclusively as a request for relief from the protective order—is necessarily a request for relief from *Martindell* and, more specifically, the promises it made to Judge McMahon to convince her to secretly modify the protective order in the first place. To be sure, the Government half-heartedly denies the applicability of the protective order because it claims it "is not a party to this case, nor to the protective order." Gov.'s Mot. p. 3. However, using the All Writs Act in an apparent attempt to avoid "party" status does not exempt the Government from assurances made to the Court in a "procedural[ly] irregular[r]," *ex parte* proceeding. *In re Grand Jury Subpoena*, Dkt. 14 at 6–9; Ex. 6, pp 6–9. There is no need to speculate about what Judge McMahon would have done about the protective order had different information been presented or if the Government had made different promises (though she likely would have denied the Government's application). *See* Gov.'s Mot. p. 4 ("Of course, neither Judge Sweet, in issuing the protective order, nor Judge McMahon, in modifying the protective order, could or did predict the Act and its requirements[.]"). The Government secured its secret amendments in the way it chose to secure them. This Court cannot go back and re-apply *Martindell* based on current circumstances, nor can it exempt the Government from assurances it made to Judge McMahon in an *ex parte* proceeding to

circumvent this Court's protective order. The Government's promise of secrecy and limited use must now be scrupulously honored.

### 2.    The Government's promises are enforceable under *Martindell*.

In fact, unsealing court files to permit the Government to publish the Boies Schiller Materials would be directly contrary to *Martindell*. Before the grand jury charged Ms. Maxwell, she settled this case. The settlement triggered paragraph 12 of the protective order, which guaranteed Ms. Maxwell that all "confidential" information would be returned or destroyed at the conclusion of the case. [Dkt. 62 ¶12]. This provision ensured Ms. Maxwell that any confidential documents would remain confidential *in perpetuity* once the case concluded. No court could modify the protective order to permit publication of confidential material after the case concluded because paragraph 12 ensured that no documents would exist to be released. Further, because Ms. Maxwell was not aware the Government had secured a secret amendment to the protective order, despite a guarantee of notice and an opportunity to be heard, [Dkt. 61 ¶14], she reasonably believed that the protective order had not been modified and, thus, continued to reasonably rely on paragraph 12's guarantee of perpetual confidentiality when settling this case. Upon settlement, this expectation became enforceable against "any third parties," including the public at large. *Martindell*, 594 F.2d at 296.

Ms. Maxwell's reasonable reliance on paragraph 12's assurance of perpetual confidentiality makes the Government's promises to Judge McMahon central to its current Motion. At base, the Government seeks permission to break its promise and publish to every member of the public materials that are currently sealed and confidential under the protective order. The Government's promises ensured that Ms. Maxwell could continue to reasonably rely on the secrecy of confidential documents because the Government promised Judge McMahon it would keep its possession of these documents secret from everyone but the grand jury.

*Martindell* enforces the "cornerstone of our administration of civil justice" by permitting witnesses to rely on protective orders to provide "essential testimony in civil litigation." *Id.* at 295. Ms. Maxwell reasonably relied on paragraph 12 in providing her deposition testimony and, later, in settling her case. After settling this matter, Ms. Maxwell reasonably believed the sealed documents were made unavailable pursuant to paragraph 12 because the Government's *ex parte* promises of continued secrecy prevented her from learning otherwise. These promises made her expectation reasonable by protecting the materials from public disclosure. The Government's promises are now enforceable under *Martindell* to ensure that Ms. Maxwell's expectation against public disclosure remains protected.

## CONCLUSION

This Court should deny the Government's Motion.

Dated: February 20, 2026

Respectfully submitted,

*s/ Jeffrey S. Pagliuca*
Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
945 North Pennsylvania Street
Denver, CO 80203
Tel 303.831.7364
lmenninger@hmflaw.com
jpagliuca@hmflaw.com

*Attorneys for Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I certify that on February 20, 2026, I electronically served this *Response* on all parties of record via ECF.

*s/ Holly Rogers*